RICHARD E. SIMPSON
A. DAVID WILLIAMS
ERNESTO G. AMPARO
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4492 (Simpson)
simpsonr@sec.gov



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------

SECURITIES AND EXCHANGE COMMISSION,

                        Plaintiff,

                  v.

CALEDONIAN BANK LTD.,
CALEDONIAN SECURITIES LTD.,
CLEAR WATER SECURITIES, INC.,
LEGACY GLOBAL MARKETS S.A., and
VERDMONT CAPITAL, S.A.

                    Defendants.

: Civ. No.
:
:
:
:
:
:
:
:
:
:
:

------

### COMPLAINT FOR INJUNCTIVE RELIEF, DISGORGEMENT, PENALTIES AND OTHER RELIEF FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY DEMAND

Plaintiff Securities and Exchange Commission alleges as follows against the Defendants named above:

1. This case arises from unregistered distributions of penny stocks of four companies. Each of the unregistered distributions took place through virtually the same pattern. The issuers first filed with the Commission bogus registration statements on Form S-1 that purported to register securities to public shareholders when, in fact, no *bona fide* sales occurred because the

securities purportedly sold remained in the control of the issuers and their affiliates. In the sham offerings, the issuers pretended to sell securities to shareholders in such places as Serbia, Mexico, Ireland, Norway, Panama and Jamaica. These restricted securities were passed off as "free trading" stock (ostensibly unrestricted stock held by shareholders not affiliated with the issuers), and the stock certificates were subsequently transferred, without restrictive legends, to Defendants Caledonian Bank Ltd., Caledonian Securities Ltd. (collectively, "Caledonian"), Clear Water Securities, Inc., Legacy Global Markets S.A. and Verdmont Capital, S.A. (collectively, with Caledonian, the "Defendants"). The Defendants deposited the stock into brokerage accounts in the United States and sold the stock to the public. In doing so, the Defendants violated Section 5(a) and (c) of the Securities Act of 1933 (the "Securities Act")[15 U.S.C. § 77e(a) & (c)] by offering and selling securities in the United States without registration statements being in effect for their offers and sales. The Defendants operated as affiliates, dealers, sales outlets and underwriters by offering and selling the penny stocks. These violations were committed in connection with four shell companies – Swingplane Ventures, Inc., Goff Corp., Norstra Energy Inc., and Xumanii, Inc. And these violations occurred simultaneously with aggressive and extensive promotion campaigns for the penny stocks of those shell companies. The Defendants' unregistered sales of securities generated more than $75 million in proceeds on penny stocks that were virtually worthless and whose prices fell to their former token levels within months of the Defendants' sales.

2. The Commission seeks a judgment from the Court: (a) finding that the Defendants violated Section 5(a) and (c) of the Securities Act; (b) permanently enjoining the Defendants from violating Section 5(a) and (c); (c) permanently prohibiting the Defendants from participating in an offering of penny stock pursuant to Section 20(g) of the Securities Act [15

U.S.C. § 77t(g)]; (d) ordering the Defendants to disgorge the sale proceeds and other ill-gotten gains that they obtained from offering and selling the securities of Swingplane, Goff, Norstra and Xumanii, and to pay prejudgment interest thereon; (e) requiring the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and (f) granting such further equitable relief as may be appropriate or necessary for the benefit of investors.

## JURISDICTION AND VENUE

3.  The Court has jurisdiction over this civil enforcement action pursuant to Section 20(b) and (c) and Section 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77t(b) & (c), 77v(a) & (c)]. The Defendants made use of the means and instruments of interstate commerce in connection with their acts, transactions, practices and courses of business alleged in this Complaint. The Defendants engaged in conduct within the United States constituting a significant step in furtherance of their violations, and the Defendants engaged in conduct outside the United States that had a foreseeable substantial effect within the United States.

4.  Venue lies in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] because certain of the acts, practices and courses of business constituting the violations described in this Complaint occurred in this District.

## THE PARTIES

5.  The plaintiff is the Securities and Exchange Commission, which brings this action pursuant to the authority conferred on it by Section 20(b) and (c) of the Securities Act [15 U.S.C. § 77t(b) & (c)].

6. Defendant Caledonian Bank Ltd. ("Caledonian Bank") is a foreign bank that provides banking, custody, fiduciary, trade execution and trust services. Its headquarters is in the Cayman Islands.

7. Defendant Caledonian Securities Ltd. ("Caledonian Securities") is a foreign broker-dealer and custodian that provides trade execution services. Its headquarters is in the Cayman Islands.

8. Defendant Clear Water Securities, Inc. ("Clear Water") purports to be a foreign broker-dealer and investment management and advisory firm. Its headquarters is in Belize.

9. Defendant Legacy Global Markets S.A. ("Legacy Global") purports to be a foreign broker-dealer and investment management and advisory firm. On September 15, 2014, the International Financial Services Commission in Belize suspended Legacy Global's license as a broker-dealer. Legacy Global's headquarters is in Belize.

10. Defendant Verdmont Capital, S.A. ("Verdmont") is a foreign broker-dealer and investment management and advisory firm. Its headquarters is in Panama.

## FACTS

## I. BACKGROUND.

11. A company may only sell stock if it: (a) registers the stock pursuant to a valid registration statement that applies to that specific offering of stock; or (b) sells the stock in a transaction that is specifically exempt from the registration requirement of Section 5 of the Securities Act. In this circumstance, the company is deemed the issuer of the stock.

12. To ensure compliance with Section 5, stock sold by the issuer in an unregistered transaction pursuant to an exemption is not freely transferable, and the stock certificate carries a

restrictive legend that prohibits the stock from being further sold to the public unless and until the registration requirement of Section 5 is met.

13.  The restrictive legend may be removed only by a transfer agent. Section 3(a)(25) of the Securities Exchange Act of 1934 [15 U.S.C. § 78c(a)(25)] defines a transfer agent as any person who, on behalf of an issuer of securities, performs certain acts, including countersigning securities upon issuance, registering the transfer of such securities, and exchanging or converting such securities.

14.  The transfer of certificated shares of stock are supposed to be effected by the presentation of a stock power endorsed and signed by the transferring shareholder authorizing the transfer of the stock, with the shareholder's endorsement authenticated by a medallion guarantee stamped onto the stock power by a participating financial institution. The financial institution stamps the medallion guarantee onto the stock power when the transferring shareholder appears personally and endorses the stock power in the presence of an employee of the financial institution.

## II.  THE DEFENDANTS OFFERED AND SOLD SWINGPLANE SECURITIES WITHOUT A REGISTRATION STATEMENT BEING IN EFFECT FOR THEIR OFFERS AND SALES.

15.  Swingplane Ventures, Inc., incorporated in the State of Nevada, was a shell company with little or no assets and no operations or revenue. Because it traded at prices less than $5.00 per share, Swingplane stock was a penny stock. On August 8, 2010, Swingplane filed with the Commission a Form S-1 registration statement for a self-underwritten initial public offering of 3,500,000 shares of common stock at a price of $0.01 per share, which would raise $35,000 exclusive of costs and fees.

16. In the Form S-1, Swingplane represented that its business plan was "selling men's and women's golf apparel." However, the company "has not commenced its planned principal operations." The Chief Executive Officer, Matthew Diehl, was "an avid fashion enthusiast" but had no prior experience running an apparel or golf-related company. Swingplane admitted that it had only $323 in assets; had no employees other than Diehl (who "does not have extensive experience in a public company setting"); had not generated sufficient cash to be profitable; and "[w]e have not sold any clothing to date." Swingplane's corporate headquarters was Diehl's apartment at 220 Summit Boulevard, Unit No. 402, Broomfield, Colorado.

