```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

            Plaintiff,

       v.                              15 Civ. 894 (WHP)

CALEDONIAN BANK LTD., et al.,

            Defendants.

------------------------------x
                                       New York, N.Y.
                                       February 9, 2015
                                       10:50 a.m.

Before:

              HON. WILLIAM H. PAULEY III,

                                       District Judge

                      APPEARANCES

RICHARD E. SIMPSON
     Attorneys for Plaintiff

PROSKAUER ROSE LLP
     Attorneys for Defendant Caledonian Bank Ltd
BY:  SIGAL P. MANDELKER
         MARGARET A. DALE
         KATHY ROCKLEN
         GEOFFREY RAICHT

CARTER LEDYARD MILBURN LLP
     Attorneys for Defendant Verdmont Capital, S.A.
BY:  ROBERT A. ZITO
```

1              (Case called)
2              THE COURT:  Good morning.  This is District Judge
3     Pauley.  You are on a speakerphone and a court reporter is
4     present recording what is being said.
5              Would counsel for the SEC give his appearance.
6              MR. SIMPSON:  Richard Simpson from the SEC.  I have
7     some other SEC attorneys:  Bridget Fitzpatrick, David Williams,
8     Gerald Hopkins, Anita Bandi, and Ernesto Amparo might be
9     joining us while the conferences are going on.
10             THE COURT:  Very well, Mr. Simpson.  Good morning.
11             Would counsel for the Defendants Caledonian Bank and
12    Caledonian Securities LTD give their appearance.
13             MS. MANDELKER:  Good morning, your Honor.  This is
14    Sigal Mandelker from Proskauer Rose.  I have with me, also from
15    Proskauer, Margaret Dale, Kathy Rocklen, and Geoffrey Raicht.
16             THE COURT:  Good morning.  Would counsel for the
17    Defendant Verdmont Capital SA give his appearance.
18             MR. ZITO:  Good morning, your Honor.  This is Bob Zito
19    from Carter Ledyard & Milburn, and I am by myself.
20             THE COURT:  Good morning, Mr. Zito.
21             I understand that some of the parties here have a
22    further application to the court.  Before we turn to that, I am
23    at a loss to understand what you are all doing.
24             Mr. Zito, you contacted my chambers about 7:30 on
25    Friday night.  You spoke with my law clerk.  My law clerk told

1    you she would speak with me.  She did.  We subsequently

2    communicated with you on Saturday that you could e-mail to my

3    law clerk and my deputy any proposed order.  We never heard

4    from you.  Instead, I understand that Mr. Simpson was

5    contacting various people in the court on Sunday morning.

6              Mr. Zito, did you communicate with Mr. Simpson your

7    conversations with chambers and the fact that I, through my law

8    clerk, had indicated as clearly as I possibly could that any

9    proposed modification of the temporary restraining order could

10   be submitted via e-mail and would be promptly reviewed and

11   passed upon by the judge?

12             MR. ZITO:  I did communicate that, your Honor.

13             THE COURT:  So what happened?

14             MR. ZITO:  Well, I am not sure what happened, your

15   Honor.  If I may, Saturday evening, I thought that we had a

16   settlement and that the papers would be prepared and be

17   submitted to your Honor on Sunday.  When I am not practicing

18   law, I happen to be an Episcopal minister, and Sunday morning I

19   was preaching at Church of the Incarnation.

20             When I got out of church, I saw a flurry of e-mails

21   regarding -- I am not sure what they were regarding.  I saw

22   that Mr. Simpson was attempting to contact the Part One Judge.

23   I then e-mailed Mr. Simpson the e-mail addresses of chambers

24   saying that your Honor was expecting the papers on this.  The

25   sequence of those communications may have been out of sync.

1      THE COURT:  Mr. Simpson, what do you have to say?

2      MR. SIMPSON:  Your Honor, I respectfully was not aware

3  that I was supposed to e-mail your law clerk, which is why I

4  was contacting the Part One Judge on Sunday morning.

5      THE COURT:  Well, did you have conversations with

6  Mr. Zito between Friday and Sunday?

7      MR. SIMPSON:  I had a conversation with Mr. Zito where

8  he did indicate that he had been in contact with chambers, but

9  I do not recall that he indicated that any proposed order

10 should be sent to your law clerk.

