Robert J.A. Zito
Mark R. Zancolli
Theodore Y. McDonough
Madelyn K. White
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
Tel. (212) 732-3200
Fax: (212) 732-3232
*Attorneys for Verdmont Capital, S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

SECURITIES AND EXCHANGE          :
COMMISSION                       :
                                 :   Civ. No. 15 CV 894 (WHP)
                  Plaintiff,     :
                                 :
         v.                      :
                                 :
CALEDONIAN BANK LTD.,            :
CALEDONIAN SECURITIES LTD.,      :
CLEAR WATER SECURITIES, INC.,    :   **DECLARATION OF**
LEGACY GLOBAL MARKETS S.A., and  :   **TAYLOR HOUSSER**
VERDMONT CAPITAL, S.A.           :
                                 :
                  Defendants.    :
                                 :

----------------------------------------------------------------x

TAYLOR HOUSSER, hereby declares, under penalty of perjury, that the following is true and correct:

1.    I am the Secretary of Verdmont Capital, S.A. ("Verdmont"), one of the defendants in the above-captioned action.

2.    I respectfully submit this declaration in opposition to the motion of the Securities and Exchange Commission (the "SEC") seeking a preliminary injunction freezing various assets valued at approximately $30.4 million on the purported grounds that Verdmont sold

7585055.12

approximately $17.6 million in unregistered securities of public companies (Goff Corp., Norstra

Energy, Inc. and Xumanii, Inc.), and therefore, violated Section 5 (a) and (c) of the Securities

Act of 1933 (the "Securities Act") (15 U.S.C. § 77e(a) and (c)) because no valid registration

statement was in effect at the time.

3.      The purpose of this declaration is to explain: (i) Verdmont's role as a broker with

regard to the transactions at issue in the SEC's Complaint (the "Complaint"); and (ii) the due

diligence exercised by Verdmont concerning the clients and transactions at issue in the

Complaint.

4.      This declaration also explains the day trading that was conducted by Verdmont on

its own account or as a broker on behalf of its clients in Verdmont's former accounts, no longer

open, at Knight Capital Americas LLC ("Knight"), Sunrise Securities Corporation ("Sunrise")

and UBS Securities ("UBS").

### Verdmont Capital, S.A.

5.      Verdmont is a corporation duly organized under the laws of the Republic of

Panama and duly licensed as a broker-dealer in Panama.  Verdmont does not accept U.S. clients,

and therefore, is advised that it need not be registered as a broker-dealer in the United States.

Verdmont trades in U.S. and non-U.S. securities on behalf of its non-U.S. clients through various

client omnibus accounts throughout the world.

### Verdmont Was Not Trading On Its Own Account,
### But Rather Was Acting As A Broker

6.      The SEC mistakenly alleges that Verdmont traded on its own account and made

"tens of millions of dollars" doing so.  (Transcript of February 6, 2015 Hearing on SEC's Motion

for Temporary Restraining Order, at 3:8-10).  To the contrary, aside from one proprietary day

trade of Xumanii stock that Verdmont executed in its house account (as described in paragraph

2

20 below), Verdmont did not sell securities of Goff, Norstra, or Xumanii – the securities at issue in the Complaint – for its own account, but rather sold them for the benefit of three of its clients. Further, copies of Verdmont's audited financial statements from 2012 and 2013 (in Spanish and with English translation) are attached hereto as Exhibits E and F, respectively, and show that during the years in which the trades at issue in Goff, Norstra and Xumanii were sold (i.e., 2012 and 2013), Verdmont did not make tens of millions of dollars from the entirety of its operations.

7.      Panamanian law generally prohibits me from disclosing information concerning Verdmont's clients.  Verdmont, however, has obtained the consent of the three Verdmont clients at issue to disclose information concerning their trading which is the subject of the Complaint. *See* Exhibit D,  copies of clients' written consent for the release of corporate brokerage account information (DA467-469).

8.      The three Verdmont clients whose trading activity is at issue here are Lornex Financial Ltd. ("Lornex," which traded in securities of Goff Corp. ("Goff"), Norstra Energy Inc. ("Norstra"), and  Xumanii International Holdings f/k/a Medora Corp. ("Xumanii")), Bamfield Equities Ltd. f/k/a Bartlett Trading ("Bamfield," which traded in Norstra), and Nautilus Growth Fund Ltd. ("Nautilus," which traded in Norstra).  Other than Lornex, Bamfield and Nautilus, no clients of Verdmont cleared certificates in Goff, Norstra or Xumanii.

