Robert J.A. Zito
Mark R. Zancolli
Theodore Y. McDonough
Madelyn K. White
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
Tel. (212) 732-3200
Fax: (212) 732-3232
*Attorneys for Verdmont Capital, S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
SECURITIES AND EXCHANGE             :
COMMISSION                          :
                                    :  Civ. No. 15 CV 894 (WHP)
            Plaintiff,              :
                                    :
       v.                           :
                                    :
CALEDONIAN BANK LTD.,               :
CALEDONIAN SECURITIES LTD.,         :
CLEAR WATER SECURITIES, INC.,       :
LEGACY GLOBAL MARKETS S.A., and     :
VERDMONT CAPITAL, S.A.,             :
                                    :
                                    :
            Defendants.             :
-------------------------------------------------------------x

# MEMORANDUM OF LAW OF DEFENDANT VERDMONT CAPITAL, S.A. IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION <u>FREEZING ASSETS</u>

CARTER LEDYARD & MILBURN LLP
COUNSELORS AT LAW
2 WALL STREET
NEW YORK, N.Y. 10005

(212) 732-3200

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT ...................................................................................................................... 7

POINT I THE SEC IS NOT ENTITLED TO A PRELIMINARY INJUNCTION FREEZING EITHER VERDMONT'S CLIENTS' ASSETS OR VERDMONT'S ASSETS ............................................................................................................................. 7

    A.    Plaintiff Has Not Shown A Likelihood Of Success On The Merits .................... 7

        1.    The Transactions Are Exempt Pursuant To Section 4(a)(1) (15 U.S.C. § 77d(a)(1)) ............................................................................................. 8

        2.    The Transactions Are Exempt Pursuant to Section 4(a)(4) (15 U.S.C. § 77d(a)(4)) – The "Broker Exemption" ................................................. 9

    B.    The Deleterious Effects Of A Continued Freeze Of Assets Outweigh The Need For A Freeze ............................................................................................. 11

POINT II THE PROPOSED INJUNCTION IS OVERLY BROAD ............................... 12

POINT III ANY MONETARY AWARD SHOULD BE LIMITED TO AN ORDER OF DISGORGEMENT ........................................................................................................... 13

CONCLUSION ................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*F.T.C. v. Bronson Partners, LLC,*
  674 F. Supp. 2d 373 (D. Conn. 2009) .................................................................................... 11

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
  559 F.3d 110 (2d Cir. 2009) .................................................................................................... 12

*Great Earth Int'l Franchising Corp. v. Milks Devs., Inc.,*
  302 F. Supp. 2d 248 (S.D.N.Y. 2004) ............................................................................. 11, 12

*Joneil Fifth Ave. Ltd. v. Ebeling & Reuss Co.,*
  458 F. Supp. 1197 (S.D.N.Y 1978) ......................................................................................... 12

*SEC v. Cavanagh,*
  155 F.3d 129 (2d Cir. 1998) ...................................................................................................... 7

*SEC v. Cavanagh,*
  1 F. Supp. 2d 337 (S.D.N.Y. 1998) .......................................................................................... 8

*SEC v. First Jersey Sec.,*
  101 F.3d 1450 (2d Cir. 1996) .................................................................................................. 13

*SEC v. Manor Nursing Centers, Inc.,*
  458 F.2d 1082 (2d Cir. 1972) ............................................................................................. 7, 11

*SEC v. McGinn, Smith & Co.,*
  2015 WL 667848 (N.D.N.Y. Feb. 17, 2015) ........................................................................ 14

*SEC v. Unifund SAL,*
  910 F.2d 1028 (2d Cir. 1990) .................................................................................................... 7

*SEC v. Universal Express, Inc.,*
  646 F. Supp. 2d 552 (S.D.N.Y. 2009) .................................................................................... 13

*Sussman v. Crawford,*
  488 F.3d 136 (2d Cir. 2007) ...................................................................................................... 7

*Wonsover v. SEC,*
  205 F.3d 408 (D.C. Cir. 2000) ............................................................................................ 9, 10

