UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| Plaintiff, | : | |
| v. | : | Civ. No. |
| CALEDONIAN BANK LTD., CALEDONIAN SECURITIES LTD., CLEAR WATER SECURITIES, INC., LEGACY GLOBAL MARKETS S.A., and VERDMONT CAPITAL, S.A. | : | |
| Defendants. | : | |

**THE SEC'S MEMORANDUM OF LAW IN SUPPORT OF ITS *EX PARTE*
APPLICATION FOR A TEMPORARY RESTRAINING ORDER FREEZING
ASSETS AND OTHER RELIEF AGAINST THE DEFENDANTS**

Richard E. Simpson
A. David Williams
Ernesto G. Amparo
Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4492 (Simpson)
simpsonr@sec.gov

Dated: Washington, D.C.
        February 6, 2015

## TABLE OF CONTENTS

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1. The Defendants Offered And Sold Swingplane
   Securities Without A Registration Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2. The Defendants Offered And Sold Goff
   Securities Without A Registration Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3. The Defendants Offered And Sold Norstra
   Securities Without A Registration Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4. The Defendants Offered And Sold Xumanii
   Securities Without A Registration Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I. THE SEC IS LIKELY TO PREVAIL ON THE
   MERITS BECAUSE THE DEFENDANTS CLEARLY
   VIOLATED SECTION 5 OF THE SECURITIES ACT . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II. THE COURT SHOULD GRANT THE TEMPORARY
    AND PRELIMINARY RELIEF SOUGHT BY THE SEC . . . . . . . . . . . . . . . . . . . . . . . . 22

A. An Asset Freeze Is Warranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B. A Repatriation Order Is Warranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C. Orders For Accountings And Expedited Discovery Are Warranted . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

## TABLE OF AUTHORITIES

**CASES**                                                                           **Page**

*European & Overseas Commodity Traders, S.A.*
    *v. Banque Paribas London*, 147 F.3d 118
    (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*FTC v. The Crescent Publishing Group, Inc.*,
    129 F. Supp. 2d 311 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Gucci America, Inc. v. Weixing Li*, 768 F.3d
    122 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*SEC v. Aragon Capital Advisors, LLC*, Case
    No. 07-cv-919 (FM), 2011 WL 3278642
    (S.D.N.Y. July 26, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*SEC v. Aronson*, Case No. 11-cv-7033 (JSR),
    2013 WL 4082900 (S.D.N.Y. Aug. 6,
    2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*SEC v. Boock*, Case No. 09-cv-8261 (DLC),
    2011 WL 3792819 (S.D.N.Y. Aug. 25,
    2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*SEC v. Bronson*, Case No. 12-cv-6421 (KMK),
    2014 WL 1613020 (S.D.N.Y. Mar. 31,
    2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*SEC v. Byers*, Case No. 08-cv-7104 (DC), 2009
    WL 33434 (S.D.N.Y. Jan. 7, 2009),
    *aff'd*, 609 F.3d 87 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*SEC v. Compania Internacional Financiera*,
    Case No. 11-cv-4904, 2011 WL 3251813
    (S.D.N.Y. July 29, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*SEC  v. Czarnik*, Case No. 10-cv-745 (PKC),
    2010 WL 4860678 (S.D.N.Y. Nov. 29,
    2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d
402 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*SEC v. Grossman*, 887 F. Supp. 649 (S.D.N.Y.
1995), *aff'd sub nom. SEC v. Estate of
Hirschberg*, 101 F.3d 109 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*SEC v. Lybrand*, Case No. 00-cv-1387 (SHS),
2000 WL 913894 (S.D.N.Y. July 6, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*SEC v. Margolin*, Case No. 92-cv-6307 (PKL),
1992 WL 279735 (S.D.N.Y.  Sept. 30, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*SEC v. Mattera*, Case No. 11-cv-8323 (PKC),
2013 WL 6485949 (S.D.N.Y. Dec. 9,
2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*SEC v. Montle*, 65 Fed. Appx. 749, 2003 WL
21182299 (2d Cir. May 16, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*SEC v. Sekhri*, Case No. 98-cv-2320 RPP, 2000
WL 1036295 (S.D.N.Y. July 26, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*SEC v. Spongetech Delivery Systems, Inc.*, Case
No. 10-cv-2031, 2011 WL 887940
(E.D.N.Y. Mar. 14, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*SEC v. StratoComm Corp.*, Case No.
1:11-cv-1188, 2014 WL 689116
(N.D.N.Y. Feb. 19, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*SEC v. Tavella*, Case No. 13-cv-4609 (NRB)
(S.D.N.Y. July 9, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*SEC v. Universal Express, Inc.*, 475 F. Supp. 2d
412 (S.D.N.Y. 2007), *aff'd*, 300 Fed.
Appx. 70, 2008 WL 4911207 (2d Cir.
2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*SEC v. Verdiramo*, 890 F. Supp. 2d 257
(S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

iii

## SECURITIES LAWS

Section 5 of the Securities Act of 1933,
   15 U.S.C. § 77e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Section 20 of the Securities Act of 1933,
   15 U.S.C. § 77t . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## PROCEDURAL RULES

Fed. R. Civ. P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Fed. R. Civ. P. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Fed. R. Civ. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Fed. R. Civ. P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## INTRODUCTION

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and Section 20(b) of the Securities Act of 1933 (the "Securities Act"), the Securities and Exchange Commission moves for a temporary restraining order freezing assets against defendants Caledonian Bank Ltd., Caledonian Securities Ltd. (collectively, "Caledonian"), Clear Water Securities, Inc. ("Clear Water"), Legacy Global Markets, S.A. ("Legacy Global") and Verdmont Capital, S.A. ("Verdmont") (collectively, with Caledonian, "the defendants").  In connection with four shell companies – Swingplane Ventures, Inc., Goff Corp., Norstra Energy Inc., and Xumanii Inc. – one or more of the defendants offered and sold penny stocks into the public markets in unregistered distributions simultaneously with aggressive public promotion campaigns for those penny stocks.[1]  Even though the companies had little or no assets and no revenues, the defendants obtained tens of millions of dollars from their sales of the stocks.  The Court should enter an asset freeze because the defendants – foreign entities with no branches, facilities or offices in the United States – have millions of dollars in assets in this country, which they could move beyond the jurisdiction of the Court.  As demonstrated below, the SEC is likely to succeed on the merits.  The defendants offered and sold securities without registration statements being in effect and thereby violated Section 5(a) and (c) of the Securities Act.

