S-1/A 1 swingplanes1a7.htm FORM S-1/A-7

As filed with the Securities and Exchange Commission on June 8, 2011

Registration No. 333-168912

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM S-1/A
Amendment No. 7
## REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933
### Swingplane Ventures, Inc.
(Name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Nevada** | **2300** | **27-2919616** |
| (State or jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**220 Summit Blvd. #402**
**Broomfield, Colorado 80021**
**(303) 803-0063**
(Address and telephone number of registrant's principal executive offices)

**Matthew R. Diehl, President**
**Swingplane Ventures, Inc.**
**220 Summit Blvd. #402**
**Broomfield, Colorado 80021**
(Name, address and telephone number of agent for service)

*Copy to:*

Clifford J. Hunt, Esquire
Law Office of Clifford J. Hunt, P.A.
8200 Seminole Boulevard
Seminole, Florida 33772
(727) 471-0444

Approximate date of commencement of proposed sale to the public: As soon as practicable after the Registration Statement becomes effective.  If any of the securities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended, check the following box. [X]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement for the same offering. [ ]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [ ] If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration number of the earlier effective registration statement for the same offering. [ ]

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company filer.  See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act (Check one):

| | |
|---|---|
| Large Accelerated Filer [ ] | Accelerated Filer [ ] |
| Non-Accelerated Filer [ ] | Smaller Reporting Company **[X]** |

Link to Table of Contents

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Share | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock par value $0.001 | 3,500,000 | $0.01 | $35,000 | $2.50 |

The offering price has been estimated solely for the purpose of computing the amount of the registration fee in accordance with Rule 457 under the Securities Act of 1933, as amended.

The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission (the "SEC" or "Commission"), acting pursuant to said Section 8(a), may determine.

BEFORE INVESTING, YOU SHOULD CAREFULLY READ THIS PROSPECTUS AND, PARTICULARLY, THE RISK FACTORS SECTION, BEGINNING ON PAGE 7. NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES DIVISION HAS APPROVED OR DISAPPROVED THESE SECURITIES, OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**Investing in our common stock involves a high degree of risk. A potential investor should carefully consider the factors described under the heading "Risk Factors" beginning at page 7.**

**Neither the Securities and Exchange Commission nor any State Securities Commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

PRELIMINARY PROSPECTUS SUBJECT TO COMPLETION DATED June 8, 2011.

2

Link to Table of Contents

The information in this prospectus is not complete and may be changed. The securities offered by this prospectus may not be sold until the Registration Statement filed with the Securities and Exchange Commission is effective. This prospectus is neither an offer to sell these securities nor a solicitation of an offer to buy these securities in any state where an offer or sale is not permitted.

<div align="center">

**PRELIMINARY PROSPECTUS**

**Dated June 8, 2011**

**SWINGPLANE VENTURES, INC.**

3,500,000 Shares of Common Stock
$0.01 per share
$35,000 Maximum Offering

</div>

Swingplane Ventures, Inc. ("Company") is offering on a best-efforts basis a maximum of 3,500,000 shares of its common stock at a price of $0.01 per share. This is the initial offering of Common Stock of Swingplane Ventures, Inc. and no public market exists for the securities being offered. The Company is offering the shares on a "self-underwritten", best-efforts, all or none basis directly through our officer and director. The shares will be offered at a fixed price of $.01 per share for a period not to exceed 180 days from the date of this prospectus. There is no minimum number of shares required to be purchased. Matt Diehl, the sole officer and director of Swingplane Ventures Inc., intends to sell the shares directly. No commission or other compensation related to the sale of the shares will be paid to our officer and director. The intended methods of communication include, without limitations, telephone, and personal contact. For more information, see the section titled "Plan of Distribution" and "Use of Proceeds" herein.

|  | **Per Share** | **Total** |
|---|---|---|
| Initial public offering price | $0.01 | $35,000 |
| Underwriting discounts and commissions | $0.0 | $0.0 |
| Proceeds, before expenses, to us | $0.01 | $35,000 |

The proceeds from the sale of the shares in this offering will be payable to Law Office of Clifford J. Hunt, P.A, Trust Account IOTA. A Trust Account will hold all the subscription funds pending placement of the entire offering. This offering is on a best effort, all-or-none basis, meaning if all shares are not sold and the total offering amount is not deposited by the expiration of the offering, all monies will be promptly returned to investors, without interest or deduction.

The Officer and director of the issuer and any affiliated parties thereof will not participate in this offering. The offering shall terminate on the earlier of (i) the date when the sale of all 3,500,000 shares is completed or (ii) one hundred and eighty (180) days from the date of this prospectus. Swingplane Ventures, Inc. will not extend the offering period beyond one hundred and eighty (180) days from the effective date of this prospectus.

Swingplane Ventures, Inc. is a development stage, start-up company and currently has no operations. Any investment in the shares offered herein involves a high degree of risk. You should only purchase shares if you can afford a complete loss of your investment.

BEFORE INVESTING, YOU SHOULD CAREFULLY READ THIS PROSPECTUS AND, PARTICULARLY, THE RISK FACTORS SECTION, BEGINNING ON PAGE 7. NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES DIVISION HAS APPROVED OR DISAPPROVED THESE SECURITIES, OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

Prior to this offering, there has been no public market for Swingplane Ventures Inc.'s common stock.

<div align="center">3</div>

Converted by EDGARwiz

Link to Table of Contents

**Item 3. Prospectus Summary.**

This summary highlights certain information contained elsewhere in this prospectus. You should read the following summary together with the more detailed information regarding Swingplane Ventures, Inc. ("Us," "We," "Our," "Swingplane," "Swingplane Ventures," the "Company," or "the Corporation") and our financial statements and the related notes appearing elsewhere in this prospectus.

**The Company**
*Our Business*

Swingplane Ventures, Inc. was incorporated in the State of Nevada on June 24th, 2010. Swingplane Ventures, Inc. is a development stage company with a principal business objective of selling men's and women's golf apparel. The Company plans to have its initial clothing line consist of shirts, pants, and skirts designed specifically for younger golfers. We plan to stay on the cutting edge of the constantly changing golf apparel market and our goal is to create a quality reputation within the youthful golfing community and golf garment marketplace. Swingplane Ventures conducted research on various marketing venues and plans to sell our initial line of clothing through our own online retail website.

Swingplane Ventures, Inc. is a development stage company that has not commenced its planned principal operations. Swingplane Ventures, Inc. operations to date have been devoted primarily to start-up and development activities. Our President, Matt Diehl, has performed all of the development activities to date, which include the following:

1. Formation of the Company;
2. Development of the Swingplane Ventures, Inc. business plan;
3. Initiated various garment designs and reviewed the use of different material for construction of our proposed product lines;
4. Conducted research on three major marketing channels/strategies including smaller retail golf shops, major retail outlets, and online sales;
5. Formulated product development and marketing strategies for product lines to include:
   - Tailored style golf shirts for younger men and women
   - Tailored style golf pants for younger men and women
6. Secured web site domain www.swingplaneventures.com;
7. Conducted research on men and women golfer demographics.

Swingplane Ventures, Inc. is attempting to become operational and anticipates sales to begin during the third quarter of operations following the completion of our offering. In order to generate revenues, Swingplane Ventures, Inc. must address the following areas:

1. Finalize and implement our marketing plan: In order to effectively penetrate our targeted market, Swingplane Ventures will use a marketing plan that includes a high-end website Our long term marketing goal is to also approach targeted golf pro shops and retail outlets, and target specific distribution channels using independent representatives. Long term, independent commissioned sales representatives will work as middlemen between Swingplane Ventures and the retailers. Their responsibilities would include approaching any/all appropriate retailers, work trade shows and employ creative marketing techniques to attract golf and/or sports-oriented retailers and shops. **This long term marketing plan is entirely dependent on future financing and thus may not occur.** The Company currently does not have any engagements, agreements, or contracts with independent commissioned sales representatives.
2. Tailor our website: Swingplane Ventures has secured the web domain located at www.swingplaneventures.com. The site is currently under construction and we plan to incorporate this site with strategic vertical market ecommerce retailers. We have budgeted the necessary funding to develop a quality site.
3. Constantly monitor our market: We plan to constantly monitor our target market and adapt to consumers needs, wants and desires. To be successful we plan to evolve and diversify our product lines to satisfy the consumer.
4. Run our Company ethically and responsibly. Conduct our business and ourselves ethically and responsibly.

**Our Statement of Organization:**

We were incorporated in Nevada on June 24, 2010, as Swingplane Ventures, Inc. Our principal executive offices are located at 220 Summit Blvd. #402, Broomfield, CO 80021. Our phone number is (303) 803-0063.

**The Offering**

The following is a brief summary of this offering. Please see the "Plan of Distribution" section for a more detailed description of the

Link to Table of Contents

| | |
|---|---|
| *Number of Shares Being Offered:* | The Company is offering 3,500,000 shares of common stock, par value $0.001 |
| *Offering Price per share* | $0.01 |
| *Offering Period:* | The shares are being offered for a period not to exceed 180 days. In the event we do not sell all of the shares before the expiration date of the offering, all funds raised will be promptly returned from the escrow account and returned to the investors, without interest or deduction. |
| *Escrow Account:* | The subscription proceeds from the sale of the shares in this offering will be payable to "Law Office of Clifford J. Hunt, P.A. Trust Account IOTA" and will be deposited in a non-interest bearing law office trust bank account until all offering proceeds are raised. All subscription agreements and checks should be delivered to Law Office of Clifford J. Hunt P.A. Failure to do so will result in checks being returned to the investor who submitted the check. Swingplane Ventures, Inc. escrow agent, Law Office of Clifford J. Hunt, P.A., acts as legal counsel for Swingplane Ventures, Inc. and is therefore not an independent third party. |
| *Net Proceeds to Company:* | $35,000 |
| *Use of Proceeds:* | We intend to use the proceeds to expand our business operations. |
| *Number of Shares Outstanding Before the Offering:* | 10,000,000 common shares |
| *Number of Shares Outstanding After the Offering:* | 13,500,000 common shares |

The offering price of the common stock bears no relationship to any objective criterion of value and has been arbitrarily determined. The price does not bear any relationship to Swingplane Ventures, Inc. assets, book value, historical earnings, or net worth.

Swingplane Ventures, Inc. will apply the proceeds from the offering to pay for accounting fees, legal and professional fees, equipment, office supplies, salaries/contractors, sales and marketing, and general working capital.

The Company has not presently secured an independent stock transfer agent. Swingplane Ventures, Inc. has identified several agents to retain that will facilitate the processing of the certificates upon closing of the offering.

The purchase of the common stock in this offering involves a high degree of risk. The common stock offered in this prospectus is for investment purposes only and currently no market for Swingplane Ventures, Inc. common stock exists. Please refer to the sections herein titled "Risk Factors" and "Dilution" before making an investment in this stock.

## SUMMARY FINANCIAL INFORMATION

The following table sets forth summary financial data derived from Swingplane Ventures, Inc. financial statements. The accompanying notes are an integral part of these financial statements and should be read in conjunction with financial statements, related notes and other financial information included in this prospectus.

<div align="center">

**SWINGPLANE VENTURES, INC.**
(A Development Stage Company)
**Statement of Operations**
For the period from inception (June 24, 2010) to March 31, 2011

</div>

| | |
|---|---|
| Revenues | $            - |

Operating expenses
    General and administrative         11,252

(Loss) from operations       (11,252)

Other income (expense)
    Interest income         -
    Interest expense         -
Loss before income taxes       (11,252)

    Income tax benefit (provision)      -
    Net Loss      $     (11,252)

Basic and diluted loss per common share    $     0.00

Basic and diluted weighted average common shares outstanding     10,000,000

*The accompanying notes are an integral part of the financial statements.*

6

Link to Table of Contents

## RISK FACTORS

Before you invest in our common stock, you should be aware that there are risks, as described below.  You should carefully consider these risk factors together with all of the other information included in this prospectus before you decide to purchase shares of our common stock.  Any of the following risks could adversely affect our business, financial conditions and results of operations.

**Risks Related To the Company**

*(1)Our Auditor Has Expressed Substantial Doubt About Our Ability To Continue As A Going Concern.*

These financial statements included with this registration statement have been prepared on a going concern basis.   We may not be able to generate profitable operations in the future and/or obtain the necessary financing to meet our obligations and repay liabilities arising from normal business operations when they come due.  The outcome of these matters cannot be predicted with any certainty at this time. These factors raise substantial doubt that we will be able to continue as a going concern.  Management plans to continue to provide for its capital needs through related party advances.  Our financial statements do not include any adjustments to the amounts and classification of assets and liabilities that may be necessary should the Company be unable to continue as a going concern.

*(2) The  Company's Needs Could Exceed The Amount Of Time Or Level Of Experience That Our Sole Officer And Director May Have.*

Our business plan does not provide for the hiring of any additional employees until sales will support the expense, which is estimated to be the third quarter of operations. Until that time, the responsibility of developing the company's business, the offering and selling of the shares through this prospectus and fulfilling the reporting requirements of a public company all fall upon Matt Diehl. While Mr. Diehl has business experience including management and accounting, he does not have extensive experience in a public company setting, including serving as a principal accounting officer or principal financial officer. Nor does Mr. Diehl have any experience running an apparel company.  Mr. Diehl has retail and sales experience in apparel prior to five years ago and is an avid fashion enthusiast, but he has never been an officer or director of an apparel company.

Mr. Diehl spends at least ten (10) hours per week on the Company's needs, or about twenty-five (25) percent of his time.  Mr. Diehl also sits on the board of one public company, TapSlide, Inc. ("TapSlide"), and has his own private consulting business as well (AppVineyard, LLC) that compete for his time.  We have not formulated a plan to resolve any possible conflict of interest with his other business activities. In the event he is unable to fulfill any aspect of his duties to the Company we may experience a shortfall or complete lack of sales resulting in little or no profits and eventual closure of the business. On August 3, 2010, Mr. Diehl agreed to become President, Officer, and Director for PaperFree Medical Solutions, Inc. ("PaperFree") in an interim capacity to provide assistance in corporate compliance and manage the corporation until a more suitable candidate for Officer and Director could be found to move that company forward. At the time Mr. Diehl accepted the officer and director positions with PaperFree, the Company was delinquent in its periodic report filings with the SEC.  On November 16, 2010, Mr. Diehl resigned from PaperFree Medical Solutions. Neither a Form 15 nor any delinquent periodic reports were filed during his tenure with PaperFree.  TapSlide also is delinquent in its periodic filings with the SEC. Although TapSlide is endeavoring to bring its periodic filings current, it remains delinquent and there is no assurance that such filings will ever be brought current. Accordingly, our sole officer and director has been unable to cause two separate entities with reporting responsibilities under the Securities Exchange Act the 1934 (the "Exchange Act") to file required reports in a timely manner. There can be no assurances that Mr. Diehl will be able to cause our Company to comply with subsequent periodic report filing deadlines in the event our registration statement is declared effective. The failure of the Company to comply with the periodic reporting requirements under the Exchange Act could ultimately result in the revocation of any effective registration by the Commission.

*(3) Since We Are A Development Stage Company, The Company Has Generated No Revenues And Does Not Have An Operating History.*

The Company was incorporated on June 24, 2010; we have not yet commenced our business operations; and we have not yet realized any revenues. We have no operating history upon which an evaluation of our future prospects can be made. Based upon current plans, we expect to incur operating losses in future periods as we incurred significant expenses associated with the initial startup of our business. Further, we cannot guarantee that we will be successful in realizing revenues or in achieving or sustaining positive cash flow at any time in the future. Any such failure could result in the possible closure of our business or force us to seek additional capital

through loans or additional sales of our equity securities to continue business operations, which would dilute the value of any shares you purchase in this offering.

