

INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

CUSIP NO. — 870787108

**NUMBER**
56

**SHARES**
90,000

# SWINGPLANE VENTURES, INC.

THIS CERTIFIES THAT   SONJA MARIC

IS THE RECORD HOLDER OF   NINETY THOUSAND

FULLY PAID AND NON-ASSESSABLE SHARES OF $0.001 PAR VALUE STOCK OF

SWINGPLANE VENTURES, INC. transferable on the books of the Corporation by the holder hereof, in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid unless countersigned by an authorized representative of the Transfer Agent.

IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized Officers, certified with the seal of the Corporation.

Dated:   08/15/2011

MATT DIEHL, CEO

SWINGPLANE VENTURES, INC.
CORPORATE
Seal
NEVADA
★ ★ ★ ★ ★

SWVI Scans 410

**SWVI TA# 104, p. 105**

A0123

NOTICE:    Signature must be guaranteed by a firm which is a member of a registered national stock exchange, or by a bank (other than a savings bank), or a trust company. The following abbreviations, when used in the inscription on the face of this certificate, shall be constructed as though they were written put in full according to applicable laws or regulations.

| | |
|---|---|
| **TEN COM** — as tenants in common<br>**TEN ENT** — as tenants by the entireties<br>**JT TEN**— as joint tenants with right of<br>survivorship and not as tenants in common | **UNIF GIFT MIN ACT** — Custodian<br>(Cust)                    (Minor)<br>under Uniform Gifts to Minors<br>Act................................<br>(State) |

Additional abbreviations may also be used though not in the above list.

**For Value Received,** _____ **hereby sell, assign and transfer unto**

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____

_____

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OR ASSIGNEE)

_____

_____

_____ **Shares**

of   the   capital   stock   represented   by   the   written   certificate,   and   do   hereby   irrevocably constitute and appoint

_____ **Attorney**

to   transfer   the   said   stock   on   the   books   of   the   within   named   Corporation   with   full   power of substitution in the premises.

Dated:_____

_____

Signature

_____

Signature (If more than one owner)

NOTICE:   THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS
WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR
WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

### AFFIX MEDALLION SIGNATURE GUARANTEE

**SWVI TA# 104, p. 106**
SWVI Scans 411

A0124



INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

CUSIP NO. 870787108

# SWINGPLANE VENTURES, INC.

**NUMBER** 600

**SHARES** **110,000**

THIS CERTIFIES THAT   OLJA HOMA

IS THE RECORD HOLDER OF   ONE HUNDRED TEN THOUSAND

FULLY PAID AND NON-ASSESSABLE SHARES OF $0.001 PAR VALUE STOCK OF

SWINGPLANE VENTURES, INC. transferable on the books of the Corporation by the holder hereof, in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid unless countersigned by an authorized representative of the Transfer Agent.

IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized Officers, certified with the seal of the Corporation.

Dated:  08/15/2011

MATT DIEHL, CEO

SWINGPLANE VENTURES, INC.
CORPORATE
**Seal**
NEVADA
★ ★ ★ ★ ★

SWVI Scans 412

**SWVI TA# 104, p. 107**

A0125

**NOTICE:** Signature must be guaranteed by a firm which is a member of a registered national stock exchange, or by a bank (other than a savings bank), or a trust company. The following abbreviations, when used in the inscription on the face of this certificate, shall be constructed as though they were written out in full according to applicable laws or regulations.

TEN COM — as tenants in common
TEN ENT — as tenants by the entireties
JT TEN— as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — Custodian
(Cust)          (Minor)
under Uniform Gifts to Minors
Act................................
(State)

Additional abbreviations may also be used though not in the above list.

**For Value Received,** _____ **hereby sell, assign and transfer unto**

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OR ASSIGNEE)

_____

_____

_____ Shares

of  the  capital  stock  represented  by  the  written  certificate,  and  do  hereby  irrevocably constitute and appoint

_____ Attorney

to  transfer  the  said  stock  on  the  books  of  the  within  named  Corporation  with  full  power of substitution in the premises.

Dated: _____

_____
Signature

_____
Signature (If more than one owner)

**NOTICE:** THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

**AFFIX MEDALLION SIGNATURE GUARANTEE**

**SWVI TA# 104, p. 108**
**SWVI Scans 413**



INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

CUSIP NO. 870787108

**NUMBER**
59

# SWINGPLANE VENTURES, INC.

**SHARES**
10,000

THIS CERTIFIES THAT   GORDANA CVETICANIN

IS THE RECORD HOLDER OF   ONE HUNDRED TEN THOUSAND

FULLY PAID AND NON ASSESSABLE SHARES OF $0.001 PAR VALUE STOCK OF

SWINGPLANE VENTURES, INC., transferable on the books of the Corporation by the holder hereof, in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid unless countersigned by an authorized representative of the Transfer Agent.

IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized Officers, certified with the seal of the Corporation.

Dated:   08/24/2011

MATT DIEHL, CEO

SWINGPLANE VENTURES, INC.
CORPORATE
**Seal**
NEVADA

SWVI Scans 414

SWVI TA# 104, p. 109

A0127

NOTICE:   Signature must be guaranteed by a firm which is a member of a registered national stock exchange, or by a bank (other than a savings bank), or a trust company. The following abbreviations, when used in the inscription on the face of this certificate, shall be constructed as though they were written out in full according to applicable laws or regulations.

**TEN COM** — as tenants in common
**TEN ENT** — as tenants by the entireties
**JT TEN**— as joint tenants with right of
survivorship and not as tenants in common

**UNIF GIFT MIN ACT** — Custodian
(Cust)                    (Minor)
under Uniform Gifts to Minors
Act.................................
(State)

Additional abbreviations may also be used though not in the above list.

**For Value Received,** _____ **hereby sell, assign and transfer unto**

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OR ASSIGNEE)

_____

_____

_____ Shares
of the capital stock represented by the written certificate, and do hereby irrevocably constitute and appoint

_____ Attorney
to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.

Dated:_____

_____
Signature

_____
Signature (If more than one owner)

NOTICE:   THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS
WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR
WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

**AFFIX MEDALLION SIGNATURE GUARANTEE**

**SWVI TA# 104, p. 110**
**SWVI Scans 415**

A0128

SECURITIES COMMISSION
Ref: 6/0-40-164/19-14
Belgrade, 9 May, 2014

# M I N U T E S

**considering the provision of information as requested by the Securities and Exchange Commission of the USA, and pertaining to the investigation of Swingplane Ventures Inc. a USA company**

Made on 9 May 2014, on the business premises of the Commodity Exchange, Novi Sad, Bulevar oslobodenja 5, considering the provision of information following the request of the US Securities and Exchange Commission, and pertaining to the investigation of activities of Swingplane Ventures Inc. a US company.

The proceeding started at 01.30 PM.

P r e s e n t:

- On behalf of the Securities Commission – the authorized person of the Commission, leading the proceedings, Goran Kprešanin – supervision officer;
- Client: Veljko Vavrin;

The supervision officer of the Securities Commission leading the proceeding gives the background of the proceeding and states the following:

-- The Securities Commission of the Republic of Serbia (hereinafter referred to as: the Commission) has received a memo from the US Securities and Exchange Commission (hereinafter: US SEC) requesting information and assistance under the Multilateral Memorandum of Understanding (MMOU), of which the Commission as an ordinary member of the International Organization of Securities Commissions is a signatory. The request states that the US SEC seeks assistance from the Commission in a confidential matter and in compliance with the IOSCO MMOU. The US SEC requests information and assistance from the Commission in investigation of Swingplane Ventures Inc. a US company, which may have engaged in unregistered distribution of its securities, fraudulent misrepresentations and market manipulation. The US SEC request also contains questions for each of the persons listed in the request.

In line with its powers set forth in Article 262, paragraph 1, item 14 of the Law on the Capital Market, the Commission is authorized to cooperate with international organizations, foreign regulators and other local and foreign authorities and organizations in order to provide legal assistance, exchange information and in other cases as needed. Article 280, paragraph 1 of the Law on the Capital Market provides

that the Securities Commission as a signatory to the IOSCO MMOU is authorized to exchange information about, inter alia, transactions, account holders, buy and sell prices, transaction times, prices and the legal person, credit institution or investment firm which conducted the transaction, as well as the statements of the persons punishable criminally and financially, pertaining to the matter of cooperation. Paragraph 2 of this Article provides that information is exchanged and services provided subject to an appropriate showing by the requesting authority of why the requesting authority requires the information or assistance, and to appropriate assurances of confidentiality, while paragraph 3 provides that the Republic of Serbia government authorities, and all the other persons in possession of the information required must file them with the Commission, in accordance with the provisions of the Law on the Capital Market.

**Prior to the commencement of the supervision proceeding the client was warned of the consequences of giving a false statement, under Article 172, paragraph 3 of the Law on General Administrative Proceeding, and answered the questions contained in the US SEC request as follows:**

Under full criminal and financial liability I am hereby stating that I bought shares of Swingplane Ventures Inc. (hereinafter: Swingplane) on 12 August 2011.

Veljko Vavrin answered the question of the supervision officer how did he learn of the Swingplane and whether anyone induced him to buy the shares and how (via telephone or in person etc.) by stating that he received all the information considering the shares of Swingplane from Fedor Ferenc. He stated that he knew Fedor Ferenc as they exercised together and they had known each other even before that.

To the question why he invested in Swingplane, why he believed this investment was worth the money, Veljko Vavrin stated that in this period he had some free assets to invest and that he got the information from Fedor Ferenc that Swingplane shares might be attractive and profitable. He added that Fedor Ferenc did not force him to buy the shares, and was not given a promise about the future sure profits.

Question: Considering the method used for purchasing the shares, please explain the steps you have taken in order to purchase the shares, have you filled out a document and signed it, if yes, what kind of a document and who gave it to you, where did you send it and did you keep a copy? Veljko Vavrin answered that Fedor Ferenc gave him a contract to sign, and that he made a bank payment. He also received the account number from Fedor Ferenc and photocopied his identification card and gave all the documents to Fedor Ferenc.

Asked by the supervision officer whether he had noticed different behavior of Fedor Ferenc, and in the period following the purchase of shares any changes in his wealth, Veljko Vavrin stated that he did not notice any changes in behavior and considering a change in wealth he claimed that he did notice that Fedor Ferenc changed his car, instead of a Volkswagen Polo he then drove a BMW.



Asked how he paid the purchase of Swingplane securities and where the money went, Veljko Vavrin answered that the purchase was made by a payment to the Procredit Bank account.

Asked by the supervision officer whether anyone gave him the money or an advance to purchase the shares and who, and whether anything was asked as a favor in return, Veljko Vavrin stated that he did not get any money and that the purchase was financed by his own funds.

Asked whether he had received a confirmation for the purchase of securities, whether it was sent to him or to anyone else Veljko Vavrin stated that after the payment he did not receive any documents.

Asked if he had sold his Swingplane shares, Veljko Vavrin stated that he did not.

To the question of the supervision officer the client responded that he did not have any suggestions, comments or remarks and that he confirmed the statement given here.

The Commission supervision officer concluded the proceeding and pronounced it completed.

The minutes were read and the client had no objections thereto.

Completed at 02.00 PM.


Supervision Officer                                   Client

Goran Kprešanin                                      Veljko Vavrin



SECURITIES COMMISSION
Ref: 6/0-40-164/14-14
Belgrade, 9 May 2014

# M I N U T E S

### considering the provision of information as requested by the Securities and Exchange Commission of the USA, and pertaining to the investigation of Swingplane Ventures Inc. a USA company

Made on 9 May 2014, on the business premises of the Commodity Exchange, Novi Sad, Bulevar oslobođenja 5, considering the provision of information following the request of the US Securities and Exchange Commission, and pertaining to the investigation of activities of Swingplane Ventures Inc. a US company.

The proceeding started at 10.00 AM.

P r e s e n t:

- On behalf of the Securities Commission – the authorized person of the Commission, leading the proceedings, Goran Kuprešanin – supervision officer;
- Client: Vojislav Malešev

The supervision officer of the Securities Commission leading the proceeding gives the background of the proceeding and states the following:

– The Securities Commission of the Republic of Serbia (hereinafter referred to as: the Commission) has received a memo from the US Securities and Exchange Commission (hereinafter: US SEC) requesting information and assistance under the Multilateral Memorandum of Understanding (MMOU), of which the Commission as an ordinary member of the International Organization of Securities Commissions is a signatory. The request states that the US SEC seeks assistance from the Commission in a confidential matter and in compliance with the IOSCO MMOU. The US SEC requests information and assistance from the Commission in investigation of Swingplane Ventures Inc. a US company, which may have engaged in unregistered distribution of its securities, fraudulent misrepresentations and market manipulation. The US SEC request also contains questions for each of the persons listed in the request.
– In line with its powers set out in Article 262, paragraph 1, item 14 of the Law on the Capital Market (Official Gazette RS, No 31/11), the Commission is competent to cooperate with international organizations, foreign regulators and other local and foreign authorities and organizations in order to provide legal assistance, exchange information and in other cases as needed. Article 280, paragraph 1 of the Law on the

Capital Market provides that the Securities Commission as a signatory to the IOSCO MMOU is authorized to exchange information about, inter alia, transactions, account holders, buy and sell prices, transaction times, prices and the legal person, credit institution or investment firm which conducted the transaction, as well as the statements of the persons punishable criminally and financially, pertaining to the matter of cooperation. Paragraph 2 of this Article provides that information is exchanged and services provided subject to an appropriate showing by the requesting authority of why the requesting authority requires the information or assistance, and to appropriate assurances of confidentiality, while paragraph 3 provides that the Republic of Serbia government authorities, and all the other persons in possession of the information required must file them with the Commission, in accordance with the provisions of the Law on the Capital Market.

**Prior to the commencement of the supervision proceeding the client was warned of the consequences of giving a false statement, under Article 172, paragraph 3 of the Law on General Administrative Proceeding, and answered the questions contained in the US SEC request as follows:**

Under full criminal and financial liability I am hereby stating that I bought shares of Swingplane Ventures Inc. (hereinafter: Swingplane) on 11 August 2011.
Vojislav Malešev answered the question of the supervision officer how did he learn of the Swingplane and whether anyone induced him to buy the shares and how (via telephone or in person etc.) by stating that he received the information considering the shares of Swingplane from Fedor Ferenc, a friend of his.
To the question why he invested in Swingplane, why he believed this investment was worth risking the money, Vojislav Malešev stated that he got the information from his friend Fedor Ferenc that the price of Swingplane shares was very favorable, that for a small amount of money a lot of shares can be obtained and that the shares would inevitably go up, securing the profit.
Considering the way in which the shares were bought, the client was asked to explain the steps taken to buy the shares. Vojislav Malešev answered the question whether he filled out and signed a document, if yes, what kind of a document and who had given the document to him and where it was sent and whether he kept a copy, by stating that Fedor Ferenc gave a contract to him and that he signed it and together with a photocopy of the identity card presented them to Fedor Ferenc and kept one copy for himself.
Asked how he paid the purchase of Swingplane securities and where the money was sent, Vojislav Malešev answered that the purchase was made by a payment to the Intesa Bank account, to the account of a lawyer a certain Clifford Hunt.
Further on, asked by the supervision officer whether anyone gave him the money or an advance to purchase the shares and who, and whether anything was asked as a favor in return, Vojislav Malešev stated that he did not get any money and that the purchase was financed by his own funds.

A0133

Asked whether he had received a confirmation for the purchase of securities, whether it was sent to him or to anyone else, Vojislav Malešev stated that he did not receive any documents.

Asked if he had sold his Swingplane shares, Vojislav Malešev stated that he did not, as he did not receive them. He added that after the payment was made to the bank account he had spoken on several occasions with Fedor Ferenc about not receiving any documents confirming the purchase of Swingplane shares and Fedor Ferenc gave him the information that he was not able to get in contact with the lawyer and that in his opinion that was some kind of a fraud in question.

To the question of the supervision officer the client responded that he did not have any suggestions, comments or remarks and that he confirmed the statement given here.

The Commission supervision officer concluded the proceeding and pronounced it completed.

The minutes were read and the client had no objections thereto.


Completed at 10.30 AM.



