From: (702) 818-5898
Patrick Mokros
Empire Stock Transfer Inc.
1859 Whitney Mesa

Henderson, NV 89014

Origin ID: LASA


FedEx
Express

E

J131012121900326

Ship Date: 22JAN13
ActWgt: 1.0 LB
CAD: 5040518/INET3370

**Delivery Address Bar Code**

SHIP TO: (480) 603-4914          BILL THIRD PARTY
**TIM SCARPINO**
**Scottsdale Capital Advisors Corp.**
**7170 E MCDONALD DR STE 6**

**SCOTTSDALE, AZ 85253**

Ref #     GOFF 148-150
Invoice #
PO #
Dept #



WED - 23 JAN  A1
PRIORITY OVERNIGHT

TRK#   **7945 7603 8428**
0201

**XH SCFA**

85253
AZ-US

PHX

518G2/781363AB

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

**GOFF Scans 299**



NUMBER
148

COMMON STOCK

# GOFF, CORP

Par Value $.001
INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

SHARES
***1,050,000***

COMMON STOCK
CUSIP 36190U107

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Caledonian Bank Limited***

is the Owner of *** One Million Fifty Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
GOFF, CORP

*transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.*

*Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.*

Dated: January 22, 2013

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

CORPORATE SEAL

XXXXXXXXXX
DIRECTOR

PRESIDENT

B 38826

GOFF Scans 301



NUMBER
149

COMMON STOCK

SHARES
***870,000***

COMMON STOCK
CUSIP 36190U107

SEE REVERSE FOR CERTAIN DEFINITIONS

# GOFF, CORP

Par Value $.001

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

THIS  CERTIFIES THAT

***Legacy Global Markets, S.A.***

is the Owner of *** Eight Hundred Seventy Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
GOFF, CORP
transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.
Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated: **January 22, 2013**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
                                    Transfer Agent and Registrar
By
          AUTHORIZED SIGNATURE

CORPORATE
SEAL

XXXXXXXXXX
DIRECTOR

PRESIDENT

B   36827

GOFF Scans 302

**Goff TA# 17, p.55**



NUMBER
150

COMMON STOCK

**SHARES**
***1,000,000***

**COMMON STOCK**
CUSIP 36190U107

SEE REVERSE FOR CERTAIN DEFINITIONS

## *GOFF, CORP*

Par Value $.001
INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

THIS CERTIFIES THAT

***Clear Water Securities Inc.***

is the Owner of *** One Million ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
**GOFF, CORP**

*transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.*

*Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.*

Dated: **January 22, 2013**

COUNTERSIGNED AND REGISTERED:
**EMPIRE STOCK TRANSFER INC.**
Transfer Agent and Registrar

By _____
AUTHORIZED SIGNATURE

CORPORATE
SEAL

XXXXXXXXX
DIRECTOR

PRESIDENT

B  38828

GOFF Scans 303

**Goff TA# 17, p.56**

**From:** Matthew Blevins
**Sent:** Tuesday, January 15, 2013 6:15 PM
**To:** Matthew Blevins
**Subject:** FW: GOFF Phil 1; 42pm 15-Jan-13
**Attachments:** GOFF Phil 12 42pm 15 Jan 13.docx

Caledonian

why not register the shares in Cede?

offer to register shares in their with FBO or in Cede.

Matthew Blevins
Empire Stock Transfer Inc.

--
Please Take Our Customer Satisfaction Survey
http://empirestock.com/survey.html



http://www.linkedin.com/pub/matthew-blevins/7/3b0/9a7
EMPIRE STOCK TRANSFER INC.
1859 Whitney Mesa Dr.
Henderson, NV 89014
Phone: (702) 818-5898
Fax: (702) 974-1444
Email: mjb@empirestock.com
Web: www.empirestock.com

CONFIDENTIALITY NOTICE: This e-mail and any attached documents contain information which is PRIVILEGED, PROPRIETARY and CONFIDENTIAL, are protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521, Federal and State copyright laws, and are intended only for the use of the recipient(s) named herein. No part of this document or any attachments may be reproduced or transmitted without permission from Empire Stock Transfer Inc. If you are not the intended recipient, you arehereby notified that any disclosure, distribution, or the taking of anyaction in reliance upon the contents of this communication is strictly prohibited. If you have received this transmission in error, please notify us immediately.

**From:** Nod [mailto:Nathaniel.Orr-Depner@caledonian.com]
**Sent:** Tuesday, January 15, 2013 9:58 AM
**To:** Matthew Blevins
**Cc:** CSL
**Subject:** GOFF Phil 1; 42pm 15-Jan-13

Good day Matt,

My name is Nathaniel Orr-Depner and I am the Managing Director for Caledonian Securities Limited.

1

**Goff TA# 17 Emails, p.5**

A0360

We are a CIMA licensed broker dealer and custodian in the Cayman Islands.  Caledonian is a 43-year old firm and our group is a pillar of the entity.

My client has requested the following certs (which are in your possession) to be cut and sent to our attention.  We act as custodian on behalf of many clients and have a good deal in custody. We would like these certs cut by yourselves and mailed to our attention.

Please let me know what other information you need to make this happen--along with the ETA.

Thanks in advance. I look forward to your reply.

Cheers,
-NOD-

**Nathaniel Orr-Depner**
Managing Director
**Caledonian Securities Limited**
**Caledonian House**
P.O. Box 1043
69 Dr. Roy's Drive, George Town
Grand Cayman KY1-1102, Cayman Islands
**Trading desk direct; +1 345 914 4850**
**Check out our online client portal:**
http://www.caledonian.com/introducing-caledonian-client-access
☎ (345) 949-0050    📱 (345) 914-4865    📱 (345) 526-4865    🖨 (345) 814 4882
✉ NOD@Caledonian.com    🌐 www.caledonian.com    NOD.CALEDONIAN



Discover Caledonian's Services
click here
CALEDONIAN
GLOBAL FINANCIAL SERVICES

▶Please consider the environment before printing this email

CALEDONIAN CONFIDENTIALITY NOTICE:

This email/fax (including any attachment(s)) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error of transmission. It is intended solely for the recipient(s) to whom it is addressed. It should not be read, copied, distributed, disclosed or otherwise used by any other person. If you have received this email/fax in error you are prohibited from opening any attachments and you are requested to delete it from your system and to notify the sender immediately.

To learn more about us visit our website www.caledonian.com

This footnote also confirms that this email message has been swept for the presence of computer viruses.

**Goff TA# 17 Emails, p.6**

A0361

| | |
|---|---|
| **From:** | Nod <Nathaniel.Orr-Depner@caledonian.com> |
| **Sent:** | Tuesday, January 15, 2013 6:28 PM |
| **To:** | Matthew Blevins |
| **Cc:** | Brian Barthlow; Caledonian Securities Limited |
| **Subject:** | Re: GOFF Phil 1; 42pm 15-Jan-13 |

Hello Matt,

I just left the office but can call any time. I will be in early on Wednesday and call.

-NOD-

Nathaniel Orr-Depner
Managing Director
Caledonian Securities Limited
Direct +1 (345) 914-4865          Mobile +
Skype: NOD.Caledonian

On Jan 15, 2013, at 6:14 PM, "Matthew Blevins" <mjb@empirestock.com> wrote:

> Please phone me in the morning to discuss this matter.
>
> Thanks,
>
> Matthew Blevins
> Empire Stock Transfer Inc.
>
> --
> Please Take Our Customer Satisfaction Survey
> http://empirestock.com/survey.html
>
> <image012.jpg><image013.png> <image014.png> <image015.jpg>
> http://www.linkedin.com/pub/matthew-blevins/7/3b0/9a7
> EMPIRE STOCK TRANSFER INC.
> 1859 Whitney Mesa Dr.
> Henderson, NV 89014
> Phone: (702) 818-5898
> Fax: (702) 974-1444
> Email: mjb@empirestock.com
> Web: www.empirestock.com
>
> CONFIDENTIALITY NOTICE: This e-mail and any attached documents contain information which is
> PRIVILEGED, PROPRIETARY and CONFIDENTIAL, are protected by the Electronic Communications Privacy
> Act, 18 U.S.C. Sections 2510-2521, Federal and State copyright laws, and are intended only for the use of
> the recipient(s) named herein.  No part of this document or any attachments may be reproduced or
> transmitted without permission from Empire Stock Transfer Inc.  If you are not the intended recipient,
> you arehereby notified that any disclosure, distribution, or the taking of anyaction in reliance upon the

1

**Goff TA# 17 Emails, p.7**

A0362

contents of this communication is strictly prohibited.  If you have received this transmission in error, please notify us immediately.

**From:** Nod [mailto:Nathaniel.Orr-Depner@caledonian.com]
**Sent:** Tuesday, January 15, 2013 9:58 AM
**To:** Matthew Blevins
**Cc:** CSL
**Subject:** GOFF Phil 1; 42pm 15-Jan-13

Good day Matt,

My name is Nathaniel Orr-Depner and I am the Managing Director for Caledonian Securities Limited.

We are a CIMA licensed broker dealer and custodian in the Cayman Islands.  Caledonian is a 43-year old firm and our group is a pillar of the entity.

My client has requested the following certs (which are in your possession) to be cut and sent to our attention.   We act as custodian on behalf of many clients and have a good deal in custody. We would like these certs cut by yourselves and mailed to our attention.

Please let me know what other information you need to make this happen--along with the ETA.

Thanks in advance. I look forward to your reply.

Cheers,
-NOD-

**Nathaniel Orr-Depner**
Managing Director
**Caledonian Securities Limited**
**Caledonian House**
P.O. Box 1043
69 Dr. Roy's Drive, George Town
Grand Cayman KY1-1102, Cayman Islands
**Trading desk direct: +1 345 914 4850**
**Check out our online client portal:**
**http://www.caledonian.com/introducing-caledonian-client-access**
<image016.jpg> (345) 949-0050    <image017.jpg> (345) 914-4865    <image018.jpg> (345) 526-4865    <image019.jpg> (345) 814 4882
<image020.jpg> NOD@Caledonian.com    <image021.jpg> www.caledonian.com    <image022.png> NOD.CALEDONIAN

<image023.jpg> <image024.jpg>
<image025.jpg>
<image026.jpg> Please consider the environment before printing this email

CALEDONIAN CONFIDENTIALITY NOTICE:

This email/fax (including any attachment(s)) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error of transmission. It is intended solely for the recipient(s) to whom it is addressed. It should not be read, copied, distributed, disclosed or otherwise used by any other person. If you have received this email/fax in error you are prohibited from opening any attachments and you are requested to delete it from your system and to notify the sender immediately.

