primarily perform, or are intended primarily to perform at the end of the offering, substantial duties for or on behalf of our company, other than in connection with transactions in securities; and (B) are not a broker or dealer, or been an associated person of a broker or dealer, within the preceding twelve months; and (C) have not participated in selling and offering securities for any issuer more than once every twelve months other than in reliance on Paragraphs (a)(4)(i) or (a)(4)(iii).

Neither Mr. Kerkenezov nor Ms. Heredia, intend to purchase any shares in this offering.

If applicable, the shares may not be offered or sold in certain jurisdictions unless they are registered or otherwise comply with the applicable securities laws of such jurisdictions by exemption, qualification or otherwise. We intend to sell the shares only in the states in which this offering has been qualified or an exemption from the registration requirements is available, and purchases of shares may be made only in those states.

In addition and without limiting the foregoing, we will be subject to applicable provisions, rules and regulations under the Exchange Act with regard to security transactions during the period of time when this Registration Statement is effective.

We will not use public solicitation or general advertising in connection with the offering. This offering will continue for the longer of: (i) 90 days after this registration statement becomes effective with the Securities and Exchange Commission, or (ii) the date on which all 60,000,000 shares registered hereunder have been sold. We may at our discretion extend the offering for an additional 90 days.

                    DESCRIPTION OF SECURITIES

Our authorized capital stock consists of 150,000,000 common shares, $0.001 par value.

COMMON STOCK

As of April 26, 2012, we have 40,513,100 shares of our common stock outstanding. We do not have any outstanding warrants, options, or other convertible securities. Holders of the common stock have no preemptive rights to purchase additional shares of common stock or other subscription rights. The common stock carries no conversion rights and is not subject to redemption or to any sinking fund provisions. All shares of common stock are entitled to share equally in dividends from sources legally available, therefore, when, as and if declared by the Board of Directors, and upon our liquidation or dissolution, whether voluntary or involuntary, to share equally in our assets available for distribution to stockholders.

The Board of Directors is authorized to issue additional shares of common stock not to exceed the amount authorized by our Articles of Incorporation, on such terms and conditions and for such consideration as the Board may deem appropriate without further stockholder action.

                              17
<PAGE>
VOTING RIGHTS

Each holder of common stock is entitled to one vote per share on all matters on which such stockholders are entitled to vote. Since the shares of common stock do not have cumulative voting rights, the holders of more than 50% of the shares voting for the election of directors can elect all the directors if they choose to do so and, in such event, the holders of the remaining shares will not be able to elect any person to the Board of Directors.

DIVIDEND POLICY

Holders of our common stock are entitled to dividends if declared by the Board of Directors out of funds legally available for dividends. Since our inception to April 26, 2012 no dividends have been declared.

We do not intend to issue any cash dividends in the future. We intend to retain earnings, if any, to finance the development and expansion of our business. However, it is possible that management may decide to declare a stock dividend in the future. Our future dividend policy will be subject to the discretion of the Board of Directors and will be contingent upon future earnings, if any, our financial condition, our capital requirements, general business conditions and other factors.

INTEREST OF NAMED EXPERTS AND COUNSEL

No expert or counsel named in this Prospectus as having prepared or certified any part thereof or having given an opinion upon the validity of the securities being registered or upon other legal matters in connection with the registration or offering of our common stock was employed on a contingency basis or had or is to receive, in connection with the offering, a substantial interest, directly or indirectly, in us. Additionally, no such expert or counsel was connected with us as a promoter, managing or principal underwriter, voting trustee, director, officer or employee.

Michael J. Morrison, 1495 Ridgeview Drive, Suite 220, Reno, Nevada, 89519, has passed upon certain legal matters in connection with the validity of the issuance of the shares of our common stock.

Sadler, Gibb & Associates, LLC of 291 South 200 West, Farmington, Utah, 84025 have audited our Financial Statements for the period November 12, 2010 (date of inception) through February 28, 2011 as well as the year ended February 29, 2012 and to the extent set forth in its report, which are included herein in reliance upon the authority of said firm as experts in accounting and auditing. There were no disagreements related to accounting principles or practices, financial statement disclosure, internal controls or auditing scope or procedure from date of appointment as our independent registered accountant through the period of audit (inception date November 12, 2010 through February 29, 2012)

BUSINESS DESCRIPTION

OVERVIEW

We are an exploration stage company, incorporated in the State of Nevada on November 12, 2010, as a for-profit company, and electing a fiscal year end of February 28. Our original name was Norstra Inc. On November 18, 2011 we filed a certificate of amendment with the Nevada Secretary of State to change our name to Norstra Energy Inc. On March 28, 2012 we filed an additional certificate of amendment with the Nevada to effect a forward split of our issued, outstanding and authorized common shares. Our business office is located at 414 Manor Road, Laredo, Texas, 78041 and our registered office is located at 4231 Dant Blvd., Reno, Nevada, 89509-7020. Our telephone number is 1-888-474-8077. We have reserved a domain main and have a staging site that can be found at www.norstraenergy.com.

<PAGE>                                                            .18

We plan on engaging in the exploration and development of oil and gas properties. We have acquired a 100% working interest in and an 80% revenue interest to approximately 40 acres of oil and gas exploration land in Reno County, Kansas which we plan to explore for oil and gas. The project is named the Lerado Extension Prospect. We anticipate conduction exploration activity on this property to ascertain whether production of oil and gas will be financially feasible given the current market for these commodities. If our exploration activity results in a positive outlook for the commercialization of the property, we anticipate on exercising the option on the property and begin production. However, there can be no assurance that we will raise sufficient funds to complete the type of exploration activity which will be necessary and then begin production.

We have had limited operations and have been issued a "going concern" opinion by our auditor, based upon our reliance on the sale of our common stock as the sole source of funds for our future operations. We will need to raise $25,000 through the sale of our common stock, in addition to the proceeds of this offering, in order to implement our business plan for the upcoming 12 months. Since our inception in November 2010, we have been involved primarily in organizational and acquisition activities. We have raised some initial capital, acquired a working interest in an oil and gas exploration property, developed a short-term and long term corporate strategy and retained experts in law and accounting. We anticipate undertaking exploration activity on the Lerado Extension Prospect by winter of 2013.

Our short term business strategy is to conduct exploration activities on the Lerado Extension Prospect, laid out in more detail in the "Description of Property" section of this Prospectus and raise sufficient capital to carry out these activities. If achieve positive results during our exploration activities, we believe we will be able to either develop the Lerado Extension Prospect to the point of production or transfer our rights in the property at a profit.

Our long term strategy calls for the acquisition of additional property rights throughout North America and the undertaking of exploration activities on those properties. Both our short term and long term strategies are dependent on the

ability to raise further capital and there can be no assurance that we will be able to raise such capital.

MARKETS

The availability of a ready market and the prices obtained for produced oil and gas depends on many factors, including the extent of domestic production and imports of oil and gas, the proximity and capacity of natural gas pipelines and other transportation facilities, fluctuating demand for oil and gas, the marketing of competitive fuels, and the effects of governmental regulation of oil and gas production and sales. A ready domestic market for oil and gas exists because of the presence of pipelines to transport oil and gas. The existence of an international market exists depends upon the presence of international delivery systems and political and pricing factors.

If we are successful in producing oil and gas in the future, the target customers for our oil and gas are expected to be refiners, remarketers and third party intermediaries, who either have, or have access to, consumer delivery systems. We intend to sell our oil and gas under both short-term (less than one year) and long-term (one year or more) agreements at prices negotiated with third parties. Typically either the entire contract (in the case of short-term contracts) or the price provisions of the contract (in the case of long-term contracts) are renegotiated at intervals ranging in frequency from daily to annually.

We have not yet adopted any specific sales and marketing plans. However, as we purchase future properties, the need to hire marketing personnel will be addressed.

                              19
<PAGE>
COMPETITION

The oil and gas industry is highly competitive. We are a new exploration stage company and have a weak competitive position in the industry. We compete with junior and senior oil and gas companies, independent producers and institutional and individual investors who are actively seeking to acquire oil and gas properties throughout the world together with the equipment, labor and materials required to operate on those properties. Competition for the acquisition of oil and gas interests is intense with many oil and gas leases or concessions available in a competitive bidding process in which we may lack the technological information or expertise available to other bidders.

Many of the oil and gas companies with which we compete for financing and for the acquisition of oil and gas properties have greater financial and technical resources than those available to us. Accordingly, these competitors may be able to spend greater amounts on acquiring oil and gas interests of merit or on exploring or developing their oil and gas properties. This advantage could enable our competitors to acquire oil and gas properties of greater quality and interest to prospective investors who may choose to finance their additional exploration and development. Such competition could adversely impact our ability to attain the financing necessary for us to acquire further oil and gas interests or explore and develop our current or future oil and gas properties.

We also compete with other junior oil and gas companies for financing from a limited number of investors that are prepared to invest in such companies. The presence of competing junior oil and gas companies may impact our ability to raise additional capital in order to fund our acquisition or exploration programs if investors perceive that investments in our competitors are more attractive based on the merit of their oil and gas properties or the price of the investment opportunity. In addition, we compete with both junior and senior oil and gas companies for available resources, including, but not limited to, professional geologists, land specialists, engineers, camp staff, helicopters, float planes, oil and gas exploration supplies and drill rigs.

General competitive conditions may be substantially affected by various forms of energy legislation and/or regulation introduced from time to time by the governments of the United States and other countries, as well as factors beyond our control, including international political conditions, overall levels of supply and demand for oil and gas, and the markets for synthetic fuels and alternative energy sources.

In the face of competition, we may not be successful in acquiring, exploring or developing profitable oil and gas properties or interests, and we cannot give any assurance that suitable oil and gas properties or interests will be available for our acquisition, exploration or development. Despite this, we hope to compete successfully in the oil and gas industry by:

    *   keeping our costs low;
    *   relying on the strength of our management's contacts; and
    *   using our size and experience to our advantage by adapting quickly to
        changing market conditions or responding swiftly to potential
        opportunities.

GOVERNMENTAL REGULATIONS AND ENVIRONMENTAL COMPLIANCE

GENERAL. Our exploration activities are subject to federal, state and local laws
and regulations governing exploration, environmental matters, occupational
health and safety, taxes, labor standards and other matters. All material
licenses, permits and other authorizations currently required for our operations
have been obtained or timely applied for. Compliance is often burdensome, and
failure to comply carries substantial penalties. The regulatory burden on the
oil and gas industry increases the cost of doing business and affects
profitability.

                                      20
<PAGE>
ENVIRONMENTAL MATTERS. Our operations are subject to numerous laws relating to
environmental protection. These laws impose substantial penalties for any
pollution resulting from our operations. We believe that our operations
substantially comply with applicable environmental laws.

SOLID WASTE. Our operations require the disposal of both hazardous and
nonhazardous solid wastes that are subject to the requirements of the Federal
Resource Conservation and Recovery Act (RCRA) and comparable state statutes. In
addition, the EPA and certain states in which we currently operate are presently
in the process of developing stricter disposal standards for nonhazardous waste.
Changes in these standards may result in our incurring additional expenditures
or operating expenses.

HAZARDOUS SUBSTANCES. The Comprehensive Environmental Response, Compensation,
and Liability Act (CERCLA), also known as the "Superfund" law, imposes
liability, without regard to fault or the legality of the original conduct, on
some classes of persons that are considered to have contributed to the release
of a "hazardous substance" into the environment. These persons include but are
not limited to the owner or operator of the site or sites where the release
occurred or was threatened and companies that disposed or arranged for the
disposal of the hazardous substances found at the site. Persons responsible for
releases of hazardous substances under CERCLA may be subject to joint and
several liability for the costs of cleaning up the hazardous substances and for
damages to natural resources. Despite the RCRA exemption that encompasses wastes
directly associated with crude oil and gas production and the "petroleum
exclusion" of CERCLA, we may generate or arrange for the disposal of "hazardous
substances" within the meaning of CERCLA or comparable state statutes in the
course of our ordinary operations. Thus, we may be responsible under CERCLA (or
the state equivalents) for costs required to clean up sites where the release of
a "hazardous substance" has occurred. Also, it is not uncommon for neighboring
landowners and other third parties to file claims for cleanup costs as well as
personal injury and property damage allegedly caused by the hazardous substances
released into the environment. Thus, we may be subject to cost recovery and to
some other claims as a result of our operations.

AIR. Our operations are also subject to regulation of air emissions under the
Clean Air Act, comparable state and local requirements and the OCSLA. The
scheduled implementation of these laws could lead to the imposition of new air
pollution control requirements on our operations. Therefore, we may incur future
capital expenditures to upgrade our air pollution control equipment. We do not
believe that our operations would be materially affected by these requirements,
nor do we expect the requirements to be any more burdensome to us than to other
companies our size involved in exploration and production activities.

WATER. The Clean Water Act prohibits any discharge into waters of the United
States except in strict conformance with permits issued by federal and state
agencies. Failure to comply with the ongoing requirements of these laws or
inadequate cooperation during a spill event may subject a responsible party to
civil or criminal enforcement actions. Similarly, the Oil Pollution Act of 1990
imposes liability on "responsible parties" for the discharge or substantial
threat of discharge of oil into navigable waters or adjoining shorelines. A
"responsible party" includes the owner or operator of a facility or vessel, or
the lessee or permittee of the area in which a facility is located. The Oil
Pollution Act assigns liability to each responsible party for oil removal costs
and a variety of public and private damages. While liability limits apply in
some circumstances, a party cannot take advantage of liability limits if the
spill was caused by gross negligence or willful misconduct, or resulted from
violation of a federal safety, construction or operating regulation. If the
party fails to report a spill or to cooperate fully in the cleanup, liability

A0459

limits likewise do not apply. Even if applicable, the liability limits for offshore facilities require the responsible party to pay all removal costs, plus up to $75 million in other damages. Few defenses exist to the liability imposed by the Oil Pollution Act.

21

<PAGE>
The Oil Pollution Act also requires a responsible party to submit proof of its financial responsibility to cover environmental cleanup and restoration costs that could be incurred in connection with an oil spill. The Oil Pollution Act requires parties responsible for offshore facilities to provide financial assurance in amounts that vary from $35 million to $150 million depending on a company's calculation of its "worst case" oil spill. We intend to have insurance to cover our facilities' "worst case" oil spill under the Oil Pollution Act regulations if we enter operations. As a result, we believe that we are in compliance with the Oil Pollution Act.

SAFETY AND HEALTH REGULATIONS. We are also subject to laws and regulations concerning occupational safety and health. We do not currently anticipate making substantial expenditures because of occupational safety and health laws and regulations. We cannot predict how or when these laws may be changed, or the ultimate cost of compliance with any future changes. However, we do not believe that any action taken will affect us in a way that materially differs from the way it would affect other companies in our industry.

INTELLECTUAL PROPERTY

We do not currently hold rights to any intellectual property and have not filed for copyright or trademark protection for our name or services.

RESEARCH AND DEVELOPMENT

Since our inception to the date of this Prospectus, we have not spent any money on research and development activities.

REPORTS TO SECURITY HOLDERS

Any member of the public may read and copy any materials filed by us with the Securities and Exchange Commission at the Securities and Exchange Commission's Public Reference Room at 100 F Street, N.E. Washington, D.C. 20549. Information on the operation of the Public Reference Room may be obtained by calling the Securities and Exchange Commission at 1-800-732-0330. The Securities and Exchange Commission maintains an internet website (http://www.sec.gov) that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the Securities and Exchange Commission.

DESCRIPTION OF PROPERTY

We plan on engaging in the exploration and development of oil and gas properties. We have acquired a 100% working interest in and to approximately 40 acres of oil and gas exploration land in Reno County, Kansas.

