

# UNITED STATES OF AMERICA

SECURITIES AND EXCHANGE COMMISSION

## ATTESTATION

I HEREBY ATTEST

*that:*

*A diligent search has this day been made of the records and files of this Commission and the records and files do not disclose that any S-1's have been received in this Commission for the period July 13, 2012, through January 12, 2015, under the name of NORSTRA ENERGY INC., pursuant to the provisions of any of the Acts administered by the Commission.*

on file in this Commission

01/12/2015
*Date*

Joseph Horneman, Management and Program Analyst

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission, Washington, DC, which Commission was created by the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is official custodian of the records and files of said Commission and was such official custodian at the time of executing the above attestation, and that he/she, and persons holding the positions of Deputy Secretary, Assistant Director, Records Officer, Branch Chief of Records Management, and the Program Analyst for the Records Officer, or anyone of them, are authorized to execute the above attestation.

For the Commission

Secretary

SEC 334 (9-12)

S-1/A 1 medoras1a5.htm MEDORA CORP. AMENDMENT NO. 5 TO THE FORM S-1

**Registration No. 333-16928**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM S-1/A-5**
**REGISTRATION STATEMENT**
**UNDER THE SECURITIES ACT OF 1933**

# MEDORA CORP.

(Name of small business issuer in its charter)

| **Nevada** | **5900** | **90-0582397** |
|---|---|---|
| (State or jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**7 Wareham Road**
**Kingston, Jamaica, WI**
**(876) 775-6074**
(telephone number)
(Address and telephone number of principal executive offices and principal place of business)

**National Registered Agents, Inc. of Nevada**
**1000 East William Street, Suite 204**
**Carson City, Nevada 89701**
**(800) 550-6724**
(Name, address and telephone number of agent for service)

Copies to:
**Gregg E. Jaclin, Esq.**
**Anslow & Jaclin, LLP**
**195 Route 9 South, Suite 204**
**Manalapan, NJ 07726**
**Tel: (732) 409-1212**
**Fax: (732) 577-1188**

Approximate date of proposed sale to public: From time to time after the effective date of this Registration Statement.

If any securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act c 1933 check the following box: ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.

If this Form is a post effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | | Accelerated filer | |
| Non-accelerated filer (Do not check if a smaller reporting company) | | Smaller reporting company | ☒ |

## CALCULATION OF REGISTRATION FEE

| Securities to be Registered | Amount To Be Registered | Offering Price Per Share (2) | Aggregate Offering Price | Registration Fee (1) |
|---|---|---|---|---|
| Common Stock by Selling | 27,054,600 | $0.0015 | $40,581.90 | $4.71 |

(1) This Registration Statement covers the resale by our selling shareholders of up to 27,054,600 shares of common stock previously issued to such selling shareholders.

(2) The offering price has been estimated solely for the purpose of computing the amount of the registration fee in accordance with Rule 457(o). Our common stock is not traded on any national exchange and in accordance with Rule 457; the offering price was determined by the price of the shares that were sold to our shareholders in a private placement memorandum. The price of $0.0015 is a fixed price at which the selling security holders may sell their shares until our common stock is quoted on the Over-The-Counter Bulletin Board ("OTCBB") at which time the shares may be sold at prevailing market prices or privately negotiated prices. There can be no assurance that a market maker will agree to file the necessary documents with the Financial Industry Regulatory Authority, which operates the OTCBB, nor can there be any assurance that such an application for quotation will be approved.

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SUCH SECTION 8(a), MAY DETERMINE.

The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the U.S. Securities and Exchange Commission ("SEC") is effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**PRELIMINARY PROSPECTUS**
***Subject to completion, dated March 14, 2011***

**Medora Corp.**
**27,054,600 SHARES OF COMMON STOCK**

The selling security holders named in this prospectus are offering 27,054,600 shares of common stock offered through this prospectus. We will not receive any proceeds from the sale of the common stock covered by this prospectus.

Our common stock is presently not traded on any market or securities exchange. The selling security holders have not engaged any underwriter in connection with the sale of their shares of common stock. Common stock being registered in this registration statement may be sold by selling security holders at a fixed price of $0.0015 per share until our common stock is quoted on the OTCBB and thereafter at a prevailing market prices or privately negotiated prices or in transactions that are not in the public market. There can be no assurance that a market maker will agree to file the necessary documents with the Financial Industry Regulatory Authority ("FINRA"), which operates the OTCBB, nor can there be any assurance that such an application for quotation will be approved. We have agreed to bear the expenses relating to the registration of the shares of the selling security holders.

We do not consider our self a blank check company. We have no plans or intentions to be acquired by or to merge with an operating company, nor do we, nor any of our shareholders, have plans to enter into a change of control or similar transaction or to change our management.

Our management or any affiliates of our company or our management have not been previously involved in the management or ownership of a development stage company that has not implemented fully its business plan, engaged in a change of control or similar transaction, or generated no or minimal revenues to date.

**Investing in our common stock involves a high degree of risk. See "Risk Factors" beginning on page 9 to read about factors you should consider before buying shares of our common stock.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**The Date of This Prospectus is: March ___, 2011**

## TABLE OF CONTENTS


| | Page No. |
|---|---|
| Summary of Our Offering | 6 |
| Risk Factors | 9 |
| Use of Proceeds | 14 |
| Determination of Offering Price | 14 |
| Plan of Distribution | 14 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Business | 27 |
| Management | 36 |
| Executive Compensation | 38 |
| Principal and Selling Shareholders | 40 |
| Description of Securities | 42 |
| Certain Transactions | 44 |
| Legal Proceedings | 45 |
| Experts | 45 |
| Legal Matters | 45 |
| Financial Statements | 45 |

## SUMMARY OF OUR OFFERING

**Our Business**

We were incorporated in the State of Nevada on May 6, 2010. Our business plan is to engage in electronic commerce ("ecommerce") through our collective buying website. Our target focus is to provide significant discounts to our registered members by allowing them to buy group coupons for local restaurants, hotels, spas, tourist attractions and bars in Jamaica. To date, we have begun operations but have yet to generate any revenues and have reserved a domain name for the company at www.medoracorp.com. Our webmasters have begun designing our website.

We are a development stage company and have begun business operations including but not limited to the development of our website, online server, hiring of employees, and locating businesses to offer their discounted products or services on our e-commerce website. However, we have not generated any revenues to this date.

Our Company's business can be categorized as an e-commerce concept. Our business concept is such that we will offer a discount on a single product or service each day for a variety of cities in Jamaica. This deal is offered for sale to our registered members with a highly reduced price, often the member will have the opportunity to get 50 percent off or more from a product or service. In order to be able to obtain the highly discounted savings, we will need to have a minimum number of items that have to be sold before everyone can get the savings. Once the target threshold is met, the member pays for the product or service directly online and in turn will receive a voucher into their email mailbox that can be used during a specified period of time. In turn, we get a percentage of the revenues from the retailer that offered the deal.

What we do is find local restaurants, spas, or other businesses that are willing to provide large discounts, provided that their name is spread to a number of registered members. Our Company advertises the business by offering the coupons online, and takes a percentage of the revenues from the retailer that offered the deal.

At this time, we have no revenue and no significant assets. Our auditors have raised substantial doubt as to our ability to continue as a going concern. As of October 31, 2010, the Company has an accumulated deficit of $20,663, limited liquidity and has not completed its efforts to establish a stabilized source of revenues sufficient to cover operating costs for the next twelve month period. The Company's sole officer and director is unwilling to loan or advance any additional capital to the Company, except for the costs associated with the preparation and filing of reports with the Securities and Exchange Commission. The continuation of Medora as a going concern is dependent upon financial support from its stockholders, the ability of Medora to obtain necessary equity financing to continue operations, and the attainment of profitable operations. To meet our cash needs, from inception to date we have raised approximately $40,000 in a private placement offering, and as of October 31, 2010 we had $21,853 cash on hand. We believe we will need to raise $230,000 over the next 12 months to continue our business operations. These estimates may change depending on the nature of our future business activities and our ability to raise capital from shareholders or other sources. At this time, we have no commitments for the funding necessary to continue in business for the next 12 months. Please refer to our Management Discussion and Analysis of Financial Condition and Results contained herein for a more detailed description.

We maintain our statutory registered agent's office at Nevada Corporate Headquarter, 101 Convention Center Drive, Suite 700 Las Vegas, Nevada 89109. Our mailing address and business office is located at 7 Wareham Road, Kingston, Jamaica, West Indies. Our telephone number is 876-775-6074. Craig McKenzie, our president, supplies this office space on a rent-free basis.

