## <u>POWER OF ATTORNEY TO TRANSFER BONDS OR SHARES</u>

FOR VALUE RECEIVED the undersigned, _Rene Lawrence_, hereby sells, assigns and transfers unto _Lornex Financial Ltd. *_, _150,000_ common shares standing in the name of the undersigned on the books of <u>Medora Corp.</u> (the "Company") represented by certificate no. _108_ and hereby irrevocably constitutes and appoints _____ (the "Transfer Agent")   the attorney of the undersigned to transfer the said shares on the books of the Company with full power of substitution in the premises.

DATED at _____, this _22_ day of _Feb_, 201_2_.

Signed in the presence of:        )
                                  )
                                  )
                                  )
_____ )  _R Lawrence_____
                                     *(Signature of person executing this power)*

SIGNATURE GUARANTEED
MERCANTILE TRUST LIMITED
FIRST FLOOR HENVILLE BUILDING
CHARLESTOWN, NEVIS, B.W.I.

Signature of transferor guaranteed by:

_____            _____
Authorized Signatory

_* Henville Building_
_Charlestown, Nevis_

## POWER OF ATTORNEY TO TRANSFER BONDS OR SHARES

FOR VALUE RECEIVED the undersigned, _Brenton Naghaer_, hereby sells, assigns and transfers unto _Lornex Financial Ltd. ✱ , 100,000_ common shares standing in the name of the undersigned on the books of Medora Corp. (the "Company") represented by certificate no. _131_ and hereby irrevocably constitutes and appoints _____ (the "Transfer Agent") the attorney of the undersigned to transfer the said shares on the books of the Company with full power of substitution in the premises.

DATED at _____, this _22_ day of _Feb_, 2012 .

Signed in the presence of:                )
                                            )
                                            )
                                            )
_____           )   _B. Naghaer_
                                                *(Signature of person executing this power)*

SIGNATURE GUARANTEED
MERCANTILE TRUST LIMITED
FIRST FLOOR HENVILLE BUILDING
CHARLESTOWN, NEVIS, B.W.I.

Signature of transferor guaranteed by:

·····················································
Authorized Signatory

_____

✱ _Henville Building_
_Charlestown, Nevis_

A0790

## POWER OF ATTORNEY TO TRANSFER BONDS OR SHARES

FOR VALUE RECEIVED the undersigned, _ANTHONY_ _BELL_,
hereby sells, assigns and transfers unto _Lorux Financial Ltd. ✱_, _650,000_
common shares standing in the name of the undersigned on the books of Medora Corp. (the
"Company") represented by certificate no. _133_ and hereby irrevocably
constitutes and appoints _____ (the "Transfer Agent")   the
attorney of the undersigned to transfer the said shares on the books of the Company with full
power of substitution in the premises.

DATED at _____, this _22_ day of _Feb_, 201_2_.

Signed in the presence of:                          )
                                                     )
                                                     )
                                                     )
_____                                      )   _A . BELL_
                                                         *(Signature of person executing this power)*

SIGNATURE GUARANTEED
MERCANTILE TRUST LIMITED
FIRST FLOOR HENVILLE BUILDING
CHARLESTOWN, NEVIS, B.W.I.

Signature of transferor guaranteed by:

Authorized Signatory

_____

✱ _Henville Building_
_Charlestown, Nevis_

## POWER OF ATTORNEY TO TRANSFER BONDS OR SHARES

FOR VALUE RECEIVED the undersigned, _Jenifer Rose_ ,
hereby sells, assigns and transfers unto _Comex Financial Ltd ✻_ , _620,000_
common shares standing in the name of the undersigned on the books of Medora Corp. (the
"Company") represented by certificate no. _136_ and hereby irrevocably
constitutes and appoints _____ (the "Transfer Agent") the
attorney of the undersigned to transfer the said shares on the books of the Company with full
power of substitution in the premises.

DATED at _____, this _22_ day of _Feb_ , 20_12_.

Signed in the presence of:     )
                      )
                      )
                      )
_____ )    _J Rose_ _____
                                   *(Signature of person executing this power)*

**SIGNATURE GUARANTEED**
**MERCANTILE TRUST LIMITED**
**FIRST FLOOR HENVILLE BUILDING**
**CHARLESTOWN, NEVIS, B.W.I.**

Signature of transferor guaranteed by:

•••••••••••••••••••••••••••••••
Authorized Signatory

_____

✻ Henville Building
Charlestown, Nevis



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

LEGAL TERMS AND CONDITIONS OF FEDEX SHIPPING DEFINITIONS. On this Air Waybill, "we", "our", "us", and "FedEx" refer to Federal Express Corporation, its subsidiaries and branches and their respective employees, agents, and independent contractors. The terms "you" and "your" refer to the shipper, its employees, principals and agents. If your shipment originates outside the United States, your contract of carriage is with the FedEx subsidiary, branch or independent contractor who originally accepts the shipment from you. The term "package" means any container or envelope that is accepted by us for delivery, including any such items tendered by you utilizing our automated systems, meters, manifests or waybills. The term "shipment" means all packages which are tendered to and accepted by us on a single Air Waybill. AIR CARRIAGE NOTICE. For any international shipments by air, the Warsaw Convention, as amended, may be applicable. The Warsaw Convention, as amended, will then govern and in most cases limit FedEx's liability for loss, delay of, or damage to your shipment. The Warsaw Convention, as amended, limits FedEx's liability. For example in the U.S. liability is limited to $9.07 per pound (20$ per kilogram), unless a higher value for carriage is declared as described below and you pay any applicable supplementary charges. The interpretation and operation of the Warsaw Convention's liability limits may vary in each country. There are no specific stopping places which are agreed to and FedEx reserves the right to route the shipment in any way FedEx deems appropriate. ROAD TRANSPORT NOTICE. Shipments transported solely by road to or from a country which is a party to the Warsaw Convention or the Contract for the International Carriage of Goods by Road (the "CMR") are subject to the terms and conditions of the CMR, notwithstanding any other provision of this Air Waybill to the contrary. For these shipments transported solely by road, if a conflict arises between the provisions of the CMR and this Air Waybill, the terms of the CMR shall prevail. LIMITATION OF LIABILITY. If not governed by the Warsaw Convention, the CMR, or other international treaties, laws, other government regulations, orders, or requirements, FedEx's maximum liability for damage, loss, delay, shortage, mis-delivery, nondelivery, misinformation or failure to provide information in connection with your shipment is limited by this Agreement and as set out in the terms and conditions of the contract of carriage. Please refer to the contract of carriage set forth in the applicable FedEx Service Guide or its equivalent to determine the contractual limitation. FedEx does not provide cargo liability or all-risk insurance, but you may pay an additional charge for each additional U.S. $100 (or equivalent local currency for the country of origin) of declared value for carriage. If a higher value for carriage is declared and the additional charge is paid, FedEx's maximum liability will be the lesser of the declared value for carriage or your actual damages. LIABILITIES NOT ASSUMED. IN ANY EVENT, FEDEX WON'T BE LIABLE FOR ANY DAMAGES, WHETHER DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL IN EXCESS OF THE DECLARED VALUE FOR CARRIAGE (INCLUDING BUT NOT LIMITED TO LOSS OF INCOME OR PROFITS) OR THE ACTUAL VALUE OF THE SHIPMENT, IF LOWER, WHETHER OR NOT FEDEX HAD ANY KNOWLEDGE THAT SUCH DAMAGES MIGHT BE INCURRED. FedEx won't be liable for your acts or omissions, including but not limited to incorrect declaration of cargo, improper or insufficient packaging, securing, marking or addressing of the shipment, or for the acts or omissions of the recipient or anyone else with an interest in the shipment or violations by any party of the terms of this agreement. FedEx won't be liable for damage, loss, delay, shortage, mis-delivery, non-delivery, misinformation or failure to provide information in connection with shipments of cash, currency or other prohibited items or in instances beyond our control, such as acts of God, perils of the air, weather conditions, mechanical delays, acts of public enemies, war, strike, civil commotion, or acts or omissions of public authorities(including customs and health officials) with actual or apparent authority. NO WARRANTY. We make no warranties, express or implied. CLAIMS FOR LOSS, DAMAGE OR DELAY. ALL CLAIMS MUST BE MADE IN WRITING AND WITHIN STRICT TIME LIMITS, SEE OUR TARIFF, APPLICABLE FEDEX SERVICE GUIDE, OR STANDARD CONDITIONS OF CARRIAGE FOR DETAILS. The Warsaw Convention provides specific written claims procedures for damage, delay or non-delivery of your shipment. Moreover, the interpretation and operation of the Warsaw Convention's claims provisions may vary in each country. Refer to the Convention to determine the claims period for your shipment. The right to damages against us shall be extinguished unless an action is brought within two years, as set forth in the Convention. FedEx is not obligated to act on any claim until all transportation charges have been paid. The claim amount may not be deducted from the transportation charges. If the recipient accepts the shipment without noting any damage on the delivery record, FedEx will assume the shipment was delivered in good condition. In order for us to consider a claim for damage, the contents, original shipping carton and packing must be made available to us for inspection. MANDATORY LAW. Insofar as any provision contained or referred to in this Air Waybill may be contrary to any applicable international treaties, laws, government regulations, orders or requirements, such provisions shall remain in effect as a part of our agreement to the extent that it is not overridden. The invalidity or unenforceability of any provisions shall not affect any other part of this Air Waybill. Unless otherwise indicated, FEDERAL EXPRESS CORPORATION, 2005 Corporate Avenue, Memphis, TN 38132, USA, is the first carrier of this shipment. Email address located at www.fedex.com.

