UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : Case No. 15-cv-894 |
| | : (WHP)(JLC) |
| CALEDONIAN BANK LTD., | : |
| CALEDONIAN SECURITIES LTD., | : |
| CLEAR WATER SECURITIES, INC., | : |
| LEGACY GLOBAL MARKETS S.A., and | : |
| VERDMONT CAPITAL, S.A. | : |
| Defendants. | : |

## DECLARATION OF GERALD W. HODGKINS

Gerald W. Hodgkins, an attorney, declares and states as follows:

1.  I am a member in good standing of the bar of the District of Columbia. I have been an
    attorney in the Division of Enforcement of the United States Securities and Exchange
    Commission ("SEC") since 1997 and served in various roles in the division, including
    Assistant Director, Branch Chief and Senior Counsel. I currently serve as an Associate
    Director and, in that capacity, I supervised the investigation into Caledonian Bank Ltd.
    and Caledonian Securities Ltd. (collectively, "Caledonian") and Verdmont Capital,
    S.A. ("Verdmont") that lead to the Complaint in Securities and Exchange Commission
    v. Caledonian Bank Ltd., et al., Case No. 15-cv-894, in the United States District Court
    for the Southern District of New York. I make this Declaration in support of the SEC's
    motion for leave to file an amended complaint and, in particular, to address the Court's
    questions as to (1) the factual basis relied upon by the SEC and the inquiry the
    Commission undertook to support its allegations in the Complaint against Verdmont;

and (2) when and how the SEC learned Caledonian's net equity totaled $25 million, and who at the SEC directed counsel to maintain the $76 million asset freeze. *See* ECF # 88, May 21, 2015 Scheduling Order at 1(a)(iii).

2. As an Associate Director, a senior officer position, I report directly to the Director of Enforcement, and supervise several Assistant Directors, who directly supervise the staff who have primary responsibility for conducting enforcement investigations. I am responsible for, among other things, evaluating the facts and evidence from an investigation to determine whether there have been violations of the federal securities laws and, if so, making a recommendation to the Commission to authorize an action based on those violations. My responsibilities also include evaluating, in consultation with the division's Trial Unit, the nature of the charges, the relief that should be sought, and the forum in which the matter should be brought. I have significant experience supervising investigations involving unregistered distributions of securities, manipulation of microcap securities (commonly referred to as "pump-and-dumps"), and foreign sellers and facilitators of manipulation schemes, including broker-dealers who sell microcap securities on behalf of their clients.

## PUMP-AND-DUMP SCHEMES

3. To provide context for the SEC's investigation in this matter, I believe it will be useful to briefly touch on the SEC's efforts to combat pump-and-dump schemes. Generally, microcap fraud often involves the illegal distribution of the stock of small companies not listed on a stock exchange accompanied by manipulation of the stock price through the dissemination of false or misleading information and unlawful trading activity.

These companies (also called "penny stock companies") tend to have low market capitalizations; limited assets and operations; and low-priced, thinly-traded stock.

4. Microcap companies are especially vulnerable to manipulation because, among other reasons, their operations are less transparent than exchange listed companies and their securities are often illiquid. The total dollar volume for this market is approximately $200 billion per year. The SEC makes information about the potential for fraud in the microcap market available at http://www.sec.gov/spotlight/microcap-fraud.shtml.

5. Pump-and-dump schemes and unlawful stock distribution schemes have long been the focus of the SEC and other financial regulatory authorities. In a typical pump-and-dump scheme, company insiders acquire large amounts of stock at little or no cost (often through illegal or deceptive means); organize a massive touting campaign to increase demand, often through promoters or false or misleading press releases (the "pump"), thereby inflating the stock price; and then sell off their stock for huge profits, often through layers of intermediaries which conceal the identities of the dumpers and other scheme participants ("the dump"). After the dump, the promotion ceases and the share price usually plummets, leaving many innocent investors with large losses and shares that are difficult to sell.

6. Companies subject to pump-and-dump schemes often start out as shell companies. These shell companies often have no operations or public markets for their securities. For example, perpetrators of pump-and-dump schemes often buy shares in the shell company and then claim that the company has developed a "hot" new product. In some cases, the company will also announce that it has new management or corporate officers. The company may also be re-incorporated, possibly under a new name.

These actions may also coincide with a large reverse stock split which is designed to increase the number of shares to be offered and sold in the public markets.

