UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,      :
                                                          :

                                  Plaintiff,     :

                                                      :

                      v.                 :  Case No. 15-cv-894
                                                     :  (WHP)(JLC)

CALEDONIAN BANK LTD.,                  :
CALEDONIAN SECURITIES LTD.,         :
CLEAR WATER SECURITIES, INC.,       :
LEGACY GLOBAL MARKETS S.A., and   :
VERDMONT CAPITAL, S.A.            :

                                                      :

                              Defendants.     :

## DECLARATION OF RICHARD E. SIMPSON

RICHARD E. SIMPSON, an attorney, declares and states as follows:

1.  I am a member in good standing of the bars of the States of Illinois and New York and am employed as a litigation attorney in the Division of Enforcement of the Securities and Exchange Commission at its Washington, D.C. headquarters.  I serve as a litigation and trial attorney for the SEC in <u>Securities and Exchange Commission</u> v. <u>Caledonian Bank Ltd., et al.</u>, Case No. 15-cv-894, in the United States District Court for the Southern District of New York.  I make this Declaration in support of the SEC's motion for leave to file an amended complaint and, in particular, to describe the circumstances of when and how the SEC learned the facts alleged in the proposed amended complaint – namely, that Defendant Verdmont Capital, S.A. ("Verdmont") sold securities issued by Swingplane Ventures, Inc., Goff Corporation, Norstra Energy Inc. and Xumanii, Inc. (the "Securities") on behalf of Lornex Financial Ltd., Nautilus Growth Fund, Inc. and Bartlett Trading Inc.

2. The SEC filed the Complaint in this action on Friday, February 6, 2015. The SEC alleged that Caledonian Bank Ltd., Caledonian Securities Ltd. (collectively, "Caledonian"), Clear Water Securities, Inc., Legacy Global Markets S.A. and Verdmont sold Swingplane, Goff, Norstra and Xumanii securities and received the proceeds of those sales. With respect to Caledonian and Verdmont, the factual basis for these allegations was that: (a) these Defendants caused the deposit of Swingplane, Goff, Norstra and/or Xumanii securities into accounts at RBC Investor Services or BNY Mellon, where the securities were held for the credit of Caledonian Bank, Caledonian Securities or Verdmont; (b) these Defendants sold Swingplane, Goff, Norstra and/or Xumanii securities through United States clearing broker accounts in their own names; and (c) bluesheet data reflected that Caledonian and Verdmont were sellers of the securities.[1] *See* the accompanying Declaration of Gerald Hodgkins for a more complete description of the factual basis.

3. In addition, with respect to Caledonian, the Swingplane, Goff and Norstra securities that it sold had derived from stock certificates that were in the name of "Caledonian Bank Ltd." Attached as Exhibit 1 are: (a) two Swingplane stock certificates, totaling 42,700,000 shares of stock, issued to Caledonian Bank Ltd.; (b) one Goff stock certificate, in the amount of 1,050,000 shares of stock, issued to Caledonian Bank Ltd.; and (c) two Norstra stock certificates, totaling 2,000,000 shares of stock, issued to Caledonian Bank Ltd.

4. On February 6, 2015, the SEC served the Complaint, the Temporary Restraining Order entered by the Court (the "TRO"), and other papers on Caledonian in the Cayman Islands and on Verdmont in Panama. As of the end of the day on February 6, none of these papers appeared on Pacer or on the Court's docket. I believe that news of the Complaint began to

---

[1] Bluesheets are a clearing broker-dealer's record of securities transactions for a given security, usually identified by ticker symbol, over a given time period.

spread over the weekend of February 7 and 8 because a blogger or reporter read a hard copy of the Complaint in the Clerk's Office and posted a story about it on the Internet on the evening of February 6. As far as I know, there was no news over the weekend of February 7 and 8 about the asset freeze imposed by the TRO.

5. On the evening of February 6, I spoke by telephone with Sigal Mandelker of Proskauer Rose LLP, attorneys for Caledonian. Ms. Mandelker requested that the SEC and Proskauer negotiate a modification of the TRO over the weekend of February 7 and 8 so that a modified TRO would be entered by the opening of the markets on the morning of Monday, February 9. Also on the evening of February 6, I spoke by telephone with Robert Zito of Carter Ledyard & Milburn LLP, attorneys for Verdmont. Mr. Zito also requested that the SEC negotiate a modification of the TRO over the weekend of February 7 and 8. On behalf of the SEC, I agreed that the SEC would negotiate with both Proskauer and Carter Ledyard over the weekend and scheduled times for conference calls with both Proskauer and Carter Ledyard to take place on February 7.

6. In a conference call at 1:30 p.m. on February 7, Mr. Zito represented to the SEC that Verdmont had sold the Securities on behalf of customers and not for its own account. Attorneys for the SEC responded that, even if that were true, Verdmont would remain liable for sale proceeds because it sold securities in unregistered transactions. This was the first occasion in which the SEC received information that Verdmont had sold the Securities not on its own behalf but, rather, for the account of customers.

7. Similarly, to the best of my recollection, in a conference call on February 7 attorneys from Proskauer represented to the SEC that Caledonian, too, had sold the Securities for the account of customers. Notwithstanding this representation, attorneys for the SEC proposed that

the asset freeze consist of a minimum bank balance in the amount of $76,677,852, which was the amount of proceeds generated by Caledonian's sales of the Securities, plus the amount of a one-time civil penalty.  On the evening of February 6, Proskauer had proposed a lower amount for the asset freeze, but by the end of this call Proskauer accepted the $76,677,852 amount proposed by the SEC.

8.  While Proskauer represented to the SEC that Caledonian had sold the Securities on behalf of customers, because of Cayman Islands bank secrecy laws, the SEC does not presently possess evidence verifying that fact.

9.  Before the opening of the markets on Monday, February 9, 2015, the SEC, Caledonian and Verdmont agreed to a modification of the TRO, which was entered by the Court.  (ECF No. 5)  In addition, the Court held a status conference at 10:50 a.m. on February 9, at which the parties and the Court discussed a second modification of the TRO with respect to Caledonian.

10.  On February 12, 2015, Verdmont represented in an accounting to the SEC that it had sold the Securities on behalf of three of its customers – Lornex Financial Ltd., Nautilus Growth Fund, Inc. and Bartlett Trading Inc.

11.  Sometime in the week of February 16, 2015, I reviewed documents that the SEC's New York Regional Office made available to me on February 11, 2015.  These documents had been provided to the SEC's Office of International Affairs ("SEC OIA") by a foreign regulatory authority, and SEC OIA forwarded the documents to the New York Regional Office.  Neither I nor anyone working on this litigation knew of the existence of these documents until after a confidential communication with a representative of the foreign regulatory authority on February 11, 2015.  The documents consisted of account opening information and trading records for a variety of Verdmont accounts.  The documents were maintained in an investigation unrelated to

4

this one.  The documents included account opening information and partial account statements for Lornex and Nautilus.  An account statement for Lornex's account at Verdmont for the period from March 18 to April 3, 2013 reflected that on March 18, 2013, Lornex had sold 8,050,000 shares of Goff stock through its account at Verdmont and that Lornex had on deposit at Verdmont 1,890,000 shares of Norstra and 17,050,000 shares of Xumanii.  This was the first documentary evidence that I reviewed (as opposed to the representations of Verdmont or its counsel) reflecting that Verdmont had on deposit and sold Securities on behalf of Lornex.

