```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SECURITIES AND EXCHANGE
     COMMISSION,
 4
                     Plaintiff,
 5
                v.                           15 Civ. 894 (WHP)
 6
     CALEDONIAN BANK LTD., et al.,
 7                                           Conference
                     Defendants.
 8
     ------------------------------x
 9
                                             New York, N.Y.
10                                           May 21, 2015
                                             12:00 p.m.
11
     Before:
12
            HON. WILLIAM H. PAULEY III
13
                                             District Judge
14

15

16
              APPEARANCES
17

18
     RICHARD E. SIMPSON
19   A. DAVID WILLIAMS
            Securities and Exchange Commission
20          Attorneys for Plaintiff

21
     CARTER LEDYARD & MILBURN LLP
22          Attorneys for Defendant Verdmont Capital
     BY:  ROBERT  J.A. ZITO
23          RARK R. ZANCOLHI
            THEODORE Y. MCDONOUGH
24

25   PROSKAUER ROSE LLP
            Attorneys for Caledonian defendants
```

F51Ssec5

BY:   MARGARET A. DALE
      SIGAL P. MANDELKER

1          (Case called)

2          THE COURT:  Good morning.

3          Given the flurry of letters that I have received in

4     advance of this conference, it is hard for me to accept the

5     proposition that the parties suggested when they filed their

6     26(f) report that they didn't need a conference at all.

7          I want to begin with a couple of housekeeping matters,

8     Mr. Simpson.  First, with respect to Clear Water Securities,

9     Inc. and Legacy Global Markets, what does the SEC intend to do?

10         MR. SIMPSON:  I think, your Honor, in due course we

11    intend to file a request for a default and then a motion for

12    default judgment pursuant to the individual rules.

13         THE COURT:  I'm not sure I understand what you mean by

14    due course.  They defaulted a long time ago, didn't they?

15         MR. SIMPSON:  Yes, your Honor.

16         THE COURT:  Have you frozen any of their assets?

17         MR. SIMPSON:  No, your Honor.

18         THE COURT:  Don't you think that if you have any

19    chance of waking them up, you should be making an application

20    to this Court for a default judgment?

21         MR. SIMPSON:  We will, your Honor.

22         THE COURT:  Good.  Earlier in this proceeding I told

23    you that you should have regional counsel from New York

24    participating with you in this matter so that you would be up

25    to speed on how we conduct business in this district and more

specifically in this courtroom.  I notice that you did take

that to heart because you had Mr. Stoelting file a notice of

appearance.  But he's not here and I haven't received anything

from him.

          I would urge you to use the resources of the regional

office when you come before me.  Now I will make an explicit

direction that someone from the regional office is to be here

who is familiar with my individual practices.  There are a lot

of things going on here that I don't understand at all.  All

right?

          MR. SIMPSON:  Yes, your Honor.

          THE COURT:  I want to turn next to the Caledonian

defendants.  What is the status of this matter with respect to

the Caledonian defendants, Mr. Simpson?

          MR. SIMPSON:  We are in settlement negotiations with

them and we have exchanged drafts of settlement papers.  I

believe that we are very far along in agreeing to those drafts.

          THE COURT:  Can you describe for me how the SEC went

from a $76 million asset freeze of Caledonian to a $7 million

asset freeze.

          MR. SIMPSON:  Your Honor, Caledonian moved for a

liquidation in the Cayman Islands and then they filed a

bankruptcy petition here in the United States.  At their

request, the liquidator wanted to have funds to be able to

start distribution proceedings there.  We negotiated a

1   $7 million freeze based on the fact that they were in

2   bankruptcy and they did not have enough funds to pay the

3   depositors.

4         THE COURT:  Wasn't it the initial $76 million asset

5   freeze that led to the collapse of Caledonian?

6         MR. SIMPSON:  Your Honor, I believe it was the filing

7   of the complaint that caused the run on the bank.

8         THE COURT:  The bank couldn't satisfy the depositors

9   because there was an asset freeze, right?

10         MR. SIMPSON:  I believe that at the end there was a

11   problem with paying off the depositors because of the asset

12   freeze.

