Robert J.A. Zito
Mark R. Zancolli
Theodore Y. McDonough
Leonardo Trivigno
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
Tel. (212) 732-3200
Fax: (212) 732-3232
*Attorneys for Verdmont Capital, S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION
                      Plaintiff,

                  v.

CALEDONIAN BANK LTD.,
CALEDONIAN SECURITIES LTD.,
CLEAR WATER SECURITIES, INC.,
LEGACY GLOBAL MARKETS S.A., and
VERDMONT CAPITAL, S.A.

                      Defendants.
-------------------------------------------------------------x

Civ. No. 15 CV 894 (WHP)

**DECLARATION OF
TAYLOR HOUSSER**

      TAYLOR HOUSSER, hereby declares, under penalty of perjury, that the following is true and correct:

      1.    I am the Secretary of Verdmont Capital, S.A. ("Verdmont"), one of the defendants in the above-captioned action.

      2.    I respectfully submit this declaration in support of Verdmont's motion for judgment on the pleadings.

      3.    According to the Amended Complaint, Verdmont sold for the account of one or

more of three clients – Lornex Financial Ltd. ("Lornex"), Bamfield Equities Ltd. f/k/a Bartlett Trading ("Bamfield" or "Bartlett") and Nautilus Growth Fund Ltd. ("Nautilus") – unregistered securities of three public companies (Goff Corp. ("Goff"), Norstra Energy, Inc. ("Norstra") and Xumanii, Inc. f/k/a Medora Corporation ("Xumanii")), and therefore, violated Section 5(a) and (c) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77e(a) and (c)) because no valid registration statement was in effect at the time. Amended Complaint at ¶¶ 1, 2, 63, 80 and 96.

4. The purpose of this declaration is to explain: (i) Verdmont's role as a broker with regard to the transactions at issue in the SEC's Amended Complaint (the "Amended Complaint"); and (ii) the due diligence exercised by Verdmont concerning the clients and transactions at issue in the Amended Complaint.

5. This declaration also explains the day trading that was conducted by Verdmont on its own account or as a broker on behalf of its clients in Verdmont's former accounts, no longer open, at Knight Capital Americas LLC ("Knight"), Sunrise Securities Corporation ("Sunrise") and UBS Securities ("UBS").

### Verdmont Capital, S.A.

6. Verdmont is a corporation duly organized under the laws of the Republic of Panama and duly licensed as a broker-dealer in Panama. Verdmont does not accept U.S. clients, and therefore, is advised that it need not be registered as a broker-dealer in the United States. Verdmont trades in U.S. and non-U.S. securities on behalf of its non-U.S. clients through various client omnibus accounts throughout the world. To the extent that Verdmont's clients seek to trade securities in the United States, Verdmont engages broker-dealers that are registered in the United States and that are familiar with the federal securities laws as its agents to execute said

2

trades.

### Verdmont Was Not Trading On Its Own Account, But Rather Was Acting As A Broker

7. At the February 6, 2015 ex parte hearing in support of its application for a temporary restraining order, the SEC mistakenly alleged that Verdmont traded on its own account and made "tens of millions of dollars" doing so. (Transcript of February 6, 2015 Hearing on SEC's Motion for Temporary Restraining Order, at 3:8-10). To the contrary, aside from one proprietary day trade of Xumanii stock that Verdmont executed in its house account (as described in paragraph 22 below), Verdmont did not sell securities of Goff, Norstra, or Xumanii – the securities at issue in the Amended Complaint – for its own account, but rather sold them for the benefit of three of its clients – Lornex, Bamfield and Nautilus – upon legitimate orders from those clients. Further, copies of Verdmont's audited financial statements from 2012 and 2013 (in Spanish and with English translation) are attached hereto as Exhibits A and B, respectively, and show that during the years in which the trades at issue in Goff, Norstra and Xumanii were sold (i.e., 2012 and 2013), Verdmont did not make tens of millions of dollars from the entirety of its operations.

8. The May 28, 2015 declaration of Gerald W. Hodgkins in support of the SEC's motion for leave to amend refers to a client omnibus account that Verdmont previously maintained at ViewTrade. That account contained clients' assets, not Verdmont's assets. On February 6, 2015, attorneys for the SEC suggested to this Court that Verdmont was in the process of dissipating and/or secreting its assets here in the United Sates and referenced certain transactions in Verdmont's client omnibus account at ViewTrade. This account was closed as of December 31, 2014, and it was closed at the option of ViewTrade, not Verdmont. Those client

3

assets were transferred to various other custodians (including Interactive Brokers in the U.S.) depending on who could accept them. These assets were not transferred for the purpose of dissipating or shielding assets. Indeed, prior to the SEC's commencement of this action on February 6, 2015, Verdmont was unaware that the SEC would be taking any action against Verdmont.

9. Panamanian law generally prohibits me from disclosing information concerning Verdmont's clients. Verdmont, however, has obtained the consent of the three Verdmont clients at issue to disclose information concerning their trading which is the subject of the Amended Complaint. *See* Exhibit C, copies of clients' written consent for the release of corporate brokerage account information (DA467-469).

