Robert J.A. Zito
Mark R. Zancolli
Theodore Y. McDonough
Leonardo Trivigno
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
Tel. (212) 732-3200
Fax: (212) 732-3232
*Attorneys for Verdmont Capital, S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

SECURITIES AND EXCHANGE
COMMISSION                                            :
                                                      :
                                                      :   Civ. No. 15 CV 894 (WHP)
                    Plaintiff,                        :
                                                      :
             v.                                       :
                                                      :
CALEDONIAN BANK LTD.,                                 :
CALEDONIAN SECURITIES LTD.,                           :
CLEAR WATER SECURITIES, INC.,                         :
LEGACY GLOBAL MARKETS S.A., and                       :
VERDMONT CAPITAL, S.A.,                               :
                                                      :
                                                      :
                    Defendants.                       :

------------------------------------------------------------ x

## MEMORANDUM OF LAW OF DEFENDANT
### VERDMONT CAPITAL, S.A. IN SUPPORT OF ITS MOTION FOR
### JUDGMENT PURSUANT TO FED. R. CIV. P. 12 (c) OR 56

# TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

PROCEDURAL BACKGROUND ................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 3

ARGUMENT ...................................................................................................................... 4

POINT I ........................................................................................................................... 4

VERDMONT MUST BE GRANTED JUDGMENT DISMISSING THE AMENDED
COMPLAINT PURSUANT TO FED. R. CIV. P. 12(C) OR 56 BECAUSE THE SEC HAS
FAILED TO PLEAD ANY EVIDENTIARY FACTS  AND HAS NO EVIDENCE
DEMONSTRATING THAT ITS THEORY OF A "SHAM" REGISTRATION IS
PLAUSIBLE ................................................................................................................... 4

      A.    The Amended Complaint Fails To Allege The Elements Of A Section 5 Claim
            Against Verdmont ................................................................................................ 7

      B.    There Is No Cognizable Theory of Liability Under Section 5 for
            A "Sham" Registration Statement, And, In Any Event, The SEC
            Has No Evidence Of Such .................................................................................. 8

POINT II ......................................................................................................................... 11

EVEN ASSUMING THE SEC HAS PLED EVIDENTIARY FACTS AND
HAS EVIDENCE OF SOME PLAUSIBLE THEORY OF LIABILITY,
VERDMONT IS NEVERTHELESS  ENTITLED TO JUDGMENT BECAUSE
IT WAS EXEMPT FROM SECTION 5 LIABILITY .................................................. 11

      A.    The Dealer Exemption ....................................................................................... 11

      B.    The Broker Exemption ....................................................................................... 15

      C.    The SEC Is Not Entitled To Disgorgement  On the Basis of
            Joint and Several Liability .................................................................................. 17

CONCLUSION ................................................................................................................. 18

i

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Abbey v. 3F Therapeutics, Inc.*,
    No. 06 CV 409 (KMW), 2009 WL 4333819 (S.D.N.Y. Dec. 2, 2009) ...................................6

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S.Ct. 1937 (2009) ...................................................................................5

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ..............................................................................................6

*Finkel v. Stratton Corp.*,
    962 F.2d 169 (2d Cir. 1992) ............................................................................................13

*Graziano v. Pataki*,
    689 F.3d 110 (2d Cir. 2012) ..............................................................................................5

*Griffin v. PaineWebber Inc.*,
    84 F. Supp. 2d 508 (S.D.N.Y. 2000) .................................................................................13

*Harris v. City of New York*,
    186 F.3d 243 (2d Cir.1999) ............................................................................................5, 7

*Kopec v. Coughlin*,
    922 F.2d 152 (2d Cir. 1991) ..............................................................................................6

*LaFaro v. N.Y. Cardiothoracic Group, PLLC*,
    570 F.3d 471 (2d Cir. 2009) ...........................................................................................4, 5

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010) ...............................................................................................6

*Prestige Builder & Management LLC v. Safeco Ins. Co. of America*,
    896 F. Supp. 2d 198 (E.D.N.Y. 2012) ...............................................................................5

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006) ..............................................................................................7

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir.) ...................................................................................................17

*SEC v. Phan*,
    500 F.3d 895 (9th Cir. 2007) .............................................................................................7

*SEC v. Platforms Wireless International Corp.,*
  617 F.3d 1072 (9th Cir. 2010) ........................................................................... 17

*SEC v. Universal Express, Inc.,*
  646 F.Supp. 552 (S.D.N.Y. 2009), aff'd 438 Fed. Appx. 23 (2d Cir. 2011) ...................... 17

