UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————
                                                :

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Case No. 15-cv-894 |
| | : (WHP)(JLC) |
| CALEDONIAN BANK LTD., | : |
| CALEDONIAN SECURITIES LTD., | : |
| CLEAR WATER SECURITIES, INC., | : |
| LEGACY GLOBAL MARKETS S.A., and | : |
| VERDMONT CAPITAL, S.A. | : |
| | : |
| Defendants. | : |

——————————————————————————:

**THE SEC'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT VERDMONT'S
<u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

Richard E. Simpson
A. David Williams
Ernesto G. Amparo
Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4492 (Simpson)
simpsonr@sec.gov

Dated:  Washington, D.C.
        June 23, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ i

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 4

ARGUMENT .................................................................................................................. 8

    I.     Standard of Decision .......................................................................................... 8

    II.    The Earlier Registrations of the Securities Do Not Cover
           Verdmont's Subsequent Sales .......................................................................... 9

    III.   Verdmont Cannot Establish That Its Sales Were Exempt
           Under Section 4 of the Securities Act ............................................................ 14

           A.  The Dealer's Exemption of Section 4(a)(3) Is Not Available .................. 16

           B.  The Broker's Exemption of Section 4(a)(4) Is Not Available .................. 20

    IV.   Verdmont Is Liable To Disgorge The Proceeds of Its Securities Sales .............. 26


CONCLUSION .............................................................................................................. 30

## TABLE OF AUTHORITIES

**CASES**                                                                    *Page (s)*

*ACAP Financial, Inc. v. SEC,*
    783 F.3d 763 (10 Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Allison v. Ticor Title Insurance Co.,*
    907 F.2d 645 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...14

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*Charles Hughes & Co. v. SEC,*
    139 F.2d 434 (2d Cir. 1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...11

*General Conference Corp. of Seventh-Day Adventists v.*
    *Seventh-Day Adventist Congregational Church,*
    887 F.2d 228 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Gilligan, Will & Co. v. SEC,*
    267 F.2d 461 (2d Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 21

*Hayden v. Paterson,*
    594 F.3d 150 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...10

*In re A.G. Becker Paribas Inc.,*
    1985 WL 548591 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...25

*In re Alessandrini & Co.*, 45 S.E.C. 399, 1973 WL
    149302 (October 31, 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..23

*In re Ira Haupt & Co.,*
    1946 WL 24150 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...12

*In re Kane,* 1986 WL 626043 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Carley*, 2008 WL 268598 (Jan. 31, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*In re Leigh,* 1990 WL 11104369 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Merrill Lynch Pierce, Fenner & Smith,* 1973 WL 149268 (1973). . . . . ...................12

*In re Quinn & Co.*, 44 S.E.C. 461, 1971 WL 120484 (1971) . . . . . . . . . . . . . . .12, 18, 22, 19

*Kane v. SEC,* 842 F.2d 194 (8th Cir. 1988)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...25

*Kelly v. Schmidberger,*
　　806 F.2d 44 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . .....................10

*Quinn & Co. v. SEC*, 452 F.2d 943 (10th Cir.
　　1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*R.A. Holman & Co., v. SEC,*
　　366 F.2d 446 (2d Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .....…...12

*SEC v. Absolutefuture.com,*
　　393 F.3d 94 (2d Cir. 2004)…………. . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*SEC v. Buntrock,*
　　2004 WL 1179423 (N.D. Ill May 25, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . .28

*SEC v. Cavanagh,*
　　155 F.3d 129 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .......4, 14, 17

*SEC v. Chinese Consolidated Benevolent*
　　*Association, Inc.*, 120 F.2d 738 (2d Cir.
　　1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*SEC v. Contorinis,* 743 F.3d 296 (2d Cir. 2014)………………………………………...30

*SEC v. Culpepper,*
　　270 F.2d 241 (2d Cir. 1959)……………………………………………………..17

*SEC v. First Jersey Sec., Inc.*
　　　101 F.3d 1450 (2d Cir. 1996)……………………………………………32

*SEC v. Guild Films Co.,*
　　279 F.2d 485 (2d Cir. 1960)…….…. . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*SEC v. Holschuh,* 694 F.2d 130 (7th Cir. 1982)…………………………………………17

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..12, 21

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..12

*SEC v. North American Research & Development*
　　*Corp.*, 424 F.2d 63 (2d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..17
*SEC v. Platforms Wireless International Corp.*,
　　617 F.3d 1072 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*SEC v. Prater,* 289 F. Supp. 2d 39 (D. Conn 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16, 17

*SEC v. Sierra Brokerage,* 712 F.3d 321 (6th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*SEC v. Universal Express, Inc.,*
    475 F. Supp. 2d 412 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*SEC v. Verdiramo*, 890 F. Supp. 257 (S.D.N.Y.2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*SEC v. Verdiramo*, 907 F. Supp. 367 (S.D.N.Y.2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...5

*Stephenson v. Deutsche Bank, AG,*
    282 F. Supp 2d 1032 (D. Minn. 2003)……... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Sterner v. Titus Transportation LP,*
    2013 WL 6506591 (M.D. Pa. Dec. 12, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*United States v. Corr,* 543 F.2d 1042 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wonsover v. SEC,* 205 F.3d 408 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 26

*World Trade Financial Corp. v. SEC*, 739 F.3d
    1243 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 23, 26

*Zacharias v. SEC,* 569 F.3d 458 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ....23

## SECURITIES LAWS

Section 2 of the Securities Act of 1933,
    15 U.S.C. § 77b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Section 4 of the Securities Act of 1933,
    15 U.S.C. § 77d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..4, 5, 17, 19, 22

Section 5 of the Securities Act of 1933,
    15 U.S.C. § 77e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 11, 13

## SEC RULES and RELEASES

Rule 144, 17 C.F.R. § 230.144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 23

*Distribution by Broker-Dealers of Unregistered*

*Securities*, Exchange Act Rel. No.
33-4445, 1962 WL 69442 (Feb. 2, 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 25

*In re Transactions in the Securities of Laser Arms*
*by Certain Broker-Dealers,* 1991 WL 292009 (1991) . . . . . . . . . . . . . . . . . . . . . . . .26

*Sales of Unregistered Securities by Broker*
*Dealers*, Exchange Act Rel. No. 9239,
1971 WL 127558 (July 7, 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28

## **MISCELLANEOUS**

Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation,*
353-54 (3d Ed. 1995)…………………………………………………………14

Eddy J. Rogers & Jason Weeden, *Resales of Securities Under*
*the Securities Act,* 1012 PLI/Corp 285, 287 (Sept. 1997)………………………….14

S. Rep. No. 1036, 83d Cong., 2d Sess. 14 (1954)………………………………………….20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 15-cv-894 |
| | : | (WHP)(JLC) |
| CALEDONIAN BANK LTD., | : | |
| CALEDONIAN SECURITIES LTD., | : | |
| CLEAR WATER SECURITIES, INC., | : | |
| LEGACY GLOBAL MARKETS S.A., and | : | |
| VERDMONT CAPITAL, S.A. | : | |
| | : | |
| Defendants. | : | |

_____:

### THE SEC'S MEMORANDUM OF LAW IN
### OPPOSITION TO DEFENDANT VERDMONT'S
### MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff Securities and Exchange Commission respectfully submits this Memorandum of

Law in opposition to the motion for judgment on the pleadings of Defendant Verdmont Capital,

S.A. ("Verdmont").  For the reasons stated below, the Court should deny the motion.

### PRELIMINARY STATEMENT

This case is about Verdmont's unregistered distributions of penny stocks issued by three

shell companies.  Verdmont, a broker-dealer operating out of Panama, engaged in these

unregistered distributions when it sold into the public markets large blocks of unknown and

thinly traded penny stocks shortly after stock splits and major changes in business and

management announced by the shell companies, and simultaneously with aggressive stock

promotion campaigns.  Even though it admits these sales of penny stocks, Verdmont seeks to

dismiss the SEC's Amended Complaint on a motion for judgment on the pleadings.

