F7G3SECC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          v.                              15 CV 894 (WHP)

CALEDONIAN BANK LTD., et al.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          July 16, 2015
                                          3:00 p.m.

Before:

                    HON. WILLIAM H. PAULEY III,

                                          District Judge

                              APPEARANCES

SECURITIES AND EXCHANGE COMMISSION
        Attorneys for Plaintiff
BY:  A. DAVID WILLIAMS
          RICHARD E. SIMPSON
          ERNESTO AMPARO
          JACK KAUFMAN

CARTER LEDYARD & MILBURN
        Attorneys for Defendant Verdmont Capital, S.A.
BY:  ROBERT J.A. ZITO
          MARK ZANCOLLI
          THEODORE Y. McDONOUGH
          BRANDON ISAACSON

PROSKAUER ROSE
        Attorneys for Defendant Caledonian Bank Ltd. and
Caledonian Securities Ltd.
BY:  MARGARET A. DALE

F7G3SECC

1          (Case called)

2          MR. WILLIAMS:  Good afternoon.  David Williams for the

3     SEC with my colleagues Richard Simpson, Ernesto Amparo, and

4     Jack Kaufman from our New York regional office.

5          THE COURT:  Good afternoon to you.

6          MR. ZITO:  Good afternoon.  Carter, Ledyard & Milburn

7     for the defendant Verdmont by Bob Zito.  I'm joined by Mark

8     Zancolli, Brandon Isaacson, and Theodore McDonough.

9          THE COURT:  Good afternoon, Mr. Zito.

10         MS. DALE:  Margaret Dale for Caledonian Bank and

11    Caledonian Securities.

12         THE COURT:  Good afternoon.  This is oral argument on

13    Verdmont's motion.  Do you wish to be heard, Mr. Zito?

14         MR. ZITO:  Your Honor, we believe that this is a very

15    simple motion, quite frankly.

16         THE COURT:  If you would be kind enough to take the

17    podium.

18         MR. ZITO:  I'm sorry, your Honor.

19         THE COURT:  Thank you.

20         MR. ZITO:  We view this motion as being a very simple

21    one.  We are resting in most part our reliance on Section

22    4(a)(3), which is the dealers exemption under Section 4 of the

23    Securities Act.  That exemption exempts transactions which have

24    occurred at any point after 40 days after the registration

25    statement has been deemed effective, so the registration was

F7G3SECC

```
1    effective.  There are undisputed facts in this case, your

2    Honor.  There are only two sets of undisputed facts.  Those are

3    when the registration statements were deemed effective by the

4    SEC.  Your Honor may take judicial notice of that.  That is a

5    matter of EDGAR, it is right on the EDGAR website, on the SEC's

6    own website, so we have that date, and then we have the date

7    when the first transactions occurred.

8            Your Honor, I have provided to the Court some

9    demonstrative exhibits that show that when those transactions

10   did occur and the pedigree, if you would, of how they were

11   acquired.  And in our reply memorandum, your Honor, we have

12   provided a chart for the Court.  It appears on page four of the

13   reply memorandum.  There is a little chart there that shows

14   when the securities were actually sold.  And references to how

15   that is demonstrated in the record.

16           I don't think that these are facts which are in

17   dispute, your Honor.  And as you can see from the dates of when

18   the transactions occurred, they are significantly after the

19   40-day period.

20           THE COURT:  Doesn't the 40-day period, isn't it also

21   measured from the date of offering to the public?

22           MR. ZITO:  It is.  There is case law that says that

23   that date, when it is offered to public, is when the

24   registration statement is effective.  Is stated effective.

25   That is the date.  So the minute that the SEC says that the
```

F7G3SECC

1    registration statement is effective, that is when it is offered

2    to the public.  And we have case law on that to which we cite

3    in both our memo and our reply.

4            THE COURT:  Why doesn't *Cavanagh* control here?

5            MR. ZITO:  Your Honor*, Cavanagh* was an S-8 case.  An

6    S-8 is a specific offering for employees stock offerings.  It

7    is a stock offering for corporate officers, directors and

8    employees, which, by its own terms under that provision, limits

9    the offering only to those people and cannot then be reissued.

10   It is not an S-1 case.  Once an S-1 registration statement has

11   been filed and once the 40-day period has elapsed, a dealer is

12   pretty much able to sell those without any liability.

13           THE COURT:  But, in *Cavanagh*, didn't the Second

14   Circuit say that the SEC could bring a claim even if a

15   registration statement was filed?

16           MR. ZITO:  I think that case is limited to the facts

17   of that case, your Honor.  An S-8 offering is limited by its

18   very nature, and in order for the transaction to have occurred

19   as to what they were trying to have occurred, under the facts

20   of *Cavanagh*, they were trying to get it out of the hands of the

21   directors and officers who received the S-8 stock, and they

22   tried to through a very certificates merger.  And the SEC and

23   Second Circuit said you couldn't do that without an additional

24   registration statement.

25           THE COURT:  How do you respond to the SEC's argument

F7G3SECC

1    that Verdmont sold outside the terms of the registration

2    statement?

3            MR. ZITO:  To the extent that the SEC argues, as I

4    understand their argument, that the registration statement was

5    confined to the four corners of the people to whom it was being

6    sold to, that's why we have exemptions.  If we look at Section

7    4 of the Exchange Act, of the Securities Act, rather,

8    specifically, liability for unregistered securities only

9    applies to issuers, underwriters, and dealers, and then only to

10   dealers after the 40-day period.  There is a specific exemption

11   for brokers who have conducted due diligence.

12           So, even assuming arguendo that the SEC is correct in

13   their proposition, and intuitively it can't really be correct

14   because you couldn't have securities markets unless you were

15   filing registration statements all the time.  The reason why

16   you're not filing registration statements all the time is

17   because they're exempt transactions.  And that's why the SEC is

18   wrong, quite frankly, your Honor.

19           THE COURT:  Does the SEC need to prove the issuers

20   controlled the initial foreign shareholders individually?

21           MR. ZITO:  Absolutely, your Honor.  We have -- if

22   we --

23           THE COURT:  Would it be enough for the SEC to show

24   that no distribution was made to shareholders generally?

25           MR. ZITO:  Not in order to rebut the exemption, your

F7G3SECC

1    Honor.  We have proven through undisputed and undisputable

2    facts that the dealer exemption applies here and that we are

3    protected by that.

4         If the SEC wants to take the position, which I believe

5    they are, that, well, that exemption does not apply, because in

6    fact Verdmont's customers were in effect statutory underwriters

7    under Section 2(a)(11).  Then they must prove, in order to

8    rebut the presumption about the exemption, they must prove that

9    the people or customers from whom we acquired the stock from,

10   that's Verdmont's customers, were either issuers -- and they

11   weren't -- or controlled by the issuers.  And control by the

12   issuers means that they had some sort of governmental control.

13   They owned 90 percent of the stock in the company.  That they

14   were related.  Their decision making was effected.

15        THE COURT:  Doesn't the timing and volume of the

16   transactions suggest that Verdmont's clients acted as issuers?

17        MR. ZITO:  Your Honor, that is mixing apples and

18   oranges.  What the SEC tries to emphasize is the volume of

19   stock.  What they forget to mention is that, number one, none

20   of Verdmont's clients ever owned more than 5 percent of the

21   issue at the time.  It never owned more than 5 percent.  And

22   they acquired the stock over time.  They bought and sold.  All

23   right.  But, what they emphasize is the word "distribution."

24   What they're doing is they're picking and choosing from the

25   definition of what underwriter is.

