UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : Case No. 15-cv-894 |
|  | : (WHP)(JLC) |
| CALEDONIAN BANK LTD., | : |
| CALEDONIAN SECURITIES LTD., | : |
| CLEAR WATER SECURITIES, INC., | : |
| LEGACY GLOBAL MARKETS S.A., and | : |
| VERDMONT CAPITAL, S.A. | : |
|  | : |
| Defendants. | : |

_____:


**THE SEC'S MEMORANDUM OF LAW IN
SUPPORT OF ITS PROPOSED SETTLEMENT WITH
DEFENDANTS CALEDONIAN BANK, LTD AND
<u>CALEDONIAN SECURITIES, LTD</u>**

Patrick R. Costello
Derek Bentsen
Bridget M. Fitzpatrick
Ernesto G. Amparo
Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4678 (Fitzpatrick)
fitzpatrickbr@sec.gov

Dated:  Washington, D.C.
        February 08, 2016

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

BACKGROUND ................................................................................................................... 2

I.    PROCEDURAL BACKGROUND ................................................................................ 2

II.   SETTLEMENT OF TERMS ....................................................................................... 3

LEGAL ANALYSIS .............................................................................................................. 3

I.    Standard of Review ........................................................................................... 3

II.   The Proposed Final Judgment and Consent are Fair and Reasonable ................... 5

      a.    The Proposed Final Judgment and Consent are Legal ................................. 5

            1.  Swingplane ........................................................................................ 9

            2.  Norstra ............................................................................................. 15

            3.  Goff .................................................................................................. 17

            4.  Xumanii ........................................................................................... 18

      b.    The Settlement Decree Satifies the Other Three Citigroup Factors ........... 22

III.  The Proposed Judgment is in the Public Interest ................................................ 23

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                                                 *Page(s)*

*Accord Consumer Fin. Prot. Bureau v. Sprint Corp.*
  Case No. 14-CV-9931 WHP, 2015 WL 3395581 *1
  (S.D.N.Y May 19, 2015)......................................................................................3

*Accord SEC v. Randolph,*
  736 F.2d 525, 529 (9th Cir. 1984) ..................................................................4, 23

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388, 391 (2006)....................................................................................3

*In re Caledonian Bank, Ltd.,*
  Case No. 15-10324-mg (Bankr. S.D.N.Y).........................................................2

*In re Tronox, Inc.,*
  Case No.  14-cv-5495 KBF, 2014 WL 5825308, at *7
  (S.D.N.Y Nov. 10, 2014) .................................................................................. 4

*SEC v. Bear, Stearns & Co. Inc.,*
  Case No. 03-cv-2937 (WHP), 2003 WL22466156, at *1
  (S.D.N.Y Oct. 31, 2003) ...............................................................................5, 23

*SEC v. Citigroup Global Markets, Inc.,*
  752 F.3d 285, 293 (2d. Cir. 2014)...................................................3, 4, 22, 23, 25

*SEC v. Contorinis,*
  743 F.3d 296, 304-05 (2d Cir. 2014) ................................................................. 6

*SEC v Cosby,*
  2000 BCSC 0338 (Mar. 29, 2000).....................................................................22

*SEC v. First Jersey Sec., Inc.,*
  101 F.3d 1450, 1474 (2d Cir. 1996)....................................................................6

*SEC v. Gibraltar Global Securities, Inc.,*
  Case No. 13-cv-2575 (GBD)(JCF) ..................................................................6, 21

*SEC v. Manterfield,*
  Claim No. HQ08X00798, High Court of Justice, Queen's Bench
  Division, Royal Courts of Justice, United Kingdom (Feb. 29, 2008)...................22

*SEC v. Wang,*
    944 F.2d 80, 85 (2d Cir. 1991)..................................................................3

*SEC v. Worldcom, Inc.,*
    273 F.Supp.2d 431, 436 (S.D.N.Y 2003)  .........................................5, 23

*SEC v. Vitesse Semiconductor Corp.,*
    771 F.Supp.2d 304, 307 (S.D.N.Y. 2011) ...........................................24

*Swift & Co. v. United States,*
    276 U.S. 311, 325-26 (1928) ................................................................3

*United States v. Int'l Business Machines Corp.*
    No. 14-CV-936 KMK, 2014 WL 3057960, at *1 (S.D.N.Y. July 7, 2014)...........25

**STATUTES AND RULES**


SECURITIES EXCHANGE ACT OF 1934

    Section 5        [15 U.S.C. § 77e(a)(c)]………………………………………1

On February 6, 2015, the SEC filed a civil enforcement action against Caledonian Bank Ltd., a bank formed in the Cayman Islands, Caledonian Securities Ltd., a broker-dealer formed in the Cayman Islands (collectively, "Caledonian"), Clear Water Securities, Inc. ("Clear Water"), Legacy Global Markets S.A. ("Legacy Global") and Verdmont Capital, S.A. ("Verdmont") alleging that they sold without registration securities issued by Swingplane Ventures, Inc., Goff Corporation, Norstra Energy Inc. and Xumanii, Inc. (collectively, the "shell companies") simultaneously with aggressive stock promotions.  Each of the shell companies was a development stage, start-up company with no assets or operations.  The SEC alleged that the Defendants violated Section 5 of the Securities Act [15 U.S.C. § 77e(a), (c)] by selling the securities without registration, and public investors were thereby deprived of relevant information about the shell companies.

The SEC and Caledonian have reached a settlement agreement that is being submitted to this Court for approval because its terms are fair, reasonable, and in the public interest.  The proposed settlement imposes remedies that appropriately balance the egregiousness of the conduct in which Caledonian engaged against the realities of Caledonian's ongoing liquidation. As part of the settlement, Caledonian's court-appointed liquidator turned over voluminous records.  These documents not only provide strong support for this settlement but also will prove beneficial to the ongoing law enforcement investigation of these matters and others.  Some of the documents are summarized below.  They demonstrate that high-level employees at Caledonian executed the relevant trades with clear awareness of their customers' highly suspicious pattern of selling large blocks of penny stocks for companies with no significant trading history or revenues, simultaneously with huge spikes in the volume and price of those penny stocks.  These transactions – which, again, related to companies with no assets, operations, or revenues – netted

approximately $38 million in proceeds.  At least one high-level Caledonian employee knew that their client's trades coincided with highly optimistic press releases – or pumps – for the relevant securities.  Moreover, Caledonian employees deleted messages with the relevant clients on more than one occasion, thereby attempting to conceal their activities; travelled to Panama to visit one client; and bragged to that client – mid pump – that Caledonian's "system makes it pretty easy." Together, this evidence paints the picture of Caledonian knowingly, or at least recklessly, assisting its clients in carrying out their pump-and-dump schemes.  The egregious nature of Caledonian's conduct warrants the significant remedies imposed by the proposed Final Judgment.  Thus, for the reasons set forth in more detail below, the SEC respectfully requests that this Court enter the proposed Final Judgment.

