G1LTSECC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SECURITIES AND EXCHANGE
    COMMISSION,
4
                    Plaintiff,
5
                 v.                        15 CV 894 (WHP)
6
    CALEDONIAN BANK, LTD., et al.,
7
                    Defendants.
8
    ------------------------------x
9                                          New York, N.Y.
                                           January 21, 2016
10                                         12:30 p.m.

11  Before:

12                      HON. WILLIAM H. PAULEY III,

13                                         District Judge

14                            APPEARANCES

15  SECURITIES AND EXCHANGE COMMISSION
         Attorneys for Plaintiff
16  BY:  PATRICK COSTELLO
         DAVID STOELTING
17       BRIDGET FITZPATRICK
         DEREK BENTSEN
18
    PROSKAUER ROSE
19       Attorneys for Defendant Caledonia Bank
    BY:  MARGARET DALE
20       MASSIEL PEDREIRA-BETHENCOURT

21  CARTER, LEDYARD & MILBURN
         Attorneys for Defendant Verdmont Capital
22  BY:  ROBERT ZITO
         MARK ZANCOLLI
23

24

25

G1LTSECC

1        (In open court, case called)

2        THE COURT:  Good afternoon.

3        All right.  I set this matter down for a status

4   conference.  I received a lengthy joint letter from the

5   parties.  Who wishes to be heard?

6        MR. COSTELLO:  Your Honor, the SEC would be happy to

7   go first.  I think that the parties have differing positions on

8   the subject dispute here which concerns some outstanding

9   discovery.  We would be happy to make our presentation first,

10  if the Court would like.

11       THE COURT:  All right.  On the issue of depositions,

12  are either of the deponents, Housser or Fisher, U.S. nationals?

13       MR. COSTELLO:  No, your Honor, it's our understanding

14  that they are either Canadian nationals or Panamanian

15  nationals.  It's not entirely clear.

16       THE COURT:  How can the SEC compel their depositions

17  here in New York?

18       MR. COSTELLO:  Well, your Honor, we can do that first

19  of all through –– in terms of putting aside the situs of New

20  York, we can use the vehicle of 30(b)(6).  We cited some case

21  law in our presentation that allows us, as the examining party,

22  either to designate specific individuals at a corporate entity,

23  or to prepare a list of topics and allow the responding entity

24  to choose.  In this case, we opted for the former.  We have

25  designated Mr. Fisher and Mr. Housser as the individuals we

1   would like to depose.  And because they are affiliated with the

2   company, we can do that.

3           THE COURT:  Are they actually affiliated with the

4   company at the current time?

5           MR. COSTELLO:  Your Honor, that is an interesting

6   question.  It's our understanding --

7           THE COURT:  I raise it because Verdmont says they're

8   not.  If that's true, how could they be a 30(b)(6) witness?

9           MR. COSTELLO:  In two ways, your Honor.  There's a

10   more straightforward way we can look at this, and then there's

11   a legal analysis, too.  The more straightforward way is simply

12   to say that while, according to the filing from Verdmont last

13   week these gentlemen may no longer be employed by Verdmont,

14   that does not change the fact that both of these gentlemen also

15   are co-owners of Verdmont.  And there's been no representation

16   made that either of one of these gentleman is no longer an

17   owner of the company.  And we cite to the Court the sworn

18   testimony of the previous 30(b)(6) witness that Verdmont

19   proffered, at which point he testified under oath that both

20   Mr. Fisher and Mr. Housser are both beneficial owners of the

21   company.

22           THE COURT:  But how does 30(b)(6) allow you to throw a

23   net that is so broad that you could depose a shareholder as

24   opposed to someone who is an officer with knowledge?  That

25   would scare the daylights, wouldn't it, out of everyone that

G1LTSECC

1    owns GM stock?

2           MR. COSTELLO:  That brings us to the second point,

3    your Honor.  The other way of looking at this is through the

4    legal principles.  The cases that we cite, and we have some

5    additional cases that we could reference for the Court, but

6    simply because a principal is no longer a principal at the time

7    of the depositions, and some these cases point out in the

8    coincidental circumstance where a notice of deposition goes out

9    and mysteriously afterwards there's a resignation, that does

10   not end the inquiry.  This vehicle through 30(b)(6) allows us

11   to proceed, because the operative question is whether there

12   still is control and affiliation.  And the cases make clear

13   that the only way that can be determined is through the

14   deposition itself.

15          And more so to the point, whether or not that

16   testimony ultimately is binding on the corporation, the cases

17   make clear that that issue is best reserved for the trial

18   itself.  But in none of these instances does that stop the

19   deposition from happening.

20          So we can still proceed here.  It is a fact-specific

21   inquiry.  Obviously we have to ask questions to both Mr. Fisher

22   and Mr. Housser to determine what relationship they continue to

23   have now that the company is in liquidation, and that we will

24   do, your Honor.

25          As far as the situs goes here in New York, based our

G1LTSECC

 1    discussions with our office of international affairs, the

 2    problem with doing this deposition in Panama is twofold.

