Robert J.A. Zito
Mark R. Zancolli
Theodore Y. McDonough
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
Tel. (212) 732-3200
Fax: (212) 732-3232
*Attorneys for Verdmont Capital, S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SECURITIES AND EXCHANGE
COMMISSION

                                  Plaintiff,

                       v.

CALEDONIAN BANK LTD.,
CALEDONIAN SECURITIES LTD.,
CLEAR WATER SECURITIES, INC.,
LEGACY GLOBAL MARKETS S.A., and
VERDMONT CAPITAL, S.A.

                              Defendants.

------------------------------------------------------------X

Civ. No. 15 CV 894 (WHP) (JLC)

**DECLARATION OF**
**<u>SHAMIMA BHANA</u>**

SHAMIMA BHANA, declares under penalty of perjury follows:

1.      On January 11, 2016, I was nominated to be the liquidator of defendant Verdmont

Capital, S.A. ("Verdmont"). I am licensed as a certified public accountant in Panama, and, prior

to January 11, 2016, I had been employed by Verdmont as Accounting and HR Manager since

October 16th, 2005.

2.      I respectfully submit this declaration in support of Verdmont's motion for a

protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.

3.      According to the Amended Complaint in this action, Verdmont sold for the



account of one or more of three clients -- Lornex Financial Ltd. ("Lornex"), Bamfield Equities

Ltd. f/k/a Bartlett Trading ("Bamfield" or "Bartlett") and Nautilus Growth Fund Ltd.

("Nautilus") -- unregistered securities of three public companies (Goff Corp. ("Goff"), Norstra

Energy, Inc. ("Norstra") and Xumanii, Inc. f/k/a Medora Corporation ("Xumanii") (collectively,

the "Securities"), and therefore, violated Section 5(a) and (c) of the Securities Act of 1933 (the

"Securities Act") (15 U.S.C. § 77e(a) and (c)) because no valid registration statement was in

effect at the time. Exhibit 1, Amended Complaint at 1, 2, 63, 80 and 96.  While the Amended

Complaint also suggests that Mariposa Acosiados S.A. ("Mariposa") (Amended Complaint,  71)

is or was a client of Verdmont, a review of Verdmont's records demonstrates that Mariposa is

not and never has been a Verdmont client.

    4.    The purpose of this declaration is to explain:  (i) Verdmont's current status

following its filing for liquidation on January 11, 2016; and (ii) Verdmont's good faith efforts to

produce documents responsive to the categories of documents requested by the SEC without

violating Panamanian law.

**The SEC's Improper Freeze of Assets of Verdmont Clients That**
**Had Nothing to Do With This Action, And the Resulting**
**Liquidation Filing By Verdmont**

    5.    Verdmont is a corporation duly organized under the laws of the Republic of

Panama and duly licensed as a broker-dealer in Panama.

    6.    On January 11, 2016, Verdmont filed for liquidation under the laws of Panama,

having no other economic choice.  Verdmont is in the process of winding down its activities and

is no longer operating on a going forward basis.  Verdmont currently employs a skeletal staff for

the sole purpose of liquidating assets and paying creditor claims, mostly labor and severance

claims of the more than 40 former employees who lost their jobs and health insurance due to the SEC's improper conduct in this case.

7.      In that regard, on February 6, 2015, the SEC improperly obtained an *ex parte* order freezing Verdmont's customers' accounts through misrepresentations to the Court, including but not limited to that Verdmont sold shares of stock in the Securities on its own behalf and "made tens of millions of dollars" doing so.  Exhibit 2, Transcript of February 6, 2015 Hearing on the SEC's Motion for a Temporary Restraining Order, at 3:8-10; Exhibit 3, February 6, 2015 Temporary Restraining Order Freezing Assets (the "TRO").  To the contrary, aside from one proprietary day trade of Xumanii stock that Verdmont executed in its house account[1], Verdmont did not sell stock of Goff, Norstra or Xumanii – the Securities at issue in the Amended Complaint's allegations against Verdmont – for its own account, but rather effected sales of the Securities on behalf of its clients upon legitimate unsolicited orders from those clients.

