PATRICK R. COSTELLO
DEREK S. BENTSEN
BRIDGET M. FITZPATRICK
ERNESTO G. AMPARO
SECURITIES AND EXCHANGE COMMISSION
100 F Street N.E.
Washington, DC 20549
(202) 551-3982  telephone (Costello)
(202) 772-9245  facsimile
costellop@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————————
:
SECURITIES AND EXCHANGE COMMISSION,                          :
:
Plaintiff,              :
:
v.                              :  Case No. 15-cv-894
:  (WHP)(JLC)
CALEDONIAN BANK LTD.,                                        :
CALEDONIAN SECURITIES LTD.,                                  :
CLEAR WATER SECURITIES, INC.,                                :
LEGACY GLOBAL MARKETS S.A., and                             :
VERDMONT CAPITAL, S.A.                                       :
:
Defendants.           :
:
——————————————————————————————:


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
TO COMPEL PRODUCTION FROM DEFENDANT VERDMONT CAPITAL, S.A.**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………………………….. ii

PRELIMINARY STATEMENT ……………………………………………...…………. 1

STATEMENT OF FACTS………………………………………………...……………... 1

ARGUMENT…………………………………………………………………….……...5

    POINT 1  - THE REQUESTED DOCUMENTS SATISFY
    THE STANDARDS SET FORTH IN FED R. CIV. P. 26(b)…………………………..5

    POINT 2 - VERDMONT WAIVED THE RIGHT TO WITHHOLD
    THE REQUESTED DOCUMENTS UNDER PANAMANIAN LAW
    OR OTHERWISE……………………………………………………...………13

    POINT 3 - A COMITY ANALYSIS UNDER *AÉROSPATIALE*
    FAVORS PRODUCTION OF THE REQUESTED DOCUMENTS……………...……15

        A.  Importance of Documents Requested and Degree of
            Specificity……………………………………………...…………………17

        B.  Whether Information Originated in the United States………………..……18

        C.  Alternative Means of Securing the Information……………..……………19

        D.  Interests of the United States and Panama………………….…..…………19

        E.  Hardship of Compliance………………………..…...…………….………22

        F.  Good Faith………………………………….…………………………...22

CONCLUSION……………………………………..…………………………...……23

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Alfadda v. Fenn,*
    149 F.R.D. 28 (S.D.N.Y. 1993)……………………...…………………………16, 20, 21

*British Int'l Ins. Co. v. Seguros La Republica, S.A.*, Case No. 90-cv-2370,
    2000 WL 713057 (S.D.N.Y. June 2, 2000) …………………….....……………..…………20

*Brown v. Hempstead Union Free School District*, Case No. 15-cv-0263(JFB)(SIL),
    2016 U.S. Dist. LEXIS 2443 (S.D.N.Y. Jan. 7, 2016) …………………….….…………6

*Charter Practices Int'l v. Robb*, Case No. 12-cv-1768,
    2015 U.S. Dist. LEXIS 34112 (D. Conn. Mar. 19, 2015) …………………………13, 14

*Chevron Corp. v. Salazar*, Case No. 11-cv-3718,
    2011 U.S. Dist. LEXIS 72564 (S.D.N.Y. July 6, 2011) ………..……………………14

*First Nat'l City Bank of NY v. IRS,*
    271 F.2d 616 (2d Cir. 1959) …………………...……………………………16, 18, 21

*Freydl v. Meringolo*, Case No. 09-cv-7196(BSJ)(KNF),
    2011 U.S. Dist. LEXIS 67742 (S.D.N.Y. June 16, 2011) ………………………………14

*Graco, Inc. v. Kremlin Inc.*,
    101 F.R.D. 503 (N.D. Ill. 1984) ………………...……………...……………10, 22

*Gropper v. Davis Ellis Real Estate, L.P.*, Case No. 13-cv-2068(ALC)(JCF),
    2014 U.S. Dist. LEXIS 16849 (S.D.N.Y. Feb. 10, 2014) ……………………….………15

*Henry v. Morgan's Hotel Group, Inc.*, Case No. 15-cv-1789(ER)(JLC),
    2016 U.S. Dist. LEXIS 8406 (S.D.N.Y. Jan. 25, 2016) ………………………………6

*NML Capital, Ltd. v. Republic of Argentina*, Case No. 03-cv-8845(TPG),
    2013 WL 491522 (S.D.N.Y. Feb. 8, 2013) ………………...……………16, 20, 21

*Richmark Corp. v. Timber Falling Consultants*,
    959 F.2d 1468 (9th Cir. 1992) ………………...…………………….……………19

*Robertson v. People Magazine*, Case No. 14-cv-6759(PAC),
    2015 U.S. Dist. LEXIS 168525 (S.D.N.Y. Dec. 16, 2015) ……………...……………6

*SEC v. Banca Della Svizzera Italiana,*
    92 F.R.D. 111 (S.D.N.Y. 1981) ………………...…………...………………20, 21

*SEC v. Euro Security Fund*, Case No. 98-cv-7347,
    1999 U.S. Dist. LEXIS 4046 (S.D.N.Y. Apr. 2, 1999) …………………….……18, 20

*SEC v. Gibraltar Global Securities, Inc.*, Case No. 13-cv-2575(GBD)(JCF),
    2016 WL 1514746 (S.D.N.Y. April 1, 2015) ………………..……………12, 21, 23

*SEC v. Gibraltar Global Securities, Inc.*, Case No. 13-cv-2575(GBD)(JCF),
    2016 WL 153090 (S.D.N.Y. Jan. 12, 2016) …………………..…………………11

*SEC v. Renert*, Case No. 01-cv-1027(PCD),
    2002 U.S. Dist. LEXIS 27373 (D. Conn. Jun. 17, 2002) ……………………………10, 22

*Société Nationale Industrielle Aérospatiale v. District Court*,
    482 U.S. 522 (1987) ………………..……………………………………… *passim*

