G3G5secA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          v.                              15 Civ. 894 (WHP)

CALEDONIAN BANK, LTD. and
VERDMONT CAPITAL, S.A. *et al.*,

                    Defendants.

------------------------------x

                                          March 16, 2016
                                          3:10 p.m.
Before:

                    HON. JAMES L. COTT,

                                          Magistrate Judge

                         APPEARANCES

U.S. SECURITIES AND EXCHANGE COMMISSION
BY:  PATRICK R. COSTELLO
     DEREK S. BENTSEN
     DAVID STOELTING

CARTER, LEDYARD & MILBURN, LLP
     Attorneys  for Defendant Verdmont Capital, S.A.
BY:  ROBERT A. ZITO
     MARK R. ZANCOLLI

G3G5secA

1                    (Case called)

2                    THE DEPUTY CLERK:  Counsel, state your name for the

3     record.

4                    MR. COSTELLO:  Good afternoon, your Honor.  Patrick

5     Costello on behalf of the SEC.

6                    THE COURT:  Good afternoon, Mr. Costello.

7                    MR. BENTSEN:  Good afternoon, your Honor.  Derek

8     Bentsen on behalf of the SEC.

9                    THE COURT:  Good afternoon, Mr. Bentsen.

10                   MR. STOELTING:  Good afternoon.  David Stoelting for

11    the SEC.

12                   THE COURT:  Good afternoon, Mr. Stoelting.

13                   MR. ZITO:  Good afternoon, your Honor.  Robert Zito of

14    Carter Ledyard for Verdmont Capital.

15                   THE COURT:  Good afternoon, Mr. Zito.

16                   MR. ZANCOLLI:  Good afternoon.  Mark Zancolli from

17    Carter Ledyard for Verdmont Capital.

18                   THE COURT:  Good afternoon, Mr. Zancolli.

19                   You may all be seated.  Let me tell you all how I have

20    been thinking about this.

21                   I have read all of the submissions including the

22    letter Mr. Zito sent today and that's probably where we should

23    start, but I like to be practical with discovery disputes.

24    This is a complicated dispute.  The threshold question,

25    obviously, is whether the information that's being sought is

1    relevant, either with respect to the SEC's establishment of the

2    prima facie case with respect to the Section 5 violation or

3    with respect to Verdmont's defenses and we can talk about that

4    and maybe we will and/or is it also relevant to the issue of

5    joint and several liability and we can talk about that.  Maybe

6    we will.

7            Let's assume for the moment that the threshold issue

8    of relevance is one that I am satisfied requires the Court to

9    consider the more complicated question here which is whether

10   Panamanian law forecloses production.  But, before we get to

11   that question, it seems to me that the Court doesn't have to

12   reach it if, in fact, as the SEC has represented, it can get

13   the documents from the Panamanian regulatory authorities and

14   Verdmont certifies that the documents that the SMV would be

15   providing are in fact the same as what they would otherwise

16   have been able to get from Verdmont.  The issue with respect to

17   that, it seems to me, is there is an uncertain timeline

18   associated with that and you have a discovery cutoff date of

19   April 30th.

20           I am also a little perplexed by the fact that, at

21   least if I am remembering what I read in the record, that the

22   SEC did not make at least a formal request of the SMV until

23   February 24th of this year, notwithstanding that these document

24   requests were made in the spring of last year at the latest.

25           So, that's another question I have, why was there a

1    delay.  And from the representations Mr. Zito has made to me

2    both in his declaration of a week or so ago and in the letter

3    dated today, I need, I think, to get a better understanding

4    both with respect to what relationship, if any, the SEC has

5    with Panamanian regulatory authorities and what information is

6    already in the SEC's possession that it received from Canadian

7    regulatory authorities.  If we go down that path and we

8    conclude that there is a realistic and rational way for the SEC

9    to obtain, on a relatively timely basis the outstanding

10   materials, and that's another question I had which is what in

11   fact does remain to be produced that the SEC does not already

12   have, then it seems to me I don't have to get into the thick of

13   it whether, number one, a United States Court's order fits

14   within the Panamanian legal framework which I think is a

15   complicated question; and two, I don't have to consider the

16   comity factors which also, it seems to me in this case, is a

17   pretty complicated analysis which I have given thought to, by

18   the way, but as is always true, if you can resolve something

19   without reaching the hard legal questions, one should do that.

20         So, that's the framework that I'm bringing here.

21   Obviously if you think I am misunderstanding or misstating

22   anything, I obviously need to be educated.  You all have lived

23   with this case far longer than I have and Judge Pauley has

24   effectively asked me to parachute in because he is otherwise

25   engaged to deal with this discrete but complex issue.

1          So, Mr. Mr. Costello, let me start with you.  I have

2     identified a number of questions that I have, let's start with

3     the letter I got from Mr. Zito today.  I assume, in part, the

4     SEC will tell me that you do not have a formal bilateral

5     agreement.  I don't know if that's a semantic distinction

6     between what may exist since Mr. Zito is operating under the

7     assumption that there is what we will call a memorandum of

8     understanding.  That's what he refers to it as in his letter.

9     Maybe a memorandum of understanding is not a formal bilateral

10    agreement.

11          So, can you answer, first of all, whether there is at

12    least a memorandum of understanding?

13          MR. ZITO:  Your Honor?

14          THE COURT:  You are not Mr. Costello.

15          MR. ZITO:  Your Honor, can we go off the record?  This

16    is a very sensitive issue and I just want to inform the Court

17    of certain sensitive facts I received on my way to the court

18    house regarding this issue.

19          THE COURT:  All right.  And you want to go off the

20    record?

21          MR. ZITO:  Yes, your Honor.

22          THE COURT:  All right, we will go off the record for a

23    minute.

24          (Discussion off record)

25          THE COURT:  Let's go back on the record.

G3G5secA

1          All right, Mr. Costello.

2          MR. COSTELLO:  Thank you, your Honor.

3          Just to give your Honor a little bit of context here,

4    in terms of agreements that the SEC has with foreign

5    regulators, those agreements can take one of three forms, as I

6    am told by my Office of International Affairs -- one is a

7    treaty, two is a formal bilateral agreement, and three is a

8    memorandum of understanding/access request.

9          It is really not necessary, I don't think, to get into

10   the nuances of what one is and one isn't and what have you

11   because I think once we relate it back to this discovery

12   dispute we will see that at the end of the day it doesn't

13   really matter.

14         And so, I will apprise the Court of a little bit of

15   the time frame here.  There has never been a formal bilateral

16   agreement or a treaty, as I understand it, for the type of

17   dispute or enforcement action that we have here between the

18   United States and Panama.  Now, that is unlike other regulators

19   around the world but between the United States and Panama or

20   the SEC and the Panamanian regulator, no such thing has ever

21   existed.

22         Recently, within the last few months, there have been

23   discussions between the SEC and the Panamanian regulator even

24   though I can't go into the substance of those discussions

25   because they're confidential, but suffice to say that the SEC

1    and the SMV have reached a memorandum of understanding/access

2    request, whatever you want to call it, but I am just pointing

3    out that it is not one of the first two categories, it is the

4    third category.

5             Now, the important thing here is that we have asked

6    the Panamanian regulator to produce, if they have it, the very

7    same documents that we have sought from Verdmont here, and

8    those are the 10 categories of documents that we have in all of

9    our filings.  So, we have asked them for the very same

10   information that we are seeking from Verdmont.

