G4cesecc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SECURITIES AND EXCHANGE
     COMMISSION,
4
                    Plaintiff,
5
              v.                        15 CV 894(WHP)
6
     CALEDONIAN BANK, et al.,
7
                    Defendants.
8
     ------------------------------x
9

10                                  April 12, 2016

11                                  11:14 a.m.

12
     Before:
13
                    HON. WILLIAM H. PAULEY III,
14
                                    District Judge
15
                         APPEARANCES
16
     U.S. SECURITIES AND EXCHANGE COMMISSION
17        Attorneys for Plaintiff
     BY:  BRIDGET FITZPATRICK
18        PATRICK COSTELLO
          DAVID STOELTING
19
     CARTER LEDYARD & MILBURN
20        Attorneys for Defendant Verdmont Capital
     BY:  ROBERT ZITO
21        MARK ZANCOLLI

22   PROSKAUER ROSE LLP
          Attorneys for Defendant Caledonian Bank
23   BY:  MARGARET DALE
          SIGAL MANDELKER MASSIEL
24        PEDREIRA-BETHENCOURT

25

G4cesecc

1          (In open court)

2          THE COURT:  Good morning, please be seated.

3          THE DEPUTY CLERK:  SEC vs. Caledonian Bank.

4   Appearances by the SEC?

5          MS. FITZPATRICK:  Good morning, your Honor.  Bridget

6   Fitzpatrick on behalf of the SEC.

7          MR. COSTELLO:  Good morning, your Honor.  Patrick

8   Costello on behalf of the SEC.

9          MR. STOELTING:  David Stoelting for the SEC.  Good

10  morning.

11         THE DEPUTY CLERK:  For the defendant?

12         MS. DALE:  Good morning, your Honor.  Margaret Dale

13  for Caledonian Bank and Caledonian Securities.  To my right is

14  Mr. Keiran Hutchinson.  He's our client.  He's a partner at EY

15  and one of the joint official liquidators of the Caledonian

16  entities.

17         To his right is Sigal Mandelker.  She's my partner.

18         Behind us is Massiel Pedreira, an associate with the

19  firm.

20         And behind Massiel is Mr. Rupert Bell, counsel to the

21  joint official liquidators in the Cayman Islands.

22         MR. ZITO:  Good morning, your Honor.  Bob Zito of

23  Carter Ledyard & Milburn from Verdmont Capital.

24         MR. ZANCOLLI:  Mark Zancolli, Carter Ledyard &

25  Milburn, for Verdmont Capital.

G4cesecc

1              MR. KASOWITZ:  Good morning, your Honor.  Marc

2     Kasowitz for proposed intervenor Sentinel Trust Services,

3     Limited.

4              MR. WELCH:  And Trevor Welch, also Kasowitz Benson.

5              THE COURT:  Good morning to all of you.

6              There are three matters that I want to address this

7     morning:  First, the SEC's proposed consent judgment with

8     Caledonian bank; second, Sentinel Trust Services' proposed

9     motion to intervene, to object to the consent judgment and seek

10    sanctions or damages from the SEC; and Verdmont's proposed

11    motions to vacate the asset freeze and for summary judgment.

12             So, with all that in mind, who from the SEC wishes to

13    be heard?

14             MS. FITZPATRICK:  Yes, your Honor.  Bridget

15    Fitzpatrick.

16             THE COURT:  If you'd be kind enough to take the

17    podium.

18             MS. FITZPATRICK:  Yes, your Honor.

19             Your Honor, the SEC respectfully requests that this

20    Court enter the proposed settlement between the SEC and

21    Caledonian Bank.  We believe its terms are both fair,

22    reasonable and in the public interests.  It represents an

23    appropriate resolution of this action at this juncture.  We

24    believe it adequately represents the interests of both parties.

25    It's the product of an arm's length negotiation.  And we

G4cesecc

1   believe the terms address the current situation and are in the

2   public's interest.

3            THE COURT:  First, Sentinel complains that they

4   haven't seen the proposed consent judgment.  Is there any

5   reason why the proposed judgment can't be docketed, or has the

6   SEC provided Sentinel with a copy?

7            MS. FITZPATRICK:  Your Honor, I believe we sent the

8   proposed judgment to the judgments clerk -- Mr. Costello, I

9   believe, can correct me if I'm wrong -- in accord with the

10  local rules.  There is no reason we cannot provide Sentinel

11  with a proposed copy.

12           They've never contacted us, your Honor.  And we had no

13  idea whether they obtained one through other sources.  But

14  there's no reason we can't share one with them.

15           THE COURT:  Ms. Dale?

16           MS. DALE:  Your Honor, Sentinel has seen the proposed

17  consent and judgment through the Cayman proceeding.

18           THE COURT:  All right.  Thank you.

19           As I understand the proposed consent judgment, the

20  SEC's proposing a pro forma $25 million recovery from

21  Caledonian Bank but actually collecting zero; right?

22           MS. FITZPATRICK:  That's correct.  This is a form of

23  settlement that is frequently used when there are bankruptcy or

24  liquidation proceedings; when the SEC acknowledges that there

25  will be creditors who have priority over the SEC in the

G4cesecc

1    proceeding and will deplete the vast majority of available

2    funds.  So in that instance the SEC typically sets the amount

3    of relief at what it believes is appropriate -- here, 25

4    million -- but then foregoes payment in recognition of the

5    realities of a liquidation or bankruptcy proceeding.

6            THE COURT:  How did the SEC come up with 25 million?

7            MS. FITZPATRICK:  It --

8            THE COURT:  Why not 50 million or 250 million?

9            MS. FITZPATRICK:  Your Honor, that was the product of

10   negotiations.  I believe our preference would have been for 34

11   million.  Caledonian's preference, I think, would have been for

12   1.4 million, reflecting the positions of the different parties.

13   The SEC's position would be that proceeds would be appropriate

14   here.  Caledonian's position would have been that commissions

15   were appropriate here.  And I think the number was a product of

16   negotiation and intended to roughly reflect about what

17   Caledonian's net equity was at the point that the SEC brought

18   the suit.

19           THE COURT:  But it really is an abstraction, isn't it?

20   What's to negotiate if the entity you're negotiating with is

21   going to pay zero no matter what the number is?  I need to

22   understand that.

23           MS. FITZPATRICK:  Yes.  I understand, your Honor.  I

24   think SEC settlements have precedential value, or that's the

25   SEC's belief; and here, the precedential value of the number of

G4cesecc

1    what we are saying disgorgement would be in this circumstance,

2    if not for a bankruptcy or liquidation proceeding.  And we

3    think this is an appropriate number.  Given the facts here, if

4    there was not a liquidation proceeding, this would be the

5    number we would settle for and expect payment of.  And that's

6    what the number's meant to signal and reflect.

