```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SECURITIES AND EXCHANGE
     COMMISSION,
 4
                     Plaintiff,
 5
                 v.                          15 Civ. 894 (WHP)
 6
     CALEDONIAN BANK LTD.;
 7   CALEDONIAN SECURITIES LTD.;
     CLEAR WATER SECURITIES, INC.;
 8   LEGACY GLOBAL MARKETS S.A.;
     and VERDMONT CAPITAL, S.A.,
 9
                     Defendants.
10
     ------------------------------x
11                                           New York, N.Y.
                                             May 20, 2016
12                                           3:25 p.m.

13   Before:

14                     HON. WILLIAM H. PAULEY III,

15                                           District Judge

16                          APPEARANCES

17   BRIDGET M. FITZPATRICK
     PATRICK R. COSTELLO
18   DEREK S. BENTSEN
     PAUL GIZZI
19        Attorneys for Plaintiff

20   PROSKAUER ROSE LLP
          Attorneys for Defendants Caledonian Bank Ltd.
21        and Caledonian Securities Ltd.
     BY:  MARGARET A. DALE
22        SIGAL P. MANDELKER
          MASSIEL PEDREIRA-BETHENCOURT
23
     KASOWITZ BENSON TORRES & FRIEDMAN
24        Attorneys for Intervenor Sentinel Trust Services Limited
     BY:  TREVOR J. WELCH
25        KALITAMARA MOODY
          JOSHUA GELNICK
```

1              (Case called)

2              MS. FITZPATRICK:  Good afternoon, your Honor, Bridget

3     Fitzpatrick along with Patrick Costello, Derek Bentsen and Paul

4     Gizzi for the SEC.

5              THE COURT:  Good afternoon.

6              MS. DALE:  Margaret Dale, Sigal Mandelker, Massiel

7     Pedreira.

8              THE COURT:  Good afternoon.

9              Is Sentinel now here?

10             MR. WELCH:  Yes, your Honor.  Trevor Welch, Kasowitz

11    Benson, for Sentinel.  These are my colleagues Kali Moody and

12    Josh Gelnick.

13             THE COURT:  Mr. Welch, don't you think you owe all of

14    the counsel and the Court an apology.  This matter was set for

15    3:00.  My chambers, we have been reaching out to you,

16    Mr. Kasowitz and everybody else who signed the brief on behalf

17    of Sentinel.  We couldn't get a hold of anybody at Kasowitz.

18    And even a few moments ago nobody is even answering the main

19    telephone number for Kasowitz.  I was coming out on the bench

20    to hear argument from those who were here to respond to your

21    reply brief.

22             Now that I have prompted you, do you want to

23    apologize?

24             MR. WELCH:  Absolutely, your Honor.

25             THE COURT:  What's the reason that you're 25 minutes

1    late?

2         MR. WELCH:  The reason is that I misunderstood that

3    the hearing was at 3:30.  I was actually in the hallway.  I

4    apologize.  I did not mean to keep the Court waiting.  It's an

5    error on my part.  I accept the blame.

6         THE COURT:  It's as clear as a bell on the docket.

7    The scheduling order couldn't be clearer.  Lawyers have

8    traveled here from Washington and from midtown.  I am not sure

9    which may be the more difficult distance to navigate on a

10   Friday afternoon.

11        MR. WELCH:  Again, I apologize, your Honor.

12        THE COURT:  Do you want to be heard?

13        MR. WELCH:  Yes, your Honor.

14        THE COURT:  Take the podium.

15        MR. WELCH:  For the record, your Honor, my name is

16   Trevor Welch, Kasowitz Benson.  We are here counsel for the

17   proposed intervenor, which is Sentinel Trust Services Limited,

18   and Sentinel seeks to intervene to object to the proposed

19   consent judgment.

20        THE COURT:  What is the specific form of relief that

21   you're actually seeking from this proposed intervention?

22        MR. WELCH:  We would like to submit a brief in

23   opposition to the proposed judgment.

24        THE COURT:  Are you seeking any damages?

25        MR. WELCH:  We are not seeking damages, your Honor.

1       THE COURT:  And what alterations would you be seeking?

2       MR. WELCH:  I'm happy to discuss that.  The consent

3 judgment has a number of features which we find objectionable,

4 to say the least.  There is a $25 million judgment that's

5 imposed jointly and severally against Caledonian Bank and

6 Caledonian Securities.  In this case Caledonian Bank did not

7 make any commissions and did not sell the securities at issue.

8 Caledonian Securities sold the securities at issue and made

9 $1.3 million in commission.

