PATRICK R. COSTELLO
DEREK S. BENTSEN
BRIDGET M. FITZPATRICK
ERNESTO G. AMPARO
SECURITIES AND EXCHANGE COMMISSION
100 F Street N.E.
Washington, DC 20549
(202) 551-3982  telephone (Costello)
(202) 772-9245  facsimile
costellop@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

SECURITIES AND EXCHANGE COMMISSION,

                     Plaintiff,

          v.                       Case No. 15-cv-894
                               (WHP)(JLC)

CALEDONIAN BANK LTD.,
CALEDONIAN SECURITIES LTD.,
CLEAR WATER SECURITIES, INC.,
LEGACY GLOBAL MARKETS S.A., and
VERDMONT CAPITAL, S.A.

                     Defendants.
_____

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT VERDMONT CAPITAL, S.A.'s MOTION TO
<u>VACATE OR MODIFY THE FREEZE OF VERDMONT'S ASSETS</u>**

## **TABLE OF CONTENTS**

Table of Authorities…………………………………………………………………………... ii

A.  Introduction…………………………………………………………………………. 1

B.  Legal Standards for an Asset Freeze…………………………………………………... 2

C.  Verdmont Has Not Demonstrated a Valid Basis for Vacating or Modifying the Asset Freeze for Attorneys' Fees or Otherwise………………………………...…………... 3

D.  Verdmont Has an Additional Source of Assets that Should be Exhausted………………. 8

E.  The Cases Verdmont Cites in its Motion are Inapposite…………………………………. 9

F.  Conclusion…………………………………………………………………………... 10

# **TABLE OF AUTHORITIES**

**Cases**                                                                     **Page**

*SEC v. Bremont*
   954 F. Supp. 726 (S.D.N.Y. 1997)……………………………………………..   4

*SEC v. Callahan,* Case No. 12-cv-1065 (ADS)
   2015 U.S. Dist. LEXIS 178114 (E.D.N.Y. Dec. 24, 2015)…………………….   4

*SEC v. Credit Bancorp. Ltd.*, Case No. 99-cv-11395
   2010 U.S. Dist. LEXIS 20836 (S.D.N.Y. Mar. 8, 2010)……………………….   3, 4

*SEC v. Dobbins*, Case No. 04-cv-0605
   2004 U.S. Dist. LEXIS 6362 (N.D. Tex. Apr. 14, 2004)………………………   7

*SEC v. Dowdell*
   175 F. Supp. 2d 850 (W.D. Va. 2001)………………………………………….   9, 10

*SEC v. Duclaud Gonzalez de Castilla*
   170 F. Supp. 2d 427 (S.D.N.Y. 2001)………………………………………….   9

*SEC v. Private Equity Mgmt. Group, Inc.*, Case No. 09-cv-2901
   2009 U.S. Dist. LEXIS 64724 (C.D. Cal. July 9, 2009)……………………….   4, 7

*SEC v. Stein*, Case No. 07-cv-3125 (GEL)
   2008 U.S. Dist. LEXIS 108604 (S.D.N.Y. Apr. 30, 2008)…………………….   3, 4, 5

*SEC v. Unifund SAL*
   910 F.2d 1028 (2d Cir. 1990)…………………………………………………..   3, 5

*Smith v. SEC*
   653 F.3d 121 (2d Cir. 2011)……………………………………………………   2, 3, 9

**Statutes**

Section 4(a)(3) of the Securities Act, 15 U.S.C. § 77d(a)(3)…………………………..   3

Section 5 of the Securities Act, 15 U.S.C. § 77e……………………………………….   3

A. **Introduction.**

Plaintiff Securities and Exchange Commission ("SEC") files this Memorandum of Law in opposition to Defendant Verdmont Capital, S.A.'s Motion to Vacate or Modify the Freeze of Verdmont's Assets (Dkt. No. 236). As set forth below, Verdmont's motion should be denied.

