<u>**Declaration of** ▮▮▮▮▮▮▮▮▮▮▮▮▮</u>

I, ▮▮▮▮▮▮▮▮▮▮▮▮▮ declare pursuant to Title 28, United States Code, Section 1746, that:

1. I am over twenty-one years of age and have personal knowledge of the matters set forth herein.

2. I began working with Gregg Mulholland and his associates ("the Mulholland Group") sometime in early 2011, when Mulholland offered me a position doing the paperwork associated with the Mulholland Group's fraudulent stock promotion schemes.

3. In this capacity, I worked with the Mulholland Group until approximately 2013. I lived in one of Mulholland's homes in Huntington Beach, California, while I was doing this work. After 2013, I had intermittent contact with members of the Mulholland Group.

4. I was introduced to Brian De Wit when I was having difficulty finding a broker who would deposit shares of a certain company for me. De Wit, who worked at Legacy Global Markets S.A. ("Legacy Global"), introduced me to an associate who could create offshore International Business Corporations ("IBCs") in whose name I could then deposit my stock at Legacy.

5. I introduced Mulholland to De Wit. After that introduction, De Wit worked closely with the Mulholland Group. The Mulholland Group profited from numerous pump-and-dump penny stock manipulations resulting from promoting and selling these stocks. Mulholland had several brokerage firms that he owned and/or controlled, including Legacy Global and Clear Water Securities, Inc. ("Clear Water").

6. The Mulholland Group used an attorney with the initials L.C. to create shell companies that were registered with the U.S. Securities & Exchange Commission ("SEC"). The initial shareholders of these companies were simply nominees and usually 100% of the

companies' stock ("the float") remained in the control of the Mulholland Group. L.C. told me that he obtained the names of the nominee shareholders from friends in other countries. Because the shareholders were foreigners, it would be harder for law enforcement to ever track them down.

7. The Mulholland Group also used a promoter with the initials J.B. who ran several stock promotion firms, including Awesome Penny Stocks.

8. During the period I worked with the Mulholland Group, Mulholland periodically called me and said that I should keep my eye out for deliveries of packages. I would then receive a package that usually contained the shares representing the entire float for a shell company and other documents that were necessary to transfer the shares into the names of IBCs that were controlled by the Mulholland Group. It was my job to get the stock transferred from the nominee shareholders and deposited at designated brokerage firms in the names of those IBCs, as well as getting the stock certificates reissued in the names of the IBCs or the ultimate sellers, including Caledonian Bank, Caledonian Securities, Ltd. ("Caledonian Securities"), Legacy Global and Clear Water.

9. As part of my role with the Mulholland Group, I determined whether the type of registration for the shell company had SEC reporting requirements that were triggered when a person or entity owned or controlled at least 5% or 10% of the total outstanding shares. I then transferred the shares into the name of approximately 10 different IBCs and was careful to keep each IBC's ownership of shares below the 5% or 10% reporting threshold of the total outstanding shares so they would not be considered insiders of the company.

10. The vast majority of the packages delivered to me contained blank stock purchase agreements for a company, signed by the nominee shareholders. I completed the agreements by filling in the name of the designated IBC as the purchaser, the amount of stock being sold to the IBC, and the purchase price. I then signed the agreement on behalf of the IBC or had the company who created the IBCs sign for the IBCs. No money changed hands in connection with the fake transactions referenced in the stock purchase agreements. The packets frequently contained blank irrevocable stock power agreements that had already been signed by the nominee shareholders. Some of them were notarized by a notary who worked for L.C. On occasions where signatures of the nominee shareholders were missing, I would sign my own name or forge the signature of the nominee shareholder.

11. I sent these agreements to a transfer agent who reissued the shares in the names of the IBCs or the ultimate sellers, such as Caledonian Bank, Caledonian Securities, Legacy Global and Clear Water.

12. At any given time, the Mulholland Group tried to have the total float of stock for a few shell companies on deposit in the names of IBCs at various brokerage firms. When J.B.'s firm had a slot open for promotion of a penny stock, the Mulholland Group would select a shell company to use with the specific promotional opportunity.

