Robert J.A. Zito
Mark R. Zancolli
Theodore Y. McDonough
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
Tel. (212) 732-3200
Fax: (212) 732-3232
*Attorneys for Verdmont Capital, S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
SECURITIES AND EXCHANGE              :
COMMISSION                           :
                                     :  Civ. No. 15 CV 894 (WHP) (JLC)
                Plaintiff,           :
                                     :
        v.                           :
                                     :
CALEDONIAN BANK LTD.,                :
CALEDONIAN SECURITIES LTD.,          :
CLEAR WATER SECURITIES, INC.,        :
LEGACY GLOBAL MARKETS S.A., and      :
VERDMONT CAPITAL, S.A.,              :
                                     :
                Defendants.          :
------------------------------------------------------------ x

**REPLY MEMORANDUM OF LAW OF DEFENDANT
VERDMONT CAPITAL, S.A. IN FURTHER SUPPORT OF ITS MOTION FOR
<u>SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56</u>**

7805912.10

**TABLE OF CONTENTS**

PAGE(S)

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

POINT I    SECTION 4(A)(3) EXEMPTED THE SUBJECT TRANSACTIONS ................... 2

POINT II   VERDMONT'S LIMITED ROLE AS A DEALER IS SPECIFICALLY
           EXCLUDED FROM THE STATUTORY DEFINITION
           OF "UNDERWRITER" ............................................................................................. 6

CONCLUSION ........................................................................................................................ 11

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*In the matter of Quinn & Co.,*
   44 S.E.C. 461, 1971 WL 120484 (1971) ................................................................................ 9

*In re Biozoom, Inc. Securities Litigation,*
   No. 1:14-CV-01087, 2015 WL 5017018 (N.D. Ohio Aug. 20, 2015) .................................... 3

*In re Laser Arms Corp. Sec. Litig.,*
   794 F. Supp. 475 (S.D.N.Y. 1989) ........................................................................................ 3

*Kubik v. Goldfield,*
   479 F.2d 472 (3d Cir. 1973) .................................................................................................. 3

*Quinn & Co. v. S.E.C.,*
   452 F.2d 943 (10th Cir. 1971) .............................................................................................. 7

*SEC v. N. Am. Res. & Dev. Corp.,*
   280 F. Supp. 106 (S.D.N.Y. 1968), *vacated in part on other grounds,* 424 F.2d 63 (2d Cir. 1970) ...................................................................................................................................... 5

*Sowell v. Butcher & Singer, Inc.,*
   1987 WL 10712 (E.D.Pa. May 13, 1987) ............................................................................. 3

**OTHER AUTHORITIES**

LOFCHIE, LOFCHIE'S GUIDE TO BROKER-DEALER REGULATION (2005) ........................................ 5

## PRELIMINARY STATEMENT

Defendant Verdmont Capital, S.A. ("Verdmont") respectfully submits this memorandum of law, in reply to the SEC's memorandum of law in opposition to Verdmont's motion for summary judgment (the "SEC Mem."), pursuant to Fed. R. Civ. P. 56, and in further support of that motion.

Verdmont's opening papers demonstrated that Section 4(a)(3) of the Securities Act (the "Dealer Exemption") exempted the securities transactions described in the Amended Complaint because each of the sales in question took place more than 40 days after the securities were "bona fide *offered* to the public" (emphasis added). Every decision on this point uniformly holds that a security is "bona fide offered to the public" on the date on which the security is listed or quoted in the so-called "pink sheets," currently, the OTC Bulletin Board or OTC Link (collectively "OTCBB").[1] Therefore, the Amended Complaint must be dismissed.

