G7FQSECo

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    SECURITIES AND EXCHANGE
3   COMMISSION
                    Plaintiff
4
            v.                          15 CV 894 (WHP)
5                                       Argument
    CALEDONIAN BANK LTD., CALEDONIAN
6   SECURITIES LTD., CLEAR WATER
    SECURITIES., INC., LEGACY GLOBAL
7   MARKETS S.A., VERDMONT CAPITAL S.A.,
    SENTINEL TRUST SERVICES LTD.,
8                   Defendants
    ------------------------------x
9                                       New York, N.Y.
                                        July 15, 2016
10                                      11:00 a.m.

11  Before:

12                  HON. WILLIAM H. PAULEY III

13                                      District Judge

14                          APPEARANCES

15  U.S. SECURITIES AND EXCHANGE COMMISSION
         Attorneys for Plaintiff
16  DERRICK BENTSEN
    PATRICK COSTELLO
17  BRIDGET FITZPATRICK
    DAVID STOELTING

18

19  CARTER LEDYARD & MILBURN
         Attorneys for Defendant Verdmont Capital
20  ROBERT ZITO
    MARK ZANCOLLI

21

22  PROSKAUER ROSE LLP
         Attorney for Defendant Caledonian Bank
23  MASSIEL PEDREIRA-BETHENCOURT

24

25

G7FQSECo

```
 1              (In open court; case called)
 2              THE DEPUTY CLERK:  Appearances by the SEC.
 3              MR. BENTSEN:  Good morning, your Honor.  Derrick
 4    Bentsen on behalf of the SEC.
 5              MR. COSTELLO:  Good morning, your Honor.  Patrick
 6    Costello on behalf of the SEC.
 7              MS. FITZPATRICK:  Bridget Fitzpatrick for the SEC.
 8              MR. STOELTING:  David Stoelting for SEC.
 9              THE COURT:  Good morning to all of you.
10              THE DEPUTY CLERK:  For Verdmont Capital.
11              MR. ZITO:  Robert Zito, Carter Ledyard & Milburn.
12    With me is Mark Zancolli, my partner.
13              THE DEPUTY CLERK:  For Caledonian Bank.
14              MS. PEDREIRA-BETHENCOURT:  Massiel Pedreira on behalf
15    of Caledonian Securities and Caledonian Bank.
16              THE COURT:  Good morning.  This is oral government on
17    Verdmont's motions.  Do you wan to be heard, Mr. Zito?
18              MR. ZITO:  If I may, your Honor.
19              THE COURT:  Yes.
20              MR. ZITO:  Good morning, your Honor.  May it please
21    the Court, I begin by clarifying what this case is about and
22    what it is not about, and I'm addressing the summary judgment
23    motion, your Honor.
24              The amended complaint alleges that Verdmont is liable
25    for selling unregistered securities under Section 5 of the
```

1    Securities Act.  The amended complaint does not allege that

2    Verdmont engaged in any pump-and-dump scheme.  Pump-and-dump

3    schemes are frauds that are prosecuted under Section 10 of the

4    34 Act.  Because this is a Section 5 case and not a Section 10

5    case, Verdmont's only obligation on this motion is to prove a

6    statutory exemption.  It is not required to prove that its

7    customers did not engage in a pump-and-dump scheme.  It would

8    be the SEC's obligation under Section 10, had they decided to

9    bring a Section 10 claim.  All the pump-and-dump allegations

10   are surplusage and they are designed to be inflammatory, but

11   even a cursory view of what the SEC thinks is evidence

12   demonstrates there is no evidence of any pump-and-dump scheme,

13   otherwise, they would have brought that Section 10 case.  All

14   they have is suspicion and innuendo.

15          Because this case is a Section 5 case and not a

16   Section 10 case, this motion is purely a matter of arithmetic.

17   The undisputed and undisputable facts show that each of the

18   trades in question were made after the 40-day holding period in

19   Section 4(a)(3) of the Securities Act.  The securities were

20   free trading, as they say in the securities industry.  And if

21   the law is followed in this case, your Honor, the amended

22   complaint must be dismissed.

23          The SEC labels the dealer exemption as being too

24   technical and remarkably asks this Court either to ignore it or

25   to rewrite it to its liking.  The SEC asks for some application

G7FQSECo

```
 1    of equity suggesting that it would have no remedy if the Court

 2    enforces the dealer exemption, although it completely ignores

 3    its remedy under Section 10.  That is there if there is a fraud

 4    being committed, the SEC has Section 10 in its arsenal.

 5             In the first instance it seems to me that the SEC's

 6    argument is with Congress, and not with this Court.  If they

 7    don't like the statute, they should be lobbying Congress to

 8    have the exemption revoked or modified in some way.  But if

 9    this exemption did not exist, your Honor, you could imagine

10    what a chilling effect that would have on the securities

11    markets as a whole.  No broker-dealer would be in the business

12    if it had to become an insurer of its customers' trades and

13    issue a new prospectus each and every time a trade is

14    conducted.  We are a nation of laws, your Honor, and the law

15    must be applied.  And the law here is that after 40 days, the

16    stocks are free trading.  Not a single case has held a dealer

17    that is acting like a dealer, such as Verdmont here, liable

18    under Section 5 after the 40-day holding period.

19             The pump-and-dump language in the complaint is indeed

20    inflammatory and wholly irrelevant to the SEC's theory of

21    liability.  Again, this is a Section 5 case, not a Section 10

22    case.  Indeed, on that fateful day in February 2015, your

23    Honor, when the SEC asked this Court to sign Verdmont's death

24    warrant and to free $17 million of assets belonging to its

25    clients who had nothing to do with these transactions, the SEC
```

G7FQSECo

falsely told your Honor that this was a pump-and-dump case, and
that Verdmont was a principal in those pump-and-dump
transactions.  No doubt your Honor believed this was a Section
10 case and not a Section 5 case that has specific statutory
exemptions for dealers such as Verdmont.

Section 10 as an antifraud position comes with it a
very high bar.  The SEC has the burden of proving a fraud by
clear and convincing evidence, and even more challenging the
burden of showing an intention to defraud.  The SEC obviously
does not have that proof here, otherwise, it would have pleaded
a Section 10 case.  I note that in the other case before your
Honor, the case against Norstra, one of the issuers of the
securities in this case, the SEC did plead a Section 10
violation.  And of course neither Verdmont nor any of its
customers were sued in that case.

So what we have here is not a pump-and-dump scheme but
a simple case of the alleged sale of unregistered securities.
Pumping and dumping has nothing to do with it.  Because this is
a Section 5 case, all we have to prove is a statutory
exemption, and we have proved unequivocally that Section
4(a)(3), the dealer's exemption, exempted the transactions in
questions.

For all the reasons set forth in our papers, your
Honor, we respectfully request that the amended complaint be
dismissed.

G7FQSECo

1          THE COURT:  With respect to the dealer's exemption,

2     can you point to any case in which a court actually addressed

3     whether unpriced zero volume quotations constituted offers to

4     the public?

5          MR. ZITO:  Your Honor, the case that we cited to, it's

6     not clear whether or not they were what they call IOI's,

7     indications of interest.  None of those cases specifically

8     address that, but what they say is that once it's listed on the

9     bulletin board the trading process begins, and in our brief,

10    your Honor, we likened this to putting a for sale sign on the

11    house.

12         THE COURT:  And I've been trying to wrap my mind

13    around that.  I guess I would ask you to take a look at Exhibit

14    5 to your declaration of May 16.  This is a report of what I

15    might characterize as sort of a pink sheet for Goff.

16         MR. ZITO:  Yes, your Honor.

17         THE COURT:  Could you just explain what this is and

18    what the various columns represent?  I've looked at deposition

19    testimony dealing with this, and I still can't say that I

20    understand it.

21         MR. ZITO:  Your Honor, I thought that the witness

22    testified as to what these columns were, but if I could just

23    confer with Mr. Zancolli.

