UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
SECURITIES AND EXCHANGE COMMISSION, :

                    Plaintiff,            :

                -against-            :

CALEDONIAN BANK LTD., *et al.*,         :

                  Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

15cv894

OPINION & ORDER

WILLIAM H. PAULEY III, District Judge:

        The Securities and Exchange Commission (the "SEC"), along with Caledonian

Bank Ltd. and Caledonian Securities Ltd. (collectively, "Caledonian") move for approval of a

proposed consent decree.  Non-party Sentinel Trust Services, Ltd. ("Sentinel"), the putative

owner of equity interests in Caledonian, objects to the proposed consent decree and seeks to

intervene in this enforcement action.  Sentinel's motion to intervene is denied and the proposed

consent decree is approved.

BACKGROUND

        On February 6, 2015, the SEC filed this enforcement action alleging violations of

Section 5 of the Securities Act of 1933 against Caledonian and three broker-dealers based in

Belize and Panama (Clear Water Securities, Inc.; Legacy Global Markets, S.A.; and Verdmont

Capital, S.A.).  The SEC alleged that Defendants sold large amounts of valueless, unregistered

securities to public investors through several "pump-and-dump" schemes.  (Compl. ¶ 1.)  The

SEC also moved, ex parte, for an asset freeze, asserting that Defendants were foreign entities,

and therefore could easily "move assets out of [their U.S.] bank accounts or brokerage accounts

at a moment's notice."  (Transcript of February 6, 2015 Hr'g ("Feb. 6, 2015 Tr."), ECF No. 52,

at 8.)  In its application, the SEC emphasized that Defendants were the "actual sellers" of those

fraudulently inflated penny stocks.  (Feb. 6, 2015 Tr. at 3:6.)  The SEC also asserted that

Defendants garnered "tens of millions of dollars" by unloading those worthless securities on

unsuspecting "American investors."  (Feb. 6, 2015 Tr. at 3:8–3:10, 4:1–13; TRO, ECF No. 6, at

2.)  In total, the SEC sought to freeze all of Caledonian Bank Limited's U.S.-based assets,[1] and

over $17 million[2] of Verdmont's U.S.-based assets.  (See Feb. 6, 2015 Tr. at 6–7; February 6,

2016 Declaration of Ernesto Amparo ("Amparo Decl."), ECF No. 62, ¶¶ 2, 6, 9; May 12, 2016

Declaration of Keiran Hutchison ("Second Hutchison Decl."), ECF No. 231, at ¶¶ 4–5.)  Based

on the SEC's representations, this Court granted the SEC's motion for an asset freeze.

As described in this Court's prior opinion and order, SEC v. Caledonian Bank

Ltd. ("Caledonian Bank I"), 145 F. Supp. 3d 290 (S.D.N.Y. 2015), the SEC's Complaint did not

reveal that Verdmont and Caledonian were primarily selling securities as agents for certain

unnamed clients, and had retained only a small fraction of the profits from the allegedly

unregistered sales.[3]  See Caledonian Bank I, 145 F. Supp. 3d at 295–96; SEC Memorandum in

Support of Approval of the Consent Decree ("SEC Mem."), ECF No. 171, at 11.  Thus, while

$76,677,852 was frozen in Caledonian's accounts, Caledonian had received just $1.4 million in

---

[1] In its application for a freeze order, the SEC reported that Caledonian's account balance at Northern Trust as of December 8, 2014 was $71,638,622.94.  (Amparo Decl. ¶ 6.)  And the SEC reported that that account was just "one" of Caledonians' U.S.-based accounts.  (Amparo Decl. ¶ 6.)  By the time the SEC sought the asset freeze, its information was stale.  It appears that in excess of $200 million in cash and securities was frozen in Caledonian's U.S.-based accounts.  (See Transcript of February 9, 2015 Hr'g ("Feb. 9 Tr."), at 5:17–6:22.)  Caledonian's counsel quickly negotiated for a reduction in the freeze to $76,677,852.  (Second Hutchison Decl. ¶ 5.)

[2] Verdmont asserts that the total assets frozen were over $28 million.  (Verdmont's Motion for Judgment on the Pleadings ("Verdmont 12(c) Motion"), ECF No. 107, at 6.)

[3] The SEC reports that Caledonian has produced documents to the Cayman Islands Monetary Authority (and then to the SEC) indicating that Clear Water and Legacy Global "were the primary Caledonian customers trading in the securities."  (SEC Mem., at 7 n.3.)  An indictment in the Eastern District of New York relating to several of these entities alleges that Legacy Global was created as part of a scheme to circumvent SEC and IRS reporting requirements through the use of offshore shell corporations.  See SEC v. Mulholland, No. 15-cv-3668 (E.D.N.Y. filed June 23, 2015).

commissions from the relevant transactions.[4]  (See SEC Mem., at 5.)  Similarly, Verdmont received only $240,000 in commissions, while the SEC secured a freeze order for over $17 million in Verdmont's U.S.-based accounts.[5]  (May 16, 2016 Declaration of Shamima Bhana ("Bhana Decl."), ECF No. 237, ¶ 6.)  In total, the freeze order encompassed approximately fifty times the assets needed to ensure that Caledonian and Verdmont could disgorge their alleged ill-gotten gains from the unregistered sales.  While SEC attorneys discovered these disparities soon after securing the asset freezes, they did not disclose them to this Court for months.  See Caledonian Bank I, 145 F. Supp. 3d at 299 (citing SEC Letter dated May 20, 2015, ECF No. 87, at 1 n.1.).

Importantly, Caledonian was not merely a securities broker—it also owned a bank in the Cayman Islands.  (E.g., Second Hutchison Decl. ¶¶ 1–8.)  After this Court issued the asset freeze, bank depositors learned that all of Caledonian's U.S.-based assets had been frozen in connection with the alleged pump-and-dump scheme.  A run on the bank ensued, and Caledonian failed.  The Cayman Islands Monetary Authority ("CIMA") then placed Caledonian into liquidation.  (Second Hutchison Decl. ¶¶ 8–12.)  The Grand Court of the Cayman Islands (the "Cayman Islands Court") appointed Keiran Hutchison and Claire Loebell of Ernst & Young as the Joint Official Liquidators (the "Cayman Liquidators") of Caledonian.  (Second Hutchison Decl. ¶¶ 10–12.)  For all practical purposes, that liquidation concluded the action with respect to Caledonian.

