UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
SECURITIES AND EXCHANGE COMMISSION, :

          Plaintiff,                    :

                                       15cv894

         -against-                    :
                                       OPINION & ORDER

CALEDONIAN BANK LTD., et al.,        :

         Defendants.           :
----------------------------------------X

WILLIAM H. PAULEY III, District Judge:

        Verdmont Capital, S.A. ("Verdmont"), a Panamanian broker-dealer, moves for summary judgment on the Securities and Exchange Commission's ("SEC's") claim that it engaged in unregistered, non-exempt distributions of securities in violation of Section 5 of the Securities Act of 1933. Verdmont also moves to vacate the freeze of its assets in the United States. Verdmont's motions are denied.

## BACKGROUND

        Familiarity with this Court's prior opinions and orders in this action is presumed. See SEC v. Caledonian Bank ("Caledonian Bank I"), 145 F. Supp. 3d 290, 306 (S.D.N.Y. 2015); SEC v. Caledonian Bank ("Caledonian Bank II"), --- F.R.D. ----, 2016 WL 5415087 (S.D.N.Y. Sept. 28, 2016). Verdmont is a broker-dealer organized and licensed under the laws of the Republic of Panama. (May 16, 2016 Declaration of Shamima Bhana ("Bhana MSJ Decl."), ECF No. 241, ¶ 3.)[1] The SEC's claims against Verdmont revolve around three offshore clients for whom it sold securities: Lornex Financial, Ltd. ("Lornex"), Bamfield Equities Ltd.

---

[1] The SEC objects that this declaration is improper because Verdmont did not disclose Ms. Bhana as a witness. (See SEC Memorandum in Opposition to Motion for Summary Judgment, ECF No. 255, at 8–12.) The SEC's objection is moot because Verdmont would not be entitled to summary judgment even if the declaration were considered.

("Bamfield")—also known as Bartlett Trading—and Nautilus Growth Fund Ltd. ("Nautilus"). (Bhana MSJ Decl. ¶ 6.)

Between 2012 and 2013, while acting on behalf of its clients, Verdmont sold the securities of three issuers: Xumanii, Inc. ("Xumanii"),[2] Goff Corp. ("Goff"), and Norstra Energy Inc. ("Norstra"). (Bhana MSJ Decl. ¶ 6.) Verdmont's sales of each security followed a similar pattern, although the timing of each step varied. Several of the transactions, as highlighted by the parties, are summarized below.

First, investors from foreign countries entered into private-placement agreements to purchase large quantities of the securities for fractions of a penny per share. In July 2010, five investors bought 3,233,333 shares of Xumanii for 0.15 cents per share. (May 16, 2016 Declaration of Robert Zito ("Zito MSJ Decl."), ECF No. 240, ¶¶ 27–31.) Between December 2010 and January 2011, two shareholders bought a total of 600,000 shares of Goff for 0.3 cents per share. (Zito MSJ Decl. ¶¶ 20–21.) Between July and September 2012, three shareholders bought 4,000,000 shares of Norstra for 0.1 cents per share. (Zito Decl. ¶¶ 23–25.)

Next, each issuer filed Form S-1 registration statements with the SEC, which the SEC declared effective. (See SEC Opposition to Verdmont's Local Rule 56.1 Statement of Undisputed Facts ("St."), ECF No. 251, ¶ 16 (Xumanii's registration statement declared effective March 14, 2011); St. ¶ 4 (Goff's registration statement declared effective November 10, 2011); St. ¶ 10 (Norstra's registration statement declared effective July 12, 2012).) Once the securities were deemed "effective" for trading purposes, third-party market makers filed applications with FINRA, seeking to initiate stock quotations in the over-the-counter markets. (See St. ¶¶ 5, 11, 17.)

---

[2] Xumanii was formerly known as Medora Corporation. (Bhana MSJ Decl. ¶ 6.)

