PATRICK R. COSTELLO
DEREK S. BENTSEN
BRIDGET M. FITZPATRICK
ERNESTO G. AMPARO
SECURITIES AND EXCHANGE COMMISSION
100 F Street N.E.
Washington, DC 20549
(202) 551-3982  telephone (Costello)
(202) 772-9245  facsimile
costellop@sec.gov

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

_____
: 
SECURITIES AND EXCHANGE COMMISSION,      :
:
                                        Plaintiff,      :
:
                              v.                   : Case No. 15-cv-894
                                                   : (WHP)(JLC)
CALEDONIAN BANK LTD.,                    :
CALEDONIAN SECURITIES LTD.,             :
CLEAR WATER SECURITIES, INC.,           :
LEGACY GLOBAL MARKETS S.A., and         :
VERDMONT CAPITAL, S.A.                   :
:
                                      Defendants.      :
_____:


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
DEFAULT JUDGMENT AGAINST DEFENDANT VERDMONT CAPITAL, S.A.**

**TABLE OF CONTENTS**

INTRODUCTION AND NATURE OF THE SEC'S CLAIM …………………………….....1

PROCEDURAL HISTORY………………………………………………….................... 2

ARGUMENT……………………………………………………………………...6

I.   Striking Verdmont's Answer And Entering Default Judgment Are The
     Proper Remedies…………………………………………………………6

II.  Default Judgment Standards……………………………………………...7

     A.   Legal Principles………………………………………………….. 7

     B.   The Complaint In This Case…………………………………… 8

III. Verdmont Violated Section 5 of the Securities Act……………………11

     A.   Elements of a Section 5 Claim…………………………………11

     B.   The Dealer's Exemption……………………………………… 12

     C.   The Broker's Exemption………………………………………13

IV.  This Court Should Grant The SEC's Requests For Relief…………………...17

     A.   Injunctive Relief…………………………………………………...17

     B.   Penny Stock Bar………………………………………………...19

     C.   Disgorgement and Prejudgment Interest………………………………19

     D.   Civil Penalty……………………………………………………23

CONCLUSION………………………………………………………………25

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page**

*Bricklayers & Allied Craftworkers Local 2 v. Moulton Masonry & Const., LLC*
    779 F.3d 182 (2d Cir. 2015)……………………………………………………..7

*Commercial Union Assurance Co v. Milken*
    17 F.3d 608 (2d Cir. 1994)…………………………………………………....21

*Eagle Assocs. v. Bank of Montreal*
    926 F.2d 1305 (2d Cir. 1991)………………………………………………....6

*Grace v. Bank Leumi Trust Co.*
    443 F.3d 180 (2d Cir. 2006)………………………………………………..6

*Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*
    973 F.2d 155 (2d Cir. 1992)………………………………………………….7

*In re OSG Sec. Litig.*
    971 F. Supp. 2d 387 (S.D.N.Y. 2013)…………………………………………...22

*In re Reserve Fund Sec. and Derivative Litig.*, Case No. 09-4346
    2013 U.S. Dist. LEXIS 141018 (S.D.N.Y. Sept. 30, 2013)……………………... 24

*In the matter of Quinn & Co.*, 44 S.E.C. 461
    1971 WL 120484 (1971)……………………………………………………….13

*Pert 35, Inc. v. Amari Aviation Ltd.*, No. 09-cv-0448
    2010 U.S. Dist. LEXIS 28761 (N.D.N.Y. Mar. 5, 2010)………………………..7

*Pinter v. Dahl*
    486 U.S. 622 (1988)…………………………………………………….. 21, 22

*RGI Brands LLC v. Cognac Brisset-Aurige*, No. 12-1369
    2013 U.S. Dist. LEXIS 55804 (S.D.N.Y. Apr. 18, 2013)……………………. 6

*Quinn & Co. v. SEC*
    452 F.2d 943 (10th Cir. 1971)……………………………………………… 13

*SEC v. Absolutefuture.com*
    393 F.3d 94 (2d Cir. 2004)…………………………...……………………… 20

*SEC v. Amerindo Inv. Advisors*
    639 F. App'x 752 (2d Cir. 2016)……………...…………………………….6

*SEC v. Bronson*
  14 F. Supp. 3d 402 (S.D.N.Y. 2014)……………………………………………… 11

*SEC v. Calvo*
  378 F.3d 1211 (11th Cir. 2004)……………………………………………………20

*SEC v. Cavanagh*
  445 F.3d 105 (2d Cir. 2006)………………………………………………………11

*SEC v. Commonwealth Chem. Sec., Inc.*
  574 F.2d 90 (2d Cir. 1978)……………………………………………………..17

*SEC v. Czarnik*, No. 10-745
  2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010)……………………………… 11

*SEC v. Elliot*, No. 09-7594
  2012 WL 2161647 (S.D.N.Y. June 12, 2012)…………………………………3

*SEC v. First Jersey Secs. Inc.*
  101 F.3d 1450 (2d Cir. 1996)……………………………………………… 19, 23

*SEC v. Gibraltar Global Secs., Inc.*, No. 13-cv-2575
  2016 WL 153090 (S.D.N.Y. Jan. 12, 2016)………………………………   2,4,20,22

*SEC v. Lybrand*
  281 F. Supp. 2d 726 (S.D.N.Y. 2003)……………………………………………25

*SEC v. Management Dynamics*
  515 F. 2d 801 (2nd Cir. 1975)………………………………………………17

*SEC v. Norstra Energy Inc.*, No. 15-4751
  2016 U.S. Dist. LEXIS 130545 (S.D.N.Y. Sept. 20, 2016)…………………… 7, 12, 24

*SEC v. Palmisano*
  135 F.3d 860 (2d Cir. 1998)………………………………………………...25

*SEC v. Platforms Wireless Int'l Corp.*
  617 F.3d 1072 (9th Cir. 2010)……………………………………………...20, 23

*SEC v. Ralston Purina Co.*
  346 U.S. 119 (1953)………………………………………………………….. 11

*SEC v. Smith*, Case No. 14-192
  2015 U.S. Dist. LEXIS 134175 (D.N.H. Oct. 1, 2015)…………………………24

*SEC v. Spyglass Equity Sys.*, Case No. 11-2371
  2012 U.S. Dist. LEXIS 189621 (C.D. Cal. Apr. 5, 2012)............................25

*SEC v. Universal Major Indus. Corp.*
  546 F.2d 1044 (2d Cir. 1976)...............................................................18

*SEC v. Verdiramo*
  890 F. Supp. 2d 257 (S.D.N.Y. 2011)....................................................11

*SEC v. Verdiramo*
  907 F. Supp. 2d 367 (S.D.N.Y. 2011)....................................................20

*SEC v. Whittemore*
  659 F.3d 1 (D.C. Cir. 2011).............................................................. 20, 21

*SEC v. Wilde*, Case No. 11-0315
  2012 U.S. Dist. LEXIS 183252 (C.D. Cal. Dec. 17, 2012)........................24

