# EXHIBIT  2

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------X
                                                )
U.S. SECURITIES AND EXCHANGE                    )
COMMISSION,                                     )
                                                )   CASE NO. 15-cv-894 (WHP)
      Plaintiffs,                               )
                                                )   EXPERT REPORT OF
      vs                                        )   ROBERT W. LOWRY
                                                )
CALEDONIAN BANK LTD.,                           )
CALEDONIAN SECURITIES LTD.,                     )
CLEAR WATER SECURITIES, INC.,                   )
LEGACY GLOBAL MARKETS S.A., and                 )
VERDMONT CAPITAL S.A.                           )
                                                )
      Defendants                                )
                                                )
------------------------------------------------X
```

## I.    Qualifications

My qualifications are set forth in the curriculum vitae which is attached to this report as Appendix A. I have more than 40 years of experience in the securities industry, including 23 years with the Securities and Exchange Commission ("SEC") in the Division of Market Regulation. I have conducted numerous broker dealer examinations and self regulatory oversight inspections of the National Association of Securities Dealers, Inc. ("NASD"), which is now known as the Financial Industry Regulatory Authority ("FINRA") and the New York Stock Exchange ("NYSE") while working in the Division of Market Regulation.[1]

---

[1]    FINRA was created through the consolidation of the NASD and the member regulation, enforcement and arbitration operations of the New York Stock Exchange. The consolidation, which was announced on Nov. 28, 2006 and approved by the Securities and Exchange Commission on July 26, 2007, became effective on July 30, 2007.

While at the SEC, the Division of Enforcement staff frequently consulted with me on cases involving markups, over-the-counter trading and sales practice abuses. I also assisted the Division of Enforcement on complex investigations and litigation matters pertaining to broker dealer activities, including matters involving market manipulation and disclosure issues. My SEC enforcement experience included taking investigative testimony, analyzing trading data and customer account statements, preparing affidavits and schedules, and giving factual and expert witness testimony in federal court on three different occasions (SEC v. First Jersey Securities, SEC v. Thomas James, and U.S. v. Eric Wynn). While I was employed at the SEC, I was successfully qualified and used as an expert in the areas of markups (SEC v. Thomas James) and securities trading in the over-the-counter market (U.S. v. Eric Wynn). I testified as a summary witness on the third occasion (SEC v. First Jersey Securities).

I am familiar with how securities markets operate (e.g., the various types of Exchange and over-the-counter ("OTC") markets); the rules, regulations, customs and practices of the securities industry; and the role of specialists, market makers and transfer agents. I am also familiar with how securities prices are determined, how to detect indicia of manipulated and non-competitive markets, the purchase and sale of private placement offerings, and the obligations of individuals who are designated with the supervisory responsibility of registered representatives ("RRs" or "brokers").

I have been retained in more than 700 matters ranging from securities arbitration, state and federal regulatory proceedings, criminal and civil proceedings in state and federal courts, as well as compliance-related audits for broker dealers and investment advisers. I provide consulting services to federal and state regulatory agencies, securities attorneys, litigants, broker-dealers and investment advisers throughout the US. I have been retained by Plaintiffs or Claimants (including the SEC, state securities regulators, the Department of Justice, broker dealers, investment advisers, hedge funds, and

individuals). I specialize in matters involving best execution, market manipulation, sales practices, suitability, investment advice, churning, damages, excessive trading, clearing firm liability, selling away and the supervision of broker dealers and investment advisers.

Since 1996, I have appeared in federal court, criminal and civil, on approximately 50 occasions. I have published articles which addressed the subjects of supervision and best execution for the Practicing Law Institute and the Public Investors Arbitration Bar Association.[2]

## II.    Engagement

I was engaged by the Securities and Exchange Commission to review and analyze the activities of Verdmont Capital S.A. ("Verdmont Capital") regarding its customer share deposits and securities transactions in three securities - Goff, Corp. ("Goff"), Norstra Energy Inc. ("Norstra"), and Xumanii, Inc f/k/a Medora Corp. ("Xumanii") - which I refer to collectively as the "subject securities".  I was asked (I) to opine whether Verdmont Capital made a thorough inquiry required of all brokers when it executed trades on behalf of three Verdmont Capital customers in the subject securities; and (ii) to address Verdmont Capital's contention as to when the first bona fide offering of the subject securities took place. The Verdmont Capital customers were Lornex Financial Ltd. ("Lornex"), Nautilus Growth Fund Inc. ("Nautilus") and Bartlett Trading, Inc. ("Bartlett").  I was also asked to describe how companies issue securities, the role of broker dealers, transfer agents, market makers and underwriters in this process.  Charges for my services are billed at a rate of $275 per hour.

## III.    Basis for Opinion

My review is based on my (1) more than 40 years of experience in the securities industry;  (2) knowledge of the customs and practices of the securities industry; (3)

---

[2]        A list of these cases is attached as Appendix B.

working knowledge of federal securities laws, rules and regulations, as well as the rules and regulations of FINRA; (4) and review of the documents which are listed in Appendix C of my report.

## IV.   Background

## A.   Issuers of Common Stock

Before a company may offer and sell its shares of common stock to the public there must be an effective registration statement on file with the SEC. In the alternative, registration is unnecessary if the transaction qualifies for an exemption. The registration requirements and exemptions from registration are set forth in the Securities Act of 1933 (the "Act"). Shares of common stock that are offered and sold to investors after a registration statement is declared effective may generally be re-sold without further registration, and can be purchased and sold in either an Exchange or in OTC transactions. Issuers may sell securities in private transactions, without registration, so long as qualifying conditions are met for the private offering exemption. Purchasers of shares in private offerings generally may not re-sell those shares in an Exchange or OTC transaction without further registration.

## B.   Registered Public Offerings

When a company intends to make a public offering, it files a registration statement with the SEC. In this case, Xumanii, Norstra and Goff filed Form S-1 registrations.[3] The registration statement, which contains a document called a prospectus, is reviewed by the SEC to ensure all of the required information is contained in the filing. The SEC does not evaluate the quality of the issuer or the proposed offering. Upon satisfactory completion of the SEC's review, the registration becomes effective, and the securities may be offered to investors.

---

[3]      Form S-1 is a Registration Statement under the Securities Act of 1933.

Expert Report of Robert W. Lowry
May 26, 2016
Page 5 of 34

The prospectus is a critical disclosure document that describes the business of the company and discusses the current risks and benefits of investing in the company, and discloses the intended use of any sales proceeds raised in the offering. The information contained in the prospectus must be accurate and complete, and it may not contain any misrepresentations or omissions of material facts. The prospectus includes audited financial data for the issuer, including items such as a balance sheet and income statement ("audited financials"). Investors rely on the disclosure information and representations contained in the prospectus before deciding whether to purchase the security.

## C.   Offerings Exempt from Registration

If a company intends to make an unregistered offering, it must satisfy one or more of the exemption provisions of the Act. These offerings are not accompanied by the types of disclosure documents that are required in a registered offering, and are typically, but not always, sold to accredited or highly experienced investors.

In this case, Goff and Xumanii were purported unregistered Regulation S offerings that were sold only to investors who lived outside the United States.

