# EXHIBIT 3

Case 1:15-cv-00894-WHP-JLC   Document 288-3   Filed 02/16/17   Page 2 of 4

Securities and Exchange Commission v.
Caledonian Bank Ltd., et al.

Alejandro Abood 30 (b)(6) - Vol. 1
February 27, 2015

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - - - - - -
 4   SECURITIES AND EXCHANGE           )
 5   COMMISSION,                       )
 6               Plaintiff,            )   CASE NO.
 7   vs.                               )   15-CV-894 (WHP)
 8   CALEDONIAN BANK LTD., CALEDONIAN  )
 9   SECURITIES LTD., CLEAR WATER      )
10   SECURITIES, INC., LEGACY GLOBAL   )
11   MARKETS  S.A. and VERDMONT CAPITAL, )
12   S.A.                              )
13               Defendants.           )
14   - - - - - - - - - - - - - - - - - -
15
16           30(b)(6) VIDEOTAPED DEPOSITION OF
17                 VERDMONT CAPITAL, S.A.
18   THROUGH ITS DESIGNATED REPRESENTATIVE, ALEJANDRO ABOOD
19                  FRIDAY, FEBRUARY 27, 2015
20
21           BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                         BY: SHARI COHEN, RPR
23                      160 SPEAR STREET, SUITE 300
24                    SAN FRANCISCO, CALIFORNIA 94105
25                                    (415) 597-5600
```

**Page 2**

```
 7       30(b)(6) Videotaped Deposition of VERDMONT CAPITAL,
 8   S.A., through its designated representative, ALEJANDRO
 9   ABOOD, at Securities & Exchange Commission, 3 World
10   Financial Center, New York New York, New York commencing
11   at 10:10 A.M., FRIDAY, FEBRUARY 27, 2015 before Shari Cohen,
12   Registered Professional Reporter pursuant to Notice of
13   Videotaped Deposition.
```

**Page 3**

```
 1   APPEARANCES OF COUNSEL:
 2   FOR THE PLAINTIFF, SECURITIES AND EXCHANGE COMMISSION:
 3       U.S. SECURITIES AND EXCHANGE COMMISSION
 4       DIVISION OF ENFORCEMENT
 5       BY:  RICHARD SIMPSON, ATTORNEY AT LAW
 6            ERNESTO AMPARO, ATTORNEY AT LAW
 7       100 F Street, N.E.
 8       Washington, D.C. 20549
 9       Telephone: (202) 551-7276
10       Email: simpsonr@sec.gov
11
12   FOR DEFENDANT VERDMONT CAPITAL:
13       CARTER LEDYARD & MILBURN LLP
14       BY:  ROBERT ZITO, ATTORNEY AT LAW
15            MARK ZANCOLLI, ATTORNEY AT LAW
16            MADELYN WHITE, ATTORNEY AT LAW
17            THEODORE MCDONOUGH, ATTORNEY AT LAW
18            FAITH COLISH, ATTORNEY AT LAW
19       2 Wall Street
20       New York, New York  10005
21       Telephone: (212) 238-8873
22       Email:  zito@clm.com
```

**Page 4**