17. In a section of the Form S-1 entitled "Going Concern," Swingplane acknowledged that "[f]or the period ended June 30, 2010, the Company has had no operations" and "has not emerged from the development stage. In view of these matters, the Company's ability to continue as a going concern is dependent upon the Company's ability to begin operations and to achieve a level of profitability."

18. Swingplane's offering of securities expired 180 days after its effective date:

> "The offering shall terminate on the earlier of (i) the date when the sale of all 3,500,000 shares is completed or (ii) one hundred and eighty (180) days from the date of this prospectus. Swingplane Ventures, Inc. will not extend the offering period beyond one hundred and eighty (180) days from the effective date of this prospectus."

19. On September 6, 2011 – *i.e.*, one year after the first filing of its Form S-1 – Swingplane represented that it had "raised $35,000 through the issuance of 3,500,000 shares of common stock to unrelated parties." The "unrelated parties" who bought the Swingplane stock were 35 individuals residing in Serbia or Mexico. The stock certificates issued in the names of these shareholders were "unlegended" – meaning that the certificates did not carry a legend

preventing the sale of the stock into the public markets. This stock comprised 100 percent of Swingplane's "float," a term used here to denote all stock issued without restrictive legends.

20. Swingplane's initial public offering and the associated Form S-1 were a sham because there was no distribution of the securities issued in the names of the shareholders, and Swingplane and its affiliates retained control of those securities. Six of the Serbian shareholders signed sworn statements averring that they did not receive certificates for the Swingplane stock that they purportedly purchased. For example, according to one of the Serbian shareholders, he "received all the information considering the shares of Swingplane from [an individual by the name of] Fedor Ferenc." "Asked whether he had received a confirmation for the purchase of securities, whether it was sent to him or to anyone else [the shareholder] stated that after the payment he did not receive any documents." The sworn statements of the other Serbian shareholders were the same. The Serbian and Mexican shareholders were nothing more than nominees – *i.e.*, shareholders whose names were used to create the illusion of a public offering pursuant to a valid registration statement when, in reality, the stock did not leave the control or custody of the issuer and its affiliates.

21. Diehl and Fedor Ferenc worked together to obtain subscription agreements for Swingplane stock from the Serbian shareholders. Ferenc collected the subscription agreements and the shareholders' passports and emailed them in pdf form to Diehl. Diehl emailed them to Swingplane's escrow agent – the Seminole, Florida law office of Clifford J. Hunt.

22. To sell securities into the public markets, Swingplane needed to have a transfer agent issue the securities without restrictive legends.

23. Emails exchanged between Diehl, Swingplane's transfer agent, Michael Adamo of New York Stock Transfer, and a lawyer representing Diehl and Swingplane by the name of Luis

Carrillo, demonstrate that the stock certificates issued in the names of the Serbian and Mexican shareholders remained in the control of Diehl. In an email dated September 12, 2011, Diehl directed Adamo to send the stock certificates – not to the Serbian and Mexican shareholders – but to Carrillo. On September 20, 2011, Adamo told Carrillo to "be on the look-out for the IPO Swingplane Ventures, Inc. certificates filed under their S1; SEC File#333168912" and to "please keep in safe & secure place due to the expensive replacement costs and foreign holder entity." A week later, Diehl informed Adamo that "Luis has the certs and all is good." Six months after that, Adamo asked Diehl, "can you get the certs Fed Ex'd back to me?" To which Diehl replied, "I'll request the certs for you." Adamo then requested that Diehl "keep me posted with the Fed Ex tracking number. Thanks."

24. On September 6, 2012 – *i.e.*, one year after representing that it had sold Swingplane stock to the nominee Serbian and Mexican shareholders – Swingplane filed a Report on Form 8-K announcing a change-of-control transaction, in which an individual by the name of Michael Voyer purportedly bought all of the stock owned by Diehl for $35,000. The Report on Form 8-K attached a letter from Diehl, dated August 22, 2012, which stated: "I, Matthew Diehl, hereby tender my resignation as President, Secretary, Treasurer and Director of Swingplane Ventures, Inc. effective immediately." Despite this ostensible resignation, Diehl's apartment continued to be Swingplane's corporate headquarters and, as described below, Diehl continued to sign, as President, the company's certificates of board resolutions. For the two years before Diehl's sale of his controlling interest, Swingplane's Reports on Form 10-Q and 10-K did not evidence any activity, operations or transactions in the golf apparel (or any other) business.

25. On May 11, 2012, Swingplane announced a forward stock split. In other words, every single share ostensibly sold to the nominee Serbian and Mexican shareholders was now 35 shares.

26. After the forward stock split, Philip Thomas Kueber, the CEO and President of Defendant Clear Water, caused the Swingplane stock certificates in the names of the nominee Serbian and Mexican shareholders to be transferred to Defendants Caledonian, Clear Water and Legacy Global. On September 6, 2012 – *i.e.*, the same day as Swingplane's Report on Form 8-K announcing the change in control from Diehl to Voyer – Kueber sent all 35 stock certificates in one batch to the company's new transfer agent, Empire Stock Transfer, for transfer to the Defendants as follows: 42,700,000 shares from certain Serbian shareholders to Caledonian Bank; 43,050,000 shares from certain Mexican shareholders to Clear Water; and 36,750,000 shares from certain Mexican shareholders to Legacy Global.

27. The stock powers that Kueber sent to Empire along with the stock certificates in the names of the nominee Serbian and Mexican shareholders were not endorsed or signed by the shareholders.

28. Nor did the Serbian shareholders consent to the transfer of "their" Swingplane stock. In his sworn statement, one of the Serbian shareholders stated as follows: "Asked if he had sold his Swingplane shares, [the shareholder] stated that he did not." The sworn statements of the other Serbian shareholders were the same.

29. Despite the absence of signed stock powers, Swingplane stepped in and, in board of directors resolutions signed by Diehl (who had resigned three weeks earlier), directed Empire to make the transfers from the Serbian and Mexican shareholders to Caledonian, Clear Water and Legacy Global. The stock certificates issued to the Defendants did not have restrictive legends.

30. The Defendants transferred the Swingplane stock certificates into their United States brokerage accounts. Empire sent the Swingplane stock certificates for 42,700,000 shares in the name of Caledonian Bank by Federal Express to Caledonian Bank in the Cayman Islands. Caledonian Bank sent the stock certificates to RBC Investor Services Trust in Toronto, Canada. RBC Investor Services sent the stock certificates to BNY Mellon in New York, New York with directions to "deposit to DTC in A/A 298307, institution #53372." BNY Mellon deposited the stock certificates into the Depository Trust Corporation ("DTC"), with BNY Mellon acting as custodian of account number 298307, a custodial omnibus account in the name of RBC Investor Services at BNY Mellon. The Swingplane stock was held for the benefit of Caledonian Bank at BNY Mellon.

31. Whenever BNY Mellon received stock certificates from RBC Investor Services – *i.e.*, in the instance described above with respect to Swingplane and in the several instances described below with respect to Goff, Norstra and Xumanii – BNY Mellon deposited the stock certificates into DTC where they were converted into stock held in street name and became transferable electronically by book entry. This conversion made the stock easier to sell into the public markets.