11     THE COURT:  Well, I will tell you, Mr. Simpson, that I

12 think that you, at the SEC headquarters in Washington, should

13 make arrangements to have someone from the SEC's New York

14 office involved with you in this case so that you're familiar

15 with what the rules of the court are.  I don't understand why

16 Mr. Zito wouldn't have made it clear to you, but it sounds like

17 he didn't even understand what kind of e-mails he was looking

18 at yesterday after he finished preaching.

19     It seems to me that you are all in a great state of

20 confusion.  I don't want you bothering other people in the

21 court, because I will cut through the Gordian Knot of this

22 case.  Is that understood, Mr. Simpson?

23     MR. SIMPSON:  Yes, your Honor.

24     THE COURT:  Mr. Zito, is that understood?

25     MR. ZITO:  Yes, your Honor.

1  THE COURT:  Now, I also understand that originally,
2  when you contacted chambers this morning, this was just going
3  to be a matter between the SEC and Caledonian Securities.  Am I
4  correct about that?
5  MR. SIMPSON:  We were requesting an additional
6  modification that would apply only to Caledonian.
7  THE COURT:  Am I correct that the SEC wanted a
8  conference call with Caledonian and not with Verdmont?
9  MR. SIMPSON:  Yes, your Honor.
10  THE COURT:  Let me tell you this, Mr. Simpson.  Every
11  party in this case who has been served and appeared will
12  participate in every conference whether they want to or not; is
13  that clear?
14  MR. SIMPSON:  Yes, your Honor.
15  THE COURT:  Good.  Now let's turn to the crisis of the
16  moment.  Who wants to be heard?
17  MR. SIMPSON:  I can begin, your Honor.  We are
18  requesting an additional modification to the TRO because,
19  according to Caledonian Bank, they are receiving a number of
20  requests for cash from other customers.  Apparently, up to this
21  point, the number of requests has reached $85 million.  If all
22  of those requests were made, the account balance would go below
23  the $76 million minimum balance.
24  What the parties are agreeing to, is that the account
25  balance at Northern Trust would be reduced to $10 million and

1   then there would be an equivalent minimum balance imposed on

2   another Caledonian Bank at Morgan Stanley that principally

3   holds securities.

4           Before we consented to the reduction in the Northern

5   Trust account, pursuant to the terms of the modification

6   entered yesterday, we wanted to contact chambers to inform your

7   Honor of that fact and get your Honor's okay to do that.

8           THE COURT:  What is the balance in the other account?

9           MR. SIMPSON:  As I understand it, there is

10  approximately $160 million in securities and approximately

11  $20 million in cash.

12          MS. MANDELKER:  Your Honor, it is approximately

13  $168 million in securities in the Morgan Stanley account.

14          THE COURT:  What kind of securities are they?

15          MS. MANDELKER:  They are investment grade securities.

16          THE COURT:  What cash is in the account?

17          MS. MANDELKER:  This morning, in the Morgan Stanley

18  account, there was 20 million, which they have been in the

19  process of trying to transfer to the Northern Trust account in

20  order to try to meet these requests for outgoing wires.  The

21  Northern Trust account is the corresponding bank which

22  processes all of their wires.

23          THE COURT:  Mr. Simpson, what are the mechanics of

24  this proposed modification?

25          MR. SIMPSON:  Well, the modification entered yesterday

1   allows for mutual consent to the reduction.  I think that if
2   your Honor, on the record, ordered or allowed that reduction,
3   we could begin that process, and then it would be formalized in
4   a further modification that we would submit to the court.
5            THE COURT:  When would you submit that further
6   modification?
7            MR. SIMPSON:  By close of business today.
8            MS. MANDELKER:  I need to just give you one update,
9   which is the bank, again, has an increasing number of requests
10  for wires from innocent customers, and they had to just vote to
11  suspend banking operations.  I believe that that means that
12  they are going to go to a liquidator.  We literally just got
13  notification of that.  Nonetheless, we would still request that
14  this modified order be put into place.
15           THE COURT:  Mr. Simpson, does the SEC want to consider
16  this development?
17           MR. SIMPSON:  Yes, your Honor.
18           THE COURT:  Why don't you take some time to consult
19  with some people.  When would you like to reconvene?  I am here
20  all day.
21           MR. SIMPSON:  We could reconvene at 2:00 o'clock,
22  would that be acceptable?
23           THE COURT:  2:00 o'clock is fine.
24           MS. MANDELKER:  Your Honor, if we have any hope of
25  saving this bank from liquidation -- I don't know if we do --

1    then we would need to take these kinds of measures immediately.