9.      Annexed hereto as Exhibit G (DA591-DA598) are revenue analyses prepared by Verdmont for the transactions at issue in the Complaint.  The analysis presented at DA595-DA598 identifies the cost to Verdmont of the transactions at issue in the Complaint and the net commission revenue paid to Verdmont as a result of the transactions at issue in the Complaint. Verdmont realized net commissions of approximately $228,665.52 as a result of the transactions at issue in the Complaint. *See* Ex.G  (DA598).  In contrast, Verdmont's clients collectively

3

realized gross proceeds of approximately $15,220,260 as a result of the transactions at issue in the Complaint. *See* Ex. G (DA594).

### Verdmont's Due Diligence Concerning
### The Clients And Transactions At Issue

10.     Verdmont neither knew nor had reason to know of the facts underlying the Complaint's allegations that the shares at issue effectively were unregistered.

11.     At the time the Goff, Norstra, and  Xumanii certificates in question were deposited with Verdmont, Verdmont normally required the following documentation and conducted the following due diligence:

a.   Examine the front and back of the stock certificate to ensure that no legend or restriction is in place.

b.   Obtain and attach documentation of how the shares were acquired by the client.  For example, if the shares were purchased through a private placement with the issuer, Verdmont requires a copy of the subscription agreement.  As another example, if the shares were purchased privately, Verdmont requires a copy of the purchase/sale agreement.

c.   Research and attach documentation on how the shares are registered with the SEC.  If the shares were registered by an S1 registration, Verdmont performs research on the SEC's filings on Bloomberg to confirm the client's name on the registration statement and then verifies that the SEC declared the registration statement as effective.  If the client acquired the shares from a third party in a private transaction, Verdmont examines the purchase/sale agreement(s) and ensures that the names of the persons from whom the shares were purchased are listed on a registration statement that was declared effective. Many times (but not every time) Verdmont would check with the transfer agent,

requesting that the transfer agent confirm in writing to Verdmont that shares were free trading, with no stops, holds or restrictions, and that the shares "tacked back" to an effective registration statement.

      d.  Verdmont performs research on the company filings on Bloomberg to ensure that the company is current with its filings.

      e.  Verdmont researches on Bloomberg the percentage of the outstanding shares that a particular certificate represents to confirm that the client's shareholding does not exceed 5% of the outstanding shares.

      f.  At the time of account opening, Verdmont asked in its Know Your Client (KYC) account documents: "Are you a director, officer or controlling shareholder of a public company? If yes attach details."

12.     Verdmont's due diligence with respect to the clients and particular transactions at issue was conducted as outlined above and did not reveal any facts which gave it reason to know or suspect the alleged facts in the Complaint that the securities were unregistered. Verdmont's due diligence is illustrated by the documents annexed hereto as Exhibit A through Exhibit C, which are described in greater detail below by client.

*Lornex Financial Ltd.*

13.     The documents annexed hereto as Exhibit A (DA1-93; 101-176) demonstrate Verdmont's due diligence concerning Lornex. Exhibit A includes "Know Your Client" documentation assembled by Verdmont when Lornex's accounts were opened, and also includes documents which show Verdmont's continuing due diligence into Lornex and its principals. *See* Ex. A (DA1-DA84).

14.     Also included within Exhibit A are documents which evidence Verdmont's due diligence regarding the Lornex transactions at issue. *See* Ex. A (DA101-DA176). Those documents demonstrate that, before sending the certificates for deposit, Verdmont confirmed that no restrictive legends were attached to the certificates and that the securities were declared as effective in the SEC database. Additionally, documents in Exhibit A establish that Verdmont reviewed Goff, Norstra, and Xumanii registration statements (*see, e.g.,* DA106-DA107; DA136; DA153-DA154), inquired into and obtained documentation concerning how the companies' shares were acquired by Lornex (DA108-DA115; DA137-146; DA157-DA176), and determined the number of outstanding shares for each company and the percentage of the outstanding shares represented by the certificate to be deposited (DA101, DA116; DA130, DA147; DA148).

*Bamfield Equities Ltd. f/k/a Bartlett Trading*

15.     The documents annexed hereto as Exhibit B (DA177-DA253) demonstrate Verdmont's due diligence concerning Bamfield. Exhibit B includes "Know Your Client" documentation assembled by Verdmont when Bamfield's accounts was opened (DA177-DA219), and also includes documents which show Verdmont's continuing due diligence into Bamfield and its principals (DA220-DA225).

16.     Also included within Exhibit B are documents which evidence Verdmont's due diligence for the Bamfield transaction at issue. *See* Ex. B (DA237-DA253). Those documents demonstrate that, before sending the Norstra certificates for deposit, Verdmont confirmed that no restrictive legends were attached to the certificates and that the securities were declared as effective in the SEC database. *See* Ex. B (DA242). Documents in Exhibit B also establish that Verdmont inquired into and obtained documentation concerning how the companies' shares were acquired by Bamfield (DA243-DA247), and determined the number of outstanding shares for

6

each company and the percentage of the outstanding shares represented by the certificate to be deposited (DA237, DA248).