*World Trade Financial Corp. v. S.E.C.*,
    739 F.3d 1243 (9th Cir. 2014) ..................................................................................... 9

**FEDERAL STATUTES**

15 U.S.C. § 77b ............................................................................................................. 8

15 U.S.C. § 77d ............................................................................................... 4, 8, 9, 11

15 U.S.C. § 77e ..................................................................................................... passim

15 U.S.C. § 77t ........................................................................................................... 14

**OTHER AUTHORITIES**

*In the Matter of E*Trade Securities, LLC and G1 Execution Services LLC*,
    SEC Administrative Proceeding, File No. 3-16192 (Oct. 9, 2014) ......................... 10

## **PRELIMINARY STATEMENT**

Defendant Verdmont Capital, S.A. ("Verdmont") respectfully submits this memorandum of law in opposition to the motion by the Securities and Exchange Commission (the "SEC"), by *ex parte* order to show cause, for a preliminary injunction freezing what are purportedly Verdmont's assets in the United States. As will be seen, however, the great majority of the assets that the SEC seeks to freeze are assets of Verdmont's clients, not Verdmont's, who are unconnected to the transactions that are the subject of the Complaint. These client assets are contained in various client omnibus accounts, which the SEC is well aware belong to Verdmont's clients and not Verdmont. Even assuming arguendo that the SEC is entitled to freeze Verdmont's assets – and it is not – it is not entitled to freeze the assets of Verdmont's clients.

Entry of a preliminary injunction freezing Verdmont's assets is unwarranted, as the SEC is unable to demonstrate that it is likely to succeed on its claims against Verdmont, or that a balance of hardships justifies a continued freeze of assets. The SEC's claim against Verdmont is premised on an alleged violation of Section 5 of the Securities Act of 1933 (the "Securities Act"), but as explained below, Verdmont's documentary evidence establishes that Verdmont, as a broker, was exempt from the requirements of Section 5 for the transactions at issue. Nor can the SEC demonstrate that the beneficial effects of a continued asset freeze would outweigh the harm that will certainly result from a freeze. As will be repeatedly stressed here, a substantial majority of the assets presently frozen belong to non-parties that have no connection to the transactions alleged in the Complaint. A continuation of the asset freeze would continue to harm those non-parties. In contrast, the only hardship the SEC would suffer from a termination of the asset freeze would be a potential difficulty to collect on a potential money judgment or penalty.

1

7582443.6

Accordingly, the SEC's motion for a preliminary injunction freezing Verdmont's assets should be denied.

## STATEMENT OF FACTS

This case arises from what the SEC alleges were unregistered distributions of public stocks of four companies – Swingplane Ventures, Inc. ("Swingplane"), Goff Corp. ("Goff"), Norstra Energy Inc. ("Norstra"), and Xumanii, Inc. ("Xumanii")[1] – in violation of Section 5(a) and (c) of the Securities Act (15 U.S.C. § 77e(a) & (c)). *See* Compl., ¶1. As alleged in the Complaint, the issuers duly filed registration statements on Forms S-1 registering the securities for distribution to public shareholders. *Id.* However, according to the SEC, the registration statements were allegedly "bogus" because no *bona fide* sales of the securities occurred because the securities which were to have been sold allegedly "remained in the control of the issuers and their affiliates." *Id.* Consequently, alleges the SEC, the issuers' registration statements were not effective. Compl., ¶¶1, 94. The SEC alleges that the restricted securities were then "passed off" as "free trading" stock, and stock certificates for shares of Goff, Norstra, and Xumanii were subsequently transferred, without restrictive legends, to Verdmont, which deposited the stock into U.S. brokerage accounts and sold the stock to the public. Compl., ¶1. In so doing, the SEC contends, Verdmont violated Section 5(a) and (c) of the Securities Act by offering and selling securities in the United States without registration statements being in effect for the offers and sales. Compl., ¶1, 2. Notably, the SEC never issued a stop order, pursuant to Section 8(d) of the 1933 Securities Act, to preclude trading in these securities, and, indeed, despite the SEC's allegations before this Court, three of these stocks, namely, Goff, Norstra and Swingplane, continue to be traded today without any action on the part of the SEC.