## STATEMENT OF FACTS

This civil enforcement action arises from the unregistered and unlawful distributions of penny stocks by defendants Caledonian Bank Ltd., Caledonian Securities Ltd., Clear Water Securities, Inc., Legacy Global Markets S.A. and Verdmont Capital, S.A.  Their offers and sales of stocks issued by Swingplane, Goff, Norstra and Xumanii occurred in virtually the same way,

---

[1]     Because they traded at prices less than $5.00 per share, the securities of Swingplane, Goff, Norstra and Xumanii were penny stocks.

involving the misuse of the SEC's registration process through sham registration statements and fictional distributions of securities to shareholders when the securities in fact remained in the control of the issuers and their affiliates.  In these issuances, the companies pretended to sell securities to shareholders residing in such places as Serbia, Mexico, Ireland, Norway, Panama and Jamaica.  In reality, the stock certificates representing the securities were not distributed to the shareholders.

The charade of registration and a public offering was sufficient to cause the transfer agent to issue stock certificates for the securities without restrictive legends, which would have prevented the sale of the securities into the public markets.  The stock certificates were subsequently sent back to the transfer agent with instructions to transfer the securities to the defendants, again without restrictive legends.  The defendants then unlawfully offered and sold the securities into the public markets through their brokerage accounts in the United States without registration statements being in effect.  The defendants made $31,686,926  in proceeds from the sale of Swingplane securities, $17,907,546 from the sale of Goff securities, $12,606,711 from the sale of Norstra securities, and $18,160,072 from the sale of Xumanii securities.

1.  **The Defendants Offered And Sold Swingplane
    Securities Without A Registration Statement.**

Swingplane Ventures, Inc., incorporated in the State of Nevada, was a development stage, start-up company that had no operations.  (A3; A38)[2]  On August 8, 2010, the company filed with the SEC a Form S-1 registration statement for an initial public offering of its common stock at a price of $0.01 per share, which would raise $35,000 exclusive of costs and fees.  (A3)

---

[2]        Citations to the SEC's Appendix accompanying this Memorandum are designated as "(A__)."

In the registration statement, Swingplane represented that its "principal business objective" was "selling men's and women's golf apparel." (A4)  However, the company "has not commenced its planned principal operations." (A4)  The Chief Executive Officer, Matthew Diehl, was "an avid fashion enthusiast" but had no prior experience running an apparel or golf-related company. (A7)  Swingplane had $323 in assets; the company had no employees other than Diehl (who "does not have extensive experience in a public company setting"); it had not generated sufficient cash to be profitable; and "[w]e have not sold any clothing to date." (A7-8; A27)

On September 6, 2011 – *i.e.*, one year after first filing its Form S-1 – Swingplane purportedly "raised $35,000 through the issuance of 3,500,000 shares of common stock to unrelated parties." (A48)  These "unrelated parties" were 35 individuals residing in Serbia and Mexico who supposedly, on their own, discovered and invested in this unknown Colorado company. (51-58)  The stock certificates issued in the names of these shareholders were "unlegended" – meaning that the certificates did not carry restrictive legends preventing the sale of the stock into the public markets. (A59-128)  The stock comprised 100 percent of Swingplane's "float" (A51-58), a term used here to denote all stock issued without restrictive legends.

This initial public offering and the associated Form S-1 were a sham because there was no distribution of the securities issued in the names of the shareholders, and Swingplane and its affiliates retained control of those securities.  Six of the Serbian shareholders were asked in a sworn interview "whether he had received a confirmation for the purchase of securities, whether it was sent to him or to anyone else," and they "stated he did not receive any documents." (131; A134; A136; A138; A140; A143)  Instead, the stock certificates were left in the possession of

3

Luis Carrillo, an attorney representing Swingplane and CEO Diehl. (A145-48) The Serbian and Mexican shareholders were nothing more than nominees.

On September 6, 2012 – *i.e.*, one year after issuing stock in the names of the Serbian and Mexican shareholders – Swingplane announced a change-of-control transaction in which an individual by the name of Michael Voyer bought all of the stock held by Diehl for $35,000. (A153) The Report on Form 8-K announcing the change of control attached a resignation letter from Diehl, dated August 22, 2012. (A158) For the two years before Diehl's sale of his controlling interest, Swingplane's public filings reported no activity, operations or transactions in the golf apparel (or any other) business.

At the same time, the Swingplane unlegended stock certificates in the names of the nominee Serbian and Mexican shareholders were transferred to defendants Caledonian, Clear Water and Legacy Global. On September 6, 2012 – *i.e.*, the same day as the Report on Form 8-K announcing the company's change in control – an individual by the name of Philip Thomas Kueber (the CEO and President of defendant Clear Water) sent the 35 Serbian and Mexican stock certificates in one batch to Swingplane's new transfer agent, Empire Stock Transfer, with instructions that Empire transfer the stock to the defendants as follows: 42,700,000 shares from certain Serbian shareholders to Caledonian Bank; 43,050,000 shares from certain Mexican shareholders to Clear Water; and 36,750,000 shares from certain Mexican shareholders to Legacy Global.[3] (A161-64)

Kueber did not have authorization from the nominee Serbian and Mexican shareholders to transfer Swingplane stock to Caledonian, Clear Water and Legacy Global. The stock powers that Kueber sent to Empire along with the stock certificates were not endorsed or signed by the

---

[3]    In the interim between the Form S-1 and these transfers of the stock to the defendants, Swingplane had effected a 35-for-1 forward stock split, so that the 3,500,000 shares issued in the names of the nominee shareholders without restrictive legends became 122,500,000 shares held by the defendants.

shareholders. (A59-128)  Instead, Swingplane stepped in and, in board of directors resolutions

signed by Diehl (even though he had resigned three weeks earlier), directed Empire to make the

transfers. (A158; A165)  Empire transferred the securities to Caledonian Bank, Clear Water and

Legacy Global as directed by Kueber and Swingplane. (A159-60)  The stock certificates did not

have restrictive legends. (A169-74)

On October 15, 2012 – *i.e.*, one month after the transfer of the stock to the defendants –

Swingplane announced a reverse merger with a company by the name of Mid Americas Corp.

and a change in its purported business from golf apparel to copper mining in Chile:

> On October 15, 2012 Swingplane Ventures Inc. . . . entered into an assignment
> agreement with Mid Americas Corp. . . . Under the terms of the assignment
> agreement the Company will be assigned all of the rights under an option
> agreement between Mid Americas Corp and Gunter and Else Durate Horta . . .
> whereby Mid Americas has the rights to acquire 75% of certain mining
> concessions in Chile. (A176)

Three months later, Swingplane issued a series of press releases creating the public

impression that it was immediately and actively engaged in copper mining exploration in the

"Algarrobo Property" in Chile.  For example:

- On January 25, 2013, Swingplane represented that, at the Algarrobo
  Property, "[h]eavy equipment has exposed high grade copper . . . . This
  exposure is actively being developed into a drift at this time." (A183)