***(4) We Don't Have Any Substantial Assets And Are Totally Dependent Upon The Proceeds Of This Offering To Fully Fund Our Business. If We Do Not Sell The Shares In This Offering We Will Have To Seek Alternative Financing To Complete Our Business Plans Or Abandon Them.***

Swingplane Ventures, Inc. has limited capital resources. To date, the Company has funded its operations from limited funding and has not generated any cash from operations to be profitable. Unless Swingplane Ventures, Inc. begins to generate sufficient revenues to finance operations as a going concern, Swingplane Ventures, Inc. may experience liquidity and solvency problems. Such liquidity and solvency problems may force Swingplane Ventures, Inc. to cease operations if additional financing is not available. No known alternative resources of funds are available to Swingplane Ventures, Inc. in the event it does not have adequate proceeds from this offering. However, Swingplane Ventures, Inc. believes that the net proceeds of the Offering will be sufficient to satisfy the start-up and operating requirements for the next twelve months.

***(5) We Cannot Predict When Or If We Will Produce Revenues, Which Could Result In A Total Loss Of Your Investment If We Are Unsuccessful In Our Business Plans.***

We have not sold any clothing to date and have not yet generated any revenues from operations. In order for us to continue with our plans and open our business, we must raise our initial capital through this offering. The timing of the completion of the milestones needed to commence operations and generate revenues is contingent on the success of this offering. There can be no assurance that we will generate revenues or that revenues will be sufficient to maintain our business. As a result, you could lose all of your investment if you decide to purchase shares in this offering and we are not successful in our proposed business plans.

7

Link to Table of Contents

*(6)  Our Continued Operations Depend On The Public's Acceptance Of Our Product Lines.  If The Public Doesn't Find Our Clothing Desirable And Suitable For Purchase And We Cannot Establish A Customer Base, We May Not Be Able To Generate Any Revenues, Which Would Result In A Failure Of Our Business And A Loss Of Any Investment You Make In Our Shares.*

The ability to develop clothing lines that the market finds desirable and willing to purchase is critically important to our success. We cannot be certain that garments and clothing lines we offer will be appealing to the market and as a result there may not be any demand and our sales could be limited and we may never realize any revenues. In addition, there are no assurances that if we alter, or develop new garments or lines of clothing in the future that the markets demand for these will develop and this could adversely affect our business and any possible revenues.

*(7)  We Are Dependent On The Services Of A Certain Key Employee And The Loss Of His Services Could Harm Our Business.*

Our success largely depends on the continuing services of our Chairman and Chief Executive Officer, Matt Diehl.  His past experience to lead and nurture small and start-up companies makes the Company dependent on his abilities.  Our continued success also depends on our ability to attract and retain qualified personnel.  We believe that Mr. Diehl possesses valuable industry and business development knowledge, experience and leadership abilities that would be difficult in the short term to replicate.  The loss of him as a key employee could harm our operations, business plans and cash flows.

*(8)  The Clothing Industry Is Highly Competitive.  If We Cannot Develop And Market Desirable Clothing Lines That The Public Is Willing To Purchase, We Will Not Be Able To Compete Successfully.  Our Business May Be Adversely Affected And We May Not Be Able To Generate Any Revenues.*

Swingplane Ventures, Inc. has many potential competitors in the clothing industry.  We consider the competition is competent, experienced, and they have greater financial and marketing resources than we do at the present. Our ability to compete effectively may be adversely affected by the ability of these competitors to devote greater resources to the development, sales, and marketing of their products than are available to us.

Some of the Company's competitors also offer a wider range of clothing lines; have greater name recognition and more extensive customer bases than the Company.  These competitors may be able to respond more quickly to new or changing opportunities, fashions and customer desires, undertake more extensive promotional activities, offer terms that are more attractive to customers and adopt more aggressive pricing policies than the Company.  Moreover, current and potential competitors have established or may establish cooperative relationships among themselves or with third parties to enhance their visibility.  The Company expects that new competitors or alliances among competitors have the potential to emerge and may acquire significant market share.  Competition by existing and future competitors could result in an inability to secure adequate market share sufficient to support Swingplane Ventures's endeavors.  Swingplane Ventures cannot be assured that it will be able to compete successfully against present or future competitors or that the competitive pressure it may face will not force it to cease operations.  As a result, you may never be able to liquidate or sell any shares you purchase in this offering.

*(9)  Our Growth May Require Additional Capital, Which May Not Be Available.*

Swingplane Ventures, Inc. has limited capital resources. Unless Swingplane Ventures, Inc. begins to generate sufficient revenues to finance operations as a going concern, Swingplane Ventures, Inc. may experience liquidity and solvency problems. Such liquidity and solvency problems may force Swingplane Ventures, Inc. to cease operations if additional financing is not available. No known alternative resources of funds are available to Swingplane Ventures, Inc. the event it does not have adequate proceeds from this offering. However, Swingplane Ventures, Inc. believes that the net proceeds of the Offering will be sufficient to satisfy the start-up and operating requirements for the next twelve months.

**Risks Related To This Offering**

*(10) We Are Selling This Offering Without An Underwriter And May Be Unable To Sell Any Shares.  Unless We Are Successful In Selling The Minimum Of The Shares And Receiving The Proceeds From This Offering, We May Have To Seek Alternative Financing To Implement Our Business Plans And You Would Receive A Return Of Your Entire Investment.*

This offering is self-underwritten, that is, we are not going to engage the services of an underwriter to sell the shares; we intend to sell them through our officer and director, who will receive no commissions. He will offer the shares to friends, relatives, acquaintances and business associates; however, there is no guarantee that he will be able to sell any of the shares. In the event we do not sell all of

Link to Table of Contents

the shares before the expiration date of the offering, all funds raised will be promptly returned to the investors, without interest or deduction.

**(11) Due To The Lack Of A Trading Market For Our Securities, You May Have Difficulty Selling Any Shares You Purchase In This Offering.**

There is presently no demand for our common stock and no public market exists for the shares being offered in this prospectus. We plan to contact a market maker immediately following the effectiveness of this Registration Statement and apply to have the shares quoted on the OTC Electronic Bulletin Board (OTCBB). The OTCBB is a regulated quotation service that displays real-time quotes, last sale prices and volume information in over-the-counter (OTC) securities. The OTCBB is not an issuer listing service, market or exchange. Although the OTCBB does not have any listing requirements per se, to be eligible for quotation on the OTCBB, issuers must remain current in their filings with the SEC or applicable regulatory authority. Market Makers are not permitted to begin quotation of a security whose issuer does not meet this filing requirement. Securities already quoted on the OTCBB that become delinquent in their required filings will be removed following a 30 or 60 day grace period if they do not make their required filing during that time. We cannot guarantee that our application will be accepted or approved and our stock listed and quoted for sale. As of the date of this filing, there have been no discussions or understandings between Swingplane Ventures, Inc. or anyone acting on our behalf with any market maker regarding participation in a future trading market for our securities. If no market is ever developed for our common stock, it will be difficult for you to sell any shares you purchase in this offering. In such a case, you may find that you are unable to achieve any benefit from your investment or liquidate your shares without considerable delay, if at all. In addition, if we fail to have our common stock quoted on a public trading market, your common stock will not have a quantifiable value and it may be difficult, if not impossible, to ever resell your shares, resulting in an inability to realize any value from your investment.

**(12) Investors In This Offering Will Bear A Substantial Risk Of Loss Due To Immediate And Substantial Dilution.**

The principal shareholder of Swingplane Ventures, Inc. is Matt Diehl who also serves as its Director, President, Secretary, and Treasurer. Mr. Diehl acquired 10,000,000 restricted shares of Swingplane Ventures, Inc. common stock at a price per share of $0.001 for a $10,000 equity investment. Upon the sale of the common stock offered hereby, the investors in this offering will experience an immediate and substantial "dilution." Therefore, the investors in this offering will bear a substantial portion of the risk of loss. Additional sales of Swingplane Ventures, Inc. common stock in the future could result in further dilution. Please refer to the section titled "Dilution" herein.

**(13) Purchasers In This Offering Will Have Limited Control Over Decision Making Because Matt Diehl, Swingplane Ventures, Inc.'s Officer, Director, And Shareholder Controls All Of Swingplane Ventures, Inc. Issued And Outstanding Common Stock.**

Presently, Matt Diehl, Swingplane Ventures Inc.'s Director, President, Secretary, and Treasurer beneficially owns 100% of the outstanding common stock. Because of such ownership, investors in this offering will have limited control over matters requiring approval by Swingplane Ventures, Inc. security holders, including the election of directors. Mr. Diehl would retain 74.1% ownership in Swingplane Ventures, Inc. common stock assuming the maximum offering is attained. Such concentrated control may also make it difficult for Swingplane Ventures, Inc. stockholders to receive a premium for their shares of Swingplane Ventures, Inc. common stock in the event Swingplane Ventures, Inc. enters into transactions, which require stockholder approval. In addition, certain provisions of Nevada law could have the effect of making it more difficult or more expensive for a third party to acquire, or of discouraging a third party from attempting to acquire, control of Swingplane Ventures Inc. For example, Nevada law provides that not less than two-thirds vote of the stockholders is required to remove a director for cause, which could make it more difficult for a third party to gain control of the Board of Directors. This concentration of ownership limits the power to exercise control by the minority shareholders.

**(14) We Will Incur Ongoing Costs And Expenses For SEC Reporting And Compliance. Without Revenue We May Not Be Able To Remain In Compliance, Making It Difficult For Investors To Sell Their Shares, If At All.**

Our business plan allows for the estimated $5,500 cost of this Registration Statement to be paid from our cash on hand. We plan to contact a market maker immediately following the effectiveness of this Registration Statement and apply to have the shares quoted on the OTC Electronic Bulletin Board. To be eligible for quotation on the OTCBB, issuers must remain current in their filings with the SEC. Market Makers are not permitted to begin quotation of a security whose issuer does not meet this filing requirement. Securities already quoted on the OTCBB that become delinquent in their required filings will be removed following a 30 or 60 day grace period if they do not make their required filing during that time. In order for us to remain in compliance we will require future revenues to cover the cost of these filings, which could comprise a substantial portion of our available cash resources. If we are unable to generate sufficient revenues to remain in compliance it may be difficult for you to resell any shares you may purchase, if at all.

Link to Table of Contents

**(15) There Has Been No Independent Valuation of the Stock, Which Means That the Stock May Be Worth Less Than the Purchase Price.**

The per share purchase price has been arbitrarily determined by us without independent valuation of the shares. The price per share in the recent sale of our stock to our founder, Matthew R. Diehl was at par value ($0.001), was not based on perceived market value, book value, or other established criteria and bears no relationship the price per share in this offering. We did not obtain an independent appraisal opinion on the valuation of the shares. Accordingly, the shares may have a value significantly less than the offering price and the shares may never obtain a value equal to or greater than the offering price.

**(16) Our CEO, Mr. Diehl, is currently a director and officer of one delinquent public company, and has previously been an officer and director of another delinquent public company.**

Mr. Diehl is COO and a director for TapSlide, Inc., which is currently delinquent in its reporting obligations. TapSlide is working to become current as soon as possible. Additionally, Swingplane Ventures and TapSlide both have corporate addresses listed as Mr. Diehl's residence. In effort to keep costs as low as possible for both companies, Mr. Diehl provides his home office on a rent free basis to both companies for their executive offices. Furthermore, Mr. Diehl became an officer and director on an interim basis for PaperFree Medical Solutions, Inc., a delinquent public company, from August 3, 2010 to November 16, 2010 in order to assist in the search for an officer and director more qualified than Mr. Diehl to move that company forward. During his time with PaperFree Medical Solutions, no Form 15 nor any other delinquent periodic report were filed. Mr. Diehl no longer spends any of his time on PaperFree Medical Solutions, Inc. It is the responsibility of the delinquent public company, PaperFree Medical Solutions, to file a Form 8-K reflecting the resignation of Mr. Diehl effective November 16, 2010. Regardless, it should be noted that Mr. Diehl has been a director and officer for two delinquent reporting public companies and hence there can be no assurances that Swingplane Ventures will remain current in its filings under his management. The failure of the Company to comply with the periodic reporting requirements under the Exchange Act could ultimately result in the revocation of any effective registration by the Commission.

**(17) Our CEO, Mr. Diehl, has no experience as an officer or director of an apparel business and may not be able implement our business plan or generate any revenue from sales of our products.**

Mr. Diehl does not have experience running an apparel company and has never been an officer or director of an apparel company. Accordingly, Mr. Diehl may not be able to implement our plan or generate any revenue from the sale of our intended products. There can be no assurance that we will be able to attract and hire officers or directors with experience in the apparel industry to implement the business plan in the event that Mr. Diehl is otherwise successful in doing so.

**(18) We may not be able to implement our business plan with the stated amount and use of proceeds and may be required to raise additional capital which may not be available for a developmental company.**

The use of proceeds section contained herein represents our stated allocation of the net proceeds from this offering based upon the current state of our business operations, current plans, and the current economic and industry conditions. We will not have any discretion to spend the proceeds in any manner inconsistent with the stated allocation of proceeds in the use of proceeds table contained herein. The amounts and timing of our actual expenditures will depend on numerous factors, including the status of our development efforts, sales and marketing activities, the amount of cash generated or used by our operations, our competition and the other factors described in this "Risk Factors" section. In the event that we experience negative results from our sales and marketing efforts, we may determine that we are in need of more working capital in order to implement the growth strategy and milestones set forth herein. There are no assurances that we will be able to raise additional capital from any institution or individual investors.

## A NOTE CONCERNING FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements about Swingplane Ventures, Inc. business, financial condition, and prospects that reflect Swingplane Ventures, Inc. management's assumptions and beliefs based on information currently available. Swingplane Ventures, Inc. can give no assurance that the expectations indicated by such forward-looking statements will be realized. If any of Swingplane Ventures, Inc. assumptions should prove incorrect, or if any of the risks and uncertainties underlying such expectations should materialize, the actual results may differ materially from those indicated by the forward-looking statements.

The key factors that are not within Swingplane Ventures Inc.'s control and that may have a direct bearing on operating results include, but are not limited to, acceptance of the products that Swingplane Ventures, Inc. expects to market, Swingplane Ventures Inc.'s ability to establish a customer base, management's ability to raise capital in the future, the retention of key employees and changes in the regulation of the industry in which Swingplane Ventures, Inc. functions.

There may be other risks and circumstances that management may be unable to predict to sustain operations. When used in this

prospectus, words such as, "believes," "expects," "intends," "plans," "anticipates," "estimates" and similar expressions are intended to identify and qualify forward-looking statements, although there may be certain forward-looking statements not accompanied by such expressions.

**Item 4. Use of Proceeds.**

Selling all of the shares in the offering will result in $35,000 gross proceeds to Swingplane Ventures Inc. We will disburse the proceeds from this offering in the priority set forth below within the first 12 months after successful completion of this offering.
  We will not have any discretion to spend the proceeds in any manner inconsistent with the stated allocation of proceeds in the use of proceeds table below.

| Application of Proceeds | $ | % of Total |
|---|---|---|
| **Total Offering Proceeds** | **35,000** | **100.00** |
| | | |
| **Offering Expenses** | | |
| Legal & Professional Fees | 1,500 | 4.39 |
| Accounting Fees | 2,500 | 7.14 |
| EDGAR Fees | 700 | 2.00 |
| Blue-sky Fees | 800 | 2.29 |
| **Total Offering Expenses** | 5,500 | 15.71 |
| | | |
| **Net Proceeds from Offering** | **29,500** | **84.29** |
| | | |
| **Use of Net Proceeds** | | |
| Accounting fees | 2,500 | 7.14 |
| Legal and Professional Fees | 1,000 | 2.86 |
| Office Equipment and Furniture | 0 | 0.00 |
| Office Supplies | 500 | 1.43 |
| Product Development | 7,000 | 20.00 |
| Wages/Contractors | 6,000 | 17.14 |
| Sales and Marketing | 8,000 | 22.86 |
| Working Capital | 4,500 | 12.86 |
| **Total Use of Net Proceeds** | **29,500** | **84.29** |
| | | |
| **Total Use of Proceeds** | **35,000** | **100.00** |

10

Link to Table of Contents

## Item 5. Determination of Offering Price.

The offering price of the common stock has been arbitrarily determined and bears no relationship to any objective criterion of value. The price does not bear any relationship to SwingPlane Ventures Inc.'s assets, book value, historical earnings, or net worth. In determining the offering price, management considered such factors as the prospects, if any, for similar companies, anticipated results of operations, present financial resources and the likelihood of acceptance of this offering.