Supervision Officer                          Client

Goran Kuprešanin                        Vojislav Malešev



SECURITIES COMMISSION
Ref: 6/0-40-164/20-14
Belgrade, 09 May 2014

## M I N U T E S
### considering the provision of information as requested by the Securities and Exchange Commission of the USA, and pertaining to the investigation of Swingplane Ventures Inc. a USA company

Made on 9 May 2014, on the business premises of the Commodity Exchange, Bulevar oslobodenja 5. Novi Sad, considering the provision of information following the request of the US Securities and Exchange Commission, and pertaining to the investigation of activities of Swingplane Ventures Inc. a US company.

The proceeding started at 02.00 PM.

P r e s e n t:

- On behalf of the Securities Commission – the authorized person of the Commission, leading the proceedings, Goran Kuprešanin – supervision officer;
- Client: Sofija Stanić;

The supervision officer of the Securities Commission leading the proceeding gives the background of the proceeding and states the following:
The Securities Commission of the Republic of Serbia (hereinafter referred to as: the Commission) has received a memo from the US Securities and Exchange Commission (hereinafter: US SEC) requesting information and assistance under the Multilateral Memorandum of Understanding (MMOU), of which the Commission as an ordinary member of the International Organization of Securities Commissions is a signatory. The request states that the US SEC seeks assistance from the Commission in a confidential matter and in compliance with the IOSCO MMOU. The US SEC requests information and assistance from the Commission in investigation of Swingplane Ventures Inc. a US company, which may have engaged in unregistered distribution of its securities, fraudulent misrepresentations and market manipulation. The US SEC request also contains questions for each of the persons listed in the request.
In line with its powers set out in Article 262, paragraph 1, item 14 of the Law on the Capital Market (Official Gazette RS, No 31/11), the Commission is competent to cooperate with international organizations, foreign regulators and other local and foreign authorities and organizations in order to provide legal assistance, exchange information and in other cases as needed. Article 280, paragraph 1 of the Law on the Capital Market provides that the Securities Commission as a signatory to the IOSCO MMOU is authorized to exchange information about, inter alia, transactions. account holders, buy and sell prices, transaction times, prices and the legal person, credit institution or investment firm which conducted the transaction, as well as the statements of the persons punishable criminally and financially, pertaining to the matter of cooperation. Paragraph 2 of this Article provides that information is exchanged and services provided subject to an appropriate showing by the requesting

A0135

authority of why the requesting authority requires the information or assistance, and to appropriate assurances of confidentiality, while paragraph 3 provides that the Republic of Serbia government authorities, and all the other persons in possession of the information required must file them with the Commission, in accordance with the provisions of the Law on the Capital Market.

**Prior to the commencement of the supervision proceeding the client was warned of the consequences of giving a false statement, under Article 172, paragraph 3 of the Law on General Administrative Proceeding, and answered the questions contained in the US SEC request as follows:**

Under full criminal and financial liability I am hereby stating that I bought shares of Swingplane Ventures Inc. (hereinafter: Swingplane) in August 2011.

Sofija Stanić answered the question of the supervision officer how did she learn of the Swingplane and whether anyone induced her to buy the shares and how (via telephone or in person etc.) by stating that she received all the information considering the shares of Swingplane from her husband Vojislav Malešev.

To the question why she invested in Swingplane, and why she believed this investment was worth risking the money, Sofija Stanić said that she wanted to invest her money and that she got the information from her husband and his friend Fedor Ferenc that investing in Swingplane was lucrative and that was how she made the investment decision.

Sofija Stanić answered the question whether she filled out and signed a document, if yes, what kind of a document and who had given the document to her and where it was sent and whether she kept a copy, by stating that her husband gave a contract to her and that she signed it, made a payment in the Intesa Bank and gave all the documents to her husband who forwarded the documents to Fedor Ferenc.

Asked how she paid the purchase of Swingplane securities and where the money went, Sofija Stanić answered that the purchase was made by a payment to the bank account.

Further on, asked by the supervision officer whether anyone gave her the money or an advance to purchase the shares and who, and whether anything was asked as a favor in return, Sofija Stanić stated that the purchase was financed by her own funds.

Asked whether she had received a confirmation for the purchase of securities, whether it was sent to her or to anyone else Sofija Stanić stated that after the payment she did not receive any documents.

Asked if she had sold her Swingplane shares, Sofija Stanić stated that she did not.

To the question of the supervision officer the client responded that she did not have any suggestions, comments or remarks and that she confirmed the statement given here.

The Commission supervision officer concluded the proceeding and pronounced it completed.

The minutes were read and the client had no objections thereto.

Completed at 02.30 PM.


Supervision Officer                                          Client

Goran Kuprešanin                                           Sofija Stanić



**SECURITIES COMMISSION**
Ref: 6/0-40-164/16-14
Belgrade, 9 May 2014

## M I N U T E S

**considering the provision of information as requested by the Securities and Exchange Commission of the USA, and pertaining to the investigation of Swingplane Ventures Inc. a USA company**

Made on 9 May 2014, on the business premises of the Commodity Exchange, Bulevar oslobođenja 5, Novi Sad, considering the provision of information following the request of the US Securities and Exchange Commission, and pertaining to the investigation of activities of Swingplane Ventures Inc. a US company. The proceeding started at 11.00 AM.

P r e s e n t:
- On behalf of the Securities Commission – the authorized person of the Commission, leading the proceedings, Goran Kurešanin – supervision officer;
- Client:  Ivana Krgović;

The supervision officer of the Securities Commission leading the proceeding gives the background of the proceeding and states the following:

The Securities Commission of the Republic of Serbia (hereinafter referred to as: the Commission) has received a memo from the US Securities and Exchange Commission (hereinafter: US SEC) requesting information and assistance under the Multilateral Memorandum of Understanding (MMOU), of which the Commission as an ordinary member of the International Organization of Securities Commissions is a signatory. The request states that the US SEC seeks assistance from the Commission in a confidential matter and in compliance with the IOSCO MMOU. The US SEC requests information and assistance from the Commission in investigation of Swingplane Ventures Inc. a US company, which may have engaged in unregistered distribution of its securities, fraudulent misrepresentations and market manipulation. The US SEC request also contains questions for each of the persons listed in the request.

In line with its powers set out in Article 262, paragraph 1, item 14 of the Law on the Capital Market (Official Gazette RS, No 31/11), the Commission is competent to cooperate with international organizations, foreign regulators and other local and foreign authorities and organizations in order to provide legal assistance, exchange information and in other cases as needed.  Article 280, paragraph 1 of the Law on the Capital Market provides that the Securities Commission as a signatory to the IOSCO MMOU is authorized to exchange information about, inter alia, transactions, account holders, buy and sell prices, transaction times, prices and the legal person, credit institution or investment firm which conducted the transaction, as well as the statements of the persons punishable criminally and financially. pertaining to the matter of cooperation. Paragraph 2 of this Article provides that information is exchanged and services provided subject to an appropriate showing by the requesting authority of why the requesting authority requires the information or assistance, and

to appropriate assurances of confidentiality, while paragraph 3 provides that the Republic of Serbia government authorities, and all the other persons in possession of the information required must file them with the Commission, in accordance with the provisions of the Law on the Capital Market.

**Prior to the commencement of the supervision proceeding the client was warned of the consequences of giving a false statement, under Article 172, paragraph 3 of the Law on General Administrative Proceeding, and answered the questions contained in the US SEC request as follows:**

Under full criminal and financial liability I am hereby stating that I bought shares of Swingplane Ventures Inc. (hereinafter: Swingplane) in August 2011.

Ivana Krgović answered the question of the supervision officer how did she learn of the Swingplane and whether anyone induced her to buy the shares and how (via telephone or in person etc.) by stating that she received all the information considering the shares of Swingplane from Fedor Ferenc.

To the question why she invested in Swingplane, why she believed this investment was worth risking the money, Ivana Krgović stated that she got the information from Fedor Ferenc that the price of Swingplane shares was very cheap, that their value could double and that was why she invested in the shares.

Considering the method used for purchasing the shares, please explain the steps you have taken in order to purchase the shares, have you filled out a document and signed it, if yes, what kind of a document and who gave it to you, where did you send it and did you keep a copy? Ivana Krgović said that Fedor Ferenc gave her a contract to sign, that was downloaded from the internet, she was also given a bank account number to make a payment, that for the purpose a special foreign currency account was opened in Intesa Bank, and that Fedor Ferenc informed her that she will get a confirmation of the purchase in a month.

Asked whether she had received a confirmation for the purchase of securities, whether it was sent to her or to anyone else and about the method in which it was received, Ivana Krgović stated that after the payment she did not receive any confirmation of the purchase.

Asked if she had sold her Swingplane shares, Ivana Krgović stated that she did not.

To the question of the supervision officer the client responded that she did not have any suggestions, comments or remarks and that she confirmed the statement given here.

The Commission supervision officer concluded the proceeding and pronounced it completed.

The minutes were read and the client had no objections thereto.

Completed at 11.30 AM.


Supervision Officer                         Client

**Goran Krešanin**                          **Vojislav Malešev**

**SECURITIES COMMISSION**
Ref: 6/0-40-164/17-14
Belgrade, 9 May 2014

## M I N U T E S
considering the provision of information as requested by the Securities and
Exchange Commission of the USA, and pertaining to the investigation of
Swingplane Ventures Inc. a USA company

Made on 9 May 2014, on the business premises of the Commodity Exchange, Bulevar oslobođenja 5, Novi Sad, considering the provision of information following the request of the US Securities and Exchange Commission, and pertaining to the investigation of activities of Swingplane Ventures Inc. a US company.

The proceeding started at 11.30 AM.

P r e s e n t:
- On behalf of the Securities Commission – the authorized person of the Commission, leading the proceedings, Goran Kuprešanin – supervision officer;
- Client:  Sonja Marić;

The supervision officer of the Securities Commission leading the proceeding gives the background of the proceeding and states the following:
The Securities Commission of the Republic of Serbia (hereinafter referred to as: the Commission) has received a memo from the US Securities and Exchange Commission (hereinafter: US SEC) requesting information and assistance under the Multilateral Memorandum of Understanding (MMOU), of which the Commission as an ordinary member of the International Organization of Securities Commissions is a signatory. The request states that the US SEC seeks assistance from the Commission in a confidential matter and in compliance with the IOSCO MMOU. The US SEC requests information and assistance from the Commission in investigation of Swingplane Ventures Inc. a US company, which may have engaged in unregistered distribution of its securities, fraudulent misrepresentations and market manipulation. The US SEC request also contains questions for each of the persons listed in the request.
In line with its powers set out in Article 262, paragraph 1, item 14 of the Law on the Capital Market (Official Gazette RS, No 31/11), the Commission is competent to cooperate with international organizations, foreign regulators and other local and foreign authorities and organizations in order to provide legal assistance, exchange information and in other cases as needed.  Article 280, paragraph 1 of the Law on the Capital Market provides that the Securities Commission as a signatory to the IOSCO MMOU is authorized to exchange information about, inter alia, transactions, account holders, buy and sell prices, transaction times, prices and the legal person, credit institution or investment firm which conducted the transaction, as well as the statements of the persons punishable criminally and financially, pertaining to the matter of cooperation. Paragraph 2 of this Article provides that information is exchanged and services provided subject to an appropriate showing by the requesting



authority of why the requesting authority requires the information or assistance, and to appropriate assurances of confidentiality, while paragraph 3 provides that the Republic of Serbia government authorities, and all the other persons in possession of the information required must file them with the Commission, in accordance with the provisions of the Law on the Capital Market.

**Prior to the commencement of the supervision proceeding the client was warned of the consequences of giving a false statement, under Article 172, paragraph 3 of the Law on General Administrative Proceeding, and answered the questions contained in the US SEC request as follows:**

Under full criminal and financial liability I am hereby stating that I bought shares of Swingplane Ventures Inc. (hereinafter: Swingplane) in August 2011.

Sonja Marić answered the question of the supervision officer how did she learn of the Swingplane and whether anyone induced her to buy the shares and how (via telephone or in person etc.) by stating that she received all the information considering the shares of Swingplane from Jovana Cvetičanin, Fedor Ferenc's girlfriend.

To the question why she invested in Swingplane, and why she believed this investment was worth risking the money, Sonja Marić said that Jovana Cvetičanin informed her that this was a good company engaged in golf equipment production and that the shares could bring some profit.

Sonja Marić answered the question whether she filled out and signed a document, if yes, what kind of a document and who had given the document to her and where it was sent and whether she kept a copy, by stating that Jovana Cvetičanin gave a contract to her and a number of the payment account in Intesa Bank, and that she signed it and together with a photocopy of the identity card and the payment slip sent it using DHL, to the address of the lawyer. Jovana Cvetičanin also gave her the information about the lawyer.

Further on, asked by the supervision officer whether anyone gave her the money or an advance to purchase the shares and who, and whether anything was asked as a favor in return, Sonja Marić stated that the purchase was financed by her own funds.

Asked whether she had received a confirmation for the purchase of securities, whether it was sent to her or to anyone else, how she received it and in what way, Sonja Marić stated that after sending the required documents via DHL, she did not receive any feedback, documents or information, and that on a couple of occasion she asked Jovana Cvetičanin for an explanation about what was happening with the shares paid and why there were no confirmations of the purchase. Jovana Cvetičanin assured her that everything was all right and that she was also waiting for the documents. Later on Jovana Cvetičanin said to her that she was not able to contact he lawyer herself, and that after a while she did not hear from Jovana Cvetičanin anymore.

Asked if she had sold her Swingplane shares, Sonja Marić stated that she did not.

To the question of the supervision officer the client responded that she did not have any suggestions, comments or remarks and that she confirmed the statement given here.



The Commission supervision officer concluded the proceeding and pronounced it completed.

The minutes were read and the client had no objections thereto.

Completed at 12.00 P.M.


Supervision Officer                          Client

Goran Kuprešanin                          Sonja Marić



**SECURITIES COMMISSION**
Ref: 6/0-40-164/15-14
Belgrade, 9 May 2014

## M I N U T E S

considering the provision of information as requested by the Securities and
Exchange Commission of the USA, and pertaining to the investigation of
Swingplane Ventures Inc. a USA company

Made on 9 May 2014, on the business premises of the Commodity Exchange, Bulevar
oslobođenja 5, Novi Sad, considering the provision of information following the
request of the US Securities and Exchange Commission, and pertaining to the
investigation of activities of Swingplane Ventures Inc. a US company.

The proceeding started at 10.30 AM.

P r e s e n t:


- On behalf of the Securities Commission – the authorized person of the Commission,
leading the proceedings, Goran Kuprešanin – supervision officer;
- Client:  Dušan Malešev;

The supervision officer of the Securities Commission leading the proceeding gives the
background of the proceeding and states the following:

The Securities Commission of the Republic of Serbia (hereinafter referred to as: the
Commission) has received a memo from the US Securities and Exchange
Commission (hereinafter: US SEC) requesting information and assistance under the
Multilateral Memorandum of Understanding (MMOU), of which the Commission as
an ordinary member of the International Organization of Securities Commissions is a
signatory.  The request states that the US SEC seeks assistance from the Commission
in a confidential matter and in compliance with the IOSCO MMOU. The US SEC
requests information and assistance from the Commission in investigation of
Swingplane Ventures Inc. a US company, which may have engaged in unregistered
distribution of its securities, fraudulent misrepresentations and market manipulation.
The US SEC request also contains questions for each of the persons listed in the
request.
In line with its powers set out in Article 262, paragraph 1, item 14 of the Law on the
Capital Market (Official Gazette RS, No 31/11), the Commission is competent to
cooperate with international organizations, foreign regulators and other local and
foreign authorities and organizations in order to provide legal assistance, exchange
information and in other cases as needed. Article 280, paragraph 1 of the Law on the
Capital Market provides that the Securities Commission as a signatory to the IOSCO
MMOU is authorized to exchange information about, inter alia, transactions, account
holders, buy and sell prices, transaction times, prices and the legal person, credit
institution or investment firm which conducted the transaction, as well as the

1

A0142

statements of the persons punishable criminally and financially, pertaining to the matter of cooperation. Paragraph 2 of this Article provides that information is exchanged and services provided subject to an appropriate showing by the requesting authority of why the requesting authority requires the information or assistance, and to appropriate assurances of confidentiality, while paragraph 3 provides that the Republic of Serbia government authorities, and all the other persons in possession of the information required must file them with the Commission, in accordance with the provisions of the Law on the Capital Market.