To learn more about us visit our website www.caledonian.com

This footnote also confirms that this email message has been swept for the presence of computer viruses.

2

A0363

| From: | Nod <Nathaniel.Orr-Depner@caledonian.com> |
|---|---|
| Sent: | Thursday, January 17, 2013 1:24 PM |
| To: | Brian Barthlow; Matthew  Blevins; Kohli, Kush (RBC IS) |
| Cc: | CSL |
| Subject: | RE: GOFF 137 144 121 119 111 109 108 103 105 122 120 |

Hello Brian and Matthew,

Thanks for your mail.
We are waiting on our sub-custodian to give us their street name. Once we have that-we will revert.
Cheers,
-NOD-


-NOD-
Caledonian Securities Limited
**Trading desk direct; +1 345 914 4850**
☎ (345) 949-0050   📞 (345) 914-4865   📱 (345) 526-4865

**From:** Brian Barthlow [mailto:brian@empirestock.com]
**Sent:** Thursday, January 17, 2013 1:09 PM
**To:** Nod; Matthew Blevins
**Cc:** CSL
**Subject:** RE: GOFF 137 144 121 119 111 109 108 103 105 122 120

Good Morning Everybody

Need to follow-up on the above-mentioned transfer. As I am to understand to keep the certificate from being Restricted control you would be able to provide us updated instructions to transfer the shares as
Caledonian Bank Limited FBO "shareholder"

Please provide me the updated instructions at your earliest convenience as we cannot hold this item past tomorrow 1/18/2013

Best Regards
BRIAN BARTHLOW

Please Take Our Customer Satisfaction Survey
http://empirestock.com/survey.html

Empire Stock Transfer Inc.
1859 Whitney Mesa Dr.
Henderson, Nevada 89014
(702) 818-5898



CONFIDENTIALITY NOTICE: This e-mail and any attached documents contain information which is PRIVILEGED,
PROPRIETARY and CONFIDENTIAL, are protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-

1

**Goff TA# 17 Emails, p.9**

A0364

2521, Federal and State copyright laws, and are intended only for the use of the recipient(s) named herein.  No part of this document or any attachments may be reproduced or transmitted without permission from Empire Stock Transfer Inc.  If you are not the intended recipient, you are hereby notified that any disclosure, distribution, or the taking of any action in reliance upon the contents of this communication is strictly prohibited.  If you have received this transmission in error, please notify us immediately.

**From:** Nod [mailto:Nathaniel.Orr-Depner@caledonian.com]
**Sent:** Tuesday, January 15, 2013 3:28 PM
**To:** Matthew Blevins
**Cc:** Brian Barthlow; Caledonian Securities Limited
**Subject:** Re: GOFF Phil 1; 42pm 15-Jan-13

Hello Matt,

I just left the office but can call any time. I will be in early on Wednesday and call.

-NOD-


Nathaniel Orr-Depner
Managing Director
Caledonian Securities Limited
Direct  +1 (345) 914-4865          Mobile +1 ▮▮▮▮▮▮▮
Skype: NOD.Caledonian

On Jan 15, 2013, at 6:14 PM, "Matthew  Blevins" <mjb@empirestock.com> wrote:

> Please phone me in the morning to discuss this matter.
>
> Thanks,
>
> Matthew Blevins
> Empire Stock Transfer Inc.
>
> --
> Please Take Our Customer Satisfaction Survey
> http://empirestock.com/survey.html
>
> <image012.jpg><image013.png> <image014.png> <image015.jpg>
> http://www.linkedin.com/pub/matthew-blevins/7/3b0/9a7
> EMPIRE STOCK TRANSFER INC.
> 1859 Whitney Mesa Dr.
> Henderson, NV 89014
> Phone:  (702) 818-5898
> Fax:  (702) 974-1444
> Email:  mjb@empirestock.com
> Web:  www.empirestock.com
>
> CONFIDENTIALITY NOTICE: This e-mail and any attached documents contain information which is PRIVILEGED, PROPRIETARY and CONFIDENTIAL, are protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521, Federal and State copyright laws, and are intended only for the use of the recipient(s) named herein.  No part of this document or any attachments may be reproduced or transmitted without permission from Empire Stock Transfer Inc.  If you are not the intended recipient,

**Goff TA# 17 Emails, p.10**

A0365

you arehereby notified that any disclosure, distribution, or the taking of anyaction in reliance upon the contents of this communication is strictly prohibited.  If you have received this transmission in error, please notify us immediately.

---

**From:** Nod [mailto:Nathaniel.Orr-Depner@caledonian.com]
**Sent:** Tuesday, January 15, 2013 9:58 AM
**To:** Matthew Blevins
**Cc:** CSL
**Subject:** GOFF Phil 1; 42pm 15-Jan-13

Good day Matt,

My name is Nathaniel Orr-Depner and I am the Managing Director for Caledonian Securities Limited.

We are a CIMA licensed broker dealer and custodian in the Cayman Islands.  Caledonian is a 43-year old firm and our group is a pillar of the entity.

My client has requested the following certs (which are in your possession) to be cut and sent to our attention.   We act as custodian on behalf of many clients and have a good deal in custody. We would like these certs cut by yourselves and mailed to our attention.

Please let me know what other information you need to make this happen--along with the ETA.

Thanks in advance. I look forward to your reply.

Cheers,
-NOD-

**Nathaniel Orr-Depner**
Managing Director
**Caledonian Securities Limited**
**Caledonian House**
P.O. Box 1043
69 Dr. Roy's Drive, George Town
Grand Cayman KY1-1102, Cayman Islands
**Trading desk direct; +1 345 914 4850**
**Check out our online client portal:**
http://www.caledonian.com/introducing-caledonian-client-access
<image016.jpg>(345) 949-0050   <image017.jpg>(345) 914-4865   <image018.jpg> (345) 526-4865   <image019.jpg> (345) 814 4882
<image020.jpg>NOD@Caledonian.com   <image021.jpg>www.caledonian.com   <image022.png> NOD.CALEDONIAN

<image023.jpg><image024.jpg>
<image025.jpg>
<image026.jpg>Please consider the environment before printing this email

CALEDONIAN CONFIDENTIALITY NOTICE:

This email/fax (including any attachment(s)) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error of transmission. It is intended solely for the recipient(s) to whom it is addressed. It should not be read, copied, distributed, disclosed or otherwise used by any other person. If you have received this email/fax in error you are prohibited from opening any attachments and you are requested to delete it from your system and to notify the sender immediately.

To learn more about us visit our website www.caledonian.com

This footnote also confirms that this email message has been swept for the presence of computer viruses.

3

**Goff TA# 17 Emails, p.11**

# GOFF - GOFF, Corp
## Stock Transfer - Final Transaction Report

2/26/13  12:47 pm

Page 1 of 1

Control Ticket Number: STTK000000040011
Type of Stock being Transferred:  CS2
Paper certifs being Transferred from: 1
Paper certifs being Transferred to:    1

Tax Reason: N/A     Acquired: 02/26/13

Transaction Number:     38
Total Shares: 8,750,000

Transfer Date: 02/26/13
Sale Amt/share: $ 0.00000

Received From: ALAN GRAHAM
Received: 02/26/13 at 09:58   Tran Type: Routine     Item Count: 1
How Received: UPS

Sent: 02/26/13 at 12:46          How Sent:
Outgoing Tracking Number:  794841091514

----Transfer From----                              ----Transfer To----

| Line # | Shareholder | Certificate Number | Number of Shares | Line # | Shareholder | Certificate Number | Shares per Certif |
|---|---|---|---|---|---|---|---|
| 1 | 17  Alan Gahan | CS2  160 | 8,750,000 | 1 | 41  Caledonian Bank Limited | CS2  163 | 8,750,000 |
| | | | 8,750,000 | | Number of new certs: 1 | | 8,750,000 |



Completed By: BB        Report Run By: BB 02/26/13 12:47:12 pm

A0367

RECEIVED
FEB 26 2013
EMPIRE STOCK TRANSFER , INC.

### MEMORANDUM

**To:** Empire Stock Transfer

**From:** Alan Gahan

**Re:** Goff, Corp.

**Date:** February 18, 2013

---

Enclosed please find shares certificate #160 for 8,750,000 shares of Goff, Corp. with a medallion guarantee attached.

Could you please re-register these shares as follows:

Caledonian Bank Limited
69 Dr. Roy's Drive George Town
Grand Cayman KY1-1102 Cayman Islands

The cost basis is $.001 per share.

Applicable transfer fees of $45.00 are enclosed as well.

Upon completion of the re-registration, could you please send the shares by Federal Express (account number 337074073) to the following address:

Caledonian Bank Limited
69 Dr. Roy's Drive George Town
Grand Cayman KY1-1102 Cayman Islands
Attention: Alicia Dixon

Please contact me at (213) 369-6575 should you have any questions regarding the foregoing. Please forward a copy of the Federal Express tracking number to:
corporatedd@gmail.com

From: (702) 818-5898        Origin ID: LASA
Patrick Mokros
Empire Stock Transfer Inc.
1859 Whitney Mesa

Henderson, NV 89014
UNITED STATES

Ship Date: 26FEB13
ActWgt: 0.5 LB
CAD: 504051814/NET3370

REF: GOFF 163
DESC-1: Legal Documents
DESC-2:
DESC-3:
DESC-4:
EEI: NO EEI 30.37(a)
COUNTRY MFG: US
CARRIAGE VALUE: 0.00 USD
CUSTOMS VALUE: 1.00 USD
T/C: R 337074073        D/T: R
SIGN: Patrick Mokros
EIN/VAT:
PKG TYPE: ENV

SHIP TO: 3459144960        BILL RECIPIENT
CALEDONIAN BANK LIMITED
CALEDONIAN BANK LIMITED
69 DR ROYS DR

GRAND CAYMAN, KY11102
KY



PM
INTL PRIORITY

TRK# 7948 4109 1514
0430

X5 GCMA

475
-KY
MIA



These commodities, technology, or software were exported from the United States in accordance with the export administration regulations. Diversion contrary to United States law prohibited.