OWNERSHIP

On February 15, 2012 Norstra Energy Inc. and Keta Oil and Gas Inc. concluded a transaction by which Norstra Energy Inc. paid USD $15,000 to acquire 100% working interest in the oil and gas leases described as: "T26S R8W THE NE/4NE/4 SECTION 30: CONTAINING 40 ACRES MORE OR LESS, LOCATED IN RENO COUNTY, STATE OF KANSAS." The purchase price was made up of $10 for the lease assignment and $14,990 as a lease bonus payment.

22

<PAGE>
The lease is for a 3 (three) year term with a commencement date of original acquisition (February 15, 2012) and grant the Company the right to explore for potential petroleum and natural gas opportunities on the respective lease. The ability to renew the lease is to be renegotiated before or upon termination if Norstra Energy Inc. should choose to renew the leasing rights.

LOCATION

The acreage is located in the Great Plains physiographic province of Kansas and the surface terrain consists of gently rolling plains. Ground elevations range from 1,500-1750 feet above sea level. The land is primarily used for agriculture and cattle grazing. There are no adverse environmental conditions on the surface or subsurface. There are numerous highway and county roads that allow easy access to the acreage and future well sites upon development of the play.

A0460

The Lerado Extension is within the oil and gas producing region of Central Kansas and lays along the southern flank of the Central Kansas Uplift, with a portion of the acreage falling within the Sedgwick Basin.

GEOLOGY

Across the uplift the normal inclination of strata is interrupted in places to form gently plunging anticlines, numerous closed structures and complex faulted areas. The rock strata dip into the basins with closed structures, plunging anticlines, and stratigraphic traps forming along the flanks of the uplift. Structural features, such as those mentioned above, are often associated with accumulation of hydrocarbons in the area. Stratigraphic traps formed as a result of differences or variations between or within stratified rock layers, creating a change or loss of porosity and/or permeability are also of major importance in hydrocarbon entrapment. Large amounts of oil and gas have produced on the uplift and on the flanks of this major Pre-Mississippian and Middle Pennsylvanian structural province.

The rocks of the Lansing-Kansas City Group account for approximately 23% of all the oil produced in the state of Kansas. the majority of which comes from the Central Kansas Uplift and the basins flanking the uplift shown in the (F2TETCONIC TAB). The Lansing-Kansas City zone in central Kansas is composed of interblended carbonates and shale's with occasional minor coals and sandstones. In the general vicinity of the Lerado Extension, the Lansing- Kansas City zones is between 100-225 feet of thickness. Of the dozen or so individual zones with-in the Lansing-Kansas City, several of the zones have potential to produce oil and gas from each well drilled.

EXPLORATION PROGRAM

The State of Kansas maintains a database of drilling information from wells drilled under leases issued by the state. Companies who drill in Kansas are required to submit their drill results to the state. Therefore, previous drilling undertaken on land adjacent to the Company's holding are required to submit their drill log data to the state government. As a result, there is a large database of drill results available to the public. The Company has not yet received any reports indicating whether or not any previous drilling has been undertaken on adjacent lands.

In order to advance our property to a stage that would make the property of interest for a farm-in opportunity we will need to undertake the early stages of exploration ourselves. Our holdings do not currently have a resource. The Company's initial work plan for the first year will include a detailed review of all publicly available data. In particular, the review will include a detailed assessment of publicly available drilling information to help us assess whether our properties may contain the type of formations that typically host crude oil in central Kansas. The review will also help to determine which other oil

23

<PAGE>
companies are exploring or drilling in our area in order to help us assess the possibility of approaching those companies for potential farm-in opportunities.

In addition to reviewing publicly available information we intend to conduct seismology studies to best make further determinations of geological potential. Seismology is a geophysical method of determining geologic structure by means of prospector-induced elastic waves. In exploration seismology, artificial sources are used that have periods of tenths of a second and tens of meters of resolution.

The seismic method as applied to exploration of oil and gas involves field acquisition, data processing, and geologic interpretation. Seismic field acquisition requires placement of acoustic receivers (geophones) on the surface. The end result of seismic data processing is the production of a subsurface profile similar to a geologic cross section. It is commonly plotted in a time scale, but it is also possible to plot it in depth. These time or depth profiles are used for geologic interpretation. Geologic interpretation of seismic data has two key components, structural and stratigraphic. Structural interpretation of seismic data involves mapping of the geologic relief of different subsurface strata by using seismic data as well as information from boreholes and outcrops. Stratigraphic interpretation looks at attributes within a common stratum and interprets changes to infer varying reservoir conditions such as lithology, porosity, and fluid content.

Based on the results of the planned work program the next step in the exploration process will likely be to approach oil companies in the area to discuss farm-in opportunities or to raise additional funds in order to drill a

well.

We believe our initial exploration program will cost approximately $40,000 to complete. This is broken down into $7,500 for review of drilling data in the area and $32,500 for an initial seismic testing and review.

We have not recognized any revenue from our oil and gas project and do not expect to generate any revenue for at least 12 months. Our property does not contain any known reserves or resources of oil or gas.

## LEGAL PROCEEDINGS

We know of no material, active or pending legal proceedings against us, nor are we involved as a plaintiff in any material proceedings or pending litigation. There are no proceedings in which our director, officer, or affiliate, or any registered beneficial shareholder are an adverse party or has a material interest adverse to us.

## MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

### MARKET INFORMATION

Our common stock is not traded on any exchange. We intend to apply to have our common stock quoted on the OTC Bulletin Board once this Prospectus has been declared effective by the SEC; however, there is no guarantee that we will obtain a listing.

There is currently no trading market for our common stock and there is no assurance that a regular trading market will ever develop. OTC Bulletin Board securities are not listed and traded on the floor of an organized national or regional stock exchange. Instead, OTC Bulletin Board securities transactions are conducted through a telephone and computer network connecting dealers. OTC

24

<PAGE>
Bulletin Board issuers are traditionally smaller companies that do not meet the financial and other listing requirements of a regional or national stock exchange.

To have our common stock listed on any of the public trading markets, including the OTC Bulletin Board, we will require a market maker to sponsor our securities. We have not yet engaged any market maker to sponsor our securities, and there is no guarantee that our securities will meet the requirements for quotation or that our securities will be accepted for listing on the OTC Bulletin Board. This could prevent us from developing a trading market for our common stock.

### HOLDERS

As of the date of this Prospectus there were 2 holders of record of our common stock.

### DIVIDENDS

To date, we have not paid dividends on shares of our common stock and we do not expect to declare or pay dividends on shares of our common stock in the foreseeable future. The payment of any dividends will depend upon our future earnings, if any, our financial condition, and other factors deemed relevant by our Board of Directors.

### EQUITY COMPENSATION PLANS

As of the date of this Prospectus we did not have any equity compensation plans.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

This section of the prospectus includes a number of forward-looking statements that reflect our current views with respect to future events and financial performance. Forward-looking statements are often identified by words like: "believe", "expect", "estimate", "anticipate", "intend", "project" and similar expressions, or words that, by their nature, refer to future events. You should not place undue certainty on these forward-looking statements, which apply only as of the date of this prospectus. These forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from historical results or our predictions.

Our financial statements are stated in United States Dollars (USD or US$) and

are prepared in accordance with United States Generally Accepted Accounting Principles. All references to "common shares" refer to the common shares in our capital stock.

We anticipate that we will meet our ongoing cash requirements through equity or debt financing. We estimate that our expenses over the next 12 months will be approximately $60,000 as described in the table below. These estimates may change significantly depending on the nature of our future business activities and our ability to raise capital from shareholders or other sources.

| Description | Estimated Completion Date | Estimated Expenses ($) |
|---|---|---|
| Legal and accounting fees | 12 months | $10,000 |
| Exploration Expenses | 12 months | $40,000 |
| General and administrative expenses | 12 months | $10,000 |
| Total | | $60,000 |

25

<PAGE>
We intend to meet our cash requirements for the next 12 months through a combination of debt financing and equity financing by way of private placements. We currently do not have any arrangements in place to complete any private placement financings and there is no assurance that we will be successful in completing any such financings on terms that will be acceptable to us.

If we are not able to raise the full $60,000 to implement our business plan as anticipated, we will scale our business development in line with available capital. Our primary priority will be to retain our reporting status with the SEC which means that we will first ensure that we have sufficient capital to cover our legal and accounting expenses. Once these costs are accounted for, in accordance with how much financing we are able to secure, we will focus on exploration activities on our property. We will likely not expend funds on the remainder of our planned activities unless we have the required capital.

We did not earn any revenues from our incorporation on November 12, 2010 to February 29, 2012. We incurred operating expenses in the amount of ($1,632) for the period from our inception on November 12, 2010 through February 29, 2012. These operating expenses were comprised of incorporation costs, website, bank service charges and other development costs.

As of February 29, 2012, our current assets were $177 and our liabilities were $4,392, which resulting in a working capital of $(4,215). As of February 29, 2012, current assets were comprised of $177 in cash. Management believes additional capital will be required in order to complete our secondary offering which we intend to raise though debt. Capital required to complete our initial exploration plans however will require equity through private placements. We currently do not have any arrangements in place to complete any private placement financings and there is no assurance that we will be successful in completing any such financings on terms that will be acceptable to us.

We have not attained profitable operations and are dependent upon obtaining financing to continue with our business plan.

OFF-BALANCE SHEET ARRANGEMENTS

We have no significant off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in our financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that are material to our stockholders.

INFLATION

The effect of inflation on our revenues and operating results has not been significant.

CRITICAL ACCOUNTING POLICIES

Our financial statements are affected by the accounting policies used and the estimates and assumptions made by management during their preparation. A complete listing of these policies is included in the notes to our financial statements for the year ended February 29, 2012. We have identified below the accounting policies that are of particular importance in the presentation of our financial position, results of operations and cash flows, and which require the application of significant judgment by management.

26
<PAGE>
USE OF ESTIMATES

In preparing these consolidated financial statements, management makes estimates and assumptions that affect the reported amounts of assets and liabilities in the balance sheets and revenues and expenses during the year reported. Actual results may differ from these estimates.

CASH AND CASH EQUIVALENTS

Cash and cash equivalents include cash on hand, demand deposits with banks and liquid investments with an original maturity of three months or less.

LOSS PER SHARE

Basic loss per share is computed by dividing net loss by the weighted average number of shares of common stock outstanding during each period. Diluted loss per share is computed by dividing net loss by the weighted average number of shares of common stock, common stock equivalents and potentially dilutive securities outstanding during each period. For the period from November 18, 2010 (inception) to February 29, 2012, there were no common stock equivalents and potential dilutive securities; however, if present, a separate computation of diluted loss per share would not have been presented, as these common stock equivalents and potential dilutive securities would have been anti-dilutive due to the Company's net loss.

CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING
AND FINANCIAL DISCLOSURE

Sadler, Gibb & Associates LLC, has audited our Financial Statements for the period from November 12, 2010 (date of inception) to February 28, 2011 and the year ended February 29, 2012 and to the extent set forth in its report, which are included herein in reliance upon the authority of said firm as experts in accounting and auditing. There were no disagreements related to accounting principles or practices, financial statement disclosure, internal controls or auditing scope or procedure during the above period.

MANAGEMENT

OFFICER AND DIRECTOR

Our sole Officer and Director will serve until her successor is elected and qualified. Our officer was elected by the board of directors and serves until her successor(s) is duly elected and qualified, or until she is removed from office. The board of directors has no nominating, auditing or compensation committees.

Dallas Kerkenezov and Sasha Heredia, our two directors and officers. Mr. Kerkenezov and Ms. Heredia The name, age and position of our officers and directors is set forth below:

27
<PAGE>

| Name | Age | Position(s) |
| ---- | --- | ----------- |
| Dallas Kerkenezov | 34 | President, Secretary/Treasurer Chief Executive Officer Principal Financial Officer and Director |
| Sasha Heredia | 31 | Director |

BUSINESS EXPERIENCE

DALLAS KERKENEZOV, PRESIDENT, SECRETARY/TREASURER, CHIEF EXECUTIVE OFFICER, PRINCIPAL FINANCIAL OFFICER AND DIRECTOR

Mr. Kerkenezov is our sole officer and a director of Norstra Energy Inc. and has served as such since our inception. Mr. Kerkenezov has spent time in both Canada and Norway in the resource exploration and production industries. Currently Mr. Kerkenezov owns his own construction company `Rom for Bygg' where his work is primarily in the oil industry with platform construction. For the summers of 2009-2011 Mr. Kerkenezov worked in the Yukon helping run staking and drilling crews for various mineral exploration companies. Prior to this time (From 2005-2011) and during the off season Mr. Kerkenezov was employed as a carpenter with Byggefirma Tunge AS.

We appointed Mr. Kerkenezov to our board of directors due to his experience in project management and exploration.

SASHA HEREDIA,  DIRECTOR

Ms. Heredia is a director of Norstra Energy Inc. and petroleum engineer with a degree from the Universidad De Oriente, Maturin in Venezuela. During her studies her graduation project was a Economic Feasibility study to test drilling shallow sands with flexible pipe in San Joaquin Fields. At present Ms. Heredia is currently employed at PDVSA Petrocedeno as the Unit Supervisor, petroleum department. Previously she worked for five years as a reservoir engineer in the petroleum department doing pressure test analysis of wells, and optimization of production.

We appointed Ms. Heredia to our board of directors due to her strong education and experience in the petroleum sector.

Currently, Mr. Kerkenezov spends approximately 25 hours a week on our affairs and Ms. Heredia devotes approximately 15 hours per week on developing our business plan and reviewing potential acquisitions.

OTHER DIRECTORSHIPS

Neither Mr. Kerkenezov nor Ms. Heredia hold, and have not held over the past five years, any other directorships in any company with a class of securities registered pursuant to section 12 of the Exchange Act or subject to the requirements of section 15(d) of such Act or any company registered as an investment company under the Investment Company Act of 1940.

                                    28
<PAGE>
                          CONFLICTS OF INTEREST

Neither Mr. Kerkenezov nor Ms. Heredia are obligated to commit their full time and attention to our business and accordingly, they may encounter a conflict of interest in allocating their time between our operations and those of other businesses. In that course of her other business activities she may become aware of investment and business opportunities which may be appropriate for presentation to us as well as other entities to which she owes a fiduciary duty. As a result she may have conflicts of interest in determining to which entity a particular business opportunity should be presented. She may also in the future become affiliated with entities that are engaged in business activities similar to those we intend to conduct.

In general, officers and directors of a corporation are required to present business opportunities to the corporation if:

    *    the corporation could financially undertake the opportunity:
    *    the opportunity is within the corporation's line of business: and
    *    it would be unfair to the corporation and its stockholders not to
         bring the opportunity to the attention of the corporation.

                   COMMITTEES OF THE BOARD OF DIRECTORS

Our two directors and officers have not established any committees, including an Audit Committee, a Compensation Committee or a Nominating Committee, or any committee performing a similar function. The functions of those committees are being undertaken by both of our directors. Because we do not have any independent directors, our board of directors believes that the establishment of committees of the Board would not provide any benefits to our company and could be considered more form than substance.

We do not have a policy regarding the consideration of any director candidates that may be recommended by our stockholders, including the minimum qualifications for director candidates, nor has our sole director established a process for identifying and evaluating director nominees. We have not adopted a policy regarding the handling of any potential recommendation of director candidates by our stockholders, including the procedures to be followed. Our two directors and officers not considered or adopted any of these policies as we have never received a recommendation from any stockholder for any candidate to serve on our Board of Directors. Given our relative size and lack of directors and officers insurance coverage, we do not anticipate that any of our stockholders will make such a recommendation in the near future.

While there have been no nominations of additional directors proposed, in the event such a proposal is made, all current members of our Board will participate in the consideration of director nominees.

Neither one of our directors is an "audit committee financial expert" within the meaning of Item 401(e) of Regulation S-K. In general, an "audit committee financial expert" is an individual member of the audit committee or Board of Directors who:

* understands generally accepted accounting principles and financial statements,
* is able to assess the general application of such principles in connection with accounting for estimates, accruals and reserves,

29

<PAGE>
* has experience preparing, auditing, analyzing or evaluating financial statements comparable to the breadth and complexity to our financial statements,
* understands internal controls over financial reporting, and
* understands audit committee functions.