**The Offering**

| | |
|---|---|
| **Common stock offered by selling security holders** | 27,054,600 shares of common stock. This number represents 43.62% of our current outstanding common stock (1). |
| **Common stock outstanding before the offering** | 62,054,600 |
| **Common stock outstanding after the offering** | 62,054,600 common shares as of March 14, 2011. |
| **Terms of the Offering** | The selling security holders will determine when and how they will sell the common stock offered in this prospectus. |
| **Termination of the Offering** | The offering will conclude upon the earliest of (i) such time as all of the common stock has been sold pursuant to the registration statement or (ii) such time as all of the common stock becomes eligible for resale without volume limitations pursuant to Rule 144 under the Securities Act, or any other rule of similar effect. |
| **Use of proceeds** | We are not selling any shares of the common stock covered by this prospectus. |
| **Risk Factors** | The Common Stock offered hereby involves a high degree of risk and should not be purchased by investors who cannot afford the loss of their entire investment. See "Risk Factors" beginning on page 9. |

(1) Based on 62,054,600 shares of common stock issued as of March 14, 2011.

Case 1:15-cv-00894-WHP-JLC Document 75-23 Filed 03/28/15 Page 9 of 33

**Selected Financial Data**

The following financial information is a summarization of the more complete historical financial information at the end of this prospectus.

| | As of October 31, 2010 (Unaudited) | As of July 31, 2010 (Audited) |
|---|---|---|
| **Balance Sheet** | | |
| Total Assets | $ 21,853 | $ 28,259 |
| Total Liabilities | $ (1,540) | $ (4,275) |
| Total Stockholder's Equity | $ 20,313 | $ 23,984 |

| | For the Three Months Ended October 31, 2010 (Unaudited) | For the Period from May 6, 2010 (inception) to July 31, 2010 (Audited) |
|---|---|---|
| **Statement of Expenses** | | |
| Revenue | $ -0- | $ -0- |
| Total Expenses | $ 16,554 | $ 4,110 |
| **Net Loss** | $ 16,554 | $ 4,110 |

A0684

## RISK FACTORS

**Please consider the following risk factors before deciding to invest in our common stock.**

**Risks associated with Medora Corp.**

***1. There is a going concern and uncertainty for us to be an ongoing business for the next twelve months. We may not generate sufficient revenue for the next twelve months to continue our business operations.***

As of October 31, 2010, we had working capital of $20,313, but have not generated revenues since inception. Our auditors have raised substantial doubt that we will be an ongoing business for the next twelve months. As of the date of this prospectus, we have commenced business operations but have not yet generated any revenues.

***2. We lack an operating history. There is no assurance our future operations will result in profitable revenues. If we cannot generate sufficient revenues to operate profitably, we may suspend or cease operations.***

We were incorporated in May 6, 2010 and have commenced business operations but have not yet generated any revenues. We have no operating history upon which an evaluation of our future success or failure can be made. Our ability to achieve and maintain profitability and positive cash flows is dependent upon:

* our ability to facilitate sales between businesses selling a product or service and our registered
* members;
* our ability to locate businesses who will sell to our registered members their products or service;
* our ability to attract registered members who will buy our products or service;
our ability to generate revenues through the sale of products and services offered to our registered members;
* our ability to successfully market our products and services;
* our ability to hire individuals who can successfully assist us in implementing our business plan;
* our ability to conduct business in light of competition;
* our ability to update our website to meet rapid changes in technology; and
* our ability to facilitate sales between the businesses and the registered members who purchase their highly discounted product or service.

Based upon current plans, we expect to incur operating losses in future periods because we will be incurring expenses and not generating sufficient revenues to be profitable. We cannot guarantee that we will be successful in generating revenues in the future. Failure to generate revenues may cause us to suspend or cease operations.

***3. We have no businesses offering their goods and services and we cannot guarantee we will ever have any. Even if we obtain businesses offering goods or services, there is no assurance that we will make a profit.***

We have no businesses offering their goods and services. We have not identified any businesses offering their goods and services and we cannot guarantee we ever will have any businesses. Even if we obtain businesses offering their goods and services, there is no guarantee that we will be able to locate our registered members who will buy our products. If we are unable to attract enough businesses to offer their products or service at a highly discounted rate to offer to our registered members, or enough registered members to buy the products from us, our website will not operate profitably and we will have to suspend or cease operations.

***4. Because we are a developing company and do not have much capital, we must limit marketing our services to potential businesses and registered members. As a result, we may not be able to attract enough registered members to operate profitably. If we do not make a profit, we may have to suspend or cease operations.***

Because we are a developing company and do not have much capital, we must limit marketing our products. The sale of our products via our website is how we will initially generate revenues. Because we will be limiting our marketing activities, we may not be able to attract enough registered members to buy or businesses to sell products to operate profitably. If we cannot operate profitably, we may have to suspend or cease operations.

***5. Because our sole officer and director will only be devoting limited time to our Company, our operations may be sporadic which may result in periodic interruptions or suspensions of operations. This activity could prevent us from attracting businesses s and registered members and result in a lack of revenues that may cause us to suspend or cease operations.***

At this time we have commenced business operations but have not yet generated any revenues. Our sole officer and director, Craig McKenzie, will only be devoting limited time to our operations. Mr. McKenzie will be devoting approximately 15 hours per week of his time to our operations. Because our sole officer and director will only be devoting limited time to our Company, our operations may be sporadic and occur at times which are convenient to him. As a result, operations may be periodically interrupted or suspended which could result in a lack of revenues and a possible cessation of operations.

***6. Because our management does not have prior experience in the marketing of products or services via the Internet, we may have to hire individuals. If we cannot afford the expense of hiring individuals we may have to suspend or cease operations.***

Because our management does not have prior experience in the marketing of products or services via the Internet, we may have to hire additional experienced personnel to assist us with our operations. If we need the additional experienced personnel and we cannot afford to hire them, we could fail in our plan of operations and have to suspend operations or cease operations entirely.

***7. Because we have only one officer and director who has no formal training in financial accounting and management, who is responsible for our managerial and organizational structure, in the future, there may not be effective disclosure and accounting controls to comply with applicable laws and regulations which could result in fines, penalties and assessments against us.***

We have only one officer and director. He has no formal training in financial accounting and management, however, he is responsible for our managerial and organizational structure which will include assessment and preparation of our disclosure controls and procedures and internal controls over financial reporting under the Sarbanes Oxley Act of 2002.

Case 1:15-cv-00894-WHP-JLC Document 75-23 Filed 03/28/15 Page 12 of 33

While Mr. McKenzie has no formal training in financial accounting matters, he has been preparing the financial statements that have been included in this prospectus. When our disclosure controls and procedures and internal controls over financial reporting under the Sarbanes Oxley Act of 2002 referred to above are implemented, he will be responsible for the administration of them. Should he not have sufficient experience, he may be incapable of creating and implementing the controls which may cause us to be subject to sanctions and fines by the SEC which ultimately could cause you to lose your investment.

***8. If Craig McKenzie, our president and sole director, should resign or die, we will not have a chief executive officer which could result in our operations being suspended or ceasing entirely. If that should occur, you could lose your investment.***

Craig McKenzie is our sole officer and director. We are extremely dependent upon him to conduct our operations. If he should resign or die we will not have a chief executive officer. If that should occur, until we find another person to ac as our chief executive officer, our operations could be suspended. In that event it is possible you could lose your entire investment.

***9. A permanent loss of data or a permanent loss of service on the Internet will have an adverse affect on our operations and will cause us to cease doing business.***

Our operations depend entirely on the Internet. If we permanently lose data or permanently lose Internet service for any reason, be it technical failure or criminal acts, we will have to cease operations and you will lose your investment.

***10. If we are unable to meet the rapid changes in technology, our services, technology and systems may become obsolete.***

Due to the costs and management time required to introduce new services and enhancements, we may not be able to respond in a timely manner to avoid becoming uncompetitive. To remain competitive, we must meet the challenges of the introduction by our competitors of new services using new technologies or the introduction of new industry standards and practices. Additionally, the website developers we use to support our technology may not provide the leve of service we expect or may not be able to properly market our r products or services on commercially reasonable terms or at all.

***11. There are a number of competitors in the online coupon industry and some of them have been operating for quite some time.***

Large amounts of funds have been already invested in research and development by coupon/discount corporations tha are reflected in the numerous product lines available today. The coupon industry, particularly the hard copy version is usually distributed in newspapers as Free Standing Inserts and by mail. Any of which, could collectively or singularly turn their interests toward our business model and bring them directly into competition with Medora Corp.