A0793



NUMBER
159

SHARES
***3,100,000***

**MEDORA CORP.**

COMMON STOCK

COMMON STOCK

CUSIP 58503H102

INCORPORATED UNDER THE LAWS OF THE STATE OF

NEVADA

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Lornex Financial Ltd.***

is the Owner of   *** Three Million One Hundred Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF

MEDORA CORP.

*transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.*

*Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.*

Dated:   **March 1, 2012**

COUNTERSIGNED AND REGISTERED:

EMPIRE STOCK TRANSFER INC.

Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

SECRETARY

PRESIDENT

CORPORATE SEAL

1A 74151

A0794

**MEDO - Medora Corp.**                                                      9/4/12   11:50 am

**Stock Transfer - Final Transaction Report**                                     Page 1 of 1

Control Ticket Number:  STTK000000036539          Transaction Number:    20          Transfer Date: 09/04/12
Type of Stock being Transferred:     CS1           Total Shares: 3,100,000           Sale Amt/share: $ 0.00000
Paper certifs being Transferred from: 1
Paper certifs being Transferred to:     1           Received From: DTC
CBRS Firm Type: DTCPRT   ID: 00000901              Received: 09/04/12 at 09:49    Tran Type: Routine    Item Count: 1
Account #: 0000    CB Control ID: 1224101524       How Received:FEDEX

                                                   Sent: 09/04/12 at 11:49          How Sent:  FEDEX
                                                   Outgoing Tracking Number:  798885197336

| ——Transfer From—— | | | | ——Transfer To—— | | | |
|---|---|---|---|---|---|---|---|
| Line # | Shareholder | Certificate Number | Number of Shares | Line # | Shareholder | Certificate Number | Shares per Certif |
| 1 | 52    Lomex Financial Ltd. | CS1    159 | 3,100,000 | 1 | 49    CEDE & CO | CS1    169 | 3,100,000 |
| | | | 3,100,000 | | Number of new certs: 1 | | 3,100,000 |

**Completed By:** CRH      **Report Run By:** CRH 09/04/12 11:50:01 am

A0795

# MEDO - Medora Corp.

9/4/12   11:50 am

## Stock Transfer - Final Transaction Report

Page 1 of 1

| | |
|---|---|
| Control Ticket Number:  STTK000000036539 | |
| Type of Stock being Transferred:    CS1 | |
| Paper certifs being Transferred from: 1 | |
| Paper certifs being Transferred to:    1 | |
| BRS Firm Type: DTCPRT   ID: 00000901 | |
| Account #: 0000   CB Control ID: 1224101524 | |

Transaction Number:     20      Transfer Date: 09/04/12
Total Shares: 3,100,000        Sale Amt/share: $ 0.00000

Received From: DTC
Received: 09/04/12 at 09:49    Tran Type: Routine    Item Count: 1
How Received: FEDEX

Sent: 09/04/12 at 11:49         How Sent:  FEDEX
Outgoing Tracking Number:   798885197336

| | ------Transfer From----- | | | | | -----Transfer To----- | | |
|---|---|---|---|---|---|---|---|---|
| Line | Shareholder | Certificate Number | Number of Shares | Line # | Shareholder | | Certificate Number | Shares per Certif |
| 52 | Lornex Financial Ltd. | CS1  159 | 3,100,000 | 1 | 49 | CEDE & CO | CS1  169 | 3,100,000 |
| | | | 3,100,000 | | Number of new certs: 1 | | | 3,100,000 |