7. During my 17-year career at the SEC I have repeatedly seen the perpetrators of unregistered distributions and penny stock manipulations using foreign locations, individuals and nominee entities to hide their identities. In the context of pump-and-dump schemes, I have also seen scenarios where: (a) sales proceeds from illegal distributions are often transferred offshore immediately; and (b) the perpetrators of the schemes use foreign broker-dealers and banks in jurisdictions with strict secrecy laws that make it difficult to obtain necessary records and testimony. International business corporations ("IBCs") sold to foreign interests and used as nominee shareholders in these schemes are used to disguise ownership or movement of assets or to facilitate illicit activity.

8. I also have repeatedly observed situations where the perpetrators of a pump-and-dump scheme using other methods to avoid detection, such as using layers of intermediaries and selling securities through multiple nominee and omnibus accounts, which makes it difficult to determine the identities of the perpetrators. In my observation, nominee securities accounts are often used by stock manipulators to hide the identity of the parties selling securities into a manipulated market.

**THE SEC'S INVESTIGATION OF CALEDONIAN AND VERDMONT**

9. The Financial Industry Regulatory Authority ("FINRA") has an Office of Fraud Detection and Market Intelligence that analyzes trading across all equity markets, over-the-counter markets included. This Office detects and investigates fraudulent or manipulative activity, including issuer fraud, pump-and-dump stock schemes, market

manipulation and account intrusions, and refers matters involving potential fraud or

misconduct that are outside FINRA's jurisdiction to the SEC's Division of

Enforcement.  In the years preceding the present action, the SEC observed a significant

surge in FINRA regulatory referrals that listed Defendants Verdmont (90 referrals since

2007) and Caledonian (114 referrals since 2012) as a seller of securities in connection

with potential manipulations of penny stocks.  *See* the accompanying Declaration of

Paul Lane, Director of FINRA's Fraud Surveillance Unit.

10. SEC staff reviewed FINRA referrals, market analysis, and bluesheeting data[1] to detect

pump-and-dump schemes.  Based on my recollection of events, and information

provided to me by other SEC staff members to assist in the preparation of this

Declaration, during the past few years, the staff observed a definite pattern of repeated

sales by Caledonian of very large blocks of unknown or obscure microcap securities of

shell company issuers, which had virtually no assets or business operations, close in

time to suspicious press releases and promotional campaigns concerning the same

stocks Caledonian was selling.  We later noticed that Verdmont was engaging in a

similar pattern of selling—often the same securities sold by Caledonian and often close

in time to suspicious press releases or promotional campaigns.  Staff began focusing on

this pattern of activity and reported these observations to me as their investigation

progressed.

11. In connection with the Division's investigation into Caledonian's and Verdmont's

activities in the penny stock markets, SEC staff reporting to me reviewed the Form S-1

registration statements for Swingplane Ventures, Inc. ("Swingplane"), Goff

---

[1]      Bluesheets are a clearing broker-dealer's record of securities transactions for a given security, usually
identified by ticker symbol, over a given time period.

Corporation ("Goff"), Norstra Energy Inc. ("Norstra"), and Xumanii, Inc. ("Xumanii") (collectively, "the subject securities").  These registration statements reflected "public offerings" that raised minimal amounts of capital for the issuer or, in the case of Goff and Xumanii, no capital at all for the issuer, because the purported "sellers" were the shareholders.  The issuers had no assets, no business operations, no revenue, no employees, and one or two corporate officers who usually had no experience with the issuer's purported line of business.

12. The purported distributions of the subject securities were to shareholders exclusively in foreign countries:  Mexico, Serbia, Ireland, Norway, Panama and Jamaica.  The corporate records do not contain telephone numbers for these shareholders.

13. Staff reporting to me reviewed the transfer agent records for Swingplane, Goff, Nostra and Xumanii, which showed clear irregularities in stock transfer documents prior to the removal of the restrictive legends for the subject securities, which allowed these securities to be traded in public markets.  The irregularities included, among other things, suspicious delivery of stock certificates to people other than the purported purchasers of the securities.  When we considered the irregularities alongside other suspicious aspects of these sales, including the seemingly preposterous representations contained in the registration statements, such as claims that the business planned to raise large amounts of money even though the companies had virtually no assets or operations and the officers of the companies had no experience relevant to the companies' business plan, we concluded that the Form S-1 registrations were not genuine sales of securities but, rather, a means to cause the transfer agent to issue supposedly unrestricted securities in unlegended stock certificates to nominee accounts.