12.  On February 24, 2015, Verdmont filed and served its papers in opposition to the SEC's motion for a preliminary injunction continuing the asset freeze.  (ECF No. 46)  In those papers, Verdmont included evidence establishing that Verdmont sold the Securities on behalf of Lornex, Nautilus and Bartlett.  Verdmont obtained voluntary waivers of these customers' rights under Panamanian secrecy laws in order to file this information with the Court.  It is unlikely that the SEC could have obtained the same information under Panamanian law in the course of its investigation, and any effort to do so would have alerted Verdmont, and possibly its customers, to the SEC's investigation.

13.  In its opposing Memorandum of Law, Verdmont argued that it was acting as a broker-dealer when it sold the Securities and that it sold the Securities for the account of its customers.  Verdmont asserted that its transactions qualified for the exemption set forth in Section 4(a)(4).  (*See* ECF No. 46 at 4 ("Verdmont is protected by the 'broker's exemption' to Section 5 in Section 4(a)(4) since it made a reasonable inquiry into the circumstances of its customers' proposed sales")  Verdmont argued that its disgorgement liability should be limited to $228,655 in net commissions and a profit of $11,300 on a single trade in one of the Securities.  (ECF No. 46 at 4, 13-14)

14.  In its February 24, 2015 opposition papers, Verdmont also included evidence establishing that most of the funds and securities that had been frozen in Verdmont's accounts at Interactive Brokers LLC and Morgan Stanley were funds and securities that belonged to Verdmont's customers, and not to Verdmont.

15.  After receiving Verdmont's opposition, I and two colleagues proceeded to draft a response to Verdmont's assertion that the offers and sales were exempt from registration.  That response was due to be filed by February 27, 2015.  The SEC's position was that the Goff, Norstra and Xumanii distributions in which Verdmont participated had numerous red flags that the customers were engaged in illegal distributions of penny stocks to public investors.  In light of those red flags, Verdmont could not meet its burden to establish that it engaged in the necessary searching inquiry to assure itself that the sellers were not involved in unregistered public distributions in violation of Section 5.

16.  On February 25, 2015, the Court held a teleconference with the parties to discuss the scheduling of hearings on the SEC's motion for a preliminary injunction as to Verdmont and Caledonian.

17.  On February 27, 2015, the SEC and Verdmont agreed to a stipulated preliminary injunction in which the amount of Verdmont's funds and securities to be frozen was reduced to $2 million.  (ECF No. 59)  The amount of $2 million was arrived at because this was the amount (with a $500,000 cushion) that Verdmont could afford to have frozen without falling below its net capital requirements under Panamanian law.  This agreement obviated the need for the SEC to file its reply memorandum of law in support of the preliminary injunction.  As explained in paragraph 14 above, that response would have explained that the SEC was likely to succeed on the merits of its claim that Verdmont violated Section 5 when it sold the securities into the

6

market and that Verdmont could not carry its evidentiary burden to show that it engaged in the necessary inquiry before selling the securities to qualify for the Section 4(a)(4) broker's exemption.  If filed, the draft reply memorandum would have made clear that the SEC was not contending that Verdmont sold the Securities for its own account, but instead sold the Securities on behalf of Lornex, Nautilus and Bartlett.  The draft reply brief argued that, whether or not Verdmont acted as a broker or sold the Securities on its own behalf, it was liable under Section 5.

18.  Also on February 27, 2015, the SEC took the deposition of Alejandro Abood, whom Verdmont designated as its witness pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.  In that deposition, the testimony of the Rule 30(b)(6) witness corroborated the evidence, served on the SEC on February 24, that Verdmont sold the Securities on behalf of Lornex, Nautilus and Bartlett.  The questions that I asked the witness were predicated on the fact that Verdmont had sold the Securities for the account of these customers.  (*See, e.g.*, Dep. Tr. at 15, 18-28, 30-39)  Attached as Exhibit 2 are the relevant pages of the deposition transcript.

19.  The testimony of the Rule 30(b)(6) witness also established that Verdmont had not conducted a reasonable inquiry into the propriety of the sales of Goff, Norstra and Xumanii.  At the time of the Goff, Norstra and Xumanii distributions, Verdmont did not know of the brokers' exemption (Dep. at 74), much less make an effort to meet its requirements.  Verdmont ended its due diligence and surveillance activities at the time that a customer deposited a stock certificate into a Verdmont account.  (Dep. at 75)  Verdmont "had no procedures pertaining to diligence when they sell securities or they didn't have at the time."[2]  (Dep. at 75)  Verdmont did not have policies or procedures specifically directed toward complying with guidance issued in the SEC's

---

[2]  In the errata sheet to this page of his deposition transcript, the Rule 30(b)(6) witness sought to change the substance of his testimony.  But even in his changed testimony, the witness admits that Verdmont's "procedures do not apply to trades themselves, but rather for depositing the physical securities."

Exchange Act Releases.  (Dep. at 77)  This testimony directly rebuts Verdmont's claim to the broker's exemption of Section 4(a)(4).

20.  On March 26, 2015, I telephoned counsel for Verdmont and proposed that the SEC file an amended complaint to reflect the fact, based on the evidence that Verdmont had produced and served, that Verdmont sold Goff, Norstra and Xumanii securities for the account of Lornex, Nautilus and Bartlett.  My purpose in making this proposal was to have the Complaint reflect facts as to which there was no genuine dispute and to do so before any of the Defendants filed an answer.  Verdmont's counsel did not agree with the SEC's proposal and, within the next 75 minutes, filed an Answer to the Complaint.  After Verdmont rejected my proposal to file an amended complaint and proceeded to file its Answer to the original Complaint, I no longer saw a reason to file an amended complaint.  I believed that the Complaint remained valid, even taking into account the newly provided information; that issues related to the new information could be addressed appropriately by stipulation; and that the Court had been appropriately informed of the information by the filing of Verdmont's papers in opposition to the SEC's motion for a preliminary injunction.  In light of these developments, I did not want to burden the Court with a motion to amend, or to burden Verdmont with the need to file an amended answer.  As of the end of March 2015, the time when Verdmont filed its Answer, the $2 million asset freeze was not a matter of contention between the SEC and Verdmont.

21.  The Court ordered that an initial pretrial conference be held on May 21, 2015.  (ECF No. 83)  In its scheduling order, the Court directed that the SEC send a courtesy copy of the Complaint and Verdmont's Answer to Chambers.  I sent these papers as directed on May 13, 2015.  At the same time, in an effort to simplify the issues to be discussed at the conference, I informed the Court in a separate letter that the SEC did not contend that Verdmont sold the

Securities for its own account, but that Verdmont sold the Securities on behalf of Lornex, Nautilus and Bartlett.  In that letter, I suggested that this issue could be dealt with by a stipulation between the SEC and Verdmont or, in the alternative, by an amended complaint.