13         THE COURT:  Was the SEC aware at the time that it came

14   before me with its ex parte application that Caledonian Bank's

15   net equity was only $$25 million and that anything above that

16   amount represented depositors' money?

17         MR. SIMPSON:  No, your Honor.

18         THE COURT:  When did you learn that?

19         MR. SIMPSON:  I believe we learned that over the

20   weekend after the filing of the complaint.

21         THE COURT:  When you learned that, did you bring that

22   to the Court's attention or seek a reduction in the assets that

23   were being frozen?

24         MR. SIMPSON:  We did not, your Honor.

25         THE COURT:  Why not?

1          MR. SIMPSON:  We were negotiating with Caledonian and

2     we I believe they requested a reduction in the freeze amount.

3     We took that to a very high level within the commission and

4     decided that we were not going to agree to that.

5          THE COURT:  How could the commission think that they

6     are entitled to a freeze of seizing moneys that belong to

7     depositors?

8          MR. SIMPSON:  Your Honor, I believe that we were

9     negotiating with Caledonian on that issue and we did not

10    specifically address that issue.

11         THE COURT:  The bank collapsed because of your

12    actions, didn't it?

13         MR. SIMPSON:  Yes, your Honor.

14         THE COURT:  It's stunning.  It's incredible government

15    overreach.  You wrote me this rather casual letter in which you

16    disclose that you have made all kinds of erroneous allegations

17    relating to Verdmont.  I'm going to turn to Verdmont in a

18    moment.  Are there a lot of erroneous allegations relating to

19    Caledonian in the complaint?

20         MR. SIMPSON:  I don't believe so, your Honor.

21         THE COURT:  Before I get to Verdmont, I want to

22    inquire of Caledonian.  Ms. Dale or Ms. Mandelker, your

23    client's equity was $25 million.  Why did you agree to a

24    $76 million asset freeze?

25         MS. DALE:  Your Honor, we were in a bad place on

1    Friday afternoon the 6th of February.  The Court had entered a

2    restraining order that actually restrained all of Caledonian

3    Bank's assets in the United States.  When we got knowledge of

4    that order late in the afternoon on the 6th, we contacted the

5    SEC to begin to negotiate a reduction, fearing exactly what

6    transpired, which was there would be a run on the bank.

7         I believe on Sunday of that weekend we negotiated with

8    the SEC and achieved a reduction of the freeze from all moneys

9    in the United States to $76 million, which was essentially

10   twice the proceeds that passed through Caledonian Bank's

11   omnibus accounts for the four securities.  We thought that may

12   continue to allow the bank to proceed.  But it didn't.

13        Over the weekend more and more depositor requests were

14   coming in for withdrawals.  Actually, I believe we negotiated

15   further and were seeking a resolution of the entire action over

16   the weekend and on that Monday.  That did not come to fruition.

17   The bank did a voluntary liquidation I believe on the 10th of

18   February, which was a Tuesday.

19        I'm not sure that entirely answered your question.  We

20   were trying to save the bank, resolve the objection, and move

21   on in those first days after we received notice of the claim.

22        THE COURT:  When did your firm inform the SEC that

23   Caledonian's net equity was 25 million?

24        MS. DALE:  Probably either that late Friday afternoon

25   or Saturday, your Honor.

1              THE COURT:  How could you conceivably agree to an

2     asset freeze of 76 million when you knew that your client's net

3     equity was 25 million?

4              MS. DALE:  Your Honor, we weren't necessarily in the

5     driver's seat on that negotiation.  We were constrained by

6     time.

7              THE COURT:  Who was in the driver's seat?

8              MS. DALE:  There was a full-on restraining order for

9     every dollar that was in the United States for Caledonian Bank.

10    At that point we were trying to do our best, as I said, to work

11    out a resolution as quickly as possible to allow the bank to

12    not fail.

13             THE COURT:  Why didn't you contact the Court about

14    that?