10. The three Verdmont clients whose trading activity is at issue here are Lornex (which traded in securities of Goff, Norstra, and Xumanii), Bamfield (which traded in Norstra), and Nautilus (which traded in Norstra). Other than Lornex, Bamfield and Nautilus, no clients of Verdmont cleared certificates in Goff, Norstra or Xumanii.

11. Annexed hereto as Exhibit D (VER000044-51) are revenue analyses prepared by Verdmont for the transactions at issue in the Amended Complaint. The analysis presented at VER000048-51 identifies the cost to Verdmont of the transactions at issue in the Amended Complaint and the net commission revenue paid to Verdmont as a result of the transactions at issue in the Amended Complaint. Verdmont realized net commissions of approximately $228,665.52 as a result of the transactions at issue in the Amended Complaint. *See* Ex.D (VER000051). In contrast, Verdmont's clients collectively realized gross proceeds of approximately $15,220,260 as a result of the transactions at issue in the Amended Complaint. *See* Ex. D (VER000048).

4

### Verdmont's Due Diligence Concerning
### The Clients And Transactions At Issue

12. Registration statements were duly filed for each of Goff, Norstra, and Xumanii. Verdmont neither knew nor had reason to know that the registration statements were allegedly a "sham," as claimed in the Amended Complaint. There was no way for Verdmont to have known that the so-called initial distributions of stock were to "insiders" or "affiliates" of the issuers, as alleged by the SEC.

13. At the time the Goff, Norstra, and Xumanii certificates in question were deposited with Verdmont, Verdmont normally required the following documentation and conducted the following due diligence:

   a. Examine the front and back of the stock certificate to ensure that no legend or restriction is in place.

   b. Obtain and attach documentation of how the shares were acquired by the client. For example, if the shares were purchased through a private placement with the issuer, Verdmont requires a copy of the subscription agreement. As another example, if the shares were purchased privately, Verdmont requires a copy of the purchase/sale agreement.

   c. Research and attach documentation on how the shares are registered with the SEC. If the shares were registered by an S1 registration, Verdmont performs research on the SEC's filings on Bloomberg to confirm the client's name on the registration statement and then verifies that the SEC declared the registration statement as effective. If the client acquired the shares from a third party in a private transaction, Verdmont examines the purchase/sale agreement(s) and ensures that the names of the persons from whom the

5

shares were purchased are listed on a registration statement that was declared effective. Many times (but not every time) Verdmont would check with the transfer agent, requesting that the transfer agent confirm in writing to Verdmont that shares were free trading, with no stops, holds or restrictions, and that the shares "tacked back" to an effective registration statement.

d. Verdmont performs research on the company filings on Bloomberg to ensure that the company is current with its filings.

e. Verdmont researches on Bloomberg the percentage of the outstanding shares that a particular certificate represents to confirm that the client's shareholding does not exceed 5% of the outstanding shares.

f. At the time of account opening, Verdmont asked in its Know Your Client (KYC) account documents: "Are you a director, officer or controlling shareholder of a public company? If yes attach details."

14. Verdmont's due diligence with respect to the clients and particular transactions at issue was conducted as outlined above and did not reveal any facts which gave it reason to know or suspect the alleged facts in the Amended Complaint that the securities were unregistered. All of the securities were registered, as Verdmont confirmed that Form S-1 registration statements had been filed and declared effective by the SEC for each of the securities. Verdmont's due diligence is illustrated by the documents annexed hereto as Exhibit E through Exhibit G, which are described in greater detail below by client.

### *Lornex Financial Ltd.*

15. The documents annexed hereto as Exhibit E (VER000201-292; VER000111-186) demonstrate Verdmont's due diligence concerning Lornex. Exhibit E includes "Know Your

Client" documentation assembled by Verdmont when Lornex's accounts were opened, and also includes documents which show Verdmont's continuing due diligence into Lornex and its principals. *See* Ex. E (VER000201-227, 236-292).

16. Also included within Exhibit E are documents which evidence Verdmont's due diligence regarding the Lornex transactions at issue. *See* Ex. E (VER000111-186). Those documents demonstrate that, before sending the certificates for deposit, Verdmont confirmed that no restrictive legends were attached to the certificates, that the securities were registered by a registration statement, and that the registration statement was declared effective in the SEC database. Additionally, documents in Exhibit E establish that Verdmont reviewed Goff, Norstra, and Xumanii registration statements (*see, e.g* VER000116-117; VER000162; VER000132-133), inquired into and obtained documentation concerning how the companies' shares were acquired by Lornex (VER000118-125; VER000163-172; DVER000136-155), and determined the number of outstanding shares for each company and the percentage of the outstanding shares represented by the certificate to be deposited (VER000111, VER000126; VER000156, VER000173; VER000127). Further, Verdmont requested and obtained written confirmation from the transfer agent that the Norstra shares were free trading with no stops, holds, or restrictions, and that the shares tacked back to an effective registration statement. *See* Ex. E (March 22, 2013 email exchange between Empire Stock Transfer and Verdmont, VER000179-180).