*SEC v. Verdiramo,*
  907 F. Supp. 2d 367 (S.D.N.Y. 2012) ................................................................. 17

*SEC v. Whittemore,*
  659 F.3d 1 (D.C. Cir. 2011) ........................................................................... 17

*Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.,*
  517 F.3d 104 (2d Cir. 2008) ............................................................................. 5

*Williams v. City of New York,*
  916 F. Supp. 2d 235 (E.D.N.Y. 2012) .................................................................. 4

*Wonsover v. SEC,*
  205 F.3d 408 (D.C. Cir. 2000) .......................................................................... 15

*World Trade Fin. Corp. v. SEC,*
  739 F.3d 1243 (9th Cir. 2014) ......................................................................... 15

**FEDERAL STATUTES**

15 U.S.C. § 77b(a)(12) .................................................................................... 12

15 U.S.C. § 77d(a)(1) ..................................................................................... 11

15 U.S.C. § 77d(a)(3) ..................................................................................... 12

15 U.S.C. § 77d(a)(4) ..................................................................................... 15

15 U.S.C. § 77e(a) .......................................................................................... 1

15 U.S.C. § 77e(c) .......................................................................................... 1

**RULES**

Fed. R. Civ. P. Rule 12(b) ................................................................................. 4

Fed. R. Civ. P. 12(c) .............................................................................. 1, 4, 6, 11

Fed. R. Civ. P. 56 ................................................................................ 1, 4, 6, 11

NY Rules of Professional Conduct Rule 3.3 ......................................................... 2, 3

**OTHER AUTHORITIES**

*In re Pierce,* Securities Act Rel. No. 9555, 2014 WL 896757 (March 7, 2015)...........................17

Wright & Miller, Federal Practice and Procedure: Civil 3D § 1367§ ...........................................4

7636032.6

## PRELIMINARY STATEMENT

Defendant Verdmont Capital, S.A. ("Verdmont") respectfully submits this memorandum of law, and the accompanying Declaration of Robert J.A. Zito, dated June 9, 2015 (the "Zito Declaration"), Declaration of Taylor Housser, dated June 9, 2015 (the "Housser Declaration") and Declaration of Glynn Fisher, dated June 9, 2015 (the "Fisher Declaration"), in support of its motion dismissing the Amended Complaint of plaintiff, Securities and Exchange Commission ("SEC"), and for granting Verdmont judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), or alternatively, for summary judgment, pursuant to Fed. R. Civ. P. 56.

It will be demonstrated below that the Amended Complaint must be dismissed and Verdmont must be granted judgment on grounds that (i) there is no cognizable legal theory of liability for a "sham" registration under Section 5 of the Securities Act of 1933 (the "Securities Act"), (ii) Verdmont, in any event, is exempt from liability under the Dealer's Exemption (Section 4(a)(3) of the Securities Act), and (iii) Verdmont, in any event, is exempt from liability under the Broker's Exemption (Section 4(a)(4) of the Securities Act).

## PROCEDURAL BACKGROUND

On February 6, 2015, the SEC filed the Complaint and obtained an *ex parte* order freezing approximately $28 million of assets belonging to Verdmont and Verdmont's clients, who had nothing to do with the securities trades in question. Of the $28 million in frozen assets, only approximately $1,561,400 in assets belonged to Verdmont. The Complaint alleged that Verdmont improperly sold, on its own behalf, unregistered securities under Section 5 of the Securities Act (15 U.S.C. § 77e(a) and (c)). The Complaint also alleged that Verdmont earned approximately $17 million as a result of the sale of unregistered securities. The issuers of the securities were Goff Corp. ("Goff"), Norstra Energy Inc. ("Norstra"), and Xumanii, Inc.

1

("Xumanii")[1] (each an "Issuer" or collectively, the "Issuers").  Zito Decl., Ex. A, Complaint, ¶1 and 2.

The sole basis for the SEC's assertion that Verdmont was the beneficial seller of the stock appears to be the fact that various stock certificates of the Issuers were deposited into an account that had "Verdmont" in the title, even though the account was a broker's client omnibus account and even though the stock certificates in question were in the names of Verdmont's clients.  Not a single stock certificate was issued in the name of Verdmont.