The Court should deny Verdmont's motion because the Amended Complaint properly alleges a *prima facie* case of violations of Section 5 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77e.  Verdmont sold securities issued by Goff Corp. ("Goff"), Norstra Energy Inc. ("Norstra") and Xumanii, Inc. ("Xumanii") (collectively, the "Securities") in unregistered distributions.  (Am. Compl., ¶ 1)  The Amended Complaint alleges that Verdmont's sales violated Section 5.  (*Id.*, ¶ 2)  Even though Goff, Norstra and Xumanii filed earlier registration statements on Form S-1 with respect to purported initial or secondary "resale" offerings of the Securities (*id.*, ¶¶ 46, 65, 82), these registrations do not cover Verdmont's subsequent sales.  Under the controlling law of this Circuit, the requirement to register securities offerings is transaction-specific, and the registration of purported offerings by the shell companies do not apply to Verdmont's sales 7 to 24 months later.[1]  *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998) ("registration of a security is transaction-specific").

In the face of the SEC's *prima facie* case for violations of Section 5, Verdmont has the burden to prove that its sales of the Securities were exempt from the registration requirement.  Verdmont raises two such exemptions, but fails to carry its burden that such exemptions as a matter of law warrant dismissing the Amended Complaint.   First, Verdmont claims its sales are exempt under the so-called "dealer's exemption" of Section 4(a)(3) of the Securities Act because Verdmont sold for statutory underwriters – *i.e.*, persons who acquired the Securities from the issuers' control persons with a view to distribution.  However, Section 4(a)(3) is not available to a dealer who sells securities for an underwriter in unregistered transactions because those transactions are part of a public offering as opposed to ordinary trading between investors in an

---

[1]  The Goff registration statement became effective on November 10, 2011; the Norstra registration statement became effective on July 12, 2012; and the Xumanii registration statement became effective on March 14, 2011.  Verdmont did not begin selling the Securities until March 18, 2013.

established market.  Second, Verdmont claims its sales are exempt under the so-called "broker's exemption" of Section 4(a)(4).  However, the broker's exemption carries with it a duty of reasonable inquiry to ensure that the securities sales a broker is being asked to execute are not part of an unregistered distribution in violation of Section 5.  That is, the broker "must take whatever steps are necessary" to ensure that its sales do not involve an issuer, an affiliate or an underwriter.  *Distributions by Broker-Dealers of Unregistered Securities*, Exchange Act Rel. No. 33-4445, 1962 WL 69442, at *1 (Feb. 2, 1962); *World Trade Financial Corp. v. SEC*, 739 F.3d 1243, 1248 (9th Cir. 2014) ("a broker is not merely an 'order taker'"); *Wonsover v. SEC*, 205 F.3d 405, 415 (D.C. Cir. 2000) (Section 4(a)(4) is not available unless "the broker after reasonable inquiry is not aware of circumstances indicating that . . . the transaction is part of a distribution of securities of the issuer") (quoting 17 C.F.R. § 230.144(g)(4)).  The facts alleged in the Amended Complaint raise so many objective red flags that Verdmont could not have engaged in the searching inquiry required under the circumstances.

Finally, the Amended Complaint properly requests that the Court hold Verdmont liable for disgorgement of all the proceeds of its sales of Goff, Norstra and Xumanii, even if Verdmont sold the Securities on behalf of customers and transferred most of the proceeds to such customers or at their direction.  Disgorgement under Section 5 is not limited to the gains retained by the seller.  *SEC v. Verdiramo*, 907 F. Supp. 2d 367, 376 (S.D.N.Y. 2012) ("a defendant may be jointly and severally liable for disgorgement even if he did not personally profit from the Section 5 violation").  Verdmont's attempt to limit the scope of disgorgement is premature, because discovery may well reveal that Verdmont collaborated with its customers in the unregistered distributions of the Securities, warranting the imposition of joint and several liability.

For these reasons, discussed more fully below, Verdmont's arguments are misplaced. The Court should deny Verdmont's motion for judgment on the pleadings.

## **STATEMENT OF FACTS**

The unregistered Goff, Norstra and Xumanii distributions began with the pretend issuance of stock certificates to purported foreign shareholders but where the certificates remained in the control of the issuers or their affiliates.  (Am. Compl., ¶¶ 49, 56, 69, 75, 85, 87) Stock certificates issued without registration must carry restrictive legends, which prevent the sellers and subsequent purchasers from selling the stock unless a registration statement is filed as to such sales.  (*Id*., ¶ 13)  By filing registration statements for purported public offerings, the issuers could request that the transfer agent issue new stock certificates without restrictive legends.[2]  (*Id*., ¶¶ 49, 68, 82)  Because all of these actions were orchestrated by the issuers or by persons who controlled the issuers, subsequent purchasers  -- in this case, Lornex Financial Ltd. ("Lornex"), Nautilus Growth Fund, Inc. ("Nautilus") and Bartlett Trading Ltd. ("Bartlett") – are deemed to have purchased the Securities from the issuers, and the unregistered sales by Lornex, Nautilus and Bartlett through Verdmont violated of Section 5 of the Securities Act.  Verdmont itself participated in unregistered public offerings when it sold millions of shares of the Securities on behalf of Lornex, Nautilus and Bartlett into the public markets.  (*Id*., ¶¶ 63, 80, 96)

Verdmont was a broker-dealer operating out of Panama.  (Am. Compl., ¶ 11)  Lornex was an international business corporation ("IBC") formed in Nevis; Nautilus was a purported mutual fund formed in the Cayman Islands; and Bartlett was an IBC formed in Samoa.  (*Id*., ¶ 16)  Verdmont sold Goff, Norstra and Xumanii securities in the United States.  (*Id*., ¶¶ 64, 81,

---

[2]      The presence of a restrictive legend is a shorthand method of readily identifying securities subject to trading restrictions.  But irrespective of the presence or absence of a legend, every offer or sale of securities in interstate commerce must be pursuant to an effective registration statement, subject to an exemption, or illegal.

97, 100)  No registration statements were filed or in effect with respect to Verdmont's sales. (*Id*., ¶¶ 64, 81, 97, 100)  Registration statements on Form S-1 had been filed for earlier offerings of the Securities, during past periods when Goff, Norstra and Xumanii did not purport to do any business and existed only as shell entities.  (*Id*., ¶¶ 46, 65, 82)

Goff, Norstra and Xumanii securities made their way from the issuers to Verdmont, and from Verdmont to the public, in the following way:  First, Goff, Norstra and Xumanii issued stock certificates in the names of the non-management shareholders, who lived in Ireland, Norway, Panama or Jamaica.  (Am. Compl., ¶¶ 45, 68, 82)  Second, a foreign entity by the name of Celtic Consultants LLC, located in Surrey, British Columbia, sent certain of the certificates to the transfer agent, located in Henderson, Nevada, for transfer to Lornex or some other IBC.  (*Id*., ¶¶ 50, 69, 86)  In the case of Norstra securities, certain of the certificates were issued in the names of Nautilus or Bartlett.  (*Id*., ¶¶ 70, 71)  Third, the certificates were deposited into the accounts of Lornex, Nautilus or Bartlett at Verdmont.  (*Id*., ¶ 16)  Fourth, Verdmont deposited the stock certificates into its account at RBC Investor Services in Toronto, Canada, which deposited the stock certificates into its account at BNY Mellon in New York, New York, which converted the certificates into stock held in street name.  (*Id*.)  Fifth, Verdmont sold the stock into the public markets through accounts in its name at Knight Capital Americas LLC, Sunrise Securities Corporation and UBS Securities LLC.[3]  (*Id*.)