F7G3SECC

1          Section 2(a)(11) defines what a statutory underwriter

2    is.  And "distribution" is part of that definition, but the

3    first part, which they don't address at all in their papers,

4    your Honor, is the fact that, in the first instance, an

5    underwriter must have acquired the stock from an issuer or from

6    someone controlled by an issuer.  They don't answer that

7    question at all.  All they say is, well, this must have been a

8    distribution.  Well, that doesn't answer the question, your

9    Honor.

10          THE COURT:  Don't they make that allegation in their

11   complaint?

12          MR. ZITO:  They make the allegation that they are an

13   underwriter without ever alleging how they are underwriters or

14   how there is some control element over the sellers of the stock

15   to Verdmont's customers.  That's never alleged, your Honor.

16   And they have no proof of that.

17          THE COURT:  On this motion, there is a big difference

18   between proof and allegations, aren't there?

19          MR. ZITO:  Not necessarily, your Honor.  We've

20   referred to -- this is a judgment on the pleadings motion as

21   opposed to a motion to dismiss.  And we have cited case law in

22   our papers that say that the Court may look at defenses and the

23   Court may look at both sides of the case and to search the

24   record to see whether there is really a case here.  Not just as

25   to the way the case has been alleged.

F7G3SECC

1                THE COURT:  All right.  I want to change focus for a

2      moment, because you helpfully submitted yesterday the

3      demonstratives that you proposed to use during your argument,

4      and I have a good grasp on two of them.  But I really don't

5      fully understand what is going on with the presplit Norstra

6      shares.  Could you take me through it a little.

7                MR. ZITO:  May I have the liberty of the courtroom,

8      your Honor?

9                THE COURT:  Sure.

10               MR. ZITO:  Your Honor, in order to --

11               THE COURT:  I assume that you've provided these

12      demonstratives to the SEC.

13               MR. ZITO:  Of course, your Honor.

14               The Goff offering as well as the Xumanii offerings

15      were made pursuant to a sale of selling shareholders.  That is

16      to say Norris and Crowley were existing shareholders under the

17      Goff offering.  That's how Lornex acquired their stock.

18               THE COURT:  I got that one.

19               MR. ZITO:  The same is true with respect to the

20      Xumanii transaction.

21               THE COURT:  Right.

22               MR. ZITO:  The Norstra was a best efforts offering.

23      In other words, it was the company that was selling stock.

24      Garpenfeldt, Sanchez, and Palmer acquired their stock not from

25      existing shareholders, but directly from the company.  Lornex

F7G3SECC

1    then acquired the stock from those entities.

2              And by the way, we submitted an opinion letter from

3    counsel saying that the stock was free and clear and able to be

4    traded.  That's part of the record and I can give you a record

5    reference on that, your Honor.

6              Then, the stock went through a series of transactions.

7    The purpose of this exhibit is to demonstrate how Verdmont's

8    customers acquired their stock.  That is to say Bartlett,

9    Lornex, Nautilus, Nautilus and Nautilus.  This is the pedigree

10   from whom they got their stock.

11             The purpose of this chart, your Honor, is to

12   demonstrate that it is the SEC's burden to demonstrate that

13   Tamarind, Pegasus, Isla, Mariposa, Coldstream, were either

14   issuers or controlled by the issuer.  The issuer being Norstra

15   itself.  They don't allege that.  In fact, the complaint

16   doesn't even mention any of these entities' names nor does it

17   allege or explain in what manner they are supposedly controlled

18   by Norstra.  That's the only way that they can demonstrate that

19   there was some sort of a distribution.  A distribution ceases

20   once the stock gets to the public.  And distribution is only

21   one part of the definition of what a statutory underwriter is.

22   The first part of the definition is you must first acquire it

23   from an issuer.  There is a ton of case law out there that says

24   an underwriter gets the stock, acquires the stock from the

25   issuer or someone controlled by the issuer, and sells to the

F7G3SECC

 1   public.

 2            Have I explained that, your Honor?

 3            THE COURT:  Yes.  But the number of shares, when we

 4   get to the transactions with Tamarind, Pegasus, what is the

 5   relationship between Tamarind and Pegasus Global?

 6            MR. ZITO:  There is no known relationship, your Honor.

 7   There is no known relationship between any of these entities.

 8            THE COURT:  Where are the shares coming from?

 9            MR. ZITO:  We have documents that can show this train.

10   We were only required, because these are our clients, to see

11   where they were getting their stock from.  And this is where

12   they got their stock from.  We don't know, nor does the SEC

13   know to my knowledge, know how Pegasus, these other investment

14   companies, acquired their stock.  Nor do I believe we're

15   required to prove that, your Honor.

16            Again, the dealers exemption focuses on this date,

17   which is 7/12/12, and then 40 days thereafter, which is when

18   Lornex actually effects the first sale, which is almost a year

19   later.  Well in excess of the 40-day period.  Therefore, the

20   exemption applies, based on undisputed and undisputable facts.

21   And if the SEC believes that these entities were issuers or

22   controlled by the issuers, which would trigger potential

23   underwriter liability upon Verdmont's customers, then they have

24   to prove that.  They have to at least allege it.  They don't

25   even allege it.  They just say this was a distribution in very,

F7G3SECC

1      very broad strokes.  This was a sham.  They use conclusory

2      language.  There are no evidentiary facts that they use at all.

3      There is not a shred of evidence that they deliver.

4              So even assuming that they allege a case, your Honor,

5      I don't know how they could ever prove this case.

6              THE COURT:  You can return to the podium.

7              MR. ZITO:  Thank you.

8              THE COURT:  Thank you.  What about the SEC's argument

9      that Verdmont was required to do a more searching inquiry into

10     the transactions?

11             MR. ZITO:  I believe your Honor is referring to the

12     broker's exemption.  There are two standalone independent

13     exemptions.  One is the dealer's exemption and one is the

14     broker's exemption.  If the dealer's exemption applies, then

15     the broker exemption is irrelevant.  It is moot.  Because the

16     transactions were exempt.  If your Honor finds that the dealer

17     exemption does not apply for whatever reason, then we would go

18     to the broker exemption, and we would then demonstrate that we

19     conducted due diligence, we found out who the principals of all

20     our clients were, we noticed that the principals of our clients

21     had no relationship with either the issuer or any of the other

22     entities.  And there is no way, this is assuming that our

23     clients were acting as underwriters.  In order for them to be

24     acting as underwriters, they must have acquired the stock from

25     the issuer or an entity controlled by the issuer.  And the SEC

F7G3SECC

1    does not explain what we should have done more or how we could

2    have discovered that, and indeed they don't even allege that in

3    the complaint, they don't even allege the controlling nature of

4    this.  So, if they don't apparently know what the nature of the

5    controlling relationship is, they apparently don't know how we

6    could have found that out.

7              THE COURT:  Anything further?

8              MR. ZITO:  Nothing further, your Honor.

9              THE COURT:  Thank you.

10             MR. WILLIAMS:  Good afternoon, your Honor.  Mr. Zito

11   is apparently resting at this point on the dealer's exemption

12   under Section 4(a)(3) of the Securities Act.  And he points to

13   the date of the registration statements, the S-1 registration

14   statements with respect to each of the three issuers, and

15   argues that 40 days had run since the point of the registration

16   statement, so these sales were exempt.

17             As your Honor noted, it is not simply the date of the

18   effective date of the registration statement that triggers --

19   that undermines the exemption.  It is also the date that the

20   securities, the first bona fide offered to the public.

21             THE COURT:  Let's just back up though for a moment.

22             MR. WILLIAMS:  Sure.

23             THE COURT:  How can the SEC make a prima facie case

24   here when the registration statement were filed?