## BACKGROUND

### I.    PROCEDURAL BACKGROUND

Shortly after the commencement of this action, the Cayman Islands Monetary Authority ("CIMA") filed winding up petitions with the Grand Court of the Cayman Islands seeking the liquidation of Caledonian Bank and Caledonian Securities.  The Cayman Court appointed two partners at Ernst & Young, Ltd. to be the Joint Liquidators of Caledonian.  The joint liquidators filed a petition in the United States Bankruptcy Court for the Southern District of New York seeking an order recognizing the Cayman liquidation as a "foreign main proceeding" pursuant to Section 1517 of Title 11 of the United States Bankruptcy Code.  *In re Caledonian Bank Ltd.*, Case No. 15-10324-mg (Bankr. S.D.N.Y.).  The Bankruptcy Court so ordered.  The effect of this recognition is that the Cayman Court will control and supervise the priority of creditors and the distribution of estate assets in Caledonian's ongoing liquidation.

## II.   **SETTLEMENT TERMS**

The settlement includes a permanent injunction against future violations of Section 5, a permanent penny stock bar, and assesses $25 million in disgorgement.  The $25 million figure represents the approximate amount of Caledonian's consolidated net equity as of January 31, 2015, the most recent month-end before the commencement of this action and the filing for Caledonian's winding-up and liquidation in the Cayman Court.  As part of the settlement process, one of the court-appointed liquidators submitted a sworn Affidavit detailing Caledonian's current financial condition.  The SEC has agreed to forgo payment of the $25 million in disgorgement because it does not appear that Caledonian will have any funds remaining after it satisfies the claims of its priority creditors.  Caledonian will neither admit nor deny the allegations.

## **LEGAL ANALYSIS**

### I.   **Standard of Review**

The Supreme Court endorses the propriety of consent judgments.  *Swift & Co. v. United States*, 276 U.S. 311, 325-26 (1928).  Similarly, the Second Circuit "recognizes a 'strong federal policy favoring the approval and enforcement of consent decrees.'"  *SEC v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 293 (2d Cir. 2014) (quoting *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991)).  A district court reviewing a consent judgment proposed by a federal law enforcement agency should "determine whether the proposed consent decree is fair and reasonable, with the additional requirement that the 'public interest would not be disserved' … in the event that the consent decree includes injunctive relief."[1]  *Citigroup Global Markets, Inc.*, 752 F.3d at 294 (quoting *eBay, Inc. v. MercExchange*, 547 U.S. 388, 391 (2006)).  *Accord Consumer Financial*

---

[1]       It is no longer necessary for the law enforcement agency to demonstrate that the proposed consent decree is adequate.  *Citigroup Global Markets, Inc.*, 752 F.3d at 294.

*Protection Bureau v. Sprint Corp.*, Case No. 14-cv-9931 (WHP), 2015 WL 3395581, at *1 (S.D.N.Y. May 19, 2015) (same); *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, Case No. 14-cv-5495 (KBF), 2014 WL 5825308, at *7 (S.D.N.Y. Nov. 10, 2014) ("[a] settlement agreement relating to liabilities under federal environmental law may be approved where it is fair, reasonable, and consistent with federal environmental law"). "Absent a substantial basis in the record for concluding that the proposed consent decree does not meet these requirements, the district court is required to enter the order." *Citigroup Global Markets, Inc.*, 752 F.3d at 294.

In evaluating a proposed consent decree for fairness and reasonableness, a district court should "at a minimum" assess the following:

(1) The basic legality of the decree, (2) whether the terms of the decree, including its enforcement mechanism are clear, (3) whether the enforcement decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind.

*Citigroup Global Markets, Inc.*, 752 F.3d at 295 (internal citations omitted). The Second Circuit has acknowledged that consent decrees vary and thus "a district court may need to make additional inquiry to ensure that the consent decree is fair and reasonable." *Id.* "The primary focus of the inquiry, however, should be on ensuring the consent decree is procedurally proper, … taking care not to infringe on the S.E.C.'s discretionary authority to settle on a particular set of terms." *Id.*

Finally, "[t]he job of determining whether the proposed S.E.C. consent decree best serves the public interest . . . rests squarely with the S.E.C., and its decision merits significant deference." *Citigroup Global Markets, Inc.*, 752 F.3d at 296. *Accord SEC v. Randolph*, 736

F.2d 525, 529 (9th Cir. 1984) ("the courts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment"); *SEC v. Bear, Stearns & Co.*, Case No. 03-cv-2937 (WHP), 2003 WL 22466156, at *1 (S.D.N.Y. Oct. 31, 2003) (the court's "review is particularly deferential when the SEC, in its role as *parens patriae*, is one of the settling parties"); *SEC v. Worldcom, Inc.*, 273 F. Supp. 2d 431, 436 (S.D.N.Y. 2003) ("where one of the settling parties is a public agency, its determinations as to why and to what degree the settlement advances the public interest are entitled to substantial deference").

## II.     The Proposed Final Judgment and Consent are Fair and Reasonable

### a.   The Proposed Final Judgment and Consent are Legal

The proposed settlement satisfies all four of the *Citigroup* elements for evaluating the fairness and reasonableness of proposed decrees.  First, with respect to the legality of the decree, this Court has already issued an Opinion and Order concluding that the Commission's virtually identical claims against Verdmont "adequately pled a prima facie case for Section 5 liability." Dkt. 140 at 24.  The proposed injunctive relief and penny stock bar are remedies that courts frequently impose upon defendants who are found liable for or settling to Section 5 violations.

Further, the amount of disgorgement is supported by the evidence that the SEC has accumulated regarding Caledonian's misconduct.[2]  The $25 million figure represents a compromise between the amount of commissions (which counsel for Caledonian approximates at $1.4 million) and the amount of proceeds (approximately $38 million) flowing from Caledonian's Section 5 violations.  The SEC has already argued to this Court that a broker who violates Section 5 should be liable for disgorging the full proceeds of those violations on a joint and several basis with other participants in the illegal distribution.  Dkt. 115 at 27-28.  Indeed, in

---

[2]      The SEC's agreement to forgo payment of this amount in light of Caledonian's liquidation is addressed in Section III below.

a recent Order entered in *SEC v. Gibraltar Global Securities, Inc.*, Case No. 13-cv-2575(GBD)(JCF), a case involving similar violations of Section 5 by a Bahamian broker-dealer, Judge Daniels held the broker liable for the proceeds of the sales of the securities – more than $10 million – even though Gibraltar wired about $7 million back to the issuer.  *See* Case No. 13-cv-2575(GBD)(JCF) (ECF No. 84, at 5-8.)  The Court noted that it was appropriate to hold the broker jointly and severally liable for total proceeds because it "played an 'indispensable role' in selling the unregistered stock and also refused to participate in discovery."  *Id.* at 8.