 3    Actually, it's twofold, but it comes back to same point.

 4    According to Panamanian law, in order for us to conduct a

 5    deposition in Panama, be it a voluntary deposition or, if the

 6    Court were to order one here, that order would be meaningless

 7    in Panama unless it was submitted through the U.S. State

 8    Department to the Department of the Interior in Panama through

 9    the letters rogatory process.  Unfortunately, Panama is not a

10    signatory to the Hague Convention, it must go through the

11    letter rogatory process.  A deposition simply cannot take place

12    in Panama as we would think it would.

13         So we would submit to the Court, if we have to go the

14    letter rogatory process, we certainly can, we would be willing

15    to do that, but we want to make sure that we move the case

16    along as expeditiously as possible, and to do that before the

17    30th of April.

18         If the Court were to enter an order requiring the

19    depositions to be here, or even in a neutral jurisdiction such

20    as London or Canada, we would be willing to do that as well.

21    And we would submit that we already offered to pay all the

22    attendant travel costs, so the concept of burden in this

23    instance is non-existent.  We suggested New York for two

24    reasons, one is also the convenience of the parties.  All

25    counsel are based in the New York area.  We can very easily get

1    up here.  And counsel for Verdmont are here in New York.

2              And as we would point out, Magistrate Francis, in a

3    similar case, having confronted this very issue, also noted

4    that it is essential for the deposition to be in the situs of

5    the forum because of Court supervision.  And we fully expect

6    there to be a significant amount of disputes that arise during

7    the deposition.  It would be much more convenient and

8    expeditious if we were to be here in close proximity to the

9    Court so supervision could take place.

10             THE COURT:  What about Verdmont's proposal that the

11   deposition be conducted by video conference?

12             MR. COSTELLO:  We would submit in this instance, your

13   Honor, that in order for this deposition to be meaningful and

14   substantive, that it be done live, just as any other deposition

15   would be.  We don't want there to be any issue at any point

16   down the road with respect to whether the deposition was

17   validly taken because it was done through video conference,

18   whether there are attendant video conference difficulties that

19   may arise during it, and we believe that we have the right to

20   have an in-person deposition.

21             And again, if the United States as a forum for this

22   deposition poses a concern for Mr. Fisher and Mr. Housser, we

23   would be more than happy to have that deposition take place in

24   either in London or even in Canada where we understand they may

25   even be citizens, so traveling back to Canada may be a form of

G1LTSECC

1   homecoming to them.  We would be well prepared to do that.  We

2   suggested New York for the reasons that I stated, not the least

3   of which is the ability for this Court to have proper

4   supervision over the deposition in case it becomes necessary.

5        As far as the relevance of these depositions is

6   concerned, your Honor, there has been an argument made by

7   Verdmont that Mr. Fisher and Mr. Housser in particular don't

8   have any personal knowledge of the matters set forth in this

9   case.  And we would submit that that is simply not true, your

10   Honor.  Verdmont had submitted initial disclosures where they

11   listed both Mr. Fisher and Mr. Housser as having significant

12   involvement in the issues at stake in this case.  They have

13   knowledge of the controls at Verdmont, they have knowledge of

14   how the assets were placed at Verdmont.  Both of those

15   gentlemen also submitted sworn declarations to this Court where

16   they went into substantial detail about the control systems in

17   place at the company, how the asset were maintained, how the

18   omnibus accounts here are domestically maintained.

19        All that information is relevant to this case, your

20   Honor, not just for the reasons that we have also stated, which

21   is that we have come into evidence based on records that

22   Verdmont itself has turned over that both Mr. Fisher and

23   Mr. Housser, being the principals of the company, also had

24   third-party companies that they controlled who coincidentally

25   happened to be customers of Verdmont who also traded in these

G1LTSECC

securities.

As the Court noted in its November order denying Verdmont's motion for judgment on the pleadings, one of the questions in this case on proceeds, whether proceeds are available here, one of the factors that goes into that analysis is whether there is substantial overlap, or the relationship between Verdmont and its customers. And so that would include customers including Jacametra Inversiones and Creekside Capital, the two entities owned by Mr. Fisher and Mr. Housser.

So we have the right to discern further information based on their involvement, which also comes back to concept of controls. And this sort of -- if the Court allows me, I could sort of tie some of the information on the documents that are in dispute together with this point while I am on it.

And this concept of controls that were in place at the company, we have to remember here how the concept of controls is relevant. Verdmont has pleaded the broker exemption as a means of affirmative defense. They have therefore put into play in discovery in this case whether there were sufficient controls in place. That was their doing. They have decided to invoke that. And they have, therefore, made the concept of controls relevant to this analysis.

Now controls, as the Court also noted in the November order, all comes down to the concept of reasonable inquiry. Did the broker-dealer do a sufficient reasonable inquiry in

G1LTSECC

1     placing these trades, in analyzing the stocks at issue, in

2     having sufficient know your customer controls in place.  And

3     that is not just with respect to the subject customers that we

4     have enumerated in the complaint, but all of Verdmont's

5     customers, particularly its customers that are also

6     coincidentally owned by its principals.

7            If the principals of this company were trading in this

8     stock at the same time that they were placing trades for their

9     customers, that goes directly to the issue of control.  Now

10    that's relevant to this concept, your Honor, even independent

11    of the concept of proceeds.  That also brings us back to this

12    point here.  And so I just dovetailed into the document issue

13    because that's also one of the arguments that the parties have

14    made.