8.      Additionally, the SEC published the Court's granting of the freeze order on its website in Litigation Release No. 23195, dated February 11, 2015 (the "Release"), available at https://www.sec.gov/litigation/litreleases/2015/lr23195.htm.    Exhibit 4.    The SEC falsely published in the Release that Verdmont and the other defendants "reap[ed] over $75 million in *illegal* sales proceeds" (emphasis added) when Verdmont earned only $239,965 in trading commissions on unsolicited trades on behalf of its customers in the ordinary course of business and on one proprietary day trade. While the SEC subsequently admitted that its representations to the Court were false and consequently amended its complaint, the SEC nevertheless continues

---

[1] All of Verdmont's trades in stock of Goff, Norstra and Xumanii were effected by Verdmont as a broker on behalf of Verdmont's clients, except for the following proprietary trades that Verdmont performed in Verdmont's house account:  bought 200,000 shares of Xumanii at $0.238 on May 13, 2013, and sold 200,000 shares of Xumanii at $0.2945 on May 13, 2013. Verdmont realized $11,300 in profit from that trade.



to publicize on its website the false statement that Verdmont and the other defendants "reap[ed] over $75 million in *illegal* sales proceeds" (emphasis added), despite being urged by Verdmont's counsel to conform its website publication to its amended pleading.

9.    As a result of the SEC's false statements to the Court and to the public and the illegal freeze that affected assets of Verdmont's customers that had nothing to do with the allegations before the Court in this case, Verdmont's business was decimated and Verdmont suffered considerable lost profits, which ultimately led to its filing for liquidation.

**Verdmont's Good Faith Efforts To Comply With**
**The SEC's Document Requests Without Violating Panamanian Law**

10.    Panamanian law prohibits Verdmont from disclosing information concerning its clients without their consent.  Article 65 of the Panamanian Securities law, the Unified Text of Decree Law 1 of 1999 and laws amending it, and Title II of Law 67 of 2011, further amended by Law 12 of 2012 and Law 56 of 2012, outlines the duty of confidentiality that Panamanian broker-dealers owe to their clients by stating as follows:

> **Article 65.**  Confidentiality of information.  Broker-dealer firms and securities brokers may not reveal information about their clients or their investment accounts or transactions in securities carried out by their clients, unless they do so with the client's consent or when the information must be revealed to the Superintendence by virtue of this Decree-Law or the regulations thereof or in the event of an order issued by the proper authority according to the law.

Article 268 of the Panamanian Securities Law outlines the penalties for disclosing confidential client information by stating as follows:

> **Article 268.**  Penalties for disclosing confidential information.  The broker-dealer firm, investment advisor, investment manager, self-regulatory organization, member of a self-regulatory organization or the director, officer or employee of any of the above, as well as the broker, analyst, superintendent, official or external consultant of the Superintendence who unlawfully discloses confidential or privileged information that has been obtained while discharging its/his functions shall be fined not less than one thousand balboas (B/.1,000.00) and not more than one hundred thousand balboas (B/.100,000.00), without prejudice to the civil and criminal penalties that may be in order.  In determining the amount

4



of the penalty, the Superintendence shall take into account *inter alia* the intention of the person who incurred the unlawful conduct, whether or not it is recidivism, the benefit gained and the damage caused. In the event that such person is a superintendent or an official of the Superintendence he shall be removed from office immediately.

*See* Exhibit 5.

11.    After the commencement of this action, Verdmont diligently sought, with varying degrees of success, written consents from its clients in a good faith effort to respond to the SEC's document requests without violating Panamanian law.

12.    Again, the three Verdmont clients whose trading activity is at issue in the Amended Complaint are Lornex (which traded in Goff, Norstra and Xumanii), Bamfield (which traded in Norstra) and Nautilus (which traded in Norstra). Other than Lornex, Bamfield and Nautilus, no clients of Verdmont cleared certificates in Goff, Norstra or Xumanii. Verdmont obtained written consents from those three clients to release to the SEC all account opening information provided to Verdmont, as well as trading records pertaining to the purchase and sale of stock in Norstra (in the case of Bamfield, Nautilus and Lornex), and stock in Goff and Xumanii (in the case of Lornex). Exhibit 6. Verdmont has produced documents responsive to the SEC's requests that were authorized to be produced by Nautilus's, Bamfield's and Lornex's written consents, including but not limited to account opening documents that those three clients provided to Verdmont and redacted account statements and spreadsheets for those clients showing trades in any of the Securities.

13.    Additionally, Verdmont obtained written consents from the following customers (in addition to Nautilus, Bamfield and Lornex) to release to the SEC all account opening information provided to Verdmont and trading records pertaining to the purchase and sale of stock in any of the Securities: Chloe Company S.A. Sub-B, Nicolaas Carel Marthunis Wilson, Egos Capital Corp., Kesef International Inc., Gleisdorf Investing Corp., A. Karst Alternative

Investments Ltd. and Harry Lappa. Exhibit 7. Verdmont has produced documents responsive to the SEC's requests that were authorized to be produced by those clients' written consents, including but not limited to account opening documents that those clients provided to Verdmont and redacted account statements and spreadsheets for those clients showing trades in any of the Securities.

14.    Article 65 of the Panamanian Securities Law prohibits Verdmont from producing to the SEC any other documents or information in its possession, custody or control responsive to the SEC's requests.