*State Farm Mut. Auto. Ins. Co. v. Fayda*, Case No. 14-cv-9792(WHP)(JCF),
    2015 U.S. Dist. LEXIS 162164 (S.D.N.Y. Dec. 3, 2015) ………………………………6

*Strauss v. Credit Lyonnais*,
    249 F.R.D. 429 (E.D.N.Y.2008) …………………..…………………..………20

*US v. Chase Manhattan Bank, N.A.*,
    584 F. Supp. 1080 (S.D.N.Y.1984) …………………..……………………20

*U.S. v. First Nat'l City Bank*,
    396 F.2d 897 (2d Cir. 1968) …………………..……………………………21

*Wultz v. Bank of China Ltd.*,
    910 F. Supp. 2d 548 (S.D.N.Y. 2012) …………………..……………..………17

## Statutes

Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e………………………..…………… *passim*

Section 4(3) of the Securities Act of 1933, 15 U.S.C. § 77d(3) …………………………… *passim*

Section 4(4) of the Securities Act of 1933, 15 U.S.C. § 77d(4) …………………………… *passim*

Section 362(b) of the Bankruptcy Code, 11 U.S.C. § 362(b)(4)………………….…..…………12

## Rules

Fed. R. Civ. P. 26(b) and Advisory Committee Notes, 2015…………………….…………… *passim*

Fed. R. Civ. P. 34 and Advisory Committee Notes, 2015…………………….…………… *passim*

## PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission files this Memorandum of Law and companion Motion pursuant to the Magistrate Judge's Order of January 27, 2016 (ECF No. 164). This matter comes before the Court as a result of Defendant Verdmont Capital, S.A.'s unjustified and continued refusal to produce several categories of documents called for by the Commission's first and second requests for production.  As set forth in more detail below, these documents are relevant to the Commission's claims, Verdmont's defenses, and the appropriate remedy for any violations that are found.   Moreover, the Commission's requests are proportional to the needs of this litigation.

Verdmont does not get a blanket excuse to ignore the Federal Rules of Civil Procedure simply because it is a foreign underwriter and broker-dealer.  Indeed, as the Southern District of New York and other district courts have ruled on many occasions, if foreign underwriters and broker-dealers like Verdmont have actively availed themselves of the privilege of conducting business within the United States by participating in the sale of tens of millions of dollars of securities in U.S. markets, then they must also bear the attendant responsibilities imposed on them by federal law.  Here, those responsibilities include producing the specific, targeted and narrowly-tailored information the Commission has requested.  And Verdmont's recent filing for liquidation, which closely tracked the Commission's pursuit of additional discovery, does not absolve Verdmont of its obligation to produce the relevant materials.

## STATEMENT OF FACTS

The Commission's Amended Complaint alleges that Verdmont engaged in the unregistered and unlawful sales of penny stock of three issuers, Goff Corp. ("Goff"), Norstra Energy Inc. ("Norstra") and Xumanii, Inc. ("Xumanii"), in violation of Section 5 of the Securities

- 1 -

Act of 1933, 15 U.S.C. § 77e. (Amend. Compl. ¶¶ 1-2, ECF No. 110.)  The distributions of these securities occurred in virtually the same way, involving the misuse of the Commission's registration process through sham registration statements and the fictional issuance of securities to public shareholders when, in fact, the securities remained in the control of the issuers or their affiliates. (*Id*. ¶ 16.)   In the offerings, the issuers pretended to sell securities to shareholders residing in such countries as Serbia, Mexico, Ireland, Norway, Panama and Jamaica. (*Id*. ¶ 1.)  In reality, however, the stock certificates representing those securities were not delivered to the shareholders. Instead, the issuers or their affiliates maintained control and possession of the certificates. (*Id*.)

The charade of a "public offering" was sufficient to cause the transfer agent to issue stock certificates without restrictive legends. (*Id*.)  The stock certificates subsequently were sent back to the transfer agent with instructions to transfer the securities to Verdmont or to brokerage accounts in its name – again without restrictive legends.  Verdmont then unlawfully offered and sold the securities into the U.S. public markets through brokerage accounts in the United States without registration statements being in effect.  (*Id*.)  Verdmont sold the stock for the account of its customers, including, among others, Lornex Financial Ltd. ("Lornex"), Nautilus Growth Fund, Inc. ("Nautilus"), Bamfield Equities, Ltd. (f/k/a Bartlett Trading) ("Bamfield"), Mr. Justin Mabanta, Jacametra Inversiones S.A. ("Jacametra") and Creekside Capital ("Creekside").[1]

---

[1]     The Commission has learned in discovery that Mr. Mabanta was an employee of Verdmont in addition to being a customer. [*See* SEC-BCSC-E-0001708.]  He submitted a sworn declaration to the Court at the outset of the case falsely representing that his customer account at Verdmont had not traded in the subject securities, when in fact it had. (ECF Nos. 43-4; 116-1.)  We also have learned from reviewing Verdmont's own documents that Jacametra Inversiones S.A. and Creekside Capital were controlled by Verdmont's principals, Messrs. Glynn Fisher and Taylor Housser.  (ECF Nos. 116-2; 116-3.)

The distributions resulted in tens of millions of dollars in proceeds from the sale of the securities. By facilitating the sales, Verdmont itself also separately earned $239,965 in commissions. (*Id*. ¶ 1.)

In its Answer to the Amended Complaint, Verdmont raised as affirmative defenses certain exemptions to the registration requirement in Section 5 of the Securities Act. (ECF No. 112.) Specifically, Verdmont invoked the dealer's exemption in Section 4(3) of the Securities Act, 15 U.S.C. § 77d(3), and the brokers' exemption in Section 4(4), 15 U.S.C. § 77d(4).  Accordingly, Verdmont itself expanded the scope of this case to include not just whether the securities at issue were registered, but also, the facts and circumstances surrounding the particular sales of the securities; the internal decision-making process at Verdmont concerning the sales; the customers who actually traded in the securities; and the proceeds realized from the sales.  In addition, because the Commission seeks disgorgement as one of the remedies in this case, proceeds from the sales are an appropriate matter for inquiry.