11            Now, I will get into the mechanics of that in a minute

12   but I just want to clarify something for the Court.  I don't

13   know what Mr. Zito may have been referring to in terms of the

14   time frame on this but, as I said, that agreement with the

15   regulator was reached only recently and we made a request for

16   these particular categories of documents only recently, and the

17   reason that we did that only recently is because there never

18   was any kind of an arrangement with the regulator back when

19   this case was filed last year.  Had there been such an

20   arrangement then perhaps we could have requested it at that

21   point in time but there was nothing.

22            Now, why there was nothing I can't speak to that, your

23   Honor.  I'm not involved in negotiations with the Panamanian

24   regulator, our Office of International Affairs handled that but

25   I can now tell the Court that there is an understanding with

1    respect to the information that is in this case.

2            THE COURT:  Why couldn't the SEC have made a request

3    of the Panamanian regulator last spring even before there was

4    any kind of agreement in the form of an MOU or any other form?

5            MR. COSTELLO:  Your Honor, all I can say is that there

6    was no mechanism in place to make that request.  The history as

7    to how the regulators interact with one another, I don't really

8    know what the history is.  All I can tell you is that there

9    never was any kind of an arrangement or communication or even

10   any kind of discourse at the time that this happened.  How it

11   came about that things changed recently, I can't go into the

12   substantive and in truth, your Honor, I really don't know how

13   that came about but all I can tell the Court is that now there

14   is a framework in place that didn't exist before.

15           THE COURT:  And is the fact that there is an MOU

16   sensitive enough that I should be sealing this transcript, at

17   least with respect to the discussion about it?  Or not so much.

18           MR. COSTELLO:  No, your Honor, it is not necessary to

19   seal it about the substance of it but, suffice to say, that in

20   this context, just to bring the Court up to speed on what

21   happened, as we understand it, Verdmont had made a request of

22   the SMV for the letter agreement or the memorandum of

23   understanding that exists between the two regulatory agencies

24   last week.  The SMV then responded to Verdmont, as we

25   understand it, and told them that under Rule 5-2015 of the

G3G5secA

1    Panamanian Securities Provisions or what have you, the

2    existence of or contents of the letter between the regulatory

3    agencies is confidential, an interregulatory agreement.  I'm

4    not quite sure of what the term is in Panama.  But, to bring

5    that back stateside, your Honor, under Section 24(d) of the

6    Exchange Act, when you have these arrangements between the SEC

7    and foreign regulators, particularly where the foreign

8    regulator asks that the contents of the agreement and the

9    specific terms of it be kept confidential as the SMV has

10   designated here, the SEC will respect that foreign regulator's

11   request.

12          And, again, I want the Court just to kind of bring

13   this into context here as to what this really means.  I frankly

14   don't see how the history of this, the terms of this, the

15   specifics of this, who signed it, when that happened, all of

16   that, that doesn't really concern the particular dispute that

17   we have here.  I think that I can represent to the Court, if

18   that's the concern from Verdmont's side, I can represent to the

19   Court that we have asked the SMV for the very same information

20   that we have asked from Verdmont.

21          THE COURT:  And you asked on February 24th?

22          MR. COSTELLO:  That was when the actual request itself

23   was made.

24          THE COURT:  And what can you tell me about the

25   timeline related to any response you expect to get, if

G3G5secA

         1   anything?  And maybe you can't, but whatever you can say in

         2   that regard I think is of critical importance here.

         3             MR. COSTELLO:  Certainly, your Honor.

         4             I can tell you that the SMF has acknowledged receipt

         5   of the request but my Office of International Affairs has

         6   informed me that they just don't have a sense, given that there

         7   has really been no history to point to unlike other regulators

         8   where we can say, oh, typically this takes a month or two

         9   months.  We don't have that here.  So, what I can try to offer

        10   the Court is perhaps an alternative to this, if maybe this is

        11   the way the Court wants to go here.

        12             We have no problem with trying to run this down with

        13   the SMV.  We have no problem with trying to get the information

        14   from them first, we will collect it, we will review it, the

        15   Court can have another status conference, we can talk about it,

        16   we can do whatever that is.  My concern is that this is not

        17   going to happen before April 30th.  So, what I might suggest as

        18   an alternative, if the Court is interested, if the Court would

        19   be willing to push back that deadline -- and I'm not sure if

        20   that would be a discussion that would need to be had with Judge

        21   Pauley, I imagine it would be -- but, in light of the

        22   circumstances here and in light of keeping in mind the comity

        23   factors and the sensitivities of Panamanian secrecy and what

        24   have you and, again, to paraphrase your Honor from earlier,

        25   maybe we can resolve this on the easier side rather than having

G3G5secA

```
 1    to get into the complicated side, maybe in light of all of that

 2    it would be best, in this instance, to push the discovery

 3    deadline back.  That would give us enough time to get the

 4    documents from the regulator, that would alleviate or moot the

 5    need for the Court to engage in any kind of a complicated

 6    analysis, and then would allow us the opportunity to again, as

 7    I believe Verdmont's liquidator has represented in one of her

 8    declarations, that she would be willing to sign off on whether

 9    the production is complete or what have you.  We can deal with

10    that down the road.

11          And then I would say what we could do in that

12    situation is we can see what the SMV has because truthfully we

13    don't know.  And I know Verdmont has represented in its filings

14    that they have given everything to the SMV but I can't verify

15    that until I actually see what the SMV gives us if they even

16    are.

17          That's not a guarantee, your Honor.  I want to put

18    that on the record too.

19          THE COURT:  What is not a guarantee?

20          MR. COSTELLO:  It is not a guarantee that the SMV will

21    give us this information.  We don't have any kind of assurance

22    that they will.  We have asked them for it.  We have no

23    mechanism or means to force them to do anything because they're

24    a foreign regulatory body, they can do what they please.  We

25    are hoping that they will give us this information.
```

G3G5secA

1          THE COURT:  Well, if there is a memorandum of

2   understanding what are you understanding?  Isn't it that you

3   are going to share information, as appropriate?  You mean in

4   these circumstances they might say it is not appropriate to

5   give you this information for some reason?

6          MR. COSTELLO:  Precisely, your Honor.  Precisely.

7          THE COURT:  Well, first of all, on the timing issue,

8   that's an application that would be need to be made to Judge

9   Pauley and not to me because he has not referred this case to

10  me for general pretrial supervision, he has referred it to me

11  for this discrete dispute.  So, I am responsible in the first

12  instance for resolving this dispute.  And I am not suggesting

13  that going to Judge Pauley might not be an appropriate thing to

14  do, indeed that may be the right thing to do here, but I think

15  we need to develop the record a little bit more.

16         What can you tell me about the what the SEC has

17  received from Canadian regulatory authorities here and how does

18  that dovetail with what you are otherwise seeking either from

19  Verdmont or the SMV?

20         MR. COSTELLO:  Certainly, your Honor.

21         We have received three categories of documents from

22  the Canadian regulator, the first category is trade blotters

23  for or trade blotters for one of the securities in question and

24  I have a copy of it, I can kind of just show the Court.

25         THE COURT:  Can I ask, is it correct and maybe I am

G3G5secA

misremembering what I read, but I thought Verdmont's counsel

was suggesting the Canadian regulators only have this

information because they must have gotten it from the SMV.  Is

that your understanding as to where it came from?  Or do you

not know?

          MR. COSTELLO:  I truly do not know, your Honor.  All I

can tell you is that these documents came from the British

Columbia Securities Commission.  Whether the BCSC, as it is

abbreviated, got those from Verdmont or whether they got those

from the SMV, whether there exists some kind of agreement

between Canada or one of the provincial regulators and the SMV

I can't speak to that because I simply don't know.