7           THE COURT:  When the SEC reports its end-of-year

8    statistics to the government and the public, is the commission

9    going to count this as a case where it recovered 25 million or

10    zero?

11           MS. FITZPATRICK:  I don't know the answer to that,

12    your Honor.  I can ask and advise the Court what happens in

13    bankruptcy proceedings.

14           I think one metric that is reported is the amount

15    collected.  And obviously here that would be zero.  How a

16    judgment is reflected when payment is being foregone in light

17    of a bankruptcy proceeding or liquidation proceeding, I don't

18    know how we report that.

19           THE COURT:  I'd like a letter from the commission

20    explaining how this settlement will be reported in the

21    commission's end-of-year statistics.

22           MS. FITZPATRICK:  Yes, your Honor.

23           THE COURT:  I make that request out of curiosity, and

24    also out of what I see to be a growing skepticism in academia

25    that the SEC's reportage of their aggregate monetary penalties

G4cesecc

1    seems to be steadily increasing, but they're not really

2    collecting any more than they were in the past.  And

3    specifically, I'm referring to a forthcoming article that I

4    suggest you take a look at by Professor Velikonja titled

5    Reporting Agency Performance:  Behind the SEC's Enforcement

6    Statistics, 101 Cornell Law Review 40.  I'm curious to see how

7    this case will fit in.

8            What's the point of a penny stock bar against a

9    company that's gone out of business?

10           MS. FITZPATRICK:  I think, your Honor, again, this is

11   a settlement that is intended to signal what the appropriate

12   relief is for these violations.  A company that is going out of

13   business, the penny stock bar is something that for any sale of

14   unregistered securities of this magnitude we would insist upon,

15   since that in some ways is the core of the violation that

16   occurred.

17           We would also insist on injunctive relief, because

18   that in many ways signals the violation that occurred.  You

19   know, settlements are very unique and take a very unique form

20   when there is a bankruptcy occurring.  But we tend to still

21   pursue the relief we would pursue in the ordinary course.  And

22   that's not something that's fashioned to this specific case.

23   As your Honor can imagine -- in fact, the Court just noted

24   collection problems -- many people go into bankruptcy to avoid

25   payment of an SEC judgment or the consequences from an SEC

G4cesecc

 1    judgment.  So the terms I think frequently do include

 2    injunctive relief across the board.

 3            My understanding -- and I can speak with our

 4    bankruptcy lawyers -- is that this closely tracks the type of

 5    settlement language we have when there is a bankruptcy or

 6    liquidation situation; that the settlement is very consistent

 7    with that language.  It was not fashioned specifically for this

 8    liquidation proceeding.  And as an institution the SEC does

 9    have an interest in continuing to have injunctive forms of

10    relief on individuals or entities who use bankruptcy or

11    liquidation proceedings to avoid the consequences of the

12    misconduct we seek to deter, your Honor.

13            THE COURT:  Let's turn for a moment to the question of

14    the Caledonian Bank's liability.  Under Section 5, Caledonian

15    Bank would be liable as a dealer for participating in

16    unregistered transactions, assuming they weren't covered by an

17    exemption.  Based on the settlement papers, the SEC infers that

18    there was no bona fide public offering to trigger the dealers

19    exemption before Caledonian sold the relevant securities.

20            The question that I have, then, is:  Did the agency

21    ascertain the persons from whom Legacy Global or Clear Water

22    obtained their securities during discovery?

23            MS. FITZPATRICK:  So I believe we included a footnote

24    in our memorandum to this regard.  We did receive paperwork

25    that indicates that in the files, there were some what we would

G4cesecc

1   call an IBC or shell company in his name.  Some of these

2   securities were held I think within Caledonian.  It was

3   frequently listed as Legacy Global more broadly being the

4   client.  I don't think we've been able to trace everything to

5   the person behind the IBCs.  We frequently see a shell company

6   from a frequency bank jurisdiction and names that are listed

7   for that shell company.

8           But within Caledonian all the orders are being placed

9   regardless of how those line up by Legacy Global and Clear

10  Water and a small percentage by the other individuals we

11  identify as customers in our papers, including I believe the

12  Benson Law Group and Titan.

13          THE COURT:  Anything further?

14          MS. FITZPATRICK:  No, your Honor.

15          THE COURT:  Thank you, Ms. Fitzpatrick.

16          Ms. Dale, the $25 million judgment's closer to the

17  total proceeds received by Caledonian's clients than it is to

18  the commission's, the $1.4 million in profit that Caledonian

19  Bank made on the transactions.  How does that dollar amount

20  account for defenses that Caledonian might have raised?

21          MS. DALE:  Well, your Honor, as soon as the joint

22  official liquidators were appointed in this action, their

23  initial focus was on trying to reduce the amount of assets

24  subject to the restraint in this court, and also seeking to

25  determine whether there was a settlement that was likely to be

G4cesecc

1   entered into expeditiously with the SEC on account of the high

2   costs of determining the facts, frankly.  This was --

3   Mr. Hutchinson and Ms. Lobel were charged with acting in the

4   best interests of the creditors, including the depositors of

5   the bank and the securities company.  And so they approached

6   the negotiations with those goals in mind.

7           With respect to your question, frankly, we never got

8   far enough into discovery to understand all of the facts and

9   circumstances, whether good or bad, your Honor.  We quickly

10  came to a resolution of some of the asset restraint to remove

11  it down from a high of $76 million to 10 million.  And that

12  released moneys to go back to the Cayman Islands so that the

13  joint official liquidators could make distributions to the

14  creditors.  And that money was very helpful, obviously, in

15  doing that.  And there have been distributions, your Honor, to

16  the creditors in the amount of 81 cents on a dollar to date.

17          We negotiated with the SEC over the course of several

18  months.  Mr. Hutchinson came up to Washington and participated

19  in those negotiations himself.  The joint official liquidators

20  are in consultation with a -- it's called a liquidation

21  committee, but it's essentially a creditor's committee of CBL.

22  And they have been participating along the way in every aspect

23  of the settlement negotiations, your Honor.

24          So this -- we call them the JOLs, but the joint

25  official liquidators have been the ones who are tasked with

G4cesecc

1    acting in the best interests of all of the stakeholders of the

2    bank and the securities company.  And for them, coming out of

3    this case with -- paying no fine and no penalty, and then

4    reducing the asset freeze to $7 million -- which if the Court

5    enters the consent and final judgment, that also will be

6    released -- that was considered a very, very good outcome under

7    the circumstances.

8             THE COURT:  Thank you.

9             MS. DALE:  You're welcome.

10            THE COURT:  Does anyone else want to be heard with

11   respect to the proposed settlement before I turn to the

12   application to intervene?

13            All right.  Mr. Kasowitz?

14            MR. KASOWITZ:  Thank you, your Honor.

15            Your Honor, I think it's pretty simple.  The approval

16   of a settlement requires that there be a finding as to whether

17   it's fair and reasonable and whether it's in the public

18   interest.  And here, there's no dispute -- there may be

19   disputes about whether this settlement is fair and reasonable.