10       The proposed consent judgment, which they waive

11 collection, is $25 million, which is 20 times the commission

12 that Caledonian Securities recovered.  What is the possible

13 basis for that?  I respectfully suggest that the SEC is

14 attempting to insulate itself from liability in future actions

15 in which we intend to assert claims against the SEC.  This will

16 be a credit or a setoff against any judgment that we would get

17 against the SEC for its misconduct in this action.

18       The $25 million with respect to Caledonian Securities

19 is way out of proportion and not in line with case law in other

20 cases.  And with respect to Caledonian Bank, Caledonian Bank,

21 which was the primary injured party here, there is no rational

22 basis.

23       We put in an affidavit explaining that the bank, as

24 distinguished from the securities entity, did not participate

25 in the securities transaction, acted literally as a passive

 1   bank, and made no commissions.  It's hard for me to fathom why

 2   the bank would be jointly and severally liable for $25 million

 3   unless the SEC was attempting to insulate itself from liability

 4   in a future action.  That's primarily what we object to.

 5          In addition, the consent judgment would commit

 6   Caledonian Bank not to even do anything that would suggest that

 7   there is no factual basis for the SEC's allegations when

 8   counsel for the liquidators said last time that we were here

 9   they had no idea if there was a factual basis.  Now, we are not

10   conceding that there is or would be a res judicata or

11   collateral estoppel issue, but we are concerned about that.

12          THE COURT:  How does committing Caledonian Bank to do

13   something commit your client, Sentinel, to do something?

14          MR. WELCH:  Well, it doesn't, your Honor.

15          THE COURT:  Right.  Why should your client, Sentinel,

16   care what Caledonian is obliged to do under the consent decree?

17          MR. WELCH:  Again, we are concerned about collateral

18   estoppel and res judicata issues if we assert claims based on

19   the same facts that the SEC alleged in their complaint.  I

20   don't want to concede that and we would dispute that.  But it

21   is a risk.

22          I think it would be helpful if I explained who

23   Sentinel is, what Sentinel is and what its interest is here, if

24   I may.  Sentinel Trust Services is the sole registered

25   shareholder of CGFSI.  CGFSI is the sole registered shareholder

of Caledonian Securities and Caledonian Bank.  As the

registered shareholder of CGFSI, it has the exclusive right to

exercise any rights that those shares have.  It holds those

shares in trust for the beneficial owners and as a trustee it

has an obligation to take all reasonable steps to try to

protect the value of what's held in trust, which is here CGFSI

shares and in turn the bank.  That is why we are concerned that

a judgment here of $25 million, which is untethered to the

facts and with respect to the bank has no rational basis, if we

assert claims in the future against the SEC, the SEC will seek

to use this judgment as a setoff.  That's our interest here and

that's why we want to object.

THE COURT:  Anything further?

MR. WELCH:  Your Honor, there is obviously various

defenses that both parties have asserted.  I'm happy to discuss

them and explain why I think they don't have validity if you

would indulge me.

THE COURT:  This is your opportunity.

MR. WELCH:  Great.  Thank you.  With respect to 21(g),

there are three cases in this circuit that have found that

21(g) only applies to compulsory consolidation in multidistrict

litigation.  It does not apply to intervention.  And if you

read the statute on its face, it does not reference

intervention.  It says consolidation and coordination.  If you

compare 21(g) with 1407, which is multidistrict litigation,

1    Section A, it uses the same phrase, consolidate and coordinate.

2    This 21(g) was meant to bar parties from consolidating under

3    the compulsory multidistrict litigation cases with an

4    enforcement action.  It doesn't talk about intervention on its

5    face.  That's what we are seeking to do here.

6         THE COURT:  Doesn't 21(g) start out with the prefatory

7    language, notwithstanding any other provision of law?

8         MR. WELCH:  Yeah, it does, your Honor.  But

9    notwithstanding any other provision of law, the force of 21(g)

10   shall apply.  But the force of 21(g) by its express terms does

11   not include barring intervention.  Intervention does not appear

12   in the statute.

13        I know your Honor at the last hearing referenced

14   *Parklane Hosiery*, a Supreme Court case, and there is a footnote

15   in that case in which the court said, well, perhaps the party

16   there could not have intervened or actually withdrawn.  It

17   doesn't say intervened.  Could not have consolidated this case.

18   And then if you look at the Eighth Circuit's decision in Flight

19   Transportation, the Eighth Circuit specifically discusses that

20   language and says, that's about consolidation.  It's not about

21   intervention.  The statute on its face doesn't talk about

22   intervention.

23        THE COURT:  But the Eighth Circuit doesn't grade my

24   papers.

25        MR. WELCH:  You are absolutely right, your Honor.

1    There is no Second Circuit authority on point.  There are three

2    district court opinions from the Second Circuit, including

3    *Bancroft* from the Southern District where they held the exact

4    same thing.  On its face 21(g) does not bar intervention.