As a preliminary matter, the SEC responds to what has now become a staple in almost every submission Verdmont makes to the Court, and what unfortunately continues to be a misrepresentation of fact. In her Declaration (Dkt. No. 237) filed in connection with Verdmont's motion, the proposed liquidator, Shamima Bhana, improperly claims – yet again – the reason that Verdmont went into liquidation was because of the SEC's alleged misrepresentations at the outset of this case and the ensuing asset freeze of Verdmont's customer accounts located in the United States (*Id.* at ¶ 7). And yet again, Ms. Bhana fails to acknowledge what Verdmont actually told the Panamanian securities regulator (SMV) in its liquidation filing:

> As is well known by the [SMV], in February of this year [sic] the SEC commenced an investigation into Verdmont and other financial entities based on transactions by a handful of investors in securities of four issuers, which investigation temporarily affected the clients of these institutions and permanently affected their reputation.
>
> As a result of this unfortunate situation, Verdmont has lost a large part of its correspondent and client relations and thus its capacity to generate new business.

(*See* Verdmont's Liquidation Filing dated January 11, 2016.)[1]

Importantly, Verdmont did not tell the SMV the asset freeze was the impetus for the liquidation, nor could it say such a thing. Indeed, as the Court is aware, the SEC and Verdmont stipulated to a number of injunctions and asset freezes in this matter. (*See*, *e.g.*, Dkt. Nos. 5, 21, 49, 57, 59, 97). Verdmont elected voluntarily to enter into each of these stipulations and

---

[1] The SEC can provide the original Spanish version of the liquidation filing upon the Court's request.

.

modifications, which is why its current attempt to portray every subsequent development as an outgrowth of alleged SEC misconduct is puzzling.[2]  And in each instance, Verdmont *consented* to the asset freezes in multiple amounts in this case.  (*See*, *e.g.*, ECF Nos. 5, 21, 49, 57, 59). Moreover, Verdmont's liquidation occurred well over a year after the SEC sought and obtained the initial asset freeze and at a time when the *only* amounts presently subject to the freeze are equal to what Verdmont claims are its commissions on the relevant transactions.[3]  This is a reasonable asset freeze, which should remain in effect because Verdmont has not and cannot satisfy the standards for vacating or modifying the freeze.

**B.    Legal Standards for an Asset Freeze.**

The Second Circuit has recognized that district courts have equity jurisdiction to address violations of the federal securities laws and the concurrent power to order all equitable relief necessary under the circumstances. *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011).  Such relief includes an asset freeze, which is "designed to preserve the status quo by preventing the dissipation and diversion of assets." *Id.*  To secure and maintain a freeze of the defendant's assets, the SEC need only show either that an inference may be drawn the defendant has violated

---

[2]    Indeed, Ms. Bhana's accusation that the SEC engaged in "misrepresentations to the Court" (Dkt. No. 237 at ¶ 5) is both false and inappropriate.  The attorneys who worked on this matter have submitted detailed declarations that delineate how and when they learned certain facts.  Verdmont's *conjecture* that, contrary to the statements in those declarations, the SEC engaged in intentional misconduct is unnecessarily inflammatory.

[3]    In his deposition on April 7, 2016, one of Verdmont's principals, Taylor Housser, testified the $239,955 in frozen funds is attributable to trading in the relevant securities only by three of Verdmont's customers, Lornex, Nautilus and Bamfield. (*See* Ex. A, Excerpts from the April 7 Deposition of Taylor Housser, at 50:7-18.)  It does not account for trading by any other customers. (*Id.*) In addition, Housser testified Verdmont charged a total commission, but then paid portions of it to, among others, the executing broker in the United States and the Verdmont account advisor whose client placed the trade, which portions then were subtracted from Verdmont's total commission to arrive at the $239,955 amount. (*Id.* at 46:19-23; 48:9-13; 49:8-18.)  Thus, the amount essentially represents Verdmont's net revenue on the trades rather than the total commissions actually charged.