13. The Mulholland Group always wanted to control the total float for the shell company that was going to be promoted. The Mulholland Group frequently caused a company's stock to be quoted on the OTC markets, with no immediate intention of selling it, because the stock was perceived as more valuable if it had some trading history.

3

14. The Mulholland Group always tried to spread out its shares on deposit across multiple brokerage firms to further conceal its ownership. I heard Mulholland participate in matched or wash trades in these companies when we worked in offices across the hall from each other.

15. During my time with the Mulholland Group, I deposited shares with Caledonian Securities. I am not aware of the precise distinctions between Caledonian Securities and Caledonian Bank so I refer to them collectively as "Caledonian" in this Declaration. In connection with the stock I deposited on behalf of the Mulholland Group, Caledonian's due diligence was either ridiculous or non-existent. Caledonian's business grew exponentially during the time I worked with them. My main contact was Nathaniel Orr-Depner, who told me that Caledonian Securities was making $1 million per month and that the Mulholland Group was far and away their biggest client. Orr-Depner told me that Caledonian Securities was the most profitable business center within Caledonian and Orr-Depner was promoted within Caledonian while I was working with the Mulholland Group.

16. During my time with the Mulholland Group, they conducted approximately 42 pump-and-dump schemes. I believe that Caledonian acted as a broker on behalf of Legacy, Clear Water, or other entities affiliated with the Mulholland Group in approximately 40 of these promotions. I personally prepared the paperwork transferring the stock certificates into the names of IBCs controlled by the Mulholland Group in connection with approximately 28 of these pump-and-dump schemes.

4

17. Caledonian charged commissions that were well above market rates in the United States. Based on my knowledge of the Mulholland Group, all of the stock sold by the Mulholland Group was sold in coordination with heavy and false promotional activity.

18. I provided Orr-Depner with estimates of when a particular stock would be "a go." Orr-Depner never asked additional questions about what would be "a go" but I was referring to the upcoming pump and dump of the relevant stocks. And the relevant stocks were consistently pumped and dumped after I made the comment that they would be "a go." The Mulholland Group made millions in profits on the penny stocks that were "a go" after being deposited at Caledonian. At Mulholland's insistence, these profits were transferred out of brokerage accounts within approximately 3 days.

19. Caledonian required some trading history for stock of the relevant shell company. As a result, the Mulholland Group engaged in "paint the tape" trades by making a very small deposit of stock (which I referred to as "baby deposits") at a different brokerage firm and then executed a series of small matched trades, while continuing to control the total float of the shell company. These small matched trades opened the door to depositing a large number of shares of the shell company at Caledonian.

20. I frequently told Orr-Depner in advance that millions of shares were going to be issued in Caledonian's name. I then asked the transfer agent to skip the step of certificating stock in the name of the "purchasing" IBCs and to certificate the shares in Caledonian's name instead. I or the transfer agent would then send Caledonian shares that were issued in its own name. In the beginning, Caledonian did not ask me for any back up documentation such as the underlying share purchase agreements, corporate documents for the IBCs, or authorizations for me to act on behalf of the nominal beneficial owners of the IBCs.

5

21. Caledonian later required some documentation for deposits but the paperwork I sent was obviously false. Sometimes, all of the share purchase agreements would be dated the same day with shareholders from different countries using the same notary in the same city. I sometimes intentionally made the paperwork reflect circumstances that were obviously false to see if anyone would notice. Caledonian never challenged the validity of the paperwork I sent them. They never rejected a single deposit of stock that I sent them.

22. I organized the transfer of shares of shell companies named Swingplane Ventures, Inc. ("Swingplane") and Goff Corp. ("Goff") as part of my work for the Mulholland Group.