---

[1] The term "pink sheets" refers to the NASDAQ paper quotation system in place prior to the institution of the electronic systems currently in place. For all purposes, the "pink sheets" means the electronic quotation system known as the OTC Bulletin Board and OTC Link. "The OTC Bulletin Board (OTCBB) is an electronic inter-dealer quotation system that displays quotes, last-sale prices, and volume information for many OTC equity securities that are not listed on a national securities exchange. Securities quoted on the OTCBB include domestic, foreign and American depository receipts (ADRs)....OTC Link LLC (OTC Link) is an electronic inter-dealer quotation system that displays quotes, last-sale prices, and volume information in exchange-listed securities, OTC equity securities, foreign equity securities and certain corporate debt securities. In addition to publishing quotes, OTC Link provides, among other things, subscribers the ability to send and receive trade messages, allowing them to communicate for the purpose of negotiating trades. All subscribers to OTC Link are broker-dealers that are members of FINRA. Subscribers are permitted to quote any OTC equity security eligible for quoting under Exchange Act Rule 15c2-11 or the applicable exemptions to Rule 15c2-11. OTC Link does not require companies whose securities are quoted on its system to meet any eligibility requirements. With the exception of some foreign issuers, the companies quoted on OTC Link tend to be closely held, very small and/or thinly traded. Most issuers do not meet the minimum listing requirements for trading on a national securities exchange. Many of these companies do not file periodic reports or audited financial statements with the SEC, making it difficult for the public to find current, reliable information about those companies." https://www.sec.gov/divisions/marketreg/mrotc.shtml.

Contrary to the plain wording of Section 4(a)(3), the SEC argues that a security is bona fide *offered* to the public only when the securities are actually *sold* to the public. In other words, the SEC asks this Court to re-write Section 4(a)(3) by replacing the word "offered" with the word "sold" so that the statutory phrase would read "bona fide *sold* to the public." Armed only with this illusive rewriting of the statute, the SEC posits that the 40 day waiting period starts to run upon the first "sale" of the securities on the OTCBB, even though the securities were offered for sale much earlier. Each of the SEC's other arguments is similarly without merit. Therefore, the Amended Complaint must be dismissed.

## POINT I

### SECTION 4(A)(3) EXEMPTED THE SUBJECT TRANSACTIONS

The SEC does not, nor can it, dispute that all of the sales by Verdmont occurred more than 40 days after the securities were first quoted on the OTCBB. Instead, it argues, as it must, that the 40-day period does not start to run until the securities were actually "sold" through the OTCBB.[2]

Not a single case supports the SEC's position that the word "offered" really means "sold." Section 2(a)(3) of the Securities Act defines an "offer for sale" as "*every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value,*" which includes a broad range of activities. 15 U.S.C. § 77b (emphasis added). A "sale" is confined to a "contract of sale or disposition of a security or interest in a security for value." *Id.* These two concepts are obviously different and the SEC attempts to conflate the two. This and similar arguments all have been uniformly rejected by the courts.

---

[2] Even if the wording of the statute was to the SEC's liking, approximately half of the transactions would be exempted nonetheless.

In *Kubik v. Goldfield*, 479 F.2d 472, 475 (3d Cir. 1973), the Third Circuit found that the dealer was entitled to the statutory exemption because "there had been a 'bona fide' offering of the stock to the public for more than forty days prior to the disputed transaction since the stock had been quoted in the 'pink sheets' since July, 1966," finding that "a 'bona fide' offer to the public may occur when a stock first *appears* in the 'pink sheets,' *even though the stock may be 'illegally' unregistered*" (emphasis added).

Further, in *Sowell v. Butcher & Singer, Inc.*, 1987 WL 10712, at *8 (E.D.Pa. May 13, 1987), the court held that the "listing" in the pink sheets constituted a bona fide public offer, even though no validly issued shares were, in fact, offered, noting that there is no authority to support a contrary position, such as that espoused by the SEC here: "Therefore I conclude that Congress made the 'bona fide' offering requirement applicable to offerings of unregistered and registered securities when they are first *available* to the public." 1987 WL 10712, at *8 (emphasis added). The court rejected the plaintiff's contention that the 40 day waiting period should commence at some date after the security is first listed in the pink sheets, as the SEC argues here, finding: "plaintiff cites no authority supporting his view that listing in the pink sheets fails to constitute a bona fide public offer." 1987 WL 10712, at *8. Here, the SEC similarly cites no authority for the proposition that the listing of the various securities on the OTCBB fails to constitute a bona fide public offer. *See also In re Biozoom, Inc. Securities Litigation*, No. 1:14-CV-01087, 2015 WL 5017018 at *4 (N.D. Ohio Aug. 20, 2015) (granting summary judgment based on the Dealer Exemption where the transactions occurred more than 40 days after the securities were listed on the OTCBB).