24         THE COURT:  Sure.

25         (Pause)

G7FQSECo

1          MR. ZITO:  Your Honor, the first column is the symbol,

2     the stock.  The second column is when the quote is first

3     published.  The next column is the time stamp, and I believe

4     that's the identical time --

5          THE COURT:  Actually, that is one point where I get

6     lost with this because if you look at it, while it's the

7     identical -- well, it's not the identical time as the published

8     time stamp.

9          MR. ZITO:  It's milliseconds.

10         THE COURT:  No.  For example, if you go down about 15.

11    To 20 lines to a transaction Goff 2/23/2012, 0:24:31:2431.  Do

12    you see that?

13         MR. ZITO:  I do, your Honor.

14         THE COURT:  You look at the "time stamp," it's an

15    altogether different day and time.  It's 2/15/2012.

16         MR. ZITO:  Yes.  I believe that that's just a lag from

17    when the bulletin board gets the quote and when it's actually

18    published.  We didn't concern ourselves, quite frankly, with

19    that difference because all of those dates do not affect the

20    40-day time period.  The trades are well after these dates,

21    well after these dates.

22         THE COURT:  But if we go to the bid, bid ask and bid

23    quantity and ask quantity, there are no bids.

24         MR. ZITO:  There are bids, your Honor.  The bid is an

25    unpriced bid.  That's a bid.

G7FQSECo

1         THE COURT:  What does that mean?

2         MR. ZITO:  Well, Lofchie explains this in his treatise

3    and is an NASD Rule and is an SEC release addressing what types

4    of bids there are.  For those of us, your Honor, who are not in

5    the industry, you think, OK, well, I'll bid $5.  Someone else

6    will bid $4 and you negotiate it.  But the securities markets

7    are much more sophisticated than that.  And Lofchie points out

8    that there are various types of bids:  Bid ask with a price,

9    indications of interest, and that basically starts the trading

10   process.  And an indication of interest, even though it is

11   unpriced as these are, trigger an obligation upon the market

12   maker, the MICA is the market maker, as Lofchie explains is

13   that if someone goes in and says to MICA give me a price and a

14   quantity, they're obligated under the NASD rules and the

15   securities release to offer a price.

16        The problem with these kinds of securities, your

17   Honor, is that they are micro, microcap companies.  They are

18   speculative companies.  They're penny stocks.  And just the

19   nature of what those are doesn't -- it's not like it's a big

20   IPO where once it's listed, people are going to be trading it

21   right away.  They list it, and sometimes it may go a day, it

22   may go a month before an actual trade starts or is consummated,

23   but this is when the trading process actually begins, once it's

24   listed on the bulletin board

25        THE COURT:  So looking at this bulletin board, page

G7FQSECo

1    Exhibit 5, can one conclude that there was any trading

2    activity?

3         MR. ZITO:  You can conclude that there was not a trade

4    on that date.  You may conclude, your Honor -- in fact, it must

5    be concluded, your Honor, that this is when the stock was

6    offered for sale.  This is when it was listed on the bulletin

7    board.  And the president of OTC ATS specifically testified

8    that these are quotes.  This is when it's first listed.  And

9    the cases we refer to your Honor said when it's first listed

10   for sale, when it's first offered for sale.  And the statute

11   says when it's first offered for sale.  The statute doesn't say

12   when it's first sold.

13        So, when it's first posted up on the bulletin board by

14   the market makers, there are various market makers that were

15   obligated under the various exchange rules to trade the

16   securities, to take the positions and to find a trade, and they

17   listed the stock.  They made formal applications to the OTC

18   bulletin board through FINRA.  Those applications were granted,

19   and they were offered for sale to the public.  And those are

20   the dates.

21        THE COURT:  When for the first time was there any

22   public trading volume with respect to Goff?

23        MR. ZITO:  I believe that the SEC offered a

24   declaration that it happened on certain dates.  We didn't offer

25   those dates.

G7FQSECo

1          THE COURT:  Right.  I'm unclear from the SEC's papers

2     whether it was March 13 or March 18.

3          MR. ZITO:  We did not proffer that point, your Honor.

4     We thought that that was irrelevant because none of the cases

5     that we relied upon -- in fact, no cases out there had ever

6     drawn a distinction when a first trade takes place as opposed

7     to when it is offered for sale.  I mean, Section 2(a) of the

8     Securities Act draws a distinction between an offer for sale as

9     opposed to an actual sale.

10          THE COURT:  Right.  But doesn't the SEC contend that

11     the Mulholland group was using these unpriced quotations to

12     simply drive up the price of Goff?

13          MR. ZITO:  There's no evidence of that, your Honor.

14     There's no evidence of that.  That is what one SEC attorney

15     says based on a pile of undocumented evidence.  They have a

16     pile of documents.  They are unauthenticated.  They have an SEC

17     lawyer looks at it and says this is what we think happened,

18     your Honor.  They don't know what happened.

19          THE COURT:  What about the confidential witness?

20          MR. ZITO:  The confidential witness as it relates to

21     Verdmont says that he called up Verdmont, and Verdmont offered

22     to refer him to an attorney.  That's how it relates to this

23     case.  He referred to the fact that he signed certain Goff

24     certificates.  There are two of the stocks that he had no

25     involvement with, and he refers to Nautilus.  Nautilus never

G7FQSECo

1    even dealt with Goff stock.  They didn't even trade in that

2    stock.  It's a hearsay affidavit.  He didn't say that he

3    controlled or explained how he controlled Nautilus, supposedly.

4    He said Mr. Mulholland told me we controlled it.

5         And if you look at the corporate evidence, it shows

6    that there are no similarities between the ownership, between

7    Mulholland.  Not only that, but all of this is irrelevant,

8    your Honor.  This is all a red herring and this is designed to

9    be, as I said in my opening, inflammatory.  What this is a case

10   involving not pump-and-dump; it is involving unregistered

11   securities.  The only issue before the Court is whether or not

12   a registration statement should have been issued for these

13   stock trades.  They characterize it as a distribution.  I don't

14   think that that's right, but it is all beside the point.  The

15   question is, is there a statutory exemption for this.  And all

16   the cases that we have uniformly hold that a stock is offered

17   for sale once it's posted on the bulletin board.  We had a

18   witness give testimony saying that those are duly posted

19   quotes.  Even though there wasn't a trade, that is a quote.

20   The trade says when is the stock first quoted on the exchange.

21   When is it first quoted; not when it's first sold, and that's

22   what the statute reads.

23        THE COURT:  Do you want to turn to the underwriter

24   liability?

25        MR. ZITO:  Of course, your Honor.

1          THE COURT:  Why do Verdmont's declarations have so

2     much information on one client, Lornex, and so much less

3     information about the other entities, Bamfield and Bartlett

4     Trading and Nautilus?

5          MR. ZITO:  That was a compliance function, your Honor,

6     that we really didn't get into over the course of discovery.

7     By the time we conducted -- the SEC conducted three

8     depositions.  They conducted a deposition of a 30(b)(6)

9     witness.  That question was never asked.  They conducted

10    depositions of two former principals of Verdmont.  That

11    question was never asked.  The principals testified in London

12    that this was a compliance function.  It was a chief compliance

13    officer that did the initial due diligence for the clients.  It

14    may have been something was raised that the compliance officer

15    wanted to know more information about, but that would be

16    speculation at this juncture.  Quite frankly, your Honor, I

17    don't see that as being part of this motion.

18         THE COURT:  All right.  The investment account

19    applications appended to the Bhana declaration lists certain

20    people as authorized signatories, like Clifford Wilkins and

21    Chris Smith.  Who are these people?

22         MR. ZITO:  We don't know, your Honor.  All we do know

23    is that they are not affiliates or in any way part of the

24    issuers or the issuers themselves.

25         THE COURT:  But how did Verdmont confirm that these

G7FQSECo

1      people were real?