---

[4] Caledonian's commissions have fluctuated between one $1.4, and more recently, $1.3 million.  (Compare, e.g., SEC Mem., at 5; SEC Memorandum in Opposition to Motion to Intervene, ECF No. 229, at 6.)  This Court uses the $1.4 million figure for purposes of this Opinion.

[5] Verdmont concedes that it engaged in a single-day proprietary trade of 200,000 shares of Xumanii securities for a profit of $11,300.  (May 16, 2016 Declaration of Shamima Bhana, ECF No. 237, at 2 n.1.)

In the ensuing months, the Cayman Liquidators negotiated a proposed consent decree between Caledonian and the SEC.  (Second Hutchison Decl. ¶ 18.)  Under the proposed decree's terms, Caledonian would consent to the SEC's requests for injunctive relief against the now-defunct bank and broker.  The SEC and Caledonian also agreed to disgorgement of $25 million, representing a compromise between the $1.4 million in commissions Caledonian received and the $38 million in net proceeds its clients obtained.  (See Final Judgment of Defendants Caledonian Bank Limited and Caledonian Securities Limited, submitted February 9, 2016 ("Final Judgment"); Transcript of May 20, 2016 Oral Argument ("May 20, 2016 Tr."), at 17:17–22.)

In this case, disgorgement of $25 million is somewhat of a legal fiction because the SEC is prepared to waive payment of that sum.  And, Caledonian is not in a position to pay a dime.  The SEC reports that the purpose behind this seemingly illusory arrangement—fixing a judgment it agrees never to enforce—is to permit Caledonian's assets to be distributed to creditors, while allowing the SEC to point to a $25 million disgorgement for the sake of precedent in future litigations.[6]  (Second Hutchison Decl. ¶ 19; Transcript of April 12, 2016 Pre-Motion Conference ("April 12, 2016 Tr."), ECF No. 213, at 5:23–6:6.)

On November 10, 2015,[7] the Cayman Liquidators sought approval of the proposed decree with the Cayman Islands Court.  (Second Hutchison Decl. ¶¶ 20–21.)  Sentinel was the only objector.  (Second Hutchison Decl. ¶ 23.)  Sentinel claims to be the "ultimate equity owner" of Caledonian.  (See Sentinel Mem., ECF No. 217, at 5.)

---

[6] Of course, this type of phantom judgment could pose challenges for the Clerk of Court.  Should the Clerk of Court docket a judgment of $25 million?  Or zero?

[7] Curiously, the Cayman Liquidators filed their application to approve the Consent Decree the same day this Court issued its Opinion and Order denying Verdmont's motion for judgment on the pleadings.  (ECF No. 140.)

Sentinel objected to any settlement between the Cayman Liquidators and the SEC. It wanted the Cayman Liquidators to sue the SEC on the ground that the initial asset freeze caused substantial and unwarranted harm to Caledonian. Sentinel's counsel asserted that it could defend the enforcement action and recover funds for Caledonian on a contingency basis by interposing a $100 million counterclaim against the SEC. But in return, Sentinel had the following demands:

1. Caledonian would reimburse Sentinel and its counsel for out-of-pocket litigation costs;

2. Sentinel's counsel would receive a 47.5% contingency fee for prevailing in any litigation against the SEC;

3. $35,700,000 of Sentinel's equity in Caledonian would be prioritized over the claims of Caledonian's other creditors; and

4. any additional amounts recovered in the action would be split fifty-fifty between Sentinel and Caledonian Bank Limited.

(Second Hutchison Decl. ¶¶ 29–32.) Under this proposal, Caledonian's creditors would not be paid in full, but Sentinel would be compensated for more than $30,000,000 of its equity. (See Second Hutchison Decl. ¶ 32.) Unsurprisingly, Sentinel's proposal failed to gain traction with Caledonian's creditors, the Cayman Liquidators, or the Cayman Islands Court.

The Cayman Liquidators advised the Cayman Islands Court that recovery from a potential counterclaim against the SEC would be speculative and unlikely; that continued litigation would be time-intensive and expensive; that the proposed order of priority would violate other creditors' rights; and that vesting control of the defense of the enforcement action in Sentinel—a non-party—would violate Cayman Islands law. (Second Hutchison Decl. ¶¶ 32–39; February 25, 2016 Declaration of Keiran Hutchison ("First Hutchison Decl."), ECF No. 185, at 20.) The Cayman Liquidators also concluded that Caledonian was unlikely to obtain a better

result than the consent decree, which was effectively an empty judgment. (Second Hutchison Decl. ¶¶ 19, 32–33.) Of course, this Court has little information concerning what the Cayman Liquidators amassed and charged out. Similarly, neither this Court nor the SEC have any assurance that whatever may have been distributed did not go into the pockets of those who orchestrated the pump-and-dump schemes, or aided and abetted them. The Cayman Islands Court rejected Sentinel's arguments and authorized the Cayman Liquidators to enter into the proposed settlement with the SEC. (Second Hutchison Decl. ¶ 35.) The SEC and Caledonian then filed memoranda seeking approval of the consent decree by this Court. (ECF Nos. 170, 171; 184–186.)

DISCUSSION

I.   <u>Motion to Intervene</u>

Sentinel seeks to intervene both "as of right" and "permissively" under Federal Rule of Civil Procedure 24.

A.   <u>Intervention as of Right</u>

"In order to intervene as of right pursuant to Rule 24(a)(2), [an] applicant must: (1) file a timely motion; (2) show an interest in the litigation; (3) show that its interest may be impaired by the disposition of the action; and (4) show that its interest is not adequately protected by the parties to the action." <u>In re Holocaust Victim Assets Litig.</u> ("HVAL"), 225 F.3d 191, 197 (2d Cir. 2000). "Failure to meet any one of these requirements suffices for a denial of the motion." <u>HVAL</u>, 225 F.3d at 197–98.