2

When FINRA approved these applications, the market makers did not offer to sell the securities at any particular value. Rather, they issued "unpriced" quotations, or "indications of interest." (See Transcript of July 15, 2016 Oral Arg. ("Oral Arg. Tr."), at 7:24–8:15.) Such quotations were offers to sell shares in the over-the-counter markets at a price of "0" dollars for a total volume of "0" shares. (See Oral Arg. Tr., at 20:25–22:20.) In other words, for an investor to purchase the securities, that investor would need to inquire further with the market makers regarding the securities. (See Verdmont Reply Memorandum in Support of Summary Judgment ("Verdmont Reply"), ECF No. 264, at 5.) Investors did not purchase the securities in response to the unpriced "indications of interest." (See June 15, 2016 Declaration of Robert W. Nesbitt ("Nesbitt Decl."), ECF No. 253, ¶ 3.)

Verdmont's clients purchased substantial quantities of each stock from the private-placement investors. (St. ¶¶ 34, 38, 43.) Verdmont then held the shares for several months until after public trading began. (See St. ¶¶ 9, 15, 21.) Verdmont's transactions for Lornex are illustrative of the pattern.

On February 15, 2012, market makers issued unpriced quotations of Goff securities on over-the-counter exchanges. (Zito MSJ Decl., Ex. 3, at 23:5–16.) On August 8, 2012, Lornex purchased 560,000 Goff shares from the private-placement shareholders. (St. ¶ 34.) Around March 13, 2013 Goff shares began public trading. (Nesbitt Decl. ¶ 3.) On March 18, 2013—more than one year after the "unpriced" quotations, but only a few days after the first public trade—Verdmont began selling Goff stock. (St. ¶ 9.)

On November 1, 2012, market makers issued unpriced quotations of Norstra securities on over-the-counter exchanges. (Zito MSJ Decl., Ex. 3, at 26:2–10) On February 5, 2013, Lornex purchased 3,687,000 Norstra shares from the private-placement shareholders. (St.

¶ 38.) On March 5, 2013, Norstra shares began public trading in the OTC markets. (Nesbitt Decl. ¶ 3.) Verdmont first sold Norstra for its clients on April 1, 2013—more than five months after the first unpriced OTC quotation, but only 26 days after the first public trade. (St. ¶ 15.)

On May 4, 2011, market makers issued unpriced quotations of Xumanii securities on over-the-counter exchanges. (Zito MSJ Decl., Ex. 3, at 24:20–25:3.) On February 22, 2012, Lornex purchased 3,100,000 Xumanii shares from the private-placement shareholders. (St. ¶ 43.) Trading began in appreciable volume[3] on May 1, 2013. (Nesbitt Decl. Ex. 3, at 5.) Verdmont first sold Xumanii for its clients on May 1, 2013—two years after unpriced quotations appeared in the OTC markets, but on the first day of substantial public trading. (St. ¶ 21.)

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Davis v. Blige, 505 F.3d 90, 97 (2d Cir. 2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving party has made the initial showing that there is no genuine issue of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

---

[3] According to a "Historical Price Table" provided by the SEC, a small number of Xumanii shares were purchased for 50 cents/share on January 18, 2012. (Nesbitt Decl., Ex 3, at 13.) No other shares were purchased for more than a year. At oral argument, the parties provided no adequate explanation for what this trade represented. (See Oral Arg. Tr., at 24:18–25:16.) Nonetheless, Verdmont does not assert that a "bona fide offer" to the public occurred on this date. (See Verdmont's Memorandum in Support of Summary Judgment, ECF No. 243, at 2.)

4

(citations omitted); see Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita, 475 U.S. at 586–87). In deciding a summary judgment motion, a court resolves all factual ambiguities and draws all factual inferences in favor of the non-moving party. Liberty Lobby, 477 U.S. at 255; Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).

## DISCUSSION

I. Motion for Summary Judgment

The SEC alleges that Verdmont's sales—which occurred shortly after the stocks first began public trading and experienced massive price swings—were part of a scheme to "pump and dump" these securities. (See SEC Memorandum in Opposition to Motion for Summary Judgment, ECF No. 255, at 17.) However, the SEC is not alleging that Verdmont's participation amounted to fraud. Rather, the SEC seeks to employ the strict-liability provisions of Section 5 to hold Verdmont liable for selling these securities for its clients in unregistered, non-exempt transactions that occurred shortly after public trading began.