*Sream, Inc. v. 752 Tobacco Candy Inc.*, No. 15-2904
  2016 U.S. Dist. LEXIS 141668 (S.D.N.Y. Oct. 11, 2016)...........................7

*Stead v. SEC*
  444 F.2d 713 (10th Cir. 1971)..............................................................17

*Walpert v. Jaffrey*, No. 13-5006
  2016 U.S. Dist. LEXIS 111057 (S.D.N.Y. Aug. 17, 2016)......................... 7

*Westchester Fire Ins. Co. v. Annex Gen. Contracting, Inc.*, No. 14-5747
  2016 U.S. Dist. LEXIS 94221 (E.D.N.Y. July 15, 2016)........................... 7

*Wilson v. Saintine Exploration & Drilling Corp.*
  872 F.2d 1124 (2d Cir. 1989)................................................................21

*Wonsover v. SEC*
  205 F.3d 408 (D.C. Cir. 2000)............................................................. 17

*World Trade Financial Corp. v. SEC*
  739 F.3d 1243 (9th Cir. 2014)....................................................14,15,16,17

## **Statutes and Regulations**

15 U.S.C. § 77b(a)(11)........................................................................ 13

15 U.S.C. § 77d(a)(1).......................................................................... 13

15 U.S.C. § 77d(a)(3)………………………………………………………… 2, 12

15 U.S.C. § 77d(a)(4)………………………………………………………… 2, 13

15 U.S.C. §§ 77e(a), (c)……………………………………………………... 1, 11

15 U.S.C. § 77l(a)(1)………………………………………………………… 21

15 U.S.C. § 77t(b)…………………………………………………………… 17

15 U.S.C. §77t(d)(2)………………………………………………………23, 24

15 U.S.C. §77t(g)…………………………………………………………... 19

15 U.S.C. § 78c(a)(51)(A)…………………………………………………… 19

17 C.F.R. § 201.1001………………………………………………………… 24

17 C.F.R. § 240.3a51-1……………………………………………………… 19

26 U.S.C. § 6621(a)(2)……………………………………………………… 23

Securities Law Enforcement Remedies Act of 1990, H.R. Rep. No. 101-616
        reprinted in 1990 U.S.C.C.A.N. 1379, 1384-86………………………………… 24

**<u>Other Authorities</u>**

*Distribution by Broker-Dealers of Unregistered Securities*
        Exchange Act Rel. No. 33-4445, 1962 WL 69442 (Feb. 2, 1962)……………… 14, 15

*Sales of Unregistered Securities by Broker-Dealers*
        Exchange Act Rel. No. 9239, 1971 WL 127558 (July 7, 1971)………………... 16

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this Memorandum of Law in support of its Motion for Default Judgment against Defendant Verdmont Capital, S.A. ("Verdmont").

## INTRODUCTION AND NATURE OF THE SEC'S CLAIM

The SEC filed this action alleging Verdmont, a foreign broker-dealer headquartered in Panama, participated in the unregistered distributions of penny stocks issued by three shell companies: Goff Corp. ("Goff"); Norstra Energy Inc. ("Norstra"); and Xumanii, Inc. ("Xumanii"). Each of these unregistered distributions followed the same pattern. The shell companies supposedly issued securities to several dozen individual foreign shareholders when, in fact, no *bona fide* transfers occurred because the securities remained in the control of the shell companies and their affiliates.  The companies filed Form S-1 registration statements with the SEC to induce the transfer agent to issue stock certificates without restrictive legends.

Unlegended certificates then were deposited into accounts at Verdmont in Panama. Verdmont, in turn, converted the stock into street name and sold it into the public markets through brokerage accounts in the United States. The sale occurred simultaneously with aggressive promotion campaigns for the securities, and generated over $17 million in proceeds. This offering of securities, however, was not registered with the SEC, and as described *infra*, was not exempt from registration. Accordingly, Verdmont violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) & (c).

As discussed in more detail below, the SEC has met the requirements for a default judgment. Accordingly, we respectfully request the Court enter an Order directing the Clerk to strike Verdmont's answer and defenses.  We also respectfully request the Court enter default judgment against Verdmont, and grant the SEC's request for injunctive relief; penny stock bar; disgorgement

plus prejudgment interest; and a civil money penalty in an amount to be determined by the Court. With respect to disgorgement, the SEC submits that given the particular posture of this case on default, it would be appropriate for the Court to follow the decision reached by this District in *SEC v. Gibraltar Global Secs., Inc.*, No. 13-cv-2575, 2016 WL 153090 (S.D.N.Y. Jan. 12, 2016), and hold Verdmont, as a broker-dealer, liable for the proceeds generated from the unregistered sale of securities.

## PROCEDURAL HISTORY

The SEC filed its initial Complaint in this matter on February 6, 2015 (Dkt. No. 1), and its operative Amended Complaint on June 10, 2015 (Dkt. No. 110). Verdmont answered the Amended Complaint on June 11, 2015 (Dkt. No. 112), and asserted the SEC's claims were barred because the offering of securities at issue was exempt from registration under the Securities Act. In subsequent verified interrogatory responses, Verdmont confirmed the particular exemptions on which it was relying were the so-called Dealer's Exemption and Broker's Exemption, codified at 15 U.S.C. §§ 77d(a)(3) and 77d(a)(4) respectively. (*See* Declaration of Patrick R. Costello dated February 16, 2017 ("Costello Dec."), at ¶ 9.)

Just prior to the filing of the Amended Complaint, Verdmont moved for judgment on the pleadings (Dkt. No. 107). By Order dated November 10, 2015 (Dkt. No. 140) (the "November Order"), the Court denied Verdmont's motion. In its opinion, the Court correctly determined that registration under Section 5 of the Securities Act is "transaction-specific," meaning that where, as here, a subsequent offering of securities occurs after a registration statement is declared effective, that subsequent offering must itself be "registered, exempt, or illegal." (*Id.* at 23-24.)

The Court also held that under the Dealer's Exemption, a dealer like Verdmont may lawfully sell securities after the expiration of 40 days from the time a registration statement becomes effective or the time the securities are bona fide offered to the public, whichever occurs later. (*Id.* at 25.) The Court noted that while as a general matter, the bona fide offering date usually coincides with the effectiveness of the registration statement, there are circumstances where the offering will occur later, such as where the parties "create[] a sham distribution to conceal a public offering." (*Id.*) The true test therefore is when the stock is "really and truly (genuinely) being offered to the public, as opposed to, say, a simulated offering." (*Id.* at 25-26.)

The Court further held with respect to the Broker's Exemption that a securities transaction by a broker is exempt from registration under Section 5 as long as the broker has conducted a "reasonable inquiry" to assure its customers are not underwriters or that the transaction is not part of a distribution of securities of the issuer. (*Id.* at 28.) The inquiry required of a broker is measured by a number of factors, including the length of time the securities are held by the customer; the nature of the transaction; the amount of securities recently sold; the trading volume; and concurrent sales by multiple customers. (*Id.* at 28-29.) In assessing these factors, the Court quoted *SEC v. Elliot*, No. 09-7594, 2012 WL 2161647 (S.D.N.Y. June 12, 2012), in noting that "[W]hen a dealer is offered a substantial block of a little-known security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for." (*Id.* at 29.)