> "Regulation S provides an exclusion from the Section 5 registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), for offerings made outside the United States by both U.S. and foreign issuers. A securities offering, whether private or public, made by an issuer outside of the United States in reliance on Regulation S need not be registered under the Securities Act. The Regulation S safe harbors are non-exclusive, meaning that an issuer that attempts to comply with Regulation S also may claim the availability of another applicable exemption from registration. Regulation S is available for offerings of both equity and debt securities."[4]

After these Regulation S offerings were purported to be completed, Goff and Xumanii filed S-1 registration statements which listed the foreign investors as selling shareholders. Instead of selling these shares into the public market, the initial

---

[4]      Goff Corp - Amended S-1 Filed November 2, 2011, Page 9.

Expert Report of Robert W. Lowry
May 26, 2016
Page 6 of 34

shareholders sold their shares in private transactions at a time that a U.S. public market did not exist for shares of Goff or Xumanii common stock.[5]

The Goff Form S-1 required Goff to file a Supplemental Prospectus if anyone other than the selling shareholders wanted to rely on the prospectus to sell their shares. In this regard, the Goff Form S-1 dated November 2, 2011 provided that:

> "If applicable, the selling shareholders may distribute shares to one or more of their nominees who are unaffiliated with us. Such nominees may, in turn, distribute such shares as described above. If these shares being registered for resale are transferred from the named selling shareholders and the **new shareholders wish to rely on the prospectus to re-sell these shares**, then **we must first file a prospectus supplement naming these individuals as selling shareholders and providing the information required concerning the identity of each selling shareholder and he or her [sic] relationship to us.** There is no agreement or understanding between the selling shareholders and any nominees with respect to the distribution of the shares being registered for resale pursuant to this registration statement. For the purpose of this registration statement nominee will be defined as: (a) a person or entity who is requested or named to act for another, such as an agent or trustee, or (b) a potential successor to another's rights under a contract." [Emphasis Added]

## D.    Role of Brokers and Dealers

A Broker Dealer ("BD") is an entity which is engaged in the business of either buying and selling securities in its own account, or on behalf of others. Some firms act in both capacities (i.e. as a broker and a dealer), and others act as either a broker, or as a dealer. In this case, Verdmont operated its business as a Broker Dealer from Panama. It was not registered with the SEC, although it routed its customers' buy and sell orders – involving securities that were traded in the United States markets – to broker dealers that were registered with the SEC. Broker Dealers are subject to the rules and regulations of the SEC, FINRA, and the states in which they conduct business.

---

[5]    There was one day, January 18, 2012, that 10,000 shares of Xumanii common stock traded at $.50 per share. The next trade occurred on April 29, 2013.

Expert Report of Robert W. Lowry
May 26, 2016
Page 7 of 34

## 1. Underwriters

BDs, acting in the capacity of underwriters, may offer securities to investors. An underwriter is (1) *any person*, including a broker dealer, who sells securities for an issuer; (2) *any person*, including a broker dealer, who purchases securities from an issuer with the intent to distribute the securities; or (3) *any person* who participates, directly or indirectly, in the offering. *Any person* includes a broker or dealer, a natural person, or an entity. An "issuer" for this purpose includes *any person* in a control relationship with the issuer. Underwriters use the company's prospectus to disclose information about the company. The securities distribution is completed when the securities *come to rest* in the hands of bona-fide investors. Once the distribution is completed, purchasing investors may generally re-sell their securities in the market without further registration.

In registered public offerings, BDs, acting as underwriters, perform critical roles. These BDs negotiate with the issuer to determine the offering price, commit capital to ensure the issuer receives the funding it needs, perform due diligence of the issuer, assist in the registration process, generate investor demand by distributing a preliminary prospectus, and introduce the offering to potential market makers.

## 2. Retail Brokers and Dealers

BDs, acting as brokers or dealers, facilitate customer purchase and sell orders after an offering is completed. BDs often execute customer orders, establish and maintain interest in new issues, prepare and distribute research about the issuer, and recommend the security to customers. A retail broker or dealer also must act as a gate keeper in order to prevent the distribution of securities in unregistered transactions. The gate keeper role requires the broker or dealer to make a comprehensive investigation whenever a customer attempts to sell a large block of an obscure security in unregistered transactions to ensure that it is not participating, either directly or indirectly, in an unregistered offering.

Expert Report of Robert W. Lowry
May 26, 2016
Page 8 of 34

### 3. Market Makers

Securities are traded either on an exchange (e.g. NYSE, AMEX), an Electronic Communication Networks ("ECNs"), or the OTC Market.  The OTC Market consists of a network of broker dealers who hold themselves out to the public as market makers[6] ("market makers") and who are ready to purchase and sell securities.  These market makers identify themselves by placing bid and ask quotation prices in electronic communications networks (i.e., NASDAQ, the OTC Bulletin Board or the OTC Markets Group Inc ("OTC Link")[7] – based on orders they receive to buy and sell securities.

A bid quotation is the price a market maker is willing to pay when buying a stock and an ask quotation is the price a market maker is willing to receive when selling a stock.  These quotations are displayed to other broker dealers and are also available to the public.  The listing criteria for securities traded on the OTC Link are less stringent than securities traded on a National Securities Exchange or NASDAQ, and often the information about a company is not current or accurate.

In a competitive market, the highest bid quote by one market maker, and the lowest ask quote by another market maker determines the NBBO (i.e. the National Best Bid Best Offer). The NBBO establishes the price customers pay to buy and sell a security. A competitive NBBO does not exist when there is only one market maker, or when there are no market makers quoting both sides of the market (i.e. a bid price, but not an ask price).

---

[6]     A BD, acting as a dealer, is a market maker when it holds itself out by entering quotations in an inter-dealer communications system as being willing to buy and sell a security for its own account on a regular or continuous basis.

[7]     The companies quoted in the OTC Markets Group network are categorized into three tiers– OTCQX, OTCQB (for development stage companies), and OTC Pink (for speculative trading marketplace).  The OTC Markets Group was previously known as the Pink OTC Markets until January 18, 2011.

Expert Report of Robert W. Lowry
May 26, 2016
Page 9 of 34

In the context of market making, competition between market makers is essential for a genuine public offering to exist.

## E.    Distribution

In a registered offering, the securities distribution is completed when the securities come to rest (i.e. dispersed) in the hands of bona-fide investors, and are available to be sold in the market. The determination of when a distribution is completed is a fact and circumstance review of the actions of each investor who participates in the offering. When asked to sell a large quantity of an obscure security that has not already been traded in the market, a broker or dealer must make a comprehensive investigation to determine how the seller acquired their shares. The broker must evaluate whether the seller is part of an ongoing distribution (i.e acting as an intermediary for the issuer or as an underwriter), or whether the seller is trading shares that have already come to rest with investors.[8]

## F.    Trading Restrictions

When an issuer offers securities directly to investors without going through the registration process, or a person, acting as a statutory underwriter, acquires securities from the issuer with a view to distribution – restrictions are placed on when, or if, the purchasers can sell their securities into the market. The length of the purchaser's holding period, the nature of the underlying transactions in which the shares were acquired, the customer's intent to sell additional shares, and the percentage of the purchaser's outstanding share balance compared to the total shares outstanding are all factors that must be examined to determine whether the securities can be re-sold into the market without further registration.