```
 1   APPEARANCES OF COUNSEL - (CONTINUED):
 2   FOR DEFENDANT CALEDONIAN:
 3       PROSKAUER ROSE LLP
 4       BY:  LEE POPKIN, ATTORNEY AT LAW
 5       11 Times Square
 6       New York, New York  10036
 7       Telephone:  (212) 969-3326
 8       Email:  lpopkin@proskauer.com
 9
10   ALSO PRESENT:
11       DAVID STOELTING, ATTORNEY AT LAW
12       ELIZABETH UNTERMAN
13       VINCENZO PETULLA, VIDEOGRAPHER
```

Case 1:15-cv-00894-WHP-JLC   Document 288-3   Filed 02/16/17   Page 3 of 4

| Securities and Exchange Commission v. Caledonian Bank Ltd., et al. | Alejandro Abood 30 (b)(6) - Vol. 1<br>February 27, 2015 |

Page 73

 1  owned by Cold Stream seems to have been sold to
 2  Nautilus, but I don't see there is information that
 3  says Nautilus had a certificate issued in its name.
 4      Q.   Would it be possible that the certificate
 5  was transferred to DTC for the benefit of Nautilus?
 6  If you look at Bates number 457, the number of shares
 7  are the same?
 8      A.   I don't see DTC mentioned anywhere on
 9  this form.  I see that there is -- the number of
10  shares match and I see Nautilus, but I cannot
11  necessarily connect the two.
12      Q.   Okay.
13          MR. SIMPSON:  Let's break for lunch.
14          THE VIDEOGRAPHER:  We are now off the
15      record at 12:48 p.m.
16          (Luncheon recess taken at 12:48 p.m.)

Page 74

 1          A F T E R N O O N   S E S S I O N
 2              (Time Noted: 1:49 p.m.)
 3
 4  A L E J A N D R O   A B O O D, resumed and testified
 5     as follows:
 6
 7  CONTINUED EXAMINATION
 8  BY SIMPSON:
 9          THE VIDEOGRAPHER:  We are back on the
10      record.  Here marks the beginning of DVD number
11      three in the deposition of Alejandro Abood.
12      The time is 1:49 p.m.
13      Q.   Mr. Abood, to your knowledge does anyone
14  at Verdmont know anything about Section 5 of the
15  Securities Act of 1933?
16      A.   I think at this point in the Complaint
17  they do.  I'm not aware that they did before.
18      Q.   Before the Complaint are you aware that
19  anyone at Verdmont knew about the broker's exemption
20  in Section 4A4 of the Securities Act?
21      A.   I'm not sure.  They may have discussed
22  this at a recent date with advisors, but it's my
23  belief that at the time of the trades they did not
24  have that information.
25      Q.   So I take it to your knowledge at the

Page 75

 1  time of the trades Verdmont did not have any policies
 2  or procedures that were specifically and expressly
 3  directed toward compliance with Section 5 of the
 4  Securities Act?
 5      A.   Not to my knowledge.  As I said before,
 6  they had no procedures pertaining to diligence when
 7  they sell securities or they didn't have at the time.
 8      Q.   Would it be correct to say that
 9  Verdmont's I guess due diligence and surveillance
10  activities conclude after the deposit of a share
11  certificate?
12      A.   For certificates that become deposited
13  that's a fair statement.  They may -- the broker
14  that's looking into the account may determine to do
15  something else, but as far as procedure goes I think
16  that's probably -- most of the diligence is done at
17  the time the certificates are deposited.
18      Q.   So let me just focus on the three stocks
19  that we're concerned with here Goff, Norstra and
20  Xumanii.  To your knowledge, did Mr. Forey or anyone
21  at Verdmont determine whether there was any trading in
22  the public markets in those stocks before selling
23  stock on behalf of Lornex and Nautilus or Bartlett?
24      A.   I understand that they are not required
25  to check how a stock is trading.  Once a client asks

Page 76

 1  for a trade, they can clear that trade through their
 2  U.S. brokers in these cases and then that's good
 3  enough for them.  I also understand that and I'm not
 4  certain on when this happened, but I've been told that
 5  they know now that there was trading activity before
 6  their clients first traded on some of these securities
 7  and I think the exact expression may have been
 8  everybody was trading them that day.
 9      Q.   Do you know whether that was Goff,
10  Norstra or Xumanii?
11      A.   Not particularly, but from what I found
12  on my review of records it would seem that the trading
13  dates that have been placed in question here with
14  regard to all of the defendants, the first trading
15  date matches for Xumanii, but when it comes to Goff
16  and Norstra there is a couple of dates five or nine
17  days I think one or the other case where when the
18  client Verdmont started trading, the security had been
19  trading for a couple of days before that.
20      Q.   But for all three of the securities, none
21  had been traded more than a few days at most?
22      A.   I'm not sure about trading records.  I'm
23  just referencing the dates of the trades that were
24  placed in question and the records that I have seen.  I
25  can determine that Verdmont's clients were not the