32. Empire sent the Swingplane stock certificates issued in the names of Clear Water (43,050,000 shares) and Legacy Global (36,750,000 shares) by Federal Express to Scottsdale Capital Advisors, an introducing broker-dealer in Scottsdale, Arizona. Scottsdale Capital Advisors deposited the stock certificates into brokerage accounts for the benefit of Clear Water and Legacy Global at Alpine Securities Corporation, a clearing broker-dealer in Salt Lake City, Utah. Kueber had trading authority over the Clear Water and Legacy Global accounts at Scottsdale Capital Advisors.

33. On September 13, 2012, Empire sent an email to Diehl and Kueber informing them that the transfers to Caledonian, Clear Water and Legacy Global had been completed: "Your transfer is complete and being sent as directed, attached are copies of the certificates and FEDEx waybills for your records."

34. On October 15, 2012 Swingplane filed a Report on Form 8-K announcing a significant change from its purported golf apparel business:

> "On October 15, 2012 Swingplane Ventures Inc. . . . entered into an assignment agreement with Mid Americas Corp. . . . Under the terms of the assignment agreement the Company will be assigned all of the rights under an option agreement between Mid Americas Corp and Gunter and Else Durate Horta . . . whereby Mid Americas has the rights to acquire 75% of certain mining concessions in Chile."

This change in business from golf apparel to Chilean mining was accompanied by a reverse merger in which Swingplane agreed to "issue a total of 300,000,000 shares of its common stock to Mid Americas or its directed assignees."

35. Three months later, Swingplane issued a series of press releases creating the public impression that it was immediately and actively engaged in copper mining exploration in the "Algarrobo Property" in Chile. For example:

- On January 24, 2013, Swingplane announced its belief that the Algarrobo Property "represents significant potential to further develop current, near surface high grade copper +/- gold mineralization identified in multiple veins into a larger commercial operation. The Company's mandate is to aggressively pursue: 1) expansion of the existing mineral potential of the Algarrobo Property, and 2) further exploration of the Property to evaluate opportunities for developing short term production capacity having potential for further expansion."

- On January 25, 2013, Swingplane represented that, at the Algarrobo Property, "[h]eavy equipment has exposed high grade copper mineralization immediately below a thin veneer of eolian sand, believed to

correlate to the workings defining the Descubridora vein. This exposure is actively being developed into a drift at this time."

- On January 30, 2013 Swingplane stated that "Due Diligence property evaluations are interpreted to indicate significant opportunity to further develop the mineral potential of the property and increase current level of development. The Company proposes to increase the current level of development by a series of short term initiatives."

- On January 31, 2013, Swingplane related that five grab samples recovered from the Algarrobo Property "document very high grade copper grades" and, "[i]n addition to high grade copper, the samples retained very anomalous levels of gold."

- On February 6, 2013, Swingplane announced that it was "completing construction of a camp on the Property capable of accommodating 30 people" and which "will be utilized to support exploration of the Property, together with current and future development activity on the Property. . . . The camp is well situated to support current operations and further, planned development in the near future."

- On February 13, 2013, Swingplane represented that "[w]ork on behalf of the company, since February 2012, has emphasized identification of high grade, copper mineralized veins for subsequent development into drifts. To date, a total of five drifts have been developed on the Property."

36. Bolstering Swingplane's press releases were spam emails sent by a foreign stock-touting website by the name of Awesome Penny Stocks "picking" Swingplane as a stock whose price could rise significantly. One of these emails was entitled "Our New Pick is SWVI." ("SWVI" was Swingplane's trading symbol.) The email represented that "[m]any analysts reports [are] stating that SWVI shares to be worth over $7." A second stated that Swingplane "has had some extremely promising results in terms of the analysis of their samples, and we have seen at least 3 analysts predict trading prices of over $7 for SWVI." (emphasis original) A follow-up newsletter announced that "SWVI is our monster pick of the month."

37. By March 30, 2013 – *i.e.*, six weeks after the completion of the stock promotion – Swingplane and Mid Americas had defaulted on their payment obligations for the purported

mining concessions on the Algarrobo Property, with the result that those concessions were permanently lost.

38. When the stock promotion began on January 23, 2013, Swingplane spiked to a closing price of $0.29 per share on a volume of 88,414,000 shares. On February 20, Swingplane closed at a high of $0.90 per share on a volume of 27,802,300 shares. By May 16, 2013, Swingplane stock had fallen to a price of $0.04 per share.

39. At the same time as the Swingplane stock promotion, Caledonian, Clear Water and Legacy Global sold the stock that they had transferred into their U.S. brokerage accounts into the public markets. These were the first sales of the stock to the public. Caledonian Bank and Caledonian Securities sold all of their 42,700,000 shares of Swingplane stock for $14,849,309; Clear Water sold 43,040,000 shares for proceeds of $7,216,246; and Legacy Global sold all of its 36,750,000 shares for proceeds of $9,622,722.

40. These three securities distributions of 122,490,000 shares of Swingplane stock generated sale proceeds of $31,686,926 for Caledonian, Clear Water and Legacy Global. In making these distributions, the Defendants violated Section 5 of the Securities Act. There was no registration statement in effect for the Defendants' offers and sales of Swingplane securities in January through May 2013. And the Defendants used the instruments and means of interstate commerce in offering and selling their Swingplane securities.

## III. THE DEFENDANTS OFFERED AND SOLD GOFF, CORP. SECURITIES WITHOUT A REGISTRATION STATEMENT BEING IN EFFECT FOR THEIR OFFERS AND SALES.

41. The Defendants' distributions of Goff, Corp. securities were effected in a way strikingly similar to the Swingplane distributions. Goff, incorporated in the State of Nevada, was a development stage, start-up company with little or no assets and no operations or revenue.

Because it traded at prices less than $5.00 per share, Goff stock was a penny stock. Goff represented that on January 28 and April 5, 2011, the company issued, purportedly pursuant to the foreign offering exemption of Regulation S of the Securities Act, 7,090,000 shares of its common stock in the names of 27 individuals residing in Ireland. These shareholders were business associates, friends and relatives of Goff's sole officers, Gary O'Flynn and Patrick Corkery. Unlike stock certificates issued pursuant to a Form S-1 registration statement, stock certificates issued pursuant to Regulation S contain a restrictive legend.

42. On August 26, 2011 – *i.e.*, four months after the completion of the Regulation S offering – Goff filed with the SEC a Form S-1 registration statement for a resale offering by all of the Irish shareholders of all of their 7,090,000 shares of common stock at a price of $0.01 per share, which would generate $70,900 for the Irish shareholders. Goff incurred the expenses of preparing and filing the Form S-1 but, because the offering was by shareholders and not the company, Goff did not receive any funds from the offering.

43. In the Form S-1, Goff represented that its business plan was "to provide web-based services that focus around our website that will operate as a link for employers in and individuals seeking employment in the UK and Ireland." However, the company acknowledged that "[w]e have yet to implement our business plan" and that "[a]t our year end . . . we had assets of $24,759 made up completely of cash and a net loss of ($4,416)." Goff admitted that "[o]ur two officers and directors, Gary O'Flynn and Patrick Corkery will only be devoting limited time to our operations" and they "do not have experience in the field of job placement services." In the notes to the company's financial statements, the auditors stated that Goff "is in the development stage as defined under ASC 915, Development Stage Enterprises."