2           MR. SIMPSON:  Your Honor, having just heard what
3    Ms. Mandelker said, I believe that we can go ahead and consent
4    to the proposed modification, notwithstanding the bank's
5    suspension of banking operations.

6           THE COURT:  To put it in two sentences:  The SEC would
7    agree to reduce the restraint on the Northern Trust account
8    from 76 million and change to 10 million, and simultaneously
9    impose a restraint on the Morgan Stanley account of Caledonian
10   Bank that holds 168 million in securities and approximately
11   20 million in cash; is that correct?

12          MS. MANDELKER:  Your Honor, I think that what we would
13   want the restraint to only be on 66.67 million on the Morgan
14   Stanley securities so that the total is the 76 million.  What
15   we would like is for there to be a requirement that we maintain
16   a minimum balance of 66.67 million on the Morgan Stanley
17   account.

18          THE COURT:  Why don't the two of you place this
19   stipulation on the record now in one place so that it is clear
20   and request my approval.

21          MR. SIMPSON:  We can do that.  Would you like me to
22   make an attempt with that, your Honor?

23          THE COURT:  I made an attempt, but that didn't pan
24   out.  You have all been working on this, and I think you, since
25   you are the ones who are agreeing to it, I think the SEC should

1     put the agreement on the record, because it is the SEC that has
2     the position of superiority at the moment.
3              MR. SIMPSON:  Just one other circumstance is that the
4     $10 million at Northern Trust would be segregated into a
5     separate account, I believe, is that correct, Ms. Mandelker?
6              MS. MANDELKER:  Yes, that's correct.
7              MR. SIMPSON:  Let me try, in brief sentences, your
8     Honor.
9              The minimum account balance at Northern Trust by the
10    parties agreement would be reduced from $76,676.852 to an
11    amount of $10 million, which would be placed in a separate
12    account at Northern Trust.  Simultaneously, a minimum balance
13    would be imposed on Caledonian Bank's account at Morgan Stanley
14    in the amount of $66,676, 852.
15             MS. MANDELKER:  That would be on the securities only.
16             MR. SIMPSON:  On the securities only.
17             THE COURT:  This segregated account at Northern Trust,
18    what is the title of that account?
19             MS. MANDELKER:  Your Honor, that account has not yet
20    been set up, but it will be set up immediately.
21             THE COURT:  In what name?
22             MR. SIMPSON:  It would be -- go ahead.
23             MS. MANDELKER:  The name of Caledonian Bank.
24             THE COURT:  Is that acceptable to the SEC?
25             MR. SIMPSON:  Yes, your Honor.  I think it is

1  acceptable because it will be clear that the $10 million will
2  be subject to an asset freeze.
3            THE COURT:  You prefaced your comment with the words
4  "I think."  My question was, is it acceptable to the SEC?
5            MR. SIMPSON:  It is acceptable, your Honor.
6            THE COURT:  Is this acceptable to Caledonian Bank?
7            MS. MANDELKER:  Yes, your Honor.  Thank you.
8            THE COURT:  You will submit a modified order no later
9  than 5:00 o'clock today.  In fact, no later than 4:30 so that I
10 can ensure that it is posted by the clerk's office.
11           MS. MANDELKER:  Yes, your Honor.
12           THE COURT:  Anything further?
13           MR. SIMPSON:  No, your Honor, not from the SEC.
14           MS. MANDELKER:  Nothing further from Caledonian Bank.
15           THE COURT:  Mr. Zito, anything further?
16           MR. ZITO:  Nothing, your Honor.  Thank you for your
17 time.
18           THE COURT:  I will await the order.  Have a good
19 afternoon.
20           MR. ZITO:  Thank you.
21           MS. MANDELKER:  Thank you, your Honor.
22           MR. SIMPSON:  Thank you.
23                                o0o
24
25