*Nautilus Growth Fund Ltd.*

17.     The documents annexed hereto as Exhibit C (DA254-393; 395-466) demonstrate Verdmont's due diligence concerning Nautilus.  Exhibit C includes "Know Your Client" documentation assembled by Verdmont when Nautilus' account was opened (DA254-DA393, DA401-DA423), and also includes documents which show Verdmont's continuing due diligence into Nautilus and its principals (DA396-DA400; DA431).

18.     Also included within Exhibit C are documents which evidence Verdmont's due diligence for the Nautilus transaction at issue. *See* Ex. C (DA443-DA466).  Those documents demonstrate that, before sending the Norstra certificates for deposit, Verdmont confirmed that no restrictive legends were attached to the certificates and that the securities were declared as effective in the SEC database. *See* Ex. C (DA450-452).  Documents in Exhibit C also establish that Verdmont inquired into and obtained documentation concerning how the companies' shares were acquired by Nautilus (DA453-455; 458-461; and 464-466), and determined the number of outstanding shares for each company and the percentage of the outstanding shares represented by the certificate to be deposited (DA443, DA456).

19.     Based on the foregoing, Verdmont has established that it did not sell any of the shares that were from the certificate deposits that are the subject of the alleged Section 5 violation in the Complaint for its own proprietary accounts, that it conducted reasonable due diligence into its clients Lornex, Bamfield, and Nautilus, that it conducted reasonable due diligence into those clients' trades in Goff, Norstra, and Xumanii stock, and that it realized only modest commission revenue in connection with the transactions at issue.

7

7585055.12

**Day Trading By Verdmont And Clients**
**Of Verdmont In Former Accounts, No Longer Open,**
**At Knight, UBS And Sunshine Securities Corp.**

20.    Verdmont performed day trades on its own account or as a broker on behalf of its

clients in Verdmont's former accounts, no longer open, at Knight, Sunrise and UBS. With

regard to Verdmont's clients' trades, Verdmont's clients placed their trades through Verdmont

either online or through their investment advisor, and those trades were routed through

Verdmont's trading system to Knight, Sunrise and UBS. The Verdmont accounts at Knight,

Sunrise and UBS were never accounts where Verdmont held any assets, as they were DVP/RVP

(delivery versus payment/receipt versus payment) accounts, meaning that Verdmont traded

securities there but the trades settled back to Verdmont's custodian. Exhibits 21 through 23 to

the Declaration of Robert W. Nesbitt in support of the SEC's motion are purportedly statements

for the former accounts that Verdmont maintained at Knight, Sunrise and UBS, respectively.

Those account statements show trades in stock of Goff, Norstra and Xumanii – the securities at

issue in the Complaint – but all of those trades were executed by Verdmont as a broker on behalf

of Verdmont's customers, except for the following proprietary trades that Verdmont performed

in Verdmont house account:  bought 200,000 shares of Xumanii at $0.238 on May 13, 2013, and

sold 200,000 shares of Xumanii at $0.2945 on May 13, 2013. Verdmont realized $11,300 in

profit from that trade.

21.    As noted above, Panamanian law generally prohibits me from disclosing

information concerning Verdmont's clients. Verdmont believes that 30 client accounts (in

addition to Lornex, Nautilus and Bamfield) and one house account day traded in Goff, Norstra

and/or Xumanii in the former accounts that Verdmont maintained at Knight, Sunrise and UBS.

Verdmont has attempted to obtain consents from those clients to disclose confidential

8

information concerning them, and Verdmont has thus far obtained consents from four of those clients (copies of which are attached hereto as Exhibit H). It appears from the SEC's document production in this case that the SEC already has in its possession the account files of another 21 of those day trader clients from the BCSC. Accordingly, Verdmont believes that there are only five outstanding clients who day traded in Goff, Norsta and/or Xumanii, and whose consent has not yet been obtained or whose confidential information the SEC does not already possess. Because some of these clients' accounts have since been closed, Verdmont has had no success to date in obtaining permission to disclose their confidential information. Verdmont nonetheless continues to diligently seek consents from these five remaining clients in an effort to remain fully compliant with both Panamanian law and the SEC's discovery requests.

WHEREFORE, Verdmont respectfully requests that the Court deny the SEC's motion for a preliminary injunction and vacate the Modified TRO as against Verdmont.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 24, 2015

_____
Taylor Housser