Verdmont is a corporation duly organized under the laws of the Republic of Panama, and is duly licensed as a broker-dealer in Panama. Verdmont does not accept U.S. clients, and as a

---

[1] Xumanii was formerly known as Medora Corporation.

3

7582443.6

result, is not required to be registered in the United States. Declaration of Glynn Fisher, dated February 24, 2015 ("Fisher Decl."), ¶5. Verdmont trades in U.S. and non-U.S. securities on behalf of its non-U.S. clients through various client omnibus accounts throughout the world. *Id.* Verdmont maintains various accounts at Morgan Stanley and Interactive Brokers LLC ("Interactive Brokers") and those are the only accounts which Verdmont has in the United States that contain assets. *Id*, ¶6. All Morgan Stanley and Interactive Brokers accounts are currently frozen as a result of this Court's *ex parte* order.

The SEC's claim against Verdmont is dependent on the mistaken assumption that Verdmont sold stock of Goff, Norstra, and Xumanii for its own account and made "tens of millions of dollars" doing so. *See* Declaration of Taylor Housser, dated February 24, 2015, ("Housser Decl."), ¶6. Except for a single proprietary day trade in Xumanii, Verdmont acted as a broker, not a principal, in connection with all of the transactions alleged in the Complaint, contrary to what the SEC asserts. Housser Decl., ¶6. As such, as explained below, Verdmont is protected by two exemptions to Section 5 contained in Sections 4(a)(1) and (4) of the Securities Act. First, as explained below, Verdmont did not act as an "issuer, underwriter, or dealer" for the transactions, so it is protected by the exemption found in Section 4(a)(1). Second, Verdmont is protected by the "broker's exemption" to Section 5 in Section 4(a)(4) since it made a reasonable inquiry into the circumstances of its customers' proposed sales.

Contrary to what the Complaint alleges, Verdmont realized net commissions of approximately $228,665.52 as a result of the transactions at issue in the Complaint, and a small profit of $11,300 on its day trade, Housser Decl., ¶¶9, 20, not "millions" of dollars as alleged by the SEC to justify the *ex parte* order. And the SEC knows that.

4

The transactions at issue involve three of Verdmont's customers: Lornex Financial Ltd. ("Lornex"); Bamfield Equities Ltd. ("Bamfield");[2] and Nautilus Growth Fund Ltd. ("Nautilus").[3] Only Bamfield is a current client of Verdmont; Lornex's and Nautilus' accounts were closed on October 16 and October 10, 2014, respectively.[4] Fisher Decl., ¶7. As explained in detail below, Verdmont's inquiries concerning Lornex's, Nautilus', and Bamfield's activities were more than reasonable, as supported by documentary evidence annexed to the Housser Declaration.[5] For example, at the time Verdmont opened each of the Lornex, Bamfield, and Nautilus accounts, Verdmont required each individual opening an account to complete a thorough "know your customer" questionnaire, which itself required that personal and professional letters of reference be provided. *See, e.g.*, Housser Decl., ¶11, 13, 15, 17 and Exs. A, B and C (DA1-DA39; DA177-DA236; DA254-DA390)). Vermont also obtained the Certificates of Incorporation (or an equivalent document) of Lornex (Housser Decl., Ex. A (DA40)), Bartlett (Housser Decl., Ex. B (DA201)), and Nautilus (Housser Decl., Ex. C (DA277)), and annually updated its due diligence on each client (*see, e.g.*, Housser Decl., Exs. A and B (DA63-DA69; DA220-DA225)).

Verdmont also conducted a thorough inquiry into all material aspects of the transactions at issue. In particular, at the time the Goff, Norstra, and Xumanii certificates were deposited, Verdmont examined them to ensure no legend or restriction was in place. Housser Decl., ¶¶14, 16, 18. It obtained documentation concerning how the shares were acquired by the client, including requesting copies of subscription agreements and purchase/sale agreements. *Id.*

---

[2] Bamfield was formerly known as Bartlett Trading Inc. ("Bartlett").