- On January 31, 2013, Swingplane related that five grab samples recovered
  from the Algarrobo Property "document very high grade copper grades"
  and, "[i]n addition to high grade copper, the samples retained very
  anomalous levels of gold." (A194)

- On February 6, 2013, Swingplane announced that it was "completing
  construction of a camp on the Property capable of accommodating 30
  people." (A196)

Bolstering Swingplane's press releases were spam emails sent by a foreign stock-touting

website by the name of Awesome Penny Stocks "picking" Swingplane as a stock whose price

could rise significantly. One of these emails, entitled "Our New Pick is SWVI,"[4] represented that "[m]any analysts reports [are] stating that SWVI shares to be worth over $7." (A207) A second stated that Swingplane "has had some extremely promising results in terms of analysis of their samples, and we have seen at least 3 analysts predict trading prices of over $7 for SWVI." (A209; emphasis original) A follow-up newsletter announced that "SWVI is our monster pick of the month." (A211)

When the stock promotion began on January 23, 2013, Swingplane stock spiked to a closing price of $0.29 per share on a volume of 88,414,000 shares. (A220) On February 20, Swingplane closed at a high of $0.90 per share on a volume of 27,802,300 shares. (A219) In contrast, by May 16, 2013 Swingplane had fallen to a price of $0.04 per share. (A218)

At the same time as the Swingplane stock promotion, Caledonian, Clear Water and Legacy Global sold the stock into the public markets. Caledonian Bank and Caledonian Securities sold all of their 42,700,000 shares of Swingplane stock for proceeds of $14,849,309; Clear Water sold all of its 43,050,000 shares for proceeds of $7,216,246; and Legacy Global sold all of its 36,750,000 shares for proceeds of $9,622,722. (Declaration of Robert W. Nesbitt, executed on February 5, 2015 ("Nesbitt Dec."), ¶¶ 7, 8, 9) Because there was no registration statement in effect for their offers and sales of Swingplane securities (A221-23), Caledonian, Clear Water and Legacy Global violated Section 5 of the Securities Act.

**2. The Defendants Offered And Sold Goff
Securities Without A Registration Statement.**

The distributions of Goff, Corp. securities were effected in a way strikingly similar to Swingplane. Goff, incorporated in the State of Nevada, was a development stage, start-up company that had no operations. (A238; A243) On January 28 and April 5, 2011, the company

---

[4]        Swingplane traded under the symbol "SWVI."

6

issued, purportedly pursuant to the foreign offering exemption of Regulation S, 7,090,000 shares of its common stock in the names of 27 individuals residing in Ireland. (A248; A250-52) These purported shareholders were business associates, friends and relatives of Goff's sole officers, Gary O'Flynn and Patrick Corkery. (A250-52)

On August 26, 2011 – *i.e.*, four months after the completion of the Regulation S offering – Goff filed a Form S-1 registration statement for a resale offering by the Irish shareholders of all of their 7,090,000 shares of common stock at a price of $0.01 per share. (A225; A232) Goff bore all costs relating to the registration of the stock but, because the offering was by shareholders and not the company, Goff did not receive any funds from the offering. (A225; A233) The registration statement represented that the company's business plan was "to provide web-based services that focus around our website that will operate as a link for employers and individuals seeking employment in the UK and Ireland." (A226) However, Goff acknowledged that "[w]e have yet to implement our business plan" and that "[a]t our year end . . . we had assets of $24,759 made up completely of cash and a net loss of ($4,416)." (A226)

This resale offering and the associated Form S-1 were a sham because there was no distribution of securities issued in the names of the shareholders, and Goff and its affiliates retained control of those securities. On December 21, 2011, Goff instructed its transfer agent, Empire Stock Transfer – *i.e.*, the same Empire Stock Transfer that participated in the Swingplane distributions – to issue stock certificates in the names of the 27 Irish shareholders. (A250) The next day, Empire received a letter from Goff's counsel directing that the stock certificates be issued without restrictive legends. (A253-54) Empire sent the unlegended stock certificates – not to the Irish shareholders – but to Goff's counsel. (A255-87) Goff's counsel did not send the stock certificates to the Irish shareholders, but to Goff officer and director O'Flynn. (A288-91)

7

Thus the stock certificates, comprising 100 percent of the "float" (A251-52), were in the hands not of the shareholders, but of Goff.  The shareholders were nothing more than nominees.

On September 24, 2012 – *i.e.*, one year after Goff first filed its Form S-1 – Celtic Consultants LLC ("Celtic"), a foreign entity with its headquarters in Surrey, British Columbia, sent to Empire Stock Transfer two Goff stock certificates totaling 600,000 shares in the names of certain of the nominee Irish shareholders for transfer to Lornex Financial, Ltd. ("Lornex"), a foreign entity with its headquarters in Nevis, British West Indies, and another foreign entity. (A292-95)  The stock powers that Celtic sent along with the stock certificates were not stamped with medallion guarantees by a financial institution; instead, the shareholders' signatures were "guaranteed" by O'Flynn.  (A298-304)  Despite the absence of medallion guarantees, Goff stepped in and supplied a board of directors resolution, signed by O'Flynn, directing Empire to make the transfers. (A296; A301)  Empire issued a new stock certificate, in the amount of 560,000 shares, to Lornex as directed by Celtic and Goff.  (A310)  Over the next weeks, this stock certificate was multiplied into 14,000,000 shares of Goff stock as a result of a 25-for-1 forward stock split and deposited into a custodial omnibus account at BNY Mellon in New York, New York for the benefit of defendant Verdmont.  (A312-22)

On January 7, 2013, Philip Thomas Kueber – *i.e.*, the same Philip Thomas Kueber who participated in the Swingplane distributions – sent nine Goff stock certificates in one batch to Empire Stock Transfer for transfer as follows:  (1) 1,050,000 shares of Goff stock from one of the nominee Irish shareholders to Caledonian Bank; (2) 1,000,000 shares from one of the Irish shareholders to Clear Water; and (3) 870,000 shares from one of the Irish shareholders to Legacy Global. (A323-27)  The stock powers that Kueber sent along with the stock certificates had signature and medallion guarantee stamps with the identification number of the San Juan

Capistrano branch of Bank of America.  (A330; A333; A336; A339; A342; A345; A348; A352;

A353)  However, no employee or officer of the San Juan Capistrano branch stamped the

medallion guarantees onto the stock powers.  (Declaration of Natalia Torres de Meneses,

executed on January 14, 2015, ¶¶ 3-5)  The Goff shares transferred to Caledonian, Clear Water

and Legacy Global were multiplied by 25 as a result of the forward stock split.

A month later, and at the request of Kueber, Empire transferred an additional 8,750,000

post-split shares of Goff stock in the name of one of the Irish shareholders to Caledonian Bank.