## Item 6. Dilution.

"Dilution" represents the difference between the offering price of the shares of common stock and the net book value per share of common stock immediately after completion of the offering. "Net Book Value" is the amount that results from subtracting total liabilities from total assets. In this offering, the level of dilution is increased as a result of the relatively low book value of Swingplane Ventures Inc.'s issued and outstanding stock. This is due in part because of the common stock issued to the Swingplane Ventures, Inc. officer, director, and employee totaling 10,000,000 shares at par value $0.001 per share versus the current offering price of $0.01 per share. Please refer to the section titled "Certain Transactions", herein, for more information. Swingplane Ventures, Inc. net book value on March 31, 2011 was ($1,252). Assuming all 3,500,000 shares offered are sold, and in effect Swingplane Ventures, Inc. receive the maximum estimated proceeds of this offering from shareholders, Swingplane Ventures, Inc. net book value will be approximately $0.0021 per share. Therefore, any new investor will incur an immediate and substantial dilution of approximately $0.0079 per share while the Swingplane Ventures, Inc. present stockholder will receive an increase of $0.0022 per share in the net tangible book value of the shares that he holds. This will result in a 75% dilution for purchasers of stock in this offering.

This table represents a comparison of the prices paid by purchasers of the common stock in this offering and the individual who purchased shares in Swingplane Ventures, Inc. previously:

### Existing Shareholder Per Share Data based on the maximum offering

| | | |
|---|---|---|
| Price Per Share | $ | 0.001 |
| Net Tangible Book Value Per Share Before the Offering | $ | 0.000 |
| Potential gain to existing shareholders | $ | 0.0022 |
| Net Tangible Book Value Per Share After the Offering | $ | 0.0021 |
| Increase in tangible book value per share to Original Shareholders | $ | 0.0022 |
| Capital Contributions | $ | 10,000 |
| Number of Shares outstanding before offering | | 10,000,000 |
| Number of Shares after offering held by existing shareholders | | 10,000,000 |
| Percentage of Ownership after offering | | 74% |

### Purchasers Per Share Data and Ownership of Shares in this offering based on the maximum offering

| | | |
|---|---|---|
| Price Per Share | $ | 0.01 |
| Dilution per share | $ | 0.0079 |
| Net Capital Contributions | $ | 29,500 |

Percentage of capital Contributions (gross)                                    75%

Number of shares after offering held by Public investors                3,500,000

Percentage of ownership after offering                                         26%

## Item 8. Plan of Distribution.

*Offering will be Sold by Our Officer and Director.*

This is a self-underwritten offering. This Prospectus is part of a Prospectus that permits our officer and director to sell the Shares directly to the public, with no commission or other remuneration payable to him for any Shares he sells. There are no plans or arrangements to enter into any contracts or agreements to sell the Shares with a broker or dealer. Matt Diehl, the sole officer and director, will sell the shares and intends to offer them to friends, family members and acquaintances. In offering the securities on our behalf, Mr. Diehl will rely on the safe harbor from broker dealer registration set out in Rule 3a4-1 under the Securities Exchange Act

11

Link to Table of Contents

of 1934. In his endeavors to sell this offering, Mr. Diehl does not intend to use any mass-advertising methods such as the Internet or print media.

Mr. Diehl will not register as a broker-dealer pursuant to Section 15 of the Securities Exchange Act of 1934, in reliance upon Rule 3a4-1, which sets forth the conditions under which a person associated with an Issuer, may participate in the offering of the Issuer's securities and not be deemed to be a broker-dealer.

a. Mr. Diehl is an officer and director and is not subject to a statutory disqualification, as that term is defined in Section 3(a)(39)of the Act, at the time of his participation; and

b. Mr. Diehl is an officer and director and will not be compensated in connection with his participation by the payment of commissions or other remuneration based either directly or indirectly on transactions in securities; and

c. Mr. Diehl is an officer and director and is not, nor will he be at the time of his participation in the offering, an associated person of a broker-dealer; and

d. Mr. Diehl is an officer and director and meets the conditions of paragraph (a)(4)(ii) of Rule 3a4-1 of the Exchange Act, in that he (A) primarily performs, or is intended primarily to perform at the end of the offering, substantial duties for or on behalf of our company, other than in connection with transactions in securities; and (B) is not a broker or dealer, or been associated person of a broker or dealer, within the preceding twelve months; and (C) has not participated in selling and offering securities for any Issuer more than once every twelve months other than in reliance on Paragraphs (a)(4)(i) (a) (4) (iii).

Our officer, director, control person and affiliates of same do not intend to purchase any shares in this offering.

*Terms of the Offering*

Swingplane Ventures, Inc. ("Company") is offering on a best-efforts basis a maximum of 3,500,000 shares of its common stock at a price of $0.01 per share. This is the initial offering of Common Stock of Swingplane Ventures, Inc. and no public market exists for the securities being offered. The Company is offering the shares on a "self-underwritten", best-efforts all or none basis directly through our officer and director. The shares will be offered at a fixed price of $.01 per share for a period not to exceed 180 days from the date of this prospectus. There is no minimum number of shares required to be purchased. This offering is on a best effort, all-or-none basis, meaning if all shares are not sold and the total offering amount is not deposited by the expiration of the offering, all monies will be returned to investors, without interest or deduction. Matt Diehl, the sole officer and director of Swingplane Ventures Inc., intends to sell the shares directly. No commission or other compensation related to the sale of the shares will be paid to our officer and director. The intended methods of communication include, without limitations, telephone, and personal contact. For more information, see the section titled "Plan of Distribution" and "Use of Proceeds" herein.

The Officer and director of the issuer and any affiliated parties thereof will not participate in this offering.

The offering shall terminate on the earlier of (i) the date when the sale of all 3,500,000 shares is completed or (ii) one hundred and eighty (180) days from the date of this prospectus. Swingplane Ventures, Inc. will not extend the offering period beyond one hundred and eighty (180) days from the effective date of this prospectus.

There can be no assurance that all, or any, of the shares will be sold. As of the date of this Prospectus, Swingplane Ventures, Inc. has not entered into any agreements or arrangements for the sale of the shares with any broker/dealer or sales agent. However, if Swingplane Ventures, Inc. were to enter into such arrangements, Swingplane Ventures, Inc. will file a post effective amendment to disclose those arrangements because any broker/dealer participating in the offering would be acting as an underwriter and would have to be so named in the prospectus.

In order to comply with the applicable securities laws of certain states, the securities may not be offered or sold unless they have been registered or qualified for sale in such states or an exemption from such registration or qualification requirement is available and with which Swingplane Ventures, Inc. has complied. The purchasers in this offering and in any subsequent trading market must be residents of such states where the shares have been registered or qualified for sale or an exemption from such registration or qualification requirement is available. As of the date of this Prospectus, Swingplane Ventures, Inc. has not identified the specific states where the offering will be sold. Swingplane Ventures, Inc. will file a pre-effective amendment indicating which state(s) the securities are to be sold pursuant to this registration statement.

Link to Table of Contents

*Deposit of Offering Proceeds*

The proceeds from the sale of the shares in this offering will be payable to Law Office of Clifford J. Hunt, P.A., Trust Account IOTA ("Trust Account") and will be deposited in a non-interest bank account until the minimum offering proceeds are raised. All subscription agreements and checks should be delivered to Law Office of Clifford J. Hunt, P.A., 8200 Seminole Boulevard, Seminole, Florida 33772. Failure to do so will result in checks being returned to the investor, who submitted the check. All subscription funds will be held in the Trust Account pending and no funds shall be released to Swingplane Ventures, Inc.until such a time as the entire offering is sold. If the entire offering is not sold and proceeds received within one hundred and eighty (180) days of the date of this prospectus, all subscription funds will be returned to investors promptly without interest or deduction of fees. The fee of the Trust Agent is $1,000.00. (See Exhibit 99(b)).

*Procedures and Requirements for Subscription*

Prior to the effectiveness of the Registration Statement, the Issuer has not provided potential purchasers of the securities being registered herein with a copy of this prospectus. Investors can purchase common stock in this offering by completing a Subscription Agreement (attached hereto as Exhibit 99(a)) and sending it together with payment in full to Law Office of Clifford J. Hunt P.A., Trust Account IOTA, 8200 Seminole Boulevard Seminole, Florida 33772. All payments are required in the form of United States currency either by personal check, bank draft, or by cashier's check. There is no minimum subscription requirement. Swingplane Ventures, Inc. reserves the right to either accept or reject any subscription. Any subscription rejected within this 30-day period will be returned to the subscriber within five business days of the rejection date. Furthermore, once a subscription agreement is accepted, it will be executed without reconfirmation to or from the subscriber. Once Swingplane Ventures, Inc. accepts a subscription, the subscriber cannot withdraw it.

**Item 9. Description of Securities to be Registered.**

Swingplane Ventures Corporation's authorized capital stock consists of 70,000,000 shares of common stock with a par value $0.001, and 5,000,000 shares of preferred stock with a par value $0.001 per share.

**COMMON STOCK**

Swingplane Ventures Corporation's authorized capital stock consists of 70,000,000 shares of common stock, with a par value of $0.001 per share.
The holders of our common stock:
1. Have equal ratable rights to dividends from funds legally available therefore, when, as and if declared by the Board of Directors;
2. Are entitled to share ratably in all of assets available for distribution to holders of common stock upon liquidation, dissolution, or

   winding up of corporate affairs;
3. Do not have preemptive, subscription or conversion rights and there are no redemption or sinking fund provisions or rights; and
4. Are entitled to one vote per share on all matters on which stockholders may vote.

**NON-CUMULATIVE VOTING**

Holders of Swingplane Ventures, Inc. common stock do not have cumulative voting rights,which means that the holders of more than 50% of the outstanding shares, voting for the election of directors, can elect all of the directors to be elected, if they so choose, and, in such event, the holders of the remaining shares will not be able to elect any of Swingplane Ventures, Inc. directors. After this offering is completed, and assuming all 3,500,000 shares being offered are sold, present stockholders will own approximately 74% of our outstanding shares.

**PREFERRED STOCK**

Swingplane Ventures, Inc. has no current plans to either issue any preferred stock or adopt any series, preferences, or other classification of the 5,000,000 shares of preferred stock authorized with a par value $0.001 as stated in the Articles of Incorporation. The Board of Directors is authorized to (i) provide for the issuance of shares of the authorized preferred stock in series and (ii) by filing a certificate pursuant to the laws of Nevada, to establish from time to time the number of shares to be included in each such series and to fix the designation, powers, preferences and rights of the shares of each such series and the qualifications, limitations or restrictions thereof, all without any further vote or action by the stockholders. Any shares of issued preferred stock would have priority over the common stock with respect to dividend or liquidation rights. Any future issuance of preferred stock may have the effect of

Link to Table of Contents

delaying, deferring, or preventing a change in control of the company without further action by the stockholders and may adversely affect the voting and other rights of the holders of common stock.

The issuance of shares of preferred stock, or the issuance of rights to purchase such shares, could be used to discourage an unsolicited acquisition proposal. For instance, the issuance of a series of preferred stock might impede a business combination by including class voting rights that would enable the holder to block such a transaction, or facilitate a business combination by including voting rights that would provide a required percentage vote of the stockholders. In addition, under certain circumstances, the issuance of preferred stock could adversely affect the voting power of the holders of the common stock. Although the Board of Directors is required to make any determination to issue such stock based on its judgment as to the best interests of stockholders, the Board of Directors could act in a manner that would discourage an acquisition attempt or other transaction that potentially some, or a majority, of the stockholders might believe to be in their best interests or in which stockholders might receive a premium for their stock over the then market price of such stock. The Board of Directors does not at present intend to seek shareholder approval prior to any issuance of currently authorized stock, unless otherwise required by law or stock exchange rules.

## PREEMPTIVE RIGHTS

No holder of any shares of Swingplane Ventures, Inc. stock has preemptive or preferential rights to acquire or subscribe for any shares not issued of any class of stock or any unauthorized securities convertible into or carrying any right, option, or warrant to subscribe for or acquire shares of any class of stock not disclosed herein.

## CASH DIVIDENDS

As of the date of this prospectus, Swingplane Ventures, Inc. has not paid any cash dividends to stockholders. The declaration of any future cash dividend will be at the discretion of the Board of Directors and will depend upon earnings, if any, capital requirements and financial position, general economic conditions, and other pertinent conditions. Swingplane Ventures, Inc. does not intend to pay any cash dividends in the foreseeable future, but rather to reinvest earnings, if any, in business operations.

## REPORTS

After this offering, Swingplane Ventures, Inc. will furnish its shareholders with annual financial reports certified by independent accountants, and may, at its discretion, furnish unaudited quarterly financial reports.

## Item 10. Interest of Named Experts and Counsel.

None of the below described experts or counsel have been hired on a contingent basis and none of them will receive a direct or indirect interest in the Company.

Our audited financial statement for the period from inception to June 30, 2010, included in this prospectus has been audited by Peter Messineo Certified Public Accountant, PCAOB- Registered Auditor, 1982 Otter Way, Palm Harbor, Florida 34685. We included the financial statements and report in their capacity as authority and experts in accounting and auditing.

Clifford J. Hunt, Esquire is counsel for our Company who has given an opinion on the validity of the securities being registered, which opinion appears elsewhere in this registration statement. Mr. Hunt has no direct or indirect interest in us.

## Item 11. Information with Respect to the Registrant.

### Description of Business

*General Information*

Swingplane Ventures, Inc. was incorporated in the State of Nevada on June 24, 2010 under the same name. Since inception, Swingplane Ventures, Inc. has not generated any revenues and has accumulated losses in the amount of $0.00 as of June 30, 2010. Swingplane Ventures, Inc. has never been party to any bankruptcy, receivership or similar proceeding, nor have it undergone any material reclassification, merger, consolidation, purchase or sale of a significant amount of assets not in the ordinary course of business.

Swingplane Ventures, Inc. has yet to commence planned operations to any significant measure. As of the date of this Registration Statement, Swingplane Ventures, Inc. has had only limited start-up operations and has not generated revenues. The Company will not be profitable until it derives sufficient revenues and cash flows from garment sales. We believes that, if we obtain the proceeds from

Link to Table of Contents

this offering, we will be able to implement the business plan and conduct business pursuant to the business plan for the next twelve months. Swingplane Ventures Inc.'s administrative office is located at 220 Summit Blvd. #402, Broomfield, CO 80021. Swingplane Ventures Inc.'s fiscal year end is June 30.

*Business Overview*

Swingplane Ventures Inc. is a development stage men's and women's golf fashion manufacturer located in Broomfield, Colorado. The Company intends for its initial clothing line to consist of tailored-fit golf shirts. The use of lightweight and breathable fibers that the Company intends to use could position the Company among larger companies in a competitive market. We plan to stay on the cutting edge of the constantly changing golf apparel market and create a reputation with the consumer of providing unique and desirable designs at affordable prices. This market dictates that new styles and designs be introduced on a regular basis, which is part of our long term strategy.

Our initial designs are planned to be tailored-fit men's golf shirts with shorter sleeves and unique design patterns. Mr. Diehl currently has design concepts and upon the successful completion of this offering we intend to search for professional assistance to turn these concepts into prototypes. We intend to market the designs under the "Swingplane" brand. Because of its fit, fibers, and design, our target market for this garment is the 15 - 35 year old male golfer as an alternative to other brands.

Current Management is comprised of Matt Diehl, CEO and President. Mr. Diehl has over 10 years of experience in working with both small and development stage companies as well as larger established companies. These companies include SendPhotos, Inc. and large companies like JPMorgan Chase. Prior to the last 5 years, Mr. Diehl sold financial products for JPMorgan Chase and was on the Board of Governors of the Metro Denver Economic Development Corporation representing Chase. Mr. Diehl is an avid golfer and fashion aficionado. Mr. Diehl distributes part of his time towards the everyday operations and forward movement of the corporation.

Acknowledging the inherent risks involved in fashion design, we will assess the need for any patents or trademarks on a continuing basis to protect our main design(s). Once the process is initiated, designs are initially protected under the Patent Pending Process provision while completing the full patenting process. This protection will cover the United States, initially, also giving first priority to the European Community.