**Prior to the commencement of the supervision proceeding the client was warned of the consequences of giving a false statement, under Article 172, paragraph 3 of the Law on General Administrative Proceeding, and answered the questions contained in the US SEC request as follows:**

Under full criminal and financial liability I am hereby stating that I bought shares of Swingplane Ventures Inc. (hereinafter: Swingplane) on 11 August 2011.

Dušan Malešev answered the question of the supervision officer how did he learn of the Swingplane and whether anyone induced him to buy the shares and how (via telephone or in person etc.) by stating that he received all the information considering the shares of Swingplane from his brother Vojislav Malešev.

To the question why he invested in Swingplane, and why he believed this investment was worth risking the money, Dušan Malešev said that at the time everyone was buying the shares and he also wanted to profit.

Considering the way in which the shares were bought, the client was asked to explain the steps taken to buy the shares. Dušan Malešev further said that he had got a contract and an account number from his brother Vojislav. He signed the contract and made a payment to the Procredit Bank account in the amount of USD 800 and submited all togethether with a photocopy of his identity card to his brother Vojislav Malešev.
Further on, asked by the supervision officer whether anyone gave him the money or an advance to purchase the shares and who, and whether anything was asked as a favor in return, Dušan Malešev stated that he did not get any money and that the purchase was financed by his own funds, at that time he had a private business and had some funds he waned to invest.
Asked whether he had received a confirmation for the purchase of securities, whether it was sent to him or to anyone else, Dušan Malešev stated that after the payment he did not receive any documents, that he did not resell the shares and that he talked to his brother Vojislav after a couple of months and that they concluded this had been a scheme. Asked by the supervision officer why they failed to report the scheme to the competent authorities, Dušan Malešev stated that his brother did not report it either and that at the time he earned well, and did not see the need to investigate further what had happened with the money.

To the question of the supervision officer the client responded that he did not have any suggestions, comments or remarks and that he confirmed the statement given here.

The Commission supervision officer concluded the proceeding and pronounced it completed.

The minutes were read and the client had no objections thereto.

Completed at 10:30 AM.

Supervision Officer                          Client
Goran Kuprešanin                            Dušan Malešev

**Michael D. Handelsman, Esq.**

| | |
|---|---|
| **From:** | Matt Diehl <mrdiehl@comcast.net> |
| **Sent:** | Tuesday, September 27, 2011 12:04 PM |
| **To:** | 'Mike Adamo' |
| **Subject:** | RE: Swingplane attorney for certs |

Luis has the certs and all is good.  Thanks Mike.

**From:** Mike Adamo [mailto:madamo@nystllc.com]
**Sent:** Monday, September 26, 2011 12:01 PM
**To:** mrdiehl@comcast.net
**Subject:** RE: Swingplane attorney for certs

Thanks, will do.  Check to make sure Luis got the certs and he is keeping them in a safe place.

Michael A. Adamo, CEO
New York Stock Transfer, LLC
25 Laurel Place
West Caldwell, NJ 07006-7717
Ph: 864-697-8552
Fax: 973-287-6665
www.nystllc.com

CONFIDENTIALITY NOTICE: This e-mail and any attached documents contain information which is PRIVILEGED, PROPRIETARY, CONFIDENTIAL and protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521, Federal and State copyright laws, and are intended only for the use of the addressee(s) named herein. If this transmission was not addressed to you, please forward it back to the original sender and delete from you records.

**From:** mrdiehl@comcast.net [mailto:mrdiehl@comcast.net]
**Sent:** Monday, September 26, 2011 1:56 PM
**To:** Mike Adamo
**Subject:** Re: Swingplane attorney for certs

Mike,

Got my cert today - thank you.  By the way, my address is #402, not #202.  Please update your records for my unit number.

Thanks,
Matt

**From:** "Mike Adamo" <madamo@nystllc.com>
**To:** lcarrillo@chlawgroup.com
**Cc:** "Matt Diehl" <mrdiehl@comcast.net>
**Sent:** Tuesday, September 20, 2011 1:43:59 PM
**Subject:** RE: Swingplane attorney for certs

Hi Luis,

1
FOIA CONFIDENTIAL TREATMENT REQUESTED                    BA000037

A0145

Long time no speak, I hope all is well.  Per the email below, be on the look-out for the for the IPO Swingplane Ventures, Inc. certificates files under their S1; SEC File #333168912.  Please note Matt's 10 million restricted shares will be sent his address of record.  The Fed Ex tracking number for the shares is 795207523026.

*please keep in safe & secure place due to the expensive replacement costs and foreign holder entity.

---

Michael A. Adamo, CEO
New York Stock Transfer, LLC
25 Laurel Place
West Caldwell, NJ 07006-7717
Ph: 864-697-8552
Fax: 973-287-6665
www.nystllc.com

CONFIDENTIALITY NOTICE: This e-mail and any attached documents contain information which is PRIVILEGED, PROPRIETARY, CONFIDENTIAL and protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521, Federal and State copyright laws, and are intended only for the use of the addressee(s) named herein. If this transmission was not addressed to you, please forward it back to the original sender and delete from you records.

**From:** Matt Diehl [mailto:mrdiehl@comcast.net]
**Sent:** Monday, September 12, 2011 1:50 PM
**To:** 'Mike Adamo'
**Subject:** Swingplane attorney for certs

Mike,

Here is the firm that you will be sending the certs to:

Luis Carrillo, Partner
email: lcarrillo@carrillohuettel.com

Alexandra is included on all correspondence:

Alexandra Falowski, Esq.
*Senior Associate Attorney*
Carrillo Huettel, LLP
3033 Fifth Avenue, Suite 400
San Diego, CA 92103
direct phone: 619-546-6159
main phone: 619-546-6100
fax: 619-546-6060

2
FOIA CONFIDENTIAL TREATMENT REQUESTED                                    BA000038

A0146

## Michael D. Handelsman, Esq.

| | |
|---|---|
| **From:** | Matt Diehl <bigdiehl@me.com> |
| **Sent:** | Friday, March 30, 2012 2:22 PM |
| **To:** | 'Mike Adamo' |
| **Subject:** | RE: Swingplane Reconfirmation Opinion for S1 Shares |

Alexandra should be sending those over today.


-----Original Message-----
From: Mike Adamo [mailto:madamo@nystllc.com]
Sent: Thursday, March 29, 2012 5:24 PM
To: 'Matt Diehl'
Subject: RE: Swingplane Reconfirmation Opinion for S1 Shares

I think so.  I just need a copy of the FINRA approval letter and copies of the subscription agreements to double check/be
sure.


Michael A. Adamo, CEO
New York Stock Transfer, LLC
25 Laurel Place
West Caldwell, NJ 07006-7717
Ph: 864-697-8552
Fax: 973-287-6665
www.nystllc.com

CONFIDENTIALITY NOTICE: This e-mail and any attached documents contain information which is PRIVILEGED,
PROPRIETARY, CONFIDENTIAL and protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-
2521, Federal and State copyright laws, and are intended only for the use of the
addressee(s) named herein. If this transmission was not addressed to you, please forward it back to the original sender
and delete from you records.


-----Original Message-----
From: Matt Diehl [mailto:bigdiehl@me.com]
Sent: Thursday, March 29, 2012 5:48 PM
To: Mike Adamo
Subject: Re: Swingplane Reconfirmation Opinion for S1 Shares

You guys got all this worked out today, yes?


On Mar 28, 2012, at 11:33 AM, Mike Adamo <madamo@nystllc.com> wrote:

> *thanks.  its better you or I have them until legal counsel advises.
> better safe than sorry.  much appreciated.  keep me posted with the
> Fed Ex tracking number.  Thanks.

1

FOIA CONFIDENTIAL TREATMENT REQUESTED

BA000055

A0147

```
>
> _____
> Michael A. Adamo, CEO
> New York Stock Transfer, LLC
> 25 Laurel Place
> West Caldwell, NJ 07006-7717
> Ph: 864-697-8552
> Fax: 973-287-6665
> www.nystllc.com
>
> CONFIDENTIALITY NOTICE: This e-mail and any attached documents contain
> information which is PRIVILEGED, PROPRIETARY, CONFIDENTIAL and
> protected by the Electronic Communications Privacy Act, 18 U.S.C.
> Sections 2510-2521, Federal and State copyright laws, and are intended
> only for the use of the
> addressee(s) named herein. If this transmission was not addressed to
> you, please forward it back to the original sender and delete from you
records.
>
>
> -----Original Message-----
> From: Matt Diehl [mailto:bigdiehl@me.com]
> Sent: Wednesday, March 28, 2012 1:29 PM
> To: Mike Adamo
> Subject: Re: Swingplane Reconfirmation Opinion for S1 Shares
>
> If the foreign investors are going to be an issue then we might need
> to go in another direction. I'll request the certs for you.
>
> Sent from my iPhone
>
> On Mar 28, 2012, at 11:24 AM, Mike Adamo <madamo@nystllc.com> wrote:
>
>> *keep me posted.  did you discuss with the attorney in SD?  can you
>> get the certs Fed Ex'd back to me?  Aaron is really just an advisor
>> to you no need to wait on him, right?  please advise.  thanks.
>>
>> _____
>> Michael A. Adamo, CEO
>> New York Stock Transfer, LLC
>> 25 Laurel Place
>> West Caldwell, NJ 07006-7717
>> Ph: 864-697-8552
>> Fax: 973-287-6665
>> www.nystllc.com
>>
>> CONFIDENTIALITY NOTICE: This e-mail and any attached documents
>> contain information which is PRIVILEGED, PROPRIETARY, CONFIDENTIAL
>> and protected by the Electronic Communications Privacy Act, 18 U.S.C.
>> Sections 2510-2521, Federal and State copyright laws, and are
>> intended only for the use of the
>> addressee(s) named herein. If this transmission was not addressed to
```

2

FOIA CONFIDENTIAL TREATMENT REQUESTED

BA000056

A0148

>> you, please forward it back to the original sender and delete from
>> you
> records.
>>
>>
>> -----Original Message-----
>> From: Matt Diehl [mailto:bigdiehl@me.com]
>> Sent: Wednesday, March 28, 2012 1:21 PM
>> To: Mike Adamo
>> Subject: Re: Swingplane Reconfirmation Opinion for S1 Shares
>>
>> No, sorry. Aaron is in Florida with his kids.
>>
>>
>> Sent from my iPhone
>>
>> On Mar 28, 2012, at 11:19 AM, Mike Adamo <madamo@nystllc.com> wrote:
>>
>>> *any updates?  thanks.
>>>
>>> _____
>>> Michael A. Adamo, CEO
>>> New York Stock Transfer, LLC
>>> 25 Laurel Place
>>> West Caldwell, NJ 07006-7717
>>> Ph: 864-697-8552
>>> Fax: 973-287-6665
>>> www.nystllc.com
>>>
>>> CONFIDENTIALITY NOTICE: This e-mail and any attached documents
>>> contain information which is PRIVILEGED, PROPRIETARY, CONFIDENTIAL
>>> and protected by the Electronic Communications Privacy Act, 18 U.S.C.
>>> Sections 2510-2521, Federal and State copyright laws, and are
>>> intended only for the use of the
>>> addressee(s) named herein. If this transmission was not addressed to
>>> you, please forward it back to the original sender and delete from
>>> you
>> records.
>>>
>>> -----Original Message-----
>>> From: Aaron Lamkin [mailto:aaron@twowinecru.com]
>>> Sent: Thursday, March 22, 2012 3:50 PM
>>> To: Mike Adamo
>>> Cc: BigDiehl
>>> Subject: Re: Swingplane
>>>
>>> Mike
>>>
>>> Can you send us the form of opinion you are looking for?
>>>
>>> Cheers!
>>>

FOIA CONFIDENTIAL TREATMENT REQUESTED                BA000057

A0149

>>> "Carpe Vino!"
>>>
>>> Thumbed from my iPhone
>>>
>>> On Mar 22, 2012, at 12:41 PM, Mike Adamo <madamo@nystllc.com> wrote:
>>>
>>>> Hi Matt,
>>>>
>>>> Thanks for following-up with Aaron.  Like I said on the phone I
>>>> would rather be safe than sorry; therefore if company counsel can
>>>> write a follow-up opinion in regards to the foreign holders being
>>>> represented on the S1 filing I guess that would suffice on our end.
>>>> Also because I believe Clifford Scott who wrote the original S1
>>>> opinion is no longer your counsel.  Moreover there are no names
>>>> attached to the actual S1 filed, unlike other company filings, etc.
>>>> Talk with counsel and
>>> let me know right away.
>>>>
>>>> _____
>>>> Michael A. Adamo, CEO
>>>> New York Stock Transfer, LLC
>>>> 25 Laurel Place
>>>> West Caldwell, NJ 07006-7717
>>>> Ph: 864-697-8552
>>>> Fax: 973-287-6665
>>>> www.nystllc.com
>>>>
>>>> CONFIDENTIALITY NOTICE: This e-mail and any attached documents
>>>> contain information which is PRIVILEGED, PROPRIETARY, CONFIDENTIAL
>>>> and protected by the Electronic Communications Privacy Act, 18 U.S.C.
>>>> Sections 2510-2521, Federal and State copyright laws, and are
>>>> intended only for the use of the
>>>> addressee(s) named herein. If this transmission was not addressed
>>>> to you, please forward it back to the original sender and delete
>>>> from you
>>> records.
>>>>
>>>>
>>>> -----Original Message-----
>>>> From: BigDiehl [mailto:bigdiehl@me.com]
>>>> Sent: Thursday, March 22, 2012 2:00 PM
>>>> To: Mike Adamo
>>>> Subject: Swingplane
>>>>
>>>> Mike,
>>>>
>>>> I talked to Aaron, who is much more familiar with this process than
>>>> I am and he didn't think that foreign investors should be a problem.
>>>> I tried to explain what you told me but he didn't think it should
>>>> be an issue. Can you maybe lay out your concerns in an email to him
>>>> (copy
>>>> me) so that we can start a dialogue about whether we're a good fit

4

FOIA CONFIDENTIAL TREATMENT REQUESTED

BA000058

A0150

>>>> or
>> not?
>>>>
>>>> In the meantime, I will contact the corporate attorney for their input.
>>>>
>>>> Thanks,
>>>> Matt
>>>>
>>>>
>>>>
>>>
>>>
>>
>>
>
>

FOIA CONFIDENTIAL TREATMENT REQUESTED                BA000059

A0151

8-K 1 spvi_8k.htm FORM 8-K

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **August 22, 2012**

# SWINGPLANE VENTURES, INC.
(Exact name of registrant as specified in its charter)

| Nevada | 000-54571 | 27-2919616 |
|---|---|---|
| (State or other jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**220 Summit Blvd. #402, Broomfield, Colorado 80021**
(Address of principal executive offices)

**303-803-0063**
(Registrant's Telephone Number)

(Former name or former address, if changed since last report)

Copy of all Communications to:

**Hunt Law Group**
Law Office of Clifford J. Hunt, P.A.
8200 Seminole Boulevard
Seminole, Florida 33772
(727) 471-0444 telephone
(727) 471-0447 facsimile
cjh@huntlawgrp.com

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐· Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐· Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐· Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐· Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## Section 5 - CORPORATE GOVERNANCE AND MANAGEMENT

### Item 5.01 Changes in Control of Registrant.

On August 22, 2012, Michael Voyer, the sole director and officer of Swingplane Ventures, Inc. (the "Company"), entered into an agreement to acquire a total 350,000,000 shares of the Company's common stock from Matthew Diehl, the Company's former director and officer, in a private transaction for an aggregate total of $35,000. The funds used for this share purchase were personal funds. Mr. Voyer's 350,000,000 shares when acquired, which acquisition is to occur before August 31, 2012, will amount to approximately 74.1% of the Company's currently issued and outstanding common stock and will effect a change in control of the Company.

### Item 5.02  Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensation Arrangements of Certain Officers.

Effective August 22, 2012, Matthew Diehl resigned from all positions with the Company, including, but not limited to that of President, Chief Executive Officer, Chief Financial Officer, Secretary, Treasurer, principal executive officer, principal financial officer, principal accounting officer and a member of the Board of Directors. The resignation did not involve any disagreement with the Company on any matter relating to the Company's operations, policies or practices.