The Warsaw Convention may apply and will govern and in most cases limit the liability of Federal Express for loss or delay of or damage to your shipment.  Subject to the conditions of the contract.

CONSIGNEE COPY - PLEASE PLACE IN POUCH

518G2DCF863A8

After printing this label:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

LEGAL TERMS AND CONDITIONS OF FEDEX SHIPPING DEFINITIONS. On this Air Waybill, "we", "our", "us", and "FedEx" refer to Federal Express Corporation, its subsidiaries and branches and their respective employees, agents, and independent contractors. The terms "you" and "your" refer to the shipper, its employees, principals and agents. If your shipment originates outside the United States, your contract of carriage is with the FedEx subsidiary, branch or independent contractor who originally accepts the shipment from you. The term "package" means any container or envelope that is accepted by us for delivery, including any such items tendered by you utilizing our automated systems, meters, manifests or waybills. The term "shipment" means all packages which are tendered to and accepted by us on a single Air Waybill. AIR CARRIAGE NOTICE. For any international shipments by air, the Warsaw Convention, as amended, may be applicable. The Warsaw Convention, as amended, will then govern and in most cases limit FedEx's liability for loss, delay of, or damage to your shipment. The Warsaw Convention, as amended, limits FedEx's liability. For example in the U.S. liability is limited to $9.07 per pound (20$ per kilogram), unless a higher value for carriage is declared as described below and you pay any applicable supplementary charges. The interpretation and operation of the Warsaw Convention's liability limits may vary in each country. There are no specific stopping places which are agreed to and FedEx reserves the right to route the shipment in any way FedEx deems appropriate. ROAD TRANSPORT NOTICE. Shipments transported solely by road to or from a country which is a party to the Warsaw Convention or the Contract for the International Carriage of Goods by Road (the "CMR") are subject to the terms and conditions of the CMR, notwithstanding any other provision of the Air Waybill to the contrary. For those shipments transported solely by road, if a conflict arises between the provisions of the CMR and this Air Waybill, the terms of the CMR shall prevail. LIMITATION OF LIABILITY. If not governed by the Warsaw Convention, the CMR, or other international treaties, laws, other government regulations, orders, or requirements, FedEx's maximum liability for damage, loss, delay, shortage, mis-delivery, nondelivery, misinformation or failure to provide information in connection with your shipment is limited by this Agreement and as set out in the terms and conditions of the contract of carriage. Please refer to the contract of carriage set forth in the applicable FedEx Service Guide or its equivalent to determine the contractual limitation. FedEx does not provide cargo liability or all-risk insurance, but you may pay an additional charge for each additional U.S. $100 (or equivalent local currency for the country of origin) of declared value for carriage. If a higher value for carriage is declared and the additional charge is paid, FedEx's maximum liability will be the lesser of the declared value for carriage or your actual damages. LIABILITIES NOT ASSUMED. IN ANY EVENT, FEDEX WON'T BE LIABLE FOR ANY DAMAGES, WHETHER DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL IN EXCESS OF THE DECLARED VALUE FOR CARRIAGE (INCLUDING BUT NOT LIMITED TO LOSS OF INCOME OR PROFITS) OR THE ACTUAL VALUE OF THE SHIPMENT, IF LOWER, WHETHER OR NOT FEDEX HAD ANY KNOWLEDGE THAT SUCH DAMAGES MIGHT BE INCURRED. FedEx won't be liable for your acts or omissions, including but not limited to incorrect declaration of cargo, improper or insufficient packaging, securing, marking or addressing of the shipment, or for the acts or omissions of the recipient or anyone else with an interest in the shipment or violations by any party of the terms of this agreement. FedEx won't be liable for damage, loss, delay, shortage, mis-delivery, non-delivery, misinformation or failure to provide information in connection with shipments of cash, currency or other prohibited items or in instances beyond our control, such as acts of God, perils of the air, weather conditions, mechanical delays, acts of public enemies, war, strike, civil commotion, or acts or omissions of public authorities (including customs and health officials) with actual or apparent authority. NO WARRANTY. We make no warranties, express or implied. CLAIMS FOR LOSS, DAMAGE OR DELAY. ALL CLAIMS MUST BE MADE IN WRITING AND WITHIN STRICT TIME LIMITS. SEE OUR TARIFF, APPLICABLE FEDEX SERVICE GUIDE, OR STANDARD CONDITIONS OF CARRIAGE FOR DETAILS. The Warsaw Convention provides specific written claims procedures for damage, delay or non-delivery of your shipment. Moreover, the interpretation and operation of the Warsaw Convention's claims provisions may vary in each country. Refer to the Convention to determine the claims period for your shipment. The right to damages against us shall be extinguished unless an action is brought within two years, as set forth in the Convention. FedEx is not obligated to act on any claim until all transportation charges have been paid. The claim amount may not be deducted from the transportation charges. If the recipient accepts the shipment without noting any damage on the delivery record, FedEx will assume the shipment was delivered in good condition. In order for us to consider a claim for damage, the contents, original shipping carton and packing must be made available to us for inspection. MANDATORY LAW Insofar as any provision contained or referred to in this Air Waybill may be contrary to any applicable international treaties, laws, government regulations, orders or requirements such provisions shall remain in effect as a part of our agreement to the extent that it is not overridden. The invalidity or unenforceability of any provisions shall not affect any other part of this Air Waybill. Unless otherwise indicated, FEDERAL EXPRESS CORPORATION, 2005 Corporate Avenue, Memphis, TN 38132, USA, is the first carrier of this shipment. Email address located at www.fedex.com.

1 of 2

2/26/2013 12:46 PM

A0369



NUMBER
160

COMMON STOCK

SHARES
***8,750,000***

COMMON STOCK
CUSIP 36190U206

**GOFF, CORP**

Par Value $.001
INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Alan Gahan***

is the Owner of  *** **Eight Million Seven Hundred Fifty Thousand** ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
**GOFF, CORP**

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed.  This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated:  **February 11, 2013**

COUNTERSIGNED AND REGISTERED:
**EMPIRE STOCK TRANSFER INC.**
Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

CORPORATE
SEAL

XXXXXXXXXX
DIRECTOR

PRESIDENT

B   40347

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
(Cust)                    (Minor)
under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*Shares of the Capital Stock represented by this Certificate and hereby irrevocably constitutes and appoints*

*Attorney to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* _____

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17AD-15.

A0371

## IRREVOCABLE STOCK POWER

For value received, the undersigned hereby sell, assign and transfer unto:

_____

_____ shares ( _____ ) of the _____

Capital stock of _____

standing in _____ name on the books of said _____

represented by Certificate No. _____

herewith and do hereby irrevocably constitute and appoint _____

_____ attorney to transfer the said stock on the books of the within

named Company with full power of substitution in the premises.


Dated _____         Signed by: _____

                                          _____

SIGNATURE GUARANTEED
MEDALLION GUARANTEED
BANK OF AMERICA, N.A

( CA714 )
SECURITIES TRANSFER AGENTS MEDALLION PROGRAM

AUTHORIZED SIGNATURE
X 9 0 0 4 9 5 7

**Extremely Ur**~~g~~ e is for use with the following servic

PHIL KUEBER
(310) 613-6260
STE 200
8200 WILSHIRE BLVD
BEVERLY HILLS  CA 90211-2331

0.2 LBS LTR 1 OF 1
SHP WT: LTR
DATE: 21 FEB 2013

SHIP
TO:  EMPIRE STOCK TRANSFER
     702-982-3634
     1859 WHITNEY MESA DR
     HENDERSON NV 89014 2085

25/Feb/2013 17:39 8904

Visit theupsstore.com or call
to find a location near you.

**Domestic Shipments**
· To qualify for the Letter rate, UPS Expr
  correspondence, urgent documents, a
  weigh 8 oz. or less. UPS Express Envel
  those listed or weighing more than 8

**International Shipments**
· The UPS Express Envelope may be use
  value. Certain countries consider elec
  ups.com/importexport to verify if you

· To qualify for the Letter rate, the UPS E
  UPS Express Envelopes weighing more

**Note:** Express Envelopes are not recomi
containing sensitive personal informatio
or cash equivalent.



NV 890 9-04

1Z5R8V560116335169

UPS NEXT DAY AIR                    1

TRACKING #: 1Z 5R8 V56 01 1633 5169



BILLING: P/P



EMPIRE STOCK TRANSFER
1859 WHITNEY MESA DR

HENDERSON NV 89014-2085

P: RED          S:          I: S
529 - 1042
              5169           1030
1Z5R8V56011633
NLJ&CIG      NULVE207
US   8904    HIP 12.1.6    ZEBRAZ4HP

FEB 26 03:58:23 2013

Mail Boxes Etc., Inc. is a UPS® company. The UPS Store® locations are independently owned and operated by franchisees of Mail Boxes Etc., Inc. in the USA and by its master licensee and its franchisees in
vary by location. Copyright © 2011 Mail Boxes Etc., Inc. 410260000509
International Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by A
Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S
01880250709  1

A0373

# Log Sheet

| | |
|---|---|
| Issuer: | GOFF-GOFF, Corp |
| Received: | 02/26/13   09:58 AM |
| Received From: | ALAN GRAHAM |
| How Received: | UPS |
| Track Number In: | 1Z5R8V560116335169 |
| Control Ticket: | STTK000000040011 |
| SEC Item Count: | 1   Routine |
| Contents: | 160 |

ID/SCL#: 36190U206160

| | |
|---|---|
| Transaction No.: | 38 |
| Track Number Out: | 794841091514 |
| Sent To: | CALEDONIAN BANK |