As with most small, early stage companies until such time our company further develops its business, achieves a stronger revenue base and has sufficient working capital to purchase directors and officers insurance, we do not have any immediate prospects to attract independent directors. When we are able to expand our Board of Directors to include one or more independent directors, we intend to establish an Audit Committee of our Board of Directors. It is our intention that one or more of these independent directors will also qualify as an audit committee financial expert. Our securities are not quoted on an exchange that has requirements that a majority of our Board members be independent and we are not currently otherwise subject to any law, rule or regulation requiring that all or any portion of our Board of Directors include "independent" directors, nor are we required to establish or maintain an Audit Committee or other committee of our Board of Directors.

WE DO NOT HAVE ANY INDEPENDENT DIRECTORS AND WE HAVE NOT VOLUNTARILY IMPLEMENTED VARIOUS CORPORATE GOVERNANCE MEASURES, IN THE ABSENCE OF WHICH, STOCKHOLDERS MAY HAVE MORE LIMITED PROTECTIONS AGAINST INTERESTED DIRECTOR TRANSACTIONS, CONFLICTS OF INTEREST AND SIMILAR MATTERS.

EXECUTIVE COMPENSATION

We have made no provisions for paying cash or non-cash compensation to our sole Officer and Director. No salaries are being paid at the present time, no salaries or other compensation were paid in cash, or otherwise, for services performed prior to our date of inception, and we do not anticipate that any compensation will be paid unless and until our operations generate sufficient cash flows.

The table below summarizes all compensation awarded to, earned by, or paid to our named sole Officer and Director for all services rendered in all capacities to us for the period from inception (November 12, 2010) through February 28, 2011 as well as the year ended February 29, 2012.

SUMMARY COMPENSATION TABLE

<TABLE>
<CAPTION>

| Name and Principal Position | Year | Salary($) | Bonus($) | Stock Awards($) | Option Awards($) | Non-Equity Incentive Plan Compensation($) | Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Dallas | 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kerkenezov CEO | 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

</TABLE>

We have not paid any salaries to our officer or our two director as of the date of this Prospectus. We do not anticipate beginning to pay salaries until we have adequate funds to do so. There are no other stock option plans, retirement, pension, or profit sharing plans for the benefit of our officer and directors other than as described herein.

30

<PAGE>
OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END

The table below summarizes all unexercised options, stock that has not vested,

and equity incentive plan awards for each named executive officer as of February 29, 2012.

<TABLE>
<CAPTION>

|  | Option Awards | | | | | Stock Awards | | |
| Name | Number of Securities Underlying Unexercised Options Exercisable(#) | Number of Securities Underlying Unexercised Options Unexercisable(#) | Equity Incentive Plan Awards; Number of Securities Underlying Unexercised Unearned Options(#) | Option Exercise Price($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested(#) | Market Value of Shares or Units of Stock That Have Not Vested($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested(#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested(#) |
| ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Dallas Kerkenezov | -- | -- | -- | -- | -- | -- | -- | -- | -- |
</TABLE>

There were no grants of stock options since inception to the date of this Prospectus.

We do not have any long-term incentive plans that provide compensation intended to serve as incentive for performance.

We have not adopted a stock option plan. We have no plans to adopt a stock option plan, but may choose to do so in the future. If such a plan is adopted, this may be administered by the board or a committee appointed by the board (the "Committee"). The committee would have the power to modify, extend or renew outstanding options and to authorize the grant of new options in substitution therefore, provided that any such action may not impair any rights under any option previously granted. We may develop an incentive based stock option plan for our officers and directors and may reserve up to 10% of our outstanding shares of common stock for that purpose.

OPTIONS GRANTS DURING THE LAST FISCAL YEAR / STOCK OPTION PLANS

We do not currently have a stock option plan in favor of any director, officer, consultant or employee of our company. No individual grants of stock options, whether or not in tandem with stock appreciation rights known as SARs or freestanding SARs have been made to our Sole Director and Officer since our inception; accordingly, no stock options have been granted or exercised by our Sole Director and Officer since we were founded.

AGGREGATED OPTIONS EXERCISES IN LAST FISCAL YEAR

No individual grants of stock options, whether or not in tandem with stock appreciation rights known as SARs or freestanding SARs have been made to our officer or directors since our inception; accordingly, no stock options have been granted or exercised by our officer or directors since we were founded.

LONG-TERM INCENTIVE PLANS AND AWARDS

We do not have any long-term incentive plans that provide compensation intended to serve as incentive for performance. No individual grants or agreements regarding future payouts under non-stock price-based plans have been made to our officer, directors or any employee or consultant since our inception; accordingly, no future payouts under non-stock price-based plans or agreements have been granted or entered into or exercised by our officer, directors or employees or consultants since we were founded.

                                    31

<PAGE>
COMPENSATION OF DIRECTORS

Our directors are not compensated by us for acting as such. They are reimbursed for reasonable out-of-pocket expenses incurred. There are no arrangements pursuant to which our directors are or will be compensated in the future for any services provided as a Director.

EMPLOYMENT CONTRACTS, TERMINATION OF EMPLOYMENT, CHANGE-IN-CONTROL ARRANGEMENTS

There are no employment contracts or other contracts or arrangements with Mr. Kerkenezov and Ms. Heredia. There are no compensation plans or arrangements, including payments to be made by us, with respect to Mr. Kerkenezov and Ms. Heredia that would result from their resignation, retirement or any other termination. There are no arrangements for Directors, Officers or Employees that would result from a change-in-control.

INDEBTEDNESS OF DIRECTORS, SENIOR OFFICERS, EXECUTIVE OFFICERS AND OTHER MANAGEMENT

Neither our officer, directors nor any associate or affiliate of our company during the last two fiscal years are or have been indebted to our company by way of guarantee, support agreement, letter of credit or other similar agreement or understanding currently outstanding.

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

The following table sets forth, as of the date of this prospectus, the total number of shares owned beneficially by our sole officer and director, and key employees, individually and as a group, and the present owners of 5% or more of our total outstanding shares. The table also reflects what her ownership will be assuming completion of the sale of all shares in this offering. The stockholder listed below has direct ownership of her shares and possesses sole voting and dispositive power with respect to the shares.

| Title of Class | Name and Address of Beneficial Owner [1] | Amount and Nature of Beneficial Ownership | Percent of Class [2] |
| --- | --- | --- | --- |
| Common Stock | Dallas Kerkenezov 414 Manor Road, Laredo Texas, 78041 | 30,513,100 | 75% |
| Common Stock | Sasha Heredia 414 Manor Road, Laredo Texas, 78041 | 10,000,000 | 25% |
| | All Officers and Directors as a Group (1 person) | 40,513,100 | 100% |

----------
[1]  The person named above may be deemed to be a "parent" and "promoter" of our company, within the meaning of such terms under the Securities Act of 1933, as amended, by virtue of their direct and indirect stock holdings. Mr. Kerkenezov and Ms. Heredia are the only "promoters" of our company. Mr. Kerenezov is our sole officer and one of our directors. Ms. Heredia is one of our two directors.
[2]  Based on 40,513,100 shares issued and outstanding as of the date of this Prospectus.

                                     32
<PAGE>
CHANGE IN CONTROL

We are not aware of any arrangement that might result in a change in control of our company in the future.

CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

On February 17, 2012 we issued 20,513,000 shares of restricted common stock to Dallas Kerkenezov, a director and officer, for consideration of 10,257. On February 25, 2012 we Issued 10,000,000 shares of restricted common stock to Dallas Kerkenezov, a director and officer, in exchange for forgiveness of $5,000 note payable to him.

There have been no other transactions since our audit date, February 29, 2012, or any currently proposed transactions in which we are, or plan to be, a participant and in which any related person had or will have a direct or indirect material interest.

DIRECTOR INDEPENDENCE

We do not currently have any independent directors. Once we engage further directors and officers, we plan to develop a definition of independence and scrutinize our Board of Directors with regard to this definition.

LEGAL PROCEEDINGS

We know of no material, active or pending legal proceedings against us, nor are we involved as a plaintiff in any material proceedings or pending litigation. There are no proceedings in which any of our directors, officers or affiliates, or any registered beneficial shareholder are an adverse party or has a material interest adverse to us.

We intend to furnish annual reports to stockholders, which will include audited financial statements reported on by our Certified Public Accountants. In addition, we will issue unaudited quarterly or other interim reports to stockholders, as we deem appropriate or required by applicable securities regulations.

DISCLOSURE OF COMMISSION'S POSITION ON INDEMNIFICATION FOR
SECURITIES ACT LIABILITIES

Our Bylaws provide that we will indemnify our directors and officers to the fullest extent not prohibited by Nevada law.

The general effect of the foregoing is to indemnify a control person, officer or director from liability, thereby making us responsible for any expenses or damages incurred by such control person, officer or director in any action brought against them based on their conduct in such capacity, provided they did not engage in fraud or criminal activity.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers or control persons pursuant to the foregoing provisions, we have been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

33

<PAGE>

REPORTS TO SECURITY HOLDERS

As a result of this offering as required under Section 15(d) of the Securities Exchange Act of 1934, we will file periodic reports with the Securities and Exchange Commission through February 28, 2013, including a Form 10-K for the year ended February 28, 2013, assuming this registration statement is declared effective before that date. At or prior to February 28, 2013 we intend voluntarily to file a registration statement on Form 8-A which will subject us to all of the reporting requirements of the 1934 Act. This will require us to file quarterly and annual reports with the SEC and will also subject us to the proxy rules of the SEC. In addition, our officers, directors and 10% stockholders will be required to submit reports to the SEC on their stock ownership and stock trading activity. We are not required under Section 12(g) or otherwise to become a mandatory 1934 Act filer unless we have more than 500 shareholders and total assets of more than $10 million on February 28, 2013. If we do not file a registration statement on Form 8-A at or prior to February 28, 2013, we will continue as a reporting company and will not be subject to the proxy statement requirements of the 1934 Act, and our officers, directors and 10% stockholders will not be required to submit reports to the SEC on their stock ownership and stock trading activity.

The public may read and copy any materials filed by us with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. We are an electronic filer. The SEC maintains an internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC. The address of that site is www.sec.gov.

WHERE YOU CAN FIND MORE INFORMATION

In the Registration Statement, certain items of which are contained in exhibits and schedules as permitted by the rules and regulations of the Securities and Exchange Commission. You can obtain a copy of the Registration Statement from the Securities and Exchange Commission by mail from the Public Reference Room of the Securities and Exchange Commission at 100 F Street, NE, Washington, D.C. 20549, at prescribed rates. In addition, the Securities and Exchange Commission maintains a Web site at http://www.sec.gov containing reports, proxy and information statements and other information regarding registrants that file electronically with the Securities and Exchange Commission. The Securities and Exchange Commission's telephone number is 1-800-SEC-0330 (1-800-732-0330). These SEC filings are also available to the public from commercial document retrieval services.

You should rely only on the information contained in this prospectus. No finder, dealer, sales person or other person has been authorized to give any information or to make any representation in connection with this offering other than those contained in this prospectus and, if given or made, such information or representation must not be relied upon as having been authorized by Norstra Energy Inc. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any of the securities offered hereby by anyone in any jurisdiction in which such offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make such offer or solicitation.

RECENT SALES OF UNREGISTERED SECURITIES

During the last three fiscal years we have had the following issuances of unregistered securities:

* In February of 2012, we issued 40,513,100 shares of our common stock to Dallas Kerkenezov our sole officer and a director and Sasha Heredia, a director, in exchange for cash of $10,257, forgiveness of a

<center>34</center>

&lt;PAGE&gt;

note payable from an officer of $5,000, and $5,000 subscription receivable. We relied upon Section 4(2) of the Securities Act, which exempts from registration "transactions by an issuer not involving any public offering.

<center>STOCK TRANSFER AGENT</center>

We have not engaged the services of a transfer agent at this time. However, within the next twelve months we anticipate doing so. Until such a time a transfer agent is retained, we will act as our own transfer agent.

<center>DEALER PROSPECTUS DELIVERY OBLIGATION</center>

Until a date, which is 90 days after the date of this prospectus, all dealers that effect transactions in these securities whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealer' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

<center>35</center>

&lt;PAGE&gt;

| | |
|---|---|
| REPORT OF INDEPENDENT ACCOUNTING FIRM | F-1 |
| BALANCE SHEETS AS OF FEBRUARY 28, 2011 AND FEBRUARY 29, 2012 | F-2 |
| STATEMENT OF OPERATIONS FOR THE PERIODS ENDED FEBRUARY 29 2012 AND FEBRUARY 28, 2011 AND FOR THE PERIOD FROM NOVEMBER 12 2010 (INCEPTION) TO FEBRUARY 29, 2012 | F-3 |
| STATEMENT OF STOCKHOLDERS' EQUITY AS OF FEBRUARY 29, 2012 | F-4 |
| STATEMENT OF CASH FLOWS FOR THE PERIODS ENDED FEBRUARY 29 2012 AND FEBRUARY 28, 2011 AND FOR THE PERIOD FROM NOVEMBER 12 2010 (INCEPTION) TO FEBRUARY 29, 2012 | F-5 |
| NOTES TO THE FINANCIAL STATEMENTS | F-6 |

<center>36</center>

&lt;PAGE&gt;

<center>SADLER, GIBB & ASSOCIATES, L.L.C.</center>

<center>REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM</center>

To the Board of Directors
Norstra Energy, Inc.

We have audited the accompanying balance sheets of Norstra Energy, Inc. (the Company) as of February 29, 2012 and February 28, 2011, and from inception on November 12, 2010 through February 29, 2012 and the related statements of operations, stockholders' deficit and cash flows for the periods then ended.

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Norstra Energy, Inc. as of February 29, 2012 and February 28, 2011 and from inception on November 12, 2010 through February 29, 2012, and the results of their operations and their cash flows for the periods then ended, in conformity with U.S. generally accepted accounting principles.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has not yet established an ongoing source of revenue sufficient to cover its operating costs which raises substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.