Should that competition decide to engage in a marketing battle with Medora Corp., the competitors' actions could have a highly negative impact on Medora Corp., including the severe reduction of potential revenues or the removal of Medora Corp. from the marketplace.

***12. None of Medora Corp's technology or business model particulars is proprietary.***

The barriers to entry in Medora Corp`s business segment are low. The technology required to commence operations for any potential competitor are available off-the-shelf and the costs of such hardware and software are not onerous. The business model, with few exceptions, is not new and can be readily adopted by those with a basic knowledge of the coupon industry and mid-level technology.

***13. Our business could grow faster than our infrastructure. We may not have the necessary resources or available funds to maintain operations which may have an adverse effect on our business.***

It is possible that our business could grow much faster than our infrastructure and available resources. Businesses offering their goods and services and registered members and consumers could lose confidence during the time it takes for our business to expand and adjust which may have an adverse effect on our business operations.

**Risks Relating To Our Common Stock**

***14. Because our Chief Executive Officer and sole Director owns approximately 56.40% of our issued and outstanding common stock, he can exert significant influence over corporate decisions that may be disadvantageous to minority shareholders.***

As of March 14, 2011, our Chief Executive Officer and sole director owns approximately 56.40% of our issued and outstanding shares of common stock. Such ownership grants him control over the Company, such ownership is sufficien to permit him to determine the outcome of all corporate transactions or other matters, including the election of directors, mergers, consolidations, the sale of all or substantially all of our assets, and a change in control. The interests of our Chief Executive Officer may differ from the interests of our other shareholders and thus may result in corporate decisions that are disadvantageous to our other shareholders.

***15. We arbitrarily determined the price of the shares of our common stock to be sold pursuant to this prospectus and such price may not reflect the actual market price for the shares.***

The initial fixed offering price of $0.0015 per share of common stock offered by us under to this Prospectus was determined by us arbitrarily. The price is not based on our financial condition and prospects, market prices of similar securities of comparable publicly traded companies, certain financial and operating information of companies engaged i: similar activities to ours, or general conditions of the securities market. The price may not be indicative of the market price, if any, for the common stock that may develop in the trading market after this offering. The market price for our common stock, if any, may decline below the initial public price at which the Shares are offered. Moreover, recently the stock markets have experienced extreme price and volume fluctuations which have had a negative impact on smaller companies. In the past, securities class action litigation has often been instituted against various companies following periods of volatility in the market price of their securities. If instituted against us, regardless of the outcome, such litigation would result in substantial costs and a diversion of management's attention and resources, which would increase our operating expenses and affect our financial condition and business operations.

***16. Additional issuances of our securities may result in immediate dilution to existing shareholders.***

We are authorized to issue up to 100,000,000 shares of common stock, $0.00001 par value per share, of which 62,054,600 shares of common stock are currently issued and outstanding. Our Board of Directors has the authority to cause us to issue additional shares of common stock. We may, in the future, issue shares in connection with financing

arrangements or otherwise. Any such issuances will result in immediate dilution to our existing shareholders' interests, which will negatively affect the value of your shares.

***17. Currently, there is no public market for our common stock, and there is no assurance that any public market will ever develop or that our common stock will be quoted for trading and, even if quoted, that a viable, liquid market with low volatility will develop.***

Currently, our common stock is not listed on any public market, exchange, or quotation system. Although we are taking steps to enable our common stock to be publicly traded, a market for our common stock may never develop. We currently plan to apply for quotation of our common stock on the OTCBB upon the effectiveness of the registration statement of which this Prospectus forms a part. However, our common stock may never be traded on the OTCBB or even if traded, a viable public market may not materialize. Even if we are successful in developing a public market, ther may not be enough liquidity in such market to enable shareholders to sell their Shares. If our common stock is not quoted on the OTCBB or if a viable public market for our common stock does not develop, investors may not be able to re-sell the Shares, rendering the same effectively worthless and resulting in a complete loss of their investment.

We are planning to identify a market maker to file an application with the Financial Industry Regulatory Authority, Inc. ("FINRA") on our behalf so that we may quote our shares of common stock on the OTCBB (which is maintained b the FINRA) commencing upon the effectiveness of our registration statement of which this Prospectus is a part. We cannot assure you that such market maker's application will be accepted by the FINRA. We are not permitted to file sucl application on our own behalf. If the application is accepted, there can be no assurances as to whether any market for ou common stock will develop or of the price at which our common stock will trade. If the application is accepted, we cannot predict the extent to which investor interest in us will lead to the development of an active, liquid trading market. Active trading markets generally result in lower price volatility and more efficient execution of buy and sell orders for investors.

In addition, our common stock is unlikely to be followed by any market analysts, and there may be few institutions acting as market makers for the common stock. Either of these factors could adversely affect the liquidity and trading price of our common stock. Until our common stock is fully distributed and an orderly market develops in our common stock, if ever, the price at which it trades is likely to fluctuate significantly. Prices for our common stock will be fixed at $0.0015 per share until such time as our common stock becomes traded on the OTCBB. However, our shares may not become traded on the OTCBB or another exchange. In addition, prices for our common stock may be influenced by many factors, including the depth and liquidity of the market for shares of our common stock, developments affecting our business, including the impact of the factors referred to elsewhere in these Risk Factors, investor perception of the Company, and general economic and market conditions. No assurances can be given that an orderly or liquid market wil ever develop for the shares of our common stock.

***18. Because we will be subject to "penny stock" rules once our shares are quoted on the OTCBB, the level of trading activity in our stock may be reduced.***

Broker-dealer practices in connection with transactions in "penny stocks" are regulated by penny stock rules adopted by the Securities and Exchange Commission. Penny stocks generally are equity securities with a price of less than $5.00 (other than securities registered on some national securities exchanges or quoted on NASDAQ). The penny stock rules

require a broker-dealer, prior to a transaction in a penny stock not otherwise exempt from the rules, to deliver a standardized risk disclosure document that provides information about penny stocks and the nature and level of risks in the penny stock market. The broker-dealer also must provide the customer with current bid and offer quotations for the penny stock, the compensation of the broker-dealer and its salesperson in the transaction, and, if the broker-dealer is the sole market maker, the broker-dealer must disclose this fact and the broker-dealer's presumed control over the market, and monthly account statements showing the market value of each penny stock held in the customer's account. In addition, broker-dealers who sell these securities to persons other than established customers and "accredited investors" must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written agreement to the transaction. Consequently, these requirements may have the effect of reducing the level of trading activity, if any, in the secondary market for a security subject to the penny stock rules, and investors in our common stock may find it difficult to sell their Shares.

## USE OF PROCEEDS

We will not receive any proceeds from the sale of the shares of common stock in this offering. All proceeds from the sale of the shares of common stock will be received by the selling shareholders.

## DETERMINATION OF OFFERING PRICE

The price of the shares has been arbitrarily determined by our board of directors. We selected the $0.0015 price for th sale of our shares of common stock. The prices at which the shares of common stock covered by the prospectus may actually be sold will be $0.0015 per share of common stock until such time as our common stock becomes traded on the OTCBB. However, our shares may not ever be traded on the OTCBB or any other exchange.

## PLAN OF DISTRIBUTION

There is currently no market for any of our shares and we cannot give assurance that the shares offered will have a market value, or that they can be resold at the offered price if and when an active secondary market might develop. If a public market does develop for our securities it may not be sustained.

There are forty-two (42) selling shareholders. They may be deemed underwriters. They may sell some or all of their common stock in one or more transactions, including block transactions:

1. on such public markets or exchanges, as the common stock may from time to time be trading;
2. in privately negotiated transactions;
3. through the writing of options on the common stock;
4. in short sales; or
5. in any combination of these methods of distribution.

The sales price to the public is fixed at $0.0015 per share until such time as the shares of our common stock become

traded on the OTCBB operated by the Financial Industry Regulatory Authority or another exchange. Our common stock may never be traded on the OTCBB or another exchange. If our common stock becomes quoted on the OTCBB or another exchange, then the sales price to the public will vary according to the selling decisions of each selling shareholder and the market for our stock at the time of resale. In these circumstances, the sales price to the public may be:

1. The market price of our common stock prevailing at the time of sale;
2. A price related to such prevailing market price of our common stock; or
3. Such other price as the selling shareholders determine from time to time.

In order to be quoted on the OTCBB, a market maker must file an application on our behalf in order to make a market for our common stock. This process usually take approximately between four (4) and twelve (12) weeks. There can be no assurance that a market maker will agree to file the necessary documents with FINRA, which operates the OTCBB, nor can there be any assurance that such an application for quotation will be approved. However, sales by selling security holder must be made at the fixed price of $0.0015 until a market develops for the stock. We have not yet engaged a market maker to apply for quotation on the OTCBB on our behalf.