THE DEPOSITORY TRUST COMPANY
55 WATER STREET  NEW YORK, NEW YORK 10041-0099

EMPIRE STOCK TRANSFER INC
PAY TO THE ORDER OF   1859 WHITNEY MESA DR.
HENDERSON

52-22
311

NV  P9014

DRAFT NO. C41047911

DATE  08/29/12    AMOUNT (IN FIGURES) $  6.00

LS6503H102 MEDORA CORP         ** 30.00

ZZ STS 10-22421020C0292 01

DOLLARS (IN WORDS)   Sixty W/100

**** VOID 60 DAYS AFTER APPROVE DATE

PAYABLE THROUGH
Wachovia Bank of Delaware
National Association

NO. CHARGEABLE CERTIFICATES  (S1)
ISSUED  /   CANCELLED  /

IF FEE EXCEEDS $400 CALL
TRANSFER OPERATIONS DEPT.
(212) 855-8601
THE BANK WILL NOT HONOR DRAFTS
IN EXCESS OF $400

⑈41047911⑈ ⑆031100225⑆ 207995106503⑈

**S.C11**   ST S ID-2242102000292   PG 01   BIN:$-620 402 PLA
**SHIPMENT CONTROL LIST**   STOCK   Copy 1 - RETAINED BY T.A.
The Depository Trust Company   ISSUE DATE  /  /   LEGAL DEPOSIT   4201297

| TRANSFER AGENT NAME | | CUSIP NUMBER | DATE | T.A. NO. | RGN ACY | CKD |
|---|---|---|---|---|---|---|
| EMPIRE STOCK | OUT | 58503H-10-2 | 08/29/12 | 33267 | DEP. | |

| LINE I.D. | DTC USE | PARTICIPANT | QUANTITY | VALUE |
|---|---|---|---|---|
| | | **** ********************************** | | |
| | | * PLEASE ISSUE THESE DENOMINATIONS: * | | |
| | | * 1 X 3.100.000.00000 * | | |
| | | **** ********************************** | | |
| 1 | 751 | 901 | 3.100.000.00000 | 3.100.000 |
| 1X | 1111 | SCL TOTALS PRESENTED | 3.100.000.00000 | $3.100.000 |
| | | REJECTED          ACCEPTED | | |

*** BONDS ARE NOW REPORTED IN UNITS OF A DOLLAR (1=$1) ***

RECEIVED
SEP 04 2012
Empire Stock Transfer

08/29/12

TRANSFER AGENT: ALL MAILED TRANSFERS SHOULD BE RETURNED WITH COPY #3 OF THIS FORM TO THE DEPOSITORY TRUST COMPANY,
P. O. BOX 222, BOWLING GREEN STATION, NEW YORK, N.Y. 10274. THE POSSESSION OF THIS DOCUMENT SHALL BE DEEMED TO BE AN
ACKNOWLEDGMENT OF THE RECEIPT BY THE DEPOSITORY TRUST COMPANY OF THE SECURITIES DESCRIBED ABOVE. INQUIRIES - CALL 1-800-654-8154

| CUSIP NUMBER | SECURITY DESCRIPTION | SCL. NO. | TOTAL |
|---|---|---|---|
| 58503H-10-2 | MEDBOX CORP         **+ | 2242102000292 | 3100000.00000 |

12242300251

C 4 1 0 4 7 9 1 1

**INSTRUCTIONS**
Write Firmly and Legibly:
1. CALCULATE FEES DUE YOU.
2. FILL IN ATTACHED DRAFT-DOLLAR AMOUNT
   IN WORDS AND FIGURES, AND ALSO
   NUMBER OF CHARGEABLE CERTIFICATES
   ISSUED AND CANCELLED.
3. DETACH AND PRESENT FOR PAYMENT.

5023C (Rev. 03/06)

The Depository Trust Company                                                DAM Deposit Ticket

| PARTICIPANT #<br>901 | Deposit Type<br>LEGAL | Deposit ID<br>1224101524 | Aisle Bin#<br>$-620 |
|---|---|---|---|
| Quantity<br>3100000.00000 | CUSIP<br>58503H102   MEDORA CORP                    *+ | | OFAC CERTIFIED |
| T/A NUMBER   O/T<br>33267   PLA | Edit Type<br>PENDING | PARTICIPANT<br>BANK OF NY | Cusip Sort Order<br>402 |
| CBRS TCN<br>11224139087WJ | | | |

1224101524

**\* NEXT DAY DEPOSIT \***



E22423028018

A0798



NUMBER
159

COMMON STOCK

SHARES
***3,100,000***

COMMON STOCK
CUSIP 58503H102
SEE REVERSE FOR CERTAIN DEFINITIONS

**MEDORA CORP.**

INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

THIS CERTIFIES THAT

***Lornex Financial Ltd.***

is the Owner of   *** Three Million One Hundred Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF

MEDORA CORP.

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated:  **March 1, 2012**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.

By

AUTHORIZED SIGNATURE

Transfer Agent and Registrar

CORPORATE SEAL

SECRETARY

PRESIDENT

A 74151

The following abbreviations, when used in the inscription of the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common

TEN ENT — as tenants by the entireties

JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — _____Custodian_____
 (Cust)              (Minor)
under Uniform Gifts to Minors Act

_____
 (State)

Additional abbreviations may also be used though not in the above list.

*For Value Received,*_____ *hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER

(PLEASE PRINT OR TYPE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*Shares*

*of the Common Stock represented by this Certificate and hereby irrevocably constitues and appoints*

*Attorney*

*to transfer the said stock on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated* _____

NOTICE   THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND
WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THIS
CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR
ENLARGEMENT OR ANY CHANGE WHATSOEVER.

SIGNATURE(S) GUARANTEED

NOTICE   THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE
GUARANTOR INSTITUTION, (BANKS, STOCKBROKERS, SAVINGS
AND LOAN ASSOCIATION AND CREDIT UNIONS) WITH MEMBERSHIP
IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM
PURSUANT TO S.E.C. RULE 17AD-15.

A0800

# Corporate Resolution

Resolution of **LORNEX FINANCIAL LTD.**

(full name of Corporation)

On motion duly made and seconded, it was unanimously resolved that:

<b>CLIFFORD WILKINS / PRESIDENT</b>

(please print the appropriate names / titles)

be and they are hereby authorized on behalf of the Company to accept, sell and convey, assign, transfer, or otherwise dispose of all or any shares, stocks, bonds, debentures, debenture stock and other securities of every description now or hereafter registered in the name of the Company or held or owned by the Company and to sign and execute on behalf of the Company all and any instruments of acceptance and transfer and other documents whenever necessary or proper to effectuate the same with full power to appoint any attorney or attorneys with full power of substitution therein, and that any and all instruments of acceptance and transfer and other documents in connection therewith heretofore signed and executed on behalf of the Company in accordance with the authority set out above are hereby ratified and confirmed.

# Certificate

I, the undersigned, Secretary of **LORNEX FINANCIAL LTD.**

(full name of Corporation)

incorporated under the laws of the Province / State of **NEVIS** hereby certify that the foregoing is a true and correct copy of a Resolution duly passed at a meeting of the Directors of said Company on the **06ᵗʰ** day of **March**, 20**12** and that the said Resolution is still in full force and effect and does not conflict with the by laws of said Company. I further certify that the following is a list together with specimen signatures of all Directors, officers and employees of the Company authorized by this Resolution:

| Print name | Title | Specimen of signature |
|---|---|---|
| CLIFFORD WILKINS | PRESIDENT | |
| | | |
| | | |
| | | |
| | | |

Dated this _____ **06ᵗʰ** day of **March**, 20**12**

**SIGNATURE GUARANTEED**
**VERDMONT CAPITAL**
Edif. High-Tech Plaza
Calle 53, Obarrio Panamá, Panamá
Ruc# 667950-1-462359

Auth. No.
_____ Authorized Officer

*Secretary* print and sign name   **VIRGILIO SANTANA**
Affix Corporate Seal (if no seal exists, certify below)

I hereby certify that there is no corporate seal.