We believed that the securities were not sold in bona fide transactions to the purported foreign purchasers, but, rather, remained in the possession and control of the issuers' affiliates. This provided supposedly "free trading" securities that could be passed off as part of the public float, when, in reality, the securities are affiliate shares that require registration if distributed to the public. The irregularities in stock transfer documents, which staff reported to me, also included:

- the lack of endorsements (signatures) by the registered owner (the nominee shareholders);
- the lack of medallion signature guaranties in stock powers, which are a means of ensuring that transfers are clearly being effected at the direction of the shareholder;
- stock transfer powers with forged medallion signature guaranty stamps;
- the repeated appearance of third-party facilitators, such as Celtic Consultants and Philip Kueber, who have no known connection to either the shareholders or the issuers;
- transfer of securities on the basis of issuer board resolutions directing the transfers, instead of medallion signature guaranties;
- transfers of securities between IBCs in Belize, Nevis, Samoa, which are bank secrecy locations; and
- as described above, lack of evidence of delivery of the stock certificates to the original shareholders, where the transfer agent sends the certificates to the issuer's officers instead of the shareholders.

14. Through an inter-agency request to a foreign regulatory authority, staff reporting to me obtained affidavits from approximately six of the Serbian shareholders of Swingplane. These shareholders averred that they did not receive their stock certificates, nor did they sell or transfer them as reflected in the stock transfer records. As a result, we believed that the sales to shareholders for all of the subject securities, all of which followed the same fraudulent pattern, were shams and that the securities never left the control of the issuers or their affiliates. We did not consider it likely that dozens of Mexican, Serbian, Irish, Norwegian, Panamanian and Jamaican shareholders would decide to buy securities issued by unknown shell companies or to sell such securities at approximately the same time, through the same agent (Celtic Consultants or Philip Kueber), which or who was located in a different country from them. Despite the lack of restrictive legends, none of these shareholders sold their securities in the public markets.

15. To the extent possible, staff reporting to me located fact witnesses in the United States and conducted interviews or testimony. For example, in connection with Goff stock powers that bore the medallion signature guaranty of Bank of America's branch in San Juan Capistrano, California, SEC staff interviewed counsel for Bank of America, who represented that the Irish shareholders who purportedly executed the medallions through Bank of America and appeared to live thousands of miles away from San Juan Capistrano, were not even customers of Bank of America.

16. The 8-K public filings for Swingplane, Goff, Norstra and Xumanii reflected that, shortly before the commencement of an active trading market, these issuers all represented that they had undergone drastic changes in their business plan, sometimes

8

through a reverse merger, contract, or business combination with obscure operating companies. Internet searches showed that the subject securities were heavily promoted by stock touting websites after the drastic changes in their business. The issuers broadcast numerous press releases over a short period of time announcing phenomenal developments in their new businesses.

17. Our analysis of the stock transfer records for Swingplane, Goff and Norstra (all of whom used the same transfer agent) reflected that large quantities of the securities were transferred in certificated form, but without restrictive legends, to Caledonian Bank Ltd. The fact that the stock certificates were issued in the actual name of Caledonian indicated that Caledonian had control or ownership of the securities. In the case of Swingplane and Norstra, Caledonian deposited the stock certificates (with signed stock powers) into an account in its name at RBC Investor Services ("RBC") in Toronto, Canada. Caledonian then caused the stock certificates to be transferred to an omnibus custodial account in the name of RBC at BNY Mellon, and BNY deposited the certificates into the Depository Trust Corporation ("DTC"), where the certificates became stock held in street name. Through various delivery-versus-payment/receipt-versus-payment ("DVP/RVP") accounts held with various U.S. brokers in the name of Caledonian Bank or Caledonian Securities, Caledonian caused the securities to be sold into the public markets, with the securities delivered on the clearing date from the RBC custodial account at BNY Mellon to counter parties through DTC's trade clearing facilities. SEC staff reporting to me concluded that Caledonian was the seller of Swingplane and Norstra securities because: (1) the securities were sold from accounts in the name of Caledonian at approximately twenty broker-dealer firms in the United

States; (2) before sale, the securities were maintained in a custodial account at BNY

Mellon in the name of RBC, at which firm Caledonian had an account in Toronto,

Canada; (3) before being transferred to BNY Mellon, the securities were in an account

in Caledonian's name at RBC; and (4) the stock certificates were issued in the name of

Caledonian.