22.  Between February 27, 2015 – the day that the stipulated preliminary injunction was agreed to by the SEC and Verdmont – and May 21, 2015 – the day of the initial pretrial conference before the Court, I had communications with counsel for Verdmont in person, by telephone and by email.  In those communications, counsel did not inform me that Verdmont was suffering financial difficulties or was in a "death-spiral" as a result of this action or the $2 million modified asset freeze.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 28, 2015.

Richard E. Simpson

9

# EXHIBIT 1



| NUMBER | | SHARES |
|---|---|---|
| 107 | | ***20,300,000*** |

**COMMON STOCK**

**SWINGPLANE VENTURES, INC.**

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

**COMMON STOCK**
CUSIP 870787207

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Caledonian Bank Limited***

Is the Owner of *** Twenty Million Three Hundred Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
SWINGPLANE VENTURES, INC.

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated: **September 13, 2012**

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
Transfer Agent and Registrar

By
AUTHORIZED SIGNATURE

CORPORATE SEAL

SECRETARY

PRESIDENT

B   33394

SWVI Scans 424

**SWVI TA# 104, p. 119**

A0173



SWVI Scans 425

SWVI TA# 104, p. 120

A0174



NUMBER
148

COMMON STOCK

SHARES
***1,050,000***

COMMON STOCK
CUSIP 36190U107

SEE REVERSE FOR CERTAIN DEFINITIONS

## GOFF, CORP

Par Value $.001
INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

THIS CERTIFIES THAT

***Caledonian Bank Limited***

Is the Owner of *** One Million Fifty Thousand ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
GOFF, CORP

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated:  January 22, 2013

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

CORPORATE
SEAL

DIRECTOR

PRESIDENT

B   38826

GOFF Scans 301

**Goff TA# 17, p.54**

A0357



NUMBER 163

COMMON STOCK

GOFF, CORP

Par Value $.001
INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

THIS CERTIFIES THAT

***Caledonian Bank Limited***

is the Owner of *** Eight Million Seven Hundred Fifty Thousand ***

SHARES

***8,750,000***

COMMON STOCK
CUSIP 36190U206

SEE REVERSE FOR CERTAIN DEFINITIONS

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF

GOFF, CORP

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated: February 26, 2013

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

CORPORATE SEAL

DIRECTOR

PRESIDENT

B 39722

A0375



COMMON STOCK

NUMBER
159

NORSTRA ENERGY INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

SHARES
***1,000,000***

COMMON STOCK
CUSIP 65654V103

SEE REVERSE FOR CERTAIN DEFINITIONS

THIS CERTIFIES THAT

***Caledonian Bank Limited***

is the Owner of*** One Million ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
NORSTRA ENERGY INC.

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated: March 25, 2013

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
Transfer Agent and Registrar

By
AUTHORIZED SIGNATURE

PRESIDENT

DIRECTOR

CORPORATE
SEAL

B 24668



NUMBER
160

COMMON STOCK

*SHARES*
***1,000,000***

COMMON STOCK
CUSIP 65654V103

SEE REVERSE FOR CERTAIN DEFINITIONS

NORSTRA ENERGY INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

THIS CERTIFIES THAT

***Caledonian Bank Limited***

Is the Owner of *** One Million ***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
NORSTRA ENERGY INC.

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly
endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated: March 25, 2013

COUNTERSIGNED AND REGISTERED:
EMPIRE STOCK TRANSFER INC.
Transfer Agent and Registrar

By

AUTHORIZED SIGNATURE

PRESIDENT

CORPORATE SEAL

DIRECTOR

B-24669

# EXHIBIT 2

# In The Matter Of:

*Securities and Exchange Commission v.*
*Caledonian Bank Ltd., et al.*

---

*Alejandro Abood 30 (b)(6)*
*Vol. 1*
*February 27, 2015*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California  94105*
*(415) 597-5600*

Original File 26263Abood.txt
**Min-U-Script® with Word Index**

Securities and Exchange Commission v.
Caledonian Bank Ltd., et al.

Alejandro Abood 30 (b)(6) - Vol. 1
February 27, 2015

Page 13

1  at Verdmont?
2      A.  No, I do not.
3      Q.  How many years of experience does Mr.
4  Hacker have buying and selling penny stocks?
5      A.  I do not think -- I'm not sure if he has
6  experience.  I understand he's an IT guy.
7      Q.  Does Verdmont solicit buy orders from its
8  customers?
9      A.  No.
10     Q.  Does Verdmont solicit sell orders from
11  its customers?
12     A.  No.
13         MR. SIMPSON: Can we have this marked as
14  SEC Deposition Exhibit 1, please.
15         (Exhibit 1, Document, marked for
16         Identification.)
17     Q.  Let me know when you are ready, Mr.
18  Abood?
19     A.  Okay.
20     Q.  Have you seen this document before?
21     A.  No, I have not.
22     Q.  Do you know if Verdmont prepares
23  documents that show buy and sell activity for
24  securities?
25     A.  Yes, they do.

Page 14

1      Q.  Would you expect that Verdmont would also
2  have a document similar to this with respect to
3  Norstra Energy and Xumanii Inc.?
4      A.  Yes, they do.
5      Q.  When a client of Verdmont begins placing
6  sell orders for a particular stock, is there any kind
7  of notice given to potential buyers or potential
8  clients of Verdmont that the sell orders are being
9  placed?
10     A.  No.
11     Q.  Do you know of any reason why a number of
12  Verdmont clients would be buying Goff Corporation
13  securities and then other Verdmont clients selling
14  Goff Corporation securities on the same day?
15     A.  No. I understand that their clients are
16  what they know as day traders.
17     Q.  Can you define what day trading means?
18     A.  When a client basically is speculating,
19  purchases a security and sells it almost immediately
20  or within a few hours or minutes basically.
21     Q.  Is there any method by which Verdmont
22  gives its clients notice that a particular security is
23  being offered or sold or being purchased?
24     A.  Not to my knowledge.
25     Q.  Have you reviewed any documents that are

Page 15

1  similar to Exhibit number 1?
2      A.  I reviewed the document that contains
3  trades for Goff, Norstra and Xumanii enacted by
4  clients Lornex, Nautilus and Bartlett or Bamfield it
5  was called before.
6      Q.  Let's begin looking at Exhibit C.
7      A.  I assume this is the account opening file
8  for Nautilus Growth Fund.
9      Q.  Yes and also I believe it includes
10  certificate deposit documents as well.
11     A.  Okay.
12     Q.  And it was included as Exhibit C to
13  Verdmont's papers in opposition to the preliminary
14  injunction motion.
15     A.  Okay.
16     Q.  What I would like to do is go through
17  Exhibit C and ask questions about particular pages and
18  I'll refer to the Bates number down at the lower right
19  hand corner.  The first page with the Bates stamp 254
20  purports to be the first page of an investment account
21  application for a client known as Nautilus Growth Fund
22  Limited.  Can you describe the process by which a
23  client opens an account or applies for an account at
24  Verdmont?
25     A.  Well, brokerage firms are required to