15             MS. DALE:  We actually were in touch with your Honor,

16    the Part I judge, on Sunday for the reduction of the

17    restraining order to $76 million, and we were continuing to

18    negotiate.  I believe we had a phone conversation with the

19    Court that Monday on which we were explaining what we were

20    doing and how we were acting to try to resolve it.

21             We thought maybe with the $76 million that the

22    withdrawal request would not exceed the amount available so

23    that we would be able to continue to survive.  That just didn't

24    work out.

25             THE COURT:  You knew that every dollar over 25 million

9

1    that was frozen belonged to somebody else, your depositors,

2    right?

3          MS. DALE:  That was our understanding, yes.  I think

4    what we were hoping, your Honor, was that we could resolve the

5    matter, there wouldn't be the run of the withdrawals, and that

6    by putting $76 million aside for a few days, we could manage to

7    a resolution.  That's what we were trying to do.

8          Once the withdrawal requests exceeded whatever we had

9    in the United States minus $76 million, then the shareholders

10   of the bank made the decision to go into voluntary liquidation.

11   They didn't want to start allowing some people to get full

12   withdrawals and others not.

13         THE COURT:  It's stunning.  It's really stunning.  You

14   bear as much responsibility for what happened as the SEC did in

15   this foolhardy exercise.  What is the status of Caledonian's

16   liquidation proceeding?

17         MS. DALE:  The status is that they have met with

18   creditors of both the bank and the securities entities in the

19   Cayman Islands, they have issued reports to the creditors

20   examining what the financial situation is, and they are hopeful

21   to begin distributions very soon.  They need to do know-your-

22   customer investigations before they can actually make

23   distributions, but they actually are hopeful that they can

24   begin those distributions in the next 60 to 90 days.

25         I don't know if your Honor is aware, but in the

F5lrsecc

1    bankruptcy action here in the Southern District of New York,

2    all of the money that had been in the United States and tied up

3    with the chapter 15 has now been allowed to be removed back to

4    the Cayman Islands, and they are in the process of taking that

5    money out, which then will give them a corpus to begin those

6    distributions.

7            THE COURT:  I was not aware of that.  How much money

8    was transferred out in the chapter 15?

9            MS. DALE:  I don't believe it actually has been

10   transferred out, your Honor.  There's about $350 million in the

11   United States, approximately.

12           THE COURT:  Anything else?  Thank you.

13           MS. DALE:  Thank you.

14           THE COURT:  Now we are going to turn to Verdmont.  By

15   the way, for this proceeding, pull the microphones closer to

16   you and you can remain seated.

17           Once again, Mr. Simpson, how did the SEC go from a

18   $19 million asset freeze against Verdmont on February 8th to a

19   $2 million asset freeze on February 27?

20           MR. SIMPSON:  Your Honor, Verdmont presented evidence

21   that the money we had frozen belonged to Verdmont's customers

22   as opposed to Verdmont itself.  Based on that evidence, we

23   agreed to reduce the frozen amount to 2 million, releasing the

24   customer funds.  Then the 2 million we received assurance was

25   Verdmont's money as opposed to customer money.

1            THE COURT:  Why 2 million?

2            MR. SIMPSON:  The 2 million in our mind was the amount

3       that Verdmont had the ability to pay without going below its

4       net capital requirements under Panamanian law.

5            THE COURT:  Did you understand at that time that

6       Verdmont was a broker?

7            MR. SIMPSON:  We understood that Verdmont was a

8       broker-dealer in Panama.

9            THE COURT:  Did you understand at that time that

10      Verdmont had only realized approximately $230,000 in

11      commissions from the sales?

12           MR. SIMPSON:  We did not know that at the time we

13      filed the complaint.  We received evidence to that effect when

14      Verdmont filed its papers in opposition to our motion for a

15      preliminary injunction.

16           THE COURT:  When you agreed to a reduction to

17      $2 million on the freeze order, did you know that Verdmont's

18      profit was $230,000 on the transactions?

19           MR. SIMPSON:  We did know that.  It was our position,

20      and our position remains, at the time that they are liable for

21      disgorgement of the proceeds as a statutory seller.

22           THE COURT:  Who is Verdmont jointly and severally

23      liable with?