### *Bamfield Equities Ltd. f/k/a Bartlett Trading*

17. The documents annexed hereto as Exhibit F (VER000580-638, VER000099-110, VER000006-10) demonstrate Verdmont's due diligence concerning Bamfield. Exhibit F includes "Know Your Client" documentation assembled by Verdmont when Bamfield's accounts was opened (VER000580-621), and also includes documents which show Verdmont's

7

continuing due diligence into Bamfield and its principals (VER000622-627).

18.   Also included within Exhibit F are documents which evidence Verdmont's due diligence for the Bamfield transaction at issue. *See* Ex. F (VER0000099-110, VER000006-10). Those documents demonstrate that, before sending the Norstra certificates for deposit, Verdmont confirmed that no restrictive legends were attached to the certificates, that the securities were registered by a registration statement, and that the registration statement was declared effective in the SEC database. *See* Ex. F (VER000104).  Documents in Exhibit F also establish that Verdmont inquired into and obtained documentation concerning how the companies' shares were acquired by Bamfield (VER000105-109), and determined the number of outstanding shares for each company and the percentage of the outstanding shares represented by the certificate to be deposited (VER000099, VER000110).  Further, Verdmont requested and obtained written confirmation from the transfer agent that the Norstra shares were free trading with no stops, holds, or restrictions, and that the shares tacked back to an effective registration statement. *See* Ex. F (March 21, 2013 email exchange between Empire Stock Transfer and Verdmont, VER000104).

### *Nautilus Growth Fund Ltd.*

19.   The documents annexed hereto as Exhibit G (VER000293-429, VER000052-53; VER000054-98, VER000187-200, VER000001-5, VER000011-15) demonstrate Verdmont's due diligence concerning Nautilus.  Exhibit G includes "Know Your Client" documentation assembled by Verdmont when Nautilus' account was opened (VER000293-429, VER000052-53, VER000059-80), and also includes documents which show Verdmont's continuing due diligence into Nautilus and its principals (VER000054-58; VER000087).

20. Also included within Exhibit G are documents which evidence Verdmont's due diligence for the Nautilus transaction at issue. *See* Ex. G (VER000187-200, VER000011-15, VER000001-5). Those documents demonstrate that, before sending the Norstra certificates for deposit, Verdmont confirmed that no restrictive legends were attached to the certificates, that the securities were registered by a registration statement, and that the registration statement was declared effective in the SEC database. *See* Ex. G (VER000194-196). Documents in Exhibit G also establish that Verdmont inquired into and obtained documentation concerning how the companies' shares were acquired by Nautilus (VER000197-199; VER000012-15; and VER000003-5), and determined the number of outstanding shares for each company and the percentage of the outstanding shares represented by the certificate to be deposited (VER000187, VER000200). Further, Verdmont requested and obtained written confirmation from the transfer agent that the Norstra shares were free trading with no stops, holds, or restrictions, and that the shares tacked back to an effective registration statement. *See* Ex. G (March 22, 2013 email exchange between Empire Stock Transfer and Verdmont, VER000190-191).

21. Based on the foregoing, Verdmont has established that it did not sell any of the shares that were from the certificate deposits that are the subject of the alleged Section 5 violation in the Amended Complaint for its own proprietary accounts, that it conducted reasonable due diligence into its clients Lornex, Bamfield, and Nautilus, that it conducted reasonable due diligence into those clients' trades in Goff, Norstra, and Xumanii stock, and that it realized only modest commission revenue in connection with the transactions at issue.

**Day Trading By Verdmont And Clients
Of Verdmont In Former Accounts, No Longer Open,
At Knight, UBS And Sunshine Securities Corp.**

22. Verdmont performed day trades on its own account or as a broker on behalf of its

clients in Verdmont's former accounts, no longer open, at Knight, Sunrise and UBS. With regard to Verdmont's clients' trades, Verdmont's clients placed their trades through Verdmont either online or through their investment advisor, and those trades were routed through Verdmont's trading system to Knight, Sunrise and UBS. The Verdmont accounts at Knight, Sunrise and UBS were never accounts where Verdmont held any assets, as they were DVP/RVP (delivery versus payment/receipt versus payment) accounts, meaning that Verdmont traded securities there but the trades settled back to Verdmont's custodian. Exhibits 21 through 23 to the Declaration of Robert W. Nesbitt, dated February 5, 2015, submitted by the SEC in support of its motion for a preliminary injunction are purportedly statements for the former accounts that Verdmont maintained at Knight, Sunrise and UBS, respectively. Those account statements show trades in stock of Goff, Norstra and Xumanii -- the securities at issue in the Amended Complaint -- but all of those trades were executed by Verdmont as a broker on behalf of Verdmont's customers, except for the following proprietary trades that Verdmont performed in Verdmont house account: bought 200,000 shares of Xumanii at $0.238 on May 13, 2013, and sold 200,000 shares of Xumanii at $0.2945 on May 13, 2013. Verdmont realized $11,300 in profit from that trade.

WHEREFORE, Verdmont respectfully requests that the Court grant judgment on the pleadings in favor of Verdmont.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 9, 2015

Taylor Housser

11