At the *ex parte* hearing on February 6, 2015, the attorneys for the SEC represented to this Court that the underlying action concerned a "pump and dump" scheme and that Verdmont earned "tens of millions of dollars" from the transactions.  In addition, the SEC represented that an asset freeze was necessary because Verdmont recently closed an account and was in the process of transferring its assets out of the United States.  In truth, however, no "pump and dump" scheme was ever alleged in the Complaint and Verdmont merely was acting as a broker-dealer in the subject transactions, except for one proprietary day trade.  In addition, the account that had been recently closed was a client omnibus account and closed in the ordinary course of business, contrary to that which was told to the Court at the *ex parte* hearing.  *See* Housser Decl., ¶8.

Despite knowing the true facts, the SEC did nothing to amend the Complaint until questioned by the Court at the Pretrial Conference on May 21, 2015.[2]  On June 8, 2015 –

---

[1]  Xumanii was formerly known as Medora Corporation.

[2]  Rule 3.3 of the New York Rules of Professional Conduct provides in relevant part that "(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or *fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer....* (d)  In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to

2

approximately *four months* after filing the Complaint – the SEC filed the Amended Complaint purporting to correct the facts incorrectly stated to this Court, pursuant to the consent of the parties.  As will be seen, however, the SEC's amendment is unavailing and its theories are fatally flawed.  For these reasons, Verdmont is entitled to judgment dismissing the Amended Complaint.

**STATEMENT OF FACTS**

Verdmont is a corporation duly organized under the laws of the Republic of Panama, and is duly licensed as a broker-dealer in Panama.  Zito Decl., Ex. C. Amend. Comp., ¶11.

Like the Complaint, the Amended Complaint does not allege that the Issuers failed to file registration statements with the SEC.  Instead, the Amended Complaint alleges that the registration statements filed by the Issuers were a "sham" because the initial stock distributions were made to "insiders" or "affiliates" of the Issuers located in Serbia, Mexico, Ireland, Norway, Panama and Jamaica, and therefore, the registrations did not become "effective."  However, with respect to each Issuer, the SEC indeed declared the registrations effective and the effectiveness of the registrations were publically posted by the SEC on its website (EDGAR).  To this day, the SEC's Notices of Effectiveness have not been revoked, but remain on the EDGAR website.  And the stock of two of these Issuers continue to be traded today (Zito Decl., Ex. F, Tr. of Pretrial Conf. at 20).

The Amended Complaint now concedes that Verdmont was acting merely as a broker on behalf of its clients (Zito Decl., Ex. C, Amended Compl., ¶¶ 63, 80 and 96) but curiously alleges that Verdmont nevertheless should disgorge $17 million, even though the Amended Complaint

---

the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse."  N.Y. Rules of Professional Conduct R. 3.3 (emphasis added).

3

fails to allege that Verdmont received more than $239,965 in commissions as a broker.  Zito Decl., Ex. C, Amended Compl., ¶ 1 and § IV.

The Amended Complaint no longer alleges that the registration statements were a sham, as had the Complaint, but instead alleges that there are facts that raise an "inference" that the registration statements were a "sham." Zito Decl., Ex. C, Amended Compl., ¶¶ 56, 75 and 87.

## ARGUMENT

### POINT I

### VERDMONT MUST BE GRANTED JUDGMENT DISMISSING THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(C) OR 56 BECAUSE THE SEC HAS FAILED TO PLEAD ANY EVIDENTIARY FACTS AND HAS NO EVIDENCE DEMONSTRATING THAT ITS THEORY OF A "SHAM" REGISTRATION IS PLAUSIBLE

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is a motion that addresses the merits of the claim as well as the defenses, as opposed to just whether a claim is stated:

> The common law demurrer could be used to search the record and raise procedural defects, or it could be employed to resolve the substantive merits of the controversy as disclosed on the fact of the pleadings.  In contrast to the common law practice, the Rule 12(c) judgment on the pleading procedure primarily is addressed to the latter function of disposing of cases on the basis of the underlying substantive merits of the parties' claims and defenses as they are revealed in the formal pleadings.

WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1367.

"A motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss pursuant to Rule 12(b)." *Williams v. City of New York*, 916 F. Supp. 2d 235, 240 (E.D.N.Y. 2012), *citing LaFaro v. N.Y. Cardiothoracic Group, PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). Thus, in ruling on a

4

12(c) motion, the court must "accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 115 (2d Cir. 2008). The court, however, is "not bound to accept as true legal conclusions couched as factual allegations." *LaFaro*, 570 F.3d at 475-476.