The Amended Complaint alleges that Verdmont's sales of the Securities on behalf of Lornex, Nautilus and Bartlett were distributions of securities without registration in violation of Section 5 of the Securities Act.  (Am. Compl., ¶¶ 1, 2)  The distributions of the Securities

---

[3]  Verdmont sold:  Goff stock into the public markets beginning on March 18, 2013; Norstra stock into the public markets beginning on March 5, 2013; and Xumanii stock into the public markets beginning on May 1, 2013.

occurred in a strikingly similar manner.  Goff, Norstra and Xumanii (collectively, the "shell companies") were development stage, start-up companies with little or no assets and no operations or revenue.  (*Id.*, ¶¶ 45, 65, 82)  The shell companies filed Form S-1 registration statements for purported offerings that generated little or no capital for them.  (*Id.*, ¶¶ 46, 65, 82) The registration statements represented that the shell companies were going into businesses in which their management did not have the required experience.  (*Id.*, ¶¶ 47, 66, 83)  After the registration statements became effective, the shell companies issued stock certificates in the names of the non-management shareholders.  (*Id.*, ¶¶ 49, 68, 85)  Celtic Consultants mailed certain of the stock certificates back to the transfer agent with instructions to transfer the stock to Lornex or other IBCs.  (*Id.*, ¶¶ 50, 69, 86)  The stock powers sent by Celtic Consultants contained irregularities.  (*Id.*, ¶¶ 50, 69, 86)  Goff and Xumanii effected forward stock splits, which multiplied the number of shares available for sale.  (*Id.*, ¶¶ 54, 89)  Goff, Norstra and Xumanii announced changes of control and management.  (*Id.*, ¶¶ 57, 72, 88)  The shell companies announced significant changes in their businesses.  (*Id.*, ¶¶ 58, 73, 91)  The shell companies issued highly optimistic press releases creating the public impression that they were immediately and actively involved in their new businesses.  (*Id.*, ¶¶ 59, 76, 92)  The press releases were bolstered by even more optimistic newsletters issued by stock-touting websites. (*Id.*, ¶¶ 60, 77, 93)  The shell companies' securities began public trading and quickly achieved high prices and large volumes.  (*Id.*, ¶¶ 62, 79, 95)  Verdmont began selling the stock on behalf of Lornex, Nautilus and Bartlett.  (*Id.*, ¶¶ 63, 80, 96)  After the stock promotions and the selling abated, the price of Goff fell to $0.01 per share, the price of Norstra fell to $0.30 per share, and the price of Xumanii fell to $0.02 per share.  (*Id.*, ¶¶ 62, 79, 95)

The Amended Complaint alleges facts and circumstances supporting the inference that there was no distribution of the Securities issued in the names of the original non-management shareholders, that the shell companies and their affiliates retained control of the Securities, and that the unlegended stock certificates were not in the hands of the shareholders, but of the shell companies or the persons who controlled them.  The transfer agent (Goff, Norstra and Xumanii used the same one) mailed the stock certificates to the shell companies instead of the shareholders.  (Am. Compl., ¶¶ 49, 68, 85)  The shareholders were grouped in pockets concentrated in foreign countries – Ireland, Norway, Panama and Jamaica – making it difficult for the SEC to contact them.  (*Id*., ¶¶ 45, 68, 82)  In the case of Goff, the shareholders were all business associates, friends and relatives of Goff's two officers.  (*Id*., ¶ 45)  In the case of Goff and Xumanii, all of the shareholders purportedly decided, all at the same time, to sell their stock instead of holding onto the shares for investment purposes.[4]  (*Id*., ¶¶ 46, 82)  After the Goff, Norstra and Xumanii registration statements became effective, none of the shareholders decided to sell their stock into the public markets, even though their stock certificates did not carry restrictive legends.  Instead, the shareholders' stock certificates found their way into the hands of Philip Kueber or Celtic Consultants, which sent the certificates in substantial batches to the transfer agent.  (*Id*., ¶¶ 50, 69, 86)  The stock powers accompanying the certificates contained irregularities.  For example, it appears that Philip Kueber forged the signature and medallion guarantee stamps of Bank of America on stock powers accompanying Goff stock certificates.  (*Id*., ¶ 53)  For Xumanii stock powers to be legitimate, seventeen shareholders would have had to

---

[4]  The Goff secondary "resale" offering – in which all of the Goff shareholders offered to sell their shares – was launched with the filing of a registration statement on August 26, 2011.  (Am. Compl., ¶ 45)  This was less than four months after the completion of the purported Regulation S offering to the shareholders.  (*Id*., ¶ 46)  The Xumanii secondary "resale" offering was launched with the filing of a registration statement on September 9, 2010 (*id*., ¶ 82) – ten days after the completion of the purported Regulation S offering to the shareholders.

travel from Jamaica to Nevis on the same day to have their powers of attorney stamped with the medallion guarantee of Mercantile Trust Ltd.  (*Id.*, ¶ 86)

As of May 6, 2013, Verdmont had sold on behalf of Lornex 14,000,000 shares of Goff stock for net proceeds of $3,526,354.  (Am. Compl., ¶ 63)  As of June 24, 2013, Verdmont had sold on behalf of Lornex, Nautilus and Bartlett a net of 9,702,000 shares of Norstra stock for net proceeds of $8,073,497.  (*Id.*, ¶ 80)  As of August 8, 2013, Verdmont had sold on behalf of Lornex a net of 17,050,000 shares of Xumanii stock for net proceeds of $6,064,353.  (*Id.*, ¶ 96) As a result of Verdmont's sales, 40,752,000 shares of Goff, Norstra and Xumanii stock were distributed into the public markets, and public investors lost $17,664,204 buying these worthless securities.  The lack of registration meant that investors had:  no information about these offerings, no information about the shell companies' likely business prospects, and no audited financial statements – information required to be contained in registration statements and given to investors in the form of a prospectus.

## ARGUMENT

### I. STANDARD OF DECISION.

Under Rule 8 of the Federal Rules of Civil Procedure, the allegations of a complaint must be "simple, concise and direct" – no technical form is required and notice pleading is generally sufficient.  *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986).  Rule 8 "requires only a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A court should deny a motion under Rule 12(b)(6) or Rule 12(c) when a complaint contains sufficient factual matter to "state a claim to relief that is plausible on its face."  *Id*. at 570.  In making this assessment, the court must accept all well-pled

allegations as true and draw all inferences in the light most favorable to the plaintiff. *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

Pursuant to applicable standards of review, Verdmont's reliance on affirmative defenses claiming exemptions from Section 5's registration requirement is fatal to its motion. "[I]f the defendant raises an affirmative defense in his answer it will usually bar judgment on the pleadings." *General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989). Where, as here, the affirmative defenses raise new matters not addressed in the complaint, they create a "material issue of fact that will prevent a motion under Rule 12(c) from being successful." *Sterner v. Titus Transportation LP*, Case No. 10-cv-2027, 2013 WL 6506591, at *2 (M.D. Pa. Dec. 12, 2013). As explained by two commentators:

> According to Rule 7(a), the plaintiff is not required to reply to affirmative defenses or new matter appearing in the answer, and, under Rule 8(d), averments in a pleading to which no responsive pleading is required are considered by the court to have been denied. Thus, when material issues of fact are raised by the answer and the defendant seeks judgment on the pleadings on the basis of this matter, his motion cannot be granted.

Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1368.

According to these standards, the Court should deny Verdmont's motion for judgment on the pleadings on both procedural and substantive grounds.

## II.  THE EARLIER REGISTRATIONS OF THE SECURITIES DO NOT COVER VERDMONT'S SUBSEQUENT SALES.

The Securities Act of 1933 protects public investors by giving them "full and fair disclosure of the character of securities" necessary for informed investment decisions. 15 U.S.C. § 77 (preamble). Section 5 of the Securities Act requires issuers to file registration statements making full disclosure of material facts before their securities can be offered or sold into the

9

public markets.  Full disclosure protects "those who do not know market conditions from the overreachings of those who do."  *Charles Hughes & Co. v. SEC*, 139 F.2d 434, 437 (2d Cir. 1943).  Registration statements are required for "distributions by issuers or acts of others who engage in steps necessary to such distributions."  *SEC v. Murphy*, 626 F.2d 633, 648 (9th Cir. 1980).  The Securities Act distinguishes between offerings that emanate from an issuer or its control persons or intermediaries – a "distribution" – and ordinary trading of securities between public investors once such securities have come to rest in the hands of investors.  A distribution, or public offering, must be accompanied by a registration statement, while ordinary trading in the secondary market is exempt from registration.