25             MR. WILLIAMS:  Your Honor, I don't think that Mr. Zito

```
1    was arguing we haven't made a prima facie case.  I think the

2    registration statement describes sales of securities, other

3    than the sales of securities that are at issue in this case.

4    Other than Verdmont's sales.  Other than the sales of Lornex,

5    Norstra and Bartlett Trading.  Those securities are not covered

6    by these registration statements.

7              In Cavanagh, the Second Circuit made clear that each

8    transaction, that each sale of a security must either be

9    pursuant to a registration statement, subject to an exemption,

10   or it's illegal.  Those are the only three possibilities for

11   each sale of a security.  The sales of securities described in

12   those S-1 registration statements are not the sales and

13   security at issue here.

14             THE COURT:  But Cavanagh was an S-8 registration

15   statement, wasn't it?

16             MR. WILLIAMS:  Yes.  An S-8 registration statement is

17   limited to certain types of securities sales, and S-1 is more

18   of a general offering.  But, both registration statements

19   describe sales of securities.  That's the purpose of --

20             THE COURT:  But S-8s describe sales essentially to

21   insiders, don't they?

22             MR. WILLIAMS:  Yes.  And S-1s can frequently describe

23   sales of securities to the general public.  In this particular

24   case, the S-1s, at least one of the S-1s describes sales to

25   certain individuals as opposed to a public offering.
```

F7G3SECC

```
1            What we allege is that these offerings, pursuant to
2    the registration statements, were not actual offerings.  What
3    we allege in the complaint is that the securities were sent to
4    a transfer agent, the transfer agent was told that pursuant to
5    this registration statement the securities were exempt.  The
6    transfer agent removes the restrictive from the securities and
7    sends the securities back to the issuer.  These securities
8    didn't go to investors.  They went, as far as the evidentiary
9    trail indicates, these securities went back to the company.
10           THE COURT:  Weren't the foreign shareholders named in
11   the S-1s?
12           MR. WILLIAMS:  Yes.
13           THE COURT:  Didn't the S-1s say that they had no
14   affiliation with the issuer?
15           MR. WILLIAMS:  That's what they said.
16           THE COURT:  What else should they have said?
17           MR. WILLIAMS:  Well --
18           THE COURT:  Does the SEC have any information or good
19   faith basis to plead that they were insiders or affiliates,
20   that they were affiliated with the issuer?
21           MR. WILLIAMS:  This is what we know about the
22   securities that went to the individuals, your Honor.  The
23   securities were sent back to the issuer.  And that these
24   securities were doled out to various IBC entities at the
25   direction, at the direction of someone who is clearly working
```

F7G3SECC

1   with the issuer.

2           THE COURT:  I have a problem with that.  The amended

3   complaint simply alleges that Empire, the transfer agent, sent

4   the stock certificates to Goff's counsel.  Right?

5           MR. WILLIAMS:  Right.

6           THE COURT:  Who then sent them, according to the

7   complaint, to O'Flynn, right?

8           MR. WILLIAMS:  Right.

9           THE COURT:  How does that show that the Irish

10  shareholders never received them?

11          MR. WILLIAMS:  Well, the indication is that the

12  transfer agent, as I said, sent them back to the company.

13          THE COURT:  Isn't that pure speculation?

14          MR. WILLIAMS:  So, there is no evidence that the

15  shares were disseminated to the investors.  But let's say that

16  actually happened.

17          THE COURT:  The S-1 says it was.  Right?

18          MR. WILLIAMS:  Okay.  So let's say they were

19  disseminated to the investors.  What happens after that, is

20  that the shares are transferred from the name of the investors

21  to Lornex, for instance.  In Mr. Zito's first chart there, the

22  shares are transferred from Norris and Crowley to Lornex.

23          Now, there is a securities purchase agreement that was

24  produced that indicates that the signatures of both Norris and

25  Crowley were guaranteed by O'Flynn.  O'Flynn is the CEO of

F7G3SECC

1   Goff.  And that securities purchase agreement was

2   transferred -- was sent to the transfer agent in order to

3   effect the transfer of the shares from Norris and Crowley to

4   Lornex.

5           Now, what the transfer agent says is that on the

6   signature of O'Flynn alone it would not have transferred the

7   shares.  What we also have is a board resolution directing the

8   shares of Norris and Crowley to be transferred to Lornex.

9           Now, there cannot be, I would suggest, clearer

10  evidence of corporate control over the transfer of shares than

11  a board resolution directing that the shares be transferred and

12  guaranteeing that the signatures were in order.  The fact that

13  Mr. Norris and Mr. Crowley's shares were transferred in a

14  coordinated fashion at the direction of a company itself is

15  substantial evidence that the company controlled this transfer

16  of shares, irrespective of whether or not they ever landed in

17  the hands of Norris or Crowley or not.

18          THE COURT:  Isn't it just a matter of what standards

19  Empire wanted to require to perform the transfer of shares?

20          MR. WILLIAMS:  Well, if the company is exercising

21  power to direct the transfer of shares, that is evidence of

22  control over the shares.  On that point I would direct your

23  Honor to a decision of the Ninth Circuit in a case called *SEC*

24  *v. Platforms Wireless*.  In that case, the Ninth Circuit was

25  reviewing a grant of summary judgment in favor of the

F7G3SECC

```
1    commission on the issue of underwriter status for the

2    defendant.  And the Ninth Circuit rejected the argument that

3    the transfer of ownership of the securities from a corporate

4    affiliate to his wife raised a genuine issue of fact as to

5    control.  And the court said ownership is one means of control,

6    but it is not the only means, and multiple persons can control

7    simultaneously.  The defendant's position is a top-ranking

8    officer of the company with the explicit power to direct the

9    specific share transfers at issue establishes control resting

10   on his title and role at the company, and that conclusion is

11   not contradicted by the mere fact of an ownership transfer.

12   That's at 617 F.3d 1072.

13            THE COURT:  Courts can confront spousal transfers all

14   the time.

15            MR. WILLIAMS:  True.

16            THE COURT:  That doesn't seem to add much, if it is

17   obvious.

18            MR. WILLIAMS:  Sure.

19            THE COURT:  How does that relate to the situation

20   here?

21            MR. WILLIAMS:  Well, your Honor, you have a number of

22   different shares being transferred in a coordinated fashion at

23   the direction of the company.  If the company is exercising

24   control over the shares of the company itself, it is

25   obviously -- I'm not sure how the company could not be in
```

1    control of the transaction if it is directing the transfer.

2         With respect to Mr. Zito's argument that the date of

3    the registration statement controls, he did cite to some Second

4    Circuit authority on that point suggesting that the

5    registration date -- the date of the registration statement

6    might be the date of public offering.

7         But in a subsequent case, the Second Circuit clarified

8    that dicta in a case called *P. Stolz Family Partnership v. Daum*

9    at 355 F.3d 92.  The Second Circuit held that the registration

10   is merely the manifestation of the underlying test which is the

11   genuineness of the offering to the public.  And that the

12   relevant question was when the stock was really and truly

13   genuinely being offered to the public, as opposed to say a

14   simulated offering.

15        That's what we believe we have here:  A simulated

16   offering.  A case in which transfers are made to various

17   foreign individuals and entities on paper, where the form of

18   the transaction is a transfer of shares, but in substance, the

19   shares are in fact given back to the company.

20        On paper, the shares are transferred from these two

21   individuals to Lornex, for instance.  But in substance, the

22   company is directing the transfer of its own shares.

23        If the company, even assuming that the individuals who

24   receive these shares did receive the shares in registered

25   offerings, if the company is later distributing these same

F7G3SECC

1    shares, you can't rely on one offering to cover subsequent

2    distributions of shares.  And to the extent that a

3    distributions reflected in the S-1s are complete when the S-1

4    says they're complete, these are inarguably different

5    distributions than securities.

6              THE COURT:  But it wasn't the company that was

7    distributing the shares later was it?  It was the chain of

8    shareholders.