In its November Opinion and Order, this Court noted that determining the proper amount of disgorgement is "entrusted to this Court's 'broad discretion' and depends on multiple factors, including [a broker's] relationship to its clients."  Dkt. 140 at 31 (citing *SEC v. First Jersey Secs. Inc.,* 101 F.3d 1450, 1474 (2d Cir. 1996).  This Court also cited *SEC v. Contorinis*, 743 F.3d 296, 304-05 (2d Cir. 2014), for the proposition that "when third parties have benefitted from illegal activity, it is possible to seek disgorgement from the violator, even if that violator never controlled the funds."  *Id.*  Here, Caledonian benefited from the illegal activity by preserving its relationship with its client and earning commissions.  Caledonian participated in that illegal activity by selling the relevant securities in its name on four separate occasions in the face of increasingly suspicious trading activity.  Moreover, Caledonian's recent document production indicates that Caledonian was complicit in its clients' fraud, and that it took significant efforts to please its clients and support their efforts, making the imposition of a larger amount of disgorgement even more appropriate.

The documents that Caledonian produced (via CIMA) as part of the settlement process indicate that the brokerage customers involved with the four relevant securities were Titan, Phillip Kueber, Legacy Global (all three of which have been indicted), Bennington Law, and

Clear Water.[3]  This document production included a 3,346 page transcript of Skype

conversations between representatives of Caledonian and Legacy Global from July 16, 2012 to

February 7, 2014.  The transcript contains conversations related to all four of the shell

companies.  Selected portions of those transcripts are attached as exhibits ("Exh.") 1-5 to this

Memorandum.  For the relevant securities, Legacy Global's trading directions are placed by

Brian De Wit, who was indicted for conspiracy to commit securities fraud, money laundering

and securities fraud.[4]  The managing director of Caledonian Securities Ltd. ("employee # 1")

---

[3]         The Court requested that the proposed settlement "when and if submitted to this
Court for approval, should address any discussions between Caledonian and the SEC about the
beneficial ownership of the shares Caledonian sold."  Dkt. 140 at 18, n. 15.  "[I]n a conference
call on February 7 [2015] attorneys from Proskauer represented to the SEC that Caledonian …
had sold the Securities for the account of customers."  Dkt. 92 ¶ 7.  At the time, Caledonian did
not provide the names of the customers or provide supporting documentation, referencing bank
secrecy laws.  Dkt. 92 ¶ 7.  As the Court is aware, the SEC and Caledonian engaged in settlement
negotiations on February 9, 2015.  Dkt. 91 ¶¶ 38-43.  During an evening call on February 9,
2015, Caledonian represented that it terminated the accounts of co-defendants Clearwater and
Legacy Global in March 2014.  Caledonian indicated that this action was taken in response to
repeated inquiries from CIMA.  At that time, Caledonian did not identify Clearwater and Legacy
Global as the clients behind the Caledonian trades alleged in the SEC's Complaint.  Pursuant to
the settlement process, Caledonian produced documents to CIMA that were, in turn, produced to
the SEC.  The CIMA documents demonstrated that Clearwater and Legacy Global were the
primary Caledonian customers trading in the securities.  Those documents also contain a letter
executed by the purported beneficial owner of more than 20 million shares of Swingplane.  The
signatory to the letter is a Belizean woman who appears to be signing letters on behalf of many
different entities domiciled in Belize, including Rosewood Financial, Inc., Highlander Overseas,
Inc., Lyford Investments, Ltd., Nautical Capital Group, Inc., Omega, and Titan Capital Corp.
The Eastern District indictment alleges (at ¶ 28) that one defendant claimed he had created Titan
and Legacy Global and incorporated more than 5,000 sham companies as a means of
circumventing SEC and IRS reporting requirements through nominee accounts.  Caledonian's
production may contain additional indicia of the use of nominee accounts in whose name the
relevant stocks technically traded.

[4]         De Wit is identified (at ¶ 8) as Legacy Global's president and primary broker in
the Eastern District indictment, which also charges Greg Mulholland as the secret owner of
Legacy Global.  In its November opinion, this Court expressed concerns that the five microcap
cases in the Southern and Eastern Districts of New York could cause "needless duplication of
effort."  Dkt. 140 at 14.  While the Court's comments about the need for better coordination
between investigations have been taken to heart, the SEC would like to provide some context for
the number of cases.  Microcap fraud is an enforcement priority for the SEC, which works to

participated in the majority of the relevant conversations.  The managing director of

Caledonian's parent company, Caledonian Global Financial Services ("employee #2") also

participated in Skype communications with Legacy Global.[5]  The Skype transcript reflects

---

bring meaningful actions in a space where individuals often obscure their identities through the
use of multiple layers of international shell companies in bank secrecy jurisdictions.  Dkt. 91 ¶ 7.
The SEC worked closely with the U.S. Attorney's Office, the IRS, the FBI and the Department
of Homeland security in parallel investigations of a securities fraud, tax evasion and money
laundering scheme involving certain Belize-based entities and individuals.  This investigation
involved an undercover officer and, as a result, the indictment was sealed and the SEC did not
bring cases arising from these investigations until the relevant individuals had been arrested in
the United States.  On September 9, 2014, Robert Bandfield was arrested on a visit to Miami.  In
the summer of 2015, Muholland was arrested on a layover in Phoenix while en route from
Canada to Mexico.  A criminal complaint against Muholland was unsealed on the day of his
arrest and a superseding indictment that also charged Phillip Kueber was subsequently unsealed.
The SEC filed separate Complaints against Bandfield, Muholland and Kueber in the Eastern
District when the criminal actions against them became public.  All three complaints focus on
different microcap securities than the four securities at issue in the present litigation.

The present case, on the other hand, was developed through FINRA referrals and market
data reflecting the role of Caledonian and Verdmont as a seller in numerous suspected penny
stock manipulations.  Dkt. 91 ¶9.  The case targeted offshore gatekeepers who violated Section 5
and, in the process, facilitated four pump-and-dump schemes.  The four foreign broker-dealers
who were named as defendants in this case engaged in the same pattern of activity and are
accused of violating the same statutory provisions.  If the SEC had elected to combine all of
these actions into a massive, sprawling case, it would have had to develop at once all aspects of
the myriad of pump and dumps, including the multitude of entities and individual participants
throughout the country and the world.  This would have needlessly delayed suing bad actors,
many engaged in ongoing microcap fraud, as to whom the SEC and other federal law
enforcement agencies were ready to act.  Even if the agencies could coordinate in such a way as
to bring all cases touching on the same off-shore financial institutions in a single action, the
sheer number of defendants and violations would have made the litigation unwieldy.  The
microcap cases in the Southern and Eastern Districts involve suspicious securities distributions
that are just a small part of the suspicious activity, still under investigation, conducted by an
expansive and shifting web of perpetrators, some but not all of whom are interconnected.  It
appears that the complete roster of perpetrators changes from one distribution to the next.  The
SEC and criminal authorities are proceeding on multiple fronts, usually focused on specific
distributions (such as, for example, Swingplane, Goff, Norstra and Xumanii), individuals,
entities or groups, and where they are most likely to obtain meaningful relief.