15           THE COURT:  Get back for one second to the sort of

16    gateway issue, which for me which is why are the notices of

17    deposition that were sent to Carter Ledyard effective if Carter

18    Ledyard says they're not authorized to accept service for the

19    deponents?

20           MR. COSTELLO:  Well, your Honor, there's two different

21    things in this instance.  They may not be authorized to accept

22    subpoenas, which they have said they are not authorized to do.

23    But this is not a subpoena, this is a deposition notice of a

24    corporate party.  Carter Ledyard entered an appearance on this

25    case on behalf of that corporate party, and these notices were

G1LTSECC

1    made of managing agents of that corporate party.  So we submit

2    that the use of the 30(b)(6) notice is a valid use.

3           Now again, your Honor, as I said before, we would be

4    more than happy to go the route of the letter rogatory.  We

5    very easily could do that.  But I just again put on the table

6    for the record that that process is going to take, according to

7    our Office of International Affairs, a minimum of twelve months

8    to complete, and don't think anybody wants to do that.  We want

9    to make sure we are moving this case along as expeditiously as

10   we can, and particularly to keep within the Court's time frame

11   of April 30.

12          So what we would suggest or submit that the Court do

13   is enter an order requiring these gentlemen to appear for a

14   deposition, either here in New York or Washington or Miami,

15   maybe if that's more convenient coming from Panama, or even in

16   London, and then we can proceed with those depositions within

17   the tape frame the Court has scheduled.

18          If the Court has any further questions on the

19   depositions issue, I will be happy to address those, otherwise

20   I could turn to the documents.

21          THE COURT:  Before turning to the documents let me

22   hear from Mr. Zito.

23          MR. ZITO:  Thank you, your Honor.  May it please the

24   Court.  I respectfully submit that this is a ruse.  And in

25   order for me to as establish that, your Honor, I have to go

1    back to what this case is all about and some of the burdens of

2    proof in this case.

3           We have claimed a dealer exemption, and the dealer

4    exemption is that if you trade in these securities after 40

5    days after the securities are deemed effective that they are

6    exempt transactions.  And there's no question as a matter of

7    fact that these transactions occurred more than 40 days after

8    the registration statements were deemed effective by the SEC.

9    That's undisputed fact.

10          The only way that the SEC is able to rebut the dealer

11    exemption is by establishing that the securities didn't rest

12    with the public at the time that the registration statements

13    were deemed effective.  In order to prove that, they have to

14    establish that all of the prior purchases of the securities

15    that landed in our customer's pockets, all the prior purchasers

16    and sellers were insiders or affiliates of insiders or

17    statutory underwriters.  And all of those people are located in

18    Bosnia, in Ireland, somewhere around the globe, and they would

19    have to prove that these people were insiders.  They can't do

20    that, your Honor.  They can't do that.  They can't prove their

21    case.  They cannot rebut the dealer exemption in this case.

22          So what the SEC is trying to do, your Honor, is trying

23    to make it impossible for Verdmont to comply with some sort of

24    a discovery ruling and say:  Gotcha.  Gotcha.  We can't prove

25    our case, so what we're going to do is we're going to get some

1    sort of discovery sanction because we know you can't comply

2    because you have no interest in complying because the entity is

3    in liquidation, and that way we're going to put some window

4    dressing on our original complaint and try and have some theory

5    by which we can go back to our ruse that $17 million in

6    proceeds are somehow responsible or could be allocated to a

7    broker-dealer who made only $250,000 in trading commissions on

8    unsolicited trades.  So this is what is happening, in my view.

9            With respect to depositions, as your Honor is well

10   aware, Verdmont is in liquidation.  I appeared before your

11   Honor several months ago on a 12(c) motion and I used the words

12   "death spiral."  And Verdmont is dead.

13           THE COURT:  Not as dead as Caledonian, right?

14           MR. ZITO:  I don't know about that, your Honor.

15   Verdmont has ceded control to the liquidator nominated under

16   Panamanian law.  The latest report I had is that they expect to

17   run out of cash by June after they pay off the claims.  They

18   have a skeletal staff, and they're just liquidating accounts,

19   moving customer accounts.  The 40 employees have all gone, they

20   have lost their health insurance.

21           So the SEC won.  The SEC has won.  So where we go from

22   here is a mystery to me.  I don't even know why we're pursuing

23   this case, because I believe that the SEC intended to try to

24   put Verdmont out of the business from the get go through the

25   freeze order which was obtained by misrepresentations, your

G1LTSECC

1    Honor.

2            So here we are in liquidation.  The death spiral is

3    complete.  Mr. Housser and Mr. Fisher have ceded control.  They

4    are nominal owners.  They are neither directors nor officers.

5    The liquidator has no control over them.  The liquidator has no

6    ability to produce them for depositions.

7            And let's talk about the relevance here.  The true

8    relevance of the lawsuit is about whether or not they were

9    underwriters and these other people that handled these

10   securities.  It's not whether Mr. Housser or Mr. Fisher

11   purchased or sold securities, that's largely irrelevant.  In

12   fact, those purchase and sales aren't the subject of this

13   complaint at all.