15.    The SEC seeks to compel Verdmont to produce ten categories of documents:  (i) regular monthly account statements from January 2012 to the present for Nautilus, Bamfield and Lornex; (ii) wire transfer, internal transfer requests, instructions and documentation reflecting destination of transfer of funds for Nautilus, Bartlett and Lornex; (iii) unredacted trade blotters reflecting trading in Goff, Norstra and Xumanii securities by Verdmont or its clients; (iv) orders, tickets, messages for Goff, Norstra, Xumanii securities by Verdmont or its clients; (v) destination/tracing of proceeds (TRO accounting); (vi) accounts with common signature authority as Nautilus, Bartlett and Lornex accounts; (vii) phone recordings concerning Goff, Norstra or Xumanii; (viii) orders, tickets, messages from Lornex, Nautilus or Bartlett; (ix) internal or external communications regarding Goff, Norstra or Xumanii; and (x) communications with Celtic or Empire. Exhibit 8, January 15, 2016 joint discovery letter to the Court (the "1/15/16 Joint Discovery Letter") [Doc. No. 161], at 3. Each of the ten categories of documents that the SEC seeks to compel Verdmont to produce exceeds the scope of the written client consents obtained by Verdmont and, as noted above, Verdmont has produced all non-



privileged documents in its possession, custody or control responsive to the SEC's requests that Verdmont is not prohibited from producing under Article 65 of the Panamanian Securities Law.

16.     With regard to the fifth category of documents that the SEC seeks to compel Verdmont to produce – an accounting of the destination or transfer of proceeds – Verdmont produced to the SEC a document on Verdmont's letterhead, dated February 12, 2015 (Exhibit 9), describing the status of the accounts of Lornex, Nautilus and Bartlett at Verdmont, including account balances, pursuant to Section V of the TRO.   Article 65 of the Panamanian Securities Law prohibits Verdmont from providing the SEC with information responsive to this category other than what it has already provided to the SEC.

17.     With regard to the seventh category of documents that the SEC seeks to compel Verdmont to produce – phone recordings concerning Goff, Norstra or Xumanii – Verdmont does not have any non-privileged recordings or other documents in its possession, custody or control responsive to this category.

18.     With regard to the ninth and tenth categories of documents that the SEC seeks to compel Verdmont to produce – internal or external communications regarding Goff, Norstra or Xumanii, and communications with Celtic or Empire – Verdmont does not have any non-privileged documents in its possession, custody or control responsive to these categories other than what it has already produced to the SEC.

19.     Each category of documents that the SEC seeks to compel Verdmont to produce, to the extent it exists, originated outside the United States.   Verdmont has never had a place of business in the United States and never accepted any U.S. clients.

20.     The SEC can obtain from the Panamanian securities regulator, the Superintendence of the Securities Market of the Republic of Panama (the "SMV"), the categories

of documents that the SEC seeks to compel Verdmont to produce.  The SMV has, or has access to, all non-privileged documents in Verdmont's possession, custody or control responsive to the categories of documents that the SEC seeks to compel Verdmont to produce.

21.   Of note, the SEC's document production to Verdmont in this case contains documents concerning Verdmont's clients, including account opening documents that certain of Verdmont's clients provided to Verdmont, that the SEC was able to obtain from one or more sources other than Verdmont, including from the BCSC (the British Columbia securities regulator).  Verdmont believes that 30 client accounts (in addition to Lornex, Nautilus and Bamfield) and one house account day traded in Goff, Norstra and/or Xumanii in the former accounts, no longer open, that Verdmont maintained at Knight Capital Americas LLC ("Knight"), Sunrise Securities Corporation ("Sunrise") and UBS Securities ("UBS"), which are United States brokers to which Verdmont's clients' trades in the Securities were routed.  As noted above, Verdmont has obtained consents from seven of those clients, in addition to producing documents for its proprietary house account (Exhibit 7).  It appears from the SEC's document production in this case that the SEC already has in its possession the account files of another 21 of those day trader clients from the BCSC.  Accordingly, Verdmont believes that there is only one outstanding client who day traded in Goff, Norstra and/or Xumanii, and whose consent has not yet been obtained or whose confidential information the SEC does not already have.

22.   In sum, Verdmont respectfully requests that the Court issue a protective order to protect Verdmont from disclosing to the SEC the additional documents that the SEC seeks in response to the ten categories of documents requested by the SEC in the 1/15/16 Joint Discovery Letter, as such disclosure by Verdmont would violate Panamanian law and subject Verdmont to

8

fines and civil and criminal penalties in Panama. A protective order is particularly warranted given that the SEC can obtain the documents that it seeks to compel Verdmont to produce by alternate means, including from the SMV.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 11th, 2016

_____
Shamima Bhana

7749616.1