In connection with its claims and Verdmont's defenses, the Commission served two sets of discovery requests – the first request for production was served on February 12, 2015, shortly after the case was originally filed; and the second request for production was served on April 20, 2015.  Copies of these requests are attached as Exhibits A and B.

Verdmont responded to the first request on February 17, 2015, and to the second on May 26, 2015.  Copies of the responses are attached as Exhibits C and D.  In its responses, Verdmont asserted various boilerplate objections, including, relevance, overbreadth, burden, oppression and harassment, without providing any explanation as to why those objections were applicable to the Commission's requests.  Notably, Verdmont did ***not*** make a specific objection to any of the requests on the basis of any Panamanian secrecy laws that might apply, nor did it describe how

- 3 -

those laws would prevent compliance with the requests.  In addition, despite objecting to every single one of the Commission's requests, Verdmont nevertheless indicated it would "produce responsive, non-privileged documents in its possession, custody or control."

Following service of its responses, Verdmont made a limited production of documents to the Commission.  In reviewing the materials, the Commission determined the production was deficient, which has given rise to this Motion.  The deficiencies can be broken down into two primary areas: (i) documents that Verdmont heavily redacted prior to production, without any indication as to how or why such a redaction was appropriate [*see*, *e.g.*, VER002112-VER002273; VER001929-VEROO2006]; and (ii) documents that Verdmont failed to produce at all.  As for the latter area, these documents can be grouped into the following categories:

    i.        Regular monthly statements for Verdmont customer accounts that traded in Goff, Norstra or Xumanii securities from January 1, 2012 to the present (First Request for Production Nos. 1-3);

    ii.       Wire transfer, internal transfer requests, instructions and documentation reflecting destination or transfer of funds for Verdmont customer accounts that traded in Goff, Norstra or Xumanii securities from January 1, 2012 to the present (First Request for Production Nos. 1-3);

    iii.      Unredacted trade blotters reflecting trading in Goff, Norstra or Xumanii securities by Verdmont itself or its customers from January 1, 2012 to the present (First Request for Production Nos. 1-4);

    iv.      Orders, tickets and/or messages for trading in Goff, Norstra and/or Xumanii securities by Verdmont itself or its customers from January 1, 2012 to the present (First Request for Production Nos. 1-5, 15);

    v.       Documents showing the destination or tracing of proceeds for trading in Goff, Norstra and/or Xumanii securities by Verdmont or its customers from January 1, 2012 to the present (First Request for Production Nos. 1-4);[2]

---

[2]     Verdmont also was required to provide this information pursuant to Paragraph 5 of the Temporary Restraining Order the Court entered on February 6, 2015 (ECF No. 6).  Despite that directive, Verdmont failed to do so.

vi.     Accounts with common signature authority as Nautilus, Bamfield and Lornex from January 1, 2012 to the present (First Request for Production Nos. 1-3);

vii.     Phone recordings concerning Goff, Norstra or Xumanii from January 1, 2012 to the present (First Request for Production No. 6);

viii.     Internal Verdmont communications (including, but not limited to, emails and Skype messages) regarding Goff, Norstra or Xumaii from January 1, 2012 to the present (Second Request for Production Nos. 1-3);

ix.     External Verdmont communications (including, but not limited to, emails and Skype messages) regarding Goff, Norstra or Xumaii from January 1, 2012 to the present (Second Request for Production Nos. 1-3); and

x.     Communications with Celtic Consultants or Empire Stock Transfer regarding Goff, Norstra or Xumaii from January 1, 2012 to the present (Second Request for Production No. 4).

Accordingly, the discovery dispute before the Court concerns only a narrow subset of all of the documents requested by the Commission. As demonstrated below, these documents are relevant to the Commission's claims and Verdmont's defenses, and are proportional to the circumstances of this case. In addition, Verdmont affirmatively waived any basis to object to the requests by stating production would be made despite the objections, and also waived any right to rely on Panamanian law by failing to include it as a specific objection to the discovery. While the Commission believes a finding of waiver is appropriate, a comity analysis between federal discovery obligations under the facts of this case and Panamanian secrecy laws also favors production of the disputed materials. We address each argument in turn.

## ARGUMENT

## POINT I

## THE REQUESTED DOCUMENTS SATISFY THE STANDARDS SET FORTH IN FED R. CIV. P. 26(b)

The standards for discovery under the recent revisions to the Federal Rules of Civil Procedure are set forth in Rule 26(b). That rule provides, in pertinent part:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

While the rule itself now references a specific proportionality requirement, the Southern District of New York has observed that courts have long had discretion to limit discovery requests that are disproportionate to the needs of a particular case. *Robertson v. People Magazine*, Case No. 14-cv-6759(PAC), 2015 U.S. Dist. LEXIS 168525, at *4-5 (S.D.N.Y. Dec. 16, 2015). In that regard, the recent amendments to the rule did not create a new standard per se; instead, they require courts to exercise their preexisting control over discovery in a more exacting manner. *Id.* at *5. This holds true not only for the discovery requests made, but also for the objections the responding party raises: "Nor is the change intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional." Fed. R. Civ. P. 26, Advisory Committee Notes, 2015.

The amendments also did not impact how a court is to construe the definition of relevance. To the contrary, "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on' any party's claim or defense." *Henry v. Morgan's Hotel Group, Inc.*, Case No. 15-cv-1789(ER)(JLC), 2016 U.S. Dist. LEXIS 8406, at *8-9 (S.D.N.Y. Jan. 25, 2016) (quoting *State Farm Mut. Auto. Ins. Co. v. Fayda*, Case No. 14-cv-9792(WHP)(JCF), 2015 U.S. Dist. LEXIS 162164, at*2 (S.D.N.Y. Dec. 3, 2015)). And while the requesting party has the burden to show how the discovery is relevant, the responding party continues to have the burden of demonstrating undue burden and expense. *Brown v. Hempstead Union Free School District*, Case No. 15-cv-0263(JFB)(SIL), 2016 U.S. Dist. LEXIS 2443, at *4 (S.D.N.Y. Jan. 7, 2016).