          THE COURT:  How did the SEC obtain this information

from the Canadian authorities?  You made a specific request for

them thinking that they might have some of this information?

          MR. COSTELLO:  As I understand it, yes, your Honor.

And again, I'm not sure of the specifics on how that happened

or whether that was done through a treaty with Canada or what

have you and, again, I am concerned that we may be getting far

afield from where we need to be in this instance.

          THE COURT:  Well, we are and we are not in the sense

that obviously the bottom line here is what remains to be

produced.

          MR. COSTELLO:  Certainly, your Honor.

          THE COURT:  I am assuming that some of what you are

seeking from Verdmont or what you were seeking from Verdmont in

these 10 categories was produced to you through the Canadian

regulatory authorities; is that not right?

MR. COSTELLO:  That is correct, your Honor.  And I was

going to tell the Court what we have received.

THE COURT:  So that's, in some respect, narrowed what

still remains to be produced; is that not right?

MR. COSTELLO:  That is true; yes, in a sense; no, with

a but, and I will explain, if the Court would allow me to.

THE COURT:  All right.

MR. COSTELLO:  The first category is trade blotters

and it is not necessary to enter this but it is basically a

trade blotter that has a list of the particular customers and

the trades that they placed in the particular security and

which clearing broker cleared those trades ultimately at the

end of the transaction.

THE COURT:  Names of the customers are identified?

MR. COSTELLO:  Some of the customers' names are

identified.  Now let me just clarify what this is and what this

isn't.

This particular plotter that I have in my hand here

pertains to the Goff Corporation, that is one of the securities

at issue.  All of the other blotters that we got from the

Canadians concern securities that are unrelated to this case; a

number of them, in fact a couple dozen, to be frank.  But there

G3G5secA

1    was no blotter for Xumanii and no blotter for Norstra.

2              I would also point out that this blotter that we got,

3    this piece of paper that I have in my hand, is an excerpt,

4    unfortunately, of all of the trades during the relevant period.

5    For example, the first trade on here begins on March 18 of 2013

6    and the last trade listed on here is April 3rd of 2013, but the

7    Goff trading extended beyond April into June.  That's the last

8    time that the very last trade was made that sunk the price back

9    to its penny stock value of cents on the dollar.

10             So, this appears to be a snippet of a point in time.

11   I'm not sure why this is a snippet of a point in time, I'm not

12   sure where the rest of it is.

13             THE COURT:  The rest of it was not produced.

14             MR. COSTELLO:  The rest of it was not produced, your

15   Honor.  And so, this is an example of -- so, this would be one

16   trade blotter or, I should say, a portion of a trade blotter

17   that really isn't telling us something that we didn't already

18   know.  So, that's the first.

19             THE COURT:  How did you already know it?

20             MR. COSTELLO:  Well, Verdmont itself had given us

21   other documents that basically provided the same information as

22   this trade blotter did.

23             THE COURT:  But not with the names of the customers

24   who didn't provide waivers.

25             MR. COSTELLO:  Some of the customers, and then the

G3G5secA

other customers, their account number is there.  So, that is

some information that we have but, again, not all of the

information.

          What I am just trying to get across to the Court is

that -- and I will go into the second and third categories in a

minute, that just because we received some things from the

Canadian regulator doesn't mean we have everything.

          THE COURT:  I assume if you had everything we probably

wouldn't be having this argument.

          MR. COSTELLO:  We would not be having this argument,

your Honor, correct.  Which is where I get back to what I said

that I am hopeful that we can get this information from the

Panamanian regulator and hopefully moot the need for any of

this.

          THE COURT:  But you have no projected timeline so if

you make an application to Judge Pauley to extend the April 0th

date you are going to ask him to extend it indefinitely?  He

obviously won't do that so what period of time would you seek

to extend it to?

          MR. COSTELLO:  What I would suggest, and I am not sure

how the Court would prefer to handle this, but if the Court is

going to do a report and recommendation, perhaps the Court

could suggest to Judge Pauley maybe on a rolling basis.  So,

for example, the discovery period ends April 30th.  Perhaps the

Court could recommend to Judge Pauley that the deadline be

G3G5secA

pushed back just two months until June 30th, we will see where
we are at that point -- hopefully we are somewhere -- and then
if we don't need any more discovery or we have everything we
have and there is no longer a dispute, then we don't need to
push it back any further.

THE COURT:  Well, to be clear, I'm not sure
procedurally that's how it would go because the discovery
dispute before me I would not be resolving on a report and
recommendation basis, I would be issuing an order which either
side could appeal from to Judge Pauley.  But I wouldn't be
doing a report and recommendation to him and resolving this
dispute, however I do, nor would I be making a recommendation
one way or the other about an extension.

If the upshot of today is we are going to hold this
discovery dispute in abeyance while you make an application to
Judge Pauley, then that's how we will deal with it,
procedurally, just to be precise on that point.

Do you follow me?

MR. COSTELLO:  I do, your Honor, and we can certainly
go that route.

THE COURT:  Can I ask you this question?  Between now
and April 30th, if there is no extension, what else is going to
be going on in this case?  Will there be depositions between
now and the end of April that have not yet been taken place but
have been scheduled or will be scheduled?

G3G5secA

1           MR. COSTELLO:  Yes, your Honor, there will be

2    depositions that will be taken.

3           THE COURT:  Of whom?

4           MR. COSTELLO:  As of now we will be taking the

5    depositions is Verdmont's principals Mr. Fisher and Mr.

6    Housser, and the parties have scheduled those to take place in

7    London in the United Kingdom on April 6th and April 7th.

8           THE COURT:  What impact, if any, does this outstanding

9    or open discovery have on those depositions?  Anything?  Other

10   than, let me just say, all lawyers always want to have every

11   piece of paper that would potentially be implicated in further

12   litigation when they take depositions knowing full well that

13   that is almost never a reality.

14          So, without that broad concept in mind what, in

15   particular, about these outstanding requests, would have an

16   impact, if any, on those depositions?  Anything?

17          MR. COSTELLO:  Well, your Honor, it would certainly be

18   nice to have the documents in advance of the depositions but.

19          THE COURT:  What if you don't?

20          MR. COSTELLO:  We are still planning to proceed with

21   the depositions.

22          THE COURT:  And won't there be plenty else to ask them

23   even without these documents?

24          MR. COSTELLO:  There will be enough to ask, your Honor

25   but, again, I just want to make sure that the Court is aware

G3G5secA

 1    that we are not contending nor I believe have we contended that

 2    one is dependent on the other.

 3         THE COURT:  No, I know that.  What I am trying to

 4    figure out is what is going to happen between now and April

 5    30th independent of the resolution of this discovery dispute.

 6    That's what I want to understand better.

 7         So, you have the deposition of the two principals.

 8    What else?

 9         MR. COSTELLO:  There may be some additional

10    depositions that the SEC will want to take.  There may not be.

11    I don't have a sense right now for what that's going to look

12    like.  We are still considering.

13         THE COURT:  You are six weeks away from the end of

14    discovery so I would think you would have some sense of what it

15    is going to look like because you are going to run out of time

16    otherwise.

17         MR. COSTELLO:  Well, we are still discussing our

18    options, your Honor.  We are still discussing strategy.  But

19    again, even if the depositions that we took were limited to

20    Mr. Fisher and Mr. Housser, the existence of the pending

21    outstanding document dispute doesn't have any impact on that in

22    the sense of that still is not something that we can control if

23    we are going the SMV route.  If we are waiting for the SMV to

24    give the documents to us we don't have control over what they

25    do over the next six weeks.