20   I have views on that.  I don't think that the $7 million was an

21   appropriate injunctive held-back amount.

22            But there's no doubt that this is not a fair and

23   reasonable settlement to the owner of Caledonian bank.  Indeed,

24   there is a unanimous concession on the part of the liquidators

25   that they have not had -- felt bound in any way, shape or form

G4cesecc

1    to even examine or consider the interests of the Caledonian

2    bank.  There is a quote from an affidavit from Mr. Hutchinson,

3    I believe, that was submitted in the proceedings in the Caymans

4    that says this:  The joint official liquidators -- this is a

5    quote -- have noted the concerns of Sentinel but do not

6    consider themselves bound to take such concerns into

7    consideration in the context of assessing the appropriateness

8    of the consent agreement.

9            And then it says -- and I found this very interesting,

10   your Honor -- because it is presently insolvent and, therefore,

11   Sentinel does not have an economic interest in the liquidation

12   of Caledonian.  It was the actions of the SEC in the first

13   instance which caused Caledonian to be bankrupt and which

14   created the insolvency situation for Sentinel.  And that's more

15   a reason that Sentinel's interests should be taken into

16   consideration in determining whether this settlement is

17   appropriate, fair and reasonable.

18           Secondly, your Honor, public interest.  Well, your

19   Honor noted himself -- the Court noted itself that there is a

20   very significant public interest here.  It said that this case

21   is a perfect example of a situation where there needs to be

22   self examination for an agency.  I can't think of a better case

23   where there needs to be self examination for an agency, because

24   in the first instance, of all of the overreaching behavior

25   engaged in by that agency at the time that the freeze order was

G4cesecc

1    obtained, the misrepresentations that were made to the Court by

2    that agency at the time that the freeze order was obtained,

3    and, your Honor, the lack of action that was taken by the bank

4    and its counsel at the time that the freeze order was obtained,

5    in addition to which, your Honor, the misrepresentations that

6    were made by the SEC continue.

7            In the settlement memorandum that the SEC has

8    submitted here, I can't put any better gloss on it than this:

9    There is a statement to the effect that documents showing that

10   it had been -- that the money and proceeds were from customers,

11   not from the bank itself, there's this statement made by the

12   SEC that it had just learned of these documents in connection

13   with the exchange of settlement documents with the liquidators.

14   That's wrong, your Honor.  It's flatout wrong.  The statement

15   was made I think in the briefing in February.  It's flatout

16   wrong.

17           Now, as the liquidators acknowledge, they hadn't

18   turned over any such documents to the SEC in connection with

19   settlement.  The fact is that the bank itself had a year

20   earlier, in March 2014, turned over such documents to its own

21   regulator, SEFA.  And when and how those documents then found

22   their way to the SEC, which very well could have been for all

23   we know prior to the time that the application for the freeze

24   order was made, none of those facts -- the SEC comes here today

25   for the purpose of trying to somehow make its behavior look

G4cesecc

1   better.  In fact, that's a misrepresentation about its

2   behavior.  And we still don't know when those documents were in

3   the possession of the SEC.

4          So the public interest here, for the purpose of the

5   self examination of the agency, has not been served.  And, in

6   fact, when I listened to counsel for the liquidators talk about

7   this settlement, it's sort of shocking to me.  Let me see.  I

8   wrote down some of this stuff.

9          We never got far enough into discovery to understand

10  the facts and circumstances, good and bad.

11         We entered into a quick settlement.

12         We represent the creditors.

13         And the amount, who knows about the amount.

14         So at a minimum, your Honor, for the purpose of

15  ascertaining whether or not the settlement is in the public

16  interest for the purpose of determining whether or not

17  appropriate self-scrutiny by the agency and remedying of this

18  egregious overreaching conduct has been achieved or will be

19  achieved, for that purpose, that's not happening with respect

20  to the parties that are before the Court right now.  That can

21  only happen with the intervention of Sentinel, which is

22  prepared to go forward with evidence that it has with respect

23  to these issues and to engage in limited, focused discovery to

24  ascertain what the appropriate facts and circumstances are; not

25  just -- I'm struck by this -- good or bad?

G4cesecc

1          THE COURT:  What relief is Sentinel seeking in seeking

2     to intervene in this action?

3          MR. KASOWITZ:  Two forms, your Honor:  A settlement

4     that is in the best public interest and damages for itself, to

5     the extent that they are available, from the SEC.

6          THE COURT:  But are damages available against the SEC

7     in an SEC enforcement action?

8          MR. KASOWITZ:  We believe that in this SEC enforcement

9     action, your Honor, they most certainly are and should be.

10    We're prepared to deal with any issues with respect to

11    sovereign immunity.  We've examined all the cases that relate

12    to it.  We believe that sovereign immunity will not be a bar in

13    this situation.  We believe that if there ever was a situation

14    where the SEC should compensate a party or an entity for its

15    egregious overreaching and misrepresentations, this is it.

16          But for their conduct, Caledonian would still be in

17    tact and in business.  And Sentinel's equity in Caledonian

18    would be in tact as well.  This was all needless, beyond

19    needless.  It's actually a tragedy.

20          THE COURT:  Well, what settlement does Sentinel

21    believe would be in the public interest?

22          MR. KASOWITZ:  Sentinel believes that a settlement in

23    the public interest would be one in which, among other things,

24    the creditors continue to be taken care of, as they have been,

25    and that there is -- which it wants to examine as well.

G4cesecc

1    Sentinel believes that there should be a proper amount set

2    forth within the settlement agreement that reflects the reality

3    of the situation, not the fiction that there was either

4    $7 million, $25 million or $35 million worth of harm done by

5    Caledonian.  Sentinel believes that there should be damages to

6    Sentinel from the SEC for the liability that the SEC has

7    incurred with respect to its conduct here.

8            THE COURT:  I guess I have to get back, though, to the

9    exchange act.  Doesn't it prohibit parties from importing

10   private claims, which is essentially what you're trying to do

11   here, into an enforcement action?

12           MR. KASOWITZ:  I don't believe it does, your Honor.  I

13   don't believe that there is a bar to those claims.  And if

14   there were --

15           THE COURT:  I think you should take a look at exchange

16   act Section 21G, because the way I read it, it prohibits

17   intervention by a party seeking to bring a claim for damages in

18   an SEC enforcement action.

19           MR. KASOWITZ:  We'll review it, your Honor.

20           THE COURT:  I think that the Supreme Court made the

21   same observation, quite frankly, in *Park Lane Hosiery*.  I mean,

22   in the end, while it might be possible for Sentinel to assert

23   some damages claim in a separate action, I think that existing

24   case law forecloses Sentinel's ability to do that in this case

25   through intervention.