5         THE COURT:  But doesn't every single judge in this

6    district agree that private claims asserted by non-SEC parties

7    cannot be brought in enforcement actions filed by the SEC?

8         MR. WELCH:  Your Honor, they may, but two points.

9         THE COURT:  They do, don't they?  Has any judge in the

10   Southern District held that a non-SEC party could bring a claim

11   in an SEC enforcement action?

12        MR. WELCH:  Not that I'm aware of, your Honor.  But to

13   be clear, we are not seeking to intervene here to assert a

14   cause of action against the SEC.  We are not seeking to

15   intervene to seek damages from the SEC.  We are seeking to

16   intervene to protect our right to do so in a subsequent action.

17        Again, as a practical matter, we are concerned that an

18   illusory $25 million judgment that the SEC waives, I am not

19   sure what that means, they will use to set off if and when we

20   get a judgment against the SEC.  They are insulating

21   themselves.  They are buying an insurance policy.  And they are

22   not buying it.  They are extracting it.  And the liquidators,

23   they have no interest in stopping this.

24        As far as they are concerned, it's not going to be

25   collected.  They are already at 91 or 95 cents on the dollar.

1   Their interest is in making the creditors and the depositors

2   whole and they are done.  They have no interest in my client's

3   interest, which was the equity interest which was entirely

4   wiped out by the freeze order here which, as your Honor held,

5   was based on misrepresentations to this Court about the key

6   facts here.

7          Caledonian Bank, at the time the freeze order was

8   obtained by the SEC, it didn't have the allegedly ill-gotten

9   proceeds in its possession.  What's totally lost here is that

10  almost a year before the SEC came into this courtroom,

11  Caledonian Bank's own regulator in the Cayman Islands came to

12  Caledonian Bank and said you know what, I think there is an

13  issue here with Legacy and Clear Water.

14         As a result, Caledonian Bank and Caledonian Securities

15  voluntarily shut down those accounts, shut down every related

16  account they could find, and, with the blessing of their local

17  regulator, disbursed the funds back to Clear Water and Legacy.

18  And in doing so they collected documents and they produced them

19  to their regulator, CIMA, who then produced them to the SEC.

20  It's not clear based on their papers.

21         I suspect that the SEC had these documents at the time

22  they came into this courtroom.  They had acknowledged those

23  papers demonstrate what Caledonian Bank has maintained all

24  along, that it never sold those securities as a principal, that

25  it never owned the proceeds, that it was acting as a broker,

1    not a principal.

2          So when they came into this courtroom, your Honor, and

3    told you that Caledonian Bank and Caledonian Securities owned

4    the securities with lining its pockets with the proceeds by

5    taking advantage of investors in the United States and that the

6    assets they asked your Honor to freeze were the proceeds,

7    ill-gotten gains, they weren't, and they had not been in the

8    possession of the bank for nearly a year.  They could have

9    known this.  They should have known this.  Indeed, I believe

10   they had the documents in their possession that would have made

11   this clear.

12         This is an unusual circumstance.  I fully appreciate

13   that the Second Circuit has narrowly limited the circumstances

14   in which a consent judgment can be objected to successfully,

15   but it didn't close the door entirely.

16         In particular, the Second Circuit in Citibank left

17   open the possibility, specifically said that, look, when, for

18   example, a consent judgment cuts off the right of private

19   litigants to assert claims, that may be against the public

20   interest.  That's our circumstance.

21         THE COURT:  You are not cut off from asserting a

22   claim.

23         MR. WELCH:  Your Honor, we could assert a claim, but

24   under Rule 24 the test is whether as a practical matter, not a

25   legal matter, you are correct.  And the SEC has pointed out

1    that there is not a release that we could assert a claim.  But

2    as a practical matter the value or the existence of that claim

3    is going to be severely impacted by an illusory $25 million

4    judgment jointly and severally liable to a bank that didn't

5    participate in the transaction, that didn't make any money.

6            The Second Circuit left a crack in the door and this

7    is the case.  This is the case where intervention is warranted

8    and objection to the consent order as drafted, frankly, should

9    succeed.  I want to stress that to intervene under Rule

10   24(a)(2), we need to have an interest in this action.  That's

11   intervention as of right, not intervention by commission.  And

12   we do have an interest and that interest is to protect the

13   value of the shares that we hold in trust and that's what we

14   seek to do.  This is not a remote interest.  We have the claims

15   we have today and if your Honor --

16           THE COURT:  Didn't you try to advance that very

17   interest in the Cayman Islands proceeding?