the federal securities laws, or a likelihood of success on the merits. *Id.* at 128. This is in contradistinction to the higher standard the SEC must meet when seeking a preliminary injunction, which requires the agency to make a substantial showing of the likelihood of success on the merits and a risk of future repetition. *Id.*

Here, the SEC has satisfied its burden in both respects. The SEC submits the Court already has determined an inference may be drawn as to Verdmont's violations of the federal securities law violations when the Court denied Verdmont's motion for judgment on the pleadings (Dkt. No. 140). And for the reasons set forth in the SEC's Memorandum of Law in Opposition to Verdmont's Motion for Summary Judgment, which is being filed contemporaneously herewith, Verdmont cannot meet the standards for the dealer's exemption under Section 4(a)(3) of the Securities Act, 15 U.S.C. § 77d(a)(3). Accordingly, the SEC has demonstrated a likelihood of success on the merits, not only in conjunction with its prima facie case for the unregistered sale of securities under Section 5 of the Securities Act, 15 U.S.C. § 77e,[4] but also as to the registration exemptions Verdmont has invoked.

C.  **Verdmont Has Not Demonstrated a Valid Basis for Vacating or Modifying the Asset Freeze for Attorneys' Fees or Otherwise.**

It is improper to vacate or modify an asset freeze to pay expenses (attorneys' fees or otherwise) when doing so would result in insufficient funds remaining to satisfy a disgorgement remedy that might be ordered if a violation of the federal securities laws is established. *See*, *e.g.*, *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990); *SEC v. Credit Bancorp. Ltd.*, Case No. 99-cv-11395, 2010 U.S. Dist. LEXIS 20836, at *6 (S.D.N.Y. Mar. 8, 2010); *SEC v. Stein*, Case

---

[4] The Court already has determined the registration requirement under Section 5 is transaction-specific (*see* Dkt. No. 140 at 23), and it is not subject to dispute in this matter that Verdmont's sales of the subject securities in the market were not registered. In addition, the SEC already submitted substantial documentation of Verdmont's violations of Section 5 in connection with its initial TRO submission. (Dkt. No. 75).

No. 07-cv-3125 (GEL), 2008 U.S. Dist. LEXIS 108604, at *2-3 (S.D.N.Y. Apr. 30, 2008). In addition, in order to release the funds, the defendant must show they are untainted and unconnected to the violations at issue in the case. *Stein*, 2008 U.S. Dist. LEXIS 108604, at *2. *See also Credit Bancorp*, 2010 U.S. Dist. LEXIS 20836, at *9-10.

As a general matter, it is well-established that civil and criminal defendants have no right to use frozen funds to pay their counsel. *Credit Bancorp Ltd.*, 2010 U.S. Dist. LEXIS 20836, at *6. This is true even if the funds are the only way a defendant would be able to hire the attorney of her choice. *Id.* at *9. The Southern District of New York has artfully summarized the issue: "Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime." *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997). And where, as here, the frozen assets do not exceed the potential disgorgement amount, vacating or modifying the freeze is improper. *Id.* Significantly, "[c]ourts have repeatedly denied requests by defendants to lift asset freezes to obtain funds for attorneys' fees where the frozen assets fall short of the amount necessary to compensate the victims of their fraud schemes." *SEC v. Callahan*, Case No. 12-cv-1065 (ADS), 2015 U.S. Dist. LEXIS 178114, at *4 (E.D.N.Y. Dec. 24, 2015); *see also SEC v. Private Equity Mgmt. Group, Inc.*, Case No. 09-cv-2901, 2009 U.S. Dist. LEXIS 64724, at *6 (C.D. Cal. July 9, 2009) (denying request to modify freeze to pay attorneys' fees and noting "the importance of preserving the integrity of disputed assets to ensure that such assets are not squandered by one party to the potential detriment of another.")