23. By the time I arranged to deposit Swingplane shares at Caledonian, the Mulholland Group had already sold stock in connection with approximately 12 pump-and-dump schemes at Caledonian. Orr-Depner and his boss, a British national with the initials P.M., attended meetings with De Wit and I. Orr-Depner and P.M. also told me that they had a meeting with the person the Mulholland Group used to create IBCs. Orr-Depner and occasionally P.M. accepted trading instructions from the Mulholland Group in connection with all of these IBCs who – on paper – had different beneficial owners. In all of these meetings, it was apparent to me that both Orr-Depner and P.M. were aware of the Mulholland Group's business model. My conversations with Orr-Depner and P.M. would not have made sense if they did not understand that the Mulholland Group was running pump-and-dump stock manipulations.

24. When I received the packet for Swingplane, it contained close to 100% of the company's float. The company's CEO, Matt Diehl, was taking direction from a member of the

6

Mulholland Group. I drafted the issuer representation letter for Swingplane and Diehl signed it.

25. I sent a memorandum to Empire Stock Transfer ("Empire") from "Corporate Services" that directed Empire to re-register the Swingplane certificates in the names of Legacy Global, Clear Water, and Caledonian Bank. "Corporate Services" is a company I made up so the paperwork would look more official. I attached a Board of Directors ("Board") resolution from Swingplane to the request that I sent to Empire. Diehl provided me with the Board resolution.

26. I also did paperwork for the Mulholland Group in connection with the promotion of Goff. Mulholland told me that Goff was a shell company that L.C. purchased in the secondary market. If there was an opportunity to do a promotion with J.B. and none of the Mulholland Group's shell companies were ready, they would buy a shell company from a third party. I believe Goff was purchased from a Canadian with whom the Mulholland Group was working more and more during the last few months of my time there (hereinafter, "the Canadian"). I believe the Canadian controlled a company called Celtic Consulting.

27. Mulholland advised me that a package was coming and I received a package for Goff. The package I received contained stock certificates and irrevocable stock powers for the nominee shareholders. I understood at the time that none of the foreign shareholders listed on the stock certificates were bona fide investors in Goff. The Goff documents in Alan Gahan's name did not contain a signature so I just signed my own name on the irrevocable stock power agreement. The majority of the other irrevocable stock power

7

agreements that I received for Goff contained signatures so I just filled in the number of shares, the stock certificate number and the Issuer name on the forms.

28. I took the Goff irrevocable stock power agreements to Bank of America for medallion guarantees, which was a requirement of the transfer agent. I told the employee at Bank of America that I was acting on behalf of the shareholders and they stamped medallions on all of the irrevocable stock power agreements for me, thereby certifying the signatures.

29. I am familiar with the allegation in the SEC Complaint in this case that I forged the medallion guarantees. That is not correct. I did not forge the medallion guarantees. However, I did tell Bank of America that I was empowered to act on behalf of the shareholders (none of whom I had ever spoken to or met).

30. When I was accounting for the Goff shares, I noticed that we were short some shares and that I did not have 100% of the float. I spoke to Mulholland about this, and he told me not to worry because the remaining shares were at Verdmont. Mulholland told me that L.C. had the shares that were at Verdmont. I know that L.C. had his own IBCs but I do not know the names of his IBCs. I knew based on conversations with L.C. that he sometimes preferred to do his trades at Verdmont.

31. I came into contact with Verdmont through L.C. who liked to use them as a broker. I spoke to Glynn Fisher at that time. I told Fisher that we would use about 10 IBCs that were incorporated in Belize if we did any trades at Verdmont. Fisher said that would be fine but also offered to introduce me to a Panamanian lawyer in case I wanted to create any IBCs in Panama. At the time of this conversation, I was a Canadian citizen living in the United States.

8

32. I am familiar with Nautilus Growth Fund, Inc. ("Nautilus"). It is one of the IBCs that the Mulholland Group controlled.

33. Sierra Growth is also an IBC controlled by the Mulholland Group. I signed three share purchase agreements for Goff as both the purchaser (Sierra Growth) and the sellers (three nominee shareholders).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 14th, 2016



9