Further still, in *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 483 (S.D.N.Y. 1989), the plaintiff argued there, as the SEC argues here, that no bona fide offering

3

7805912.10

occurred and that the 40 day holding period "cannot run until at least (a) the corporation whose stock is being sold has been formed, and (b) some minimally *bona fide* step has been taken to start a *genuine* public offering" (emphasis added). The court specifically rejected this simulated offering theory based on the plain wording of Section 4(3)(A):

> By its terms, section 4(3)(A) permits trading in *unregistered* securities in violation of section 5 upon expiration of the forty day withholding period. Courts have determined the "bona fide" offering date of an unregistered security to be *the date the security was first quoted by a dealer in the pink sheets*, which is the date on which trading in the security commenced.

Id. (citations omitted) (emphasis added).

Here, each of the various market maker dealers for the three securities applied to FINRA for OTCBB listing and each of those applications was granted by FINRA:

> This letter will confirm that on February 14, 2012, acting in reliance upon the information contained in the filing, we have cleared Spartan's [the market maker dealer's] request for an unpriced quotation on the OTC Bulletin Board and OTC Link for GOFF.

*See* Zito Decl., Ex. 16. The FINRA letters for the other securities are attached as Exhibits 18 and 20 to the Zito Declaration.

To the extent that the SEC is arguing that the market maker dealers' unpriced quote is not a quote or not a listing on the OTCBB, it is wrong. An unpriced quotation is one of many forms of OTCBB quotations:

> Another computerized equity trading service maintained by the NASD, in addition to Nasdaq, is the OTC Bulletin Board ("OTCBB"), an electronic quotation facility that allows qualified market makers to enter, update and display priced bids and/or offers (which may be one-or two sided) on a real-time basis for certain securities, or they may enter *unpriced indications of interest* (including "bid wanted" or "offer wanted" indications)....

4

7805912.10

> Unpriced indications trigger no obligation to trade the subject security at a particular price or size; however, *a broker-dealer displaying an unpriced indication of interest must supply on request to another broker-dealer a bid or offer that must be firm for at least one trading unit* (typically 100 shares).

LOFCHIE, LOFCHIE'S GUIDE TO BROKER-DEALER REGULATION (2005), at p. 412 (emphasis added). Mr. Modeski, President of OTC Link ATS, specifically testified that an unpriced indication of interest is, indeed, a quote. Zito Decl., Ex. 3, Modeski Tr. at 23:17-20. An unpriced indication of interest is analogous to the posting of a "For Sale" sign on a homeowner's lawn.

In the final analysis, the Dealer Exemption was worded by Congress to be an unqualified safe harbor for dealers selling the securities more than 40 days after the securities are offered to the public.[3] The 40 day waiting period is a bright line that prevents dealers from "'even unknowingly taking part' in the initial distribution of securities to the public." *SEC v. N. Am. Res. & Dev. Corp.*, 280 F. Supp. 106, 125 (S.D.N.Y. 1968), *vacated in part on other grounds,* 424 F.2d 63 (2d Cir. 1970). Clearly, Verdmont has established that it is entitled to the Dealer Exemption. Conversely, the SEC simply refuses to recognize this important statutory protection and, instead, boldly asks this Court to re-write Section 4(a)(3) to its liking.

---

[3] The 1954 House Report with regard to the Dealer Exemption makes clear that Congress intended the 40 day holding period to be a bright line:

> [I]n the case of an unlawful offering of unregistered securities, a dealer would not be able to trade lawfully in such securities within 40 days (1 year under the present act) after the date on which the unlawful distribution of such securities to the public in fact commenced. And if the dealer is a participant in any such unlawful distribution he cannot lawfully effect transactions in the unregistered securities so long as he is engaged in the distribution even though the 40-day period has expired.

H.R. Rep. 83-1542, 83rd Cong., 2nd Sess., at 19 (1954), 1954 WL 3159 at *2995.

7805912.10

In sum, Section 4(a)(3) exempted the transactions because each of the sales occurred significantly more than 40 days after the date the securities were listed on the OTCBB. And because these facts are undisputed and undisputable, Verdmont is entitled to summary judgment. Verdmont has no further obligations to obtain relief under the Dealer Exemption.