2               MR. ZITO:  Your Honor, it's not unusual.  I mean, even

3      here in the United States -- I mean, number one, we have

4      passports.  We have passports that show the information of the

5      underlying principals of these corporations.  And to the extent

6      there are additional signatories, that would be like having a

7      power of attorney.  I mean, there is nothing untoward that

8      there is a power of attorney that is offered to have someone

9      else be a signatory.  Many times legal attorneys in fact act as

10     attorneys in fact on behalf of their clients.

11              THE COURT:  Well, how do you know that they are not

12     connected to the issuers?

13              MR. ZITO:  Because the names don't match up.  If you

14     look at the prospectuses, the prospectus is required to issue

15     all of the control people, all right?  And all the control

16     people are not listed.  And in addition to that, I believe in

17     the bundle of documents that are before your Honor are

18     affidavits from the entities saying that they are not

19     associated with any public company.

20              But for the purpose of the underwriter argument, your

21     Honor, even assuming that Verdmont's customers were statutory

22     underwriters under Section 2(a)(11), that doesn't make Verdmont

23     an underwriter.  It is very clear under the statute that

24     dealers can actually execute trades on behalf of underwriters

25     with impunity.  As long as they don't have a managerial role in

G7FQSECo

1    a underwriting, they are exempt from the definition of

2    underwriter.  Section 2(a)(11) says that and SEC Rule 141

3    specifically says that and all the treatises uniformly say

4    that.

5              THE COURT:  All right.  Do you want to turn to the

6    motion concerning the asset freeze or do you want to wait until

7    we hear from --

8              MR. ZITO:  Your Honor, there's not much to argue

9    there.  It's a discretionary motion.  $240,000 are frozen.  My

10   firm is owed somewhere around $400,000.  We recently received a

11   $75,000 payment from Verdmont.  I'm told that Verdmont has very

12   little cash yet.  Unless we can get some of that money, we are

13   not going to get paid, your Honor.  So, if this case goes

14   beyond today, I don't see us having any role, quite frankly,

15   unless there's an appeal in the Second Circuit from the

16   granting of a motion for summary judgment.  If the Court were

17   inclined to grant our motion and the SEC were inclined were to

18   appeal that, I think as a matter of principle we would want to

19   defend that appeal before the Second Circuit.

20             THE COURT:  Has Verdmont tried to claw back any of the

21   480,000 or so in dividends that the SEC asserts Verdmont paid

22   to its principals last year?

23             MR. ZITO:  My understanding is that they were required

24   to make those principal distributions under Panamanian law.

25             THE COURT:  But my question is whether they tried --

G7FQSECo

1          MR. ZITO:  There would be no basis for a clawback.

2     They would be required to make that distribution.

3          THE COURT:  Anything further?

4          MR. ZITO:  Nothing, your Honor.

5          THE COURT:  Thank you, Mr. Zito.

6          Mr. Bentsen.

7          MR. BENTSEN:  Good morning, your Honor.  Starting with

8     the underwriter point, *Quinn* clearly controls.  And I don't

9     mean controls in the sense that it's -- it's the Tenth Circuit.

10    They don't grade your homework in this case, but it's the exact

11    point at issue here.  *Quinn* was a broker-dealer selling for

12    their client, who is a statutory underwriter.  They tried to

13    make the same argument there that Mr. Zito just made.  We're

14    not a statutory underwriter because we're just getting

15    commissions.  And the commission in its administrative decision

16    in the Tenth Circuit said that doesn't matter because if you

17    are selling for an underwriter, 403 doesn't apply, and it is

18    your burden to prove that your client is not an underwriter.

19    That's the only case that we cite that Verdmont actually takes

20    on, and they cite it, and say it doesn't apply here because

21    really that's a 40-day case.  The preceding paragraph is

22    precisely on the point that if a broker-dealer sells for an

23    underwriter, the exemptions do not apply.  All you have to do

24    is look at that administrative decision, go one paragraph up

25    from where Verdmont cites, and it is the first sentence:  403

G7FQSECo

```
1    does not apply if you sell for the underwriter.  That's the
2    point the Tenth Circuit affirmed that on.
3              THE COURT:  But if you're trading for an underwriter
4    and are only trading for commissions, you're not an
5    underwriter, are you?
6              MR. BENTSEN:  You're not an underwriter necessarily,
7    but that's the point of Quinn.  The 403 exemption does not
8    apply if the client of the broker-dealer is an underwriter.
9    Quinn raised that, and the courts and the commission said, it
10   doesn't matter because if your client is an underwriter, you
11   can't claim the 403 exemption.  It doesn't matter whether
12   Verdmont is a statutory underwriter or not because their client
13   is, and they have the burden of proving that their client was
14   not.  403 doesn't apply.
15             Also, in looking at that rule, if they try to invoke
16   that rule by statute the commissions are being paid to them by
17   an underwriter, that is just what the statute says.  They are
18   admitting that their clients were underwriters, which vitiates
19   403.  They can't claim it.  You can then go into the rule, it
20   requires that the commissions not be greater than given to any
21   other person or entity that's providing a similar function.
22             If we go back to Mr. Housser's declaration -- I
23   believe it's document 45 -- and you look at how he detailed out
24   the commissions that Verdmont was receiving and then came to
25   the executing broker in the United States for the same
```

G7FQSECo

1    function, trying to sell the securities, what was being paid to

2    the actual executing broker was miniscule compared to the

3    commissions that Verdmont was taking.  There were trades in

4    which Verdmont was charging clients over $30,000 to simply take

5    the order or purportedly take the order and transmit it to the

6    executing broker in the U.S. which was then receiving $500.

7         Because Verdmont was getting more commissions than

8    other broker-dealers who were doing a similar function, by Rule

9    141 they are not allowed to claim that exemption.  But it

10   doesn't matter because if the client is an underwriter, 403

11   cannot apply, and it is their burden to prove it.

12        THE COURT:  Is there any authority for that in this

13   circuit?  I mean, other than the Tenth Circuit case in *Quinn*.

14        MR. ZITO:  *Quinn* is the clearest.  *Culpeper* is very

15   similar.  That was dealing with an underwriter in a slightly

16   different context.  *Petaluma* in the Ninth Circuit is also

17   similar.  *Quinn* is the clearest case that addresses this

18   particular point most directly.

19        Going back to the evidence, your Honor asked how

20   Verdmont knew who these people were.  There is no competent

21   testimony or evidence whatsoever about what the relationship

22   between Verdmont's clients and the issuers are.  The only

23   competent evidence is the declaration from the witness who

24   identified certain of their clients as being part of them all.

25   That's co-conspirator testimony.  It's a declaration.  We can

G7FQSECo

1    bring that witness here.  All of the evidence that Verdmont

2    tries to bring in is all hearsay.  It's what a third person

3    told Verdmont out of quote.

4              THE COURT:  Let's talk about that declaration for a

5    minute of the confidential witness.

6              That witness only transferred shares for Goff and

7    Swingplane, right.

8              MR. BENTSEN:  That is correct, your Honor.

9              THE COURT:  He doesn't know anything about Xumani or

10   Norstra stocks, right?

11             MR. BENTSEN:  That is correct.

12             THE COURT:  If he doesn't know the names of any of

13   Verdmont's clients other than Nautilus, how can this Court

14   conclude that those clients were statutory issuers being "under

15   the control" of Norstra, Goff or Xumani?

16             MR. BENTSEN:  Certainly, your Honor.

17             It goes back to evidence that has been proffered time

18   and time again about the manner in which the shares got to

19   Verdmont.  The transfer agent's records -- all this was

20   submitted months and months and months ago that was addressed

21   almost verbatim from the amended complaint that your Honor

22   reviewed in a motion to dismiss.