1.   <u>Timeliness of the Motion</u>

The timeliness of a motion to intervene turns on a number of factors, such as the length of time the applicant had notice; the prejudice that intervention works on the existing

6

parties; prejudice to the applicant from denying the motion; and any "unusual circumstances" that counsel for or against intervention.  See HVAL, 225 F.3d at 198.

      The SEC asserts Sentinel's motion is untimely because Sentinel had notice of the settlement for many months and unsuccessfully objected in the Cayman Islands proceeding. However, until the Cayman Islands Court authorized the settlement, and the SEC and Caledonian moved in this Court for approval, Sentinel had no basis to intervene here.  Once the SEC sought approval of the settlement on February 9, 2016, Sentinel acted promptly, seeking a pre-motion conference just days later.  Accordingly, Sentinel's motion was timely.

      2.   <u>Interest in the Litigation</u>

      The primary question to be resolved on Sentinel's motion is whether it has any "interest" that would warrant its appearance as an intervenor.  While Sentinel asserts that it was the "ultimate equity owner" when Caledonian was a going concern, that contention is debatable.

      There are many strata above and below Sentinel.  Caledonian's sole shareholder of record is Caledonian Global Financial Services Inc. ("CGFSI"), which is an intermediate holding company for a group of Cayman Islands financial service companies.  CGFSI's sole shareholder, in turn, is Sentinel, another Cayman Islands company.  Moreover, Sentinel's "beneficial interest" in the shares it purports to "own" is dubious.  Sentinel holds those shares for the beneficiaries of the "New World STAR Trust."  The beneficiaries of that trust are not identified.

      The ownership of Sentinel is also elusive.  It is a corporate entity 100% owned by "Blackbriar Holdings, Inc.," which in turn is 100% owned by "Tiger Management Holdings, Ltd.," which in turn is 100% owned by "Spartan Holdings Ltd.," which is 100% owned by "Iconic Holdings Investment, Ltd," whose principals are undisclosed.  (See Sentinel's

Supplemental Rule 7.1 Statement, ECF No. 227.)  Navigating the labyrinth of Caledonian's

ownership is an ordeal rivaling Theseus's, but without Ariadne's guiding string.  It is an

understatement to say that Sentinel and its controlling affiliates' interest in this action is opaque:



Sentinel asserts that intervention would serve the interests of whoever or whatever is behind this matrix.  Specifically, Sentinel asserts that intervention would allow: (1) vacatur of the freeze order;[8] (2) preservation of its ability (presumably as the agent for undisclosed beneficiaries behind the New World STAR Trust veil) to obtain a money judgment against the SEC; and (3) continued litigation of objections to the consent decree, particularly with respect to provisions that would "release any claims by Caledonian against the SEC, without any compensation for the complete destruction of [Caledonian's] business."   (Complaint-in-Intervention, ECF No. 218-1, at 9.)

     a.   Interest in Reducing Assets Subject to the Freeze Order

At oral argument, counsel conceded that Sentinel's interest in reducing the asset freeze was mooted by a recent stipulation between Caledonian and the SEC to reduce the minimum balances in Caledonian's accounts to $1,300,000.  (See ECF No. 226; May 20, 2016 Tr., at 13 ([Counsel:] "[T]he parties strategically mooted that issue, which I'm fine with, frankly.").)  Moreover, one of the provisions of the consent decree to which Sentinel objects would authorize the release of those very funds.  (See Final Judgment, at 5.)

In any event, even if Sentinel was the sole equity holder of Caledonian's stock, it would not be entitled to the monies released from the asset freeze at issue in this litigation.  As demonstrated by the Cayman Islands liquidation proceedings, Caledonian's liabilities exceed its assets.  (See, e.g., Second Hutchison Decl. ¶ 36 ("[T]here will be insufficient assets realizable in CBL and CSL to respectively pay each of their creditors in full . . . .").)  And the plan of distribution in the Cayman Islands liquidation would not remit the asset freeze monies to

_____

[8] In its reply memorandum in support of intervention, Sentinel disavows any interest in intervening to seek sanctions from the SEC.  (Sentinel's Reply Mem., ECF No. 244, 6 n.9.)

Sentinel, but to Caledonian's non-priority creditors as a whole,[9] who are unlikely to recoup their deposits or investments from the liquidation in full.  (Second Hutchison Decl. ¶¶ 37–38.)  As an equity owner, Sentinel stands at the end of the line in the liquidation.  Thus, any recovery by Sentinel from a reduction in the asset freeze turns on the unlikely event that the parties and the Cayman Islands Court alter the terms of a distribution plan they already approved.  It is well-established Sentinel cannot seek intervention as of right based on such a tentative financial interest, which, at best, is "contingent upon the occurrence" of an unlikely "sequence of events." See Wash. Elec. Co-Op., Inc. v. Mass. Mun. Wholesale Elec. Co., 922 F.2d 92, 92 (2d Cir. 1990).

      b.   Interest in Compensation from the SEC

      Sentinel also argues that it is entitled to intervene and pursue a claim that the SEC should compensate it for the "complete destruction" of its interest in Caledonian's business. (Sentinel Mem., ECF No. 217, at 17–18.)  But Sentinel is only an agent for the trust beneficiaries.  Specifically, Sentinel fears that approval of the proposed decree will either release any claims that Sentinel might choose to bring against the SEC for the loss of the beneficiaries' equity; or permit the SEC to use the nominal $25 million disgorgement award to "set off" any recovery that Sentinel might obtain in a follow-on action.[10]

      Sentinel does not explain why an agreement between the SEC and Caledonian would affect Sentinel's ability to file an action against the SEC.  At oral argument, this Court explored that with counsel:

---

[9] Under Cayman Islands law, Caledonian's "priority" creditors are employees or depositors with a claim of $20,000 or less in Cayman Islands dollars (KYD).  While priority creditors have been satisfied in full, other creditors have not.  (Second Hutchison Decl. ¶ 37.)

[10] Sentinel also appears to argue that it could bring these claims on behalf of Caledonian.  But Caledonian is a separate legal entity that is now adverse to Sentinel.  Sentinel provides no adequate explanation for how it could compel another party to sue the SEC.