Under Section 5 of the Securities Act of 1933, "securities [must] be registered with the SEC before any person may sell or offer to sell" them. SEC v. Cavanagh, 445 F.3d 105, 111 (2d Cir. 2006) ("Cavanagh IV"). The "purpose" of the Act is to "protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions." Pinter v. Dahl, 486 U.S. 622, 637–38 (1988). The Act's registration requirement is "transaction-specific," and accordingly, each separate transaction requires its own registration. See SEC v. Cavanagh ("Cavanagh II"), 155 F.3d 129, 133 (2d Cir. 1998);

5

Caledonian Bank I, 145 F. Supp. 3d at 306. Nonetheless, there are many exemptions from the registration requirement. Here, Verdmont urges this Court to apply the "dealer exemption."

A. <u>Dealer Liability</u>

A "dealer" is any entity engaged in the business of acting as "agent, broker, or principal" for securities issued by others. See Securities Act § 2(a)(12), 15 U.S.C. § 77b(a)(12). Under the Securities Act, "the provisions of [Section 5] shall not apply to . . . transactions by a dealer." § 4(a)(3), 15 U.S.C. § 77d(a)(3). However, this exemption does not apply when the "transactions in a security as to which a registration statement has been filed" took place before the later of "forty days after the effective date of [the] registration statement" or "forty days after the first date upon which the security was bona fide offered to the public." § 4(a)(3)(B). The purpose of this forty-day buffer period is to "prevent dealers from even unknowingly taking part" in the initial distribution of securities to the public. Caledonian Bank I, 145 F. Supp. 3d at 307 (citing SEC v. N. Am. Res. & Dev. Corp., 280 F. Supp. 106, 125 (S.D.N.Y. 1968), vacated in part on other grounds, 424 F.2d 63 (2d Cir. 1970)).

As this Court held in Caledonian Bank I, the date a registration statement is declared effective does not always coincide with the date of a "bona fide" offering to the public:

> Normally, the two components of the disjunctive "whichever is later" test occur simultaneously. . . . However, the statute "recognizes that there will be circumstances in which stock covered by an effective registration statement has not genuinely been offered to the public." In re Lehman Bros. Sec. & ERISA Litig., 903 F. Supp. 2d 152, 171 (S.D.N.Y. 2012). For example, if the parties created a sham distribution to conceal a public offering that took place later, the bona fide offering date would differ from the effective date of the registration statement. To assess whether an offering is bona fide, "the relevant question . . . is when was the stock really and truly (genuinely) being offered to the public, as opposed to, say, a simulated offering." P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 99 (2d Cir. 2004) (citing Louis Loss & Joel Seligman, SECURITIES REGULATION § 2–B–6, n. 285 (3d ed. 1996)). A registration statement alone does not make an offering bona fide.

6

Caledonian Bank I, 145 F. Supp. 3d at 307.

Verdmont's motion for summary judgment on the dealer exemption hinges on the answer to this question: When were these securities "bona fide offered to the public"? § 4(a)(3), 15 U.S.C. § 77d(a)(3). If the market makers' unpriced quotations were "bona fide" offers, Verdmont's sales—which occurred more than 40 days later—are exempt. By contrast, if no "bonda fide" offers occurred until members of the public purchased the quoted securities, then Verdmont began selling securities during a time period not covered by the dealer exemption.

Verdmont argues that an unpriced indication of interest is always a bona fide offer to the public, citing several cases in which courts held that securities were deemed "offered" to the public once they were listed on over-the-counter exchanges. See, e.g., In re Laser Arms Corp. Secs. Litig., 794 F. Supp. 475, 483 (S.D.N.Y. 1989); Kubik v. Goldfeld, 479 F.2d 472, 475 (3d Cir. 1973); In re Biozoom, Inc. Secs. Litig., No. 14-cv-1087, 2015 WL 5017018, at *4 (N.D. Ohio Aug. 20, 2015); Sowell v. Butcher & Singer, Inc., No. 84-0714, 1987 WL 10712, at *8 (E.D. Pa. May 13, 1987). However, none of those cases are analogous to the circumstances here: an unpriced quotation in response to which no trading actually occurs. For example, in Laser Arms, the district court held that a "bona fide" offering occurred on the "date the security was first quoted" which was also "the date on which trading in the security commenced." Laser Arms, 794 F. Supp. at 483.