In the November Order, the Court also addressed the SEC's demand for joint and several disgorgement of the proceeds generated from Verdmont's customer transactions. (*Id.* at 30-31.)

The Court observed that disgorgement is a discretionary matter and is dependent on, among other things, Verdmont's "relationship to its clients." (*Id.* at 31.)  Relatedly, in its Order dated September 28, 2016, approving the settlement between the SEC and Defendants Caledonian Bank Ltd. and Caledonian Securities Ltd. (collectively, "Caledonian"), the Court noted joint and several disgorgement may be appropriate where a broker-dealer "clearly serves as the 'enabler' for a chain of events resulting in foreseeable unlawful profits . . . to require disgorgement of those profits from the broker." (*See* Dkt. No. 271 at 22.)  The Court also referenced *Gibraltar*, where, in the limited context of a default judgment, a broker-dealer was held liable for the proceeds of securities transactions. (*Id.*)

After the Court entered the November Order, the SEC moved forward with discovery against Verdmont. Two matters served as the focal point during the proceedings: (i) Verdmont's continued failure to produce numerous categories of documents in response to the SEC's document requests, including records showing how the proceeds of the securities transactions were transferred; and (ii) Verdmont's refusal to make its principals, Glynn Fisher and Taylor Housser, available for deposition.  As for the document discovery, Verdmont asserted a series of boilerplate objections referencing Panamanian bank secrecy laws in an effort to shield customer information from the SEC, including information concerning the proceeds.  After a hearing before Magistrate Cott, who reserved ruling on the applicability of the secrecy laws, Verdmont abstained from producing relevant documents while the SEC undertook the circuitous route of obtaining some of Verdmont's information from the Panamanian securities regulator.  However, in spite the regulator's cooperation, the documents received were not complete.[1]

---

[1]     When it was time to resolve the bank secrecy question in the wake of the deficient document production, Verdmont elected instead not to pay its counsel, Carter Ledyard & Milburn, which caused counsel to withdraw from this case.

As for the depositions, because Verdmont was adamant that Messrs. Fisher and Housser would "not fly to the United States" under any circumstances (*see* Dkt. No. 223, Exh. A), the SEC paid to conduct the depositions in London. During their depositions, Messrs. Fisher and Housser revealed: (i) Verdmont paid $600,000 in dividends to them and to other principals in November 2015 ***after*** Verdmont already had claimed to the Court a few months prior that it was in a so-called financial death spiral (*see* Dkt. No. 250, Exhs. C, D); (ii) that the $239,955 amount in frozen funds was Verdmont's net revenue on the securities trades, not the actual commissions earned, which were much higher (*Id.*, Exh. A); and (iii) that despite not having done any prior research into Goff, Norstra or Xumanii and not "even [knowing] the name of" those companies, Messrs. Fisher and Housser traded in the securities along with their customers on the very first day of the distributions. (Costello Dec., at ¶ 12, Ex. 4, Excerpts from the Transcript of the Deposition of Taylor Housser ("Housser Dep."), at 69-70; *see also* Dkt. No. 191, Exhs. 1, 3 (showing, among others, Jacametra Inversiones, Creekside Capital and Chloe Company, companies owned by Messrs. Fisher and Housser, trading in the securities under account numbers XXXXX9605, XXXXX9307 and XXXXX0452)).

After discovery closed, Verdmont filed a motion for summary judgment solely on the Dealer's Exemption to registration (Dkt. No. 239).  Despite having maintained consistently since the outset of this case that the 40-day period under the exemption began to run as soon as the registration statements were declared effective,[2] and despite repeating this contention in its pre-motion conference letter (Dkt. No. 206), Verdmont "about-faced" in the motion for summary judgment, arguing that the 40-day period was not tied to the effectiveness of the registration

---

[2]    As noted above, this is an incorrect statement of law, as the November Order points out. Simply because a registration statement is declared effective does not necessarily mean securities are bona fide offered to the public, which is what the Dealer's Exemption requires.

statement, but instead began to run as soon as various third-party market makers placed zero quantity, unpriced bids on the OTC Link and the OTC Bulletin Board, which are types of over-the-counter exchanges. (*See generally* Dkt. No. 243.)

In its Order on October 28, 2016 denying the motion (Dkt. No. 273), the Court rejected Verdmont's position and observed, among other things, that (i) unlike other cases, actual trading in the securities in this case did not coincide with placement of the bids on the exchanges; (ii) despite the exchanges' restriction that bids be firm for at least one trading unit if requested by another market maker, Verdmont failed to proffer any evidence that such firm bids in fact were made. (*See* Dkt. No. 273 at 7-8.)

Upon the denial of summary judgment, counsel for Verdmont moved to withdraw. Verdmont's liquidator, Shamima Bhana, who also doubled as the company's head of human resources, submitted a declaration indicating Verdmont no longer intended to defend the case. (*See* Dkt. No. 281.)  By Endorsed Order dated January 18, 2017 (Dkt. No. 284), the Court instructed the SEC to file this motion.

## **ARGUMENT**

## I.   **Striking Verdmont's Answer And Entering Default Judgment Are The Proper Remedies**

As a corporate entity, Verdmont is not permitted to proceed *pro se* in this matter. Instead, it must be represented by counsel.  *SEC v. Amerindo Inv. Advisors*, 639 F. App'x 752, 754 (2d Cir. 2016); *Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 192 (2d Cir. 2006).

Where, as here, a corporate entity like Verdmont fails to retain counsel, both the Second Circuit and this District have held the appropriate course is to strike the entity's pleadings and enter default judgment. *See*, *e.g.*, *Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1306 (2d Cir. 1991); *RGI Brands LLC v. Cognac Brisset-Aurige*, No. 12-1369, 2013 U.S. Dist. LEXIS

55804, at *16 (S.D.N.Y. Apr. 18, 2013); *see also Westchester Fire Ins. Co. v. Annex Gen. Contracting, Inc.*, No. 14-5747, 2016 U.S. Dist. LEXIS 94221, at *45 (E.D.N.Y. July 15, 2016) (same); *Pert 35, Inc. v. Amari Aviation Ltd.*, No. 09-cv-0448, 2010 U.S. Dist. LEXIS 28761, at *7 (N.D.N.Y. Mar. 5, 2010).   Accordingly, this Court should strike Verdmont's answer and defenses to the Amended Complaint and enter default judgment as a matter of law.