---

[8]     "However, as with the dealers' exemption, the brokers' exemption is not applicable to transactions involving an underwriter." Quinn & Co. v. SEC, 452 F. 2d 943, 947.

G.     **BDs Role as a Gatekeeper**

A broker dealer has a responsibility to ensure that he does not participate in an illegal unregistered public offering. If the broker dealer sells securities offered by an issuer or a person in a control relationship with the issuer, those transactions ordinarily require registration. If the broker dealer sells securities offered by a person who acquired those securities from the issuer with the intent to re-sell in the market, those transactions ordinarily require registration.

Thus, when a customer of a broker dealer attempts to either deposit or sell a large quantity of an obscure security, a broker dealer has a duty, when acting as either a broker or a dealer, to make a comprehensive investigation of the surrounding circumstances to determine whether the shareholder is an intermediary of the issuer, or a statutory underwriter. It is important that the BD know both the customer and the security.

H.     **Penny Stocks**

The trade price for the securities that were purchased and sold by Lornex, Nautilus and Bartlett was less than $5. The market for low priced securities is covered by special SEC rules that were designed to protect investors from the fraudulent activities of issuers, promoters and broker dealers.

In the early 1990's, the SEC adopted rules designed to prevent the fraudulent purchase and sale of low-priced shares of common stock issued by small companies with little or no business activity (i.e. "penny stocks"). Previously, the markets for these low-priced securities that were traded on the Pink Sheets were not visible to investors and were often manipulated by the issuers, promoters and the broker dealers that traded these securities.

In general, penny stocks are equity securities issued by companies which (1) have a market price of less than $5; (2) are not traded on a qualified national securities exchange or automated quotation system sponsored by a SEC-registered national

securities association; and (3) have shareholders' equity of less than $5 million.[9]  In

addition, an issuer's shares of common stock would not qualify for an exception to the

penny stock rules if the net tangible assets (i.e. the difference between total assets and

total liabilities) are less than $2 million if the issuer has been in continuous operation for

at least three years, or $5 million if the issuer has been in continuous operation for less

than three years.

     Many penny stock shares were never subject to a registration statement filed with

the SEC, or periodic filings with the SEC.  As a result, when these shares of penny stocks

are first traded on OTC Link, the markets for trading these shares are particularly

susceptible to market manipulation schemes because the financial condition of the

company is not adequately disclosed.  In addition, the markets for these securities are

often illiquid because the shares were either never previously traded, or traded

infrequently.  In addition, these shares are owned or controlled by a small group of

investors and the shares are not widely held by the public.  As a result, it is not difficult

for the participants of a manipulative scheme to acquire and issue large quantities of a

company's stock, and thereafter sell the shares at artificially inflated prices.

     The price of penny stock shares is often artificially inflated by a network of

promoters, broker dealers and investor relations firms who make undisclosed deals with

the issuers to tout a company's stock, provide false information about the company, and

enter trades in the market that are designed to mislead investors.  These undisclosed deals

often include cash and issuance of unregistered stock to the promoters and investor

relation firms employed by the issuer to create the illusion of an active market for the

issuer's securities.  The shares are either acquired directly from the issuer, or insiders of

the issuer (i.e. past and present officers or directors of the issuer), at nominal prices in

---

[9]     Penny stocks are defined by Rule 3a51-1 of the Securities Exchange Act of 1934.

**Expert Report of Robert W. Lowry**
**May 26, 2016**
**Page 12 of 34**

private securities transactions.

The company which issues the shares is typically a shell or start-up company with little or no business activity, or the means to implement a business plan. In most cases, the shares of unregistered stock acquired by the promoters and investor relation firms have little or no market value, and there is little or no public demand for the shares when they are issued.

## V.    Time Line

### A.    Xumanii

During the period between May and October 2010, Xumanii purported to make a registered Regulation S offering to 42 individuals who resided outside of the U.S. (Jamaica) which totaled 27,054,600 shares and raised $40,582. On September 9, 2010, Xumanii filed an S-1 registration statement with the SEC which identified the 42 individuals as selling shareholders. None of the 42 individuals had received share certificates at the time the S-1 was filed. The S-1 registration was declared effective on March 14, 2011. On May 4, 2011, Empire Stock Transfer ("Empire"), issued certificates for the 27,054,600 Xumanii shares acquired by the 42 shareholders, but mailed the certificates to Medora Corp c/o Curtis Daye, instead of mailing the certificates to each shareholder.[10]  In July 2012, Xumanii shares were split 5.5 for 1, and as a result the total number of Xumanii shares increased from 27,054,600 to 148,800,300.[11]

On February 23, 2011, a broker dealer filed a Form 211 with FINRA which sought

---

[10]    Empire was the transfer agent for Xumanii. A0729-A0733. Empire was also the Transfer agent for Goff and Norstra.

[11]    On July 11, 2012, Xumanii declared a stock split of 5.5 for 1 (i.e. one share before the split equaled 5.5 shares after the split).

approval to enter quotes on the OTC Bulletin Board and the Pink Quote.[12]  This application was cleared on May 3, 2011.[13]  The first quote – in name only[14] – was entered on May 4, 2011 and the first quote with a bid was entered on June 3, 2011. A chart which summarizes the daily market quotations for Xumanii stock is attached as Summary Exhibit 1.

The 42 purported Xumanii shareholders sold <u>all</u> of their 27,054,600 pre-split shares to eleven foreign entities, including Lornex, in private transactions between June 16, 2011 and March 7, 2012.[15]  A chart which summarizes these private transactions with the eleven foreign entities is attached as Summary Exhibit 2.  At the same time, there was no bona fide market for Xumanii shares even though the purported initial investors could have sold their Xumanii shares into the public market without restrictions.

Throughout this period, there were no NBBO quotations,[16] and no reported trading volume with the exception of one day, January 18, 2012.  For that day, there was reported

---

[12]  The Form 211 Application was submitted by Capital Path Securities LLC ("PATH") F000004-F000010.  A Form 211 must be filed by a broker dealer when it intends to make a market in a security.  When it filed the Form 211, PATH represented that it had satisfied all applicable requirements of SEC Rule 15c2-11 and the filing and information requirements of FINRA Rule 6432.

[13]  F000200.  In the May 5, 2011 letter to PATH, FINRA stated that "this letter will confirm that on May 3, 2011, acting in reliance upon the information contained in the filing, we have cleared [PATH's] request for an unpriced quotation . . .".

[14]  The market maker entered its name without entering either a bid or ask quotation.

[15]  A copy of the Empire Transaction Journal for Xumanii is attached.  <u>See</u> Appendix D.

[16]  In a competitive market, the highest bid quote by one market maker, and the lowest ask quote by another market maker determines the NBBO.  The NBBO establishes the price customers pay to buy and sell a security.