Case 1:15-cv-00894-WHP-JLC   Document 288-3   Filed 02/16/17   Page 4 of 4

| Securities and Exchange Commission v. | Alejandro Abood 30 (b)(6) - Vol. 1 |
| Caledonian Bank Ltd., et al. | February 27, 2015 |

Page 77

1  first to trade those securities.
2    Q.  You're not aware that Verdmont had any
3  policies or procedures to comply with any Securities
4  Exchange Act releases pertaining to brokerage firms?
5       MR. ZITO:  Objection.  Answer the best
6    you can.
7    A.  Can you rephrase because I don't
8  understand the question.
9    Q.  To your knowledge, did Verdmont have any
10 policies or procedures that were specifically directed
11 toward complying with any guidance issued in
12 Securities & Exchange Act releases?
13      MR. ZITO:  Objection.  Answer the best
14   you can.
15   A.  No, I don't know.
16   Q.  Do you know what a Securities & Exchange
17 Act release is?
18   A.  No, I do not.
19   Q.  At the time that trading in Goff and
20 Norstra and Xumanii started trading, did you find any
21 documentation showing that anyone at Verdmont
22 considered whether these were development stage
23 start-up companies?
24   A.  No, they were not required to review the
25 companies that they were trading.  It wasn't in the

Page 78

1  procedure and basically the fact that's been stated
2  before is that they do not recommend or advise the
3  clients to purchase or sell these securities, thus
4  they just limited themselves to effecting the client's
5  instructions and placing their orders with the U.S.
6  brokers.
7    Q.  So I take it that there is nothing under
8  Panamanian law that requires a Panamanian brokerage
9  firm to determine whether stocks that it's executing
10 sales on or registered?
11   A.  If the broker in Panama would be
12 executing the sale, that's a different thing.  I
13 understand they are not executing these sales, but the
14 only rules you have regarding suitability which is I
15 think what we are getting at are if you are advising a
16 client as to the purchase or sale of a security, then
17 you should have enough information on that security
18 and have enough information in the client profile to
19 determine that it's a suitable security for the client
20 or it's in the client's best interest to sell the
21 security that's in its portfolios, but when a client
22 is selling a security on his own account or at least
23 by his own -- having made his own decision, then there
24 is no requirement on the law that the broker know
25 anything about the security.

Page 79

1    Q.  I take it that since it was not required
2  under Panamanian law at the time of executing sales on
3  Goff, Norstra and Xumanii Verdmont did not undertake
4  to investigate the status of these companies?
5    A.  Again, I believe they did not execute the
6  sales.  Execution was done by U.S. brokers, but at the
7  time they took the client's instruction they did not
8  look into the securities at all.
9    Q.  I just want to make sure that we don't
10 get hung up on nomenclature.  If Verdmont was not
11 executing sales on behalf of its clients, can you
12 describe the action that Verdmont was actually doing
13 on behalf of the clients?
14   A.  Okay, Verdmont would receive an
15 instruction from a client and they would place an
16 order with their U.S. brokers within the limits of the
17 instruction received by the client and the U.S. broker
18 would basically execute and clear the trade.  I think
19 there is an exception to that that's documented on May
20 13th I believe Verdmont purchased for its own account
21 200,000 securities of I think it was Xumanii, I'm not
22 sure right now where they purchased 200,000 shares for
23 their own account so at that point we can assume that
24 they did look into the matters of the fact of the
25 securities to make that purchase.

Page 80

1    Q.  So I guess the correct description of
2  Verdmont's role then would be that Verdmont places
3  orders for purchasers and sales of securities pursuant
4  to its client's instructions?
5    A.  For as far as it goes with securities not
6  registered in Panama I would say that's the case.  At
7  this time I can't recall if Verdmont is a member of
8  the local stock market, the Panamanian stock market so
9  if they were a member of the local market, they could
10 place trades on their own, otherwise they'll have to
11 work through a broker that's a member as they do with
12 trades executed outside of Panama.
13   Q.  So at the time that it was placing orders
14 with its U.S. brokers for Goff, Norstra and Xumanii,
15 Verdmont did not undertake any inquiry whether these
16 were little known securities?
17   A.  I believe they didn't.
18   Q.  They did not?
19   A.  They did not.
20   Q.  And they did not determine whether Goff,
21 Norstra and Xumanii had undergone a recent change in
22 business?
23   A.  No, they did not.
24   Q.  And they did not undertake an inquiry
25 whether there had been any recent changes in control