44. The Form S-1 provided that "the selling shareholders may distribute shares to one or more of their nominees" who could, in turn, distribute the shares. But if

> "the new shareholders wish to rely on the prospectus to resell these shares, then we must first file a prospectus supplement naming these individuals as selling shareholders and providing the information required concerning the identity of each selling shareholder and his or her relationship to us."

Elsewhere, the Form S-1 stated that "[t]he resale of our common stock must be by way of registration or through reliance upon an exemption from registration."

45. Goff's resale offering and the associated Form S-1 were a sham because there was no distribution of the securities supposedly issued to the shareholders, and Goff and its affiliates retained control of those securities. Empire issued stock certificates in the names of the Irish shareholders without restrictive legends on the purported ground that the underlying stock was registered under the Form S-1. Empire sent the stock certificates – not to the Irish shareholders – but to Goff's counsel, Horowitz Cron & Armstrong of Lake Forest, California. Horowitz Cron did not send the stock certificates to the Irish shareholders but, instead, sent them to "Gary O'Flynn, Goff Corp., Unit 9, Noel O'Flynn Commercial Center, Old Mallow Rd., Cork City, Ireland." Thus the unlegended stock certificates, comprising 100 percent of the "float," were in the hands not of the shareholders, but of Goff. Indeed, Empire did not issue the stock certificates in the names of the Irish shareholders until December 23, 2011 – *i.e.*, four months after the first filing of the Form S-1, in which all of the shareholders were named as the selling shareholders. The Irish shareholders were nothing more than nominees.

46. On September 24, 2012 – *i.e.*, one year after Goff first filed its Form S-1 – Celtic Consultants LLC ("Celtic"), a foreign entity with its headquarters in Surrey, British Columbia, sent to Empire Stock Transfer two Goff stock certificates totaling 600,000 shares in the names of

certain of the Irish shareholders, for transfer to a foreign entity by the name of Lornex Financial Ltd. ("Lornex"), with its headquarters in Nevis, British West Indies, and another foreign entity. The stock powers that Celtic sent along with the stock certificates were not stamped with medallion guarantees by a financial institution; instead, the shareholders' signatures were "guaranteed" by Goff officer O'Flynn. Despite the absence of medallion guarantees, Goff stepped in and supplied a board of directors resolution, signed by O'Flynn, directing Empire to make the transfers. Empire issued a new stock certificate, without a restrictive legend and in the amount of 560,000 shares, to Lornex as directed by Celtic and Goff. Several weeks later, this stock was deposited into a custodial omnibus account at BNY Mellon for the benefit of Verdmont.

47. On January 7, 2013, Philip Thomas Kueber – *i.e.*, the same Philip Thomas Kueber who participated in the Swingplane distributions – sent nine Goff stock certificates in one batch to Empire Stock Transfer for transfer to the Defendants as follows: (1) 1,050,000 shares of Goff stock from one of the Irish shareholders to Caledonian Bank; (2) 1,000,000 shares of Goff stock from one of the Irish shareholders to Clear Water; and (3) 870,000 shares of Goff stock from one of the Irish shareholders to Legacy Global. Caledonian, Clear Water and Legacy Global deposited their Goff stock into brokerage accounts in their names at Scottsdale Capitol Advisors in Scottsdale, Arizona.

48. In regard to this transfer, Empire became concerned because it believed that more than 10 percent of Goff's stock would be in the name of Caledonian Bank. To facilitate the transfer, Nathaniel Orr-Depner, the Managing Director of Caledonian Securities, sent an email to Empire on January 15, 2013 describing Caledonian Securities as a licensed broker-dealer and custodian in the Cayman Islands. Orr-Depner told Empire: "Please let me know what other

information you need to make this happen – along with the ETA." Empire and Orr-Depner discussed the transfer by telephone the following morning.

49. To cause the transfers to be made, Kueber sent to Empire stock powers ostensibly signed by the Irish shareholders. The signature and medallion guarantee stamps on the stock powers had the identification number of the San Juan Capistrano, California branch of Bank of America. However, no employee or officer at the San Juan Capistrano branch stamped the signature and medallion guarantees onto the stock powers. In fact, the Irish shareholders were not customers of Bank of America. However, Kueber *was* a customer of Bank of America, and in the past the Bank had stamped signature and medallion guarantees on documents with Kueber's signature.

50. Similar to the Swingplane stock split, on January 21, 2013, Goff effected a 25-for-1 forward split of its stock, so that Caledonian's 1,050,000 pre-split shares of Goff stock became 26,250,000 post-split shares; Clear Water's 1,000,000 pre-split shares of Goff stock became 25,000,000 post-split shares; Legacy Global's 870,000 pre-split shares of Goff stock became 21,750,000 post-split shares; and Verdmont's 560,000 pre-split shares of Goff stock became 14,000,000 post-split shares.

51. On February 26, 2013, at the request of Kueber, Empire executed a transfer of 8,750,000 post-split shares of Goff stock from one of the nominee Irish shareholders to Caledonian Bank. The stock power that Kueber sent along with the stock certificate was signed – not by the Irish shareholder – but by Kueber. Furthermore, in a memorandum purportedly from him to Empire, the Irish shareholder told Empire to "[p]lease contact me at (213) 369-6575 should you have any questions." The number (213) 369-6575 was not a telephone number in Ireland, but was Kueber's telephone number.

52. On March 5, 2013 – *i.e.*, two months after the initial transfer of Goff stock to Caledonian, Clear Water and Legacy Global – Goff filed a Report on Form 8-K announcing a change-of-control transaction in which an individual by the name of Warwick Calasse bought all of the stock owned by officers O'Flynn and Corkery for $25,000. O'Flynn and Corkery resigned, and Calasse was appointed in their stead. Calasse was supposedly qualified to be sole officer and director of Goff because, among other things, "[f]rom 2006 to 2010, Mr. Calasse held various training and management positions with horse farms and stables in the United Kingdom and Zimbabwe." Goff's corporate headquarters moved from Cork, Ireland to Medellin, Colombia. During the tenure of O'Flynn and Corkery, Goff's filings with the Commission did not evidence any activity, operations or transactions in the job placement (or any other) business.

53. The next week, on March 12, 2013, Goff filed a Report on Form 8-K announcing a significant change in business: the company's newly created Nevada shell corporation, Golden Glory Resources Inc. ("Golden Glory Nevada") had entered into an Assignment Agreement with Golden Glory Resources S.A., a Panamanian corporation ("Golden Glory Panama"), by which Golden Glory Nevada "acquired an option to purchase a 100% interest in and to a certain Columbian mining concession known as La Frontera (The Frontier) Project, code number LGC-15011, located in the Aquales region, Caldes Department, Republic of Colombia." The Report on Form 8-K represented that

> "we have abandoned our former business plan and entered the business of mineral exploration and are now an exploration stage mining company engaged in the identification, acquisition and exploitation of metals and minerals with a focus on gold and diamond mineralization on La Frontera Property."

54. Beginning three days after its change of business, Goff issued a series of press releases creating the public impression that it was immediately and actively engaged in gold and diamond exploration in Colombia. For example:

- On March 15, 2013, a Goff press release, entitled "Goff Corp. Subsidiary Golden Glory Resources Acquires 100 Percent Interest in the La Frontera Gold Project in Colombia's Hottest Gold Exploration Region," represented that "[a]pproximately two-thirds of Colombian gold production has been from placer deposits in the Department of Antioquia, which is immediacy [sic] adjacent to and straddles about 30% of the leases where Golden Glory's La Frontera Project is located." Goff stated that "this project is seen to be on the order of six times as large as notable prospects with similar gold type and potential."