[3] Other than Lornex, Bamfield, and Nautilus, no clients of Verdmont cleared certificates in Goff, Norstra, or Xumanii.

[4] The Complaint also suggests that Maripose Acosiados S.A. is or was Verdmont's client, but Verdmont has reviewed its records and has found no documents that suggest Maripose is now or ever was Verdmont's client. Fisher Decl., ¶9.

[5] Citations to documents annexed to the Housser Declaration are abbreviated "DA____".

5

Verdmont researched how the shares were registered with the SEC, contacted transfer agents for confirmation that the shares were valid and free trading without stops or restrictions, and performed Bloomberg research to ensure that its customers were not attempting to sell an unusual amount of the companies' outstanding shares (*i.e.*, that the customers' holdings did not exceed 5% of outstanding shares). Verdmont also conducted so-called "World-Check" searches. *See, e.g.* Housser Decl., Ex. A(DA60), B (DA225), C(DA396). None of Verdmont's due diligence revealed any "red flags" indicating that additional inquiry might be necessary. *See* Housser Decl., ¶12.

Most importantly, a substantial majority of the assets presently frozen, belong not to Verdmont, but to Verdmont's clients. Verdmont's account at Morgan Stanly contains separate client subaccounts for Verdmont's clients and does not contain any assets that belong to Verdmont. Fisher Decl., ¶10. Nor do any of those assets belong to Lornex, Bamfield, or Nautilus. *Id.*, ¶11. Verdmont owns no assets in the Morgan Stanley omnibus account and did not conduct proprietary trading in that account. *Id.*, ¶10.

Verdmont's account at Interactive Brokers contains client accounts with assets owned by Verdmont's clients, and also contains a house account with assets owned by Verdmont. Fisher Decl., ¶13. The Verdmont house account at Interactive Brokers contains approximately $1,370,000 USD equivalent in cash. *Id.*, ¶14. The SEC required Verdmont to add $1,317,172 of its own assets to this account to obtain the SEC's consent to allow Verdmont to continue to trade on behalf of its clients.

Of the three Verdmont clients whose trading activity is at issue in this case (i.e., Lornex, Bamfield and Nautilus), only Bamfield owns assets in Verdmont's account at Interactive Brokers, and those assets are approximately $275,000 in cash and securities worth approximately

$34,000. *Id.* Verdmont has internally frozen all of Bamfield's worldwide assets under its control pending further disposition by this Court. Fisher Decl., ¶8.

## ARGUMENT

### POINT I

### THE SEC IS NOT ENTITLED TO A PRELIMINARY INJUNCTION FREEZING EITHER VERDMONT'S CLIENTS' ASSETS OR VERDMONT'S ASSETS

Because a preliminary injunction is an "extraordinary and drastic remedy," it should not be granted unless the movant, "by a *clear showing,* carries the burden of persuasion." *Sussman v. Crawford,* 488 F.3d 136, 139-140 (2d Cir. 2007) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)) (emphasis in original). The SEC is entitled to temporary and preliminary injunctive relief upon "a substantial showing of likelihood of success as to both a current violation and *the risk of repetition.*'" *SEC v. Cavanagh,* 155 F.3d 129, 132 (2d Cir. 1998))(emphasis added); *see also SEC v. Unifund SAL,* 910 F.2d 1028, 1039 (2d Cir. 1990) ("Like any litigant, the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks."). Additionally, a preliminary injunction which would continue a freeze on a defendant's assets "requires particularly careful consideration" by the court of "the disadvantages and possible deleterious effect of a freeze . . . weighed against the considerations indicating the need for such relief." *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1105-06 (2d Cir. 1972).

### A.  Plaintiff Has Not Shown A Likelihood Of Success On The Merits

Section 5 of the Securities Act generally prohibits the sale of unregistered securities. 15 U.S.C. § 77e. The Complaint incorrectly alleges that Verdmont bought and sold approximately $17.6 million in unregistered securities of public companies on its own behalf and, therefore,

7

violated Section 5 (a) and (c) of the Securities Act (15 U.S.C. § 77e(a) and (c)). *See, e.g.,* Compl., ¶58, 74, 89. But Verdmont was acting as a broker.