(A367-68; A373)  It is doubtful that this Irish shareholder consented to the transfer of "his"

stock.  The stock power that Kueber sent along with the stock certificate was signed, not by the

Irish shareholder, but by Kueber, as a comparison with the signature on Kueber's driver's license

demonstrates.  (A370; A376)

On March 5, 2013 – *i.e.*, two months after the initial transfer of Goff stock to Caledonian,

Clear Water and Legacy Global – Goff announced a change-of-control transaction in which

O'Flynn resigned from the company and an individual by the name of Warwick Calasse was

appointed as sole officer.  (A377-78)  Calasse was supposedly qualified for this position because,

among other things, "[f]rom 2006 to 2010, Mr. Calasse held various training and management

positions with horse farms and stables in the United Kingdom and Zimbabwe."  (A378)  The

next week, on March 12, 2013, Goff announced a significant change from its purported job

placement business:

> [W]e have abandoned our former business plan and entered the business of
> mineral exploration and are now an exploration stage mining company engaged in
> the identification, acquisition and exploitation of metals and minerals with a focus
> on gold and diamond mineralization on La Frontera Property. (A384)

Beginning three days after its change of business, Goff issued a series of press releases creating the public impression that it was immediately and actively engaged in gold and diamond exploration on "La Frontera Property" in Colombia.  For example:

- On March 15, 2013, Goff issued a press release, entitled "Goff Corp. Subsidiary Golden Glory Resources Acquires 100 Percent Interest in the La Frontera Gold Project in Colombia's Hottest Gold Exploration Region."  (A410)

- On March 25, 2013, Goff represented that Golden Glory Resources "plans to begin a 5,000-meter diamond drilling program on its La Frontera Gold Project in Department of Caldes, Colombia within 90 days."  (A416)

- On March 27, 2013, Goff related that "Golden Glory Resources is developing a comprehensive exploration program for its La Frontera Gold Project in Colombia; Phase One groundwork will provide basis for follow-on planned diamond drilling."  (A422)

Bolstering the Goff press releases was a newsletter posted on April 2, 2013 on a stock-touting website by the name of Penny Stock Pillager:

> After years of turmoil, the Colombian government is stepping in to help legitimate mining companies pull gold from their resource-rich soil.  By grabbing a plot of land directly in the Colombian gold sector, <u>investors in Goff Corporation could be on the verge of true wealth</u>!  (A425; emphasis original)

There is no trading data available for Goff on March 14, 2013, the day before the company's March 15 press release announcing its purported interest in "Columbia's hottest gold exploration region."  On March 18, the first trading day *after* the release, Goff stock spiked to a closing price of $0.28 per share on a volume of 263,914,096 shares.  (A438)  On April 5, Goff stock closed at a high of $0.58 per share on a volume of 22,003,500 shares.  (A437)  In contrast, by June 4, 2013 Goff stock had fallen to a price of $0.01 per share.  (A436)

At the same time as the Goff stock promotion, Caledonian, Clear Water, Legacy Global and Verdmont sold the stock into the public markets.  Caledonian sold all of its 35,000,000 shares of Goff stock for proceeds of $6,860,685; Clear Water sold all of its 25,000,000 shares for

proceeds of $4,226,689; Legacy Global sold all of its 21,750,000 shares for proceeds of $3,293,816; and Verdmont sold all of its 14,000,000 shares for proceeds of $3,526,354. (Nesbitt Dec., ¶¶ 12, 13, 14, 15)  Because there was no registration statement in effect for these sales of Goff securities (A439-41), the defendants violated Section 5 of the Securities Act.

3.  **The Defendants Offered And Sold Norstra**
     **Securities Without A Registration Statement.**

Caledonian's and Verdmont's distributions of Norstra Energy Inc. securities were strikingly similar to Swingplane and Goff.  Norstra, incorporated in the State of Nevada, purported to be an exploration stage company but had no operations or revenues.  (A445; A471-72)  On April 30, 2012, Norstra filed with the SEC a Form S-1 registration statement for a self-underwritten initial public offering of 60,000,000 shares of its common stock at a price of $0.001 per share, which would raise $60,000 exclusive of costs and fees.  (A443)

In its Form S-1, Norstra represented that its business plan was "engaging in the exploration and development of oil and gas properties."  (A445)  However, the company "never had significant operations . . . [w]e have yet to generate positive earnings," and the company "had cash in the amount of $177, and liabilities of $4,392 for a working capital of $ (4,215)." (A448; A452-53)  The sole officer of Norstra was an individual by the name of Dallas Kerkenezov, whose qualifications for heading up this oil and gas company included working three summers in the Yukon "helping run staking and drilling crews for various mineral exploration companies" and working for six years "as a carpenter with Byggefirma Tunge AS," a contractor in Randaberg, Norway.  (A464)

Norstra's initial public offering resulted in the issuance of 33,250,000 shares of common stock.  (A497)  But this offering and the associated Form S-1 were a sham because there was no distribution of the securities issued in the names of the shareholders, and Norstra and its affiliates

11

retained control of those securities. On September 7, 2012, Norstra's transfer agent, Empire Stock Transfer – *i.e.*, the same Empire Stock Transfer that participated in the Swingplane and Goff distributions – issued 25 stock certificates without restrictive legends in the names of 9 individuals residing in Norway and 16 individuals in Panama. (A496-97; A500-02)  But instead of sending the stock certificates to the shareholders, Empire sent them to "Norstra Energy Inc., Madlasto 11, Stavanger, Hafrsfjord 4045, Norway," which was sole officer Kerkenezov's address. (A503)  The shareholders were nothing more than nominees.

On February 5, 2013, Celtic Consultants – *i.e.*, the same Celtic Consultants that participated in the Goff distributions – directed the transfer of 3,687,000 shares of Norstra stock from certain of the Norwegian and Panamanian shareholders to Lornex Financial, Ltd. and another foreign entity. (A504-07)  The stock power that Celtic sent along with the stock certificate in the name of the Norwegian shareholder was not stamped with a medallion guarantee by a financial institution; instead, the shareholder's signature was "guaranteed" by what appears to be Kerkenezov's signature. (A510)  The two stock powers signed by the Panamanian shareholders were notarized by a notary public in Panama. (A513-18)  Despite the absence of medallion guarantees, Norstra stepped in and, in a board of directors resolution signed by Kerkenezov, directed Empire to make the transfers from the Norwegian and Panamanian shareholders to Lornex. (A508)  The Norwegian shareholder's stock power signed in Norway, the notarizations of the Panamanian shareholders' stock powers executed in Panama, Kerkenezov's board resolution signed in Norway, and Celtic's FedEx label to Empire from British Columbia, were all implausibly dated the same day – February 5, 2013. (A508; A512; A515; A518; A520)