*Distribution*

The Company plans to initially focus its effort of distribution through online sales directly to the consumer. With our limited resources, the cost efficiencies involved in online sales is our targeted method for the distribution of our products. The company has secured a distinctive URL (web address) in www.swingplaneventures.com. A portion of the funds raised by this offering (see "Use of Proceeds") will go toward developing our website. Currently, the company does not have a website in place but desires to build a website upon completion of this offering. The Company anticipates hiring an outside third party web developer to design and build the website. We have used the Price Quote Calculator at WebPageFX (www.webpagefx.com) to estimate the cost of a fully functioning website with ecommerce functionality to be between $5,000 and $9,000. While it is possible that the costs for a fully functional website could greatly exceed $5,000 to $9,000, we believe that we can have a third party web development company build a website to our specifications that will generate revenues for a price in that range. Such a website would be comprised of company information, every product that we offer, and the ability to generate sales with just a few clicks of the mouse. The proposed website would also include efforts by the Company to engage in SEO (Search Engine Optimization) and cross-marketing/linking with other golf-related websites to drive traffic to www.swingplaneventures.com. At this time, no other websites or companies have been engaged, negotiated with, or contracted to participate in cross-linking or cross-marketing with the Company with regard to website related activities.

*Product Development*

The original thought behind the design/concept was to target young golfers who are looking for stylish and comfortable golf apparel at reasonable prices. The current design incorporates the use of breathable microfibers and design and fit desireable to today's younger golfers. We hope that these successful design elements and company branding will create a unique distinction for Swingplane Ventures in this competitive market.

Long term goals include the development of a full line of this innovative golf apparel comprised of shirts, pants, shorts, skirts, and hats. The addition of other products such as shorts, skirts, and headwear are planned long term activities that depend entirely on future financing and thus may not occur. Swingplane Ventures plans to offer fits, fabrics, and designs that younger golfers should find desirable and at a reasonable prices.

Clearly defined goals, both short and long term, will be an intricate part of the daily decision making process within the organization. It is with these defined goals in mind that allows Swingplane Ventures to feel confident with the many decisions required to maintain progressive working concepts.  Within the next 12 months, Swingplane Ventures plans to have all current design board projects patterned, prototyped, and manufacturing requirements completed for direct markets.

15

Link to Table of Contents

*Industry Analysis and Competition*
*Industry and Trend Analysis*

According to Sundale Research's State of the Industry: Golf Equipment in the U.S, report, published June of 2006, "changing demographics in the golf industry are causing a shift in golf fashions. High-tech golfwear like haute-tailored wet and wind resistant outfits and trendy footwear and gloves are driving sales." The report goes on to say that sales of these products are expected to be more than 2.4 billion in 2010. Professional golfers are the primary source for the changes in style popularity and fabrics that younger golfers are seeking. One needs only to look at the top players in the world to see the youthful, tailored-fit styles that the pros are wearing. The market for tailored and dry-fabric golf clothing has balooned since J. Lindeberg first hit the scene in 1997 with its pioneering golf line worn by young professional golfers. Note: the most popular tour professionals with youth today are under 35 years old. These younger amateur golfers are our market. A copy of Sundale Research's State of the Industry report is included as an exhibit to this prospectus.

With prices now ranging from $75 to $125 for a high-end golf polo shirt, it's no wonder that new brands are emerging all the time, each trying to distinguish itself with different fabrics, cuts, fits, designs, and branding elements. As long as customers continue to want the next, best, latest golf clothing without much resistance to higher prices, the golf garment market will continue to provide opportunity for smaller independent manufacturers trying to acquire market share, especially when combining those elements with a lower price point.

There is no doubt as to the popularity of high end golf apparel evidenced by the success of J. Lindeberg, a company whose golf shirts and pants set the tone for the look that younger golfers are seeking. Other companies such as Adidas, Puma, Nike, Ecco, Ashworth, Cutter & Buck, and Sligo have also enjoyed recent success attributed to the popularity of their design elements and fabrics. The market for high end golf apparel is highly competitive. As a smaller company, Swingplane Ventures will need to provide equal style and comfort at a lower price than the brands mentioned above to be competitive. Most of our competitors have much greater financial resources and longer operating histories than we do and as a result may be able to offer their apparel at lower prices. While we will strive to find the lowest prices for fabric and design, there are no assurances that we will be able to do so. If we are not able to offer lower priced clothing with popular styling, we will be forced to compete with other manufacturers that have higher budgets for marketing and as such will have a competitive advantage. Since we have not commenced planned operations to any significant measure and have not generated revenues, we do not presently possess any market share of sales generated in the industry.

As the next generation of golfers mature, they are demanding all their golf apparel be stylish, tailored-filling, and reasonably priced. There are more women and girls taking up golf than ever before and yet the bulk of stylish and tailored-fit golf clothing are driven towards the aging male market. By utilizing high quality breathable "dry" materials and desirable fits and designs, Swingplane Ventures hopes to gain popularity with the younger generation of golfers - both male and female.

*Delineation of the Market Area and Identification of Target Markets*

According to National Golf Foundation (http://www.golflink.com/facts_6346_many-people-play-golf-usa.html), nearly 29 million people play golf in the United States alone, and that number has remained between 25 and 30 million since 2000. However, due to the fit, fabric, and graphics of our designs, Swingplane Ventures hopes to grow quickly with its sales and marketing efforts because non-golfers will also find the clothing to be comfortable, cool, and stylish. The apparel of Swingplane Ventures may cross over in the active/leisure market, tennis market, and other markets where simply looking good in casual wear is desired. We intend to introduce a garment line into the fashion market that may increase our sales possibilities, with the ability of the consumer to choose its style preference within our line.

Fashion industry marketing seems to have only one worldwide boundary, the demarcation between developed and undeveloped countries. The planned market areas will include North America, South America, Europe, Australia, and Asia.

1.  Young Men and Women Aged 15 to 21:  This is the main target sales demographic to be exploited by Swingplane Ventures Inc.  These young golfers are pre-budget age and tend to be spontaneous wave buyers.  Their purchases are predicated on what is being bought by their friends and little attention is given to cost especially within the $20.00 - $50.00 pricing range. Most of Swingplane Ventures fashions will be priced within that range.

2.  College Men and Women: A large number of college-aged men and women play golf, tennis, and dress active/casual on a daily basis.  With the introduction of garments in school colors, traditional school support can also be realized, offering an emotional purchase.  Additionally, with a lower price point than our competition but a look that is very aggressively styled for this group, these garments can be worn off the golf course to class and other active/leisure activities.

3.  Women Golfers Aged 25 to 45 : These women make up a large part of the main demographic because this is the demographic

that is calling for more stylish and better fitting activewear at more affordable prices.  Despite the offerings by our competitors, there is an apparent lack in the affordable golf apparel market for women.  Through aggressive styling, form-

16

Link to Table of Contents

fitting/tailored-fitting, "dry" breathable fabrics, and lower price points than similar garments by other companies, Swingplane Ventures aims to meet the exacting needs of today's women golfers.

4. Men Golfers Aged 25 to 45: These men make up an important part of our main demographic because they purchase more golf clothing than any other segment. Because the garments are not only uniquely stylish, but also very functional and practical for all forms of exercise, the loyal demands of the active market can be met.

*Marketing*

In its long term planning, Swingplane Ventures will employ three (3) major marketing strategies in an effort to gain market share in the active/leisure market. Online marketing via the Internet will be utilized initially, followed in the future with an outside commissioned sales force and print media ads. The long term marketing phases of a commissioned sales force and print ad campaigns may be entirely dependent on future financing and thus may not occur. These strategies are listed in order of budget requirement to allow Swingplane Ventures the ability to use revenues gained from the most cost effective method of marketing (online via internet) to fund the more expensive but valuable method of marketing (commission sales) and subsequently using revenues from both of the previous to fund the most expensive and very effective form of marketing and product branding (print media). However, it should be noted that there may not be enough revenues from online marketing to completely fund either the sales force or print ad campaigns. Again, these may be partially or completely dependent on future financing and thus may not occur.

*Online Marketing*

Americans spent more online on clothing in 2006 than they did on computer hardware and software for the first time in history, according to the National Retail Federation's article, stating the first part of "The State of Retailing Online 2007," the tenth annual Shop.org study conducted by Forrester Research, which surveyed 170 retailers. To read the article online, please visit http://www.nrf.com/modules.php?name=news&op=viewlive&sp_id=292.

And, according to the U.S. Census Bureau, "E-Stats, 2008 E-commerce Multi-sector Report'' (published May 2010), online clothing and clothing accessories sales grew from $2.061 billion in 2007 to $2.539 billion in 2008. That report can be found online at the following URL:

http://www.census.gov/compendia/statab/cats/wholesale_retail_trade/online_retail_sales.html

Also, the overview report can be found at URL:

http://www.census.gov/econ/estats/index.html

This report shows tables with the overall growth of online sales from 2000 to 2008 which the Company finds very encouraging. Given the above statistic along with the relative ease and cost effectiveness in creating an online marketing presence, Swingplane Ventures feels that once the garments have been produced, it can start generating revenues with comparatively little cash outlay. Through the online tools offered by companies like Google, E-Bay, and Craig's List, Swingplane Ventures will be able to reach a global audience with the same capital as used to be necessary to reach a very local limited market.

Additionally, social media outlets such as Twitter, Facebook, MySpace, and many others have opened up a new and powerful method for shoppers to share their likes and dislikes for products. Properly placed and managed social media networks for the company will provide Swingplane Ventures with tools to generate revenue from online purchases with comparatively little cash outlay.

*Commissioned Sales Force*

Once revenues are generated from online sales and a full line of products have been prototyped, developed, and produced, Swingplane Ventures's plan is to implement sales via an outside commissioned sales force. The only costs to the company is the creation of samples for each and every sales person to have as well as print media to properly promote all of the products. With the introduction of a full fashion line, Swingplane Ventures plans to be represented in all major fashion marts located in Los Angeles, Chicago, New York, and Dallas. All formal representation will be done on a commission basis. With available investment capital, it will be possible to supply all major distributors with the necessary samples for proper displaying. Additionally, commissioned sales people will contact golf clubs via telephone to introduce the club managers to our offerings and drive them to the company website. Swingplane Ventures has set goals to be represented in hundreds, or even thousands of golf courses and clubs around the country. Currently, Swingplane Ventures does not have any representation in any golf courses or golf clubs.

*Print Media*

In order to properly brand the Swingplane Ventures products an extensive print media campaign will have to be utilized.  The pitfall to this method of marketing and branding is the relative high cost when compared to online marketing and commissioned sales. Although online sales growth statistics are overwhelmingly positive, strong competitors in the apparel industry still rely on traditional print media for product marketing and more importantly, product branding.  Advertising statistics show that a consumer generally needs to see a product 4 – 6 times prior to actively participating in a purchase.  Most rate cards for monthly publications are designed for the advertiser to purchase 6 consecutive months of advertising space to be effective in achieving its marketing/branding goal.

Media advertising will be monitored closely and handled as efficiently as possible. With magazine advertising costs mentioned above, publications will be carefully selected. Joint advertising campaigns will be sought out between Swingplane Ventures and larger

17

Link to Table of Contents

distributors such as department stores. We do not currently have any joint advertising campaigns with larger distributors. Joint campaigns are a viable way to stretch the advertising dollar. Markets intended to be covered in our monthly media effort will include golf, sports, tennis, youth athletics, and casual wear worlds. With the associated costs, photography and models, a six month print media campaign can be quite expensive for our Company at the present. Swingplane Ventures has done the necessary due diligence on this marketing medium and plans to incorporate this in our next phase of operations.

*12 Month Growth Strategy and Milestones*

Our mission is to maximize shareholder value through expanding the scope of operations and evaluating and cultivating new and alternative revenue generating opportunities. The Company is committed to development of new and innovative products. While a strategic and wisely executed marketing campaign is key to expanding our wholesale and retail customer base; providing new, cutting-edge, innovative products will position the Company in the best possible way for long term success.

The Company planned the goals and milestones based on raising $35,000 through this offering. We have taken careful consideration to budget the $35,000 to sustain operations for a twelve-month period following the closing of this offering. However, there are no assurances that we will be able to sustain operations for a twelve-month period with $35,000.00 of paid in capital regardless of our careful planning. In the event that we do not realize the full proceeds from this offering and are required to promptly return investor subscription proceeds, we will be forced to scale back our efforts to accomodate for a reduced amount of capital from other potential, yet unknown, sources. In this event, the Company plans to have a strategic planning session to budget for this shortfall.

We may determine that we are in need of more working capital in order to implement the growth strategy and milestones set forth herein. We will not have any discretion to spend the proceeds in any manner inconsistent with the stated allocation of proceeds in the use of proceeds table contained herein. There are no assurances that we will be able to raise additional capital from any institution or individual investors.

Note: The Company planned the milestones based on quarters following the closing of the offering.

Quarter
0-3 Months
- Finish garment designs currently proposed
- Create patterns and prototypes
- Explore online marketing options
- Interview Photographers and Models

4-6 Months
- Begin development of Online Marketing Website
- Hire photographer and determine photo shoot layout
- Hire models and prepare garments for photo shoot
- Continue design work on initial product line
- 1st Photo Shoot
- Negotiate for online merchant account

7-9 Months
- Purchase garments for sale and promotional distribution efforts
- Finish Website "look and feel" design with full e-commerce
- Add content to website from photo shoot
- Integrate shopping cart for online sales
- Determine online marketing venues based on budget (Google, E-Bay; vertical apparel markets)

10-12 Months
- Analyze online marketing and make necessary changes for increased sales

- Continue to develop design ideas for long term product line
- Prepare for year 2 marketing and possible long term introduction of commissioned sales force

*Patents and Trademarks*

At the present we do not have any patents or trademarks.

Acknowledging the inherent risks involved in fashion design, we will assess the need for any patents or trademarks on a continuing basis to protect our main design(s). Once the process is initiated, designs are initially protected under the Patent Pending Process provision while completing the full patenting process. This protection will cover the United States, initially, also giving first priority to the European Community.

*Need for any Government Approval of Products or Services*

We do not require any government approval for our products or services.

18

A0025

Link to Table of Contents

*Research and Development Activities*

Other than time spent researching our proposed business the Company has not spent any funds on research and development activities to date. Swingplane Ventures does plan to spend funds on Product Development as detailed in sections titled "Use of Proceeds", "Description of Business" and "Management's Discussion and Analysis or Plan of Operation".

*Environmental Laws*

Our operations are not subject to any Environmental Laws.

*Employees and Employment Agreements*

We currently have one employee, our executive officer, Matt Diehl who currently devotes 10 hours a week to our business and is responsible for the primary operation of our business. There are no formal employment agreements between the company and our current employee.

**Description of Property**

We do not own any real property. Our business is presently operated from the residence of our President located at 220 Summit Blvd. #402, Broomfield, CO 80021. Mr. Diehl, the sole officer and director of the Company provides the office space free of charge and no lease exists. We consider our current principal office space arrangement adequate and will reassess our needs based upon the future growth of the company.

**Legal Proceedings**

We are not currently a party to any legal proceedings nor are any contemplated by us at this time.

**Market Price of and Dividends on the Company's Common Equity and Related Stockholder Matters**

No public market currently exists for shares of our common stock. Following completion of this offering, we intend to have our common stock listed for quotation on the Over-the-Counter Bulletin Board.

**Impact of the "Penny Stock" Rules On Buying Or Selling Our Common Stock**

The Securities and Exchange Commission has adopted rules that regulate broker-dealer practices in connection with transactions in penny stocks. Penny stocks are generally equity securities with a price of less than $5.00 (other than securities registered on certain national securities exchanges or quoted on the Nasdaq system, provided that current price and volume information with respect to transactions in such securities is provided by the exchange or system).

A purchaser is purchasing penny stock which limits the ability to sell the stock. The shares offered by this prospectus constitute penny stock under the Securities and Exchange Act. The shares will remain penny stocks for the foreseeable future. The classification of penny stock makes it more difficult for a broker-dealer to sell the stock into a secondary market, which makes it more difficult for a purchaser to liquidate his/her investment. Any broker-dealer engaged by the purchaser for the purpose of selling his or her shares in us will be subject to Rules 15g-1 through 15g-10 of the Securities and Exchange Act. Rather than creating a need to comply with those rules, some broker-dealers will refuse to attempt to sell penny stock.