Effective August 22, 2012 Michel Voyer was appointed as President, principal executive officer, Chief Financial Officer, Secretary, Treasurer, principal financial officer, principal accounting officer and a member of the Board of Directors of the Company.

The biography for Mr. Voyer is set forth below:

Michel Voyer graduated (B.A.A.) from Université du Québec à Montréal (U.Q.A.M.) in 1979 and is a financial planner (F.pl.), having become a member of the Institut québécois de planification financière (I.Q.P.F.) in 1998.

From October 1981 to August 1995, he worked as Director of Finance for Studio Green Scenes Inc., a manufacturer based in Montréal. He developed financial structures to expand the company across Canada. He implemented a market for import business with Guatemala, Mexico and U.S.A. and export business to U.S.A., France, Korea, and Japan.

Since September 1995, Michel Voyer has been working for Desjardins Group (the largest cooperative financial group in Canada) as a financial planner where he has developed and maintained a personalized relationship with wealthy individuals and business members. Michel Voyer has over 30 years of experience with companies involved in different sectors.

A0153

We have no arrangements or agreements with Mr. Voyer relating to compensation as an officer or director. There have been no transactions between the Company and Mr. Voyer since the Company's last fiscal year which would be required to be reported herein.

**Involvement in Certain Legal Proceedings**

During the past ten years, Mr. Voyer has not been the subject of the following events:

Acting as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, leverage transaction merchant, any other person regulated by the Commodity Futures Trading Commission, or an associated person of any of the foregoing, or as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or

1. A petition under the Federal bankruptcy laws or any state insolvency law was filed by or against, or a receiver, fiscal agent or similar officer was appointed by a court for the business or property of such person, or any partnership in which he was a general partner at or within two years before the time of such filing, or any corporation or business association of which he was an executive officer at or within two years before the time of such filing;

2. Convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses);

3. The subject of any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining him from, or otherwise limiting, the following activities;

   i) Acting as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, leverage transaction merchant, any other person regulated by the Commodity Futures Trading Commission, or an associated person of any of the foregoing, or as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or

   ii) Engaging in any type of business practice; or

   iii) Engaging in any activity in connection with the purchase or sale of any security or commodity or in connection with any violation of Federal or State securities laws or Federal commodities laws;

4. The subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any Federal or State authority barring, suspending or otherwise limiting for more than 60 days the right of such person to engage in any activity described in paragraph 3(i) in the preceding paragraph or to be associated with persons engaged in any such activity;

5. Was found by a court of competent jurisdiction in a civil action or by the Commission to have violated any Federal or State securities law, and the judgment in such civil action or finding by the Commission has not been subsequently reversed, suspended, or vacated;

3

---

A0154

6.  Was found by a court of competent jurisdiction in a civil action or by the Commodity Futures Trading Commission to have violated any Federal commodities law, and the judgment in such civil action or finding by the Commodity Futures Trading Commission has not been subsequently reversed, suspended or vacated;

7.  Was the subject of, or a party to, any Federal or State judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated, relating to an alleged violation of:

    i)    Any Federal or State securities or commodities law or regulation; or

    ii)   Any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order, or

    iii)  Any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or insurance company, or engaging in or continuing any conduct or practice in connection with such activity;

8.  Was the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act (15 U.S.C. 78c(a)(26))), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act (7 U.S.C. 1(a)(29))), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

4

**ITEM 9.01     EXHIBITS.**

**(a)  Financial statements of business acquired**

None.

**(b)  Exhibits**

| Exhibit | Document Description | |
|---------|--------------------|----|
| 99.1 | RESIGNATION OF MATTHEW DIEHL | Filed herewith |

5

A0156

## SIGNATURES

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**SWINGPLANE VENTURES, INC.**

Dated: September 6, 2012

By:    */s/ Michel Voyer*
        Michel Voyer
        Chief Executive Officer

6

A0157

# Matthew Diehl

**400 Quivas Street**
**Denver, CO 80204**

August 22, 2012

Dear Sir or Madam:

I, Matthew Diehl, hereby tender my resignation as President, Secretary, Treasurer and Director of Swingplane Ventures, Inc. effective immediately.

With regards,

Matthew Diehl

A0158

# SWING - Swingplane Ventures, Inc.
## Stock Transfer - Final Transaction Report

9/13/12  12:12 pm

Page 1 of 2

Control Ticket Number: STTK000000036596
Type of Stock being Transferred:      CS1
Paper certifs being Transferred from: 0
Paper certifs being Transferred to:   6
CB Received: / /
Tax Reason: N/A      Acquired: 09/13/12

Transaction Number:    104
Total Shares: 122,500,000

Transfer Date: 09/13/12
Sale Amt/share: $ 0.00000

Received From: PHIL KUEBER
Received: 09/07/12 at 10:03   Tran Type: Routine      Item Count: 1
How Received: UPS

Sent: 09/13/12 at 12:12      How Sent:  FEDEX
Outgoing Tracking Number:  VARIOUS

——Transfer From——      ——Transfer To——

| Line # | | Shareholder | Certificate Number | | Number of Shares | Line # | | Shareholder | Certificate Number | | Shares per Certif |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3 | HECTOR CASILLAS SUAREZ | BKE | 5 | 3,500,000 | 1 | 39 | Legacy Global Markets, S.A. | CS1 | 103 | 14,000,000 |
| 2 | 4 | MARIA ISABEL GONZALEZ ANGELES | BKE | 3 | 3,500,000 | 2 | 39 | Legacy Global Markets, S.A. | CS1 | 104 | 22,750,000 |
| 3 | 5 | DULCE JULIA SANGUINO BECERRIL | BKE | 1 | 3,500,000 | 3 | 40 | Clear Water Securities | CS1 | 105 | 22,750,000 |
| 4 | 6 | FRANCISCO GERARDO ALVAREZ MATURANO | BKE | 7 | 3,500,000 | 4 | 40 | Clear Water Securities | CS1 | 106 | 20,300,000 |
| 5 | 7 | SMILJA BLACE | BKE | 22 | 3,150,000 | 5 | 41 | Caledonian Bank Limited | CS1 | 107 | 20,300,000 |
| 6 | 8 | MARINA BOGDANOVIC | BKE | 18 | 3,150,000 | 6 | 41 | Caledonian Bank Limited | CS1 | 108 | 22,400,000 |
| 7 | 9 | DJORDJE BOGDANOVIC | BKE | 17 | 3,150,000 | | | | | | |
| 8 | 10 | ELIGIO GERARDO CASTANEDA ESTRADA | BKE | 8 | 3,500,000 | | | | | | |
| 9 | 11 | SRDJAN CULIC | BKE | 29 | 3,850,000 | | | | | | |
| 10 | 12 | MILORAD CVETICANIN | BKE | 33 | 4,200,000 | | | | | | |
| 11 | 13 | GORDANA CVETICANIN | BKE | 24 | 3,850,000 | | | | | | |
| 12 | 14 | SRDJAN FRANCUSKI | BKE | 28 | 3,850,000 | | | | | | |
| 13 | 15 | VLATKA GNJATOVIC | BKE | 34 | 3,150,000 | | | | | | |
| 14 | 16 | NEMANJA GOVEDAROVIC | BKE | 13 | 2,800,000 | | | | | | |
| 15 | 17 | OLJA HOMA | BKE | 25 | 3,850,000 | | | | | | |
| 16 | 18 | MILENA KOJADINOVIC | BKE | 30 | 3,850,000 | | | | | | |
| 17 | 19 | IVANA KORAC | BKE | 35 | 4,200,000 | | | | | | |
| 18 | 20 | BRANKA KORICA | BKE | 31 | 4,200,000 | | | | | | |

Completed By: BB      Report Run By: BB 09/13/12 12:12:33 pm

**SWVI TA# 104, p. 1**
**SWVI Scans 306**

# SWING - Swingplane Ventures, Inc.
## Stock Transfer - Final Transaction Report

9/13/12  12:12 pm

Page 2 of 2

Control Ticket Number: STTK000000036596
Type of Stock being Transferred:   CS1
Paper certifs being Transferred from: 0
Paper certifs being Transferred to:   6
CB Received: / /
Tax Reason: N/A    Acquired: 09/13/12

Transaction Number:   104
Total Shares: 122,500,000

Transfer Date: 09/13/12
Sale Amt/share: $ 0.00000

Received From: PHIL KUEBER
Received: 09/07/12 at 10:03   Tran Type:Routine    Item Count: 1
How Received:UPS

Sent: 09/13/12 at 12:12    How Sent:  FEDEX
Outgoing Tracking Number:  VARIOUS

| Line # | | Shareholder | Certificate Number | | Number of Shares | Line # | Shareholder | Certificate Number | Shares per Certif |
|---|---|---|---|---|---|---|---|---|---|
| | | ----Transfer From---- | | | | | ----Transfer To---- | | |
| 19 | 21 | IVANA KRGOVIC | BKE | 20 | 3,150,000 | | | | |
| 20 | 22 | DJURDJA LINJACKI | BKE | 27 | 3,850,000 | | | | |
| 21 | 23 | DUSAN MALESEV | BKE | 12 | 2,800,000 | | | | |
| 22 | 24 | VOJISLAV MALESEV | BKE | 15 | 4,200,000 | | | | |
| 23 | 25 | SONJA MARIC | BKE | 21 | 3,150,000 | | | | |
| 24 | 26 | HILDA DALILA MARTINEZ GALVAN | BKE | 4 | 3,500,000 | | | | |
| 25 | 27 | ADRIANA MORALES DIAZ | BKE | 10 | 3,500,000 | | | | |
| 26 | 28 | MILICA NESTOROVIC | BKE | 32 | 4,200,000 | | | | |
| 27 | 29 | ELENA GUERRA PARDILLO | BKE | 9 | 3,500,000 | | | | |
| 28 | 30 | SMILJANA PAVLOVIC | BKE | 26 | 3,850,000 | | | | |
| 29 | 31 | INES RADOVIC | BKE | 19 | 3,150,000 | | | | |
| 30 | 32 | TOMAS SALGADO DAMIAN | BKE | 2 | 3,500,000 | | | | |
| 31 | 33 | GRISELDA SANTILLAN CORIA | BKE | 6 | 3,500,000 | | | | |
| 32 | 34 | SOFIJA STANIC | BKE | 16 | 3,150,000 | | | | |
| 33 | 35 | TATJANA STEFANOVIC | BKE | 23 | 3,150,000 | | | | |
| 34 | 36 | VELJKO VAVRIN | BKE | 11 | 2,800,000 | | | | |
| 35 | 37 | ALEKSANDAR VUJAKOVIC | BKE | 14 | 2,800,000 | | | | |

122,500,000

Number of new certs: 6

122,500,000

Completed By: BB    Report Run By: BB 09/13/12 12:12:33 pm

SWVI TA# 104, p. 2
SWVI Scans 307

A0160

**MEMORANDUM**



RECEIVED

SEP 12 2012

Empire
Stock Transfer

To:        Matt Levins
           Empire Stock Transfer

From:      Corporate Services

Re:        Swingplane Ventures Inc.                    *104*

Date:      September 11, 2012

---

Enclosed please find the following share certificates for common shares of
Swingplane Ventures Inc., and corresponding re-registration instructions. Taking
into account a forward split of 35:1 could you please re-register the certificates as
follows:

| Cert # | Shareholder | Amount |
|--------|-------------|--------|
| 39 | Hilda Dalila Martinez Galvan | 100,000 |
| 38 | Maria Isabel Gonzalez Angeles | 100,000 |
| 37 | Tomas Salgado Damian | 100,000 |
| 36 | Dulce Julia Sanguino Becerril | 100,000 |

Could you please re-register these shares as follows:

Legacy Global Markets, S.A.                            14,000,000
2nd Floor, Caye Bank Bldg.
Coconut Drive, San Pedro Ambergris Caye
Belize

SWVI TA# 104, p. 3
SWVI Scans 308

A0161

| Cert # | Shareholder | Amount | |
|--------|-------------|--------|---|
| 70 | Ivana Korac | 120,000 | *19* |
| 57 | Smilja Blace | 90,000 | *7* |
| 67 | Milica Nestorovic | 120,000 | *28* |
| 68 | Milorad Cveticanin | 120,000 | *12* |
| 69 | Vlatka Gnjatovic | 90,000 | *15* |
| 71 | Smiljana Pavlovic | 110,000 | *30* |

Could you please re-register these shares as follows:

Legacy Global Markets, S.A.                     22,750,000
2nd Floor, Caye Bank Bldg.
Coconut Drive, San Pedro Ambergris Caye
Belize

| Cert # | Shareholder | Amount | |
|--------|-------------|--------|---|
| 65 | Milena Kojadinovic | 110,000 | *18* |
| 58 | Tatjana Stefanovic | 90,000 | *35* |
| 72 | Djurdja Linjacki | 110,000 | *22* |
| 63 | Srdjan Francuski | 110,000 | *14* |
| 64 | Srdjan Culic | 110,000 | *11* |
| 66 | Branka Korica | 120,000 | *26* |

Could you please re-register these shares as follows:

Clear Water Securities                          22,750,000
Suite 220, Caye Bank Bldg.
Coconut Drive, San Pedro Ambergris Caye
Belize

A0162

| Cert # | Shareholder | Amount | |
|--------|-------------|--------|---|
| 53 | Marina Bogdanovic *8* | 90,000 | 3,150,000 |
| 54 | Ines Radovic *31* | 90,000 | 3,150,000 |
| 55 | Ivana Krgovic *21* | 90,000 | 3,150,000 |
| 56 | Sonja Maric *25* | 90,000 | 3,150,000 |
| 60 | Olja Homa *17* | 110,000 | 3,850,000 |
| 59 | Gordana Cveticanin *13* | 110,000 | 3,850,000 |

Could you please re-register these shares as follows:

Clear Water Securities                                  20,300,000
Suite 220, Caye Bank Bldg.
Coconut Drive, San Pedro Ambergris Caye
Belize

The cost basis is $.001 per share.

Applicable transfer fees are enclosed as well.

Upon completion of the re-registration, could you please send the shares by Federal Express (account number 337074073) to the following address:

Scottsdale Capital Advisors
7170 E McDonald Drive, Suite 6,
Scottsdale, AZ 85253
Attention: Timothy Scarpino

| Cert # | Shareholder | Amount |
|--------|-------------|--------|
| 46 | Veljko Vavrin *36* | 80,000 |
| 40 | Hector Casillas Suarez *3* | 100,000 |
| 41 | Griselda Santillan Coria *33* | 100,000 |
| 42 | Francisco Gerardo Alvarez Maturano *6* | 100,000 |

| 43 | Eligio Gerardo Castaneda Estrada  *10* | 100,000 |
| 44 | Elena Guerra Pardillo  *29* | 100,000 |

Could you please re-register these shares as follows:

Caledonian Bank Limited                                20,300,000
69 Dr. Roy's Drive George Town
Grand Cayman KY1-1102 Cayman Islands

| Cert # | Shareholder | Amount |
|---|---|---|
| 45 | Adriana Morales Diaz  *27* | 100,000 |
| 47 | Dusan Malesev  *23* | 80,000 |
| 48 | Nemanja Govedarovic  *16* | 80,000 |
| 49 | Aleksandar Vujakovic  *37* | 80,000 |
| 50 | Volislav Malesev  *24* | 120,000 |
| 51 | Sofija Stanic  *34* | 90,000 |
| 52 | Djordje Bogdanovic  *9* | 90,000 |

Could you please re-register these shares as follows:

Caledonian Bank Limited                                22,400,000
69 Dr. Roy's Drive George Town
Grand Cayman KY1-1102 Cayman Islands

Upon completion of the re-registration, could you please send these shares (42,700,000 in total) by Federal Express (account number 337074073) to the following address:

Caledonian Bank Limited
69 Dr. Roy's Drive George Town
Grand Cayman KY1-1102 Cayman Islands
Attention: Alicia Nixon

Please contact me at (213) 364-3395 should you have any questions regarding the foregoing. Please forward a copy of the Federal Express tracking number to: corporatedd@gmail.com

SWVI TA# 104, p. 6
SWVI Scans 311

A0164

CERTIFIED RESOLUTIONS ADOPTED BY BOARD OF DIRECTORS OF SWINGPLANE
VENTURES, INC.
A NEVADA CORPORATION

The undersigned hereby certifies that he is the duly elected, qualified and acting
President of the above-named Corporation and in that capacity in charge of its
official records including the minute book containing original minutes of meetings
of its Board of Directors; and that on the 11th day of September, 2012, a meeting of
said Board of Directors was duly convened and held, with a quorum present
throughout the proceedings thereof, at which the following resolutions were duly
moved, seconded and carried, said resolutions remaining in full force and effect at
the date of this certificate:

BE IT RESOLVED: That EMPIRE STOCK TRANSFER INC., Transfer Agent for this
corporation be, and it hereby is, directed to process the transfer request regarding
the certificate below, and this Board of Directors does hereby extend this
corporation's irrevocable agreement to indemnify said Transfer Agent for all loss,
liability or expense in carrying out the authority and direction herein contained on
the terms herein set forth. The Transfer Agent shall maintain the right to uphold the
transfer in the event of forgery.