Completed: 02/26/13

| Fees: | Due: | Rcvd: | Check #: |
|---|---|---|---|

Assigned To:

Certificate Number(s) or Book Entry ID's:  1

CS2-163

Comments:

Initials     Date

_____ _____ Logged In
_____ _____ Medallion Verified
_____ _____ Review Documents
_____ _____ Processed by
_____ _____ Stamp Certificates as Canceled and Transferred
_____ _____ Final Review/Authentification
_____ _____ Batch Completed and Made Available
_____ _____ Management Review

A0374



NUMBER
163

SHARES
***8,750,000***

COMMON STOCK

**GOFF, CORP**

Par Value $.001
INCORPORATED UNDER THE LAWS OF THE STATE OF

NEVADA

COMMON STOCK
CUSIP 36190U206

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Caledonian Bank Limited***

is the Owner of *** Eight Million Seven Hundred Fifty Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF

**GOFF, CORP**

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated: **February 26, 2013**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
By                                Transfer Agent and Registrar

AUTHORIZED SIGNATURE

CORPORATE
SEAL

xXXXXXXXx
DIRECTOR

PRESIDENT

B   39722

A0375



SEC-GRABOWSKI_S-E-0000255

A0376

```
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>g6673.txt
<DESCRIPTION>CURRENT REPORT DATED 2-26-13
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K

CURRENT REPORT
Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) February 26, 2013

GOFF, CORP.
(Exact name of registrant as specified in its charter)

| Nevada | 333-176509 | 27-3129919 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

Carrera 43 A # 1-50, Torre Proteccion
Piso 6, San Fernando Plaza
Medellin, Colombia                                N/A
(Address of principal executive offices)      (Zip Code)

Registrant's telephone number, including area code (087) 154-7690

9 NOF Commercial Centre Industrial Park, Old Mallow Rd, Cork City, Ireland
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

```
<PAGE>
```
ITEM 1.01 ENTRY INTO MATERIAL DEFINITIVE AGREEMENT
ITEM 5.01 CHANGES IN CONTROL OF REGISTRANT
ITEM 5.02 DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF CERTAIN OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN OFFICERS

On February 26, 2013, we received resignations from Gary O'Flynn, as President, Chief Executive Officer, Treasurer, Secretary and Director of our company, and Patrick Corkery, as a director of our company. Their resignations were not the

result of any disagreements with our company regarding its operations, policies, practices or otherwise. Concurrently with Mr. O'Flynn's and Mr. Corkery's resignations, we appointed Warwick Calasse as President, Chief Executive Officer, Chief Financial Officer, Secretary, Treasurer and as a member to our Board of Directors, effective February 26, 2013.

Also on February 26, 2013, Mr. Calasse acquired an aggregate of 108,750,000 shares of our common stock from Mr. O'Flynn, our former Director and Officer, and Mr. Corkery, our former Director, for an aggregate consideration of $25,000. The funds used for this share purchase were Mr. Calasse's personal funds. Mr. Calasse's 108,750,000 shares amount to approximately 38% of our currently issued and outstanding common stock. In conjunction with the sale of the shares, Mr. O'Flynn and Mr. Corkery each provided us with releases from any debt owed to each, respectively, by our company. Both the share purchase agreement and the release are filed as exhibits to this Current Report on Form 8-K.

WARWICK CALASSE

Mr. Warwick Calasse has an extensive entrepeunerial and operational management background working in the private sector in both the United Kingdom and Southern Africa. From 2006 to 2010, Mr. Calasse held various training and management positions with horse farms and stables in the United Kingdom and Zimbabwe. From 2006 through 2008, he was employed as a trainer at Clare House Stables in Dullingham, Suffoll, United Kingdom. From February 2009 through February 2010, he served as Manager at Sambok Farm, Marondera, Zimbabwe where he managed a staff of 60 and stable of 120 horses. From March to August of 2010, he served as Manager of the Tippits Polo Yard in Midhurst, United Kingdom. Since August, 2010, Mr. Calasse has served as executive officer and director of Raftec Investments, a firm which he owns and controls. Raftec is a chemicals importer located in Harare, Zimbabwe and focusing on foam rubber products and chemicals for the mineral exploration industry. Mr. Calasse is 30 years of age.

We believe that Mr. Calasse is qualified to sit on our board of directors due to his extensive consulting and managing experience.

Our board of directors consists solely of Warwick Calasse. There have been no other transactions since the beginning of our last fiscal year or any currently proposed transactions, in which we are, or plan to be, a participant and the amount involved exceeds $120,000 or one percent of the average of our total assets at year end for the last two completed fiscal years, and in which any related persons had or will have a direct or indirect material interest.

ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS

10.1 Release from Patrick Corkery

10.2 Release from Gary O'Flynn

10.3 Share Purchase Agreement among the Company, Warwick Calasse, Patrick Corkery and Gary O'Flynn

2

<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GOFF, CORP.

```
/s/ Warwick Calasse
---------------------------------
Warwick Calasse
Director