/s/ Sadler, Gibb & Associates, LLC
-------------------------------------------
Sadler, Gibb & Associates, LLC
Salt Lake City, UT
April 24, 2012

                                    F-1
<PAGE>
NORSTRA ENERGY, INC.
(An Exploration Stage Company)
Balance Sheets

<TABLE>
<CAPTION>

|  |  | February 29, 2012 | February 28, 2011 |
|---|---|---|---|
| <S> |  | <C> | <C> |
|  | ASSETS |  |  |
|  |  |  |  |
| CURRENT ASSETS |  |  |  |
|   Cash |  | $      177 | $       -- |
|   Total Current Assets |  | 177 | -- |
| OTHER ASSETS |  |  |  |
|   Oil and gas properties, unproved (full cost method) |  | 19,064 | -- |
|   Total Other Assets |  | 19,064 | -- |
|  |  |  |  |
|   TOTAL ASSETS |  | $ 19,241 | $       -- |
|  |  |  |  |
|  | LIABILITIES AND STOCKHOLDERS' EQUITY |  |  |
|  |  |  |  |
| LONG-TERM LIABILITIES |  |  |  |
|   Asset retirement obligation |  | $  4,392 | $       -- |
|   Total Liabilities |  | 4,392 | -- |

```
STOCKHOLDERS' EQUITY
   Common stock; 150,000,000 shares authorized,
      at $0.001 par value, 40,513,100 and nil shares issued
      and outstanding, respectively                    40,513          --
   Subscriptions receivable                             (5,000)         --
   Additional paid-in capital                          (19,032)       1,225
   Deficit accumulated during the exploration stage     (1,632)      (1,225)
                                                       --------      --------
      Total Stockholders' Exploration                   14,850          --
                                                       --------      --------

      TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY       $ 19,241      $   --
                                                       ========      ========
```

</TABLE>


The accompanying notes are an integral part of these financial statements

                                    F-2
<PAGE>
NORSTRA ENERGY, INC.
(A Exploration Stage Company)
Statements of Operations

<TABLE>
<CAPTION>

| | For the Years Ended | | From Inception on November 12, 2010 Through February 29, 2012 |
| | February 29, 2012 | February 28, 2011 | |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| REVENUES | $       -- | $       -- | $       -- |
| | | | |
| OPERATING EXPENSES | | | |
|    General and administrative | -- | 1,225 | 1,225 |
|    Accretion expense | 327 | -- | 327 |
| | ---------- | ---------- | ---------- |
|       Total Operating Expenses | 327 | 1,225 | 1,552 |
| | ---------- | ---------- | ---------- |
| LOSS FROM OPERATIONS | (327) | (1,225) | (1,552) |
| | ---------- | ---------- | ---------- |
| OTHER EXPENSES | | | |
|    Interest expense | 80 | -- | 80 |
| | ---------- | ---------- | ---------- |
|       Total Other Expenses | 80 | -- | 80 |
| | ---------- | ---------- | ---------- |
| LOSS BEFORE INCOME TAXES | (407) | (1,225) | (1,632) |
| PROVISION FOR INCOME TAXES | -- | -- | -- |
| | ---------- | ---------- | ---------- |
| NET LOSS | $   (407) | $ (1,225) | $ (1,632) |
| | ========== | ========== | ========== |
| BASIC LOSS PER SHARE | $   (0.00) | $   0.00 | |
| | ========== | ========== | |
| WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING | 1,275,255 | -- | |
| | ========== | ========== | |

</TABLE>


The accompanying notes are an integral part of these financial statements

                                    F-3
<PAGE>
NORSTRA ENERGY, INC.
(An Exploration Stage Company)
Statements of Stockholders' Equity (Deficit)

<TABLE>
<CAPTION>

                                                            Deficit
                                                            Accumulated

| | Common Stock | | Additional Paid-In Capital | Subscriptions Receivable | During the Development Stage | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance at inception on November 12, 2010 | -- | $ -- | $ -- | $ -- | $ -- | $ -- |
| Captial contribution (no shares issued), November 2010 | -- | -- | 1,225 | -- | -- | 1,225 |
| Net loss from inception on November 12, 2010 through February 28, 2011 | -- | -- | -- | -- | (1,225) | (1,225) |
| Balance, February 28, 2011 | -- | $ -- | 1,225 | -- | (1,225) | -- |
| Issuance of shares in February 2012 upon conversion of debt at an average price of $0.001 per share | 20,513,100 | 20,513 | (10,257) | -- | -- | 10,257 |
| Issuance of shares for cash in February 2012 | 10,000,000 | 10,000 | (5,000) | -- | -- | 5,000 |
| Common shares issued in February 2012 upon execution of subscription agreement at $0.001 per share | 10,000,000 | 10,000 | (5,000) | (5,000) | -- | -- |
| Net loss for the year ended February 29, 2012 | -- | -- | -- | -- | (407) | (407) |
| Balance, February 29, 2012 | 40,513,100 | $ 40,513 | $ (19,032) | $ (5,000) | $ (1,632) | $ 14,850 |

</TABLE>

The accompanying notes are an integral part of these financial statements.

F-4

<PAGE>

NORSTRA ENERGY, INC.
(An Exploration Stage Company)
Statements of Cash Flows

<TABLE>
<CAPTION>

| | For the Years Ended | | From Inception on November 12, 2010 Through February 29, 2012 |
|---|---|---|---|
| | February 29, 2012 | February 28, 2011 | |
| OPERATING ACTIVITIES | | | |
| Net loss | $ (407) | $ (1,225) | $ (1,632) |
| Adjustments to reconcile net loss to net cash used by operating activities: | | | |
| Expenses paid on the Company's behalf by a related party | -- | 1,225 | 1,225 |
| Accretion expense - oil and gas property | 327 | -- | 327 |
| Changes in operating assets and liabilities: | -- | -- | -- |
| Net Cash Used in Operating Activities | (80) | -- | (80) |
| INVESTING ACTIVITIES | | | |
| Purchase of oil and gas leases | (15,000) | -- | (15,000) |
| Net Cash Used in investing activities | (15,000) | -- | (15,000) |
| FINANCING ACTIVITIES | | | |
| Common stock issued for cash | 10,257 | 10,257 | |
| Proceeds from notes payable to related party | 5,000 | -- | 5,000 |
| Net Cash Provided by Financing Activities | 15,257 | -- | 15,257 |

| | | | | | |
|---|---|---|---|---|---|
| NET DECREASE IN CASH | | 177 | -- | | 177 |
| CASH AT BEGINNING OF PERIOD | | -- | -- | | -- |
| | | -------- | -------- | | -------- |
| CASH AT END OF PERIOD | $ | 177 | $ -- | $ | 177 |
| | | ======== | ======== | | ======== |

SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| CASH PAID FOR: | | | | | |
|   Interest | $ | -- | $ -- | $ | -- |
|   Income Taxes | $ | -- | $ -- | $ | -- |
| CASH PAID FOR: | | | | | |
|   Stock issued in exchange for | $ | 5,000 | $ -- | $ | 5,000 |
|   forgiveness of related party debt | | | | | |
|   Stock subscription recievable | | 5,000 | -- | | 5,000 |
|   Capitalized asset retirement obligation | | 4,064 | -- | | 4,064 |

</TABLE>


The accompanying notes are an integral part of these financial statements.

F-5

<PAGE>
NORSTRA ENERGY INC.
(An Exploration Stage Company)
Notes To The Financial Statements
February 29, 2012 and February 28, 2011

1. ORGANIZATION AND BUSINESS OPERATIONS

NORSTRA ENERGY INC. ("the Company") was incorporated under the laws of the State
of Nevada, U.S. on November 12, 2010. The Company is in the exploration stage as
defined under Accounting Standards Codification ("ASC") 915 and it intends to
engage in the exploration and development of oil and gas properties.

The Company has not generated any revenue to date and consequently its
operations are subject to all risks inherent in the establishment of a new
business enterprise. For the period from inception, November 12, 2010 through
February 29, 2012 the Company has accumulated losses of $1,632.

On March 30, 2012, the Company approved a 2:1 forward split of the Company's
stock. Following this split, the Company's authorized capital increased to
150,000,000 common shares with a par value of $0.001 per share and the
outstanding shares of the Company's capital stock increased to 40,513,100. The
effect of this forward split has been retroactively applied to the common stock
balances at February 29, 2012, and reflected in all common stock activity
reflected in these financial statements since that time.

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

a) Basis of Presentation
The financial statements of the Company have been prepared in accordance with
generally accepted accounting principles in the United States of America and are
presented in US dollars. The Company's fiscal year end is February 28.

b) Going Concern
The financial statements have been prepared on a going concern basis which
assumes the Company will be able to realize its assets and discharge its
liabilities in the normal course of business for the foreseeable future. The
Company has incurred losses since inception resulting in an accumulated deficit
of $1,632 as of February 29, 2012 and further losses are anticipated in the
development of its business raising substantial doubt about the Company's
ability to continue as a going concern. The ability to continue as a going
concern is dependent upon the Company generating profitable operations in the
future and/or to obtain the necessary financing to meet its obligations and
repay its liabilities arising from normal business operations when they come
due. Management intends to finance operating costs over the next twelve months
with existing cash on hand and loans from directors and or private placement of
common stock.

c) Cash and Cash Equivalents
The Company considers all highly liquid instruments with a maturity of three
months or less at the time of issuance to be cash equivalents. The Company had
$177 and $-0- of cash and cash equivalents at February 29, 2012 and February 28,

A0474

2011, respectively.

d) Use of Estimates and Assumptions
The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

e) Financial Instruments
The carrying value of the Company's financial instruments approximates their fair value because of the short maturity of these instruments.

F-6

<PAGE>
NORSTRA ENERGY INC.
(An Exploration Stage Company)
Notes To The Financial Statements
February 29, 2012 and February 28, 2011

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

f) Stock-based Compensation
We measure and recognize stock-based compensation expense using a fair value-based method for all share-based awards made to employees and nonemployee directors, including grants of stock options and other stock-based awards. To date, the Company has not adopted a stock option plan and has not granted any stock options.

g) Income Taxes
Income taxes are accounted for under the assets and liability method. Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled.

h) Basic and Diluted Net Loss per Share
Basic EPS is computed by dividing net loss available to common shareholders (numerator) by the weighted average number of shares outstanding (denominator) during the period. Diluted EPS gives effect to all potentially dilutive common shares outstanding during the period. Diluted EPS excludes all potentially dilutive shares if their effect is anti-dilutive. At February 29, 2012 and February 28, 2011, no potentially dilutive shares were issued or outstanding.

i) Recent Accounting Pronouncements
The Company has evaluated recent accounting pronouncements and their adoption has not had or is not expected to have a material impact on the Company's financial position or statements.

j) Oil and Gas Properties
The Company uses the full cost method of accounting for oil and natural gas properties. Under this method, all acquisition, exploration and development costs, including certain payroll, asset retirement costs, other internal costs, and interest incurred for the purpose of finding oil and natural gas reserves, are capitalized. Internal costs that are capitalized are directly attributable to acquisition, exploration and development activities and do not include costs related to production, general corporate overhead or similar activities. Costs associated with production and general corporate activities are expensed in the period incurred. Proceeds from the sale of oil and natural gas properties are applied to reduce the capitalized costs of oil and natural gas properties unless the sale would significantly alter the relationship between capitalized costs and proved reserves, in which case a gain or loss is recognized.

Capitalized costs associated with impaired properties and capitalized costs related to properties having proved reserves, plus the estimated future development costs, and asset retirement costs under ASC 410 "Asset Retirement and Environmental Obligations", are amortized using the unit-of-production method based on proved reserves. Capitalized costs of oil and natural gas properties, net of accumulated amortization and deferred income taxes, are limited to the total of estimated future net cash flows from proved oil and natural gas reserves, discounted at ten percent, plus the cost of unevaluated properties.

F-7

<PAGE>

A0475

10-K 1 norstra-form_10k.htm FORM 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K**

(Mark One)

**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended **February 28, 2013**

or

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from [   ] to [   ]

Commission file number: **333-181042**

**NORSTRA ENERGY INC.**
(Exact name of registrant as specified in its charter)

| **Nevada** | **27-1833279** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2860 Exchange Boulevard, Suite 400, South Lake TX** | **76092** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(888) 474-8077**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange On Which Registered |
|---|---|
| **N/A** | **N/A** |

Securities registered pursuant to Section 12(g) of the Act:   **None.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes [   ]   No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes [   ]   No [X]

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the last 90 days.
Yes [X]   No [   ]

## PART I

### Cautionary Note Regarding Forward-Looking Statements

Except for historical information, this annual report contains forward-looking statements. Such forward-looking statements involve risks and uncertainties, including, among other things, statements regarding our business strategy, future revenues and anticipated costs and expenses. Such forward-looking statements include, among others, those statements including the words "expects," "anticipates," "intends," "believes" and similar language. Our actual results may differ significantly from those projected in the forward-looking statements. Factors that might cause or contribute to such differences include, but are not limited to, those discussed in the sections "Business," "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." You should carefully review the risks described in this Annual Report on Form 10-K and in other documents we file from time to time with the Securities and Exchange Commission. You are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this report. We undertake no obligation to publicly release any revisions to the forward-looking statements or reflect events or circumstances after the date of this document.

Although we believe that the expectations reflected in these forward-looking statements are based on reasonable assumptions, there are a number of risks and uncertainties that could cause actual results to differ materially from such forward-looking statements.

All references in this Form 10-K to "company," "Norstra Energy," "we," "us" or "our" mean Norstra Energy Inc., unless otherwise indicated.

**Item 1.    Business**

**Corporate Overview**

We are an exploration stage company, incorporated in the State of Nevada on November 12, 2010 under the name Norstra Inc., as a for-profit company. Our fiscal year end is February 28. Our office is located at 2860 Exchange Boulevard, Suite 400, South Lake TX 76092. Our telephone number is 1-888-474-8077. Our website and further information about our company can be found at http://www.norstraenergy.com.

On November 18, 2011, we filed a certificate of amendment with the Nevada Secretary of State to change our name from Norstra Inc. to Norstra Energy Inc.

On March 28, 2012, we filed a certificate of change with the Nevada Secretary of State to effect a 2 new for 1 old forward split of our authorized and issued and outstanding shares of common stock such that our authorized capital increased from 75,000,000 shares of common stock with a par value of $0.001 to 150,000,000 shares of common stock with a par value of $0.001.

Effective February 27, 2013, the Nevada Secretary of State accepted for filing a Certificate of Amendment, wherein our company amended our Articles of Incorporation to create 50,000,000 shares of preferred stock, $0.001 par value for which our board of directors may fix and determine the designations, rights, preferences or other variations of each class or series within each class of preferred stock of our company. The creation of the preferred stock was approved on February 26, 2013 by written consent by our board of directors and the holders of 54.94% of our voting securities. Our company's authorized capital now consists of 150,000,000 shares of common stock and 50,000,000 shares of preferred stock, all with a par value of $0.001.

A0477

## Current Business

We are engaged in the exploration and development of oil and gas properties.

On February 1, 2011, we entered into an agreement with an unrelated third-party entity to purchase a 100% interest and an 80% net revenue interest in an oil and mineral lease in Reno County, Kansas. As consideration for the purchase, our company paid $15,000 in cash. Our company has not incurred any exploration or development costs in connection with this lease. We have had limited operations and have been issued a "going concern" opinion by our auditor, based upon our reliance on the sale of our common stock as the sole source of funds for our future operations.

Effective February 27, 2013, we entered into a secured promissory note in an aggregate principal amount of $100,000 pursuant to the terms of a subscription agreement between our company and Jackson Bennett, LLC. The note bears interest at an annual rate of 10% which is to be paid with principal in full on the maturity date of February 27, 2015. The principal amount of the note together with interest may be converted into shares of our common stock, at the option of Jackson Bennett, LLC, at a conversion price of $0.25 per share.

Additionally, on March 1, 2013, we entered into consulting agreements with Mr. Glen Landry, our president, chief executive officer, secretary, treasurer and director, and Mr. Dallas Kerkenezov, our chief financial officer. Mr. Landry will receive a consulting fee of $5,000 per month and shall be issued 1,000,000 shares of our preferred stock, which will be convertible into 10,000,000 shares of our common stock upon achievement of production from the South Sun River Bakken Prospect. Mr. Kerkenezov shall receive $500 a month for performing duties as our chief financial officer. Both agreements have a term of 12 months.

Also on March 1, 2013, Mr. Kerkenezov, or chief financial officer and Ms. Heredia, our former director, cancelled a total of 35,513,100 shares of our common stock held by them. Mr. Kerkenezov cancelled 27,013,100 and Ms. Heredia cancelled 8,500,000. These shares were cancelled in order to make our company more attractive for financing, given the capital requirements of the South Sun River Bakken Prospect.

On March 12, 2013, we entered into a farmout agreement with Summit West Oil, LLC for approximately 10,000 acres of oil and gas exploration property in northwest Montana known as the South Sun River Bakken Prospect. This property has since become our main focus. Under the terms of the farmout agreement, we are required to carry out the following expenditures in order to earn ownership of the property:

- $60,000 by April 5, 2013 for the acquisition of seismic and other exploration data; (requirement met);

- $140,000 by April 30, 2013 for the reinterpretation of the seismic data as well as delineation and surveying of potential drill locations; (requirement met);

- Drilling of an additional horizontal well at an estimated expenditure of $5,000,000 by June 30, 2013;

- Drilling of a horizontal well at an estimated expenditure of $5,000,000 by December 31, 2013; and

- Drilling of an additional horizontal well at an estimated expenditure of $5,000,000 by December 31, 2014.