If our common stock becomes listed on the OTCBB it will have an affect on our liquidity. Our liquidity may be negatively impacted by the significant costs associated with our public company reporting requirements, costs associated with newly applicable corporate governance requirements, including requirements under the Sarbanes-Oxley Act of 2002 and other rules implemented by the Securities and Exchange Commission. We expect all of these applicable rules and regulations to significantly increase our legal and financial compliance costs and to make some activities more time consuming and costly.

Additionally, our stock is a penny stock. Burdens are imposed upon broker-dealers by penny stock requirements that may discourage broker-dealers from effecting transactions in our securities, which could severely limit the market price and liquidity of our securities. These requirements may restrict the ability of broker-dealers to sell our common stock and may affect your ability to resell our common stock.

The shares may also be sold in compliance with the Securities and Exchange Commission's Rule 144. The selling shareholders may also sell their shares directly to market makers acting as principals or broker/dealers, who may act as agent or acquire the common stock as a principal. Any broker/dealer participating in such transactions as agent may receive a commission from the selling shareholders; or if they act as agent for the purchaser of such common stock, from such purchaser. The selling shareholders will likely pay the usual and customary brokerage fees for such services. Broker/dealers may agree with the selling shareholders to sell a specified number of shares at a stipulated price per share and, to the extent such broker/dealer is unable to do so acting as agent for the selling shareholders, to purchase, as principal, any unsold shares at the price required to fulfill the

---

respective broker/dealer's commitment to the selling shareholders. Brokers/dealers, who acquire shares as principals, may thereafter resell, such shares from time to time in transactions in a market or on an exchange, in negotiated transactions or otherwise, at market prices prevailing at the time of sale or at negotiated prices, and in connection with such re-sales may pay or receive commissions to or from the purchasers of such shares. These transactions may involve cross and block transactions that may involve sales to and through other broker/dealers.

We can provide no assurance that all or any of the common stock offered will be sold by the selling shareholders. We

are bearing all costs relating to the registration of the common stock, estimated to be $20,000. The selling shareholders, however, will pay commissions or other fees payable to broker/dealer in connection with any sale of the common stock. The selling shareholders must comply with the requirements of the Securities Act of 1933 and the Securities Exchange Act of 1934, in the offer and sale of the common stock. In particular, during such times as the selling shareholders may be deemed to be engaged in a distribution of the common stock, and therefore be considered to be an underwriter, they must comply with applicable law and may among other things:

1. Not engage in any stabilization activities in connection with our common stock;
2. Furnish each broker/dealer through which common stock may be offered, such copies of this prospectus, as amended from time to time, as may be required by such broker/dealer; and
3. Not bid for or purchase any of our securities or attempt to induce any person to purchase any of our securities other than as permitted under the Securities Exchange Act of 1934.

There is no assurance that any of the selling shareholders will sell any or all of the shares offered by them. Under the securities laws of certain states, the shares may be sold in such states only through registered or licensed broker/dealers. In addition, in certain states the shares may not be sold unless they have been registered or qualified for sale in that state or an exemption from registration or qualification is available and is met. There are no pre-existing contractual agreements for any person to purchase the shares.

Of the 62,054,600 shares of common stock outstanding as of March 14, 2011, 35,000,000 shares are owned by our sole officer and director.

**Dividends**

We have not declared any cash dividends, nor do we intend to do so. We are not subject to any legal restrictions respecting the payment of dividends, except that they may not be paid to render us insolvent. Dividend policy will be based on our cash resources and needs, and it is anticipated that all available cash will be needed for our operations, in the foreseeable future.

**Section 15(g) of the Exchange Act**

Our shares are covered by Section 15(g) of the Securities Exchange Act of 1934, as amended, and Rules 15g-1 through 15g-6 and Rule 15g-9 promulgated thereunder. They impose additional sales practice requirements on broker-dealers who sell our securities to persons other than established customers and accredited investors (generally institutions with assets in excess of $5,000,000 or individuals with net worth in excess of $1,000,000 or annual income exceeding $200,000 or $300,000 jointly with their spouses). While Section 15(g) and Rules 15g-1 through 15g-6 apply to brokers-dealers, they do not apply to us.

---

Rule 15g-1 exempts a number of specific transactions from the scope of the penny stock rules. Rule 15g-2 declares unlawful broker-dealer transactions in penny stocks unless the broker-dealer has first provided to the customer a standardized disclosure document.

Rule 15g-3 provides that it is unlawful for a broker-dealer to engage in a penny stock transaction unless the broker-dealer first discloses and subsequently confirms to the customer current quotation prices or similar market information concerning the penny stock in question.

Rule 15g-4 prohibits broker-dealers from completing penny stock transactions for a customer unless the broker-dealer first discloses to the customer the amount of compensation or other remuneration received as a result of the penny stock transaction.

Rule 15g-5 requires that a broker-dealer executing a penny stock transaction, other than one exempt under Rule 15g-1 disclose to its customer, at the time of or prior to the transaction, information about the sales persons compensation.

Rule 15g-6 requires broker-dealers selling penny stocks to provide their customers with monthly account statements.

Rule 15g-9 requires broker-dealers to approved the transaction for the customer's account; obtain a written agreement from the customer setting forth the identity and quantity of the stock being purchased; obtain from the customer information regarding his investment experience; make a determination that the investment is suitable for the investor; deliver to the customer a written statement for the basis for the suitability determination; notify the customer of his right and remedies in cases of fraud in penny stock transactions; and, the FINRA's toll free telephone number and the central number of the North American Administrators Association, for information on the disciplinary history of broker-dealers and their associated persons. The application of the penny stock rules may affect your ability to resell your shares.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

This section of the prospectus includes a number of forward-looking statements that reflect our current views with respect to future events and financial performance. Forward-looking statements are often identified by words like: believe, expect, estimate, anticipate, intend, project and similar expressions, or words which, by their nature, refer to future events. You should not place undue certainty on these forward-looking statements, which apply only as of the dat of this prospectus. These forward-looking statements are subject to certain risks and uncertainties that could cause actua results to differ materially from historical results or our predictions.

We are a development stage corporation and have not yet generated or realized any revenues from our business operations.

Our auditors have raised substantial doubt as to our ability to continue as an on-going business for the next 12 months We have not generated any revenue and have begun to develop our website, locate businesses willing to offer significan discounts of their products or services to our registered members.

To meet our need for cash we raised $40,582 in a private placement offering. We cannot guarantee that since we have begun operations that we will stay in business after twelve months. If we are unable to secure enough businesses of products or services at suitably low pricing or enough registered members willing to buy the products at higher than the price we have negotiated with our businesses, we may quickly use up the proceeds from the offering and will need to find alternative sources, like a second public offering, or a private placement of securities in order for us to maintain our operations. Our sole officer and director is unwilling to loan or advance any additional capital to the Company, except

for the costs associated with the preparation and filing of reports with the Securities and Exchange Commission. At the present time, we have not made any arrangements to raise additional cash, other than from our private offering. If we need additional cash and cannot raise it we will either have to suspend operations until we do raise the cash, or cease operations entirely. We believe the funds from the offering will be enough to develop our growth strategy for the next 1: months.

If we need more money we will have to revert to obtaining additional money as described in the above stated paragraph. Other than as described in these two paragraphs, we have no other financing plans.

**Plan of Operation**

Our business concept is for Medora to present a daily discount for a niche market item (such as a spa, restaurant, or a tour outing), and if enough people sign up for the deal, the subscribers get the discount. The coupons are sent to the buyers by e-mail. Conversely, if the quota is not reached, the deal is off, and no one is charged for what they subscribec to buy. If the deal does not work out, the company that Medora was "advertising" through discounted items, and the subscribers will be reimbursed.

A material challenge to our business operations is getting enough registered members to purchase discounted product: from businesses that participate in our program, and in order to achieve this goal we will create incentives for our registered members to inform others of the discounts that businesses are offering on our website. We will encourage our registered members to share news about deals through email, Facebook, and Twitter, and guarantee that if one of our registered members sends our Company link to a friend, and the friend buys a Medora Coupon ("Coupon") within 72 hours, the individual who sent the link will get $10 worth of Medora credits in their account. In addition, if a user sends a referral to a friend, who then subscribes within 72 hours, the person who sent the referral will get $10 worth of Medor: credits in their account when their friend buys their first deal with Medora. If we are unable to locate businesses or fail t generate enough traffic to our website it may have a material impact on our revenues or income or may result in our liquidity decreasing.