*Secretary* sign name

Notes:
1. The Secretary who certified the Resolution **must** be an officer OTHER THAN the person(s) authorized to execute the assignment for the securities.
2. This form cannot be used by:
   - an incorporated company which only has a sole officer and sole director
   - sole proprietorship **SIGNATURE GUARANTEED** 𝗗𝗗𝗨𝗨
     **MEDALLION GUARANTEED** 𝗦𝗦𝗔𝗔
     RBC DEXIA INVESTOR
     SERVICES TRUST

(02/2004)

( TCR09 )   AUTHORIZED SIGNATURE
**2800****
SECURITIES TRANSFER AGENTS MEDALLION PROGRAM™

A0801

# IRREVOCABLE STOCK POWER

FOR VALUE RECEIVED, the undersigned does (do) hereby sells, assigns and transfers to:

_____
**(Name of Transferee)**

CEDE & CO.          13-2555119
BOX #20
BOWLING GREEN STATION
NEW YORK, NEW YORK 10004

_____
(Transferee's Address)

_____ shares of the *COMMON* stock of *Medora Corp.*

represented by Certificate(s) No(s) *159*

standing in the name of the undersigned on the books of the said Company.

The undersigned does (do) hereby irrevocably constitute and appoint ... BANK OF NEW YORK MELLON

................................attorney to transfer the said stock on the books of

said Company, with full power of substitution in the premises.

Dated *March 06th, 2012*

Signature of Transferors                    In the presence of:

_____                      _____
                                            Signature of Witness

SIGNATURE GUARANTEED
MEDALLION GUARANTEED
RBC DEXIA INVESTOR
SERVICES TRUST

( TCR09 )              AUTHORIZED SIGNATURE
                       Z8005215
SECURITIES TRANSFER AGENTS MEDALLION PROGRAM
SIGNATURE GUARANTEED BY

SIGNATURE GUARANTEED
VERDMONT CAPITAL
Edif. High-Tech Plaza
Calle 53, Obarrio Panamá, Panamá
Ruc 667950-1-562359

Auth. No.

Authorized Officer

A0802



Align top of FedEx Express® shipping label here.

## earthsmart
FedEx carbon-neutral
envelope shipping

ORIGIN ID: SKYA 212 85 54 000 00
SHIPPING DEPARTMENT
THE DEPOSITORY TRUST/CENTRAL D
55 WATER ST STE SL2

NEW YORK, NY 10041
UNITED STATES US

TO EMPIRE STOCK TRANSFER (702)818-5898
MATT BLEVINS         (00033267)
1859 WHITNEY MESA DR.

HENDERSON        . NV 89014

Ship Date: 30AUG12
ActWgt: 1 LB
System#: 8877/FXRS0855
Account: S 105264941

**FedEx**
Express

**E**

Ref: HD—MIE DEPOSIT
INV:
PO:

Delivery Address
Barcode

BILL SENDER



TRK#
0201   **4736 3439 7870**       TUE – 04SEP     A1
                               ** 2DAY **

:VV – LASA                      LAS
                               NV-US
                               89014



ATTENTION
**Courier**
**SIGNATURE REQUIRED.**
Under all circumstances, signature MUST be
obtained. Package is not to be left without a
signature.

**FedEx.**
Federal Express

SEL04  1/85                              SEL

A0803

## Log Sheet

| | | |
|---|---|---|
| Issuer: | MEDO-Medora Corp. | |
| Received: | 09/04/12     09:49 AM | ID/SCL#: 2242102000292 |
| Received From: | DTC | |
| How Received: | FEDEX | |
| Track Number In: | 473634397870 | |
| Control Ticket: | STTK000000036539 | |
| SEC Item Count: | 1     Routine | |
| Contents: | 159 | |

Transaction No.:    20                    Completed: 09/04/12

Track Number Out: FEDEX 798885197336

Sent To:

Fees:          Due:                    Rcvd:              Check #:

Assigned To:

Certificate Number(s) or Book Entry ID's:  1

CS1-169

Comments:

Initials      Date

_____ _____ Logged In

_____ _____ Medallion Verified

_____ _____ Review Documents

_____ _____ Processed by

_____ _____ Stamp Certificates as Canceled and Transferred

_____ _____ Final Review/Authentification

_____ _____ Batch Completed and Made Available

_____ _____ Management Review

https://www.fedex.com/shipping/html/en/PrintIFrame.html

From: (702) 818-5899
Patrick Mokros
Empire Stock Transfer Inc.
1859 Whitney Mesa

Henderson, NV 89014

Origin ID: LASA



Ship Date: 04SEP12
ActWgt: 0.5 LB
CAD: 5040518/INET3300

J12201207160325

SHIP TO: (212) 855-8362

**Attn: TRANSFER DEPT**
**The Depository Trust Company**
**55 WATER ST**
**STE SL2**
**NEW YORK, NY 10041**

BILL SENDER

Delivery Address Bar Code

Ref #    MEDO 169
Invoice #
PO #
Dept #



TRK# **7988 8519 7336**
0201

**XA SXYA**

WED - 05 SEP  A1
PRIORITY OVERNIGHT

**10041**
NY-US

**EWR**



515G1003A/A44

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

1 of 1

9/4/2012 11:50 AM

A0805



NUMBER
169

SHARES
***3,100,000***

COMMON STOCK

*MEDORA CORP.*

COMMON STOCK

INCORPORATED UNDER THE LAWS OF THE STATE OF

NEVADA

CUSIP 58503H102
SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***CEDE & CO***

Is the Owner of  *** Three Million One Hundred Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
**MEDORA CORP.**

*transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed.  This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.*

*Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.*

Dated:  **September 4, 2012**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

CORPORATE SEAL

SECRETARY

PRESIDENT

B  29946

Page: 1   Document Name: Untitled

```
S242              AUTOMATED SECURITIES PROCESSING SYSTEM  AKU   01/05/15   09:37
                    HISTORY BASIC DATA INQUIRY SCREEN   DATA FROM ARCHIVE

  ASP TRN  1130090050717    DTC ID              LAST MODIFIED DATE

  ACCOUNT  298307-A  DMS RBCT TAX EXEMPT CLIENT ACCOUNT
  CUSIP  98387X203   XUMANII
  TRANSACTION TYPE   RECEIVE FREE     INSTRUCTION SOURCE  UNKNOWN   COND  FINAL

  TRADING  INST  00000000   ADJUSTMENT REORGAN          VIA CODE  DTCR
  CLEARING INST  99996755                               STATUS   REC
  SOURCE REG        SOURCE LOC        FINAL REG   DTC  FINAL LOC  DTC
  TRADE DATE 12/07/12 SETL DATE 12/07/12 POST DATE 01/09/13

  UNITS          17,050,000      FINAL MONEY
  UNDERLYING CUSIP               OVERS/SHORT            FED FUNDS NO
  PRINCIPAL                      INCOME                 SEC
  COMMISSION                     STATE TAX              BK CHG
                                 PATH #
  VER         010913      REC           010913


  4-© §           1    Sess-1    160.254.155.24    CTCPS038        1/1
```

Name: xeccdck - Date: 01/05/2015  Time: 9:38:05 AM

Confidential Treatment Requested by BNY Mellon                    BNYM_CAL_072673

A0807

8-K 1 medora8kw.htm

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**FORM 8-K
CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report: May 10, 2012

**MEDORA CORP.**
--------------------
(Exact name of registrant as specified in its charter)

| **Nevada** | **333-169770** | **N/A** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**7 Wareham Road
Kingston, Jamaica**

(Address of Principal Executive Offices) (Zip Code)

**(876) 775-6074**
--------------
Registrant's telephone number, including area code

N/A
-------
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c)

**SECTION 5 - CORPORATE GOVERANCE AND MANAGEMENT**

A0808

**ITEM 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

**Appointment of Director**

On April 30, 2012 Alexandre Frigon was appointed to the Board of Directors.