18. Staff reporting to me traced 37,050,000 Xumanii shares in DTC transfers to BNY

Mellon from other DTC participants that had deposited Xumanii stock certificates to

DTC for the credit of the Caledonian's RBC custodial account at BNY Mellon, and

those securities were subsequently sold through the accounts in the name of Caledonian

at its U.S. broker-dealer firms and delivered to counter parties.  Staff reporting to me

believed that Caledonian was the seller of Goff securities because:  (1) the securities

were sold from an account in the name of Caledonian at Scottsdale Capital Advisors in

Scottsdale, Arizona; and (2) the stock certificates were issued in the name of

Caledonian and deposited at Scottsdale into an account in the name of Caledonian.

19. The sales of Goff, Norstra and Xumanii securities by Verdmont were very similar to the

sales of the securities by Caledonian.  Like Caledonian, Verdmont had an account at

RBC, and therefore had at its disposal RBC's custodial account at BNY Mellon.

Instead of the twenty broker-dealer accounts that Caledonian had, Verdmont had

DVP/RVP accounts at three broker-dealers.  Verdmont sold the subject securities

through these accounts, which were in Verdmont's name.  Because these were

DVP/RVP accounts, no funds or securities were deposited in them.  Funds and

securities were on deposit at the bank and custodial account at BNY Mellon,

respectively, but in the name of RBC.  SEC staff reporting to me was able to determine

that Goff, Norstra and Xumanii securities were held for the credit of Verdmont in the BNY Mellon account because in a number of instances we had obtained documentation for "delivery with a custodian" ("DWACs") requests and the conversion of stock certificates into stock held in street name, which reflected that the securities were deposited into RBC's account at BNY Mellon "for credit to Verdmont Capital." The documentation reflects that the stock certificates were in the names of Lornex, Nautilus or Bartlett.[2] The stock powers accompanying the stock certificates were filled out without the name of a transferee, making them the equivalent of blank checks.

20. In sum, SEC staff reporting to me, believed that Verdmont was the seller of the Goff, Norstra and Xumanii securities because:  (1) the securities were sold through broker-dealer accounts in the name of Verdmont; (2) before sale, the securities were maintained in an account at BNY Mellon in the name of RBC, at which Verdmont had an account; (3) the DWACs that we obtained indicated that the securities being held at BNY Mellon were "for credit to Verdmont Capital;" and (4) the net amount of the shares being sold from Verdmont's broker-dealer accounts exactly matched the number of shares being held at BNY Mellon.  After the Complaint was filed, staff reporting to me obtained documentation showing that Verdmont had, in fact, deposited Goff, Norstra and Xumanii stock certificates issued to Lornex, Nautilus and Bartlett into its own account at RBC.

21. Before the filing of the Complaint, Ernesto Amparo, a member of the investigative staff reporting to me, had a number of conversations with in-house counsel of BNY Mellon.

---

[2]  Frequently other foreign entities were involved as well, such as:  Jackson Bennett LLC, formed in Nevis; Tamarind Investment, formed in Samoa; and Mariposa Acosiados S.A., formed in Belize.

As Mr. Amparo later described to me, he asked BNY Mellon's counsel whether it was possible for BNY Mellon to determine whether a particular security held in the RBC account could be attributed to an underlying beneficial owner. BNY Mellon's counsel indicated that they had no information to determine beneficial ownership of securities held in the RBC custodial account. Similarly, Mr. Amparo requested beneficial ownership information relating to securities held at RBC for accounts of Verdmont and Caledonian. RBC responded that they had no information regarding beneficial owners.

22. To determine for certain whether Caledonian and Verdmont were selling for their own account or on behalf of customers would require a review of the actual account statements for the customers maintained by Caledonian and Verdmont. At the time the SEC filed its Complaint, SEC staff reporting to me had no knowledge of any relevant Caledonian or Verdmont customer account statements available to the SEC. To request such account statements from Caledonian or Verdmont would likely have been futile: first, because Caledonian and Verdmont are beyond the subpoena power of the SEC; and, second, based on my experience in investigations and litigation, they likely would refuse to produce such documents pursuant to Cayman Islands or Panamanian bank secrecy laws. The only impact of such a request would have been to alert Caledonian and Verdmont to our investigation in advance of our application for a TRO and provide them with an opportunity to move funds out of the United States.