Page 16

1  open accounts with due diligence KYC and anti-money
2  laundering procedures.  That's in Regulation 5 of 2006
3  issued by the Superintendent of the Securities Market
4  formerly the National Securities Commission now the
5  superintendent of the Securities Market and the
6  procedure at Verdmont follows Regulation 5 2006 by
7  getting information from the client pertaining to who
8  the beneficial owner in this case the corporate
9  account, getting facts, domicile business number,
10  postal code if available and also getting information
11  regarding the investor's profile meaning asking about
12  if they are sophisticated.  I mean asking a few
13  questions to determine if they are sophisticated,
14  conservative, moderate investor and a series of other
15  questions that are required by the regulation.
16     Q.  If I can, I'll just refer to it in
17  abbreviated form as basically the know your customer
18  rules; is that okay?
19     A.  Sure.
20     Q.  Does Verdmont understand what the purpose
21  of the know your customer rules is?
22     A.  Yes, they do.
23     Q.  What is the purpose of the know your
24  customer rules?
25     A.  Ultimately to determine who the

Securities and Exchange Commission v.
Caledonian Bank Ltd., et al.

Alejandro Abood 30 (b)(6) - Vol. 1
February 27, 2015

---

Page 17

1  beneficial owner of the company is and if the
2  investments that that client is going to acquire are
3  suitable for his investment profile.
4      Q.   Is the purpose also to obtain information
5  as to whether or not the client is complying with the
6  applicable laws and regulations in his or her trading
7  in the account?
8      A.   Could you repeat that?
9      MR. SIMPSON:  Could you read it back,
10  please.
11      (Record read.)
12      A.   No, I don't think so.
13      Q.   Is the principal purpose then to make
14  sure that the client is buying and selling securities
15  that are appropriate to his or her profile?
16      A.   Part of the purpose of the account
17  opening form is to determine if the client is buying
18  securities. If a broker is going to be making
19  recommendations and advice, he should do it under the
20  lines that are provided in the form and even if the
21  client is not -- I mean if the broker is not providing
22  advice to the client, whenever the client requests a
23  purchase of a security, the broker has to check the
24  profile and there is a rule that stipulates that if
25  the client is purchasing a security that's not

---

Page 18

1  suitable, then the broker has to tell him so and if he
2  still pursues the idea of purchasing that security, a
3  form has to be filled out.
4      Q.   I guess also the purpose is to find out
5  who the beneficial owner of the account is?
6      A.   Correct.
7      Q.   So with respect to Bates number 254 the
8  client identification is Nautilus Growth Fund
9  Limited. Does Verdmont have knowledge or information
10  as to who the beneficial owner of Nautilus Growth Fund
11  is?
12      A.   Yes, I do and I believe I saw it in this
13  exhibit.
14      Q.   So is the beneficial owner or owners of
15  Nautilus Growth Fund?
16      A.   The controlling owner is a person by the
17  name of Francois Lambercy and I believe that non
18  management shares are owned by BSI in Luxembourg.
19      Q.   I believe that the documents within
20  Exhibit C indicate that BSI Luxembourg is a bank in
21  Luxembourg; is that correct?
22      A.   I understand that's the case, yes.
23      Q.   That BSI Luxembourg is a subsidiary of a
24  Swiss bank called BSI S.A., is that your
25  understanding?

---

Page 19

1      A.   That's my understanding from my knowledge
2  of the bank.
3      Q.   Is it Verdmont's belief that the actual
4  owner of those shares of Nautilus Growth Fund are
5  owned by BSI Luxembourg or is it Verdmont's belief
6  that those shares are owned by a person who has an
7  account at BSI Luxembourg?
8      A.   I do not think that they delve into who
9  was behind BSI. They identify Francois Lambercy as a
10  controlling shareholder and that's where their due
11  diligence in KYC was mostly directed.
12      Q.   Mr. Lambercy is the beneficial owner of
13  Nautilus Growth Fund by virtue of his ownership of
14  Keyse Management Limited; is that correct?
15      A.   Yes, that's the case.
16      Q.   What did Verdmont do to determine that
17  Mr. Lambercy was the owner of Keyse Management?
18      A.   They filled out beneficial owner forms
19  that they have for these type of cases where the
20  beneficial owner makes a declaration in his ownership
21  of the company.
22      Q.   We will go through Exhibit C and we'll
23  probably find that form and I may ask some more
24  questions about that when we get to it.
25      A.   Sure.

---

Page 20

1      MR. ZITO:  Can I confer with the witness?
2      MR. SIMPSON:  Sure.  Let's go off the
3  record.
4      THE VIDEOGRAPHER:  We are now off the
5  record at 10:34 a.m.
6      (Recess taken.)
7      THE VIDEOGRAPHER:  We are now on the
8  record at 10:36 a.m.
9      Q.   Did Verdmont make an inquiry as to
10  whether Nautilus Growth Fund had any business other
11  than buying and selling securities?
12      A.   Yes, there is a form in the account
13  opening file that has a question that basically asks
14  what the nature of the business the company is in and
15  in most cases when the corporate account is opened,
16  the nature of the business will be just to trade
17  securities.
18      Q.   I see that the registered corporate
19  address of Nautilus is a post office box in Grand
20  Cayman, do you see that?
21      A.   Yes.
22      Q.   Do you know if Nautilus Growth Fund has
23  or does Verdmont know whether Nautilus Growth Fund has
24  any office or suite of offices at Clifton House aside
25  from a post office box?

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Securities and Exchange Commission v.
Caledonian Bank Ltd., et al.

Alejandro Abood 30 (b)(6) - Vol. 1
February 27, 2015

Page 21

1     A.  No, that's not acquired by the KYC rule.

2     **Q.  Does Verdmont make an inquiry beyond the**

3 **requirements of the KYC rule?**

4     A.  Verdmont follows the certain good

5 practice provisions included in the KYC rule such as

6 reviewing lists. They review OFAC, World Check and

7 Google for the beneficial owner in the company.

8     **Q.  I see the account advisor on this account**

9 **is a person by the name of Conley Forey, do you see**

10 **that?**

11     A.  Yes.

12     **Q.  What is the function of an account**

13 **advisor at Verdmont?**

14     A.  The function of an account advisor is

15 basically brokerage, taking client's orders.

16     **Q.  Does the account advisor also give advice**

17 **to the customer as to particular securities to buy or**

18 **sell?**

19     A.  No, that would go against the Verdmont

20 brokerage account agreement.

21     **Q.  So is the account advisor's function**

22 **merely to administer the account on behalf of a**

23 **particular customer?**

24     A.  His function is basically to communicate

25 with the client and take whatever orders the client

Page 22

1 has in order to effect those orders and have them

2 executed by the brokers wherever the nature of the

3 security requires execution.