24           MR. SIMPSON:  To the Verdmont customers who sold the

25      securities.

```
 1              THE COURT:  Why aren't they named as defendants?

 2              MR. SIMPSON:  We did not learn that they were the

 3    sellers until the end of February, and our investigation is

 4    continuing.

 5              THE COURT:  What have you been doing since the end of

 6    February about bringing the customers into this case?

 7              MR. SIMPSON:  We have been focused on litigating

 8    against Verdmont.  We were focused on preparing for a

 9    preliminary injunction hearing with Caledonian at the end of

10    March.  Since then we have been dealing with Verdmont's

11    discovery requests.

12              THE COURT:  So you focused on all the wrong things,

13    the preliminary injunction that never happened and that anybody

14    could have told you was not going to happen.  I get the feeling

15    that despite all the SEC lawyers who are on this case, nobody

16    is paying any real attention to it.

17              Where is your proposed amended complaint?

18              MR. SIMPSON:  We have it back in the office.

19              THE COURT:  You didn't bring it with you?  You came up

20    from Washington and you didn't bring a copy?

21              MR. SIMPSON:  No, your Honor.

22              THE COURT:  Because the record would not otherwise

23    reflect my amazement, I'll just say, wow.

24              Your letter mentions that you plan to be offering a

25    draft stipulation to Verdmont.  Could you tell me what that is.
```

F5lrsecc

```
 1                 MR. SIMPSON:  The stipulation, in effect, says that
 2     Verdmont sold the securities for the account of its three
 3     customers.
 4                 THE COURT:  What was that stipulation supposed to
 5     accomplish?
 6                 MR. SIMPSON:  It clarifies that Verdmont sold on
 7     behalf of three customers as opposed to for its own account and
 8     that Verdmont received commissions and the proceeds of the
 9     sales went to the three customers.
10                 THE COURT:  Isn't that what an amended complaint is
11     supposed to be about?
12                 MR. SIMPSON:  Yes, your Honor.
13                 THE COURT:  That's why you need to be thoroughly
14     familiar with the practices in the Southern District and in
15     particular the practices of the judge you are appearing before.
16                 When exactly did the SEC learn that Verdmont acted as
17     a broker in these transactions?
18                 MR. SIMPSON:  I believe at the same time that they
19     filed their opposition to our motion for a preliminary
20     injunction.
21                 THE COURT:  When was that?
22                 MR. SIMPSON:  That was approximately February 20.
23                 THE COURT:  When you learned those facts, why didn't
24     you amend your complaint at that time?
25                 MR. SIMPSON:  Your Honor, we did offer to amend the
```

F5Lrsecc

1    complaint at the end of March.

2              THE COURT:  To whom?

3              MR. SIMPSON:  To defense counsel.

4              THE COURT:  Is that the way you think rule 15

5    operates?

6              MR. SIMPSON:  Your Honor, you are correct, that is not

7    the way rule 15 operates.

8              THE COURT:  What kind of inquiry did the SEC make into

9    Verdmont's role in the transactions before drafting its

10   complaint and coming into this court to get a freeze order?

11             MR. SIMPSON:  We obtained brokerage account statements

12   that showed that the accounts from which the securities were

13   sold were in the name of Verdmont.

14             THE COURT:  Wouldn't a reasonable inquiry at that time

15   have revealed that Verdmont acted as a broker.

16             MR. SIMPSON:  I don't believe that that's correct,

17   your Honor.

18             THE COURT:  You did know at the time that you drafted

19   your complaint that Verdmont's clients owned the stock at one

20   point, didn't you?

21             MR. SIMPSON:  Yes, your Honor.

22             THE COURT:  You allege in the complaint that a new

23   stock certificate was issued, right, to Lornex, Verdmont's

24   client?