"To survive a motion to dismiss [or motion for judgment on the pleadings], a complaint must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009) (internal quotation marks omitted); *accord Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012). Plausibility, however, "asks for more than a sheer possibility" that a defendant has acted improperly. *See Ashcroft*, 556 U.S. at 678, 129 S.Ct. 1937. A claim only has "facial plausibility when the plaintiff pleads *factual content* that allows a court to draw the reasonable inference that a defendant is liable  for the misconduct alleged." *See Ashcroft*, 556 U.S. at 678, 129 S.Ct. 1937 (emphasis added). The plaintiff's pleading, therefore, "must include more than an 'unadorned, the defendant unlawfully-harmed-me accusation;' mere legal conclusions, 'a formulaic recitation of the elements of a cause of action,' or 'naked assertions' by the plaintiff will not suffice." *Prestige Builder & Management LLC v. Safeco Ins. Co. of America*, 896 F. Supp. 2d 198, 202 (E.D.N.Y. 2012), *quoting Ashcroft*, 556 U.S. at 678, 129 S.Ct. 1937. "The district court should grant a motion [for judgment on the pleadings] if ... it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief*." Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

In determining whether a plaintiff has met its burden, the "court may consider 'the facts as asserted within the four corners of the complaint' together 'with the documents attached to the

complaint as exhibits, and any documents incorporated in the complaint by reference.'" *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks and citations omitted).

When presented with materials outside the pleadings as part of a defendant's Rule 12(c) motion, the court has two options: "[it] may exclude the additional material and decide the motion on the [pleadings] alone or it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Kopec v. Coughlin,* 922 F.2d 152, 154 (2d Cir. 1991). "Federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings offered in conjunction with a ... motion [to dismiss or for judgment on the pleadings], and thus complete discretion in determining whether to convert the motion to one for summary judgment." *Abbey v. 3F Therapeutics, Inc.,* No. 06 CV 409 (KMW), 2009 WL 4333819, at *5 (S.D.N.Y. Dec. 2, 2009) (quotation omitted)

6

**A.     The Amended Complaint Fails To Allege The Elements Of A Section 5 Claim
Against Verdmont**

"To state a cause of action under Section 5, one must show (1) lack of a registration statement as to the subject securities; (2) the offer or sale of securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006). *See also SEC v. Phan*, 500 F.3d 895, 901-902 (9th Cir. 2007) (The SEC "must point to *evidence* that (1) no registration statement was in effect as to the securities")(emphasis added).

The Amended Complaint fails to put forth any claim or evidentiary facts showing a plausible claim. The Amended Complaint is comprised of conceded facts, factual assertions without any evidentiary basis, and legal conclusions that are unsupported by either the law or the facts. In short, the SEC "can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris*, *supra*, 186 F.3d at 247 (2d Cir. 1999). Accordingly, Verdmont is entitled to judgment.

The Amended Complaint fails to allege the first element – lack of a registration statement as to the subject securities. Registration statements were filed with regard to each of the securities (i.e., Goff, Norstra and Xumanii). *See* Zito Decl., Ex. C, Amended Complaint, ¶46 ("On August 26, 2011 . . . Goff filed with the SEC a Form S-1 registration statement . . .") and Fisher Decl., Ex. A, Amended Form S-1 registration statement filed by Goff on November 2, 2011; Zito Decl., Ex. C, Amended Complaint, ¶65 ("On April 30, 2012, Norstra filed with the SEC a Form S-1 registration statement . . . ") and Fisher Decl., Ex. G, Amended Form S-1 registration statement filed by Norstra on July 12, 2012; and Zito Decl., Ex. C, Amended Complaint, ¶82 (". . . the September 9, 2010 filing of a Form S-1 registration statement" for

7

Medora (Xumanii) and Fisher Decl., Ex. M, Amended Form S-1 registration statement filed by Medora (Xumanii) on March 14, 2011.

Indeed, each of those registration statements were declared effective by the SEC. *See* Fisher Decl., Ex. A (November 10, 2011 SEC Notice of Effectiveness for Form S-1 of Goff), Ex. G (July 12, 2012 SEC Notice of Effectiveness for Form S-1 of Norstra), and Ex. M (March 14, 2011 SEC Notice of Effectiveness for Form S-1 of Medora (Xumanii).

Thus, it is undisputed, and undisputable, that registration statements were filed with respect to each of the Issuers, each registration statement was declared effective by the SEC and the SEC never issued a stop order to preclude trading in those three securities. Indeed, the SEC's counsel confirmed at the Pretrial Conference that "there are two of the stocks that are [still] traded on the open market." Zito Decl., Ex. F, Tr. of Pretrial Conference, at 20. Thus, because the SEC has failed to show the first element of its Section 5 claim – lack of a registration statement as to the subject securities – Verdmont is entitled to judgment dismissing the Amended Complaint.