A distribution is "the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public."  *In re Ira Haupt & Co.*, 23 S.E.C. 589, 1946 WL 24150, at *7 (1946) (quotation omitted).  *Accord SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005), *R.A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966).  *Accord Ira Haupt & Co.*, 1946 WL 24150 at *9 (a public distribution consists of "transactions by which substantial quantities of securities are disposed of to the public").  Depending on the circumstances, the sale of a relatively small number of shares might constitute a distribution.  *In re Quinn & Co.*, 44 S.E.C. at 466, 1971 WL 120484 at *2 and 6 n.32 (sale of 25,000 shares was a public distribution even though approximately 2,982,915 shares were issued and outstanding).

In an SEC civil enforcement action for violations of Section 5, the court first addresses the issue of whether the SEC has alleged a *prima facie* case – that is, whether "securities were offered or sold in interstate commerce and . . . no registration statement was filed for any such offering or sale."  *SEC v. Prater*, 289 F. Supp. 2d 39, 51 (D. Conn. 2003).   In its motion for

judgment on the pleadings, Verdmont's leading argument is that the Amended Complaint fails to allege a *prima facie* case because Verdmont's 2013 sales of the Securities were covered by earlier registration statements filed by Goff, Norstra and Xumanii for purported offerings of the Securities in 2011 and 2012.  Verdmont sold the Securities beginning in March 2013 in sales not described or covered by the prior registration statements.  (Am. Compl., ¶¶ 62-63, 79-80, 95-96, 102)  Verdmont contends that once a registration statement is filed for any sale of a security, subsequent sales of that security do not need to be registered and, thus, cannot violate Section 5. (ECF No. 107 at 7-8)  Verdmont cites no legal authority in support of this argument.  Indeed, it cannot because the argument misconstrues Section 5.

Section 5 provides:

(a)  Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly

(1)  to . . . sell such security through the use or medium of any prospectus or otherwise . . .

(c)  It shall be unlawful for any person, directly or indirectly, to . . . sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . .

15 U.S.C. § 77e.  Together, these provisions require that a registration statement be filed and in effect before a person offers or sells a security.

A registration statement permits an issuer, or other persons, to make only the offers and sales described in the registration statement.  In this case, the fact that there were registration statements purportedly allowing the Securities to be offered to the shareholders (Norstra) or by the shareholders (Goff, Xumanii) is irrelevant to the question of whether Verdmont can subsequently offer or sell the Securities.  *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (Section 5 violation occurred when stock from an earlier registered offering "was sold by a

'control person' and accordingly such stock was required to have been re-registered before

sale").  Two commentators have explained that

> it is really the offering or sale of the particular security that is registered and not
> the security itself – that is, once a security has been sold pursuant to a registration
> statement, subsequent sales are not themselves sales for which a registration
> statement is in effect.  Each sale of a security, then, must either be made pursuant
> to a registration statement or fall under a registration exemption.

Eddy J. Rogers & Jason Weeden, *Resales of Securities Under the Securities Act*, 1012 PLI/Corp

285, 287 (Sept. 1997) (available on Westlaw).  *Accord Allison v. Ticor Title Insurance Co.*, 907

F.2d 645, 648 (7th Cir. 1990) ("Section 5 applies to transactions; each sale must be registered or

exempt"); Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation*, 353-54 (3d Ed.

1995) ("though in form an issuer registers its *securities*, in substance it registers *offerings* – or

more precisely perhaps, securities *with respect* to specified offerings") (emphasis original).

The controlling law in this Circuit is that the registration requirement attaches to each

sale of a security.  In *SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998), the court rejected

defendants' argument that an earlier Form S-8 registration statement permitted subsequent

unregistered sales of securities, as ordinarily registration is "for a single, defined offering of

securities."  *Id*. at 133.  The court subsequently reiterated that "*[e]ach* sale of a security must

either be made pursuant to a registration statement or fall under a registration exemption."

*Cavanagh*, 445 F.3d at 133 (emphasis added).  *Accord SEC v. Universal Express, Inc.*, 475 F.

Supp. 2d 412, 422 (S.D.N.Y. 2007) ("the requirement of registration applies to each act of

offering or sale; proper registration of a security at one stage does not necessarily suffice to

register subsequent offers or sales of that security"), *aff'd*, 300 Fed. Appx. 70, 2008 WL 4911207

(2d Cir. 2008).  Because the registration requirement is specific to each offering of securities,

Verdmont cannot rely on Goff, Norstra and Xumanii registration statements covering earlier

12

sales (during periods prior to significant changes in the companies' business) to escape Section 5 liability for its subsequent, unregistered sales of the Securities.

The registration statements for Goff, Norstra and Xumanii did not extend to sales of the Securities beyond the four corners of the registration statements.  For example, the Goff registration statement provided that "the selling shareholders may distribute shares to one or more of their nominees" who could, in turn, distribute the shares.  (Am. Compl., ¶ 48)  But if

> the new shareholders wish to rely on the prospectus to resell these shares, then we must first file a prospectus supplement naming these individuals as selling shareholders and providing the information required concerning the identity of each selling shareholder and his or her relationship to us.  (*Id.*)

Elsewhere, the Goff registration statement directed that "[t]he resale of our common stock must be by way of registration or through reliance upon an exemption from registration."  (*Id.*)

Norstra's purported offering of securities expired 180 days after its July 12, 2012 effective date:

> This offering will terminate upon the earlier to occur of (i) 90 days after this registration statement becomes effective with the Securities and Exchange Commission, or (ii) the date on which all 60,000,000 shares registered hereunder have been sold.  We may, at our discretion, extend the offering for an additional 90 days.  In any event, the offering will end within 180 days of this Registration Statement being declared effective.  (Am. Compl., ¶ 67)

Verdmont's sales of Norstra stock began in April 2013 – beyond the 180-day cut-off.  (*Id.*, ¶ 102)

A comparison between the information available in the shell companies' earlier registration statements and the "information" broadcast in the aggressive stock promotion campaigns that were underway at the time of Verdmont's sales demonstrates why Verdmont's reliance on the earlier registration statements would frustrate Section 5's mandate that public investors receive accurate, complete and timely disclosure of an issuer's financial information

and management's discussion of business risks and future prospects.  The new information disseminated into the markets at the time of Verdmont's sales bore no resemblance to the information disclosed in the earlier registration statements.  The shell companies were in completely different businesses.  For example, the registration statement for Goff represented that the company was in the business of Internet-based job placement in the United Kingdom and Ireland.  (Am. Compl., ¶ 47)  Less than two years later, Goff purportedly held a mining lease and was actively involved in gold and diamond exploration in Colombia.  (*Id.*, ¶¶ 58-60)  The registration statement disclosed that Goff was a development stage company with no assets, operations or revenue, warned that investing in the company was highly risky, and acknowledged that the company faced a number of hurdles before it could be successful.  (*Id.*, ¶¶ 45, 47)  The March 2013 stock promotion campaign was not constrained by any such warnings (except for the standard disclaimer as to forward-looking statements) and was not supported by audited financial statements.  (*Id.*, ¶ 61)  The investors who bought the Goff, Norstra and Xumanii securities sold by Verdmont were deprived of the information needed to inform their investment decisions.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 127 (1953) (in determining whether sales of a security are exempt, "[t]he focus of inquiry should be on the need of the offerees for the protections afforded by registration").

Verdmont's argument that the earlier registration statements covered its subsequent sales is contrary both to the law and to the purpose served by registration.  The SEC has adequately pled a *prima facie* case that Verdmont violated Section 5.