9              MR. WILLIAMS:  But, when you say the chain of

10   shareholders, the chain of -- these shares are being

11   transferred by the shareholders in unison.  In a coordinated

12   fashion at the direction of the company.  So when the company

13   is directing these transfers in a coordinated fashion, the

14   company is controlling those transfers.  And as such, the

15   parties who are being directed by the company are under common

16   control with the issuer and are treated as issuers.

17             THE COURT:  Hypothetically, let's assume that the

18   initial Irish shareholders of Goff were affiliates of the

19   issuer.  Okay.

20             MR. WILLIAMS:  Yes.

21             THE COURT:  And they filed the S-1.  If I bought

22   shares without knowing that, would I have to file another

23   registration statement to resell my shares?

24             MR. WILLIAMS:  Could you repeat the hypothetical, your

25   Honor?

F7G3SECC

1              THE COURT:  Let's assume that the Irish shareholders

2      in Goff were affiliates of the issuer.

3              MR. WILLIAMS:  Yes.

4              THE COURT:  And the S-1 was filed here, as it was.  If

5      I bought shares from them, would I be subject to having to file

6      another registration statement to resell my shares?

7              MR. WILLIAMS:  So if you as an individual investor

8      bought Mr. Norris' shares and wanted to resell them.

9              THE COURT:  Right.  And I didn't know that they were

10     affiliated individuals with the issuer.  Would I nevertheless

11     have to file a registration statement to sell my shares?

12             MR. WILLIAMS:  Your Honor, if you buy from an

13     affiliate or an issuer with the intent to sell the securities,

14     then you are acting as an underwriter.

15             THE COURT:  So the answer to my question is "yes."

16             MR. WILLIAMS:  Yes.  If you are buying shares from

17     Mr. Norris or Mr. Crowley and they are affiliates of the

18     issuer, and you buy these shares with the intent to resell them

19     to the public, as opposed to for investment purposes, you are

20     acting as an underwriter.  And the unique aspect of this case

21     is that these are companies that at the time of these

22     transfers, they did no business.  They had no revenues.  There

23     is no investment intent in someone buying these shares because

24     there is nothing to invest in.  The only purpose is to acquire

25     these shares, to try and turn them around as a part of what we

F7G3SECC

1    believe is a scheme to promote the stock.

2            There is no business here.  There is no investment

3    intent that one might buy shares from Mr. Norris or Crowley

4    from.  It is merely a circuitous route to distribute these

5    issuer shares to the public upon commencement of the

6    promotional activities.

7            THE COURT:  What about if we assume that they were not

8    affiliates?  That they were not affiliated with the issuer?

9    Would an ordinary member of the public, like me, have to file a

10   registration statement?

11           MR. WILLIAMS:  If you --

12           THE COURT:  If I had bought the shares and was trying

13   to sell them.  Resell them.

14           MR. WILLIAMS:  If an ordinary member of the public

15   bought the shares from Mr. Norris' 210,000 shares and wanted to

16   resell them to the public, and Mr. Norris had no connection

17   with the company, again, the question is are you buying from an

18   issuer with the intent -- with the intent to distribute them?

19   If you're not buying --

20           THE COURT:  I'm buying from Norris, and for the

21   purposes of this hypothetical, we are assuming that Norris is

22   not affiliated with the issuer.

23           MR. WILLIAMS:  I think that generally speaking the

24   answer to the question is no, your Honor, because the shares

25   have been distributed to the public.  That said, the Second

F7G3SECC

 1    Circuit has been pretty clear that an issuer's distribution

 2    extends through the entire process by which the shares leave

 3    the issuer and come to rest in the hands of the investing

 4    public.  So if you're talking about a large block of securities

 5    that have not been previously distributed to the public that

 6    emanate from an issuer, there is at least a question of fact as

 7    to whether or not this is a distribution.  And acting as an

 8    intermediate step within the context of a distribution will

 9    confer upon you underwriter status.  Whether you know it or

10    not.  If you are acting as an intermediary to help this issuer

11    disseminate its shares to the investing public, you are an

12    underwriter.

13         So, the question would be in your hypothetical whether

14    or not this is part of a distribution.  And that's a factual

15    question.

16         THE COURT:  I'm having difficulty understanding the

17    SEC's argument that, on the one hand, the registration

18    statement was a sham, and on the other, you argue that there

19    was really no registration statement here for these sales.

20         MR. WILLIAMS:  Well, what we're saying, your Honor, is

21    that based on how the facts appear, it does not appear there

22    was any sort of genuine or bona fide offering of the securities

23    to the public.  But, I'm not sure I follow exactly --

24         THE COURT:  If the registration statement is needed

25    for every sale.

1           MR. WILLIAMS:  Yes.

2           THE COURT:  Why do you need to make an argument about

3      the registration statements being a sham?

4           MR. WILLIAMS:  Well, I think it explains what is going

5      on here.  It explains why Mr. Norris and Crowley, whether they

6      legitimately received the share certificates or whether they

7      didn't, they are essentially part of the issuer.  They are part

8      of the issuer distribution.  Because as we set out in our

9      papers and we allege in the complaint, the transfers of

10     securities through them, through Lornex and ultimately sold to

11     the public in a coordinated fashion on March 18, was the path

12     by which these shares emanated from the issuer to the public.

13     And so, whether or not we believe that the registration was a

14     sham, for the reasons that we set forth, the securities were

15     sent back to the company.  After the securities were sent back

16     to the company, we see an entity called Celtic Consultants.

17          THE COURT:  What is that entity?

18          MR. WILLIAMS:  It is an entity in Canada that

19     exercised control over a significant number of these

20     transactions.

21          THE COURT:  Who controlled Celtic Consultants?

22          MR. WILLIAMS:  We don't exactly know who controls

23     Celtic Consultants, your Honor.  But what we do know about

24     Celtic Consultants is that Celtic Consultants, the transaction

25     that you see there with respect to the Norstra shares, that

F7G3SECC

```
1    these four million shares are transferred to Lornex.  They were

2    transferred at the direction of Celtic Consultants sending an

3    advice to the transfer agent directing transfers into any

4    number of entities.  We see the transfer from Lornex to Jackson

5    Bennett was also directed by Celtic Consultants.

6              THE COURT:  Starting on that first point about Celtic

7    Consultants and Lornex.

8              MR. WILLIAMS:  Yes.

9              THE COURT:  Don't you need to show a connection

10   between Celtic Consultants and the issuer for your sham theory

11   to have any factual support?

12             MR. WILLIAMS:  Well, we do show a connection between

13   Celtic Consultants and the issuer, your Honor, because what we

14   show is that Celtic Consultants is directing these -- is

15   sending these directions to transfer these shares to the

16   placement agent accompanied with board resolutions from the

17   company.  So clearly, Celtic Consultants is working with the

18   company, because in each of these transfer directions, Celtic

19   Consultants is providing the transfer agent a board resolution

20   directing the transfer of shares.  We see the interaction --

21             THE COURT:  How do you know that's just not a

22   procedural mechanism?

23             MR. WILLIAMS:  A procedural -- how do I know what is

24   not a procedural mechanism, your Honor?

25             THE COURT:  Celtic Consultants is involved just
```

F7G3SECC

1   administratively, procedurally.

2            MR. WILLIAMS:  It may be, your Honor.  Even if that's

3   the case, there is common control being exercised over all of

4   the securities.  And if --

5            THE COURT:  How do you know?  Where is that alleged in

6   the complaint, in the amended complaint?

7            MR. WILLIAMS:  It is.

8            THE COURT:  How do you know it?

9            MR. WILLIAMS:  It is alleged that the boards of the

10  various companies entered resolutions directing the transfer of

11  the shares.  And as I explain, your Honor, that's an indication

12  that the company itself is directing control over the transfer

13  of these shares.