[5]     Because the SEC's investigation into violations of the securities laws by other
entities and individuals remains ongoing, we are redacting the names individuals who appear to
have participated in this conduct but have not yet been charged in any of the pending actions in
the Southern and Eastern Districts from exhibits.

tremendous trading activity by Legacy Global approximately one year after Caledonian was acquired by New World Holdings, a privately held investment company in the Cayman Islands. (Exh. 6).  The bank launched Caledonian Securities the same year.  From 2012 through 2015, the SEC received 114 FINRA referrals for Caledonian in connection with the potential manipulation of penny stocks.  Dkt. 91 at ¶ 9.

The Skype conversations for the shell companies and several relevant emails are described in more detail below.  They demonstrate that senior Caledonian employees were aware of the ongoing pump-and-dumps and facilitated Legacy Global in its efforts to capitalize on those schemes.  Indeed, at one point, Caledonian advises a potential customer that they are unable to take his trades because he is an American.  (Some foreign broker-dealers take the position that they are not required to register in the U.S. pursuant to Rule 15(a)(6) of the Exchange Act if they do not solicit U.S. persons).  The customer responded and asked if it would work if he set up an IBC that is not American.  Employee #2 replied that the potential client would "be better looked after by a broker dealer we work closely with called Legacy Global[.]" (Exh. 7).  In other words, Caledonian was well aware that its client, Legacy Global, was trading on behalf of entities and/or individuals who were using IBCs to skirt regulatory requirements. All of the communications discussed below can be imputed to Caledonian through the principle of *respondeat superior* and thus provide a strong evidentiary basis for approving a settlement that imposes a large amount of disgorgement and all available injunctive relief.

### 1.  **Swingplan**e

In mid-October 2012, Caledonian advised De Wit that Swingplane's stock had been rejected by RBC because it was sub penny – it had never traded.  (Exh. 8).  Swingplane's first trade was recorded 3 business days later.  De Wit informed Caledonian the day of the trade and

asked them to re-deposit the Swingplane stock now that it had traded.  (Exh. 8).  Within a month,

on November 28, 2012, employee #1 reported to De Wit that "[Swingplane] has now been

deposited into DTC.  LGM is now long 42,700,000 [shares of Swingplane]."[6] (Exh. 1, Skype at

829).  De Wit replied, "I can imagine that [Swingplane] will be a go in dec or jan."[7]  (*Id.*)  At the

point that De Wit made this comment, Swingplane had only traded once – October 23 – for a

total of 20,000 shares.  Moreover, just a little more than a month had passed since Swingplane

filed an 8-K announcing its dramatic change in business from selling golf apparel (without ever

generating revenue) to Chilean mining.  (Amend. Cmplt. ¶ 38).

By January 21, 2013, Swingplane had only traded on four days for a total of 161,477

shares.  There were a total of 29 media reported trades.  (Exh. 9).  However, as anticipated by De

Wit, all of this changed in January when the stock was "a go."  (Exh. 1 at 829).  On January 22,

2013, Swingplane had media reported volume of more than 15 million shares based on 305

trades in a single day, with Caledonian selling more than 4.5 million shares.  (Exhs. 9 & 11).

The Skype transcript reflects that at least 3.5 million of these shares were based on orders from

---

[6] To provide some context for the use of the acronym "DTC," Caledonian deposited the Swingplane stock certificates (with signed stock powers) into an account in its name at RBC Investor Services ("RBC") in Toronto, Canada.  Caledonian then caused the stock certificates to be transferred to an omnibus custodial account in the name of RBC at BNY Mellon, and BNY deposited the certificates into the Depository Trust Corporation – or DTC – where the certificates became stock held in street name.  (Amend Cmplt ¶33; Dkt 91 ¶17).

[7] Employee #2 participated in this portion of the conversation with De Wit joking that he "can have his new hat and shoes" after being informed that the stock was in Caledonian's DTC account.  (Exh. 1 at 829).  Employee # 2 appears to have been aware of some problems with trades ordered by De Witt.  On November 30, 2012, he told De Wit: "those trades that [another Caledonian employee] mentioned got busted, we were delivered the physical certs back by the broker."  (Exh. 5 at  876).  De Wit replied: "ok."  The two men discussed that the stock was trading at less than one cent and only one broker would trade it in that condition: Scottsdale.  They then decide that selling through Scottsdle would cost more than they would make.  (*Id*. at 876-77).  Employee #2 appears to have removed some of his skype conversations with De Wit and employee #1 (*id*. at 94) and to have travelled to Panama with employee #1 to visit De Wit in August 2013.  (*Id*. at 2457, 2620-21).

Legacy Global.  (Exh. 1 at 1222).  In other words, a single customer in a single day traded more than twenty times as many shares as had ever previously traded – and this was just a portion of an apparent overnight explosion in volume.  During this large uptick in volume, employee #1 expressed concern regarding a new broker they were using, Wilson, Davis & Co., Inc., warning that he did not know them well and he "just [didn't] want them to screw things up and hammer it." (*Id*. at 1220-21).

That same day, in a discussion of Swingplane trades, employee #1 cautioned De Wit, "Clearwater is giving us orders," to which De Wit responded, "no prob."  (*Id*. at 1221). Employee #1 then wrote: "FYI – we had another account bidding what you were selling with the same MM (market maker)," and "We can't do that as it raises red flags."  (*Id*.  1223-34).  The "red flag" this type of activity usually raises is a wash trade done through a single market maker, which is a form of market manipulation in which an investor simultaneously sells and buys the same financial instrument at the same broker-dealer suggesting that perhaps the trades are not arm's length but coordinated to move the market price.  Caledonian advised De Wit, "We will use other MMs between clients," presumably referring to market makers.

A day after this flurry of trading in Swingplane, Caledonian noticed press releases about the company and forwarded them to its customer.  (*Id*. at 1230-31 (Swingplane "has restructured their assignment agreement regarding the acquisition of certain mining concessions in Chile")).  This same day, January 23, Swingplane had media reported volume of approximately 88 million shares.  (Exh. 9).  Again, prior to January 22, 2013, Swingplane had only traded on four days for a total of 161,477 shares.  Caledonian sold approximately 14.5 million shares (roughly three times the prior day's historic volume) on January 23, 2013.  (Exh. 9).  In the midst of this selling activity, De Wit asked, "who can I use to bid for 1mm [Swingplane] at 0.27?"  Employee #1

replied: "BID – we can use Vert" to which De Wit responded, "plz do so and NO SHOW,"[8]

followed by "size" and "day."  Employee #1 and another Caledonian employee both wrote

messages in response to this instruction.  Both messages were deleted.  (Exh. 1 at 1235).  After

removing messages, employee #1 told De Wit, "this is in," presumably referencing the

Swingplane trade.  (*Id.* at 1235).