14           So why does the SEC really care about this?  These

15   accounts, there were three clients involved, your Honor, they

16   were Nautilus, Bamfield and Lornex.  These accounts were

17   handled by a junior broker by the name of Mr. Forey.  These

18   were not accounts of Mr. Fisher and Mr. Housser.

19           THE COURT:  The problem is if a court started asking

20   the question why does an agency like the SEC care about this or

21   that, we would never get off the dime, and higher courts have

22   instructed that agencies are free to exercise their regulatory

23   and prosecutorial discretion even if the rest of us can't

24   discern a purpose to it.

25           MR. ZITO:  Your Honor has identified the proper

G1LTSECC

```
 1   procedure.  If they want the testimony of these individuals,
 2   the federal rules are very complete and have vehicles for doing
 3   this, and that is by letters rogatory.
 4          THE COURT:  But aren't you the one who objected
 5   vigorously to the SEC's initial request to extend discovery in
 6   this case into the summer of 2017?
 7          MR. ZITO:  Your Honor, they wanted to extend discovery
 8   for I believe a year to 18 months.
 9          THE COURT:  I said 2017.
10          MR. ZITO:  Yes, yes.
11          THE COURT:  Right.
12          MR. ZITO:  And what I offered to do -- I have spoken
13   with these individuals, your Honor, and I offered to have them
14   testify via videotape, which is done all the time, every day of
15   the week.
16          THE COURT:  What about taking a trip to Canada to
17   Toronto to visit family, or to Miami?
18          MR. ZITO:  These individuals will not come to United
19   States, your Honor.  They are not going to come to United
20   States.
21          THE COURT:  Toronto or --
22          MR. ZITO:  I could raise that, or Panama.
23          THE COURT:  Or London.
24          MR. ZITO:  Or Panama.  In the initial discovery
25   scheduling the SEC told this Court that they were prepared to
```

G1LTSECC

1    go to Panama.  So let them go to Panama, your Honor.  I don't

2    know if I will participate in that, but let them go to Panama.

3    And it would be cheaper to have one SEC lawyer fly down to

4    Panama than it would to have several witnesses come up to

5    wherever.  And I could participate by telephone or something.

6    And my clients have nothing to hide, your Honor.

7            THE COURT:  But the SEC says they can't conduct a

8    deposition in Panama.

9            MR. ZITO:  That's ludicrous, your Honor.  I mean

10   depositions are -- in the 21st century we have technology that

11   makes it very, very easy to take a deposition by video

12   conference, even by telephone.  It's very simple.  And if

13   they're worried about the admissibility of it, that's easily

14   handled by waivers.  We're prepared to waive that.  Let them do

15   the video conference.

16           And if they're willing to do that, we'll make sure

17   that we can get them to testify quickly so the discovery cut

18   offs are not running afoul.  And we offered all this to the

19   SEC.  They just don't want that.  They want them here in the

20   United States because they know that these people will not fly

21   to the United States.  That's why they want it, your Honor.

22           THE COURT:  I guess, Mr. Costello, I come back to the

23   issue of what's wrong with the plaintiff's offer of a

24   videotaped deposition, or alternatively, didn't someone from

25   your agency fly to Panama and conduct a deposition earlier in

G1LTSECC

1   this litigation?

2           MR. COSTELLO:  No, I don't believe that happened, your

3   Honor.  And with respect to --

4           THE COURT:  Was it Caledonian then?

5           MR. COSTELLO:  That probably wouldn't have been in

6   Panama, that would be in the Cayman Islands, but all I can do

7   is represent to the Court what the subject matter experts at

8   the Office of International Affairs told me, and that that is a

9   deposition cannot legally take place not only under letters

10  rogatory but also apparently Panamanian law without the letter

11  rogatory process.  So unfortunately, your Honor, our hands are

12  tied here.

13          THE COURT:  But Verdmont is willing to stipulate all

14  of that away.

15          MR. COSTELLO:  Well, I understand that Verdmont may be

16  willing to do that, but this is not a question of what Verdmont

17  is wanting to do, this is a question of legally can we take

18  this deposition in Panama without offending Panamanian law, and

19  our Office of International Affairs said we cannot.

20          With respect to videotape or non-videotape, I have

21  heard of a number of arguments from Verdmont's counsel, either

22  Mr. Fisher and Mr. Housser know nothing about the case, in

23  which case it doesn't matter how we do a deposition, videotape

24  or in person, or they do know something.  And if they do know

25  something about the case and they are willing to appear on

G1LTSECC

1   videotape, they should be willing to appear in person.

2          That goes back to the question of inconvenience or

3   burden, and neither one of those factors is at issue here

4   because the government is going to be picking up the tab for

5   the travel.  And if they're concerned about coming to the

6   United States for whatever reason, we would be willing to do

7   that in Canada, and again, be more of a homecoming for them, as

8   I said before.

9          So either they want to be deposed because they know

10  something, or they don't.  I'm not sure I understand what

11  Verdmont's counsel is getting at, but if they are willing to

12  appear on a videotape, then they should be willing to appear in

13  person.  Because as we all know, an in-person deposition is

14  much more meaningful than one on videotape.  And all of the

15  attendant burdens that goes with that erased here.