In considering both the nature of the information sought in this instance and whether its production is proportional to the needs of the case, the Commission submits it has satisfied the standards for proper discovery. The documents at issue represent a specific, targeted and narrowly-tailored subset of information that is related directly to the Section 5 claim the Commission has charged as well as the Section 4(3) and Section 4(4) exemptions Verdmont has raised. The tailoring of the information to this subset will enable the Commission to complete its discovery efforts by April 30, 2016 – the date Judge Pauley set for the close of fact discovery. (ECF No. 157 at 2.)

In his Opinion and Order entered on November 10, 2015, Judge Pauley set out the elements constituting the Commission's prima facie case, as well as the elements for each of the exemptions Verdmont has invoked. Under Section 5 of the Securities Act, the Commission needs to show an offer or sale of securities was made in interstate commerce or by the mails for which no registration statement was in effect. (ECF No. 140 at 23.) As Judge Pauley noted, the registration requirement is transaction-specific. Here, that means both the original "offering" as well as Verdmont's subsequent sales of the securities on behalf of its customers had to be "registered, exempt, or illegal." (*Id.* at 24.)

As for the dealer's exemption in Section 4(3) of the Securities Act, Verdmont needs to show it sold the securities after a period of 40 days from the date the registration statements were declared effective, or the date the securities were bona fide offered to the public, whichever is later. (*Id.* at 25.) The relevant determination as to whether an offering of securities is "bona fide" is when the stock is "really and truly (genuinely) being offered to the public, as opposed to, say, a simulated offering." (*Id.*) Judge Pauley also observed that a "registration statement alone does not make an offering bona fide." (*Id.* at 26.)

And with respect to the broker's exemption set forth in Section 4(4) of the Securities Act, the relevant determination is whether Verdmont performed a "reasonable inquiry" into the sales in the accounts of its customers, which would include such factors as the length of time the securities have been held; the nature of the transaction; the amount of securities sold and the dates; the trading volume; and concurrent sales by multiple clients.  (*Id.* at 28-29.)

Given the complex nature of the exemptions Verdmont has raised, Judge Pauley aptly noted in his Opinion and Order that "fulsome discovery" would be needed.  (*Id.* at 30.)  The documents the Commission seeks center around the trades Verdmont made on its own behalf and on behalf of its customers in Goff, Norstra and Xumanii securities; the involvement Verdmont had in those transactions; sale and buy orders Verdmont received from its customers; sales proceeds earned and where they were transferred; and internal and external communications Verdmont had concerning the trades.  Each of these areas is critical to a determination of how the distributions of the securities occurred; whether Verdmont can meet its burden to invoke the exemptions; and the nature and relationship between Verdmont and its clients.

For example, to ascertain whether the original purported offerings in 2011 and 2012 of the securities were, as Judge Pauley phrased, "simulated offerings," the requested customer and trading data will allow the Commission to determine, among other things, whether Verdmont's customers were looking at the securities at issue well in advance of the actual trades made in 2013 and the extent of Verdmont's communications with its customers surrounding the securities themselves. This is one of the reasons why the Commission has asked for a time period of January 1, 2012 to the present for the discovery.

In addition, in order to understand the basis for the broker's exemption, the requested customer documents, trading data and communications will enable the Commission to look at the

length of time the securities were held before sale and resale; how the customers became interested in the securities in the first place; the due diligence Verdmont performed on the issuers and on its customers; the trading volume; and how many of Verdmont's customers were buying and selling the securities at the same time. The "reasonable inquiry" element of the broker's exemption really comes down to the issue of control – did Verdmont have sufficient controls in place during 2011-13 to make sure its customers were not colluding with the issuers, and did the vast and substantial sales of the securities (that were theretofore thinly traded), all of which occurred at the same time, raise appropriate red flags?

Verdmont has maintained in these proceedings that it already has produced "thousands of pages" of information to us. We are not disputing that. Verdmont indeed produced many documents. The problem here is that Verdmont produced only *some* of what was requested. And with respect to what it did produce, Verdmont heavily redacted all customer account identifying information so we are unable to determine the customers' accounts that traded in the securities. For the reasons noted above, the information redacted is relevant to this case, and especially relevant to Verdmont's own defenses. It was therefore error for Verdmont to make the redactions. In addition, as noted above, the time period in this case is from 2012 onward. The redacted statements only were from 2013.

Moreover, Verdmont obtained and filed customer waivers from Nautilus, Bamfield and Lornex with the Court. (ECF No. 45-7.) At a minimum, therefore, it was error to redact information for these customers because the waivers specifically allow disclosure of the information. In that regard, it is a mystery how Verdmont was unable to obtain similar waivers from its other customers, particularly Jacametra and Creekside. As noted above, the principals of Verdmont (Messrs. Fisher and Housser) also are the principals of Jacametra and Creekside. It

would seem to be a rather simple task for Mr. Fisher to ask himself for a waiver, and for Mr. Housser to do the same.  Indeed, Verdmont had an obligation to do just that.  As held in *SEC v. Renert*, Case No. 01-cv-1027(PCD), 2002 U.S. Dist. LEXIS 27373 (D. Conn. Jun. 17, 2002), it is the obligation of the party opposing discovery to do everything in its power to make documents available and not shift the burden to the requesting party.  "If there is a basis for civil liability, the solution is not, as defendants propound, to require plaintiff to seek waivers from all identified investors, ***but rather to require defendants to produce evidence that they sought waivers from the clients as they, not plaintiff, must endeavor to comply with the legitimate discovery requests***." *Id*. at *13 n.9 (citations omitted) (emphasis supplied). *See also Graco, Inc. v. Kremlin Inc.*, 101 F.R.D. 503, 527 (N.D. Ill.1984) (the foreign statute interfering with discovery was not the "problem" of either the court or the party seeking discovery; it was the "problem" of the party whose documents were shielded from discovery by foreign laws).  Verdmont obviously is capable of getting the waivers (having done so for Nautilus, Bamfield and Lornex), but has made no effort to meet its obligation of seeking waivers from its remaining customers (including Jacametra and Creekside), choosing instead to hide behind baseless excuses.