G3G5secA

1          What we were suggesting to the Court is if for

2     whatever reason the discovery deadline can't be pushed back,

3     then there is really no other alternative than to get these

4     documents from Verdmont and either go through a comity analysis

5     or not go through a comity analysis or what have you.

6          THE COURT:  Well, let's assume we deal with all of

7     this on the merits -- and I am confident in telling you that I

8     am not going to rule today on the merits but I would try to

9     rule as promptly thereafter as I could.  Whoever doesn't win is

10    going to appeal to Judge Pauley and then you are going to give

11    Judge Pauley some version of this -- the record should reflect

12    I am holding a stack of records some inches deep -- and that

13    will run its course up until April 30th.  And then, no matter

14    what, I guess Judge Pauley would have to extend, in some

15    respect, if he rules that there should be production.  And if

16    he didn't, that would be the end of it.

17         So, I suppose in some respects that is a neater and

18    cleaner way to proceed except that the clock may run out in

19    that scenario.

20         What I am trying to figure out is if you clear the

21    field, if you will, so that the only outstanding issue is this

22    document production, that may be more appealing to Judge Pauley

23    for one thing and would give me a better understanding of why,

24    to use an expression, putting a pin in this dispute while we

25    let the SMV process run its course, at least for some period of

G3G5secA

1      time to see what happens and having a further status conference

2      to see whether this should or shouldn't be resolved may be the

3      better way to go.  I don't know.

4              MR. COSTELLO:  I think we can certainly tell the Court

5      now with some sense of confidence that the depositions that we

6      have scheduled will probably still -- will go forward on April

7      6th and 7th even if the document dispute isn't resolved at that

8      point.  And then, if the Court at that point were to say that

9      maybe put a pin in this so that we can see what happens with

10     the SMV, I think we would be comfortable with that.  Otherwise,

11     we wouldn't have offered that to the Court.  I mean, I think

12     that's probably the easiest way to go and it seems to be the

13     least intrusive way to go.  But, again, as we have said in our

14     filings, we are just concerned that the deadline is not going

15     to get pushed back and then we are in a little bit of a pickle

16     having not done anything now when we could have.

17             THE COURT:  Well, let me ask something else.

18             Aside from the two scheduled depositions and any other

19     depositions that may be scheduled what else, if anything, is

20     outstanding as far as discovery is concerned?  Anything?

21             MR. COSTELLO:  I believe that's it, your Honor.

22             THE COURT:  So, April 30th will come and leaving aside

23     this issue, depositions will be concluded and then Verdmont is

24     going to make a summary judgment motion.  That's my

25     understanding from colloquy and the papers.

G3G5secA

 1                 Is that not right, Mr. Zito?

 2                 MR. ZITO:  That's correct, your Honor.

 3                 THE COURT:  All right.  Mr. Costello, why don't you

 4     sit down for a minute.

 5                 Mr. Zito, let me ask you this.  I am assuming you are

 6     going to make a summary judgment motion on some relatively

 7     quick timeline after discovery closes 30 days thereafter or

 8     thereabouts, whatever you work out with Judge Pauley.

 9                 MR. ZITO:  Yes, your Honor.

10                 THE COURT:  Does this document production issue that

11     we are working through now have an impact on your motion?

12                 MR. ZITO:  Absolutely not.

13                 THE COURT:  Okay.

14                 Is there any document that you would be relying on for

15     your motion that has not otherwise been produced to the SEC?

16                 MR. ZITO:  No, your Honor.

17                 THE COURT:  No.

18                 MR. ZITO:  No.

19                 THE COURT:  Okay.

20                 And, Mr. Costello -- Mr. Zito, you can sit again --

21     Mr. Costello, do you have any sense that any of these documents

22     we are talking about would be necessary to your opposition of

23     Verdmont's summary judgment motion?

24                 MR. COSTELLO:  Oh absolutely, your Honor.

25                 THE COURT:  So, flesh that out for me a little bit.

G3G5secA

1              MR. COSTELLO:  Well, your Honor, I'm not sure exactly

2      what their motion is going to look like but assume, for

3      argument's sake, that they're going to move for summary

4      judgment on the broker's exemption under Section 4.4 in the

5      Exchange Act.  The broker's exemption is a fact-specific

6      exemption that depends on the level of controls that a

7      broker-dealer has in place to ascertain whether or not its

8      customers are colluding with issuers to engage in massive,

9      illegitimate distributions of securities and there are a number

10     of factors that Judge Pauley aptly laid out in his November

11     opinion as to what that means.  There has to be a reasonable

12     inquiry that a broker-dealer is making and that inquiry looks

13     at, for example, when the orders from its customers are placed,

14     how soon or how long before the actual trading are those orders

15     received, are orders from multiple customers being received on

16     the very same day, are orders to sell matched with orders to

17     buy.  In other words, if one customer is wanting to unload a

18     million shares of Norstra and another customer on the very same

19     day is trying to buy a million shares of Norstra.  That's

20     probative of the question of whether the control were in place.

21             There is also the question of overlapping principles

22     in IBC.  Also the question of proceeds after the sales were

23     done, after the net proceeds were realized and they were

24     transferred from the clearing broker in the United States back

25     to Verdmont in Panama?  How did Verdmont disburse these

G3G5secA

proceeds?  The wire transfer information so if there was

$50,000 in net proceeds made after commissions were taken out,

were those proceeds wired to their customer, whoever that was

on paper?  Were those proceeds wired to someone else, perhaps a

principal of that customer who overlaps into 10 different

customers?  What is the relationship between those principals

and principals of Verdmont themselves who were trading in the

securities?  Did the principals of Verdmont trade in orders in

advance of their customers?

          The list goes on but just using that as an example,

the documents that we have asked for in the 10 categories, for

example one of the categories concerns orders, tickets and

messages.  Documentation.  When these orders were placed.  That

type of information would assess whether Verdmont had

sufficient controls in place.

          THE COURT:  Did you get any of those documents from

the Canadian regulatory authorities?

          MR. COSTELLO:  No, we did not, your Honor, and that's,

to come back to that trade blotter, this particular trade

blotter is a blotter in the sense that it's more of a

spreadsheet summarial-type document that has some columns in

it, but in a broker-dealer brokerage in their record-keeping

system there would be a series of additional columns on here.

For example, the date the order was placed, the date the

instruction was received, how the order was received, and

G3G5secA

Verdmont, according to Verdmont's own internal procedures and

the account agreement that it has with its clients, it

specifically says in there that Verdmont will maintain a

rigorous -- is the term that they use in there -- log of how

they get these orders from their customers, when they get these

orders, and will keep that log in what they say is

chronological order.  They then will send confirmations of

these trades that the customers are placing within 24 hours.

That information the Canadians did not give us and,

consequently, that is one of the categories of information that

we are seeking here and hopefully the SMV has that information.

But, that's to give the Court a flavor of what we

would need in order to have an opposition.

THE COURT:  When you say hopefully the SMV has these

documents, I think if -- and certainly Judge Pauley would be

unhappy if I deferred any resolution of this -- you sought and

got an extension from him, there was ultimately a production to

the SEC, and some significant part of the information you were

seeking wasn't produced to you because the SMV didn't have it.

So, I am a little concerned about your use of the word

"hopefully."  I mean, what makes you think they do have it?