G4cesecc

1           MR. KASOWITZ:  Thank you, your Honor.  And I was going

2      to get to that.

3           That doesn't foreclose -- and we certainly are and

4      will consider a separate action.  And then we'll deal with the

5      sovereign immunity issues.  But that doesn't foreclose the

6      appropriateness of Sentinel's intervention here for the purpose

7      of assuring that there is a proper record.

8           THE COURT:  All right.  Well, I'm confident the SEC

9      probably has some observations they'd like to make in response

10     to this argument.

11          MS. FITZPATRICK:  Yes.

12          MR. KASOWITZ:  Thank you, your Honor.

13          THE COURT:  Thank you, Mr. Kasowitz.

14          Go ahead, Ms. Fitzpatrick.

15          MS. FITZPATRICK:  Thank you, your Honor.

16          I just want to clarify the standard, because I think

17     Mr. Kasowitz says the settlement has to be in the public

18     interest.  We believe the settlement is in the public interest.

19     But as the Court is aware, the Second Circuit in Citigroup

20     articulated the standard as, a determination of the settlement

21     does not disserve the public interest.  And that's a

22     deferential standard to a law enforcement agency.  I just

23     wanted to clarify the applicable case law.

24          I also want to address briefly the allegation that

25     there was a misrepresentation in the brief submitted in support

G4cesecc

1   of the settlement.

2            The consent decree and the preliminary injunction had

3   a means for the SEC to obtain documents, which was to make a

4   request through CEMA and for Caledonian to comply with those

5   requests.  We did not make these requests prior to bringing the

6   asset freeze because it would have triggered notice to the

7   bank.  However, once we agreed upon this process, we repeatedly

8   made requests.  Those are confidential.  I don't believe they

9   were shared with Caledonian.  And after we had reached an

10   agreement on the settlement, which included that process, we

11   received a tremendous amount of documents from CEMA.

12            We didn't have transparency into when and how

13   Caledonian was giving those documents to CEMA.  They didn't

14   have transparency necessarily into our specific requests

15   because there's a middleman and there's confidentiality that

16   covers our communications with CEMA.  We received a tremendous

17   amount of material, some of which is attached to our

18   memorandum, that we think is tremendously beneficial to ongoing

19   law enforcement efforts as a result of this process.

20            But I think that there may have been, based on

21   communications with counsel for Caledonian, a little bit of

22   confusion.  And some of the documents may have been provided to

23   the regulator earlier than we thought they were.  We construed

24   it as being part of the settlement because we got it after we

25   made the requests that we were making pursuant to the

G4cesecc

1    settlement agreement we reached.

2           So to the extent the papers are confusing on that

3    front, I apologize, your Honor.  I didn't realize it until

4    after we received all the papers that there's any confusion.

5    We did not have access to any of this information at the time

6    we filed the TRO.  We think the information further bolsters

7    the case for Caledonian's liability.

8           I heard counsel to suggest that somehow the settlement

9    is happening, and there's nothing in the record that would

10   support that liability.  As your Honor is aware, there was a

11   tremendous amount of record evidence showing the unregistered

12   distribution that was attached to our initial declaration in

13   support of the TRO.  We now have even more evidence.  If we

14   were to proceed with this case because the settlement was

15   rejected, we would litigate it vigorously.  And we would

16   seek -- of course it would ultimately be up to your Honor -- an

17   even greater amount of disgorgement.  As I mentioned, this is a

18   negotiated number.

19          And I just want to explain for your Honor why we view

20   this number as important, even if it's not being paid, and why

21   we would never have settled to a number that was only

22   commissions, even if it was not being paid.  And that's because

23   we do think our settlements have precedential value.  And we

24   think it's important in this context, where you have repeat

25   players from bank secrecy jurisdictions that are permitting the

G4cesecc

1    sale of unregistered securities, even if it's by their clients,

2    that disgorgement be more than commissions.  And that's because

3    a disgorgement is only commissions, and the money is swept

4    offshore and then transferred to the clients from a

5    jurisdiction where if we don't get an asset freeze, we can't

6    get a penalty or collect a penalty, this profit model is

7    profitable.  If disgorgement is only commissions, it means that

8    a bank can do this type of transaction for a myriad of

9    customers, and when it's caught, just disgorge what it gained

10   from that single customer and then keep the commissions for all

11   the other customers.

12          So we believe that it be important when you see this

13   sort of repeat conduct -- and here you do see Caledonian

14   engaging in four sets of unregistered distributions in the

15   midst of what appear to be four separate pump and dumps.  When

16   you have a repeat player -- and now that we have more

17   documents, we know these are being done by the same clients,

18   and in incredibly suspicious circumstances of which high-level

19   people are aware at Caledonian -- that disgorgement reflect a

20   higher number.

21          So in fairness to Caledonian, if we were to continue

22   with this litigation, the SEC would both litigate it

23   vigorously, and we would ask this Court for an even greater

24   amount of disgorgement and possibly a penalty, although we

25   would have difficulty enforcing the penalty in the Cayman

G4cesecc

1    Islands.  And I think that context was lost in Sentinel as

2    intervention.

3           The only other thing I'd like to raise is it's not

4    clear to me that Sentinel is the owner of Caledonian.  When I

5    Google Caledonian, the owner is another entity, Caledonian

6    Global Financial Services.  And it's unclear to me how Sentinel

7    has standing through these layers of ownership.  If we were

8    trying to collect our judgment against Sentinel, I'm sure that

9    they would highlight all these layers of ownership and say that

10   we weren't allowed to do so.  But they seem to be just glossed

11   over in the request to intervene in this action, which we do

12   not believe is necessary, both for the reasons your Honor

13   stated and for the reasons we articulated in our letter.

14          If there are no other questions, your Honor, I think

15   we've responded to Mr. Kasowitz's arguments.

16          THE COURT:  Thank you.

17          MS. FITZPATRICK:  Thank you, your Honor.

18          THE COURT:  Ms. Dale?

19          MS. DALE:  Picking up on SEC's last point, your Honor,

20   "who is Sentinel" I think is an important consideration here.

21          THE COURT:  I will ask Mr. Kasowitz in a moment, so he

22   can bare himself.