18           MR. WELCH:  Your Honor, the issues there were

19   fundamentally different.  The issue there is whether the

20   liquidator was exercising its business judgment in determining

21   that it made commercial sense for the estate to enter into the

22   settlement.  The standards here are completely different.  The

23   standards under --

24           THE COURT:  Under *Citigroup*, how could this court

25   force the settling parties to alter the decree?

1         MR. WELCH:  It can't, your Honor.  As I understand it,

2    Citigroup gives the Court the opportunity, the thumbs up or

3    thumbs down.  One of the requirements of *Citigroup* is that the

4    Court determines that the consent judgment is in the public

5    interest, that it's fair and reasonable and that it has a

6    factual basis.  None of those have been shown here.  In

7    particular, the public interest.  It's not in the public

8    interest for the SEC to use an illusory $25 million judgment to

9    insulate itself, ensure itself against the liability for its

10   own misconduct.

11        I want to come back to the collateral estoppel issue.

12   In the Cayman proceeding, the issue that the liquidators in

13   their papers point out, the only issue that was decided there,

14   was whether the proposed consent judgment is in the commercial

15   best interests of Caledonian reflected by the commercial

16   judgment of the liquidator.

17        Here this is not a settlement, your Honor.  This is a

18   consent judgment, a judgment.  They are asking this Court to

19   give the stamp of approval and the force of a federal judgment

20   to the terms that they have agreed to.

21        And so as the Second Circuit said in *Citigroup Global*,

22   this Court is not a rubber stamp.  This Court has to make sure

23   that this is in the public interest.  The business judgment of

24   the liquidator does not conform with the public interest.  The

25   business judgment of the liquidator does not mean that the

 1    proposed consent judgment is fair and reasonable.

 2            THE COURT:  What amount of money does Sentinel believe

 3    should be in place in the consent decree instead of 25 million?

 4            MR. WELCH:  I'd like to address that, your Honor.

 5    Thank you for bringing it up.

 6            THE COURT:  I'm giving you only a minute because then

 7    I want to hear from other counsel because we were all very

 8    patient waiting for you.

 9            MR. WELCH:  Your Honor, again, I apologize profusely.

10            We think there was $1.3 million recently.  The parties

11    stipulated to reduce the $7 million fees over to $1.3 million.

12    Frankly, that's the appropriate amount and it shouldn't be

13    joint and several.  It should be $1.3 million against

14    Caledonian Securities, which is the only entity that made any

15    money.

16            THE COURT:  Isn't that exactly what it will be?

17            MR. WELCH:  No, your Honor.  It's $25 million.

18            THE COURT:  But you were also objecting to the amount

19    of money that was frozen, weren't you?

20            MR. WELCH:  Right.  And the parties strategically

21    mooted that issue, which I'm fine with, frankly.

22            THE COURT:  I thought that's what you wanted on that

23    score.

24            MR. WELCH:  That is what we wanted.  But I also think

25    that the consent judgment shouldn't be any more than $1.3

 1   million and it shouldn't be joint and several.  It should be

 2   just against Caledonian Securities, not against the bank.

 3              THE COURT:  All right.  I think I have your argument.

 4              MR. WELCH:  Again, I apologize, your Honor.

 5              THE COURT:  Ms. Fitzpatrick.

 6              MS. FITZPATRICK:  Thank you, your Honor.

 7          Your Honor, Sentinel should familiarize itself with

 8   the record of the case in which it seeks to intervene.  It

 9   represented to this Court that there was absolutely no basis in

10   that Caledonian Bank did not participate in the transactions at

11   issue.

12          On the very first day this case was filed the SEC also

13   submitted 1900 pages of documentary evidence supporting its

14   request for an asset freeze.  And in that appendix,

15   specifically on page A173, it shows shares of Swingplane

16   Ventures being issued in certificates in the name of Caledonian

17   Bank.

18          Similarly, with respect to another security that was

19   sold in an unregistered distribution during an active pump and

20   dump, Goff, at page A368 of the appendix submitted on the very

21   first day of this case, it shows 8,750,000 shares of Goff being

22   registered in the name of Caledonian Bank Limited.

23          And similarly on page A634, the SEC submitted evidence

24   that shares of Norstra, yet another unregistered distribution

25   Caledonian participated in during an active pump and dump where

1    Caledonian's customers magically made millions on securities

2    that it never traded before, those shares were certificated in

3    the name of Caledonian Bank.

4         The SEC has submitted substantial briefing on the

5    factual predicate for this settlement that include new

6    documents as well as documents that were presented to this

7    Court on the very first day of this case.

8         I have no idea what basis counsel for Sentinel has for

9    suggesting that the SEC had those documents on an earlier

10   occasion.  We have represented to the Court exactly how and

11   when we received them.  If they have evidence to the contrary,

12   they should share it and we will do due diligence to see if

13   it's accurate.  But a hypothetical assumption that we have

14   those documents earlier is both unhelpful and almost as

15   speculative as the claims they seek to bring, your Honor.