Ultimately, the focus of the inquiry is equity. The defendant must show the "disadvantages and possible deleterious effect of a freeze" outweigh the considerations justifying

the need for the freeze, including assurance an eventual disgorgement judgment may be satisfied. *Stein*, 2008 U.S. Dist. LEXIS 108604, at *3.

In this case, it is clear Verdmont has not met the requirements to vacate or modify the freeze, either to pay its attorneys or for other purposes. First, the amount frozen, $239,955, either is (i) woefully inadequate to satisfy an eventual disgorgement judgment consisting of proceeds in the tens of millions of dollars, which is a potential amount the Court may elect to impose in this case (*see* Dkt. No. 140 at 31); or (ii) exactly equal to the amount of commissions Verdmont claimed it earned on the customer trades in this case, all of which it would be required to disgorge if the SEC prevails. In either event, vacatur or modification of the frozen amount would result in insufficient funds remaining to satisfy any disgorgement remedy the Court would impose. *Unifund*, 910 F.2d at 1041.

Second, Verdmont cannot demonstrate the frozen funds are untainted and unconnected to the violations at issue. Instead, as noted above, Verdmont already has conceded the funds are commissions earned on the unregistered sales of securities Verdmont made on behalf of its customers. If those sales do not qualify for an exemption under Section 4 of the Securities Act (and for the reasons set forth in our Memorandum of Law in opposition to Verdmont's Motion for Summary Judgment, they do not), then the funds are per se tainted and connected to the violations of Section 5 of the Securities Act.

And third, on all available facts, the equities weigh strongly against releasing any of the frozen funds. Verdmont claims its proposed liquidator, Shamima Bhana, requires the full $239,955 to complete the liquidation, including the costs of defending this case. Notably, Verdmont's liquidation has yet to be recognized by a U.S. Court (as was the case with Caledonian). As part of her Declaration, Ms. Bhana submitted a claimed budget (Dkt. No. 237-

4) which purports to show Verdmont running out of money by the end of last month.[5] But Ms. Bhana fails to provide any detail or support for the various entries she itemizes in the budget for the months of May-September 2016 (Dkt. No. 237-4). For example, she identifies a "liabilities payment" in May in the amount of $423,038 but fails to explain what that is. She also fails to delineate why the "monthly regular expenses" increases from $11,273.72 in May to over $21,000 for the remaining months. Furthermore, the claimed budget Verdmont originally submitted to the Court (Dkt. No. 203 at 4) in connection with its request for a prehearing conference on its motion to vacate the freeze (which budget was as of February 28, 2016) revealed total cash in the amount of $768,290.44. By contrast, the budget Ms. Bhana included in her Declaration, which was as of May 12, 2016, shows cash in the amount of $335,603.14 (Dkt. No. 237-4.) The deficit between the cash amounts is $192,687. According to the first budget, expenses for the month of April 2016 totaled $378,790.40, and there were disbursements for March of $72,302.15. If the deficit for the cash amounts is attributable to expenses for March and April (which would be the intervening months between submission of the two budgets), then the SEC questions how the $192,687 deficit was sufficient to cover over $450,000 in expenses for those two months.

But perhaps the most substantial omission from her Declaration is an explanation as to why the single largest expense of "legal fees" in the monthly amount of $85,000 is necessary or reasonable in these circumstances. Curiously, of that amount, $50,000 per month is being set aside to pay Carter, Ledyard & Milburn in this litigation. Adding up the months of May-September, according to the budget, will result in payments to Carter, Ledyard & Milburn totaling $250,000 (*i.e.*, the entirety of the frozen funds). At these rates, all available funds will

---

[5] The budget contains no plan to pay creditors or even an indication that creditor payments are contemplated. For the reasons detailed in this Memorandum of Law, there is no reason in this case for Verdmont to prioritize its own employees and attorneys over creditors when it comes to the frozen funds.

be spent on legal fees well before the case is resolved (assuming Verdmont's Motion for Summary Judgment is denied). Thus, neither relevant goal will be accomplished: (i) Verdmont will not have representation for the duration of this case; and (ii) more importantly, there will be absolutely no money left to satisfy an eventual SEC judgment.