### POINT II

### VERDMONT'S LIMITED ROLE AS A DEALER IS SPECIFICALLY EXCLUDED FROM THE STATUTORY DEFINITION OF "UNDERWRITER"

In an apparent concession that Verdmont qualifies for the Dealer Exemption, the SEC tacks to a different argument: Verdmont was a statutory underwriter. According to the SEC, Verdmont achieved "underwriter" status simply because it effected trades on behalf of customers, which the SEC argues were "underwriters." Yet again, not a single case supports the SEC's argument. No court has ever held that a dealer who executes trades after the Section 4(a)(3) 40 day holding period is an underwriter. Nor has any court determined that a dealer becomes an underwriter merely because it executes trades on behalf of an underwriter. As will be seen, the statutory definition of "underwriter" and Securities Act Rule 141 specifically exclude the activities engaged in by Verdmont.

First, Verdmont does not bear the burden of disproving that it is an "underwriter." Indeed, each of the courts in *Kubik, Laser Arms* and *Biozoom* dismissed the claims against the dealers based solely on proof that the dealers qualified for the Dealer Exemption, without ever requiring the dealer to additionally *disprove* that it was an underwriter. Verdmont is required to prove a statutory exemption only. There is no law that creates a presumption that Verdmont was an underwriter, which, as a result, Verdmont has to disprove. The Dealer Exemption is an exemption under the statute. "Not an underwriter" is not a statutory exemption. Likewise,

6

Verdmont is not required to *disprove* that it was an issuer, another class of persons liable under Section 5. Nevertheless, and regardless of burden of proof, it is obvious that Verdmont was not an underwriter.

Fundamentally, "[a]n underwriter is one who purchases stock from the issuer with an intent to resell to the public." *Quinn & Co. v. S.E.C.*, 452 F.2d 943, 946 (10th Cir. 1971). Verdmont never purchased any stock from any of the issuers. And while Section 2(a)(11) of the Securities Act defines an underwriter as a person who "participates or has a direct or indirect participation in the underwriting," it specifically excludes dealers such as Verdmont who simply collect a customary commission in the transaction:

> The term "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; *but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.* As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

Section 2(a)(11)(15 U.S.C. § 77b(a)(11)) (emphasis added). Notably, the SEC conveniently excludes this critical language in italics when quoting the statute in a transparent attempt to confuse an otherwise obvious point. *See* SEC Mem. at p. 8. It is undisputed that Verdmont received nothing more than a customary commission for effecting the trades of its customers. Amended Compl., ¶¶ 63, 80 and 96.

Perhaps more importantly, the Commission specifically promulgated Securities Act Rule 141 – yet another authority conveniently omitted by the SEC here – to protect dealers

7

like Verdmont from being included within the statutory underwriter definition, as noted by Professor Hazen:

> SEC Rule 141 provides that a dealer's commission includes the normal spread between the offering price and the dealer's cost, whether the dealer was purchasing the security prior to reselling it or *acting merely as a broker executing a customer's order*.

THOMAS LEE HAZEN, THE LAW OF SECURITIES REGULATION, 6th Ed. (Hornbook Series) (2009) at p. 212. (Emphasis added).

Securities Act Rule 141(c) specifically limits the definition of underwriter to persons who "*manage*" the "distribution of all or a substantial part of the particular issue":

> The term usual and customary distributors' or sellers' commission in section 2(11) of the Act shall mean a commission or remuneration, commonly known as a spread, paid to or received by any person selling securities either for his own account or for the account of others, which is not in excess of the amount usual and customary in the distribution and sale of issues of similar type and size; and not in excess of the amount allowed to other persons, if any, for comparable service in the distribution of the particular issue; *but such term shall not include amounts paid to any person whose function is the management of the distribution of all or a substantial part of the particular issue, or who performs the functions normally performed by an underwriter or underwriting syndicate.*"

15 C.F.R. § 230.141 (emphasis added).

Verdmont did not "*manage*" the distribution of "*all or a substantial part*" of the securities here. Nor did Verdmont perform the functions of a traditional underwriter by purchasing securities from the issuers and then reselling the securities to the general public and, indeed, the Amended Complaint does not allege these facts. Notably, in *Laser Arms,* the plaintiff argued for the imposition of underwriter status upon the market-maker dealers there, which the court declined to do. 794 F. Supp. at 484. In short, Verdmont was not an underwriter as a matter of law.