23             That all raises an inference that the shares always

24   were in the custody and control of the issuer until they were

25   deposited to Verdmont which would make them statutory

G7FQSECo

underwriters.  The witness's declaration strengthens that

directly as to Nautilus and Goff in that he was involved with

those entities and shares.  But also given that all of these

transactions flowed in a very similar manner, the inference,

which at this point we have to take all the inferences in favor

of the Commission, the inference is that the same is true for

all of these shares and clients; that they were shams that were

under the control of the issuer and were statutory

underwriters.

        The bigger point here, it is Verdmont's burden to

prove that they were not underwriters.  The Commission doesn't

have to prove that in any capacity.  They need to bring

competent evidence to the court to prove that.  We would then

dispute it with the evidence that we just talked about.  But

the only evidence they have are the account applications which

are out-of-court statements by third parties.  It's the very

definition of hearsay.  It doesn't turn into non-hearsay just

because Verdmont has it in their file someplace.  It's the

statement by the individuals to Verdmont.

        Now, that would help them in the 404 broker exemption

as to what their due diligence was and what they were told and

going on that path, but they haven't moved on that.  Here, for

a 403 exemption, they have to prove their client was not a

statutory underwriter, that Verdmont themselves were not a

statutory underwriter, and they have wholly failed to proffer

G7FQSECo

1   competent evidence to do so.  All they have is rank hearsay, so

2   they haven't met their burden.

3              Now, whether we go to a fact-finder later on and have

4   him decide this issue, and they put up whatever evidence they

5   do, and we put up our evidence and the fact-finder gets to

6   decide, for the purpose of summary judgment, there is no

7   competent evidence before the Court to establish that their

8   clients were not statutory underwriters.  For that reason

9   alone, summary judgment has to be denied because they just have

10  simply not met their burden.

11             If your Honor is done on the underwriter point, we can

12  shift back to the 40-day.  These are mutually exclusive reasons

13  to deny the summary judgment.  If an underwriter is involved,

14  403 cannot be claimed.

15             THE COURT:  You're going to turn to the dealer

16  exemption now.

17             MR. BENTSEN:  Well, the underwriter is part of the

18  dealer exemption as well.  It's simply a different basis to

19  conclude that it doesn't apply here.  The 40-day window is

20  another reason to conclude it.  The key here is bona fide offer

21  to the public.  Verdmont has to prove that whatever offer

22  they're claiming was a bona fide offer.  This was a big issue

23  in the motion to dismiss.  The Second Circuit and your Honor

24  had concluded that that inquiry is when a stock was genuinely

25  and truly being offered to the public.  What Verdmont has

G7FQSECo

```
1    proffered here are quotes that offer to sell zero shares to the
2    public.  That is simply not a bona fide offer.  It's not even
3    an offer.  They are saying we will sell you nothing.  That is
4    what that quote is.  We don't dispute that it is a quote within
5    the term as used by the bulletin board.  It is a quote with a
6    zero volume unpriced.  More on the zero volume I think is the
7    key here.  It is not a bona fide offer to the public.  The
8    public could do nothing to actually buy these shares.

9            There is also no evidence that these market makers had
10   any shares to sell at any time.  We could have taken discovery
11   on that, but this is Verdmont's theory of the case that was
12   develop after discovery.  Their interrogatories don't have this
13   answer which have never been amended.  The premotion letter to
14   the Court has never addressed this theory.  This only came at
15   the end after discovery was closed.  We would happily have gone
16   and taken depositions of those market makers and sussed this
17   out.  But as of now there is no evidence that they had any
18   shares which would have explained why they were putting zero
19   quantity out.  They had no shares to sell.  Even if they had
20   shares, the fact that it's zero quantity asked, they are not
21   willing to sell anything.  It is zero.  We heard from Mr. Zito,
22   well, if things don't sell within time.  There is no evidence
23   of any of that.

24           THE COURT:  How often in your experience do you see
25   OTC sheets like this where there's a zero offer?
```

G7FQSECo

1          MR. BENTSEN:  This is the first time I've seen it,

2     your Honor, but this is not an area that I am a particular

3     expert in, so I would not even try to opine as to how often

4     this occurs.

5          THE COURT:  Just in looking at this, if it is as the

6     SEC claims, why isn't FINRA or the SEC or somebody looking at

7     the over-the-counter sheets and when we see something like this

8     doing something about it as opposed to waiting years?

9          MR. BENTSEN:  Well, I would say that there's nothing

10     actually wrong with doing this.  This is perfectly allowed.

11     They applied for permission.  Now, whether there's fraudulent

12     statements in those applications, that's a different question,

13     but they are allowed to make these quotes.  That's all within

14     the rules.

15          THE COURT:  But how is it a quote?

16          MR. BENTSEN:  By definition I think it's a quote.

17     OTC's rules, FINRA's rules define what a quote is.  They're

18     allowed to do unpriced indication of interest.  Here there is

19     zero quantity though.  They are just not bona fide offering

20     anything to the public, and that's a different question.

21          If you go and look at all the cases that Verdmont

22     cited, there is language in there about quotes and listing, but

23     in each of those, either in a follow-on sentence, there is

24     always a comment about how trading started occurring or in the

25     facts section, you see if that matches up.  There is no court

G7FQSECo

1    that looked at a zero quantity ask and said, well, that's a

2    bona fide offer to the public.  That issue has just never come

3    up.

4         In most of these cases, the only real disputed issue,

5    like, for example, in the @Cubic Third Circuit case, the issue

6    there was not when shares were actually available to the

7    public.  It was whether or not unregistered securities could be

8    bona fide offered to the public.  And the answer to that was,

9    yes, because the public could genuinely and truly buy them.

10   So, none of these cases turned on anything like what we are

11   seeing in this case.

12        THE COURT:  So let me go back for a second then to the

13   question that I put to Mr. Zito.  For each of the securities,

14   what's the specific date that the SEC contends that a bona fide

15   offering to the public first occurred?  Because as I said, in

16   looking at these papers, just with respect to Goff, I was

17   somewhat confused whether it was March 13 or March 18.

18        MR. BENTSEN:  Yes, your Honor.  The difference there

19   is what you often see is you see a couple of trades that begin

20   transactions so, for example, on Goff, the first trade that was

21   recorded was recorded on March 13.  What you see five days

22   later is the volume take off and the trading is sustained.

23        Now, if this was a couple of trades in 40 days, then

24   this would be a closer question, and the focus would have to be

25   on whether those trades or the offers that resulted in those

G7FQSECo

1    trades or what was happening around that were in fact bona

2    fide.  Were they what's called paying the tape and match trades

3    to start going?  We don't have to get into any of that here

4    because the first day of trades is within the 40-day window of

5    when Verdmont begins trading.  And because they're doing

6    distributions, the 40-day window just continues and precludes

7    them from ever claiming the exemption.

8         THE COURT:  So, with respect to the other securities,

9    what's the specific date?

10        MR. BENTSEN:  For Norstra, it first traded sustained

11   after March 5.  On Xumani, there was a one-off trade on

12   January 18, 2012.  This is where Verdmont had moved using that

13   dates.  We had to inquire as to the validity of that trade and

14   the parties involved.  It then began trading on April 29, 2013

15   with sustained trading happening two days later on April 1 --

16   on May 1, excuse me.  And those dates all come from the

17   exhibits to the declaration of Robert Nesbitt.

18        THE COURT:  When you talk about a one-off trade, for

19   example, with respect to Xumani shares, there was a trade in

20   January 2010, right?

21        MR. BENTSEN:  That's correct, your Honor.

22        THE COURT:  Is that the date on which public trading

23   started?

24        MR. BENTSEN:  That would be an interesting question

25   and we would get into trying to track down who traded?  Was it

G7FQSECo

1    a privately negotiated trade?  Was there a bid offer ask that

2    this came through a market maker?  That would all be things we

3    would have to get into.