> THE COURT: How does compelling Caledonian Bank to do something commit your client, Sentinel to do something?
>
> [COUNSEL]: Well, it doesn't, your Honor.
>
> THE COURT: Right.   Why should your client, Sentinel, care what Caledonian is obliged to do under the consent decree?
>
> [COUNSEL]: Again, we are concerned about collateral estoppel and res judicata issues if we assert claims based on the same facts that the SEC alleged in their complaint.  I don't want to concede that and we would dispute that. But it is a risk.

(May 20, 2016 Tr., at 5:12–5:21.)  Construing these arguments liberally, Sentinel appears to be suggesting that Caledonian's consent decree would preclude Sentinel from suing the SEC based on: (1) claim preclusion; (2) issue preclusion (i.e., collateral estoppel); or (3) Federal Rule of Civil Procedure 13, which requires counterclaims based on the same "transaction or occurrence" as the underlying litigation to be filed in the first proceeding in which they can be asserted.  At bottom, the flaw with Sentinel's argument is that whoever is behind Caledonian, apparently it is not Sentinel.

Courts apply federal common law to determine the scope of a prior federal judgment's preclusive effect.  Taylor v. Sturgell, 553 U.S. 880, 891 (2008).  One type of preclusion is "claim preclusion."  Under claim preclusion, a "final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'"  Taylor, 553 U.S. at 892 (citation omitted).  Notably, however, that doctrine does not bind anyone to a "judgment in personam in a litigation in which he is not . . . a party."  Taylor, 553 U.S. at 893.  Because Sentinel is not a named party to this action, claim preclusion does not apply to it.[11]

---

[11] While there are certain "exceptions" to the rule against nonparty preclusion, none are relevant here.  See Taylor, 553 U.S. at 893–95.  Indeed, the SEC has conceded Sentinel's ability to litigate its claim in another action.  (See SEC Mem. in Opposition to Motion to Intervene, ECF No. 228, at 11.)

Another form of preclusion is "issue preclusion," or collateral estoppel. "Federal principles of collateral estoppel . . . require that [](1) [an] identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided . . . ; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006). These elements are not satisfied here. Entering an SEC consent judgment against Caledonian does not decide—much less "fully litigate" or "resolve" —the separate issue of whether the SEC is liable to Sentinel, a non-party, for damages relating to Caledonian's collapse.

Finally, this Court construes Sentinel's concern that Sentinel might not be able to assert claims in a new action "based on the same facts that the SEC alleged" as a concern with the impact of the compulsory-counterclaim rule. Under Federal Rule of Civil Procedure 13(a), a party's pleading must "state as a counterclaim any claim that—at the time of its service—the pleader has against the opposing party if the claim: [] arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A); see also Critical-Vac Filitration Corp. v. Minuteman Intern., Inc., 233 F.3d 697, 699 (2d Cir. 2000). If a party has such a "compulsory counterclaim" and does not plead it, "the claim cannot be raised in a subsequent lawsuit." Critical-Vac, 233 F.3d at 699 (citation omitted). Yet again, however, Caledonian—not Sentinel—is the party litigating this action. Accordingly, Sentinel is unaffected by the compulsory-counterclaim bar.

Even if Sentinel were Caledonian's representative, it could not bring a counterclaim against the SEC in this enforcement action. Under Section 21(g) of the Exchange Act, parties are prohibited from "consolidat[ing] or coordinat[ing]" private claims with enforcement actions brought by the SEC in which equitable relief is sought. See Exchange Act

§ 21(g), 15 U.S.C. § 78u(g).  To this Court's knowledge, every judge in this District has interpreted that provision to mean that claims for damages by non-SEC parties cannot be brought (without the SEC's consent) in the enforcement action to which they purport to relate.  See SEC v. Pinchas, 421 F. Supp. 2d 781, 784 (S.D.N.Y. 2006) (Holwell, J.); SEC v. McCaskey, 56 F. Supp. 2d 323, 325 (S.D.N.Y. 1999) (Kram, J.); SEC v. Thrasher, No. 92-cv-6987, 1995 WL 456402, at *3 (S.D.N.Y. Aug. 2, 1995) (Keenan, J.); SEC v. Downe, No. 92-cv-4092, 1994 WL 67826, at *3 (S.D.N.Y. Mar. 3, 1994) (Leisure, J.); SEC v. Lorin, No. 90-cv-7461, 1991 WL 155767, at *1 (S.D.N.Y. Aug. 7, 1991) (Leval, J.); see also May 20, 2016 Tr., at 8 ("THE COURT: . . . Has any judge in the Southern District held that a non-SEC party could bring a claim in an SEC enforcement action?"  [Counsel]: Not that I'm aware of, your honor.").  Claims for damages against the SEC relating to this enforcement action must be brought, if at all, in another case.

        c.   Other Potential Interests

        While Section 21(g) bars counterclaims against the SEC in enforcement actions, it does not preclude all forms of intervention.  "There is no persuasive authority which suggests that [S]ection 21(g) . . . bars intervention in all SEC enforcement actions."  S.E.C. v. Credit Bancorp, Ltd., 194 F.R.D. 457, 465 (S.D.N.Y. 2000) (quoting SEC v. Prudential Secs., Inc., 171 F.R.D. 1, 4 (D.D.C. 1997)); see SEC v. Flight Transp. Corp., 699 F.2d 943, 950 (8th Cir. 1983) (same); cf. SEC v. Qualified Pensions Inc., No. 95-cv-1746, 1998 WL 29496 (D.D.C. 1998) (barring intervention only when it involved the assertion of private claims from another lawsuit). Accordingly, Sentinel's lack of an "interest" sufficient for intervention as of right does not categorically preclude Sentinel from intervening under Rule 24(b).  See Credit Bancorp, 194 F.R.D. at 468.