Verdmont also argues that an unpriced quotation is a "bona fide" offer because over-the-counter exchanges require market makers displaying such quotations to provide a "bid or offer that must be firm for at least one trading unit (typically 100 shares)" if requested by another broker. (See Verdmont Reply, at 5) (citing LOFCHIE'S GUIDE TO BROKER-DEALER REGULATION (2005)). But at the summary judgment stage, Verdmont proffers no evidence that

7

such "firm" offers actually occurred. Indeed, the SEC's trading data shows that there was zero—or virtually zero—volume in the relevant securities until less than forty days before Verdmont began selling for its clients. (See Nesbitt Decl. ¶¶ 1–3.)

Moreover, the SEC has submitted evidence from a confidential witness ("CW-1")—formerly employed by the Mulholland Group when it did business with Verdmont—that the "indications of interest" were sham quotations designed to perpetuate the penny-stock scheme. Specifically, CW-1 avers that the Mulholland Group orchestrated the pump-and-dump scheme and intended to "control the total float" of the securities. (June 14, 2016 Declaration of Confidential Witness-1 ("CW-1 Decl."), ECF No. 254, CW-1 Decl., ¶ 13.) The confidential witness reports that, in order to drive up the price of the penny stocks during the pump and dump, the Mulholland Group "frequently caused a company's stock to be quoted on the OTC markets, with no immediate intention of selling it, because the stock was perceived as more valuable if it had some trading history." (CW-1 Decl., ¶ 13.)

In view of this evidence, the answer to the question of whether the "indications of interest"—the zero-dollar quotations—constituted bona fide offers to the public is, at minimum, a material disputed fact. Accordingly, Verdmont is not entitled to summary judgment on the dealer exemption for transactions that occurred within 40 days after public trading began.

B. Underwriter Liability

Verdmont asserts that even if its initial transactions were within the 40-day prohibited period, "approximately half" of the transactions would still be exempt because they took place more than 40 days after public trading began. (Verdmont Reply, at 2 n.2.) The SEC argues that even assuming that such transactions were exempt from "dealer" liability, they would still be subject to "underwriter" liability.

An entity may be subject to liability as an underwriter if, among other things, it has "purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security." Securities Act § 2(a)(11). The "issuer" from whom the underwriter purchases such securities is defined to include any person "directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." Securities Act § 2(a)(11). When an entity engages in a securities transaction with someone affiliated with an issuer in this manner, the entity is deemed an "underwriter" for purposes of the Securities Act. And if the underwriter's transaction is unregistered and non-exempt, that transaction violates Section 5.

Verdmont asserts that dealers and underwriters are mutually exclusive under the Securities Act. (Verdmont Reply, at 6–7.) Under Section 2(a)(11), an entity cannot be an underwriter if its interest in a transaction is "limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission." Section 2(a)(11); see Securities Act Rule 141(c), 15 C.F.R. § 230.14; see also THOMAS LEE HAZEN, LAW OF SECURITIES REGULATION 212 (6th ed. 2009) (noting that statutory definition of an underwriter is intended to exclude "members of the selling group and nonparticipating brokers"). In this action, however, the SEC is not conceding that Verdmont's commission came from an "underwriter or dealer." Rather, the SEC both contests Verdmont's argument on the dealer exemption and maintains that Verdmont also acted as a statutory underwriter. And the SEC has created a dispute of material fact on this issue, submitting evidence that any "commission" Verdmont obtained was not a usual "commission from an underwriter or dealer," Section 2(a)(11), but a payment from entities jointly controlled by the issuers.

9

The SEC's confidential witness avers, for example, that the Mulholland Group's Goff stock was on deposit at Verdmont. (CW-1 Decl. ¶ 30.) CW-1 spoke with one of Verdmont's principals, Glynn Fisher, and discussed how the Mulholland Group would do business with Verdmont. (CW-1 Decl. ¶ 31.) CW-1 also recounts that Nautilus, one of Verdmont's clients, was a shell corporation controlled by the Mulholland Group. (CW-1 Decl. ¶ 32.) While CW-1 does not identify Verdmont's other clients with specificity, the SEC suggests that an inference may be drawn from CW-1's knowledge about Verdmont's connection to the Mulholland Group that Verdmont's other clients were also controlled by the same group. (See, e.g., CW-1 Decl. ¶ 32.)