## II.   Default Judgment Standards

### A.   Legal Principles

A default is "'deemed to constitute a concession of all well pleaded allegations of liability, [but] . . . is not considered an admission of damages.'" *SEC v. Norstra Energy Inc.*, No. 15-4751, 2016 U.S. Dist. LEXIS 130545, at *1 (S.D.N.Y. Sept. 20, 2016) (quoting *Bricklayers and Allied Craftworkers Local 2 v. Moulton Masonry & Const., LLC*, 779 F.3d 182, 189 (2d Cir. 2015)).   A defendant may not raise any defense at the relief stage that "effectively contests settled issues of liability." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992) (evidence of comparative negligence precluded at damages inquest following default judgment).   Accordingly, if this Court enters judgment by default, it will legally establish Verdmont's liability for violating Sections 5(a) and 5(c) of the Securities Act, irrespective of the Dealer's Exemption and Broker's Exemption or any other defense Verdmont has raised.[3]

In assessing damages, the district court accepts as true all of the factual allegations of the complaint, save for those relating to damages, and the plaintiff bears the burden of introducing sufficient evidence to establish the amount of damages with reasonable certainty.  *Sream, Inc. v. 752 Tobacco Candy Inc.*, No. 15-2904, 2016 U.S. Dist. LEXIS 141668, at *30-31 (S.D.N.Y. Oct.

---

[3]      Given that Verdmont's answer will be stricken, these defenses no longer are at issue in the case.   Nevertheless, the SEC presents its arguments in Sections III.B and III.C below as to why, even if the Dealer's Exemption and Broker's Exemption still were applicable, they do not prevent the Court's granting of default judgment in the SEC's favor.

- 7 -

11, 2016). The plaintiff is entitled to all reasonable inferences in its favor based upon the evidence presented. *Id.* at *31. A determination of damages may be made on the basis of detailed affidavits and documentary evidence in lieu of an evidentiary hearing. *Walpert v. Jaffrey*, No. 13-5006, 2016 U.S. Dist. LEXIS 111057, at *12 (S.D.N.Y. Aug. 17, 2016).

### B. The Complaint In This Case

Based upon the principles set forth in Section II.A above, Verdmont, by virtue of its default, is deemed to have admitted the allegations from the SEC's operative Amended Complaint (Dkt. No. 110) ("Compl.").[4]

This case arises in relevant part from Verdmont's unregistered and unlawful distributions of securities in three issuers: Goff, Norstra and Xumanii. (Compl., ¶ 1.) During the time period, Verdmont was a broker-dealer based in Panama (*id.*, ¶ 11), and operated as an affiliate, dealer, sales outlet and underwriter by distributing the securities. (*Id.*, ¶ 2.) Because the subject securities traded at less than $5.00 a share, the securities qualified as penny stocks. (Compl., ¶¶ 45, 65, 82.)[5]

Verdmont's sales of the securities followed a particular course. Lornex Financial Ltd. ("Lornex"), Nautilus Growth Fund Inc. ("Nautilus"), and Bartlett Trading Inc. ("Bartlett"), all of which were customers of Verdmont, deposited stock certificates into accounts they maintained at Verdmont. (*Id.*, ¶ 16.) Lornex was an international business corporation ("IBC") formed in Nevis, British West Indies; Nautilus was a mutual fund formed in the Cayman Islands; and Bartlett, now known as Bamfield Trading Inc., was an IBC formed in Samoa. (*Id.*) Verdmont

---

[4]     For space reasons, the discussion in Section II.B is intended to be a summary of the allegations in the Amended Complaint.
[5]     As noted by Witness 1, the issuers and their purported foreign shareholders were part of the Mulholland Group. (*See* Dkt. No. 254, ¶ 22.) The group retained 100% of the float while these shareholders were used as nominees. (*Id.*, ¶ 6.)

subsequently deposited the stock certificates into an omnibus account it maintained at RBC Investor Services Trust ("RBC") in Toronto, Canada, and RBC, in turn, deposited the stock into an omnibus custodial account it maintained at BNY Mellon in New York, New York ("BNY Mellon"). (*Id.*)  BNY deposited the certificates into the Depository Trust Corporation ("DTC"), where they were converted into stock held in street name and became transferable by book entry. (*Id.*)

Verdmont subsequently sold the stock into the public markets through accounts in its name at clear broker-dealer firms, each of which had delivery and receive versus payment arrangements with Verdmont and BNY Mellon. (*Id.*)  Verdmont had the proceeds transferred to the firm's headquarters in Panama, where it credited the proceeds to its customers' accounts. (*Id.*)

The transactions involving the subject securities each followed a similar pattern.  The companies themselves were development or exploration stage companies based in Nevada, with little to no assets or operations.  (*Id.*, ¶¶ 45, 65, 82.)  Each filed a Form S-1 registration statement with the SEC with respect to a purported initial offering of securities, in the case of Norstra, or a purported resale offering, in the case of Goff and Xumanii. (*Id.*, ¶¶ 46, 65, 82.)  These offerings, however, were not legitimate distributions of the securities but mere shams designed to create the appearance thereof.

For each issuer, the transfer agent – acting on instructions from third-party Celtic Consultants ("Celtic") – mailed the unlegended stock certificates, in the names of the purported foreign shareholders identified in the registration statements, not to the individual shareholders but to the issuers. (*Id.*, ¶¶ 49, 68, 85.)  Celtic also sent some of the certificates directly to the transfer agent with instructions to transfer them to some of Verdmont's customers.  (*Id.*, ¶¶ 50,

69, 86.)  The entire transfer process itself was rife with irregularities.  For example, the Goff Irish shareholders' signatures were not stamped with the required medallion guarantees by a financial institution, but instead were purportedly guaranteed by one of Goff's officers; the Norstra Norwegian and Panamanian shareholders' stock power documents and notarizations, the Norstra board resolution, and Celtic's shipping label to the transfer agent were all dated the same day; the Xumanii stock certificates all had powers of attorney signed by 17 Jamaican shareholders on the same day a bank in Nevis supposedly issued medallion stamps; and each issuer supplied the transfer agent with a board of directors resolution directing the transfer agent to make the transfer.  (*See id.*)  At the end, the transfer agent issued new stock certificates to Verdmont's customers who then deposited them into Verdmont's accounts. (*Id.*, ¶¶ 50, 69-70, 86.)

After the share transfer process was complete, the issuers authorized forward stock splits that increased the number of shares held by Verdmont's customers.  (*Id.*, ¶¶ 54, 89.)  The issuers then underwent coincidental changes in control and business plans, through reverse mergers, contracts and other combinations with operating companies. Goff started out in the job placement industry in Europe but decided to change to mineral exploration in Colombia; Norstra touted a lucrative ownership interest in an oil and gas venture in Montana through a farmout agreement that obligated it to pay approximately 140 times its assets over the following 18 months; and Xumanii went from the tourism sector to social networking.  (*Id.*, ¶¶ 47, 58, 73, 88.) Aggressive stock promotions and news releases followed.  (*Id.*, ¶¶ 59, 76, 92.)  The stock of each issuer went from practically no volume and minimal value to exponential numbers in the weeks that followed, and then plummeted back to the pre-distribution levels.  (*Id.*, ¶¶ 62, 79, 95.)  When all was said and done, the transactions in which Verdmont participated resulted in proceeds of

$3,526,354 for sales of Goff stock; $8,073,497 for Norstra; and $6,064,353 for Xumanii.  (*Id.*, ¶¶ 63, 80, 96.)  And as noted above, Verdmont's principals participated in the distribution alongside their customers, despite claiming not to have known what Goff, Norstra or Xumanii even were.