trading volume of 10,000 shares at $0.50 per share.  The reported trade price raises a red flag (i.e. whether this was a bona fide market transaction) when the reported trade price is compared to the opening and closing bid quotations for January 18, 2012.  The opening and closing high bid on that day was $0.05 and there were no ask quotes.[17]  However, during a seven minute period beginning at 12:11 pm and ending at 12:18 pm, one market maker, PATH, raised its bid quote from $.05 to $0.50 and then reduced its bid quote from $0.50 to $0.05.[18]  In addition, the high bid did not change after the stock split on July 11, 2012 – the high bid remained at $0.10 per share for the entire month of July 2012.  In a bona-fide market, market makers adjust their quotes for a stock split – but a change in the bid quotes did not occur in July 2012.

More than a year later, a second Xumanii market transaction occurred in late April 2013, when 5,000 shares were traded.  Two days later, on May 1, 2013, the trading volume spiked to 37.1 million shares.  Thereafter, the trading volume ranged from 2.95 million to 188.39 million shares per day during the next two months.  A Bloomberg chart which summarizes the daily price and share volume is attached as Summary Exhibit 3.

On May 1, 2013, Lornex sold 2,772,500 Xumanii shares it had delivered to Verdmont Capital on March 5, 2012.[19]  Verdmont Capital customers bought 1,133,300 Xumanii shares on May 1, 2013.[20]

For the period commencing on May 1, 2013 and continuing through May 30, 2013, Lornex sold all 17,050,100 post-split Xumanii shares it acquired from initial shareholders,

---

[17]   Otherwise, the high bid was $0.05 from September 22, 2011 to April 13, 2012.

[18]   PATH is the broker dealer that submitted the Form 211 to FINRA and OTC Link to make a market in Xumanii.

[19]   See Appendix E.

[20]   A summary of the Xumanii transactions is attached as Summary Exhibit 4.

and sold an additional 150,000 Xumanii shares it purchased in the OTC market in May 2013.  Lornex realized net proceeds of $4,343,994 during this one month period.    Two Verdmont Capital principals, Glynn Fisher and Taylor Housser, each purchased Xumanii shares for one of their own IBCs on May 13, 2013.  Fisher purchased Xumanii for his Chloe Company S.A. IBC account and Housser purchased Xumanii for his Jacametra IBC account.

**B.    Goff**

During the period between January and April 2011, Goff purported to make an unregistered Regulation S offering to 27 individuals who resided outside of the U.S. (Ireland) which totaled 7,090,000 shares and raised $20,400.  On August 26, 2011, Goff filed an S-1 registration statement with the SEC which identified the 27 individuals as selling shareholders.  None of the 27 individuals had received share certificates at the time the S-1 was filed.  The S-1 registration was declared effective on November 10, 2011.

On December 21, 2011, Empire issued 7,090,000 Goff share certificates to the 27 shareholders, however, the 27 certificates were mailed by Goff's law firm to Gary O'Flynn in Ireland, rather than to each shareholder.[21]  In January 2013, Goff shares were split 25 for 1, and as a result the total number of Goff shares increased to 177,250,000.[22]

On December 6, 2011, a broker dealer filed a Form 211 with FINRA which sought approval to enter quotes on the OTC Bulletin Board and the Pink Quote.[23]  This

---

[21]    A0288-A0289.

[22]    On January 4, 2013, Goff declared a stock split of 25 for 1 (i.e. one share before the split equaled 25 shares after the split).

[23]    The Form 211 Application was submitted by Spartan Securities Group Ltd F000315-F000323.

application was cleared on February 14, 2012.[24]  The first quote, in name only[25], was entered on February 15, 2012 and the first quote with a bid was entered on March 20, 2012.  A chart which summarizes the daily market quotations for Goff stock is attached as Summary Exhibit 5.  It should be noted that the high bid was $0.04, both before and after the January 4, 2013 stock split.  As noted above, in a bona-fide market, market makers adjust their quotes for a stock split – but a change in the bid quotes did not occur in January 2013.

The 27 initial Goff shareholders sold <u>all</u> of their 7,090,000 pre-split shares to twelve foreign entities, including Lornex, in private transactions between May 16, 2012 and February 11, 2013.[26]  A chart which summarizes these private transactions between the initial shareholders and the twelve foreign entities is attached as Summary Exhibit 6. During this period, there were no NBBO quotations, or daily trading volume even though the purported initial investors could have sold their Goff shares into the public market without restrictions.

The first public trading activity occurred in March 2013.  On March 13, 2013, there was a small 1,000 share trade, and then on March 18, 2013, trading volume exploded to 263.9 million shares.  From then on, trading volume ranged from 3.1 million to 88.6 million during the next two months.  A Bloomberg chart which summarizes the daily price and share volume is attached as Summary Exhibit 7.

Commencing on March 18, 2013, and continuing through May 6, 2013, Lornex sold all 14 million of the post-split Goff shares it delivered to Verdmont Capital[27] and

---

[24]   F000344.

[25]   The market maker entered its name without entering either a bid or ask quotation.

[26]   A copy of the Empire Transaction Journal for Goff is attached.  <u>See</u> Appendix F.

[27]   <u>See</u> Appendix G.

realized sale proceeds totaling $2,080,327.[28]  Of note, Lornex sold 8.05 million shares of Goff stock on March 18, 2013, and other Verdmont Capital customers purchased an almost equal amount, 8.095 million shares.  The same Verdmont Capital principals, Glynn Fisher and Taylor Housser, each purchased Goff shares for one of their own IBCs on that day. Fisher purchased Goff shares for his Creekside Capital account, and Housser purchased Goff shares for his Jacametra account.

### C.    Norstra

Norstra filed an S-1 registration statement with the SEC on April 30, 2012, and the registration statement was declared effective on July 12, 2012.  During the period between July 2012 and September 2012, Norstra claimed president Dallas Kerkenezov ("Kerkenezov") and a claimed Norstra director, Sasha Heredia ("Heredia"), purported to sell 33,250,000 shares to 25 individuals who resided outside of the U.S. (Norway and Panama), and raised $332,500.

Empire issued 33,250,000 Norstra shares to the 25 purported shareholders on September 7, 2012. On the same day, it mailed these certificates to an address for Norstra in Hafrsfjord Norway – rather than to the 25 shareholders[29] or to the Texas executive office address, which Norstra had previously disclosed in its April 12, 2012 Form S-1 filing with the SEC.[30]

On September 10, 2012, a broker dealer filed a Form 211 with FINRA which

---

[28]    A summary of the Goff transactions is attached as Summary Exhibit 8.

[29]    A0502-A0503.

[30]    The executive office address on the Norstra Form S-1 was 414 Manor Road, Laredo, Texas.

sought approval to enter quotes on the OTC Bulletin Board and the Pink Quote.[31]  This application was cleared on October 31, 2012.[32]  The first quote, in name only[33], was entered on November 1, 2012 and the first quote with a bid and an ask was entered on November 26, 2012.  However, the following day, November 27, 2012 and continuing until March 4, 2013, there were bid quotes  – but no ask quotes. A chart which summarizes the daily market quotations for Norstra stock is attached as Summary Exhibit 9.