- On March 18, 2013, Goff issued a press release entitled "Goff Corporation Has Appointed Experienced Colombian Mining and Explosives Expert Manuel Hernando Serna as a Director of the Board."

- On March 22, 2013, Goff announced that "Golden Glory Resources expects to pursue its exploration program that will employ leading geological consultants and their own geological staff to carry out the program. . . . This first phase exploration is anticipated within 90 days."

- On March 25, 2013, Goff represented that Golden Glory Resources "plans to begin a 5,000-meter diamond drilling program on its La Frontera Gold Project in Department of Caldes, Colombia within 90 days."

- In a press release on March 26, 2013, Goff's sole officer and director, Calasse, stated that "he expects gold's current price level will help fuel the company's efforts to target a bulk tonnage, low-grade type gold and silver project on Golden Glory's leases, and that the time is right for gold in Columbia." Calasse further stated that "[w]e will be the first [on the Project] to explore using the full range of modern gold and silver discovery methods."

- On March 27, 2013, Goff related that "Golden Glory Resources is developing a comprehensive exploration program for its La Frontera Gold Project in Colombia; Phase One groundwork will provide basis for follow-on planned diamond drilling."

55. Bolstering the Goff press releases was a newsletter posted on April 2, 2013 on a stock-touting website by the name of Penny Stock Pillager, which stated:

"After years of turmoil, the Colombian government is stepping in to help legitimate mining companies pull gold from their resource-rich soil. By grabbing a plot of land directly in the Colombian gold sector, underline investors in Goff Corporation could be on the verge of true wealth! underline" (emphasis original)

56. The representations of Goff and Penny Stock Pillager were never supported by audited financial statements evidencing true wealth, gold mining interests, or diamond drilling. On or before March 18, 2013, Goff was required to filed a "super" Report on Form 8-K that included all of the information required in a Report on Form 10. The company did not file such a Report on Form 8-K on March 18 or any time thereafter. Goff stopped filing Reports on Forms 10-K and 10-Q at all times after March 18, 2013.

57. There is no trading data available for Goff on March 14, 2013, the day before the company's March 15 press release announcing its mining interest in "Colombia's hottest gold exploration region." On March 18, the first trading day *after* the release, Goff stock spiked to a closing price of $0.28 per share on a volume of 263,914,096 shares. On April 5, Goff stock closed at a high of $0.58 per share on a volume of 22,003,500 shares. By June 4, 2013, Goff stock had fallen to a price of $0.01 per share.

58. Simultaneously with the Goff stock promotion, Caledonian, Clear Water, Legacy Global and Verdmont sold the stock into the public markets. Theirs were the first sales of the stock to the public. Caledonian Bank sold all of its 35,000,000 shares of Goff stock for proceeds of $6,860,685; Clear Water sold all of its 25,000,000 shares for proceeds of $4,226,689; Legacy Global sold all of its 21,750,000 shares for proceeds of $3,293,816; and Verdmont sold all of its 14,000,000 shares for proceeds of $3,526,354.

59. These sales of 95,750,000 shares of Goff stock generated proceeds of $17,907,546 for Caledonian, Clear Water, Legacy Global and Verdmont. In making these distributions, the

Defendants violated Section 5 of the Securities Act. There was no registration statement in effect for the Defendants' offers and sales of Goff securities. And the Defendants used the instruments and means of interstate commerce in offering and selling their Goff securities.

## IV. THE DEFENDANTS OFFERED AND SOLD NORSTRA SECURITIES WITHOUT A REGISTRATION STATEMENT BEING IN EFFECT FOR THEIR OFFERS AND SALES.

60. Caledonian's and Verdmont's distributions of Norstra Energy Inc. securities were effected in a way strikingly similar to the Swingplane and Goff distributions. Norstra, incorporated in the State of Nevada, purported to be an exploration stage company but had little or no assets and no operations or revenues. Because it traded at prices less than $5.00 per share, Norstra stock was a penny stock. On April 30, 2012, Norstra filed with the SEC a Form S-1 registration statement for a self-underwritten initial public offering of 60,000,000 shares of its common stock at a price of $0.001 per share, which would raise $60,000 exclusive of costs and fees.

61. In the Form S-1, Norstra represented that its business plan was "engaging in the exploration and development of oil and gas properties." However, the company did not "generate any revenues from our operations" and "had cash in the amount of $177, and liabilities of $4,392 for a working capital of $ (4,215)." The sole officer of Norstra was an individual by the name of Dallas Kerkenezov, whose qualifications for heading up this oil and gas exploration company included working three summers in the Yukon "helping run staking and drilling crews for various mineral exploration companies" and working for six years "as a carpenter with Byggefirma Tunge AS," a contractor in Randaberg, Norway. Norstra purportedly owned a 100 percent working interest in "approximately 40 acres of oil and gas exploration land in Reno

County, Kansas," for which it paid $15,000. This working interest was not recorded in Reno County property records, and Norstra did not report having operations on this property.

62. Norstra's offering of securities expired 90 days after its effective date:

> "This offering will terminate upon the earlier to occur of (i) 90 days after this registration statement becomes effective with the Securities and Exchange Commission, or (ii) the date on which all 60,000,000 shares registered hereunder have been sold. We may, at our discretion, extend the offering for an additional 90 days. In any event, the offering will end within 180 days of this Registration Statement being declared effective."

63. Norstra represented in subsequent filings with the Commission that, in the initial public offering, the company sold 33,250,000 shares of common stock for proceeds of $33,250. However, Norstra's initial public offering and the associated Form S-1 were a sham because there was no distribution of the securities supposedly issued to the shareholders, and Norstra and its affiliates retained control of those securities. On September 7, 2012, Norstra's transfer agent, Empire Stock Transfer – *i.e.*, the same Empire Stock Transfer that participated in the Swingplane and Goff distributions – issued 25 unlegended stock certificates in the names of nine individuals residing in Norway and sixteen individuals in Panama. But instead of sending the stock certificates to the Norwegian and Panamanian shareholders, Empire sent them to "Norstra Energy Inc., Madlasto 11, Stavanger, Hafrsfjord 4045, Norway," which was the address of Norstra's sole officer, Dallas Kerkenezov. The shareholders were nothing more than nominees. The stock comprised 100 percent of Norstra's "float."

64. On February 5, 2013, Celtic Consultants – *i.e.*, the same Celtic Consultants that participated in the Goff distributions – directed the transfer of 3,687,000 shares of Norstra stock from three of the Norwegian and Panamanian shareholders to Lornex Financial – *i.e.*, the same Lornex Financial that participated in the Goff distributions – and another foreign entity. The

stock power that Celtic sent along with the stock certificate in the name of the Norwegian shareholder was not stamped with a medallion guarantee by a financial institution; instead, the shareholder's signature was "guaranteed" by what appears to be Kerkenezov's signature. The two stock powers signed by the Panamanian shareholders were notarized by a notary public in Panama. Despite the absence of medallion guarantees by a financial institution, Norstra stepped in and, in a board of directors resolution signed by Kerkenezov, directed Empire to make the transfer from the Norwegian and Panamanian shareholders to Lornex. The Norwegian shareholder's stock power purportedly signed in Norway, the notarizations of the Panamanian shareholders' stock powers effected in Panama, Kerkenezov's board resolution signed in Norway, and Celtic's FedEx label to Empire from Surrey, British Columbia, were all implausibly dated the same day – February 5, 2013.