Section 4 of Securities Act contains two exemptions from the prohibitions contained in Section 5. Under Section 4(a)(1) (15 U.S.C. §77d(a)(1), transactions are exempt from Section 5 if they are conducted "by any person other than an issuer, underwriter, or dealer." Section 4(a)(4) also exempts "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders." 15 U.S.C. § 77d(a)(4). It cannot be disputed that Verdmont was acting as a broker on behalf of its clients and did not sell the securities for its own account. Therefore, these transactions were exempt transactions for Verdmont under Sections 4 (a)(1) and (4) of the Securities Act.

### 1. The Transactions Are Exempt Pursuant To Section 4(a)(1) (15 U.S.C. § 77d(a)(1))

Section 4(a)(1) creates an exemption "for transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). "The purpose of this exemption is to allow the free trading among individual investors of securities that have already been registered." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998) *aff'd* 155 F.3d 129. The SEC has not alleged that Verdmont was an issuer or dealer in connection with the transactions and, as explained below, Verdmont was not an underwriter.

An underwriter is defined as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking[.]" 15 U.S.C. § 77b(a)(11). The claims against Verdmont are premised on the notion that Verdmont owned and

8

traded for its own account the stock in Goff, Norstra, or Xumanii. But as explained in both the Fisher and Housser Declarations, Verdmont made only one proprietary day trade in Xumanii stock, and realized $11,300 in profit from that trade. Housser Decl., ¶¶6, 20. That is, Verdmont bought and sold the identical amount of stock on the same day. Nor did Verdmont "offer[]or sell[] for an issuer" stock in Goff, Norstra, or Xumanii. Rather, Verdmont acted merely as a broker for its clients – Lornex, Bamfield, and Nautilus. Because Section 4(a)(1) applies to Verdmont's role in the transactions at issue, the SEC cannot establish that it is likely to succeed on the merits of its claim that Verdmont violated Section 5 of the Securities Act.

### 2. The Transactions Are Exempt Pursuant to Section 4(a)(4) (15 U.S.C. § 77d(a)(4)) – The "Broker Exemption"

The transactions at issue are also exempt from the registration requirements of Section 5 because Verdmont merely performed "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders." 15 U.S.C. § 77d(a)(4). As explained above, Verdmont acted merely as an agent for its clients, and all of Verdmont's transactions were executed upon legitimate customer orders from Lornex, Bartlett, and Nautilus. *See* Housser Decl., ¶6.

The "broker exemption" may be claimed where a broker conducts a reasonable inquiry into the circumstances of a transaction. *World Trade Fin. Corp. v. SEC*, 739 F.3d 1243, 1248 (9th Cir. 2014) (citing *Wonsover v. SEC*, 205 F.3d 408 (D.C. Cir. 2000)). The extent of the inquiry required will vary based on the circumstances. *Id.* "A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to [the dealer], may ordinarily proceed with considerable confidence." *Wonsover*, 205 F.3d at 415 (citation omitted). If "a dealer is offered a substantial block of a

9

little-known security . . . where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters" then a deeper inquiry is required. *Id.* (citation omitted).

The facts here raised no concerns requiring that Verdmont conduct an exhaustive inquiry. Nevertheless, Verdmont, as is its standard practice (*see* Housser Decl., ¶¶11, 12) conducted a comprehensive and thorough inquiry into all material aspects of the transactions. In particular, at the time the Goff, Norstra, and Xumanii certificates were deposited, Verdmont: examined them to ensure no legend or registration was in place; obtained documentation concerning how the shares were acquired by the client, including requesting copies of subscription agreements and purchase/sale agreements; researched how shares were registered with the SEC; contacted transfer agents by email concerning shares privately acquired by customers from third parties for confirmation that the shares were valid and free trading without stops or restrictions; performed Bloomberg research to ensure the company was current with its filings and that customer shareholders did not exceed 5% of outstanding shares; and confirmed that the customer was not an affiliate of the company. Housser Decl., ¶11.