The Norstra stock transferred to Lornex followed a circuitous route to end up for the benefit of Verdmont.  On March 4, 2013 – *i.e.*, one month after receiving Norstra stock -- Lornex transferred 1,857,000 shares of the stock to Jackson Bennett LLC, a foreign entity with its headquarters in Nevis.  (A524-37)  Jackson Bennett transferred the shares to Tamarind Investments, a foreign entity with its headquarters in Samoa.  (A538-51)  Tamarind Investments transferred the shares to Bartlett Trading, a foreign entity with its headquarters in Samoa.  (A552-62)  On May 31, 2013, the shares were deposited into the custodial omnibus account at BNY Mellon and converted into stock held in street name.  (A563-67)

Similarly, on March 28, 2013, 1,850,000 Norstra shares in the name of Bartlett Trading, 1,840,000 Norstra shares in the name of Lornex, and 1,840,000 Norstra shares in the name of Nautilus Growth Fund, Inc., a hedge fund with its headquarters in the Cayman Islands, were deposited into the custodial omnibus account at BNY Mellon.  (A568-94)  In May 2013, Nautilus Growth Fund transferred an additional 1,000,000 shares of Norstra stock to BNY Mellon, and Mariposa Acosiados S.A., a foreign entity with its headquarters in Belize, transferred 1,315,000 shares of Norstra to BNY Mellon.  (A595-616)  All of this Norstra stock, totaling 9,702,000 shares, was held for the benefit of Verdmont.

On March 5, 2013, Norstra announced that Kerkenezov had resigned and was replaced by Glen Landry, purportedly "a seasoned exploration geologist." (A617)  A week later, on March 12, Norstra announced in a Report on Form 8-K that it had "entered into a farmout agreement . . . for approximately 10,000 acres of oil and gas exploration property in northwest Montana . . . and known as the South Sun River Bakken Prospect." (A619)

Two weeks later, on March 25, 2013, Celtic instructed Empire to transfer a Norstra stock certificate for 2,000,000 shares of stock in the name of one of the nominee Norwegian

shareholders to Caledonian Bank. (A621-25) The stock power that Celtic sent along with the stock certificate was not stamped with a medallion guarantee; instead, the shareholder's signature was "guaranteed" by a signature that appears to Kerkenezov's. (A627-29) Despite the absence of a medallion guarantee, Norstra stepped in and, in a board of directors resolution signed by Kerkenezov (even though he had resigned from Norstra three weeks earlier), directed Empire to make the transfer from the Norwegian shareholder to Caledonian Bank. (A626)

Shortly after its March 12 Report on Form 8-K announcing the farmout agreement on the South Sun River Bakken Prospect, Norstra issued a series of press releases creating the public impression that it was immediately and actively engaged in oil and gas exploration in northwest Montana. For example:

- On March 18, 2013, in a press release entitled "Norstra Enters Bakken Oil Boom," Norstra announced that the "South Sun River Prospect was identified by the Company's management as an excellent target for a Bakken well." (A636)

- On April 1, 2013, Norstra represented that CEO Landry "is in the process of assembling the technical team right now and the group will start confirming the first drill location based on the available geological and seismic data." (A638)

- On April 22, 2013, Norstra reported that the company's "management and technical team met with the company's operator to review current operations and establish detailed guidelines for the planned drilling program on the South Sun River Project." (A642)

- On May 28, 2013, Norstra related that "its geological team has identified the first drill location on the Company's South Sun River Bakken Prospect." (A647)

Bolstering the Norstra press releases was a newsletter sent by email on May 9, 2013 by a stock-touting website by the name of Eric Dany's Stock Prospector:

> Brand new, soon-to-be released, USGS survey could signal Round 2 of the Bakken profit fest! Invest now in Norstra Energy (NORX) before the USGS Report unleashes a new stampede to buy Bakken drillers and this 50-cent stock soars to $5 on its way to $25! (A651)

Norstra began public trading on March 5, 2013, in the price range of $0.35 to $0.37 per share. (A673) On April 2 – the day after the company's April 1 press release announcing the purported assembly of an oil exploration team – Norstra stock rose to a closing price of $0.56 per share on a volume of 1,197,200 shares. (A672) On June 5, Norstra stock closed at a high of $1.56 per share on a volume of 6,048,300 shares. (A671) In contrast, by August 19, 2013 Norstra stock had fallen back to a price of $0.30 per share. (A670)

At the same time as the Norstra stock promotion, Caledonian sold 5,753,000 shares of Norstra stock for proceeds of $4,533,213, and Verdmont sold all of its 9,702,000 shares for proceeds of $8,073,497. (Nesbitt Dec., ¶¶ 18, 19) Because there was no registration statement in effect for these sales of Norstra securities (A674-76), Caledonian and Verdmont violated Section 5 of the Securities Act.

**4. The Defendants Offered And Sold Xumanii
   Securities Without A Registration Statement.**

Caledonian's and Verdmont's distributions of Xumanii, Inc. securities were strikingly similar to Swingplane, Goff and Norstra. Xumanii's corporate predecessor, Medora Corporation, was incorporated in the State of Nevada as a development stage, start-up company with no operations. (A682) Medora issued 27,054,600 shares of its common stock, purportedly pursuant to Regulation S, in the names of 42 individuals residing in Jamaica. (A730-31; A734-37) This was followed by the September 9, 2010 filing of a Form S-1 registration statement for a resale offering in which the Jamaican shareholders were the selling shareholders. (A679; A715-16)

In its Form S-1, Medora represented that its business plan was to "engage in electronic commerce . . . through our collective buying website" and "provide significant discounts to our registered members by allowing them to buy group coupons for local restaurants, hotels, spas,

15

tourist attractions and bars in Jamaica." (A682)  However, the company acknowledged that "we have no revenue and no significant assets.  As of October 31, 2010, the Company has an accumulated deficit of $20,663, limited liquidity and has not completed its efforts to establish a stabilized source of revenues." (A682)

This resale offering and the associated Form S-1 were a sham because there was no distribution of the securities issued in the names of the shareholders, and Medora and its affiliates retained control of those securities.  On May 24, 2011, Empire Stock Transfer – *i.e.*, the same Empire Stock Transfer that participated in the Swingplane, Goff and Norstra distributions – issued 27,054,600 shares of Medora in stock certificates without restrictive legends in the names of the Jamaican shareholders. (A726-27)  But instead of delivering the stock certificates to the Jamaican shareholders, Empire sent them to "Curtis Daye, Medora Corp., Lot 118 Greenwich Acres, Mammee Bay, St. Ann, Jamaica." (A733)  The shareholders were nothing more than nominees.  The stock issued to them comprised 100 percent of the "float."