The penny stock rules require a broker-dealer, prior to a transaction in a penny stock not otherwise exempt from those rules, to deliver a standardized risk disclosure document, which:

- Contains a description of the nature and level of risk in the market for penny stock in both Public offerings and secondary trading;

- Contains a description of the broker's or dealer's duties to the customer and of the rights and remedies available to the customer with respect to a violation of such duties or other requirements of the Securities Act of 1934, as amended;

- Contains a brief, clear, narrative description of a dealer market, including "bid" and "ask" price for the penny stock and the significance of the spread between the bid and ask price;

- Contains a toll-free number for inquiries on disciplinary actions;

- Defines significant terms in the disclosure document or in the conduct of trading penny stocks; and

- Contains such other information and is in such form (including language, type, size and format) as the Securities and Exchange Commission shall require by rule or regulation.

Link to Table of Contents

The broker-dealer also must provide, prior to effecting any transaction in a penny stock, to the customer:

- The bid and offer quotations for the penny stock;
- The compensation of the broker-dealer and its salesperson in the transaction;
- The number of shares to which such bid and ask prices apply, or other comparable information relating to the depth and liquidity of the market for such stock; and
- Monthly account statements showing the market value of each penny stock held in the customer's account.

In addition, the penny stock rules require that prior to a transaction in a penny stock not otherwise exempt from those rules; the broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written acknowledgement of the receipt of a risk disclosure statement, a written agreement to transactions involving penny stocks, and a signed and dated copy of a written suitability statement. These disclosure requirements will have the effect of reducing the trading activity in the secondary market for our stock because it will be subject to these penny stock rules. Therefore, stockholders may have difficulty selling their securities.

*REGULATION M*

Our officer and director, who will offer and sell the Shares, is aware that he is required to comply with the provisions of Regulation M promulgated under the Securities Exchange Act of 1934, as amended. With certain exceptions, Regulation M precludes the officers and directors, sales agents, any broker-dealer or other person who participate in the distribution of shares in this offering from bidding for or purchasing, or attempting to induce any person to bid for or purchase any security which is the subject of the distribution until the entire distribution is complete.

**Reports to Security Holders**

We will file reports and other information with the U.S. Securities and Exchange Commission ("SEC"). You may read and copy any document that we file at the SEC's public reference facilities at 100 F. Street, N.E., Washington, D.C. 20549. Please call the SEC at 1-800-732-0330 for more information about its public reference facilities. Our SEC filings will be available to you free of charge at the SEC's web site at www.sec.gov.

**Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" and elsewhere in this report. The management's discussion, analysis of financial condition, and results of operations should be read in conjunction with our financial statements and notes thereto contained elsewhere in this prospectus.*

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. As shown in the accompanying financial statements, the Company has incurred an accumulated deficit of $11,252 for the period from inception to March 31, 2011. As the Company's business operations have been focused on developing our business plan and market research, this raises substantial doubt about the Company's ability to continue as a going concern.

The following table provides selected financial data about our company for the period from the date of inception through March 31, 2011. For detailed financial information, see the financial statements included in this prospectus.

**Balance Sheet Data:**

|  | March 31, 2011 (unaudited) | June 30, 2010 (audited) |
|---|---|---|
| Cash | $ 323 | $ 10,000 |
| Total assets | $ 323 | 10,000 |
| Total liabilities | $1,575 | 0 |
| Shareholders' Equity | ($1,252) | $ 10,000 |

Link to Table of Contents

Other than the shares offered by this prospectus, no other source of capital has been identified or sought. If we experience a shortfall in operating capital prior to funding from the proceeds of this offering, our director has verbally agreed to advance the company funds to complete the registration process.

*Plan of Operation*

*Going Concern*

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. For the period ended March 31, 2011, Company has had no operations. As of March 31, 2011, the Company has not emerged from the development stage. In view of these matters, the Company's ability to continue as a going concern is dependent upon the Company's ability to begin operations and to achieve a level of profitability. The Company intends on financing its future development activities and its working capital needs largely from the sale of public equity securities with some additional funding from other traditional financing sources, including term notes until such time that funds provided by operations are sufficient to fund working capital requirements. The financial statements of the Company did not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern. As shown in the accompanying financial statements, the Company has a working capital deficit of $1,252, as of March 31, 2011 and the Company has incurred an accumulated deficit of $11,252 for the period from Inception to March 31, 2011. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The future of the Company is dependent upon its ability to obtain financing and upon future profitable operations from the development of its planned business. Management has plans to seek additional capital through a private placement and public offering of its common stock. These conditions raise substantial doubt about the Company's ability to continue as a going concern. These financial statements do not include any adjustments that might arise from this uncertainty.

The financial statements do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts of and classification of liabilities that might be necessary in the event the Company cannot continue in existence.

As of May 27, 2011, the Company has $315 in cash and cash equivalents.

*Proposed Milestones to Implement Business Operations*

The following milestones are estimates only. The working capital requirements and the projected milestones are approximations only and subject to adjustment based on costs and needs. However, we will not have any discretion to spend the proceeds of the offering in any manner inconsistent with the stated allocation of proceeds in the use of proceeds table contained herein. Our 12 month budget is based on minimum operations which will be completely funded by the $35,000 raised through this offering. If we begin to generate profits we will increase our marketing and sales activity accordingly. We estimate sales to begin in the third quarter following closing of the offering. Because our business is driven by actual sales of garments, our revenue requirements will be reviewed and adjusted based on those actual sales. The costs associated with operating as a public company are included in our budget. Management will be responsible for the preparation of the required documents to keep the costs to a minimum.

The Company planned the goals and milestones based on raising $35,000 through this offering. We have taken careful consideration to budget the $35,000 to sustain operations for a twelve-month period following the closing of this offering. However, there are no assurances that we will be able to sustain operations for a twelve-month period with $35,000 of paid in capital regardless of our careful planning. In the event that we do not realize the full proceeds from this offering and are required to promptly return investor subscription proceeds, we will be forced to scale back our efforts to accomodate for a reduced amount of capital from other potential, yet unknown, sources. In this event, the Company plans to have a strategic planning session to budget for this shortfall.
 We may determine that we are in need of more working capital in order to implement the growth strategy and milestones set forth herein. However, we will not have any discretion to spend the proceeds from the offering in any manner inconsistent with the stated allocation of proceeds in the use of proceeds table contained herein. There are no assurances that we will be able to raise additional capital from any institution or individual investors.

We plan to complete our milestones as follows:

*0- 3 MONTHS*

Management will concentrate on the completion of the Registration Statement and finish the garment designs currently proposed. We estimate this will cost approximately $3,000 and have budget this cost in the Wages/Contractor line item in the Use of Proceeds. The Company will also start working on creating the patterns and prototypes. Swingplane Ventures estimates this will cost approximately $2,000 and this amount is budgeted in the Product Development line item in the Use of Proceeds. Swingplane Ventures also plans to explore online marketing options and interview photographers and models. The Company does not anticipate any fees associated with

Link to Table of Contents

**Directors and Executive Officers**

Directors of the corporation are elected by the stockholders to a term of one year and serve until a successor is elected and qualified. Officers of the corporation are appointed by the Board of Directors to a term of one year and serves until a successor is duly appointed and qualified, or until he or she is removed from office. The Board of Directors has no nominating, auditing or compensation committees.

The names and ages of our directors and executive officers are set forth below:

**Directors and Executive Officers**

| Name | Age | Position |
|---|---|---|
| Matthew Diehl | 34 | President, Secretary and Chairman of the Board of Directors (1) |

(1) Mr. Diehl will serve as a director until the next annual shareholder meeting.

The term of office of each director of the Company ends at the next annual meeting of the Company's stockholders or when such director's successor is elected and qualifies. No date for the next annual meeting of stockholders is specified in the Company's bylaws or has been fixed by the Board of Directors. The term of office of each officer of the Company ends at the next annual meeting of the Company's Board of Directors, expected to take place immediately after the next annual meeting of stockholders, or when such officer's successor is elected and qualifies.

**Background of Executive Officers and Director**

The following information sets forth the backgrounds and business experience of the directors and executive officers.

MATTHEW DIEHL, PRESIDENT, SECRETARY AND CHAIRMAN OF THE BOARD OF DIRECTORS

Mr. Diehl has over 10 years of experience in business development in both early stage and established companies like SendPhotos, Inc. and large companies like JPMorgan Chase. From early 2002 to May of 2005, Mr. Diehl sold financial products, primarily home mortgage loans as a Loan Officer, for JPMorgan Chase. Towards the end of his tenure there, from approximately September of 2004 through April of 2005, Mr. Diehl was on the Board of Governors of the Metro Denver Economic Development Corporation representing Chase. As a member of this Board, Mr. Diehl voted on political and other measures to be performed on behalf of the Board to grow economic development in and around the Denver metro area. He was not compensated for his Board membership as his efforts were volunteered on a monthly-meeting basis. In the last five years, he has worked with SendPhotos, Inc. as Director of Sales and Operations from May of 2005 until it was acquired by Avanquest Software in October of 2006 and stayed on at Avanquest as the Multimedia Sales Manger through October of 2007. In those roles Mr. Diehl sold business-to-business software products and direct-to-consumer software products as well as assisting in general operations, web-site marketing and software product design. We believe that this specific experience at SendPhotos, Inc. and subsequently with Avanquest Software makes Mr. Diehl an asset to the Company as we begin design and development of our own website and online marketing strategies.

After that, he headed up the photo kiosk program for LifePics, Inc. as the Kiosk Product Manager, which entailed managing the development of photo software for kiosk hardware. He managed a team of software developers as well as assisting in software product design, website marketing and business-to-business sales. After growing that part of the business from January of 2008, that division was broken up in October 2008. Again, the Company feels that Mr. Diehl's experience being part of a growing small business as well as website design and online marketing strategies lends to the Company's current needs. Since then, he has been COO and a director for TapSlide, Inc., where he is currently working on a part-time basis. Mr. Diehl devotes about 5-10 hours per week on TapSlide. TapSlide has a mobile software application for sale in the Apple App Store called Inked Magazine, which sells for $1.99 each. TapSlide has generated some revenues from this application and has operations, though not substantial, and is currently working to catch up on its delinquent filings. In January 2010, Mr. Diehl started a limited liability company for his consultancy and business development skills called AppVineyard, LLC in Colorado. He spends the majority of his time with his own company, AppVineyard, LLC selling software applications and business development services.

Furthermore, Mr. Diehl agreed on August 3, 2010 to come aboard temporarily, as an Officer and Director, for PaperFree Medical Solutions, Inc. in order to assist in the search for an Officer and Director more qualified than Mr. Diehl to move that company forward. Mr. Diehl resigned from PaperFree Medical Solutions on November 16, 2010 and has no further involvement with the Company whatsoever. It is the responsibility of PaperFree Medical Solutions to file a Form 8-K to disclose the resignation of Mr. Diehl but unfortunately at the time of this statement, no such Form 8-K has been filed.

Mr. Diehl is an avid golfer and fashion aficionado. Because of his experience in business development, corporate growth and expansion, and public company experience, the Company believes that Mr. Diehl is an ideal candidate for Director and Officer. Mr. Diehl distributes part of his time towards the everyday operations and forward movement of the corporation.

**Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934 requires our directors and executive officers, and persons who own more than ten percent of our common stock, to file with the Securities and Exchange Commission initial reports of ownership and reports of changes of ownership of our common stock. Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish us with copies of all Section 16(a) forms they file.

We intend to ensure to the best of our ability that all Section 16(a) filing requirements applicable to our officers, directors and greater than ten percent beneficial owners are complied with in a timely fashion.

**Executive Compensation**

Currently, our officer and director receives no compensation, other than shares of common stock previously issued, for his services during the development stage of our business operations. He is reimbursed for any out-of-pocket expenses that he incurs on our behalf. In the future, we may approve payment of salaries for officers and directors, but currently, no such plans have been approved. We also do not currently have any benefits, such as health or life insurance, available to our employees.

<div align="center">23</div>

Link to Table of Contents

(1) The percentages are based on a Before-Offering total of 10,000,000 shares of common stock issued and outstanding as of the date of this prospectus and assume none of the 10,000,000 shares of our current security holder's shares will be sold and all of the 3,500,000 shares registered in the offering will be sold.

(2) As used in this table, "beneficial ownership" means the sole or shared power to vote, or to direct the voting of, a security, or the sole or share investment power with respect to a security (i.e., the power to dispose of, or to direct the disposition of a security).

(3) Assumes the sale of the maximum amount of this offering (3,500,000 shares of common stock) by Swingplane Ventures, Inc. The aggregate amount of shares to be issued and outstanding after the offering is 13,500,000.

## Future Sales By Existing Stockholder

A total of 10,000,000 shares have been issued to the existing stockholder, all of which are held by our sole officer and director and are restricted securities, as that term is defined in Rule 144 of the Rules and Regulations of the SEC promulgated under the Act. Under Rule 144, such shares can be publicly sold, subject to volume restrictions and certain restrictions on the manner of sale, commencing one year after their acquisition. Any sale of shares held by the existing stockholder (after applicable restrictions expire) and/or the sale of shares purchased in this offering (which would be immediately resalable after the offering), may have a depressive effect on the price of our common stock in any market that may develop, of which there can be no assurance.

Our principal shareholder does not have any plans to sell his shares at any time after this offering is complete.

## Certain Relationships and Related Transactions

Matt Diehl is our sole officer and director. We are currently operating out of the premises of Mr. Diehl the officer and director of our Company, on a rent-free basis for administrative purposes. There is no written agreement or other material terms or arrangements relating to said arrangement.

We do not currently have any conflicts of interest by or among our current officer, director, key employee or advisors. We have not yet formulated a policy for handling conflicts of interest, however, we intend to do so upon completion of this offering and, in any event, prior to hiring any additional employees. We do not presently have any independent directors. We consider independent directors to be individuals who are not employed by the Company in any capacity and who do not have any equity ownership interest in the Company. Our Board of Directors is comprised of our President, Matt Diehl. We intend to seek independent directors for our board of directors when the Company begins generating revenues and we are able to provide compensation for our board of director members.

At the date of incorporation, a stock subscription was received for 10,000,000 shares of our $0.001 common stock, at par for $10,000, which was received as of June 30, 2010.

## Transactions With Related Persons, Promoters and Certain Control Person

To the best of our knowledge there are no transactions involving any director, executive officer, or any security holder who is a beneficial owner or any member of the immediate family of the officers and directors, or any related persons or promoters.


## Item 12. Disclosure of Commission Position on Indemnification for Securities Act Liabilities

Pursuant to the Articles of Incorporation and By-Laws of the corporation, we may indemnify an officer or director who is made a party to any proceeding, including a law suit, because of his position, if he acted in good faith and in a manner he reasonably believed to be in our best interest. In certain cases, we may advance expenses incurred in defending any such proceeding. To the extent that the officer or director is successful on the merits in any such proceeding as to which such person is to be indemnified, we must indemnify him against all expenses incurred, including attorney's fees. With respect to a derivative action, indemnity may be made only for expenses actually and reasonably incurred in defending the proceeding, and if the officer or director is judged liable, only by a court order. The indemnification is intended to be to the fullest extent permitted by the laws of the State of Nevada.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers and controlling persons pursuant to the provisions above, or otherwise, we have been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act, and is, therefore, unenforceable.