IN WITNESS WHEREOF, the undersigned has set his hand in his capacity above
mentioned and affixed the seal of the above named corporation, all this 11th day of
September, 2012.

By: _____

Matthew Diehl, President

| Cert # | Shareholder | Amount |
|--------|-------------|--------|
| 39 | Hilda Dalila Martinez Galvan | 100,000 |
| 38 | Maria Isabel Gonzalez Angeles | 100,000 |
| 37 | Tomas Salgado Damian | 100,000 |
| 36 | Dulce Julia Sanguino Becerril | 100,000 |

Could you please re-register these shares as follows:

Legacy Global Markets, S.A.                          14,000,000
2nd Floor, Caye Bank Bldg.
Coconut Drive, San Pedro Ambergris Caye
Belize

| Cert # | Shareholder | Amount |
|--------|-------------|--------|
| 70 | Ivana Korac | 120,000 |
| 57 | Smilja Blace | 90,000 |
| 67 | Milica Nestorovic | 120,000 |
| 68 | Milorad Cveticanin | 120,000 |
| 69 | Vlatka Gnjatovic | 90,000 |
| 71 | Smiljana Pavlovic | 110,000 |

Could you please re-register these shares as follows:

Legacy Global Markets, S.A.                          22,750,000
2nd Floor, Caye Bank Bldg.
Coconut Drive, San Pedro Ambergris Caye
Belize

| Cert # | Shareholder | Amount |
|--------|-------------|--------|
| 65 | Milena Kojadinovic | 110,000 |
| 58 | Tatjana Stefanovic | 90,000 |
| 72 | Djurdja Linjacki | 110,000 |
| 63 | Srdjan Francuski | 110,000 |
| 64 | Srdjan Culic | 110,000 |
| 66 | Branka Korica | 120,000 |

Could you please re-register these shares as follows:

Clear Water Securities                          22,750,000
Suite 220, Caye Bank Bldg.
Coconut Drive, San Pedro
Ambergris Caye, Belize

| Cert # | Shareholder | Amount |
|--------|-------------|--------|
| 53 | Marina Bogdanovic | 90,000 |
| 54 | Ines Radovic | 90,000 |
| 55 | Ivana Krgovic | 90,000 |
| 56 | Sonja Maric | 90,000 |
| 60 | Olja Homa | 110,000 |
| 59 | Gordana Cveticanin | 110,000 |

Could you please re-register these shares as follows:

Clear Water Securities                          20,300,000
Suite 220, Caye Bank Bldg.
Coconut Drive, San Pedro Ambergris Caye
Belize

| Cert # | Shareholder | Amount |
|--------|-------------|--------|
| 46 | Veljko Vavrin | 80,000 |
| 40 | Hector Casillas Suarez | 100,000 |
| 41 | Griselda Santillan Coria | 100,000 |
| 42 | Francisco Gerardo Alvarez Maturano | 100,000 |
| 43 | Eligio Gerardo Castaneda Estrada | 100,000 |
| 44 | Elena Guerra Pardillo | 100,000 |

A0167

Could you please re-register these shares as follows:

Caledonian Bank Limited                              20,300,000
69 Dr. Roy's Drive George Town
Grand Cayman KY1-1102 Cayman Islands

| Cert # | Shareholder | Amount |
|--------|-------------|--------|
| 45 | Adriana Morales Diaz | 100,000 |
| 47 | Dusan Malesev | 80,000 |
| 48 | Nemanja Govedarovic | 80,000 |
| 49 | Aleksandar Vujakovic | 80,000 |
| 50 | Volislav Malesev | 120,000 |
| 51 | Sofija Stanic | 90,000 |
| 52 | Djordje Bogdanovic | 90,000 |

Could you please re-register these shares as follows:

Caledonian Bank Limited                              22,400,000
69 Dr. Roy's Drive George Town
Grand Cayman KY1-1102 Cayman Islands

SWVI TA# 104, p. 10
SWVI Scans 315

A0168



NUMBER
103

SHARES
***14,000,000***

COMMON STOCK

COMMON STOCK
CUSIP 870787207

**SWINGPLANE VENTURES, INC.**

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Legacy Global Markets, S.A.***

is the Owner of *** Fourteen Million ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
SWINGPLANE VENTURES, INC.

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated:   **September 13, 2012**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
Transfer Agent and Registrar

By _____   _____
AUTHORIZED SIGNATURE

SECRETARY                    PRESIDENT

CORPORATE SEAL

B   33398

SWVI Scans 420

**SWVI TA# 104, p. 115**

A0169



NUMBER
104

COMMON STOCK

SHARES
***22,750,000***

COMMON STOCK
CUSIP 870787207

SEE REVERSE FOR CERTAIN DEFINITIONS

## SWINGPLANE VENTURES, INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

THIS CERTIFIES THAT

***Legacy Global Markets, S.A.***

is the Owner of *** Twenty-Two Million Seven Hundred Fifty Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
SWINGPLANE VENTURES, INC.

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.
Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated:   **September 13, 2012**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.

By

AUTHORIZED SIGNATURE          Transfer Agent and Registrar

CORPORATE SEAL

SECRETARY

PRESIDENT

B   33397

SWVI Scans 421

**SWVI TA# 104, p. 116**



NUMBER
105

COMMON STOCK

SHARES
***22,750,000***

COMMON STOCK
CUSIP 870787207

SEE REVERSE FOR CERTAIN DEFINITIONS

## SWINGPLANE VENTURES, INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

THIS CERTIFIES THAT

***Clear Water Securities***

is the Owner of *** Twenty-Two Million Seven Hundred Fifty Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
SWINGPLANE VENTURES, INC.

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated:  **September 13, 2012**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

CORPORATE SEAL

SECRETARY

PRESIDENT

B  33396

SWVI Scans 422

**SWVI TA# 104, p. 117**

A0171



NUMBER
106

SHARES
***20,300,000***

COMMON STOCK

*SWINGPLANE VENTURES, INC.*

COMMON STOCK
CUSIP 870787207

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Clear Water Securities***

is the Owner of *** Twenty Million Three Hundred Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
SWINGPLANE VENTURES, INC.

*transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.*

*Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.*

Dated:   **September 13, 2012**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
                                Transfer Agent and Registrar
By

AUTHORIZED SIGNATURE

CORPORATE
SEAL

SECRETARY                              PRESIDENT

B   33395

SWVI Scans 423

**SWVI TA# 104, p. 118**

A0172



NUMBER
107

COMMON STOCK

SHARES
***20,300,000***

COMMON STOCK
CUSIP 870787207

**SWINGPLANE VENTURES, INC.**

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Caledonian Bank Limited***

Is the Owner of *** Twenty Million Three Hundred Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
SWINGPLANE VENTURES, INC.

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated:   **September 13, 2012**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
                                                Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

CORPORATE
SEAL

SECRETARY                    PRESIDENT

B   33394

SWVI Scans 424

SWVI TA# 104, p. 119

A0173



NUMBER
108

COMMON STOCK

SHARES
***22,400,000***

COMMON STOCK
CUSIP 870787207

*SWINGPLANE VENTURES, INC.*

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Caledonian Bank Limited***

is the Owner of *** Twenty-Two Million Four Hundred Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
SWINGPLANE VENTURES, INC.

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.
Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated:   **September 13, 2012**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
Transfer Agent and Registrar

By
AUTHORIZED SIGNATURE

CORPORATE SEAL

SECRETARY

PRESIDENT

B   33393

SWVI Scans 425

SWVI TA# 104, p. 120

A0174

8-K 1 form8k.htm 8-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**FORM 8-K**

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **October 15, 2012**

**SWINGPLANE VENTURES, INC.**

*Exact name of registrant as specified in its charter*

| Nevada | 000-54571 | 27-2919616 |
|---|---|---|
| *(State or other jurisdiction of incorporation)* | *(Commission File Number)* | *(IRS Employer Identification No.)* |

**Punta Pacifica, Torres de las Americas, Piso 15, Torre A,  Panama**

| *(Address of principal executive offices)* | *(Zip Code)* |
|---|---|

*Registrant's telephone number, including area code*

**220 Summit Blvd. #402 Broomfield, CO 80021**

*(Former name or former address, if changed since last report)*

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[  ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[  ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[  ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[  ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

1

## SECTION 1. – REGISTRANT'S BUSINESS AND OPERATIONS

**Item 1.01 Entry into a Material Definitive Agreement.**

On October 15, 2012, Swingplane Ventures, Inc. (the "Company") entered into an assignment agreement with Mid Americas Corp. ("Mid Americas"). Under the terms of the assignment agreement the Company will be assigned all of the rights under an option agreement between Mid Americas Corp and Gunter Stromber and Elsa Dorila Durate Horta (the "Vendors") whereby Mid Americas has the rights to acquire 75% of certain mining concessions in Chile (the "Option Agreement").

Under the Option Agreement and certain amendments thereto, Mid Americas is required to pay the following payments:

(i)    $950,000 cash payments through to October 15, 2012
(ii)   $250,000 cash payment on December 1, 2012
(iii)  $750,000 cash payment on or before June 30, 2013
(iv)   $750,000 cash payment on or before June 30, 2014
(v)    $5,000,000 cash payment to be made from net proceeds of Production.

Further, the agreement calls for Mid Americas to incur expenditures in an aggregate amount of $20,000,000 over a period of three (3) years from the Effective Date as follows:

(i) $10,000,000 to be placed in trust with the Optionee for expenditure on the Property within 180 days October 1st (the "Effective Date") to be fully expended within eighteen (18) months of the Effective Date.

(ii) $10,000,000 to be expended on or before three years from the Effective Date;

(iii) until the Option is earned retain the services of Gunter Stromberger at a fee of $25,000 per month, which fee shall commence with the commencement of operations on the mining concessions by Mid Americas.

Mid Americas has paid the $950,000 as required under the initial agreement therefor the Company will be required to assume the December 1, 2012 payment obligation of $250,000 and all other payments thereafter.

In exchange for the assignment, the Company must undertake the following actions:

(i) issue a total of 300,000,000 shares of its common stock to Mid Americas or its directed assignees, of which a total of 10,000,000 shares of common stock to be issued to Mid Americas shall be included for registration in the registration statement defined in below;

(ii) cause the cancellation of a total of 337,500,000 of its common stock currently held by its sole officer and director;

(iii) file a registration statement with the requisite regulatory authorities to raise up to $10,000,000 by way of the sale of up to 40,000,000 shares of the common stock of Swingplane, of which no less than seventy-five percent of the funds raised under such registration statement shall be used to fund the required payments under the Original Property Agreement and the Amendments thereto.

2

The closing of this transaction will effect a change in control of the Company.

The transaction is expected to close on or before October 31, 2012.

**The Company intends to file a Super 8-K concurrent with the closing of this transaction.**

**SECTION 9 - FINANCIAL STATEMENTS AND EXHIBITS**

**Item 9.01 Financial Statements and Exhibits.**
**(d) Exhibits**

| Exhibit No. | Exhibit Description | |
|---|---|---|
| 10.1 | Assignment Agreement between the Company and  Mid Americas Corp dated October 15, 2012 | Filed herewith |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**SWINGPLANE VENTURES, INC.**

| | | |
|---|---|---|
| Dated: **October 15,  2012** | By: | */s/ Michel Voyer* |
| | Name: | Michel Voyer |
| | Title: | Chief Executive Officer, President, Secretary, Treasurer,Chief Financial Officer and  Director |

3

2013-01-24 MWR SWVI Negotiates Option Agr
Wire: Market Wire (MWR) Date: Jan 24 2013  7:00:00
Swingplane Negotiates Option Agreement

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
 BN 01/24 07:00 \*SWINGPLANE NEGOTIATES OPTION PACT
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Swingplane Negotiates Option Agreement

SANTIAGO, CHILE -- (Marketwire) -- 01/24/13 --  Swingplane Ventures
Inc. (the "Company") (OTCBB: SWVI) has recently negotiated a share
exchange agreement with a company holding an Option Agreement to
acquire a 75% percent interest in the Algarrobo Property. The
Algarrobo Property (the "Property") is an Iron Oxide -Copper-Gold
(IOCG) property located approximately 850 km north of Santiago, in
the III Region, Province of Chanaral, Chile. The city of Copiapo is
located approximately 43 km to the southeast of the Property, with
the small port city of Caldera 25 km to the east. The Property
consists of 32 tenures, comprising a total of 6,161 ha (15,224
acres).

Mining operations completed to date, on both the Property and
immediately adjacent tenures, have resulted in a large number of
workings, of which approximately 35 comprise near surface workings
greater than 2 m in depth to more extensive, historical mining
operations extending several hundred meters below surface. Historical
mining activity has defined, and is centered around, three main
mineralized trends, as follows:

\*T

--  Panga, Ecuador, Uruguay, etc. in the north
--  Descubridora, Estaca, Viuda, etc. in the center
--  Buena Vista, Alicia, etc. in the south
\*T


These workings, particularly the old mines developed along these well
defined mineralized trends, have produced variable quantities of high
grade copper ore, predominantly as copper oxides, in a supergene
enriched oxide zone extending to an approximate depth of 120 metres
below surface. The oxide zone is typically underlain by a
transitional zone of mixed copper oxides and copper sulphides, with
underlying copper sulfide ores mined to greater depth (i.e. 450
meters in the Viuda Mine).

The three major mineralized trends (above), and a fourth less well
developed mineralized trend (Mantos Ossa), are well defined by
previous workings and clearly evident on satellite (i.e. Google
Earth) imagery. These workings clearly define a well mineralized zone
having a surface extent of at least 3 km, with an interpreted
potential surface extent of at least 4 km, and potentially up to 6.5
km or more. At surface, the veins vary between as little as 15 cm to
as much as 1.5 m, however, they rapidly increase in thickness in the
near su
b-surface to at least 1.5 and 2.5 m. A limited underground
sampling program completed by the property vendor in 2000 reported
"blows," regions along the vein as exposed by the underground
workings in which the mineralized veins, "...were up to 60 m
horizontally and 40 m vertically, with widths between 1.5 meters and
more than 5 meters - Estaca mine" (Stromberger 2000).

In addition to the four "Major Veins" described above, a number of

A0178

2013-01-24 MWR SWVI Negotiates Option Agr

sub-parallel, subordinate veins are interpreted to be present between the major veins presently identified. These subsidiary, often mineralized veins are interpreted to represent secondary veins developed as splays off the primary veins and/or a nested set of primary and/or en echelon secondary veins representing "horse-tails."

Management believes the Property represents significant potential to further develop current, near surface high grade copper +/- gold mineralization identified in multiple veins into a larger commercial operation. The Company's mandate is to aggressively pursue: 1) expansion of the existing mineral potential of the Algarrobo Property, and 2) further exploration of the Property to evaluate opportunities for developing short term production capacity having potential for further expansion.

Currently, a total of five have been developed into drifts driven on high grade copper-bearing mineralized veins identified at surface.

The president, Mr. Voyer, says, "This is a very exciting undertaking for the company and we are very fortunate to be part of the Algarrobo project."

The content of this news release has been reviewed by Rick Walker, B.Sc., M.Sc., P. Geo., a Qualified Person for the purposes of NI 43-101, with the ability and authority to verify the authenticity and validity of the data herein.

This Press release has been revised and approved by the President of the Company.