Date: March 4, 2013


                                    3

</TEXT>
</DOCUMENT>
```

8-K 1 g6684.htm

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**
Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) **March 6, 2013**

# GOFF, CORP.

(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Nevada** | **333-176509** | **27-3129919** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **Carrera 43 A # 1-50, Torre Proteccion, Piso 6, San Fernando Plaza, Medellin, Colombia** | |
| (Address of principal executive offices) | **N/A** |
| | (Zip Code) |

Registrant's telephone number, including area code **087-154-7690**

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**SPECIAL NOTE REGARDING FORWARD LOOKING STATEMENTS**

This report contains forward-looking statements. The forward-looking statements are contained principally in the sections entitled "Description of Business," "Risk Factors," and "Management's Discussion and Analysis of Financial Condition and Results of Operations." These statements involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from any future results, performances or achievements expressed or implied by the forward-looking statements. These risks and uncertainties include, but are not limited to, the factors described in the section captioned "Risk Factors" below. In some cases, you can identify forward-looking statements by terms such as "anticipates," "believes," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "projects," "should," "would" and similar expressions intended to identify forward-looking statements. Forward-looking statements reflect our current views with respect to future events and are based on assumptions and subject to risks and uncertainties. Given these uncertainties, you should not place undue reliance on these forward-looking statements. These forward-looking statements include, among other things, statements relating to:

- our anticipated exploration programs and our ability to manage the programs effectively;

- our ability to identify commercially recoverable quantities of tungsten;

- our ability to keep up with rapidly changing technologies and evolving mining industry standards.

- our dependence on the growth in demand for tungsten; and

- the loss of key members of our senior management.

Also, forward-looking statements represent our estimates and assumptions only as of the date of this report. You should read this report and the documents that we reference and filed as exhibits to this report completely and with the understanding that our actual future results may be materially different from what we expect. Except as required by law, we assume no obligation to update any forward-looking statements publicly, or to update the reasons actual results could differ materially from those anticipated in any forward-looking statements, even if new information becomes available in the future.

**Use of Certain Defined Terms**

Except where the context otherwise requires and for the purposes of this report only:

- the "Company," "we," "us," and "our" refer to the business of GOFF, Corp., a Nevada corporation (as well as our wholly owned subsidiary Golden Glory Resources Inc, a Nevada corporation.);

- "Exchange Act" refers the Securities Exchange Act of 1934, as amended;

- "SEC" refers to the Securities and Exchange Commission;

- "Securities Act" refers to the Securities Act of 1933, as amended; and

- "U.S. dollars," "dollars" and "$" refer to the legal currency of the United States.

**ITEM 3.03 MATERIAL MODIFICATION TO RIGHTS OF SECURITY HOLDERS**

**Designation of Series "A" Preferred Stock**

On March 6, 2013 our sole director approved the designation of 10,000,000 shares of Series "A" Preferred Stock, par value $0.00 per share. The attributes of the Series "A": Preferred Stock include, but are not limited to, the following:

- the Series A Preferred Stock shall share rateably with the holder of our Common Stock in any dividends;

- except where it is entitled to vote the Series A Preferred Stock shall be entitled to vote with the holders of th Company's Common Stock as a class at the rate of seventy-five (75) common share votes per share of Series Preferred Stock;

- the holder of any shares of Series "A" Preferred Stock may, at such holder's option, elect to convert all or any portio of the shares of Series A Preferred Stock held by such person into a number of fully paid and non-assessable share of Common Stock equal to thirty (30) shares of Common Stock for each share of Series A Preferred

The above description of the Series "A" Preferred Stock is a summary and is qualified entirely by the description of th designations, powers, preferences and relative and other special rights and the qualifications, limitations and restrictions set out i the Certificate of Designation included as Exhibit 3.4 of this report.

## ITEM 1.01 ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT

## ITEM 2.01 COMPLETION OF ACQUISITION OR DISPOSITION OF ASSETS

## ITEM 3.02 UNREGISTERED SALES OF EQUITY SECURITIES

### Share Cancellation Agreement and Issuance of Series "A" Preferred Stock

On March 8, 2013 we entered into a Cancellation Agreement with our director and sole officer, Warwick Calasse, pursuant to which Mr. Calasse tendered for cancellation 158,750,000 share of our common stock held by him in consideration of the issuance to him of 5,000,000 shares of our Series "A" Preferred Stock. The agreement was entered into as a condition of the Assignment Agreement with Golden Glory Resources S.A. described below. Information with respect Mr. Calasse's beneficial ownership of our securities is contained in section of the Current Report entitled Security Ownership Of Certain Beneficial Owners And Management. These securities issued to Mr. Calasse were issued in an offshore transaction relying on Regulation S and/or Section 4(2) of the Securities Act of 1933, as amended

### Acquisition of Option to Purchase La Frontera Mining Concession

On March 8, 2013, through our wholly owned subsidiary, Golden Glory Resources Inc., we entered into an Assignment Agreemer with Golden Glory Resources S.A. ("Golden Glory Panama"), a company incorporated under the laws of Panama, we acquired a option to purchase a 100% interest in and to a certain Columbian mining concession known as La Frontera (The Frontier) Projec code number LGC-15011, located in the Aguadas region, Caldas Department, Republic of Colombia.

In consideration of the assignment of rights, we issued to Golden Glory Panama 5,000,000 shares of our Series "A" Preferre Stock, and have agreed to assume all obligations of Golden Glory Panama pursuant to the Assignment Agreement dated Januar 21, 2013 (the "Underlying Assignment Agreement") between Golden Glory Panama, as assignee, and Sertesaz Ltd., and C&ENEl SA, the current Colombian owners which own 60% and 40% of the concession, respectively. The securities issued to Golden Glor Panama were issued in an offshore transaction relying on Regulation S and/or Section 4(2) of the Securities Act of 1933, a amended.

To date, Golden Glory Panama has satisfied an aggregate of $70,000 in respect of payment obligations pursuant to the Underlyin Assignment Agreement. In order to exercise our option to purchase La Frontera Project we will be required to satisfy the followin additional payments and exploration expenditures:

- an aggregate of $120,000 payable in six equal quarterly installments beginning March 31, 2013;

- an aggregate of $40,000 payable in two equal installments by September 30, 2015 and December 31, 201! respectively;

- an annual payment of approximately $12,500 (beginning August 20, 2013) in respect of state surface fees for th property;

A0382

- completion of a $1,500,000 work program by March 7, 2015 with the following requirements:

    o  $250,000 in expenditures by March 7, 2014;

3

A0383

- o  $500,000 in expenditures by March 7, 2015;

- o  $750,000 in expenditures by March 7, 2016; and

- o  General and administrative expenses included in the work program budget shall not exceed $200,000.

- a royalty equal to $2 per ounce of gold, payable per ounce from production, for every ounce of gold up to 5 millio ounces that is designated as a "Proven" reserve pursuant to an independently prepared technical report in accordanc with Canadian National Instrument 43-101,

As a result of the acquisition we have entered the business of mineral exploration and are now an exploration stage minin company engaged in the identification, acquisition, and exploration of metals and minerals with a focus on gold and diamon mineralization on our La Frontera Property. For further details on our business, please see the section entitled "Business" beginnin on page 2.

### ITEM 5.06 CHANGE IN SHELL COMPANY STATUS

Our management has determined that, as of the closing of the Assignment Agreement with Golden Glory Resources S.A. describe above, our company has ceased to be a shell company as defined in Rule 12b-2 of the United States Securities Exchange Act o 1934, as amended.

### ITEM 8.01 - OTHER EVENTS

### Incorporation of Golden Glory Resources Inc.

On February 22, 2013 we incorporated a wholly owned subsidiary, Golden Glory Resources Inc., a Nevada corporation.

### FORM 10 INFORMATION DISCLOSURE

As disclosed elsewhere in this report, on March 7, 2013, through our wholly owned subsidiary, Golden Glory Resources Inc pursuant to an Assignment Agreement with Golden Glory Resources S.A. ("Golden Glory Panama"), a company incorporate under the laws of Panama, we acquired option to purchase a 100% interest in and to a certain Columbian diamond minin concession known as La Frontera (The Frontier) Project, code number LGC-15011, located in the Aguadas region, Calda Department, Republic of Colombia. Item 2.01(f) of Form 8-K states that if the registrant was a shell company, as we wer immediately before the acquisition of assets under Item 2.01, then the registrant must disclose the information that would b required if the registrant were filing a general form for registration of securities on Form 10.

Accordingly, we are providing below the information that would be included in a Form 10 if we were to file a Form 10. Please not that the information provided below relates to our company after the acquisition of La Frontera Project, unless otherwis specifically indicated.

### BUSINESS

*General Overview*

We were incorporated on July 12, 2010 under the laws of the state of Nevada. Our principal offices are located at 9 Carrera 43 A # 1-50, Torre Proteccion, Piso 6, San Fernando Plaza, Medellin. Colombia    Our telephone number is 087-154-7690.
Our initial business plan was to provide web-based networking and job-placement services for employers and individuals seeking employment in the UK and Ireland. We were unable to implement our initial business plan due to our inability to obtain adequate financing, and to prevailing negative conditions in the financial and employment markets since our incorporation.

4

Since our inception, we have focused our limited managerial and financial capacity almost entirely on the registration of a resale prospectus on form S-1 which was declared effective on November 10, 2011.

On February 14, 2012 our common shares became eligible for quotation on the OTC Bulletin Board under the symbol GOFF.OB. However, there have been no public trades of our common shares to date.

Due to our ongoing inability to implement our initial business plan, in fiscal 2012, our management began evaluating various alternatives available to our company to ensure our continuation as a going concern and to preserve our shareholders' investment in our common shares.

In accordance with board approval, we filed a Certificate of Change dated January 22, 2013 with the Nevada Secretary of State to give effect to a forward split of our authorized, issued and outstanding shares of common stock on a 25 new for one (1) old basis, such that our authorized capital will be increased from 75,000,000 to 1,875,000,000 shares of common stock and correspondingly, our issued and outstanding shares of common stock was increased from 11,440,000 to 286,000,000 common shares, all with a par value of $0.001. The forward stock split became effective with the Over-the-Counter Bulletin Board at the opening of trading on January 24, 2013. Our new CUSIP number is 36190U206.

On February 26, 2013, we received resignations from Gary O'Flynn, as President, Chief Executive Officer, Treasurer, Secretary and Director of our company, and Patrick Corkery, as a director of our company. Their resignations were not the result of any disagreements with our company regarding its operations, policies, practices or otherwise. Concurrently with Mr. O'Flynn's and Mr. Corkery's resignations, we appointed Warwick Calasse as President, Chief Executive Officer, Chief Financial Officer, Secretary, Treasurer and as a member to our Board of Directors, effective February 26, 2013.

Also on February 26, 2013, Mr. Calasse acquired an aggregate of 108,750,000 shares of our common stock from Mr. O'Flynn, our former Director and Officer, and Mr. Corkery, our former Director, for an aggregate consideration of $25,000. The funds used for this share purchase were Mr. Calasse's personal funds. Mr. Calasse's 108,750,000 shares amount to approximately 38% of our currently issued and outstanding common stock. In conjunction with the sale of the shares, Mr. O'Flynn and Mr. Corkery each provided us with releases from any debt owed to each, respectively, by our company. Both the share purchase agreement and the release are filed as exhibits to this Current Report on Form 8-K.

On February 28, 2013 we entered into a consulting agreement with our sole officer and director, Warwick Calasse, regarding the provision of his management services as president and chief executive officer of the our company. The term of the agreement is 12 months, subject to renewal or early termination by mutual consent of the parties. In consideration of Mr. Calasse's services for the 12 month term, on February 28, 2013, we issued to Mr. Calasse 100,000,000 shares of our common stock. As a result of the transaction, Mr. Calasse held approximately 54.08% of our currently issued and outstanding common shares.

On March 4, 2012, anticipation of the events announced in this Current Report, and further to the consent of the holders of a majority of our common shares, we filed a Certificate of Amendment with the Nevada Secretary of State to authorize 100,000,000 preferred shares with a par value of $0.01. Pursuant to the amendment, our board of directors may fix and determine the designations, rights, preferences or other variations of each class or series of preferred stock issued from time to time. Our authorized capital will now consists of 1,875,000,000 shares of common stock and 100,000,000 shares of preferred stock, each with a par value of $0.001.