A0478

Once we complete the above obligations, we will hold a 100% interest in the property, subject to an underlying 20% burden to Summit West Oil, LLC and the State of Montana.

Effective April 5, 2013, we entered into a secured promissory note in an aggregate principal amount of $50,000 pursuant to the terms of a subscription agreement. The note bears interest at an annual rate of 10% which is to be paid with principal in full on the maturity date of April 5, 2015. The principal amount of the note together with interest may be converted into shares of our common stock at the option of the holder, at a conversion price of $0.30 per share.

Effective April 25, 2013, we entered into a secured promissory note in an aggregate principal amount of $180,000 pursuant to the terms of a subscription agreement between our company and Jackson Bennett, LLC. The note bears interest at an annual rate of 10% which is to be paid with principal in full on the maturity date of April 25, 2015. The principal amount of the note together with interest may be converted into shares of our common stock at the option of the holder, at a conversion price of $0.50 per share.

We have had limited operations and have been issued a "going concern" opinion by our auditor, based upon our reliance on the sale of our common stock as the sole source of funds for our future operations.

## Markets

The availability of a ready market and the prices obtained for produced oil and gas depends on many factors, including the extent of domestic production and imports of oil and gas, the proximity and capacity of natural gas pipelines and other transportation facilities, fluctuating demand for oil and gas, the marketing of competitive fuels, and the effects of governmental regulation of oil and gas production and sales. A ready domestic market for oil and gas exists because of the presence of pipelines to transport oil and gas. The existence of an international market exists depends upon the presence of international delivery systems and political and pricing factors.

If we are successful in producing oil and gas in the future, the target customers for our oil and gas are expected to be refiners, remarketers and third party intermediaries, who either have, or have access to, consumer delivery systems. We intend to sell our oil and gas under both short-term (less than one year) and long-term (one year or more) agreements at prices negotiated with third parties. Typically either the entire contract (in the case of short-term contracts) or the price provisions of the contract (in the case of long-term contracts) are renegotiated at intervals ranging in frequency from daily to annually.

We have not yet adopted any specific sales and marketing plans. However, as we purchase future properties, the need to hire marketing personnel will be addressed.

## Competition

The oil and gas industry is highly competitive. We are a new exploration stage company and have a weak competitive position in the industry. We compete with junior and senior oil and gas companies, independent producers and institutional and individual investors who are actively seeking to acquire oil and gas properties throughout the world together with the equipment, labor and materials required to operate on those properties. Competition for the acquisition of oil and gas interests is intense with many oil and gas leases or concessions available in a competitive bidding process in which we may lack the technological information or expertise available to other bidders.

6

A0479

Many of the oil and gas companies with which we compete for financing and for the acquisition of oil and gas properties have greater financial and technical resources than those available to us. Accordingly, these competitors may be able to spend greater amounts on acquiring oil and gas interests of merit or on exploring or developing their oil and gas properties. This advantage could enable our competitors to acquire oil and gas properties of greater quality and interest to prospective investors who may choose to finance their additional exploration and development. Such competition could adversely impact our ability to attain the financing necessary for us to acquire further oil and gas interests or explore and develop our current or future oil and gas properties.

We also compete with other junior oil and gas companies for financing from a limited number of investors that are prepared to invest in such companies. The presence of competing junior oil and gas companies may impact our ability to raise additional capital in order to fund our acquisition or exploration programs if investors perceive that investments in our competitors are more attractive based on the merit of their oil and gas properties or the price of the investment opportunity. In addition, we compete with both junior and senior oil and gas companies for available resources, including, but not limited to, professional geologists, land specialists, engineers, camp staff, helicopters, float planes, oil and gas exploration supplies and drill rigs.

General competitive conditions may be substantially affected by various forms of energy legislation and/or regulation introduced from time to time by the governments of the United States and other countries, as well as factors beyond our control, including international political conditions, overall levels of supply and demand for oil and gas, and the markets for synthetic fuels and alternative energy sources.

In the face of competition, we may not be successful in acquiring, exploring or developing profitable oil and gas properties or interests, and we cannot give any assurance that suitable oil and gas properties or interests will be available for our acquisition, exploration or development. Despite this, we hope to compete successfully in the oil and gas industry by:

- keeping our costs low;
- relying on the strength of our management's contacts; and
- using our size and experience to our advantage by adapting quickly to changing market conditions or responding swiftly to potential opportunities.

**Government Regulations**

GENERAL. Our exploration activities are subject to federal, state and local laws and regulations governing exploration, environmental matters, occupational health and safety, taxes, labor standards and other matters. All material licenses, permits and other authorizations currently required for our operations have been obtained or timely applied for. Compliance is often burdensome, and failure to comply carries substantial penalties. The regulatory burden on the oil and gas industry increases the cost of doing business and affects profitability.

ENVIRONMENTAL MATTERS. Our operations are subject to numerous laws relating to environmental protection. These laws impose substantial penalties for any pollution resulting from our operations. We believe that our operations substantially comply with applicable environmental laws.

A0480

*Inability and unlikelihood to pay dividends*

To date, we have not paid, nor do we intend to pay in the foreseeable future, dividends on our common stock, even if we become profitable. Earnings, if any, are expected to be used to advance our activities and for general corporate purposes, rather than to make distributions to stockholders. Prospective investors will likely need to rely on an increase in the price of our company's stock to profit from his or her investment. There are no guarantees that any market for our common stock will ever develop or that the price of our stock will ever increase.

Since we are not in a financial position to pay dividends on our common stock and future dividends are not presently being contemplated, investors are advised that return on investment in our common stock is restricted to an appreciation in the share price. The potential or likelihood of an increase in share price is questionable at best.

### Item 1B.    Unresolved Staff Comments

As a "smaller reporting company", we are not required to provide the information required by this Item.

### Item 2.    Properties

Our company's principal place of business and corporate offices are located at 2860 Exchange Boulevard, Suite 400, South Lake TX 76092, our telephone number is 1-888 474-8077. We pay rent at approximately $1,000 per month.

### Reno County, Kansas Property

On February 1, 2011, we entered into an agreement with an unrelated third-party entity to purchase a 100% interest and an 80% net revenue interest in an oil and mineral lease in Reno County, Kansas. As consideration for the purchase, our company paid $15,000 in cash. Our company has not incurred any exploration or development costs in connection with this lease. We have had limited operations and have been issued a "going concern" opinion by our auditor, based upon our reliance on the sale of our common stock as the sole source of funds for our future operations.

On February 15, 2012, our company and Keta Oil and Gas Inc. concluded the transaction in which our company paid $15,000 to acquire 100% working interest in the oil and gas leases described as T26S R08W the E/2 NE/4 Section 30, containing 83 acres more or less, located in Reno County, State of Kansas. The purchase price was made up of $10 for the lease assignment and $14,990 as a lease bonus payment.

The lease is for a three year term with a commencement date of original acquisition of February 15, 2012 and grants our company the right to explore for potential petroleum and natural gas opportunities on the lease. The ability to renew the lease is to be renegotiated before or upon termination if our company should choose to renew the leasing rights.

### LOCATION

The acreage is located in the Great Plains physiographic province of Kansas and the surface terrain consists of gently rolling plains. Ground elevations range from 1,500-1750 feet above sea level. The land is primarily used for agriculture and cattle grazing. There are no adverse environmental conditions on the surface or subsurface. There are numerous highway and county roads that allow easy access to the acreage and future well sites upon development of the play.

13

A0481

The Lerado Extension is within the oil and gas producing region of Central Kansas and lays along the southern flank of the Central Kansas Uplift, with a portion of the acreage falling within the Sedgwick Basin.

### GEOLOGY

Across the uplift the normal inclination of strata is interrupted in places to form gently plunging anticlines, numerous closed structures and complex faulted areas. The rock strata dip into the basins with closed structures, plunging anticlines, and stratigraphic traps forming along the flanks of the uplift. Structural features, such as those mentioned above, are often associated with accumulation of hydrocarbons in the area. Stratigraphic traps formed as a result of differences or variations between or within stratified rock layers, creating a change or loss of porosity and/or permeability are also of major importance in hydrocarbon entrapment. Large amounts of oil and gas have produced on the uplift and on the flanks of this major Pre-Mississippian and Middle Pennsylvanian structural province.

The rocks of the Lansing-Kansas City Group account for approximately 23% of all the oil produced in the State of Kansas, the majority of which comes from the Central Kansas Uplift and the basins flanking the uplift. The Lansing-Kansas City zone in central Kansas is composed of interblended carbonates and shale's with occasional minor coals and sandstones. In the general vicinity of the Lerado Extension, the Lansing- Kansas City zones is between 100-225 feet of thickness. Of the dozen or so individual zones with-in the Lansing-Kansas City, several of the zones have potential to produce oil and gas from each well drilled.

### EXPLORATION PROGRAM

 Since acquiring the South Sun River Bakken Prospect, we have changed our focus away from the Reno County Property.  Depending on the results of the South Sun River Bakken operations, we may abandon or renew exploration activity on the Reno County Property.

We have not recognized any revenue from our oil and gas project and do not expect to generate any revenue for at least 12 months. This property does not contain any known reserves or resources of oil or gas.

**South Sun River Bakken Prospect**

On March 12, 2013, we entered into a farmout agreement with Summit West Oil, LLC for approximately 10,000 acres of oil and gas exploration property in northwest Montana known as the South Sun River Bakken Prospect. Under the terms of the farmout agreement, we are required to carry out the following expenditures in order to earn ownership of the property:

- $60,000 by April 5, 2013 for the acquisition of seismic and other exploration data;  (requirement met)
- $140,000 by April 30, 2013 for the reinterpretation of the seismic data as well as delineation and surveying of potential drill locations; (requirement met)
- Drilling of an additional horizontal well at an estimated expenditure of $5,000,000 by June 30, 2013;
- Drilling of a horizontal well at an estimated expenditure of $5,000,000 by December 31, 2013; and
- Drilling of an additional horizontal well at an estimated expenditure of $5,000,000 by December 31, 2014.

14

Once we complete the above obligations, we will hold a 100% interest in the property, subject to an underlying 20% burden to Summit West Oil, LLC and the State of Montana.

LOCATION AND GEOLOGY

The South Sun River Bakken Prospect is an over-pressured Bakken shale resource play in Lewis & Clark County, Montana, in the developed Bakken Fairway that extends southwards from Alberta, Canada into northwest Montana. Potential oil production is estimated throughout the literature and publications at 10-15 MMBO per square mile in areas where the Bakken is thermally mature and where the critical middle Sappington Member is between 20'-30' thick. It encompasses a superb land package of 10,097.99 mineral acres. It is where the western edge of the Bakken Fairway plunges into contact with the tectonically heated Thrust Zone and where we believe the resulting thermal maturity of the Bakken offers the highest potential for oil production.



Oil generation from organically rich shale units is considered to commence at Ro=0.65%, with peak oil generation occurring at Ro=1.00% and the end of oil generation occurring when Ro >1.3%. Ro values associated with the Bakken range from 0.6% in the east to >1.00% toward the west and south.



15

A0483

Our audited financial statements are stated in United States Dollars and are prepared in accordance with United States Generally Accepted Accounting Principles.

**Results of Operations**

We have generated no revenues and have incurred $44,090 in expenses since inception through February 28, 2013.

The following table provides selected financial data about our company for the year ended February 28, 2013 and February 29, 2012.

| Balance Sheet Date | | 02/28/13 | | 02/29/12 |
|---|---|---|---|---|
| Cash | $ | 99,550 | $ | 177 |
| Total Assets | $ | 125,114 | $ | 19,241 |
| Total Liabilities | $ | 114,473 | $ | 4,392 |
| Stockholders' Equity | $ | 10,641 | $ | 14,849 |

**Plan of Operation**

We are a start-up, exploration-stage company and have not yet generated or realized any revenues from our business operations.

Our auditors have issued a going concern opinion on our audited financial statements for the year ended February 28, 2013. This means that there is substantial doubt that we can continue as an on-going business for the next twelve months unless we obtain additional capital to pay our bills. This is because we have not generated any revenues and no revenues are anticipated until we begin removing and selling minerals. There is no assurance we will ever reach this point. Accordingly, we must raise cash from sources from other sources. Our only other source for cash at this time is investments by others. We must raise cash to implement our project and stay in business. As of February 28, 2013, our company had $99,550 in cash on hand.

On March 12, 2013 our company entered into a farmout agreement with Summit West Oil, LLC for approximately 10,000 acres of oil and gas exploration property in northwest Montana. Under the terms of the farmout agreement, we are required to carry out the following expenditures in order to earn ownership of the property:

- $60,000 by April 5, 2013 for the acquisition of seismic and other exploration data (requirement met);
- $140,000 by April 30, 2013 for the reinterpretation of the seismic data as well as delineation and surveying of potential drill locations (requirement met);
- Drilling of an additional horizontal well at an estimated expenditure of $5,000,000 by June 30, 2013;
- Drilling of a horizontal well at an estimated expenditure of $5,000,000 by December 31, 2013; and

- Drilling of an additional horizontal well at an estimated expenditure of $5,000,000 by December 31, 2014.

If we are unable to complete any phase of exploration because we do not have sufficient capital, we will cease operations until we raise more money. If we cannot or do not raise additional capital, we will cease operations. If we cease operations, we do not have any additional plans at this time.

22

**NORSTRA ENERGY, INC.**
**(An Exploration Stage Company)**

**INDEX TO AUDITED FINANCIAL STATEMENTS**

**From Inception on November 12, 2010 through February 28, 2013**

| | Page |
|---|---|
| Audit Report of Independent Accountants | F-2 |
| Balance Sheets | F-3 |
| Statements of Operations | F-4 |
| Statement of Stockholders' Equity (Deficit) | F-5 |
| Statements of Cash Flows | F-6 |
| Notes to the Audited Financial Statements | F-7 |

F-1

A0485



## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors
Norstra Energy, Inc.

We have audited the accompanying balance sheets of Norstra Energy, Inc. ("the Company") as of February 28, 2013 and February 29, 2012 and the related statements of operations, stockholders' deficit and cash flows for the years then ended and for the cumulative period from November 12, 2010 (date of inception) through February 28, 2013. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion the financial statements referred to above present fairly, in all material respects, the financial position of Norstra Energy, Inc. ("the Company") as of February 28, 2013 and February 29, 2012 and the related statements of operations, stockholders' deficit and cash flows for the years then ended and for the cumulative period from November 12, 2010 (date of inception) through February 28, 2013, in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the financial statements, the Company has not yet established an ongoing source of revenue sufficient to cover its operating costs which raises substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also described in Note 2. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Sadler, Gibb & Associates, LLC

Salt Lake City, UT
June 5, 2013

F-2

**Norstra Energy Inc.**
*(An Exploration Stage Company)*
**Balance Sheets**

|  | | February 28, 2013 | | February 29, 2012 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| Current Assets | | | | |
| Cash | $ | 99,550 | $ | 177 |
| Deposits | | 6,500 | | - |
| Total Current Assets | | 106,050 | | 177 |
| | | | | |
| Other Assets | | | | |
| Oil and gas properties (full cost method) | | 19,064 | | 19,064 |
| Total Other Assets | | 19,064 | | 19,064 |
| | | | | |
| **TOTAL ASSETS** | $ | 125,114 | $ | 19,241 |
| | | | | |
| | | | | |
| ***LIABILITIES AND STOCKHOLDERS' EQUTIY*** | | | | |
| | | | | |
| **LIABILITIES** | | | | |
| Current Liabilities | | | | |
| Accounts payable | $ | 1,113 | $ | - |
| Due to shareholder | | 8,274 | | - |
| Total Current Liabilities | | 9,387 | | - |
| | | | | |
| Long Term Liabilities | | | | |
| Asset retirement obligation | | 5,059 | | 4,392 |
| Convertible notes payable | | 100,000 | | - |
| Accrued interest – note payable | | 27 | | - |
| Total Long Term Liabilities | | 105,086 | | 4,392 |
| | | | | |
| **TOTAL LIABILITIES** | | 114,473 | | 4,392 |
| | | | | |
| **STOCKHOLDERS' EQUITY (note 3)** | | | | |
| Preferred stock, par value $0.001, 50,000,000 preferred shares authorized, none issued and outstanding | | | | |
| Common Stock, par value $0.001, 150,000,000 shares authorized, 73,763,100 and 40,513,100 shares issued and outstanding, respectively | | 73,763 | | 40,513 |
| Subscriptions receivable | | - | | (5,000) |
| Additional paid-in capital | | (19,032) | | (19,032) |
| Deficit accumulated during the exploration stage | | (44,090) | | (1,632) |
| Total Stockholders' Equity | | 10,641 | | 14,849 |
| | | | | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ | 125,114 | $ | 19,241 |

The accompanying notes are an integral part of these financial statements.