---

We plan to implement our business operations by finding local restaurants, spas, or other businesses that are willing t provide large discounts if their name is spread to a number of new registered members. Our Company advertises the business by offering coupons online, and then taking a portion of the money spent on each coupon. At this time, our President has approached several local businesses in Kingston, Jamaica that are willing to participate in the group buyin program prepared by the Company. However, no formal agreements have been signed with any business at this moment We believe that if the local economy in Jamaica is struggling, businesses we target to offer discounts for our program may be more inclined to participate in order to generate more business. However, if the local economy in Jamaica deteriorates extensively there may be few businesses in Jamaica who have the goods and services to participate in our program. In addition, some participating businesses in Jamaica may only operate their businesses during certain seasons which may impede our ability to implement our business operations.

Our business concept seeks to target the service and tourism sector. We believe that our concept is attractive in both a growing and shrinking economy because it allows our registered members access to daily discounts by participating

businesses who have the opportunity to generate more income through increased sales. Our concept allows businesses tc generate more income and consumers to save more money.

In both a growing and shrinking economy we anticipate that businesses will use our program as a marketing tool and to generate income from repeat customers. Additionally, registered members will likely prefer to receive a discount whether the economic environment is positive or negative.

However, the local Jamaican economy may be volatile because it is dependent on tourism. Any signs of decline in tourist visits could directly cause local businesses to slow down business operations or go bankrupt which would directl affect the number of businesses able to participate in offering large discounts of their goods and services in exchange fo bulk sales. With fewer visitors to the local Jamaican economy there will likely be fewer registered members to our website, and if this is the case it will directly affect the businesses being able to meet their thresholds set for group buyers. A slowdown in the local economy may impact our short term liquidity.

To help prevent liquidity concerns, Medora will have to also target businesses that will have offerings of goods and services that will be attractive to the local community and not dependant on tourists. Having businesses that have offerings that are attractive enough to generate local people to be registered members to our website will increase our Company's exposure and will address our long-term liquidity concerns.

We anticipate that we will meet our ongoing cash requirements through generating limited revenue, equity or debt financing. We estimate that our expenditures over the next 12 months (beginning December 2010) will be approximatel $230,000 as described in the table below. These estimates may change significantly depending on the nature of our future business activities and our ability to raise capital from shareholders or other sources.

| Description | Estimated Completion Date | Estimated Expenses ($) |
|---|---|---|
| Legal | 12 months | 30,000 |
| Beta testing and servicing costs | January 15, 2011 | 25,000 |
| Marketing and advertising | January 1, 2011and ongoing | 5,000 - 10,000 |
| Investor relations and capital raising | 12 months | 10,000 |
| ***Management costs | 12 months | 10,000 |
| **Salaries | February 15, 2011 | 18,000 |
| Fixed asset purchases for technology center | 12 months | 25,000 |
| *Operating costs and general and administrative expenses | 12 months | 45,000 |
| **Consulting fees | 12 months | 12,000 |
| Accounting fees | 12 months | 45,000 |
| Total | 12 months | 230,000 |

*Operating costs and general and administrative expenses are the costs which we will incur with our day to day business. These include such things as rent, phone, utilities, leaseholds, salaries, insurance and licenses.

**Salaries will be paid to future employees who will assist the Company with its sales and marketing efforts. Consulting fees will be paid to any outside consultant that the Company needs to bring in for any form of special expertise not possessed by the sole officer and director of the Company.

***Management costs will be any costs associated to paying any future manager who will assist with the overseeing of the running of the business and who will be responsible for supervising the sales and marketing efforts.

Our specific goal is to profitably sell discounted products and services to our registered members on our Internet website by allowing the public to buy group coupons for local restaurants, hotels, spas, tourist attractions and bars in Jamaica. Our web developers did not finish all aspects of our website in the time frame that was originally planned due to the complex nature associated with creating an operational collective buying website. Starting on January 1, 2011, we intend to accomplish our goals within the next 3 months by completing the following steps:

1. Immediately begin to establish our office by leasing premises and acquire the equipment required to begin sales. Our web developers had to meet the following requirements which complex nature contributed to the delay in developing and beta testing our website until the end of January 2011:

---

**Tech Specification:**

- Develop the Magento Shopping Cart for purchases (Zend Framework);
- Support Linux Hosting (LAMP Environment);
- 100% customizable source code; and

**General Features:**

- Referral System;
- Daily Deals Email Subscription for multiple mities;
- Social Media: Deal sharing through Facebook and Twitter;
- Email/Invite a friend option;
- Paypal : Void the authorization, if the deal is not completed.
- Google Maps integration for businesses;
- One-page easy shopping cart system;
- Integrated with PayPal merchant Gateway by default;
- Recently closed deals can be viewed in a separate page;
- Ability to place the deals in advance;
- User account page with purchase history and account overview details with the ability to manage shipping addresses, password changes, and print invoices;
- Shopping Cart can be integrated with SSL certificates;
- Ability to add more pages using the backend system;
- Support all languages;
- Ability to add "Discuss the Deal" section for required deals;

- Follow links for facebook, twitter, linkedin;
- Gift to friend - Deals can be bought for a friend;

**Additional Features:**

- User friendly Magento Admin Panel with secure Login;
- Multiple admin accounts that can be created with different privileges;
- Unlimited number of cities or locations can be added with different deals;
- Create new deals in advance;
- Easy-to-use daily deals module in which the admin can specify start/end time, deal dates, and minimum and maximum purchase requirements;
- Ability to view all the user details and purchases;
- Once the deal closes, users will not be able to purchase more deals;
- Functional reporting system; and
- Recent deals can be added through the administrator module;

---

2. At this time, we have consulted with our web developers and taken the necessary steps to confirm that our website is currently being beta tested. We anticipate that our website will be live by the first week of February. We will now begin to look at hiring commissioned sales staff to start marketing our website to merchants in order to initially keep costs down. Once we accumulate sales we will consider hiring full time staff around April 15, 2011 which we believe will cost approximately $2,000 per month. Our sole officer and director will handle our administrative duties. We expect to spend $2,000 to $5,000 for our office premises to be operational. We have begun our website development and have retained a website developer to create a state of the art website to promote our products. We expect to spend $15,000 for the website which will include graphics, back-end database, shopping cart, interactive links with Facebook and Twitter, search engine optimization, and links from our site.

3. Marketing and advertising will be focused on promoting our website and products. The advertising campaign may also include the design and printing of various sales materials. As soon as our website is beta tested around the end of January 2011, we intend to begin marketing our website around March 1, 2011 through Google, Facebook, and Twitter with an initial budget of about $5,000 will be spent on these mediums. Additionally, we will market through traditional sources such as advertising in magazines, billboards, telephone directories and preparing and sending out flyers and mailers both through the regular mail and via email. Advertising and promotion will be an ongoing effort but the initial cost of developing the campaign is estimated to cost $5,000 to $10,000.

We anticipate that we will generate revenue as soon as we are able to offer group discounted coupons for products/services for sale on our website by the middle of March 2011. This will happen once we negotiate agreements with one or two businesses of products/services. We plan to be profitable within 12 months of signing the contracts with the businesses. We are not going to buy or sell any plant or significant equipment during the next twelve months.

We intend to meet our cash requirements for the short term by generating limited revenue and the next 12 months through a combination of debt financing and equity financing by way of private placements. We currently do not have any arrangements or commitments in place to complete any private placement financings and there is no assurance that we will be successful in completing any such financings on terms that will be acceptable to us.

If we are not able to raise the full $230,000 to implement our business plan as anticipated, we will scale our business development in line with available capital. Our primary priority will be to retain our reporting status with the SEC whicl means that we will first ensure that we have sufficient capital to cover our legal and accounting expenses. Once these costs are accounted for, in accordance with how much financing we are able to secure, we will focus on market awareness, testing and servicing costs as well as marketing and advertising to social media marketing websites. We will likely not expend funds on the remainder of our planned activities unless we have the required capital.

---

If we are able to raise the required funds to fully implement our business plan, we plan to implement the below business actions in the order provided below. If we are not able to raise all required funds, we will prioritize our corporate activities as chronologically laid out below because the activity which needs to be undertaken in the initial months is prerequisite for future operations. We anticipate that the implementation of our business will occur as follows

**December 2010 to June 2011**

- Beta Testing of the website
- Complete design of the website
- Design marketing materials
- Complete Legal Agreements for the Businesses
- Begin Marketing the Company's website to potential businesses wanting to offer discounts for their products and services
- Complete certain asset purchases such as dedicated servers, and computer equipment.
- Market Company on Social Media websites as Facebook and Twitter.