There are no transactions between Mr. Frigon and the Company that are reportable under Item 404(a) of Regulation S-K. There are no family relationships among our directors or executive officers.

## SECTION 9 - FINANCIAL STATEMENTS AND EXHIBITS

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits. The following is a complete list of exhibits filed as part of this Report. Exhibit numbers correspond to the numbers in the exhibit table of Item 601 of Regulation S-K.

| Exhibit No. | | Description |
|---|---|---|
| 99.1 | | CV of Alexandre Frigon |
| 99.2 | | Directors Resolution |

### SIGNATURES

 Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, hereunto duly authorized.

### MEDORA CORP..

By: /s/ Craig McKenzie
-------------------------------
Craig McKenzie, President

Date: May 10, 2010

8-K/A 1 super8kxumaniiv3clean.htm

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 8-K/A**

**CURRENT REPORT**
Pursuant to Section 13 OR 15(d) of
The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): _____ May 1, 2013 _____

**Xumanii, Inc.**
(Exact name of registrant as specified in its charter)

| Nevada | 333-169280 | 90-09582397 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**PO Box 309, Ugland House South Church Street**
**George Town Grand Cayman KY1-1104 Cayman Island**
(Address of principal executive offices) (zip code)

Registrant's telephone number, including area code: _____ 305-600-0732 _____

**Medora Corp**
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**FORWARD-LOOKING STATEMENTS**

This Current Report on Form 8-K (the "Current Report") contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document include, among others, statements regarding our capital needs, business plans and expectations. Such forward-looking statements involve assumptions, risks and uncertainties regarding, among others, the success of our startup business plan, availability of funds, government regulations, operating costs, our ability to achieve

significant revenues, our business model and products and other factors. Any statements contained herein that are not statements of historical fact may be deemed to be forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expect," "plan," "intend," "anticipate," "believe," "estimate," "predict," "potential" or "continue," the negative of such terms or other comparable terminology. In evaluating these statements, you should consider various factors, including the assumptions, risks and uncertainties set forth in reports and other documents we have filed with or furnished to the Securities and Exchange Commission (the "SEC"). These factors or any of them may cause our actual results to differ materially from any forward-looking statement made in this document. While these forward-looking statements, and any assumptions upon which they are based, are made in good faith and reflect our current judgment regarding future events, our actual results will likely vary, sometimes materially, from any estimates, predictions, projections, assumptions or other future performance suggested herein. The forward-looking statements in this document are made as of the date of this document, and we do not intend or undertake to update any of the forward-looking statements to conform these statements to actual results, except as required by applicable law, including the securities laws of the United States.

Unless otherwise indicated, in this Form 8-K, references to "we," "our," "us," the "Company," or the "Registrant" refer to Xumanii, Inc. (f/k/a Medora Corp., Inc.), a Nevada corporation.

## SECTION 1 – REGISTRANT'S BUSINESS AND OPERATIONS

### Item 1.01 Entry into a Material Definitive Agreement.

The information contained in Item 2.01 below is incorporated by reference herein.

## SECTION 2 – FINANCIAL INFORMATION

### Item 2.01 Completion of Acquisition or Disposition of Assets.

## DESCRIPTION OF BUSINESS

Except as otherwise indicated by context, references to "we," "us" or "our" hereinafter in this Form 8-K are to the business of Xumanii, this also includes references to "our common stock," "our shares of common stock" or "our capital stock" or similar terms shall refer to the common stock of the Registrant.

**Overview**

**XUMANII®** is an all-inclusive online platform that provides users the opportunity to create a "Live Broadcast" in true High Definition. Xumanii's® new, patent pending technology integrates proprietary hardware and software wirelessly, streaming live feeds from multiple cameras in High Definition Audio/Visual with capabilities of up to 10 Megabits per second. All feeds stream directly to a designated PC or Laptop that has the Company's software installed allowing the "Producer" to pick and choose camera angles, camera fades as well as all other production enhancements used in today's television broadcasts in real time.

This Live Production streams to any Computer, Smart phone, or tablet allowing viewers to watch the concerts, sporting event, and other events from anywhere in the world. This technology integrated the Hardware and Software allowing for the highest quality "live broadcast" without the exorbitant expenditure of traditional methods currently used in the marketplace exclusively on Xumanii.com. The Company's technology can also be provided to each Artist allowing them to broadcast any event in which they feel that they would like their fans to be a part of either for free or for a ticket price. The Artist/s will also have the ability to charge a monthly subscription fee for fans to watch any and all events that the Artist chooses to share such behind the scenes of concerts and while on tour, fan interaction and promotional giveaways.

Xumanii® has been designed to bring the live aspect of social media to life.

To meet our need for cash we have raised $943,062 in loans from third parties during the year 2012 and 2013 to date. We cannot guarantee that since we have adopted and implemented a new startup business plan and have begun operations that we will stay in business after twelve months. If we are unable to secure enough broadcasts of performance artists and or business products or services to advertize at suitably low pricing or enough registered members willing to buy the products at the price we have negotiated with our businesses, we may quickly use up our current cash and will need to find alternative sources, such as a second public offering, or a private placement of securities in order for us to maintain our operations. At the present time, we have not made any arrangements to raise additional cash, other than from the loans that have been received. If we need additional cash and cannot raise it we may either have to suspend operations until we do raise the cash, or cease operations entirely. If we need more money we will have to revert to obtaining additional funds as described above. Other than as described above, we have no other financing plans.

Prior to the adoption of the Xumanii Startup business plan, we were a public reporting "shell company," as defined in Rule 12b-2 of the Securities Exchange Act of 1934, as amended and the rules and regulations promulgated thereunder ("Exchange Act"). Accordingly, pursuant to the requirements of Item 2.01(f) of Form 8-K, set forth below is the information that would be required if the Registrant were filing a general form for registration of securities on Form 10 under the Exchange Act, for the Registrant's common stock, which is the only class of its securities subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act..On March 13, 2013, we filed a revised annual report on form 10-K/A, incorporating the "Form 10 level disclosure."

As a result of the adoption of the new startup business plan, our management team consists of Alexandre Frigon, President, Chief Executive Officer, Chief Financial Officer and Secretary, Treasurer and Director. Mr. Frigon is supported by a team of industry professionals, software engineers, programmers and designers.