23. Because pump-and-dump schemes or unregistered distributions are often conducted through a series of foreign entities, primarily IBCs that are prohibited from engaging in business in its domicile or with citizens of its domicile, it can be difficult to enforce our judgments against such entities in foreign jurisdictions. In many cases, a foreign

seller's "corporate address" is a mail drop or a service that acts as a registered agent for hundreds of such entities.  The SEC seeks asset freezes in civil enforcement actions against these schemes to ensure that funds are available to satisfy in whole or in part any judgment entered in favor of the SEC.  Furthermore, the SEC endeavors to keep the existence of an investigation confidential in advance of an emergency motion for an asset freeze so that potential defendants do not move funds outside of the United States and beyond the reach of the Court.

24. Staff reporting to me worked to identify bank and brokerage accounts in the names of Caledonian, Verdmont, Clear Water Securities, Inc. and Legacy Global Market S.A. We were only able to identify significant U.S. accounts in the name of Caledonian and Verdmont.

25. In December 2014, we learned that Verdmont had an account at BNP Paribas ("BNP") that contained approximately $34 million in funds and securities. Approximately one week before the filing of the Complaint, SEC staff reporting to me discovered, from a review of the most recent account statement, that the BNP account had been closed and that Verdmont had moved $34 million out of the account.  The account statement for this account showed that it was in the name of Verdmont.  It did not state that the account was in the name of Verdmont's customers.  We made no further inquiries of this account once we learned it had been closed, other than to determine where the assets went.  We were able to trace approximately one-half of this $34 million to an account in Verdmont's name at Interactive Brokers LLC.  Staff requested that Interactive Brokers produce a January 2015 account statement or similar document for each account in the name of Verdmont Capital.  In response to this request, Interactive

Brokers produced daily activity statements for one account, with the alias of "House." These account statements did not have any information on underlying beneficial owners. For the next several days before the filing of the Complaint, staff reporting to me was in frequent contact with the Chief Compliance Officer at Interactive Brokers. After we filed the Complaint, this Compliance Officer confirmed that the account had no beneficial ownership information and he could not tell what particular assets, if any, were held for customers of Verdmont. SEC staff reporting to me believes that Interactive Broker's Chief Compliance Officer shared this information with SEC staff prior to filing the Complaint.

26. SEC staff reporting to me determined that Caledonian had an account at Northern Trust International Banking Corporation in Jersey City, New Jersey. Staff reviewed account statements from Northern Trust (which did not indicate that funds or assets were being held for the benefit of Caledonian's customers as opposed to Caledonian itself). In the week leading up to the filing of the Complaint, an attorney at the SEC reporting to me was in frequent contact with a representative from Northern Trust's legal department. The Northern Trust legal representative did not inform the SEC that Caledonian's account at Northern Trust contained funds belonging to Caledonian's customers.

## POST-FILING DISCUSSIONS WITH CALEDONIAN

27. On February 6, 2015, we moved this Court for a temporary restraining order ("TRO") freezing Caledonian and Verdmont's U.S. assets. In our proposed order, which was entered by the Court, we asked for repatriation of all proceeds from the sale of the subject securities and that the Defendants provide a sworn accounting of all proceeds

from the sale of the subject securities within five days.  *See* ECF # ___ at Sections IV
and V.

28. This Court granted our motion for a TRO against Caledonian on Friday, February 6,
2015.  Counsel for Caledonian, Proskauer Rose ("Proskauer"), reached out to the SEC
almost immediately, and I, along with other SEC staff, quickly began protracted
discussions with counsel about seeking modifications to the TRO to address the
financial pressures Caledonian and Verdmont were experiencing as a result of the
SEC's civil action.  During the following few days, we were in constant contact with
Proskauer and worked long hours to modify the TRO.  While we vigorously
represented our client's interests, we made ourselves available to defense counsel
throughout the weekend and during the evenings.

29. I recall that Proskauer asked for a reduction of the asset freeze but I do not recall the
amount.  At this time, the SEC believed (as it still does) that it was entitled to
disgorgement measured by the proceeds of the relevant transactions and a penalty of
equal amount for a total of approximately $76 million.

30. SEC counsel worked with Proskauer over the weekend and entered a modified TRO
reducing the amount of the freeze on Sunday February 8, 2015.  The first modified
TRO lifted the freeze as to Caledonian and permitted the bank to engage in sales,
transfers and withdrawals of assets in the normal course of business so long as a
$76,677,852 minimum balance was maintained in the United States.  *See* ECF 5 at ¶
4(a).