4     **Q.  How many account advisors does Verdmont**

5 **have in its employment?**

6     A.  I'm unfamiliar with that figure.

7     **Q.  I see that Nautilus Growth Fund's e-mail**

8 **address is VSantanaRipoll@ATCapital.com, do you see**

9 **that?**

10     A.  Yes.

11     **Q.  Are you familiar with a person named**

12 **Virgilio Santana Ripoll?**

13     A.  Yes, I have seen his information in these

14 records. I understand he's an accountant in the

15 Dominican Republic.

16     **Q.  Do you know if he's -- what is his**

17 **capacity in connection with Nautilus's account at**

18 **Verdmont?**

19     A.  As stated in the form he's an authorized

20 signatory.

21     **Q.  What does it mean to be an authorized**

22 **signatory?**

23     A.  It means that he can give out

24 instructions on behalf of the company.

25     **Q.  At the time that this form was filled**

Page 23

1 out, he was the only signatory; is that correct?

2     A.  I believe so.

3     **Q.  Then I believe subsequently probably**

4 **about a month later another signatory was added to the**

5 **account; is that your understanding?**

6     A.  I'm not sure about that.

7     **Q.  Maybe to save time I'll ask the question**

8 **again when we get to the appropriate page.**

9     A.  Perfect.

10     **Q.  So I take it you never met Mr. Santana**

11 **Ripoll personally?**

12     A.  No, I have not.

13     **Q.  As the authorized signatory is he also**

14 **authorized to place buy and sell orders on behalf of**

15 **Nautilus?**

16     A.  He would be, yes.

17     **Q.  You see that he has an e-mail address**

18 **that's associated with something called HECapital.com?**

19     A.  Does Verdmont know what HE Capital is?

20     A.  I'm not sure.

21     **Q.  Does Verdmont know whether or not HE**

22 **Capital is associated in some way with a person named**

23 **Clifford Wilkins?**

24     A.  That could be. I recall the name HE

25 Capital in a sort of curriculum that was included in

Page 24

1 one of the account opening forms so it may be that of

2 Clifford Wilkins.

3     **Q.  Would Verdmont as part of its inquiry**

4 **under the know your customer rule go to the HE Capital**

5 **website to see what was there?**

6     A.  Not necessarily.

7     **Q.  Would Verdmont send an e-mail to Mr.**

8 **Santana Ripoll at that e-mail address to make sure it**

9 **was valid?**

10     A.  Not necessarily.

11     **Q.  Let's go to the next page which is Bates**

12 **number 255. First of all, Nautilus indicates that**

13 **it's a sophisticated or high net worth investor; do**

14 **you see that?**

15     A.  Yes.

16     **Q.  Can you estimate approximately what**

17 **percentage of Verdmont's clients are sophisticated or**

18 **high net worth investors?**

19     A.  I don't have that information.

20     **Q.  Then I see that Nautilus's corporate**

21 **annual income is $10,000, do you see that?**

22     A.  Yes. I believe that's -- it's my

23 understanding that this is only a holding company for

24 trading securities so it has no activities. Any monies

25 or income this company will have would come from the

Securities and Exchange Commission v.
Caledonian Bank Ltd., et al.

Alejandro Abood 30 (b)(6) - Vol. 1
February 27, 2015

Page 25

1   basis of the monies deposited there by the beneficial
2   owner and the gains that they made on trades.
3       Q.   Then the company's corporate net worth is
4   $150,000, do you see that?
5       A.   Yes.
6       Q.   Then lower in the page Bates number 255
7   Nautilus indicates that the amount to be deposited in
8   the account is in fact $150,000, do you see that?
9       A.   Yes.
10      Q.   So I suppose that since Nautilus's
11  business is buying and selling securities, it would
12  not be a matter of concern that it deposited its
13  entire net worth into the account of Verdmont?
14      A.   That's correct.
15      Q.   Then Nautilus indicates that its
16  investment objectives is 100 percent speculation, do
17  you see that?
18      A.   Yes.
19      Q.   What percentage of Verdmont's clients on
20  their forms indicate that their investment objectives
21  are 100 percent speculation?
22      A.   I'm unfamiliar with Verdmont clients
23  aside from the three clients that had come in question
24  within this investigation.
25      Q.   Then we see that Nautilus also expects to

Page 27

1       Q.   Then we see that Nautilus expects that
2   its transaction volume and turn over will be ten
3   trades per month and then I guess a turn over of
4   $20,000, do you see that?
5       A.   Yes.
6       Q.   Does Verdmont periodically check a
7   client's actual transaction volume and compare it to
8   the expected transaction volume that's on the account
9   opening document?
10      A.   Not necessarily. Brokers are supposed to
11  monitor their client's transactions.  There is no
12  system out there in place to detect this immediately
13  so I don't know.
14      Q.   Would it be a cause of concern for
15  Verdmont if a client put that their expected turn over
16  was $20,000 and then their actual turn over over the
17  course of the account went up to the magnitude of
18  approximately $9 million?
19      A.   It should be a matter of concern, but the
20  markets are volatile so it really is hard to determine
21  if a client's turn over will be what he said it would
22  be.
23      Q.   If we could turn to the next page that's
24  Bates number 256, we see that there is the beneficial
25  owner disclosure of Keyse Management and BSI

Page 26

1   deposit it looks like three securities, do you see
2   that, it's handwritten on Bates number 255?
3       A.   Yes.
4       Q.   So would that indicate that those
5   securities have no present market value at the time of
6   deposit?
7       A.   I don't believe that could be construed
8   that way, but I don't think the stated value of the
9   securities are there.
10      Q.   Is it fairly common at Verdmont for
11  customers to deposit fixed certificated securities
12  into their account?
13      A.   Again, I'm not familiar with the
14  activities of other Verdmont clients. I have seen the
15  records for Lornex, Nautilus and Bamfield and I
16  understand at least for those clients it's regular
17  occurrence to deposit certificates.
18      Q.   Nautilus indicates that the deposit is to
19  be made by a transfer from Pan America Capital Group,
20  do you see that?
21      A.   Yes.
22      Q.   Is Verdmont familiar with Pan America
23  Capital Group?
24      A.   I believe that's another brokerage firm.
25  I don't know the details, but yes, they should be.

Page 28

1   Luxembourg and then there is some handwriting next to
2   BSI Luxembourg which appears to have two question
3   marks and then it says this must be a mistake.  Do you
4   see that?
5       A.   Yes, I do.
6       Q.   Do you have any knowledge or information
7   as to what that handwritten notation is referring to?
8       A.   No, I don't know what it refers to or who
9   placed it there.
10      Q.   Then it indicates BSI Luxembourg owns 65
11  percent of the class A shares.  Was there any inquiry
12  made as to who owned the other 35 percent of the class
13  A shares?
14      A.   No, I believe not. I believe it was
15  their understanding or assumption during the account
16  opening process that the controller of the company was
17  KC Management Limited and class A shares probably
18  didn't have any voting rights.
19      Q.   In point of fact after Nautilus's account
20  at Verdmont was becoming active, who in fact placed
21  orders, buy and sell orders in that account?
22      A.   You mean the person contacting the broker
23  itself?
24      Q.   Yes.
25      A.   I'm unsure.

Securities and Exchange Commission v.
Caledonian Bank Ltd., et al.