25             MR. SIMPSON:  Yes, your Honor.

F5lrsecc

```
 1              THE COURT:  Didn't that suggest to you that Verdmont
 2   was acting as a broker?
 3              MR. SIMPSON:  Then the Lornex certificate was
 4   deposited into an account in the name of Verdmont, which led us
 5   to believe that the stock had been transferred to Verdmont.
 6              THE COURT:  Let me hear from Mr. Zito.
 7              MR. ZITO:  Good afternoon, your Honor.
 8              THE COURT:  You can stay seated, too.
 9              MR. ZITO:  Thank you, your Honor.
10              THE COURT:  Just pull the microphone closer.
11              MR. ZITO:  Your Honor, Verdmont Capital is, as stated
12   in my letter to the Court, a reputable broker-dealer fully
13   regulated under the laws of Panama.  It is a boutique broker-
14   dealer.  It has only about $10 million in net Capital.  As a
15   result of this lawsuit, as a result of the asset freeze that
16   was effected on its clients, its business is in a death spiral.
17              Presently, there is $2 million which is posted as
18   security.  Because of the freeze order of $28 million in client
19   assets, we had to negotiate something quickly with the SEC,
20   your Honor, because the Panamanian regulators had threatened to
21   shut us down if we couldn't free up client assets.  The client
22   assets freeze was a huge lever on our ability to negotiate the
23   freeze order or the preliminary injunction order.
24              THE COURT:  Why did you agree to it if you had been
25   acting as a broker?
```

1              MR. ZITO:  Your Honor, we were faced with Panamanian

2    regulators who were on premises immediately hearing about this

3    lawsuit and the freeze order.  They were conducting an

4    immediate examination of Verdmont.  The regulators communicated

5    to us that at all costs you need to have the assets of the

6    customers unfrozen.

7              We tried to negotiate a $200,000 freeze.  We started

8    at $200,000.  The SEC rejected that.  In fact, they wanted I

9    think somewhere about $5 million in the initial negotiations.

10   We had a horse trade which ultimately got down to $2 million.

11   That was the best we could do.  Otherwise, we would be faced

12   with having client assets continue to be frozen and run the

13   risk of having the Panamanian regulators shut us down.  That

14   was what we were faced with.  We were between a rock and a hard

15   place.  We had no exit.

16             After negotiating that, we negotiated the preliminary

17   injunction in such a way for it to be a placeholder without

18   prejudice to us coming back to your Honor and seeking relief

19   from that freeze order that was stipulated to.  That's why we

20   are here, your Honor.

21             Putting aside the freeze order for a second, your

22   Honor, the complaint and the allegations are false and

23   demonstrably false, and I think the SEC admits they are false.

24   What is concerning here, your Honor, is the fact that the SEC

25   alleges that there was a sham registration.

1          To put this in context, they are not claiming that

2     some securities were sold without a registration statement.

3     Registration statements were duly filed with the SEC.  K-1s

4     were filed with the SEC.  A whole bunch of public filings were

5     filed with the SEC.

6          The SEC has this theory of liability that these

7     registration statements weren't really registration statements,

8     they were shams, because the stock was delivered to nominees or

9     agents of the issuers, and because of that, the stock was never

10    transferred, there was no distribution of the stock to the

11    public.  That's their claim.

12         If we dig into the papers that were submitted to your

13    Honor on the preliminary injunction motion, there isn't a

14    single affidavit of anyone with personal knowledge testifying

15    that that is the case other than the Swingplane transaction,

16    which is the first transaction which does not affect Verdmont,

17    your Honor.  I'm only talking about the Goff transaction, the

18    Norstra transaction, and the Medora/Xumanii transactions.

19         There is nothing there.  All there is is a data dump,

20    a bunch of documents.  No one authenticates the documents other

21    than an SEC attorney.  And there is no affidavit of anyone

22    having knowledge of the facts laying out how this was a sham, a

23    purported shame.

24         As we have been getting to initial disclosures, from

25    what I understand from the SEC's theory of the case, these

1    nominees are located in Panama, in Ireland, in places elsewhere

2    outside the United States.  There is no evidence in the SEC

3    document discovery that shows that the SEC has interviewed

4    these people.  There is no evidence that they have given any

5    affidavits.  There is no evidence that they are going to be

6    able to testify here.