**B.     There Is No Cognizable Theory of Liability Under Section 5 for A "Sham" Registration Statement, And, In Any Event, The SEC Has No Evidence Of Such**

Research reveals that *no* court has ever held a party liable under Section 5 by determining that a registration statement duly filed with the SEC and, indeed, deemed effective by the SEC, was a "sham." There are certainly antifraud provisions within the Securities Act and the Securities Exchange Act of 1934 that might be applicable to issuers for the dissemination of a fraudulent registration statement. But the SEC makes no such assertions here, nor could it.

Even if there were a basis for such a theory, the SEC provides no evidentiary facts by which it might or can prove that the initial stock recipients were "insiders" or "affiliates" of the

8

Issuers, the sole basis of the SEC's "sham" theory. In connection with the SEC's prior motion to amend, it failed to submit a single declaration of someone having personal knowledge of the initial public offerings or documents demonstrating that the persons who initially received the stock were "insiders" or "affiliates." Nor is there a scintilla of evidence or even an allegation that Verdmont participated in these registrations or had any knowledge of any alleged insider/affiliate distributions of stock.

The most the SEC has to say is contained in a hearsay declaration submitted in support of the SEC's motion to amend by Gerald W. Hodgkins, dated May 28, 2015 (the "Hodgkins Declaration"), an Associate Director in the Division of Enforcement. Docket Entry 91. Mr. Hodgkins certainly will not be a witness in this case. The only facts he offered in connection with the SEC's insider/affiliate theory concerned Swingplane Ventures, Inc. ("Swingplane"). However, the SEC does not allege that Verdmont sold for itself or its clients any Swingplane stock.

All Mr. Hodgkins could offer is:

> Through an inter-agency request to a foreign regulatory authority, staff reporting to me obtained affidavits from approximately six of the Serbian shareholders of Swingplane. These shareholders averred that they did not receive their stock certificates, nor did they sell or transfer them as reflected in the stock transfer records.

Docket Entry 91, Hodgkins Decl., ¶14. In other words, the only "proof" the SEC has to show that the stock was issued to insiders or affiliates consists of affidavits from six out of the thirty-five original shareholders (16% of the initial stockholders) who claim they did not receive their stock certificates, despite the fact the stock ledgers show that they did. This is proof of nothing. Just because six stockholders did not receive their stock does not make it more likely than not that their stock went to insiders or affiliates or remained in the control of Swingplane. There are

9

many neutral reasons for these six stockholders not receiving their stock. Perhaps they failed to pay for it. Perhaps they decided to back out of the deal. At best, these affidavits show that there is an inconsistency between what they believed happened and what the stock transfer records reveal. It certainly does not prove any fraudulent activity or that Swingplane's registration statement was a "sham." Of course, it says nothing about the twenty-nine other shareholders who presumably did receive their stock in accordance with the transfer documents. And even assuming that these statements have some probative value, the SEC has failed to explain how the testimony of these six Serbian nationals will be procured and made admissible. The "affidavits" to which Mr. Hodgkins refers, are not even affidavits, but are merely hearsay "transcripts" of interviews allegedly conducted by foreign regulators that have been translated from Serbian to English. According to the SEC's disclosures, the SEC does not even know where these Serbian nationals reside. (*See* Ex. 5 to the Richard Simpson Declaration, dated February 4, 2015.)

Most importantly, the circumstances of the Swingplane offering have nothing to do with the SEC's case against Verdmont, as the SEC does not allege that either Verdmont or its clients sold any Swingplane stock. The case against Verdmont is limited to the stock of Goff, Norstra and Xumanii. Mr. Hodgkins fails to mention any affidavits of stockholders of Goff, Norstra and Xumanii.

Quite remarkably, Mr. Hodgkins' only offer of proof that the stock of Goff, Nostra and Xumanii was transferred to "insiders" or "affiliates," is a bald conclusion, wholly unsupported by any facts:

> As a result [of statements made by six out of thirty-five Swingplane stockholders], we believed that the sales to shareholders for all of the subject securities, all of which followed the same fraud pattern, were shams and that the securities never left the control of the issuers or their affiliates.

10

Hodgkins Decl., ¶14 (emphasis added).