## III.  VERDMONT CANNOT ESTABLISH THAT ITS SALES WERE EXEMPT UNDER SECTION 4 OF THE SECURITIES ACT.

"The effect of [the *prima facie* case] is to cast upon [the seller] the burden of showing that for some reason Sections 5(a) and (c) do not apply to [it]."  *SEC v. North American*

14

*Research & Development Corp.*, 424 F.2d 63, 71 (2d Cir. 1970).  *Accord SEC v. Ralston Purina Co.*, 346 U.S. at 126 ("[k]eeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable"); *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959)(the rationale of *Ralston Purina* "applies as well to a broker-dealer who claims the benefit of a similar exemption").  The exemptions are strictly construed against the seller "to promote full disclosure of information for the protection of the investing public."  *Cavanagh*, 445 F.3d at 115.  *Accord SEC v. Verdiramo*, 890 F. Supp. 2d 257, 266 (S.D.N.Y. 2011).

The distinction between a public offering and ordinary trading is at the heart of the registration exemptions allowed by the Securities Act.  For example, under Section 4(a)(1), "everyday trading between members of the investing public," *North American Research*, 424 F.2d at 72, is exempt from the registration requirement.  Conversely, distributions involving issuers, their intermediaries (such as control persons and statutory underwriters), and professional brokers and dealers, are not exempt under Section 4(a)(1).  Even where the person selling the securities is not an issuer, underwriter or dealer, he or she is not protected by Section 4(a)(1) if the offer or sale of securities is part of a transaction by another person who is an issuer, underwriter or dealer.  *SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir. 1959).  Persons "who are engaged in steps necessary to the distribution of security issues," *SEC v. Chinese Consolidated Benevolent Association, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941), are not entitled to the Section 4(a)(1) exemption.  *Accord SEC v. Guild Films Co.*, 279 F.2d 485, 490 (2d Cir. 1960); *SEC v. Holschuh*, 694 F.2d 130, 138 (7th Cir. 1982).

Even though Verdmont initially contended that its sales of Goff, Norstra and Xumanii securities were exempt under Section 4(a)(1) (ECF No. 46 at 8-9), it has apparently abandoned

that contention.  Now, Verdmont admits that it "was acting as a broker on behalf of its clients"
(ECF No. 107 at 9) and "may have been a dealer" (*id.* at 11).  *See* Section 2(a)(12) of the
Securities Act, 15 U.S.C. § 77b(a)(12) (a dealer is "any person who engages either for all or part
of his time, directly or indirectly, as agent, broker, or principal, in the business of offering,
buying, selling, or otherwise dealing or trading in securities issued by another person").  Given
the unavailability of Section 4(a)(1) to brokers and dealers, Verdmont must look elsewhere for
an exemption.  *See In re Quinn & Co.*, 44 S.E.C. 461 (Jan. 25, 1971), 1971 WL 120484, at *4
(1971), *aff'd sub nom. Quinn & Co. v. SEC*, 452 F.2d 943 (10th Cir.).  Thus, Verdmont contends
that its sales are exempt under:  (1) the "dealer's exemption" in Section 4(a)(3), and (2) the
"broker's exemption" in Section 4(a)(4).  Neither is available here.

## A.  The Dealer's Exemption Of Section 4(a)(3) Is Not Available.

Sections 4(a)(3) and (4) are the two exemptions from registration applicable to broker-
dealers.  The registration requirement of Section 5 applies to any person who offers to sell or buy
any security, unless the transaction is exempted.  Because a broker-dealer regularly buys and
sells securities as a principal (dealer) or as an agent (broker), Congress had to decide which kinds
of transactions involving broker-dealers should be exempt from Section 5.  As one commentator
explained:

> The primary purpose of the [Act] was to ensure that persons making a public
> offering of securities would disclose all material information about the issuer and
> the offering so that prospective purchasers could make intelligent investment
> decisions.  If this goal was to be achieved, some way had to be found for
> distributing to the public the mandated disclosure that was embodied in the
> statutory prospectus.  An obvious choice for this task was the professional broker-
> dealer who is often an essential link between the ultimate investors and an issuer,
> or a majority security holder who plans to distribute securities.

J. William Hicks, *Exempted Transactions Under The Securities Act of 1933*, § 12:1 (updated

2015) (available on Westlaw) ("*Hicks*").  It is the broker-dealer who, when participating in a

public offering of securities, furnishes investors with a prospectus containing the required material information.  In contrast, no prospectus is required once securities have come to rest in the hands of public investors, who then use a broker to make further trades in an already-established secondary public market.  The dealer's and broker's exemptions spring from the legislative premise that Section 5 was intended to require registration for distributions while exempting ordinary trading in the secondary market.  If a broker assists in an unregistered distribution, it does not deliver a statutory prospectus to public investors because, by definition, no such prospectus exists, and the investors who buy in such a distribution are deprived of the full disclosure that is required by Section 5.

The dealer's exemption in Section 4(a)(3) provides that "[t]he provisions of section 5 shall not apply to . . . transactions by a dealer . . . except – (A) transactions taking place prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter . . ." 15 U.S.C. § 4(a)(3)(A).  The broker-dealer is exempt from Section 5 liability if it functions as a principal or agent in ordinary trading transactions.  In contrast, as the Commission explained in *Quinn & Co.*,

> The dealer's exemption in Section 4(3) is not available to a dealer who is selling unregistered securities for an underwriter.  The House Report, again emphasizing the distinction between trading and distribution, stated that in recognition of the fact that a dealer is often concerned not only with the distribution of securities but also with trading in securities, an exemption was provided for a dealer as to trading when such trading occurs after [the] period of distribution.  It is apparent from that statement that transactions by a dealer during the period of distribution are not exempted from the registration and prospectus requirements, and this conclusion is particularly compelling when the dealer is acting directly for a statutory underwriter.

44 S.E.C. 461, 1971 WL 120484 at *5.

Section 4(a)(3) is similarly unavailable for broker-dealers who are not participants in the underlying public offering but who transact in the securities within the first forty days from when

17

the securities were first *bona fide* offered to the public by the issuer or by or through an underwriter.  Even if the broker transacts outside of the forty day period, however, he is not entitled to the 4(a)(3) exemption if he is trading for an underwriter in light of the purpose of Section 4 to exempt only ordinary trading and not distributions.  In connection with the 1954 amendments to what is now Section 4(a)(3), the Senate Report cautioned that "if the dealer is a participant in any such unlawful distribution he cannot lawfully affect [sic] transactions in the unregistered securities so long as he is engaged in the distribution even though the 40-day period has expired."  Senate Rep. No. 1036, 83d Cong., 2d Sess. at 14 (1954).

To qualify for the Section 4(a)(3) exemption, Verdmont has the burden of proving that its sales of Goff, Norstra and Xumanii securities were not part of an unregistered distribution by an underwriter.  The well-pled allegations in the Amended Complaint demonstrate that Verdmont is not likely to carry its burden.  First, Verdmont's sales were a distribution of substantial blocks of securities to public investors and therefore were public offerings as opposed to ordinary trading transactions.  There is nothing ordinary about offering and selling into the markets millions of shares of unknown penny stocks that had not previously been sold to public investors.

Second, Verdmont's customers – Lornex, Nautilus and Bartlett – acquired their securities from parties under the control of the issuers or their affiliates and with the intent to distribute those securities to the public.  Verdmont's customers therefore were statutory underwriters under Section 2(a)(11).  The facts and circumstances show that there was no distribution of the Goff, Norstra and Xumanii securities issued in the names of the non-management shareholders, that the shell companies and their affiliates retained control of the Securities, and that the unlegended stock certificates were not in the hands of the shareholders, but of the shell companies or the persons who controlled them.  The transfer agent mailed the stock certificates to the shell

companies instead of the shareholders.  (Am. Compl., ¶¶ 49, 68, 85)  When the stock certificates were transferred, the transfer was effected by third-parties such as Philip Kueber or Celtic Consultants, which sent the certificates in substantial batches to the transfer agent.  (*Id*., ¶¶ 50, 69, 86)  In each case, the issuer stepped in and directed the transfer agent to make the transfers. (*Id*., ¶¶ 50, 69, 86)  The stock powers accompanying the stock certificates contained irregularities, indicating that the shareholders had not consented to the transfer of their securities.[5]  (*Id*., ¶¶ 50, 53, 69, 86).  The allegations of the Amended Complaint support the strong inference that the securities obtained by Verdmont clients were "controlled" by the issuers.  *SEC v. Kern*, 425 F.3d 143, 150 (2nd Cir. 2005) (owners of stock "controlled" by issuer "where, as here, the controlling persons so dominated those controlled as to be able to gain upwards of 90% of the stock from Owners"); *SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 330 (6th Cir. 2013) (denying exemption for transfers from 33 shareholders who provided stock powers to affiliate-defendant who controlled the transaction.).