14            And the issue of Celtic Consultants directing the

15  transfers to Lornex go the other way.  The shares that go to

16  Lornex in this transaction are approximately 300,000 less than

17  the shares that were purportedly sold to it.  Lornex directs

18  those shares to go to some other entity at the direction of

19  Celtic Consultants.  What we see here is Celtic Consultants

20  divvying out the shares of each of the issuers into various

21  entities, these entities received the shares and begin selling

22  the shares in what appears to be a coordinated fashion at the

23  same time.  Prior to the sales undertaken by these entities,

24  the public can't buy these shares.

25            Your Honor, your Honor posited a hypothetical of

F7G3SECC

1    buying Mr. Norris' shares or Mr. Crowley's shares.  Unless you

2    came upon one or the other of them, you'd never have a chance

3    to, because they weren't available to be bought prior to the

4    public offering in the securities on the date in which the

5    promotional -- the day after the promotional activities began

6    and the selling commenced.

7             THE COURT:  What is the link between Celtic

8    Consultants and the issuer?

9             MR. WILLIAMS:  The link between Celtics Consultants

10   and the issuer is Celtic appears to be directing the transfer

11   of the issuer -- of millions of shares of issuer securities to

12   the placement agent, and accompanying these transfer directions

13   are board resolutions from the company authorizing and

14   indemnifying the transfer agent for the transfers.

15            THE COURT:  What if Celtic Consultants was taking

16   direction at the shareholder's request?

17            MR. WILLIAMS:  If the Celtics Consultants were taking

18   direction at the shareholder's request, they were still acting

19   pursuant to the issuer's authority to transfer the shares,

20   because the placement agent would not have effected the

21   transfers for the reason that the stock purchase agreements did

22   not have what they call medallion guarantees for the

23   signatures.  So, the only way that these shares could be

24   transferred was pursuant to a board direction indemnifying the

25   transfer agent from making the transfers.

F7G3SECC

1          So, we have the board essentially authorizing these

2     transfers in a coordinated fashion with Celtic.  Whether Celtic

3     is taking direction from the company or the company is giving

4     direction to the Celtic, there is coordinated control being

5     exercised over all of these shares by the company.

6          THE COURT:  If I'm the shareholder and I'm giving

7     direction to transfer the shares, and the transfer agent may

8     insist on certain protocols, whether it is a medallion or a

9     board of directors resolution or something else, right?

10         MR. WILLIAMS:  Yes.  And in *SEC v. Kern* there was a

11    situation where the shareholders had given over powers of

12    attorney to the control person to allow the control person to

13    transfer the shares.  And they knew that they were doing that

14    and they were willing to go along with that.  But at the same

15    time, because they were acting in coordination with the issuer,

16    the Second Circuit held that that common control transformed

17    all of those individuals into the issuer.

18         THE COURT:  Where is there any allegation like that

19    here?

20         MR. WILLIAMS:  Well, the allegation is in the fact

21    that the shares are being transferred to these entities in a

22    coordinated fashion at the direction of the issuer.

23         THE COURT:  At what point was Verdmont no longer

24    entitled to rely on the previously filed registration statement

25    before executing sales?

1          MR. WILLIAMS:  Previously executed -- well, your

2    Honor, that's the thing.  Is that when we're talking about

3    control here, and when your Honor is asking where our

4    allegation is, the issue of control is relevant to Verdmont's

5    status as an underwriter.  Which is relevant to their claim for

6    an exemption, but it is not relevant to our prima facie

7    violation case.  So we haven't undertaken to plead facts that

8    would necessarily undermine every exemption that Verdmont might

9    or might not rely on.  We don't believe we have to do that.

10         What we have to do, what Verdmont has to do, is to

11   prove it's entitled to an exemption.  And we think that the

12   Second Circuit said in *SEC v. Culpepper* that they have to prove

13   that their clients were not underwriters.  They have to prove

14   that their clients were not taking from the issuer.  We think

15   they have to prove that in order to prove their entitlement to

16   a exemption.

17         The prima facie case deals with the sales of

18   securities made by Verdmont in accounts in the name of Verdmont

19   in the United States that were not described on any

20   registration statement anywhere.  If you sell a security that

21   is not described in a registration statement, then you have to

22   prove entitlement to an exemption.

23         THE COURT:  But there was a registration statement

24   here, right?

25         MR. WILLIAMS:  There was a registration statement that

1     covered prior sales.  Not the sales that are at issue here.

2     So, if Verdmont --

3          THE COURT:  Who can rely on that registration

4     statement when they were filed?

5          MR. WILLIAMS:  So, Verdmont's point is what we did is

6     we looked to see that these statements were subject to a prior

7     registration statement, and we assumed that any subsequent

8     trading was ordinary market trading, and there is an exemption

9     for ordinary market trading.  The 4(a)(1) exemption.  But

10    Congress has said that brokers and dealers are not entitled to

11    that exemption.  In order for a broker or a dealer to be exempt

12    from the registration requirements, they have to satisfy the

13    4(a)(3) exemption or the 4(a)(4) exemption, both of which

14    require them to conduct some sort of inquiry or analysis into

15    whether or not they're acting as an underwriter, because they

16    are the gatekeeper.

17         But for Verdmont making its accounts in the United

18    States available to these foreign IBCs, these transactions

19    wouldn't have happened.  They are the gatekeepers to the U.S.

20    securities markets.  For that reason they have some obligation

21    to satisfy themselves that the transactions that they're

22    undertaking are not pursuant to an issuer offering.

23         THE COURT:  Assume that these registration statements,

24    these S-1s were not shams.

25         MR. WILLIAMS:  Yes.

1            THE COURT:  Could Verdmont rely on them?

2            MR. WILLIAMS:  Could Verdmont rely on them for what

3    purpose?  To sell the securities?

4            THE COURT:  For executing sales at the direction of

5    their clients.

6            MR. WILLIAMS:  No.  So if the clients sell securities,

7    those securities are not pursuant to a registration statement,

8    so they would have to be exempt.  So Verdmont would either have

9    to show entitlement to the broker's exemption or the dealer

10   exemption.  And to the extent that the sales took place within

11   40 days of an issue or offering, they would not be entitled to

12   that exemption.

13           THE COURT:  But the sales did not occur within 40

14   days, did they?

15           MR. WILLIAMS:  Yes.  Well, they occurred within 40

16   days of what we believe the date of the public offering was.

17   They were beyond 40 days of the registration statement, that's

18   true.  And I see your point, your Honor.

19           I think the answer to your question is if they sold

20   these securities pursuant to the 4(a)(3) exemption, they would

21   be entitled to that exemption if -- hold on one minute.  Judge,

22   just so I'm clear on your hypothetical.  Your hypothetical is

23   if the registration statements were legitimate, could Verdmont

24   sell pursuant to its customer's directions?

25           THE COURT:  Correct.

F7G3SECC

1             MR. WILLIAMS:  Okay.  So, I think the answer is -- I

2      think the answer is yes.  But, they would have to satisfy

3      themselves, even if the registration statements were

4      legitimate, they would have to satisfy themselves that this

5      sale was not a subsequent part of the offering.  The

6      registration statements themselves describe --

7             THE COURT:  How would they do that?  How would

8      Verdmont do that?

9             MR. WILLIAMS:  Sure.  There is evidence in the record

10     that there were communications between Verdmont and the

11     transfer agent, for instance.  Verdmont would e-mail the

12     transfer agent a one-sentence e-mail that said we just want to

13     make sure that this security tacks back to the registration

14     statement and that's it.  Verdmont could have also asked --

15            THE COURT:  Didn't they do that?

16            MR. WILLIAMS:  They did that, yes.

17            THE COURT:  So, what more should they have done?

18            MR. WILLIAMS:  They should have asked the transfer

19     agent who direct these transfers or shares.  The answer would

20     have been Celtic Consultants.  Who is Celtic Consultants?  And

21     they would have gotten an answer to that.  How were Celtic

22     Consultants able to effect these transfers in the absence of a

23     signature medallion guarantee?