By this time, as evidenced by the Skype transcript, a high-level Caledonian employee

was aware that (1) its client deposited shares in a stock with virtually no trading history and

predicted the month when its trading volume would explode, (2) the uptick in volume preceded a

company press release by a day, and (3) the same client, which had deposited a huge block of

Swingplane shares, wanted to buy shares in the midst of its selling, a common tactic used in

pump and dumps.  In the midst of all of this activity, two Caledonian employees deleted their

Skype messages to the relevant client, but still continued to carry out the orders.

The following morning, January 24, 2013, employee #1 advised De Wit that "as of last

night, SWVI, Swingplane Ventures, was marked Caveat Emptor by OTC markets.  Can you

please advise or update us on this?  I appreciate the understanding of our concerns."  OTC

market groups identify securities with a caveat emptor symbol (a skull with crossbones) to

inform investors that there may be a reason to exercise additional care.  At the same time,

employee #1 advised Legacy Global, "News on the firm out too," and attached a Swingplane

press release announcing the company's purported deal to acquire 75 percent of the Algarrobo

Property along with management's belief that "the property represents significant potential to

further develop current, near surface high grade copper+/-gold mine mineralization identifies in

---

[8]      Typically, "no show" refers to the size of an order because customers are concerned that they will not get the best price if the market can see that they want to buy or sell a large quantity of stock.

multiple veins into a larger commercial operation." (*Id*. at 1238-39; Amend. Cmplt. ¶ 39). Approximately one minute after forwarding the press release, employee #1 sent De Wit a message and immediately deleted it.[9] (Exh. 1 at 1240). De Wit responded, "you gotta show me how to remove messages." Employee #1 complied and instructed De Wit to "right click." (*Id*. at 1240).

Within three minutes, De Wit instructed Caledonian to "plz bid for 2mm [Swingplane] at 0.275 with vert (Vertical Group, a U.S. broker-dealer) no show." Employee #1 responded, "On it – NO SHOW," meaning no one could see the size of the order. (*Id*. at 1241). Trading records reveal that – consistent with this instruction – Caledonian bought 2 million shares of Swingplane on January 24, 2013. (Exh. 9). Over the next week, from January 25 through January 31, 2013, Caledonian sold approximately 2.9 million shares of Swingplane and bought approximately 5.6 million shares. (*Id*.). During this time, on January 28, Employee #1 advised De Wit, "[Swingplane] news also out" and attached Swingplane's press release updating the public "on Chile's Rich Mineralization." (Exh. 1 at 1260). The press release then announced that the mines on Swingplane's Chilean property "produced variable quantities of high grade copper," and that "further exploration and immediate small scale production is well justified." (Exh. 1 at 1261).

De Wit asked Caledonian to bid on Swingplane at $0.276 and $0.281 (*Id*. at 1263, 1265). Caledonian was aware of concerns about the stock. Employee #1 asked De Wit, "Hi – just following up on [Swingplane]. It is still bones. Any feedback or clarity … on when it will go current?" "Bones" is presumably a reference to caveat emptor or buyer-beware status. De Wit

---

[9]     During the same minute, employee #1 also forwarded a press release for Terra Tech, which reported a push to legalize marijuana, so it is somewhat unclear if the deletion relates to Swingplane or Terra Tech. (Exh. 1 at 1240).

responded that someone "was in panama …[and] will be reaching out today to otcmarkets to get clarity."  The two men then had the following exchange:

> EMPLOYEE #1:  Our [Swingplane] bid is well below now.  Stock trading up nicely.
> De Wit: nice.
> EMPLOYEE #1: [Swingplane] off to the races
> EMPLOYEE #1: Our bid left behind like me at prom…

(*Id.* at 1266).  Employee #1 then quoted a $0.303 price for Swingplane.  (*Id.*)  During this time period, employee #1 (and thus Caledonian) were watching the trading in Swingplane very closely.  On January 29, 2013, both employee #1 and De Wit deleted a series of Skype messages during a discussion of Legacy Global's Swingplane bids.  (*Id.* at 1276).   That same day, employee #1 advised De Wit that there was a "monster" bid for Swingplane at the price of $0.345.  De Wit declined to sell and said they thought it would be even bigger the following day.  (*Id.* at 1280).  On January 30, 2013, Swingplane issued another press release announcing that due diligence property evaluations "indicate significant opportunity to further develop the mineral potential of the property."  (Amend. Cmplt. ¶ 39).  De Wit wrote: "Hi [] … I confirm [Swingplane] is on the berlin bourse and we are looking to transfer 20mm."  (Exh. 1 at 1283).  The next day, January 31, 2013, Swingplane announced that five grab samples recovered from the property "document very high grade copper grades" and "retained anomalous levels of gold."  (Amend. Cmplt. ¶ 39).  In a Skype message with Legacy Global, employee #1 wrote: "Morning Brian – In the U.S. line – you started the day with 24,161,683 [Swingplane].  As you are flipping 20MM – you will have 4MM."  (Exh. 1 at 1286).   During the course of the day, employee #1 noted, "[Swingplane] UP now … wow."  (*Id.* at 1293).  Throughout the pump of Swingplane, Caledonian demonstrated awareness of both (1) successive, highly optimistic press releases (*id.* at 1296), and (2) the fact that its client, Legacy Global, was buying shares of Swingplane while having a large block of shares to sell, which is suggestive of an intent to bolster the price.  For

example, on January 30, 2013, employee #1 wrote: "You SOLD 1.1 MM at 0.37 … BOUGHT 1.1 MM with Vert earlier @.37" and described the trades as cancelling each other out, "Flat for scratch." (*Id.* 1298-99). This is the same type of transaction employee #1 previously referenced as raising "red flags," presumably because of the potential to manipulate the market. The same day as the "flat for scratch" trades, employee #1 advised Legacy Global that it would still have 7 million (of the original 27 million) shares "in case you want to get more active." Employee #1 added, "No push – just like seeing you with a monster gain into a stock with volume and uptick." (*Id.* at 1301).

It is important to place this "monster gain" in perspective. Collectively, the Defendants in the SEC action and their clients distributed approximately 122 million shares of Swingplane stock for sale proceeds of approximately $31 million. (Amend. Cmplt. ¶ 44). The majority of these proceeds were earned throughout January and February of 2013 – approximately four months after a company with no resources or history of generating *any* revenue announced that it was going into the mining industry. (*Id.* ¶ 27). Within three months of Swingplane's promotion – of which Caledonian was aware – the stock had fallen from $0.90 per share to $0.04. (*Id.* ¶ 42). The chances that a customer could perfectly hit the crest of this uptick in trading volume and price without any information about the scheme being perpetrated (and upcoming aggressive touting campaign) are probably on par with the chances of winning the lottery.