16          THE COURT:  Because the SEC is going to bear it.

17          MR. COSTELLO:  Correct, your Honor.

18          THE COURT:  Mr. Zito, I think you should take up with

19  them where they would like their depositions to be conducted.

20          MR. ZITO:  They would like to have it in Panama, your

21  Honor.

22          THE COURT:  It's not going to be in Panama in the next

23  three months.  The litigation will keep going through letters

24  rogatory, something that none of them want, I would think, they

25  would want to get this resolved.

G1LTSECC

1          MR. ZITO:  Your Honor, I don't know what is going to

2     happen with this litigation, quite frankly.  I don't know how

3     much I'm going to be able to participate in this litigation.

4          THE COURT:  I understand that.  But they can pick a

5     place where they want to be deposed where it's not subject to

6     the constraints under the Hague Convention.  London is such a

7     place, Toronto is such a place.  There's probably a lot of

8     other places, as long as they don't pick some place like

9     Tahiti.

10         MR. ZITO:  That might be a good alternative.

11         THE COURT:  Actually it's winter there now, but even

12    winter in Tahiti isn't bad, although it's rainy.

13         MR. ZITO:  I will discuss it with them.  This is the

14    first I'm hearing that the SEC was prepared to proceed in

15    anyplace outside the United States.  So I am happy to discuss

16    that with them.  And I think that if Toronto is amenable to the

17    SEC, as the SEC has represented to this Court that it is, I

18    would have no problems in proposing that to them, your Honor,

19    and I could report back to the Court shortly.

20         THE COURT:  And it could be any major city in Canada

21    depending upon where they reside, Vancouver, Edmonton,

22    Montreal.

23         MR. ZITO:  How about the Bahamas, your Honor?

24         THE COURT:  I don't know what the Hague Convention

25    rules are in the Bahamas.  I think if they're willing to appear

G1LTSECC

1    by videotape they and there are legal restraints on that in

2    Panama, and the SEC is willing to bear all the attendant

3    expenses for them to appear for depositions outside of the

4    United States, they should pick a place and advise the SEC in

5    the next week as to place.  Alternatively, in the absence of

6    such a selection, I may well order a place and then everybody

7    can run to another court and see whether I got it right.

8           MR. ZITO:  I will be happy, in the spirit of

9    cooperation, to speak with them.  I do want to reiterate the

10   fact that the liquidator has no control over these individuals,

11   and this would be on a purely a voluntary basis.  They are not

12   officers or directors, and this is in the spirit -- solely the

13   spirit of cooperation.

14          THE COURT:  I appreciate that, but I also think it's

15   in their interest to --

16          MR. ZITO:  I think it is, too.

17          THE COURT:  -- to give a deposition, and I'm sure you

18   do, too, because otherwise you wouldn't be advising them to

19   come up with --

20          MR. ZITO:  I wouldn't be here, your Honor.

21          THE COURT:  All right.  Now there are a number of

22   document issues here and questions involving Panamanian bank

23   secrecy.

24          MR. ZITO:  Your Honor, if I could put a -- there are

25   certain privacy laws in Panama which makes it illegal as a

G1LTSECC

1    crime.  And it's different from the laws in Switzerland or

2    elsewhere, and really privacy laws are not secrecy laws, and

3    there is actually a movement under foot to repeal those laws,

4    apparently, within the Panamanian legislature.  And those laws

5    may be repealed, as I hear, as early as April or May of this

6    year.

7            The liquidator is a Panamanian citizen, and the

8    liquidator, if she were to turn over these documents without

9    consent of the customers, would be committing a crime, and she

10   is simply not going to do that.  In conversations with the SEC

11   regarding potential settlement of this case, we talked about

12   cooperation going forward, and the SEC was willing to accept

13   for purposes of a settlement that if we made sure that the

14   documents, whatever documents we have, were delivered to the

15   Panamanian regulators, that they would obtain the documents

16   from the Panamanian regulators, as they have all along.

17           And by the way, this case has been pending for a year,

18   and I suspect that they have been getting all sorts of

19   documents from the Panamanian regulators.  As we have seen in

20   the discovery, they're getting documents from all kinds of

21   regulators all around the world.

22           So again, either they want the information or they're

23   trying to plan a ruse and play gotcha because they know, they

24   know that the liquidator is not going to commit a crime.  And

25   so if she is forced to either obey an order of your Honor,

G1LTSECC

respectfully, or obey Panamanian law where she lives and where
she could be arrested, she is going to comply with Panamanian
law.

        And we are happy to facilitate that, and we will be
happy to allow them to get whatever documents they want from
the Panamanian regulators, but the liquidator isn't going to
commit a crime, your Honor.  She's a certified public
accountant.  She's with a good firm.  She's not going to do
that.  And they know that.

        MR. COSTELLO:  If I may, your Honor, I want to clarify
one thing.  The liquidator that has been proposed in this
liquidation is not at an independent firm.  She happens to be
the director of accounting and the director of human resources
at Verdmont.  So Verdmont is in effect proposing its own HR
head as the liquidator.  And whether or not that's an
independent liquidator is, I suppose, for the Panamanians to
figure out, but I wanted Court to be aware of that.