Verdmont's burden and expense in producing the documents is minimal. To date, Verdmont has never denied having possession, custody or control of the materials, so gathering them up and sending to the Commission should not prove too difficult.  Moreover, the fact that Verdmont already has produced some of the documents in redacted form means the documents exist and obviously have been segregated  (otherwise, they could not have been redacted).  If there is an unreasonable expense associated with producing the materials, Verdmont can seek to shift the attendant costs to the Commission, which the Commission would be prepared to accept.

To facilitate the process, the Commission can even provide several hard drives in order to transfer the data electronically and help minimize the expense.

As for the Commission's access to the information, Verdmont has argued in these proceedings that we can simply ask Panama's securities regulator, the Superintendencia del Mercado de Valores ("SMV"), for the information.  This is not a viable alternative under Rule 26(b).  Verdmont has provided no assurances the SMV has the particular documents in question; that the SMV would or could share the documents with us even if they did have them; or that the SMV would do so in a timely manner sufficient to comply with the April 30, 2016 close of fact discovery.  To the extent the Commission is able to obtain the documents from the SMV, we would withdraw our motion to compel the information from Verdmont – assuming, however, that Verdmont will provide a sworn declaration confirming the production from the SMV is complete   But Verdmont cannot evade its discovery obligations in the meantime on grounds that this contingency may occur.

In addition, the requested documents are relevant and critical to a determination of proceeds as a measure of the Commission's disgorgement claim. Judge Pauley already has observed in this case that whether Verdmont may be jointly and severally liable with its customers for the proceeds of the sales of the securities depends on Verdmont's "relationship to its clients." (ECF No. 140 at 31.)  Similarly, in *SEC v. Gibraltar Global Securities, Inc.*, Case No. 13-cv-2575(GBD)(JCF), 2016 WL 153090, at *4 (S.D.N.Y. Jan. 12, 2016), a case involving a similar set of facts as the instant case for violations of Section 5 of the Securities Act, Judge Daniels last month held a Bahamian broker-dealer jointly and severally liable for sales proceeds because of the "indispensable role" it played in the unregistered distributions of the securities. Accordingly, under Rule 26(b)'s amount in controversy standard, whether the measure of

damages in this case is limited just to Verdmont's commissions (approximately $240,000) or whether it encompasses sales proceeds of tens of millions of dollars is directly dependent on the customer information contained in the documents the Commission has requested. That information will reveal the relationship Verdmont had with its clients and the actual role it played in the securities offerings in this case.

Finally, the fact that Verdmont has filed for liquidation does not serve as a justification for withholding the discovery. The liquidation has not been filed or recognized in the United States. Even if it had, the Bankruptcy Code explicitly provides that the filing of a bankruptcy proceeding "does not operate as a stay . . . of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power." 11 U.S.C. § 362(b)(4). The code recognizes that law enforcement actions have deterrent impact and defendants like Verdmont should not be permitted to evade the consequences of their misconduct simply by initiating bankruptcy proceedings.

In addition, we note that in *Gibraltar*, Magistrate Francis was confronted with the very same issue the Court faces here – the Bahamian broker-dealer there also was involved in liquidation during the pendency of discovery. Magistrate Francis nevertheless ordered the broker-dealer to produce the documents the Commission had requested, noting, among other things, the suspicious timing of the liquidation filing itself. *See Gibraltar*, 2016 WL 1514746, at *5 (S.D.N.Y. April 1, 2015). Similarly, we point out here that according to the liquidation paperwork Verdmont filed in Panama, it appears Verdmont's principals (among them, Messrs.

Fisher and Housser) voted to place Verdmont into liquidation at a board meeting on January 7, 2016 – the very same day we held a meet-and-confer with Verdmont's counsel during which we discussed taking depositions of Messrs. Fisher and Housser (and which Judge Pauley already has ruled should take place).

**POINT 2**

**VERDMONT WAIVED THE RIGHT TO WITHHOLD THE REQUESTED DOCUMENTS UNDER PANAMANIAN LAW OR OTHERWISE**

The Commission submits this Court may resolve the issues at stake in this Motion on procedural grounds, without needing to get into a substantive analysis of comity.  In particular, Verdmont waived its right to object to the requested documents on the basis of Panamanian secrecy laws by failing to include it as a specific objection in its responses.  And even if that basis had been included, Verdmont nevertheless waived the right to withhold the documents in any event because Verdmont indicated, in its responses to the requests, that responsive information would still be produced "subject to and without waiving" the objections.

The 2015 amendments to the Federal Rules of Civil Procedure included revisions to Rule 34 that were intended to correct the difficulties caused by the precise type of response Verdmont has made in this case.  Although responding to a request for production "without waiving" an objection is a widespread practice, it was never contemplated by the rules to begin with, and it prevents the propounding party from determining whether the request has been fully answered. *Charter Practices Int'l v. Robb*, Case No. 12-cv-1768, 2015 U.S. Dist. LEXIS 34112, at *6 n.2 (D. Conn. Mar. 19, 2015).  Professor Moore has observed that "[i]f the responding party both answers and objects to the interrogatory at the same time, the objection may be deemed waived, and the answer, if responsive, will stand." *Id.*  The recent amendments addressed the concerns

raised by Professor Moore as they applied to requests for production under Rule 34.  *Id.*  As the

Advisory Committee noted, in pertinent part:

> Rule 34(b)(2)(B) is amended to require that objections to Rule 34 requests be stated with specificity. This provision adopts the language of Rule 33(b)(4), eliminating any doubt that less specific objections might be suitable under Rule 34.
>
> Rule 34(b)(2)(C) is amended to provide that an objection to a Rule 34 request must state whether anything is being withheld on the basis of the objection. This amendment should end the confusion that frequently arises when a producing party states several objections and still produces information, leaving the requesting party uncertain whether any relevant and responsive information has been withheld on the basis of the objections. The producing party does not need to provide a detailed description or log of all documents withheld, but does need to alert other parties to the fact that documents have been withheld and thereby facilitate an informed discussion of the objection.