MR. COSTELLO:  That's just it, your Honor, I don't

know whether they have it or not.  Verdmont has represented

how -- its liquidator had represented that the SMV does but I

don't have any way of independently verifying whether that's

G3G5secA

```
 1    the case.  That's why I am saying I am hopeful that what
 2    Verdmont has represented is true and Verdmont seems very
 3    confident that that's the case but until I can see what the SMV
 4    gives me I have no way of verifying that.
 5                THE COURT:  Well, when the SEC made its request of the
 6    SMV on February 24th, did it do so and communicate that in the
 7    court in the United States there was currently an April 30th
 8    deadline, so the sooner they could get to this the better it
 9    would be all around?  Or some equivalent of that?
10                MR. COSTELLO:  What we did is, your Honor, trying to
11    be as respectful as possible of a foreign regulatory body, we
12    intimated that time is a concern.  But, again, we do not have
13    any control over how a foreign regulatory body responds to a
14    request for information.  We simply don't know what's going to
15    happen and we don't know how long it's going to take as I have
16    been told by my Office of International Affairs.
17                THE COURT:  And I gather, just to come full circle
18    although I suspect I know the answer to this, a letters
19    rogatory is not a realistic possibility here given the
20    inevitable length that that usually takes.
21                Is that a fair and accurate statement?
22                MR. COSTELLO:  That is a fair statement, your Honor.
23                Also, we did present all of these issues in the
24    discovery plan that the parties had prepared jointly back in
25    December.  We flagged all of these issues.  We said that there
```

G3G5secA

 1    are some concerns with trying to get information out of a

 2    foreign country.  Letters rogatory is an option but that's

 3    going to take a minimum of a year which is why we originally

 4    had proposed a longer discovery period.  It was Verdmont that

 5    wanted a March 30 deadline and it was the Court, ultimately,

 6    that set an April 30 deadline.

 7            Now, we had said that we would be fine with a March 30

 8    deadline if Verdmont's principals submitted to a deposition,

 9    which they have agreed to do, and if Verdmont produced all the

10    documents to us which unfortunately hasn't been done and

11    doesn't look like it is going to be done, at least not

12    voluntarily.

13            THE COURT:  It is not going to be done voluntarily

14    because they say Panamanian law prevents them from doing it and

15    then we get into that issue.

16            MR. COSTELLO:  And that's the conundrum, your Honor.

17            THE COURT:  Mr. Zito, I have let Mr. Costello make a

18    lot of arguments and address a lot of my questions.  What do

19    you want to say to me about any or all of these issues?  What

20    are your thoughts?

21            MR. ZITO:  Your Honor, let me start with what the

22    motion for summary judgment is going to look like.

23            Mr. Costello, the SEC has always skipped over the main

24    defense of this case which is the so-called dealer's exemption.

25    They talk about this broker's exemption but they never once

G3G5secA

1    ever implied as to why the dealer's exemption doesn't apply

2    here, and it applies because if you didn't have a dealer's

3    exemption virtually every transaction where there is a

4    registration statement that was filed would be subject to a

5    Section 5 violation.  So, Congress enacted this dealer's

6    exemption to prevent constant litigation over every trade such

7    as these.

8              So, if we focus on what that dealer's exemption is, it

9    is very simple.  Okay?  If trades in the securities happen more

10   than 40 days after the registration statement is declared

11   effective by the SEC, if the trade happens in more than 40

12   days, then the transaction is exempt.  Section 5 doesn't apply.

13   And in each of these cases a registration statement was on

14   file, the SEC itself declared them effective, and each and

15   every one of these trades took place after that 40-day period.

16             THE COURT:  Well, we are not here to argue your

17   summary judgment motion.  I am certainly not prepared to do

18   that.  But, the SEC has a different theory about registration,

19   right?

20             MR. ZITO:  Right.

21             THE COURT:  It has to be pre-registered, effectively,

22   as I understand their position.  Is that not right?

23             MR. ZITO:  According to the amended complaint they're

24   saying, well, this was all a sham because the securities never

25   came to rest with the public because it was all with

individuals, it was all with insiders and people in the

control.  They've never produced any evidence of that but they

say it in the complaint.

THE COURT:  Okay.

MR. ZITO:  And I assume that's what they're going to

prove or what they're trying to prove.

THE COURT:  They'll have to put something in the

record before Judge Pauley in that point in opposition to your

motion, presumably.

MR. ZITO:  So then what they're going to have to say,

they're going to have to disprove that that 40-day period

doesn't start to run until some later period, although they've

never explained to us what that later period is but that's what

they would have to prove.  So, it is a timing issue.  It has

nothing to do with these trades.

But, let me now turn over to the dealer's exemption

which is the broker's exemption which is the second.  We don't

get to the broker's exemption unless they're able to prove that

this was all a sham and they've taken not a single deposition

in this case of anyone who has testified that they were a sham

or that they were insiders, that the trades were made to

affiliates.  And they haven't served any notices to take

depositions.  They said we wanted to take letters rogatory, we

want to take testimony of people in Ireland, in Belize, in

Bulgaria.

1          They have never obtained any letters rogatory and that

2    is at the heart of their case.  They have to prove this sham

3    theory what they themselves plead in the amended complaint.

4    So, they haven't done that so I am confident, your Honor, that

5    we are going to prevail on the dealer's exemption but let's now

6    move to the broker's exemption.

7          THE COURT:  Well, I don't want to belabor this too

8    much because the reason why I asked about the summary judgment

9    motion was only because I was trying it figure out what the

10   relationship, if any was, between the discovery that is at

11   issue right now and what is going to transpire once discovery

12   closed whether it is April 30th or any other date.

13         MR. ZITO:  And as I think your Honor can see, the only

14   proof that's germane to the dealer's exemption is when was the

15   registration statement filed, that the Court can take judicial

16   notice of off of Edgar when the registration statement was

17   deemed effective.  Again, that's on the SEC Edgar website, the

18   Court can take judicial notice of that.  And, thirdly, when did

19   the trades take place?  And we have produced all the documents

20   as to when those trades took place.  Okay?

21         So, those three pieces of fact demonstrate that all

22   the transactions took place after the 40-day waiting period.

23   All right?  The transactions are exempt.  All right?  None of

24   the documents that Mr. Costello is referring to had anything to

25   do with this dealer's exemption.  They have nothing to do with

G3G5secA

1    it.

2              THE COURT:  Is Verdmont, for purposes of summary

3    judgment, accepting that the SEC has established a prima facie

4    case under Section 5?

5              MR. ZITO:  Your Honor, it is very --

6              THE COURT:  In other words is the discovery here, if

7    it is relevant, relevant to the defenses, not to the Section 5

8    violation, per se?

9              MR. ZITO:  The law requires us to prove an exemption.

10   The law requires us to prove an exemption and we have proved

11   the exemption and we will continue to prove the exemption by

12   those three facts and those are undisputable facts and we will

13   prove those facts.

14             For them to now at that juncture, the burden of proof

15   shifts back to them to say, well, it is not really a 40-day

16   period because something else happened, there was a simulated

17   offering which they allege, they say there was a simulated

18   offering because that 40-day period shouldn't start to run

19   there, it should start to run at some later period, although

20   they never specify what that later period is because this was

21   all a sham and they say this in the most conclusory way.  All

22   right?  This is all a sham.

23             Once we have proved the 40-day period they then have

24   to prove that the 40-day period really isn't a 40-day period

25   because there was some sham going on and I don't know how they

G3G5secA

1    prove that.  They certainly don't prove it by trade blotters.

2            And, your Honor, while we are talking about trade

3    blotters, we produced all the trade blotters.  We produced, in

4    excruciating detail, all these blotters showing exactly when

5    the trades happen, the volume of the trades, and the exact

6    dates.

7            So, I don't know what all of this has to do with the

8    40-day waiting period and that's what this case -- it is nice.

9    It is interesting, I guess, but it is not going to relate to

10   the depositions.  It is not going to relate to the summary

11   judgment motion.