23          MS. DALE:  They represent to the Court, they're,

24   quote, the owner of all of the equity, end quote, of CBL and

25   CSL, which is just not accurate from what we understand.  From

G4cesecc

```
1    their filings in the Cayman Islands -- and I will get back to

2    that in one moment -- we understand that they represented

3    themselves to be the sole shareholder of the company that the

4    SEC just referenced.  It's called Caledonian Global Financial

5    Services, Inc.  And in turn, Caledonian Global Financial

6    Services, Inc. is the sole shareholder of CBL and CSL.

7           So Sentinel is the parent of an equally insolvent

8    parent of CBL and CSL.  CGSFI -- Caledonian Global Financial

9    Services, Inc. -- is in liquidation in the Cayman Islands as

10   well.  And the joint official liquidators of Caledonian Bank in

11   Caledonian securities are also the official liquidators of

12   CGSFI.

13          So I think it's misleading for Sentinel to reference

14   repeatedly that it is Sentinel's equity interest in Caledonian

15   CBL and CSL that is at issue here.  In fact, it is CGSFI that

16   has the equity interest in the entities before your Honor.

17          And as Ms. Fitzpatrick mentioned, Sentinel set up this

18   corporate structure.  And it's much more complicated than what

19   I have been able to explain here today.  So we assume that they

20   will -- they must abide by the corporate structure that they

21   set up.  And they can't simply just drop down to being the sole

22   owner of all of the equity of CBL and CSL.

23          Also, I should mention this, Sentinel is a creditor of

24   CBL but one of approximately 1,400 creditors.  And their

25   ownership -- the value of their creditor interest is
```

G4cesecc

.01 percent of the outstanding creditors.  99.99 percent of the

creditors of CBL support this settlement, as does the

liquidation committee, which was appointed to provide input to

the joint official liquidators, as do the joint official

liquidators, as does the Cayman court.

          In their letter to you, your Honor, of February 12th,

Sentinel failed to disclose that they have previously made the

same application before the Cayman court and were rejected.

They have already had a full and fair opportunity to object to

the settlement.  That objection was overruled.  And they should

be estopped from attempting to raise intervention here.  The

joint official liquidators, having been appointed by the Cayman

court to oversee and be responsible for the estates at issue,

are charged with acting in the best interests of all of those

stakeholders.  And that's what they're doing.

          Sentinel, among other creditors, received notice that

the joint official liquidators were going to make application

to the Cayman court for approval to enter into this settlement.

They received that notice.  They were the only ones to object

to it.  They proceeded to make that objection formally before

the Court.

          There was a hearing on January 26th in the Cayman

Islands where the Court heard both sides of this issue.  They

heard Sentinel's objections.  And they rejected them.  And in

the order that the Grand Court of the Cayman Islands entered,

G4cesecc

1  they said that the joint official liquidators were, quote,

2  authorized to enter consent agreement in the SEC proceeding and

3  to take such additional steps and execute any such additional

4  documents as might be necessary or desirable in order to

5  fulfill the obligations contained in the consent agreement.

6  We've attached that to Mr. Hutchinson's declaration as

7  Exhibit D.

8       Your Honor, the case of *Cybernaut Capital*

9  *Management* -- it's a case from your Honor -- it's right on

10  point here.  It should control the outcome here.  We mentioned

11  it in our letter to your Honor.  Just like the petitioner in

12  *Cybernaut*, Sentinel has had that full and fair opportunity to

13  brief its issues before the Grand Court of the Cayman Islands.

14  And they rejected those arguments after considering them.

15  Therefore, they should be estopped.

16       The only other point I would make is I think

17  Mr. Kasowitz misquoted me, I'm sure unintentionally.  I

18  mentioned a quick settlement, not in terms of the settlement of

19  the final resolution of the action, but in terms of the

20  restraining order and the amount that was in the restraining

21  order.  That was a key issue for our client.  It had been at

22  $76 million, and within less than a month after the joint

23  official liquidators being appointed, we negotiated it down to

24  $7 million.  So that was the quick settlement that I was

25  talking about; not the settlement of the action, which took

G4cesecc

1      actually many months more.

2                THE COURT:  Thank you, Ms. Dale.

3                Mr. Kasowitz, would you like to respond?

4                MR. KASOWITZ:  Sure.  Thank you, your Honor.

5                THE COURT:  Perhaps if you could begin with explaining

6      to me what the corporate hierarchy is that makes Sentinel the

7      equity owner of Caledonian Bank.

8                MR. KASOWITZ:  Sure.  Counsel just explained it.

9                Sentinel is the owner of 100 percent of the stock of

10     CGFSI, which is in turn 100 percent owners of Caledonian Bank

11     and Caledonian Securities.  Sentinel is the beneficial owner of

12     those interests, your Honor.  That's our position here.  And

13     so -- it's the party in interest.  I heard statements about

14     complicated structures and the like.  It's as simple as that.

15               THE COURT:  And CGSFI is in liquidation?

16               MR. KASOWITZ:  I understand that as a result of the

17     activities here and the freeze order, which put a run on the

18     bank, that CGFSI is in trouble, yeah.

19               THE COURT:  Anything further?

20               MR. KASOWITZ:  Yes, your Honor.

21               With respect to the issue of collateral estoppel, I'll

22     just touch on it quickly.  The case that counsel cited,

23     *Cybernaut*, is exactly on point and favors us.  It says, among

24     other things, that issues are not identical where the standards

25     governing them are significantly different.  And the Cayman

G4cesecc

1     proceeding, the standard that was observed by the fact-finder

2     was, quote, the best interest of Caledonian's creditors, closed

3     quote.

4          Here, the standard to be determined or to be applied

5     with respect to the settlement is whether the consent decree

6     is, quote, fair and reasonable, closed quote, and, quote, in

7     the public interest, closed quote.  Those are different

8     standards.  They are not identical.  Collateral estoppel does

9     not apply, and we are not a creditor.  We are an equity owner.

10          Thank you, your Honor.

11          THE COURT:  Thank you, Mr. Kasowitz.

12          Look, I'll fix a briefing schedule, if you want, but I

13     think in the colloquy that we've had, I've tried to make it

14     clear why I don't think a motion to intervene here would be

15     successful.  I'm willing to be persuaded to the contrary, if

16     you want to pursue it.  And if you decide, after thinking about

17     this, that you want to pursue it, just send me the shortest of

18     letters, and I'll fix a briefing schedule.

19          But I think that the proposed intervention, as I

20     understand it, is really barred by exchange act, Section 21G,

21     and decisions that have construed that statute to prohibit

22     intervention in enforcement actions.

23          MR. KASOWITZ:  Your Honor, my understanding of those

24     cases was the argument that had been advanced by the SEC -- and

25     I'm going to go back and look at them.  But the argument that

G4cesecc

had been advanced by the SEC was that intervention would not be

permitted without the SEC's consent.  And while that has been a

position that's been taken by some federal courts in this

country, it is not the position in the Second Circuit, where,

among other things, courts both in the Eastern District and

this Court have taken the position such consent is not

necessary.  If your Honor is talking about -- I heard your

Honor to be suggesting that the issue of damages is precluded

by 21G -- that's what we'll go back and take a look at.

THE COURT:  And, I mean, even beyond that, though, why

aren't your objections here barred by collateral estoppel,

given the presentation that you made in the courts in the Grand

Cayman Islands?