16        With respect to Caledonian Bank, I would note that in

17   the SEC submission in support of this settlement, which was

18   voluminous and had many exhibits, many of the communications

19   with the clients or e-mails that showed what could be described

20   as a troubling business trend being engaged in by Caledonian

21   security also showed a participant of the individual named as

22   employee No. 2.  He was the managing director of the parent

23   company, CGFSI, the company whose interests Sentinel now seeks

24   to stand in the shoes and claims to be the 100 percent

25   shareholder of.

G5KMSECC

```
 1              The managing director of CGFSI responded to an e-mail
 2       about the SEC halting trading in Norstra Security, an
 3       unregistered distribution in which Caledonian traded huge
 4       volumes of shares during a pump-and-dump scheme.
 5              The managing director of CGFSI responded to an e-mail
 6       about how they better get an SEC insider on the payroll because
 7       this Norstra thing looks bad.  And then they continued to
 8       execute the orders of the same clients in a subsequent pump and
 9       dump, an unregistered distribution that was done with the
10       Zumoni Company.
11              Your Honor, the idea that Caledonian Bank has no
12       liability here is frankly rebutted by the documents that were
13       submitted on the first day of this case, and Sentinel has not
14       referenced a single payment has happened after the first week
15       of this case.  In fact, there is a new complaint in this
16       matter, an amended complaint.  And Sentinel has not identified
17       a single allegation in the amended complaint that is
18       inaccurate.  So it is completely unclear how it would be
19       prejudiced by the settlement of this case.
20              Moreover, the idea that the SEC is engaging in an
21       enforcement action and a settlement to whitewash and insulate
22       its own conduct is equally ridiculous, your Honor.  The terms
23       of which they complain are standard terms and all SEC consent
24       decrees about what litigants can and cannot say when they
25       settle an action, and we can provide examples if your Honor
```

1    would like.  I know your Honor has entered several such decrees

2    in the past.

3         Your Honor, the disgorgement number here was

4    extensively briefed and, once again, Sentinel should

5    familiarize itself with the record of action in which it seeks

6    to be a party.

7         Your Honor ruled on a motion to dismiss by Verdmont

8    which asked your Honor to dismiss any claim for disgorgement

9    above commissions.  And your Honor correctly recognized that

10   disgorgement is an area of broad discretion and many factors

11   may make that appropriate here to impose disgorgement beyond

12   commissions.  Factors such as giving the proceeds back to a

13   client, which has occurred here.  In fact, factors such as the

14   active participation and assistance in the unregistered

15   distributions that is shown by the communications attached to

16   the SEC's memorandum in support of this settlement.

17        25 million represents a compromised number, your

18   Honor.  In litigation the SEC would seek full proceeds and ask

19   this Court to impose a penalty.  But settlements reflect

20   compromise.  Caledonian took the position that it was 1.3

21   million.  We took the position that the appropriate number was

22   in excess of more than 30 million.

23        There is legal support for that number, including this

24   Court's own opinion in this case in the recent *Gibraltar*

25   opinion, also in the Southern District of New York, as well as

1    the reasoning behind the Second Circuit's opinion in

2    *Contorinis*.  Rather than look at any of those cases or this

3    Court's own opinion on the motion to dismiss that Verdmont

4    filed, Sentinel simply assumes that the settlement is illegal

5    because there is a $1.3 million dollar cap, your Honor.

6         Your Honor, Sentinel likes to quote criticisms that

7    have already been lobbied against the SEC and then say that it

8    is in the public interests that it be permitted to intervene to

9    criticize the SEC.  Those criticisms are already in a public

10   opinion that has been issued by this Court.

11        What Sentinel expects to add to that dialogue months

12   later, when the parties have worked to resolve that action, is

13   extremely unclear.  Sentinel claims to want to submit a brief

14   in which it criticizes the settlement.  It has submitted a

15   letter and a motion to intervene in which it criticized the

16   settlement.

17        It has now appeared before this court twice to

18   criticize the settlement and its purported inaccuracies, such

19   as that Caledonian Bank did not do anything, do not survive any

20   scrutiny of the record.  Indeed, the declaration of

21   Mr. Orr-Depner that they submitted in support of these

22   purported factual inaccuracies is itself false because it

23   claims the Caledonian Bank played absolutely no role in these

24   transactions when the certificates were issued for the stock in

25   Caledonian Bank's name for several of these shares, millions of

1    these shares.