Regardless, it appears that payment of all of the frozen funds to cover legal fees has been the plan for quite some time. Indeed, as counsel for Verdmont unabashedly stated at the hearing before Judge Cott on March 16, 2016:

> I also want to point out, your Honor, that we have voluntarily agreed to deposit and freeze $240,000. We are going to need access to that $240,000 -- my firm is going to need access to that $240,000 so that we can continue to represent Verdmont in these protracted proceedings.

(Ex. B, Excerpt from the Transcript of the March 16 Hearing before Judge Cott, at 37:2-6.)

In addition, Verdmont has provided no basis to allow the Court to assess whether the amount of attorneys' fees requested is reasonable, or whether the attorneys have "already been paid, for example, by retainer." *SEC v. Dobbins*, Case No. 04-cv-0605, 2004 U.S. Dist. LEXIS 6362, at *7 (N.D. Tex. Apr. 14, 2004); *see also Private Equity Mgmt.*, 2009 U.S. Dist. LEXIS 64724, at *8 (denying request to modify freeze to pay attorneys' fees because defendant, *inter alia*, provided only generalized statements about the case rather than demonstrating why the fees were reasonable). Moreover, counsel should not be allowed priority over Verdmont's other creditors. The Court therefore should be circumspect of the request for $50,000 a month on the part of Verdmont's counsel.[6]

---

[6] This is to say nothing about the other $35,000 per month Verdmont proposes to pay its two other outside counsel firms.

**D.      Verdmont Has an Additional Source of Assets that Should be Exhausted.**

Assuming that Verdmont had met the legal standards to modify or vacate the freeze (and for the reasons noted above in Sections B and C, Verdmont has not), there is an additional source of assets that Verdmont should be required to exhaust before any vacatur or modification may be made.

At his deposition in April, Verdmont's principal, Glynn Fisher, testified Verdmont paid out $600,000 in dividends in 2015. (Ex. C, Excerpts from the April 6 Deposition of Glynn Fisher, at 113:15-17.) Almost 80% of that was paid to Mr. Fisher and his co-principals, Taylor Housser and Matthew Hocker. (*Id.* at 113:20-22; 54:15-17; 55:2-11.) Mr. Fisher did not recall when in 2015 the dividends were paid, but stated they came from "retained earnings."[7] (*Id.* at 98:15-20.) Mr. Housser testified at his deposition that he believed the dividends were paid in the first half of 2015. (Ex. D, Excerpts from the April 7 Deposition of Taylor Housser, at 41:10-17.) Mr. Housser confirmed Verdmont paid out dividends to its principals on a yearly basis as authorized by the company's board of directors (which coincidentally was comprised of himself, Mr. Fisher and Mr. Hocker). (*Id.* at 42:6-9, 13-24.) The payment of these dividends appears to be consistent with Mr. Fisher's decision to move his own customer accounts, Creekside Capital and Satori Investments, to a different brokerage before Verdmont filed for liquidation earlier this year. Indeed, Mr. Fisher testified that he "start[ed] to see the writing on the wall in terms of where Verdmont was going and how much longer it would last." (Ex. C, at 144:12-16.)

In her Declaration, Ms. Bhana makes no mention of these distributions as potential assets for Verdmont. Given the timing of these distributions, and Mr. Fisher's comment about seeing

---

[7] It is possible these dividends were paid after the SEC obtained its initial asset freeze on February 6, 2015, lending further support to the SEC's argument, as noted above in Section A, that the initial asset freeze did not cause Verdmont's liquidation.

the handwriting on the wall, the SEC submits Ms. Bhana should be required, on behalf of Verdmont, to provide a detailed accounting to the Court of when these payments were made and any other payments Verdmont made to its principals or employees during the course of this litigation.  *See*, *e.g.*, *Smith*, 653 F.3d at 125 (rejecting modification to an asset freeze when alternative assets are available).  Ms. Bhana should also describe what attempts, if any, are being made to recapture these funds in the Panamanian liquidation proceeding.