8

7805912.10

Notwithstanding the definitions set forth in Section 2(a)(11) and Securities Act Rule 141, the SEC proffers the sweeping proposition that any dealer who effects a trade on behalf of an underwriter automatically becomes an underwriter. However, even assuming Verdmont's customers were underwriters – and the evidence before this Court demonstrates that they were not[4] – Verdmont is nonetheless excluded from the definition of underwriter.

The SEC's reliance on *In the matter of Quinn & Co., Inc.*, 44 S.E.C. 461, 1971 WL 120484, at *4 (1971), an SEC administrative decision, is misplaced. The Commission did not determine that Quinn Co. was an underwriter, as the SEC tells this Court. Quinn Co. was a broker-dealer. Quinn Co. was never an underwriter. Nor did the Commission deem it was an underwriter because it executed trades on behalf of an underwriter. Quinn Co. was found liable under Section 5 because it could not avail itself of either the Broker Exemption in Section 4(a)(4) (because it knew that its customers were underwriters) or the Dealer Exemption (because it executed trades within the 40-day waiting period). As to the Dealer Exemption, the Commission stated:

> Moreover, by its specific terms the Section 4(3) dealers' exemption is not available during the 40 days after the first date upon which the security was offered to the public by an underwriter; nor is such exemption available for transactions as to securities constituting the whole or a part of an unsold allotment to the dealer as a participant in the public sale of such securities by an underwriter. *Sicne [sic] Quinn Co. through Dornacker undertook to sell all or part of White's block of Mountain stock for him almost immediately after he obtained the stock certificates from the issuer, it is apparent that it was not entitled to the exemption under Section 4(3) for trading transactions by dealers.*

*In the matter of Quinn & Co.,* 1971 WL 120484, at *5 (1971). Thus, Quinn Co. was not an underwriter, but a broker-dealer who could not qualify for either the Broker Exemption or the

---

[4] Verdmont's documents amply demonstrate that its customers were not controlled by the issuers of the securities. *See* Declaration of Shamima Bhana, dated May 16, 2016, ¶¶21-27, Exs. 17-19.

9

7805912.10

Dealer Exemption. Contrary to what the SEC tells this Court, *no* court has ever determined that a dealer who merely executes trades on behalf of an underwriter after the 40 day waiting period achieves underwriter status simply for performing that function.

Perhaps more importantly, Professor Hazen observes that the Section 2(a)(11) dealer carve-out was specifically designed to protect dealers who might be acting on behalf of underwriters:

> The statutory definition [of underwriter] excludes members of the selling group from the definition of underwriter. Although certainly involved in the distribution process, those dealers who receive nothing more than their ordinary sales commissions are not classified as section 2(a)(11) underwriters. The exclusion of transactions in which the only remuneration is "the usual and customary distributors' or sellers' commission" is designed to protect members of the selling group and nonparticipating brokers from being included in the concept of underwriter.

HAZEN, THE LAW OF SECURITIES REGULATION, 6th Ed. (Hornbook Series) (2009) at p. 212.

In short, the SEC's assertion that Verdmont was an "underwriter," aimed at denying Verdmont protection under the Dealer Exemption, is unavailing. Applying the plain wording of the statutory definition contained in Section 2(a)(11) and the plain wording of Securities Act Rule 141, there is no evidence even remotely suggesting that Verdmont was an "underwriter." Nor does the Amended Complaint even allege such a managerial role. Indeed, even assuming arguendo that Verdmont's customers were, in fact, underwriters, Verdmont acted merely as "a person whose interest is limited to a commission *from an underwriter* or dealer not in excess of the usual and customary distributors' or sellers' commission," as specifically excluded by the statutory definition of underwriter contained in Section 2(a)(11). (Emphasis added). Thus, even if Verdmont's customers were underwriters, Verdmont was not. All other arguments raised by the SEC are beside the point.

## CONCLUSION

For all the foregoing reasons, Verdmont is entitled to summary judgment.

Dated: New York, New York
       Southern District of New York
       June 29, 2016

Respectfully submitted,

**CARTER LEDYARD & MILBURN LLP**

By _____
   Robert J. A. Zito
   Mark R. Zancolli
   Theodore Y. McDonough
Two Wall Street
New York, New York 10005
Telephone: (212) 732-3200
Facsimile: (212) 732-3232
Email: zito@clm.com

*Attorneys for Defendant Verdmont Capital, S.A.*

11