4              Verdmont hasn't moved on that.  They moved on one

5    particular -- the day the shares were all first listed and

6    quoted on the OTC, and in each of those cases it was for zero

7    quantity.  They were offering nothing.  That's where the focus

8    here is because that's Verdmont's motion.  Whether we can shift

9    later on --

10             THE COURT:  Let's say that January 2012 trade of

11   Xumani was the start of public trading in those shares, and the

12   first bona fide trade.  Wouldn't all of Verdmont's trading in

13   Xumani be outside of the 40-day period?

14             MR. BENTSEN:  So if this just came in and it was

15   determined that that was the first bona fide offer to the

16   public, then the 40-day clock would run.  Verdmont, however,

17   still couldn't claim an exemption because they would still need

18   to prove that their clients were not statutory underwriters

19   engaging in a distribution.  If that is what it happening, and

20   it is Verdmont's burden to prove that is not what is happening,

21   they cannot claim the exception.  403 just simply does not

22   apply to selling for a statutory underwriter and a

23   distribution.

24             So we come at this in two different ways.  Verdmont

25   has failed on both of these bases.  So, even if they had

1    succeeded on one of them, the other is still precludes summary

2    judgment in their favor at this point.

3         THE COURT:   In Verdmont's reply memo, they say that

4    even if there was no bona fide public offering until shortly

5    before Verdmont started trading for its clients, about half of

6    the trades are still exempt because they occurred more than 40

7    days after public trading started.   Does the SEC agree with

8    that?

9         MR. BENTSEN:   No.

10        THE COURT:   Tell me why not.

11        MR. BENTSEN:   Again, they would have to prove they

12   were not selling on behalf of a statutory underwriter.   Then if

13   you actually go to what's on page 5 of their reply brief.

14        THE COURT:   OK.

15        MR. BENTSEN:   It's footnote 3.

16        THE COURT:   Why don't you just go ahead and make your

17   point.

18        MR. BENTSEN:   They are quoting from a House report on

19   the dealer exemption.   What it does is it makes clear that if

20   you had started to unlawfully sell securities, you can't then

21   claim the exemption 40 days after.   If you're part of the

22   distribution, you never can reclaim the exemption.   You don't

23   get to violate with one share on day one, try to minimize your

24   conduct, wait 40 days, and then complete your distribution.   It

25   will never apply to you.   Once you've violated it, you can't

G7FQSECo

1    come back 40 days until you've finished the distribution and

2    now you're into regular trading.

3         THE COURT:  What's the support for that other than the

4    House report?

5         MR. BENTSEN:  I think it's the general how this -- the

6    whole exemptions are structured and what the cases all talk

7    about is that distributions are never exempt.  If you're

8    engaged in a distribution, you don't get an exemption.  All

9    distributions must be registered.  If they are selling shares

10   out in a distribution, they can't then claim it 40 days later

11   just because you are still in the distribution.  Once the

12   distribution has ended and we're now into regular trading, 40

13   days has eclipsed, then they can claim the exemption for those

14   later trades.  Until the distribution is done, until their

15   clients have finished putting up their shares in the

16   marketplace for the first time, the exemption never comes back

17   in.

18        THE COURT:  What happened with respect to the

19   documents that were produced by the Panamanian security

20   regulators?

21        MR. BENTSEN:  We are trying to review them.  A lot of

22   them are in Spanish.  We are trying to determine at this point

23   if they are a complete production of all of the documents in

24   question such that we can put that issue to bed.  There wee

25   several thousand pages.  When I've gone through them, they are

G7FQSECo

1    not in any particular discernible order.  They are out of order

2    in many cases, which makes it hard to see if they are in fact

3    complete.  We are endeavoring to get through that as quickly as

4    we can, so that we can either put that issue to rest or if we

5    determine it is incomplete, we can bring that issue back up to

6    Judge Cott.

7              THE COURT:  Turning to the asset freeze for a moment.

8              MR. BENTSEN:  Mr. Costello is going to address the

9    asset freeze.

10             THE COURT:  That's fine.

11             MR. BENTSEN:  Thank you, your Honor.

12             THE COURT:  Thank you, counsel.

13             MR. COSTELLO:  Good morning, your Honor.  If your

14   Honor had a question pending, I'd be happy to address it.

15             THE COURT:  Well, it seems that the SEC is still

16   reserving its argument that something more than commissions

17   should be disgorged, or do I have that wrong?

18             MR. COSTELLO:  No, you have that correct, your Honor.

19   The SEC contends that, yes, in fact something much more than

20   commissions should be disgorged.  We contend that proceeds

21   would be the proper measure of damages in this case, assuming

22   that we in fact get to that stage.  That actually dovetails

23   into a point that I did want to make this morning, your Honor.

24             That determining whether or not there are sufficient

25   funds frozen that would equal disgorgement or exceed

G7FQSECo

1   disgorgement, which is a standard the Court should consider, as

2   the cases have pointed out, it is a bit premature to make that

3   determination at this point because, as the Court knows, the

4   damages phase of the case is the second phase.  We haven't

5   gotten to that phase yet.  The Court would need to decide

6   whether (A) disgorgement is appropriate, and (B) if it is

7   appropriate, what the proper measures should be, but that's for

8   a later date after the substantive liability issues are first

9   resolved.  So, just looking at the timing and the sequence of

10  this, whether the Court should vacate or modify the freeze, we

11  would contend it is a bit premature.

12       No matter how the Court looks at it, we would contend

13  that, as the cases pointed out, if the frozen funds are

14  insufficient to satisfy a disgorgement award, that it would not

15  be proper to vacate or modify the freeze.  The Court can look

16  at it in two ways:  Either the frozen funds are woefully

17  inadequate to satisfy an eventual proceeds judgment or the

18  frozen funds are exactly equal to the commissions judgment;

19  commission being commissions earned, not the Securities

20  Exchange Commission, your Honor.

21       So, in any event, the standard wouldn't be met.  The

22  frozen funds would not exceed the disgorgement award.  We

23  recognize, of course, that vacating or modifying the freeze is

24  discretionary with the Court, but we would just point out that

25  courts both within this district and in other districts across

G7FQSECo

the country have said that when the standard is not met, that

it would not be appropriate to vacate it, nor would it be

appropriate looking at it from the other standard, your Honor,

which is that Verdmont would need to show that the amount

frozen is not tainted in any way.

What we would contend is that if it turns out that

Verdmont does not qualify for the Section 403 exemption such

that all of the commissions earned would be the result of an

unregistered offering in violation of Section 5, then all of

that money, all of those funds are per se tainted, which would

be the other standard that they haven't met.

Then the third standard, looking at this in terms of

the equities, your Honor, one thing that I did want to point

out which relates to this concept of dividend payments, we in

looking through the documents that we received from the S&P, as

Mr. Bentsen said, that review is still ongoing, but we did come

a cross one particular document that we wanted to bring to the

Court's attention.  It was Verdmont's interim financial

statements that Verdmont submitted to the Panamanian regulator

where Verdmont indicated in there exactly when those dividends

were paid, and, more importantly, for the point Mr. Zito

raised, how were they paid.

According to the financial statements, the board

directors of Verdmont, which as we know from Mr. Fisher's

deposition testimony consists of himself, Mr. Housser and their

partner Mr. @Hocher, so the three of those gentlemen convened

in November of 2015, and the financial statements indicate that

they voted to authorize payment of dividends in the amount of

603,250 balboas, the Panamanian currency, and that's about a

one-for-one conversion there.  So that would be consistent with

Mr. Fisher's testimony of the 600,000.

Interestingly enough, the financial statements do not

say that the dividend payments were made as a result of

Panamanian law, as was said earlier.  They do not say that the

dividends were required to be made.  And, in fact, if that was

the case, then, frankly, there would be no reason to have a

board of directors meeting to vote on it if it is a matter of

Panamanian law.  Interestingly enough, on that subject,

Mr. Fisher testified in his deposition back in April that

dividends were paid by the Verdmont board to its principals,

which, again, consisted of himself, Mr. Housser and Mr. Hocher

every year since Verdmont had been in existence except, he

said, in 2009 at the height of the market crash dividends were

not paid, which, again, if dividends are required to be paid

under Panamanian law, one would wonder why they weren't paid in

2009.