B.  Permissive Intervention

When intervention of right is unavailable, a court may still "permit a party to intervene if the party 'has a claim or defense that shares with the main action a common question of law or fact.'"  In re Platinum and Palladium Commodities Litig., No. 10-cv-3617, 2014 WL 3500655, at *7 (S.D.N.Y. 2014) (citing Fed. R. Civ. P. 24(b)).  Permissive intervention "necessarily vests broad discretion in the district court to determine the fairest and most efficient method of handling a case with multiple parties and claims."  SEC v. Everest Mgmt. Corp., 475 F.2d 1236, 1240 (2d Cir. 1972).  "When considering a request for permissive intervention, a district court must 'consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.'"  AT&T Corp. v. Sprint Corp., 407 F.3d 560, 561 (2d Cir. 2005).  Permissive intervention is strongly disfavored in SEC enforcement actions because "[t]he intervention of a private plaintiff might tend to discourage or at least to complicate efforts to obtain a consent decree."  Everest Mgmt., 475 F.2d at 1240.  The "complicating effect of the additional issues and the additional parties" in such actions typically "outweighs any advantage of a single disposition of the common issues."  Everest Mgmt., 475 F.2d at 1240 (citation omitted).  Sentinel argues that its complaints regarding the terms of the proposed consent decree share common questions of law or fact with the underlying SEC enforcement action.

But Sentinel's showing is not sufficient to defeat the presumption that permissive intervention is inappropriate in this SEC enforcement action.  Intervention at this stage serves only to delay the prolonged settlement negotiations between the SEC and Caledonian.  The consent decree has now been considered and approved by the SEC's attorneys; the Commission; Caledonian's attorneys; the Cayman Liquidators; and the Cayman Islands Court.  Because

Sentinel cannot intervene to assert a damages claim against the SEC in this enforcement action, Sentinel's only apparent purpose in intervening is to object—as a non-party observer—that entering the proposed consent decree would disserve the public interest.

At this stage, Sentinel's complaints about the proposed consent decree have already been heard.  They were extensively briefed through pre-motion letters; a pre-motion conference; formal motions to intervene; oral arguments; and the proposed complaint-in-intervention attached to their motion.  Formal intervention now serves no further purpose in this action.  However, while Sentinel's motion is denied,[12] its arguments about the propriety of the decree have been considered in this Court's analysis of the SEC's motion for approval of the decree.

II.    The Proposed Consent Decree

The proposed consent decree provides that Caledonian is permanently enjoined from future Section 5 violations and permanently barred from participating in any offering of a penny stock.  (Final Judgment, at 3–4; Consent of Defendants Caledonian Bank Limited and Caledonian Securities Limited, submitted February 9, 2016 ("Caledonian Consent.")).  Under the proposed decree, Caledonian Bank and Caledonian Securities would be jointly and severally liable for $25,000,000, representing the "approximate consolidated equity of Caledonian Bank and its subsidiaries" when Caledonian began its liquidation.  (See Final Judgment, at 4.) However, the SEC seeks to waive that liability in its entirety.  Finally, the proposed consent

---

[12] Because Sentinel does not satisfy the applicable standards for mandatory or permissive intervention, this Court need not address Caledonian's argument that Sentinel is collaterally estopped from reasserting objections it raised before the Cayman Islands Court.  Even assuming that federal substantive collateral-estoppel law applies in this action, addressing Caledonian's argument on that score would amount to an exercise in recharacterization— whether the "issue" presented in the Cayman Islands proceeding was the overall propriety of the consent decree, or merely the conclusion that the decree was in the best interest of Caledonian's creditors.

decree would lift the remainder of the asset freeze imposed on Caledonian.  (See Final Judgment, at 5.)

The Second Circuit recognizes a "strong federal policy favoring the approval and enforcement of consent decrees."  SEC v. Citigroup Global Mkts., Inc., 752 F.3d 285, 293–94 (2d Cir. 2014) (citation omitted).  While a factual basis must exist for the decree, it is sufficient for the SEC to "set[] out [] colorable claims, supported by factual averments [that may be] neither admitted nor denied by the wrongdoer."  Citigroup, 752 F.3d at 295.  But a district judge is not a "rubber stamp" and is not to "simply accept a proposed S.E.C. consent decree without any review."  Citigroup, 752 F.3d at 293, 297–98; cf. CFPB v. Sprint Corp., No. 14-cv-9931, 2015 WL 3395581, at *1 (S.D.N.Y. May 19, 2015) ("How the [CFPB] believes a judge can evaluate the proposed settlement with a one sentence joint motion, no memorandum of law, and no declarations, eludes this Court."); CFTC v. Deutsche Bank AG, No. 16-cv-6544 (S.D.N.Y. Sept. 22, 2016) ("While regulatory agencies such as the CFTC should be afforded deference, a district judge's duty extends beyond that of a rubber stamp.") (internal quotations omitted). Accordingly, a judge may decline to enter the proposed consent decree if there is no "substantial basis in the record" for concluding that it meets these requirements.  Citigroup, 752 F.3d at 294. To determine whether a consent decree should be entered, the court assesses whether it is "fair and reasonable," and if injunctive relief is involved, whether it would "disserve" the public interest.  Citigroup, 752 F.3d at 294.

A.  "Fair and Reasonable"

Whether a consent decree is "fair and reasonable" turns on "(1) [] basic legality of the decree . . . ; (2) whether the terms of the decree, including its enforcement mechanism, are clear . . . ; (3) whether the consent decree reflects a resolution of the actual claims in the

complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind." The "primary focus" should be on "ensuring the consent decree is procedurally proper." Citigroup, 752 F.3d at 294–95.

The proposed decree clearly resolves all of the SEC's claims that Caledonian violated Section 5 by selling securities without registrations or exemptions on behalf of its clients. While the relevant securities were initially subject to Form S–1 registration statements, the Securities Act also required that Caledonian's sales be either separately registered or exempt from registration. Caledonian Bank I, 145 F. Supp. 3d at 306 (citing THOMAS LEE HAZEN, 1 LAW OF SECURITIES REGULATION § 4.1). The SEC has also submitted evidence that Caledonian did not separately register the sales on behalf of its clients, that they were not exempt from registration, and that Caledonian was not covered by the "dealer" exemption because no "genuine" public offering had occurred with respect to the securities it sold. (See, e.g., SEC Mem., Exs. 8, 12, 13, 14.)