While the SEC's evidence concerning the identities of Verdmont's clients is relatively thin, it is Verdmont that bears the burden of proving it is not an underwriter once the SEC makes a prima facie case for such liability under Section 5. See SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953); accord Cavanagh IV, 445 F.3d at 111 n.13. Verdmont's evidence on that score is not convincing. Verdmont submits a declaration from its former head of Accounting and Human Resources, who is now its Panamanian liquidator. That declaration provides mere legal conclusions about the identities of Verdmont's clients, stating that Verdmont did not acquire any stock from issuers or persons who were controlled by issuers, that Verdmont was "not an underwriter," and that Verdmont's customers were "not controlled by the issuers of the securities." (Bhana MSJ Decl. ¶¶ 21–24.) These conclusory statements merely track the language of the statute and are bereft of any details.

Verdmont's only factual support for these propositions is that its clients' investment-account applications contained the names of persons who did not purport to be "director[s] or officer[s]" of the issuers. (Bhana Decl. ¶¶ 25–27; Exs. 17, 18, 19.) The

10

applications, however, provide virtually no substantive information about who Verdmont's clients are, other than their names and business addresses. Moreover, even if it were true that the directors and officers of Verdmont's clients did not work directly for the issuers of the securities at issue, that fact does not foreclose a conclusion that such entities were "under direct or indirect common control with the issuer[s]" through the Mulholland Group. See Securities Act § 2(a)(11). Accordingly, because a dispute of material fact exists as to whether Verdmont was acting as an underwriter for entities commonly controlled by the issuer, it is not entitled to summary judgment, even as to trades that occurred more than 40 days after public trading in the relevant securities began.

II.   Motion to Lift the Asset Freeze

Verdmont also seeks to remove the $239,995 minimum-balance restriction imposed on its accounts. Verdmont argues that releasing such funds is necessary because (1) the SEC raised no inference of a securities-law violation; and (2) such funds are necessary to continue its liquidation.

"To persuade a court to unfreeze assets, the defendant must establish that the funds he seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial." SEC v. Stein, No. 07-cv-3125, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009) (citation omitted). "The touchstone of the inquiry is equity. [T]he disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief." Stein, 2009 WL 1181061, at *1 (brackets in original) (internal quotation marks omitted) (quoting SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1106 (2d Cir. 1972)). Verdmont asserts that the equities tip in favor of unfreezing its assets, analogizing its situation to that of a natural person

who requires the court's intervention to pay for living expenses. See <u>SEC v. Dowdell</u>, 175 F. Supp. 2d 850, 856 (W.D. Va. 2001); <u>SEC v. Duclaud Gonzalez de Castilla</u>, 170 F. Supp. 2d 427, 429 (S.D.N.Y. 2001).

Verdmont's frozen assets now equal the amount of commissions it received from the transactions at issue. Because Verdmont's motion for summary judgment is denied, this Court cannot conclude that such commissions are "untainted," and therefore worthy of being unfrozen. Moreover, unlike the defendants in the <u>Dowdwell</u> and <u>Duclaud</u> actions, Verdmont is a corporation—not a natural person—and does not need its assets to pay for the necessities of life. In fact, Verdmont is being liquidated, and in 2015 apparently paid out at least $600,000 in dividends (of which 80% was distributed to its principals). (See SEC Memorandum in Opposition to Motion to Unfreeze, Ex. C, ECF No. 250-3, April 6, 2016 Deposition of Glynn Fisher, 54:15–17, 55:2–11, 113:15–17, 113:15–22.) Accordingly, Verdmont is not entitled to an order unfreezing its assets.

## CONCLUSION

Verdmont's motions for summary judgment and to vacate the asset freeze are denied. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 236 and 239.

Dated: October 28, 2016
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.