## III.   Verdmont Violated Section 5 of the Securities Act

Through its conduct, Verdmont violated Section 5 of the Securities Act.  In addition, as discussed below, Verdmont has not satisfied the elements for the Dealer's Exemption or the Broker's Exemption to registration.

### A.   Elements of a Section 5 Claim

To prevail on its claim under Section 5, the SEC must show (i) lack of a registration statement as to the subject securities; (ii) the offer or sale of the securities; and (iii) the use of interstate transportation or communication and the mails in connection with the offer or sale.  *See* 15 U.S.C. §§ 77e(a) & (c); *SEC v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006); *SEC v. Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014).[6]

As this Court correctly determined in the November Order, registration under Section 5 is "transaction-specific," meaning that where, as here, a subsequent offering of securities occurs after a registration statement is declared effective, that subsequent offering must itself be "registered, exempt, or illegal." (*See* Dkt. No. 140 at 24.)  In addition, as the Court noted in the November Order (Dkt. No. 140 at 24), once the SEC demonstrates the three *prima facie* elements, the burden shifts to Verdmont to prove it is entitled to an exemption from registration. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *Cavanagh*, 445 F.3d at 111 n.13; *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 268 (S.D.N.Y. 2011).

---

[6]     Scienter is not an element of a Section 5 claim, which imposes strict liability on sellers of unregistered securities.  *See Bronson*, 14 F. Supp. 3d at 408; *see also SEC v. Czarnik*, No. 10-745, 2010 WL 4860678, at *11 (S.D.N.Y. Nov. 29, 2010).

In this case, the securities offerings at issue were distributions Verdmont made on behalf of itself and its customers beginning in or around March 2013. By virtue of the default, Verdmont has conceded liability under Section 5. *See Norstra Energy*, 2016 U.S. Dist. LEXIS 130545, at *1. Furthermore, there really was no dispute between the parties that Verdmont's sales of the subject securities were not registered. Instead, Verdmont contended throughout the litigation that it was exempt from registration under either the Dealer's Exemption or the Broker's Exemption. Neither exemption, however, is applicable and Verdmont's inability to meet its burden of proof with respect to the exemptions was evident even before the default.

### B.     The Dealer's Exemption

As discussed above, Verdmont moved for summary judgment under the Dealer's Exemption, 15 U.S.C. § 77d(a)(3), on grounds that the 40-day period began to run as soon as various third-party market makers placed zero quantity, unpriced bids on the OTC Link and the OTC Bulletin Board, which are types of over-the-counter exchanges. (*See generally* Dkt. No. 243.) In denying the motion, the Court rejected Verdmont's position and observed, among other things, that (i) unlike other cases, actual trading in the securities in this case did not coincide with placement of the bids on the exchanges; (ii) despite the exchanges' restriction that bids be firm for at least one trading unit if requested by another market maker, Verdmont failed to proffer any evidence that such firm bids in fact were made. (*See* Dkt. No. 273 at 7-8.) The Court also cited the Declaration of Witness 1 dated June 14, 2016 (Dkt. No. 254), and further noted that the placement of bids on the exchanges were sham quotations designed to cause the securities to seem more valuable to the public. (*See* Dkt. No. 273 at 8.)

In defaulting, Verdmont has not come forward with any additional evidence or arguments as to why the placement of zero quantity, unpriced bids on the exchanges amounted to bona fide

offerings of Goff, Norstra and Xumanii securities.  To the contrary, the SEC retained Robert W. Lowry as an expert witness who opined, among other things, that (i) a competitive market cannot exist where only one market maker is quoting only one side of the transaction (*i.e.*, a bid price with no ask price); (ii) competition between market makers is an essential component of a genuine public offering; and (iii) because the securities lacked these hallmarks, the first *bona fide* public offering of the securities did not take place until 2013 when Verdmont brokered the transactions on behalf of its customers into the public markets. (Costello Dec., at ¶ 10, Ex. 2, Expert Report of Robert W. Lowry ("Lowry Report"), at 8-9, 33-34.)  Because those transactions occurred prior to the expiration of the 40-day period, Verdmont cannot satisfy the requirements for the Dealer's Exemption.[7]

### C.     The Broker's Exemption

Verdmont also cannot rely on the Broker's Exemption under 15 U.S.C. § 77d(a)(4).  As discussed above, brokers like Verdmont are required to perform a "reasonable inquiry" to assure its customers are not underwriters or that the transaction is not part of a distribution of securities

---

[7]     There is also the question of whether Verdmont acted as a statutory underwriter, either by itself or by brokering the transactions on behalf of customers who meet the definition of an underwriter under Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).   Indeed, Section 4(a)(1) of the Securities Act specifically carves out transactions by underwriters from the list of those transactions exempted from registration under Section 5.  *See* 15 U.S.C. § 77d(a)(1). And if Verdmont is deemed an underwriter, then it cannot qualify for either the Dealer's Exemption or Broker's Exemption as a matter of law. *See In the matter of Quinn & Co.*, 44 S.E.C. 461, 1971 WL 120484, at *4 (1971), *aff'd Quinn & Co. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971) (holding that the dealers and brokers exemptions are inapplicable to transactions involving an underwriter.))

As the Court noted in its Order denying Verdmont's motion for summary judgment (Dkt. No. 273 at 8-11), it was Verdmont's burden to prove it was not acting as an underwriter in connection with the transactions of Goff, Norstra and Xumanii securities.  The Court rejected the evidence and arguments Verdmont raised on that front, and in defaulting, Verdmont has not proffered any additional evidence to meet its burden.

of the issuer.  (Dkt. No. 140 at 28.)  The SEC has issued guidance concerning the circumstances involved in this case:

> [W]here substantial amounts of a previously little known security appear in the trading markets within a fairly short period of time and without the benefit of registration . . . it must be assumed that these securities emanate from the issuer or from persons controlling the issuer, unless some other source is known and the fact that the certificates may be registered in the names of various individuals could merely indicate that those responsible for the distribution are attempting to cover their tracks.

(*Distribution by Broker-Dealers of Unregistered Securities*, Exchange Act Rel. No. 33-4445, 1962 WL 69442, at *2 (Feb. 2, 1962)).  In analyzing the SEC's guidance, the Ninth Circuit found a broker did not qualify for the exemption because (i) the issuer was a little-known development stage company with a very short operating history; (ii) the company had recently undergone a reverse merger, forward stock split, and name change; (iii) the stock was thinly traded in the over-the-counter market; and (iv) the company had just begun trading shortly before the initiation of trading by the broker. *See World Trade Financial Corp. v. SEC*, 739 F.3d 1243, 1247 (9th Cir. 2014).