The 25 shareholders sold all 33,250,000 of their Norstra shares to twelve foreign entities, including Lornex, in private transactions between December 6, 2012 and March 27, 2013.[34]  A chart which summarizes these private transactions is attached as Summary Exhibit 10.  During this period, there were no NBBO quotations, or daily trading volume until March 5, 2013, even though the purported initial investors could have sold their Norstra shares into the public market without restrictions.

On March 5, 2013, there were trades totaling 131,800 shares, and thereafter the trading volume increased to as many as 12.0 million shares on June 6, 2013.  A Bloomberg chart which summarizes the daily price and share volume is attached as Summary Exhibit 11.

Commencing on March 5, 2013 and continuing through June 21, 2013, Lornex, Nautilus and Bartlett bought small quantities of Norstra shares and sold large quantities of

---

[31]     The Form 211 Application was submitted by Glendale Securities Inc F000203-F000209.

[32]     F000391.

[33]     The market maker entered its name without entering either a bid or ask quotation.

[34]     A copy of the Empire Transaction Journal for Norstra is attached.  See Appendix H.

Expert Report of Robert W. Lowry
May 26, 2016
Page 19 of 34

Norstra shares in the OTC market for substantial net gains.[35]  Summary Exhibit 13

summarizes the Norstra trading activities of Lornex, Nautilus and Bartlett.

### Summary Exhibit 13

| Customer Name | Shares Bought | Buy Amount | Shares Sold | Sell Amount | Gain/ Loss |
|---|---|---|---|---|---|
| Nautilus Growth Fund Ltd. | 519,800 | $440,505 | 4,674,800 | $6,072,823 | $5,632,318 |
| Bartlett Equities Ltd. | 0 | $0 | 3,707,000 | $3,317,018 | $3,317,018 |
| Lornex Financial Ltd. | 50,000 | $18,436 | 1,890,000 | $1,518,726 | $1,500,291 |
| Totals | 569,800 | 458,941 | $10,271,800 | $10,908,568 | $10,449,627 |

## VI.    Opinion

Based on the analysis above, it is my opinion that Verdmont Capital ignored red

flags which required a comprehensive investigation of Lornex, Nautilus and Bartlett

when these IBCs delivered large blocks of securities to Verdmont Capital for sale into the

market. The obligation to make that kind of investigation required Verdmont Capital to

(1) know the customer, (2) know the security, and (3) ensure that it was not acting for an

issuer or control person, or underwriter, engaged in an illegal distribution of an

unregistered security.  Verdmont Capital also failed to monitor the purchase and sale

activity of these IBCs after the shares were deposited into their accounts.

### Red Flags

Verdmont Capital, as a broker dealer, must investigate red flags in order to

reasonably supervise its business activities.[36] When customers deliver large quantities of

obscure securities, the broker dealer is required to conduct a vigorous investigation into

the circumstances of how the customer acquired the security, the customer's background

---

[35]    A summary of the Norstra transactions is attached as Summary Exhibit 12.

[36]    A description of red flags for this case start on page five and continue through
page ten of this report.

and investment history. Based on my regulatory and industry experience, broker dealers must investigate these matters, and it is not enough for broker dealers to rely on the customer's unverified statements to prevent the sale of unregistered securities. In this regard, the SEC has stated that:

> "when a dealer who offers to sell, or is asked to sell a substantial amount of securities must take whatever steps are necessary to be sure that this is a transaction not involving an issuer, person in a control relationship or an underwriter. For this purpose, it is not sufficient for him merely to accept 'self serving statements of his sellers and their counsel without reasonably exploring the possibility of contrary facts'."[37]

## Bona Fide Distribution to the Public

Based on my experience, it is my opinion that the distributions of Goff, Norstra and Xumanii securities were not completed (i.e. had not come to rest with public investors) until 2013, which is the period Lornex, Nautilus and Bartlett sold the shares they acquired from the initial shareholders. Prior to mid-March 2013, a small group of foreign entities owned 100% of the outstanding float of Goff, Norstra and Xumanii. These shares were acquired in private securities transactions with the purported initial shareholders of Goff, Norstra and Xumanii, all of whom resided outside of the U.S. There were <u>no</u> competitive NBBO quotations, and virtually no public trading market activity prior to March 2013.

The shares Lornex deposited at Verdmont Capital and later sold were acquired from both the purported initial shareholders and other foreign entities. After market trading commenced, Lornex sold all the shares it deposited with Verdmont Capital during the following short periods: Goff (March 18, 2013-May 6, 2013), Norstra (April 11,

---

[37]   In the Matter of Transactions in the Securities of Laser Arms Corporation by Certain Broker Dealers, 1991 SEC Lexis 257.

2013-June 11, 2013) and Xumanii (May 1, 2013-May 30, 2013).

The shares Nautilus and Bartlett deposited at Verdmont Capital and later sold were acquired from other foreign entities. Nautilus sold all the Norstra shares it acquired during the short period between April 11, 2013 to June 21, 2013. Bartlett sold all the Norstra shares it acquired during the short period between May 21, 2013 to June 17, 2013.

**Lornex, Nautilus and Bartlett Deposited These Large Quantities of Securities**

Three foreign International Business Corporations entities ("IBCs"), Lornex, Nautilus and Bartlett delivered large quantities of securities to Verdmont Capital, prior to selling these shares into the market. At the time that these initial share certificates were delivered to Verdmont Capital, (1) the shares were recently acquired, either directly or indirectly, from the purported initial shareholders in private transactions; (2) there were no NBBO quotations or public markets for Goff, Norstra and Xumanii; (3) Lornex, Nautilus and Bartlett sold all of the shares beginning shortly after the securities started trading; and (4) Goff, Norstra and Xumanii had not reported any meaningful business activities or revenue in their SEC filings.

The foregoing circumstances required Verdmont, as a broker dealer, to make a comprehensive investigation into how the IBC entities acquired their securities. Any such investigation would have revealed additional red flags. In this regard:

- The timing and circumstances of these purported purchases from the initial shareholders raise questions whether the securities were ever in the hands of the purported initial shareholders, and whether the original shareholders were nominees – this would be relevant to any inquiry whether the IBCs acquired securities from the issuer or persons under the control of the issuer with the intent to distribute; and

- Lornex purchased the shares directly from the purported initial shareholders of Goff, Norstra and Xumanii who lived in far flung jurisdictions, but obtained the share certificates from an indirect route orchestrated by the

Expert Report of Robert W. Lowry
May 26, 2016
Page 22 of 34

issuers[38].