65. The Norstra stock transferred to Lornex followed a circuitous route through several foreign entities to end up for the benefit of Verdmont. On March 4, 2013 – *i.e.*, one month after receiving the Norstra stock – Lornex transferred 1,857,000 shares of the stock to Jackson Bennett LLC, a foreign entity with its headquarters in Nevis. Jackson Bennett transferred these shares to Tamarind Investments, a foreign entity with its headquarters in Samoa. Tamarind Investments transferred the shares to Bartlett Trading, a foreign entity with its headquarters in Samoa. On May 31, 2013, the shares were deposited into the custodial omnibus account at BNY Mellon for the benefit of Verdmont.

66. Similarly, on March 28, 2013, 1,850,000 Norstra shares in the name of Bartlett Trading, 1,840,000 Norstra shares in the name of Lornex, and 1,840,000 Norstra shares in the name of Nautilus Growth Fund, Inc., a hedge fund with its headquarters in the Cayman Islands, were deposited into the custodial omnibus account at BNY Mellon and held for the benefit of

Verdmont. In May 2013, an additional 1,000,000 shares of Norstra stock from Nautilus Growth Fund, and 1,315,000 shares of Norstra from Maripose Acosiados S.A., a foreign entity with its headquarters in Belize, were deposited into BNY Mellon for the benefit of Verdmont. These deposits add up to 9,702,000 shares of Norstra stock for the benefit of Verdmont.

67. On March 5, 2013, Norstra filed a Report on Form 8-K announcing that "Dallas Kerkenezov resigned as president, chief executive officer, secretary, treasurer and director of our company." Glen Landry, purportedly "an independent exploration geologist," became Norstra's new CEO, President, Secretary, Treasurer and Director. During Kerkenezov's tenure, Norstra's filings with the Commission did not evidence any activity, operations or transaction in the oil and gas (or any other) business.

68. A week later, on March 12, 2013, Norstra announced in a Report on Form 8-K that it had "entered into a farmout agreement with Summit West Oil, LLC . . . for approximately 10,000 acres of oil and gas exploration property in northwest Montana . . . and known as the South Sun River Bakken Prospect." As a condition precedent to obtaining an ownership interest in the property, Norstra was required to make oil and gas exploration expenditures of more than $15,000,000 over the next eighteen months. Norstra had $106,050 in current assets – 0.7 percent of the $15,000,000 needed.

69. Two weeks later, on March 25, 2013, Celtic sent to Empire a Norstra stock certificate for 2,000,000 shares of stock in the name of one of the nominee Norwegian shareholders for transfer to Caledonian Bank. The stock power that Celtic sent along with the stock certificate was not stamped with a medallion guarantee by a financial institution; instead, the shareholder's signature was "guaranteed" by a signature that appears to be Kerkenezov's. Despite the absence of a medallion guarantee, Norstra stepped in and, in a board of directors resolution signed by

Kerkenezov (even though he had resigned from Norstra three weeks earlier), directed Empire to make the transfer from the Norwegian shareholder to Caledonian Bank. Celtic instructed Empire to send the new stock certificates in the name of Caledonian to Legacy Global in Belize.

70. Shortly after its March 12, 2013 Report on Form 8-K announcing the South Sun River farmout agreement, Norstra issued a series of press releases creating the public impression that it was immediately and actively engaged in oil and gas exploration in Montana. For example:

- On March 18, 2013, in a press release entitled "Norstra Enters Bakken Oil Boom," Norstra announced that the "South Sun River Prospect was identified by the Company's management as an excellent target for a Bakken well."

- On April 1, 2013, Norstra represented that CEO Landry "is in the process of assembling the technical team right now and the group will start confirming the first drill location based on the available geological and seismic data." According to Landry, "[t]he Bakken is a uniform deposit and our initial review of the work that myself, as well as others, did in the 1980s shows that the South Sun River Prospect could have just as much potential as the rest of the Bakken in eastern Montana."

- On April 22, 2013, Norstra reported that the company's "management and technical team met with the company's operator to review current operations and establish detailed guidelines for the planned drilling program on the South Sun River Project."

- On May 20, 2013, Landry stated in a Norstra press release that "we received the first seismic interpretation from our geophysical team in Denver and are reviewing the proposed first drill location internally. Once we have evaluated and cross-referenced the proposed location with the actual surface conditions for the drilling operations we will send our surveying team out to stake the location and design the drilling pad."

- On May 28, 2013, Norstra related that "its geological team has identified the first drill location on the Company's South Sun River Bakken Prospect."

- On June 8, 2013, Norstra announced "that it has appointed an operator for the South Sun River Project in Montana."

71. Bolstering the Norstra press releases was a newsletter sent by email on May 9, 2013 by a stock-touting website by the name of Eric Dany's Stock Prospector, which stated:

"Brand new, soon-to-be released, USGS survey could signal Round 2 of the Bakken profit fest! Invest now in Norstra Energy (NORX) before the USGS Report unleashes a new stampede to buy Bakken drillers and this 50-cent stock soars to $5 on its way to $25!"

72. The representations of Norstra and Eric Dany's Stock Prospector were never supported by audited financial statements evidencing a profit fest, oil drilling or operations. On May 30, 2014, Norstra announced that it was unable to timely file an audited Report on Form 10-K, as required. Norstra did not file such a Report on Form 10-K at any time thereafter.

73. Norstra began public trading on March 5, 2013, in the price range of $0.35 to $0.37 per share. On April 2 – the day after the company's April 1 press release announcing the purported assembly of an oil exploration team – Norstra stock rose to a closing price of $0.56 per share on a volume of 1,197,200 shares. On June 5, Norstra stock closed at a high of $1.56 per share on a volume of 6,048,300 shares. By August 19, 2013, Norstra stock had fallen back to a price of $0.30 per share.

74. Simultaneously with the Norstra stock promotion, Caledonian and Verdmont sold the stock into the public markets. Caledonian Bank and Caledonian Securities sold 5,753,000 shares of Norstra stock for proceeds of $4,533,213, and Verdmont sold all of its 9,702,000 shares of Norstra stock for proceeds of $8,073,497. These sales occurred approximately one year after Nostra filed its sham Form S-1 registration statement which, by its own terms, expired in ninety days.

75. These securities distributions of 15,455,000 shares of Norstra stock generated proceeds of $12,606,711 for Caledonian and Verdmont. In making these distributions,

Caledonian and Verdmont violated Section 5 of the Securities Act. There was no registration statement in effect for their offers and sales of Norstra securities. And Caledonian and Verdmont used the instruments and means of interstate commerce in offering and selling their Norstra securities.

## V. THE DEFENDANTS OFFERED AND SOLD XUMANII SECURITIES WITHOUT A REGISTRATION STATEMENT BEING IN EFFECT FOR THEIR OFFERS AND SALES.