Verdmont's due diligence was more than reasonable and did not raise any red flags suggesting that additional inquiry might be necessary. Because the stocks were for all apparent purposes registered during the time of the transactions, Verdmont could not have been put on notice of any problems and made all reasonable inquires under the circumstances. *Cf. In the Matter of E*Trade Sec., LLC and G1 Execution Serv. LLC*, SEC Administrative Proceeding, File No. 3-16192 (Oct. 9, 2014) (in which it was undisputed that the securities at issue were never registered). Verdmont's due diligence was in line with industry practice and gave it no reason to suspect that the securities at issue in the Complaint were effectively unregistered. Because

10

Section 4(a)(4) applies to the transactions, the SEC cannot establish that it is likely to succeed on the merits of its claim that Verdmont violated Section 5 of the Securities Act, and its motion for a preliminary injunction should be denied.

**B.     The Deleterious Effects Of A Continued Freeze Of Assets Outweigh The Need For A Freeze**

Even if the Court were to conclude that the SEC has demonstrated a likelihood of success on the merits of its claim – and it has not – the SEC nevertheless has failed to demonstrate that a freeze of Verdmont's clients' assets, or even Verdmont's assets is justified here. Before granting a preliminary injunction freezing Verdmont's assets, a court must consider whether the harmful effects of such a freeze outweigh the need for such relief. *Manor Nursing Ctrs.*, 458 F.2d at 1106. A court also should consider the impact on non-parties. Where granting the preliminary injunction would injure non-parties, that is a factor which weighs against granting the relief requested. *See Great Earth Int'l Franchising Corp. v. Milks Devs., Inc.*, 302 F. Supp. 2d 248, 255 (S.D.N.Y. 2004) ("In assessing the balance of hardships between plaintiff and defendant, the court must also consider potential harm to the non-parties.") (quoting 13 Moore's Federal Practice, § 65.22[1][e] (3d ed. 2003)).

The great majority of the currently frozen assets are owned by Verdmont clients, innocent third parties that have no connection to the erroneous allegations contained in the Complaint. Fisher Decl., ¶¶5-14. Assets of such "relief defendants", who are unnamed and who are not accused of wrongdoing, may only be frozen where the individuals: (1) have received ill-gotten funds; and (2) have no legitimate claim to the funds. *See, e.g., F.T.C. v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 392 (D. Conn. 2009) (finding that FTC had not met its burden of showing that funds in the possession of relief defendant were ill-gotten or that relief defendant did not

11

have legitimate claim to funds). The SEC bears the burden of establishing that a freeze of relief defendants' assets is justified. *Id.* Here, however, the SEC has not – because it cannot – demonstrate that the individuals and entities whose assets are frozen possess "ill-gotten" funds to which they have no legitimate claim. Indeed, precisely the opposite is true.

The SEC essentially concedes that the only harm it would suffer would be the inability to fully collect on a money judgment or have an order of disgorgement satisfied. *See* Transcript of February 6, 2015 Hearing on Plaintiff's *Ex Parte* Application for Temporary Restraining Order, 4:3-13. But any judgment would, at most, require disgorgement of profits of commissions of less than $250,000. *See* Housser Decl., ¶9, Ex. G (DA598). That hardly justifies freezing more than $28 million in assets which primarily belong to Verdmont clients who have nothing to do with this matter. *See* Fisher Decl., ¶12, 14. Freezing Verdmont's clients' assets undoubtedly has a devastating effect on those clients' liquidity and ability to operate their businesses. It is clear that a freeze of Verdmont's assets will do more harm than potential good. Accordingly, the Court should deny Plaintiff's motion. *See Joneil Fifth Ave. Ltd. v. Ebeling & Reuss Co.,* 458 F. Supp. 1197, 1201-02 (S.D.N.Y 1978) (denying preliminary injunction that would harm third party's business); *Great Earth,* 302 F. Supp. 2d at 255 (denying preliminary injunction that would prevent third parties from taking steps to increase their business revenues).