Nine months later, on March 1, 2012, Celtic Consultants – *i.e.*, the same Celtic Consultants that participated in the Goff and Norstra distributions – sent to Empire Medora twenty stock certificates in one batch in the names of certain of the Jamaican shareholders for transfer to Lornex Financial – *i.e.*, the same Lornex Financial that participated in the Goff and Norstra distributions – and three other foreign entities.  (A738)  It is doubtful that these shareholders consented to the transfer of "their" stock to these foreign entities.  Seventeen of the stock certificates included a "power of attorney to transfer bonds or shares" purportedly signed by the shareholder, and each shareholder's signature was guaranteed by what purports to be the medallion stamp of Mercantile Trust Ltd. of Charlestown, Nevis, whose headquarters was in the same building as Lornex. (*See, e.g.*, A789-92)  Each power of attorney was implausibly dated

the same day – February 22, 2012.  It is highly unlikely that seventeen shareholders traveled from Jamaica to Nevis on the same day to have their powers of attorney stamped with the medallion guarantee of Mercantile Trust Ltd.

In addition to the powers of attorney, Medora stepped in and, in a board of directors resolution signed by Craig McKenzie, the company's sole officer and director, directed Empire to make the transfers.  (A785-88)  Following the instructions of Celtic and Medora, Empire issued 3,100,000 shares of Norstra stock to Lornex.  (A794)  These shares, multiplied into 17,050,000 shares as a result of a 5.5-for-1 forward stock split, were deposited into the custodial omnibus account at BNY Mellon for the benefit of Verdmont.  (A795-807)

On May 10, 2012, Medora announced that McKenzie had resigned as sole officer and director and was replaced by an individual by the name of Alexandre Frigon.  (A809)  In a May 2, 2013 "super" Report on Form 8-K Medora, its name changed to "Xumanii," announced a reverse merger and a new business plan, much different from its purported business of providing discounts to tourists visiting Jamaica:  "Our startup business plan for Xumanii is to broadcast live events in HD from multiple cameras wirelessly, with an extremely low production cost." (A816)

On April 17, 2013 – *i.e.*, two weeks before the announcement of the reverse merger – 20,000,000 post-split shares of Xumanii stock were deposited into the custodial omnibus account at BNY Mellon for the benefit of Caledonian Bank.  (A822-23)  On May 2 – the same day as the reverse merger – 17,050,000 post-split shares of Xumanii were deposited into BNY Mellon for the benefit of Caledonian Bank.  (A824)  This adds up to 37,050,000 shares of Xumanii.

17

Also on May 2, 2013, Xumanii began to issue a series of press releases creating the

public impression that it was immediately and actively engaged in its new business of live event

broadcasting.  For example:

- On May 2, 2013, Xumanii announced that the company had "acquired the master license to a cutting-edge IP portfolio that will significantly enlarge the Company's current platform technology." (A825)

- On May 21, 2013, Xumanii related that it "has significantly expanded its platform capabilities by successfully integrating additional components within Xumanii's proprietary software that will now allow content to be broadcasted Live over smart phone and mobile devices such as tablets." (A833)

- On May 24, 2013, Xumanii claimed that it was in talks "with Abu Dhabi Media, a large scale media conglomerate that has holdings in several major media and online markets including Abu Dhabi Radio, Emarat FM Radio, Majid magazine, The National newspaper, Image Nation, The United Printing Press as well as being an investor in VEVO which is a joint venture music video website operated by Sony Music Entertainment, Universal Music Group, and Abu Dhabi Media with EMI licensing its content to the group without taking an ownership stake." (A835)

Bolstering the Xumanii press releases were newsletters posted on stock-touting websites

"picking" Xumanii as a good investment opportunity.  In a May 17, 2013 newsletter entitled

"Today's Pick Is:  XUII,"[5] Penny Stock Heroes represented that Xumanii was negotiating "with

artists Kanye West, Lil Wayne, Rick Ross, 2 Chainz and record labels such as Universal

Records, Def Jam records, Epic records, Columbia records, RCA records, and many more."

(A837)  On the same day, Hotstocked listed five "fundamental reasons why we think XUII could

skyrocket in the near term," including the claim that the company had "already launch high

profile broadcasts, and seem to have every intention of launching even bigger events in the very

near future."  (A839)  Three days later, Hotstocked reported that "Xumanii (XUII) is taking over

the entertainment industry. . . . Xumanii is transforming and revolutionizing the live broadcast

---

[5]  XUII was Xumanii's trading symbol.

experience with its patent pending technology, online platform and solution of hardware and software." (A841)

Xumanii's common stock commenced trading on the public markets on April 29, 2013, when it closed at a price of $0.10 per share on a volume of 5,000 shares. (A846) On May 2 – the day of the "super" Report on Form 8-K announcing the change in business from tourist discounts to live event broadcasting – Xumanii spiked to a closing price of $0.19 per share on a volume of 15,237,200 shares. (A846) On July 22, Xumanii stock closed at a high of $0.67 per share on a volume of 28,745,200 shares. In contrast, by September 27, 2013 Xumanii stock had fallen to a price of $0.02 per share. (A844)

At the same time as the Xumanii stock promotion, Caledonian and Verdmont sold the stock into the public markets. Caledonian sold all of its 37,050,000 shares of Xumanii stock for proceeds of $12,095,719, and Verdmont sold all of its 17,050,000 shares of Xumanii stock for proceeds of $6,064,353. (Nesbitt Dec., ¶¶ 22, 23). Because there was no registration statement in effect for these sales of Xumanii securities (A849-50), Caledonian and Verdmont violated Section 5 of the Securities Act.

<b>ARGUMENT</b>

## I.  THE SEC IS LIKELY TO PREVAIL ON THE MERITS BECAUSE THE DEFENDANTS CLEARLY VIOLATED SECTION 5 OF THE SECURITIES ACT.

The SEC is likely to prevail at trial in proving that Caledonian Bank, Caledonian Securities, Clear Water, Legacy Global and Verdmont violated Section 5 of the Securities Act because they offered and sold securities without a registration statement being in effect as to their offers and sales. A person violates Section 5 if he or she offers or sells a security without a registration statement being in effect. 15 U.S.C. § 77e(a) & (c). *Accord SEC v. Cavanagh*, 445

F.3d 105, 111 (2d Cir. 2006)("Section 5 requires that securities be registered with the SEC

before any person may sell or offer to sell such securities"); *SEC v. Boock*, Case No. 09-cv-8261

(DLC), 2011 WL 3792819, at *15 (S.D.N.Y. Aug. 25, 2011)(same); *SEC v. Czarnik*, Case No.

10-cv-745 (PKC), 2010 WL 4860678, at *11 (S.D.N.Y. Nov. 29, 2010)(same).

> Proof of a violation of Section 5 consists of three *prima facie* elements:
>
> (1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale.