In the event that a claim for indemnification against such liabilities, other than the payment by us of expenses incurred or paid by one of our directors, officers, or controlling persons in the successful defense of any action, suit or proceeding, is asserted by one of our

Link to Table of Contents

**INDEX TO FINANCIAL STATEMENTS**

**SWINGPLANE VENTURES, INC.**

*(A Development Stage Company)*

For the Period from June 24, 2010 (Date of Inception)

Through June 30, 2010

| | |
|---|---|
| REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | F-2 |
| Balance Sheet | F-3 |
| Statement of Operations | F-4 |
| Statement of Stockholder's Equity | F-5 |
| Statements of Cash Flows | F-6 |
| Notes to the Financial Statements | F-7 |

F-1

Link to Table of Contents

**Peter Messineo**
**Certified Public Accountant**
**1982 Otter Way Palm Harbor FL 34685**
peter@cpa-ezxl.com
**T   727.421.6268   F   727.674.0511**

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and
Stockholders of Swingplane Ventures, Inc.:

I have audited the balance sheets of Swingplane Ventures, Inc. as of June 30, 2010 and the related statement of operations, changes in stockholder's equity, and cash flows for the year then ended and for the period June 24, 2010 (date of inception) through June 30, 2010. These financial statements were the responsibility of the Company's management. My responsibility was to express an opinion on these financial statements based on my audits.

I conducted my audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that I plan and perform the audits to obtain reasonable assurance about whether the financial statements were free of material misstatement. The Company was not required to have, nor was I engaged to perform, an audit of its internal control over financial reporting. My audit included consideration of internal control over financial reporting as a basis for designing audit procedures that were appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, I express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. I believe that my audit provide a reasonable basis for my opinion.

In my opinion, the financial statements, referred to above, present fairly, in all material respects, the financial position of Swingplane Ventures, Inc. as of June 30, 2010, and the results of its operations and its cash flows for the year then ended and for the period June 24, 2010 (date of inception) through June 30, 2010, in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has no revenues from operation, has not emerged from the development stage, and is requiring traditional financing or equity funding to commence its operating plan. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Further information and management's plans in regard to this uncertainty were also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Peter Messineo, CPA
Peter Messineo, CPA
Palm Harbor, Florida
July 30, 2010

F-2

Link to Table of Contents

Swingplane Ventures, Inc.
*(A Development Stage Corporation)*

**Balance Sheet**

|  | June 30, 2010 |
|---|---|
| **Assets** | |
| Cash | $ 10,000 |
| Total current assets | 10,000 |
| Total assets | $ 10,000 |
| **Liabilities and Stockholders' Equity** | |
| Stockholders' deficit: | |
| Common stock; $0.001 par value; 75,000,000 shares authorized; 10,000,000 shares issued and outstanding | $ 10,000 |
| Capital in excess of par value | - |
| Accumulated earnings during development stage | - |
| Total stockholders' equity | 10,000 |
| Total liabilities and stockholders' equity | $ 10,000 |

*The Accompanying notes are an integral part of the financial statements*

F-3

Link to Table of Contents

**Swingplane Ventures, Inc.**
*(A Development Stage Corporation)*

**Statement of Operations**

|  | For the Period from June 24, 2010 (Date of Inception) through June 30, 2010 | |
|---|---|---|
| Revenue: | | |
| Sales | $ - | |
| | - | |
| Expenses: | | |
| Selling, general and administrative | - | |
| | - | |
| Net loss | $ - | |
| Net loss per common share, basic and diluted | $ 0.00 | |
| Weighted average number of common shares, basic and diluted | 10,000,000 | |

*The accompanying notes are an integral part of the financial statements.*

F-4

Link to Table of Contents

Swingplane Ventures, Inc.
*(A Development Stage Corporation)*

Statement of Stockholders' Deficit

For the Period from June 24, 2010 (Date of Inception) through June 30, 2010

| | | Common Stock | | Capital in Excess of Par Value | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|
| | | Shares | Amount | | | |
| **Balance, June 24, 2010 (Date of Inception)** | | $ | - | $ - | $ - | $ - |
| Issuance of common stock for cash (June 24, 2010) | = | 10,000,000 | 10,000 | - | - | 10,000 |
| Net loss for the period June 24, 2010 (Date of Inception) through June 30, 2010 | | - | - | - | - | - |
| **Balance, June 30, 2010** | | **10,000,000** | **$  10,000** | **$       0** | **$       0** | **$    10,000** |

*The accompanying notes are an integral part of the financial statements.*

F-5

Link to Table of Contents

Swingplane Ventures, Inc.
*(A Development Stage Corporation)*

Statement of Cash Flows

|  | For the Period from June 24, 2010 (Date of Inception) through June 30, 2010 |
|---|---|
| **Operating activities** | |
| Net loss | $ 0 |
| Adjustments to reconcile net loss to net cash used by operating activities: | |
| Net cash used by operating activities | 0 |
| **Investing activities** | |
| Net cash used by investing activities | 0 |
| **Financing activities** | |
| Proceeds from issuance of common stock | 10,000 |
| Net cash provided by financing activities | 10,000 |
| **Net increase (decrease) in cash and cash equivalents** | 10,000 |
| **Cash and cash equivalents, beginning of period** | 0 |
| **Cash and cash equivalents, end of period** | $ 10,000 |
| Supplemental information: | |
| Cash paid during the year for interest | $ 0 |
| Cash paid during the year for taxes | $ 0 |

*The accompanying notes are an integral part of the financial statements.*

F-6

Link to Table of Contents

**Swingplane Ventures, Inc.**
*(A Development Stage Corporation)*

**Notes to Financial Statements**

For the Period from June 24, 2010 (Date of Inception) through June 30, 2010

**1.      Background Information.**

Swingplane Ventures, Inc. (the "Company"), a Nevada corporation, is a development stage men's and women's golf fashion manufacturer located in Broomfield, Colorado.  The Company's initial clothing line consists of tailored-fit golf shirts, pants and skirts that younger golfers are demanding from the standpoint of comfort, style and fabric.  The Company plans to stay on the cutting edge of the constantly changing golf apparel market and our goal is to create a quality reputation within the youthful golfing community and golf garment marketplace.

The first designs will take into consideration of the fit, style and fabrics that younger golfers are demanding, including tailored-fit shirts with shorter sleeves and fabrics that are wet and wind resistant, such as microfibers used today in tennis and active wear tops.  Our initial design is a tailored-fit men's golf shirt with shorter sleeves and unique (and colorful) design patterns.  This current design will be marketed under the "Swingplane Ventures" brand.  Because of its fit, fibers, and design, this garment will attract the 12 - 35 year old male golfer market as an alternative to much higher priced brands with similar styling.

**2.      Going Concern.**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern.  For the period ended June 30, 2010, the Company has had no operations.  As of June 30, 2010, the Company has not emerged from the development stage.  In view of these matters, the Company's ability to continue as a going concern is dependent upon the Company's ability to begin operations and to achieve a level of profitability.  The Company intends on financing its future development activities and its working capital needs largely from the sale of public equity securities with some additional funding from other traditional financing sources, including term notes until such time that funds provided by operations are sufficient to fund working capital requirements.  The financial statements of the Company do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

**3.      Significant Accounting Policies.**

The significant accounting policies followed are:

**FASB Codification -** In June 2009, the FASB issued ASC 105, *Generally Accepted Accounting Principles,* effective for interim and annual reporting periods ending after September 15, 2009. This statement establishes the Codification as the source of authoritative accounting principles used in the preparation of financial statements in conformity with generally accepted accounting principles. The Codification does not replace or affect guidance issued by the SEC or its staff. As a result of the Codification, the references to authoritative accounting pronouncements included herein in our Form S-1/A now refer to the Codification topic section rather than a specific accounting rule as was past practice.

**Use of estimates -** The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

**Cash and cash equivalents -** All cash, other than held in escrow, is maintained with a major financial institution in the United States. Deposits with this bank may exceed the amount of insurance provided on such deposits. Temporary cash investments with an original maturity of three months or less are considered to be cash equivalents.

**Research and development expenses -** Expenditures for research, development, and engineering of products are expensed as incurred.

Link to Table of Contents

**Common stock -** The Company records common stock issuances when all of the legal requirements for the issuance of such common stock have been satisfied.

**Revenue and cost recognition –** The Company has no current source of revenue; therefore the Company has not yet adopted any policy regarding the recognition of revenue or cost.

**Advertising Costs -** The Company's policy regarding advertising is to expense advertising when incurred.

**Income Taxes -** Income taxes are provided for the tax effects of transactions reported in the financial statements and consist of taxes currently due plus deferred taxes resulting from temporary differences. Such temporary differences result from differences in the carrying value of assets and liabilities for tax and financial reporting purposes. The deferred tax assets and liabilities represent the future tax consequences of those differences, which will either be taxable or deductible when the assets and liabilities are recovered or settled. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized.

The Company adopted the provisions of FASB ASC 740-10 "*Uncertainty in Income Taxes*" (ASC 740-10), on January 1, 2007. The Company has not recognized a liability as a result of the implementation of ASC 740-10. A reconciliation of the beginning and ending amount of unrecognized tax benefits has not been provided since there is no unrecognized benefit since the date of adoption. The Company has not recognized interest expense or penalties as a result of the implementation of ASC 740-10. If there were an unrecognized tax benefit, the Company would recognize interest accrued related to unrecognized tax benefits in interest expense and penalties in operating expenses.

**Earnings (Loss) Per Share -** Basic loss per share is computed by dividing net loss attributable to common stockholders by the weighted average common shares outstanding for the period. Diluted loss per share is computed giving effect to all potentially dilutive common shares. Potentially dilutive common shares may consist of incremental shares issuable upon the exercise of stock options and warrants and the conversion of notes payable to common stock. In periods in which a net loss has been incurred, all potentially dilutive common shares are considered anti*dilutive and thus are excluded from the calculation. At June 30, 2010, the Company did not have any potentially dilutive common shares.

**Financial instruments** – In September 2006, the Financial Accounting Standards Board (FASB) introduced a framework for measuring fair value and expanded required disclosure about fair value measurements of assets and liabilities. The Company adopted the standard for those financial assets and liabilities as of the beginning of the 2008 fiscal year and the impact of adoption was not significant. FASB Accounting Standards Codification (ASC) 820 "*Fair Value Measurements and Disclosures*" (ASC 820) defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date.. ASC 820 also establishes a fair value hierarchy that distinguishes between (1) market participant assumptions developed based on market data obtained from independent sources (observable inputs) and (2) an entity's own assumptions about market participant assumptions developed based on the best information available in the circumstances (unobservable inputs). The fair value hierarchy consists of three broad levels, which gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). The three levels of the fair value hierarchy are described below:

- Level 1 - Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities.

- Level 2 - Inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly, including quoted prices for similar assets or liabilities in active markets; quoted prices for identical or similar assets or liabilities in markets that are not active; inputs other than quoted prices that are observable for the asset or liability (e.g., interest rates); and inputs that are derived principally from or corroborated by observable market data by correlation or other means.

- Level 3 - Inputs that are both significant to the fair value measurement and unobservable.

Fair value estimates discussed herein are based upon certain market assumptions and pertinent information available to management as of June 30, 2010. The respective carrying value of certain on-balance-sheet financial instruments approximated their fair values due

Link to Table of Contents

to the short-term nature of these instruments. These financial instruments include accounts receivable, other current assets, accounts payable, accrued compensation and accrued expenses. The fair value of the Company's notes payable is estimated based on current rates that would be available for debt of similar terms which is not significantly different from its stated value.

On June 24, 2010, the Company applied ASC 820 for all non-financial assets and liabilities measured at fair value on a non-recurring basis. The adoption of ASC 820 for non-financial assets and liabilities did not have a significant impact on the Company's financial statements.

**Subsequent events** - Subsequent events have been evaluated through the date of the audit report, which were available to be issued.

**Recent accounting pronouncements**

At inception the Company adopted ASC 470, *Debt with Conversion and Other Options – Cash Conversion* ("ASC 470") (formerly referenced as FASB Staff Position APB No. 14-1, *Accounting for Convertible Debt Instruments That May Be Settled in Cash upon Conversion (Including Partial Cash Settlement)*), which requires issuers of convertible debt that may be settled wholly or partly in cash when converted to account for the debt and equity components separately. Where applicable, ASC 470 must be applied retrospectively to all periods presented. The adoption of ASC 470 did not have an impact on the Company's financial statements.
In August 2009, the Financial Accounting Standards Board or FASB issued Accounting Standards Update 2009-05, *Fair Value Measurements and Disclosures* ("Topic 820") - Measuring Liabilities at Fair Value an Update 2009-05. Update 2009-05 amends subtopic 820-10, "Fair Value Measurements and Disclosures- Overall" and provides clarification for the fair value measurement of liabilities in circumstances when quoted prices for an identical liability in an active market are not available. The amendments also provide clarification for not requiring the reporting entity to include separate inputs or adjustments to other inputs relating to the existence of a restriction that prevents the transfer of a liability when estimating the fair value of a liability. Additionally, these amendments clarify that both the quoted price in an active market for an identical liability at the measurement date and the quoted price for an identical liability when traded as an asset in an active market when no adjustments to the quoted price of the asset are required are considered Level 1 fair value measurements. These requirements are effective for financial statements issued after the release of Update 2009-05. The Company adopted the requirements on June 24, 2010 and it did not have a material impact on our financial position, results of operations or related disclosures.
Other recent accounting pronouncements issued by the FASB (including its EITF), the AICPA, and the SEC did not or are not believed by management to have a material impact on the Company's present or future financial statements.

4.    **Income Taxes.**

There is no current or deferred income tax expense or benefit for the period ended June 30, 2010.

The provision for income taxes is different from that which would be obtained by applying the statutory federal income tax rate to income before income taxes. The items causing this difference are as follows:

|  | June 24, 2010 (Date of Inception) through June 30, 2010 |
|---|---|
| Tax benefit at U.S. statutory rate | $ - |
| State income tax benefit, net of federal benefit | - |
|  | $ - |

The Company did not have any temporary differences for the period from June 24, 2010 (Date of Inception) through June 30, 2010.

**5. Related Party Transactions**

On June 24, 2010, the Company sold 10,000,000 shares of its $0.001 common stock to an officer of the Company for a $10,000. The officers and directors of the Company are involved in other business activities and may, in the future, become  involved in other

Link to Table of Contents

Swingplane Ventures, Inc.
(A Development Stage Corporation)

Financial Statements

As of March 31, 2011 (unaudited)
and the Period June 24, 2010 (Date of Inception)
through March 31, 2011 (unaudited)

Contents

Financial Statements:

| | |
|---|---|
| Balance Sheets | 2 |
| Statements of Operations | 3 |
| Statements of Changes in Stockholders' Deficit | 4 |
| Statements of Cash Flows | 11 |
| Notes to Financial Statements | 13 |

**Swingplane Ventures, Inc.**
**(A Development Stage Corporation)**

**Balance Sheets**

| | March 31, 2011 (unaudited) | June 30, 2010 (audited) |
|---|---|---|
| **Assets** | | |
| Current Assets | | |
| Cash | $ 323 | 10,000 |
| Total Current Assets | 323 | 10,000 |
| Total Assets | $ 323 | $ 10,000 |
| **Liabilities and Stockholders' Equity (Deficit)** | | |
| Current Liabilities | | |
| Accounts payable | $ 1,575 | $ — |
| Total Current Liabilities | 1,575 | — |
| Stockholders' (Deficit) Equity: | | |
| Common stock $0.001 par value; 75,000,000 shares authorized; 10,000,000 shares issued and outstanding | 10,000 | 10,000 |
| Capital in excess of par value | — | — |
| Accumulated deficit during development stage | (11,252 ) | — |

| | | |
|---|---:|---:|
| Total Stockholders' (Deficit) Equity | (1,252 ) | 10,000 |
| Total Liabilities & Stockholders' Equity | $ 323 | $ 10,000 |

*The accompanying notes are an integral part of the financial statements.*

**Swingplane Ventures, Inc.**
**(A Development Stage Corporation)**
**Statements of Operations**
**(unaudited)**

| | For the Three Months Ended March 31, 2011 | For the Nine Months Ended March 31, 2011 | For the Period from June 24, 2010 (Date of Inception) through March 31, 2011 |
|---|---:|---:|---:|
| **Revenue:** | | | |
| Sales | $ — | $ — | $ — |
| | — | — | — |
| **Expenses:** | | | |
| Selling, general and administrative | 225 | 11,252 | 11,252 |
| | 225 | 11,252 | 11,252 |
| Net loss | $ 225 | $ (11,252) | (11,252 ) |
| Net loss per common share, basic and diluted | $ 0.00 | $ 0.00 | $ 0.00 |
| Weighted average number of common shares, basic and diluted | 10,000,000 | 10,000,000 | 10,000,000 |