Mr. Michel Voyer
 President

Safe Harbor Statement
 THIS NEWS RELEASE CONTAINS "FORWARD-LOOKING STATEMENTS", AS THAT TERM IS DEFINED IN SECTION 27A OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND SECTION 21E OF THE UNITED STATES SECURITIES EXCHANGE ACT OF 1934, AS AMENDED. STATEMENTS IN THIS NEWS RELEASE, WHICH ARE NOT PURELY HISTORICAL, ARE FORWARD-LOOKING STATEMENTS AND INCLUDE ANY STATEMENTS REGARDING BELIEFS, PLANS, EXPECTATIONS OR INTENTIONS REGARDING THE FUTURE.

EXCEPT FOR THE HISTORICAL INFORMATION PRESENTED HEREIN, MATTERS DISCUSSED IN THIS NEWS RELEASE CONTAIN FORWARD-LOOKING STATEMENTS THAT ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH STATEMENTS. STATEMENTS THAT ARE NOT HISTORICAL FACTS, INCLUDING STATEMENTS THAT ARE PRECEDED BY, FOLLOWED BY, OR THAT INCLUDE SUCH WORDS AS "ESTIMATE", "ANTICIPATE", "BELIEVE", "PLAN" OR "EXPECT" OR SIMILAR STATEMENTS ARE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS CONTAINED IN THIS NEWS RELEASE INCLUDE STATEMENTS RELATING TO THE COMPANY'S PLANS TO ENTER INTO A MINING OPTION AGREEMENT WITHIN THE NEXT FORTY-FIVE DAYS. RISKS AND UNCERTAINTIES FOR THE COMPANY INCLUDE, BUT ARE NOT LIMITED TO, THE RISKS ASSOCIATED WITH MINERAL EXPLORATION AND FUNDING AS WELL AS THE RISKS SHOWN IN THE COMPANY'S MOST RECENT ANNUAL AND QUARTERLY REPORTS ON FORM 10-K AND FORM 10-Q, RESPECTIVELY, AND FROM TIME-TO-TIME IN OTHER PUBLICLY AVAILABLE INFORMATION REGARDING THE COMPANY. OTHER RISKS INCLUDE RISKS ASSOCIATED WITH THE REGULATORY APPROVAL PROCESS, COMPETITIVE COMPANIES, FUTURE CAPITAL REQUIREMENTS AND THE COMPANY'S ABILITY AND LEVEL OF SUPPORT FOR ITS EXPLORATION AND DEVELOPMENT ACTIVITIES. THERE CAN BE NO ASSURANCE THAT THE COMPANY'S EXPLORATION EFFORTS WILL
Page 2

```
                      2013-01-24 MWR SWVI Negotiates Option Agr
SUCCEED AND THE COMPANY WILL ULTIMATELY ACHIEVE COMMERCIAL SUCCESS.
THESE FORWARD-LOOKING STATEMENTS ARE MADE AS OF THE DATE OF THIS NEWS


Swingplane Ventures, Inc.

For more information, please visit our website at
Web: www.swingplaneventuresinc.com
Or call Investor Relations: 1-800-253-1692

-0- Jan/24/2013 12:00 GMT

--------------------------=====================------------------------------
                            Copyright (c) 2013

############################ END OF STORY 1 ############################
```

A0180

2013-01-25 MWR SWVI Provides Data on Algarrobo
Wire: Market Wire (MWR) Date: Jan 25 2013  7:00:00
Swingplane Ventures, Inc. Provides Historical Data on the Algarrobo

Swingplane Ventures, Inc. Provides Historical Data on the Algarrobo

SANTIAGO, CHILE -- (Marketwire) -- 01/25/13 --  Swingplane Ventures,
Inc. (OTCBB: SWVI) (the "Company") is pleased to update information
on the History of the Algarrobo property.

Swingplane Venture Inc.'s (the "Company") Algarrobo Property (the
"Property") is an Iron Oxide-Copper-Gold (IOCG) property located
approximately 850 km north of Santiago, in the III Region, Province
of Chanaral, Chile. The city of Copiapo is located approximately 43
km to the southeast of the Property, with the small port city of
Caldera 25 km to the east. The Property consists of 32 tenures,
comprising a total of 6,161 ha (15,224 acres).

The following anecdotal history for the Property and immediately
adjacent area has been modified slightly from Stromberger (2012). The
following anecdotal history of the Property and immediate area was
compiled by the Property Vendor. The historical information has not
been verified.

A copy of his non NI 43-101 compliant report is available at:

http://www.swingplaneventuresinc.com/images/docs/Stromberger_Report_April_2012.p
df

"Copper from limited surface exposures on, and immediately adjacent
to, the Algarrobo Property was first mined in the late 1700s. Since
that time, approximately 35 mines have been excavated on 4 primary
and approximately 10 secondary veins. It has been estimated that the
historical British operator produced copper ore having a cut-off
grade of +/- 6% Cu.

Major copper mines around the world generally average less than 1%
copper, a prime example is Freeport McMoRan's Grasberg mine which has
approximately 2.5 billion tonnes of copper grading at 1.1%.

The Algarrobo copper deposit was discovered in 1808, with large scale
industrial mining operations initiated in 1868 and active for
approximately 25 years. In 1890, a report on the Algarrobo mines by
Francisco San Roman led to an evaluation of the feasibility of
constructing a railroad line from Caldera to facilitate transport of
copper ore at lower transportation costs. The railroad was also
expected to permit more efficient exploitation of the mineral
reserves, given that the cut-off grade for the Algarrobo copper ore
was 12% Cu at that time. Ore quality and reserves at that time were
deeme
d to be of sufficient grade and tonnage for the British operator
of the mines to undertake construction of a 20 km railroad from the
port of Caldera to Algarrobo. "High grade ore", thought to comprise
ore greater than 15% Cu was shipped directly to England, while "low
grade ore", ore grading less than 15% Cu, was processed at a local
smelter in Caldera prior to shipment to England. (Note: "Ore" is used
in the context of the reference cited and may not be NI 43-101
compliant).

The railroad operated into the 1940s, with a cable car system used to
transport ore from mining operations at an elevation of approximately
1100 m to the railhead at approximately 650 m. In the mid-1900s, a
road was also built from Caldera, allowing re-processing of ore waste
on several occasions. The mine dumps left by the British operator
Page 1

A0181

2013-01-25 MWR SWVI Provides Data on Algarrobo
provide some clues regarding the grade of ore extracted from the historical operations. Over approximately 20 years, between 1960 and 1980, the waste dumps have been reprocessed three times by local miners. ENAMI, the state controlled Chilean mining company, constructed the 35 km road to the area for this purpose. Available records document that the grade of material initially processed graded between 6 - 8% Cu, dropping to a grade between 4 - 6% Cu during the second phase of processing and 3-4% from the third phase. The material remaining is estimated to grade between 1.5 - 2% Cu. The railway is still on the property today.

No quantitative data are available with regard to cumulative production for the Property. In his report, San Roman estimated approximately 800,000 tonnes of 12% plus mineral had been extracted by the 1890s, with close to the same amount of material in the waste dumps, grading between 3% and 4. At this time, it is estimated that approximately 200,000 tonnes of "low grade" dump material remains.

From the 1920's until 1997, sporadic manual production on a limited basis was undertaken by local miners (pirquineros) on extensions of the veins previously mined. Most of the workings evident on the Algarrobo Property, and immediately adjacent ground, have been excavated and operated using hand tools, with limited mechanization and are, therefore, generally restricted to surface and/or shallow sub-surface workings, at depths ranging between 5 meters to 40 meters. Local pirquineros claim that until 1973 they sold ore grading 6% Cu and above to ENAMI as direct smelting ore. In 1973 ENAMI raised the cut-off grade for direct smelting ore to 12% Cu. All of the ore mined by the pirquineros has been hand sorted to meet the ENAMI requirements.

In 1997, American Canyon Mining initiated processing of mine waste dumps for recovery of low grade copper, with assayed grades between 1.5% and 2.5% copper, on a preliminary test basis in leach pads on site. Approximately 9,000 tonnes of mineralized, low grade ore was crushed, screened and piled after laboratory leach tests showed satisfactory results. The project was shut down in 1998 due to the decline in copper prices" Stromberger (2012).

In 2000, the property vendor, Gunter Stromberger, undertook a sampling program of some of the workings and waste dumps on the Property and immediately adjacent ground. A total of 160 samples were taken from surface, near surface and underground workings. The results of this program will be reported in a separate Press Release.

In 2009, the property vendor undertook a rotary drill program in an attempt to assess vein continuity and grade in the near sub-surface. A total of 10 holes were drilled, with four (#11 - 14) abandoned due depth of overburden ( > 25 m - the amount of casing available). Generally, the holes that encountered bedrock documented anomalous background levels of copper, ranging from 0.10% to a maximum of 1.05%. Six of the holes intersected copper mineralized veins. The results of the drill program will be reported in a separate Press Release.

Between 2010 and early 2012, the property vendor exposed several high grade copper mineralized veins at surface and developed an approximately 3 m wide x 4 m high drift, the "Veta Gruesa Centre" Drift on the Veta Gruesa. A second drift, the "Exploration" Drift, is located approximately 350 west of the Veta Gruesa Centre drift and had just encountered the footwall of the Veta Gruesa at the time of the Company's Due Diligence property evaluation in February, 2012.

Page 2

2013-01-25 MWR SWVI Provides Data on Algarrobo

Since the Due Diligence property evaluation in February, 2012, the property vendor has opened up two additional drifts on behalf of the Company, comprised of a third drift on the Veta Gruesa (Veta Gruesa East), the False Estaca Drift and initial development on the Descubridora Vein. Heavy equipment has exposed high grade copper mineralization immediately below a thin veneer of eolian sand, believed to correlate to the workings defining the Descubridora Vein. This exposure is actively being developed into a drift at this time. In addition, heavy equipment is currently working to remove sand in order to expose the Descubridora Vein approximately 40 m farther west and at slightly lower elevation so as to provide a second drift on this high grade copper vein. Finally, ore is currently being stockpiled at surface in anticipation of receipt of the license required to sell the o

re from the Property to the government-owned ENAMI facility at Copiapo, located approximately 43 km to the south.

The content of this news release has been reviewed by Rick Walker, B.Sc., M.Sc., P. Geo., a Qualified Person for the purposes of NI 43-101, with the ability and authority to verify the authenticity and validity of the data herein.

Michel Voyer
 President and Director

Safe Harbor Statement

THIS NEWS RELEASE CONTAINS "FORWARD-LOOKING STATEMENTS", AS THAT TERM IS DEFINED IN SECTION 27A OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND SECTION 21E OF THE UNITED STATES SECURITIES EXCHANGE ACT OF 1934, AS AMENDED. STATEMENTS IN THIS NEWS RELEASE, WHICH ARE NOT PURELY HISTORICAL, ARE FORWARD-LOOKING STATEMENTS AND INCLUDE ANY STATEMENTS REGARDING BELIEFS, PLANS, EXPECTATIONS OR INTENTIONS REGARDING THE FUTURE.

EXCEPT FOR THE HISTORICAL INFORMATION PRESENTED HEREIN, MATTERS DISCUSSED IN THIS NEWS RELEASE CONTAIN FORWARD-LOOKING STATEMENTS THAT ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH STATEMENTS. STATEMENTS THAT ARE NOT HISTORICAL FACTS, INCLUDING STATEMENTS THAT ARE PRECEDED BY, FOLLOWED BY, OR THAT INCLUDE SUCH WORDS AS "ESTIMATE", "ANTICIPATE", "BELIEVE", "PLAN" OR "EXPECT" OR SIMILAR STATEMENTS ARE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS CONTAINED IN THIS NEWS RELEASE INCLUDE STATEMENTS RELATING TO THE COMPANY'S PLANS TO ENTER INTO A MINING OPTION AGREEMENT WITHIN THE NEXT FORTY-FIVE DAYS. RISKS AND UNCERTAINTIES FOR THE COMPANY INCLUDE, BUT ARE NOT LIMITED TO, THE RISKS ASSOCIATED WITH MINERAL EXPLORATION AND FUNDING AS WELL AS THE RISKS SHOWN IN THE COMPANY'S MOST RECENT ANNUAL AND QUARTERLY REPORTS ON FORM 10-K AND FORM 10-Q, RESPECTIVELY, AND FROM TIME-TO-TIME IN OTHER PUBLICLY AVAILABLE INFORMATION REGARDING THE COMPANY. OTHER RISKS INCLUDE RISKS ASSOCIATED WITH THE REGULATORY APPROVAL PROCESS, COMPETITIVE COMPANIES, FUTURE CAPITAL REQUIREMENTS AND THE COMPANY'S ABILITY AND LEVEL OF SUPPORT FOR ITS EXPLORATION AND DEVELOPMENT ACTIVITIES. THERE CAN BE NO ASSURANCE THAT THE COMPANY'S EXPLORATION EFFORTS WILL SUCCEED AND THE COMPANY WILL ULTIMATELY ACHIEVE COMMERCIAL SUCCESS. THESE FORWARD-LOOKING STATEMENTS ARE MADE AS OF THE DATE OF THIS NEWS RELEASE, AND THE COMPANY ASSUMES NO OBLIGATION TO UPDATE THE FORWARD-LOOKING STATEMENTS, OR TO UPDATE THE REASONS WHY ACTUAL RESULTS COULD DIFFER FROM THOSE PROJECTED IN THE FORWARD-LOOKING STATEMENTS. ALTHOUGH THE COMPANY BELIEVES THAT THE BELIEFS, PLANS, EXPECTATIONS AND INTENTIONS CONTAINED IN THIS NEWS RELEASE ARE

Page 3

                    2013-01-25 MWR SWVI Provides Data on Algarrobo
REASONABLE, THERE CAN BE NO ASSURANCE THOSE BELIEFS, PLANS,
EXPECTATIONS OR INTENTIONS WILL PROVE TO BE ACCURATE. INVESTORS
SHOULD CONSIDER ALL OF THE INFORMATION SET FORTH HEREIN AND SHOULD
ALSO REFER TO THE RISK FACTORS DISCLOSED IN THE COMPANY'S PERIODIC
REPORTS FILED FROM TIME-TO-TIME WITH THE UNITED STATES SECURITIES AND
EXCHANGE COMMISSION.

THIS NEWS RELEASE HAS BEEN PREPARED BY MANAGEMENT OF THE COMPANY WHO
TAKES FULL RESPONSIBILITY FOR ITS CONTENTS. NO SECURITIES REGULATORY
AUTHORITY HAS APPROVED OR DISAPPROVED OF THE CONTENTS OF THIS NEWS
RELEASE. THIS NEWS RELEASE SHALL NOT CONSTITUTE AN OFFER TO SELL OR
THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF
THESE SECURITIES IN ANY JURISDICTION IN WHICH SUCH OFFER,
SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR
QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH JURISDICTION.


Swingplane Ventures, Inc.
For more information please visit our web site at:
W: www.swingplaneventuresinc.com
Or contact
Investor relations: 1-800-253-1692

-O- Jan/25/2013 12:00 GMT

-------------------------------==================------------------------------
                            Copyright (c) 2013

############################ END OF STORY 1 ############################

A0184

2013-01-28 MWR SWVI Provides Info on Chile's Rich Mineralization
Wire: Market Wire (MWR) Date: Jan 28 2013  7:13:33
Swingplane Ventures, Inc. Provides Information on Chile's Rich Mineralization

Swingplane Ventures, Inc. Provides Information on Chile's Rich Mineralization

SANTIAGO, CHILE -- (Marketwire) -- 01/28/13 --  Swingplane Ventures,
Inc. (OTCBB: SWVI) (the "Company") is pleased to update information
on Chile's Rich Mineralization.

Chile's well established copper porphyry belt, which hosts world
class deposits including CODELCO's giant Chuquicamata deposit which,
by excavated volume, is the largest open pit copper mine in the
world. For many years it was the mine with the largest annual
production in the world, but nevertheless it remains the mine with by
far the largest total production of approximately 29 million tonnes
of copper to the end of 2007. The La Escondida (BHP Billiton 57.5%,
30% by Rio Tinto) deposit is currently the highest producing copper
mine in the world. Its 2007 production of 1.483 million tonnes of
copper was worth US $10.12 billion and represented 26% of Chilean
copper production, according to the US Geological Survey's
preliminary estimates of 2007 world mine output.