### Business Subsequent to the Closing of the Acquisition

On March 8, 2013, as a result of our acquisition of an option to purchase La Frontera Project we have abandoned our former business plan and entered the business of mineral exploration and are now an exploration stage mining company engaged in the identification, acquisition, and exploration of metals and minerals with a focus on gold and diamond mineralization on La Frontera Property.

Since we are an exploration stage company, there is no assurance that a commercially viable mineral reserve exists on any of our current or future properties. To date, we do not know if an economically viable mineral reserve exists on our property and there is no assurance that we will discover one. Even if we do eventually discover a mineral reserve on our property, there can be no assurance that we will be able to develop our property into a producing mine and extract those resources. Both mineral exploration and development involve a high degree of risk and few properties which are explored are ultimately developed into producing mines.

We intend to conduct exploration and development programs on La Frontera Project and to satisfy our obligations under the terms of the Assignment Agreement with Golden Glory Resources S.A. ("Golden Glory Panama") for the purchase of a 100% interest in the propert. For a description of La Frontera Project please see the section entitled "Properties" beginning on page 12.

*Competition*

We are a mineral resource exploration company. We compete with other mineral resource exploration companies for financing and for the acquisition of new mineral properties. Many of the mineral resource exploration companies with whom we compete have greater financial and technical resources than those available to us. Accordingly, these competitors may be able to spend greater amounts on acquisitions of mineral properties of merit, on exploration of their mineral properties and on development of their mineral properties. In addition, they may be able to afford more geological expertise in the targeting and exploration of mineral properties. This competition could result in competitors having mineral properties of greater quality and interest to prospective investors who may finance additional exploration. This competition could adversely impact on our ability to finance further exploration and to achieve the financing necessary for us to develop our mineral properties.

*Compliance with Government Regulation*

We are committed to complying with and are, to our knowledge, in compliance with, all governmental and environmental regulations applicable to our company and our properties. Permits from a variety of regulatory authorities are required for many aspects of mine operation and reclamation. We cannot predict the extent to which these requirements will affect our company or our properties if we identify the existence of minerals in commercially exploitable quantities. In addition, future legislation and regulation could cause additional expense, capital expenditure, restrictions and delays in the exploration of our properties.

*Research and Development Expenditures*

We have incurred $Nil in research and development expenditures over the past two fiscal years.

*Employees*

Currently, we do not have any employees. We have entered into consulting agreements with Warwick Calasse, our president, chief executive officer, treasurer, secretary and director, regarding the provision of his services to our company as executive officer. Our directors, executive officer and certain contracted professionals play an important role in the running of our company. We do not expect any material changes in the number of employees over the next 12 month period. We intend to outsource contract employment as needed.

We will engage contractors from time to time to consult with us on specific corporate affairs or to perform specific tasks in connection with our financing efforts and exploration programs.

*Subsidiaries*

Our sole and wholly owned subsidiary is Golden Glory Resources Inc., a Nevada corporation.

*Intellectual Property*

We do not own, either legally or beneficially, any patent or trademark.

6

A0386

## RISK FACTORS

Our business operations are subject to a number of risks and uncertainties, including, but not limited to those set forth below:

### Risks Associated With Mining

*Our property is in the exploration stage. There is no assurance that we can establish the existence of any mineral resource on our property in commercially exploitable quantities. Until we can do so, we cannot earn any revenues from operations and if we do not do so we will lose all of the funds that we expend on exploration. If we do not discover any mineral resource in a commercially exploitable quantity, our business could fail.*

We have not established that it contains any mineral reserve, nor can there be any assurance that we will be able to do so. If we do not, our business could fail.

A mineral reserve is defined by the Securities and Exchange Commission in its Industry Guide 7 (which can be viewed over the Internet at http://www.sec.gov/divisions/corpfin/forms/industry.htm#secguide7) as that part of a mineral deposit which could be economically and legally extracted or produced at the time of the reserve determination. The probability of an individual prospect ever having a "reserve" that meets the requirements of the Securities and Exchange Commission's Industry Guide 7 is extremely remote; in all probability our mineral resource property does not contain any 'reserve' and any funds that we spend on exploration will probably be lost.

Even if we do eventually discover a mineral reserve on our property, there can be no assurance that we will be able to develop our property into a producing mine and extract those resources. Both mineral exploration and development involve a high degree of risk and few properties which are explored are ultimately developed into producing mines.

The commercial viability of an established mineral deposit will depend on a number of factors including, by way of example, the size, grade and other attributes of the mineral deposit, the proximity of the resource to infrastructure such as a smelter, roads and a point for shipping, government regulation and market prices. Most of these factors will be beyond our control, and any of them could increase costs and make extraction of any identified mineral resource unprofitable.

*Mineral operations are subject to applicable law and government regulation. Even if we discover a mineral resource in a commercially exploitable quantity, these laws and regulations could restrict or prohibit the exploitation of that mineral resource. If we cannot exploit any mineral resource that we might discover on our property, our business may fail.*

Both mineral exploration and extraction require permits from various foreign, federal, state, provincial and local governmental authorities and are governed by laws and regulations, including those with respect to prospecting, mine development, mineral production, transport, export, taxation, labor standards, occupational health, waste disposal, toxic substances, land use, environmental protection, mine safety and other matters. There can be no assurance that we will be able to obtain or maintain any of the permits required for the continued exploration of our mineral properties or for the construction and operation of a mine on our properties at economically viable costs. If we cannot accomplish these objectives, our business could fail.

We believe that we are in compliance with all material laws and regulations that currently apply to our activities but there can be no assurance that we can continue to remain in compliance. Current laws and regulations could be amended and we might not be able to comply with them, as amended. Further, there can be no assurance that we will be able to obtain or maintain all permits necessary for our future operations, or that we will be able to obtain them on reasonable terms. To the extent such approvals are required and are not obtained, we may be delayed or prohibited from proceeding with planned exploration or development of our mineral properties.

*If we establish the existence of a mineral resource on our property in a commercially exploitable quantity, we will require additional capital in order to develop the property into a producing mine. If we cannot raise this additional capital, we will not be able to exploit the resource, and our business could fail.*

7

If we do discover mineral resources in commercially exploitable quantities on our property, we will be required to expend substantial sums of money to establish the extent of the resource, develop processes to extract it and develop extraction and processing facilities and infrastructure. Although we may derive substantial benefits from the discovery of a major deposit, there can be no assurance that such a resource will be large enough to justify commercial operations, nor can there be any assurance that we will be able to raise the funds required for development on a timely basis. If we cannot raise the necessary capital or complete the necessary facilities and infrastructure, our business may fail.

*Mineral exploration and development is subject to extraordinary operating risks. We do not currently insure against these risks. In the event of a cave-in or similar occurrence, our liability may exceed our resources, which would have an adverse impact on our company.*

Mineral exploration, development and production involves many risks which even a combination of experience, knowledge and careful evaluation may not be able to overcome. Our operations will be subject to all the hazards and risks inherent in the exploration for mineral resources and, if we discover a mineral resource in commercially exploitable quantity, our operations could be subject to all of the hazards and risks inherent in the development and production of resources, including liability for pollution, cave-ins or similar hazards against which we cannot insure or against which we may elect not to insure. Any such event could result in work stoppages and damage to property, including damage to the environment. We do not currently maintain any insurance coverage against these operating hazards. The payment of any liabilities that arise from any such occurrence would have a material adverse impact on our company.

*Mineral prices are subject to dramatic and unpredictable fluctuations.*

We expect to derive revenues, if any, either from the sale of our mineral rights or from the extraction and sale of ore. The price of those commodities has fluctuated widely in recent years, and is affected by numerous factors beyond our control, including international, economic and political trends, expectations of inflation, currency exchange fluctuations, interest rates, global or regional consumptive patterns, speculative activities and increased production due to new extraction developments and improved extraction and production methods. The effect of these factors on the price of base and precious metals, and therefore the economic viability of any of our exploration properties and projects, cannot accurately be predicted.

*The mining industry is highly competitive and there is no assurance that we will continue to be successful in acquiring mineral claims. If we cannot continue to acquire properties to explore for mineral resources, we may be required to reduce or cease operations.*

The mineral exploration, development, and production industry is largely un-integrated. We compete with other exploration companies looking for mineral resource properties. While we compete with other exploration companies in the effort to locate and acquire mineral resource properties, we will not compete with them for the removal or sales of mineral products from our properties if we should eventually discover the presence of them in quantities sufficient to make production economically feasible. Readily available markets exist worldwide for the sale of mineral products. Therefore, we will likely be able to sell any mineral product that we identify and produce.

In identifying and acquiring mineral resource properties, we compete with many companies possessing greater financial resources and technical facilities. This competition could adversely affect our ability to acquire suitable prospects for exploration in the future. Accordingly, there can be no assurance that we will acquire any interest in additional mineral resource properties that might yield reserves or result in commercial mining operations.

**Risks Related To Our Company**

*The fact that we have not earned any operating revenues since our incorporation raises substantial doubt about our ability to continue to explore our mineral properties as a going concern.*

We have not generated any revenue from operations since our incorporation and we anticipate that we will continue to incur operating expenses without revenues unless and until we are able to identify a mineral resource in a commercially exploitable quantity on our mineral property and we build and operate a mine. We had cash in the amount of $5,653 as of December 31, 2012. At December 31, 2012, we had working capital deficit of $19,911. We incurred a net loss of $48,261 since inception. We estimate

that our average monthly operating expenses will be approximately $48,000, including mineral property costs, professional

8

A0389

services and administrative costs and exploration expense. Should the results of our planned exploration require us to increase our current operating budget, we may have to raise additional funds to meet our currently budgeted operating requirements for the next 12 months. As we cannot assure a lender that we will be able to successfully explore and develop our mineral property, we will probably find it difficult to raise debt financing from traditional lending sources. We have traditionally raised our operating capital from sales of equity securities, but there can be no assurance that we will continue to be able to do so. If we cannot raise the money that we need to continue exploration of our mineral property, we may be forced to delay, scale back, or eliminate our exploration activities. If any of these were to occur, there is a substantial risk that our business would fail.

These circumstances lead our independent registered public accounting firm, in their report dated September 27, 2012, to comment about our company's ability to continue as a going concern. Management has plans to seek additional capital through a private placement of its capital stock. These conditions raise substantial doubt about our company's ability to continue as a going concern. Although there are no assurances that management's plans will be realized, management believes that our company will be able to continue operations in the future. The financial statements do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts and classification of liabilities that might be necessary in the event our company cannot continue in existence." We continue to experience net operating losses.