F-3

A0487

**Norstra Energy Inc.**
*(An Exploration Stage Company)*
**Statements of Operations**

| | February 28, 2013 | | 29, 2012 | | Cumulative From Inception (November 12, 2010) to February 28, 2013 | |
|---|---|---|---|---|---|---|
| **REVENUES:** | $ | - | $ | - | $ | - |
| **OPERATING EXPENSES:** | | | | | | |
| *General and administrative* | | 27,901 | | 80 | | 29,206 |
| *Accretion expense* | | 667 | | 327 | | 994 |
| *Professional fees* | | 13,863 | | - | | 13,863 |
| **Total Operating Expenses** | | 42,431 | | 407 | | 44,063 |
| **OTHER EXPENSES** | | | | | | |
| Interest expense | | (27) | | - | | (27) |
| *NET LOSS* | $ | (42,458) | $ | (407) | $ | (44,090) |
| *Basic and Diluted loss per Common Share* | $ | (0.00) | $ | (0.00) | | |
| *Basic and Diluted Weighted Average Number of Common Shares Outstanding* | | 59,585,703 | | 1,275,255 | | |

The accompanying notes are an integral part of these financial statements.

F-4

**Norstra Energy, Inc.**
*(An Exploration Stage Company)*
**Statements of Changes in Stockholders' Equity**
**For the Period Beginning November 12, 2010 (Inception) to February 28, 2013**

| | Common Shares | | Additional Paid-In Capital | Subscriptions Receivable | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance- November 12, 2010 (Inception) | - $ | - $ | - $ | - | - $ | - |
| Capital contribution (no shares issued), November 2010 | - | - | 1,225 | - | - | 1,225 |
| Loss for the period | - | - | - | | (1,225) | (1,225) |
| Balance – February 28, 2011 | - | - | 1,225 | | (1,225) | - |
| Common shares issued for cash at $0.001 per share upon conversion of debt | 20,513,100 | 20,513 | (10,257) | - | - | 10,257 |
| Common shares issued for cash at $0.001 per share | 10,000,000 | 10,000 | (5,000) | - | - | 5,000 |
| Common shares issued upon execution of subscription agreement at $0.001 per share | 10,000,000 | 10,000 | (5,000) | (5,000) | - | - |
| Loss for the year | - | - | - | - | (407) | (407) |
| Balance – February 29, 2012 | 40,513,100 | 40,513 | (19,032) | (5,000) | (1,632) | 14,849 |
| Common shares issued for cash at $0.001 per share | 33,250,000 | 33,250 | - | 5,000 | | 38,250 |
| Loss for the year | - | - | - | | (42,458) | (42,458) |
| Balance – February 28, 2013 | 73,763,100 $ | 73,763 $ | (19,032) $ | | (44,090) $ | 10,641 |

The accompanying notes are an integral part of these financial statements.

F-5

A0489

**Norstra Energy, Inc.**
*(An Exploration Stage Company)*
**Statements of Cash Flows**

| | | Year Ended February | | Cumulative From Inception (November 12, 2010) to February 28, 2013 |
|---|---|---|---|---|
| | | 28, 2013 | 29, 2012 | |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net loss for the period | $ | (42,458) | $ (407) | $ (44,090) |
| Adjustments to reconcile net loss to net cash used in operations: | | | | |
| Expenses paid on the Company's behalf by a related party | | 6,774 | - | 6,774 |
| Accretion expense – oil and gas property | | 667 | 327 | 994 |
| Changes in operating assets and liabilities | | | | |
| Deposits | | (6,500) | - | (6,500) |
| Accounts Payable | | 1,113 | - | 1,113 |
| Accrued interest, note payable | | 27 | - | - |
| Net cash used in operating activities | | (40,377) | (80) | (41,708) |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Purchase of oil and gas leases | | - | (15,000) | (15,000) |
| Net cash provided by (used in) investing activities | | - | (15,000) | (15,000) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Proceeds from notes payable to related party | | 1,500 | 5,000 | 6,500 |
| Proceeds from subscription receivable | | 5,000 | - | 5,000 |
| Issuance of common stock for cash | | 33,250 | 10,257 | 44,731 |
| Proceeds from convertible notes payable | | 100,000 | | 100,027 |
| Net cash provided by (used in) financing activities | | 139,750 | 15,257 | 156,258 |
| | | | | |
| Net increase (decrease) in cash and cash equivalents | | 99,373 | 177 | 99,550 |
| | | | | |
| Cash and cash equivalents - beginning of period | | 177 | - | - |
| | | | | |
| Cash and cash equivalents - end of period | $ | 99,550 | $ 177 | $ 99,550 |
| | | | | |
| *Supplemental Cash Flow Disclosure:* | | | | |
| Cash paid for interest | $ | - | $ - | $ - |
| Cash paid for income taxes | $ | - | $ - | $ - |
| | | | | |
| **Non-Cash Financing and Investing Activities** | | | | |
| Stock issued in exchange for forgiveness of related party debt | | - | 5,000 | 5,000 |
| Stock subscription receivable | | - | 5,000 | 5,000 |
| Capitalized asset retirement obligation | | - | 4,064 | 5,059 |

The accompanying notes are an integral part of these financials.

F-6

**Norstra Energy Inc.**
*(An Exploration Stage Company)*
**Notes to Audited Financial Statements**
**February 28, 2013 and February 29, 2012**

NOTE 1.  ORGANIZATION AND BUSINESS OPERATIONS

NORSTRA ENERGY INC. ("the Company") was incorporated under the laws of the State of Nevada, U.S. on November 12, 2010.  The Company is in the exploration stage as defined under Accounting Standards Codification ("ASC") 915 and it intends to engage in the exploration and development of oil and gas properties.

The Company has not generated any revenue to date and consequently its operations are subject to all risks inherent in the establishment of a new business enterprise.  For the period from inception, November 12, 2010 through February 28, 2013 the Company has accumulated losses of $44,090.

On March 30, 2012, the Company approved a 2:1 forward split of the Company's stock. Following this split, the Company's authorized capital increased to 150,000,000 common shares with a par value of $0.001 per share and the outstanding shares of the Company's capital stock has since increased to 73,763,100. The effect of this forward split has been retroactively applied to the common stock balances at February 29, 2012, and reflected in all common stock activity reflected in these financial statements since that time.

NOTE 2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

The financial statements of the Company have been prepared in accordance with generally accepted accounting principles in the United States of America and are presented in US dollars.  The Company's fiscal year end is February 28.

**Cash and Cash Equivalents**

The Company considers all highly liquid instruments with a maturity of three months or less at the time of issuance to be cash equivalents. The Company had $99,550 and $177 of cash and cash equivalents at February 28, 2013 and February 29, 2012, respectively.

**Use of Estimates and Assumptions**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Financial Instruments**

The carrying value of the Company's financial instruments approximates their fair value because of the short maturity of these instruments.

F-7

**Stock-based Compensation**

Stock-based compensation is accounted for at fair value in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 718). To date, the Company has not adopted a stock option plan and has not granted any stock options.

**Income Taxes**

Income taxes are accounted for under the assets and liability method. Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled.

**Basic and Diluted Net Loss per Share**

The Company computes net loss per share in accordance with ASC 260,"Earnings per Share". ASC 260 requires presentation of both basic and diluted earnings per share (EPS) on the face of the income statement.

Basic EPS is computed by dividing net loss available to common shareholders (numerator) by the weighted average number of shares outstanding (denominator) during the period. Diluted EPS gives effect to all potentially dilutive common shares outstanding during the period. Diluted EPS excludes all potentially dilutive shares if their effect is anti-dilutive. At February 28, 2013 and February 29, 2012, no potentially dilutive shares were issued or outstanding.

**Recent Accounting Pronouncements**

Except for rules and interpretive releases of the SEC under authority of federal securities laws and a limited number of grandfathered standards, the FASB ASC is the sole source of authoritative GAAP literature recognized by the FASB and applicable to the Company. Management has reviewed the aforementioned rules and releases and believes any effect will not have a material impact on the Company's present or future consolidated financial statements.

**Oil and Gas Properties**

The Company uses the full cost method of accounting for oil and natural gas properties. Under this method, all acquisition, exploration and development costs, including certain payroll, asset retirement costs, other internal costs, and interest incurred for the purpose of finding oil and natural gas reserves, are capitalized. Internal costs that are capitalized are directly attributable to acquisition, exploration and development activities and do not include costs related to production, general corporate overhead or similar activities. Costs associated with production and general corporate activities are expensed in the period incurred. Proceeds from the sale of oil and natural gas properties are applied to reduce the capitalized costs of oil and natural gas properties unless the sale would significantly alter the relationship between capitalized costs and proved reserves, in which case a gain or loss is recognized.

F-8

**Item 9B.   Other Information**

Effective March 1, 2013, Dallas Kerkenezov resigned as president, chief executive officer, secretary, treasurer and director of our company.  His resignation was not the result of any disagreements with our company regarding our operations, policies, practices or otherwise.  Mr. Kerkenezov will remain as our chief financial officer.  Also on March 1, 2013, Ms. Sasha Heredia resigned as our director.

Concurrently with Mr. Kerkenezov's and Ms. Heredia's resignations, our company appointed Glen Landry to act as president, chief executive officer, secretary, treasurer and director of our company, effective March 1, 2013.

<div align="center">

**PART III**

</div>

**Item 10.   Directors, Executive Officers and Corporate Governance**

All directors of our company hold office until the next annual meeting of the security holders or until their successors have been elected and qualified. The officers of our company are appointed by the board of directors and hold office until their death, resignation or removal from office. The directors and executive officers, their ages, positions held, and duration as such, are as follows:

| Name | Position Held with the Company | Age | Date First Elected or Appointed |
|------|-------------------------------|-----|--------------------------------|
| Glen Landry | President, Chief Executive Officer, Secretary, Treasurer and Director | 63 | March 1, 2013 |
| Dallas Kerkenezov | Chief Financial Officer | 34 | November 12, 2010 |

**Business Experience**

The following is a brief account of the education and business experience during at least the past five years of each director, executive officer and key employee of our company, indicating the person's principal occupation during that period, and the name and principal business of the organization in which such occupation and employment were carried out.

*Glen Landry – President, Chief Executive Officer, Secretary, Treasurer and Director*

Glen Landry has acted as our president, chief executive officer, secretary, treasurer and director since March 1, 2012. Glen Landry is a seasoned exploration geologist with almost 40 years of experience.  Mr. Landry received his Bachelor of Science in Geology from the University of Montana in 1974.  Since then, he has accumulated over 30 years of experience in the oil and gas industry alone.  After finishing his degree he was employed as a consulting geologist for a number of mineral as well as oil and gas exploration companies, including Johns-Manville, Westinghouse, Peter Kiewitt, Chevron and Marathon throughout Montana, Wyoming and Alaska.  During the 1980s he was president of Western Reserves. a Billings, Montana company engaged in exploration and production of oil and gas.  The company was involved in a number of successful joint ventures as well as property acquisition of over 150 wells from Texaco.  During this time he was also engaged by Occidental to undertake exploration work on claims in northwest Montana.  After resigning from Western Reserves, Mr. Landry was again active as a consulting geologist for companies such as Apache and EnCana.  Since 1997, Mr. Landry has been an independent exploration geologist and has been undertaking exploration and development work of a large number of oil and gas concessions throughout Montana.  His focus has been on underdeveloped Alberta Fairway Bakken properties as well has heavy oil reserves in northwest Montana.

<div align="center">

33

</div>

We appointed Glen Landry as an officer and director of our company because of his experience in the oil and gas industry.

### *Dallas Kerkenezov – Chief Financial Officer*

Dallas Kerkenezov has acted as our chief financial officer since November 12, 2010. Mr. Kerkenezov resigned as our president, chief executive officer, secretary, treasurer and director on March 1, 2013. Mr. Kerkenezov spent time in both Canada and Norway in the resource exploration and production industries. Currently Mr. Kerkenezov owns his own construction company `Rom for Bygg' where his work is primarily in the oil industry with platform construction. For the summers of 2009-2011 Mr. Kerkenezov worked in the Yukon helping run staking and drilling crews for various mineral exploration companies. Prior to this time (from 2005-2011) and during the off season Mr. Kerkenezov was employed as a carpenter with Byggefirma Tunge AS.

### Employment Agreements

For the year ended February 28, 2013, we had no formal employment agreements with any of our employees, directors or officers.

Subsequent to the year ended February 28, 2013, on March 1, 2013, we entered into consulting agreements with Mr. Glen Landry, our president, chief executive officer, secretary, treasurer and director, and Mr. Dallas Kerkenezov, our chief financial officer. Mr. Landry will receive consulting fees of $5,000 per month and shall be issued 1,000,000 shares of our preferred stock, which will be convertible into 10,000,000 shares of our common stock upon achievement of production from a well owned by us in the state of Montana. Mr. Kerkenezov shall receive $500 a month for performing duties as our chief financial officer. Both agreements have a term of 12 months and may be terminated by either party by providing 30 days written notice.

### Family Relationships

There are no family relationships between any of our directors, executive officers and proposed directors or executive officers.