**July 2011 to December 2011**

- If initial launch is successful in one city, expand the concept to other cities in Jamaica.
- Hire additional marketing and sales staff.
- Attend trade shows
- Market products to hotels and resorts, pubs, restaurants, spas throughout the designated cities.
- Hire personnel to manage the technical aspects of the website and the daily offerings.
- Hire in house accounting staff to manage the fulfillments of the transactions.
- Purchase additional assets such as vehicles for sales calls.

Our concept is to utilize collective buying to get a daily deal on local goods and services. Medora plans to bring buyers and sellers together in a collaborative way that offers the consumer competitive prices and businesses a large number of new customers. By promising businesses a minimum number of customers, we can offer attractive deals with competitive prices. We plan to save consumers money and in return to generate more revenue for the businesses we feature.

**Limited operating history; need for additional capital**

There is no historical financial information about us upon which to base an evaluation of our performance. We are a start-up (development stage) company and have not generated any revenues. We cannot guarantee we will be successful in our business operations. Our business is subject to risks inherent in the establishment of a new business enterprise, including limited capital resources and possible cost overruns due to price and cost increases in services and products.

To become profitable and competitive, we have to locate and negotiate agreements with established businesses to offer their products/services for sale to us at pricing that will enable us to establish and sell the products/services to our clientele.

We have no assurance that future financing will be available to us on acceptable terms. If financing is not available on satisfactory terms, we may be unable to continue, develop or expand our operations. Equity financing could result in additional dilution to our existing stockholder.

---

**Results of operations**

**From Inception on May 6, 2010 to October 31, 2010**

During the period we incorporated the company, hired the attorney, and hired the auditor for the preparation of this registration statement. We have prepared an internal business plan. We have reserved the domain name www.medoracorp.com and begun the development of our website. Our net loss since inception is $20,663 as a result of incurring expenses of $8,424 for consulting fees, $7,040 for accounting fees, $3,594 for legal fees and $1,605 for genera and administrative and other expenses as they relate to the filing of this registration statement.

At inception, we sold 35,000,000 shares of common stock to our former sole officer and director, Dr. Jehovan Owayne Fairclough for approximately $7,000. On June 10, 2010, Dr. Fairclough appointed Craig McKenzie as his replacement by way of board resolution as the president, chief executive officer, chief financial officer, treasurer, secretary and sole member of the board of directors. On June 10, 2010, Dr. Jehovan Fairclough resigned as the president chief executive officer, chief financial officer, treasurer, secretary and sole member of the board of directors and sold Craig McKenzie his 35,000,000 shares of common stock for $7,000 in a private transaction.

These shares were issued in reliance on the exemption under Section 4(2) of the Securities Act of 1933, as amended (the "Act"). These shares of our common stock qualified for exemption under Section 4(2) of the Securities Act of 1933 since the issuance shares by us did not involve a public offering. The offering was not a "public offering" as defined in Section 4(2) due to the insubstantial number of persons involved in the deal, size of the offering, manner of the offering and number of shares offered. We did not undertake an offering in which we sold a high number of shares to a high number of investors. In addition, the foregoing investors had the necessary investment intent as required by Section 4(2) since they agreed to and received share certificates bearing a legend stating that such shares are restricted pursuant to Rule 144 of the 1933 Securities Act. This restriction ensures that these shares would not be immediately redistributed into the market and therefore not be part of a "public offering." Based on an analysis of the above factors, we have met the requirements to qualify for exemption under Section 4(2) of the Securities Act of 1933 for this transaction.

During the period from May 6, 2010 (inception) to October 31, 2010, we sold 27,054,600 shares of our common stocl at $0.0015 per share for a total of $40,582 to forty two (42) investors.

We issued these shares in reliance on the safe harbor provided by Regulation S promulgated under the Securities Act of 1933, as amended. These investors who received the securities represented and warranted that they are not "U.S. Persons" as defined in Regulation S. In the alternative, the issuance of these shares was exempt from registration pursuant to Section 4(2) of the Securities Act. We made this determination based on the representations of the Shareholders which included, in pertinent part, that such shareholders were either (a) "accredited investors" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act, or (b) not a "U.S. person" as that term i: defined in Rule 902(k) of Regulation S under the Act, and that such shareholders were acquiring our common stock, for investment purposes for their own respective accounts and not as nominees or agents, and not with a view to the resale or distribution thereof, and that the Shareholders understood that the shares of our common stock may not be sold or otherwise disposed of without registration under the Securities Act or an applicable exemption therefrom.

---

***Lack of Revenues***

We have limited operational history. From our inception on May 6, 2010 to October 31, 2010 we did not generate any revenues. We anticipate that we will incur substantial losses for the foreseeable future and our ability to generate any revenues in the next 12 months continues to be uncertain.

***Expenses***

For the period from May 6, 2010 (inception) to October 31, 2010 our expenses were as follows:

| Type of Expense | ($) |
|---|---|
| General and administrative | 1,605 |
| Professional fees | 19,058 |

During the period from May 6, 2010 (inception) to October 31, 2010 our total expenses were $20,663.

***Net Loss***

For the period from May 6, 2010 (inception) to October 31, 2010 we incurred a net loss of $20,663.

On August 30, 2010, we completed our private placement offering by selling an additional 13,008,667 shares of our common stock at $0.0015 per share for a total of $19,513 to twenty (20) investors. We issued these shares in reliance on the safe harbor provided by Regulation S promulgated under the Securities Act of 1933, as amended. These investors who received the securities represented and warranted that they are not "U.S. Persons" as defined in Regulation S. In the alternative, the issuance of these shares was exempt from registration pursuant to Section 4(2) of the Securities Act. We made this determination based on the representations of the Shareholders which included, in pertinent part, that such shareholders were either (a) "accredited investors" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act, or (b) not a "U.S. person" as that term is defined in Rule 902(k) of Regulation S under the Act, and that such shareholders were acquiring our common stock, for investment purposes for their own respective accounts and not as nominees or agents, and not with a view to the resale or distribution thereof, and that the Shareholders understood

that the shares of our common stock may not be sold or otherwise disposed of without registration under the Securities Act or an applicable exemption therefrom.

**Liquidity and capital resources**

As of the date of this prospectus, we have yet to generate any revenues from our business operations.

As of October 31, 2010, our total assets were $21,853 comprised entirely of cash and our total liabilities were $1,540 comprised of trade accounts payable.

---

In May 2010, we executed a consulting agreement whereby we agreed to pay Executive Consulting Services, (ECS) Group $1,000 per month for the next year. ECS provides administrative, compliance, accounting, and SEC reporting support for the operations of the Company. Administrative duties include maintaining compliance with regulatory agencies such as Nevada Secretary of State and the Securities and Exchange Commission, maintaining the Corporate Minute Book, is the Company's bookkeeper, and is an EDGAR/IDEA filing service. Additionally, ECS acts as liaison between the Company's president and auditor, legal counsel, transfer agent, registered agent and the SEC. Upon SEC effectiveness, ECS will continue to provide administrative and compliance support especially as it relates to the preparation of financial statements and reports on Form 10-Q, 10-K and 8-K.

We anticipate that we will meet our ongoing cash requirements through generating limited revenue, equity or debt financing. We estimate that our expenditures over the next 12 months (beginning December 2010) will be approximatel $230,000. These estimates may change significantly depending on the nature of our future business activities and our ability to raise capital from shareholders or other sources.

Our specific goal is to profitably sell discounted products and services to our registered members, or those people wh sign up with us on our website will be deemed a registered member, by allowing the public to buy group coupons for local restaurants, hotels, spas, tourist attractions and bars in Jamaica.

We anticipate that we will generate revenue as soon as we are able to offer group discounted coupons for products/services for sale on our website by the middle of March 2011. This will happen once we negotiate agreements with one or two businesses of products/services. We plan to be profitable within 12 months of signing the contracts with the businesses. We are not going to buy or sell any plant or significant equipment during the next twelve months.

We intend to meet our cash requirements for the short term by generating limited revenue and the next 12 months through a combination of debt financing and equity financing by way of private placements. We currently do not have any arrangements or commitments in place to complete any private placement financings and there is no assurance that we will be successful in completing any such financings on terms that will be acceptable to us.

If we are not able to raise the full $230,000 to implement our business plan as anticipated, we will scale our business development in line with available capital. Our primary priority will be to retain our reporting status with the SEC whicl means that we will first ensure that we have sufficient capital to cover our legal and accounting expenses. Once these costs are accounted for, in accordance with how much financing we are able to secure, we will focus on market awareness, testing and servicing costs as well as marketing and advertising to social media marketing websites. We will likely not expend funds on the remainder of our planned activities unless we have the required capital.