### Intellectual Property

We currently have prepared 3 patent applications for our technology and are in the process of filing with the US Patent Office and the Canadian Intellectual Property Office. We have received trademarks by way of licensing agreement with Xumanii, Inc. a Cayman Corporation, in Canada, for the name "Xumanii" (file 1 404 779)and for the phrase "Live is Beautiful" (file 1 407 369) and in the United States "Xumanii" (file 77581679) and for the phrase "Live is Beautiful" (file 77581665).

There are 3 additional patents that the Company would like to file that are in the final stages of review with our Patent Attorney's. These completed Patent Applications are for the following:

X-Pak®        X-Feed® Software              Xumanii® Media Player

### X-Feed® Software

All feeds stream directly to any chosen laptop that has Xumanii's patent-pending software installed, turning any laptop into a full production station. All feeds stream into the chosen laptop allowing for the producer to control what the viewer will be seeing in real time through multiple camera angles, fading in and out of each shot as well as all other variations of product that were only available through exorbitant production expenditures and limited to television production.

### X-Pak®

The Company has developed a revolutionary new way to stream content on the internet using any camera and without the need of internet cables or additional camera equipment. Live broadcast through patent-pending X-Pak® that allows for a wireless Wi-Fi live stream without the restrictions of existing live stream technology or the expense of traditional television broadcasts. Originally the machine was the size

A0812

of a cable box, but over the past 5 months the Company has hired a full staff of software developers and Engineers to redesign this product. Working closely with an Engineering Firm in Hong Kong the Company has fully redesigned the X-Pak® reducing the unit to the size of a wireless modem. This makes the X-Pak® small enough to attach to a belt or bolt directly onto a camera.

**Xumanii® Channel**

Similar to a Facebook[TM] or Youtube[TM] page, Artists and Record Labels open a Xumanii® Channel, where they have the unique experience of bringing their fans closer by providing "All-Access" into all aspects of their lives, tours, events, and any other content that the Artist decides they would like to display. All events, concerts, etc. are at the discretion of the Artist/Artist Management, informing their fans via social media as well as their Xumanii® calendar on their channel. One more key feature of utilizing the Xumanii® Channel is there are no commercials, language or time restrictions as in traditional television events.

A0813

Ustream is a website that consists of a network of diverse channels providing a platform for lifecasting and live video streaming of events online. Established in March 2007 the site has over 2,000,000 registered users who generate 1,500,000+ hours of live streamed content per month with over ten million unique hits per month.

## MARKETING PLAN

XUMANII is looking to position itself as a leading promoter of live music events with the technology capability tostream events live over the Internet. With the increasing digitalization of music and the progressively larger presence online video in today's technology driven world, having events with an offline and online element will position XUMANII for growth within the market. XUMANII plans to utilize a reality TV show concept, in particular the Search for the Next XUMANII girls, to gain brand recognition and establish themselves in the market place.As XUMANII establishes a presence in the market, primarily through the production of the online reality TVshows, the Company will produce and stream concerts.XUMANII's strategy is blended in order to drive attendance at live events as well as internet channels. In order to accomplish this, the Company must use traditional methods of concert promotion in conjunction with a viral marketing component geared towards virtual attendance. The figure below is an overview of the various marketing channels and strategies XUMANII will employ. The campaign will focus on an overarching nationalstrategy that will be complimented by local efforts prior to concert dates.The main goal is to sell our equipment to get small, medium and large producers across the world to be self sufficient and produce million of hours of live streaming by themselves. XUMANII will produce their own concerts and reality show to showcase its technology to the world, but the end goal is to get the entire world to produce live content by themselves. Xumanii also intends to employ third party consultants to assist Xumanii in marketing telecom and mobile applications.



**Branding**

We will utilize various forms of media and print advertising to promote our brand. Anticipated forms of print media include brochures, catalogues and advertisements in entertainment publications. Our management will also attend and participate in key industryrelated trade shows throughout the world to promote our brand and products. We will design and utilize the internet as a forum to promote our brand and proprietary production technologies that result in higher quality products. Our website will be regularly updated to ensure proper informational flow to the respective members, performance artists and end use customers.

## GROWTH AND FUTURE OPPORTUNITIES

**XUMANII® Revenue Opportunities**

Xumanii can derive revenues from multiple sources. First, we have the ability to charge a fee to consumer to watch an live broadcast event (Pay-Per-View Event). Second, we can offer free content and display sponsorship and advertisers ads. This will put Xumanii in a unique position with sponsors and Fortune 500 Companies for their online ad budgets. Third, we will derive revenues by the sales of our patent pending X-Pak® machines to all kinds of producers worldwide. Forth, Xumanii also has the ability to license its Intellectual Properties to other companies and partner who wants to take advantage of the live broadcast technologies.

**"Pay-Per-View" Concert Experience**

Xumanii® now allows Artists to providing fans from around the world with a truly once in a lifetime experience of access that until now was reserved for the people who can afford backstage passes and/or within the inner circle of the Artist's camp. This is also an additional revenue stream because Xumanii® can offer multiple levels of ticket sales just as a concert seats range in price according to the level of viewership that a fan would like to experience the event just as ticket sales range in price.

**"Free" Concert Experience**

Xumanii® understands that some events are best offered free of charge to maximize Global viewership in order to promote a new album release, tour date announcement and other newsworthy events. The Company works directly with Artists/Management to determine the best way to provide the fans with the greatest value, maximizing the visibility and viewership of each and every event chosen for a broadcast. For many events, the Free Broadcast model may work best. The Company has effective Account Executives that can bring scalable Corporate Sponsorship through our multilevel Advertising Components. These include but are not limited to CPM "Cost per Mille"/CPC "Cost per Click" models, product placements as well as direct Corporate Sponsorship/Endorsements including direct Artist Endorsements from Sponsors that may be pre-existing.

**XUMANII® Promotions**

Another key differentiating factor that the Company holds is a marketing and promotion Facebook application called the "Xumanii® Promoter App". Also patent pending, that allows current fans of each Artist to become Xumanii™/ Facebook™ promoters for their favorite artist or producer. This application turns a fan into an advertisement distributor for the artist, reaching all Facebook™ friends of the promoter. Facebook™ users who take advantage of this Promotional tool receive many benefits that includes but not limited to discounted PPV tickets, exclusive Concert memorabilia, and other exciting benefits.

Advertising Model through Xumanii® Promoter App-Average Facebook™ promoters have around 1,000 friends; this means that each of our Xumanii™-Facebook™ promoters will promote the live broadcast message to 1,000 people.

**XUMANII® IP Licensing**

The Company has been approached by several Companies to license / lease the usage of the Xumanii® Hardware and Software. These Companies have been CDN providers who are using traditional Television equipment to stream events. As previously mentioned this method is very expensive and significantly reduces the mobility of the camera crews.