31. By the afternoon of Sunday, February 8, 2015, Caledonian represented to me and other
SEC staff that the bank only had capital of $25 million.  It is possible that counsel for

Caledonian shared this information earlier in the weekend, but I do not recall such a conversation.

32. Also, on Monday February 9, 2015, Proskauer called the SEC and asked for a second modification of the TRO. Proskauer told the SEC that Caledonian received $54 million in withdrawal requests and that they expected the number to grow because news of the SEC's filing had spread. At this time, we believed the Complaint, but not the asset freeze, was a matter of public record.

33. On February 9, 2015, the SEC negotiated a stipulated TRO with Caledonian ("the third TRO"). The Order stated that it was being entered "in consideration of the severe losses that the clients and customers of the Caledonian Defendants might incur if such clients and customers were unable to order transactions in the normal course of business in certain broker and financial institution accounts maintained by the Caledonian Defendants in the United States which were impacted by the TRO." ECF # 3 at 1.

34. Given the large withdrawal requests that were made to Caledonian over the weekend, as represented to me by Proskauer, it was unclear to me during the first part of Monday, February 9, whether any steps taken by Proskauer, the SEC or the Court would preclude Caledonian from filing for liquidation. As reported to me by Proskauer either over the weekend or on Monday, officers at Caledonian were concerned that the bank would not be able to honor all the withdrawal requests in an orderly manner.

35. The third TRO required a $10 million minimum balance in Caledonian's Northern Trust account and an approximately $66 million minimum balance in a different Caledonian account. The third TRO permitted Caledonian to transact business in these

accounts as long as the minimum balances were maintained and the bank denied

withdrawal requests from any customers who had traded in the subject securities. *See*

*id.* at ¶¶ 6, 9.  The third TRO specifically provided that Defendants would not have to

repatriate proceeds pursuant to Section IV or the original TRO, provided it maintained

a $76 million minimum balance. *Id.* at ¶ 10.

36. On February 9, 2015, the Court conducted a telephonic hearing.  During the hearing,

Proskauer stated, "I need to just give you one update, which is the bank, again, has an

increasing number of requests for wires from innocent customers, and they had to just

vote to suspend banking operations.  I believe that means that they are going to go to a

liquidator."  Proskauer warned the SEC staff and the Court on that call, "[I]f we have

any hope of saving the bank from liquidation – I don't know if we do – then we would

need to take these kinds of measures immediately."

37. The parties then proceeded with finalizing the third TRO immediately.  Prior to the

order being filed with the Court, Caledonian announced on its website that, as of 10:50

am Cayman time (11:50 am EST), it had "exercised its right to suspend the operation of

all services to its customers."  I have attached a snapshot of Caledonian's website that I

took at 12:56 on February 9, 2015 as exhibit 1.  The notice on Caledonian's website

attributed this suspension to an increase in withdrawal requests after being named a

defendant in an SEC case.  This message made no reference to the asset freeze.

Caledonian represented that it would be liaising with its regulator, the Cayman Islands

Monetary Authority ("CIMA").

38. Later that same day, February 9, 2015, Proskauer asked us to engage in speedy

settlement negotiations.  Proskauer indicated to us that we would have to reach a

settlement within 24 hours in order to possibly prevent the bank from entering

liquidation.  It was my understanding at this time from discussions with Proskauer that

simply lowering the minimum balance requirement in the Court's modified TRO would

not slow the withdrawal requests enough to save the bank.  A settlement in principle on

all claims, which could be disclosed to depositors as soon as possible, was the only

potential means of preventing liquidation.  At this time, the SEC had no knowledge

about whether some of the frozen funds could be traced to entities or individuals other

than Caledonian who might have had traded in the subject securities.

39. Proskauer sent the SEC audited financials for Caledonian but not its parent company,

Caledonian Global Financial Services Inc., at 5:37 p.m. on February 9, 2015.  We had a

settlement discussion with Proskauer at approximately 8:00 p.m. that evening.  During

the settlement conversation, Proskauer told the SEC that Caledonian would liquidate

the next day if the parties did not reach settlement quickly.  During that call, which

lasted over an hour, I spoke to the Managing Director of Caledonian, who provided me

an oral presentation on Caledonian's financial condition.

40. Proskauer made a settlement proposal to me and other SEC staff either on Monday

night or Tuesday morning.  The key aspect of that proposal was that the financial relief

would be $5 million.