Alejandro Abood 30 (b)(6) - Vol. 1
February 27, 2015

Page 29

1  Q. When a Verdmont customer places a buy or
2  sell order, is that typically done over the telephone?
3  A. As I understand, they have several means
4  of placing orders with their broker. One means is by
5  telephone meaning either a phone call or an electronic
6  message. Another means is by e-mail and another means
7  they have access to an on line platform and they place
8  orders through the platform.
9  Q. At the time of placing orders, does the
10  account advisor monitor the orders as they are being
11  placed to know exactly what's going on?
12  A. He has knowledge of the orders that are
13  placed through him.
14  Q. Does the account advisor then execute the
15  orders on behalf of the client?
16  A. No, they do not -- at least not in these
17  cases. These orders were not executed by the brokers
18  at Verdmont, but brokers at Knight, UBS and Sunrise.
19  Q. Can you explain the process by which the
20  order that's placed with Verdmont then gets
21  communicated and eventually results in a sale at say
22  UBS?
23  A. There is communication with the U.S.
24  brokers, I'm not familiar with the form of that
25  communication, but they get the order and they just

Page 30

1  basically pass it on or effect it to the broker in the
2  U.S. for these cases. They have brokers in other
3  countries as well.
4  Q. Does Verdmont have any system for
5  determining whether the person the Verdmont customer
6  that's placing orders to Verdmont is actually one of
7  the signatories to the account?
8  A. Yes, I believe they would have knowledge
9  or be familiar with the client and its signatories to
10  verify that they can -- they have the authority to
11  place these trades and some of these clients the
12  broker may be very well familiar because they are
13  active and in constant communication with the broker.
14  Q. On Bates number 256 there is a line and a
15  box that's right above the application signature and
16  the question in the printed form says is the account
17  holder acting as an intermediary nominee or otherwise
18  holding the accounts' assets on behalf of a third
19  party, do you see that?
20  A. Yes.
21  Q. Then Nautilus has check marked yes to
22  that question.
23  A. Right.
24  Q. What is the purpose of that question
25  being in the account opening application?

Page 31

1  A. The KYC rules require that you identify
2  if the account holder is acting on its own behalf or
3  on behalf of third persons so it's a question required
4  by law and the purpose is to determine that if there
5  is another beneficial owner you should identify that
6  other beneficial owner.
7  Q. Who is the intermediary or let me
8  rephrase that. Who is the beneficial owner then on
9  whose behalf Nautilus is acting as an intermediary or
10  a nominee?
11  A. I believe that the reason why that
12  question was answered in that manner is that Virgilio
13  Santana was opening the account and they were -- the
14  beneficial owner was Francois Lambercy.
15  Q. So then I guess Mr. Santana Ripoll is the
16  intermediary or nominee on behalf of Mr. Lambercy; is
17  that correct?
18  A. Yes, he's acting for Nautilus on behalf
19  of the beneficial owner.
20  Q. Did Verdmont make any inquiry as to what
21  Mr. Santana Ripoll's connection was with Nautilus?
22  A. As I said, I believe he's an accountant.
23  Q. Was there any inquiry made to Mr. Santana
24  Ripoll's relationship or connection with Mr. Lambercy?
25  A. No, Santana was treated as a party that

Page 32

1  had to be identified so Verdmont obtained a copy of
2  its ID and letters of reference, but was not required
3  to make a connection as to the nature of how they were
4  related.
5  Q. Was there an inquiry made as to whether
6  Mr. Santana Ripoll was authorized to open an account
7  at Verdmont on behalf of Nautilus?
8  A. An inquiry is made probably into his
9  position in the company. There is a form I have seen
10  in this exhibit where he is apparently an officer of
11  the company I believe.
12  Q. So we'll probably get to that form as we
13  go through the document.
14  A. I think it's a certificate of in
15  incumbency.
16  Q. The account opening form that we just
17  looked at, is that a typical account opening form
18  that's used by brokerage firms in Panama?
19  A. Yes, very similar to what everybody else
20  has.
21  Q. If we look at Bates number 272, we see
22  that there is a memorandum and Articles of Association
23  of Nautilus. What's the purpose of including the
24  incorporation documents and the bylaws of an account
25  holder?

Securities and Exchange Commission v.
Caledonian Bank Ltd., et al.

Alejandro Abood 30 (b)(6) - Vol. 1
February 27, 2015

Page 33

1    A.   Okay, back to the KYC rules it requires
2  that you identify the customer and in this case the
3  company being the customer these are the equivalent of
4  identification documents for the customer.
5    Q.   On Bates number 310 we have a document
6  called articles of incorporation of Vervet Management
7  Services, do you see that?
8    A.   Yes.
9    Q.   Did Verdmont become aware that Vervet
10  Management Services was a company that was controlled
11  or operated by Mr. Santana Ripoll?
12    A.   I'm not too familiar with the nature of
13  the business of Vervet and what it was doing as part
14  of the account, but yes, there is evidence that
15  suggests that they knew that he was in control of the
16  company.
17    Q.   Did Vervet have trading authority into
18  the account at -- the Nautilus account at Verdmont?
19    A.   I'm not sure.
20    Q.   If we look at Bates number 313, this
21  appears to be some sort of certification that's
22  executed by Associated Trustees Limited, do you see
23  that?
24    A.   Yes.
25    Q.   Is Verdmont aware of the business of

Page 34

1  Associated Trustees Limited?
2    A.   Yes, I believe that Associated Trustees
3  Limited provided a letter of reference for one of the
4  parties in these companies and it states so in that
5  letter that they are resident agents.
6    Q.   Do you know if Associated Trustees
7  Limited provides a service by which it will
8  incorporate companies in Nivas on behalf of
9  individuals?
10    A.   I'm not familiar with this company, but
11  I'm familiar with resident agent services and I
12  believe that's the purpose of being a resident agent.
13    Q.   Did it come to Verdmont's knowledge that
14  the address of Associated Trustees Limited being in
15  the Henville building appears to be the same address
16  as Lornex?
17    A.   It would seem to be the case and based on
18  my own experience of having traveled to similar
19  jurisdictions, it's not uncommon for many of the
20  resident agents and companies of said small
21  jurisdictions to have the same or similar addresses.
22  Some of these are one road islands.
23    Q.   Is it your experience that one of the
24  services that a registered agent provides is to act as
25  a corporate address for companies that its

Page 35

1  incorporating?
2    A.   That's correct.
3    Q.   If we compare Bates number 316 to Bates
4  number 327, 316 appears to be the first page of the
5  general bylaws of Vervet Management and then Bates
6  number 327 appears to be the last page of the bylaws
7  and does that indicate that the director of Vervet
8  Management is Mr. Santana Ripoll?
9    A.   That's what's stated there, yes.
10    Q.   Then if we turn to Bates number 334, can
11  you describe what this document is?
12    A.   It seems to be a corporate resolution
13  whereby Nautilus Growth Fund provides authorized
14  signatory capacity to Vervet Management Services
15  Limited.
16    Q.   Who signs on behalf of Nautilus giving
17  Vervet these management authorities?
18    A.   335 I recognize the signature of Santana.
19    Q.   So Mr. Santana Ripoll on behalf of
20  Nautilus is authorizing Vervet to have management over
21  Nautilus's account at Verdmont and then it appears
22  that the director of Vervet is Mr. Santana Ripoll; is
23  that correct?
24    A.   Yes, it would seem that he's both signing
25  as director of the company Nautilus Growth Fund and