7            One of the reasons I'm raising this, your Honor, is

8    because one of the things I asked for in my letter is I think

9    we may need an evidentiary hearing here.  The SEC's burden

10   under the Cavanagh case is a substantial showing of likelihood

11   of success as to both a current violation and the risk of

12   repetition.  They have to show a substantial showing of a

13   likelihood of success.

14           If they are going to have a case here, your Honor, I

15   really don't care what the complaint says, what is their case?

16   How are they going to prove it?  Who is going to take that

17   stand and testify?  What documents are going to come into

18   evidence and how are they going to authenticate those

19   documents?

20           THE COURT:  Why did you stipulate to it?  I had

21   scheduled a hearing.

22           MR. ZITO:  Your Honor, it was time is of the essence.

23   We didn't know, if we had a hearing, how long the hearing would

24   take.  We didn't know how long it would take to have a

25   decision.  There were a lot of unknowns that litigators take

                                                                    19

1    into account when they have other regulators threatening to put

2    your client out of business.

3            Had we known that we could have had an evidentiary

4    hearing on that date and had we known that the Court would have

5    issued a decision quickly, perhaps we would have done that.

6    But there was no way of knowing that, your Honor.  I'm sorry,

7    but that's why we are here.

8            THE COURT:  I scheduled a hearing.

9            MR. ZITO:  It was a hearing, your Honor.  The hearing

10   was scheduled.

11           THE COURT:  Right.  It was scheduled.  I was looking

12   forward to it.  You took it away from me, all of you.  Even in

13   March, when you submitted the 26(f), you didn't even want this

14   conference.  Right?

15           MR. ZITO:  We didn't want a conference, your Honor,

16   with respect to the report.

17           THE COURT:  You have just told me your client's in a

18   death spiral.  But until I scheduled this conference sua sponte

19   and started to get these letters, I had no inkling as to what's

20   going on.  It's remarkable all around here.

21           MR. ZITO:  Your Honor, I was in the process.  I

22   actually had a letter draft requesting a pre-motion conference

23   to dissolve the preliminary injunction.  That letter actually

24   was about to be signed when I received your Honor's scheduling

25   order.  Your Honor trumped me and mooted out my request.  Thank

1    you.

2              THE COURT:  You want to make a motion for judgment on

3    the pleadings, right?

4              MR. ZITO:  Yes.

5              THE COURT:  The SEC, if they could get around to

6    figuring out the Court's individual rules and rule 15, would be

7    making a motion to amend their complaint, which would probably

8    obviate the need for a judgment on the pleadings.  Are some of

9    these stocks continuing to be traded on the open market, Mr.

10   Simpson?

11             MR. SIMPSON:  Your Honor, there are two of the stocks

12   that are traded on the open market.  The market price for those

13   stocks is zero.  That's no dollars and no cents.  The SEC's

14   powers to suspend trading in a security lasts for ten days.  We

15   can get a ten-day trading suspension.  We can also get an order

16   taking a stock off the market if it's delinquent in its

17   filings.  But there are so many companies that are delinquent

18   in their filings that it is just a wave that the SEC cannot

19   overcome.

20             THE COURT:  So you just don't do anything, right?

21   You're telling me that because there are so many companies that

22   are delinquent in their filings, the SEC has given up delisting

23   them and suspending them from trading for a delinquency, right?

24             MR. SIMPSON:  No.  The SEC continues to get companies

25   suspended from trading for delinquency.  We have a delinquent

1   filing program that we do.  But it is just an overwhelming

2   case, an overwhelming burden.

3        THE COURT:  I'm going to add to the burdens of the

4   SEC.  You are going to get going on this case.  We are going to

5   have a hearing in this case.  I'm going to direct the SEC to

6   file a motion to amend their complaint.  I think that Mr. Zito

7   has raised some very troubling concerns in his letter

8   application to the Court.

9        As part of this motion to amend, Mr. Simpson, I want

10  the SEC to include a detailed explanation of exactly when and

11  how the SEC learned of the information that is causing it to

12  seek to amend the allegations in its complaint.  As part of

13  that motion to amend, I want a separate declaration from

14  someone with knowledge explaining the factual basis relied upon

15  by the SEC and the inquiry that the SEC undertook for the

16  allegations against Verdmont in the original complaint.