In sum, it is undisputed that the issuers of the securities filed registration statements, that such registration statements were declared effective by the SEC, and that the SEC never issued a stop order, pursuant to Section 8(d) of the Securities Act, to preclude trading in the securities. No court has ever imposed Section 5 liability under a "sham" registration theory, and even assuming that such a theory is viable, the SEC has no proof and has failed to allege evidentiary facts that show how such a purported claim is "plausible." Therefore, Verdmont is entitled to judgment under Fed. R. Civ. P. 12(c) or 56.

**POINT II**

**EVEN ASSUMING THE SEC HAS PLED EVIDENTIARY FACTS
AND HAS EVIDENCE OF SOME PLAUSIBLE THEORY
OF LIABILITY, VERDMONT IS NEVERTHELESS  ENTITLED TO JUDGMENT
BECAUSE IT WAS EXEMPT FROM SECTION 5 LIABILITY**

**A.      The Dealer Exemption**

Even if the SEC's "sham" registration statement theory could give rise to Section 5 liability – and it cannot – and even if the SEC had any evidence to prove that the registration statements were a "sham"– and it does not – Verdmont was nonetheless exempt from liability under Section 4(a)(3) (the "Dealer Exemption") of the Securities Act.

Section 5 liability applies only to "issuers, underwriters and dealers."  15 U.S.C. § 77d(a)(1). Verdmont was certainly not an issuer or an underwriter.  Verdmont may have been a dealer, but it was not in the business of buying or selling the securities of the Issuers.  It engaged

11

in only one day trade.[3]  Verdmont merely effected unsolicited trades on behalf of its clients.  If Verdmont was not a dealer, then liability under Section 5 liability may not be imposed.

But even assuming Verdmont was a dealer for purposes of Section 4(a)(1) of the Securities Act, the transactions were nevertheless exempt from liability due to the Dealer Exemption (Section 4(a)(3)).  The Dealer Exemption exempts all "transactions by a dealer," except under three limited circumstances that are not applicable here:

> (A)  transactions taking place prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter,
>
> (B)  transactions in a security as to which a registration statement has been filed taking place prior to the expiration of forty days after the effective date of such registration statement or prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter after such effective date, whichever is later (excluding in the computation of such forty days any time during which a stop order was issued under section 77h of this title is in effect as to the security), or such shorter period as the Commission may specify by rules and regulations or order, and
>
> (C)  transactions as to securities constituting the whole or a part of an unsold allotment to or subscription by such dealer as a participant in the distribution of such securities by the issuer or by or through an underwriter.
>
> With respect to transactions referred to in clause (B), if securities of the issuer have not previously been sold pursuant to an earlier effective registration statement the applicable period, instead of forty days, shall be ninety days, or such shorter period as the Commission may specify by rules and regulations or order.

15 U.S.C. § 77d(a)(3).

---

[3] The Securities Act defines a "dealer" as "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person."  15 U.S.C. §77b(a)(12).

12

None of the transactions alleged in the Amended Complaint fall within any of the three exceptions to Section 4(a)(3).[4]  The first two exceptions (Sections 4(a)(3)(A) and 4(a)(3)(B)) do not apply because none of the transactions effected by Verdmont took place prior to the expiration of forty days after the first date upon which the security was offered to the public, or prior to the expiration of forty days after the effective date of the registration statement.

The Goff registration statement was declared effective by the SEC on November 10, 2011.  Verdmont's client (Lornex) purchased shares of Goff from selling shareholders under the registration statement on August 8, 2012 – nearly a year later.  The first sale of Goff stock effected by Verdmont on behalf of any of its clients took place on March 18, 2013 – nearly two years later.  *See* Fisher Decl., ¶7 and Exs. A to E.   It is beyond cavil that the Goff transactions alleged in the Amended Complaint occurred well after the 40 day period in Sections 4(a)(3)(A) and 4(a)(3)(B).  Therefore, the transactions were unequivocally exempt from Section 5 as a result of the Dealer's Exemption.

Similarly, the Norstra registration statement was declared effective by the SEC on July 12, 2012.  Verdmont's client (Lornex) purchased shares of Norstra stock on February 5, 2013 from shareholders who purchased and were issued shares under the registration statement on September 7, 2012 – more than six months after the SEC declared the registration statement effective – and the first sale of Norstra stock effected by Verdmont on behalf of any of its clients took place on April 1, 2013 – nearly a year after the SEC declared the registration statement

---

[4] Where a registration statement has been filed and declared effective by the SEC, the date a security is "bona fide offered to the public" is the effective date of the registration statement. *See Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992); *Griffin v. PaineWebber Inc.*, 84 F. Supp. 2d 508, 512 (S.D.N.Y. 2000) ("A security is bona fide offered to the public at the effective date of the registration statement").  In any event, as explained above, even using the first date on

13

effective, and unequivocally more than forty days after the SEC declared the registration statement effective. *See* Fisher Decl., ¶8 and Exs. G to K.