The events following the transfer of the Securities to Lornex, Nautilus and Bartlett demonstrate their intent to sell the Securities in public distributions.  They deposited the stock certificates with Verdmont, which sold the Securities on their behalf in large blocks over periods of days or weeks, simultaneously with aggressive stock promotion campaigns, and into public markets that had never before been exposed to Goff, Norstra or Xumanii, all worthless shell companies.  (Am. Compl., ¶¶ 58-63, 76-80, 91-96)  They were underwriters.  *See Gilligan, Will & Co. v. SEC,* 267 F.2d at 467–68 (shares sold more than ten months after being acquired had not been "held for investment" and thus were bought "with a view to distribution.").  As the broker-dealer selling securities for these underwriters, Verdmont was an essential link in the

---

[5] An effective registration statement simply authorizes the offering.  It does not prove that the security was actually offered and sold.

chain of transactions whereby securities originating from the issuer came to rest in the hands of public investors.  Section 4(a)(3) is therefore unavailable to exempt Verdmont's sales from Section 5 liability.

Even if Verdmont were not selling for statutory underwriters, Verdmont's sales were at the beginning of the public offerings  -- in the case of Goff, on the first day of trading – and thus within the forty-day period excluded from the exemption as provided in Section 4(a)(3)(A). *Quinn & Co.*, 44 S.E.C. 461, 1971 WL 120484 at *5 (broker-dealer "was not entitled to the exemption under Section 4(3) for trading transactions by dealers" because it sold all or part of the stock almost immediately after customer "obtained the stock certificates from the issuer").

## B.  The Broker's Exemption Of Section 4(a)(4) Is Not Available.

The only other exemption for broker-dealers is the limited broker's exemption of Section 4(a)(4).  Section 4(a)(4) exempts from registration "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders."  15 U.S.C. § 77d(a)(4).  Section 4(a)(4) was a necessary exemption to allow a broker to engage in the limited role of trading in securities on an unsolicited basis in the first forty days of a public offering, even if the broker was unable to deliver a prospectus.  *See Hicks*, § 13:1.  But just like Section 4(a)(3), Section 4(a)(4) is "intended to exempt trading transactions with respect to securities already issued to the public," but not "distributions by issuers or underwriters."  *In re Quinn & Co.*, 44 S.E.C. at 466, 1971 WL 120484 at *4.  *Accord Quinn & Co. v. SEC*, 452 F.2d at 946.  The Commission has consistently held that this exemption is not available "when the broker knows *or has reasonable ground to believe* that the selling customer's part of the transaction is not exempt since in that event the broker likewise violates Section 5 by participating in a non-exempt transaction."  *In re Quinn & Co.*, 44 S.E.C. at at 467,

1971 WL 120484 at *5 (emphasis added).  *Accord In re Carley*, 92 SEC 1316 (Jan. 31, 2008),

2008 WL 268598, at *9, *granted in part, denied in part and remanded sub nom. Zacharias v.*

*SEC*, 569 F.3d 458 (D.C. Cir. 2009).

      As the Ninth Circuit recently recognized, "a broker is not merely an 'order taker.'"

*World Trade Financial Corp. v. SEC*, 739 F.3d 1243, 1248 (9th Cir. 2014).  *Accord In re Leigh*,

50 S.E.C. 189, 193, 1990 WL 1104369, at *4 (1990) (same).  A *bona fide* "broker's transaction"

is one in which the broker

> *after reasonable inquiry* is not aware of circumstances indicating that the person
> for whose account the securities are sold is an underwriter with respect to the
> securities or that the transaction is part of a distribution of securities of the issuer.

Rule 144(g)(4), 17 C.F.R. § 230.144(g)(4) (emphasis added).[6]  *Accord World Trade*, 739 F.3d at

1248.  The broker has a continuing responsibility "to know both its customers and the securities

being sold."  *Sales of Unregistered Securities by Broker-Dealers*, 1971 WL 127558 at *2.  This

duty of reasonable inquiry is important because "violations of the antifraud and other provisions

of the securities laws frequently depend for their consummation . . . on the activities of broker-

dealers who fail to make diligent inquiry to obtain sufficient information to justify their activity

in the security."  *In re Alessandrini & Co.*, 45 S.E.C. 399, 406, 1973 WL 149302, at *6 (Oct. 31,

1973), *aff'd sub nom. Budin v. SEC*, 508 F.2d 836 (2d Cir.1974).

      Verdmont does not dispute its duty of reasonable inquiry.  But it argues in conclusory

fashion that this duty was satisfied by simply noting the existence of a registration statement at

the time it received the Securities and noting that the Securities "tack back" to prior purported

---

[6] Rule 144 provides a non-exclusive safe harbor under the Section 4(1) exemption for the
resale of securities held by an affiliate of the issuer, regardless of how the affiliate acquired the
securities, as well as for the resale of "restricted securities" under certain conditions.  The
definition of "brokers' transactions" is employed in Rule 144's manner of sale condition (Rule
144(f)) for entitlement to the safe harbor.

offerings described in registration statements.  Verdmont claims that it would be unfair to expect

it to detect the "sham" nature of those prior offerings.[7]  But irrespective of the legitimacy of the

prior offerings, Verdmont's responsibility as a broker did not end upon receipt of the Securities.

A broker has

> a responsibility to be aware of the requirements necessary to establish an
> exemption from the registration requirements of the Securities Act, and should be
> reasonably certain that such an exemption is available before engaging in
> transactions which raise a question of compliance with those requirements.

*In re Merrill Lynch Pierce, Fenner & Smith*, 45 S.E.C. 185, 188, 1973 WL 149268, at *3 (1973).

The broker "must take whatever steps are necessary to be sure" that it is not participating in

transactions involving an issuer, a control person of the issuer, or an underwriter.  *Quinn*, 44

S.E.C. at 468, 1971 WL 120484 at *5.

Verdmont's description of its purportedly "reasonable inquiry" is silent as to any actions

it took after receiving the Securities; it apparently did nothing to confirm that the sales made in

Verdmont accounts were not part of a public distribution.  Verdmont was confronted with

numerous red flags indicating otherwise.  As the Commission noted in a seminal Exchange Act

Release issued more than fifty years ago:

> The amount of inquiry called for necessarily varies with the circumstances of
> particular cases.  A dealer who is offered a modest amount of a widely traded
> security by a responsible customer, whose lack of relationship to the issuer is well
> known to him, may ordinarily proceed with considerable confidence.  On the
> other hand, when a dealer is offered a substantial block of a little-known security,
> either by persons who appear reluctant to disclose exactly where the securities
> came from, or where the surrounding circumstances raise a question as to whether
> or not the ostensible sellers may be merely intermediaries for controlling persons
> or statutory underwriters, then *searching inquiry* is called for.

---

[7] Had Verdmont read the registration statements it purports to have relied upon, it would
have known that its sales were improper.  As explained above (*supra* at p. 13) the registration
statement for Goff states that subsequent sales of the securities required additional registration.