24            THE COURT:  These are questions that the SEC has

25     asked, and the SEC hasn't gotten an answer, has it, from Celtic

F7G3SECC

1   Consultants?

2          MR. WILLIAMS:  We've gotten an answer from the

3   transfer agent, your Honor.  And the transfer agent has told us

4   that the shares were transferred at the direction -- well,

5   based on a board resolution issued by the company.  And as I

6   indicated, the presence of a board resolution authorizing the

7   transfer of the shares in a coordinated fashion is substantial

8   evidence that the company is directing or is certainly playing

9   a role in controlling the transfer of these shares.  That's

10  information that the transfer agent shared with us.  That's

11  information that Verdmont could have obtained from the transfer

12  agent without any particular effort.  It would have alerted

13  Verdmont that this is a part of an issuer distribution.

14         There are a number of different red flags that we lay

15  out in our papers, your Honor, that Verdmont could have and

16  should have made itself aware of.

17         What Verdmont did was it asked the question of the

18  transfer agent at the time it received the shares, and then

19  some weeks later, when the actual offering to the public took

20  place, Verdmont did nothing over the next few transactions.

21  And the case law makes clear that Verdmont is not a mere order

22  taker as a broker.  Verdmont has obligations to make sure it is

23  not participating as part of an unregistered offering.

24  Particularly here, where the registration statements deal with

25  entities that had no business, had no revenues, and the shares

F7G3SECC

```
1    are being offered to the public at a later point at which

2    promotional activities are indicating that an Internet -- what

3    had been a Internet job placement company is now mining for

4    gold and press releases with extravagant revenue projections.

5            THE COURT:  Let's say for a moment that there was no

6    change in the business of the entity, but there was an

7    aggressive stock promotional campaign.  Would Verdmont need to

8    file a new registration statement?

9            MR. WILLIAMS:  Verdmont should have been aware of a

10   promotional campaign at the time it began executing these

11   trades in securities that had not previously been publicly

12   traded, in a situation in which they have a client selling

13   large blocks of shares of these securities, millions of shares

14   of these securities.  There are a substantial number of red

15   flags along those lines.

16           We have Lornex -- and Mr. Zito made a point earlier

17   today that none of the clients had more than 5 percent of --

18   controlled 5 percent of the flow.  But with respect to one of

19   the securities, you have Lornex with 4.999 percent of the float

20   and Nautilus with 4.999 percent of the float, and you look at

21   the signature cards for Lornex and Nautilus and it is the same

22   person on both accounts.

23           There are a substantial number of red flags that were

24   within either the possession of Verdmont or within Verdmont's

25   ability to obtain them that would have alerted them that they
```

F7G3SECC

1    were participating in an issuer offering that was not

2    registered.

3              THE COURT:  If this was a new offering or a new

4    distribution, doesn't the SEC have to allege facts that support

5    the idea that it was emanating from the issuer or an

6    underwriter?

7              MR. WILLIAMS:  Your Honor, again, I think what we need

8    to allege to establish a prima facie violation of Section 5 is

9    these sales were not covered by a registration statement and

10   they were in interstate commerce.

11             With respect to whether or not this was a new issuing

12   or new distribution, I think that it is inherent in the fact

13   that the offering is not described in the prior registration

14   statement, that it is a different offering.

15             I think every time an issuer goes to the market to

16   sell its securities, either directly or indirectly through

17   intermediaries, through underwriters, it must be pursuant to a

18   registration statement.  That's the whole point of the

19   registration statement, your Honor, is that the individuals who

20   are inside the company with knowledge of the company's goings

21   on need to disclose what's going on inside the company to

22   members of the public who are buying those securities.

23             THE COURT:  What in the SEC's view sets Verdmont apart

24   from the brokers and financial institutions involved in these

25   transactions who operated out of the United States, like

1    Scottsdale Capital?

2              MR. WILLIAMS:  Well, Verdmont --

3              THE COURT:  And the Bank of New York Mellon.

4              MR. WILLIAMS:  Well, Verdmont, number one, your Honor,

5    Verdmont is receiving certificated shares which are different

6    than shares that are processed electronically through a

7    computer.  They're receiving from a client, they're handing

8    them a stack of a million shares and this certificate.  That in

9    and of itself is a substantial indication that these are shares

10   that are emanating directly from the issuer.  That's how you

11   get the certificated shares at least in the first instance.

12   And the shares are of substantial volumes.  There are millions

13   of shares.  And the sales transactions that take place take

14   place in accounts in the name Verdmont.

15             And if you ask the U.S. broker-dealers whose account

16   this is, they say it's Verdmont's account.  And yeah, we knew

17   the customer, our customer was Verdmont.  Verdmont is the one

18   undertaking these transactions.

19             THE COURT:  It almost sounds to me like with your

20   reference to the Ninth Circuit case that you are suggesting

21   that brokers should treat registered securities as unregistered

22   when performing due diligence.  What is the point of having the

23   registration statement if you're required to make all these

24   inquiries?

25             MR. WILLIAMS:  Well, typically, when you talk about a

F7G3SECC

registered security, your Honor, I think you're referring to
the restrictive legend that appears on the security that
indicates whether or not the stock is re-traded.  I don't think
that running a security through a registration -- through a
registered offering and having the restricted legend removed
eliminates you from the requirements of Section 5.  I think
that's frankly what was going on here.  Is that there were
these offerings, whereby -- and the offerings were unusual,
your Honor, in that most times, when issuers go to the market
to sell their securities pursuant to the registration
statement, it is done for the purpose of raising money for the
company.  That's the main reason that companies go to the
market to sell their securities.

          These are not done for that purpose.  These were done,
well, we think it was done for the purpose of eliminating the
restrictive legend from the securities and for no other
purpose.  But if there was any purpose for these transactions
other than that, it is not apparent to us.  These were
securities that were sent to the transfer agent, the
restrictive legend was removed, and they were sent back to
where they came from.  There they stayed for, as far as anyone
knew, until these transactions were directed at the behest of
Celtic Consultants, facilitated by board resolutions of the
companies themselves, into these IBC accounts who all began
trading on a coordinated basis on what appears to be the same

F7G3SECC

1    day shortly after promotional activities began.

2            So I think that the ordinary case of someone buying an

3    issuer security pursuant to an offering and having a broker

4    deposit them in the account and then trading securities, is a

5    bit different than a case of an offering undertaken by a

6    company that does no business, undertakes the offering not to

7    raise any money or for any other apparent legitimate purpose,

8    and then the security is sent back to the company, at which

9    point they remain until they're distributed to these offshore

10   IBCs where trading can commence shortly after promotional

11   activities begin.

12           THE COURT:  In your argument today, you used the

13   adjective simulated registration statement.  In your motion

14   papers, you used the adjective sham registration statement.

15   How is a broker-dealer supposed to know whether a registration

16   statement is really just a fiction, a sham, or as you've said,

17   simulated, by which I assume you mean fiction, if it has been

18   filed with the SEC and deemed effective.

19           MR. WILLIAMS:  And the broker's exemption, your Honor,

20   would on its face exempt transactions that a broker undertakes

21   with respect to securities that have previously been subject to

22   registration statements on its face.  It says broker's

23   transactions executed upon customer orders on any exchange or

24   over-the-counter market but not the solicitation of such

25   orders.