### 2. Norstra

There are also a substantial number of Skype communications related to the trading of Norstra, which are attached as exhibit 2. These transcripts also reflect that Caledonian's employees were well aware of the relevant stock's lack of trading history and heavy promotion and their customer's huge, perfectly-timed profits. Norstra had never traded before March 5,

2013 and the best available quote prior to that time was a previous $0.02 bid.  (Exh. 12).  Then, on March 5, 2013, Legacy Global placed a buy order for Norstra and employee #1 responded that the stock "has never traded before and is 0.02 bid."  (Exh. 2 at 1577).  Legacy Global then bid $0.32 on the stock (16 times the only existing bid).  Employee #1 sent a message that "this feels weird/wrong stock" and then forwarded a press release title, "Norstra names new CEO," with the comment, "that is all I see."  (*Id*. at 1578).[10]  It turns out that Norstra was not the wrong stock.  Although it had never traded before, Norstra began trading at other firms that same day at higher prices (which meant that Legacy Global's high bid was not accepted).  Legacy Global somehow predicted that a company with no history of trading that had never earned any revenues was going to trade in this range.  The next day, on March 6, 2013, employee #1 warned Legacy Global that they had to stop placing Norstra bids with a certain broker who "got spooked by our OTC flow."  (*Id*. at 1950).  By March 18, Norstra was announcing its entry into the "Bakken Oil Boom."  (Amend. Cmplt. ¶ 76).

Employee #2 was aware of problems with Norstra.  On June 26, 2013, a trader who appears to be linked to Legacy Global wrote sent employee #2 the following email:

> Spoke to Jim this am.  They temporarily halted NORX.  I think what I suggested about **getting an SEC insider on the payroll** is prudent as we want to stay ahead of the curve!

(Exh. 10) (emphasis added).  Employee #2 responded, "Ok, I hear you."  (*Id*.).  Regardless of what its author intended, this email demonstrates that a high-level Caledonian employee was aware that its trading in Norstra was extremely problematic.  In total, Caledonian sold more than 5 million shares of Norstra for proceeds in excess of $4.5 million.  (Amend. Cmplt. at ¶ 80).

---

[10]     The same day as this initial reference to a bid on Norstra, the company filed a Report Form 8-K announcing that Glen Landry, purportedly "an independent exploration geologist" was Norstra's new CEO.  (Amend. Cmplt. ¶ 72).  This relatively high bid occurred three weeks before 2 million Norstra shares arrived at Caledonian.  (Amend. Cmplt ¶ 74).

These proceeds were earned on a security that – according to Caledonian's own employee – had never traded before.  In other words, the same clients appeared to hit the lottery a second time.

### 3.  Goff

Like Norstra and Swingplane, Goff had virtually no trading history or assets prior to effecting a 25-for-1 forward split of its stock.  (Amend. Cmplt. ¶ 54).  Goff shares were then transferred to Caledonian more than a month before any public trading in the company.  (Exh. 13).  Within two months of the stock split, the company filed a Form 8-K announcing a change of control and – one week later – Goff filed a new Form 8-K announcing an Assignment Agreement that gave it rights to a Colombian mining concession.  (Amend. Cmplt. ¶¶ 57-58). Goff then issued press releases on March 15 and 18, 2013, which gave the impression that Goff was immediately and actively engaged in gold and diamond exploration in Colombia.  (Amend. Cmplt. ¶ 59).  Employee #1 knew of Goff's press releases and sent them to De Wit.  (Exh. 3 at 1715-16).  For example, on April 3, 2013, employee #1 reported to De Wit: "They *just* put out an article on Goff," followed by "Goff is one of the 5 gold stocks you MUST own" and a promise to forward the entire article.  (*Id*. at 1693).  Within 40 minutes of this article, Legacy Global asked for a "no show" bid, or a bid where the market cannot see the size of the block of shares you want to purchase, on Goff at a price of $0.466 and Caledonian appears to execute the order without any reservations.  (*Id*. at 1694-96).

Caledonian knew that Legacy Global and Clearwater – its two customers trading in these securities – were connected.  De Wit placed orders for Clearwater.  (Exh. 3 at 374-76).  On April 4, 2013, while the pump of Goff was ongoing, employee #1 transferred $5 million from Clearwater's banking account to its trading account on De Wit's authority.  (*Id.* at 1715-16).  The discussion of the $5 million occurred within the same hour that employee #1 forwarded two

press releases about Goff to De Witt and referred to the stock (now trading at $0.5811) as "a

PONY."  (*Id*. at 1714-16).  Caledonian appears to have been aware that the price of Goff dropped

steeply soon after the majority of their clients' trades.  On April 10, 2013, employee #1 wrote the

following two messages to De Wit:

> GOFF – WELL off lows, now just off 18%.  Nothing working and no press –
> but wanted to make sure you saw 32 MM traded so far.  3.5 hours to go.

> GOFF doing a walk all the way back.  It is nearly a dime off its low.

(*Id*. at 1755-56).  By the close of trading on April 10, 2013, Goff was listed at $ 0.273.  (Exh.

13).  A mere five days earlier, Goff had been "a pony" trading at $ 0.5811.  (Exh. 3 at 1714-16).

But Caledonian's clients managed to weather the steep peaks and valleys in Goff's price

perfectly during this period of heavy promotion.  Caledonian sold 35 million shares of Goff for

proceeds of approximately $6.8 million.  (Amend. Cmplt. ¶ 63).

### 4.  Xumanii

Xumanii, like Swingplane and Goff, was a company that had "no revenue and no

significant assets" before undergoing a 5.5-for-1 forward stock split.  (Amend. Cmplt. ¶¶ 84, 89).

Prior to May 1, 2013, Xumaniii had traded on two days for a total volume of 1,500 shares and

total dollar volume of $5,500.  (Exh. 14).  Then, in a single day on May 1, 2013, there were

2,517 reported transactions in Xumanii for a total volume of 37 million shares and total dollar

volume of almost $9 million.  (*Id.*).  Legacy Global was an active participant in this trading, with

De Wit placing a series of incremental orders.  (Exh. 4 at 1911-1920).  De Wit then asked

Caledonian to sell 250,000 shares of Xumaniii at every penny increase in price until the stock hit

$0.40.  Employee #1 responded to this request with: "Getting fills," "We are out there for you,"

"liftoff," and "**our system makes it pretty easy**." (*Id*. at 1914-15) (emphasis added).  In

response to the comment about Caledonian's system making it easy, De Wit responded, "whew."