        With respect to getting information from the
Panamanian regulator, and which is abbreviated as MV, if I may
refer to that in this presentation, as from the declaration
that Mr. Zito submitted in connection with their motion against
our request for a preliminary injunction, they submitted a
declaration from a Panamanian attorney who had gone through the
various aspects of these Panamanian secrecy laws.  And the
attorney had said under oath in his sworn declaration that in

G1LTSECC

1   order to get documents from the Panamanian regulator, there had

2   to be a memorandum of understanding in between the United

3   States and Panama.  And as the attorney correctly pointed out

4   at that time, there is no memorandum of understanding.  So

5   contrary to what counsel has just said, we have not been

6   getting loads and loads of documents from regulator all along,

7   because the regulator can't give them to us because there is no

8   memorandum in effect.

9          Now whether that will change in the short term is a

10  possibility.  There have been discussions about doing that

11  between the U.S. and Panama, and that may prove to have some

12  fruition to it, but I just want the Court to be aware of what

13  we're talking about.  The problem is that we're talking about

14  unknowns right now.  We don't know what the Panamanian

15  regulator has and what they don't have.

16         Now we don't want everything that they have, nor have

17  we asked for everything from Verdmont.  The issue that we're

18  talking about today is a very narrow list of documents.  And so

19  it could be purely by coincidence that the regulator happens to

20  have these, assuming, number one, that the memorandum is

21  signed, assuming, number two, that these documents exist,

22  assuming, number three, that the regulator even decides to give

23  them to us, which is not a guarantee, and number four, that

24  they can do so before April 30.  Those are a whole series of

25  unknowns, your Honor.  Those are a whole series of risks that

1   we really don't want to take.

2            We want to be sure, again, to come back to what I said

3   earlier about moving this case along as quickly as we can, we

4   would be happy to wait and see what we can get from the

5   regulator, but I just don't want to be in a position where I'm

6   having to come to the Court by close to April 30 and say I'm

7   sorry, your Honor, but the regulator hasn't given us anything,

8   and then we're right back to where we started here again.  So

9   what we're suggesting in this instance is, again, a very narrow

10  subset of documents that we contend Verdmont has not produced.

11  And I have not seen a valid reason articulated in their

12  response as to why they can't produce these as a general

13  matter.

14           On the Panamanian secrecy law side, simply because the

15  secrecy laws exist doesn't end the inquiry.  There's a Supreme

16  Court case that goes through the exact posture where these laws

17  have been invoked, and whether or not the U.S. should show

18  deference to these laws in providing national comity is an

19  analysis, a very thoughtful analysis that has to be done.  If

20  the Court wants to get that to point, perhaps we can order

21  briefing on the issue as to whether the secrecy laws should be

22  ignored, or maybe perhaps that they shouldn't.  But again,

23  that's something for I guess a briefing schedule or something

24  we can take up on another occasion.

25           But just on the substance of these documents, Verdmont

G1LTSECC

1    has objected to this on a series of grounds.  I would note,

2    though, that this concept of Panamanian secrecy law was not

3    included in their response.  And under Rule 34(b), I would

4    submit that it's waived because they didn't raise it.

5            MR. ZITO:  Your Honor, I hate to interrupt, but that's

6    just not true.  That is blatantly wrong, your Honor.

7            THE COURT:  Calm down.

8            MR. ZITO:  Sorry.

9            MR. COSTELLO:  And well, your Honor, I happen to have

10    the responses here.  We can easily go through them and see

11    if -- specifically the rule requires you to object with

12    specificity, and they did not do that, so they didn't comply

13    with the rule.  But putting that aside, the rule -- in their

14    responses they also said, in response to each one,

15    notwithstanding the objections that we raised, we will produce

16    all the documents to you.  So I would submit that they waived

17    their right to object on both of those bases.

18            But even getting into the substance of some of the

19    things that they said about the time period being overbroad,

20    that's an important one that I want to bring to the Court's

21    attention.  They have produced some documents to us from 2013

22    forward.  Those documents were in a redacted form, and I will

23    address that in a second, but they said that the operative time

24    period is 2013, and SEC, that's all you get.

25            Well, again, I would submit that, based on what

G1LTSECC

 1   Verdmont has done itself in this case, they have invoked the
 2   dealer exemption, and they have just contended, in fact I
 3   believe it was Mr. Zito a few minutes ago himself who contended
 4   that the operative time period here dates back to the
 5   effectiveness of the S1 registration statements, which were in
 6   2011 and 2012.  So if Mr. Zito contends that that was the
 7   operative time period, that coincides with the time period of
 8   discovery that we included in our requests.

 9          So based on their invocation of the dealer exemption
10   and the statement that Mr. Zito made a moment ago, the time
11   period per se has to be reasonable, and we have the right to
12   discern all of the trading that went on, because whether the
13   S1s were effective or not is for another day, but we have the
14   right to discern what happened from that time forward.  So that
15   time period itself is in fact reasonable.