Fed. R. Civ. P. 34, Advisory Committee Notes, 2015; *see also Charter Practices*, 2015 U.S.

Dist. LEXIS 34112, at *6 n.2; *Chevron Corp. v. Salazar*, Case No. 11-cv-3718, 2011 U.S. Dist.

LEXIS 72564, at *4-5 (S.D.N.Y. July 6, 2011) (noting the problem with stating production will

be made "subject to" objections is that "there is no way definitively to ascertain the extent to

which the defendants have limited responses on this ground, let alone the bases on which they

have done so.")

Accordingly, under Rule 34 as it now reads, Verdmont could not elect both to object and

to represent at the same time that production would be made.  To the contrary, Verdmont had to

***either*** state that production "will be permitted as requested" ***or*** "state with specificity the grounds

for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B).  Verdmont failed

to do that.[3]

---

[3]     The only thing Verdmont actually did do was assert a series of improper boilerplate objections including, among others, relevance, overbreadth, burden, oppression and harassment, without providing any explanation as to how or why those objections were applicable to the Commission's requests.  *See Freydl v. Meringolo*, Case No. 09-cv-7196(BSJ)(KNF), 2011 U.S. Dist. LEXIS 67742, at *6-7 (S.D.N.Y. June 16, 2011) ("[B]oilerplate objections that include unsubstantiated claims of undue burden,

Even if Verdmont had followed the proper procedure for answering the request, it still failed to preserve the ability to raise Panamanian secrecy laws as an objection. As noted above, under Fed. R. Civ. P. 34(b)(2)(B), Verdmont did not state that particular objection "with specificity" as it was required to do. Because of that deficiency, Verdmont also failed to comply with Fed. R. Civ. P. 34(b)(2)(C), which now reads, in part: "An objection must state whether any responsive materials are being withheld on the basis of that objection." There is no mention anywhere in Verdmont's responses that it is withholding the requested documents on the basis of Panamanian secrecy laws. (*See* Exhibits C and D.)

As such, the Commission submits that Verdmont waived the right to withhold the requested documents from the Commission.

## POINT 3

### A COMITY ANALYSIS UNDER *AÉROSPATIALE* FAVORS PRODUCTION OF THE REQUESTED DOCUMENTS

Prior to engaging in a full comity analysis, the Commission notes as a preliminary matter that the Court may dispose of this issue on a more straightforward basis. Verdmont submitted a declaration from a Panamanian attorney on February 24, 2015 (ECF No. 44), in connection with its opposition to the Commission's motion for a preliminary injunction. The declaration purported to describe the relevant provisions of Panama's bank secrecy laws that Verdmont contends prohibit disclosure of the requested documents. While the attorney described the laws generally, he left out a discussion concerning the last clause of one of the provisions. Article 65 of Panama's Securities Law provides that customer information can be disclosed not only if the

---

overbreadth and lack of relevancy" while producing "no documents and answer[ing] no interrogatories . . . are a paradigm of discovery abuse."); *Gropper v. Davis Ellis Real Estate, L.P.*, Case No. 13-cv-2068(ALC)(JCF), 2014 U.S. Dist. LEXIS 16849, at *10 (S.D.N.Y. Feb. 10, 2014) ("General and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information.") As noted above in Point 1, such boilerplate objections fail the proportionality standard in Rule 26(b).

customer waives the secrecy protections, but also "in the event of an order issued by the proper authority according to the law." (*See* ECF No. 44 at ¶ 4.)

In *NML Capital, Ltd. v. Republic of Argentina*, Case No. 03-cv-8845(TPG), 2013 WL 491522, at *7 (S.D.N.Y. Feb. 8, 2013), the Southern District of New York addressed similar clauses under Panama's constitution and banking law. Judge Griesa held there was no indication in those laws, and no evidence before the court, that the "proper authority" was limited to a Panamanian authority. Instead, Judge Griesa noted an order from a United States court also could qualify as the "proper authority." *See id.; see also First Nat'l City Bank of NY v. IRS*, 271 F.2d 616, 620 (2d Cir. 1959) (same). As it is Verdmont's burden to prove the existence and application of Panamanian law (*see Alfadda v. Fenn,* 149 F.R.D. 28, 34 (S.D.N.Y.1993)), and as Verdmont has offered no evidence that an Order from this Court would not qualify as a "proper authority" under Article 65, the Commission submits that this Court may lawfully order production of the requested documents without offending Panamanian secrecy protections and without even needing to get into a comity analysis.

Should the Court determine a comity analysis is required, however, the Commission submits that in this instance, comity favors production of the requested documents. The seminal case for determining the interplay between foreign blocking or secrecy laws and federal discovery rules is *Société Nationale Industrielle Aérospatiale v. District Court*, 482 U.S. 522 (1987). There, the Supreme Court laid out a series of five factors for lower courts to consider when deciding whether comity should be given to the foreign law or whether federal discovery obligations should control: (i) the importance to the investigation or litigation of the documents or other information in question; (ii) the degree of specificity of the request; (iii) whether the information originated in the United States; (iv) the availability of alternative means of securing

the information; and (v) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the foreign state where the information is located. *Aérospatiale*, 482 U.S. at 544.  In the Second Circuit, the comity analysis also involves two additional factors: (vi) hardship of compliance; and (vii) the good faith of the party resisting discovery. *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 553 (S.D.N.Y. 2012).

> ### A.      Importance of Documents Requested and Degree of Specificity

The requested documents represent a specific, targeted and narrowly-tailored subset of information that is related directly to the Section 5 claim the Commission has brought as well as the Section 4(3) and Section 4(4) exemptions Verdmont has raised.  The customer information, trading and sales data, and communications about the issuers and stock sales are the very types of documents that are routinely subject to discovery in securities enforcement actions in this Court every day.