12           THE COURT:  What is your view as to how we should

13   proceed?

14           MR. ZITO:  Your Honor, this case has been banging

15   around for a year.  It seems to me that if the SEC was sincere

16   about being interested in these documents, they could have

17   gotten them from the SMV or they could have at least initiated

18   a request or an MOU.  I mean, your Honor, what they say here is

19   that the SEC and SMV are not parties to any treaties or other

20   formal bilateral agreements but they didn't mention the fact

21   that there is an MOU.

22           THE COURT:  Well, there wasn't one until recently, it

23   sounds like.

24           MR. ZITO:  Well --

25           THE COURT:  And they felt that they couldn't ask in

G3G5secA

 1    any formal way for any assistance unless and until there was

 2    one.  So, that's their position on that.

 3              MR. ZITO:  Well, they could have asked -- well, then

 4    fine.  Then they have to make a case as to why the discovery

 5    cutoff should be extended.  What is the good cause for that?

 6              THE COURT:  Well, the good cause is it may take the

 7    SMV longer than another two weeks to process this request.

 8              MR. ZITO:  And I will come back with, one, delay,

 9    because they could have done this -- they haven't -- I haven't

10    heard as to a reason why they didn't make the request a year

11    ago if they haven't made a request a year ago.  I'm being told

12    that there was an exchange of information that goes back to

13    April of last year.

14              Also, your Honor, I want to be very clear here, that

15    we did not produce documents, Verdmont did not produce

16    documents to the Canadian regulators.  They only gave documents

17    to the Panamanian regulators.  The SEC got documents from the

18    Canadian regulators who got the documents from the Panamanian

19    regulators.  And they've had these documents for months, your

20    Honor.

21              THE COURT:  Well, let me ask you this.  If discovery

22    is scheduled to conclude on April 30th, and you are going to

23    file a motion for summary judgment on May 30th, and the SEC's

24    opposition to that motion is going to be due June 30th, why

25    shouldn't we extend the discovery solely for the purpose of

G3G5secA

 1    seeing whether the SMV produces these documents to the SEC by

 2    May 30th and have a status conference at that time and then see

 3    if it has.  That may be the end of it.  And if it hasn't, then

 4    what they may choose to do is under Rule 56 invoke the

 5    provision of we can't fully respond until we have this

 6    discovery.  Or, they may decide they don't need it because they

 7    can fully respond to the motion.

 8            MR. ZITO:  That's why we could make the motion.

 9            THE COURT:  So I am responding to your delay point

10    which is nothing will be delayed if discovery ends April 30th,

11    you make your motion by May 30th, we have a conference on May

12    31st and I am advised then or before then this worked out with

13    the SMV, this hasn't worked out with the SMV, we have a

14    timeline from the SMV, whatever is known.  That's more than two

15    months from now and I assume the SEC is going to say, in the

16    most polite, diplomatic way possible to the SMV this case is

17    moving forward and if you can do anything to expedite your

18    process it will be of great assistance.  And however they would

19    do that, one regulator to the other, in the same way I am sure

20    in some circumstances the Panamanian authorities will need the

21    American authorities to do the same.  That's why you enter into

22    such MOUs.  But, meanwhile, you are not delayed because these

23    depositions that you all agreed to are taking place in April,

24    the discovery deadline remains April 30th, you make your motion

25    on May 30th, and then on May 31st, with the expectation that

G3G5secA

1   the SEC is going to respond to your motion on June 30th, we

2   then have a discussion perhaps first with me on this point and

3   then secondarily with Judge Pauley, depending on how it shakes

4   out if the schedule changes.  And I am putting these dates out

5   there without authority from Judge Pauley so he may not abide

6   by this but I certainly, to Mr. Costello's point, would

7   recommend it given sort of the posture we are in now.

8          What about that as a scenario?

9          MR. ZITO:  My response is two-fold.

10         One, as long as I'm not being delayed from making my

11   motion for summary judgment, okay, and because there is

12   $250,000 -- Verdmont is in liquidation.  It is going to cease

13   to operate, it is losing money at the rate of $200,000 a month.

14   The more this continues to get delayed, the more of the

15   probability that my ability of getting paid and being able to

16   defend Verdmont starts to run out.  So, we have got a short

17   window here under the liquidation.  If the SEC is able to drag

18   this out as long as possible they know that the cash will dry

19   up and I'm not going to get paid and I'm not going to stay in

20   this case if I'm not getting paid.  They know that.

21         THE COURT:  Why is that in the SEC's interest?

22         MR. ZITO:  Because if I am not in the case then they

23   can move for a default and they can get a default judgment and

24   say we won.

25         THE COURT:  Which will be worth what?

G3G5secA

 1              MR. ZITO:  Well --

 2              THE COURT:  I'm not sure that's what this is about.

 3              MR. ZITO:  Well, I think it is, your Honor, because if

 4      you look at the Caledonian settlement, they settled the

 5      Caledonian case for zero, no money on the dollar.  What they

 6      got -- what they got -- was an admission from Caledonian that

 7      the $25 million that the SEC wrongfully froze was something

 8      that Caledonian was responsible for.  That's what they got.

 9      And the reason why this case hasn't settled is because they

10      want us to admit that their initial freeze order that was

11      illegal, based on misrepresentations to Judge Pauley, that that

12      $17 million was something we were responsible for.

13              That's what this is all about.

14              THE COURT:  Okay.  Well --

15              MR. ZITO:  And, your Honor --

16              THE COURT:  But to your point, you are not going to be

17      delayed by my proposal, are you?  I mean, you wouldn't be

18      making summary judgment motion any sooner than the schedule I

19      am suggesting.

20              MR. ZITO:  By that timeline, your Honor, no.  But I am

21      not sanguine as we have seen how these things drag on as if

22      there is always something else and maybe there is something

23      else and then there is another delay and another delay.

24              Under the guidelines, under the timetable your Honor

25      just set forth, no, as long as I'm not being delayed on the

G3G5secA

 1    motion.

 2              I also want to point out, your Honor, that we have

 3    voluntarily agreed to deposit and freeze $240,000.  We are

 4    going to need access to that $240,000 -- my firm is going to

 5    need access to that $240,000 so that we can continue to

 6    represent Verdmont in these protracted proceedings.

 7              THE COURT:  Well, that's outside the scope of my

 8    referral so you will have to talk to Mr. Costello about that

 9    and you may have to talk to Judge Pauley about that.

10              MR. ZITO:  We are in the process of writing Judge

11    Pauley about that, your Honor.  We asked the SEC to consent to

12    that and they haven't consented to that.  So they don't want to

13    consent to freeing up the money but they want us to consent on

14    extending deadlines.

15              THE COURT:  This is my proposal, this is not their

16    proposal, so as far as I'm concerned we are not extending the

17    discovery deadline, we are keeping it in place.  You are taking

18    the two depositions that are already scheduled and any other

19    depositions that are properly noticed between now and April

20    30th.  April 30th comes, discovery is over.  You make a motion.

21    The 30th is Memorial Day so I will say the 31st of May, right?

22    And then the SEC's response is due June 30th, 30 days later.

23    And then you reply two weeks thereafter, you have a fully

24    submitted motion before Judge Pauley by July 14th.

25              That's about as fast as you could do on this schedule

1    and that hasn't moved the April 30th date at all which, in my

2    experience, when a date is set in a case like this it almost

3    always moves.  So, it is not moving the date.