MR. KASOWITZ:  The standards are different, your

Honor.  There, the specific standard, as I just said is, quote,

the best interests of the creditors.  Our client is, A, not a

creditor; and B, the standard here is different, considerably

different.  It's talking about a settlement that is fair and

reasonable, on the one hand, and also in the public interest.

That looks to me to be distinctly different from what is in the

best interests of the creditors, which doesn't take into

account an equity holder, and certainly doesn't take into

account terms like fair and reasonable, and definitely doesn't

take into account the public interest.

So I don't think it is barred, your Honor.

G4cesecc

```
 1              THE COURT:  All right.  Anything further on this
 2     point, before I move to Mr. Zito's application on behalf of
 3     Verdmont?
 4              MS. FITZPATRICK:  Not from the SEC, your Honor.
 5              THE COURT:  Anything?
 6              MS. DALE:  Your Honor, all I would say on this point
 7     is that we've already been waiting more than two months now
 8     since we've gotten the authorization from the Cayman Islands
 9     court to proceed here.  And I think that Caledonian should be
10     reserving its rights to move for sanctions itself for some
11     frivolous motion practice that may delay further the end of
12     this case and the return of moneys to the creditors of
13     Caledonian Bank and Caledonian securities.
14              Thank you.
15              THE COURT:  And it may not.  It may not come to
16     fruition.  All right?
17              Mr. Zito, you've been patient.
18              MR. ZITO:  Good morning, your Honor.  May it please
19     the Court.
20              We have two issues before, your Honor.  One is the
21     freeze order, which involves $240,000; I'm rounding up.  And
22     the other issue is our proposed motion for summary judgment.
23     Because the SEC's case on its merits is at the heart of both of
24     these motions, I'd like to address that for a moment, your
25     Honor.
```

G4cesecc

1          As we briefed in great detail, your Honor, on our

2     12(c) motion at the beginning of the case, we are relying

3     primarily on what's called the so-called dealer exemption.  And

4     it's pretty straightforward.  We're relying on the date when

5     the -- we're relying on the fact that each of the issuers filed

6     registration statements with the SEC; two, that the SEC

7     declared those registration statements effective; and more than

8     40 days -- in fact, in some cases it's about two years since

9     that waiting period expired, that 40-day waiting period

10    expired, that all these trades occurred.  Therefore, we think

11    we're entitled to the benefit of the dealer exemption and have

12    the case dismissed.

13          We briefed this in excruciating detail on our 12(c)

14    motion, and remarkably, the SEC never responded to it.  And

15    your Honor denied our motion, stating that the Court was

16    unwilling to treat that motion as one for summary judgment.

17    The SEC has now had a year's worth of discovery.  Discovery is

18    coming to a close in two weeks.  We have a proposed briefing

19    schedule which the Court has now adopted.  And I believe our

20    motion is unassailable, because the SEC hasn't responded to why

21    the dealer exemption doesn't apply.  The only thing that we've

22    heard, both on the initial briefing on this case and

23    throughout, sort of in passing, is this was a sham.  This was a

24    sham.  But there's never any articulation as to why that is a

25    sham.

G4cesecc

1          THE COURT:  But how will Verdmont show that there's no

2     dispute of material fact that its client's purchases were not

3     part of the pump-and-dump scheme?

4          MR. ZITO:  Your Honor, all as I understand -- and I

5     respectfully submit that our burden on this case is to prove

6     the exemption.  For us to prove the exemption, we need to prove

7     three facts.  And this is routinely the case, because, in fact,

8     there's a treatise out there that said, if this dealer

9     exemption were not allowed this kind of liberality, the

10    securities markets would come to a complete halt.  Dealers are

11    given this exemption.  And typically what happens is that a

12    deal will go to the SEC and your website, see there's a

13    registration statement on file, see that it's declared

14    effective and calculate the waiting period.  And that's how

15    they make the trades.

16         So our burden, your Honor, respectfully, we believe,

17    is three facts:  One, registration statement on file.  The

18    Court can take judicial notice of that through EDGAR.

19         Two, registration statements deemed effective.  Again,

20    the Court can take judicial notice of that fact.  It's a matter

21    of public -- it's a public fact on the EDGAR website.

22         And three, we will prove that the trades took place

23    more than 40 days after the waiting period.  In our view that

24    proves the exemption.  Now, if the SEC says, well, the waiting

25    period doesn't exactly start then, it should start someplace

G4cesecc

1    else, we don't know when they say that is.  They say it's a

2    sham, but it's incumbent upon them.  The burden shifts to them,

3    your Honor, to establish that there was some sham.  There was

4    some -- we don't know there's a pump and dump.  But if they're

5    claiming that it was a pump and dump, they have to prove that

6    our clients were a part of that.  And they can't prove that,

7    because we're able to prove that Verdmont's customers were

8    unrelated.  They were not the issuers, and they were not

9    affiliates of the issuers or were they insiders.

10         So even giving the SEC every benefit of the doubt,

11   every benefit of the doubt, your Honor, the fact of the matter

12   is that by the time Verdmont's customers received the stock,

13   the distribution had terminated, had terminated.  And they

14   could not be liable because they sold the stock for 40 days

15   after.

16         But they haven't come forward with any proof.  And

17   over a year's gone by, and they haven't sought to take the

18   testimony of people overseas who they say were part of this

19   sham.  Not one deposition was taken in this case, other than

20   our clients, your Honor.  So I don't know what evidence that

21   they have to come forward and present to the Court that will

22   demonstrate this sham to rebut our exemption case.

23         THE COURT:  Let me turn for a moment to your motion to

24   unfreeze the assets.  Didn't you stipulate in June of last year

25   to the asset freeze and waive any argument?

G4cesecc

 1          MR. ZITO:  No, your Honor.  We stipulated to the

 2    preliminary injunction, with a reservation that we could move

 3    to modify it at any time.  That's in the language of the

 4    stipulation.  Both sides, the SEC as well as Verdmont, reserved

 5    their rights.  We did not waive anything, your Honor.

 6          THE COURT:  What's changed since June 3 of last year

 7    when you entered into the stipulation that would justify

 8    eliminating the asset freeze?

 9          MR. ZITO:  The company has gone into liquidation.  The

10    company has completely collapsed as a result of the initial

11    asset freeze in this case of the $17 million and the false

12    publication by the SEC on its website in a litigation release

13    that says that, we participated in $75 million of illegal

14    profits.  I mean, once that was out there, we asked them to

15    take that off of the website, and they didn't do that.  The

16    business cratered to the point where now we submitted a budget

17    to the Court which shows that there's only -- there was only

18    $455,000 in cash on hand.  That's against a projected expenses

19    of this month of $378,000.  And that's only allocating $50,000

20    from my law firm.