2            I would also note that there are dozens, if not more,

3    problematic communications between that Caledonian employee and

4    the client here, Legacy Global, in the Skype messages and

5    e-mails that we attached to our brief in support of the

6    settlement.  They identify one and claim that it was inaccurate

7    because they were bragging about their technology, not trying

8    to assist a pump and dump.  But that very technology is what

9    allowed the shares to be filtered to different market makers in

10   the United States, different broker dealers in the United

11   States so that the red flags of matched sales and purchases by

12   identical clients in the same stocks, with volume exploding,

13   when they have never traded before, would not be as likely to

14   be caught by those broker dealers' compliance.  Bragging about

15   that technology is actually bragging about Caledonian's ability

16   to assist the quick implementation of an unregistered

17   distribution.

18           Your Honor, we believe the $25 million figure

19   reflected in this disgorgement is the appropriate figure and it

20   is the appropriate figure for programmatic reasons to signal to

21   others what they can expect in terms of disgorgement in an SEC

22   enforcement action if they engage in this sort of brazen

23   conduct, four simultaneous, enormous unregistered

24   distributions, your Honor.

25           The amended complaint here reflects a repeat violator

G5KMSECC

 1    of Section 5 and the $25 million figure is intended to reflect

 2    that, to reflect that and its deterrent value, to reflect what

 3    the SEC will seek when it does enforce the securities laws.

 4    Because the public interest discussed in Citigroup is not the

 5    public interest of trusts with unknown beneficiaries and

 6    tangential connections to corporations they have placed in

 7    liquidation.  It is the interest in the enforcement of the

 8    securities laws by the SEC.  That is the governing public

 9    interest and the SEC, as noted by the Second Circuit in

10    *Citigroup*, is politically accountable if it does not act in

11    that interest.  There is absolutely nothing Sentinel can add to

12    that discussion and there is no reason that Sentinel should be

13    appointed as a champion of that public interest when all it has

14    done to date is quote things that are already in the public

15    record.  They are adding nothing to the debate.  They are doing

16    nothing but unduly delaying the resolution of a case and

17    imposing additional litigation costs and burden on the SEC and

18    Caledonian.  The law favors consent decrees and it disfavors

19    intervention in SEC cases.

20              THE COURT:  What do you make, if anything, of the

21    statements in Section 21(g)'s legislative history that its

22    purpose was to provide an identical exemption from the MDL

23    statute to the exemption for DOJ in antitrust actions?

24              MS. FITZPATRICK:  Your Honor, I read the term

25    consolidate in its plain meaning.  And what intervention is is

1    consolidating another claim so that it can be addressed in one

2    setting.  And what they are seeking to do here is to

3    consolidate the battle they have had with the Cayman Islands in

4    terms of who speaks for Caledonian and interest in unspecified

5    litigation they have yet to file with what is going to happen

6    here.  I believe that falls within the ambit of the term

7    consolidation in it 21(g).  It says notwithstanding any other

8    law.

9         The statute does have a phrase for multidistrict

10   litigation, but it does not reference multidistrict litigation

11   in a text or explicitly limit itself to multidistrict

12   litigation.  It says notwithstanding any other law, nothing

13   should be consolidated within an SEC action without the SEC's

14   intent.  The intent of that statute was to prevent what

15   Sentinel seeks to do here, which is to unduly delay and

16   complicate public enforcement actions.

17        THE COURT:  If Sentinel has been harmed, does the SEC

18   believe that Sentinel could file an action against the SEC?

19        MS. FITZPATRICK:  Yes.  We have stated in our papers,

20   they are free to file a complaint.  I imagine there will be a

21   very strong motion to dismiss to that complaint on many issues,

22   including standing in sovereign immunity and that may result in

23   protected litigation.

24        Our position is, they should file a complaint and that

25   complaint can be tested in a courtroom by a judge through

1    motions practice if they truly believe they should be harmed.

2         But this unspecified interest that may be hurt by

3    unspecified provisions of the consent decree, it's too

4    indefinite a problem to warrant intervention here.  And the

5    type of litigation we are talking about, the filing of a

6    complaint, the full briefing and argument of a motion to

7    dismiss, waiting for an opinion, there is absolutely no reason

8    to inject that sort of delay into this Court's determination of

9    the propriety of the proposed settlement between the SEC and

10   Caledonian.

11        THE COURT:  Anything further, Ms. Fitzpatrick.

12        MS. FITZPATRICK:  If the Court has no other questions,

13   no, your Honor.

14        THE COURT:  Thank you.

15        Ms. Dale.

16        MS. DALE:  Thank you, your Honor.  I'll try to be

17   brief.

18        We think that Sentinel is trying to do an end run

19   around a number of things in this case; first of all, the

20   Court-sanctioned decision made by the joint official

21   liquidators to enter into the settlement which they deemed to

22   be in the best interests of the estate and the creditors,

23   namely, entering into a settlement that requires Caledonian to

24   pay nothing, no fines, no penalties.  We also think they are

25   trying to do an end run around the 1400 creditors of CBL and

G5KMSECC

 1    CSL who did not object to the settlement; also the liquidation

 2    committee of CBL who approved the settlement.