**E.      The Cases Verdmont Cites in its Motion are Inapposite.**

Neither case Verdmont cites in its motion supports vacating or modifying the asset freeze here.  In *SEC v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427 (S.D.N.Y. 2001), the court actually rejected the defendants' requested modification to the freeze order to pay living expenses, given the lack of sufficient proof of financial condition and the presence of additional sources of income.  As for the decision to allow a modification for payment of attorneys' fees, the court noted the SEC had not met its burden on its insider trading claim to satisfy the inference of a securities law violation the court initially found at the time the original freeze was entered, and summary judgment subsequently was entered in favor of the defendants.  *Id.* at 430.  Here, on the other hand, as noted above, the SEC has met its burden to satisfy its claim under Section 5 of the Securities Act, and Verdmont cannot prevail on its motion for summary judgment on the registration exemptions.

And in *SEC v. Dowdell*, 175 F. Supp. 2d 850 (W.D. Va. 2001), the defendants requested a modification to the asset freeze to allow them to pay living expenses and attorneys' fees.  As for living expenses, the court found the defendants had no other sources of income and were not seeking "luxuries."  *Id.* at 854-55.  Here, as noted above, the liquidator's declaration contains a number of deficiencies and fails to explain many of the claimed budget amounts and why those

amounts (particularly the excessive attorneys' fees) are reasonable. In addition, Verdmont may have an additional source of income and assets – it could claw back the $600,000 in dividends paid to Messrs. Fisher, Housser and Hocker last year. As for attorneys' fees, the court in *Dowdell* noted very clearly the same would be an improper basis for modification of the freeze where, as here, the defendant, Verdmont, has (i) failed to show the frozen assets are untainted, and (ii) as described above, no matter how the disgorgement amount is calculated, it will equal or exceed the entirety of the frozen funds. *Id.* at 855. Accordingly, both *Duclaud Gonzalez de Castilla* and *Dowdell* are inapposite.

**F.     Conclusion.**

For the reasons set forth above, the SEC respectfully requests the Court deny Verdmont's motion to vacate or modify the freeze of Verdmont's assets.

Dated: Washington, D.C.
　　　　June 15, 2016

Respectfully submitted,

/s/ Patrick R. Costello
Patrick R. Costello
Derek S. Bentsen
Bridget M. Fitzpatrick
Ernesto G. Amparo

Local Counsel:

David Stoelting
Securities and Exchange Commission
Brookfield Place, 200 Vesey Street
New York, New York 20181
(212) 336-0174  telephone
(212) 336-1323  facsimile
stoeltingd@sec.gov

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-5985
(202) 551-3982  telephone (Costello)
(202) 772-9245  facsimile
costellop@sec.gov

## **CERTIFICATE OF SERVICE**

I certify that on June 15, 2016, I electronically filed the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT VERDMONT CAPITAL, S.A.'s MOTION TO VACATE OR MODIFY THE FREEZE OF VERDMONT'S ASSETS using the CM/ECF system, which will send notification of such filing to counsel for Defendants Caledonian Bank Ltd., Caledonian Securities Ltd. and Verdmont Capital, S.A. at the following addresses:

| | |
|---|---|
| Robert J.A. Zito<br>Carter Ledyard Milburn LLP<br>Two Wall Street<br>New York, New York 10005<br>zito@clm.com<br>Attorneys for Defendant<br>Verdmont Capital, S.A. | Sigal P. Mandelker<br>Margaret A. Dale<br>Proskauer Rose LLP<br>Eleven Times Square<br>New York, New York 10036<br>smandelker@proskauer.com<br>mdale@proskauer.com<br>Attorneys for Defendants Caledonian Bank Ltd. and Caledonian Securities Ltd. |

/s/ Patrick R. Costello
Patrick R. Costello