But the relevance of this, your Honor, is very

interesting because in May of 2015, this Court held a hearing

on the continued propriety of the preliminary injunction over

Verdmont and the asset freeze, and counsel went on the record

G7FQSECo

```
1    to this Court and said, and I quote, "As a result of this
2    lawsuit, as a result of the asset freeze that was effected on
3    its clients, its business is in a death spiral."  That was the
4    word or phrase that was used, and in fact this Court then
5    repeated that phrase, death spiral, a couple of times
6    throughout the remainder of that hearing when determining
7    whether to act with a sense of urgency and schedule a follow-up
8    hearing on this based on counsel's representations that the
9    company was in a death spiral.
10           So, for a company that is in a death spiral, here you
11   have -- that's in May 2015.  Then six months later, in
12   November 2015, this very same company that is in a professed
13   death spiral then pays out $600,000 to its principles.  The
14   question is, where was that money coming from?
15           Mr. Fisher told us in April at his deposition in
16   London that, like most corporate structures, that money was
17   paid out of retained earnings.  Well, if the money is paid out
18   of retained earnings, the board certainly could vote to keep
19   that money as part of retained earnings, and, hence, retain
20   those funds as earnings, and yet Verdmont did not, which is why
21   we find it a little confusing how Verdmont can represent in its
22   papers that these dividends in 2015 were paid in the ordinary
23   course, and there was nothing, I believe the term was, unusual
24   about that payment.  Well, I'm a little bit skeptical of
25   somebody referring to a dividend payment as being unusual when
```

G7FQSECo

 1    the very company that is making that dividend payment is in a

 2    so-called professed death spiral.

 3            So we would submit that Ms. Bhana, the liquidator,

 4    should be required at least to present to this Court some kind

 5    of information about what is being done to claw that payment

 6    back because it is simply inappropriate for a company that is

 7    in a death spiral to go out and pay $600,000 to its principals.

 8    That is the one point I wanted to address, your Honor.

 9            The other point is with respect to releasing these

10    funds to pay for attorneys' fees.  With all due respect to

11    Carter, Ledyard and Milburn, your Honor, the case law that we

12    cited that deals with a situation where defendants are

13    requesting a vacator to an asset freeze to pay attorneys, all

14    of those cases necessarily involve situations where the

15    attorneys needed the funds in order to continue financing the

16    litigation.  That's part and parcel of why you're making a

17    motion to release the funds in order to pay the attorneys.  And

18    yet courts in this district and in other districts around the

19    country were not moved or influenced simply because the

20    attorney isn't going to get paid.  That still requires an

21    analysis and thoughtful consideration of the issues at stake

22    and the standards that I explained before, number one, will the

23    amount of funds be sufficient to cover the eventual

24    disgorgement order; and, two, whether those funds are tainted.

25    Those are still things that need to be taken into account, and

G7FQSECo

1    the standard is not simply not, I as the attorney am not going

2    to get paid and I may, therefore, no longer be involved in the

3    case.  Well, that's not what the standard is.

4         The third point I wanted to make -- actually, I wanted

5    to make two additional points, your Honor.  The third is

6    that -- and this is similar to the point Mr. Bentsen raised a

7    moment ago.  Verdmont has contended that if you look at the

8    commissions that were earned after the 40-day clock began using

9    the SEC's start dates in March and April, respectively, breach

10   of the three securities, that after the 40-day clock expires

11   beginning on day 41, any commissions earned at that point would

12   not properly be subject to the freeze because those commissions

13   would be lawful.  And as my colleague, Mr. Bentsen, pointed

14   out, that is simply not the case.

15        I also wanted to on that issue let the Court know that

16   it wasn't just the House that concluded that in their

17   proceedings held in 1954 when they were amending the Securities

18   Act.  It also was the Senate.  And the Senate had heard from

19   various experts in the industry, not only from the commission,

20   but also in the private sector, but the Senate had the

21   following quote, which I think is very poignant here, your

22   Honor.

23        The Senate said:  If the dealer is a participant in

24   any unlawful distribution, he cannot lawfully effect

25   transactions in the unregistered securities so long as he is

G7FQSECo

1    engaged in the distribution even though the 40-day period has

2    expired.

3              So, if you are a dealer, and you are engaged in an

4    unlawful distribution, you cannot take advantage of the dealer

5    exemption no matter when; whether it's on day one, whether it's

6    on day ten, day 40, day 41, day 101.  You cannot take advantage

7    of that, period.  That is the point that we made in our summary

8    judgment motion and also here, your Honor; that all of the

9    conditions earned are therefore tainted.

10             The final point I wanted to address is something

11   Verdmont that had raised in its reply papers.  They had pointed

12   out, and again taking it out of context, representation or an

13   argument that we had made to the Court during the hearing on

14   the Caledonian settlement.  They had said, well, if the SEC

15   doesn't seem to care about collecting the money from

16   Caledonian, then why should they care about collecting the

17   money from us.

18             I do want to point out there are some important

19   distinctions between how the case of Caledonian has proceeded

20   and how it has proceeded with Verdmont.  Number one, the

21   Caledonian case resulted in a settlement, which the Court knows

22   is still pending before the Court.  Verdmont has not settled

23   the case and has not even indicated an interest in settling the

24   case.  It's contested.  That's the first point.

25             The second is that in Caledonian, there was an

G7FQSECo

```
 1    independent liquidator that was appointed by the Cayman Islands
 2    Monetary Authority.  That independent liquidator is with Ernst
 3    & Young.  In this case, your Honor, we don't have an
 4    independent liquidator.  We have a current Verdmont employee
 5    who has been at Verdmont for a very long time acting in various
 6    capacities, including CFO, I believe, and the director of human
 7    resources.  That is not the same thing as a neutrally
 8    independently appointed person to conduct the affairs of a
 9    company in liquidation.
10           The third point is that the resolution with Caledonian
11    involved full financial disclosure and full document
12    production.  Verdmont has made neither to the SEC.  In fact,
13    Verdmont itself has refused to produce even documentation to us
14    and has forced us to go get it from the Panamanian regulator,
15    which we've done.
16           The next issue is that Caledonian, as the Court knows,
17    was a conglomerate.  It wasn't just an investment house.  It
18    also was a deposit institution, so there were a number of
19    affected entities there who were simply depositors, which were
20    different than those who were investing in these operations
21    purely for profit.
22           Third, Caledonian had a number of cooperation
23    obligations as part of that settlement, and Verdmont has none
24    of that.  So it's simply not enough to point out that, well, we
25    didn't do it for them, so they shouldn't do it for us.  That
```

G7FQSECo

 1    was a special situation that involved negotiated points and an

 2    independent liquidator, your Honor, so it's not the same thing.

 3            Those are all the points I wanted to make.  If the

 4    court has any additional questions, I'd be happy to address

 5    them.

 6            THE COURT:  Thank you, Mr. Costello.

 7            MR. COSTELLO:  Thank you, your Honor.

 8            THE COURT:  Mr. Zito.

 9            MR. ZITO:  So much to say, your Honor, in such little

10    time.

11            The statutory scheme, your Honor, of Section 5 makes

12    three classes of persons liable under the statute.  Those three

13    persons are issuers, underwriters and dealers.  Statute Section

14    4 outlines circumstances under which a dealer is exempt from

15    liability.

16            These are statutory definitions.  It's a statutory

17    exemption.  That is the law.  It's the law of the land.

18    Congress makes the law.  The SEC doesn't make the law.  SEC, no

19    matter what they think the definitions should be of a what an

20    underwriter is, no matter what they think the dealer exemption

21    might be or should be, they don't make the law, your Honor.