In this action, however, the SEC's argument for the "basic legality" of this decree bears further scrutiny. A proposed consent decree with the Government is legal "so long as it is within the Court's authority to enter the decree and within the Plaintiff's authority to enforce it." United States v. International Business Machines Corp., No 14-cv-936, 2014 WL 3057960, at *1 (S.D.N.Y. July 7, 2014) (citing Benjamin v. Jacobson, 172 F.3d 144, 158 (2d Cir. 1999)). The SEC's proposed consent judgment boils down to two essential provisions. First, the proposed decree provides for injunctive relief and a bar on trading in "penny stocks," which is plainly within the SEC's authority. See, e.g., Exchange Act Section 15(b)(6)(A), 15 U.S.C. § 78o(b)(6)(A). Second, it provides for disgorgement of $25,000,000, which is then waived. That disgorgement calculation represents efforts by Caledonian and the SEC to reach a

"compromise" between the $1.4 million in commissions that Caledonian received for the subject transactions and the $38 million in proceeds that accrued to Caledonian's clients.  (See SEC Mem., at 5.)  Caledonian's position was that it should only disgorge ill-gotten gains it actually obtained, while the SEC maintained it should disgorge the amount of the illicit proceeds received by its clients due to Caledonian's efforts.

To determine whether this Court would be authorized to grant such relief, "disgorgement" must be distinguished from a "civil penalty."  In an enforcement action in federal district court, the SEC may seek civil penalties to discourage a defendant from attempting to engage in unlawful action in the future.  See S.E.C. v. Razmilovic, 738 F.3d 14, 38 (2d Cir. 2013) (citing Securities Act Section 20, 15 U.S.C. § 77t(d); Exchange Act Section 21, 15 U.S.C. § 78u(d)(3)).  The SEC may also seek disgorgement: a "reasonable approximation of profits causally connected to the [securities] violation."  S.E.C. v. Contorinis ("Contorinis III"), 743 F.3d 296, 300 (2d Cir. 2014).  As distinguished from civil penalties, disgorgement "does not serve a punitive function," and "may not exceed the amount obtained through the [defendants'] wrongdoing."  Contorinis III, 296 F.3d at 301.  The sole purpose of disgorgement is to "depriv[e] violators of the fruits of their illegal conduct," forcing them to "give up the amount by which [they were] unjustly enriched."  Contorinis III, 296 F.3d at 300.  Because disgorgement is an equitable remedy, it should not be applied mechanically.  However, where the SEC seeks only "disgorgement," the relief should be disgorgement—not a penalty.

A recurring question in this proceeding has been the amount of funds that could appropriately be frozen—or later disgorged—from Defendants in connection with their alleged securities violations.  See Caledonian Bank I, 145 F. Supp. 3d at 290, 301–02, 310.  While the Second Circuit has not squarely addressed this question with respect to Section 5 of the

Securities Act, it has struggled with the broader issue of whether disgorgement is limited to profits a party receives, or incorporates all profits "caused" by the violation—to whomever they accrued.  For example, in SEC v. First Jersey Securities, the Second Circuit affirmed a disgorgement award that held individual defendant Robert Brennan liable not only for his own illicit profits, but for profits obtained by First Jersey Securities, his wholly owned company.  101 F.3d 1450, 1476 (2d Cir. 1996).  The Court of Appeals reasoned that Brennan's 100% ownership of the firm warranted holding him jointly and severally liable because "to the extent that the Firm's net worth was increased by its unlawful activities, so was Brennan's personal wealth."  First Jersey, 101 F.3d at 1476.  The Court of Appeals was careful to point out, however, that different facts could lead to a different result:

> Brennan's contention that he should be required to disgorge only amounts that he withdrew from the Firm might be more persuasive if he had owned less than all of First Jersey's stock.  But he was the Firm's sole owner; not surprisingly, he testified at trial that he could request a check in any amount at any time and the Firm would issue one to him. . . . [Nonetheless, n]o more than the total amount of First Jersey's unlawful profits, plus interest on those amounts, is to be disgorged.

First Jersey, 101 F.3d at 1476.

More recently, the Court of Appeals addressed a disgorgement award against Joseph Contorinis, a Managing Director of Jeffries & Company who executed insider trades on behalf of an investment entity he controlled called the "Paragon Fund."  Contorinis III, 743 F.3d at 301.  In 2010, when Contorinis was convicted of securities fraud, he appealed to the Second Circuit, arguing that the district judge had improperly ordered forfeiture not only of sums that Contorinis received, but of the total profits and avoided losses of the Paragon Fund ($12.65 million).  See United States v. Contorinis ("Contorinis I"), 692 F.3d 136, 145 (2d Cir. 2012). The Second Circuit reversed the forfeiture order, concluding that the Government had failed to

provide any authority "standing for the proposition that a defendant may be required to forfeit funds never acquired by him or someone working in concert with him." Contorinis I, 692 F.3d at 147. The Court of Appeals remanded to the district court for a determination of the monies that Contorinis personally obtained through the illegal trades. Contorinis I, 692 F.3d at 148 n.4.

But the SEC's civil enforcement action against Contorinis yielded a different result. After Contorinis was convicted, the district court granted summary judgment to the SEC and ordered him to disgorge $7,260,604, representing profits that accrued to the "Paragon Fund," not to him. SEC v. Contorinis ("Contorinis II"), No. 09-cv-1043, 2012 WL 512626, at *6 (S.D.N.Y. 2012). On appeal, the SEC argued—despite Contorinis I—that the disgorgement award properly included profits that Contorinis never personally received. The Court of Appeals affirmed the disgorgement order, concluding that a criminal forfeiture (which cannot be "imposed upon innocent owners") differs from civil disgorgement (which serves a broader "remedial purpose"). Contorinis III, 743 F.3d at 306. The Circuit reasoned that disgorgement from a securities-law violator need not be limited to a person's "direct pecuniary benefit," particularly where a violator's misconduct could result in other "illicit benefits for the [violator] that are indirect or intangible," like "enhanced reputation" or the "psychic pleasures of enriching a family member." Contorinis III, 743 F.3d at 306. Accordingly, while Contorinis could not be ordered to forfeit more than he personally earned in a criminal proceeding, he could be ordered to disgorge such amounts in a civil proceeding as long as it is did not exceed the "maximum of the total gain" from the illegal trading. Contorinis III, 743 F.3d at 306, 309. But see Contorinis III, 743 F.3d at 311 (Chin, J., dissenting) (concluding that the Paragon Fund's gains should not have been included in Contorinis's disgorgement calculation, and were more properly disgorged from the Fund itself).