Similarly, here, Verdmont has failed to comply with the requirements incumbent upon brokers dealing in transactions of little-known securities. According to Verdmont's corporate representative, at the time of the Goff, Norstra and Xumanii distributions, Verdmont was unaware of the Broker's Exemption to registration. (Costello Dec., at ¶ 11, Ex. 3, Excerpts from the Transcript of the Deposition of Alejandro Abood ("Abood Dep."), at 74-75.)   In fact, Verdmont ended its due diligence and surveillance activities at the time a customer deposited a stock certificate into a Verdmont account.  (*Id.* at 75.)  Verdmont "had no procedures pertaining to diligence when they sell securities or they didn't have at the time." (*Id.*)  Verdmont also did

not have any policies specifically directed toward complying with guidance issued in the SEC's

releases.  (*Id.* at 77.)

Because Verdmont did not conduct any aspect of the Section 4(a)(4) inquiry – searching

or otherwise – the company did not know or ignored red flags raised by the Goff, Norstra and

Xumanii distributions:

- **No public trading.** There had been little or no public trading in the securities
  before Verdmont began selling these stocks. Verdmont did not determine whether
  there was any trading in the public markets for the stock because, according to
  Verdmont's corporate representative, Verdmont was "not required to check how a
  stock is trading."  (*Id.* at 75.)

- **Aggressive stock promotions.** The public trading in the stocks coincided with
  aggressive promotional campaigns to generate investor interest in the companies.
  (Compl., ¶¶ 60, 77, 93).

- **Large blocks of securities.**  Verdmont accepted the deposit of, and sold on behalf
  of its customers: 14,000,000 shares of Goff stock, 9,702,000 shares of Norstra
  stock, and 17,050,000 shares of Xumanii stock.  (*Id.*, ¶¶ 63, 80, 96).

- **Development stage companies.** All three shell companies had short operating
  histories, another red flag under *World Trade*.  739 F.3d at 1247. Verdmont did
  not consider whether the shell companies were development stage start-up
  companies because "they were not required to review the companies that they
  were trading."  (Abood Dep. at 77)

- **Little known securities.** The shell companies' securities were little known.
  Before the promotion campaigns, there was no news in the public domain about
  them.[8]

- **Inexplicable changes in business.**   The companies underwent inexplicable
  changes in business at or near the time the securities began trading.

- **Recent changes in control.**  Each of the shell companies announced new CEOs
  and new controlling shareholders shortly before public trading began.

---

[8]      Because large quantities of previously unknown securities were appearing in the public
markets for the first time without the benefit of registration, Verdmont was required "to assume
that these securities emanate from the issuer or from persons controlling the issuer." 1962 SEC
Release, 1962 WL 69442 at *2.

- **Origin of the securities.**  The transfers of stock from nominee shareholders were effected without the shareholders' signatures being authenticated by medallion guarantees.  The stock powers and agreements for the transfer of stock were dated the same day.

- **Forward stock splits.**  Goff effected a 25-for-1 forward stock split, and Xumanii effected a 5.5-for-1 forward stock split.

These red flags, "when examined individually or in the aggregate, indicate that sales in a security should be halted immediately." *Sales of Unregistered Securities by Broker-Dealers*, Exchange Act Rel. No. 9239, 1971 WL 127558, at *2 (July 7, 1971).  Because Verdmont did not conduct a searching inquiry into Goff, Norstra and Xumanii, public investors lost over $17 million paying for worthless securities.  Indeed, "[w]hen customers deliver large quantities of obscure securities, the broker dealer is required to conduct a vigorous investigation into the circumstances of how the customer acquired the security, the customer's background and investment history." (Lowry Report, at 19-20.)  Moreover, "it is not enough for broker dealers to rely on the customer's unverified statements to prevent the sale of unregistered securities." (*Id.* at 20.)

The fact that the stock certificates were not restricted does not absolve Verdmont of its obligation to conduct a searching inquiry.  "[B]oth courts and the Commission have cautioned against relying on the presence, or lack thereof, of restrictive legends."  *World Trade*, 739 F.3d at 1249.  Verdmont was required to conduct a searching inquiry into its customers' stock deposits, particularly where, as here, the documents accompanying the deposits were "unprofessional, incomplete, and contained boiler-plate and fill-in-the-blank details regarding the purchase transactions." (Lowry Report at 22.)

Nor did Verdmont satisfy its responsibilities if it did no more than contact the transfer agent, because "brokers rely on third-parties at their own peril, and will not avoid liability

through that reliance when the duty of reasonable inquiry rests with the brokers." *World Trade*, 739 F.3d at 1249. *See also Stead v. SEC*, 444 F.2d 713, 716 (10th Cir. 1971) ("[C]alling the transfer agent is obviously not a sufficient inquiry"); *Wonsover v. SEC*, 205 F.3d 408, 415 (D.C. Cir. 2000) ("Precedent will not suffer [the broker's] argument that he justifiably relied on the clearance of sales by the RSD, the transfer agent and counsel").

Thus, because Verdmont availed itself of the privilege of conducting securities transactions in the United States, it was obligated to follow the proper procedures in conducting a searching inquiry of its customers.  Given the corporate representative's testimony, and the utter failure of Verdmont to conduct even a peripheral inquiry (preferring instead, for reasons that became quite obvious throughout this litigation, simply to "rubber stamp" the transactions), Verdmont has not satisfied the requirements to meet the Broker's Exemption as a matter of law.

In short, a default judgment finding Verdmont liable for Section 5 violations is appropriate both because Verdmont has ceased participating in the litigation and because there is substantial persuasive evidence of Verdmont's violations.

## IV.    This Court Should Grant The SEC's Requests For Relief

### A.    Injunctive Relief

Under Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), the SEC is entitled to injunctive relief when it establishes (i) a violation of the federal securities laws, and (ii) a reasonable likelihood of future violations. *See*, *e.g.*, *SEC v. Commonwealth Chem. Sec.*, *Inc.,* 574 F.2d 90, 99-100 (2nd Cir. 1978). Permanent injunctions against future securities law violations may be issued as part of a judgment by default upon a finding that a factual basis for such relief exists.  *See, e.g., SEC v. Management Dynamics*, 515 F. 2d 801, 814 (2nd Cir. 1975).

In determining whether a defendant is reasonably likely to continue to violate the securities laws, district courts generally consider: (i) the egregiousness of the conduct; (ii) the isolated or recurrent nature of the infraction; (iii) the degree of scienter involved; (iv) the sincerity of the defendant's assurances against future violations; and (v) the defendant's recognition of the wrongful nature of its conduct. *See SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976). Here, each of the factors set forth above weighs in favor of the Court entering a permanent injunction.

First, Verdmont's conduct was egregious and its actions demonstrate a deliberate or reckless disregard of the registration requirement. As noted above, the company shirked its responsibilities as a broker-dealer and permitted an obvious, unregistered distribution of securities to take place. Perhaps most telling of all, Verdmont's principals themselves even got in on the action and started trading on the very first day, along with dozens of Verdmont customers, in stocks of three issuers that had little to no assets or operational history and minimal trading volume. It really should not be too much of a leap for Verdmont, as the gatekeeper in that scenario, to suspect that something was awry. But given Verdmont's prior dealings as a broker with the attorney who facilitated the Mulholland Group's vast assortment of pump-and-dump schemes, it is not difficult to understand why Verdmont turned a blind eye here. (*See* Dkt. No. 254, ¶ 31.) Second, Verdmont's actions in this case were not one-off occurrences. Instead, they spanned a period of 6 months and resulted in over $17 million in proceeds. Third, by electing no longer to defend this case, Verdmont and its principals have provided no assurances against future violations of the securities laws. And finally, given Verdmont's recalcitrance in this case, particularly in skirting its discovery obligations, Verdmont has never owned up to its

misconduct and has failed to recognize how wrongful it was.  Accordingly, the Court should enter a permanent injunction against the company.