In addition, Lornex provided documents to Verdmont Capital that should have caused Verdmont, as a broker dealer, to ask further questions. For example, the deposit of 3,687,000 Norstra shares into its account at Verdmont Capital on February 19, 2013, contained supporting documents related to Lornex's private purchases from the initial shareholders. These documents appeared unprofessional, incomplete, and contained boiler-plate and fill-in-the-blank details regarding the purchase transactions. These documents were similar in appearance, contained signatures that were inconsistent with the spelling on the stock certificates (i.e. the names were spelled differently), and some were only partially completed. The sellers' signatures on the documents were not supported by any independent signature verification method (i.e. they were not guaranteed or notarized). Housser's exhibits included the fronts of the stock certificates, but not the backs.[39] The signature on the backs of the stock certificates is important because it shows whether, or not, the customer signed the certificate, and confirms whether the investor was, at some point, in possession of the certificates. Moreover:

- The information that was required on the back of the stock certificate included the name and address of the shareholder, a social security number or other identifying number, the number of shares, the name of the party with the authority to transfer the shares, the date and the signature of the shareholder. Under the shareholder signature line, the certificate provides notice that "the signature(s) to this assignment must correspond with the name(s) as written on the face of this

---

[38]   Four other IBCs (Gotoma Capital, Peaceful Lion, Quezon Group and Sierra Growth) purchased shares directly from the purported initial shareholders of all three issuers, Goff, Norstra and Xumanii. Two others (Isla Invesco and Morris Capital) also purchased shares directly from the initial shareholders of two of the issuers, Goff and Norstra.

[39]   From my review of other documents, the backs were not signed by the investors - A0510-0511, A0513-0514 and A0516-0517.

certificate in every particular without alteration or enlargement or any change whatsoever." In addition, there is space for a signature(s) guaranteed along with notice that "the signature(s) should be guaranteed by an **eligible guarantor, institution** (banks, stockbrokers, savings and loan association and credit unions) with membership in an approved signature guarantee medallion program pursuant SEC Rule 17AD-15. [Emphasis Added]"

- Lornex provided Irrevocable Stock Powers ("stock powers") to Verdmont Capital in lieu of the information required on the back of the stock certificate. The stock powers which were all dated February 5, 2013 required the following information: the shareholders name, the quantity, the certificate number, the signature date, where the document was signed and "signature guaranteed by information". The stock power did not require a social security or other identifying number or the address of the shareholder. The stock powers that Lornex submitted to Verdmont Capital did not provide information about where the stock power was signed, or the name of the eligible institution that guaranteed the shareholder's signature.

- Lornex provided a Corporate Resolution that was purportedly signed by Virgilio Santana-Ripoll, but it was undated and incomplete. The "fill in the blanks" for the dates the resolution was signed and the date the resolution was authorized, were blank. In addition, unlike the other Corporate Resolutions that Lornex provided to Verdmont Capital, this document did not have a "Signature Guaranteed Verdmont Capital" stamp.

- Lornex produced the documents detailing how it acquired the 3,687,000 Norstra shares it intended to deposit into its Verdmont Capital account: three Agreements for the Purchase of Common Stock ("SPA" or "Stock Purchase Agreement"). The SPA contained "fill in the blanks" for the seller's name, the date, the quantity of shares, the price, the total amount of the purchase and the closing date. The signature of each purported seller was not notarized or guaranteed. The name of one seller was spelled "Blixen Palmer" on the SPA and the stock certificate, and "Bleixen Palmer" on the Irrevocable Stock Power. The signature on each document was spelled "Bleixen Palmer". Additionally, the stock certificate was for one million shares, but the SPA was for the purchase of 687,000 shares.

## What is a Searching Inquiry

It was Verdmont's responsibility to know its customers, the source of securities

**Expert Report of Robert W. Lowry**
**May 26, 2016**
**Page 24 of 34**

delivered into its customer accounts, review the stocks purchased and sold in its customer

accounts, and fully inquire about the circumstances of how the customer obtained the

securities.[40]

In the 1971 release, the SEC described the reasons for a broker dealer's obligation

to make a searching inquiry:

> "A firm's participation in an unregistered public distribution has frequently been a
> major factor in the success of this unlawful activity since the firm affords sellers
> access to the market place and may create an appearance of propriety and
> substance otherwise lacking. The potential harm to the public is particularly acute
> when securities of a little-known issuer, or one concerning which reliable
> information is not readily available, are sold to the public on the over-the-counter
> market."

The duty to make a searching inquiry is especially important in this case because

of the substantial quantity of shares Lornex, Nautilus and Bartlett delivered to and sold at

Verdmont Capital.

> "The amount of inquiry called for necessarily varies with the circumstances of
> particular cases. A dealer who is offered a modest amount of a widely traded
> security by a responsible customer, whose lack of relationship to the issuer is well
> known to him, may ordinarily proceed with considerable confidence. On the other
> hand, **when a dealer is offered a substantial block of a little-known security**,
> either by persons who appear reluctant to disclose exactly where the securities
> came from, **or where the surrounding circumstances raise a question as to**

---

[40]   While "the amount of inquiry called for necessarily varies with the circumstances
of particular cases," all registered broker-dealers should establish minimum
standard procedures to prevent and detect violations of the federal securities laws
and to ensure that the firm meets its continuing responsibility to know both its
customers and the securities being sold. There should be written supervisory
procedures that cover sales as well as purchases. These must be made known to
salesman and be sufficient to reveal promptly to supervisory officials transactions
which may, when examined individually or in the aggregate, indicate that sales in
a security should be halted immediately pending further inquiry.  Release No.
33-5168, 1971 WL 12755.

> **whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters**, then searching inquiry is called for.[41]" [Emphasis Added]

It is my experience when the SEC provides guidance, as it did in this 1971 release, broker dealers will develop internal procedures that are designed to comply with such guidance. They will also designate specially trained supervisory and compliance personnel to implement these procedures, and train registered representatives how to apply this guidance to customer transactions.

## Verdmont Capital Failed to Make the Required "Searching Inquiry" When it did not Make a Thorough Investigation

The deposits Lornex, Nautilus and Bartlett made into their Verdmont Capital accounts required a comprehensive investigation as described in the 1962 SEC release. For example, the 1962 release provided:

> "The problem becomes particularly acute where substantial amounts of a previously little known security appear in the trading markets within a fairly short period of time and without the benefit of registration under the Securities Act of 1933. In such situations, it must be assumed that these securities emanate from the issuer or from persons controlling the issuer, unless some other source is known and the fact that the certificates may be registered in the names of various individuals could merely indicate that those responsible for the distribution are attempting to cover their tracks." [Release No. 34-6721, 1962 WL 69442].

In my experience, broker dealers must be aware of these obligations when they are presented with substantial amounts of an obscure security and thoroughly investigate red flags. In addition, as I noted above, broker dealers have developed internal procedures that are designed to comply with these obligations. Unlike other broker dealers, Verdmont Capital did not conduct a thorough investigation when Lornex, Nautilus and Bartlett deposited large quantities of Goff, Norstra and Xumanii shares into their

---

[41]     Release No. 34-6721, 1962 WL 69442.

Expert Report of Robert W. Lowry
May 26, 2016
Page 26 of 34

accounts, despite many red flags:

- In this case, there were virtually <u>no</u> OTC market trades[42] or competitive NBBO quotations for Goff, Norstra and Xumanii securities prior the first delivery of shares to Verdmont Capital;

- According to the Form S-1's, these initial shareholders acquired their shares after they were solicited by the founders of the three companies, but by early 2013, these founders had little or no involvement with the activities of the company.