76. Caledonian's and Verdmont's distributions of Xumanii, Inc. securities were effected in a way strikingly similar to the Swingplane, Goff and Norstra distributions. Xumanii's corporate predecessor, Medora Corporation, was incorporated in the State of Nevada and was a development stage, start-up company with little or no assets and no operations or revenues. Because it traded at prices less than $5.00 per share, Medora stock was a penny stock. The company issued 27,054,600 shares of its common stock, purportedly pursuant to Regulation S of the Securities Act, in the names of 42 individuals residing in Jamaica. Stock certificates issued pursuant to Regulation S are issued with restrictive legends. However, this Regulation S offering was followed by the September 9, 2010 filing of a Form S-1 registration statement for a resale offering by all of the Jamaican shareholders of the 27,054,600 shares at a price of $0.0015 per share. Medora incurred the expenses of preparing and filing the Form S-1, but the company did not receive any funds from the offering.

77. In the Form S-1, Medora represented that its business plan was to "engage in electronic commerce . . . through our collective buying website" and "provide significant discounts to our registered members by allowing them to buy group coupons for local restaurants, hotels, spas, tourist attractions and bars in Jamaica." However, the company's management "does not have prior experience in the marketing of products or services via the

Internet," and its sole officer and director, Craig McKenzie, "has no formal training in financial accounting and management" and "will only be devoting limited time to our operations." McKenzie's day job was that of a technical assistant at a blood transfusion facility; his responsibilities included "[b]lood component preparation, distribution, inventory, preparation of daily and monthly statistics, and to assist Medical Technologists."

78. Medora acknowledged that "we have no revenue and no significant assets. As of October 31, 2010, the Company has an accumulated deficit of $20,663, limited liquidity and has not completed its efforts to establish a stabilized source of revenues." In the financial statements in the Form S-1, Medora's auditors described Medora as a development stage company.

79. Medora's resale offering and the associated Form S-1 were a sham because there was no distribution of the securities supposedly issued to the shareholders, and Medora and its affiliates retained control of those securities. On May 24, 2011, Empire Stock Transfer – *i.e.*, the same Empire Stock Transfer that participated in the Swingplane, Goff and Norstra distributions – issued 27,054,600 shares of Medora in stock certificates without restrictive legends in the names of the 42 Jamaican shareholders. But instead of delivering the stock certificates to the Jamaican shareholders, Empire sent them to "Curtis Daye, Medora Corp., 118 Greenwich Acres, Mammee Bay, St. Ann, Jamaica." Empire's May 24, 2011 issuance of the stock certificates in the names of the Jamaican shareholders was more than seven months subsequent to the first filing of the Form S-1, in which all of the shareholders were named as the selling shareholders. The shareholders were nothing more than nominees. The stock comprised 100 percent of Medora's "float."

80. On March 1, 2012, Celtic Consultants – *i.e.*, the same Celtic Consultants that participated in the Goff and Norstra distributions – sent to Empire twenty Medora stock

certificates in one batch in the names of certain of the Jamaican shareholders for transfer to Lornex Financial – *i.e.*, the same Lornex Financial that participated in the Goff and Norstra distributions – and three other foreign entities. Seventeen of the stock certificates included a "power of attorney to transfer bonds or shares" purportedly signed by the shareholder, and each shareholder's signature was guaranteed by what purports to be the medallion stamp of Mercantile Trust Ltd. in Charlestown, Nevis. However, all seventeen powers of attorney were dated the same day – February 22, 2012. For these documents to be legitimate, seventeen shareholders would have had to travel from Jamaica to Nevis on the same day to have their powers of attorney stamped with the medallion guarantee of Mercantile Trust Ltd. The powers of attorney included a line to designate the location at which the shareholder signed the stock power. This line was left blank on all seventeen of the powers of attorney. In addition to the powers of attorney, Medora stepped in and, in a board of directors resolution signed by McKenzie, directed Empire to make the transfers. Empire issued a new stock certificate, representing 3,100,000 shares of Medora stock, to Lornex as directed by Celtic and Medora. On December 7, 2012, these shares were deposited into the custodial omnibus account at BNY Mellon for the benefit of Verdmont.

81. On May 10, 2012, Medora filed a Report on Form 8-K announcing that McKenzie had resigned and was replaced by an individual by the name of Alexandre Frigon. This appointment presaged a significant change in Medora's purported business of selling discounts and group coupons to tourists visiting Jamaica. A resume accompanying the Report on Form 8-K described Frigon as the founder and CEO of a privately held company by the name of Xumanii, which provided a "Social Networking website" that "[a]llows consumers to broadcast live events and shows on a wireless basis." In a Pre-14C filing six months later, on October 29,

2012, Medora announced a change of its name from "Medora Corp." to "Xumanii." During

McKenzie's tenure, Medora's filings with the Commission did not evidence any activity,

operations or transactions in the discount and group coupon (or any other) business.

82. Similar to Swingplane and Goff, in this same time period Xumanii announced a 5.5-

for-1 forward stock split, so that Verdmont's 3,100,000 pre-split shares of Xumanii stock became

17,050,000 post-split shares.

83. On April 17, 2013, 20,000,000 post-split shares of Xumanii stock were deposited

into the custodial omnibus account at BNY Mellon for the benefit of Caledonian Bank. On May

2, an additional 17,050,000 shares of Xumanii stock were deposited into BNY Mellon for the

benefit of Caledonian Bank. Thus, 37,050,000 shares of Xumanii stock were being held for the

benefit of Caledonian Bank at BNY Mellon.

84. On May 2, 2013, Xumanii filed a "super" Report on Form 8-K announcing an

acquisition by which "former president and director Craig McKenzie sold his shares to the

Directors and officers of Xumanii." Xumanii represented that "[w]e have received trademarks

by way of licensing agreement with Xumanii, Inc., a Cayman Corporation, in Canada, for the

name 'Xumanii' . . . and for the phrase 'Live is Beautiful.'" The company reported that "[o]ur

startup business plan for Xumanii is to broadcast live events in HD from multiple cameras

wirelessly, with an extremely low production cost."

85. Beginning the day of its "super" Report on Form 8-K, Xumanii issued press releases

creating the public impression that it was immediately and actively engaged in its new business

of live event broadcasting. For example:

- On May 2, 2013, Xumanii announced that it had "acquired the master license to a
  cutting-edge IP portfolio that will significantly enlarge the Company's current
  platform technology." The company represented that it had already "developed

proprietary technology capable of broadcasting live events in HD wirelessly from multiple cameras for an extremely low production cost."

- On May 13, 2013, Xumanii represented that it "will host [hip hop artist] PUSHA-T live on their proprietary live streaming broadcast platform located at www.xumanii.com. Xumanii and Pusha-T recently signed a 2-year Agreement, which includes four concert events over the next two years."

- On May 15, 2013, Xumanii reported that it "has appointed John 'Monopoly' Johnson, one of the most successful and well-known hip-hop scout and Artist Manager." CEO Frigon stated that Johnson's "reach, business acumen, reputation and talent is of the highest caliber in the Music Industry and it is with great pleasure that we welcome him aboard."

- On May 16, 2013, Xumanii stated that it had "signed International Music Superstar Akon. This event is scheduled to be Broadcasted Live on Saturday May 25th exclusively on Xumanii.com."

- On May 21, 2013, Xumanii related that it "has significantly expanded its platform capabilities by successfully integrating additional components within Xumanii's proprietary software that will now allow content to be broadcasted Live over smart phone and mobile devices such as tablets."

- On May 24, 2013, Xumanii announced that the company "and it's consultant partners have begun initial talks with Abu Dhabi Media, a large scale media conglomerate that has holdings in several major media and online markets including Abu Dhabi Radio, Emarat FM Radio, Majid magazine, The National newspaper, Image Nation, The United Printing Press as well as being an investor in VEVO which is a joint venture music video website operated by Sony Music Entertainment, Universal Music Group, and Abu Dhabi Media with EMI licensing its content to the group without taking an ownership stake."