## POINT II

### THE PROPOSED INJUNCTION IS OVERLY BROAD

Preliminary injunctive relief "should be 'narrowly tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 119 (2d Cir. 2009) (citation omitted). The scope of the relief Plaintiff requests is unwarranted, as it seeks to restrain Verdmont's clients' assets and all of

12

Verdmont's assets in the United States, rather than only an amount sufficient to satisfy a potential order of disgorgement (i.e., approximately $250,000). Aside from the fact that most of the assets now frozen belong to innocent third parties, the SEC provides no support for continuing a restraint of more than $28 million, other than its objectively false allegation that Verdmont earned $17 million from trades in its own account. Compl., ¶58, 74, 89. Therefore, even if this Court determines that the SEC has carried its burden of demonstrating that it is entitled to some form of injunctive relief, Verdmont respectfully submits that no more than $239,965.52 – the amount of its commissions and the profits on its one day trade – adequately protects the SEC's interests.

## POINT III

### ANY MONETARY AWARD SHOULD BE LIMITED TO AN ORDER OF DISGORGEMENT

The SEC seeks disgorgement and civil monetary penalties in connection with Verdmont's alleged violations of Section 5. For the reasons explained below, an order of disgorgement, if issued, should be limited to Verdmont's profits from the trades at issue. A district court may order disgorgement of *profits* obtained through violation of federal securities laws. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996). "In determining the amount of disgorgement to be ordered, a court must focus on the extent to which a defendant has *profited* from his [violation]." *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009), *aff'd* 438 Fed. Appx. 23 (2d Cir. 2011)(emphasis added). Here, Verdmont realized net revenue of approximately $228,665.52 as a result of the transactions at issue in the Complaint, and realized profits of $11,300 as a result of its proprietary trading in Xumanii. *See* Housser

Decl., ¶¶9, 20. Accordingly, an order of disgorgement, if entered, should be limited to $239,965.52.

In addition, the Securities Act provides for discretionary civil penalties in three tiers: (i) a first-tier penalty for any violation; (ii) a second-tier penalty if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and (iii) a third-tier penalty if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2).[6] Verdmont respectfully submits that, should the Court determine that Verdmont violated Section 5, such violation was, at worst, the product of negligence. The SEC has not attempted to quantify an appropriate penalty, therefore no penalty is warranted. *See SEC v. McGinn, Smith & Co., Inc.*, 2015 WL 667848, at *16 (N.D.N.Y. Feb. 17, 2015) (declining to impose civil penalty where SEC made "no attempt to identify" the amount of an appropriate penalty). However, if the Court finds that a penalty is warranted, Verdmont submits that a first-tier penalty is appropriate.

---

[6] The statute also provides that, for each violation, the amount of the penalty "shall not exceed the greater of": (i) the specified maximum amount for a natural person or any other person "[f]or each violation", or (ii) "the gross amount of pecuniary gain to such defendant as a result of the violation." *Id.* §§ 77t(d)(2). The maximum amounts specified for a natural person and for any other person respectively are: a first-tier penalty of $5,000 and $50,000, a second-tier penalty of $50,000 and $250,000, and a third-tier penalty of $100,000 and $500,000. 15 U.S.C. §§ 77t(d)(2).

14

## CONCLUSION

For the reasons explained above, Verdmont respectfully requests that the Court deny the SEC's motion for a preliminary injunction freezing Verdmont's assets and for related relief.

Dated: February 24, 2015
      New York, New York

                               Respectfully submitted,

                               **CARTER LEDYARD & MILBURN LLP**

By /s/ *[signature]*
Robert J. A. Zito
~~Mark R. Zancolli~~
Theodore Y. McDonough
Madelyn K. White
Two Wall Street
New York, New York 10005
Telephone: (212) 732-3200
Facsimile: (212) 732-3232
Email: zito@clm.com

*Attorneys for Defendant Verdmont Capital, S.A.*

15