*SEC v. Bronson*, Case No. 12-cv-6421 (KMK), 2014 WL 1613020, at *4 (S.D.N.Y. Mar. 31,

2014). *Accord SEC v. Cavanagh*, 445 F.3d at 111 n.13; *European & Overseas Commodity

Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n.4 (2d Cir. 1998).

"Scienter is not an element of a section 5 violation." *SEC v. Czarnik*, 2010 WL 4860678

at *11. *Accord SEC v. Bronson*, 2014 WL 1613020 at *4 ("Section 5 imposes strict liability on

offerors and sellers of unregistered securities regardless of any degree of fault, negligence or

intent on the seller's part")(quoting *SEC v. StratoComm Corp.*, Case No. 1:11-cv-1188, 2014

WL 689116, at *16 (N.D.N.Y. Feb. 19, 2014)); *SEC v. Aronson*, Case No. 11-cv-7033 (JSR),

2013 WL 4082900, at *8 (S.D.N.Y. Aug. 6, 2013)("scienter is not an element of the offense").

Once the SEC demonstrates the three *prima facie* elements, the burden shifts to the

defendants to prove that they are entitled to an exemption from registration. *SEC v. Ralston

Purina Co.*, 346 U.S. 119, 126 (1953) ("[k]eeping in mind the broadly remedial purposes of the

federal securities legislation, imposition of the burden of proof on an issuer who would plead the

exemption seems to us fair and reasonable"); *SEC v. Cavanagh*, 445 F.3d at 111 n.13 ("[o]nce a

prima facie case has been made, the defendant bears the burden of proving the applicability of an

exemption"); *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 268 (S.D.N.Y. 2011)(same).

Sellers of securities in unregistered distributions are *not* exempt from Section 5 merely because such securities were purportedly registered in an earlier offering.  The registration requirement applies to each sale of a security, and its exemptions apply to transactions, not to individuals or securities.  *SEC v. Mattera*, Case No. 11-cv-8323 (PKC), 2013 WL 6485949, at *10 (S.D.N.Y. Dec. 9, 2013) ("section 4(1) provides an exemption for transactions, not individuals"); *SEC v. Czarnik*, 2010 WL 4860678 at *11 (same).  As this Court held:

> Registration of a security is "transaction-specific," in that the requirement of registration applies to each act of offering or sale; proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security.

*SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007), *aff'd*, 300 Fed. Appx. 70, 2008 WL 4911207 (2d Cir. 2008).

And, as the Second Circuit held:

> Although the language of Section 5 standing alone does not clearly indicate whether a registration statement must be filed for each offering of a security, other portions of the Act, regulations and the SEC's interpretative statements overwhelmingly support the SEC's position in this case.  For example, Section 4 provides exceptions to the registration requirement of Section 5 for specific transactions, indicating that registration of a security is transaction-specific.

*SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998).  "Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public." *SEC v. Cavanagh*, 445 F.3d at 115.  *Accord SEC v. Verdiramo*, 890 F. Supp. 2d at 266 (same); *SEC v. Boock*, 2011 WL 3792819 at *19 (same).

The evidence described in the Statement of Facts above demonstrates that the SEC is likely to succeed on its Section 5 claim and is entitled to the temporary and preliminary relief that it seeks.  The defendants offered and sold securities in Swingplane, Goff, Norstra and Xumanii, obtaining tens of millions of dollars in proceeds.  They did so simultaneously with

aggressive and extensive promotions for the stocks of these worthless shell companies.  No

registration statement was in effect for their offers and sales.  Nor are the defendants helped by

the illusory distributions to pockets of nominee shareholders in Serbia, Mexico, Ireland, Norway,

Panama and Jamaica, even if those distributions occurred.  "*Each sale* of a security must either

be made pursuant to a registration statement or fall under a registration exemption." *SEC v.

Cavanagh*, 445 F.3d at 133 (emphasis added).  The SEC has made a *prima facie* showing that the

defendants violated Section 5.

## II. THE COURT SHOULD GRANT THE TEMPORARY AND PRELIMINARY RELIEF SOUGHT BY THE SEC.

### A. An Asset Freeze Is Warranted.

This Court should enter an asset freeze as to Caledonian Bank, Caledonian Securities,

Clear Water, Legacy Global and Verdmont.  The United States district courts have the inherent

equitable authority to freeze defendants' assets pending a judgment of disgorgement.  *Gucci

America, Inc. v. Weixing Li*, 768 F.3d 122, 130 (2d Cir. 2014)("[p]laintiffs here seek the

equitable remedy of an accounting of profits.  In such circumstances, the district court has the

inherent equitable authority to issue the Asset Freeze Injunction").  To obtain a temporary

restraining order or a preliminary injunction freezing assets, the SEC "must show either a

likelihood of success on the merits, or that an inference can be drawn that the party has violated

the securities laws." *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011)(quoting *SEC v. Byers*, Case

No. 08-cv-7104(DC), 2009 WL 33434, at *3 (S.D.N.Y. Jan. 7, 2009), *aff'd*, 609 F.3d 87 (2d Cir.

2010)).  *Accord SEC v. Montle*, 65 Fed. Appx. 749, 2003 WL 21182299, at *2 (2d Cir. May 16,

2003)(same); *SEC v. Cavanagh*, 155 F.3d at 132 (same).[6]  As demonstrated in the Statement of

---

[6]      For an asset freeze, "the SEC need not show that it would face irreparable harm were the injunction not to issue." *SEC v. Montle*, 2003 WL 21182299 at *2.  This is a lesser standard than that required for an preliminary

Facts and Argument Section I above, the SEC is likely to succeed on the merits, and an inference can be drawn that the defendants violated Section 5 of the Securities Act.

An asset freeze can operate with respect to assets that are not traceable to the illegal activity. *SEC v. Spongetech Delivery Systems*, 2011 WL 887940 at *9 ("[i]t is clear that . . . a defendant can be ordered to disgorge funds that were not causally tied to the fraudulent activity"); *SEC v. Sekhri*, Case No. 98-cv-2320 RPP, 2000 WL 1036295, at *1 (S.D.N.Y. July 26, 2000)("a freeze need not be limited only to funds that can be directly traced to defendant's illegal activity"); *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995) ("[i]t is irrelevant whether the funds affected by the Assets Freeze are traceable to the illegal activity, [where the defendants] are jointly and severally liable for the profits"), *aff'd, SEC v. Estate of Hirshberg*, 101 F.3d 109 (2d Cir. 1996).

Asset freezes are available in cases alleging strict liability under Section 5. *SEC v. Tavella*, Case No. 13-cv-4609 (NRB), slip op. at 2 (S.D.N.Y. July 9, 2013)(in a Section 5 case, "[t]here is good cause to believe that . . . defendants will dissipate, conceal, or transfer from the jurisdiction of this Court assets which could be subject to an order directing disgorgement or the payment of civil money penalties"); *SEC v. Lybrand*, Case No. 00-cv-1387 (SHS), 2000 WL 913894, at *9 (S.D.N.Y. July 6, 2000)(asset freeze granted where the SEC sought such a freeze "solely on the basis of the alleged registration violations").