*The accompanying notes are an integral part of the financial statements.*

F-11

Link to Table of Contents

**Swingplane Ventures, Inc.**
*(A Development Stage Corporation)*

Statement of Stockholders' Deficit

For the Period from June 24, 2010 (Date of Inception) through March 31, 2011

|  | Common Stock | | Capital in Excess of Par Value | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|
|  | Shares | Amount |  |  |  |
| **Balance, June 24, 2010 (Date of Inception)** | — | $ — | $ — | $ — | $ — |
| Issuance of common stock for cash (June 24, 2010) | 10,000,000 | 10,000 | — | — | 10,000 |
| Net loss for the period June 24, 2010 (Date of Inception) through June 30, 2010 | — | — | — | — | — |
| **Balance, June 30, 2010** | **10,000,000** | $ **10,000** | $ **0** | $ **0** | $ **10,000** |
| Net loss for the nine months ended March 31, 2011 (unaudited) | — | — | — | (11,252 ) | (11,252 ) |
| **Balance, March 31, 2011 (unaudited)** | **10,000,000** | $ **10,000** | $ **0** | $ **(11,252** ) | $ **(1,252** ) |

*The accompanying notes are an integral part of the financial statements.*

F-12

Link to Table of Contents

**Swingplane Ventures, Inc.**
*(A Development Stage Corporation)*

Statement of Cash Flows

| | For the Nine Months Ended March 31, 2011 (unaudited) | For the Period from June 24, 2010 (Date of Inception) through March 31, 2011 (unaudited) |
|---|---|---|
| **Operating activities** | | |
| Net loss | $ (11,252) | $ (11,252) |
| Adjustments to reconcile net loss to net cash used by operating activities: | | |
| Increase in accounts payable | 1,575 | 1,575 |
| Net cash used by operating activities | (9,677) | (9,677) |
| | | |
| **Investing activities** | | |
| Net cash used by investing activities | 0 | 0 |
| | | |
| **Financing activities** | | |
| Proceeds from issuance of common stock | 0 | 10,000 |
| Net cash provided by financing activities | 0 | 10,000 |
| | | |
| **Net (decrease) increase in cash and cash equivalents** | (9,677) | 398 |
| | | |
| **Cash and cash equivalents, beginning of period** | 10,000 | 0 |
| | | |
| **Cash and cash equivalents, end of period** | $ 323 | $ 323 |
| | | |
| Supplemental information: | | |
| Cash paid during the year for interest | $ 0 | $ 0 |
| Cash paid during the year for taxes | $ 0 | $ 0 |

*The accompanying notes are an integral part of the financial statements.*

F-13

Link to Table of Contents

(b)  *Request for Acceleration of Effective Date.*  Insofar as indemnification for liabilities arising under the Securities Act  may be permitted to directors, officers and controlling persons of the registrant according the foregoing provisions, or otherwise, the undersigned registrant has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable.

In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel that the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(4)  That, for the purpose of determining liability under the Securities Act to any purchaser:

(i)  Each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. *Provided, however,* that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized in the City of Broomfield, State of Colorado on June 7, 2011.

**(Registrant)**

**SWINGPLANE VENTURES, INC.**

By:  /s/ Matthew R. Diehl

Matthew R. Diehl, President

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/Matthew R. Diehl<br>Matthew R. Diehl | Principal Executive Officer, Principal Accounting Officer, Chief Financial Officer, Secretary, Chairman of the Board of Directors | June 7, 2011 |

II-3

10-Q 1 swingplane_10q.htm FORM 10-Q

<div align="center">

**SECURITIES AND EXCHANGE COMMISSION**
Washington D.C. 20549

# FORM 10-Q

</div>

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

<div align="center">

For the Quarterly period ended **September 30, 2011**

</div>

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

<div align="center">

For the transition period from _____ to _____

Commission file number: **333-168912**

# SWINGPLANE VENTURES, INC.

(Exact name of small business issuer as specified in its charter)

</div>

| | |
|---|---|
| **Nevada** | **27-2919616** |
| (State or other jurisdiction of Incorporation or organization) | (I.R.S. Employer Identification No.) |

<div align="center">

**220 Summit Blvd. #402, Broomfield, Colorado 80021**
(Address of principal executive offices)

**303-803-0063**
(Issuer's telephone number)

_____
(Former name, former address and former fiscal year, if changed since last report)

</div>

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for at least the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "accelerated filer, large accelerated filer and smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

There were 45,000,000 shares of the Registrant's $0.001 par value common stock outstanding as of September 30, 2011.

**Earnings (Loss) Per Share -** Basic loss per share is computed by dividing net loss attributable to common stockholders by the weighted average common shares outstanding for the period. Diluted loss per share is computed giving effect to all potentially dilutive common shares. Potentially dilutive common shares may consist of incremental shares issuable upon the exercise of stock options and warrants and the conversion of notes payable to common stock. In periods in which a net loss has been incurred, all potentially dilutive common shares are considered anti*dilutive and thus are excluded from the calculation. At September 30, 2011, the Company did not have any potentially dilutive common shares.

**Financial instruments -** In September 2006, the Financial Accounting Standards Board (FASB) introduced a framework for measuring fair value and expanded required disclosure about fair value measurements of assets and liabilities. The Company adopted the standard for those financial assets and liabilities as of the beginning of the 2008 fiscal year and the impact of adoption was not significant. FASB Accounting Standards Codification (ASC) 820 *"Fair Value Measurements and Disclosures"* (ASC 820) defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. ASC 820 also establishes a fair value hierarchy that distinguishes between (1) market participant assumptions developed based on market data obtained from independent sources (observable inputs) and (2) an entity's own assumptions about market participant assumptions developed based on the best information available in the circumstances (unobservable inputs). The fair value hierarchy consists of three broad levels, which gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). The three levels of the fair value hierarchy are described below:

Level 1 -   Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities.

Level 2 -   Inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly, including quoted prices for similar assets or liabilities in active markets; quoted prices for identical or similar assets or liabilities in markets that are not active; inputs other than quoted prices that are observable for the asset or liability (e.g., interest rates); and inputs that are derived principally from or corroborated by observable market data by correlation or other means.

Level 3 -   Inputs that are both significant to the fair value measurement and unobservable.

Fair value estimates discussed herein are based upon certain market assumptions and pertinent information available to management as of September 30, 2011. The respective carrying value of certain on-balance-sheet financial instruments approximated their fair values due to the short-term nature of these instruments. These financial instruments include accounts receivable, other current assets, accounts payable, accrued compensation and accrued expenses. The fair value of the Company's notes payable is estimated based on current rates that would be available for debt of similar terms which is not significantly different from its stated value.

On June 24, 2010, the Company applied ASC 820 for all non-financial assets and liabilities measured at fair value on a non-recurring basis. The adoption of ASC 820 for non-financial assets and liabilities did not have a significant impact on the Company's financial statements.

**Recent accounting pronouncements**

Except for rules and interpretive releases of the SEC under authority of federal securities laws and a limited number of grandfathered standards, the FASB Accounting Standards Codification™ ("ASC") is the sole source of authoritative GAAP literature recognized by the FASB and applicable to the Company.  Management has reviewed the aforementioned rules and releases and believes any effect will not have a material impact on the Company's present or future financial statements.

10

A0047

**4. Income Taxes.**

There is no current or deferred income tax expense or benefit for the three months ended September 30, 2011.

The provision for income taxes is different from that which would be obtained by applying the statutory federal income tax rate to income before income taxes. The items causing this difference are as follows:

|  | Three Months Ended September 30, 2011 | | June 24, 2010 (Date of Inception) through September 30, 2011 | |
|---|---|---|---|---|
| Tax benefit at U.S. statutory rate | $ | 4,800 | $ | 9,000 |
| State income tax benefit, net of federal benefit |  | — |  | — |
| Valuation allowance |  | (4,800) |  | (9,000) |
|  | $ | — | $ | — |

The Company did not have any temporary differences for the three month period ended September 30, 2011.

**5. Stock Subscription and Related Party Transactions**

On June 24, 2010, the Company sold 10,000,000 shares of its $0.001 common stock to an officer of the Company for a $10,000 stock subscription receivable.

On September 6, 2011, the Company raised $35,000 through the issuance of 35,000,000 shares of common stock to unrelated parties.

The officers and directors of the Company are involved in other business activities and may, in the future, become involved in other business opportunities that become available. They may face a conflict in selecting between the Company and other business interests. The Company has not formulated a policy for the resolution of such conflicts.

The Company does not own or lease property or lease office space. The office space used by the Company was arranged by the founder of the Company to use at no charge.

The above amount is not necessarily indicative of the amount that would have been incurred had a comparable transaction been entered into with independent parties.

11

**Item 2. Management's Discussion and Analysis or Plan of Operation.**

**Forward Looking Information**

Information contained in the following discussion of results of operations and financial condition and in certain of the notes to the financial statements included in this document contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, which can be identified by the use of words such as "may,""will," "expect," "anticipate," "estimate," or "continue," or variations thereon or comparable terminology. In addition, all statements other than statements of historical facts that address activities, events, or developments the Company expects, believes, or anticipates will or may occur in the future, and other such matters, are forward-looking statements. The following discussion should be read in conjunction with the Company's unaudited financial statements and related notes included elsewhere herein.

The Company's future operating results may be affected by various trends and factors, which are beyond the Company's control. The important factors that could prevent us from achieving our stated goals and objectives include, but are not limited to, those set forth in our Form S-1/A filed with the Commission on June 8, 2011. We undertake no responsibility or obligation to update publicly these forward-looking statements, but may do so in the future in written or oral statements. Investors should take note of any future statements made by or on our behalf. The Company cautions the reader that a number of important factors discussed herein, and in other reports filed with the Commission could affect the Company's actual results and cause actual results to differ materially from those discussed in forward-looking statements.

Overview

Swingplane Ventures Inc. is a development stage men's and women's golf fashion manufacturer located in Broomfield, Colorado. The Company intends for its initial clothing line to consist of tailored-fit golf shirts, pants, and skirts. The use of lightweight and breathable fibers that the Company intends to use could position the Company among larger companies in a competitive market. We plan to stay on the cutting edge of the constantly changing golf apparel market and create a reputation with the consumer of providing unique and desirable designs at affordable prices. This market dictates that new styles and designs be introduced on a regular basis.

Our initial design is planned to be a tailored-fit men's golf shirt with shorter sleeves and unique design patterns. Mr. Diehl currently has some designs in mind and has the ability to finalize the initial shirt design, fit, and fabric. Currently the Company has no agreements or contracts in place with any designers or manufacturers, but upon successful completion of our proposed offering it is expected to seek out manufacturers and prototypes. We intend to market this current design under the "Swingplane" brand. Because of its fit, fibers, and design, our target market for this garment is the 15 - 35 year old male golfer as an alternative to other brands.

The Company currently has not developed or sold any products but is in the development stage for its products. Without sufficient additional financing, the Company will not be able to complete the development or introduce its apparel to the market and may have to discontinue operations.

**Liquidity and Capital Resources**

We have not generated positive cash flows from operating activities. The primary source of capital has been from the sale of equity securities. Our primary use of capital has been for professional fees, and general and administrative costs. Our working capital requirements are expected to increase in line with the growth of our business.

We have no lines of credit or other bank financing arrangements. We expect that working capital requirements will be funded through a combination of our existing funds, cash flow from operations and issuance of equity and debt securities.

12

## SIGNATURES

In accordance with the requirements of the Securities Exchange Act of 1934, as amended, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Swingplane Ventures, Inc.**

Date: November 3, 2011

By: */s/ Matthew Diehl*
Matthew Diehl,
**Chief Executive Officer and Principal
Accounting Officer**

17



Corporate Universe Web
First Access

Posting Date: 08/30/2012



Main Menu | Log Out | Contact Us | Help Menu



## Detailed Holder List

**DIRECT TRANSFER**

Effective: 08/30/2012

PH: 919-481-4000. | F: 646-225-7104
TA@ISSUERDIRECT.COM | WWW.ISSUERDIRECT.COM

Issue: Swingplane Ventures, Inc - Com Stock     Ticker:     CUSIP ID: **870787108**

| Tax Id | Certificate | Name & Address | Date Issued | Date Cancelled | Holder Total % Held / Shares Held | Unit Price | Stop Code |
|--------|-------------|----------------|-------------|----------------|-----------------------------------|------------|-----------|
| 000000000-8145 | | HECTOR CASILLAS SUAREZ C DE LA MORA 302 MINERAL DE LA REFORMA, HGO. FRACC CAMPESTRE VILLAS DEL ALAMO, MEXICO 42184 | | | 3,500,000.00 0.741% | | |
| | 40 BOOK5 | | 07/14/2011 05/11/2012 | 05/11/2012 | 100,000 3,500,000 | N/A N/A | |
| | | | | Total Shares: | 3,500,000 | | |
| 000000000-8142 | | MARIA ISABEL GONZALEZ ANGELES C TUXPAN 108-12 CUAUHTEMOC, D.F. COL ROMA SUR, MEXICO 06760 | | | 3,500,000.00 0.741% | | |
| | 38 BOOK3 | | 07/15/2011 05/11/2012 | 05/11/2012 | 100,000 3,500,000 | N/A N/A | |
| | | | | Total Shares: | 3,500,000 | | |
| 000000000-8140 | | DULCE JULIA SANGUINO BECERRIL C SAN RAFAEL ATLIXCO 3472 | | | 3,500,000.00 0.741% | | |

**SWVI TA# 104, p. 13**
**SWVI Scans 318**

8/31/2012 12:42 PM

A0051



A6-203
TLAHUAC
COL ZAPOTITLA,
MEXICO 13300

| | 36 | | 07/13/2011 | 05/11/2012 | 100,000 | N/A |
| | BOOK1 | | 05/11/2012 | | 3,500,000 | N/A |
| | | | | Total Shares: | 3,500,000 | |

000000000-8147   FRANCISCO                    3,500,000.00
                 GERARDO                          0.741%
                 ALVAREZ
                 MATURANO
                 C AMADO NERVO
                 14-402
                 BENITO JUAREZ,
                 D.F.
                 COL MODERNA,
                 MEXICO 03510

| | 42 | | 07/13/2011 | 05/11/2012 | 100,000 | N/A |
| | BOOK7 | | 05/11/2012 | | 3,500,000 | N/A |
| | | | | Total Shares: | 3,500,000 | |

000000000-8162   SMILJA BLACE                 3,150,000.00
                 TRG SRPSKIH                      0.667%
                 DOBROVOLJACA
                 4
                 23300
                 VOJVODINA
                 KIKINDA,
                 SURINAME 00000

| | 57 | | 08/24/2011 | 05/11/2012 | 90,000 | N/A |
| | BOOK22 | | 05/11/2012 | | 3,150,000 | N/A |
| | | | | Total Shares: | 3,150,000 | |

000000000-8158   MARINA                       3,150,000.00
                 BOGDANOVIC                       0.667%
                 VELIZARA
                 KOSANOVICA
                 51/10
                 11000
                 BELGRADE
                 BELGRADE,
                 SURINAME 00000

| | 53 | | 08/26/2011 | 05/11/2012 | 90,000 | N/A |
| | BOOK18 | | 05/11/2012 | | 3,150,000 | N/A |
| | | | | Total Shares: | 3,150,000 | |

000000000-8157   DJORDJE                      3,150,000.00
                 BOGDANOVIC                       0.667%
                 VELIZARA
                 KOSANOVICA
                 51/10
                 11000
                 BELGRADE
                 BELGRADE,
                 SURINAME 00000

| | 52 | | 08/26/2011 | 05/11/2012 | 90,000 | N/A |
| | BOOK17 | | 05/11/2012 | | 3,150,000 | N/A |
| | | | | Total Shares: | 3,150,000 | |

**SWVI TA# 104, p. 14**
**SWVI Scans 319**

8/31/2012 12:42 PM

A0052

http://192.168.14.226/cuprod/Menu16/SHLListing.csp?SII=870787108...