The Chilean Iron Belt (CIB) is a similarly narrow, north-south
oriented belt containing hundreds of magnetite-apatite
("Kiruna-type") and Iron Oxide-Copper-Gold (IOCG) occurrences located
outboard (i.e. on the coastal side) of the porphyry belt and extends
approximately 600 km from 31 degrees S north to 25 degrees S. The CIB
hosts several large IOCG mines, including Candelaria (Freeport
McMoran) mine which as of December 31, 2011 reported a resource of
399 million tonnes of copper grading at 0.58% copper and 0.13% gold,
recoverable proven and probable reserves. The Mantoverde mine (Anglo
American), as well as numerous smaller mines and/or projects,
including Santo Domingo (Capstone Mining) mine which highlighted in
its pre-feasibility study completed in the third quarter of 2011
average annual production of 144 million pounds of copper, 4.1
million tonnes of iron concentrate and 15 thousand ounces of gold.
Additional mines include Relincho (Teck Corp) and Andacollo (Teck
Corp (90%) / ENAMI (10%)).

Note: The preceding contains grades and tonnages reported by the
companies cited. The grades and tonnages cited may not be compliant
with NI 43-101. Mantoverde, Santo Domingo and the Punta Del Cobre -
Candelaria Belt are considered representative of IOCG-t
ype deposits
in similar structural settings both north and south of the Property
and, as such, are considered analogues for the style of
mineralization on the Property.

"Manto-type" copper deposits overlap the CIB over a distance of
approximately 1100 km, between 33 degrees S to 21 degrees S. In
addition, IOCG occurrences have been reported within the "manto-type"
belt from just south of Vallenar (29 degrees  S) to just south of
Chanaral (26 degrees  S). These well defined belts are spatially
associated with the Atacama Fault, a well developed fault system that
extends from Iquique (20 degrees  S) north to La Serena (30 degrees
S).

The Algarrobo Property (the "Property") is interpreted to be an IOCG
occurrence located in the southern portion of CIB in the area of
overlap with "manto-type" copper occurrences, consistent with other
IOCG occurrences reported in the area. The Property is located on the
west margin of the Atacama Fault System and hosted within the Pluton
Sierra El Robe, a dioritic to quartz dioritic pluton of Jurassic age.
Page 1

2013-01-28 MWR SWVI Provides Info on Chile's Rich Mineralization

Faulting associated with the Atacama Fault System is believed to be the primary control on mineralization, both in terms of the controlling structures hosting mineralization and the fluid conduits that allowed movement of metal-rich fluids. Copper-rich hematite is the predominant form of mineralization in the oxidized zone near surface, with copper sulphides underlying a variably developed transitional zone below approximately 120 m.

Mining operations in the Algarrobo area are comprised of near surface workings to more extensive operations extending several hundred metres below surface. Approximately 35 mines, ranging from near surface excavations to underground mines, have defined, and are centered around, three main mineralized trends, as follows:

*T

-- Panga, Ecuador, Urguay, etc. in the north
-- Descubridora, Estaca, Viuda, etc. in the center
-- Buena Vista, Alicia, etc. in the south
*T


The mines developed along these well defined mineralized trends have produced variable quantities of high grade copper, shipped as direct smelting ore to the ENAMI facility at Copiapo, approximately 45 km south of the Property.

Further exploration and immediate small scale production is well justified.

Michel Voyer
 President and Director

Safe Harbor Statement

THIS NEWS RELEASE CONTAINS "FORWARD-LOOKING STATEMENTS," AS THAT TERM IS DEFINED IN SECTION 27A OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND SECTION 21E OF THE UNITED STATES SECURITIES EXCHANGE ACT OF 1934, AS AMENDED. STATEMENTS IN THIS NEWS RELEASE, WHICH ARE NOT PURELY HISTORICAL, ARE FORWARD-LOOKING STATEMENTS AND INCLUDE ANY STATEMENTS REGARDING BELIEFS, PLANS, EXPECTATIONS OR INTENTIONS REGARDING THE FUTURE.

EXCEPT FOR THE HISTORICAL INFORMATION PRESENTED HEREIN, MATTERS DISCUSSED IN THIS NEWS RELEASE CONTAIN FORWARD-LOOKING STATEMENTS THAT ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH STATEMENTS. STATEMENTS THAT ARE NOT HISTORICAL FACTS, INCLUDING STATEMENTS THAT ARE PRECEDED BY, FOLLOWED BY, OR THAT INCLUDE SUCH WORDS AS "ESTIMATE," "ANTICIPATE," "BELIEVE," "PLAN" OR "EXPECT" OR SIMILAR STATEMENTS ARE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS CONTAINED IN THIS NEWS RELEASE INCLUDE STATEMENTS RELATING TO THE COMPANY'S PLANS TO ENTER INTO A MINING OPTION AGREEMENT WITHIN THE NEXT FORTY-FIVE DAYS. RISKS AND UNCERTAINTIES FOR THE COMPANY INCLUDE, BUT ARE NOT LIMITED TO, THE RISKS ASSOCIATED WITH MINERAL EXPLORATION AND FUNDING AS WELL AS THE RISKS SHOWN IN THE COMPANY'S MOST RECENT ANNUAL AND QUARTERLY REPORTS ON FORM 10-K AND FORM 10-Q, RESPECTIVELY, AND FROM TIME-TO-TIME IN OTHER PUBLICLY AVAILABLE INFORMATION REGARDING THE COMPANY. OTHER RISKS INCLUDE RISKS ASSOCIATED WITH THE REGULATORY APPROVAL PROCESS, COMPETITIVE COMPANIES, FUTURE CAPITAL REQUIREMENTS AND THE COMPANY'S ABILITY AND

A0186

        2013-01-28 MWR SWVI Provides Info on Chile's Rich Mineralization
LEVEL OF SUPPORT FOR ITS EXPLORATION AND DEVELOPMENT ACTIVITIES.
THERE CAN BE NO ASSURANCE THAT THE COMPANY'S EXPLORATION EFFORTS WILL
SUCCEED AND THE COMPANY WILL ULTIMATELY ACHIEVE COMMERCIAL SUCCESS.
THESE FORWARD-LOOKING STATEMENTS ARE MADE AS OF THE DATE OF THIS NEWS
RELEASE, AND THE COMPANY ASSUMES NO OBLIGATION TO UPDATE THE
FORWARD-LOOKING STATEMENTS, OR TO UPDATE THE REASONS WHY ACTUAL
RESULTS COULD DIFFER FROM THOSE PROJECTED IN THE FORWARD-LOOKING
STATEMENTS. ALTHOUGH THE COMPANY BELIEVES THAT THE BELIEFS, PLANS,
EXPECTATIONS AND INTENTIONS CONTAINED IN THIS NEWS RELEASE ARE
REASONABLE, THERE CAN BE NO ASSURANCE THOSE BELIEFS, PLANS,
EXPECTATIONS OR INTENTIONS WILL PROVE TO BE ACCURATE. INVESTORS
SHOULD CONSIDER ALL OF THE INFORMATION SET FORTH HEREIN AND SHOULD
ALSO REFER TO THE RISK FACTORS DISCLOSED IN THE COMPANY'S PERIODIC
REPORTS FILED FROM TIME-TO-TIME WITH THE UNITED STATES SECURITIES AND
EXCHANGE COMMISSION.

THIS NEWS RELEASE HAS BEEN PREPARED BY MANAGEMENT OF THE COMPANY WHO
TAKES FULL RESPONSIBILITY FOR ITS CONTENTS. NO SECURITIES REGULATORY
AUTHORITY HAS APPROVED OR DISAPPROVED OF THE CONTENTS OF THIS NEWS
RELEASE. THIS NEWS RELEASE SHALL NOT CONSTITUTE AN OFFER TO SELL OR
THE SOLICITATION OF AN OFFER TO
BUY NOR SHALLTHERE BE ANY SALE OF
THESE SECURITIES IN ANY JURISDICTION IN WHICH SUCH OFFER,
SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR
QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH JURISDICTION.


For more information please visit our web site at:

Swingplane Ventures, Inc.
www.swingplaneventuresinc.net
Or contact Investor relations at:
1-800-253-1692

-0- Jan/28/2013 12:13 GMT

------------------------------=================-------------------------------
                        Copyright (c) 2013

############################ END OF STORY 1 ############################

Page 3

A0187

2013-01-30 PRN SWVI Outlines Extensive Mineralization
Wire: PR Newswire (PRN) Date: Jan 30 2013  11:56:54
Swingplane Ventures, Inc Outlines Extensive Mineralization with Depths of 450 meters
and Strikes of 4 kilometers

Swingplane Ventures, Inc Outlines Extensive Mineralization with Depths of 450
                    meters and Strikes of 4 kilometers

PR Newswire

SANTIAGO, Chile, Jan. 30, 2013

SANTIAGO, Chile, Jan. 30, 2013 /PRNewswire/ -- Swingplane Ventures, Inc.
(OTC-BB: SWVI) (the "Company") is pleased to announce a NI43-101 report and
outlines extensive mineralization.

Swingplane Venture, Inc.'s (the "Company") Algarrobo Property (the "Property")
is an Iron Oxide –Copper-Gold (IOCG) property located approximately 850 km
north of Santiago, in the III Region, Province of Chanaral, Chile.  The city
of Copiapo is located approximately 43 km to the southeast of the Property,
with the small port city of Caldera 25 km to the east. The Property consists
of 32 tenures, comprising a total of 6,161 ha (15,224 acres).

A NI 43-101 report on the Property has recently been received by Company.  The
report was based on separate Due Diligence property evaluations (February and
December, 2012) and a review of available information.  The report will be
available today on the Company's web-site at: www.swingplaneventuresinc.net.


The Main Mineralized Trend is very well defined by abundant workings, both
historical and arising from more recent work, ranging from shallow pits and
workings to mine development extending to depths up to 450 m below surface.
Taken together, these workings delineate at least three "Major Veins", having
clearly evident surface extent up to 1.3 km, with an interpreted potential
surface extent of at least 4 km along strike.

Results from two Due Diligence property evaluations are interpreted to
indicate a significant opportunity to further develop the mineral potential of
the Property and increase the current level of development.  The Company
proposes to increase the current level of development by a series of short
term initiatives including, but not limited to, the following:

   o Secure receipt of the license required for sale of ore from the Property
     to the government owned ENAMI facility in Copiapo in January, 2013.
   o Initial purchase of two jumbo scoops and a mechanized blast hole.
   o Purchase of  three, 30 tonne ore trucks to facilitate cost efficient
     transport of ore from the Property to the ENAMI facility at Copiapo
   o Purchase of a grader with which to maintain roads to, and within, the
     Property.
   o Purchase of an Excavator with which to expose and initially develop
     drifts.
   o Purchase of a crusher, Water Truck and D6 to D8 dozer (ore equivalent).

At the current time, limited production in the immediate area emphasizes
recovery and sale of high grade copper ore having an average grade of 9% Cu
("Direct Shipping Ore").  In addition, it is believed opportunities exist for
realizing additional value from the high grade copper ore documented on the
Property and, more specifically, from the drifts currently developed through
additional processing of high grade mineralized material.  Further processing
of high grade mineralized material on-site should be evaluated with the
objective of producing a silver- and/or gold-rich copper concentrate.  In
addition, further processing may present an opportunity for adding separate
flotation / processing circuits for recovery of by-product molybdenum, cobalt
and/or Light Rare Earth Elements
                              Page 1

A0188

2013-01-30 PRN SWVI Outlines Extensive Mineralization

A number of observations have been made with respect to interpreted development potential of the Property, as follows:

- o A number of well mineralized veins, up to 3.5 m thick at surface, exhibiting continuity along strike lengths up to 1.3 km and comprised of high grade copper mineralization, define a trend having minimum dimensions of 8 km northeast-southwest by 2.5 km wide and comprised of at least three Major Veins and an unknown of subsidiary veins.
- o High grade lenses have been documented underground, with maximum dimensions of 40 m horizontally by 60 metres vertically.  These lenses are tentatively interpreted to represent "blows" along veins, possible dilation zones along mineralized faults, evidence of structural control on development of mineralized veins along active faults and/or intersection of two (or more) mineralized veins and the associated damage zones .  Such lenses or "blows" represent concentrations of high grade ore and, therefore, considerable economic value for development.
- o A total of five drifts have been developed on the Property.  Three of the drifts, the "Veta Gruesa Centre", "Exploration" and Veta Gruesa East, have been developed along the Veta Gruesa, separated by a minimum of 150 m. The remaining two, False Estaca and Descubridora, are developed along interpreted extensions of Major Veins.  Work is underway to expose a second drift on the Descubridora Vein, approximately 40 m farther west and at slightly lower elevation, due to the very high grade copper ore (up to 50% Cu) exposed in the initial Descubridora Drift.
- o Similar, significant development potential is interpreted along the eastern projection of the Manto Ossa and Veta Gruesa, east of the existing Veta Gruesa East Drift.
- o An additional 11 high grade copper mineralized veins have been exposed, with a minimum of 8 additional sites proposed, for subsequent development into production drifts.
- o Documented copper grades described vary from background values between 0.3 and 2%, low grade copper between 2 and 5%, to "Direct Smelting Ore" averaging 9%, with high grade copper values in excess of 24% (to as high as 50% Cu content).
- o The potential depth extent of high grade mineralization, extending from a near surface oxide zone  through a transitional zone to an underlying sulphide zone, is currently unknown, however, there is no information suggesting it would not extend below the current depth of the existing workings.  The maximum depth of historical workings (i.e. 450 m – Viuda Mine) is interpreted to have been limited by technology available rather than the base of sulphide mineralization.
- o Currently, "Direct Shipping Ore" shipped from the Property has received payment predominantly for copper.  ENAMI currently pays for copper recovered from either copper oxide or copper sulphides, retaining the first gram of gold and/or the first ounce of silver from any "Sulphide" ore processed.  Further processing of the copper ore on-site may result in production of a silver- and/or gold-rich copper concentrate, thereby maximizing the value of gold and/or silver content
- o In addition, further processing of the copper ore may present an opportunity for adding separate flotation / processing circuits for recovery of by-product molybdenum, cobalt and/or Light Rare Earth Elements

The area including the Property encompasses an abundance of workings, within which all known major mineralized veins identified to date are located. Recent exploratory work is interpreted to indicate excellent potential for identification, and subsequent development, of multiple, high grade copper mineralized veins over a large area, potentially extending from the Roble tenures, through the eolian sand covered Angela tenures to the south, southwest and west.

Mineralized veins were previously interpreted to be limited to those comprising the north-northeast – west-southwest trending Major Veins.  Recent
Page 2

A0189

2013-01-30 PRN SWVI Outlines Extensive Mineralization
exploration is interpreted to suggest that, in addition to the Major Veins, at
least two additional sets of subordinate, subsidiary and/or en echelon copper
mineralized veins have been identified, which supplement the mineral potential
of the Major Veins.  Thickness, grade and mineralogy of veins identified on
the Property, and immediately adjacent ground, is interpreted to suggest
significant potential for identification of both additional high grade
copper-rich veins and confirmation of potentially economic copper
mineralization at greater, but potentially minable, depth

High grade mineralization identified at, and near surface, is dominated by
"almagrado", an informal term for an intimate mix of high grade copper
minerals and hematite.  An extensive suite of copper oxides, copper sulfates
and secondary copper, interpreted to comprise supergene enrichment, dominate
near surface, oxide mineralization.  Extensive development of these supergene
minerals is closely associated with high grade copper mineralized veins as an
accompanying halo of lower grade mineralization.  Supergene oxides transition
to hypogene sulphide minerals at greater depth below surface.  The near
surface, oxidized mineralization has been extensively worked to date, with
deeper transitional, mixed oxide / sulphide and deeper sulphide mineralization
reported predominantly from the deeper historical workings.  .

The Company believes there is potential for discovery, and subsequent
development, of a large number of additional, high grade copper mineralized
veins similar to those currently developed drifts.  In support of this
interpretation, Company has had an additional 11 high grade copper mineralized
veins exposed, with a minimum of 8 additional sites proposed, for subsequent
development.

Given the overall size of and the extent of the workings developed within, and
immediately adjacent to, the Property, the number of samples taken to date
from the Property to evaluate the grade of veins exposed in workings is very
small.  However, the development potential of the Property and immediately
adjacent ground, is well established, although poorly documented.  The terms
of the Option Agreement require an increase from the current level of
development, concurrent with an exploration program to further evaluate the
Property.