*We intend to issue additional shares of common stock or preffered stock, which would reduce investors' percent of ownership and may dilute our share value.*

Our Articles of Incorporation authorize the issuance of 1,875,000,000 shares of common stock and 100,000,000 Preferred Shares, each with a par value $0.001 per share, of which 227,250,000 common shares and 10,000,000 Series "A" Preferred shares are issued and outstanding. The future issuance of common stock or preferred stock may result in substantial dilution in the percentage of our common stock held by our then existing shareholders. We may value any common stock or preferred stock issued in the future on an arbitrary basis. The issuance of common stock or preferred stock for future services or acquisitions or other corporate actions may have the effect of diluting the value of the shares held by our investors, and might have an adverse effect on any trading market for our common stock.

*If we do not obtain additional financing, our business will fail.*

At December 31, 2012, we had cash on hand of $5,653, and we had accumulated a deficit of $48,261 in business development expenses. Our current burn rate is the cost associated with costs of being a reporting issuer and is projected to increase substantially once our exploration operations begin. We anticipate that additional funding will be needed for general administrative expenses and marketing costs. We intend to raise the required funds through equity or debt financing however we have no definitive arrangements to secure any additional capital. There is no guarantee that we will be able to raise additional capital and because of this our business may fail. We have not generated any revenue from operations to date. The specific cost requirements needed to maintain operations will depend upon the success of our planned exploration program and is subject to a wide possible variance.

We do not currently have any arrangements for financing. Obtaining additional funding will be subject to a number of factors, including general market conditions, investor acceptance of our business plan and initial results from future exploration activities. These factors may impact the timing, amount, terms or conditions of additional financing available to us. The most likely source of future funds available to us is through the sale of additional shares of common stock or advances from our sole director.

*Because our officer and directors have other business interests, they may not be able or willing to devote a sufficient amount of time to our business operations, causing our business to fail.*

Our officer and director, Warwick Calasse, will only be devoting limited time to our operations. Mr. Calasse will handle most of the company's day to day operations and intends to devote 10 to 20 hours of his week to our business affairs until such a time as cash salary can be drawn. Because our sole officer and director will only be devoting limited time to our operations, our operations may be sporadic and occur at times which are convenient to him. As a result, operations may be periodically interrupted or suspended which could impede the development of our business or result in the cessation of operations.

9

*Because our sole executive officer has no experience or training in the field of mineral exploration our business has a higher risk of failure.*

Our sole executive officer, Warwick Calasse, does not have experience or training in the field of mineral exploration. Because of this lack of experience there is a risk that some of the strategic or operational factors needed to achieve exploration or production milestones may be overlooked. If we are unable to achieve exploration or production milestones required to exercise our option to purchase La Frontera Project, our business could fail or require additional financing beyond our current budget.

*Because we our sole executive officer has limited training and experience in financial accounting and management, our business has a higher risk of failure.*

Our business has a sole executive officer, Warwick Calasse, who has limited training in financial accounting and management; however, he is responsible for our managerial and organizational structure, which will include preparation of disclosure and accounting controls. When the disclosure and accounting controls referred to above are implemented, he will be responsible for the administration of them. Should he not have sufficient experience, he may be incapable of creating and implementing the controls which may cause us to be subject to sanctions and fines by the SEC which ultimately could cause an investor to lose their investment. Mr. Calasse's limited training and experience in financial accounting and management my result in a material misstatement of our Company's financial statements. In addition due our Company's lack of accounting personnel we may be unsuccessful in maintaining effective internal controls over financial reporting and disclosure controls and procedures, which may result in material misstatements of our financial statements.

*Because our sole executive officer controls 66.37% of the voting rights attached to our issued and outstanding securities, he can make and control corporate decisions that may be disadvantageous to minority shareholders.*

Our sole executive officer, Warwick Calasse, controls approximately 66.37% of the voting rights attached to our issued and outstanding securities. Accordingly, he will have a significant influence in determining the outcome of all corporate transactions or other matters, including mergers, consolidations, and the sale of all or substantially all of our assets. He will also have the power to prevent or cause a change in control. The interests of our officers and directors may differ from the interests of the other stockholders and thus result in corporate decisions that are disadvantageous to other shareholders.

*U.S. investors may experience difficulties in attempting to effect service of process and to enforce judgments based upon U.S. federal securities laws against the company and its non-U.S. resident officers and directors.*

We are organized under the laws of State of Nevada, but our sole officer and director is a non-U.S. resident. Consequently, it may be difficult for investors to affect service of process on Warwick Calasse in the United States and to enforce in the United States judgments obtained in United States courts against him based on the civil liability provisions of the United States securities laws. Since our assets will be located in Columbia and other non-US countries it may be difficult or impossible for U.S. investors to collect a judgment against us. In addition, any judgment obtained in the United States against us may not be enforceable in the United States.

*We have limited experience as a public company.*

We have a limited operating history as a public company and our management has no experience in complying with the various rules and regulations, which are required of a public company. As a result, we may not be able to operate successfully as a public company, even if our operations are successful. We plan to comply with all of the various rules and regulations, which are required of a public company. However, if we cannot operate successfully as a public company, your investment may be adversely affected. Our inability to operate as a public company could be the basis of your losing your entire investment in us.

As a public company we will incur additional costs including but not limited to the following: Audit, Legal, SEC fees, Transfer Agent, and EDGAR filing fees. These costs are expected to run between $15,000 and $35,000 per year.

10

A0391

*We do not expect to pay dividends in the foreseeable future.*

We have never paid any dividends on our common stock. We do not expect to pay cash dividends on our common stock at any time in the foreseeable future. The future payment of dividends directly depends upon our future earnings, capital requirements, financial requirements and other factors that our board of directors will consider. Since we do not anticipate paying cash dividends on our common stock, a return on your investment, if any, will depend solely on an increase, if any, in the market value of our common stock

**Risks Associated with Our Common Stock**

*If a market for our common stock does not develop, shareholders may be unable to sell their shares.*

There is currently no market for our common stock and we can provide no assurance that a market will develop. On February 14 2012 our common stock became eligible for quotation on the Over the Counter Bulletin Board, however no market for our common stock has since developed and no public trade of our common stock has occurred. If no market is ever developed for our shares, will be difficult for shareholders to sell their stock. In such a case, shareholders may find that they are unable to achieve benefit from their investment.

*Trading on the OTC Bulletin Board may be volatile and sporadic, which could depress the market price of our common stock an make it difficult for our stockholders to resell their shares.*

Our common stock is quoted on the OTC Bulletin Board service of the Financial Industry Regulatory Authority. Trading in stock quoted on the OTC Bulletin Board is often thin and characterized by wide fluctuations in trading prices, due to many factors that may have little to do with our operations or business prospects. This volatility could depress the market price of our common stock for reasons unrelated to operating performance. Moreover, the OTC Bulletin Board is not a stock exchange, and trading of securities on the OTC Bulletin Board is often more sporadic than the trading of securities listed on a quotation system like NASDAQ or a stock exchange like NYSE Amex. Accordingly, shareholders may have difficulty reselling any of their shares.

*Our stock is a penny stock. Trading of our stock may be restricted by the SEC's penny stock regulations and FINRA's sale practice requirements, which may limit a stockholder's ability to buy and sell our stock.*

Our stock is a penny stock. The Securities and Exchange Commission has adopted Rule 15g-9 which generally defines "penny stock" to be any equity security that has a market price (as defined) less than $5.00 per share or an exercise price of less than $5.00 per share, subject to certain exceptions. Our securities are covered by the penny stock rules, which impose additional sales practice requirements on broker-dealers who sell to persons other than established customers and "accredited investors". The term "accredited investor" refers generally to institutions with assets in excess of $5,000,000 or individuals with a net worth in excess of $1,000,000 or annual income exceeding $200,000 or $300,000 jointly with their spouse. The penny stock rules require a broker dealer, prior to a transaction in a penny stock not otherwise exempt from the rules, to deliver a standardized risk disclosure document in a form prepared by the SEC which provides information about penny stocks and the nature and level of risks in the penny stock market. The broker-dealer also must provide the customer with current bid and offer quotations for the penny stock, the compensation of the broker-dealer and its salesperson in the transaction and monthly account statements showing the market value of each penny stock held in the customer's account. The bid and offer quotations, and the broker-dealer and salesperson compensation information, must be given to the customer orally or in writing prior to effecting the transaction and must be given to the customer in writing before or with the customer's confirmation. In addition, the penny stock rules require that prior to transaction in a penny stock not otherwise exempt from these rules, the broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written agreement to the transaction. These disclosure requirements may have the effect of reducing the level of trading activity in the secondary market for the stock that is subject to these penny stock rules. Consequently, these penny stock rules may affect the ability of broker-dealers to trade our securities. We believe that the penny stock rules discourage investor interest in, and limit the marketability of, our common stock.

In addition to the "penny stock" rules promulgated by the Securities and Exchange Commission, the Financial Industry Regulator Authority has adopted rules that require that in recommending an investment to a customer, a broker-dealer must have reasonabl grounds for believing that the investment is suitable for that customer. Prior to recommending speculative low priced securities t their non-institutional customers, broker-dealers must make reasonable efforts to obtain information about the customer's financia status, tax status, investment objectives and other information. Under interpretations of these rules, the Financial Industr Regulatory Authority believes that there is a high probability that speculative low-priced securities will not be suitable for at leas some customers. The Financial Industry Regulatory Authority ' requirements make it more difficult for broker-dealers t recommend that their customers buy our common stock, which may limit your ability to buy and sell our stock.

*Any additional funding we arrange through the sale of our common stock will result in dilution to existing shareholders.*

We must raise additional capital in order for our business plan to succeed. Our most likely source of additional capital will b through the sale of additional shares of common stock. Such stock issuances will cause stockholders' interests in our company to b diluted. Such dilution will negatively affect the value of investors' shares.

## Other Risks

*Trends, Risks and Uncertainties*

We have sought to identify what we believe to be the most significant risks to our business, but we cannot predict whether, or t what extent, any of such risks may be realized nor can we guarantee that we have identified all possible risks that might aris Investors should carefully consider all of such risk factors before making an investment decision with respect to our common stock

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Purchase of Significant Equipment

We do not intend to purchase any significant equipment over the next twelve months.