### Involvement in Certain Legal Proceedings

None of our directors, executive officers, promoters or control persons has been involved in any of the following events during the past five years:

1.    A petition under the Federal bankruptcy laws or any state insolvency law was filed by or against, or a receiver, fiscal agent or similar officer was appointed by a court for the business or property of such person, or any partnership in which he was a general partner at or within two years before the time of such filing, or any corporation or business association of which he was an executive officer at or within two years before the time of such filing;

2.    Such person was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses);

3.    Such person was the subject of any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining him from, or otherwise limiting, the following activities:

34

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereto duly authorized.

|  | NORSTRA ENERGY INC. |
|--|--|
|  | (Registrant) |

Dated: June 7, 2013                      /s/ Glen Landry
                                         **Glen Landry**
                                         President, Chief Executive Officer, Secretary, Treasurer, and Director
                                         (Principal Executive Officer)

Date: June 7, 2013                       /s/ Dallas Kerkenezov
                                         **Dallas Kerkenezov**
                                         Chief Financial Officer
                                         (Principal Financial and Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

Dated: June 7, 2013                      /s/ Glen Landry
                                         **Glen Landry**
                                         President, Chief Executive Officer, Secretary, Treasurer and Director
                                         (Principal Executive Officer)

44

A0495

# NORST - Norstra Energy Inc.
## Stock Transfer - Final Transaction Report

9/7/12   3:12 pm

Page 1 of 2

| | |
|---|---|
| Control Ticket Number:  STTK000000036619 | Transaction Number:     2          Transfer Date: 09/07/12 |
| Type of Stock being Transferred:    CS1 | Total Shares: 33,250,000          Sale Amt/share: $ 0.00100 |
| Paper certifs being Transferred from: 0 | |
| Paper certifs being Transferred to:    25 | Received From: NOSTRA |
| CB Received: 09/07/12 | Received: 09/07/12 at 14:57    Tran Type: Not an Item  Item Count: 0 |
| Tax Reason: Sale    Acquired: 09/07/12 | How Received: EMAIL |
| | Sent: 09/07/12 at 15:11       How Sent:  FEDEX |
| | Outgoing Tracking Number:   798920736829 |

-----Transfer From-----                                    -----Transfer To-----

| Line # | Shareholder | Certificate Number | Number of Shares | Line # | | Shareholder | Certificate Number | | Shares per Certif |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 1 | 3 | Jaymin Rowlands | CS1 | 103 | 2,000,000 |
| | | | | 2 | 4 | Per Freisberg | CS1 | 104 | 2,000,000 |
| | | | | 3 | 5 | Solveig Olien | CS1 | 105 | 2,000,000 |
| | | | | 4 | 6 | Malene Myrestrand | CS1 | 106 | 2,000,000 |
| | | | | 5 | 7 | Grethe Vestrheim | CS1 | 107 | 2,000,000 |
| | | | | 6 | 8 | Toringe Halvorsen | CS1 | 108 | 2,000,000 |
| | | | | 7 | 9 | Manuricio A. Torres | CS1 | 109 | 250,000 |
| | | | | 8 | 10 | Nathan Nash | CS1 | 110 | 2,000,000 |
| | | | | 9 | 11 | Brett Nash | CS1 | 111 | 2,000,000 |
| | | | | 10 | 12 | Maria Garpenfeldt | CS1 | 112 | 2,000,000 |
| | | | | 11 | 13 | Anthony Callender | CS1 | 113 | 1,000,000 |
| | | | | 12 | 14 | Tanisha C Wileadev | CS1 | 114 | 1,000,000 |
| | | | | 13 | 15 | Katherine Sanchez | CS1 | 115 | 1,000,000 |
| | | | | 14 | 16 | Bodgica Navarro | CS1 | 116 | 1,000,000 |
| | | | | 15 | 17 | Nicolas Valencia | CS1 | 117 | 1,000,000 |
| | | | | 16 | 18 | Samar Dixon | CS1 | 118 | 1,000,000 |
| | | | | 17 | 19 | Gladys Valenca | CS1 | 119 | 1,000,000 |
| | | | | 18 | 20 | Jessica Jemmott | CS1 | 120 | 1,000,000 |

# NORST - Norstra Energy Inc.
## Stock Transfer - Final Transaction Report

9/7/12   3:12 pm

Page 2 of 2

| | |
|---|---|
| Control Ticket Number:  STTK000000036619 | Transaction Number:     2          Transfer Date: 09/07/12 |
| Type of Stock being Transferred:     CS1 | Total Shares: 33,250,000          Sale Amt/share: $ 0.00100 |
| Paper certifs being Transferred from: 0 | |
| Paper certifs being Transferred to:     25 | Received From: NOSTRA |
| CB Received: 09/07/12 | Received: 09/07/12 at 14:57    Tran Type: Not an Item Item Count: 0 |
| Tax Reason: Sale     Acquired: 09/07/12 | How Received: EMAIL |
| | Sent: 09/07/12 at 15:11          How Sent:  FEDEX |
| | Outgoing Tracking Number:     798920736829 |

------Transfer From------                                    -----Transfer To-----

| Line # | Shareholder | Certificate Number | Number of Shares | Line # | Shareholder | Certificate Number | | Shares per Certif |
|---|---|---|---|---|---|---|---|---|
| | | | | 19 | 21 | Yessenig Castillo | CS1 | 121 | 1,000,000 |
| | | | | 20 | 22 | Catherine Alguero | CS1 | 122 | 1,000,000 |
| | | | | 21 | 23 | Yaremi Cebeno | CS1 | 123 | 1,000,000 |
| | | | | 22 | 24 | Jexn Carlos Quiroz | CS1 | 124 | 1,000,000 |
| | | | | 23 | 25 | Blixen Palmer | CS1 | 125 | 1,000,000 |
| | | | | 24 | 26 | Angelyny P. Cedeno | CS1 | 126 | 1,000,000 |
| | | | | 25 | 27 | Isaiash Perez | CS1 | 127 | 1,000,000 |

Number of new certs: 25                                    33,250,000

Completed By: CW        Report Run By: BB 09/07/12  3:12:36 pm

**Norstra TA# 2, p. 2**

A0497

# MICHAEL J. MORRISON
### ATTORNEY AND COUNSELOR AT LAW

1495 RIDGEVIEW DRIVE, SUITE 220
RENO, NEVADA 89519
(775) 827-6300
FAX (775) 827-6311
E-MAIL: VentureLawUSA@gmail.com
WEBSITE: www.VentureLawUSA.com

September 6, 2012

Empire Stock Transfer Inc.
Corporate Office
1859 Whitney Mesa Dr.
Henderson, NV 89014

Re: <u>Norstra Energy Inc.</u>

Dear Sir/Madam:

You have requested our opinion, as counsel, with respect to the validity and tradability of **33,250,000 shares of common stock** (the "Shares") of Norstra Energy Inc., a Nevada corporation (the "Company"), sold and issued pursuant to a registration statement on Form S-1 (the "Registration Statement") filed on April 30, 2012, with the United States Securities and Exchange Commission ("SEC") under the Securities Act of 1933, as amended (the "Securities Act"), relating to the sale from time to time of up to a maximum of 60,000,000 shares of common stock of the Company.

In connection with rendering our opinion, we have examined such documents, including, but not limited to filings contained in the SEC database, and have reviewed such questions of law as we have considered necessary and appropriate for the purposes of our opinion set forth below. In rendering our opinion set forth below, we have assumed the authenticity of all documents submitted to us as originals, the genuineness of all signatures and the conformity to authentic originals of all documents submitted to us as copies. We have also assumed the legal capacity for all purposes relevant hereto of all natural persons and, with respect to all parties to agreements or instruments relevant hereto other than the Company, that such parties had the requisite power and authority (corporate or otherwise) to execute, deliver and perform such agreements or instruments, that such agreements or instruments have been duly authorized by all requisite action (corporate or otherwise), executed and delivered by such parties and that such agreements or instruments are the valid, binding and enforceable obligations of such parties.

Based on filings contained in the SEC database, pursuant to section 8(a) of the Securities Act, the SEC declared the Company's Registration Statement effective on July 12, 2012 (the "Effective Date"). Subsequent to the Effective Date, the Shares of the Company were offered for sale and sold to the public in accordance with terms and conditions set forth in the Registration Statement.

1

**Norstra TA# 2, p. 3**

A0498

Based thereon, **it is our opinion** that the **33,250,000 Shares** thereafter sold to **25 shareholders, listed in the attached Exhibit "A"**, are duly authorized, validly issued, fully-paid and non-assessable shares of common stock of the Company, and are **free-trading and unrestricted** under the Securities Act.

Yours truly,

Michael J. Morrison, Esq.

cc: Norstra Energy Inc.

2

**Norstra TA# 2, p. 4**

A0499

**NORSTRA ENERGY INC. SHAREHOLDER LIST**

CUSIP NUMBER:
65654V 103

EXHIBIT "A"

| | FULL NAME AND ADDRESS | BECAME A MEMBER | | NO. OF SHARES | PRICE PER SHARE |
|---|---|---|---|---|---|
| 3 | Jaymin Rowlands<br>Malthavgkroken 20, 4046 Harfsfjord<br>Norway | 26-Aug | 2012 | 2,000,000 | $0.001 |
| 4 | Per Freisberg<br>Theresegate 23A, 0584, Oslo<br>Norway | 16-Jul | 2012 | 2,000,000 | $0.001 |
| 5 | Solveig Olien<br>Fasawveien 35, 4042, Harfsfjord<br>Norway | 17-Jul | 2012 | 2,000,000 | $0.001 |
| 6 | Malene Myrestrand<br>Madlasto 11, 4045 Hafrsfiord,<br>Norway | 31-Jul | 2012 | 2,000,000 | $0.001 |
| 7 | Grethe Vestrheim<br>Malthaugkroken 20, 4046 Hafrsfjord<br>Norway | 26-Aug | 2012 | 2,000,000 | $0.001 |
| 8 | Toringe Halvorsen<br>Lokkeveien 40, 4008, Stavanger<br>Norway | 16-Jul | 2012 | 2,000,000 | $0.001 |
| 9 | Manuricio A. Torres<br>Lokkeveien 40, 4008, Stavanger<br>Norway | 31-Aug | 2012 | 250,000 | $0.001 |
| 10 | Nathan Nash<br>93, Mollegata, 4008, Stavanger, Norway | 15-Jul | 2012 | 2,000,000 | $0.001 |
| 11 | Brett Nash<br>60 Mollegata, 4008, Stavanger, Norway | 14-Jul | 2012 | 2,000,000 | $0.001 |
| 12 | Maria Garpenfeldt<br>Ledaalsgata 10, 4008, Stavanger,<br>Norway. | 14-Jul | 2012 | 2,000,000 | $0.001 |
| 13 | Anthony Callender<br>San Francisco Calle 74<br>Edif Elida Aprt 8, Republic Of Panama | 1-Aug | 2012 | 1,000,000 | $0.001 |
| 14 | Tanisha C Wileadev<br>Call 14 Rio Abajo<br>Republic Of Panama | 3-Aug | 2012 | 1,000,000 | $0.001 |
| 15 | Katherine Sanchez<br>Carrasquilla Casa 380, Apt 30 panama<br>Republic Of Panama | 3-Aug | 2012 | 1,000,000 | $0.001 |
| 16 | Bodgica Navarro<br>Aguadulce El Roble Casa N. 67<br>Republic Of Panama | 1-Aug | 2012 | 1,000,000 | $0.001 |
| 17 | Nicolas Valencia<br>Call 5' Parguilapebie,<br>Republic Of Panama | 3-Aug | 2012 | 1,000,000 | $0.001 |
| 18 | Samar Dixon<br>Calle 14 Rioabajo, Casa No 2314<br>Republic Of Panama | 26-Jul | 2012 | 1,000,000 | $0.001 |
| 19 | Gladys Valenca<br>Calleo Pargue Le Fefevre Casa 08<br>Republic Of Panama | 27-Jul | 2012 | 1,000,000 | $0.001 |
| | Jessica Jemmott | | | | |

**Norstra TA# 2, p. 5**

A0500

| | | | | | |
|---|---|---|---|---|---|
| 20 | Calle 14 Rio Abajo<br>Case 2975, Republic Of Panama | 28-Jul | 2012 | 1,000,000 | $0.001 |
| 21 | Yessenig Castillo<br>Calle 5 Parque Lefebre Casa 23 D.<br>Republic Of Panama | 27-Jul | 2012 | 1,000,000 | $0.001 |
| 22 | Catherine Alguero<br>Chucunaque Tumba muerto Apt. 8. 17<br>Republic Of Panama | 30-Jul | 2012 | 1,000,000 | $0.001 |
| 24 | Yaremi Cebeno<br>San Francisco, Barriada Crespo,<br>Apt. 28, Edif, 406, republic of panama | 30-Aug | 2012 | 1,000,000 | $0.001 |
| 25 | Jexn Carlos Quiroz<br>San Miguelito, Montgoscorocil,<br>Aitauira, Replublic of Panamal | 31-Aug | 2012 | 1,000,000 | $0.001 |
| 26 | Blixen Palmer<br>Los Andes #2, Casa 180<br>Republic Of Panama | 1-Sep | 2012 | 1,000,000 | $0.001 |
| 27 | Angelyny P. Cedeno<br>Pednegal-Monteria, C# 412<br>Republic Of Panama | 3-Sep | 2012 | 1.000.000 | $0.001 |
| 28 | Isaiash Perez<br>Cerroviento Calle, Q Casa 48-B Via<br>Principal, Replublic Of Panama | 3-Sep | 2012 | 1,000,000 | $0.001 |
| | Total Free Trading Shares: | | | *33,250,000* | |

**Norstra TA# 2, p. 6**

A0501

# Log Sheet

| | |
|---|---|
| Issuer: | NORST-Norstra Energy Inc. |
| Received: | 09/07/12    02:57 PM         ID/SCL#: |
| Received From: | NOSTRA |
| How Received: | EMAIL |
| Track Number In: | |
| Control Ticket: | STTK000000036619 |
| SEC Item Count: | 0 |
| Contents: | ISSUANCE OF 33,250,000 F/T PERSUANT TO S1 |

Transaction No.:   **2**              Completed: 09/07/12

Track Number Out: FEDEX 798920736829

Sent To:

'

Fees:        Due:              Rcvd:              Check #:

Assigned To:

Certificate Number(s) or Book Entry ID's:  25

CS1-103,CS1-104,CS1-105,CS1-106,CS1-107,CS1-108,CS1-109,CS1-110,CS1-111,CS1-112,CS1-113,CS1-114,CS1-115,CS1-116,CS1-117,CS1-118,CS1-119,CS1-120,CS1-121,CS1-122,CS1-123,CS1-124,CS1-125,CS1-126,CS1-127

Comments:

Initials     Date

_____ _____ Logged In

_____ _____ Medallion Verified

_____ _____ Review Documents

_____ _____ Processed by

_____ _____ Stamp Certificates as Canceled and Transferred

_____ _____ Final Review/Authentification

_____ _____ Batch Completed and Made Available

_____ _____ Management Review

**Norstra TA# 2, p. 7**

From: (702) 818-5898
Patrick Mokros
Empire Stock Transfer Inc.
1859 Whitney Mesa

Henderson, NV 89014
UNITED STATES

Origin ID: LASA


FedEx
Express

Ship Date: 07SEP12
ActWgt: 1.0 LB
CAD: 5040518/INET3300

REF: NORSTRA 101-127
DESC-1: Legal Documents
DESC-2:
DESC-3:
DESC-4:
EEI: NO EEI 30.37(a)
COUNTRY MFG: US
CARRIAGE VALUE: 0.00 USD
CUSTOMS VALUE: 1.00 USD
T/C: S 304351560          D/T: R
SIGN: Patrick Mokros
EIN/VAT:
PKG TYPE: ENV

SHIP TO: 7028185898          BILL SENDER

**NORSTRA ENERGY INC**
**NORSTRA ENERGY INC**
**MADLASTO 11**
**STAVANGER**

**HAFRSFJORD,  4045**
NO

TRK#   7989 2073 6829
0430

PM
INTL PRIORITY

**X6 SVGA**

4045
-NO
OSL

These commodities, technology, or software were exported from the United States in accordance with the export administration regulations. Diversion contrary to United States law prohibited.

The Warsaw Convention may apply and will govern and in most cases limit the liability of Federal Express for loss or delay of or damage to your shipment. Subject to the conditions of the contract.