---

## BUSINESS

### General

We were incorporated in the State of Nevada on May 6, 2010. Our business plan is to engage in electronic commerce ("ecommerce") through our website, which is a collective buying site. Our target focus is to provide significant discount to our registered members by allowing them to buy group coupons for local restaurants, hotels, spas, tourist attractions and bars in Jamaica. In return, our businesses are able to sell a large amount of goods or services and market their business to numerous customers. To date, we have begun operations but have yet to generate any revenues. We have reserved a domain name for the company at www.medoracorp.com and our webmasters have begun designing our website.

At this time our sole officer and director is responsible for constructing, operating and maintaining our web site. Additionally, he will be responsible for finding businesses that are willing to provide large discounts if we agree to sell their merchandise to a large number of new customers. Our sole officer and director and commissioned sales staff will focus on advertising coupons of the participating businesses online to promote sales and facilitate buying on our website

We maintain our statutory registered agent's office at Nevada Corporate Headquarter, 101 Convention Center Drive, Suite 700 Las Vegas, Nevada 89109 and our mailing address and business office is located at 7 Wareham Road, Kingston, Jamaica, West Indies. Our telephone number is 876-775-6074. Craig McKenzie, our president, supplies this office space on a rent-free basis.

### Industry Background and Analysis

### Social Networking

We believe social networking is one of the fastest growing industries on the planet. Websites such as Facebook and Twitter have come a long way in only a few years to be household names all over the world. We believe the power of social media has become so prevalent in the last few years, businesses use these websites to help sustain themselves, and in many situations, use these mediums as their primary source of generating revenue. We believe that Facebook and Twitter, as well as many other types of social media websites have become an excellent way of getting a business's message across. We intend to create a Medora customer group on these social media websites to keep registered members informed about discounts businesses are offering on our website.

We believe the potential of social networking websites is enormous. It is a very popular trend on the internet for users to continually expand their network on these websites. The more people that are on one's network of contacts, the easier it is for them to keep in touch with people, make new friends with similar interests, share media (such as photos and

videos), share thoughts, and so on. We intend to rely on social networking as a means of conducting public relations.

---

**Word of Mouth Marketing**

We believe a huge marketing opportunity on the internet is spreading word of mouth, a form of free advertising. We believe the internet has provided the biggest medium to spread word of mouth and social networking sites have been the place where everyone has come together. These days, companies have the capabilities of increased speed at which the message comes across. Bloggers and journalist can post their thoughts and reviews of products, and then people in all corners of the world can read it immediately. We believe the scale of which people can get their message across is also enormous.

Twitter is a good example of this. If a company wants to release a statement to the media, they can use Twitter as a tool to do it. Afterwards, people can use twitter to respond, and everybody has access to all information as well as the abilities to connect with each other and start forums and conversations. Not only is word of mouth considered free advertising, but we believe it is one of the most powerful advertising tools out there. We intend to implement word of mouth advertising into our business model by creating blogs where past registered members can review products or services they bought and educated other prospective buyers.

**Loyalty Marketing**

Loyalty marketing is based on strategic management. It is the approach to marketing in which a company offers incentives to customers in order to generate and maintain business revenue. Incentives can be in the form of coupons, discounts, repeat sales incentives, and multiple item sales incentives (such as buy 2 get 1 free). The subjective assessment by the customer of whether or not to purchase a product or service is ultimately based on their sense of valu the product has, which many times are due to the incentive being offered.

The concept of loyalty marketing has been prevalent in all industries for almost a century, but in the 1980's and 1990' it started to explode in many forms and in and of itself became an industry. In 1981, Airline Corporations launched the first scale modern "loyalty marketing program" with their Frequent Flyer Program. This model allows customers who fl often to eventually receive gifts, discounts, free flights, or upgraded seats. The entire concept was designed to retain customers and not have them switch to other airlines. Within a few years, almost every other airline created their own frequent flyer program. This repeat-business model soon spread to many other industries. The credit card industry uses points systems for frequent users of their cards to eventually redeem points for certain gifts. Nowadays, many retailers offer their own credit cards to customers in hopes of obtaining repeat business and offering deals on purchases.

The business model of loyalty marketing is based on customer satisfaction. Through this method, employees must be trained to obtain specific goals. We believe the quality of the product or service leads to customer satisfaction, which leads to customer loyalty, repeat business, and ultimately profitability. In order to obtain profitability, the satisfaction level of the customer should be high enough to tell their family and friends (word of mouth) and attract new customers. Some companies, have devised plans to not only offer incentives to buy its products through its website, but also additional incentives to refer their friends to the products. We intend to implement the concept of loyalty marketing into our business model by offering these incentives to our customers to refer friends to the products in our website.

---

**The Team Buying Concept**

The team buying concept, known in Chinese as Tuangou was originated in the People's Republic of China. Several people, sometimes friends, but also possibly strangers connect over the internet. They agree to approach a business of a specified product in order to haggle with the business as a group in order to get discounts. The group agrees to purchase the same item. All parties benefit, as the buyers pay less, while the business benefits by selling multiple items at once. We believe this concept works well in China because of the culture of bargaining and getting discounts on items. This process also has an additional benefit for the shopper, as it is more likely the business can be trusted if more than one buyer can vouch for the particular business, as the buyer may have purchased items from the business in the past, or has researched information about the business. We intend to implement group buying into our business plan. We anticipate that Social Networking, Word of Mouth Marketing, Loyalty Marketing, and Team Buying Marketing will facilitate our marketing strategy by generating traffic and sales to our website. We will reach our registered members and promote ou businesses through advertisements that will link to our website on such sites including but not limited to Facebook, and Twitter. These social media sites will be used to locate both businesses and registered members that are interested in a discounted group sales provided by our website. We will be dependent on having traffic that represents both the word o mouth nature of the site, as well as its basis in the online community. We anticipate that Facebook and Twitter will be one of the top promoting sites for our website. We believe that our traffic will rely less heavily on search engines and more on the power of social media.

We believe Team Buying Marketing coupled with Social Media will allow us to reach customers who will sign up to our website and become registered members and in turn will fuel our business. It is the way of the future and an innovative way of reaching out to many users at once. Friends who post Medora deals on Facebook become our advertisers. We anticipate that we will begin to make profits by attracting repeat customers and offering businesses a new way of tapping into a new demographic of customers being introduced to a particular business by a group of buyers

**Similar Business Models from the United States**

Groupon.com depends on word of mouth and viral marketing. Groupon's concept consists of gathering a certain number of people together to each buy a certain product or service. The product or service up for sale will probably have a significant discount from its original price, usually in the range of 50% off. Due to people's social network, people can inform their friends that there is a deal going on, and from there the world spreads about the deal. If Groupon gathers enough people within a certain amount of time, everybody is able to buy the item at a discounted rate. If enough people do not sign up for the item, nobody gets anything, and nobody is charged for anything. The point at which enough people purchase the item and the deal becomes valid is called the "tipping point."

Groupon's business model specifies daily deals, so if enough of the item is purchased within one day, everyone who ordered the item would be able to purchase it at the discount rate. An example of how this works would be for an amusement park ticket. Groupon may post that a ticket normally selling for $60 to an amusement park in San Francisco is now selling for $30, and 500 people have to buy it. If the quota of $500 is filled in the specified time (one day), then everybody gets the tickets at the discounted price. If the quota is not filled, then the deal is void. On other websites, there may be a longer time limit or no time limit for the item at all, but the deal will only occur if when the item reaches the specified quota. The Groupon model features daily deals for certain cities and areas within the United States. One of its primary intentions is to help the local economy and help local businesses gain a wider customer base.

Other competitors to Groupon include LivingSocial, BuyWithMe, MyCityDeal, GroupSwoop, and TownHog. They all feature the same "Daily Deal" business model and have few distinctions. They all claim to be the place with the best deal in town. Each city only has a few deals per day, so it is not as if the customer can pick and choose anything that he or she wants. One distinction that LivingSocial has is the "free link" strategy. In this model, one buyer can send a link to his or her friends to a certain item. If three or more people purchase the item using that link, then that buyer will get the deal for free.

Since group buying is a relatively new concept in the U.S., as it started with Groupon and other websites in only late 2008. Therefore, the long term results of this concept are yet to be seen, and we cannot currently assure that this concept can sustain itself in the U.S. or Jamaica.