These costs range depending on the number of cameras in use the cost of the unions to move equipment in and out of the Arena cable connectivity and wiring for each camera and the cost of such equipment. With the Xumanii Live Broadcast system these expenses are drastically reduced which leads us to believe that one of the immediate revenue opportunities is to provide this technology to larger platforms such as VEVO™ Microsoft Subsidiaries and other Companies who have either begun live streaming concerts or

have expressed such interests in the past 12 months.

**Plan of Operations**

Our startup business plan for Xumanii is to broadcast live events in HDfrom multiple cameras, wirelessly, with an extremely low production cost.Xumanii will allow content to be broadcasted as a Pay-Per-View model, generating revenues from consumers directly or as a "FREE" content model, generating revenues from advertisement, product placements and sponsorship.

A material challenge to our business operations has been getting enough registered members. In order to achieve this goal we have to create incentives for our registered members to inform others of the broadcasts on our website. We will encourage our registered members to share news about the broadcasts through email, Facebook, and Twitter, and other social media websites. If we are unable to get new subscribers or fail to generate enough traffic to our website it may have a material impact on our revenues or income or may result in our liquidity decreasing.

We plan to implement our business operations by finding performance artists or other businesses that are willing to broadcast and or advertize in order to spread to existing members and new registered members. To date we have had good success in finding artists that are willing to broadcast live performances, and we have had some success in obtaining registered members. To date we have 11 201 registered members.

To better manage our payment processing we have selected PayPal to facilitate our online transactions.

In both a growing and shrinking economy we anticipate that performance artists will use our website as a marketing tool and to generate income from repeat customers on a Pay-Per-View Format. Additionally, registered members will likely prefer to receive notification as to upcoming performances.

To help prevent liquidity concerns, we will also target businesses in the immediate area of the performance that will have offerings of goods and services that will be attractive to that local community. Having businesses that have offerings that are attractive enough to generate local people to be registered members to our website will increase our exposure and will assist in addressing our long-term liquidity concerns.

To date we have received a total of $943,063in advances from third parties in order to implement our new startup business plan

Currently, we do not have any future arrangements or commitments in place to complete any private placement financings and there is no assurance that we will be successful in completing any such financings on terms that will be acceptable to us.

**Limited Operating History; Need for Additional Capital**

There is limited historical financial information about us upon which to base an evaluation of our performance. We are a start-up (development stage) company and have not generated any revenues. We cannot guarantee we will be successful in our business operations.

Our business is subject to risks inherent in the establishment of a new business enterprise, including limited capital resources and possible cost overruns due to price and cost increases in services and products.

To become profitable and competitive, we have to locate and negotiate agreements with established performance artists and or businesses to enable us to offer these venues to our clientele

We have no assurance that future financing will be available to us on acceptable terms. If financing is not available on satisfactory terms, we may be unable to continue, develop or expand our operations. Equity

A0816

financing could result in additional dilution to our existing stockholders.

We anticipate that we will need to meet our ongoing cash requirements through the generation of revenue or equity and/or debt financing. We estimate that our expenditures over the next 12 months will be approximately $1,385,997as described in the table and chart below. These estimates may change significantly depending on the nature of our future business activities and our ability to raise capital from shareholders or other sources.

| Type | Amount | Percent |
|---|---|---|
| Salaries | 535,023.18 | 38.60% |
| Professional services (IT development) | 291,744.39 | 21.05% |
| Equipment(purchase) | 45,975.61 | 3.32% |
| Professional services (lawyers & accountant) | 81,500.00 | 5.88% |
| Professional services (Biz Dev) | 120,000.00 | 8.66% |
| Office, rent and expenses(phone, etc) | 126,645.60 | 9.14% |
| Travel expense for employees | 73,111.26 | 5.27% |
| Government Fees | 15,078.00 | 1.09% |
| Event production fees | 28,251.08 | 2.04% |
| Business Development fees | 21,228.30 | 1.53% |
| Servers & Bandwidth | 36,000.00 | 2.60% |
| Bank fees & interest | 7,040.53 | 0.51% |
| Administration | 2296.02 | 0.17% |
| Event Publicity and promotion | 2103.32 | 0.15% |
| Total | 1,385,997.28 | 100.00% |

We intend to meet our cash requirements for the short term by generating revenue and, if possible, through a combination of debt financing and equity financing by way of private placements. We currently do not have any arrangements or commitments in place to complete any private placement financings and there is no assurance that we will be successful in completing any such financings on terms that will be acceptable to us.

If we are not able to raise the full $1,385,997 to fully implement our startup business plan for the next year as anticipated, we will scale our business development in line with available capital. Our primary priority will be to retain our reporting status with the SEC which means that we will first ensure that we have sufficient capital to cover our legal and accounting expenses. Once these costs are accounted for, in accordance with how much financing we are able to secure, we will focus on market awareness, and servicing costs as well as marketing and advertising to social media marketing websites. We will likely not expend funds on the remainder of our planned activities unless we have the required capital.

A0817



If we are able to raise the required funds we wilfully implement our startup business plan. If we are not able to raise all required funds, we will prioritize our corporate activities.

**Regulations**

The conduct of our business, and the production, distribution, sale, advertising, labeling, safety, transportation and use of our products, may be subject to various laws and regulations administered by federal, state and local governmental agencies in the United States, as well as to foreign laws and regulations administered by government entities and agencies in markets where we may operate and sell our products. It is our policy to abide by the laws and regulations that apply to our business.

In the United States, we are or may be required to comply with certain federal laws, laws governing equal employment opportunity, customs and foreign trade laws and regulations, and various other federal statutes and regulations. We may also be subject to various state and local statutes and regulations. We will rely on legal and operational compliance programs, as well as local counsel, to guide our businesses in complying with applicable laws and regulations of the jurisdictions in which we do business.
We do not anticipate at this time that the cost of compliance with U.S. and foreign laws will have a material financial impact on our operations, business or financial condition, but there are no guarantees that new regulatory and tariff legislation may not have a material negative effect on our business in the future.

**Employees**

We currently have 4 executive employees, of which each has an employment agreement. We anticipate the need to hire additional personnel to assist in implementing our startup business plan over the course of the next twelve months.

**Property**

Our business office is located at PO Box 309, Ugland House South Church StreetGeorge Town Grand Cayman KY1-1104 Cayman Island. Our office space is provided without charge by the sole officer and director of the Company.

We currently have prepared 3 patent applications for our technology and are in the process of filing with the US Patent Office and the Canadian Intellectual Property Office. We have received trademarks in Canada, for the name "Xumanii" (file 1 404 779) and for the phrase "Live is Beautiful" (file 1 407 369) and in the United States "Xumanii" (file 77581679) and for the phrase " Live is Beautiful" (file 77581665).

**RISK FACTORS**

*You should carefully consider the risks described below together with all of the other information*

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The Company has two classes of its stock outstanding, its common stock and preferred stock. The following table sets forth certain information as of the date herein, with respect to the beneficial ownership of our common stock for (i) each director and officer, (ii) all of our directors and officers as a group, and (iii) each person known to us to own beneficially five percent (5%) or more of the outstanding shares of our common stock. As of the date herein, there were 341, 300,300 shares of common stock outstanding.