41. On the morning of Tuesday, February 10, I discussed Caledonian's settlement proposal

with the SEC staff working on the civil action and then with the Director of

Enforcement, Andrew Ceresney.  We determined that we could not recommend the

settlement proposal to the Commission because the financial relief was inadequate

when considering the proceeds Caledonian received from the sales at issue in the case,

which by our calculations was approximately $34 million, and Caledonian's balance sheet as represented to us the night before, which indicated that the bank had assets significantly greater than $5 million. Specifically, we understood the Caledonian's equity was $25 million, five times the amount the firm was offering to resolve the matter.

42. Also on the morning of February 10, 2015, representatives of the SEC spoke with CIMA and learned that CIMA planned to meet that day to discuss its regulatory options, which included the potential appointment of a controller for Caledonian.

43. The SEC spoke with Proskauer and rejected Caledonian's settlement offer at approximately 11:30 a.m. on February 10, 2015. During this call, Caledonian indicated that it would be seeking liquidation that afternoon.

44. Within an hour of that call, Proskauer advised the SEC that it would be making an emergency motion to the Court. We agreed to participate immediately. Richard Simpson informed Proskauer that we would oppose their request to lower the minimum balance in the two accounts subject to the TRO to $25 million, but he said that he would present the request to the other SEC attorneys involved in the ongoing negotiations. I concurred with this decision, as did other SEC managers reporting to me, who were also working on the SEC team. Given that Proskauer had represented to me less than 18 hours earlier that liquidation could only be averted if we had a settlement in principle, it was unclear to me that lowering the minimum account balance would avert liquidation. I also believed that CIMA may take appropriate action within the day. These factors influenced our view that the SEC should not stipulate to a lower minimum balance. While I generally kept Mr. Ceresney apprised of

developments in the case, I do not have a specific recollection of discussing with him Proskauer's late request to lower the minimum balance. Mr. Ceresney also has no recollection of such a discussion.

45. At the time of these discussions, we were aware that (1) there had been a run on the bank based on the Complaint (prior to any publicity regarding the asset freeze); (2) two modifications to the asset freeze had not alleviated the situation; (3) Caledonian had publicly announced that it was suspending operations; (4) Caledonian told us it would have to file for liquidation if we did not accept its settlement offer (which we rejected); and (5) there was a strong possibility that CIMA would take some action within the day.

46. The Court asked Caledonian to submit a written application in advance of a conference. Prior to filing this application, Caledonian's shareholders voted to place the bank in liquidation. *See* ECF 10. Moreover, CIMA appointed two controllers to assume the affairs of Caledonian. *See* CIMA Public Notice (Feb. 10, 2015), attached as exh. 2. I believe there was litigation in the Cayman Islands between the principals of Caledonian and CIMA that resulted in the CIMA controllers taking over the bank's assets.

47. The CIMA controllers subsequently placed Caledonian in liquidation. The SEC has worked with the controllers and agreed to any reductions of the asset freeze that were necessary to distribute funds to customers in accordance with the priorities of the Cayman liquidation proceeding. *See* ECF 67.

## POST-FILING DISCUSSIONS WITH VERDMONT

48. With respect to Verdmont, the Declaration of my colleague, Mr. Simpson, details the chronology of the SEC's discussions with Verdmont and agreement to reduce the amount of the asset freeze.

49. To my knowledge, we agreed to a freeze that provided Verdmont with a cushion for operating expenses and, as far as I can recall, no one at the SEC was informed that Verdmont was in a "death spiral" as a result of the asset freeze.

50. Mr. Simpson's declaration details the circumstances under which counsel for Verdmont and Caledonian represented that they were acting as sellers of the subject securities on behalf of customers. We did not immediately lower the freeze after these representations because (1) we had no documentation establishing these facts until after February 10; and (2) we believed that proceeds were the correct disgorgement amount in this case regardless of whether Verdmont or Caledonian were selling on behalf of customers.

51. In addition to disgorgement and a penalty, the SEC's Complaint seeks a penny stock bar. This is an important form of relief that would prevent Verdmont from operating in the microcap space for at least some period of time. Penny stock bars have great deterrent value and protect investors. Although I have not been involved in settlement discussions with Verdmont, I understand from SEC staff reporting to me that we have not been able to engage in meaningful settlement negotiations with Verdmont because it views a penny stock bar of any duration as a "non-starter."