Page 36

1  signing as director of Vervet Management.
2    Q.   Is the corporate resolution form, is that
3  a fairly common form for broker's firms in Panama?
4    A.   Yes, it is.
5    Q.   I take it that the purpose of that form
6  is to identify the parties who have I suppose trading
7  authority over a brokerage account?
8    A.   That's basically -- those are forms that
9  are used by brokers and banks in order to get in their
10  own terms get authorization in terms that they believe
11  are appropriate that there is in fact a corporate
12  resolution of an appointment and that if they so take
13  instruction from the person that's been appointed,
14  that they are covered from any liabilities if the
15  company further rejects the authority of that person.
16    Q.   So the effect of this corporate
17  resolution is to give Vervet Management I suppose in
18  the form of Mr. Virgilio Santana authority to trade in
19  the Nautilus account at Verdmont?
20    A.   It would seem so.
21    Q.   Then if we go to Bates number 336, this
22  document purports to be a Certificate of Incumbency.
23  What's the purpose of a Certificate of Incumbency?
24    A.   The KYC rule requires when you open an
25  account to a corporation that you produce a

Securities and Exchange Commission v.
Caledonian Bank Ltd., et al.

Alejandro Abood 30 (b)(6) - Vol. 1
February 27, 2015

Page 37

1  Certificate of Incorporation and that certificate
2  requires that you provide information regarding the
3  date of incorporation, that the company is in good
4  standing, that you provide names of the officers and
5  directors, names of the attorneys, power of attorneys
6  issued and names of their legal representative. This
7  rule was drafted very much understanding how a
8  Certificate of Incorporation is prepared under Panama
9  law, but that tends to not be the case in other
10  jurisdictions so Certificates of Incorporation like
11  the ones include in this exhibit will not contain all
12  that information so as a means of complying with the
13  rule, brokers tend to prepare Certificate of
14  Incumbencies or forms of Certificate of Incumbency
15  for the client to provide additional information
16  required by the rule.
17      Q.  So is the effect of this Certificate of
18  Incumbency on Bates number 336, does that indicate
19  that the single director of Vervet Management is Mr.
20  Virgilio Santana?
21      A.  Yes.
22      Q.  And that Vervet Management does not have
23  any -- let me back up because I may misunderstand what
24  this Certificate of Incumbency is.  Is this a
25  Certificate of Incumbency for Vervet Management or for

Page 38

1  Nautilus Growth Fund?
2      A.  It says here Nautilus Growth Fund is a
3  corporation so Vervet is the director or sole director
4  of Nautilus Growth Fund.
5      Q.  That's February 16, 2010 the date of this
6  Certificate of Incumbency?
7      A.  That's correct.
8      Q.  Then if we look on the next page Bates
9  number 337, is that a Certificate of Incumbency that
10  pertains to Vervet Management?
11      A.  That's correct.
12      Q.  The sole director of Vervet Management is
13  Mr. Virgilio Santana; is that correct?
14      A.  That seems to be what's stated there,
15  yes.
16      Q.  And the company does not have any
17  officers?
18      A.  Apparently so.
19      Q.  If we turn to Bates number 340, can you
20  describe what this document is?
21      A.  This is a form as prepared by Verdmont
22  Capital and completed by their clients.  It states
23  that the purpose of the form is to know their clients
24  and that it must be completed for each beneficial
25  owner and signatory of a Verdmont Capital account

Page 39

1  including individuals names and power of attorneys and
2  trading authorizations.
3      Q.  So this I guess is it okay if I call it
4  an individual know your customer form?
5      A.  Sure.
6      Q.  So this individual know your customer
7  form is dated October 25, 2007 if we look at Bates
8  number 341?
9      A.  That's correct.
10      Q.  I guess at that time Mr. Virgilio Santana
11  had an e-mail address of VSantana@Stealthpost.com, do
12  you see that?
13      A.  Yes, I see that.
14      Q.  The account of Nautilus at Verdmont was
15  opened in approximately February of 2010; is that
16  correct?
17      A.  That's correct.
18      Q.  Is it your understanding that this
19  individual know your customer form is the form that
20  Mr. Virgilio Santana filled out for the account of
21  Lornex?
22      A.  I believe that is reasonable to
23  understand, yes.
24      Q.  Then if we go to the page Bates stamped
25  342 and 343, this appears to be the know your customer

Page 40

1  form that Mr. Virgilio Santana filled out at the time
2  that the Nautilus account was opened; is that your
3  understanding?
4      A.  Yes, that seems to be the case.
5      Q.  On Bates number 342 the form indicates
6  that Mr. Virgilio Santana is a self-employed
7  accountant.  What inquiry if any did Verdmont make to
8  determine whether or verify that Mr. Virgilio Santana
9  was in fact a self-employed accountant?
10      A.  I believe they did some checks on Google
11  for this particular person, but I'm not -- I cannot
12  state that they indeed did something to verify that he
13  had accounting licenses or anything other that would
14  credit him as an accountant.
15      Q.  If we turn forward to Bates 435, does
16  that appear to be the results of a Google search for
17  Mr. Virgilio Santana?
18      A.  Yes, it's a Google search dated June 26,
19  2009.
20      Q.  If we turn back to Bates number 342, we
21  see that Mr. Virgilio Santana lives in the Dominican
22  Republic, do you see that?
23      A.  Yes, that's what he stated on the form.
24      MR. SIMPSON:  Let's have this marked as
25      the next exhibit.

Securities and Exchange Commission v.
Caledonian Bank Ltd., et al.

Alejandro Abood 30 (b)(6) -  Vol. 1
February 27, 2015

Page 73

1 owned by Cold Stream seems to have been sold to
2 Nautilus, but I don't see there is information that
3 says Nautilus had a certificate issued in its name.
4    Q.   Would it be possible that the certificate
5 was transferred to DTC for the benefit of Nautilus?
6 If you look at Bates number 457, the number of shares
7 are the same?
8    A.   I don't see DTC mentioned anywhere on
9 this form. I see that there is -- the number of
10 shares match and I see Nautilus, but I cannot
11 necessarily connect the two.
12    Q.   Okay.
13       MR. SIMPSON: Let's break for lunch.
14       THE VIDEOGRAPHER: We are now off the
15 record at 12:48 p.m.
16       (Luncheon recess taken at 12:48 p.m.)
17
18
19
20
21
22
23
24
25