17       If the SEC is unwilling to unfreeze moneys above the

18  $230,000 that represent Verdmont's profit, I'm going to put the

19  matter down for an evidentiary hearing on that specific issue.

20  And because Verdmont is in a death spiral, I am going to fix a

21  prompt hearing.

22       How much time, Mr. Simpson, does the SEC need to

23  present evidence to this Court as to why the SEC is entitled to

24  continue a $2 million asset freeze on Verdmont?

25       MR. SIMPSON:  Two weeks from today.

 1           THE COURT:  How much time would you need to present

 2   witnesses?  I'm going to schedule a hearing.

 3           MR. SIMPSON:  No more than a day, your Honor.

 4           THE COURT:  All right.  I'm going to put this matter

 5   down for an evidentiary hearing on June 8.  Mr. Zito, how much

 6   time does Verdmont think it needs with respect to the hearing?

 7           MR. ZITO:  Your Honor, probably a day, I would think.

 8           THE COURT:  You will be ready to go.

 9           MR. ZITO:  Your Honor, if I could ask for some sort of

10   a witness list and an exhibit list 24 hours before the hearing,

11   that would be helpful in my preparation.

12           THE COURT:  Yes.  By the close of business on June 4,

13   Thursday, June 4, the parties will exchange witness lists and

14   exhibit lists.  Mr. Simpson, when you get back to your office

15   in Washington, I want you to send to all counsel and the Court

16   the SEC's proposed amended complaint.  I generally believe that

17   motions to amend complaints, especially at the early stage of a

18   litigation, are needless motions.  But in this case the SEC has

19   some explaining to do.  I want to understand their position

20   fully.

21           When can the SEC file its motion to amend its

22   complaint?

23           MR. SIMPSON:  One week from today.

24           THE COURT:  Fine.  By May 28th.

25           How much time do you want, Mr. Zito, to oppose it?

F5lrsecc

```
1              MR. ZITO:  A week, your Honor.

2              THE COURT:  Fine.  June 4.  I'll take any reply by the

3    morning of June 8th, when we start the hearing.

4              Now, are there any matters that any of the parties

5    want to raise with the Court?

6              MR. SIMPSON:  No, your Honor.

7              MR. ZITO:  Nothing here, your Honor.

8              MS. DALE:  Nothing, your Honor.

9              THE COURT:  I'm just amazed at what's been going on in

10   this case without any information really being provided to the

11   Court.  The time for neglect is over.  All hands are going to

12   be on deck.  The New York regional counsel's office is going to

13   be involved and people are going to start to think about the

14   business consequences of the actions here.  That comment is

15   directed not just at the SEC but at all the defense counsel in

16   the case.

17             The SEC has a canon of ethics, right, Mr. Simpson?

18             MR. SIMPSON:  Yes, your Honor.

19             THE COURT:  One of those canons is that the power to

20   investigate carries with it the power to defame and destroy,

21   right?

22             MR. SIMPSON:  Yes, your Honor.

23             THE COURT:  There's been a lot of that going on in

24   this case.  By the way, when the affidavit explaining what's

25   gone on in this case is submitted, and you mentioned the issues
```

F5LRSECC

1   about the equity of Caledonian being 25 million and the

2   insistence that there be a much larger asset freeze, I want to

3   know not just the level at which the SEC made that decision but

4   who made that decision.  Do you understand?

5          MR. SIMPSON:  Yes, your Honor.

6          THE COURT:  Right.  I want to know exactly where it

7   went.  I want to know if Mr. Ceresney was involved in that

8   decision.  And if he was, maybe he should come up here and

9   explain it to the Court.

10          I'll issue a scheduling order so there will be no

11   question about this.

12          Once again, Mr. Zito, you know you have a hearing.

13          MR. ZITO:  Thank you, your Honor.

14          THE COURT:  Have a good weekend.

15          (Adjourned)

16

17

18

19

20

21

22

23

24

25