Likewise, the Xumanii (initially named Medora Corporation) registration statement was declared effective by the SEC on March 14, 2011. Verdmont's client (Lornex) purchased shares of Medora (Xumanii) stock from selling shareholders under the registration statement on February 22, 2012, nearly a year after the SEC declared the registration statement effective. The first sale of Medora (Xumanii) stock effected by Verdmont on behalf of any of its clients took place on May 1, 2013 – nearly a year after the SEC declared the registration statement effective. See Fisher Decl., ¶9 and Exs. M to Q.

The following table illustrates the relevant dates with regard to the applicability of the Dealer Exemption here:

| Security | Date Form S-1 Filed | Date Amended Form S-1 Filed | Date of SEC Notice of Effectiveness of Form S-1 | Date of First Purchase of the Security by a Verdmont Client | Date of First Sale of the Security Effected by Verdmont on behalf of a Client |
|---|---|---|---|---|---|
| Goff | 8/26/11 | 11/2/11 | 11/10/11 | 8/8/12 | 3/18/13 |
| Norstra | 4/30/12 | 7/11/12 | 7/12/12 | 2/5/13[5] | 4/1/13 |
| Xumanii | 9/9/10 | 3/14/11 | 3/14/11 | 2/22/12 | 5/1/13 |

Finally, the third exception (Section 4(a)(3)(C)) to the Dealer Exemption is inapplicable here because the transactions effected by Verdmont did not concern securities constituting an unsold allotment to or subscription by Verdmont as a participant in the distribution of the securities. Fisher Decl., ¶11.

---

which a Verdmont client purchased the securities as the applicable trigger date, Verdmont still falls within the dealer exemption.

[5] Verdmont's client (Lornex) purchased 3,687,000 shares of Norstra stock on February 5, 2013 from shareholders (Garpenfeldt, Sanchez and Palmer) who purchased and were issued shares under the registration statement on September 7, 2012. *See* Fisher Decl., ¶8.

14

In sum, Verdmont is unequivocally exempt from liability due to the Dealer Exemption. Therefore, Verdmont is entitled to judgment dismissing the Amended Complaint.

**B.      The Broker Exemption**

Even assuming that the SEC's "sham" registration theory is valid and provable – and it is not – and even assuming Verdmont is not entitled to the Dealer Exemption – and it is – Verdmont is still entitled to the Broker Exemption under Section 4(a)(4) of the Securities Act because Verdmont merely performed "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders."  15 U.S.C. § 77d(a)(4).   All of Verdmont's transactions were executed upon legitimate customer orders from Lornex, Bartlett, and Nautilus.  *See* Housser Decl., ¶7.   The Amended Complaint concedes this fact.

The "broker exemption" may be claimed where a broker conducts a reasonable inquiry into the circumstances of a transaction.  *World Trade Fin. Corp. v. SEC,* 739 F.3d 1243, 1248 (9th Cir. 2014) (citing *Wonsover v. SEC,* 205 F.3d 408, 415 (D.C. Cir. 2000)).  The extent of the inquiry required will vary based on the circumstances.  *Id.*  "A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to [the dealer], may ordinarily proceed with considerable confidence." *Wonsover,* 205 F.3d at 415 (citation omitted).

While the SEC alleges a number of facts and circumstances which purportedly gave rise to an "inference" that the registration statements were "shams," the SEC does not allege that Verdmont knew or should have known those facts.  As demonstrated above, the SEC offers no proof showing that the registrations in question were a "sham."  The SEC inexplicably fails to explain how Verdmont could have discovered evidence of these alleged "shams" when the SEC,

15

with all its staff, subpoena power and its ability to obtain confidential information from securities regulators around the globe has been unable to do so. Indeed, the facts of which Verdmont was aware raised no concerns requiring that Verdmont conduct anything more than a reasonable inquiry, which Verdmont conducted. Verdmont, as is its standard practice (*see* Housser Decl., ¶¶13, 14) conducted a comprehensive and thorough inquiry into all material aspects of the transactions. In particular, at the time the Goff, Norstra, and Xumanii certificates were deposited, Verdmont: examined them to ensure no legend or restriction was in place; obtained documentation concerning how the shares were acquired by the client, including requesting copies of subscription agreements and purchase/sale agreements; researched how shares were registered with the SEC; contacted transfer agents by email concerning shares privately acquired by customers from third parties for confirmation that the shares were valid and free trading without stops or restrictions; performed Bloomberg research to ensure the company was current with its filings and that customer shareholders did not exceed 5% of outstanding shares; and confirmed that the customer was not an affiliate of the company. *See* Housser Decl., ¶13.