*Distributions by Broker-Dealers of Unregistered Securities*, Exchange Act Rel. No. 33-4445, 1962 WL 69442, at *2 (Feb. 2, 1962) (emphasis added) ("*Distributions by Broker-Dealers*"). *Accord In re Kane*, 48 S.E.C. 617, 621, 1986 WL 626043, at *4 (1986), *aff'd sub nom. Kane v. SEC*, 842 F.2d 194 (8th Cir. 1988); *In re A.G. Becker Paribas Inc.*, 48 S.E.C. 118, 120, 1985 WL 548591, at *2 (1985). The Commission warned brokers that it was not enough "merely to accept 'self-serving statements of [their] sellers and their counsel without reasonably exploring the possibility of contrary facts.'" *Distributions by Broker-Dealers*, 1962 WL 69442 at *1. *See also ACAP Financial, Inc. v. SEC*, 783 F.3d 763, 766 (10th Cir. 2015) (finding that the broker "ignored a number of warning signs that the [securities] sales were illegal.").

The 1962 Release described the circumstances in which a broker *must assume* that the securities originate from the issuer or an affiliate:

> [W]here substantial amounts of a previously little known security appear in the trading markets within a fairly short period of time and without the benefit of registration . . . it *must be assumed* that these securities emanate from an issuer or from persons controlling the issuer, unless some other source is known and the fact that the certificates may be registered in the names of various individuals could merely indicate that those responsible for the distribution are attempting to cover their tracks.

*Distributions by Broker-Dealers*, 1962 WL 69442 at *2 (emphasis added).

In 1991, the Commission again reminded brokers of their duty to investigate large sales of unknown securities:

> The Commission has repeatedly stated that a broker-dealer that is asked to sell a large block of a relatively unknown stock must conduct an appropriate inquiry regarding the need for registration and must be alert to any unusual circumstances that may exist or which may come to light. The inquiry must be made prior to the initiation of sales of the securities and must be appropriate in light of the particular circumstances which confront the broker-dealer to ensure that the transaction does not involve an issuer, a person in a control relationship with an issuer, or a statutory underwriter.

*In re Transactions in the Securities of Laser Arms Corp. by Certain Broker-Dealers*, 48 S.E.C. 305, 1991 WL 292009, at *14 (1991).  *See also Wonsover v. SEC*, 205 F.3d 408, 415 (D.C. Cir. 2000) (finding that broker was required to use a "searching inquiry" when presented with "a substantial block of a little-known and thinly traded security under circumstances raising questions not only as to whether the ostensible sellers may have been intermediaries for controlling persons or statutory underwriters but also whether they even existed.")

The Goff, Norstra and Xumanii distributions raised numerous red flags that Verdmont either did not know or ignored because it did not conduct the inquiry – searching or otherwise – required by Section 4(a)(4).  Indeed, the red flags confronting Verdmont were very similar to the red flags noted in the Ninth Circuit's recent *World Trade* decision in finding that the broker failed to use a searching inquiry:

> (1) iStorage [the issuer] was a little-known development stage issuer that had a very short operating history; (2) the company had recently undergone a reverse merger, forward stock split, and name change; (3) the stock was thinly traded in the over-the-counter market; and (4) iStorage had just begun trading shortly before the initiation of trading by the [brokers].

*World Trade*, 739 F.3d at 1247.

The red flags for Verdmont included:

- Aggressive stock promotions.  These included both wildly optimistic press releases and even more optimistic stock-touting newsletters.  (Am. Compl., ¶¶ 59-60, 76-77, 92-93)

- No public trading before the stock promotions.  When public trading began, the price of Goff went from $0.00 to $0.28 per share on a volume of 263,914,096 shares; and the price of Xumanii went from $0.10 to $0.19 per share on a volume of 15,240,000 shares.  The price and volume increases for Norstra were less dramatic but followed the same upward trend.  (*Id.*, ¶¶ 62, 79, 95)

- Large blocks of securities.  Verdmont sold:  a net of 14,000,000 shares of Goff and generated net proceeds of $3,526,354; a net of 9,702,000 shares of Norstra generating net proceeds of $8,073,497; and a net of 17,050,000

shares of Xumanii generating net proceeds of $6,064,353.  (*Id.*, ¶¶ 63, 80, 96)

- Development or exploration stage companies.  Goff and Xumanii were development stage, start-up companies with little or no assets and no operations or revenue; Norstra purported to be an exploration stage company but also had little or no assets and no operations or revenue. (*Id.*, ¶¶ 45, 65, 82)

- Little known securities.  Before the stock promotion campaigns, there was no news in the public domain about Goff, Norstra or Xumanii.[8]

- Inexplicable changes in business.  Goff's business changed from Internet job placement to gold and diamond exploration; Norstra's business changed from oil and gas exploration on a 40-acre tract of land in Kansas to exploration in 10,000 acres in the South Sun River Bakken Prospect in Montana; and Xumanii's business changed from selling discounts to tourists in Jamaica to broadcasting live events in high definition over the Internet.  (*Id.*, ¶¶ 58, 73, 91)

- Recent changes in control.  Goff announced a change in control on March 5, 2013; Norstra announced the replacement of its CEO on March 5, 2013; and Xumanii announced the resignation of its CEO on May 10, 2012.  (*Id.*, ¶¶ 57, 72, 88)

- Forward stock splits.  On January 21, 2013, Goff effected a 25-for-1 forward stock split; and Xumanii effected a 5.5-for-1 stock split.  (*Id.*, ¶¶ 54, 89)

- Use of a Panamanian brokerage firm.  The threshold question is, Why did Lornex, Nautilus and Bartlett choose to retain a brokerage firm *in Panama* to sell securities to buyers in the public markets in the United States?  None of them had any connection with Panama:  Lornex was formed in Nevis and its signatories were in the Dominican Republic and the United Kingdom; Nautilus was formed in the Cayman Islands and its signatories were in the Dominican Republic and Switzerland; and Bartlett was formed in Samoa and its signatory was in the Dominican Republic.

- Use of international business corporations.  The owners and signatories of Lornex, Nautilus and Bartlett chose to sell securities, not individually in their own names, but in the form of foreign entities incorporated in Nevis, the Cayman Islands and Samoa, all bank secrecy jurisdictions.  This provided a cloak of secrecy for the owners of these foreign entities.

---

[8]  This changed when the "news" broadcast by the stock promotion campaigns hit the market, causing spikes in trading volume from 0 shares to tens of millions of shares.

These red flags, "when examined individually or in the aggregate, indicate that sales in a security should be halted immediately pending further inquiry." *Sales of Unregistered Securities*, 1971 WL 127558 at *2.  Because Verdmont did not conduct a searching inquiry into Goff, Norstra and Xumanii, public investors lost $17,646,205 paying for worthless securities.

Verdmont missed so many red flags that one might suspect that Verdmont was not merely closing its eyes but was in on the scheme to distribute Goff, Norstra and Xumanii securities into the public markets in violation of Section 5.  At this stage, however, it is clear at least that Verdmont's sales of the Securities are not exempt under Section 4(a)(4).  The well-pled facts in the Amended Complaint demonstrate that Verdmont cannot carry its burden to prove its entitlement to exemption. [9]  The absence of all Section 4 exemptions means that Verdmont is liable for violating Section 5.

## IV.   VERDMONT IS LIABLE TO DISGORGE THE PROCEEDS OF ITS SECURITIES SALES.

The Amended Complaint properly requests that the Court hold Verdmont liable for disgorgement of both commissions and proceeds of its sales of Goff, Norstra and Xumanii securities, even if Verdmont sold the Securities on behalf of Lornex, Nautilus and Bartlett and transferred most of the proceeds to those customers or at their direction.  Verdmont challenges its potential liability for disgorgement of sale proceeds.  This request that the Court should somehow strike proceeds from the Amended Complaint is premature and should be denied.  *SEC v. Buntrock*, Case No. 02-cv-2180, 2004 WL 1179423, at *3 (N.D. Ill. May 25, 2004) ("to the extent that the defendants challenge the SEC's 'pleading' of the disgorgement remedy, that

---

[9]   Verdmont's burden requires it to come forward with *proof* of its entitlement to exemption, not merely bald assertions. *See Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1065 (D. Minn. 2003) (Section 4 exemption "is an affirmative defense that must be *proved* by the [asserting] party . . . and is therefore generally not a basis for a motion to dismiss.").

challenge is rejected as untimely because none of the defendants have yet been found liable for any securities violation"); *SEC v. Cotton*, Case No. 06-905, 2006 WL 6380798, at *18 (C.D. Cal. Dec. 4, 2006)("[I]t is premature for the Defendant to challenge the Commission's request for disgorgement relief at the pleading stage.").  Because the Amended Complaint adequately alleges that Verdmont's sales violated Section 5, and disgorgement is an available remedy, the Court should await determining the scope of disgorgement until after a finding of liability.