1          That language by its terms covers what your Honor is

2     asking about.  But the case law has evolved in such a way that

3     brokers are under an obligation to conduct an inquiry for the

4     reason that they are the gatekeeper.  They have unique access

5     to our markets.  They're responsible to ask hard questions, not

6     just to their customer, but undertake an independent analysis

7     to ensure that they're not participating in an issue or

8     offering.  And we've laid out any number of different red flags

9     that would have been presented to them that they did not

10    uncover that would disallow them that exemption, even though by

11    the language of the exemption they qualify for it.

12          THE COURT:  Anything further?

13          MR. WILLIAMS:  No, your Honor.

14          THE COURT:  Thank you.  Mr. Zito, anything further?

15          MR. ZITO:  Yes.  I think I'll have quite a bit, your

16    Honor.

17          The SEC, your Honor, is conflating basically the two

18    exemptions.  There are two exemptions.  There is a dealer

19    exemption and there is a broker exemption.  The dealer

20    exemption does not require due diligence.  And the dealer

21    exemption is actually lost in the event that the dealer is

22    participating in an underwriting.  A broker exemption does

23    require due diligence, and it supersedes any underwriting.

24    Even assuming that a broker is acting on behalf of an

25    underwriter unknowingly, that is a defense.  But these are two

1       separate exemptions.

2                I want to deal with the dealer exemption first.  Under

3       Section 4(a)(3), the dealer exemption is very clear that a

4       dealer is exempt for anything other than trades that occur

5       within the 40 days of when the effective date -- or the

6       security is offered bona fide to the public.  There is case law

7       which we've cited, it is the *Finkel v. Stratton* case which is a

8       F.Supp. case here in the Southern District of New York, 2000.

9       "A security is bona fide offered to the public at the effective

10      date of the registration statement."  That is the case.

11               The SEC is now arguing, well, that date should not be

12      used because this was all a sham.  And it is all a sham.  Well,

13      what point, I think your Honor asked this question.  At what

14      point was it offered to the public.  Your Honor asked that

15      question.  If that's not the date, and if I may, your Honor, go

16      over to this.

17               If these red dates are not the dates when the

18      securities were offered to the public, 11/11, 7/12, 3/4/11, and

19      concededly, all these transactions occur well after that 40-day

20      period.  And the case law I just cited, your Honor, is that is

21      the date that you look at.  That's the date you look at.

22               But now he's saying this was a sham so you can't look

23      at that date.  So the next question is, assuming they're right.

24      Assuming only arguendo, when was it genuinely offered to the

25      public?  It was at least no later than this date.  8/8/12.  And

F7G3SECC

1   at least somewhere in here, 5/31/13, when Verdmont's customers

2   acquired it.

3           There is no allegation here, your Honor, that the

4   customers of Verdmont were in any way affiliates or related or

5   controlled by the issuer.  That's not the allegation here.  So,

6   they are the public.  So if they got the stock at these dates,

7   your Honor, we then have to look to when did they sell it.  Was

8   it 40 days after that.  And we provided the Court with a graph

9   of that.  It is on page 14 of our opening memo of law and

10  moving memo of law.  It is the fifth column of that graph.  And

11  it shows the date when the securities were first purchased by

12  Verdmont's customers.  And then it shows when the sales

13  occurred.

14          If your Honor compares these two columns you'll see

15  that the shortest period of time is two months, three months.

16  And that's in the Norstra offing.  In some instances, the

17  trades don't happen for a year.  So it is well past 40 days.

18  Even giving Mr. Williams the credit of that argument, he's

19  still wrong, because it is still more than 40 days when the

20  securities ultimately rest with the public.

21          But that's just part of the analysis, your Honor,

22  because one thing that the SEC still has not addressed is how

23  was there control over the sellers of these securities.  The

24  securities that sold to Verdmont's customers.  How was there

25  control.  And how do we define control.

F7G3SECC

And the Second Circuit defines control as the possession, direct or indirect, of the power to indirect or cause the direction of the management and policies of a person, whether the ownership of voting securities by contract or otherwise.

THE COURT:  What about the board of directors resolutions?

MR. ZITO:  That's not -- your Honor, that does not withstand any scrutiny.  What that is, is an indemnification to the transfer agent.  It says "Be it resolved, transfer agent for this corporation be and hereby is directed to process the transfer request regarding certificate and this board of directors does hereby extend this corporation's irrevocable agreement to indemnify said transfer agent for all loss."

All that is saying, all that is doing is the transfer agent says, well, I don't want to transfer this stock unless it is a bona fide certificate.  So they go to the corporation. They say, well, are these bona fide certificates.  You know, if we're going to transfer this, we don't want to transfer fraudulent certificates.  This is a routine document.  Every stock transaction has an indemnification from the company. That doesn't demonstrate control.

And that's the other problem with the SEC's arguments, your Honor, is they say control.  These transactions were controlled.  The transactions were controlled.  That's not

F7G3SECC

```
 1   their burden.  Their burden isn't to show that the transactions
 2   were controlled.  Their burden is to demonstrate that these
 3   entities were controlled by the issuer.  They're talking about,
 4   well, control, there is some sort of control and there is
 5   direction on transferring these stocks.  But they haven't come
 6   up with a scintilla of any kind of evidence or even an
 7   allegation in the complaint as to how these entities, the
 8   sellers of the stock were controlled, therefore making our
 9   customers underwriters.  They must show that they were
10   controlled.  They don't even mention these entities in the
11   complaint, your Honor.  If they don't even mention these
12   entities in the complaint, how can they explain how they were
13   controlled by the issuer?  That's what control means.
14          With respect to the broker exemption, your Honor, the
15   SEC still has not explained what possibly Verdmont could have
16   done to find out again how these entities were controlled.  The
17   fact that there is a board resolution, that doesn't mean that
18   they're controlling anything.  And when I say control, they
19   must demonstrate that the sellers of the securities were
20   controlled by the issuer.  They paint with a broad brush
21   control.
22          We don't know who Celtic Consultants is.  The SEC
23   doesn't even know who Celtic Consultants is.  We don't know who
24   the shareholders of Celtic Consultants are.  We don't know who
25   the officers and directors of Celtic Consultants are.  We don't
```

F7G3SECC

know if there is joint ownership between the issuer and Celtic
Consultants.  They are a consultant.

They are looking at ghosts in this case.  They see
that documents are being transferred.  Well, the stock
certificates were sent back to the company.  There is nothing
untoward about that.  The company asked to have new
certificates issued by transfer agent.  The company gets it.
The company then reissues the stock to the stockholders as an
accommodation.  That's a neutral fact.  There is nothing
untoward about that.  They haven't demonstrated any control, at
all, over those entities that sold stock to Verdmont's
customers.

Your Honor, we need to prove only two facts in this
case.  And these are two facts that are undisputed and
undisputable.  And that fact is, one, when was the effective
date of the registration statements.  That's on EDGAR.  It is
in our brief.  It is not contested, it is not contestable.  The
other fact is when Verdmont's customers, the alternative
effective date or when it was offered bona fide to the public,
is when Verdmont's customers received the stock.  So even
giving Mr. Williams the benefit of his argument, he's still
wrong.  Because we still have 40 days after that when the sale
of the stocks occur.  And that is undisputed and is
undisputable.

Your Honor, I want to talk a little bit about the

F7G3SECC

searching nature of this motion.  This is not just a motion to

dismiss, and this is not merely a motion that says, well, have

they stated a cause of action, regardless of whether there is a

basis for it.  But this is a searching motion.  We have

attached documents, we have given the Court evidence of our

position, we've submitted volumes of affidavits of merits.

We've submitted volumes of documentary evidence showing how the

trades occurred.

        The only thing that the SEC has submitted is a

declaration from an SEC lawyer, and some documents that they

obtained from overseas regulators that we don't even know what

they are.  How are they going to prove their case?  If we go

forward, your Honor, are they going to take testimony of these

people in Ireland, these people in Bosnia, these people in

Belize?  Is this how we're going to conduct this case?  Or

shouldn't that have been investigated beforehand and so we know

what we're dealing with.