(*Id*. at 1915).  Xumanii opened that day at a price of $0.153 and reached an intra-day high of $0.307.  Caledonian sold more than 4.5 million shares of Xumanii through multiple accounts. (Exh. 14).

The day after this unprecedented volume of trading, Xumanii filed a Form 8-K announcing a new business plan and issued a press release indicating that it was immediately and actively engaged in the business of live broadcasting because it had "acquired the master license to a cutting-edge IP portfolio."  (Amend. Cmplt. ¶¶ 91-92).  Additional promotional materials were issued throughout May, indicating that the company had "already launch[ed] high profile broadcasts" and that its stock "could skyrocket in the near term."  (Amend. Cmplt. ¶¶ 92-93). On July 22, 2013, Xumanii closed at a high of $0.67 per share on trading volume of approximately 28 million shares.  (Amend. Cmplt. ¶ 95).  However, the company's Form 10-K for the year ended July 31, 2013, disclosed that Xumanii had "not yet generated or realized any revenues from [its] business operations."  (Amend. Cmplt. ¶ 94).  By September 11, 2013, the stock had fallen to a price of $0.02 per share.  (Amend. Cmplt. ¶ 95).  Yet once again Caledonian's clients timed the spike in trading volume and price perfectly.  The Bank sold 37 million shares for proceeds of $12 million.  (Amend. Cmplt ¶ 96).

Moreover, it's important to consider that Caledonian sold millions of shares of Xumanii *after* a high level employee received the "SEC insider" email advising that trading in Norstra had been halted.  (Exh. 10).  The Xumanii trades were largely for the same client.  To fully understand how suspicious the circumstances of these trades should have been Caledonian, one need only review the Skype transcript for June 12, 2013.  (Exh. 2 at 2245-2246).  At 7:58 a.m., employee #1 informed De Wit that the 1.8 million Norstra transfer had settled.  At 8:26 a.m., De

Wit asked, "just a question…is vert the only mm that can to RNWB."[11]  Employee #1 replies:
"We've spoken to all other relations," immediately followed by, "no one else wants to touch."
De Wit says this is "all good."  Employee #1 then adds, "I worry we may lose Vert over it,"
immediately followed by, "Their compliance isn't liking it."  (*Id.* at 2246).  De Wit responded in
under thirty seconds with a bid to buy 1 million shares of Xumanii "and show full size."  (*Id.*)
This type of bid, which was made by someone with a huge block of shares to sell, could
effectively set a floor for the price of the stock.  In other words, while executing trades in
Xumanii, Caledonian is settling the proceeds of another pump and dump (Norstra) and advising
the same client that they can only find one broker dealer who will touch their business in another
security – and even that broker's compliance department finds the trades problematic.

***

The SEC has provided this wealth of detail about Caledonian's role in the relevant
transactions to address any concerns the Court may have about a settlement that measures
disgorgement in excess of Caledonian's commissions and based in part on the proceeds of the
transaction.  The court in *Gibraltar* recognized that this is appropriate when a broker dealer plays
an "indispensable role" in the transactions that violate Section 5 and this Court has noted that the
relationship between the broker and its clients is an important part of the inquiry.  *Gibraltar*,
Case No. 13-cv-2575 at *8; Dkt. 140 at 31.  Here, the stock was issued in certificates in
Caledonian's name and ultimately sold from U.S. accounts held in Caledonian's name.  This
helped Caledonian's clients find markets and skirt regulatory scrutiny.  Employee #1 explained
this benefit in an email about a different stock to a trader connected to Legacy Global.  The

---

[11]     The SEC believes this question is asking whether Vertical Group, a U.S. broker-
dealer, is the only market maker who will handle shares in Renewable Corporation (whose ticker
symbol is RNWB).

trader asked why they had to tell a different client they could not trade in the same stock.

Employee #1 responded:

> Brokers have volume restrictions.  They simply won't trade in a name anymore.  Furthermore – CSL [Caledonian Securities] has an internal guideline where we don't like to do more then 30-35% of the volume on the day.  We get scrutinized by custodians and regulators on this.

> This is a name that has no trade history in it – and now it has high volume.  We've been able to move a large amount of stock for you and [the client] has been kept in the loop the entire time.

> We want to help and have done all we can.  Tomorrow is a new day and we can get some more done for you and your client.

(Exh. 15).  Employee #2 responded to the trader's complaint with a different spin on

Caledonian's role in these types of trades – high volume in securities with no history.  He wrote:

> When we trade through US [broker-dealers] it's Caledonian's name on the print[.]  Being a significant proportion of the daily volume in a name that has only just started trading and is now doing crazy volume isn't good for us, and ultimately isn't good for our clients[.]

> **We're in this for the long haul** and don't want to blow up because one client wants to be 100% of the volume.

> The 3m average daily volume on that name is 2.4m, we did 30%+ of 14m today…

(Exh. 16) (emphasis added).  In its own words, Caledonian's role was indispensable and, based

on these facts, Caledonian would not be able to establish that it engaged in a reasonable inquiry

to ensure that it was not participating in an illegal distribution.

All of the evidence set forth above demonstrates that Caledonian knew of the pump and

dumps and otherwise facilitated their clients' fraud.  Dkt. 140 at 4.  Here, Caledonian knew that

the same customers were coordinating trades in at least four consecutive pump and dumps.

Indeed, it actually advised its clients when the press releases or "pumps" became public, and

witnessed transactions coordinated perfectly with these pumps.  But the bank continued to

certificate the stock in its own name, transfer it into a DTC account, and sell it in U.S. markets. Given the wealth of evidence that Caledonian violated Section 5 – and was potentially complicit in other violations of the securities laws by its clients – there is no substantial basis for questioning the legality of the settlement.  *Citigroup*, 752 F.3d at 294.

### b.  The Settlement Decree Satisfies the Other Three *Citigroup* Factors

The other three *Citigroup* factors for evaluating the fairness and reasonableness of the proposed settlement are easily met here.  First, the terms of the Consent Judgment, including its enforcement mechanism, are clear.  *See* Proposed Consent Judgment, filed simultaneously herewith.  Second, the settlement resolves the actual claims in the Complaint.  Indeed, it resolves the SEC's action against Caledonian in its entirety.  *Id*.  Finally, the settlement is not tainted by any improper collusion or corruption of some kind.  It is the product of good-faith, arms-length negotiation, taking into account the litigation risks faced by both parties and the benefits to both parties of avoiding those risks and avoiding a protracted litigation.  Caledonian agreed the Court would assess an amount of disgorgement that was greater than commissions but less than proceeds.  The SEC agreed that the proposed judgment would not include a civil penalty, which could be difficult to enforce in the Cayman Islands.  *SEC v. Manterfield*, Claim No. HQ08X00798, High Court of Justice, Queen's Bench Division, Royal Courts of Justice, United Kingdom (Feb. 29, 2008) (noting in *dicta* that civil penalties would not be enforceable); *SEC v. Cosby*, 2000 BCSC 0338 (Mar. 29, 2000) (SEC disgorgement judgment was enforceable in British Columbia, but noting in *dicta* that civil penalties would not be enforceable).