16          I would also say, though, your Honor, to the extent
17   this is raised again, because it came up as a subject of the
18   depositions, and I'm not sure that it was relevant for the
19   depositions and I don't think it's relevant here either, but on
20   the burden of proof I think counsel for Verdmont may have
21   confused the burden here.  They have invoked both of the
22   exemptions, the broker and the dealer.  I don't know if they're
23   planning on abandoning the broker exemption, they didn't seem
24   to hone on in that earlier, but if they are going to continue
25   to press forward both, they have the burden to prove that.  We

G1LTSECC

```
 1    don't have the burden to rebut that, they have the burden to
 2    prove it.
 3          They also have a burden to prove -- contrary to what
 4    they said in their motion papers, they have the burden to prove
 5    that they were not an underwriter.  Again, that's not really
 6    relevant for purposes of these documents, your Honor, but I did
 7    want to bring that to the Court's attention in case that comes
 8    up again.  So in terms of the time period, we submit that it is
 9    proper.
10          Now the second thing I wanted to bring to the Court's
11    attention is this concept of redactions that they have done.
12    They have submitted heavily redacted documents where they have
13    taken out all account identifying information all together from
14    all of their customers, even the customers for whom they
15    obtained client waivers from, Nautilus, Bartlett and Lornex.
16    Those clients had waived any kind of Panamanian secrecy thing
17    that may exist.  So it was improper to redact that information.
18          And secondly, I point out on the concept of waivers
19    alone, Mr. Fisher and Mr. Housser are both the principals of
20    customers, so they find themselves in the unique position of
21    being the principal of the broker and the principal of the
22    customer.  So it would seem a rather simple task for Mr. Fisher
23    to ask himself to sign a waiver, and for Mr. Housser to do the
24    same, but they haven't done that, and I suppose that's for
25    obvious reasons.
```

G1LTSECC

1          But with respect to the account statements itself, the

2     redaction was improper.  And again, this case -- contrary to

3     what counsel said, this case is not just limited to the three

4     particular customers that we have identified in the complaint.

5     Those were merely examples.  Because they invoked the broker

6     exemption, because they invoked the dealer exemption, we have

7     the right to test controls, not just for those three customers,

8     but for all of their customers dating back into 2011 and 2012.

9     And that's, of course, to say nothing on the concept of

10     relevance of this as far as the measure of damages is

11     concerned, which the Court observed in its November order.

12          And so we would submit that when they provide these

13     documents to us, these account statements, they can't have that

14     redaction in there.  The redaction is improper.  We need to

15     have the customer identifying information.  We have to be able

16     to see whether these controls were done correctly.  We have to

17     be able to see who these customers were and their relationship

18     with the principal in order to test the relevance of their

19     defenses, the concept of proceeds, and this information has to

20     date back into that time period in order to be proper.  I think

21     in terms of the actual documents themselves, they speak for

22     themselves, your Honor, in terms of the specific things that we

23     enumerated in there.

24          There is one final category of things, for example,

25     communications with customers or communications with the

G1LTSECC

 1   transfer agent or communications with outside third parties.

 2   They claim in their responses that no such documents exist.

 3   Now, personally, I find that hard to believe, but I suppose

 4   there's nothing I can do about that.  And putting aside the

 5   fact that if there is not a single written communication

 6   between Verdmont and its customers concerning a trade in stock,

 7   I would find that to be severely deficient under their control

 8   concept in the broker exemption.  But that would have to mean

 9   necessarily that all the communications on these trades were

10   done orally, which is yet all the more reason why these

11   depositions needs to take place, particularly of Mr. Forey and

12   Mr. Mabanta, who were identified earlier as the brokers who

13   executed these trades.  We would have the right, based on that

14   representation alone, to find out what type of communications

15   these people had if nothing was in writing, which, again, I

16   find very difficult to believe, but I suppose that is what it

17   is.

18          So those are the three major points I wanted to make.

19   The actual list itself speaks for itself in our papers.  We did

20   bring along the proposed order for the Court to review.

21          Unless the Court has any questions, I'm done with my

22   presentation.

23          THE COURT:  Thank you, Mr. Costello.

24          MR. ZITO:  First of all, if there's -- there's no

25   motion before the Court, and we would like the opportunity to

G1LTSECC

1    brief all of these issues at the appropriate time if it's

2    necessary.

3               THE COURT:  There are some complex issues here,

4    especially as they relate to what I'll call the Panamanian

5    privacy laws.  Listening to you, I am convinced that the issues

6    relating to the documents and the extent of redactions and the

7    application of Panamanian law is a matter that I'm going to

8    refer to Magistrate Judge Cott today, who is the magistrate

9    assigned to this case.  And I'm going to ensure that he gets

10   the benefit of the comments that you have all made on the

11   record here about this issue in advance of setting a short

12   briefing schedule on the matter.

13              So if you want to say anything further to me or Judge

14   Cott vicariously through this transcript, now is the moment

15   where I will turn to the third issue.

16              MR. ZITO:  I will try and be brief because there are a

17   lot of issues that Mr. Costello raised.

18              THE COURT:  There were.

19              MR. ZITO:  But I will say that on the one hand

20   Mr. Costello doesn't want to go down to Panama because he's

21   afraid to offend Panamanian law, on the other hand, he thinks

22   nothing of having a liquidator offending Panamanian law.  So I

23   think they have to be consistent in their positions.