It is critical that Verdmont produce the information the Commission has requested.  As discussed above in Point 1, the documents bear directly on the issues of whether the original purported offerings in 2011 and 2012 of the securities were, as Judge Pauley phrased, "simulated offerings"; how the securities came to market; how Verdmont's customers became interested in securities that, prior to the relevant time period, had only been thinly traded; whether Verdmont itself engaged in a "reasonable inquiry" prior to placing the trades; and whether the company had sufficient controls in place from 2011-2013 to ensure proper due diligence protocols were in effect.  In addition, the requested documents also will allow the Commission and this Court to ascertain whether it is appropriate to hold Verdmont jointly and severally liable in disgorgement for the sales proceeds realized from the sales.  For example, the information contained within the

communications Verdmont had with its customers, as well as the customers' particularized trading activities, will demonstrate the role Verdmont played in these transactions, and whether that role was "indispensable" to the unregistered distributions, as Judge Daniels framed the issue in *Gibraltar*.

Verdmont is the sole repository of this information. Not surprisingly, the overwhelming majority of its customers have not signed waivers permitting the disclosure, instead opting to take full advantage of doing business in Panama and its safe haven of bank secrecy. With all due respect to the laws of a foreign sovereign, however, when those same individuals choose to do business in the United States, and make active use of our markets while reaping tens of millions of dollars in sales proceeds, Panamanian bank secrecy cannot, and should not, dictate the disclosure of information. *See First Nat'l City Bank*, 271 F.2d at 620 ("If the Bank cannot, as it were, serve two masters and comply with the lawful requirements both of the United States and of Panama, perhaps it should surrender to one sovereign or the other the privileges received therefrom.") Given the critical importance of the documents the Commission has requested, comity favors production in this matter. *SEC v. Euro Security Fund*, Case No. 98-cv-7347, 1999 U.S. Dist. LEXIS 4046, at *10-11 (S.D.N.Y. Apr. 2, 1999) ("[T]he SEC's ability to proceed is crippled by a total lack of production, particularly with respect to asset identification.")

### B.     Whether Information Originated in the United States

Some of the information sought by the Commission[4] either: (i) originated from the United States; (ii) was received by individuals, brokerages and transfer agents in the United States; (iii) could be accessed by individuals, brokerages and transfer agents in the United States;

---

[4]     The Commission acknowledges that at least based on Verdmont's representations concerning its customer base, not all of the requested documents would have originated in the United States. But given that Verdmont has not made any of this information available, it would be premature to make that determination until actual disclosure of the documents is made.

or (iv) reflected securities transactions carried out by brokerages in the United States. By definition, communications between Verdmont and these entities necessarily involved a United States participant. While records of these transactions may be kept in Panama, such records directly involved United States entities.

Most importantly, the documents presumably are located in Panama, but that adds no weight to the analysis since there is no conflict between United States and Panamanian law as noted above because this Court can order the production. As demonstrated, disclosure by Verdmont pursuant to this Court's Order would not violate Panamanian law.

**C.      Alternative Means of Securing the Information**

As discussed above in Point 1, it is not a viable alternative for the Commission to seek the requested documents from Panama's securities regulator, the SMV.  Verdmont has provided no assurances the SMV has the particular documents in question; that the SMV would or could share the documents with the Commission even if they did have them; or that the SMV would do so in a timely manner sufficient to comply with the April 30 deadline for completing fact discovery.  Nevertheless, to the extent we are able to retrieve the documents from the SMV, we would withdraw our motion to compel the information from Verdmont – assuming, however, Verdmont will provide a sworn declaration confirming the production from the SMV is complete.  Unfortunately, because we cannot depend on the SMV, we need to pursue the motion to compel simultaneously in order to be sure the parties meet the April 30 deadline.

**D.      Interests of the United States and Panama**

As a general matter, courts are reluctant to defer to foreign secrecy laws when the purpose would be to frustrate the open exchange of information contemplated in the discovery process. *See*, *e.g.*, *Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468 (9th Cir. 1992)

(affirming order of production notwithstanding Chinese secrecy laws); *Strauss v. Credit Lyonnais,* 249 F.R.D. 429, 438 (E.D.N.Y.2008) (refusing protective order sought on basis of French bank secrecy law); *British Int'l Ins. Co. v. Seguros La Republica, S.A.,* Case No. 90–cv–2370, 2000 WL 713057 (S.D.N.Y. June 2, 2000) (declining to defer to Mexican bank secrecy law); *Alfadda,* 149 F.R.D. 28 (denying protective order sought on the ground of Swiss bank secrecy); *US v. Chase Manhattan Bank, N.A.,* 584 F. Supp. 1080 (S.D.N.Y.1984) (refusing protective order sought on basis of Hong Kong bank secrecy law). *See also NML* 2013 WL 491522 (expressing frustration with objecting party's belated foreign-law objections and ordering production notwithstanding asserted conflicts with Spanish data protection laws, Brazilian bank secrecy laws, a Bolivian sovereignty statute, the Chilean bank secrecy law, the Panamanian Constitution and other laws, the Paraguayan Constitution and other laws, the common law in the Cayman Islands, Argentina's bank secrecy law, and Uruguayan bank secrecy law).

Judges in the Southern District of New York have held that the interests of the United States in maintaining the integrity of its securities markets outweighs the more flexible interests of foreign sovereigns in enforcing their confidentiality laws in instances where there is an actual conflict of law.  *See*, *e.g.*, *Euro Security*, 1999 U.S. Dist. LEXIS 4046, at *10; *SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 112 (S.D.N.Y. 1981).  The United States also has a significant "interest in the full and fair adjudication of matters before its courts, which is only possible through complete discovery." *Alfadda*, 149 F.R.D. at 34.