4            Now, there is a footnote.  The footnote is if your

5    papers are due May 31st we will need to schedule now a status

6    conference that week, of the week of May 31st, so I can be

7    fully apprised of the status of this issue which I am

8    effectively leaving open which I am not that keen to do,

9    frankly.  But, it seems to me that if the SMV is going to

10   produce all of this information and produce it on May 31st, it

11   seems unwise in the extreme to me for me to issue a decision,

12   whoever I rule against taking an appeal of that decision to

13   Judge Pauley, us all trying to work at rapid-fire speed only to

14   have that superseded by the production that all here have

15   agreed would moot the question.

16           So, that's why I am suggesting we proceed this way.

17           MR. ZITO:  Your Honor, like I said, we have no

18   interest in preventing the SEC from getting information.  They

19   can get information and they have been getting information

20   without our help and I have no problem with them continuing to

21   get information.  If they get it a day after discovery cutoff I

22   am not going to say, oh, you can't use that because you got the

23   information a day after the cutoff.  I mean, that's certainly

24   not in our interest.  Our only interest again is in delay and

25   making a summary judgment motion as soon as possible.  That's

G3G5secA

1    our interest.

2              THE COURT:  All right.

3              Mr. Costello, on May 31st, if you don't have this

4    information and we have a conference on June 1st, what will

5    happen then?

6              MR. COSTELLO:  Well, your Honor, I guess that depends

7    on what --

8              THE COURT:  What you know from the SMV at that point?

9              MR. COSTELLO:  Well, I mean, if we don't have the

10   documents from the SMV then I guess I would ask the Court then,

11   I suppose we would pick up at that point to the question of

12   whether Verdmont should be required to produce the documents

13   and then I guess we will have to get into the comity analysis.

14             But, I guess I am just concerned because this would be

15   on June 1st which is now a month after the close of discovery,

16   then couldn't Verdmont simply say at that point well, discovery

17   is closed?

18             THE COURT:  Well, no, because it would be closed

19   subject to this issue being resolved.  So, the production, if

20   it is to be ordered either by me and/or Judge Pauley or not,

21   will obviously post-date the April 30th date but I'm trying to

22   hedge our bets collectively, if you will, because if the SMV

23   makes this production to you, it doesn't do it neatly before

24   April 30th but does it in mid-May, let's say, it doesn't seem

25   wise for the judicial apparatus, if you will, as well as you

1   all, to continue to litigate this question when it would be

2   mooted and you have some expectation, it seems to me, that that

3   could happen.

4          It is not unlikely.  I mean you can't predict, I

5   understand that.  I'm not committing you to the expectation

6   that it will definitively be produced by the SMV.  And, as far

7   as I'm concerned, in some respects if I issued a decision 10

8   days from now I would be done with this but I don't know that

9   that's the most practical way to proceed because if I were to

10  issue a decision on March 25th, let's say, and there are two

11  weeks to file objections and you all file objections by the

12  14th day which is early April, April 8th or whatever it might

13  be, and by the time Judge Pauley gets to it he might have to

14  write his own decision, we are at April 30th.

15         So, I am not sure that scenario takes us to a better

16  place is my point.  And I am not trying to shirk any

17  responsibilities because I am more than happy to write a

18  decision in this matter and we have been working on one, to be

19  candid with you, but I also want to be practical because that

20  makes the most sense.  And I also want to be mindful of the

21  dictates of Rule 26, among other things, which requires even a

22  greater emphasis on proportionality as you all know we focused

23  on, and there are some separate issues about that since we do

24  have a company that is in liquidation and I don't know what

25  burden there would be here as far as putting Verdmont to its

1    proof in the state that it is in, at least that was represented

2    to the Court.  That is another issue that we have to air out

3    and I am not sure we need to do that today.

4             Does anybody have anything else they want to offer at

5    this juncture, counsel?

6             MR. COSTELLO:  Nothing from us, your Honor.

7             THE COURT:  All right.

8             Mr. Zito?

9             MR. ZITO:  In closing, your Honor, I just want to

10   emphasize that I strongly submit that the information that the

11   SEC claims it doesn't have -- and I'm not even sure it exists

12   to the extent that I have heard about these blotters -- I don't

13   see how this relates in any way to the summary judgment or to

14   any liability or any defense in this case.

15            THE COURT:  All right.  Well, I think I will allow you

16   all to agree to disagree on that point and happily I don't have

17   to resolve that particular point.  I am more interested in the

18   practicalities.  Do I hear either side objecting to the

19   scenario that I have proposed, if you will, where the discovery

20   deadline would remain in place subject to resolution of this so

21   it would post-date the discovery close but, in the meantime,

22   the summary judgment schedule would run its course and then we

23   would, once the defendant's papers are filed, we would have a

24   status conference so I could revisit where this stood?  And

25   obviously if at any point between now and May 31st there was

G3G5secA

1    information that the Court needed to know, either the SMV had

2    produced the information, the SMV had said it will not produce

3    the information or anything like that, I assume that the SEC

4    would provide both me and Judge Pauley for that matter and the

5    defense whatever information they had.

6              MR. ZITO:  I'm not opposed to that.  Again, we only

7    care about the filing of our summary judgment motion.

8              THE COURT:  Right.

9              MR. ZITO:  If that's not a bar to the filing of our

10   summary judgment motion, I know that Judge Pauley requests that

11   there be a pre-motion conference and in accordance with those

12   kinds of deadlines we will request that motion conference

13   immediately, the pre-motion conference immediately.

14             THE COURT:  What I was thinking of doing is taking a

15   short recess and seeing if I could get him on the phone and

16   tell him where we are in all of this and see if he has any

17   views.  I don't know if he is in Court this afternoon or not.

18             So, why don't we take a short recess and let me

19   attempt to do that.

20             MR. ZITO:  Thank you, your Honor.

21             (Recess)

22             THE COURT:  Mr. Zito, am I right in assuming that in

23   your summary judgment motion you are going to rely on both the

24   dealer's exemption and the broker's exemption, or are you just

25   going to argue with respect to the dealer's exemption?

G3G5secA

```
 1            MR. ZITO:  I haven't decided that yet but --
 2            THE COURT:  I will tell you why I am asking.
 3            It seems to me, unless I misunderstood Mr. Costello,
 4    that his focus on the relevance of these documents was with
 5    respect to the broker's exemption.  That's what I heard today.
 6            Is that not a fair statement?  That's what you
 7    emphasized in your presentation today, Mr. Costello.
 8            MR. COSTELLO:  Your Honor, I spoke about the broker's
 9    exemption and then Mr. Zito took over after that.  There is
10    also --
11            THE COURT:  You think they're relevant to both
12    exemptions?
13            MR. COSTELLO:  Yes, that's correct.
14            THE COURT:  And you want the documents for both
15    exemptions?
16            MR. COSTELLO:  Correct, your Honor.
17            THE COURT:  All right.  So let's leave it there then.
18    I was thinking that there was a faster path to resolution here
19    which was that if Mr. Zito said I'm only going to move on the
20    dealer's exemption and the SEC recognized that these documents
21    really were far more relevant, if I can put it that way, to the
22    broker's exemption, then it might narrow things.  But, I gather
23    you are not prepared to commit to any of that.  You want to
24    make your motion on both prongs, presumably, or you don't know
25    yet and haven't decided and Mr. Costello is not willing to --
```

G3G5secA

1          MR. ZITO:  They're somewhat entwined, your Honor, if I

2     can just address it briefly.

3          The broker's exemption isn't -- what Mr. Costello

4     seemed to be alluding to was suitability, whether or not these

5     were suitable trades, know your customer and all that kind of

6     thing.  That's not what the broker's exemption relates to.