21          And, your Honor, we were all in London taking

22    depositions last week.  And that $50,000 was eaten up last

23    week.  So for us to start to go into a briefing on the summary

24    judgment motion, we're going to be well behind, and there's not

25    enough money to pay us.  And we think that Verdmont should have

G4cesecc

1    the ability of a defense in this case, especially where the

2    case is so thin.  There's case law that says that the Court has

3    discretion to allow a release of these funds for the payment of

4    legal fees, and it's fair and it's reasonable.  And especially

5    reasonable, your Honor, in light of the stated policy by the

6    SEC lawyers, which is that once -- the stated policy as I heard

7    about 15 minutes or maybe a half an hour ago was that once a

8    company goes into liquidation, they have no interest in

9    collecting money.

10          So we're in liquidation.  They're never going to

11   collect money.  So if they had no interest in collecting money,

12   as they cut a deal with Caledonian, why do they even care about

13   the $240,000?

14          THE COURT:  All right.  I got it.

15          Let me hear from the SEC.

16          MS. FITZPATRICK:  And, your Honor, Mr. Costello is

17   prepared --

18          THE COURT:  Sure.

19          MS. FITZPATRICK:  -- for the summary judgment, but if

20   I could just address the liquidation issue.

21          THE COURT:  Yes.

22          MS. FITZPATRICK:  Thank you, your Honor.

23          I believe Mr. Zito either misheard me or I misspoke.

24   I want to be quite clear:  Once a company is in liquidation, we

25   still have plenty of interest in collecting money.  We just

G4cesecc

1    recognize the reality that priorities are set by law.  And if

2    there are claims of priority over ours, by law, and that those

3    are going to eat up all of the funds, our settlement will

4    reflect that.

5             I think we're in something of a different situation

6    here.  Verdmont does not have a companion bankruptcy case in

7    the United States that recognizes, as was the case with

8    Caledonian, the ongoing liquidation as an official proceeding.

9    So they're in a completely different legal posture.

10             And here, we have frozen funds that would be available

11   to satisfy our judgment.  And the budget we're being shown is

12   saying that those funds will go largely to pay for law firms,

13   and that even that will not get us to the end of the case.

14             So it's not as if the funds would be available, and

15   then suddenly Verdmont would have counsel fully funded for the

16   end of the case.  They would only last about two more months.

17   We would be in the same situation.  And the SEC would be left

18   with nothing.  We did not construe the budget Mr. Zito

19   presented to this Court, showing how the money would be used if

20   released, as something similar to the type of detailed

21   financial information that Caledonian gave us about how it was

22   going to distribute funds when we lowered the asset freeze that

23   showed that distributions would be made to depositors who

24   complied with certain "know your customer" and other

25   regulations.

G4cesecc

1          Here, the money would be going to lawyers for work

2     that has yet to be done.  And it will not be enough.  And the

3     SEC and this Court would be left with nothing as a result of

4     this litigation.  And we don't think that's appropriate in this

5     instance.  And we are willing and able to defend the freeze, if

6     necessary.

7          Mr. Costello is prepared to discuss the merits of the

8     proposed summary judgment motion, your Honor, if there's no

9     questions on that front.

10          THE COURT:  All right.  But it sounds like the motion

11     with respect to the asset freeze has got to be teed up first,

12     doesn't it?  Because if I keep the asset freeze in place,

13     undoubtedly Mr. Zito is going to be making an application to

14     withdraw as counsel.

15          Is that a fair statement, Mr. Zito, or not?

16          MR. ZITO:  May I address the Court from here?

17          THE COURT:  Yes.

18          MR. ZITO:  That's a distinct possibility.  I don't

19     know what the work in progress is -- as they say, the WIP,

20     is -- and what the hours are.  And once we get to a certain

21     level, I have to go to my executive committee for approvals and

22     things like that.  I think we want to litigate this case.  We

23     don't want to get hurt, your Honor.

24          MS. FITZPATRICK:  Your Honor, I'm sorry.  I just want

25     to add one piece of information.

G4cesecc

1          My understanding is that the depositions last week in

2   London, the principals of Verdmont stated that Mr. Zito

3   represented them personally.  And my understanding is also that

4   they represented that there was a $600,000 dividend paid last

5   year by Verdmont.  So I think there may be other means of

6   compensation available to Mr. Zito for --

7          THE COURT:  Fair enough.

8          MS. FITZPATRICK:    -- depositions that took place last

9   week.

10         If Mr. Zito were to prevail on summary judgment, the

11  case would be done and the money would be released.  If he were

12  to litigate the asset freeze and prevail, the money would be

13  released.  That may cover the litigation in the asset freeze,

14  and maybe there would be enough left for summary judgment.  But

15  it's a little bit of a chicken-and-an-egg analysis.  That's

16  between Mr. Zito and his client.  We're happy for him to

17  litigate everything.  We just don't think it's an appropriate

18  basis for releasing the money to pay Mr. Zito and a few other

19  law firms, your Honor.

20         THE COURT:  All right.  Thank you.

21         Mr. Costello.

22         MR. COSTELLO:  Good afternoon, your Honor.

23         I just wanted to briefly address some of the arguments

24  that counsel for Verdmont had made in connection with the

25  summary judgment or the anticipated motion for summary

G4cesecc

judgment.  And I think it might be helpful to start by just

stating for the Court what the SEC's position on what the

applicable standard is in connection with the dealers

exemption.

        And the SEC refers to the opinion and order that this

Court entered in November of last year, where the Court

articulated what the correct standard is on the dealers

exemption.  And that standard is that the dealers exemption

applies, provided that the sales of securities are done after a

40-day period dating from either the effectiveness of the S1

registration statements or the time that the securities at

issue are first bona fide offered to the public, whichever one

of those triggers occurs later.

        So the only operative trigger in this instance, your

Honor, is not just the effectiveness of the registration

statements; the Court also needs to take into account when the

first bona fide offering is.

        Now, the question here is:  Who bears the burden on

showing that?  Well, as the exemption itself states, and as the

Court itself articulated, Verdmont bears the burden on showing

the Court when the first bona fide offering of the securities

took place.

        Now, if Verdmont plans to contend that that bona fide

offering coincided with the S1 registration statements being

declared effective, then Verdmont can certainly argue that.

G4cesecc

But it would be Verdmont's burden to show all of the attendant

circumstances behind what a bona fide public offering is.  And

based on the extent of the record to date, your Honor, there

doesn't seem to be any evidence of that even occurring at the

time these registration statements were declared effective.

        There is a significant amount of evidence to show that

the first time that these securities were bona fide offered to

the public coincided with the time that Verdmont sold millions

of shares of these securities in the public markets in 2013.

There is substantial evidence of that.  There doesn't seem to

be any evidence that there was a bona fide offering at the time

that the registration statements were declared effective.  But

no matter which date Verdmont contends is the trigger date,

it's Verdmont's burden to show that.