 3            We think they are trying to do an end run around the

 4    Cayman court's decision after having heard these same

 5    objections that it raises here, and the Cayman Court rejected

 6    those and approving the joint official liquidators entering

 7    into the consent agreement.

 8            They are also trying to do an end run around the

 9    liquidation process that they actually put into motion in the

10    Cayman Islands.  Sentinel is the parent of the parent of CBL

11    and CSL.  Their immediate subsidiary is CGFSI.  That company

12    was put into voluntary liquidation by Sentinel in 2015, and

13    they agreed to appoint the joint official liquidators of CBL

14    and CSL as the joint official liquidators of CGFSI.  They have

15    now ceded control of CGFSI in the Cayman Islands to the

16    liquidators who are the same liquidators as CBL and CSL.

17            Having started that process, now they are trying to

18    change the exact structure that they put into place and trying

19    to take back some level of controls, which has been

20    relinquished and then rejected by the Cayman court.

21            Finally, in terms of what we think they are doing an

22    end run around is that we are the parties here.  CBL and CSL

23    are the parties here.  Under *Citigroup* we have the discretion

24    to enter into the settlement in the business judgment of the

25    joint official liquidators if it makes sense, and it does.

1        If they were allowed to intervene, what would that

2   accomplish?  It would upset a settlement agreement.  It would

3   potentially stop the remaining distribution of assets to the

4   creditors.  It would likely force the joint official

5   liquidators to put more money aside because the Court, as you

6   said, can't compel the parties to renegotiate the terms of the

7   consent agreement.  If the SEC is not willing to do that, then

8   we are facing a litigation again with a potential liability of

9   up to perhaps $76 million or more.  And why would we be doing

10  that?  To litigate a speculative claim that CBL and CSL are not

11  intending to litigate?  This consent agreement judgment does

12  not preclude Sentinel if they have a direct claim from bringing

13  it.

14        THE COURT:  Suppose that the issue, if you will, that

15  Sentinel wants to raise is whether the consent decree is fair

16  and reasonable to the public.  How is that addressed by the

17  Cayman proceeding that focused on the commercial interests of

18  the creditors?

19        MS. DALE:  Your Honor, Sentinel is not wrapping itself

20  in the public interest here.  It is not doing what's right for

21  the interests of the American public.  And so if that's what

22  they are trying to say they are doing, that's I think a

23  fallacy.

24        And in the Cayman court the interest of the public was

25  the creditors of CBL and CSL and that was the focus of the

 1   Cayman court consideration of Sentinel's proposals and

 2   objections down there.

 3           But Sentinel is only trying to protect Sentinel's

 4   interests here.  I think it's just disingenuous for them to say

 5   that they are trying to take on the mantle of the public

 6   interest in this situation.

 7           Your Honor, if I have a few more minutes.  Sentinel,

 8   what they are asking for has been very confusing and

 9   inconsistent and in their own words they said that they want to

10   intervene to "preserve its ability as a practical matter to

11   assert claims directly or derivatively on behalf of

12   Caledonian."  They want to "protect the public interest in

13   holding the government -- in this case, the SEC -- accountable

14   for its conduct," "to compel the parties to address" certain

15   issues relating to the SEC's conduct.  But none of these

16   issues, none of these interests is sufficient in the context of

17   a motion to intervene and that's what we are here on.  It

18   should be denied.

19           With respect to the direct claim that Sentinel

20   proposes to bring, if it has one, it can bring it.  There is no

21   release.  The consent judgment reads on CBL and CSL only.

22           There is some flip-flopping going on in terms of the

23   remedy that they have been seeking.  On April 12 they told your

24   Honor that they wanted a settlement that was in the public

25   interest and damages for itself, to the extent they are

1    available from the SEC.  The proposed complaint and

2    intervention seeks, among other things, an order rejecting the

3    settlement and an award to Caledonian of all damages

4    proximately caused by the freeze order.  Further inconsistency,

5    they say in their reply, footnote 1, that they are not alleging

6    a claim for the loss of its equity interest, so we are not sure

7    exactly what this direct claim relates to.

8              With respect to perchance bringing a derivative claim

9    on behalf of CBL and CSL, under our understanding of Cayman

10   law, which they have not refuted in their papers, is that they

11   don't have a derivative claim to bring.  They are not a

12   shareholder of CBL or CSL but rather the shareholder of the

13   shareholder.  They are not entitled to bring a derivative claim

14   under U.S. law, but under Cayman law the rights of the

15   shareholders here, CBL, CSL --

16             THE COURT:  The court reporter is not as invested in

17   this case as all of us are.  Give him a little slack,

18   especially on a Friday afternoon after 4:00.