22    The law is made by Congress, and your Honor enforces the law.

23    The SEC has rule-making authority so whether they think that

24    whether a dealer should be involved or not be involved, I mean,

25    all of that is made out of whole cloth.  There is nothing in

G7FQSECo

```
 1   the statutory dealer's exemption that says that a dealer shall

 2   not be entitled to this exemption in the event that it is

 3   conducting a transaction on behalf of an underwriter.  That's

 4   just not in the statute.  They're grabbing this from an

 5   administrative decision -- from dicta in an administrative

 6   decision made 50 years ago in this Quinn case, and they're

 7   creating out of one little bit of cloth 14 sweaters.  That's

 8   what they've knitted and they've put it before your Honor.

 9           Now, the problem with that, your Honor, is that what

10   they conveniently forget to tell the Court is that the Quinn

11   case, the reason why the dealer wasn't entitled to the dealer

12   exemption is because it dealt within the 40 days.  It was the

13   40 days.  And the 40 days, your Honor, wasn't created out of a

14   vacuum.  It wasn't created abstractly.  It was created so that

15   brokers in the interest of interstate commerce, sophisticated

16   commerce with people making trades in milliseconds, that a

17   dealer couldn't possibly say, oh, we've got a trade coming over

18   the line.  Oh, we've got an underwriter.  Pull it.  It's not an

19   underwriter.  They've got a trade.  They've got to execute that

20   trade.  And they're obligated to make the best execution and

21   execute their fiduciary duties.  They cannot possibly do that.

22           In fact, the 1954 Amendment to the statute reduced the

23   one-year waiting period to 40 days, and all the legislative

24   history says this is a bright line.  This is so a dealer

25   doesn't inadvertently get involved in the distribution.  It's a
```

G7FQSECo

1   cutoff period as a matter of law.  They may not like it.

2   That's the law, your Honor.

3   Now, if there's some sort of a fraud here, and they'd

4   like to get up before this Court and say, well, I see this

5   document, and let me tell you what this document is.  It's not

6   their document.  They didn't create those documents.  They

7   don't have any crystal knowledge of those documents.  They

8   haven't submitted a single declaration authenticating any of

9   the documents they have before your Honor.  These are all

10  unauthenticated documents.  In fact, they cite in their brief

11  that you can't rely on unauthenticated documents in a summary

12  judgment motion, but that's precisely what they do.

13  But if they really believe that there was a fraud

14  here, a pump-and-dump -- and that's what a pump-and-dump is,

15  your Honor.  It's fraud with a capital F.  That there was a

16  fraud here, they have in their arsenal Section 10.  They don't

17  have to rely on 5.  They're trying to conflate 10 and 5 and let

18  your Honor think that there was some massive fraud going on

19  here and somehow we've facilitated it.  Well, bring that case.

20  Bring that case.  They haven't.  And for good reason.  Because

21  there is no case.  And they are just hunting around in the

22  shadows trying to influence your Honor and make your Honor

23  think that maybe there was some fraud here, maybe someone was

24  hurt.  Anyone who deals in these penny stocks are sophisticated

25  traders.  They are not blue-haired old ladies out there that

G7FQSECo

1    lost their life savings or anything like that.  These people

2    are all sophisticated.  Anyone who trades in these stocks gets

3    what they deserve.  There are no innocent parties here.

4              There is no authority for the doctrine that anyone

5    that a dealer who makes trades on behalf of an underwriter

6    becomes an underwriter, and that's what they're saying.  The

7    statutory definition of underwriting -- we only have to prove,

8    arguably -- and I would take exception to that, but for purpose

9    of this argument, your Honor, I will say we will prove that we

10   were not underwriters.  We don't have to prove that our

11   customers weren't underwriters because the statute 2(a)(11)

12   Specifically allows us to make trades on behalf of underwriters

13   and not be swapped up in the underwriting, and the statute

14   doesn't say, well, you lose your dealer exemption.  The statute

15   doesn't say that.  The only thing that says that is some dicta

16   in some 50-year-old administrative opinion.  And with all due

17   with respect to the Securities and Exchange Commission, they

18   don't make the law.  We know time and time again that the

19   Securities and Exchange Commission likes to legislate through

20   enforcement.

21             That is precisely what the Caledonian settlement is

22   about.  They are pointing the finger at us and saying, well,

23   you haven't settled the case.  The reason why we haven't

24   settled the case since they opened up that door, your Honor, is

25   because what they want us to do is to concede that we are

G7FQSECo

liable for all of the proceeds, all of the proceeds, and they

are trying to create law.  And with this Caledonian -- because

they put that in the Caledonian settlement, and now what

they're going to go is they're going to say, oh, well, Judge

Pauley determined that a broker isn't liable just for

disgorgement.  Judge Pauley determined that you're liable for

all of the proceeds regardless of the commissions of what you

got.  And the sole underpinning for that decision, that

strategic move on their part is a pre-Newman insider trading

case.  Not a Section 5 case.  A pre-Newman insider trading

case, where the trader had inside information and made a profit

for his fund.  And the court said, well, I can't disgorge from

the fund.  They're not a wrongdoer.  I have to disgorge from

the trader.  So they said, well, you disgorge the amount of

profits that you got from the fund.

I doubt that case would hold up post Newman, but

that's the only case they have, and that is why they are

insisting on saying we want all of the proceeds, all of the

proceeds, not just the commissions, because they want to

legislate by enforcement and they want to use your Honor's

imprimatur in order to preach that gospel.

Referring to the confidential informant, he mentions

Nautilus; that he had some dealings with Nautilus.  He doesn't

say what dealings he had with Nautilus, and he said he had some

dealings with Goff.  And there's a disconnect because Nautilus

G7FQSECo

1    never dealt in Goff.  So I respectfully submit, your Honor,

2    that affidavit, that declaration is useless.

3           The SEC then goes on to say, well, the dealer

4    exception doesn't work because a bona fide offer doesn't happen

5    until a sale actually happens, and all the cases uniformly say

6    that it's not -- if we look at the statute, it's when the

7    distribution process begins, when is the first offer to the

8    public made.  Not when the first transactions are made.  That's

9    the statutory language.  I didn't write it.  Carter Ledyard

10   didn't write it.  The SEC didn't write that language.  That's

11   the language we have to deal with, and that's the language we

12   have to follow.

13          As to the testimony regarding what is a quote and what

14   is not a quote, your Honor, we had a deposition of the

15   president of the OTC bulletin board, ATS.  The president

16   testified.  A lawyer from Carter Ledyard asked all these

17   questions.  What does this mean?  Is this a quote?  She said,

18   yes, this is a quote.  The SEC didn't ask one question.  They

19   didn't ask one question.  Now all of a sudden -- they were at

20   the deposition.  This deposition didn't happen at 3:00 in the

21   morning on the 4 train station.  This happened at our offices.

22   They showed up.  They flew up from Washington.  They sat there.

23   They listened.  No questions.  And now they are trying to

24   complain that, well, they didn't have an opportunity really to

25   ferret out what these quotes are.

1    We looked at the case law.  In fact, your Honor

2  referred to the *Biozoom* case in denial of the 12(c) motion.

3  Your Honor said we referred to the *Biozoom* case.  We looked at

4  that closely, and the *Biozoom* case said precisely what we are

5  saying on this motion.  That's when the first quote is made.

6  So we said maybe we need some testimony.  We saw the FINRA

7  applications.  Let's get some testimony.  We issued the

8  subpoena.  They were there.  They could have taken all the

9  testimony in the world.

10    In terms of the question as to whether or not in IOI,

11  indication of interest, is it a quote or not a quote.  Again,

12  your Honor, I refer, respectfully, the Court to Mr. Lofchie's

13  treatise as a partner at Davis Polk.  The SEC was claiming,

14  well, that doesn't mean anything.  There's no obligation to

15  trade, so that doesn't mean anything, and they have no

16  authority for that.  That's the problem that I have with this

17  case, is that the SEC stands up before this Court and just says

18  things without any authority, without any evidentiary footing,

19  without any basis.