However, Contorinis III appears to have a limited reach.  First, the Court of Appeals' narrow holding on the SEC's disgorgement theory seems to have been cabined to "consideration of the tipper-tippee context" in insider-trading cases.  Contorinis III, 743 F.3d at 305–06; see also Contorinis III, at 305 n.5 (describing decision's "precise" inquiry as the "disgorgement liability for an insider trader who had trading power but not disbursement control over a financial vehicle whose funds were used to perpetrate the fraud").  In tipper-tippee insider-trading cases, broad disgorgement may be justified by the original "tipper's" responsibility for the chain of events leading to the unlawful trades.  Second, the Court of Appeals' holding relied on the notion that Contorinis had also received certain "psychic" and non-pecuniary benefits—a rationale called into question by a more recent Second Circuit decision.  Compare Contorinis III, 743 F.3d at 303, with United States v. Newman, 773 F.3d 438, 452 (2d Cir. 2014) (inference of personal benefit in an insider-trading case is "impermissible in the absence of . . . an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature").  Third, the Court of Appeals emphasized that the decision of whether third-party proceeds may be disgorged from the primary violator is a discretionary and equitable matter for the district court.  See Contorinis III, 743 F.3d at 306.  Indeed, courts around the country still disagree on "the extent to which a party can be ordered to disgorge total gain from an unlawful act, when the party has not personally received the full benefit of the wrongdoing."  Contorinis III, 743 F.3d at 305 n.5.

Considered together, First Jersey and Contorinis III appear to suggest that disgorgement of third-party profits by a securities violator may be appropriate when that violator had a substantial financial interest in—or substantial control over—unlawful profits obtained by that third party.  See Contorinis III, 743 F.3d at 300 (disgorged defendant had "investment

control" over third party making unlawful trades); First Jersey, 101 F.3d at 1458 (disgorged

defendant had "100% owner[ship]" of company making unlawful trades); Caledonian Bank I,

145 F.3d at 310 (disgorging broker of its clients' proceeds requires some "relationship" between

the broker and the clients); cf. SEC v. Cole, --- F. App'x ----, 2016 WL 4703901, at *1 (2d Cir.

Sept. 8, 2016) (rejecting pro se individual defendants' challenge that they could not be disgorged

of profits from corporate entities where allegations of control over those entities "were

corroborated by 46 SEC exhibits" and the defendants failed to challenge a default judgment);

SEC v. Whittemore, 659 F.3d 1, 12 (D.C. Cir. 2011) (defendants jointly liable with clients where

defendants could not establish where the "the ill-gotten gains finally came to rest").  And if a

broker clearly serves as the "enabler" for a chain of events resulting in foreseeable unlawful

profits, it may be appropriate to require disgorgement of those profits from the broker.

      The SEC appears to propose a broader disgorgement theory: that a broker who

violates Section 5 by making unregistered trades for its clients should be inherently "liable for

disgorging the full proceeds of those violations on a joint and several basis with other

participants in the illegal distribution."  (SEC Mem., at 5.)  In support of that proposition, the

SEC cites a recent case holding a Bahamian broker-dealer liable for the proceeds of securities

sales effected for an issuer, even though 70% of those proceeds had been wired back to the

issuer.  SEC v. Gibraltar Global Secs., Inc., No. 13-cv-2575, 2016 WL 153090 (S.D.N.Y. Jan.

12, 2016).  Notably, however, that order is an unreported decision adopting a magistrate judge's

report and recommendation on a default judgment because the defendants ceased participating in

discovery.  This is not particularly compelling authority.

      As further support, the SEC argues that disgorgement should be broadly construed

to take the place of a substantial civil penalty.  The SEC acknowledges that it did not seek a civil

penalty because it would be difficult to enforce in the Cayman Islands. (See April 12, 2016 Tr., at 20–21.)[13]  Nevertheless, the SEC argues that to adequately deter violations of the securities laws, an enabler should disgorge more than the profits he obtained from the unlawful securities transactions:

> [The SEC:] We think it's important . . . [w]here you have repeat players from bank secrecy jurisdictions that are permitting the sale of unregistered securities, even if it's by their clients, that disgorgement be more than commissions.  And that's because [if] a disgorgement is only commissions, and the money is swept offshore and then transferred to the clients from a jurisdiction . . . [where] we can't get a penalty or collect a penalty, this profit model is profitable.  If disgorgement is only commissions, it means that a bank can do this type of transaction for [] myriad [] customers, and when it's caught, just disgorge what it gained from that single customer and then keep the commissions for all the other customers.

(April 12, 2016 Tr., at 19:19–20:11.)  The law is clear, however, that the purpose of disgorgement is to offset a defendant's unjust enrichment, not to punitively deter violations, which is the role of a civil penalty.  See SEC v. Official Comm. of Unsecured Creditors of WorldCom, Inc., 467 F.3d 73, 81 (2d Cir. 2006 ("Disgorgement . . . does not result in any actual economic penalty . . . ."); cf. SEC v. Cavanagh, 445 F.3d 105, 117 (2d Cir. 2006) ("Unlike damages, [disgorgement] is a method of forcing a defendant to give up the amount by which he was unjustly enriched.").  The SEC cannot simply rebrand the disgorgement remedy to escape the complexities of enforcing a penalty overseas.