### B.      Penny Stock Bar

Pursuant to Section 20(g) of the Securities Act, 15 U.S.C. §77t(g), the Court should permanently bar Verdmont from participating in any offering of a penny stock.  That section permits district courts to impose such bars against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock.

Section 3(a)(51)(A) and Rule 3a51-1 of the Exchange Act, 15 U.S.C. § 78c(a)(51)(A) and 17 C.F.R. § 240.3a51-1, define the term "penny stock" as "any equity security other than a security" that is, *inter alia*, excluded based on exceeding a minimum price (generally $5.00 per share).  The subject securities meet the definition of "penny stock" because, during the relevant time period, each traded at less than $5.00 per share. (Compl., ¶¶ 45, 65, 82.)  In addition, Verdmont participated in an offering of a penny stock because it engaged in activities for the purpose of issuing, trading, and/or inducing or attempting to induce the purchase or sale of the securities.  As a result, a penny stock bar against the company is appropriate.

### C.      Disgorgement and Prejudgment Interest

The SEC has already argued to this Court that a broker-dealer like Verdmont who violates Section 5 should be liable for disgorging the full proceeds of those violations on a joint and several basis with other participants in the illegal distribution.  (*See* Dkt. Nos. 115 at 26-30; 169 at 5-6.)  In its prior Order, this Court noted that determining the proper amount of disgorgement is "entrusted to this Court's 'broad discretion' and depends on multiple factors, including [a broker's] relationship to its clients." (Dkt. No. 140 at 30-31, citing *SEC v. First Jersey Secs. Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996)).  While the Court expressed some

concerns over the proceeds theory in a subsequent Order (Dkt. No. 271 at 18-24), the Court also acknowledged this District's prior decision in *Gibraltar*. There, in the limited context of default, this District used the proceeds theory in assessing disgorgement against the broker.

As a general matter, personal profit is not a prerequisite for full Section 5 disgorgement liability. Indeed, in *SEC v. Verdiramo*, 907 F. Supp. 2d 367, 376 (S.D.N.Y. 2011), one of the defendants contended he "never sold a single share of" the subject security and "did not receive a single dime as a consequence of the challenged transactions." However, the court held that "[t]his argument is meritless because a defendant may be jointly and severally liable for disgorgement even if he did not personally profit from the Section 5 violation." *Id. Accord SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010) ("We have never held that a personal financial benefit is a prerequisite for joint and several liability" in a Section 5 case); *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) ("It is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in" Section 5 violations).

Disgorgement on a joint and several basis is warranted where there is "successive ownership of profits already realized." *SEC v. Absolutefuture.com*, 393 F.3d 94, 96 (2d Cir. 2004). Disgorgement consists of "a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset;" it "establishes a personal liability, which the defendant must satisfy regardless [of] whether he retains the selfsame proceeds of his wrongdoing." *SEC v. Whittemore*, 659 F.3d 1, 10 (D.C. Cir. 2011).

Joint and several liability has been imposed where "there was evidence [that the defendant] transferred some of the proceeds for [the co-defendant's] benefit . . . [the defendant] never established where the ill-gotten gains finally came to rest." *Whittemore*, 659 F.3d at 12.

So too here.  In *Whittemore*, the D.C. Circuit recognized that "[v]ery often defendants move funds through various accounts to avoid detection, use several nominees to hold securities or improperly deprived [sic] profits, or intentionally fail to keep accurate records and refuse to cooperate with investigators in identifying illegal profits." *Id*   In this case, despite being directed in the temporary restraining order to provide an accounting of all proceeds transfers from the stock sales, and despite being served with discovery requesting the same, again and again, Verdmont refused to produce ***anything*** concerning how the proceeds were transferred and to whom.  In these circumstances, it would be appropriate for the Court to presume that Verdmont retained the proceeds itself.

Indeed, disgorgement in a Section 5 case brought by the SEC is predicated in large part on Section 12(a)(1), which provides that any person who "offers or sells a security in violation of section 5" is liable to the purchaser, who may "recover the consideration paid for such security with interest thereon." 15 U.S.C. § 77l(a)(1). In *Pinter v. Dahl*, 486 U.S. 622 (1988), the Supreme Court held a broker, like Verdmont, can be liable as a statutory seller under Section 12(a)(1) for the consideration paid by the buyer when the broker solicits purchases on behalf of the seller:

> It long has been "quite clear," that when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller.

*Id*. at 646.  *Accord Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989) ("It is clear from the Court's opinion [in *Pinter*] that its concern had to do with persons such as brokers who might act on the seller's behalf for a profit").  *See Commercial Union Assurance Co v. Milken*, 17 F.3d 608, 616 (2d Cir. 1994) ("[A] law firm that performed strictly ministerial acts was 'collateral' to a transaction, but 'brokers who might act on the

seller's behalf for a profit' could be liable" under Section 12); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 396 (S.D.N.Y. 2013) ("A 'statutory seller' is defined as a person who either passes title to the plaintiff for value or successfully solicits the purchase"). The Supreme Court reasoned that "[i]n order to effectuate Congress' intent that § 12(1) civil liability be *in terrorem* . . . the risk of its invocation should be felt by solicitors of purchases." *Pinter*, 486 U.S. at 646.  As a broker that solicited purchases in the unregistered distributions, Verdmont is jointly and severally liable for the full amount of the proceeds generated by its sales.

Given (i) the numerous red flags that surrounded the transactions at issue, (ii) the fact that Verdmont's sales of the securities were aggregated in omnibus accounts held solely in its name and not in the name of its customers, (iii) the fact that Verdmont refused to produce any information during discovery demonstrating how the proceeds of the sales were paid out to the customers, (iv) the highly suspicious circumstances surrounding massive, all-of-a-sudden trading in securities that had little to no prior volume or history, and (v) the fact that Verdmont's principals themselves began trading at the same time, the evidence suggests that Verdmont colluded with its customers in the unregistered distribution of Goff, Norstra and Xumanii securities. And given that Verdmont has deliberately defaulted, the SEC submits it would be appropriate for the Court to follow *Gibraltar* and hold, in the limited context of this case, that an award of proceeds as the measure of disgorgement is in order. Whether the same can or should be done in other circumstances, such as where a defendant litigates its liability under Section 5 or introduces evidence of how the proceeds were paid out, is not a question the Court need answer today.  Where, as here, a broker has defaulted, and the evidence tends to show collusion with its customers, an award of proceeds is proper.