- The shares of Goff and Xumanii split prior to Lornex sales, even though Goff and Xumanii shares were not publicly traded;

- After acquiring their shares, Lornex, Nautilus and Bartlett immediately deposited their certificates into their accounts at Verdmont Capital (<u>See</u> Summary Exhibit 14);

### Summary Exhibit 14

|  | Xumanii | Goff | Norstra |
|---|---|---|---|
| **Lornex** |  |  |  |
| Date Acquired | 03/01/12 | 09/25/12 | 02/07/13 |
| Date Delivered | 03/05/12 | 09/28/12 | 02/19/13 |
|  |  |  |  |
| **Bartlett** |  |  |  |
| Date Acquired |  |  | 03/08/13 |
| Date Delivered |  |  | 03/22/13 |
|  |  |  |  |
| **Nautilus** |  |  |  |
| Date Acquired |  |  | 03/20/13 |
| Date Delivered |  |  | 03/22/13 |

- On one day, March 22, 2013, Lornex, Nautilus and Bartlett delivered a substantial quantity of Norstra shares to Verdmont Capital that same day;

---

[42]    There was one exception, a Xumanii trade on January 18, 2012 of 10,000 shares at $.50 per share. The next Xumanii trade occurred on April 29, 2013. As discussed above, however, this single trade was suspicious and raised red flags. [Section V.A.]

- Lornex, either directly or indirectly, acquired its shares in private transactions from the purported initial investors of Goff, Norstra and Xumanii;

- Nautilus and Bartlett acquired their Norstra shares from other foreign entities;

- At the time Lornex delivered 3,687,000 shares to Verdmont Capital on February 19, 2013,[43] Norstra stock had not traded in the OTC market– and there were no NBBO quotes when Lornex delivered the certificate.  The first Norstra trade in a public market occurred just two weeks later on March 5, 2013;

- Lornex had acquired these shares from three of the purported initial Norstra shareholders on February 5, 2013  – and the Norstra shares were issued to Lornex on February 8, 2013.  On February 22, 2013, just three days later, Verdmont Capital returned the shares to Lornex;

- Before selling their Norstra shares, Lornex and Nautilus purchased 100,000 Norstra shares for their Verdmont Capital accounts between March 5, 2013 and March 27, 2013 and accounted for 11 of the 13 trades at Verdmont Capital during this period. At the same time, the price of Norstra stock increased from $.35 to $.45 per share;

- On March 22, 2013, Lornex (1,840,000), Nautilus (1,840,000) and Bartlett (1,850,000) each delivered an Norstra share certificate to Verdmont Capital.[44] Verdmont Capital deposited these shares into their customer accounts without inquiring about the circumstances that three customers were depositing the same security into their accounts.  The sources for these shares is attached as Summary Exhibit 15;

- The Norstra shares Lornex and Nautilus deposited on March 22, 2013 were acquired in private securities transactions with the same foreign entity – Isla Invesco – on March 20, 2013.  Isla Invesco had acquired these shares from purported Norstra initial investors on February 9, 2013.  Lornex and Nautilus sold these shares from their Verdmont Capital accounts;

---

[43]     A copy of the Physical Certificate Deposit form is attached as Appendix I.

[44]     See Appendix J.

**Expert Report of Robert W. Lowry**
**May 26, 2016**
**Page 28 of 34**

- The Norstra shares Bartlett deposited on March 22, 2013 were acquired in a private securities transaction with a foreign entity – Pegasus Global on March 8, 2013.  Pegasus Global acquired the shares from another foreign entity – Blacklight S.A. on February 20, 2013.  There was a span of 24 days from the date Blacklight acquired shares from a purported Norstra initial investors and the date Bartlett acquired its shares.  Bartlett sold these Norstra shares from its Verdmont Capital account;

- On May 31, 2013, Bartlett acquired 1,857,000 Norstra shares from Tamarind Investments Inc., and these shares were deposited into street name the same date.  Previously, Tamarind Investments acquired these shares from another foreign entity – Jackson Bennett on April 2, 2013.  Jackson Bennett acquired these shares from Lornex on March 4, 2013 – just days after Verdmont Capital mailed the shares back to Lornex on February 22, 2013.  Bartlett sold the 1,857,000 Norstra shares from its Verdmont Capital account; and

- On May 31, 2013, Nautilus acquired 1,000,000 Norstra shares from Coldstream Summit, and an additional 1,315,000 from Mariposa Acosiados S.A.  Nautilus sold these shares from its Verdmont Capital account.

**Additional Factors Verdmont Capital, as a Broker Dealer, Should Have Considered – but Did Not**

The short holding period that Lornex, Nautilus and Bartlett held the Norstra shares they acquired is another important factor that a broker dealers must consider in order to determine whether the shares had come to rest in the hands of bona-fide investors or whether the shares were purchased with a view to public distribution.

It is my experience that when a customer attempts to deposit or sell large quantities of obscure securities, broker dealers have procedures that are designed to inquire about the customer's holding period (i.e. the length of time they owned the security) in order to determine the customer's investment intent, before the shares are deposited or sold.  They also have specially trained compliance and supervisory personnel to make the determination, rather than the registered representative.

In this case, the holding period (i.e. the amount of time that elapsed from when Lornex, Nautilus and Bartlett acquired their shares until the shares were deposited at Verdmont Capital) was less than one month.

Based on my experience, broker dealers consider the facts and circumstances regarding these private sale transactions between Lornex and the initial shareholders. Although the details of these purchase transactions are limited, Lornex acquired the Norstra shares from three of the initial shareholders (Norway and Panama)[45], Goff shares from two of the initial shareholders (Ireland) and Xumanii shares from five of the initial shareholders (Jamaica). These initial shareholders, who lived in different parts of the world (Ireland, Panama, Jamaica and Norway), purportedly acquired their shares directly from the issuer.  Two of the securities were exempt Regulation S offerings, and one security was a purported self-underwritten offering.

Conley Forey, who was the broker assigned to the Lornex, Nautilus and Bartlett accounts, had the initial responsibility to make a comprehensive investigation of the facts and circumstances regarding (1) the private transactions between the initial investors and Lornex, and (2) the private transactions between other IBCs and Lornex, Nautilus and Bartlett.  However, despite all the red flags, the apparent relationship between Lornex and Nautilus,[46] and the knowledge of Verdmont Capital that Santana-Ripoll was related to both companies (Lornex and Nautilus) in a professional capacity[47], the Goff, Norstra and

---

[45]     Norstra Shareholder List, F000377-F000379.

[46]     Forey would know from taking orders from Lornex and Nautilus, and from the Verdmont Capital customer account agreements that Virgilio Santana-Ripoll, an accountant who resided in the Dominican Republic at the time, was a signatory for both the Lornex and Nautilus accounts.  Copies of Resolutions signed by Santana-Ripoll are attached as Appendix K.

[47]     Alejandro Aboud, the Verdmont Capital 30(b)(6) witness testified that Verdmont Capital knew that Virgilio Santana-Ripoll was related to these companies in a

Xumanii shares were deposited into the Verdmont Capital for Lornex, Nautilus and Bartlett, and then sold.

Empire, rather than the three customers, sent the Goff, Norstra and Xumanii certificates to Verdmont Capital directly,[48] along with purported backup information regarding how the newly registered shares were acquired by Lornex, Nautilus and Bartlett. When the certificates and backup information reached Verdmont Capital, Forey completed a Physical Certificate Deposit form that was required by Verdmont Capital. The Physical Certificate Deposit form was a check list of tasks Forey was to complete.