86. Newsletters posted on stock-touting websites bolstered these press releases by "picking" Xumanii as a good investment opportunity. A May 17, 2013 Penny Stock Heroes newsletter was entitled "Today's Pick Is: XUII." (XUII was Xumanii's trading symbol.) The newsletter represented that Xumanii was "currently negotiating with artists Kanye West, Lil Wayne, Rick Ross, 2 Chainz and record labels such as Universal Records, Def Jam records, Epic records, Columbia records, RCA records, and many more." On the same day, Hotstocked listed five "fundamental reasons why we think XUII could skyrocket in the near term," including the

claim that the company had "already launch high profile broadcasts, and seem to have every intention of launching even bigger events in the very near future." Three days later, Hotstocked reported that "Xumanii (XUII) is taking over the entertainment industry. . . . Xumanii is transforming and revolutionizing the live broadcast experience with its patent pending technology, online platform and solution of hardware and software."

87. In contrast to the representations of Xumanii and Hotstocked that the company was taking over the entertainment industry, the company's Report on Form 10-K for the year ended July 31, 2013 – *i.e.*, less than two months after the stock promotion – disclosed that Xumanii had "not yet generated or realized any revenues from [its] business operations." A subsequent Report on Form 10-Q was similarly bereft of revenues. On January 28, 2014, Xumanii represented to the Commission's Division of Corporation Finance that the company was engaged in the business – not of broadcasting live events in high definition – but of providing a "file sharing/data storage service" and selling "computer tablets."

88. Xumanii stock commenced trading in the public markets on April 29, 2013, when it closed at a price of $0.10 per share on a volume of 5,000 shares. On May 2 – the day of the "super" Report on Form 8-K announcing the change into the business of live event broadcasting – Xumanii spiked to a closing price of $0.19 per share on a volume of 15,240,000 shares. On July 22, Xumanii stock closed at a high of $0.67 per share on a volume of 28,745,200 shares. By September 11, 2013, Xumanii stock had fallen to a price of $0.02 per share.

89. Simultaneously with the Xumanii stock promotion, Caledonian and Verdmont sold the stock into the public markets. Caledonian sold all of its 37,050,000 shares of Xumanii stock for proceeds of $12,095,719, and Verdmont sold all of its 17,050,000 shares for proceeds of $6,064,353.

90. These securities distributions of 54,100,000 shares of Xumanii stock generated proceeds of $18,160,072 for Caledonian and Verdmont. In making these distributions, Caledonian and Verdmont violated Section 5 of the Securities Act. There was no registration statement in effect for their offers and sales of Xumanii securities. And Caledonian and Verdmont used the instruments and means of interstate commerce in offering and selling their Xumanii securities.

## FIRST CLAIM

91. The SEC realleges paragraphs 1 through 90 above.

92. Defendants Caledonian Bank Ltd., Caledonian Securities Ltd., Clear Water Securities, Inc., Global Legacy Markets S.A. and Verdmont Capital, S.A. each violated Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) & (c)].

93. Between approximately January 2013 through approximately August 2013, these Defendants, directly or indirectly, and notwithstanding the fact that there was no applicable exemption: (a) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means and instruments of transportation, securities as to which no registration statement was in effect; and (c) made use of means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed. No valid registration statement was filed with the Commission or in effect with respect to Caledonian Bank's or Caledonian Securities' sales of, and offers to sell, shares of stock in Swingplane Ventures, Inc.,

33

Goff Corp., Norstra Energy Inc. and Xumanii, Inc. No valid registration statement was filed with the Commission or in effect with respect to Clear Water's or Legacy Global's sales of, and offers to sell, shares of stock in Swingplane and Goff. No valid registration statement was filed with the Commission or in effect with respect to Verdmont's sales of, and offers to sell, shares of stock in Goff, Norstra and Xumanii. There was no distribution of Swingplane, Goff, Norstra or Xumanii securities issued in the names of the shareholders, and the issuers and their affiliates retained control of those securities.

94. Even if the initial registrations attempted by Swingplane, Goff, Norstra and Xumanii were valid, those registrations were effective only as to the transfers of securities contemplated by the Form S-1 registration statements. The registrations were not effective as to the Defendants' subsequent offers and sales of stock to the public. Additionally, the registrations did not extend to offers and sales that were made following reverse mergers or significant changes in the issuers' businesses, because those mergers and changes rendered the information and audited financial statements in the Forms S-1 aged, irrelevant and stale. For example, the Form S-1 for Swingplane pertained to a shell company whose business plan purportedly consisted of the contemplated sale of golf apparel sometime in the future, not to an operating company purportedly involved in copper mining exploration in Chile. The ostensible mining exploration operations were not verified by audited financial statements, which would have been a necessary part of any Form S-1 to be filed for the Defendants' offers and sales.

95. By their own terms, the purported Form S-1 offerings did not extend to the Defendants' offers and sales. The offering launched by Swingplane's Form S-1 terminated 180 days from the June 8, 2011 effective date of the Form S-1. Caledonian, Clear Water and Legacy Global sold their Swingplane stock in 2013 – beyond 180 days after the effective date. With

respect to Goff, any new shareholders wishing to sell their stock in reliance on that company's Form S-1 could not do so unless the company first filed a prospectus supplement naming the new shareholders as selling shareholders. This never happened with respect to Caledonian, Clear Water, Legacy Global or Verdmont. The offering launched by Norstra's Form S-1 terminated 180 days from the July 12, 2012 effective date of the Form S-1. Caledonian and Verdmont sold their Norstra stock beginning in April 2013 – beyond 180 days after the effective date.

96. Because the Defendants' offers and sales of Swingplane, Goff, Norstra and Xumanii securities to the public were not registered and were executed in interstate commerce, the elements of a *prima facie* case of violations of Section 5 of the Securities Act are present in this action.

97. The Defendants made offers of securities in the United States and sold securities in the United States in that: (a) sales were executed by broker-dealer firms in the United States; (b) irrevocable liability with respect to sales was incurred in the United States; and (c) title with respect to sales passed in the United States.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

Enter judgment in favor of the Commission finding that the Defendants each violated Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) & (c)] as alleged in this Complaint;

II.

Permanently enjoin the Defendants, their agents, servants, employees, attorneys-in-fact and assigns, and those persons in active concert or participation with them or who receive actual

notice of the injunction by personal service or otherwise, from violating Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) & (c)];

III.

Permanently prohibit the Defendants from participating in an offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)];

IV.

Order the Defendants to disgorge, with prejudgment interest thereon, all illicit profits or other ill-gotten gains received, and all amounts by which the Defendants have been unjustly enriched, as a result of the misconduct alleged in this Complaint including, as to each Defendant, their own illicit profits, ill-gotten gain, illegal losses avoided, or unjust enrichment, and such future amounts as the Court may find appropriate;

V.

Order the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)]; and

VI.

Grant such further relief as the Court deems just and proper, including such equitable relief as may be appropriate or necessary for the benefit of investors.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action as to all issues so triable.

Dated: Washington, D.C.
February 6, 2015

Respectfully submitted,

*Richard E. Simpson*

Richard E. Simpson
A. David Williams
Ernesto G. Amparo
Attorneys for Plaintiff
Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4492 (Simpson)
simpsonr@sec.gov