"Courts can also consider whether the 'asset freeze is needed in order to prevent [the defendant] from secreting or dissipating his assets.'" *SEC v. Spongetech Delivery Systems, Inc.*, Case No. 10-cv-2031, 2011 WL 887940, at *9 (E.D.N.Y. Mar. 14, 2011)(quoting *SEC v. Margolin*, 1992 WL 279735, at *6 (S.D.N.Y. Sept. 30, 1992)).

---

injunction against securities violations. *SEC v. Cavanagh*, 155 F.3d at 132 ("[a]n asset freeze requires a lesser showing").

There is good cause to believe that the defendants – all foreign entities with no branches, facilities or offices in the United States – are likely to transfer to their "home base" in the Cayman Islands, Belize or Panama assets or funds they have in the United States. *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 420-21 (S.D.N.Y. 2001)("the fact that the defendants live abroad and use off-shore accounts raises a concern that they may transfer their funds beyond the Court's jurisdiction and dissipate the assets available for any eventual award"). They already transferred the proceeds from their sales of Swingplane, Goff, Norstra and Xumanii securities, shortly after they completed those sales in the first half of 2013. (*See, e.g.*, account statements generated by Scottsdale Capital Advisors, Nesbitt Dec. Exhs. 18, 19, 20) Beginning on September 9, 2014, Caledonian Bank transferred funds out of an account at Deutsche Bank Trust Company America which reduced the account balance from $21,802,576 to $0.[7] (Declaration of Ernesto G. Amparo, executed February 5, 2015 ("Amparo Dec."), ¶¶ 3-5) Despite such transfers, the SEC found an account at Northern Trust International Banking Corporation in which, as of December 8, 2014, Caledonian Bank held $71,638,622. (*Id.*, ¶ 6) As of November 28, 2014, Verdmont had $37,279,113 in a brokerage account at BNP Paribas Prime Brokerage, Inc. (*Id.*, ¶ 7) On January 5 and 6, 2015, Verdmont transferred all or almost all securities from that account, leaving it with an account balance of $2,960. (*Id.*, ¶ 8) Despite such transfers, the SEC found an account at Interactive Brokers LLC in which, as of January 31, 2015, Verdmont held $17,745,515.[8] (*Id.*, ¶ 9) An asset freeze is necessary to prevent the further dissipation and

---

[7]      September 9, 2014 – the beginning date of Caledonian Bank's transfers – is the same day that the United States Attorney for the Eastern District of New York unsealed an indictment against Legacy Global and its principal, Brian De Wit. (Amparo Dec., ¶ 4) The circumstances of these transfers gives rise to a serious concern that the Defendants, in the absence of an asset freeze, are likely to transfer assets outside of the United States once they are informed of this civil enforcement action.

[8]      Verdmont transferred a portion of its securities at BNP Paribas into its account at Interactive Brokers, which is a broker-dealer firm headquartered in Greenwich Connecticut. However, Verdmont also transferred a portion of its securities to JP Morgan Chase Bank, with further notation to Euroclear Bank, and a portion of its securities to BMO Harris Bank, N.A., with further notation to Weiser Asset Management. (Amparo Dec., ¶ 8) A

transfer of assets and funds in the United States and to ensure their availability for disgorgement, prejudgment interest, civil money penalties, and distribution to the victims of the defendants' Section 5 violations.

**B.   A Repatriation Order Is Warranted.**

The Court should order that Caledonian Bank, Caledonian Securities, Clear Water, Legacy Global and Verdmont return to the United States, or "repatriate," the proceeds that they obtained from their sales of Swingplane, Goff, Norstra and Xumanii securities, or an amount equal thereto. A repatriation order is within a district court's equitable powers and is appropriate in this case. *SEC v. Compania Internacional Financiera*, Case No. 11-cv-4904, 2011 WL 3251813, at *13 (S.D.N.Y. July 29, 2011) ("an order to bring assets to the United States is appropriate if needed to make effective an asset freeze and preserve assets for potential future relief"); *SEC v. Aragon Capital Advisors, LLC*, Case No. 07-cv-919 (FM), 2011 WL 3278642, at *10 (S.D.N.Y. July 26, 2011)(repatriation order was warranted where "some of the unlawful proceeds of the . . . Defendants' trading activities are, or have been, held abroad" and such proceeds "are necessary to satisfy the monetary relief [the SEC] seeks"); *FTC v. The Crescent Publishing Group, Inc.*, 129 F. Supp. 2d 311, 325-26 (S.D.N.Y. 2001)(repatriation of "all funds now or hereafter held in foreign accounts" was warranted where "[t]he corporate defendants do not appear to be in a position to satisfy claims of the dimension that seem to be at issue here").

The defendants transferred the proceeds from their unregistered securities sales shortly after they completed those sales in the first half of 2013. A repatriation order is necessary to ensure that there are sufficient assets in the United States for the defendants to satisfy a judgment.

---

Google search indicates that Euroclear Bank purports to be a bank incorporated in Belgium, and Weiser Asset Management purports to be an investment firm with its headquarters in the Bahamas.

**C. Orders For Accountings And**
   **Expedited Discovery Are Warranted.**

An order requiring accountings by the defendants of their securities sales proceeds is necessary to identify the holders and locations of such proceeds and to help ensure that the funds are frozen and available to satisfy a judgment. *SEC v. Lybrand*, 2000 WL 913894 at *12 ("[i]n light of the SEC's showing on the merits and the threat of dispersal of assets, an accounting is appropriate"). An order for expedited discovery will facilitate the SEC's efforts to marshal evidence for the preliminary injunction hearing, address the defendants' argument (if any) that they are entitled to an exemption from the registration requirement of Section 5, and identify the holders and locations of sale proceeds. Such discovery is authorized by Rules 26, 30 and 33 of the Federal Rules of Civil Procedure and the Court's equitable powers. *Aragon Capitol Advisors, LLC*, 2011 WL 3278642 at *11 ("limited expedited discovery concerning the Defendants' assets is warranted").

**CONCLUSION**

For the reasons stated, the Court should enter a temporary restraining order freezing assets and other relief.

Dated:  Washington, D.C.
   February 6, 2015

          Respectfully submitted,

          Richard E. Simpson
          A. David Williams
          Ernesto G. Amparo
          Attorneys for Plaintiff
          Securities and Exchange
          Commission
          100 F Street, N.E.
          Washington, D.C. 20549
          (202) 551-4492 (Simpson)
          simpsonr@sec.gov