| 000000000-8148 | ELIGIO GERARDO CASTANEDA ESTRADA AND TULIPANES 1004 MAZATLAN, SIN FRACC JACARANDAS, MEXICO 82157 | | | 3,500,000.00 0.741% | |
|---|---|---|---|---|---|
| 43 BOOK8 | | 07/13/2011 05/11/2012 | 05/11/2012 | 100,000 3,500,000 | N/A N/A |
| | | | Total Shares: | 3,500,000 | |
| 000000000-8169 | SRDJAN CULIC BELE NJIVE 31 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 3,850,000.00 0.815% | |
| 64 BOOK29 | | 08/15/2011 05/11/2012 | 05/11/2012 | 110,000 3,850,000 | N/A N/A |
| | | | Total Shares: | 3,850,000 | |
| 000000000-8173 | MILORAD CVETICANIN FRUSKOGORSKA 29 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 4,200,000.00 0.889% | |
| 68 BOOK33 | | 08/24/2011 05/11/2012 | 05/11/2012 | 120,000 4,200,000 | N/A N/A |
| | | | Total Shares: | 4,200,000 | |
| 000000000-8164 | GORDANA CVETICANIN FRUSKOGORSKA 29 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 3,850,000.00 0.815% | |
| 59 BOOK24 | | 08/24/2011 05/11/2012 | 05/11/2012 | 110,000 3,850,000 | N/A N/A |
| | | | Total Shares: | 3,850,000 | |
| 522212323-2 | MATTHEW DIEHL 220 SUMMIT BLVD SUITE #402 BROOMFIELD, CO 80021 | | | 350,000,000.00 74.074% | |
| 35 BOOK36 | | 06/24/2011 05/11/2012 | 05/11/2012 | 10,000,000 350,000,000 | N/A N/A Restricted Rule 144 |
| | | | Total Shares: | 350,000,000 | |

SWVI TA# 104, p. 15
SWVI Scans 320

8/31/2012 12:42 PM

A0053



| | | | | | |
|---|---|---|---|---|---|
| 000000000-8168 | SRDJAN FRANCUSKI STEVANA MUSICA 14/20 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 3,850,000.00 0.815% | |
| 63 BOOK28 | | 08/17/2011 05/11/2012 | 05/11/2012 | 110,000 3,850,000 | N/A N/A |
| | | | Total Shares: | 3,850,000 | |
| 000000000-8174 | VLATKA GNJATOVIC PRIMORSKA 25 11000 BELGRADE BELGRADE, SURINAME 00000 | | | 3,150,000.00 0.667% | |
| 69 BOOK34 | | 08/26/2011 05/11/2012 | 05/11/2012 | 90,000 3,150,000 | N/A N/A |
| | | | Total Shares: | 3,150,000 | |
| 000000000-8153 | NEMANJA GOVEDAROVIC DR. DORDA JOANOVICA 3 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 2,800,000.00 0.593% | |
| 48 BOOK13 | | 08/17/2011 05/11/2012 | 05/11/2012 | 80,000 2,800,000 | N/A N/A |
| | | | Total Shares: | 2,800,000 | |
| 000000000-8165 | OLJA HOMA BUL SLOBODANA JOVANOVICA G6 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 3,850,000.00 0.815% | |
| 60 BOOK25 | | 08/15/2011 05/11/2012 | 05/11/2012 | 110,000 3,850,000 | N/A N/A |
| | | | Total Shares: | 3,850,000 | |
| 000000000-8170 | MILENA KOJADINOVIC PASTEROVA 8 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 3,850,000.00 0.815% | |
| 65 BOOK30 | | 09/01/2011 05/11/2012 | 05/11/2012 | 110,000 3,850,000 | N/A N/A |
| | | | Total Shares: | 3,850,000 | |

SWVI TA# 104, p. 16
SWVI Scans 321

8/31/2012 12:42 PM

A0054

| | | | | | |
|---|---|---|---|---|---|
| 000000000-8176 | | IVANA KORAC MISE DIMITRIJEVICA 2 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | 4,200,000.00 0.889% | |
| | 70 BOOK35 | 08/26/2011 05/11/2012 | 05/11/2012 | 120,000 4,200,000 | N/A N/A |
| | | | Total Shares: | 4,200,000 | |
| 000000000-8171 | | BRANKA KORICA IVA ANDRICA 17 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | 4,200,000.00 0.889% | |
| | 66 BOOK31 | 08/17/2011 05/11/2012 | 05/11/2012 | 120,000 4,200,000 | N/A N/A |
| | | | Total Shares: | 4,200,000 | |
| 000000000-8160 | | IVANA KRGOVIC BUL DESPOTA STEFANA 6 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | 3,150,000.00 0.667% | |
| | 55 BOOK20 | 08/15/2011 05/11/2012 | 05/11/2012 | 90,000 3,150,000 | N/A N/A |
| | | | Total Shares: | 3,150,000 | |
| 000000000-8167 | | DJURDJA LINJACKI KRALJA PETRA 194 23300 VOJVODINA KIKINDA, SURINAME 00000 | | 3,850,000.00 0.815% | |
| | 62 72 BOOK27 | 08/24/2011 08/24/2011 05/11/2012 | 08/24/2011 05/11/2012 | 110,000 110,000 3,850,000 | N/A N/A N/A |
| | | | Total Shares: | 3,850,000 | |
| 000000000-8152 | | DUSAN MALESEV ROMENACKI POT 55A 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | 2,800,000.00 0.593% | |
| | 47 BOOK12 | 08/17/2011 05/11/2012 | 05/11/2012 | 80,000 2,800,000 | N/A N/A |
| | | | Total Shares: | 2,800,000 | |

**SWVI TA# 104, p. 17**
**SWVI Scans 322**
8/31/2012 12:42 PM

A0055

http://192.168.14.226/cuprod/Menu16/SHLListing.csp?SII=870787108...



| | | | | | | |
|---|---|---|---|---|---|---|
| 000000000-8155 | VOJISLAV MALESEV BALZAKOVA 10 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 4,200,000.00 0.889% | | |
| | 50 BOOK15 | 08/17/2011 05/11/2012 | 05/11/2012 | 120,000 4,200,000 | N/A N/A | |
| | | | Total Shares: | 4,200,000 | | |
| 000000000-8161 | SONJA MARIC .BELE NJIVE 31 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 3,150,000.00 0.667% | | |
| | 56 BOOK21 | 08/15/2011 05/11/2012 | 05/11/2012 | 90,000 3,150,000 | N/A N/A | |
| | | | Total Shares: | 3,150,000 | | |
| 000000000-8143 | HILDA DALILA MARTINEZ GALVAN C EINSTEIN MZA 3 224 PACHUCA DE SOTO, HGO. COL PARQUE DE POBLAMIENTO, MEXICO 42032 | | | 3,500,000.00 0.741% | | |
| | 39 BOOK4 | 07/15/2011 05/11/2012 | 05/11/2012 | 100,000 3,500,000 | N/A N/A | |
| | | | Total Shares: | 3,500,000 | | |
| 000000000-8150 | ADRIANA MORALES DIAZ C PUERTO PROGRESO 1748 GUADALAJARA, JAL. COL CIRC BELISARIO, MEXICO 44330 | | | 3,500,000.00 0.741% | | |
| | 45 BOOK10 | 07/14/2011 05/11/2012 | 05/11/2012 | 100,000 3,500,000 | N/A N/A | |
| | | | Total Shares: | 3,500,000 | | |
| 000000000-8172 | MILICA NESTOROVIC SKERLICEVA 4 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 4,200,000.00 0.889% | | |
| | 67 BOOK32 | 08/15/2011 05/11/2012 | 05/11/2012 | 120,000 4,200,000 | N/A N/A | |
| | | | Total Shares: | 4,200,000 | | |

**SWVI TA# 104, p. 18**
**SWVI Scans 323**
8/31/2012 12:42 PM

A0056



| | | | | | | |
|---|---|---|---|---|---|---|
| 000000000-8149 | ELENA GUERRA PARDILLO C XOCHICALCO 135 5 BENITO JUAREZ, D.F. COL NARVARTE, MEXICO 03020 | | | 3,500,000.00 0.741% | | |
| | 44 BOOK9 | | 09/20/2011 05/11/2012 | 05/11/2012 | 100,000 3,500,000 | N/A N/A |
| | | | | Total Shares: | 3,500,000 | |
| 000000000-8166 | SMILJANA PAVLOVIC BOSKA BUHE 2 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 3,850,000.00 0.815% | | |
| | 61 71 BOOK26 | | 08/24/2011 08/24/2011 05/11/2012 | 08/24/2011 05/11/2012 | 110,000 110,000 3,850,000 | N/A N/A N/A |
| | | | | Total Shares: | 3,850,000 | |
| 000000000-8159 | INES RADOVIC STEVANA MUSICA 14/20 21000 VOJVODINA NOVI SAD, SURINAME 00000 | | | 3,150,000.00 0.667% | | |
| | 54 BOOK19 | | 08/24/2011 05/11/2012 | 05/11/2012 | 90,000 3,150,000 | N/A N/A |
| | | | | Total Shares: | 3,150,000 | |
| 000000000-8141 | TOMAS SALGADO DAMIAN CALZ DE LA CHARRERIA 68 DEP 101 ALVARO OBREGON, D.F. COL COLINAS DEL SUR, MEXICO 01430 | | | 3,500,000.00 0.741% | | |
| | 37 BOOK2 | | 07/13/2011 05/11/2012 | 05/11/2012 | 100,000 3,500,000 | N/A N/A |
| | | | | Total Shares: | 3,500,000 | |
| 000000000-8146 | GRISELDA SANTILLAN CORIA C EMILIANO ZAPATA 134 MARAVATIO, MICH. COL SAN MIQUEL CURAHUANGO, MEXICO 61250 | | | 3,500,000.00 0.741% | | |

SWVI TA# 104, p. 19
SWVI Scans 324

8/31/2012 12:42 PM

A0057



| | 41 | 08/17/2011 | 05/11/2012 | 100,000 | N/A |
| | BOOK6 | 05/11/2012 | | 3,500,000 | N/A |
| | | | Total Shares: | 3,500,000 | |

| 000000000-8156 | SOFIJA STANIC | | | 3,150,000.00 | |
| | SEKSPIROVA 5 | | | 0.667% | |
| | 21000 | | | | |
| | VOJVODINA | | | | |
| | NOVI SAD, | | | | |
| | SURINAME 00000 | | | | |

| | 51 | 08/12/2011 | 05/11/2012 | 90,000 | N/A |
| | BOOK16 | 05/11/2012 | | 3,150,000 | N/A |
| | | | Total Shares: | 3,150,000 | |

| 000000000-8163 | TATJANA | | | 3,150,000.00 | |
| | STEFANOVIC | | | 0.667% | |
| | MILETE JAKSICA | | | | |
| | 2A | | | | |
| | 21000 | | | | |
| | VOJVODINA | | | | |
| | NOVI SAD, | | | | |
| | SURINAME 00000 | | | | |

| | 58 | 08/15/2011 | 05/11/2012 | 90,000 | N/A |
| | BOOK23 | 05/11/2012 | | 3,150,000 | N/A |
| | | | Total Shares: | 3,150,000 | |

| 000000000-8151 | VELJKO VAVRIN | | | 2,800,000.00 | |
| | KARADORDEVA | | | 0.593% | |
| | 72 | | | | |
| | 21000 | | | | |
| | VOJVODINA | | | | |
| | NOVI SAD, | | | | |
| | SURINAME 00000 | | | | |

| | 46 | 08/17/2011 | 05/11/2012 | 80,000 | N/A |
| | BOOK11 | 05/11/2012 | | 2,800,000 | N/A |
| | | | Total Shares: | 2,800,000 | |

| 000000000-8154 | ALEKSANDAR | | | 2,800,000.00 | |
| | VUJAKOVIC | | | 0.593% | |
| | PASTEROVA 10 | | | | |
| | 21000 | | | | |
| | VOJVODINA | | | | |
| | NOVI SAD, | | | | |
| | SURINAME 00000 | | | | |

| | 49 | 08/17/2011 | 05/11/2012 | 80,000 | N/A |
| | BOOK14 | 05/11/2012 | | 2,800,000 | N/A |
| | | | Total Shares: | 2,800,000 | |

36 Total Holders    Grand Total --> 472,500,000



INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

CUSIP NO. 870787308

**NUMBER** 889

# SWINGPLANE VENTURES, INC.

**SHARES** **100,000**

THIS CERTIFIES THAT   HILDA DALILA MARTINEZ GALVAN

IS THE RECORD HOLDER OF   ONE HUNDRED THOUSAND

FULLY PAID AND NON ASSESSABLE SHARES OF $0.001 PAR VALUE STOCK OF

SWINGPLANE VENTURES, INC., transferable on the books of the Corporation by the holder hereof, in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid unless countersigned by an authorized representative of the Transfer Agent.

IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized Officers, certified with the seal of the Corporation.

Dated:  07/15/2011

MATT DIEHL, CEO

SWINGPLANE VENTURES, INC.
CORPORATE
Seal
NEVADA
★ ★ ★ ★ ★

SWVI Scans 346

**SWVI TA# 104, p. 41**

A0059

NOTICE:   Signature must be guaranteed by a firm which is a member of a registered national stock exchange, or by a bank (other than a savings bank), or a trust company. The following abbreviations, when used in the inscription on the face of this certificate, shall be constructed as though they were written out in full according to applicable laws or regulations.

| TEN COM — as tenants in common | UNIF GIFT MIN ACT — Custodian |
|---|---|
| TEN ENT — as tenants by the entireties | (Cust)          (Minor) |
| JT TEN— as joint tenants with right of | under Uniform Gifts to Minors |
| survivorship and not as tenants in common | Act............................. |
| | (State) |

Additional abbreviations may also be used though not in the above list.

**For Value Received,** _____ hereby sell, assign and transfer unto

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OR ASSIGNEE)

_____

_____

_____ Shares
of the capital stock represented by the written certificate, and do hereby irrevocably constitute and appoint

_____ Attorney
to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.

Dated:_____

_____
Signature

_____
Signature (If more than one owner)

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS
WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR
WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

**AFFIX MEDALLION SIGNATURE GUARANTEE**

**SWVI TA# 104, p. 42**

SWVI Scans 347

A0060



INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

CUSIP NO. 870787108

NUMBER
38

SHARES
100,000

# SWINGPLANE VENTURES, INC.

THIS CERTIFIES THAT    MARIA ISABEL GONZALEZ ANGELES

IS THE RECORD HOLDER OF    ONE HUNDRED THOUSAND

FULLY PAID AND NON ASSESSABLE SHARES OF $0.001 PAR VALUE STOCK OF

SWINGPLANE VENTURES, INC. transferable on the books of the Corporation by the holder hereof, in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid unless countersigned by an authorized representative of the Transfer Agent.

IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized Officers, certified with the seal of the Corporation.

Dated:  07/15/2011

MATT DIEHL, CEO

SWINGPLANE VENTURES, INC.
CORPORATE
Seal
NEVADA

SWVI Scans 348

**SWVI TA# 104, p. 43**

A0061

NOTICE:   Signature must be guaranteed by a firm which is a member of a registered national stock exchange, or by a bank (other than a savings bank), or a trust company. The following abbreviations, when used in the inscription on the face of this certificate, shall be constructed as though they were written out in full according to applicable laws or regulations.

**TEN COM** — as tenants in common
**TEN ENT** — as tenants by the entireties
**JT TEN**— as joint tenants with right of survivorship and not as tenants in common

**UNIF GIFT MIN ACT** — Custodian
(Cust)                    (Minor)
under Uniform Gifts to Minors
Act................................
(State)

Additional abbreviations may also be used though not in the above list.

**For Value Received,** _____ **hereby sell, assign and transfer unto**

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OR ASSIGNEE)

_____

_____

_____ Shares
of the capital stock represented by the written certificate, and do hereby irrevocably constitute and appoint

_____ Attorney
to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.

Dated:_____

_____
Signature

_____
Signature (If more than one owner)

NOTICE:   THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

**AFFIX MEDALLION SIGNATURE GUARANTEE**

**SWVI TA# 104, p. 44**
SWVI Scans 349

A0062