Recently developed workings on the Property, namely the "Veta Gruesa Centre",
"Exploration", Veta Gruesa East, False Estaca and Descubridora drifts, attest
to the significant potential that exists for identification of new areas for
development on high grade mineralized veins.  These new workings have been
developed predominantly within the last year, on veins up to 3.5 metres thick
and yielding copper grades in excess of 24% (to as high as 50% Cu content).
Sale of "Direct Shipping Ore" is pending, requiring receipt of a license from
ENAMI specific to the Property.  The Company anticipates receipt of the
license within a month, facilitating transport and sale of stockpiled ore.

In summary, the Property is interpreted to have considerable potential to host
high grade, copper mineralized, Iron Oxide-Copper-Gold (IOCG)-style vein
mineralization, comprising both exploration and development potential for the
Property.  This interpreted potential is from high grade copper mineralized
veins, and includes possible production of copper concentrate from current
"waste" dumps and low grade, copper mineralized haloes surrounding high grade
veins, as well as from elevated levels of background copper mineralization,
proposed for future evaluation.  Recommended exploration in the short term
will be undertaken with an emphasis on developing existing and/or newly
discovered, well mineralized, high grade copper veins into small scale
operations with which to develop anticipated cash flow for the Company.

The content of this news release has been reviewed by Rick Walker, B.Sc.,
M.Sc., P. Geo., a Qualified Person for the purposes of NI 43-101, with the
ability and authority to verify the authenticity and validity of the data
herein.

                              Page 3

2013-01-30 PRN SWVI Outlines Extensive Mineralization

Michel Voyer
President and Director

For more information please visit our web site at:
www.swingplaneventuresinc.net

Or contact Investor relations at:
1-800-253-1692

Safe Harbor Statement

THIS NEWS RELEASE CONTAINS ""FORWARD-LOOKING STATEMENTS"", AS THAT TERM IS DEFINED IN SECTION 27A OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND SECTION 21E OF THE UNITED STATES SECURITIES EXCHANGE ACT OF 1934, AS AMENDED. STATEMENTS IN THIS NEWS RELEASE, WHICH ARE NOT PURELY HISTORICAL, ARE FORWARD-LOOKING STATEMENTS AND INCLUDE ANY STATEMENTS REGARDING BELIEFS, PLANS, EXPECTATIONS OR INTENTIONS REGARDING THE FUTURE.

EXCEPT FOR THE HISTORICAL INFORMATION PRESENTED HEREIN, MATTERS DISCUSSED IN THIS NEWS RELEASE CONTAIN FORWARD-LOOKING STATEMENTS THAT ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH STATEMENTS. STATEMENTS THAT ARE NOT HISTORICAL FACTS, INCLUDING STATEMENTS THAT ARE PRECEDED BY, FOLLOWED BY, OR THAT INCLUDE SUCH WORDS AS "ESTIMATE"", """ANTICIPATE"", ""BELIEVE"", ""PLAN"" OR ""EXPECT"" OR SIMILAR STATEMENTS ARE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS CONTAINED IN THIS NEWS RELEASE INCLUDE STATEMENTS RELATING TO THE COMPANY''S PLANS TO ENTER INTO A MINING OPTION AGREEMENT WITHIN THE NEXT FORTY-FIVE DAYS. RISKS AND UNCERTAINTIES FOR THE COMPANY INCLUDE, BUT ARE NOT LIMITED TO, THE RISKS ASSOCIATED WITH MINERAL EXPLORATION AND FUNDING AS WELL AS THE RISKS SHOWN IN THE COMPANY'S MOST RECENT ANNUAL AND QUARTERLY REPORTS ON FORM 10-K AND FORM 10-Q, RESPECTIVELY, AND FROM TIME-TO-TIME IN OTHER PUBLICLY AVAILABLE INFORMATION REGARDING THE COMPANY. OTHER RISKS INCLUDE RISKS ASSOCIATED WITH THE REGULATORY APPROVAL PROCESS, COMPETITIVE COMPANIES, FUTURE CAPITAL REQUIREMENTS AND THE COMPANY''S ABILITY AND LEVEL OF SUPPORT FOR ITS EXPLORATION AND DEVELOPMENT ACTIVITIES. THERE CAN BE NO ASSURANCE THAT THE COMPANY''S EXPLORATION EFFORTS WILL SUCCEED AND THE COMPANY WILL ULTIMATELY ACHIEVE COMMERCIAL SUCCESS. THESE FORWARD-LOOKING STATEMENTS ARE MADE AS OF THE DATE OF THIS NEWS RELEASE, AND THE COMPANY ASSUMES NO OBLIGATION TO UPDATE THE FORWARD-LOOKING STATEMENTS, OR TO UPDATE THE REASONS WHY ACTUAL RESULTS COULD DIFFER FROM THOSE PROJECTED IN THE FORWARD-LOOKING STATEMENTS. ALTHOUGH THE COMPANY BELIEVES THAT THE BELIEFS, PLANS, EXPECTATIONS AND INTENTIONS CONTAINED IN THIS NEWS RELEASE ARE REASONABLE, THERE CAN BE NO ASSURANCE THOSE BELIEFS, PLANS, EXPECTATIONS OR INTENTIONS WILL PROVE TO BE ACCURATE. INVESTORS SHOULD CONSIDER ALL OF THE INFORMATION SET FORTH HEREIN AND SHOULD ALSO REFER TO THE RISK FACTORS DISCLOSED IN THE COMPANY'S PERIODIC REPORTS FILED FROM TIME-TO-TIME WITH THE UNITED STATES SECURITIES AND EXCHANG ECOMMISSION.

THIS NEWS RELEASE HAS BEEN PREPARED BY MANAGEMENT OF THE COMPANY WHO TAKES FULL RESPONSIBILITY FOR ITS CONTENTS. NO SECURITIES REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED OF THE CONTENTS OF THIS NEWS RELEASE. THIS NEWS RELEASE SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALLTHERE BE ANY SALE OF THESE SECURITIES IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH JURISDICTION.

SOURCE Swingplane Ventures, Inc.

Website: http://www.swingplaneventuresinc.net/

A0191

```
          2013-01-30 PRN SWVI Outlines Extensive Mineralization
-0- Jan/30/2013 16:56 GMT

-----------------------------===================----------------------------
                            Copyright (c) 2013

############################# END OF STORY 1 #############################
```

A0192

2013-01-31 MWR SWVI High Grade Copper Analysis
Wire: Market Wire (MWR) Date: Jan 31 2013  18:33:56
Swingplane Ventures, Inc. High Grade Copper Analyses

Swingplane Ventures, Inc. High Grade Copper Analyses

SANTIAGO, CHILE -- (Marketwire) -- 01/31/13 --  Swingplane Ventures,
Inc. (OTCBB: SWVI) (the "Company") is pleased to update information
on the History of the Algarrobo property.

Swingplane Venture Inc.'s (the "Company") Algarrobo Property (the
"Property") is an Iron Oxide -Copper-Gold (IOCG) property located
approximately 850 km north of Santiago, in the III Region, Province
of Chanaral, Chile. The city of Copiapo is located approximately 43
km to the southeast of the Property, with the small port city of
Caldera 25 km to the east. The Property consists of 32 tenures,
comprising a total of 6,161 ha (15,224 acres).

Between December 6 and 9th, 2012, a second property evaluation was
undertaken on the Property, during which 6 additional representative
grab samples were recovered, primarily to evaluate high grade
mineralized material recovered from the recently exposed Descubridora
Drift. Grab samples were recovered from high grade mineralized
material visually sorted into four piles, grading approximately 10%
(ALGARW12-011 - mix of high grade mineralized material from
Descubridora and False Estaca workings), 20% (ALGARW12-010), 30%
(ALGARW12-009) and 40% (ALGARW12-012) Cu. These samples have a high
proportion of Brochantite (Cu4SO4(OH)6 which, as a mineral, contains
approximately 70% copper content. The fifth sample, ALGARW12-008, was
of high grade mineralized material recovered from recent development
from the Veta Gruesa Centre Drift having visible gold developed along
fracture surfaces.

*T

| Sample | Easting | Northing | Wgt | Cu | Mo | Ag | Co | Fe | Au |
|--------|---------|----------|-----|-----|-----|-----|-----|-----|-----|
|        |         |          | kg | % | ppm | ppm | ppm | % | ppm |
| ALGA12RW-007 | 343799 | 7008248 | 2.02 | 24.92 | 192 | 25.3 | 851 | 0.54 | 1.765 |
| ALGA12RW-008 | 344433 | 7007462 | 1.06 | 6.274 | 662 | 5.6 | 471 | 24.96 | 3.156 |
| ALGA12RW-009 | 343799 | 7007462 | 3.40 | 46.58 | 154 | 4.7 | 15 | 34.33 | 1.221 |
| ALGA12RW-010 | 343799 | 7007462 | 4.02 | 17.19 | 190 | 24.8 | 1458 | 2.83 | 3.269 |
| ALGA12RW-011 | 343799 | 7007462 | 3.08 | 18.35 | 260 | 20.0 | 1611 | 34.08 | 2.237 |
| ALGA12RW-012 | 343799 | 7007462 | 2.84 | 41.26 | 182 | 112.9 | 540 | 28.82 | 0.657 |

Note: Grab samples are selective by nature and are unlikely to represent
average grades of the deposit.
Initial analysis by Group 1E 4 acid digestion followed by multi-element,
Inductively Coupled Plasma (ICP) with ICP-ES finish. Over-limit analysis for
copper by Group 8TD.OL 4 acid digestion with AAS finish. Finally High Grade
copper analysis by Classical Titration. Gold by Fire Assay with AAS finish.

*T

A0193

2013-01-31 MWR SWVI High Grade Copper Analysis

The suite of samples recovered document very high grade copper grades. Samples were recovered from stockpiles of visually sorted, high grade mineralized material for shipment and sale to ENAMI. In addition to high grade copper, the samples all returned very anomalous levels of gold, ranging between 0.657 and 3.269 ppm. Molybdenum values are all moderately to highly anomalous, ranging between 154 and 662 ppm. Similarly, silver grades are strongly elevated in all samples, with four returning silver between 20.0 and 112.9 g/t Ag. Cobalt values are moderately to strongly elevated, consistent with sample results from the previous property visit, ranging between 15 and 1611, with an average of 824 ppm.

Iron values from ALGARW12-007 are surprisingly low, however, an analysis of 24.92% Cu is interpreted to suggest the sample represents copper oxides rather than "almagrado" (an intimate mix of high grade copper minerals and hematite).

Samples were sent to Acme Analytical Laboratories S.A. in Copiapo. High grade copper samples were sent, internally, from the Acme lab in Copiapo to their lab in Vancouver, BC for quantitative volumetric analysis of high grade copper content (classical titration).

The ENAMI facility at Copiapo (45 km south of the Property) is a government owned smelter and processing facility, primarily for copper ore. The minimum grade accepted, without penalty, is 9% copper. Sale of high grade mineralized material to ENAMI requires a license from ENAMI after a thorough review of the application for license and a review of the property and workings for which the license is being sought. The Company expects to receive the necessary license required for sale of high grade mineralized material on behalf of the Company within the month.

The content of this news release has been reviewed by Rick Walker, B.Sc., M.Sc., P. Geo., a Qualified Person for the purposes of NI 43-101, with the ability and authority to verify the authenticity and validity of the data herein.

Safe Harbor Statement

THIS NEWS RELEASE CONTAINS "FORWARD-LOOKING STATEMENTS," AS THAT TERM IS DEFINED IN SECTION 27A OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND SECTION 21E OF THE UNITED STATES SECURITIES EXCHANGE ACT OF 1934, AS AMENDED. STATEMENTS IN THIS NEWS RELEASE, WHICH ARE NOT PURELY HISTORICAL, ARE FORWARD-LOOKING STATEMENTS AND INCLUDE ANY STATEMENTS REGARDING BELIEFS, PLANS, EXPECTATIONS OR INTENTIONS REGARDING THE FUTURE.

EXCEPT FOR THE HISTORICAL INFORMATION PRESENTED HEREIN, MATTERS DISCUSSED IN THIS NEWS RELEASE CONTAIN FORWARD-LOOKING STATEMENTS THAT ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH STATEMENTS. STATEMENTS THAT ARE NOT HISTORICAL FACTS, INCLUDING STATEMENTS THAT ARE PRECEDED BY, FOLLOWED BY, OR THAT INCLUDE SUCH WORDS AS "ESTIMATE," "ANTICIPATE," "BELIEVE," "PLAN" OR "EXPECT" OR SIMILAR STATEMENTS ARE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS CONTAINED IN THIS NEWS RELEASE INCLUDE STATEMENTS RELATING TO THE COMPANY'S PLANS TO ENTER INTO A MINING OPTION AGREEMENT WITHIN THE NEXT FORTY-FIVE DAYS. RISKS AND UNCERTAINTIES FOR THE COMPANY INCLUDE, BUT ARE NOT LIMITED TO, THE RISKS ASSOCIATED WITH MINERAL EXPLORATION AND FUNDING AS WELL AS THE RISKS SHOWN IN THE COMPANY'S MOST RECENT ANNUAL AND QUARTERLY REPORTS ON FORM 10-K AND FORM 10-Q,

A0194

2013-01-31 MWR SWVI High Grade Copper Analysis
RESPECTIVELY, AND FROM TIME-TO-TIME IN OTHER PUBLICLY AVAILABLE
INFORMATION REGARDING THE COMPANY. OTHER RISKS INCLUDE RISKS
ASSOCIATED WITH THE REGULATORY APPROVAL PROCESS, COMPETITIVE
COMPANIES, FUTURE CAPITAL REQUIREMENTS AND THE COMPANY'S ABILITY AND
LEVEL OF SUPPORT FOR ITS EXPLORATION AND DEVELOPMENT ACTIVITIES.
THERE CAN BE NO ASSURANCE THAT THE COMPANY'S EXPLORATION EFFORTS WILL
SUCCEED AND THE COMPANY WILL ULTIMATELY ACHIEVE COMMERCIAL SUCCESS.
THESE FORWARD-LOOKING STATEMENTS ARE MADE AS OF THE DATE OF THIS NEWS
RELEASE, AND THE COMPANY
ASSUMES NO OBLIGATION TO UPDATE THE
FORWARD-LOOKING STATEMENTS, OR TO UPDATE THE REASONS WHY ACTUAL
RESULTS COULD DIFFER FROM THOSE PROJECTED IN THE FORWARD-LOOKING
STATEMENTS. ALTHOUGH THE COMPANY BELIEVES THAT THE BELIEFS, PLANS,
EXPECTATIONS AND INTENTIONS CONTAINED IN THIS NEWS RELEASE ARE
REASONABLE, THERE CAN BE NO ASSURANCE THOSE BELIEFS, PLANS,
EXPECTATIONS OR INTENTIONS WILL PROVE TO BE ACCURATE. INVESTORS
SHOULD CONSIDER ALL OF THE INFORMATION SET FORTH HEREIN AND SHOULD
ALSO REFER TO THE RISK FACTORS DISCLOSED IN THE COMPANY'S PERIODIC
REPORTS FILED FROM TIME-TO-TIME WITH THE UNITED STATES SECURITIES AND
EXCHANGE COMMISSION.

THIS NEWS RELEASE HAS BEEN PREPARED BY MANAGEMENT OF THE COMPANY WHO
TAKES FULL RESPONSIBILITY FOR ITS CONTENTS. NO SECURITIES REGULATORY
AUTHORITY HAS APPROVED OR DISAPPROVED OF THE CONTENTS OF THIS NEWS
RELEASE. THIS NEWS RELEASE SHALL NOT CONSTITUTE AN OFFER TO SELL OR
THE SOLICITATION OF AN OFFER TO BUY NOR SHALLTHERE BE ANY SALE OF
THESE SECURITIES IN ANY JURISDICTION IN WHICH SUCH OFFER,
SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR
QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH JURISDICTION.


Michel Voyer
President and Director
For more information please visit our web site at:
W: www.swingplaneventuresinc.net
Or contact;
Investor relations: 1-800-253-1692

-0- Jan/31/2013 23:33 GMT

------------------------------=========================------------------------------
Copyright (c) 2013

############################ END OF STORY 1 ############################

Page 3

A0195