### Personnel Plan

We do not expect any material changes in the number of employees over the next 12 month period. We do and will continue t outsource contract employment as needed.

### Off-Balance Sheet Arrangements

There are no off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financia condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capita resources that is material to investors.

Our principal capital resources have been through the subscription and issuance of common stock, although we have also use stockholder loans and advances from related parties.

### Cash Requirements

We intend to conduct exploration activities on our newly optioned property over the next twelve months. We estimate ou operating expenses and working capital requirements for the next twelve month period to be as follows:

### Estimated Expenses For the Next Twelve Month Period

| | | |
|---|---|---:|
| General, Administrative, and Corporate Expenses | $ | 200,000 |
| Property Option Payments | $ | 80,000 |
| Exploration | $ | 300,000 |

**Total**                                                                    $   **580,000**

12

At present, our cash requirements for the next 12 months outweigh the funds available to maintain or develop our properties. Of th $580,000 that we require for the next 12 months, we had $5,653 in cash as of December 31, 2012. In order to improve ou liquidity, we intend to pursue additional equity or debt financing from private investors or possibly a registered publi offering. Other than as set out below, we currently do not have any arrangements in place for the completion of any further privat placement financings and there is no assurance that we will be successful in completing any further private placement financings. I we are unable to achieve the necessary additional financing, then we plan to reduce the amounts that we spend on our busines activities and administrative expenses in order to be within the amount of capital resources that are available to us.

**Results of Operations.**

The following summary of our results of operations should be read in conjunction with our audited financial statements for th period from inception to June 30, 2011 and for the year ended June 30, 2012, and our interim financial statements for the perio ended December 31, 2012.

Our operating results for the periods from July 12, 2010 (date of inception) to June 30, 2011, for the year ended June 30, 2012, fo the three and six month periods ended December 31, 2012, and for the period from July 12, 2010 (date of inception) to Decembe 31, 2012 are as follows:

| | Three Months Ended December 31, 2012 | | Six Months Ended December 31, 2012 | | Year Ended June 30, 2012 | | Period From July 12, 2010 (date of inception) to June 30 2011 | | Period From July 12, 2010 (date of inception) to December 31 2012 |
|---|---|---|---|---|---|---|---|---|---|
| Operating Expenses | $ | 11,010 | $ | 15,168 | $ | 28,677 | $ | 4,416 | $ | 48,261 |
| Other Expenses | | $Nil | | $Nil | | $Nil | | $Nil | | $Nil |
| Net Income (Loss) | $ | (11,010) | $ | (15,168) | $ | (28,677) | $ | (4,416) | $ | (48,261 |

*Revenues*

We have not earned any revenues since our inception to the period ended December 31, 2012 and we do not anticipate earnin revenues in the near future.

*Expenses*

Our expenses for the periods from July 12, 2010 (date of inception) to June 30, 2011, for the year ended June 30, 2012, for the thre and six month periods ended December 31, 2012, and for the period from July 12, 2010 (date of inception) to December 31, 201 are as follows:

| | Three Months Ended December 31, 2012 | Six Months Ended December 31, 2012 | Year Ended June 30, 2012 | Period From July 12, 2010 (date of inception) to June 30 2011 | Period From July 12, 2010 (date of inception) to December 31 2012 |
|---|---|---|---|---|---|

A0395

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Consulting Fees | $ | 3,300 | $ | 3,935 | $ | 6,000 | | $Nil | $ | 9,935 |
| General and Administrative | $ | 2,817l | $ | 4,677 | $ | 10,414 | $ | 4,416 | $ | 19,509 |
| Professional Fees | $ | 4,893 | $ | 6,556 | $ | 12,263 | | $Nil | $ | 18,819 |

13

12/4/2014

A0396

**Liquidity and Financial Condition**

Our financial position as at June 30, 2011, June 30, 2012, and December 31, 2012, is as follows:

|  | June 30, 2011 | June 30, 2012 | December 31, 2012 |
|---|---|---|---|
| Current Assets | $ 24,759 | $ 1,565 | $ 5,653 |
| Current Liabilities | $ 825 | $ 6,308 | $ 25,564 |
| Working Capital (Deficiency) | $ 23,934 | $ (4,743) | $ (19,911) |

**Cash Flows**

|  | Six Months Ended December 31, 2012 | Year Ended June 30, 2012 | Period From July 12, 2010 (date of inception) to June 30 2011 | Period From July 12, 2010 (date of inception) to December 31 2012 |
|---|---|---|---|---|
| Net cash provided by (used in) Operating Activities | $ (13,717) | $ (26,194) | $ (4,416) | $ (44,327 |
| Net cash provided by (used in) Financing Activities | $ 17,805 | $ 3,000. | $ 29,175 | $ 49,980 |
| Increase (Decrease) in Cash during the Period | $ 4,088 | $ (23,194) | $ 24,759 | $ 5,653 |
| Cash, Beginning of Period | $ 1,565 | $ 24,759 | $Nil | $Nil |
| Cash, End of Period | $ 5,653 | $ 1,565 | $ 24,795 | $ 5,653 |

**Going Concern**

Our financial statements have been prepared on a going concern basis, which implies that we will continue to realize our assets an discharge our liabilities in the normal course of business. Our company incurred net losses of $48,261 since Inception (July 1, 2010) to December 31, 2012 and has nominal operations and no revenue, raising substantial doubt about our ability to continue a a going concern. Our financial statements do not include any adjustments that might be necessary if the company is unable t continue as a going concern.

The continuation of our business is dependent upon obtaining further financing, meeting our contractual obligations with respect t our La Frontera Property, completing a successful program of exploration on La Frontera Project, and, finally, achieving profitable level of operations. We will seek additional sources of capital through the issuance of debt c equity financing, but there can be no assurance we will be successful in this regard. What's more, the issuance of additiona equity securities by us could result in a significant dilution in the equity interests of our current stockholders. Obtaining commercia loans, assuming those loans would be available, will increase our liabilities and future cash commitments.

There are no assurances that we will be able to obtain further funds required for our continued operations. We will pursue variou financing alternatives to meet our immediate and long-term financial requirements. There can be no assurance that additiona financing will be available to us when needed or, if available, that it can be obtained on commercially reasonable terms. If we ar not able to obtain the additional financing on a timely basis, we will be unable to conduct our operations as planned, and we wi not be able to meet our other obligations as they become due. In such event, we will be forced to scale down or perhaps even ceas our operations.

A0397

**Critical Accounting Policies**

*Basis of Presentation and Interim Financial Statements*

The financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States ("US GAAP") and are expressed in U.S. dollars.  The Company's fiscal year end is June 30.

The accompanying financial statements have been prepared by the Company without audit. In the opinion of management, a adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results c operations, and cash flows at December 31, 2012, and for all periods presented herein, have been made.

Certain information and footnote disclosures normally included in financial statements prepared in accordance with accountin principles generally accepted in the United States of America have been condensed or omitted. It is suggested that these condense financial statements be read in conjunction with the financial statements and notes thereto included in the Company's June 30, 201 audited financial statements.

*Use of Estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions tha affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financia statements and the reported amounts of revenues and expenses during the reporting period. The Company regularly evaluate estimates and assumptions related to the deferred income tax asset valuation allowances. The Company bases its estimates an assumptions on current facts, historical experience and various other factors that it believes to be reasonable under th circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities and th accrual of costs and expenses that are not readily apparent from other sources. The actual results experienced by the Company ma differ materially and adversely from the Company's estimates. To the extent there are material differences between the estimate and the actual results, future results of operations will be affected.

*Cash and cash equivalents*

The Company considers all highly liquid instruments with a maturity of three months or less at the time of issuance to be cas equivalents.  As at December 31 and June 30, 2012, the Company did not have any cash equivalents.

*Basic and Diluted Net Loss per Share*

The Company computes net loss per share in accordance with ASC 260, *Earnings per Share*. ASC 260 requires presentation c both basic and diluted earnings per share ("EPS") on the face of the income statement. Basic EPS is computed by dividing net los available to common shareholders (numerator) by the weighted average number of shares outstanding (denominator) during th period. Diluted EPS gives effect to all dilutive potential common shares outstanding during the period using the treasury stoc method and convertible preferred stock using the if-converted method. In computing diluted EPS, the average stock price for th period is used in determining the number of shares assumed to be purchased from the exercise of stock options or warrants. Dilute EPS excludes all dilutive potential shares if their effect is anti dilutive. As at December 31 and June 30, 2012, the Company did nc have any potentially dilutive shares.

*Recent Accounting Pronouncements*

The Company has implemented all new accounting pronouncements that are in effect. These pronouncements did not have an material impact on the financial statements unless otherwise disclosed, and the Company does not believe that there are any othe new accounting pronouncements that have been issued that might have a material impact on its financial position or results c operations.

**PROPERTIES**

As of the date of this current report, our executive and administrative offices are located at 9 Carrera 43 A # 1-50, Torr

A0398

Proteccion, Piso 6, San Fernando Plaza, Medellin, Colombia. We believe these facilities are adequate for our current needs an that alternate facilities on similar terms would be readily available if needed.

15

A0399

As of the date of this current report on Form 8-K, we hold an option to acquire a 100% interest in La Frontera Project pursuant to an option agreement entered into by our subsidiary. For a description of the option agreement, please see the section entitled "Business" above.

**La Frontera Project**

*Location and Access*

The LGC-15011 Project, known as "La Frontera" or "The Frontier", is located in the northern department of Caldas, Republic of Columbia (LGC-15011 has 30% area in the department of Antioquia), in the village of Puente Piedra, in the municipality of Aguadas. The Project is situated in the Cordillera Central of the Andes Mountains and is bounded by the Magdalena River on the east and the Cauca River on the west.

The county of Aguadas sits approximately 40 kilometers away from La Pintada (Antioquia) and may be accessed from la Pintada by unpaved road with an approximate aggregate travel time of four hours. Travel from La Pintada is by unpaved road through Aguadas (40 kilometers /90 minutes) and Encimadas (20 kilometers over 90 minutes). From Encimadas, which sits at 2,400 meters above sea level (masl), the project site is accessed by descending to an elevation of 1,8000 masl to the river Arma. Travel is by unpaved mountain road with highly variable conditions. Travel time from Encimadas is approximately one hour and fifteen minutes. The site is accessible year round and exploration activities are not subject to seasonal interruption.

*Local Resources and Infrastructure*

According to the Departamento Administrativo Nacional de Estadistica ("DANE") census of 2005, the municipality of Aguadas had a population of 22,307. Basic resources are available in the municipality of Caldas including emergency medical services, temporary accommodations, and fuel. Any mining development on the Project would have access to the national electrical transmission grid. Water supply and cellular phone coverage in the area are limited.

*Legal Status*

The mining concession contract LGC-15011 was registered in the National Mining Registry o August 21, 2012 and expires o August 21, 2042. It is in the first year of the concession contract term. According to the certificate from the National Mining registry, the mining concession contract is duly registered and is in the exploration phase. Collectively, the title covers approximately 1227.94 hectares made up of 21 exploitation licenses.

In accordance with Colombian law, the holder of the mining licenses has a right to access the parcel of land covered by such mining Licenses and may perform exploration and exploitation work on them, subject to indemnification for damages to the owners of such parcel of land that may arise from such access, and the activities carried on by the holder of the mining licenses. The limits of the Project were map-staked and therefore no boundary markers exist. As of the date of this report, none of the licenses have been surveyed.

*Mineral Licenses in Colombian Law*

Mineral rights in Colombia are reserved to the federal government and governed by the Colombian Mining Code. The Colombian Mining Code has been changed and amended on several occasions. The oldest version relevant to the LGC-15011 Project is Decree 2685 of 1988 (the "Previous Mining Code"), which has been replaced and superseded in its entirety by Law 685 of 2001, as amended by Law 1382 of 2010 (the "Modified Mining Code"). The mining law is administered by the Ministry of Mines and Energy. By means of Decree 4134 of 2011, Ingeominas, the former mining Authority, was liquidated and divided into two entities: the *Agencia Nacional Minera* (National Mining Agency), which grant mining concessions and perform follow-up and control duties on granted mining titles, and the *Servicio Geológico Colombiano* (Colombian Geological Survey), which is in charge of performing studies to identify the availability of natural resources in the Colombian subsoil.

16

A0400