**CONSIGNEE COPY - PLEASE PLACE IN POUCH**

515G1/003A/AA44

After printing this label:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

LEGAL TERMS AND CONDITIONS OF FEDEX SHIPPING DEFINITIONS. On this Air Waybill, "we", "our", "us", and "FedEx" refer to Federal Express Corporation, its subsidiaries and branches and their respective employees, agents, and independent contractors. The terms "you" and "your" refer to the shipper, its employees, principals and agents. If your shipment originates outside the United States, your contract of carriage is with the FedEx subsidiary, branch or independent contractor who originally accepts the shipment from you. The term "package" means any container or envelope that is accepted by us for delivery, including any such items tendered by you utilizing our automated systems, meters, manifests or waybills. The term "shipment" means all packages which are tendered to and accepted by us on a single Air Waybill. AIR CARRIAGE NOTICE. For any international shipments by air, the Warsaw Convention, as amended, may be applicable. The Warsaw Convention, as amended, will then govern and in most cases limit FedEx's liability for loss, delay of, or damage to your shipment. The Warsaw Convention, as amended, limits FedEx's liability. For example in the U.S. liability is limited to $9.07 per pound (205 per kilogram), unless a higher value for carriage is declared as described below and you pay any applicable supplementary charges. The interpretation and operation of the Warsaw Convention's liability limits may vary in each country. There are no specific stopping places which are agreed to and FedEx reserves the right to route the shipment in any way FedEx deems appropriate. ROAD TRANSPORT NOTICE. Shipments transported solely by road to or from a country in which is a party to the Warsaw Convention or the Contract for the International Carriage of Goods by Road (the "CMR") are subject to the terms and conditions of the CMR, notwithstanding any other provision of this Air Waybill to the contrary. For those shipments transported solely by road, if a conflict arises between the provisions of the CMR and this Air Waybill, the terms of the CMR shall prevail. LIMITATION OF LIABILITY. If not governed by the Warsaw Convention, the CMR, or other international treaties, law's, other government regulations, orders, or requirements, FedEx's maximum liability for damage, loss, delay, shortage, mis-delivery, nondelivery, misinformation or failure to provide information in connection with your shipment is limited by this Agreement and as set out in the terms and conditions of the contract of carriage. Please refer to the contract of carriage set forth in the applicable FedEx Service Guide or its equivalent to determine the contractual limitation. FedEx does not provide cargo liability or all-risk insurance, but you may pay an additional charge for each additional U.S. $100 (or equivalent local currency) for the country of origin) of declared value for carriage. If a higher value for carriage is declared and the additional charge is paid, FedEx's maximum liability will be the lesser of the declared value for carriage or your actual damages. LIABILITIES NOT ASSUMED. IN ANY EVENT, FEDEX WON'T BE LIABLE FOR ANY DAMAGES, WHETHER DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL IN EXCESS OF THE DECLARED VALUE FOR CARRIAGE (INCLUDING BUT NOT LIMITED TO LOSS OF INCOME OR PROFITS) OR THE ACTUAL VALUE OF THE SHIPMENT, IF LOWER, WHETHER OR NOT FEDEX HAD ANY KNOWLEDGE THAT SUCH DAMAGES MIGHT BE INCURRED. FedEx won't be liable for your acts or omissions, including but not limited to incorrect declaration of cargo, improper or insufficient packaging, securing, marking or addressing of the shipment, or for the acts or omissions of the recipient or anyone else with an interest in the shipment or violations by any party of the terms of this agreement. FedEx won't be liable for damage, loss, delay, shortage, mis-delivery, non-delivery, misinformation or failure to provide information in connection with shipments of cash, currency or other prohibited items or in instances beyond our control, such as acts of God, perils of the air, weather conditions, mechanical delays, acts of public enemies, war, strike, civil commotion, or acts or omissions of public authorities (including customs and health officials) with actual or apparent authority. NO WARRANTY. We make no warranties, express or implied. CLAIMS FOR LOSS, DAMAGE OR DELAY. ALL CLAIMS MUST BE MADE IN WRITING AND WITHIN STRICT TIME LIMITS. SEE OUR TARIFF, APPLICABLE FEDEX SERVICE GUIDE, OR STANDARD CONDITIONS OF CARRIAGE FOR DETAILS. The Warsaw Convention provides specific written claims procedures for damage, delay or non-delivery of your shipment. Moreover, the interpretation and operation of the Warsaw Convention's claims provisions may vary in each country. Refer to the Convention to determine the claims period for your shipment. The right to damages against us shall be extinguished unless an action is brought within two years, as set forth in the Convention. FedEx is not obligated to act on any claim until all transportation charges have been paid. The claim amount may not be deducted from the transportation charges. If the recipient accepts the shipment without noting any damage on the delivery record, FedEx will assume the shipment was delivered in good condition. In order for us to consider a claim for damage, the contents, original shipping carton and packing must be made available to us for inspection. MANDATORY LAW insofar as any provisions contained or referred to in this Air Waybill may be contrary to any applicable international treaties, law's, government regulations, orders or requirements such provisions shall remain in effect as a part of our agreement to the extent that it is not overridden. The invalidity or unenforceability of any provisions shall not affect any other part of this Air Waybill. Unless otherwise indicated, FEDERAL EXPRESS CORPORATION, 2005 Corporate Avenue, Memphis, TN 38132, USA, is the first carrier of this shipment. Email address located at www.fedex.com

# NORST - Norstra Energy Inc.
**Stock Transfer - Final Transaction Report**

2/7/13   2:27 pm

Page 1 of 1

Control Ticket Number: STTK000000039643
Type of Stock being Transferred:   CS1
Paper certifs being Transferred from: 3
Paper certifs being Transferred to:   2

Tax Reason: N/A    Acquired: 02/07/13

Transaction Number:   10         Transfer Date: 02/07/13
Total Shares: 4,000,000          Sale Amt/share: $ 0.00000

Received From: CELTIC CONSULTANTS
Received: 02/06/13 at 09:46    Tran Type: Routine    Item Count: 1
How Received: FED EX

Sent: 02/07/13 at 14:25         How Sent: FED EX
Outgoing Tracking Number: 794705651766

| Line # | | Shareholder | Certificate Number | Number of Shares | Line # | | Shareholder | Certificate Number | Shares per Certif |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 12 | Maria Garpenfeldt | CS1 112 | 2,000,000 | 1 | 36 | Lornex Financial Ltd. | CS1 139 | 3,687,000 |
| 2 | 15 | Katherine Sanchez | CS1 115 | 1,000,000 | 2 | 31 | Sierra Growth Inc. | CS1 140 | 313,000 |
| 3 | 25 | Blixen Palmer | CS1 125 | 1,000,000 | | | | | |
| | | | | 4,000,000 | | Number of new certs: 2 | | | 4,000,000 |

— Transfer From — / — Transfer To —

---

**CELTIC CONSULTANTS LLC**

0935

DATE 20 13-02-05
Y Y Y Y M M D D

U.S. DOLLAR ACCOUNT

PAY to the order of   *EMPIRE STOCK TRANSFER*   $ 95 -

*NINETY FIVE*

xx/100 DOLLARS U.S. FUNDS

**BMO ◆ Bank of Montreal**
FIRST BANK TOWER, 595 BURRARD ST.
VANCOUVER,B.C.  V7X 1L7

CELTIC CONSULTANTS LLC

RE *NORX*

PER

⑈000935⑈ ⑆00040⑈001⑆ 4656⑈607⑈ 45

---

Completed By: RAM    Report Run By: RAM 02/07/13  2:27:35 pm

A0504

LORNEX FINANCIAL LTD.
Henville Building
Charlestown, Nevis
lornex@corptrax.com

RECEIVED
FEB 06 2013
Empire
Stock Transfer

February-5-13

Empire Stock Transfer

Subject:    4,000,000 shares of Norstra Energy Inc.

-------------------------------------------------------------------------------

Attached you will find certificate(s) totalling 4,000,000 shares. We wish to
transfer the shares as follows:

1 x 3,687,000 F/T
Lornex Financial Ltd.
Henville Building
Charlestown, Nevis

Please courier via Fedex, using account 4817-3416-9 the new certificate to the
following:

Verdmont Capital SA, Edificio Verdmont Ave., Aquilino De La Guardia, No.18, Cuidad
de Panama, Republica de Panama, Ph: 011-507-301-9000. Attention: Conley Forey

1 X 313,000 F/T
Sierra Growth Inc.
Henville Building
Charlestown, Nevis

Please courier via Fedex, using account 4817-3416-9 the new certificate to the
following:

Celtic Consultants LLC, 6054 165 Street, Surrey, BC V3S5V4, Ph: 604-788-5126.
Attention: Certificate Handling

Cost basis for the shares is $.05 and the acquisition date is February 5, 2013. We
do not have an EIN as we are not registered in the USA. Also attached is your
payment of 95.00 for fees incurred for this transaction.

Any and all questions/concerns, please email lornex@corptrax.com

Thank you.

[ ] Restricted Email        [ ] Indemnity Notice
[ ] Indemnity Required       [ ] Transfer Notice
[ ] No Medallion            [ ] No Fees
[ ] No Instructions          [ ] Indemnity Attached

[ ] Other _____

A0505

Schedule A
Blixen Palmer

Sierra Growth Inc. 1 X 313,000 F/T
Henville Building
Charlestown, Nevis

Lornex Financial Ltd. 1 X 687,000 F/T
Henville Building
Charlestown, Nevis

**Roberta Mors**

| | |
|---|---|
| **From:** | Roberta Mors |
| **Sent:** | Wednesday, February 06, 2013 3:48 PM |
| **To:** | 'norstraenergy@hotmail.com' |
| **Subject:** | Empire Stock Transfer Inc. - Indemnification Notice Norstra Energy Inc. 112 115 125 4,000,000Shrs 2.6.13 |
| **Attachments:** | Norstra Energy 112 115 125 4,000,000Shrs 2.6.13.pdf |

Attached you will find a transfer and indemnification notice that we have received. We are sending this as part of an optional notification practice. We will process the request tomorrow morning as long as the transfer is in good order. No action by the issuer is necessary unless there is a known circumstance under which the transfer should not be completed. Please advise if this is the case by sending a STOP request and explanation by email or fax. We will review the STOP and proceed accordingly. We hope this will assist in communication of transfer activity and further our client relationship. Please let us know if you have any special needs that we might be able to assist with.

Thanks,

Roberta Mors
Empire Stock Transfer Inc.

*Process 2-7-13*

--------------------

Additionally, here is some information that might be of assistance to our public company clients.

We have EDGAR an filings department. You'll benefit from high quality and reliable services without the hidden fees associated with many other EDGAR filers. We provide fast turn-around times and offer a complete range of filing services, from registration statements to periodic reports, in all EDGAR formats. Documents are handled by our staff only. Nothing is sent outside our office or outside the country. When outsourcing documents to Empire Stock Transfer, you will receive accurate and punctual filing using our advanced conversion technology. Our staff maintains the expertise to file your documents quickly and efficiently. Our EDGAR Filing Service produces high-quality documents with minimal effort, allowing us to dedicate ourselves to customer service and value. Our straightforward, itemized pricing structure guarantees that you will never be surprised upon receiving a statement.

We are a DTCC FAST participant agent. FAST is The Depository Trust Company's Fast Automated Securities Transfer service. What makes it fast and automated is that it does away with paperwork and paper securities almost completely, so that securities transfer agents can electronically provide custody, transfer, deposit and withdrawal services very quickly and efficiently. One feature of FAST is its balancing confirmation system, which delivers a daily record of the opening position, total credits, total debits and closing position in each FAST issue involved in a transaction the previous day.

What is DTC eligibility? This means that your company's stock is eligible for deposit with DTC aka "Cede & Co" aka the Street. Your company's security holders will be able to deposit their particular shares with a brokerage firm. Clearing firms, as full participants with DTC, handle the DTC eligibility submissions to DTC. Transfer agents were responsible for eligibility coordination years ago. Now, in order to make a new issue of securities eligible for DTC's delivery services, a completed and signed eligibility questionnaire must be

1

CERTIFIED RESOLUTIONS ADOPTED BY BOARD OF DIRECTORS OF
<NORSTRA ENERGY INC.>
A NEVADA CORPORATION

The undersigned hereby certifies that he is the duly elected, qualified and acting President of the above-named Corporation and in that capacity in charge of its official records including the minute book containing original minutes of meetings of its Board of Directors; and that on the _5_ day of _FEB_, 20_13_ , a meeting of said Board of Directors was duly convened and held, with a quorum present throughout the proceedings thereof, at which the following resolutions were duly moved, seconded and carried, said resolutions remaining in full force and effect at the date of this certificate:

BE IT RESOLVED:  That EMPIRE STOCK TRANSFER INC., Transfer Agent for this corporation be, and it hereby is, directed to process the transfer request regarding the certificate below, and this Board of Directors does hereby extend this corporation's irrevocable agreement to indemnify said Transfer Agent for all loss, liability or expense in carrying out the authority and direction herein contained on the terms herein set forth.  The Transfer Agent shall maintain the right to uphold the transfer in the event of forgery.

IN WITNESS WHEREOF,  the undersigned has set his hand in his capacity above mentioned and affixed the seal of the above named corporation, all this _5_ day of _FEB_, 20_13_ .

[SEAL]

By: _____
<Dallas Kerkenezov>, President

| Cert No(s) | Registered To: | No. of Shares | Transfer To or CANCEL: | No. of Shares: |
|---|---|---|---|---|
| 112 | MARIA GARPENFELDT | 2,000,000 | TRANSFER PER STOCK POWER | 2,000,000 |
| 115 | KATHERINE SANCHEZ | 1,000,000 | " | 1,000,000 |
| 125 | BLIXEN PALMER | 1,000,000 | " | 1,000,000 |

A0508

### ISLAND OF NEVIS
### OFFICE OF THE REGISTRAR OF COMPANIES

## *CERTIFICATE OF INCORPORATION*

I HEREBY CERTIFY that

## *LORNEX FINANCIAL LTD.*

is duly incorporated and has filed articles of incorporation under the provisions of the Nevis Business Corporation Ordinance 1984, as amended, on

### *24th August, 2007*

Given under my Hand & Seal at Charlestown
This *24th* day of *August, 2007*

_____
Registrar of Companies

62tjd44E

No.  C  32893



NUMBER
112

COMMON STOCK

SHARES
***2,000,000***

COMMON STOCK
CUSIP 65654V103

NORSTRA ENERGY INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Maria Garpenfeldt***

Is the Owner of  *** Two Million ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
NORSTRA ENERGY INC.

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed.  This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated:   **September 7, 2012**

COUNTERSIGNED AND REGISTERED:
**EMPIRE STOCK TRANSFER INC.**
Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

CORPORATE
SEAL

XXXXXXXXXX
DIRECTOR

PRESIDENT

B 24471

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____ Custodian _____
                                 (Cust)                (Minor)
                         under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,* _____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

_____

(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

_____

_____ *Shares*

*of the Capital Stock represented by this Certificate and hereby irrevocably constitutes and appoints*

_____ *Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* _____

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION. (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17AD-15.

# IRREVOCABLE STOCK POWER

**KNOW ALL MEN BY THESE PRESENTS,**

THAT, I, _MARWA GHYRPE NEELOT_ FOR VALUE RECEIVED have bargained, sold,
assigned and transferred by these present unto _LORNEX FINANCIAL LTD._
_HENVILLE BUILDING, CHARLESTOWN, NEVIS_

_2,000,000_ shares of common stock in the capital of **NORSTRA**

**ENERGY INC.** standing in my name on the books of the said Company represented by

Certificate No. _112_ herewith **AND** I, do hereby constitute and appoint _____

_____ my true and lawful Attorney,

IRREVOCABLY, for me and in my name and stead but to his use, to sell, assign, transfer and

make over all or any part of the said stock, and for that purpose to make and execute all

necessary acts of assignment and transfer thereof, and to substitute one or more persons with like

full power, hereby ratifying and confirming all that my said Attorney or his substitute or

substitutes shall lawfully do by virtue hereof.

**IN WITNESS WHEREOF,** I have hereunto set my hand and seal at _____
this _5_ day of _FEBRUARY_ , 20 _13_ .

SIGNED, SEALED and DELIVERED by:

Signature Guaranteed by:



NUMBER
115

COMMON STOCK

SHARES
***1,000,000***

COMMON STOCK
CUSIP 65654V103

**NORSTRA ENERGY INC.**

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Katherine Sanchez***

Is the Owner of  *** One Million ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
**NORSTRA ENERGY INC.**

*transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed.  This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.*

*Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.*

Dated:  **September 7, 2012**

COUNTERSIGNED AND REGISTERED:
**EMPIRE STOCK TRANSFER INC.**          Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

CORPORATE
SEAL

XXXXXXXXXX
DIRECTOR

PRESIDENT

B 24468

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____·_____Custodian_____
(Cust)                                    (Minor)
under Uniform Gifts to Minors Act

_____
(State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,_____hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*Shares*

*of the Capital Stock represented by this Certificate and hereby*

*irrevocably constitutes and appoints*

*Attorney*

*to transfer the said stock on the books of the within-named Corporation*

*with full power of substitution in the premises.*

*Dated* _____

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM PURSUANT TO S.E.C. RULE 17AD-15.

A0514