**Our Operations and Strategies**

**Business Model**

We intend to find local restaurants, spas, or other businesses that are willing to provide large discounts if their products are sold to a large amount of customers. Our Company advertises the business by offering the coupons online, and takes a portion of the money spent on them. Our major expenses will be related to marketing to the social media websites and brand awareness marketing campaigns. Our revenues will be directly related to the success of these marketing dollars and if traffic will be generated to our site, we believe that retaining a percentage of all the sales will result in revenues and potential profitability. At this time, our President has approached several local businesses in Kingston, Jamaica that are willing to participate in the group buying program prepared by the Company. However, no formal agreements have been signed with any business at this moment.

Our concept is that every day, Medora will present a discount for a niche market item (such as a spa, restaurant, or a paintball outing), and if enough people sign up for the deal, they get the discount. The coupons are sent to the buyers by e-mail. Conversely, if the quota is not reached, the deal is off, and no one is charged for what they promised to buy. Of course, if the deal doesn't work out, the company that Medora was "advertising" through the discounts, and the people who signed up to buy them will be reimbursed.

The success of each deal relies on getting enough people to sign up, and in order to achieve this goal we will create some incentives for our subscribers to spread the word about the discounts they offer. Medora will encourage its registered members to share news about deals through email, Facebook, and Twitter, and promises that if one of their users sends our Company link to a friend, and the friend buys a Medora Coupon (coupon) within 72 hours, the one who sent the link will get $10 worth of Medora credits in their account. Also, if a user sends a referral to a friend, who then subscribes within 72 hours, the person who sent the referral will get $10 worth of Medora credits in their account when their friend buys their first deal with Medora.

By promising businesses a minimum number of customers, we can offer deals that aren't available elsewhere.

We plans to bring buyers and sellers together in a fun and collaborative way that offers the consumer an unbeatable

deal, and businesses a large number of new customers. The plan is to save consumers more money and in return to generate more revenue for the businesses we feature. We plan to establish standard contracts or arrangements for participating businesses and terms of use for participating consumers at the end of December, once our beta tests are complete.

At this time we are not aware of any existing or probable governmental regulations which may have a material adverse effect on our business operations. If governmental regulations arise which impede our ability to conduct our business operations we may have to limit our business plan or cease operations.

We believe that we can implement our current business plan with our sole officer and director contributing fifteen (15 hours a week. In addition, we intend to hire additional employees upon generating limited revenue.

***The Group Buying Concept***

The concept of group buying is becoming one of the fastest marketing channels for local businesses. Since the succes: of the site groupon.com the concept has been taking off. Since Groupon is only available in a number of cities, there is a definite unmet demand available in cities in Jamaica not offered by our competition.

Group buying works by offering unbeatable deals to local customers on products or services (from 50-90% off). The catch is that a minimum number of people need to sign up for the deal to go through. If enough people buy, the deal is on! Otherwise, nobody gets the deal.

A coupon number and barcode is given to each customer after a deal goes through. Each coupon has an ID that is shown in the businesses customer account, which is then used for verification).

To begin, we intend to begin selling deep discounted deals for items available in the cities of Montego Bay, Ocho Rios, and with a focus on Kingston, Jamaica market. Kingston is the capital of Jamaica and also its largest city. As the site grows, and traffic increases, we plan to take it to other cities and towns of Jamaica.

**Website**

Our webmasters are currently developing our website. It is anticipated that our website will be ready for beta tests around the end of January. Once the site is tested it will be ready for launch and only at this point can we begin bringing in any revenues. Due to the necessary security precautions required to protect the information of our customers it is anticipated that the costs associated in creating our website will be initially around $15,000 which will be paid through the capital currently in our account and if necessary, additional private placement offerings of our securities. Our dependence on the Internet is crucial as without it we would not be able to generate any traffic and in turn generate any revenues. In addition, without the Internet we would not be able to securely transmit any credit card numbers by SSL directly to a secure payment process and at no time will credit card information be stored on any third party servers.

We intend to create a very simple website for the consumer to use. We plan for the text to be very large and easy to read. Posted deals will likely have large text, accompanied by enticing pictures. Under the link, we plan to give a short description of the deal. If the link to the deal is clicked, we intend to include the following in the description:

- Multiple pictures and possibly video of the deal being offered

- A detailed description of the offer
- The original price of the item being offered
- The amount of the discount of the offered deal
- The amount saved by using this coupon
- The total number of minimum purchases needed to ensure the deal is valid
- The amount of purchases so far
- A link that can be clicked to send this offer to one's friends and family
- A countdown timer until the exact deadline of the deal
- A very large "BUY" button to purchase the item
- Links to Facebook and Twitter to tell one's friends about the offer
- A map of where the item can be picked up
- Additional deals in the specified area
- A secured site allowing individuals to purchase items using their credit cards and debit cards.

After the item is purchased using a credit or debit card, we plan to prompt the user to print out the details, so the item can be picked up at the specified location. Additionally, there will likely be a bar code that is printed out. In many cases, the item being offered is a service, rather than a specific good. In that case, one may need to travel to the location to redeem their voucher, which may be used at a later time. The item purchased doesn't need to be redeemed on the same day, but we plan to set a time limit specified by the business.

Since the company's business model is intended to help the local economy, everything being sold on the website would have to be redeemed in person, instead of purchasing online and receiving goods through the mail. This prevents wholesalers and businesses who already sell items in bulk from using this website as a tool to sell their goods. We believe the website is a means to help spur the local retail economy. We believe that after the sale is made, the local retailer has a much wider customer base from which repeat sales of their products is likely. This can be in the form of another discount deal or direct customer contact to the business.

**Social Aspect of the Website**

One aspect of the website that we intend to implement is its social aspect. We believe that people who purchase items online for deep discounts will probably be repeat customers. Many of the items offered will likely be restaurant deals, spa deals, and places where people can go to be active in the community and socialize. Therefore, it is probable that a new community of common users is being created. We intend to have a "Socialize" button on the website, so buyers can get in touch with other buyers, and possibly use the deal together.

---

We plan to not share contact information of users with anybody, including businesses and other users. We intend to set up a personal account on the website with a personal inbox that users will be able to get in touch with other users. Initially, users can post items on the website forum, and after that, we will likely be able to contact people personally on their company inbox. Additionally, we plan to have users create a "network" of friends such as the Facebook model, in order to get in touch with each other, and see if their friends are going to purchase the deal.

**Sales and Marketing Strategy**

**Marketing Approach**

We believe it is very important for us to generate a lot of website traffic. If enough people do not come to the website it will be impossible for the company to survive. Enough people need to make purchases on the website in order for our business to be successful. Both businesses and customers alike need to be aware of the website's existence. Customers will only be aware of its existence if good deals are available from trusted businesses. Businesses will only be interested in using us as a medium if enough website traffic is generated. However, there will be no risk to the business if the minimum is not reached, and the brand name generated some interest.

We refer to businesses as those who are willing to offer a minimum discount of at least 50% of their goods or services to the registered members of our website. These businesses will share their profits with us and will gain exposure of our group buying concept. Additionally, we refer our customers as those people who are willing to register as a member on our website and who wish to receive daily updates to buy a product or service at a discount from businesses offering their product or service on our website.

At the beginning of the launch of the website, there may not be much traffic, so we intend to set minimum purchases at a low level. For example, the minimum purchase level may be at 50 participants in order for the deal to be valid. As more website traffic is created, the threshold may increase to 300 participants that must purchase the deal in order for it to be valid.

**Marketing Channels**

As internet-generated group buying is not a common theme currently in Jamaica, we plan to aggressively market this concept to both businesses and potential registered members . We plan to take a bilateral approach to its marketing plan. It is important for the sales team to get across the message of "risk free" participation. If the deals do not reach validity, then the business still had a method of free advertising. Additionally, if a deal does reach validity, registered members are likely to use this business repeatedly. In order for the Company to get in touch with various businesses willing to offer their goods and services, we intend to use the following channels:

- **Trade Shows** - This is a highly effective medium, allowing the company to showcase itself, its abilities, and its potential. Here it can make contact with local retailers and people involved in local industry.

- **Telephone solicitations** - Our telephone solicitation concept is very unique, and is an effective marketing tool. Since the business is not at risk and is able to market its name, it can only benefit the business to post a deal even if it doesn't become valid.
- **E-mail solicitations** - We will use email as a way of becoming known in the community. The Company will use software specifically designed to arrive in a business's email inbox and not in its spam box.
- **Personal visits from sales representatives** - This is a method that will be highly effective, especially in Jamaica. A van will be utilized for the sole use of the sales representatives. The company believes that will allow for efficiency, smooth operation, and put itself in direct contact with the businesses and major decision-makers.
- **Website** - The website will have a section specifically designed for business accounts.
- **Traditional Advertising** - Magazine and newspaper advertising is an effective way of reaching an audience that is involved in specific industries