To our knowledge, except as indicated in the footnotes to this table or pursuant to applicable community property laws, the persons named in the table have sole voting and investment power with respect to the shares of common stock indicated.

| Name and Address of Beneficial Owner(1) | Shares Beneficially Owned | Percentage Beneficially Owned |
|---|---|---|
| **Directors and Executive Officers** | 192,500,000 | |
| Alexandre Frigon, , Chief Executive Officer, Chief Financial Officer, President and SecretaryPO Box 309, Ugland House South Church Street George Town Grand Cayman KY1-1104 Cayman Islands | | 56.3% |
| **5% Shareholders** | | |
| Alexandre Frigon, , 309, Ugland House South Church Street George Town Grand Cayman KY1-1104 Cayman Islands | | 56.3% |

(1)    Beneficial ownership has been determined in accordance with Rule 13d-3 under the Exchange Act. Pursuant to the rules of the SEC, shares of common stock which an individual or group has a right to acquire within 60 days pursuant to the exercise of options or warrants are deemed to be outstanding for the purpose of computing the percentage ownership of such individual or group, but are not deemed to be beneficially owned and outstanding for the purpose of computing the percentage ownership of any other person shown in the table.

## DIRECTORS AND EXECUTIVE OFFICERS

**Current Officers and Directors:**

| Name | Age | Position | Since |
|---|---|---|---|
| Alexandre Frigon, | 32 | President, Chief Executive Officer, Chief Financial Officer, President and Secretary,Treasurer and Director | 2012 |

*Alexandre Frigon, r, President, Chief Executive Officer, Chief Financial Officer and Secretary, Treasurer and Director.*

On April 30, 2012, Mr. Alexandre Frigon was appointed to the Board of Directors and on May 30, 2012 he was appointed president, principal accounting officer, principal executive officer, principal financial officer, secretary, treasurer and sole member of our board of directors.

**Xumanii** (2006- Present) Founder and CEO a *Social Networking website that allows consumers to broadcast live events and shows on a wireless basis.*

**Flukii.com** (2006 - 2010) Founder and CEO *Marketing - Processing Company and Services* SPOG international Inc. (2006 - 2010) Consultant *Financial operations and overall management*

**Burst Record / Management Inc.** (2005 - 2006) Founder and CEO *Music producer & Artist management: Canada, US, Europe tours Record label management*

**Parallel Lab Inc.** (2002 - 2005) Founder and CEO *Software design* o *Developed innovative tools to improve efficiency*

**SN Hawaii Inc.** (1999 - 2002) Founder and CEO *Organization of Ocean safety and lifeguard class in Hawaii*

**Tachyon Design Inc.** (1996-1999) Founder and CEO *Web design and programming*

Studied year 1 of the Chartered Financial Analyst Program CFA Institute, Ass. Invest. Professionals, 2010

Bachelor of Commerce (major in Market Finance) Montreal University, École des Hautes Études Commerciales (H.E.C.) 2002

Stock Brokerage License Quebec Securities Commission, 2000

Bachelor in International Economics Brébeuf College, 1999

**Terms of Office**

The Company's directors are appointed for a one-year term to hold office until the next annual general meeting of the Company's shareholders or until removed from office in accordance with the Company's bylaws and the provisions of the Nevada Revised Statutes. The Company's directors hold office after the expiration of his or her term until his or her successor is elected and qualified, or until he or she resigns or is removed in accordance with the Company's bylaws and the provisions of the Nevada Revised Statutes.

The Company's officers are appointed by the Company's Board of Directors and hold office until removed by the Board.

**Involvement in Certain Legal Proceedings**

No director, executive officer, significant employee or control person of the Company has been involved in any legal proceeding listed in Item 401(f) of Regulation S-K in the past 10 years.

**Committees of the Board**

Our Board of Directors held no formal meetings during the fiscal year ended July 3131, 2012. All

(d)    Exhibits

| Exhibit No. | Description |
|---|---|
| 3.1 | Articles of Incorporation (incorporated by reference to the Registrant's Registration Statement on Form S-1 filed on June 2, 2008) |
| 3.2 | Bylaws (incorporated by reference to the Registrant's Registration Statement on Form S-1 filed on June 2, 2008) |
| 10.1 | Amended Employment Agreement Alexandre Frigon(incorporated by reference to the Registrant's Current Report on Form 8-K  filed on January 8, 2013) |
| 10.2 | Employment Agreement Jean-Francois Jauvin(incorporated by reference to the Registrant's Current Report onForm 8-K  filed on January 8, 2013) |
| 10.3 | Employment Agreement Hanna Marya(incorporated by reference to the Registrant's Current Report on Form 8-K  filed on January 8, 2013) |
| 10.4 | Employment Agreement Steeve Schira(incorporated by reference to the Registrant's Current Report on Form 8-K  filed on January 8, 2013) |
| 10.5 | License agreement with Xumanii (Cayman) filed herewith. |
| 10.6 | Share purchase Agreement with Craig McKenzie filed herewith. |
| 99.1 | Financial Statements of Xumanii for the fiscal years ended July 31, 2012 and 2011(incorporated by reference on Form 10-K/A  filed on March 13, 2013) |
| 99.2 | Financial Statements of Xumanii, unaudited financial statements for the quarter ended January 31, 2013( incorporated by reference on Form 10-Q  filed on March 19, 2013) |

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**XUMANII, INC.**

Date: May 2, 2013                    By:    /s/ *Alexandre Frigon*
                                            Name: Alexandre Frigon
                                            Title: President, Chief Executive
                                            Officer, Chief Financial Officer
                                            (Principal Accounting Officer)

S242                 AUTOMATED SECURITIES PROCESSING SYSTEM  AKU    01/05/15    09:27
                      HISTORY BASIC DATA INQUIRY SCREEN    DATA FROM ARCHIVE

ASP TRN  1131070055907      DTC ID              LAST MODIFIED DATE

ACCOUNT   298307-A  DMS RBCT TAX EXEMPT CLIENT ACCOUNT
CUSIP  98387X203   XUMANII
TRANSACTION TYPE     RECEIVE FREE      INSTRUCTION SOURCE  UNKNOWN    COND  FINAL

TRADING  INST  00000000   BROWN BROTHERS HAR            VIA CODE   DTC
CLEARING INST         10                               STATUS  REC
SOURCE REG        SOURCE LOC       FINAL REG   DTC  FINAL LOC   DTC
TRADE DATE 04/17/13 SETL DATE 04/17/13 POST DATE 04/17/13

UNITS           10,000,000       FINAL MONEY
UNDERLYING CUSIP                 OVERS/SHORT          FED FUNDS NO
PRINCIPAL                        INCOME                 SEC
COMMISSION                       STATE TAX            BK CHG
                           PATH #
VER         041713      REC         041713

4-© §          1    Sess-1    160.254.155.24       CTCPS038        1/1

Name: xeccdck - Date: 01/05/2015  Time: 9:28:02 AM

Confidential Treatment Requested by BNY Mellon

BNYM_CAL_072671

A0822