52. Other than these cursory settlement discussions, to my knowledge, Verdmont has not discussed with the SEC any business ramifications stemming from the stipulated

preliminary injunction ("SPI") prior to filing its May 14, 2015 letter seeking dismissal of the Complaint and dissolution of the SPI.

53. In its May 14 letter to the Court, Verdmont represents that "one conversation with Mr. Ford., BNP's Chief Compliance Officer, would have revealed that the BNP account contained client assets and that the account was closed in the ordinary course of business." ECF # 85 at 4.

54. Following this assertion, a member of the SEC staff reporting to me spoke with Mr. Ford and told me about the conversation. Mr. Ford is not BNP's Chief Compliance Officer. Rather, he is the Chief Compliance Officer at View Trade Securities, Inc. View Trade Securities was Verdmont's introducing broker and BNP was View Trade's clearing broker.

55. Mr. Ford represented to the SEC Staff member, as reported to me, that the account was opened solely in Verdmont's name. Mr. Ford expressed his belief that, as an omnibus account, Verdmont's account at ViewTrade held assets of Verdmont's customers. However, Mr. Ford confirmed that there was no information in the account statement that indicated or identified underlying beneficial owners. He further confirmed that the account had no sub-accounts.

56. Mr. Ford told staff that, in November or December 2014, he informed Verdmont's principal, Glyn Fisher, about FINRA's inquiries into low-priced securities held by Verdmont and gave Verdmont until the end of December 2014 to find another introducing broker. Mr. Ford told the SEC staff member that he decided to close Verdmont's account because he was not comfortable with Verdmont's holdings of numerous low-priced securities and was concerned about FINRA's inquiries

concerning the low-priced securities.  According to Mr. Ford, Verdmont's account at

View Trade was closed at the end of December 2014.

I declare under penalty of perjury that the
foregoing is true and correct.  Executed on
May 28, 2015.

Gerald W. Hodgkins

23

# EXHIBIT 1

# URGENT NOTICE TO ALL BANK CUSTOMERS

9 February 2015

Dear Customer,

The Bank regrets to inform all customers that, as of 10:50am today, 9 February 2015, it has exercised its right, in exceptional circumstances, under clause 20.1 of the Master Account Agreement, to suspend the operation of all services to its customers, which extends to accepting deposits and processing any and all withdrawals. This suspension has been made necessary by an increase in withdrawal requests outside of the ordinary course of business following the Bank being named a defendant in a claim filed in the Unites States by the Securities and Exchange Commission ("SEC").

The Bank is liasing with its regulator, the Cayman Islands Monetary Authority, about this matter. The Bank has reluctantly taken the step of suspending services at this point only to ensure that all depositors are treated fairly and in order to seek an urgent resolution with the SEC to enable it to resume normal operations as soon as possible.

Further information about this matter will be provided to customers shortly.

# EXHIBIT 2



CAYMAN ISLANDS
**MONETARY AUTHORITY**

10th **February 2015**

**PUBLIC NOTICE**

### Re: Caledonian Securities Limited and Caledonian Bank Limited – In Controllership

The public is advised that effective 10th February 2015 the Cayman Islands Monetary Authority ("the Authority") appointed Mr. Keiran Hutchison and Ms. Claire Loebell ("the Controllers") of the firm of Ernst & Young Ltd., to assume control of the affairs of Caledonian Securities Limited ("CSL") pursuant to section 17(2)(viii) of the Securities Investment Business Law (2011 Revision). On that same date, the Authority appointed Mr. Hutchison and Ms. Loebell to assume control of the affairs of Caledonian Bank Limited ("CBL" and, together with CSL, the "Licensees") pursuant to section 18(1)(v) of the Banks and Trust Companies Law (2013 Revision).

Effective with this appointment the Controllers assumed immediate control of the affairs of CBL and have all the powers necessary, to the exclusion of any operator, to administer the affairs of CBL in the best interests of its depositors, investors, and creditors. The Controllers also assumed immediate control of the affairs of CSL and has all the powers necessary, to the exclusion of any operator, to administer the affairs of CSL in the best interests of its clients, investors, and creditors. The Controllers are also responsible for assessing the financial position of the Licensees and submitting a report to the Authority by a date to be specified.

Written enquiries to the Controllers should be forwarded to Barry MacManus by email at barry.macmanus@ky.ey.com or telephone (345) 814-8997.