Page 74

1       A F T E R N O O N  S E S S I O N
2       (Time Noted: 1:49 p.m.)
3
4 A L E J A N D R O  A B O O D, resumed and testified
5       as follows:
6
7 CONTINUED EXAMINATION
8 BY SIMPSON:
9       THE VIDEOGRAPHER: We are back on the
10    record. Here marks the beginning of DVD number
11    three in the deposition of Alejandro Abood.
12    The time is 1:49 p.m.
13    Q.   Mr. Abood, to your knowledge does anyone
14 at Verdmont know anything about Section 5 of the
15 Securities Act of 1933?
16    A.   I think at this point in the Complaint
17 they do. I'm not aware that they did before.
18    Q.   Before the Complaint are you aware that
19 anyone at Verdmont knew about the broker's exemption
20 in Section 4A4 of the Securities Act?
21    A.   I'm not sure. They may have discussed
22 this at a recent date with advisors, but it's my
23 belief that at the time of the trades they did not
24 have that information.
25    Q.   So I take it to your knowledge at the

Page 75

1 time of the trades Verdmont did not have any policies
2 or procedures that were specifically and expressly
3 directed toward compliance with Section 5 of the
4 Securities Act?
5    A.   Not to my knowledge. As I said before,
6 they had no procedures pertaining to diligence when
7 they sell securities or they didn't have at the time.
8    Q.   Would it be correct to say that
9 Verdmont's I guess due diligence and surveillance
10 activities conclude after the deposit of a share
11 certificate?
12    A.   For certificates that become deposited
13 that's a fair statement. They may -- the broker
14 that's looking into the account may determine to do
15 something else, but as far as procedure goes I think
16 that's probably -- most of the diligence is done at
17 the time the certificates are deposited.
18    Q.   So let me just focus on the three stocks
19 that we're concerned with here Goff, Norstra and
20 Xumanii. To your knowledge, did Mr. Forey or anyone
21 at Verdmont determine whether there was any trading in
22 the public markets in those stocks before selling
23 stock on behalf of Lornex and Nautilus or Bartlett?
24    A.   I understand that they are not required
25 to check how a stock is trading. Once a client asks

Page 76

1 for a trade, they can clear that trade through their
2 U.S. brokers in these cases and then that's good
3 enough for them. I also understand that and I'm not
4 certain on when this happened, but I've been told that
5 they know now that there was trading activity before
6 their clients first traded on some of these securities
7 and I think the exact expression may have been
8 everybody was trading them that day.
9    Q.   Do you know whether that was Goff,
10 Norstra or Xumanii?
11    A.   Not particularly, but from what I found
12 on my review of records it would seem that the trading
13 dates that have been placed in question here with
14 regard to all of the defendants, the first trading
15 date matches for Xumanii, but when it comes to Goff
16 and Norstra there is a couple of dates five or nine
17 days I think one or the other case where when the
18 client Verdmont started trading, the security had been
19 trading for a couple of days before that.
20    Q.   But for all three of the securities, none
21 had been traded more than a few days at most?
22    A.   I'm not sure about trading records. I'm
23 just referencing the dates of the trades that were
24 placed in question and the records that I have seen. I
25 can determine that Verdmont's clients were not the

Securities and Exchange Commission v.
Caledonian Bank Ltd., et al.

Alejandro Abood 30 (b)(6) - Vol. 1
February 27, 2015

Page 77

1  first to trade those securities.
2      Q.  You're not aware that Verdmont had any
3  policies or procedures to comply with any Securities
4  Exchange Act releases pertaining to brokerage firms?
5          MR. ZITO: Objection.  Answer the best
6     you can.
7      A.  Can you rephrase because I don't
8  understand the question.
9      Q.  To your knowledge, did Verdmont have any
10  policies or procedures that were specifically directed
11  toward complying with any guidance issued in
12  Securities & Exchange Act releases?
13          MR. ZITO: Objection.  Answer the best
14     you can.
15     A.  No, I don't know.
16     Q.  Do you know what a Securities & Exchange
17  Act release is?
18     A.  No, I do not.
19     Q.  At the time that trading in Goff and
20  Norstra and Xumanii started trading, did you find any
21  documentation showing that anyone at Verdmont
22  considered whether these were development stage
23  start-up companies?
24     A.  No, they were not required to review the
25  companies that they were trading.  It wasn't in the

Page 78

1  procedure and basically the fact that's been stated
2  before is that they do not recommend or advise the
3  clients to purchase or sell these securities, thus
4  they just limited themselves to effecting the client's
5  instructions and placing their orders with the U.S.
6  brokers.
7      Q.  So I take it that there is nothing under
8  Panamanian law that requires a Panamanian brokerage
9  firm to determine whether stocks that it's executing
10  sales on or registered?
11     A.  If the broker in Panama would be
12  executing the sale, that's a different thing.  I
13  understand they are not executing these sales, but the
14  only rules you have regarding suitability which is I
15  think what we are getting at are if you are advising a
16  client as to the purchase or sale of a security, then
17  you should have enough information on that security
18  and have enough information in the client profile to
19  determine that it's a suitable security for the client
20  or it's in the client's best interest to sell the
21  security that's in its portfolios, but when a client
22  is selling a security on his own account or at least
23  by his own -- having made his own decision, then there
24  is no requirement on the law that the broker know
25  anything about the security.

Page 79

1      Q.  I take it that since it was not required
2  under Panamanian law at the time of executing sales on
3  Goff, Norstra and Xumanii Verdmont did not undertake
4  to investigate the status of these companies?
5      A.  Again, I believe they did not execute the
6  sales.  Execution was done by U.S. brokers, but at the
7  time they took the client's instruction they did not
8  look into the securities at all.
9      Q.  I just want to make sure that we don't
10  get hung up on nomenclature.  If Verdmont was not
11  executing sales on behalf of its clients, can you
12  describe the action that Verdmont was actually doing
13  on behalf of the clients?
14     A.  Okay, Verdmont would receive an
15  instruction from a client and they would place an
16  order with their U.S. brokers within the limits of the
17  instruction received by the client and the U.S. broker
18  would basically execute and clear the trade.  I think
19  there is an exception to that that's documented on May
20  13th I believe Verdmont purchased for its own account
21  200,000 securities of I think it was Xumanii, I'm not
22  sure right now where they purchased 200,000 shares for
23  their own account so at that point we can assume that
24  they did look into the matters of the fact of the
25  securities to make that purchase.

Page 80

1      Q.  So I guess the correct description of
2  Verdmont's role then would be that Verdmont places
3  orders for purchasers and sales of securities pursuant
4  to its client's instructions?
5      A.  For as far as it goes with securities not
6  registered in Panama I would say that's the case.  At
7  this time I can't recall if Verdmont is a member of
8  the local stock market, the Panamanian stock market so
9  if they were a member of the local market, they could
10  place trades on their own, otherwise they'll have to
11  work through a broker that's a member as they do with
12  trades executed outside of Panama.
13     Q.  So at the time that it was placing orders
14  with its U.S. brokers for Goff, Norstra and Xumanii,
15  Verdmont did not undertake any inquiry whether these
16  were little known securities?
17     A.  I believe they didn't.
18     Q.  They did not?
19     A.  They did not.
20     Q.  And they did not determine whether Goff,
21  Norstra and Xumanii had undergone a recent change in
22  business?
23     A.  No, they did not.
24     Q.  And they did not undertake an inquiry
25  whether there had been any recent changes in control