The Amended Complaint fails to specify the additional diligence Verdmont should have performed and further fails to explain how that diligence would have uncovered any evidence of a "sham," especially when the SEC's diligence failed to produce such. Indeed, there are no documents, let alone documents that were publically available to Verdmont, to prove that the initial distributions of the securities were made to "affiliates" or "insiders." The SEC's theory is nothing short of remarkable and disingenuous.

**C.     The SEC Is Not Entitled To Disgorgement On the Basis of Joint and Several Liability**

The Amended Complaint seeks disgorgement of "proceeds and commissions generated by the Defendants' sales of Swingplane, Goff, Norstra and Xumanii securities." Zito Decl., Ex. C, Amended Compl., §IV.  There is no law supporting such a theory for several reasons.  First, the Amended Complaint does not allege that any of Verdmont's clients were issuers, underwriters or dealers and therefore liable under Section 5.  Second, the Amended Complaint fails to make a single allegation that Verdmont and its clients were alter egos giving rise to joint and several liability.[6]  Indeed, Verdmont's clients are not even parties to this action.  Third, only profits may be disgorged obtained through violation of federal securities laws.  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996).  "In determining the amount of disgorgement to be ordered, a court must focus on the extent to which a defendant has profited from his [violation]."  *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y.

---

[6] On its motion to amend, the SEC cited several cases for joint and several liability.  But these cases are plainly inapposite, factually distinguishable, and unavailing as none of them involve a broker that executed trades for its clients.  In fact, those cases undermine the SEC's theory by making clear that joint and several liability for disgorgement of profits is appropriate only where the parties are alleged to have "collaborated" or had a "close relationship" with each other.  *See, e.g., In re Pierce,* Securities Act Rel. No. 9555, 2014 WL 896757 (March 7, 2014) (defendant who directed pump and dump scheme was liable for disgorging amounts he received and amounts paid into accounts of closely-held corporations he controlled); *SEC v. Platforms Wireless International Corp.,* 617 F.3d 1072 (9th Cir. 2010) (defendant, who was Chairman and CEO of company that issued unregistered securities, was liable for disgorging amounts he received and amounts his company received); *SEC v. Whittemore,* 659 F.3d 1 (D.C. Cir. 2011) (defendant who directed pump and dump scheme was liable for disgorgement of illegal profits); *SEC v. Verdiramo,* 907 F. Supp. 2d 367 (S.D.N.Y. 2012) (defendant, who was acting President of company that issued unregistered securities, was liable for disgorging amounts received by the "collaborating or closely related parties," including his father).  The Amended Complaint concedes that Verdmont was acting merely as a broker on behalf of its clients.  *See, e.g.,* Zito Decl., Ex. C, Amended Compl., ¶¶ 50, 63, 70-71, 80, 86, 96.  It does not allege the "collaboration" or "close relationship" required to impose disgorgement on a joint and several basis.

17

2009), aff'd 438 Fed. Appx. 23 (2d Cir. 2011) (emphasis added).  Disgorgement "is designed to deprive wrongdoers of any unjust enrichment," but "[i]t is not, however, intended to be punitive."  *Id.*  In sum, under these circumstances, the SEC is not entitled to disgorgement of profits allegedly made by Verdmont's customers.

## **CONCLUSION**

For the reasons explained above, Verdmont respectfully requests that the Court grant Verdmont judgment dismissing the Amended Complaint.

Dated:  New York, New York
       June 11, 2015

                                      Respectfully submitted,

                                      **CARTER LEDYARD & MILBURN LLP**

                                      By _____
                                        Robert J. A. Zito
                                        Mark R. Zancolli
                                        Theodore Y. McDonough
                                        Leonardo Trivigno
                                      Two Wall Street
                                        New York, New York 10005
                                        Telephone: (212) 732-3200
                                        Facsimile: (212) 732-3232
                                        Email: zito@clm.com

                                      *Attorneys for Defendant Verdmont Capital, S.A.*