In any event, Verdmont should be liable for the proceeds of its sales of Goff, Norstra and Xumanii securities into the public markets.  Verdmont sold the Securities from accounts in its own name at brokerage firms in the United States.  Verdmont admits that it transferred the sale proceeds to its headquarters in Panama, where it credited the proceeds to the accounts of Lornex, Nautilus and Bartlett.  If that is the case, Verdmont can be held liable for disgorgement of the proceeds on a joint and several basis with its customers – meaning, simply, that Verdmont's monetary liability can be reduced by any amounts that the SEC collects from the customers. Disgorgement on a joint and several basis is warranted where there is "successive ownership of profits already realized."  *SEC v. Absolutefuture.com*, 393 F.3d 94, 96 (2d Cir. 2004). Disgorgement consists of "a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset;" it "establishes a personal liability, which the defendant must satisfy regardless [of] whether he retains the selfsame proceeds of his wrongdoing."  *SEC v. Whittemore*, 659 F.3d 1, 10 (D.C. Cir. 2011) (quotations omitted).  *Accord  SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010) ("[w]e have never held that personal financial benefit is a prerequisite for joint and several liability in a Section 5 case).  In the insider trading context, the Second Circuit has held that "district courts possess discretion to allocate disgorgement liability . . . to those responsible for the illegal acts, including those with

27

investment power over third-party accounts used to make illegal investments." *SEC v. Contorinis*, 743 F.3d 296, 304 (2d Cir. 2014).

Courts have imposed disgorgement against all wrongdoers jointly and severally where "[a]lthough there was evidence [that the defendant] transferred some of the proceeds for [a co-defendant's] benefit . . . [the defendant] never established where the ill-gotten gains finally came to rest." *SEC v. Whittemore*, 659 F.3d at 12.  So too here.  In *Whittemore*, the D.C. Circuit recognized that "[v]ery often defendants move funds through various accounts to avoid detection, use several nominees to hold securities or improperly deprived [sic] profits, or intentionally fail to keep accurate records and refuse to cooperate with investigators in identifying illegal profits." *Id*   The Court ordered Verdmont to serve a sworn accounting of the ultimate disposition of the proceeds of the Securities sales.  Verdmont served in response an unsworn document disclosing nothing more than that Lornex and Nautilus accounts were closed, and that "[a]ll balances and holdings of these accounts were withdrawn."  Lornex appears to have been one of Vermont's largest clients, with millions in assets, and regularly traded in large blocks of physical securities like those at issue here. Incomplete account records reflect millions of dollars moving in and out of Lornex accounts with transfers identified only as "wire transfer" or "internal transfer." Verdmont has not disclosed whether the individual named on signature cards for *both* Lornex and Nautilus has signatory authority over other accounts at Verdmont. (*See* Dkt. Nos. 45-1, 45-4).  Verdmont claims to have transferred sale proceeds to its customers, and this is where the trail ends.

Moreover, evidence obtained thus far in discovery demonstrates that Verdmont's role in the Goff, Norstra and Xumanii distributions extended beyond that of a mere broker.  Verdmont was actively creating the appearance of a competitive market for these worthless penny stocks

28

appearing in the public market for the first time.  For example, on March 18, 2013 – the first

trading day after Goff issued a press release announcing its gold and diamond mining activities –

a market for the stock was created by a substantial volume of both buy and sell orders emanating

from a number of accounts at Verdmont.  A trading blotter that the SEC received from a foreign

regulator reflects that on March 18, Verdmont engaged in 27 separate transactions in Goff

securities through more than a dozen different accounts.  *See* Exhibit 1 to the Declaration of

David Williams ("Williams Decl."), filed herewith.  Verdmont engaged in 21 "buy" transactions

on behalf of different Verdmont client accounts.  Verdmont made the buys at prices of $0.22 to

$0.24 per share, and in the aggregate bought more than 5 million shares of Goff.  *Id*.

One of the "customers" buying Goff through Verdmont was an IBC named Creekside

Capital, whose sole signatory and apparent beneficial owner is Glyn Fisher, the President and co-

owner of Verdmont.  Williams Decl. Ex. 2.  Another "customer" was Jacametra Inversiones

S.A., whose sole signatory and 100% beneficial owner is Taylor Housser, the Secretary and other

co-owner of Verdmont.  Williams Decl. Ex. 3.  Together, Creekside and Jacametra bought over

half a million shares of Goff stock and subsequently sold the stock at a profit.

After the multiple buy orders for Goff stock on March 18, 2013, the Verdmont accounts

ordered five successive sells.  Williams Decl. Ex. 1.  The first sell order was executed at a price

of $0.28 per share.  Of more than 8 million shares of Goff sold through Verdmont, almost all of

it originated from the Lornex account.  After the first day, almost all of the Verdmont accounts

who bought Goff stock sold it at a profit.  Trading blotters for Norstra and Xumanii reflect

similar trading patterns.

In response to the SEC's document requests, Verdmont has not produced trading records

demonstrating that the Goff trades from the customer accounts were ordered by the customer or

otherwise unsolicited.  None of this trading has been mentioned – much less explained – by Fisher or Housser in their declarations submitted to the Court.  Further discovery is necessary for the SEC to determine whether Verdmont and its principals in fact collaborated with Lornex, Nautilus and Bartlett, and other customers in unregistered distributions of the Securities.  *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996).  Verdmont offers no persuasive reason for foreclosing discovery by means of a premature ruling on the scope of disgorgement.

## **CONCLUSION**

The Amended Complaint adequately alleges that Verdmont sold Goff, Norstra and Xumanii securities without registration and thereby violated Section 5 of the Securities Act. Verdmont's sales are not exempt under either the dealer's exemption of Section 4(a)(3) or the broker's exemption under Section 4(a)(4) because Verdmont sold for statutory underwriters – *i.e.*, persons who acquired the Securities from the issuers' control persons with a view to a public offering, and because Verdmont cannot establish that it conducted a reasonable inquiry to determine whether its sales were part of illegal distributions.  And because the Commission has properly alleged violations of Section 5, any ruling on the scope of disgorgement is premature. The Court should deny Verdmont's motion for judgment on the pleadings.

Dated:  Washington, D.C.
      June 23, 2015

Respectfully submitted,

  /s/ David Williams          
Richard E. Simpson
A.  David Williams
Ernesto G. Amparo
Attorneys for Plaintiff
Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4492 (Simpson)
simpsonr@sec.gov

## CERTIFICATE OF SERVICE

I certify that on June 23, 2015, I electronically filed the foregoing SEC'S

MEMORNADUM OF LAW IN OPPOSITION TO DEFENDANT VERDMONT'S MOTION

FOR JUDGMENT ON THE PLEADINGS using the CM/ECF system, which will send

notification of such filing to counsel for Defendants Caledonian Bank Ltd., Caledonian

Securities Ltd. and Verdmont Capital, S.A. at the following addresses:

| | |
|---|---|
| Robert J.A. Zito | Sigal P. Mandelker |
| Carter Ledyard Milburn LLP | Margaret A. Dale |
| Two Wall Street | Proskauer Rose LLP |
| New York, New York 10005 | Eleven Times Square |
| zito@clm.com | New York, New York 10036 |
| Attorneys for Defendant | smandelker@proskauer.com |
| Verdmont Capital, S.A. | mdale@proskauer.com |
| | Attorneys for Defendants Caledonian |
| | Bank Ltd. and Caledonian Securities |
| | Ltd. |

_/s/ David Williams_____
David Williams

31