        I have nothing further, your Honor.

        THE COURT:  Mr. Williams.

        MR. WILLIAMS:  Thank you, your Honor.  To Mr. Zito's

point on, first of all, to Mr. Zito's point on the question of

control.  I think a threshold issue is who has the burden in

that respect.  The issue of control is relevant to Verdmont's

underwriter status, relevant to Verdmont's client's underwriter

status, is relevant to Verdmont's affirmative defense.  We

F7G3SECC

1   don't have the burden of negating every affirmative defense in

2   our complaint.  And furthermore, it is Verdmont's burden to

3   prove the existence of an exemption.  This is why they're

4   required to undertake this searching inquiry, your Honor.  This

5   is why they're under an obligation to find out exactly where

6   these shares come from, to ensure they don't come from an

7   issuer offering, your Honor.

8            Mr. Zito read the language of the board resolution

9   that dealt with the control issue, and the resolution -- he

10  read it correctly -- it dealt with directing the transfer agent

11  to transfer these shares from one individual to the other.  And

12  Mr. Zito says, well, the SEC doesn't have any indication that

13  the issuer controlled Tamarind's investments or Pegasus Global

14  or Isla Invesco, and that's true.

15           What we have is evidence that the company controlled

16  the shares that were in the names of those entities.  And if

17  they controlled those shares, then they're exercising control,

18  irrespective of who those entities are, irrespective if they

19  agreed to transfer the shares.  What those board resolutions

20  do, if Tamarind Investments wanted to sell its securities to

21  Bartlett Trading, it executed an agreement, the transfer agent

22  would not have transferred those shares.  If Tamarind

23  Investments doesn't exist, and the transfer certificate was

24  forged, with the board resolution, those shares are

25  transferred.  The board resolution is the operative vehicle by

F7G3SECC

1   which the shares transferred, irrespective of what the share

2   transfer agreements said.

3          The companies made these transfers happen.  And the

4   companies making these transfers happen suggests that the

5   company is exercising control over the shares of those

6   entities, whoever the entities are.

7          And if the company is exercising control over millions

8   of shares of its own securities in these transactions, then

9   this is an issuer offering.

10          And Mr. Zito points to the dates in his papers by

11   which Verdmont's client's obtained the shares.  These were

12   private offerings.  This is not the date in which the

13   securities were bona fide offered to the public.  These

14   securities were bona fide offered to the public on the day

15   after the first press release was issued and the public trading

16   commenced.  That was the day it was offered to the public.  Not

17   these sort of private transactions that may or may not have

18   taken place, but were effected, unquestionably effected by

19   virtue of board resolutions directing the transfer of shares.

20   This was an issuer offering, and the date these securities were

21   bona fide offered to the public are the date that these issuer

22   affiliates started selling.

23          THE COURT:  What has the SEC shown to rebut Verdmont's

24   evidence of the dealer's exemption?

25          MR. WILLIAMS:  We've shown, your Honor, the dealer's

F7G3SECC

exemption does not apply if Verdmont is selling for an

underwriter, and Mr. Zito acknowledges as much.  We've shown

that Lornex and the various other entities were in common

control, at least the securities of Lornex and these various

other entities were under the common control of the issuer by

virtue of the issuer directing these shares to be transferred.

        Does that evidence support the inference of control?

We submit it does, your Honor.  I don't know what more evidence

of issuer exercising control over transfer of shares you can

have other than a board resolution saying transfer these

shares.

        The cases we cited support the proposition if you have

the power to effect the transfer of the shares, you control

those shares, whoever's name is on them.  That's not just the

*Platforms Wireless* case.  That's also *SEC v. Kern*, that's also

the *SEC v. CR Brokerage* that we cited from the Sixth Circuit.

Same situation where you have individuals working in concert

with the control person, and they are allowing this person to

direct the transfers of their shares.  So we presented

substantial evidence that the issuer is exercising control over

all of the shares of these companies.

        THE COURT:  Are any of the shares still trading, by

the way?

        MR. WILLIAMS:  Are any of the shares --

        THE COURT:  Right.

F7G3SECC

1          MR. WILLIAMS:  Our understanding is that Verdmont's

2   clients sold all of their shares during the periods relevant to

3   the complaint.  There is no trading suspension on the shares.

4   So the shares are still active.  But there is no -- limited or

5   no activity in the securities.

6          THE COURT:  Is that what the SEC said in the other

7   case that it filed here in this district that's before Judge

8   Sweet related to the Norstra?

9          MR. WILLIAMS:  Is --

10          THE COURT:  Shares.

11          MR. WILLIAMS:  Is what the SEC --

12          THE COURT:  That they're not traded.  That they're not

13   trading.

14          MR. WILLIAMS:  I believe that there was a trading

15   suspension in Norstra briefly, but those are temporary.

16          THE COURT:  In Norstra you're going after the issuer,

17   aren't you?

18          MR. WILLIAMS:  Yes.  Your Honor, I think that even in

19   this case, our investigation in this case is ongoing.  We're

20   trying to make a concerted effort to go after the gatekeepers

21   in this case, the avenue by which the shares were sold.  In

22   that context, Verdmont is the entity that provided the forum

23   for the U.S. security markets for all of these sales.

24          THE COURT:  Why in the SEC's view wasn't the Norstra

25   case related to this case since you are going after the issuer?

F7G3SECC

1          MR. WILLIAMS:  The conduct, obviously the conduct does

2     overlap a little bit.  But in that case, it is a fraud case

3     against the issuer for misrepresentations and fraud.  This is a

4     case involving unregistered sales of securities.  Certainly the

5     unregistered sales benefited from and profited from that

6     illegal promotion.  But, the individuals at issue in that case

7     are different than the individuals in this case.

8          THE COURT:  You don't think there would be any

9     judicial economy or you just want to get away from me.

10          MR. WILLIAMS:  That's not the issue, your Honor.

11     Would there be judicial economy in --

12          THE COURT:  It is hard to see what issue there is,

13     other than a little judge shopping.

14          MR. WILLIAMS:  That's not the issue, your Honor.

15          THE COURT:  Well then, what is the issue?  Since by

16     your own admission there is overlap you've said, and they're

17     related.

18          MR. WILLIAMS:  To my knowledge, we brought to the

19     attention of Judge Sweet the related nature of the cases.

20          THE COURT:  You didn't file the case in that fashion.

21     All right.  Your civil cover sheet puts an obligation on you as

22     a litigant in this court to mark a case as possibly related to

23     another case pending in this court.  Doesn't it?

24          MR. WILLIAMS:  Yes, your Honor.

25          THE COURT:  So, why didn't you mark it as possibly

F7G3SECC

1   related to another case pending in this court?

2            MR. WILLIAMS:  It should have been so marked, your

3   Honor.  To the extent it wasn't, that issue was brought to the

4   attention of Judge Sweet.

5            THE COURT:  Anything else?

6            MR. WILLIAMS:  Nothing else, your Honor.

7            THE COURT:  The government prevails when they play

8   everything above board.  I'm paraphrasing the Supreme Court.

9   I'm sure you know what case I'm talking about.

10           The letter that your commission wrote to Judge Sweet

11  endeavored to explain why the cases were different, and why you

12  didn't file it in the first instance.  And so, it's plainly

13  obvious to anyone exactly what the SEC was up to here.  And I'm

14  just putting you on notice that if it happens again, I'm going

15  to take it up with other authorities and I'll take action on

16  it, because it is an abuse.

17           Decision reserved.  Have a good afternoon.

18                             o0o

19

20

21

22

23

24

25