In sum, the proposed settlement is fair and reasonable and the record before this Court does not afford a substantial basis for concluding otherwise.

### III.      The Proposed Judgment is in the Public Interest

As noted above, "[t]he job of determining whether the proposed S.E.C. consent decree best serves the public interest . . . rests squarely with the S.E.C., and its decision merits significant deference." *Citigroup Global Markets, Inc.*, 752 F.3d at 296. *Accord SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) ("the courts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment"); *SEC v. Bear, Stearns & Co*., Case No. 03-cv-2937 (WHP), 2003 WL 22466156, at *1 (S.D.N.Y. Oct. 31, 2003) (the court's "review is particularly deferential when the SEC, in its role as parens patriae, is one of the settling parties"); *SEC v. Worldcom, Inc*., 273 F. Supp. 2d 431, 436 (S.D.N.Y. 2003) ("where one of the settling parties is a public agency, its determinations as to why and to what degree the settlement advances the public interest are entitled to substantial deference").  The SEC believes that resolving this action with respect to Caledonian on the proposed terms does not disserve or harm the public interest.  To the contrary, the proposed settlement promotes the public interest.

First, the proposed settlement obtains substantial relief, including all available injunctive relief, against a defendant in connection with four separate unlawful distributions and, in so doing, sends an important deterrent message to other broker-dealers.  Second, the proposed settlement requires Caledonian to make reasonable efforts to respond to any request by CIMA, following an inter-agency request by the SEC.  The SEC has already received a substantial production as a result of a request that it made pursuant to this agreement.  Some of the evidence it obtained is discussed above.  These documents are valuable to ongoing law enforcement investigations and underscore why this settlement is in the public interest.  *See SEC v. Randolph*, 736 F.2d 525, 530 (9th Cir. 1984) ("[t]he agreement of [the defendants] to cooperate in these

investigations must also be considered" in determining whether a proposed consent decree is fair and reasonable).

Finally, the monetary component of the settlement is in the public interest given the realities of the liquidation proceeding in the Cayman Islands. As discussed above, the amount of disgorgement is substantial and represents almost all of Caledonian's net equity at the time it filed for liquidation. The SEC's agreement to forgo enforcing its claim for this amount is based on the priorities that have been set in the liquidations proceeding. The SEC obtained an Affidavit from one of Caledonian's joint liquidators as part of the settlement process. In the liquidation, the creditors with the first priority are the depositors of Caledonian. The SEC recognizes that the depositors take precedence over the SEC in a Cayman liquidation proceeding. In July 2015, the Joint Liquidators made substantial payments to depositors who complied with the applicable anti-money laundering, and know your customer, and FATCA (tax compliance) requirements. In a sworn Affidavit, one of the joint liquidators has represented that any payment to the SEC in settlement of this action is likely to result in a direct reduction in the return to the creditors of Caledonian Bank Ltd. Moreover, with respect to Caledonian Securities Ltd., the joint liquidator estimates that after satisfaction of the liquidation costs, it is likely there will be zero assets available for distribution to CSL's unsecured creditors (which would include the SEC). Thus, even if the SEC were to obtain a finding of liability in a contested proceeding, Caledonian's depositors would have priority over the SEC in the Cayman liquidation proceeding, and it is unlikely that the SEC would be able to collect any money in the liquidation proceeding.[12] *See SEC v. Vitesse Semiconductor Corp.*, 771 F. Supp. 2d 304, 307 (S.D.N.Y.

---

[12]    The liquidation priorities provide important context for the $5 million settlement offer that the SEC rejected on February 10, 2015. At the time, the SEC was told that the parties would have to "reach a settlement within 24 hours in order to *possibly* prevent the bank from

2011) ("the financial terms of the proposed settlement . . . make more sense once one understands the current financial condition of this troubled company and how little money it now is in a position to pay").

Finally, the proposed Final Judgment promotes the public interest because, in addition to all of the facts and circumstances described in this Memorandum, it furthers the SEC's goals of: (1) encouraging prompt and effective responses to alleged securities law violations; (2) imposing liability on parties the SEC believes to be responsible for those violations; and (3) reducing the inefficient expenditure of public funds on lengthy litigation. *See International Business Machines Corp.*, 2014 WL 3057960 at *4. The SEC therefore respectfully requests that this Court afford the required substantial deference to the SEC's assessment that this settlement is in the public interest and enter the proposed Final Judgment. *Citigroup Global Markets, Inc.*, 752 F.3d at 296.

## CONCLUSION

The relevant factors militate in favor of the proposed settlement instead of ongoing litigation. The settlement is fair, reasonable and in the public interest. The SEC respectfully requests that the Court approve and enter the Consent and Judgment submitted with this Memorandum of Law.

---

entering into liquidation." Dkt. 91 at 18 (emphasis added). At the time, the SEC had just filed its case and believed that the proposed settlement was inadequate when contrasted with Caledonian's proceeds from the sales and Caledonian's balance sheet. *Id*. at 18-19. Moreover, the SEC had no assurances that a settlement would – in fact – prevent liquidation. And, in the event of liquidation, it is unclear that the SEC could have collected or kept the $5 million that was offered. Bankruptcy Code section 547 allows a debtor or trustee to avoid certain payments made by a debtor for an antecedent debt on or within 90 days before the date of the filing of the bankruptcy petition. *See* 11 *U.S.C. §547(b)*.

Dated:  Washington, D.C.
February 8, 2016

Respectfully submitted,

/s/ *Bridget Fitzpatrick*
Patrick Costello
Derek Bentsen
Bridget Fitzpatrick
Ernesto G. Amparo
Attorneys for Plaintiff
Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4678 (Fitzpatrick)
fitzpatrickbr@sec.gov

## CERTIFICATE OF SERVICE

I certify that on February 8, 2016, I electronically filed the foregoing SEC's Memorandum of Law in Support of its Proposed Settlement with Defendants Caledonian Bank, Ltd. and Caledonian Securities, Ltd. using the CM/ECF system, which will send notification of such filing to counsel for Defendants Caledonian Bank Ltd., Caledonian Securities Ltd. and Verdmont Capital, S.A. at the following addresses:

Robert J.A. Zito
Carter Ledyard Milburn LLP
Two Wall Street
New York, New York 10005
zito@clm.com

Attorneys for Defendant
Verdmont Capital, S.A.

Sigal P. Mandelker
Margaret A. Dale
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
smandelker@proskauer.com
mdale@proskauer.com

Attorneys for Defendants
Caledonian Bank Ltd. and
Caledonian Securities Ltd.

/s/ *Bridget Fitzpatrick*
Bridget Fitzpatrick