24              Secondly, it's the first I have heard that they can't

25   get documents from the Panamanian regulators, and that's just

1    not true because they got a copy of the liquidation papers

2    directly from the Panamanian liquidators.  And your Honor, they

3    got them before we, Carter Ledyard, were able to get them.  So

4    they have a much better line of communication with the

5    regulators down there than we do with our own clients.  So that

6    should be put on the record.

7            More importantly, your Honor, so we're clear about

8    what documents we're looking for, they're not looking for

9    documents that are the subjects of the trades that are the

10   subject of this complaint, those have all been produced.  What

11   they're looking for is all of the trades, all of the trades

12   from these three clients, which are Nautilus, Bamfield and

13   Lornex, who, to my knowledge, they haven't sued.  They haven't

14   gone after them.  And they want all of their documents through

15   us, which they know we can't produce as a matter of Panamanian

16   law.

17           Finally, your Honor, the other issue about the 2013 --

18   that they didn't get any documents prior to 2013, the reason

19   why they didn't get them is because they don't exist.  The

20   trading didn't start until 2013.  So that's that issue.

21           Turning finally to the burden of proof, they keep

22   talking about the broker's exemption and they never talk about

23   the dealer exemption.  And they keep talking about controls

24   when it's not about controls, it's about due diligence.  And

25   the SEC hasn't once explained to us what they expected that had

G1LTSECC

1    certain due diligence been conducted on the broker's exemption,

2    what we could have done to incur when this the SEC isn't really

3    sure what happened.  They have a feeling.  They have some kind

4    of a belief, but that's only through their communications with

5    foreign regulators, which we don't have access to.

6           So they never explained what we should have done in

7    order to discover their alleged theory of this case.  That's

8    the broker exemption.  With respect to dealer exemption, that's

9    been proved.  We proved that in our 12(c) motion.  And your

10   Honor said that the Court cannot look at that exemption, we're

11   only looking at the complaint.  And I get that.  I get that.

12   But the proof that we submitted to this Court was dispositive,

13   your Honor.  The securities were deemed effective on X date and

14   all these trades happened after 40 days.  And that is something

15   that is not disputed by the SEC.

16          What they dispute is that this was a sham transaction.

17   Well, they have got a lot of proving to do if they want to

18   prove that these were a sham transaction, and I don't

19   understand why they're not overseas trying to get that

20   evidence, which we don't object to.  And they have had this

21   case for a year, and there was no stay against obtaining that

22   evidence.  They should be getting that evidence instead of

23   having this diversion, your Honor.  Thank you.

24          THE COURT:  Thank you, Mr. Zito.

25          Lastly, Mr. Zito, there's Verdmont's request

1    concerning lifting the asset freeze.

2          MR. ZITO:  Your Honor, we're not a position to address

3    that at this juncture.  The finances of the company are rapidly

4    changing on a daily basis.  We would respectfully request leave

5    at the appropriate time to submit a letter addressing those

6    issues.

7          THE COURT:  Fine.  That's not a matter that I would

8    refer to the magistrate, I'm just referring to magistrate the

9    document issues here.

10          I will anticipate receiving a letter by the end of

11    next week as to whether there's been some agreement concerning

12    a situs for the depositions of Mr. Fisher and the other

13    gentleman.

14          MR. ZITO:  Very well, your Honor.

15          THE COURT:  Anything further at this time?

16          Caledonian is here.  What is the status, Mr. Costello,

17    of the settlement with the Cayman Islands regulatory authority?

18          MS. FITZPATRICK:  Yes, your Honor, Ms. Fitzpatrick,

19    Ms. Dale is here as well.

20          My understanding is the settlement will be submitted

21    to a Cayman court at the end of the month.  And depending on

22    the resolution of that month, we will promptly -- depending on

23    the resolution of that process, we will promptly submit it to

24    the Court and the SEC will submit a memorandum very closely

25    thereafter in support of the acceptance of the settlement.

G1LTSECC

1          MS. DALE:  Your Honor, the hearing in the Cayman

2     Islands is January 26.

3          THE COURT:  Fine.  Thank you, Ms. Dale.

4          Anything further?

5          MR. COSTELLO:  Just one point of clarification, your

6     Honor, with respect to the parties' directive to negotiate on a

7     situs for the deposition, that applies to Mr. Fisher,

8     Mr. Housser, Mr. Mabanta and Mr. Forey, is that correct?

9          THE COURT:  I think I was really focusing on Fisher

10    and the other gentleman, Housser.

11         MR. ZITO:  Your Honor, Mr. Forey and Mr. Mabanta, we

12    don't represent them.  They are long gone.  They are only lower

13    broker employees, and we have -- they're gone.

14         THE COURT:  It's time to start somewhere.  Start with

15    Housser and Fisher in Canada or London, I leave it to you to

16    decide with them what is best.  If not, I will enter an order

17    imposing a solution.

18         MR. COSTELLO:  Understood, your Honor.

19         THE COURT:  All right.  Thank you all for coming in.

20    Have a good afternoon, and get back to Washington before the

21    snow starts to fly.

22         MR. COSTELLO:  Thank you, your Honor.

23                            o0o

24

25