It follows that disclosure should be compelled where no actual conflict of law exists. Further, courts routinely have applied the principle that a foreign government's failure to express a view that the disclosure at issue threatens its national interests "militates against a finding that

strong national interests of the foreign country are at stake." *Gibraltar*, 2015 WL 1514746, at *5; *Alfadda*, 149 F.R.D. at 34; *see also Banca Della*, 92 F.R.D. at 117-18.  As a matter of course, foreign governments never have hesitated to make their objections known when they feel vital national interests are being threatened.  *Alfadda*, 149 F.R.D. at 34.  Notably, Panama has taken no such action in this case.

Rather, Verdmont has made no showing of any concern by Panama about any conflict of laws.  To the contrary, the record is that the interests of the United States and Panama are fully aligned in the proper application of the law.  Indeed, as noted above, Article 65 of Panama's Securities Law expressly allows disclosure of customer information pursuant to a lawful order, which would include an order from this Court.  *See NML Capital*, 2013 WL 491522, at *7; *First Nat'l*, 271 F.2d at 620.  And moreover, where, as here, Verdmont's customers themselves can expressly waive the secrecy protections, then such protections are a private interest and do not implicate the national interests of Panama. *U.S. v. First Nat'l City Bank*, 396 F.2d 897, 903-04 (2d Cir. 1968).

Again, it was Verdmont and its customers who, under the veil of secrecy in Panama, elected to transact business in the United States and reap tens of millions of dollars in the process.  They cannot now have it both ways – either stay anonymous and trade offshore, or identify yourself when you fleece the U.S. securities markets.  And if its customers insist on trading here, Verdmont could easily have required them to waive any secrecy protections in advance in response to Commission inquiries such as that in the present case.  Given Verdmont's reluctance to surrender the documents, and the nature of the customers it did business with, it is not hard to imagine why Verdmont would not want to require such a waiver.

### E.      Hardship of Compliance

Verdmont will not suffer any hardship in producing the requested documents.  As noted above in Point 1, Verdmont has never denied having possession, custody or control of the materials, so organizing and sending them to the Commission should be a rather straightforward and simple task.  If for some reason there is an unreasonable expense associated with producing the materials, Verdmont can seek to shift the attendant costs to the Commission, which the Commission would be prepared to accept.  To facilitate the process, the Commission can even provide several hard drives in order to transfer the data electronically and help minimize the expense.

Additionally, the fact that Verdmont already has produced some of the documents in redacted form is telling. That means (i) the documents exist; (ii) Verdmont sent them to its counsel in New York; (iii) counsel reviewed and segregated them; and (iv) counsel decided to redact the information the Commission seeks.  Again, production in this instance should not be a difficult task to accomplish.

### F.      Good Faith

Finally, the Commission submits Verdmont has not acted in good faith in resisting production of the requested documents.  Indeed, Verdmont has failed to meet its obligation as the party opposing discovery to do everything in its power to make the documents available and not shift the burden to the Commission.  *See Renert*, 2002 U.S. Dist. LEXIS 27373, at *13; *Graco*, 101 F.R.D. at 527 (the foreign statute interfering with discovery was not the "problem" of either the court or the party seeking discovery; it was the "problem" of the party whose documents were shielded from discovery by foreign laws).  Rather, Verdmont has now spent well over a year attempting to prevent the Commission from seeking lawful, relevant discovery.

- 22 -

Moreover, the circumstances surrounding Verdmont's claimed liquidation filing should not be overlooked.  In analyzing the *Société* factors in *Gibraltar*, Magistrate Francis noted the defendants there voted to place the company in liquidation shortly after learning the Commission intended to file an enforcement action.  *Gibraltar*, 2015 WL 1514746, at *5.  Magistrate Francis found that to be evidence of bad faith.  He also ordered that defendants produce all documents called for by the Commission's discovery requests, notwithstanding the pendency of liquidation proceedings.  *Id.* at *6.

Similarly, here, according to the liquidation paperwork Verdmont filed in Panama, it appears Verdmont's principals (among them, Messrs. Fisher and Housser) voted to place Verdmont into liquidation at a board meeting on January 7, 2016 – the very same day counsel for the Commission held a meet-and-confer with Verdmont's counsel during which the parties discussed taking depositions of Messrs. Fisher and Housser.  As was the case in *Gibraltar*, this represents bad faith on the part of Verdmont, and yet another example of how Verdmont continues to engage in a patent affront to this Court in connection with its discovery obligations.

## **CONCLUSION**

For the reasons set forth above, the Commission respectfully submits Verdmont should be required to produce the outstanding documents called for by the Commission's first and second requests for production within 10 days.


Dated: Washington, D.C.                                    Respectfully submitted,
      February 12, 2016


                                               /s/ Patrick R. Costello_____
                                             Patrick R. Costello
                                             Derek S. Bentsen
                                             Bridget M. Fitzpatrick
                                             Ernesto G. Amparo

Local Counsel:

David Stoelting
Securities and Exchange Commission
Brookfield Place, 200 Vesey Street
New York, New York 20181
(212) 336-0174  telephone
(212) 336-1323  facsimile
stoeltingd@sec.gov

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-5985
(202) 551-3982  telephone (Costello)
(202) 772-9245  facsimile
costellop@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 12, 2016, I electronically filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION FROM DEFENDANT VERDMONT CAPITAL, S.A. using the CM/ECF system, which will send notification of such filing to counsel for Defendants Caledonian Bank Ltd., Caledonian Securities Ltd. and Verdmont Capital, S.A. at the following addresses:

| | |
|---|---|
| Robert J.A. Zito | Sigal P. Mandelker |
| Carter Ledyard Milburn LLP | Margaret A. Dale |
| Two Wall Street | Proskauer Rose LLP |
| New York, New York 10005 | Eleven Times Square |
| zito@clm.com | New York, New York 10036 |
| Attorneys for Defendant | smandelker@proskauer.com |
| Verdmont Capital, S.A. | mdale@proskauer.com |
| | Attorneys for Defendants Caledonian |
| | Bank Ltd. and Caledonian Securities |
| | Ltd. |

/s/ Patrick R. Costello
Patrick R. Costello