7          The broker's exemption relates to whether or not there

8     were any red flags to know whether these stocks were not

9     registered.  And typically what every brokerage house does is

10    that they go to the SEC database, they see if there is a

11    registration statement on file, they see whether or not there

12    is a registration that is effective and if you look at all the

13    blotters it says checked SEC file, checked SEC file.  Those are

14    the kinds of things, that's the diligence they do.  They don't

15    look at whether other clients are trading in this, what time of

16    day they're trading in it.  All they want to know is are these

17    trades happening in 40 days, is there something happening with

18    the principals, do the principals appear to be insiders.  They

19    look at who the principals of the companies are and that's more

20    or less the extent of the analysis.

21          THE COURT:  That's fine.  I think I opened up a can of

22    worms.

23          Mr. Costello, suffice to say, you think these

24    documents have relevance for both exemptions; is that correct?

25          MR. COSTELLO:  Yes, your Honor.  That's correct.

1           THE COURT:  And relevance, if you want to just say for

2      the record with respect to the dealer's exemption, is what?

3           MR. COSTELLO:  Well, the dealer's exemption hinges on

4      whether the offering was a bona fide public offering.  Judge

5      Pauley has already delineated the standards for that and that's

6      the question, is it a simulated offering or is it being

7      genuinely offered to the public as part of a legitimate public

8      sale.

9           So, in this instance, for example, your Honor, the

10     certificates that were cleared came in 2011 and 2012.  I don't

11     know whether in Verdmont's motion for summary judgment they're

12     going to contend that the bona fide offering took place at that

13     point, whether it took place at the time the registration

14     statements were effective or some other point in time.  But, if

15     that's the point in time that they're going to argue, then we

16     have the right to know, well, if this public offering was a

17     legitimate offering, then there would be quotations, there

18     would be bids, there would be prices, there would be asks.  And

19     if there is not -- and I'm going to represent that there wasn't

20     to my knowledge -- then how did these clients get interested in

21     these securities which at that point had never been traded

22     before?  How all of a sudden did they get interested in that?

23     Were they making a market for these things?  Were they

24     matching?  And again Mr. Zito is correct, the two exemptions do

25     overlap in that sense.  But, if multiple clients are all part

G3G5secA

of the same buy, trade, matched -- paint the tape as it is

called, your Honor -- that goes to the question of whether this

offering is simulated or whether it is bona fide.  And I don't

know what Mr. Zito is planning to argue in his motion but

whatever it is, these documents hold the key to that.

          MR. ZITO:  I'm going to argue very simply, your Honor,

that all the trades took place after the 40-day holding period.

If the SEC believes that that 40-day period should start to run

in some period of time, none of the documents they've requested

go to that issue.

          THE COURT:  Okay.

          I was able to reach Judge Pauley and he is amenable to

the schedule that I have suggested to you all with the

understanding, Mr. Zito, that when you submit your pre-motion

letter you will reference the fact that this was the schedule

that was proposed, and in fact I will put an order out on the

docket to that effect with this schedule that we have in mind

here.  I plan to issue an order that will deny both motions

without prejudice to their renewal, that I will schedule a

status conference for the week of May 31st, that will set the

schedule such that May 31st will be the date for the motion,

assuming a pre-motion conference and any other requirement that

Judge Pauley has is met, and subject to his modifying the

schedule as he sees fit.  And then the SEC will file its

response by June 30th, and the defendant will respond by July

G3G5secA

1    14th.

2              If, in the interim, there is any developments with

3    respect to the SMV's ability to produce this information to the

4    SEC, obviously you would apprise both Judge Pauley and I of

5    that fact is how I think I will leave it.  Okay?

6              MR. COSTELLO:  Yes, your Honor.

7              MR. ZITO:  Thank you, your Honor.

8              THE COURT:  Before I let you go, is there any other

9    open issue relating to this dispute that I need to deal with,

10   or does this resolve it satisfactorily at this juncture?

11             MR. ZITO:  The only issue I have, your Honor, is

12   whether we need to seal the transcript and, if so, to what

13   extent, and I just quite frankly don't know the answer to that.

14             THE COURT:  Well, does the SEC have any view about

15   whether the transcript needs to be sealed?

16             MR. COSTELLO:  I don't believe it does, your Honor,

17   but if Mr. Zito is concerned and he wants to brief the issue or

18   look further into it, then I propose he can but I don't see an

19   issue with it.

20             THE COURT:  Mr. Zito, you tell me.

21             MR. ZITO:  Well, in an abundance of caution, your

22   Honor, let's seal it.

23             THE COURT:  Well, I'm not going it seal the whole

24   thing.

25             MR. ZITO:  Just the portions about the MOU, my

1    understanding is that that is the -- well, then I will have to

2    go through it.

3              Can I confer with my client, your Honor?

4              THE COURT:  Can you confer with your client?

5              MR. ZITO:  And can I notify the Court by tomorrow?

6              THE COURT:  I assume that the transcript is going to

7    be ordered, correct?  And once it is ordered it will eventually

8    get put on the docket.  However, there is an interim period of

9    time once the record is transcribed where parties can make

10   objections or make requests, redactions, etc.  So, in that

11   intervening period of time if you have an application you

12   should make it.

13             MR. ZITO:  Thank you, your Honor.

14             THE COURT:  And with respect to redactions, I

15   assume -- there has been some discussion in all these papers

16   about what was produced, some of which was redacted, some of

17   which wasn't redacted.  Do I need to reach any of that at this

18   juncture?  I just am raising that in an abundance of caution.

19   Or, has that been sufficiently resolved?

20             MR. COSTELLO:  Your Honor, I believe that if as

21   Verdmont said that the SMV has all of the documents then,

22   presumably, the SMV would have all of these particular redacted

23   documents in a non-redacted form and so, presumably, once we

24   get the production from the SMV, we will see all of these

25   documents in a non-redacted form.  If we don't, then I guess we

G3G5secA

 1   can take up the issue of the redactions along with the status

 2   conference the Court will hold.

 3           THE COURT:  All right.

 4           Is there any particular day of the week, since

 5   Mr. Costello you are coming from Washington, yes?

 6           MR. COSTELLO:  Correct, your Honor.

 7           THE COURT:  Do you have a preference as to when you

 8   come up to New York?  Does that matter one way or the other to

 9   you?  Would you rather it be a Friday, for example, as opposed

10   to some other day of the week?  Is that better or worse?

11           MR. COSTELLO:  If the Court has a Friday available,

12   certainly that would be.

13           THE COURT:  We will look at the calendar.

14           Dave, do you have the calendar in front of you?

15           So, Friday, June 3rd, shall we have a status

16   conference then?

17           MR. COSTELLO:  If your Honor would give me a moment

18   just to check my calendar?  Yes, your Honor, it appears that

19   June 3rd would work.

20           THE COURT:  Do you have preference for the morning or

21   the afternoon?

22           MR. COSTELLO:  The morning would be good, your Honor.

23           THE COURT:  Shall we say 10:00?

24           MR. COSTELLO:  Yes, your Honor.  That sounds good.

25           THE COURT:  Mr. Zito, does that seem okay with you?

G3G5secA

1          MR. ZITO:  That's fine, your Honor.

2          THE COURT:  All right.  So, we will have a status

3     conference on June 30 at 10:00.  Obviously if events overtake

4     the circumstances such that the conference is mooted, we will

5     adjourn it if you provide a basis for us to do so, but

6     otherwise, I will see you then and I wish you good luck, and be

7     well until then.

8          MR. COSTELLO:  Thank you, your Honor.

9          MR. ZITO:  Thank you, your Honor.

10          THE COURT:  Thank you, all.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25