        The other thing I just wanted to point out, your

Honor, is one other aspect that might inform how the summary

judgment briefing will go.  It's case law in the Second Circuit

and, in fact, in this district as well, that if a dealer or a

broker or a broker/dealer has customers who are acting as

underwriters in connection with a distribution of securities,

if that's the case, then that entity, that broker-dealer

entity, loses the right to invoke the dealers exemption and the

brokers exemption.

        Now, normally speaking, your Honor, the question of

whether or not customers are underwriters is usually answered

G4cesecc

1   in the context of the brokers exemption.  That's part of the

2   inquiry.  And the Court noted that in its November order.

3          But if Verdmont is not planning to move on the brokers

4   exemption, then Verdmont needs to show undisputed evidence that

5   its customers were not underwriters, because unless and until a

6   decision is made on that issue, then it cannot be decided

7   whether Verdmont can even invoke the dealers exemption.  And

8   there can't be a lingering question of that before the summary

9   judgment takes place.

10         So Verdmont also will need to introduce undisputed

11  evidence on that front, unless, of course, Verdmont actually

12  decides to move on both of the exemptions, in which case

13  necessarily that analysis would be subsumed within the brokers

14  exemption.

15         But I just wanted to point that out for the Court.  So

16  the SEC plans to oppose this summary judgment motion on the

17  grounds that there is no evidence that these securities were

18  bona fide offered to the public at any time before Verdmont

19  engaged in that distribution in 2013 for all three securities.

20         Unless the Court has any questions.

21         THE COURT:  Thank you, Mr. Costello.

22         MR. COSTELLO:  Thank you, your Honor.

23         MR. ZITO:  I'll be brief, your Honor.

24         There's a presumption that when there's a registration

25  statement that is on file, and when it is declared effective by

G4cesecc

1    the SEC, that the securities are in play and they are offered

2    to the public.  That's black letter law.  That's a presumption.

3    And sometimes an apple is just an apple, a pumpkin is just a

4    pumpkin.  There's a registration statement, it's declared

5    effective, and that's it.

6            Courts have recognized, and your Honor has recognized,

7    that there are some instances where once that registration --

8    effective date of the registration statement may not

9    necessarily be the date when they are offered for sale.  And

10   those are different circumstances.  In fact, your Honor pointed

11   to when there are private securities that are at play.  And

12   that's not public securities but private securities, because

13   there's no registration statement that's being declared

14   effective in the private securities.  So in order to look at

15   the Section 5 claim, you have to look at when they're actually

16   offered, as opposed to when the registration statement was

17   declared effective.

18           And your Honor mentioned those cases.  And I read

19   those cases last night.  And they all talk about how this later

20   date really relates to when you have private securities as

21   opposed to public securities.  And our case deals with public

22   securities.

23           And it's our position -- and I don't want to restate

24   it, your Honor; you have heard it already -- they have to prove

25   something in this case.  We're going to prove the exemption.

G4cesecc

1   They have to prove this sham theory.  And they know that.

2   Otherwise, they wouldn't have spent 40 pages in their complaint

3   talking about all the sham.  Although the sham addresses the

4   Swingplane securities, it never addresses the three securities

5   that are involved in this case.  They keep talking about the

6   Swingplane securities.  So they have no evidence at all.

7            But all that being said, there are two critical words,

8   your Honor, that I wanted to give to the Court.  One is the

9   term underwriter, which is a conclusion.  It's a conclusion.

10  It's not a fact.  It's a conclusion based on various facts.

11  And the other word is a distribution, a stock distribution.

12           When a registration statement is on file, you look at

13  what the distribution is.  The distribution ends once the stock

14  comes to rest with the general public.  Once it goes from the

15  issuer and it rests with the general public, the distribution

16  has ended.

17           The definition of an underwriter is a person who

18  acquires stock from an issuer, which none of our clients, none

19  of Verdmont's customers, ever acquired any customers from --

20  never acquired any stock from the issuers or participated in

21  the distribution, insofar as our customers are not affiliates

22  or insiders.  And they concede that.  They concede that our

23  customers are not issuers or affiliates of the issuers or

24  insiders of the issuers.  Therefore, by the time they get the

25  stock, the distribution is over.  And they held the stock for

G4cesecc

```
 1    more than 40 days.  And the dealers exemption applies.  That's

 2    the end of the case, your Honor.

 3              THE COURT:  Mr. Zito, do you want to file both motions

 4    simultaneously?

 5              SPEAKER:  They are in a way inextricably related, your

 6    Honor.  So it may make sense for the Court and the expediency.

 7              THE COURT:  When would you like to file them?

 8              MR. ZITO:  The discovery cut-off is due the 30th of

 9    this month.  We would like to have -- we would like to

10    accelerate the briefing on this, your Honor.  We'd like to file

11    all our motions by May 15th.

12              THE COURT:  May 16th.  Never on Sunday.  Right?

13              MR. ZITO:  Thank you, your Honor.

14              THE COURT:  May 16th.

15              How much time does the SEC want to oppose the motions?

16              MS. FITZPATRICK:  Thirty days, your Honor.

17              THE COURT:  June 15th.

18              MR. ZITO:  Two weeks for reply, your Honor.

19              THE COURT:  June 29th for reply.  And for now, I'll

20    set the case down for oral argument on July 15th, but that

21    might change.  I'll put it down for 11:00.

22              With respect to the SEC's motion for approval of the

23    consent decree decision, decision is reserved.  I expect that

24    I'll issue an order.

25              And if the SEC can get the supplemental letter that
```

G4cesecc

1    the Court requested by the end of this week, that would be

2    fine.

3             Mr. Kasowitz, if you decide you want to press the

4    motion to intervene in this case, just send me the shortest of

5    letters to that effect, with a proposed date on which you'd be

6    prepared to file your motion.  And I'll fix a briefing schedule

7    thereafter.

8             MR. KASOWITZ:  Thank you, your Honor.

9             THE COURT:  Yes, Ms. Fitzpatrick?

10            MS. FITZPATRICK:  Your Honor, I apologize.  I believe

11   I may be on vacation July 15th.  Is your Honor aware what

12   day -- I don't have my calendar.

13            THE COURT:  That's a Friday.

14            MS. FITZPATRICK:  The Friday the week after the 4th?

15            THE COURT:  That's the 8th.

16            MS. FITZPATRICK:  Okay.  Thank you, your Honor.  It's

17   fine.  Thank you.

18            THE COURT:  So July 15th it is.

19            Ms. Dale.

20            MS. DALE:  May we have Sentinel's attorney to have by

21   a date certain to get you their letter?

22            THE COURT:  By Thursday?

23            MR. KASOWITZ:  That's fine, your Honor.

24            THE COURT:  That way we'll know.

25            MS. DALE:  Thank you.

G4cesecc

1              THE COURT:  Anything else?

2              MS. FITZPATRICK:  No, your Honor.

3              THE COURT:  Thank you all.  Have a good afternoon.

4              (Adjourned)