19             MS. DALE:  It was CBL, CSL, CGFSI, and Sentinel.  They

20   are all Cayman Islands registered entities and therefore under

21   the internal affairs doctrine the Cayman Islands law is what's

22   going to determine the rights of the shareholders.  So we

23   submitted an affidavit from the Cayman Islands lawyer --

24             THE COURT:  Would you agree that the substantive law

25   with respect to collateral estoppel in this case would also

1   emanate from the Cayman Islands, not federal law here, because

2   it was the Cayman Islands that was the rendering jurisdiction,

3   and isn't that the way it usually goes in a federal -- let's

4   say in a federal question case where we have state law from a

5   rendering jurisdiction?

6           MS. DALE:  What I would say is that this Court would

7   be giving comity to the decisions of the Cayman court.  I think

8   that's correct, how your Honor is positing it.  I would think

9   though that if someone were to bring an action in the Southern

10  District of New York, if Sentinel were to bring an action, if

11  there was a collateral estoppel emanating from the Cayman

12  Islands court, I think that this Court would do its own

13  analysis though of whether the issues were the same and the

14  issues were litigated fully below.

15          But I think for our purposes, because what was

16  litigated below is the same issue they seem to be asserting in

17  this court, collateral estoppel applies and the Court should

18  give comity to the decision of the Grand Court of the Cayman

19  Islands.

20          Your Honor, do you have anything else?

21          THE COURT:  Anything further?

22          MS. DALE:  No.  I'm finished.

23          THE COURT:  Thank you very much, Ms. Dale.

24          Mr. Welch, if you want two minutes to respond, I'll

25  give it to you.

 1              MR. WELCH:  Thank you for indulging me, your Honor.  I

 2       appreciate it.

 3              First of all, let's be absolutely clear.  We want to

 4       submit, to intervene, a brief in opposition to the consent

 5       judgment.  That's it.  Your Honor has the power to limit the

 6       purposes for which we intervene.  That's what we are seeking.

 7       We disagree with the SEC's characterization of those documents.

 8       That's what I want to brief.  They say we just assume that

 9       their $25 million judgment is illegal.  No.  We don't assume

10       it.  That's what we want to brief.  We want to intervene for

11       that purpose.

12              In terms of the public interest, we are not wrapping

13       ourselves in the flag.  *Citigroup Global*, public interest.  A

14       consent decree made to serve the public interest if it barred

15       private litigants from pursuing their own claims independent of

16       the relief obtained under the consent decree.  That's our issue

17       here.  Rule 24 talks about practical impact, not --

18              THE COURT:  How is your claim barred?

19              MR. WELCH:  It's not barred.  I'm concerned about a

20       $25 million setoff for an illusory judgment that's

21       disproportionate for the securities entity and is without a

22       rational basis for the bank.  The SEC didn't say that they

23       wouldn't use it as a setoff and I expect they will.

24              THE COURT:  What about all the certificated shares

25       that were issued to Caledonian Bank?

G5KMSECC

1          MR. WELCH:  Let me call your attention to Exhibit B2

2   to the Welch declaration in support of our moving papers.  It's

3   docket No. 218-2.  This was the first Orr-Depner declaration.

4   And in paragraph 4 it states:  The stock certificates of those

5   companies were registered in CBL's name, but they were held by

6   CBL on behalf of its clients.

7          It's my understanding that the bank was a 25-year-old

8   bank with longstanding relationships with New York and other

9   American institutions and that they wouldn't do business with a

10   securities entity which was a newly formed entity, and

11   therefore it functioned as a bank.  It held the securities in

12   name only, but it was the securities arm that did those

13   transactions.  There was a lot of talk of unduly delaying and

14   bringing claims in this action.

15          Again, all we are asking for is the opportunity to put

16   in a brief to oppose some of the things that were said here

17   today and clarify some of the representations based on what's

18   already been submitted.

19          With respect to comity, comity is for final judgments

20   and collateral estoppel under any law the issues have to be the

21   same.  The issues weren't the same.  The only issue that was

22   resolved down in Cayman is whether it was in the commercial

23   best interest of the estate.

24          Unless your Honor has anything else.

25          THE COURT:  Thank you, counsel.

1           Decision on the motion is reserved.  I intend to

2    decide this matter promptly.

3           I also know that I have an ongoing dispute regarding

4    reimbursement of expenses.  I find that one to be marvelously

5    entertaining and I will resolve it shortly.  If Verdmont were

6    here today, I would resolve it now, but I don't know what

7    planet they are on.

8           Have a great weekend.

9                              o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25