20    Lofchie says, your Honor, unpriced indications trigger

21  no obligation to trade a subject security at a particular price

22  or size.  However -- they like to quote only the first parts of

23  the sentences -- however, a broker-dealer displaying an

24  unpriced indication of interest must supply on request to

25  another broker-dealer a bid or offer that must be firm for at

G7FQSECo

1    least one trading unit typically a hundred shares.  And they

2    cite NASD Rule 6530, SEC release number 34-40878.

3            In terms of relying on *Quinn* for the proposition that

4    anyone who also deals with an underwriter somehow attains

5    underwriter status is -- putting aside the fact that it doesn't

6    meet the statutory definition.  Underwriter is specifically

7    defined -- 2(a)(11) in the statute defines what an underwriter

8    is.  Rule 141, the SEC explains what that definition is.

9            Second Circuit in 2011 in the Lehman Brothers case

10   specifically declined to attach underwriter liability to

11   Moody's, to the rating agencies in connection with the

12   collapsed commercialized mortgage obligation cases.  The Second

13   Circuit said, well, OK, not everybody is an underwriter.  And

14   it was tried in that case, the class action plaintiff lawyers

15   tried to attach underwriter status to people who were rating

16   the bonds, and the Second Circuit said, no, that's not it.

17   We've got separate classes, separate buckets.  Either we're an

18   underwriter, a dealer, clearly, we're not an underwriter.

19   Dealing on behalf of -- executing a trade on behalf of an

20   underwriter doesn't make us an underwriter, OK?  There's

21   nothing in the statute that says that if you execute a trade,

22   you lose your dealer exemption.  The statute just doesn't say

23   that.  In fact the statute, if you go to 2(a)(11) says just the

24   opposite.  It says that you avoid underwriter liability if

25   you're just getting a commission, if you're just simply getting

G7FQSECo

1    commission.  It isolates one class of people as classic

2    underwriters.

3          An underwriter -- let's go back to the beginning.

4    What's an underwriter?  An underwriter is a broker-dealer that

5    agrees for a price to purchase the stock from the company going

6    public.  They get a management fee for that, and they manage

7    the distribution of all or substantially all of the stock.

8    That's a classic underwriter.

9          They are claiming that customers of Verdmont were

10   underwriters when they were only dealing with couple of -- they

11   weren't dealing with the whole issue.  They didn't even buy

12   from any of the issuers.  These are private sales transactions.

13   There is nothing unlawful about that or untoward.  It happens

14   all the time.  Before Facebook went public, there was a slew of

15   funds that were created just to buy up the private stock before

16   the IPO.  That's the business of it.  That's the way it's done.

17   There's nothing illegal about it.

18         There's another -- a 40-day period starts to run when

19   the stock is first offered to the public.  The public is

20   defined axiomatically as anyone who is not an issuer or

21   controlled by the issuer.  None of the evidence before your

22   Honor, the authenticated evidence before your Honor, is that

23   any of Verdmont's customers, the principals of the customers

24   were also principals of the issuers.  So by definition, if they

25   weren't insiders, if they weren't, you know, acting on behalf

G7FQSECo

1    of the insiders -- and there's documentation that shows that

2    they bought their stock in private sales transactions.  So if

3    they are not the issuer, then they are by definition the

4    public.  So the 40-day period starts to run when they get the

5    stock.  All the customers held it for 40 days so you still get

6    within the 40-day rule.  It still works.

7         Your Honor, we have produced every documents that

8    they've asked for.  Your Honor is well aware of the privacy

9    laws we have in Panama.  We worked around that by producing the

10   documents to the regulators, and the regulators have turned

11   over all those documents.  Many of those documents are not

12   before this Court, and I am not going to address the comments

13   made by Mr. Costello as to his speculation as to what those

14   documents mean or don't mean.

15        I have nothing further, your Honor.

16        MR. BENTSEN:  Your Honor, may I very briefly?

17        THE COURT:  Very briefly, Mr. Bentsen.

18        MR. BENTSEN:  Verdmont just said that the only place

19   that has said the presence of an underwriter in a transaction

20   vitiates 403(a) on a commission was 50 years, ago and that

21   there is nowhere else that says that.  I'm going to assume that

22   Verdmont hasn't bothered to read the Circuit opinion affirming

23   the commission in that case.  So I direct the court to *Quinn*

24   *and Company v. SEC*, 452 F.2d 943.  It's in our brief.  This is

25   what the Tenth Circuit said, which clearly is not the

G7FQSECo

1    commission.

2           The dealers' and brokers' exemptions contained in 15

3    U.S.C. Sec. 77d are inapplicable here.  These exemptions are

4    inapplicable to transactions involving an underwriter.  Since

5    the transaction effected by Quinn and Company, a broker-dealer

6    or for White in the present case involved an underwriter,

7    (White) the exemptions are not available.

8           That is what the Court said.  That is what they

9    affirmed to try to say that the Commission's conclusion in the

10   same facet was dicta.  That is how the Circuit affirmed the

11   Commission and held that a broker-dealer who sells for an

12   underwriter cannot claim that exemption.

13          Earlier in that case, indicated that since the

14   petitioners, a broker-dealer are claiming the availability of

15   the exemption from registration, the burden of proof is clearly

16   upon them to prove that White, their client, was not an

17   underwriter.

18          The only court that actually has addressed this has

19   directly held that a broker-dealer selling for their client has

20   the burden to prove that their client was not an underwriter

21   and that the presence of an underwriter vitiates their

22   exemption.  There is no competent evidence, none whatsoever,

23   about the relationship between Verdmont's clients and the

24   issuers to say they are not underwriters.  Verdmont has simply

25   proffered nothing to meet its burden, and that in effect

G7FQSECo

1    precludes summary judgment.

2           There's a lot of talk about what the commission does

3    and does not do.  And I'm not going to get into that because I

4    think we've taken up enough of your Honor's time.  Given the

5    explicit statement that this case doesn't exist even though

6    it's clearly cited and is affirming the Commission's decision

7    in that case, I simply wanted to point that out.

8           Thank you, your Honor, if you have no further

9    questions.

10          MR. ZITO:  If I may make one note on that, your Honor.

11          THE COURT:  You are going to get the absolute last

12   word because you are the moving party, but this is it.

13          MR. ZITO:  This is it, your Honor, and I will be

14   brief.

15          I urge the Court to read *Quinn*.  I urge the Court --

16   and to read the administrative opinion and to determine what's

17   dicta and what's not dicta.  What's very clear is that the

18   dealer was not entitled to the extension because it dealt

19   within the first 40 days.  It's very clear, and that's in the

20   administrative opinion.  Sometimes we all know that in cobbling

21   together an opinion words come out which are maybe not

22   necessarily intentional, OK.

23          The other point is that, your Honor, we referred the

24   Court to four decisions, four cases, that sustained the

25   dealer's exemption and granted the party's summary judgment.

G7FQSECo

```
 1   Biozoom was one of them.  In none of those cases did they say

 2   that there was a burden to prove that your customer wasn't an

 3   underwriter or anything like that.  In fact, I know for a

 4   fact -- I haven't read these cases in a while -- but I'm pretty

 5   sure that those cases all involved underwriters, and it wasn't

 6   whether or not the underwriters may be liable.  The question is

 7   whether or not the dealer is liable.  It's the dealer.  All of

 8   this cannot be conflated.  They're separate boxes.

 9           I've taken up enough of your time, your Honor.  Thank

10   you very much.

11           THE COURT:  Counsel, thank you for your arguments.

12   Decision reserved.

13           Is there anything else the parties want to raise while

14   they're all here?

15           MR. BENTSEN:  No, your Honor.

16           THE COURT:  Anything from the defendant?

17           MR. ZITO:  Nothing, your Honor.

18           THE COURT:  Have a good weekend.

19           (Adjourned)

20

21

22

23

24

25
```