In sum, the fact that Caledonian brokered unregistered transactions for its clients would not, by itself, tend to suggest that disgorgement of sale proceeds accruing only to Caledonian's clients would be appropriate.  And the evidence that Caledonian exercised "control" over the alleged pump-and-dump scheme is relatively thin, relying largely on

---

[13] The proposed decree gives a different reason for not imposing civil penalties: the accuracy of Caledonian's representations in this action and Caledonian's cooperation with the Cayman Islands Monetary Authority.  (Final Judgment, at 5.)

inferences to be drawn from Caledonian's business relationship with Clear Water and Legacy Global, which were seemingly eager to trade in securities that lay dormant in the public markets. (See, e.g., SEC Mem. Exs. 1–5, 8, 12, 13.)  But while this Court is not fully persuaded that the SEC's evidence could support the scope of its disgorgement remedy at a trial, this is not a trial— it is a jointly proposed motion for a consent judgment.

"Trials are primarily about the truth.  Consent decrees are primarily about pragmatism."  Citigroup, 752 F.3d at 295.  As the SEC acknowledged at argument, while it could have attempted to prove its disgorgement theory in litigation, "settlements reflect compromise." (May 20, 2016 Tr., at 17:17–22.)  And decisions about whether a particular legal theory would have prevailed are "uniquely for the litigants to make."  Citigroup, 752 F.3d at 295.  "It is not within the district court's purview to demand 'cold, hard, solid facts, established either by admissions or by trials' as to the truth of the allegations in the complaint as a condition for approving a consent decree."  Citigroup, 752 F.3d at 295 (citation omitted).

Here, the SEC and Caledonian have made their own assessment of the likely risks of proceeding in this litigation.  The parties sought approval of a settlement before the Cayman Islands Court, which benefits the SEC by granting its requested injunctive relief and a placating $25 million disgorgement award.  In return, Caledonian, now in liquidation, need not pay any monetary relief to the SEC, and can return those funds to creditors and depositors.  While Caledonian could at some stage have challenged the validity of the SEC's disgorgement theory, or its own liability more generally, conceding these legal disputes was the cost of settlement.

B.  Improper Collusion and the Public Interest

A district court must examine whether a consent decree is "tainted by improper collusion or corruption of some kind," or "raises a suspicion that the consent decree was entered

into as a result of improper collusion between the S.E.C. and the settling party."  Citigroup, 752

F.3d at 295–96.  Similarly, where injunctive relief is involved, a court must find that the "public

interest would not be disserved" by entry of the decree.  Citigroup, 752 F.3d at 295.  Here, the

proposed consent decree was, in part, the product of Caledonian's collapse after the SEC

obtained the freeze order.  Accordingly, the question arises whether the proposed decree

effectively "whitewashes" the manner in which the SEC brought this action by adopting a

notional $25 million settlement with a bankrupt defendant.  (May 20, 2016 Tr., at 16:21.)

        After Caledonian collapsed, the Cayman Liquidators negotiated the terms of the

proposed consent decree at arms' length with the SEC.  Sentinel's alternative proposal—that

Caledonian engage in a lengthy and risky countersuit—was considered and rejected by the

Cayman Islands Court.  (First Hutchison Decl. ¶ 21.)  Ultimately the Cayman Islands Court

agreed with the Cayman Liquidators' proposal.  The manner in which this agreement was

negotiated does not suggest any impropriety.

        Certainly, the proposed decree—a phantom judgment against a defunct entity—

raises many questions.  How have U.S. investor victims and U.S. securities markets benefited

from this enforcement action and proposed settlement?[14]  How does a $25 million disgorgement

judgment that is waived—and not disclosed in SEC public reports—serve as a deterrent?  What

message does a pro forma disgorgement send to scam artists and the offshore financial

institutions that enable their frauds?  To that end, has the SEC ascertained whether any

---

[14] Indeed, investor victims are not even mentioned in the proposed consent decree.  And past SEC decrees have been criticized for overstating the amount of funds actually collected.  See, e.g., Urska Velikonja, Reporting Agency Performance: Behind the SEC's Enforcement Statistics, 101 CORNELL L. REV. 901, 904 (2016) ("The [SEC] statistic 'monetary penalties ordered' also overstates the actual figure: it includes . . . penalties ordered but waived due to defendant's financial inability to pay.").  However, the SEC disputes such criticisms, and asserts that, "[c]onsistent with past practice," it "will not include the $25 million disgorgement figure in its public reports of agency statistics."  However, the SEC offered this Court no precedents for that practice.  (See April 15, 2016 SEC Letter, ECF No. 211, at 1.)

distributees in the Cayman Islands liquidation were themselves participants in the pump-and-dump scheme?  See Second Hutchison Decl. ¶ 37 (dividends declared to creditors as long as they provided the Cayman Liquidators with "valid banking instructions" and complied with anti-money laundering and know-your-customer requirements).  And who is really behind the multitude of corporate veils that remain intact in this case?

For better or worse,[15] the public's interest in "knowing the truth" behind a litigation is not to be considered to evaluate the decree.  Citigroup, 752 F.3d at 297.  The Second Circuit instructs that a district judge's authority to conclude that a "proposed" consent decree in an SEC case is not in the public interest is circumscribed.  See Citigroup, 752 F.3d at 296 ("The job of determining whether the proposed S.E.C. consent decree best serves the public interest [] rests squarely with the S.E.C., and its decision merits significant deference.").  And as discussed above, no participants in this proceeding have set forth a legitimate basis for concluding that the consent decree would harm the public or "bar[] private litigants from pursuing their own claims." Citigroup, 752 F.3d at 297.  Accordingly, the proposed consent decree is approved.

CONCLUSION

Sentinel's motion to intervene is denied.  The SEC, Caledonian Bank, and Caledonian Securities' motion for approval of the proposed consent decree is granted.  The Clerk of Court is directed to close the motions pending at ECF Nos. 170 and 216.

Dated: September 28, 2016
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

---

[15] See, e.g., S.E.C. v. Citigroup Global Mkts Inc., 34 F. Supp. 3d 379, 380–81 (S.D.N.Y. 2014) ("[T]his Court fears that, as a result of the Court of Appeal[s]'s decision, the settlements reached by governmental regulatory bodies and enforced by the judiciary's contempt powers will in practice be subject to no meaningful oversight whatsoever.").