The total principal disgorgement to be assessed against Verdmont for the proceeds generated through sales of Goff, Norstra and Xumanii securities is $17,664,205. (*See* Declaration of Robert W. Nesbitt dated February 5, 2015 (Dkt. No. 80) ("Nesbitt Dec."), at ¶¶ 15, 19, 23; *see also* Compl., ¶¶ 63, 80, 96.)  The SEC also seeks $1,589,778 in prejudgment interest.  (Costello Dec., at ¶ 15.)  This amount was calculated in accordance with the delinquent tax rate established by the Internal Revenue Service, 26 U.S.C. § 6621(a)(2), assessed on a quarterly basis, beginning on August 8, 2013 (the latest date on which the unregistered offering of the subject securities took place), and capped at 9% in accordance with Rule VII(B)(iv) of the Court's Individual Practices.  (*Id.* at ¶¶ 14-15.)  This rate of interest "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from [the] fraud." *First Jersey*, 101 F.3d at 1476; *see also Platforms Wireless*, 617 F.3d at 1099 (applying the delinquent tax rate on disgorgement award).[9]

Accordingly, the total disgorgement amount to be entered against Verdmont, including principal and prejudgment interest, is **$19,253,983**.

### D. Civil Penalty

Under Section 20(d)(2) of the Securities Act, the Court may impose a penalty against Verdmont in an amount that is the greater of (i) its pecuniary gain, or (ii) specific statutory amounts multiplied by the number of violations committed. *See* 15 U.S.C. § 77t(d)(2). The

---

[9]     Prior to its default, Verdmont argued that disgorgement should be limited to commissions and quantified the total at $239,965 (the amount in frozen funds).  The SEC disagrees with this argument for the reasons discussed above.  Moreover, as noted above, one of Verdmont's principals, Taylor Housser, confirmed at his deposition that the chart he submitted to the Court in connection with a previous declaration (Dkt. No. 45-10) showed that the amount in frozen funds was actually Verdmont's net revenue rather than the commissions it earned.  (*See* Dkt. No. 250, Exh. A.)  Despite Verdmont's consistently representing the amount of frozen funds was equal to the commissions, the true amount of commissions earned on the sales of the subject securities for Lornex, Nautilus and Bartlett was actually $473,573. (*See id.*; *see also* Dkt. No. 45-10 at 9.) Prejudgment interest owed on that amount would be $42,622. (Costello Dec., at ¶ 16.)

statutory amounts are adjusted for inflation under the Debt Collection Improvement Act of 1996, and are categorized into tiers – (i) First Tier penalties for companies engaging in misconduct during the time period at issue in this case carry a maximum of $80,000 per violation; (ii) Second Tier penalties are $400,000 per violation and are levied when the defendant's violations involve, among other things, the deliberate or reckless disregard of a regulatory requirement (such as the registration of a securities offering); and (iii) Third Tier penalties carry a maximum of $775,000 per violation and are levied when the defendant's violations not only involve the deliberate or reckless disregard of a regulatory requirement, but also result in substantial losses or pose the risk of substantial losses to investors. *See* 15 U.S.C. § 77t(d)(2); 17 C.F.R. § 201.1001; *see also Norstra*, 2016 U.S. Dist. LEXIS 130545, at *2-3; *SEC v. Wilde*, Case No. 11-0315, 2012 U.S. Dist. LEXIS 183252 at *44 (C.D. Cal. Dec. 17, 2012) (noting a penalty may be imposed for each "violation"); *SEC v. Smith*, Case No. 14-192, 2015 U.S. Dist. LEXIS 134175, at *3 n.2 (D.N.H. Oct. 1, 2015) (holding that courts may look to the number of statutory provisions the defendant violated); *In re Reserve Fund Sec. and Derivative Litig.*, Case No. 09-4346, 2013 U.S. Dist. LEXIS 141018, at *66 (S.D.N.Y. Sept. 30, 2013) (courts also may "look to either the number of violative transactions or the number of investors to whom illegal conduct was directed.")[10]

Within the allowable ranges and tier levels, the total penalty amount imposed is ultimately to be determined by the court "in light of the facts and circumstances." 15 U.S.C. § 77t(d)(2)(A). An appropriate penalty should achieve two goals: punishment of the violator and deterrence to future violators. *See* Securities Law Enforcement Remedies Act of 1990, H.R.

---

[10]   For instance, if the Court used as the metric the number of transactions in the subject securities that Verdmont brokered on behalf of its customers, then Verdmont committed a minimum of 50 violations of the Securities Act just in March 2013 alone. (*See generally* Dkt. No. 191, Exhs. 1-2.) And using the Third Tier multiple as an example, the result would be a penalty of no less than $38,750,000.

Rep. No. 101-616, at 19-21 (1990), reprinted in 1990 U.S.C.C.A.N. 1379, 1384-86.  It should advance the goals of "encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry."  *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998); *SEC v. Spyglass Equity Sys.*, Case No. 11-2371, 2012 U.S. Dist. LEXIS 189621 at *8 (C.D. Cal. Apr. 5, 2012).

In assessing a penalty, district courts sometimes consider the factors discussed above in Section IV.A for the imposition of injunctive relief.  *See SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003).  As we set forth therein, Verdmont's conduct in this case was egregious and therefore a substantial civil penalty is warranted.  We therefore ask the Court to enter an amount the Court believes is appropriate within the formula set forth in Section 20(d)(2) of the Securities Act.

## **CONCLUSION**

For the reasons set forth above, the SEC respectfully requests the Court enter an order directing the Clerk to strike Verdmont's Answer and Defenses (Dkt. No. 112).  We also respectfully request the Court enter default judgment against Verdmont, and grant the SEC's request for injunctive relief; penny stock bar; disgorgement of proceeds plus prejudgment interest; and a civil money penalty in an amount to be determined by the Court.  A proposed order and default judgment are attached.  We also have submitted these documents to the Orders and Judgments Clerk pursuant to the Electronic Case Filing Rules and Instructions.

Dated: Washington, D.C.                    Respectfully submitted,
       February 16, 2017


                                           /s/ Patrick R. Costello
                                           Patrick R. Costello
                                           Derek S. Bentsen
Local Counsel:                             Bridget M. Fitzpatrick
                                           Ernesto G. Amparo
David Stoelting
Securities and Exchange Commission         Securities and Exchange Commission
Brookfield Place, 200 Vesey Street         100 F Street, N.E.
New York, New York 20181                   Washington, D.C. 20549-5985
(212) 336-0174  telephone                  (202) 551-3982  telephone (Costello)
(212) 336-1323  facsimile                  (202) 772-9245  facsimile
stoeltingd@sec.gov                         costellop@sec.gov

## **CERTIFICATE OF SERVICE**

I certify that on February 16, 2017, I caused to be served the foregoing MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT VERDMONT CAPITAL, S.A. by international overnight mail addressed to Defendant Verdmont Capital, S.A. as follows:

> Verdmont Capital, S.A., *pro se*
> c/o Shamima Bhana, Liquidator
> Edificio Verdmont, Ave. Aquilino de la Guardia No. 18
> Ciudad de Panama, Republica de Panama

/s/ Patrick R. Costello
Patrick R. Costello