Despite all of the foregoing circumstances, Verdmont did not address whether Lornex, Nautilus and Bartlett sales were part of a distribution despite the red flags regarding the circumstances of how these customers acquired the shares that were deposited into their accounts.

It is my experience that broker dealers, unlike Verdmont Capital, have implemented procedures that are based on SEC guidance, in the form of releases and enforcement actions, that whenever a broker or dealer is asked to sell a substantial amount of securities, it must take whatever steps are necessary to be sure that:

> "this is a transaction not involving an issuer, person in a control relationship with an issuer, or an underwriter. For this purpose, it is not sufficient for him to merely to accept self-serving statements of the sellers and their counsel without reasonably exploring the possibility of contrary facts. The amount of inquiry necessarily varies with the circumstances of particular cases. A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to him, may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a little-known security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the

---

professional capacity.

[48]   Empire was the transfer agent for Goff, Norstra and Xumanii.

surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for".[49]

When Lornex delivered the Norstra shares it purchased from the purported initial shareholders of Goff, Norstra and Xumanii, Verdmont had a duty to ask more questions (e.g., were the initial shareholder shares acquired in a public offering, how did Lornex identify the initial shareholders, how was the price negotiated or how long had the initial shareholders owned their shares), and documented the responses. Verdmont should have determined the circumstances regarding how Lornex, Nautilus and Bartlett acquired shares from the other IBCs (were the shares acquired in a public offering, how did Lornex, Nautilus and Bartlett identify the IBC, and how long the IBC owned their shares). Verdmont Capital, however, failed to do so.[50]

It is my experience that broker dealers have procedures that are designed to make these determinations, before a stock is deposited into a customer account, and before a stock is sold. These determinations are made by supervisory and compliance personnel who are specially trained to perform these duties.

**Relationship Between the Foreign Entities and the Foreign Shareholders**

It is my opinion that Verdmont Capital did not investigate the circumstances surrounding how Lornex, Nautilus and Bartlett acquired the shares from the initial shareholders, or whether Lornex, Nautilus and Bartlett were acting merely as intermediaries for controlling persons or as statutory underwriters. Verdmont Capital provided no information about whether there were, or were not, any connections between

---

[49]  In the Matter of Transactions in the Securities of Laser Arms Corporation by Certain Broker Dealers, 1991 SEC Lexis 257.

[50]  See 74:13 to 81:20 – Alejandro Aboud, the Verdmont Capital 30(b)(6) witness testimony.

**Expert Report of Robert W. Lowry**
**May 26, 2016**
**Page 32 of 34**

the initial investors and Lornex.

Verdmont needed to address the possibility that the Lornex, Nautilus and Bartlett deposits of Norstra shares that were acquired from these shareholders were related, and had a duty to raise concerns about their investment intent of Lornex, Nautilus and Bartlett (i.e. were the shares acquired with the intent to distribute).  It is my experience that broker dealers have procedures that are designed to prevent customers from depositing and selling large quantities of an unknown stock, until they conduct a thorough investigation of how the customer obtained the security, the market conditions for the security, and information about the issuer.  Here, such an investigation would have identified:

- Lornex made four large deposits into its Verdmont Capital account;

- Nautilus made two large deposits of Norstra shares into its Verdmont Capital account; and

- Bartlett made two large deposits of Norstra shares into its Verdmont Capital account

**Supervision**

The delivery of large blocks of securities by one or more customers requires diligent attention by the broker dealer and its supervisory persons.  When one customer continually deposits large blocks of securities, it is essential for the broker dealer to determine the length of the customer's holding period, the nature of the underlying transactions in which the customer acquired the shares, the customer's intent to sell additional shares, and the customer's percentage of outstanding shares compared to the total shares outstanding are all factors Verdmont Capital had to examine before selling the securities into the market.

In addition, broker dealers are required to (1) prepare written procedures which are designed to reasonably supervise all of the firms business activities, (2) reasonably implement these procedures, and (3) reasonably investigate red flags.  It is my experience

**Expert Report of Robert W. Lowry**
**May 26, 2016**
**Page 33 of 34**

that red flags require a vigorous response to even indications of wrongdoing. Many

regulatory cases involving failure to supervise arise from situations where supervisors

were aware only of red flags or suggestions of irregularity rather than actual knowledge

of wrongdoing. It is my opinion, based on my experience and review, Verdmont Capital

did not make the thorough investigation broker dealers' are required to make in these

circumstances.

## VII.   Application of the Dealers Exemption

I am aware that Verdmont Capital contends that the 40-day period in the Section

4(a)(3) dealer's exemption began to run on the day when the securities were first quoted

on the OTC Bulletin Board and on OTC Link. I have reviewed Verdmont Capital's

Summary Judgment Motion and I disagree with Verdmont Capital's contention based on

the evidence in the record.

It is my opinion, based on my regulatory and industry experience, that Goff,

Norstra and Xumanii shares did not reach the public market until March 2013 for Goff

and Norstra, and late April 2013 for Xumanii. Prior to that time, the foreign entities,

including Lornex, Nautilus and Bartlett, acquired their shares in private transactions from

the initial share holders, and there was not a public market for these securities.

It is my experience that broker dealers develop internal procedures that are

designed to investigate the market conditions for a security, and the facts and

circumstances about how a customer acquired a security in order to determine if, or when

there was a public market for a security. These procedures are implemented whenever a

customer attempts to deposit or sell a large quantity of an obscure security.

When Lornex, Nautilus and Bartlett delivered their shares to Verdmont Capital, it

was required, as stated in the SEC releases described above, to thoroughly investigate the

circumstances of how each customer acquired their shares before the shares could be

deposited into, and sold from its customers' accounts  In addition, Verdmont Capital's

investigation had to determine for the shares of each issuer (1) the quantity and price of shares traded in the market, (2) how long the shares were traded, and (3) whether the market activity was consistent with the financial and business activities of each issuer.

Had Verdmont Capital investigated the trading of Goff, Norstra and Xumanii, it should have discovered that there was no competitive market at the time the shares were delivered. Therefore, there was no NBBO to calculate the inside bid and ask price, which is essential for a competitive market to exist. In the absence of competitive market conditions, these securities could not have come to rest in the hands of the investing public, once they were acquired by the foreign entities, including Lornex, Nautilus and Bartlett, and thus a bona fide offering of the securities could not have taken place until 2013. In addition, with the exception of one trade - which appears to be an outlier, there was no U.S. market activity until 2013. None of the initial shareholders ever sold shares in the U.S. market – even though their shares were covered by an effective registration statement.

It is my opinion that in order to rely on the Section 4(a)(3) exemption, Verdmont Capital, like all broker dealers, would have to determine when, or if, the Goff, Norstra and Xumanii made a "bona fide" offering to the public.

I reserve the right to supplement my report so that I may consider additional documents, testimony or arguments in forming my opinions.

May 26, 2016

Respectfully Submitted

Robert W. Lowry